1
Todd M. Schneider (SBN 158253)
Jason H. Kim (SBN 220279)
2
Kyle G. Bates (SBN 299114)
SCHNEIDER WALLACE COTTRELL
3
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
4
Emeryville, California 94608
Tel: (415) 421-7100
5
Fax: (415) 421-7105
tschneider@schneiderwallace.com
6
jkim@schneiderwallace.com
kbates@schneiderwallace.com
7

8
*Attorneys for Plaintiff*
*[Additional Counsel Appear on Signature Page]*
9

**UNITED STATES DISTRICT COURT**
10
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11
MOLINA HEALTHCARE, INC.,                    Case No.

12
              Plaintiff,

13
      v.                                  **COMPLAINT**

14
ACTAVIS ELIZABETH, LLC; ACTAVIS
HOLDCO US, INC.; ACTAVIS PHARMA, INC.;
15
AKORN, INC.; AMNEAL                          **DEMAND FOR A JURY TRIAL**
PHARMACEUTICALS, INC.; APOTEX CORP.;
16
ASCEND LABORATORIES, LLC;
AUROBINDO PHARMA USA, INC.;
17
BRECKENRIDGE PHARMACEUTICAL, INC.;
CAMBER PHARMACEUTICALS, INC.;
18
CITRON PHARMA, LLC; DR. REDDY'S
LABORATORIES INC.; EMCURE
19
PHARMACEUTICALS, LTD.; ENDO
INTERNATIONAL PLC; EPIC PHARMA, LLC;
20
FOUGERA PHARMACEUTICALS INC.;
GENERICS BIDCO I, LLC; GLENMARK
21
PHARMACEUTICALS INC., USA;
GREENSTONE LLC; G&W LABORATORIES,
22
INC.; HERITAGE PHARMACEUTICALS INC.;
HI-TECH PHARMACAL CO., INC.; IMPAX
23
PHARMACEUTICALS, LLC F/K/A/ IMPAX
PHARMACEUTICALS, INC.; LANNETT
24
COMPANY, INC.; LUPIN
PHARMACEUTICALS, INC.; MAYNE
25
PHARMA, INC.; MORTON GROVE
PHARMACEUTICALS, INC.; MYLAN, INC.;
26
MYLAN, N.V.; MYLAN PHARMACEUTICALS,
INC.; OCEANSIDE PHARMACEUTICALS,
27
INC.; PAR PHARMACEUTICAL, INC.; PAR
PHARMACEUTICAL COMPANIES, INC.;
28
PERRIGO COMPANY PLC; PERRIGO NEW

1   YORK, INC.; PFIZER, INC.; SANDOZ, INC.,
    SUN PHARMACEUTICAL INDUSTRIES, INC.;
2   TARO PHARMACEUTICALS INDUSTRIES
    LTD.; TARO PHARMACEUTICALS USA, INC.;
3   TELIGENT, INC.; TEVA PHARMACEUTICALS
    USA, INC.; UDL LABORATORIES INC.;
4   UPSHER-SMITH LABORATORIES, LLC;
    VALEANT PHARMACEUTICALS
5   INTERNATIONAL; VALEANT
    PHARMACEUTICALS NORTH AMERICA
6   LLC; VERSAPHARM, INC.; WEST-WARD
    PHARMACEUTICALS CORP.; WOCKHARDT
7   USA LLC; ZYDUS PHARMACEUTICALS
    (USA) INC.,

8
                         Defendants.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

I.      NATURE OF THE CASE .......................................................................... 1

II.     THE DRUGS SUBJECT TO THE CONSPIRACY .......................... 5

III.    JURISDICTION AND VENUE ............................................................ 17

IV.     THE PARTIES ......................................................................................... 18

        A.     Plaintiff ........................................................................................ 18

        B.     Defendants .................................................................................... 19

        C.     Co-Conspirators .......................................................................... 29

V.      REGULATORY AND ECONOMIC BACKGROUND .................. 29

        A.     Generic Drugs Should Provide Lower-Priced Options for Purchasers......... 29

        B.     The Prescription Drug Market ................................................. 31

        C.     The Prescription Drug Distribution System ......................... 32

        D.     The Market for Generic Drugs is Highly Susceptible to Collusion ............... 33

VI.     GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY .... 35

        A.     Congress launched an investigation into generic price hikes........................... 36

        B.     The DOJ Investigates Criminal Generic Drug Collusion ............................... 37

        C.     State Attorneys General Launch Their Own Investigation .............................. 39

VII.    THE GENERIC DRUG MARKET .................................................... 42

        A.     The Cozy Nature Of the Industry and Opportunities for Collusion ............ 42

               1.     Trade Association Meetings and Conferences ..................................... 43

                      a.     National Association of Chain Drug Stores .......................... 44

                      b.     Generic Pharmaceutical Association......................................... 45

                      c.     Healthcare Distribution Management Association................. 47

                      d.     Efficient Collaborative Retail Marketing................................. 48

                      e.     Minnesota Multistate Contracting Pharmacy Alliance .......... 49

                      f.     Healthcare Supply Chain Association...................................... 49

COMPLAINT AND DEMAND FOR JURY TRIAL

2. Industry Dinners and Private Meetings................................................. 50

3. Personal Telephone Calls, E-Mails, and Text Message Communications .................................................................................. 52

4. Individual Relationships ........................................................................ 52

    a. Ara Aprahamian ............................................................... 53

    b. David Berthold.................................................................. 54

    c. Jim Brown ......................................................................... 55

    d. Maureen Cavanaugh ........................................................ 56

    e. Marc Falkin ....................................................................... 57

    f. Jim Grauso ........................................................................ 58

    g. Kevin Green ...................................................................... 60

    h. Armando Kellum .............................................................. 62

    i. Jill Nailor .......................................................................... 63

    j. James Nesta ....................................................................... 64

    k. Konstantin Ostaficiuk ..................................................... 65

    l. Nisha Patel ........................................................................ 66

    m. David Rekenthaler ............................................................ 68

    n. Rick Rogerson .................................................................. 69

    o. Tracy Sullivan ................................................................... 70

B. The Overarching Conspiracy Between Generic Drug Manufacturers – Playing Nice in the Sandbox ........................................................................ 71

C. Generic Drug Price Spikes Since 2013 ..................................................... 85

VIII. THE CONSPIRACY .............................................................................. 86

IX. HERITAGE ............................................................................................... 87

A. Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion ................................................................................ 87

1. Nimodipine ............................................................................... 88

    a. The Heritage/Sun Agreement ........................................ 88

1

       b.     The Heritage/Ascend Agreement ................................................... 91

2      2.     Zoledronic Acid ................................................................................. 92

3      3.     Meprobamate ..................................................................................... 94

4      4.     Doxy DR ............................................................................................ 96

5        a.     The Heritage/Mylan Agreement ..................................................... 96

6        b.     The Heritage/Mayne Agreement................................................... 100

7      5.     Hydralazine HCL ........................................................................... 105

8    B.     Agreements to Fix Prices ................................................................ 106

9      1.     Doxy Mono ...................................................................................... 106

10      2.     Heritage 2014 Price Increases ........................................................ 112

11        a.     Acetazolamide ................................................................................. 115

12        b.     Fosinopril HCTZ ............................................................................ 121

13        c.     Glipizide-Metformin...................................................................... 123

14        d.     Glyburide......................................................................................... 123

15        e.     Glyburide-Metformin .................................................................... 125

16        f.     Leflunomide .................................................................................... 127

17        g.     Methimazole ................................................................................... 129

18        h.     Nystatin ........................................................................................... 129

19        i.     Paromomycin................................................................................... 136

20        j.     Theophylline ER ............................................................................ 137

21        k.     Verapamil ........................................................................................ 141

X.    TEVA                                                 143

   A.     Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors ................................................................................................. 143

     1.     April 2013: Teva Hires Nisha Patel .................................................. 143

     2.     Ranking "Quality of Competition" to Identify Price Increase Candidates ................................................................................................. 147

a.     The "High Quality" Competitor Relationships ................... 148

b.     Mylan (+3) ............................................................ 148

c.     Watson/Actavis (+3) ........................................... 149

d.     Sandoz (+3) ........................................................ 150

e.     Glenmark (+3) ................................................... 150

f.     Taro (+3) ............................................................ 151

g.     Lupin (+2) ......................................................... 151

B.    Price Increase Hiatus ........................................................ 151

C.    New Relationships Emerge .............................................. 152

D.    Competitors Become "High Quality" After Successfully Colluding With Teva ........................................................................... 153

E.    Quality Competitors Collude With Each Other, Sandoz/Mylan ................. 153

F.    Commitment to the Overarching Conspiracy ................... 154

G.    Low Quality Competitors Comply with the Overarching Conspiracy ......... 155

H.    Teva Profitability Increases Dramatically ....................... 155

I.    Teva and its Executives Knowingly Violated the Antitrust Laws ................. 155

XI.   THE OVERARCHING CONSPIRACY IN OPERATION WITH RESPECT TO THE SUBJECT DRUGS   159

A.    Customer and Market Allocation Agreements To Maintain Market Share and Avoid Price Erosion ........................................................... 159

1.    Teva/Mylan ............................................................. 159

a.     Fenofibrate ...................................................... 159

b.     Clonidine TTS .................................................. 162

c.     Tolterodine ER .................................................. 166

d.     Capecitabine ..................................................... 170

2.    Teva/Sandoz ........................................................... 172

a.     Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa) . 172

b.     Temozolomide ................................................. 173

c.   Tobramycin ........................................................ 176

d.   Dexmethylphenidate HCL ER.............................. 178

3.   Teva/Lupin ................................................................ 180

a.   Lamivudine/Zidovudine (Combivir) ..................... 180

b.   Irbesartan ............................................................. 182

c.   Drospirenone and Ethinyl Estradiol (Ocella) ...................... 183

d.   Norethindrone/Ethinyl Estradiol ......................... 185

4.   Teva/Greenstone ....................................................... 186

a.   Oxaprozin ............................................................. 186

a.   Tolterodine Tartrate ............................................. 188

b.   Piroxicam .............................................................. 190

c.   Cabergoline .......................................................... 193

5.   Teva/Actavis .............................................................. 194

a.   Amphetamine/Dextroamphetamine ER.................. 194

b.   Amphetamine/Dextroamphetamine IR ................. 195

c.   Dextroamphetamine Sulfate ER............................ 195

d.   Clonidine TTS ...................................................... 196

e.   Budesonide Inhalation ......................................... 198

f.   Celecoxib .............................................................. 198

6.   Teva/Par .................................................................... 199

a.   Omega-3-Acid Ethyl Esters ................................. 199

b.   Entecavir .............................................................. 201

c.   Budesonide DR..................................................... 203

7.   Teva/Taro .................................................................. 204

a.   Enalapril Maleate................................................. 204

b.   Nortriptyline HCL ................................................ 207

COMPLAINT AND DEMAND FOR JURY TRIAL

8.    Teva/Zydus ....................................................................... 210

      a.    Fenofibrate ............................................................ 211

      b.    Paricalcitol ........................................................... 214

      c.    Niacin ER .............................................................. 216

      d.    Etodolac ER ........................................................... 219

9.    Teva/Glenmark .................................................................. 220

      a.    Moexipril HCL ......................................................... 220

      b.    Desogestrel/Ethinyl Estradiol (Kariva) ................................ 222

      c.    Gabapentin ............................................................ 222

10.   Teva/Lannett ................................................................... 223

      a.    Baclofen .............................................................. 223

11.   Teva/Amneal .................................................................... 226

      a.    Norethindrone Acetate ................................................. 226

12.   Teva/ Dr. Reddy's .............................................................. 227

      a.    Oxaprozin ............................................................. 227

      b.    Paricalcitol .......................................................... 228

13.   Mylan / Sandoz ................................................................. 232

      a.    Valsartan HCTZ ........................................................ 232

B.    Taking the Overarching Conspiracy to a New Level: Price Fixing (2012 – 2015) ............................................................................ 234

1.    July 31, 2012 Price Increase ................................................... 234

      a.    Nadolol ............................................................... 235

      b.    Labetalol HCL ......................................................... 238

      c.    Nitrofurantoin MAC .................................................... 238

2.    February – April 2013: Increasing Prices Before A New Competitor Enters the Market: Budesonide Inhalation Suspension .................... 239

3.    May 13, 2013 Price Increase – Tizanidine ......................................... 240

4.      May 24, 2013 First List of Price Increases .......................................... 242

            a.      Glenmark................................................................................... 243

            b.      Sandoz ...................................................................................... 246

            c.      Taro........................................................................................... 249

5.      July 3, 2013 Price Increases .............................................................. 250

            a.      Upsher-Smith............................................................................ 252

            b.      Mylan ........................................................................................ 253

            c.      Sandoz ...................................................................................... 256

6.      July 19, 2013 Price Increase – Enalapril Maleate .............................. 257

7.      August 9, 2013 Price Increases .......................................................... 262

            a.      Mylan ........................................................................................ 265

            b.      Pravastatin ................................................................................ 268

            c.      Etodolac .................................................................................... 276

8.      July 2013 – January 2014: Competitors Seek to "Follow" Price Increases:
        Haloperidol and Trifluoperazine HCL, Benazepril HCTZ,
        Levothyroxine, Clomipramine HCL....................................................... 279

            a.      Haloperidol and Trifluoperazine ............................................ 281

            b.      Benazepril HCTZ ..................................................................... 283

            c.      Levothyroxine........................................................................... 285

            d.      Clomipramine HCL................................................................... 289

9.      March 7, 2014: Price Increases and Overarching Conspiracy Converge
        (Niacin ER)........................................................................................... 295

            a.      Niacin ER.................................................................................. 295

10.     April 4, 2014 Price Increases.............................................................. 297

            a.      Cephalexin................................................................................ 302

            b.      Azithromycin and Medroxyprogesterone............................... 303

            c.      Clarithromycin ER.................................................................... 307

            d.      Ketoconazole............................................................................ 309

|  |  | e. | Estradiol/Norethindrone Acetate and Cyproheptadine HCL | 311 |
|  |  | f. | Diflunisal | 313 |
|  |  | g. | Ethosuximide | 314 |
|  | 11. | | Impact of April 4, 2014 Price Increases to Teva | 315 |
|  | 12. | | April 15, 2014 Price Increase (Baclofen) | 316 |
|  | 13. | | July 1, 2014 Price Increase (Fluocinonide) | 319 |
|  | 14. | | August 28, 2014 Price Increases | 327 |
|  |  | a. | Enalapril Maleate | 328 |
|  |  | b. | Prochlorperazine | 328 |
|  |  | c. | Mylan | 329 |
|  |  | d. | Taro | 332 |
|  |  | e. | Zydus | 335 |
|  | 15. | | January 28, 2015 Price Increases | 336 |
|  |  | a. | Propranolol HCL Tablets | 337 |
|  |  | b. | Ciprofloxacin HCL and Glimepiride | 340 |
|  |  | c. | Griseofulvin | 342 |
| C. | | | COMPETITORS BECOME "HIGH QUALITY" AFTER SUCCESSFULLY COLLUDING WITH TEVA | 343 |
|  | 1. | | Apotex | 343 |
|  | 2. | | Zydus | 344 |
|  | 3. | | Heritage | 345 |
|  | 4. | | Lupin | 345 |
|  | 5. | | Par | 346 |
|  | 6. | | Greenstone | 347 |
|  | 7. | | Amneal | 348 |
|  | 8. | | Rising | 349 |
|  | 9. | | Breckenridge | 351 |

1
          10.    Glenmark ........................................................................ 352

2
          11.    Camber ........................................................................... 352

3
XII.    OTHER DRUGS                            357

4
       A.    Albuterol Sulfate........................................................... 357

5
       B.    Amitriptyline ................................................................. 357

6
       C.    Clobetasol Propionate ................................................... 359

7
       D.    Desonide........................................................................ 363

8
       E.    Digoxin ......................................................................... 365

9

10
       F.    Divalproex Sodium ER ................................................. 368

11
       G.    Doxy Hyclate ................................................................ 371

12
       H.    Econazole ...................................................................... 375

13
       I.    Lidocaine ...................................................................... 378

14
       J.    Metronidazole .............................................................. 379

15
       K.    Propranolol HCL capsules............................................ 380

16
       L.    Ursodiol ........................................................................ 382

17
XIII.   CONCIOUSNESS OF GUILT                383

18
XIV.   SPOILATION OF EVIDENCE               386

19
XV.    OBSTRUCTION OF JUSTICE              387

20
XVI.   PLAINTIFF'S PURCHASES AND ANTITRUST INJURY   388

21
XVII.  INTERSTATE TRADE AND COMMERCE       388

22
XVIII. TOLLING AND FRAUDULENT CONCEALMENT   389

23
XIX.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY 390

24
XX.    CAUSES OF ACTION                     390

25
XXI.   DEMAND FOR JUDGMENT           600

26
XXII.  JURY DEMAND                     600

27

28

Plaintiff Molina Healthcare, Inc. ("Molina" or "Plaintiff") files this Complaint against Defendants Actavis Elizabeth, LLC, Actavis Holdco US, Inc., Actavis Pharma, Inc., Akorn, Inc., Amneal Pharmaceuticals, Inc., Apotex Corp., Ascend Laboratories, LLC, Aurobindo Pharma USA, Inc., Breckenridge Pharmaceutical, Inc., Camber Pharmaceuticals, Inc., Citron Pharma, LLC, Dr. Reddy's Laboratories Inc., Emcure Pharmaceuticals, Ltd., Endo International, plc, Epic Pharma, LLC, Fougera Pharmaceuticals Inc., G&W Laboratories, Inc., Generics Bidco I, LLC, Glenmark Pharmaceuticals Inc., USA, Greenstone LLC, Heritage Pharmaceuticals Inc., Hi-Tech Pharmacal Co., Inc., Impax Pharmaceuticals, LLC f/k/a/ Impax Pharmaceuticals, Inc., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Mayne Pharma, Inc., Morton Grove Pharmaceuticals, Inc., Mylan, Inc., Mylan, N.V., Mylan Pharmaceuticals, Inc., Oceanside Pharmaceuticals, Inc., Par Pharmaceutical Companies, Inc., Par Pharmaceuticals, Inc., Perrigo Company PLC, Perrigo New York, Inc., Pfizer, Inc., Sandoz, Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceutical Industries, Ltd., Taro Pharmaceuticals USA, Inc., Teligent, Inc., Teva Pharmaceuticals USA, Inc., UDL Laboratories Inc., Upsher-Smith Laboratories, LLC, Valeant Pharmaceuticals International, Valeant Pharmaceuticals North America LLC, VersaPharm, Inc. West-Ward Pharmaceutical Corp., Wockhardt USA LLC, and Zydus Pharmaceuticals (USA) Inc., (collectively "Defendants") and alleges based on personal knowledge as to the facts pertaining to it and information made public during ongoing government investigations of Defendants and other generic drug companies, and upon information and belief as to all other matters, as follows:

## I.     NATURE OF THE CASE

1.      Plaintiff brings this action to recover damages it incurred from egregious overcharges it paid for certain widely-used generic drugs, arising from a far-reaching conspiracy among Defendants and others to blatantly fix the price of such drugs. This conspiracy increased the Defendants' profits, and that of others working with them, at the expense of Plaintiff, a private health benefit provider, as well as consumers and the government.

2.      In the pharmaceutical industry, generic drug entry predictably and typically results in increased price competition, which reduces the price of drugs for wholesalers, retailers, consumers, and third-party payers ("TPPs") like Plaintiff. Defendants here, however, along with other generic drug

manufacturers, conspired to manipulate the relevant markets, allocate these markets amongst themselves, and obstruct generic competition in an ongoing scheme to fix, increase, stabilize, and/or maintain the price of the drugs identified in Section II below (the "Subject Drugs"). The Defendants' scheme continues to affect the generic drug markets for the Subject Drugs. While this Complaint alleges facts as to the Subject Drugs, this scheme and conspiracy extends to other generic drugs.

3.    Defendants orchestrated their conspiracy through secret communications and meetings, both at private and public events, like trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (n/k/a Association for Accessible Medicines), the Healthcare Distribution Management Association ("HDMA") (n/k/a Healthcare Distribution Alliance), the Efficient Collaborative Retail Marketing organization ("ECRM"), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), and the Healthcare Supply Chain Association ("HSCA"), among others.

4.    The conspiracy, which infected the entire generic marketplace, was designed to evade detection. Pursuant to a "fair share" scheme, Defendants predetermined market share, fixed prices, and rigged bids on the over 100 Subject Drugs listed below, as well as additional drugs. This fair share understanding was often referred to by Defendants as the "rules of engagement" for the generic drug industry and permeated every segment of the industry. The modus operandi was to avoid competition among generic manufacturers that would normally result in significant price erosion and significant savings for purchasers, particularly insurers – like Plaintiff – responsible for paying the bulk of the prescription drug costs in the United States. This overarching conspiracy, effectuated by a series of drug-specific conspiracies, thwarted competition across the generic drug industry

5.    Predictably, the results of the conspiracy were severe. The prices of generic drugs skyrocketed at unprecedented rates, some by more than 1000%., like for example, Albuterol Sulfate (3,400%), Amitriptyline (2,400%), Clobetasol Propionate (1,800%), Clomipramine (2,600%), Doxazosin Mesylate (1053%), Doxycycline (8,000%), Fluconazole (1,570%), Leflunomide (1,300%), Nadolol (2,762%), Oxybutynin Chloride (between 1,100 and 1,500%), Propranolol HCL (1,000%), and Ursodiol (1,000%).

6.    These price increases are consistent with Medicare Part D price increases found by the Government Accountability Office ("GAO") for many of the Subject Drugs, including Acetazolamide

ER, Amiloride HCL/HCTZ, Amitriptyline, Baclofen, Benazepril HCTZ, Bumetanide, Carbamazepine, Cephalexin, Cimetidine, Ciprofloxacin HCL, Clarithromycin ER, Clobetasol Propionate, Clomipramine, Clotrimazole, Desonide, Dextroamphetamine Sulfate, Digoxin, Diltiazem HCL, Divalproex Sodium ER, Doxazosin Mesylate, Doxycycline Hyclate, Econazole, Enalapril Maleate, Ethosuximide, Etodolac, Fluconazole, Fluocinonide, Fluoxetine HCL, Haloperidol, Ketoconazole, Labetalol HCL, Lidocaine, Methotrexate, Nadolol, Nitrofurantoin MAC, Nystatin, Oxaprozin, Oxybutynin Chloride, Piroxicam, Pravastatin, Prazosin HCL, Prochlorperazine, Ranitidine HCL, Theophylline ER, Tobramycin, Trifluoperazine HCL, and Ursodiol.[1]

7.      By 2012, Heritage Pharmaceuticals, Inc. ("Heritage"), Teva Pharmaceuticals USA Inc. ("Teva"), and their co-conspirators embarked on one of the most egregious and massive price-fixing conspiracies in the history of the United States. They leveraged the culture of cronyism in the generic drug industry to avoid price erosion, increase prices for targeted products, and maintain artificially-inflated prices across their respective product portfolios without triggering a "fight to the bottom" among competitors. While Heritage and Teva spearheaded the particular conspiracies that are the subject of this Complaint, these conspiracies are part of an even larger, overarching conspiracy and understanding of how the generic manufacturers fix prices and allocate markets to suppress competition.

8.      Defendants routinely and systematically communicated with one another to determine and agree on how much market share, and which customers, each conspirator was entitled to. They effectuated their market allocation by either refusing to bid for particular customers or providing outrageously high cover bids. This created an artificial equilibrium that enabled the conspirators to then collectively raise and/or maintain prices for a particular generic drug.

9.      Defendants understood and acted upon an underlying code of conduct widespread in the generic drug industry: any time a competitor enters a particular drug market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high. While different drugs may involve different

---

[1] Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases, GAO-16-706 (August 2016) ("the GAO Report").

competitors, this understanding remains constant and is the backbone of the industry wide conspiracy.

10.     As one example of this conspiracy, Teva selected a core group of "High Quality" conspirators that it had existing conspiratorial relationships with, and targeted drugs that Teva and High Quality competitors overlapped on for price increases. Teva and the High Quality competitors understood that they would lead and follow each other's price increases, and did so frequently and successfully.

11.     The market for each of the Subject Drugs was small enough to foster collusion, but still large enough that prices should have remained at their historical, near marginal cost levels. Defendants overcame this obstacle and produced extraordinary price increases, as reflected in industry-wide data, by engaging in a concerted effort to grow their conspiracy and dominate the market for the Subject Drugs.

12.     This industry-wide data is consistent with the substantial price increases Plaintiff suffered for the Subject Drugs.

13.     At the peak of the collusive activity involving Teva, during a 19-month period from July 2013 through January 2015, Teva significantly raised prices on dozens of different generic drugs. Teva colluded with High Quality conspirators on most of them.

14.     Similarly, Heritage around this same time significantly raised prices on 15 drugs in collusion with many of the Defendants.

15.     Defendants knew their conduct was unlawful. They limited their communications to in-person meetings, or mobile phone calls, to avoid creating a record of their conduct. When communications were reduced to writing or text messages, Defendants often destroyed the evidence of those communications.

16.     Executives and others at the highest levels in many of Defendant companies, including among others, Ara Aprahamian, David Berthold, James (Jim) Brown, Maureen Cavanaugh, Tracy Sullivan DiValerio, Marc Falkin, James (Jim) Grauso, Kevin Green, Armando Kellum, Robin Hatosy, Rajiv Malek,  Satish Mehta, Jill Nailor, James (Jim) Nesta, Konstantin (Kon) Ostaficiuk, Nisha Patel, David Rekenthaler, and Richard (Rick) Rogerson conceived, directed, and ultimately benefitted from these schemes.

17.     This scheme to fix and maintain prices, allocate markets, and otherwise stifle competition caused, and continues to cause, significant harm to the United States healthcare system. Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and various state antitrust and unfair competition laws, as alleged herein. As a result of the conspiracy, Plaintiff paid substantially inflated and anticompetitive prices for generic pharmaceutical drugs, and Defendants illegally profited as a result.

18.     Plaintiff seeks treble damages and injunctive relief on account of Defendants' unlawful scheme to fix, maintain, and stabilize prices for the Subject Drugs.

## II.     THE DRUGS SUBJECT TO THE CONSPIRACY

19.     Acetazolamide. Acetazolamide is an extended release anhydrase inhibitor medicine used to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure. It may be sold in an extended release ("ER") formulation.

20.     Adapalene. Adapalene is a topical retinoid used to treat acne and other skin conditions. Adapalene comes in different forms including gels and creams.

21.     Albuterol Sulfate. Albuterol sulfate is a bronchodilator that targets the β-2 receptor of the lungs to relax muscles in the airways to increase pulmonary airflow. It is used to treat shortness of breath caused by asthma and chronic obstructive pulmonary disease. It was first discovered in the 1960s and is listed as an "Essential Medicine" by the World Health Organization ("WHO").

22.     Amiloride HCL/HCTZ. Amiloride hydrochloride ("HCL") and amiloride hydrochlorothiazide ("HCTZ") are diuretics typically used in combination to treat hypertension, heart failure, or extra fluid in the body (edema). They also help to treat or prevent low potassium levels. Both medications are included on the WHO's list of Essential Medicines.

23.     Amitriptyline. Amitriptyline is a tricyclic antidepressant. Amitriptyline is included on the WHO's list of Essential Medicines.

24.     Amoxicillin/Clavulanate. Amoxicillin/clavulanate is an antibiotic consisting of amoxicillin and clavulanate potassium. Amoxicillin is an antibiotic used to treat bacterial infections such as middle ear infections, strep throat, pneumonia, skin infections, urinary tract infections, and others. Clavulanate potassium is an inhibitor to bacterial resistance. Amoxicillin/clavulanate is included on the

WHO's list of Essential Medicines.

25.     Amphetamine/Dextroamphetamine. Amphetamine/dextroamphetamine is a combination stimulant used to treat attention deficit hyperactivity disorder (ADHD) and narcolepsy. The medication comes in both extended release (ER) and instant release (IR) forms.

26.     Azithromycin. Azithromycin is an antibiotic used to treat bacterial infections, sexually-transmitted infections, and malaria. It is included on the WHO's list of Essential Medicines.

27.     Baclofen. Baclofen is a muscle relaxant and an anti-spastic agent. It is used to treat muscle symptoms caused by multiple sclerosis, including spasms, pain, and stiffness. It is also used to treat muscle spasms in people with spinal injury or disease.

28.     Benazepril HCTZ. Benazepril hydrochlorothiazide is an angiotensin converting enzyme ("ACE") inhibitor. It is used to treat hypertension (high blood pressure).

29.     Bethanechol Chloride. Bethanechol chloride is used to treat dry mouth and bladder problems such as the inability to urinate or empty the bladder completely.

30.     Budesonide. Budesonide is a corticosteroid. The inhaled form is used for long-term management of asthma and chronic obstructive pulmonary disease. It can also be used to treat allergic rhinitis and nasal polyps. The pill form is delayed release (DR) and is used to treat inflammatory bowel diseases including Crohn's disease, ulcerative colitis, and microscopic colitis. Budesonide is included on the WHO's list of Essential Medicines.

31.     Bumetanide. Bumetanide is a diuretic used to treat swelling as a result of heart failure, liver failure, or kidney problems. It is also be used to treat high blood pressure.

32.     Buspirone HCL. Buspirone hydrochloride is used for the short-term treatment of anxiety disorders, particularly generalized anxiety disorders.

33.     Cabergoline. Cabergoline is a dopamine receptor agonist used in the management of prolactinomas. It is also used as an antidepressant and lactation suppressor.

34.     Capecitabine. Capecitabine is a chemotherapy medication used to treat breast cancer, gastric cancer, and colorectal cancer. It is included on the WHO's list of Essential Medicines.

35.     Carbamazepine. Carbamazepine.is an anticonvulsant medication used to treat epilepsy and neuropathic pain. It is also used to treat schizophrenia and bipolar disorder. It is included on the

WHO's list of Essential Medicines.

36.     Cefdinir. Cefdinir is an antibiotic used to treat pneumonia, otitis media, strep throat, and cellulitis.

37.     Cefprozil. Cefprozil is a cephalosporin antibiotic used to treat ear infections, skin infections, and other bacterial infections.

38.     Celecoxib. Celecoxib is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain and inflammation from osteoarthritis, acute pain in adults, rheumatoid arthritis, ankylosing spondylitis, painful menstruation, juvenile rheumatoid arthritis, and to reduce the number of colon and rectal polyps in people with familial adenomatous polyposis.

39.     Cephalexin. Cephalexin is a cephalosporin antibiotic used to treat bacterial infections including otitis media, streptococcal pharyngitis, bone and joint infections, pneumonia, cellulitis, and urinary tract infections. It is included on the WHO's list of Essential Medicines.

40.     Cimetidine. Cimetidine is a histamine receptor antagonist that inhibits stomach acid production and is used to treat heartburn and peptic ulcers.

41.     Ciprofloxacin HCL. Ciprofloxacin hydrochloride is an antibiotic used to treat bacterial infections including bone and joint infections, intra-abdominal infections, infectious diarrhea, respiratory tract infections, skin infections, typhoid fever, and urinary tract infections. It is included on the WHO's list of Essential Medicines.

42.     Clarithromycin ER. Clarithromycin is an antibiotic used to treat bacterial infections including strep throat, pneumonia, skin infections, h. pylori infection, and Lyme disease, among others. It can be taken in extended release tablet form. It is included on the WHO's list of Essential Medicines.

43.     Clemastine Fumarate. Clemastine fumarate is an antihistaminic compound used to treat hay fever and allergy symptoms including sneezing, runny nose, red itchy tearing eyes, and to relieve the itching and swelling of hives.

44.     Clobetasol Propionate. Clobetasol propionate is a steroid and anti-inflammatory agent. It is used to treat inflammation and itching caused by several skin conditions, such as allergic reactions, eczema, and psoriasis. Clobetasol propionate is one of the most prescribed dermatological drugs in the United States. It comes in a variety of forms, including a cream, foam, gel, lotion, ointment, shampoo,

solution, and spray.

45.     Clomipramine. Clomipramine is a tricyclic antidepressant. It is used to treat symptoms of obsessive-compulsive disorder. It is included on the WHO's list of Essential Medicines.

46.     Clonidine TTS. Clonidine transdermal therapeutic system ("TTS") is used to treat high blood pressure, ADHD, drug withdrawal (alcohol, opioids, or tobacco), menopausal flushing, diarrhea, and certain pain conditions. Clonidine TTS is sold in transdermal patches.

47.     Clotrimazole. Clotrimazole is an antifungal medication used to treat vaginal yeast infections, oral thrush, diaper rash, pityriasis versicolor, and types of ringworm including athlete's foot and jock itch. Clotrimazole is sold as a topical solution applied as a cream at various doses. It is included on the WHO's list of Essential Medicines.

48.     Cyproheptadine HCL. Cyproheptadine hydrochloride is an antihistamine used to relieve allergy symptoms such as watery eyes, runny nose, itching eyes and nose, sneezing, hives, and itching.

49.     Desmopressin Acetate. Desmopressin acetate is used to treat diabetes insipidus, bedwetting, hemophilia a., von Willebrand disease, and high blood urea levels. It is included on the WHO's list of Essential Medicines.

50.     Desogestrel/Ethinyl Estradiol (Kariva). Desogestrel/ethinyl estradiol, brand name Kariva, is a progestin medication used in birth control pills for women and also for treatment of menopausal symptoms in women.

51.     Desonide. Desonide, which includes .05% topical ointment and .05% topical cream, is a topical corticosteroid anti-inflammatory used to treat skin disorders including eczema, psoriasis, and dermatitis. It is a low-potency medication and, therefore, is more commonly prescribed for children or for adults to use in sensitive areas like the eyelids.

52.     Dexmethylphenidate HCL ER. Dexmethylphenidate hydrochloride is a central nervous system ("CNS") stimulant used to treat ADHD. It can be taken in an extended release form.

53.     Dextroamphetamine Sulfate ER. Dextroamphetamine sulfate is a CNS stimulant and amphetamine enantiomer used to treat ADHD and narcolepsy. It can be taken in an extended release form.

54.     Diclofenac Potassium. Diclofenac potassium is an NSAID used to treat pain,

inflammatory disorders, and dysmenorrhea.

55.    Dicloxacillin Sodium. Dicloxacillin sodium is an antibiotic of the penicillin class used to treat mild-to-moderate staphylococcal infections.

56.    Diflunisal. Diflunisal is an NSAID used to treat mild to moderate pain, osteoarthritis, and rheumatoid arthritis.

57.    Digoxin. Digoxin is a cardiotonic glycoside. It is used to treat heart failure and atrial fibrillation (irregular and/or rapid heart rate). It is included on the WHO's list of Essential Medicines.

58.    Diltiazem HCL. Diltiazem hydrochloride is a calcium channel blocker used to treat hypertension, angina, and heart arrhythmias.

59.    Disopyramide Phosphate. Disopyramide phosphate is an antiarrhythmic medication used to treat ventricular tachycardia.

60.    Divalproex Sodium ER. Divalproex sodium extended release is used to treat various types of seizure disorders, to treat manic episodes related to bipolar disorder, and to prevent migraine headaches. It works by restoring the balance of neurotransmitters in the brain.

61.    Doxazosin Mesylate. Doxazosin mesylate is used to treat symptoms of an enlarged prostate and hypertension.

62.    Doxycycline. Doxycycline is a tetracycline antibiotic. It is used to treat bacterial infections, such as acne, urinary tract infections, intestinal infections, eye infections, gonorrhea, chlamydia, and periodontitis. It is also used to treat symptoms of rosacea. It is included on the WHO's list of Essential Medicines. Doxycycline hyclate ("Doxy Hyclate") is a water-soluble form of doxycycline that absorbs quickly into the bloodstream. A delayed release version of doxycycline hyclate ("Doxy DR") is used to treat acne. Doxycycline monohydrate ("Doxy Mono") is significantly less water soluble and absorbs more slowly than Doxy Hyclate. It is also used to prevent malaria.

63.    Drospirenone and Ethinyl Estradiol (Ocella). Drospirenone and ethinyl estradiol, brand name Ocella, is a progestin medication used in birth control pills and menopausal hormone therapy.

64.    Econazole. Econazole refers to econazole nitrate cream 1%. Econazole is a topical antifungal agent used to treat skin infections caused by fungus or yeast, including ringworm, tinea versicolor, and yeast infections. Econazole is available in topical cream, ointment, emollient-cream, or

gel form.

65.     Enalapril Maleate. Enalapril maleate is used to treat hypertension, symptomatic heart failure, asymptomatic left ventricular dysfunction, and diabetic kidney disease.

66.     Entecavir. Entecavir is an antiviral medication used to treat hepatitis B virus infection. It is included on the WHO's list of Essential Medicines.

67.     Epitol. Epitol is a branded generic form of Carbamazepine, described above.

68.     Estazolam. Estazolam is a benzodiazepine used to treat sleep disorders.

69.     Estradiol. Estradiol is used in menopausal hormone therapy to prevent and treat moderate to severe menopausal symptoms such as hot flashes, vaginal dryness, and atrophy. It is also used to treat osteoporosis.

70.     Estradiol/Norethindrone Acetate (Mimvey). Estradiol/norethindrone acetate, brand name Mimvey, is a combination estradiol and norethisterone acetate used to treat vasomotor symptoms, vulvar and vaginal atrophy, and osteoporosis associated with menopause.

71.     Ethinyl Estradiol/Levonorgestrel (Portia and Jolessa). Ethinyl estradiol/levonorgestrel, brand names Portia and Jolessa, is a combined birth control pill comprised of ethinyl estradiol, an estrogen, and levonorgestrel, a progestin. It is also used to treat symptoms of menstruation and endometriosis, and for emergency contraception. It is included on the WHO's list of Essential Medicines.

72.     Ethinyl Estradiol/Norethindrone (Balziva). Ethinyl estradiol/norethindrone, brand name Balziva, is a combination of ethinyl estradiol, an estrogen, and norethisterone, a progestin. It is used for birth control, and to treat menstruation symptoms, endometriosis, and menopausal symptoms. It is included on the WHO's list of Essential Medicines.

73.     Ethosuximide. Ethosuximide is used for absence seizures. It is included on the WHO's list of Essential Medicines.

74.     Etodolac. Etodolac is an NSAID used for the management of mild to moderate pain, fever, and inflammation.

75.     Fenofibrate. Fenofibrate is used to treat abnormal blood lipid levels. It also used to treat high cholesterol to reduce the risk of cardiovascular disease and diabetic retinopathy in those with

1  diabetes mellitus.

2      76.    Fluconazole. Fluconazole is an antifungal medication used to treat fungal infections

3  including candidiasis, blastomycosis, coccidioidomycosis, cryptococcosis, histoplasmosis,

4  dermatophytosis, and pityriasis versicolor. It is included on the WHO's list of Essential Medicines.

5      77.    Fluocinonide. Fluocinonide, which includes 0.05% topical cream, 0.05% topical

6  ointment, and 0.05% topical gel, is a topical glucocorticoid used to treat psoriasis and eczema. It

7  reduces the swelling, itching, and redness that can occur in these types of skin irritations.

8      78.    Fluoxetine HCL. Fluoxetine hydrochloride is an antidepressant of the selective

9  serotonin reuptake inhibitor (SSRI) class used for treatment of major depressive disorder, obsessive-

10  compulsive disorder, bulimia nervosa, panic disorder, and premenstrual dysphoric disorder. It is

11  included on the WHO's list of Essential Medicines.

12      79.    Flurbiprofen. Flurbiprofen is an NSAID primarily used as a pre-operative antibiotic as

13  well as for arthritis or dental pain.

14      80.    Flutamide. Flutamide is a nonsteroidal antiandrogen used to treat prostate cancer. It is

15  also used to treat androgen-dependent conditions such as acne, excessive hair growth, and high

16  androgen levels in women.

17      81.    Fluvastatin Sodium. Fluvastatin sodium is a statin used to treat high cholesterol and to

18  prevent cardiovascular disease.

19      82.    Fosinopril HCTZ. Fosinopril hydrochlorothiazide is a combination of an ACE drug

20  with a diuretic used to treat hypertension and heart failure.

21      83.    Gabapentin. Gabapentin is an anticonvulsant medication used to treat seizures,

22  neuropathic pain, hot flashes, and restless pain syndrome. Some doctors also prescribe it to treat

23  anxiety disorders, insomnia, and bipolar disorder.

24      84.    Glimepiride. Glimepiride is used to treat diabetes mellitus type 2 by controlling high

25  blood sugar.

26      85.    Glipizide-Metformin. Glipizide-metformin is a combination of glipizide (a sulfonylurea

27  that stimulates the body's natural insulin production) with metformin (a biguanide that reduces the

28  body's absorption of sugar) that works to control blood sugar in patients with type-2 diabetes.

86.     Glyburide. Glyburide is an oral medication used to control blood sugar in patients with type-2 diabetes.

87.     Glyburide-Metformin. Glyburide-metformin is a combination medication used to control blood sugar in patients with type-2 diabetes.

88.     Griseofulvin. Griseofulvin is an antifungal medication used to treat dermatophytosis (ringworm). It is included on the WHO's list of Essential Medicines.

89.     Haloperidol. Haloperidol is an antipsychotic used to treat schizophrenia, tics in Tourette syndrome, mania in bipolar disorder, nausea and vomiting, delirium, agitation, acute psychosis, and hallucinations caused by alcohol withdrawal.  It is included on the WHO's list of Essential Medicines.

90.     Hydralazine HCL. Hydralazine hydrochloride is a vasodilator used to treat hypertension and heart failure.

91.     Hydroxyurea. Hydroxyurea is used to treat sickle-cell disease, chronic myelogenous leukemia, cervical cancer, polycythemia vera, and psoriasis. It is included on the WHO's list of Essential Medicines.

92.     Hydroxyzine Pamoate. Hydroxyzine pamoate is an antihistamine used to treat itchiness, anxiety, and nausea due to motion sickness.

93.     Irbesartan. Irbesartan is used to treat hypertension, heart failure, and diabetic kidney disease.

94.     Isoniazid. Isoniazid is an antibiotic used to treat tuberculosis and atypical mycobacterial infections. It is included on the WHO's list of Essential Medicines.

95.     Ketoconazole. Ketoconazole is an antifungal medication used to treat fungal infections such as tinea, cutaneous candidiasis, pityriasis versicolor, dandruff, and seborrheic dermatitis. It is also used to treat excessive hair growth and Cushing's syndrome.

96.     Ketoprofen. Ketoprofen is a propionic NSAID that has analgesic and antipyretic effects. It is used to treat arthritis-related inflammatory pains, severe toothaches, musculoskeletal pain, and nerve pain.

97.     Ketorolac Tromethamine. Ketorolac tromethamine is an NSAID used for the management of moderate to severe pain.

98.     Labetalol HCL. Labetalol hydrochloride is used to treat hypertension and for the long-term management of angina.

99.     Lamivudine/Zidovudine (Combivir). Lamivudine/zidovudine, brand name Combivir, is a combination antiretroviral medication used to treat human immunodeficiency virus (HIV) / acquired immunodeficiency syndrome (AIDS). It is included in the WHO's list of Essential Medicines.

100.    Leflunomide. Leflunomide is an immunosuppressive and anti-inflammatory agent. It is used to reduce inflammation that causes pain and swelling in patients with rheumatoid arthritis.

101.    Levothyroxine. Levothyroxine is a manufactured, synthetic form of the thyroid hormone, thyroxine. It is used to treat hypothyroidism, a condition in which the thyroid gland fails to produce enough hormone. It is also used to treat goiter (enlarged thyroid gland), thyroid cancer, and cretinism (congenital hypothyroidism). First manufactured in 1927, levothyroxine is included on the WHO's list of Essential Medicines. Levothyroxine was, by number of prescriptions, the second most popular prescription drug in the United States in the first quarter of 2016. Over 120 million prescriptions are written, per annum, for levothyroxine in the U.S, treating 15% of Americans over the age of 55.

102.    Lidocaine. Lidocaine is a local anesthetic agent. It is used to numb an area of the body to reduce pain or discomfort caused by invasive medical procedures. It is sold in several formulations and combinations, including lidocaine-prilocaine.

103.    Loperamide HCL. Loperamide hydrochloride is used to treat diarrhea caused by gastroenteritis, inflammatory bowel disease, or short bowel syndrome. It is included on the WHO's list of Essential Medicines.

104.    Medroxyprogesterone. Medroxyprogesterone is a progestin used to treat conditions such as absent or irregular menstrual periods and abnormal uterine bleeding. It is also used with estrogens to decrease the risk of endometrial hyperplasia. A derivative, medroxyprogesterone acetate, is a progestin used as a method of birth control and in menopausal hormone therapy. It is also used to treat endometriosis, abnormal uterine bleeding, abnormal sexuality in males, and certain types of cancer. It is included on the WHO's list of Essential Medicines.

105.    Meprobamate. Meprobamate is an oral tranquilizer used to treat short term anxiety, tension, and insomnia.

106.    Methimazole. Methimazole is an oral medication used to treat hyperthyroidism.

107.    Methotrexate. Methotrexate is a chemotherapy agent and immune system suppressant used to treat cancer, autoimmune diseases, and ectopic pregnancy, and also for medical abortions. It is used to treat cancers such as breast cancer, leukemia, lung cancer, lymphoma, and osteosarcoma, and autoimmune diseases such as psoriasis, rheumatoid arthritis, and Crohn's disease. It is included on the WHO's list of Essential Medicines.

108.    Metronidazole. Metronidazole is an antibiotic available in cream, jelly, and lotion form. It is used to treat vaginal infections, among other infections.

109.    Moexipril HCL. Moexipril hydrochloride is an ACE inhibitor used to treat hypertension and congestive heart failure.

110.    Moexipril HCL/HCTZ. Moexipril hydrochlorothiazide is a combination of moexipril HCL, as described above, and hydrochlorothiazide, a diuretic.

111.    Nabumetone. Nabumetone is an NSAID used to treat pain and inflammation.

112.    Nadolol. Nadolol is used to treat hypertension and for long-term treatment of angina pectoris. It is also used for heart rate control in people with atrial fibrillation, prevention of migraine headaches, prevention of bleeding veins in people with cirrhosis, and to treat people with high levels of thyroid hormone.

113.    Niacin ER. Niacin is an organic compound that is a form of vitamin B3. It is an essential human nutrient and the extended release form is used to treat high blood cholesterol and niacin deficiency.

114.    Nimodipine. Nimodipine is a dihydropyridine calcium channel blocker used to manage and reduce problems caused by bleeding blood vessels in the brain.

115.    Nitrofurantoin MAC. Nitrofurantoin microcrystal ("MAC") is an antibiotic used to treat bladder infections. It is included on the WHO's list of Essential Medicines.

116.    Norethindrone Acetate. Norethindrone acetate is a progestin used in birth control pills, menopausal hormone therapy, and for treatment of gynecological disorders such as abnormal uterine

bleeding.

117.     Nortriptyline HCL. Nortriptyline hydrochloride is used to treat depression, neuropathic pain, ADHD, and anxiety and is also used for smoking cessation.

118.     Nystatin. Nystatin is an antifungal medication. It is used to treat yeast infections, diaper rash, thrush, and esophageal candidiasis. It is included on the WHO's list of Essential Medicines.

119.     Omega-3-Acid Ethyl Esters. Omega-3 acid ethyl esters are the omega-3 fatty acids eicosapentaenoic acid (EPA) and docosahexaenoic acid (DHA) found in fish oil. The combination is used to reduce triglyceride levels in adults with severe hypertriglyceridemia.

120.     Oxaprozin. Oxaprozin is an NSAID used to relieve inflammation, swelling, stiffness, and join pain associated with osteoarthritis and rheumatoid arthritis.

121.     Oxybutynin Chloride. Oxybutynin chloride is used to treat an overactive bladder. It is also used to treat bed wetting in children and excessive sweating.

122.     Paricalcitol. Paricalcitol is used for the prevention and treatment of secondary hyperparathyroidism associated with chronic kidney disease.

123.     Paromomycin. Paromomycin is a broad-spectrum oral antibiotic. It is used to treat parasitic infections in the intestines and complications of liver disease. It is included on the WHO's list of Essential Medicines.

124.     Penicillin VK. Penicillin VK potassium ("VK") is an antibiotic used to treat bacterial infections including strep throat, otitis media, and cellulitis. It is also used to treat rheumatic fever and to prevent infections following removal of the spleen. It is included on the WHO's list of Essential Medicines.

125.     Pentoxifylline. Pentoxifylline is a xanthine derivative used to treat muscle pain, cramping, numbness, or weakness in people with peripheral artery disease. It is also used for the treatment of chronic venous leg ulcers and alcoholic hepatitis.

126.     Piroxicam. Piroxicam is an NSAID used to treat rheumatoid arthritis and osteoarthritis, primary dysmenorrhea, and post-operative pain, and is also used as an analgesic in the treatment of inflammatory conditions.

127.     Pravastatin. Pravastatin is statin used to lower cholesterol and triglycerides in the blood. Pravastatin was, by number of prescriptions, the twenty-third most popular prescription drug in the United States in the first quarter of 2016.

128.     Prazosin HCL. Prazosin hydrochloride is used to treat hypertension, symptoms of an enlarged prostate, and posttraumatic stress disorder.

129.     Prochlorperazine. Prochlorperazine is used to treat nausea, schizophrenia, migraines, and anxiety.

130.     Propranolol HCL. Propranolol hydrochloride is a beta-blocker used to treat hypertension, heart rhythm disorders, tremors, and other heart and circulatory conditions, and to prevent heart attacks, migraine headaches, and angina. Propranolol is available as a capsule, a tablet, an oral liquid solution, and an injection. It is included on the WHO's list of Essential Medicines.

131.     Raloxifene HCL. Raloxifene hydrochloride is used to prevent and treat osteoporosis in postmenopausal women and those on glucocorticoids. It is also used for reduction of risk and treatment of invasive breast cancer and to reduce breast density.

132.     Ranitidine HCL. Ranitidine hydrochloride is used to treat peptic ulcer disease, gastroesophageal reflux disease, Zollinger-Ellison syndrome, and hives. It is included on the WHO's list of Essential Medicines.

133.     Tamoxifen Citrate. Tamoxifen citrate is used to prevent and treat breast cancer. It is included on the WHO's list of Essential Medicines.

134.     Temozolomide. Temozolomide is an oral chemotherapy drug used to treat some brain cancers, astrocytoma, and glioblastoma multiforme.

135.     Theophylline ER. Theophylline ER is used to treat asthma and airway constriction associated with long-term asthma and other lung problems including chronic bronchitis and emphysema.

136.     Tizanidine. Tizanidine is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

137.     Tobramycin. Tobramycin is an antibiotic used to treat various bacterial infections, particularly gram-negative infections.

138.    Tolmetin Sodium. Tolmetin sodium is an NSAID used to reduce hormones that cause pain, swelling, tenderness, and stiffness in conditions such as osteoarthritis, rheumatoid arthritis, and juvenile rheumatoid arthritis.

139.    Tolterodine. Tolterodine is used to treat frequent urination, urinary incontinence, and urinary urgency. It is sold in extended release form and as tolterodine tartrate.

140.    Topiramate Sprinkle. Topiramate sprinkle is used to treat epilepsy and alcohol dependence and to prevent migraines.

141.    Trifluoperazine HCL. Trifluoperazine hydrochloride is an antipsychotic used to treat schizophrenia and for the short-term treatment of generalized anxiety disorder.

142.    Ursodiol. Ursodiol is a naturally-occurring bile acid that is manufactured and sold as a prescription medication to dissolve gallstones made of cholesterol in patients whose gallbladders do not need to be removed or where surgery is not an option. It is also used to prevent the formation of gallstones and to treat primary biliary cirrhosis (an autoimmune disease in which the bile ducts in the liver are destroyed). Ursodiol can also be used to prevent organ rejection in liver transplant patients.

143.    Valsartan HCTZ. Valsartan hydrochlorothiazide is used to treat hypertension, heart failure, and diabetic kidney disease.

144.    Verapamil. Verapamil is a calcium channel blocker. It is used to treat hypertension, angina, and certain heart rhythm disorders. It is included on the WHO's list of Essential Medicines.

145.    Warfarin Sodium. Warfarin sodium is an anticoagulant used to treat blood clots such as deep vein thrombosis and pulmonary embolism. It is also used to prevent stroke in people who have atrial fibrillation, valvular heart disease, or artificial heart valves. It is included on the WHO's list of Essential Medicines.

146.    Zoledronic Acid. Zoledronic acid is a biphosphate used to prevent bone fractures in cancer patients. It is included on the WHO's list of Essential Medicines.

## III.    JURISDICTION AND VENUE

147.    This Court has jurisdiction over this action pursuant to 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. Plaintiff asserts claims for relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over the state law claims

1    alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal

2    antitrust claims as to form part of the same case or controversy.

3              148.    This Court has personal jurisdiction over Defendants because each Defendant

4    transacted business throughout the United States (including in this District), sold and distributed one or

5    more of the Subject Drugs throughout the United States (including in this District), has registered

6    agents in the United States (including in this District), may be found in the United States (including in

7    this District), engaged in an unlawful conspiracy to artificially increase prices for one or more of the

8    Subject Drugs that was directed at and had the intended effect of causing injury to persons residing in,

9    located in, or doing business throughout the United States (including in this District), and is otherwise

10   subject to the service of process provisions of 15 U.S.C. § 22.

11             149.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b)-(d).

12   Defendants transact business within this District, have agents and can be found in this District, and the

13   relevant interstate trade and commerce is carried out, in substantial part, in this District.

14             150.    Defendants sold and distributed generic pharmaceuticals in a continuous and

15   uninterrupted flow of interstate commerce, which included sales of the Subject Drugs in the United

16   States (including in this District). Defendants' conduct had a direct, substantial, and reasonably

17   foreseeable effect on interstate commerce in the United States (including in this District).

18   **IV.    THE PARTIES**

19           **A.    Plaintiff**

20             151.    Molina Healthcare Inc. is a publicly traded healthcare management organization

21   headquartered in Long Beach, CA.  Molina provides health care services to families and individuals who

22   qualify for government-sponsored programs like Medicaid. Molina is driven by the belief that each

23   person deserves quality care.

24             152.    Molina Healthcare was founded in 1980 by Dr. C. David Molina, an emergency room

25   physician, who recognized that many low-income patients were coming to the emergency room for

26   treatment for common illnesses because they did not have family doctors to provide care and

27   information. Dr. Molina established a network of primary care clinics with the goal of treating this

28   underserved community.

COMPLAINT AND DEMAND FOR JURY TRIAL

153.    In 1996, as the need to more effectively manage and deliver health care services to low-income populations grew, Molina became a licensed health plan in California.  Subsequently, Molina expanded to numerous other states across the nation, operating through state-licensed subsidiaries. Molina currently serves approximately 3.3 million members across 14 states and Puerto Rico.

154.    Molina Healthcare Inc. ("MHI") is the parent company, and assignee of the claims, of subsidiaries and affiliates that provide health insurance that cover medical expenses incurred by the plan's beneficiaries.  These assignor subsidiaries include:  Molina Healthcare of California, Molina Healthcare of California Partner Plan, Inc., Molina Healthcare of Florida, Inc., Molina Healthcare of Illinois, Inc., Molina Healthcare of Kentucky, Inc., Molina Healthcare of Michigan, Inc., Molina Healthcare of Mississippi, Inc., Molina Healthcare of Missouri, Inc., Molina Healthcare of New Mexico, Inc., Molina Healthcare of New York, Inc., Molina Healthcare of Ohio, Inc., Molina Healthcare of Puerto Rico, Inc., Molina Healthcare of South Carolina, Inc., Molina Healthcare of Texas, Inc., Molina Healthcare of Texas Insurance Company, Molina Healthcare of Utah, Inc. (d/b/a Molina Healthcare of Utah and Molina Healthcare of Idaho), Molina Healthcare of Virginia, Inc., Molina Healthcare of Washington, Inc., and Molina Healthcare of Wisconsin, Inc. Collectively, the purchases of these entities are referred to as the "Molina Purchases."

155.    The benefits for these health plans include prescription drug coverage under which claims for the Subject Drugs have been, and continue to be, submitted and paid. Under Molina's prescription drug coverage, if a provider orders a brand name drug and there is a generic available, Molina will cover the generic medication.

**B.    Defendants**

156.    Defendant Actavis Holdco US, Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In March 2015, Actavis plc, the then-parent company of Defendants Actavis Elizabeth, LLC and Actavis Pharma, Inc., merged with Allergan, Inc. and changed its name to Allergan plc ("Allergan"). In August 2016, Teva Pharmaceutical Industries Ltd., the Israeli parent company of Defendant Teva, purchased Allergan's generics business, which included Defendants Actavis Elizabeth and Actavis Pharma, Inc. The assets and liabilities of Allergan's generics business were transferred to the newly-formed Actavis Holdco. Actavis Holdco is a wholly-

1   owned subsidiary of Defendant Teva.

2   157.   Defendant Actavis Elizabeth, LLC ("Actavis Elizabeth") is a Delaware limited liability

3   company with its principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary

4   of Defendant Actavis Holdco and is a research and development and manufacturing entity for the

5   Actavis generics operations.

6   158.   Defendant Actavis Pharma, Inc., is a Delaware corporation with its principal place of

7   business at 400 Interpace Parkway, Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis

8   Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from

9   Allergan plc. It manufactures, markets, and/or distributes generic pharmaceuticals.

10   159.   Actavis Holdco, Actavis Elizabeth, and Actavis Pharma, Inc. are collectively referred to

11   herein as "Actavis." At all times relevant to the Complaint, Actavis marketed and sold one or more of

12   the Subject Drugs in this District and throughout the United States.

13   160.   Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of

14   business in Lake Forest, Illinois. Akorn is the parent company of Defendant Hi-Tech Pharmacal Co.,

15   Inc. At all times relevant to the Complaint, Akorn marketed and sold one or more of the Subject Drugs

16   in this District and throughout the United States.

17   161.   Defendant Amneal Pharmaceuticals, Inc. ("Amneal") is a Delaware corporation with a

18   principal place of business at 400 Crossing Boulevard, Bridgewater, New Jersey. At all times relevant to

19   the Complaint, Amneal marketed and sold one or more of the Subject Drugs in this District and

20   throughout the United States.

21   162.   Defendant Apotex Corp. ("Apotex") is a Delaware corporation with a principal place of

22   business at 2400 North Commerce Parkway, Weston, Florida. At all times relevant to the Complaint,

23   Apotex marketed and sold one or more of the Subject Drugs in this District and throughout the United

24   States.

25   163.   Defendant Ascend Laboratories, LLC ("Ascend") is a New Jersey corporation with its

26   principal place of business in Parsippany, New Jersey. At all times relevant to the Complaint, Ascend

27   marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

28

164.    Defendant Aurobindo Pharma USA, Inc., ("Aurobindo") is a Delaware corporation with its principal place of business at 6 Wheeling Road Dayton, New Jersey. At all times relevant to this Complaint, Aurobindo marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

165.    Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business at 1 Passaic Avenue, Fairfield, New Jersey. At all times relevant to the Complaint, Breckenridge marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

166.    Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business at 1031 Centennial Avenue, Piscataway, New Jersey. At all times relevant to the Complaint, Camber marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

167.    Defendant Citron Pharma, LLC ("Citron") is a Delaware corporation with its principal place of business in East Brunswick, New Jersey. During the relevant time period, Citron marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

168.    Defendant Dr. Reddy's Laboratories Inc. ("Dr. Reddy's") is a New Jersey corporation with its principal place of business at 107 College Road East, Princeton, New Jersey. Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian company with its principal place of business in Hyderabad, India. At all times relevant to the Complaint, Dr. Reddy's marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

169.    Defendant Emcure Pharmaceuticals, Ltd. ("Emcure") is an Indian corporation with its principal place of business in Pune, India. Emcure is the parent company of Defendant Heritage Pharmaceuticals, Inc. and Emcure Pharmaceuticals USA, Inc., both of which have their principal place of business in East Brunswick, New Jersey. Emcure participated in and at times directed the business activities of Defendant Heritage Pharmaceuticals, Inc. At all times relevant to the Complaint, Emcure marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

170.    Defendant Endo International plc ("Endo") is an Irish company with global headquarters in Dublin, Ireland, and U.S. headquarters in Malvern, Pennsylvania. Endo is the parent

company of Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. In August 2014, Endo's subsidiary, Generics International (US), Inc. d/b/a Qualitest Pharmaceuticals, acquired co-conspirator, DAVA Pharmaceuticals, Inc. ("DAVA"). In September 2015, Endo completed the acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc., and merged Par's business with Endo's subsidiary co-conspirator Qualitest Pharmaceuticals, Inc. ("Qualitest"), naming the segment Par Pharmaceutical, Inc. Par is thus the successor in interest to both DAVA and Qualitest. At all times relevant to the Complaint, Endo marketed and sold one or more of the Subject Drugs in this District and throughout the United States, and also participated in and directed the business activities of Defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc.

171.    Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York. At all times relevant to the Complaint, Epic marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

172.    Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. It is under common ownership with Defendant Sandoz, Inc., as both are wholly-owned subsidiaries of Novartis AG ("Novartis"). Fougera specializes in the production, marketing, and sale of dermatological products. At all times relevant to the Complaint, Fougera marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

173.    Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business in South Plainfield, New Jersey. At all times relevant to the Complaint, G&W marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

174.    Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware company with its principal place of business in Huntsville, Alabama, and formerly conducted business as Qualitest. Generics Bidco is a wholly owned subsidiary of Defendant Endo, and affiliate of Defendant Par (defined below). At all times relevant to the Complaint, Generics Bidco marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

175.     Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with a principal place of business at 750 Corporate Drive, Mahwah, New Jersey. At all times relevant to the Complaint, Glenmark marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

176.     Defendant Greenstone LLC, ("Greenstone") is a limited liability company located at 100 Route 206, North Peapack, New Jersey. Greenstone is a wholly-owned subsidiary of Defendant Pfizer, Inc. ("Pfizer"), a global pharmaceutical company headquartered in New York, New York, and has at all relevant times operated as the generic drug division of Pfizer. Greenstone operates out of Pfizer's Peakpack, New Jersey campus, and a majority of Greenstone's employees are also employees of Pfizer's Essential Health Division, including Greenstone's President, and use an @pfizer.com e-mail address. Greenstone employees also use Pfizer for financial analysis, human resources, and employee benefit purposes, making the two companies essentially interchangeable. At all times relevant to the Complaint, Greenstone marketed and sold one or more of the Subject Drugs in this District and throughout the United States under the direction and control of Pfizer.

177.     Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. Heritage is a wholly-owned subsidiary of Defendant Emcure. At all times relevant to the Complaint, Heritage marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

178.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. Hi-Tech is a wholly-owned subsidiary of Defendant Akorn. Upon information and belief, in or around 2009, Defendant Hi-Tech obtained 5 generic ANDA applications from DFB Pharmaceuticals, Inc. At all times relevant to the Complaint, Hi-Tech marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

179.     Defendant Impax Laboratories, LLC, formerly known as Impax Laboratories, Inc., ("Impax") is a Delaware limited liability company with its principal place of business in Hayward, California. At all times relevant to the Complaint, Impax marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

180.    Defendant Lannett Company, Inc., ("Lannett") is a Delaware corporation with its principal place of business at 9000 State Road, Philadelphia, Pennsylvania. At all times relevant to the Complaint, Lannett marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

181.    Defendant Lupin Pharmaceuticals, Inc., ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland. Lupin is a wholly-owned subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India. At all times relevant to the Complaint, Lupin marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

182.    Defendant Mayne Pharma, Inc. ("Mayne") is a Delaware corporation with its principal place of business in Paramus, New Jersey. Mayne is a wholly-owned subsidiary of Mayne Pharma Group Limited, an Australian company with its principal place of business in Salisbury, Australia. In 2012, Mayne acquired Metrics, Inc. and its division Midlothian Laboratories ("Midlothian") and operated under the name Midlothian since that time. At all times relevant to the Complaint, Mayne marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

183.    Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business in Morton Grove, Illinois. Morton Grove is a wholly-owned subsidiary of Defendant Wockhardt, Ltd. At all times relevant to the Complaint, Morton Grove marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

184.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania. It is the parent company of Defendant Mylan Pharmaceuticals, Inc. and Defendant UDL Laboratories Inc.

185.    Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business at 1000 Mylan Boulevard, Canonsburg, Pennsylvania.

186.    Defendant Mylan N.V. is a Dutch company with its principal place of business and global headquarters in Canonsburg, Pennsylvania. Mylan N.V. is the direct parent of Defendant Mylan Inc. and the ultimate parent of Defendants Mylan Pharmaceuticals, Inc. and UDL Laboratories Inc.

187.    Mylan Inc., Mylan Pharmaceuticals, Inc., and Mylan N.V. are collectively defined as "Mylan." At all times relevant to the Complaint, Mylan marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

188.    Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with its principal place of business in Aliso Viejo, California. Oceanside is a wholly-owned subsidiary of Defendants Valeant Pharmaceuticals International and Valeant Pharmaceuticals North America LLC. At all times relevant to the Complaint, Oceanside marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

189.    Defendant Par Pharmaceutical Companies, Inc., is a Delaware corporation with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York.

190.    Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a direct subsidiary of Defendant Par Pharmaceutical Companies, Inc.

191.    Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are each wholly-owned subsidiaries of Defendant Endo and are collectively referred to as "Par." At all times relevant to the Complaint, Par has marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

192.    Defendant Perrigo Company plc ("Perrigo plc") is an Irish company with its principal place of business in Dublin, Ireland. Perrigo plc's North American base of operations is located at 515 Eastern Avenue, Allegan, Michigan 49010. Perrigo plc's prescription drug business focuses primarily on the manufacture and sale of extended topical prescription pharmaceuticals.

193.    Defendant Perrigo New York, Inc. ("Perrigo New York") is a Delaware corporation with its principal place of business in Bronx, New York. Perrigo New York is a wholly-owned subsidiary of Perrigo plc.

194.    Perrigo plc and Perrigo New York are collectively referred to collectively as "Perrigo." During the relevant time period, Perrigo marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

195.     Defendant Pfizer, Inc., ("Pfizer") is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, N.Y. Pfizer is a global biopharmaceutical company and is the corporate parent of Defendant Greenstone. At all times relevant to the Complaint, Pfizer has participated in and directed the business activities of Defendant Greenstone.

196.     Defendant Sandoz, Inc., ("Sandoz") is a Colorado corporation with its principal place of business at 100 College Road West, Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. At all times relevant to the Complaint, Sandoz marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

197.     Defendant Sun Pharmaceuticals Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. Until February 2011, Sun was known as Caraco Pharmaceutical Laboratories, Ltd. Since 2011, Sun has been a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian company with its principal place of business in Mumbai, India, which also owns, and owned throughout the relevant period, a large majority stake of Defendants Taro Pharmaceutical Industries Ltd. and Taro Pharmaceuticals USA, Inc. In late 2012, Sun acquired URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, Pennsylvania. Sun also does business under the name Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997. Unless addressed individually, Sun, URL, Mutual and Caraco are collectively referred to herein as "Sun." During the relevant time period, Sun marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

198.     Defendant Taro Pharmaceuticals Industries Ltd. is an Israeli company with its principal place of business in Haifa Bay, Israel. Throughout the relevant time period, the Indian parent company of Defendant Sun has owned a large majority stake of Pharmaceuticals Industries Ltd.. At all times relevant to the Complaint, Taro Pharmaceuticals Industries Ltd. participated in and directed the business activities of Defendant Taro Pharmaceuticals USA, Inc.

199.     Defendant Taro Pharmaceuticals USA, Inc. is a New York corporation with its principal place of business at 3 Skyline Drive, Hawthorne, New York.

200.    Taro Pharmaceuticals Industries Ltd. and Taro Pharmaceuticals USA, Inc. are collectively referred to herein as "Taro." At all times relevant to the Complaint, Taro marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

201.    Defendant Teligent, Inc. (f/k/a IGI Laboratories, Inc.) ("Teligent") is a Delaware corporation with its principal place of business in Buena, New Jersey. During the relevant time period, Teligent marketed and sold one or more of the Subject Drugs in this District and throughout the United States, either on its own or through subsidiaries.

202.    Defendant Teva Pharmaceuticals USA, Inc., ("Teva") is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania. Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli corporation with its principal place of business in Petah Tikva, Israel. At all times relevant to the Complaint, Teva marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

203.    Defendant UDL Laboratories Inc. ("UDL") is an Illinois corporation with its principal place of business in Rockford, Illinois. UDL is a subsidiary of Defendant Mylan Inc. At all times relevant to the Complaint, UDL marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

204.    Defendant Upsher-Smith Laboratories, LLC, ("Upsher-Smith") is a Minnesota limited liability company located at 6701 Evenstad Drive, Maple Grove, MN. Upsher-Smith is a subsidiary of Sawaii Pharmaceutical Co., Ltd., a large generics company in Japan. At all times relevant to the Complaint, Upsher-Smith marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

205.    Defendant Valeant Pharmaceuticals International is a Canadian company with its principal place of business in Bridgewater, New Jersey. Valeant Pharmaceuticals International was a California company until September 2010 when it merged with Biovail Corporation, a Canadian company.

206.    Defendant Valeant Pharmaceuticals North America, LLC is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. It is a wholly-owned subsidiary of Valeant Pharmaceuticals International. Defendant Oceanside is a wholly-owned subsidiary of Valeant

Pharmaceuticals North America, LLC.

207.    Valeant Pharmaceuticals International, Valeant NA, and Oceanside will collectively be referred to herein as "Valeant." During the relevant time period, Valeant marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

208.    Defendant VersaPharm, Inc. ("VersaPharm") is a Georgia corporation with its principal place of business at 1775 West Oak Parkway, Suite 800, Marietta, Georgia. On August 12, 2014, Defendant Akorn acquired VPI Holdings Corp., the parent company of VersaPharm. At all times relevant to the Complaint, VersaPharm marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

209.    Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey. At all times relevant to the Complaint, West-Ward marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

210.    Defendant Wockhardt USA LLC, ("Wockhardt") is a Delaware limited liability company located at 20 Waterview Boulevard, 3rd Floor, Parsippany, New Jersey. At all times relevant to the Complaint, Wockhardt marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

211.    Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with its principal place of business at 73 Route 31 North, Pennington, New Jersey. At all times relevant to the Complaint, Zydus marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

212.    When any allegation of the Complaint refers to any representation, act, or transaction of Defendants, or any agent, employee, or representative thereof, such allegation shall be deemed to mean that such principals, officers, directors, employees, agents, or representatives of Defendants acted within the scope of their actual or apparent authority, and performed such representations, acts, or transactions on behalf of Defendants.

**C.      Co-Conspirators**

213.      Various other persons, firms, entities, and corporations not named as defendants in this Complaint have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

214.      The true names of additional co-conspirators are presently unknown to Plaintiff. Plaintiff may amend this Complaint to allege the true names of additional co-conspirators as they are discovered.

215.      The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

**V.      REGULATORY AND ECONOMIC BACKGROUND**

**A.  Generic Drugs Should Provide Lower-Priced Options for Purchasers**

216.      Generic drugs provide a lower-cost but therapeutically equivalent substitute for brand-name drugs. Congress enacted the Hatch-Waxman Act ("Hatch-Waxman") in 1984 to encourage the production and sale of cheaper generic drugs by simplifying the regulatory hurdles that generic pharmaceutical manufacturers must clear to market and sell their drug products.[2]

217.      To obtain marketing approval for a generic drug, an Abbreviated New Drug Application ("ANDA") must be filed with the Food and Drug Administration's ("FDA") Center for Drug Evaluation and Research's ("CDER"), Office of Generic Drugs ("OGD").

218.      When the FDA approves an ANDA, that generic drug receives an "AB" rating from the FDA. This signifies the generic drug is therapeutically equivalent to a reference listed drug ("RLD"). RLD can either be a brand-name drug or a generic drug if the brand is not currently marketed. Therapeutic equivalence indicates the generic is both pharmaceutically equivalent (having the same active ingredient(s), same dosage form and route of administration, and identical strength or concentration) and bioequivalent (no significant difference in the rate and extent of absorption of the

---

[2] Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

1  active pharmaceutical ingredient) to the RLD.

2  219.  Typically, AB-rated generic versions of brand-name drugs are priced significantly below

3  their brand-name counterparts. The only material difference between a generic and its brand name

4  counterparts is price. When multiple generic manufacturers enter the market, prices erode, sometimes

5  by as much as 90%, as price competition increases. An FDA study recently noted that "generic

6  competition is associated with lower drug prices, with the entry of the second generic competitor being

7  associated with the largest price reduction." Because of this, AB-rated generic drugs gain market share

8  rapidly. As more generic drugs enter the market, the price of those drugs should progressively decrease,

9  resulting in lower costs for purchasers, like Plaintiff. These cost reductions were the intent of Hatch-

10  Waxman's expedited generic approval pathway.

11  220.  Because each generic of the same RLD is readily substitutable for another generic, the

12  products behave like commodities; price is the only differentiating feature, and the basis for

13  competition.[3] Generic competition, therefore, when functioning in a market undisturbed by

14  anticompetitive forces, reduces drug costs by driving prices down for AB-rated generic versions of

15  brand-name drugs. Predictably, the longer generic drugs remain on the market, the lower their prices

16  will become, ever nearing closer to a manufacturer's marginal costs.

17  221.  In the United States, a prescription drug may be dispensed to a patient only by a

18  licensed pharmacist pursuant to a doctor's prescription that identifies the drug. The prescription may

19  only be filled with either the brand-name drug identified or an AB-rated generic version. Pharmacists

20  may (and, in most states, must) substitute an AB-rated generic for the brand-name drug, without

21  seeking or obtaining permission from the prescribing doctor (unless the prescribing physician indicated

22  "dispense as written" on the prescription).

---

23
24  [3]  *See, e.g.,* Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact,* at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at*
25  https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-
26  short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical*
27  *Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.
28

222.     Generic competition enables purchasers like Plaintiff to purchase a generic version of a brand-name drug at substantially lower prices. In fact, studies have shown that use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[4]

**B.     The Prescription Drug Market**

223.     The United States is a venue ripe for illegal anticompetitive exploitation of prescription drug prices due to laws that regulate how prescription drugs are prescribed and filled.

224.     For most consumer products, the person responsible for paying for the product selects the product. When the payer is also the user of the product, the price of the product plays an appropriate role in the person's choice. This incentivizes manufacturers to lower the price of their product. The pharmaceutical marketplace departs from this norm.

225.     In most instances, a pharmacist dispenses a prescription pursuant to a doctor's prescription, and the patient and his/her health insurer pay for the prescription drug. The pharmacist may dispense only the brand-name drug named in the prescription or its AB-rated, FDA-approved generic equivalent, as set forth above.

226.     Therefore, the doctor's prescription defines the relevant product market, because it limits the consumer's (and the pharmacist's) choice to the drug named therein.

227.     Brand pharmaceutical sellers exploit this departure from consumer norms by employing "detailing" teams that persuade doctors to prescribe the branded product without advising the doctor on the cost of the product. The most important tool that insurers, like Plaintiff, who bare the overwhelming majority of the cost of these prescription drugs, have is the availability of generic drugs in a competitive market. When drug manufacturers begin selling AB-rated generic drugs, insurers, along with others in the distribution chain, are able to substantially drive down the prices paid for those drugs.

228.     For example, TPP health insurers, like Plaintiff, have complex formulary structures that incentivize doctors, pharmacists and insureds to prescribe, dispense, and fill AB-rated generic drugs when available.

---

[4] GPhA, *Generic Drug Savings in the U.S.* (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

### C.      The Prescription Drug Distribution System

229.      Drug manufacturers supply drug products. Rather than develop new drugs, generic manufacturers focus on manufacturing drugs that can be substituted for the brand drug product. Generic drugs can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments, creams, solutions, emollients, and gels. A manufacturer seeking to sell a drug in the United States must obtain FDA approval. The FDA typically evaluates whether the drug is safe and efficacious, the manufacturing process, labelling, and quality control.

230.      Generic manufacturers operate facilities and compete with one another to sell the drugs they produce to wholesalers, distributors, retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health insurance plans. Competition among generic drug manufacturers is dictated by price and supply; as such generic manufacturers do not differentiate their products. Consequently, generic drugs are usually marketed only by the name of the active ingredient.

231.      Drug suppliers include the manufacturers or other companies that contract with a manufacturer to sell a drug product made by the manufacturer. Drug manufacturers typically sell their products through supply agreements negotiated with wholesalers, distributors, pharmacy benefit managers, and mail-order or specialty pharmacies.

232.      Generic manufacturers report list prices for each generic drug that they offer, including the average wholesale price ("AWP") and wholesale acquisition cost ("WAC"). The WAC represents the manufacturers' list price, and typically does not represent discounts that may be provided. Manufacturers may supply the same generic drug at several different prices depending on the customer or type of customer.

233.      Generic manufacturers must also report their average manufacturer prices ("AMP") to the Centers for Medicare and Medicaid if they enter into a Medicaid rebate agreement. AMP is the average price paid to the manufacturer for the drug in the United States by (a) wholesalers for drugs distributed to retail community pharmacies and (b) retail community pharmacies that purchase drugs directly from the manufacturer.

234.     Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers. Wholesalers and distributors pay lower prices to acquire generics than the corresponding branded drug.

235.     Pharmacies purchase drugs, either directly from manufacturers or from wholesalers/distributors. Pharmacies may be traditional retail pharmacies, specialty pharmacies, or mail-order pharmacies. Pharmacies also pay lower prices to acquire generic drugs than to acquire the corresponding branded drug.

236.     Finally, insurers and insureds purchase the prescribed drug, typically in some type of cost sharing arrangement, depending on an insurer's formulary placement, among other things.

237.     To combat rising costs, some third-party payers and PBMs have implemented Maximum Allowable Costs ("MACs") that set the upper limit on what they will pay for a generic drug. TPPs and PBMs set MACs based on a variety of factors, including the lowest acquisition cost in the market for that generic drug. MAC pricing effectively requires pharmacies, retailers, and PBMs to purchase the lowest-price version of a generic drug on the market, regardless of WAC. As a result, a manufacturer should not, in a properly functioning market, be able to significantly increase its price without incurring the loss of a significant volume of sales. A manufacturer can only raise its price in the presence of MAC pricing if it knows it is conspiring with competitors to raise their prices too.

**D.     The Market for Generic Drugs is Highly Susceptible to Collusion**

238.     Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act, as it constitutes a conspiracy to fix prices and allocate markets and customers. As such, Plaintiff is not required to define relevant markets. However, there are certain features characteristic of the market for generic drugs which indicate that it is susceptible to collusion and that collusion caused the price increases.

239.     Factors showing that a market is susceptible to collusion include:

a.     High level of industry concentration: A small number of competitors control roughly 100% of the market for each of the Subject Drugs. Beginning in 2005, the generic pharmaceutical market has undergone remarkable and extensive consolidation, rendering it ripe for collusion. As a result, for most of the Subject Drugs, there were between

two and four manufacturers providing that drug for sale in the United States during the relevant time period, rendering each market sufficiently concentrated to carry on collusive activities.

b.     Sufficient numbers to drive competition: While the market for each of the Subject Drugs had a small enough number of competitors to foster collusion, the number of sellers or potential sellers was large enough that prices should have remained at their historical, near marginal cost levels absent collusion.

c.     High barriers to entry: The high costs of manufacturing, developing, testing, securing regulatory approval, and oversight are among the barriers to entry in the generic drug market. The Defendants here control virtually all of the market for the Subject Drugs and sell those drugs pursuant to FDA approvals granted years before the price hikes began in 2012. Any potential new entrant would have to go through the lengthy ANDA approval process before commercially marketing its product. This type of barrier to entry increases a market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

d.     High inelasticity of demand and lack of substitutes: Each of the Subject Drugs is generally a necessity for each patient to whom it is prescribed, regardless of price. Substituting non-AB rated drugs presents challenges, and both patients and physicians are unwilling to sacrifice patient wellbeing for cost savings. For many patients, the particular Subject Drug they are prescribed is the only effective treatment.

e.     Commoditized market: Defendants' products are fully interchangeable because they are bioequivalent. Thus, pharmacists may freely substitute one for another. The only differentiating feature, and therefore the only way a Defendant can gain market share, is by competing on price.

f.     Absence of departures from the market: There were no departures from the market during the relevant period sufficient to explain the drastic price increases.

g.     Absence of non-conspiring competitors: Defendants have maintained all or virtually all of the market share for each of the Subject Drugs between 2010 and the present.

1    Thus, Defendants have market power in the market for each of the Subject Drugs, which

2    enables them to increase prices without loss of market share to non-conspirators.

3              h.      Opportunities for contact and communication among competitors:

4    Defendants participate in the committees and events of the GPhA, HDMA, ECRM, MMCAP,

5    HSCA, and other industry groups, as set forth below, which provide and promote opportunities

6    to communicate. The grand jury subpoenas to Defendants targeting inter-Defendant

7    communications further support the existence of communication lines between competitors

8    with respect to generic pricing and market allocation.

9              i.      Size of Price Increases: The magnitude of the price increases involved in

10   this case further differentiates it from examples of parallelism. Oligopolists testing price

11   boundaries must take a measured approach. But the increases are not 5% or even 10% jumps –

12   they are of far greater magnitude. A rational company would not implement such large increases

13   unless it was certain that its conspirator-competitors would follow.

14             j.      Reimbursement of Generic Drugs: The generic market has institutional

15   features that inhibit non-collusive, parallel price increases. These features include MAC pricing,

16   insurers' formulary placements, and required substitution at the pharmacy level. As a result, the

17   usual hesitance of an oligopolist to unilaterally raise prices is embedded in the generic

18   reimbursement system.

19   **VI.     GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY**

20             240.    Defendants and other generic drug manufacturers' conduct has resulted in extensive

21   and widespread scrutiny by federal and state regulators, including the United States Department of

22   Justice Antitrust Division, the United States Senate, the United States House of Representatives, and

23   the Attorneys General of 46 states, the District of Columbia, and Puerto Rico ("the State AGs").

24             241.    The DOJ's and State AGs' investigations followed a Congressional hearing and

25   investigation, which itself was prompted by a January 2014 letter from the National Community

26   Pharmacists Association ("NCPA") to the United States Senate Committee on Health, Education,

27   Labor, and Pensions ("Senate HELP Cmte.") and the United States House Energy and Commerce

28   Committee highlighting nationwide spikes in prices for generic drugs.

**A.  Congress launched an investigation into generic price hikes**

242.    In January 2014, the NCPA urged the Senate Help Cmte. and the House Energy and Commerce Committee to hold hearings on significant generic pharmaceutical price spikes, citing surveys and data from over 1,000 community pharmacists who reported price hikes on essential generic pharmaceuticals exceeding 1,000%.

243.    On October 2, 2014, Senator Bernie Sanders, then Chair of the Subcommittee on Primary Health and Retirement Security of the Senate HELP Cmte. and Representative Elijah E. Cummings, Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers, including Actavis, Apotex, Dr. Reddy's, Endo, Heritage, Lannett, Mylan, Par, Sun, Teva, and Zydus, requesting information about the escalating prices of generic drugs.[5] More recently on August 13, 2019, Senator Sanders and Representative Cummings sent letters to executives of Mylan and Teva – companies that did not produce documents in response to the 2014 letters – asking for drug pricing information as part of their ongoing probe into the rising cost of generics.

244.    Senator Sanders and Representative Cummings issued a joint press release, advising that "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses." They noted the "huge upswings in generic drug prices that are hurting patients" and having a "very significant" impact, threatening pharmacists' ability to remain in business.[6]

245.    On February 24, 2015, Senator Sanders and Representative Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and

---

[5] Press Release, U.S. Senator Bernie Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[6] *Id.*

Medicaid programs."[7] The OIG responded to the request on April 13, 2015, advising it would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [AMP] exceeded the specified inflation factor."[8]

246.    In August 2016, the GAO issued the GAO Report, a study examining Medicare Part D prices for 1,441 generic drugs between 2010 and 2015. The study found that 300 of the 1,441 drugs experienced at least one "extraordinary price increase" of 100% or more. Among the drugs with extraordinary price increases were 47 of the Subject Drugs: Acetazolamide ER, Amiloride HCL/HCTZ, Amitriptyline, Baclofen, Benazepril HCTZ, Bumetanide, Carbamazepine, Cephalexin, Cimetidine, Ciprofloxacin HCL, Clarithromycin ER, Clobetasol Propionate, Clomipramine, Clotrimazole, Desonide, Dextroamphetamine Sulfate ER, Digoxin, Diltiazem HCL, Divalproex Sodium ER, Doxazosin Mesylate, Doxycycline Hyclate, Econazole, Enalapril Maleate, Ethosuximide, Etodolac, Fluconazole, Fluocinonide, Fluoxetine HCL, Haloperidol, Ketoconazole, Labetalol HCL, Lidocaine, Methotrexate, Nadolol, Nitrofurantoin MAC, Nystatin, Oxaprozin, Oxybutynin Chloride, Piroxicam, Pravastatin, Prazosin HCL, Prochlorperazine, Ranitidine HCL, Theophylline ER, Tobramycin, Trifluoperazine HCL, and Ursodiol.[9]

## B.    The DOJ Investigates Criminal Generic Drug Collusion

247.    The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry in 2014 that initially focused on just two drugs.[10] Most of the Defendants here have come under DOJ scrutiny.

---

[7] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[8] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, United States Senator (Apr. 13, 2015), *available at* https://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

[9] GAO Report at Appx. III.

[10] Joshua Sisco, *DoJ believes collusion over generic drug prices widespread-source*, POLICY AND REGULATORY REPORT (June 26, 2015), available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf; David McLaughlin and Caroline Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG MARKETS (Nov. 3, 2016), available at https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

248.    The DOJ first charged Heritage executives Jeffrey Glazer and Jason Malek with criminal counts related to price collusion for Doxy Hyclate and Glyburide. The two pleaded guilty to violating Section 1 of the Sherman Act.

249.    Actavis, Aurobindo, Dr. Reddy's, Endo, Fougera (through Sandoz), Impax, Lannett, Mylan, Par, Sandoz, Sun, Taro, and Teva admitted to receiving grand jury subpoenas from the DOJ. The DOJ executed a search warrant on Mylan in the fall of 2016. In 2017, Perrigo disclosed that its offices were searched as well.[11]

250.    Upon information and belief, the DOJ has granted conditional amnesty to one Defendant.

251.    Information disclosed by some Defendants evidence the broad scope of the conspiracy.

252.    In Lannett's November 3, 2014 quarterly report filed with the Securities and Exchange Commission ("SEC"), it disclosed that its "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[12] Lannett added that "[t]he subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[13]

253.    Mylan has also disclosed that it received DOJ subpoenas relating to various generic drugs, and that DOJ executed search warrants in connection thereto.[14] Actavis, Fougera, Par, Sandoz, Taro, and Teva also received DOJ subpoenas relating to their marketing and pricing of generic pharmaceuticals, and communications with competitors.[15]

---

[11] A search warrant will only be issued if DOJ was able to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan.

[12] Lannett Company, Inc., Quarterly Report (Form 10-Q) at 16 (Nov. 6, 2014).

[13] *Id.*

[14] Mylan Inc., Annual Report (Form 10-K) at 160 (Feb. 16, 2016); Mylan Inc., Quarterly Report (Form 10-Q) at 58 (Nov. 9, 2016).

[15] Novartis, 2016 ANNUAL REPORT at 217, available at https://www.novartis.com/sites/www.novartis.com/files/novartis-20-f-2016.pdf; Par Pharmaceutical

254.    A DOJ grand jury subpoena is significant; it indicates "staff [ ] considered the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[16]

255.    The DOJ has intervened in numerous civil antitrust actions that are now part of the consolidated and coordinated proceedings styled *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724 (E.D. Pa.), stating that these cases overlap with the DOJ's ongoing criminal investigation.

256.    On May 31, 2019, the DOJ released a statement that Heritage admitted that it "conspired to fix prices, rig bids, and allocate customers for glyburide," and agreed to pay $7 million in criminal penalty and civil damages, and to cooperate fully with ongoing parallel investigations into the generics industry.

**C.    State Attorneys General Launch Their Own Investigation**

257.    In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. Based on evidence procured through their own subpoena-power, the State AGs filed a civil action alleging a wide-ranging series of conspiracies implicating numerous generic drugs and manufacturers. *The Connecticut Mirror* reported that the State AGs "suspected fraud on a broader, nearly unimaginable scale," that "new subpoenas are going out, and the investigation is growing beyond the companies named in the suit."[17] Then-CTAG George Jepsen called the evidence obtained in that investigation "mind-boggling."[18]

258.    Mr. Jepsen confirmed the scope of the State AGs' action in a press release in December 2016:

---

Companies, Inc., Annual Report (Form 10-K) at 37 (Mar. 12, 2015); Taro Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) (Sept. 9, 2016); Teva Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) at 33 (Nov. 15, 2016).

[16] DOJ, ANTITRUST DIV. MANUAL (5th ed. 2015) at III-82.

[17] Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, THE CONN. MIRROR (Jan. 27, 2017), available at https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/. *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the CTAG issued its first subpoena. Id.

[18] *Id.*

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States. . . While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers - and, indeed, our healthcare system as a whole - who paid for these actions through artificially high prices for generic drugs.[19]

259.     In their consolidated amended complaint filed on June 18, 2018 ("State AG Complaint No. 1"), the State AGs broadened their case to include fifteen drugs, all of which are Subject Drugs in this Complaint. At the time, CTAG Jepsen stated that "[t]he issues we're investigating go way beyond the two drugs and six companies. Way beyond…We're learning new things every day."[20] According to a recent interview with Joseph Nielsen, the court-appointed Liaison Counsel for the State AGs in these consolidated MDL proceedings, "[t]his is most likely the largest cartel in the history of the United States."[21]

260.     On May 10, 2019 the State AGs filed a new complaint focusing on a conspiratorial web Teva constructed with various other Defendant generic drug manufacturers, named herein, that led to either artificial stabilization or price increases on over 100 generic drug products ("State AG Complaint No. 2"), all of which are Subject Drugs in this Complaint. The allegations in the State AG Complaint No. 2 were based on "(1) the review of many thousands of documents produced by dozens of companies throughout the generic pharmaceutical industry, (2) an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of

---

[19] Press Release, Attorney General George Jepsen, Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies (Dec. 15, 2016), available at https://portal.ct.gov/AG/Press-Releases/2016-Press-Releases/Connecticut-Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.

[20] Kaiser Health News, *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices,* THE DAILY BEAST, Dec. 21, 2016, http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices?source=twitter&via=desktop.

[21] Christopher Rowland, *Investigation of Generic "Cartel" Expands to 300 Drugs,* THE WASHINGTON POST, December 9, 2018, available at https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to-300-drugs/2018/12/09/fb900e80-f708-11e8-863c-9e2f864d47e7_story.html?utm_term=.a838a7f671cd.

Defendant companies and other generic manufacturers, and (3) information provided by several as-of-yet unidentified cooperating witnesses who were directly involved in the conduct alleged…"[22]

261.    During the course of their investigation, the States AGs obtained cooperation from a number of individuals. The expected testimony from certain of those individuals will directly support and corroborate the allegations throughout the State AG Complaint No. 2 and this Complaint. Some of those cooperating witnesses include:

    a.    A former pricing executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-1];

    b.    A former sales and marketing executive at non-Defendant Rising Pharmaceuticals, Inc. ("Rising") and Sandoz during the time period relevant to this Complaint [referred to herein as CW-2];

    c.    A former senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-3];

    d.    A former senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-4];

    e.    A former senior executive at Glenmark during the time period relevant to this Complaint [referred to herein as CW-5]; and

    f.    Jason Malek ("Malek"), former Vice President of Commercial Operations at Heritage.

262.    Teva has, at all times relevant to the Complaint, maintained a live database that it refers to as Delphi where it has catalogued nearly every decision it has made regarding the products it sells, including those decisions that were made collusively – which Teva often referred to as "strategic" decisions. Although the State AGs do not have full access to that database, they have obtained static

---

[22] State AG Complaint No. 2 at ¶4. The State AGs detail their extensive investigatory efforts in State AG Complaint No. 2. They have compiled over 7 million documents, issued more than 300 subpoenas to telephone carriers, issued over 30 subpoenas to generic drug manufacturers and examined the names and contact information of over 600 drug manufacturer employees, giving the State AGs a "unique perspective to know who in the industry was talking to who, and when" *Id.* ¶¶ 64-65. The State AGs have also corroborated these allegations through cooperating witnesses, including senior executives and employees of many Defendants named here.

images of the database that were internally disseminated over time by Teva, which were referred to as Market Intel Reports. Through its review and investigation of some of those reports, in combination with the phone records, the State AGs have, to date, identified over 300 instances of collusion where Teva spoke to competitors shortly before or at the time it made what the company referred to as a "strategic" market decision. A number of those instances are detailed throughout this Complaint.

## VII.    THE GENERIC DRUG MARKET

### A.  The Cozy Nature Of the Industry and Opportunities for Collusion

263.    The collusion alleged herein infested the generic drug industry.

264.    At all relevant times, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning the Subject Drugs, along with other drugs, which had the actual and intended effect of causing Plaintiff to pay artificially inflated prices at supracompetitive rates.

265.    In formulating and effectuating their conspiracy, Defendants engaged in various forms of anticompetitive conduct, including but not limited to:

      a.    Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of the Subject Drugs in the United States;

      b.    Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid-rigging for the Subject Drugs sold in the United States;

      c.    Agreeing during those meetings, conversations, and communications to engage in price increases, market and customer allocation, and/or bid-rigging for the Subject Drugs sold in the United States;

      d.    Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers with respect to the Subject Drugs sold in the United States;

e.       Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

f.       Selling the Subject Drugs in the United States at collusive and noncompetitive prices; and

g.       Accepting payment for the Subject Drugs sold in the United States at collusive and noncompetitive prices.

266.     The Defendants ensured that all conspirators were adhering to their collective scheme by communicating (1) at trade association meetings and conferences; (2) at private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers; and (3) through individual, private communications between and among Defendants' employees by use of the telephone, electronic messaging, and similar means.

### 1.       Trade Association Meetings and Conferences

267.     Throughout the year, many healthcare entities within the generic drug industry hold multi-day conferences wherein generic manufacturers are invited to attend. Further, Defendants and other generic drug manufacturers attend various trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA")(now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") (now the Association of Accessible Medicine), Efficient Collaborative Retail Marketing ("ECRM"), the Minnesota Multistate Contracting Pharmacy Alliance ("MMCAP"), and the Healthcare Supply Chain Association ("HSCA"). Between February 20, 2013 and December 20, 2014, there were at least forty-four different tradeshows or customer conferences where Defendants had the opportunity to, and actually did, meet in person, which gave rise to the opportunity to reach these agreements without fear of detection.

268.     At the various trade shows and conferences, Defendants' employees interacted with one another and discussed their respective businesses. Many of these events included social and recreational outings such as golf, lunch, cocktail parties, and dinners that provided additional opportunities to meet with competitors. Defendants used these opportunities to share competitively-sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their

1  contracts with customers, and in turn to implement schemes that unreasonably restrain competition in

2  the United States' market for generic drugs.

3      269.    In fact, in the Association for Accessible Medicine's Antitrust Compliance Policy

4  Manual updated in January 2018, well after litigation and investigation surrounding generic drug pricing

5  conspiracies began, the trade association explicitly stated, "Meetings, communications and contacts that

6  touch on antitrust matters present special challenges. A simple example will illustrate this. Suppose that

7  competitors were to discuss their prices at a meeting or in a document, and that their prices increased

8  shortly afterward. A jury might view this as evidence that their discussions led to an agreement on

9  pricing, and thus violated the antitrust laws." It went on to warn "Do not discuss any subjects that

10  might raise antitrust concerns (including prices, market allocations, refusals to deal, and the like) unless

11  you have received specific clearance from counsel in advance." The Association also warns members to

12  avoid creating written records, and "avoid language that might be misinterpreted to suggest that the

13  Association condones or is involved in anticompetitive behavior."

14          *a.    National Association of Chain Drug Stores*

15      270.    NACDS "advances a pro-patient and pro-pharmacy agenda. For the ultimate benefit of

16  the customers served by NACDS members, the mission of NACDS is to advance the interests and

17  objectives of the chain community pharmacy industry, by fostering its growth and promoting its role as

18  a provider of healthcare services and consumer products."

19      271.    NACDS hosts an Annual Meeting, attended only by member companies' executives,

20  that it claims is "the industry's most prestigious gathering of its most influential leaders. It is the classic

21  'Top-to-Top' business conference, attended by industry decision makers." It boasts that it will give

22  companies "a unique opportunity to gain new insights into today's changing marketplace and set your

23  course for the future," and the "opportunity to meet and discuss strategic issues with key trading

24  partners" to "set [] the stage for profitable business."

25      272.    NACDS also hosts a Total Store Expo annually, which similarly boasts that is it "the

26  industry's largest gathering of its most influential leaders. It will give you and your company a unique

27  opportunity to gain new insights into today's evolving marketplace and set your course for the future."

28

273.     NACDS members include Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Pfizer, Sandoz, Taro, Teva, Upsher-Smith, Wockhardt, and Zydus.

*b.     Generic Pharmaceutical Association*

274.     GPhA (now called Association for Accessible Medicines) is the "nation's leading trade association for manufacturers and distributors of generic prescription drugs…"[23] GPhA was created in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance. Regular members are "corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[24]

275.     GPhA's website offers members the opportunity to "participate in shaping the policies that govern the generic industry." GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." It boasts networking opportunities as one of the cornerstone benefits of membership: "GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[25]

276.     Actavis, Amneal, Apotex, Dr. Reddy's, Glenmark, Heritage, Impax, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, Wockhardt, and Zydus are regular members of GPhA, and have been since 2013. Furthermore, executives of these companies frequently attend GPhA meetings and events.

---

[23] GPhA, Membership, available at http://web.archive.org/web/2015041303008/http://www.gphaonline.org:80/about/membership.

[24] *Id.*

[25] *Id.*

277.   Executives from Actavis, Amneal, Apotex, Fougera, Impax, Lupin, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, and Zydus served on GPhA's Board of Directors during overlapping times at various points both prior to and after 2013, including:

a.   2011 Board of Directors: Debra Barrett, Senior Vice President Global Affairs and Public Policy, Teva; Douglas S. Boothe, CEO, Actavis; Don DeGolyer, President and CEO, Sandoz; Tony Mauro, President, Mylan North America as Vice-Chair; Pat LePore, CEO, Par; and Joe Renner, CEO, US Division, Zydus.

b.   2012 Board of Directors: Charlie Mayr, Senior Vice President Watson Pharmaceuticals, now a division of Teva; Joe Renner, CEO, US Division, Zydus; Douglas S. Boothe, CEO, Actavis; Debra Barrett, Senior Vice President Global Affairs and Public Policy, Teva; Don DeGolyer, President and CEO, Sandoz; Tony Mauro, President, Mylan North America as Chair; and Chirag Patel, President, Amneal.

c.   2013 Board of Directors:[26] Tony Mauro, President, Mylan North America as Chair; Don DeGolyer, President and CEO, Sandoz as Vice Chair; Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Pharmaceuticals; Carole Ben-Maimon, President, Global Pharmaceuticals (div.) of Impax[27]; Doug Boothe, Executive Vice President & General Manager, Perrigo Company; Jeffrey Glazer, President and CEO, Heritage; Charlie Mayr, Chief Communications Officer - Global, Actavis Inc.; Joseph Renner, President & CEO, Zydus; Chirag Patel, President, Amneal; and Jeff Watson, President, Apotex.

d.   2014 Board of Directors:[28] Carole Ben-Maimon, President, Global Pharmaceuticals (div.) of Impax; Doug Boothe, Executive Vice President & General Manager,

[26] GPhA Announces 2013 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2013-board-of-directors.

[27] In 2016, Ben-Maimon joined Teligent's Board of Directors. She also previously held positions at Qualitest and Teva. While at Global Pharmaceuticals at Impax, she worked with Teligent's Grenfell-Gardner on a development, supply, and marketing agreement for another generic topical drug.

[28] GPhA Announces 2014 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2014-board-of-directors.

Perrigo Company; Jeffrey Glazer, President and CEO, Heritage; Peter Goldschmidt, President, Sandoz US; Tony Mauro, President, Mylan Inc.; Allan Oberman, CEO and President, Teva Americas Generics; Joseph Renner, President & CEO, Zydus; Jeff Watson, President, Apotex; and Paul McGarty, President, Lupin as at-large director.

e. 2015 Board of Directors:[29] Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Americas; Doug Boothe, Executive Vice President & General Manager, Perrigo Company; Jeffrey Glazer, President and CEO, Heritage; Peter Goldschmidt, President, Sandoz US; Jim Kedrowski, Executive Vice President, Sun; Marcy Macdonald, Vice President of Regulatory Affairs, Impax; Marcie McClintic Coates, Head of Global Regulatory Affairs, Mylan Inc.; Paul McGarty, President, Lupin; Tony Pera, President, Par Pharmaceuticals; Joseph Renner, President & CEO, Zydus; and Jeff Watson, President, Apotex.

f. 2016 Board of Directors:[30] Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Americas; Heather Bresch, CEO, Mylan N.V. as Chair; Peter Goldschmidt, President, Sandoz US; Jim Kedrowski, Executive Vice President, Sun; Marcy Macdonald, Vice President of Regulatory Affairs, Impax; Paul McGarty, President, Lupin; Tony Pera, President, Par Pharmaceuticals as Secretary-Treasurer; Joseph Renner, President & CEO, Zydus; Richard Stec, Vice President, Perrigo Company; and Jeff Watson, President, Apotex as Vice Chair.

*c.  Healthcare Distribution Management Association*

278.    HDMA, now called HDA, is a national trade association that represents "primary pharmaceutical distributors," connecting the nation's drug manufacturers to over 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[31] HDMA holds regular conferences at which its

---

[29] GPhA Announces 2015 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2015-board-of-directors/.

[30] GPhA Announces 2016 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2016-board-of-directors/.

[31] *About*, HAD, https://healthcaredistribution.org/about.

1    members, including generic drug manufacturers, meet to discuss various issues affecting the

2    pharmaceutical industry.

3         279.     Several Defendants were members of HDMA at overlapping times between 2013 and

4    the present. For instance, as of July 2015, HDMA's manufacturer membership list included Amneal,

5    Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Lupin, Mayne,

6    Mylan, Par, Pfizer, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, and Zydus, as well as Allergan, now a

7    division of Actavis.[32] As of March 2016, HDMA's manufacturer membership list included Akorn,

8    Amneal, Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Lupin,

9    Mayne, Mylan, Par, Perrigo, Pfizer, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, and Zydus, as well

10   as Allergan.[33]

11                              *d.*     *Efficient Collaborative Retail Marketing*

12        280.     ECRM hosts strategic events and offers innovative technology solutions to help buyers

13   and manufacturers improve sales, reduce expenses, and enter the market faster and more efficiently.[34] It

14   conducts "Efficient Program Planning Sessions" ("EPPS"), in which generic drug manufacturers,

15   purchasers, and other industry professionals meet "to discuss new business opportunities, review

16   contracting strategies, and future business planning activities."[35] Sessions include one-on-one strategic

17   meetings meant to maximize time, grow sales, and uncover trends.

18

19

20

[32] *Manufacturer Members*, HDMA,
21   https://web.archive.org/web/20150715222616/http://www.healthcaredistribution.org:80/about/me
     mbership/manufacturer/manufacturer-members#.Wrj50y7wZpg.
22
[33] *Manufacturer Members,* HDMA,
23   https://web.archive.org/web/20160329122456/http://www.healthcaredistribution.org:80/about/me
     mbership/manufacturer/manufacturer-members
24
[34] *See* Company Overview of Efficient Collaborative Retail Marketing Company, LLC, Bloomberg ,
25   https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=106996762; *See also
     Alkaline Water Co. Enjoys Valued Participation at National Retail Marketing Trade Show*, The Alkaline Water
26   Co., http://thealkalinewaterco.com/2013/08/06/alkaline-water-co-enjoys-valued-participation-
     national-retail-marketing-trade-show/.
27
[35] ECRM, Health System/Institutional Pharmacy EPPS,
28   https://ecrm.marketgate.com/Sessions/2019/06/HospitalAlternateSitePharmacyPharmaceuticals.

281.    At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independent pharmacies.

                    e.    *Minnesota Multistate Contracting Pharmacy Alliance*

282.    MMCAP hosts various meetings and conferences throughout the year that are regularly attended by Defendants' representatives with price setting capabilities. According to its website, MMCAP is a "free, voluntary group purchasing organization [("GPO")] for government facilities that provide healthcare services. MMCAP has been delivering pharmacy and healthcare value to members since 1985. MMCAP's membership extends across nearly every state in the nation, delivering volume buying power. Members receive access to a full range of pharmaceuticals and other healthcare products and service; such as medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

                    f.    *Healthcare Supply Chain Association*

283.    HSCA is a trade association that represents leading healthcare GPOs, including for-profit and not-for-profit corporations, purchasing groups, associations, multi-hospital systems and healthcare provider alliances. According to its website, "HSCA and its member GPOs are committed to delivering the best products at the best value to healthcare providers, to increasing competition and innovation in the market, and to being supply chain leaders in transparency and accountability." HSCA's annual event, the National Pharmacy Forum, connects supply chain professionals, pharmaceutical industry representatives, including generic drug manufacturers and suppliers, and others to provide "top-level educational opportunities coupled with one-to-one networking and business-building opportunities."

284.    GPhA, HDMA, ECRM, MMCAP, and HSCA frequently held meetings and events between 2012 and the present, and high-level representatives and corporate officers from Defendants, including employees with price-setting authority, attended these meetings. A list of those meetings and attendees is attached as Exhibit A.

285.    At these various conferences and trade shows, Defendants' employees and representatives, as well as representatives of other generic drug manufacturers, discussed their

1  respective businesses and customers, and discussed the conspiratorial price increases alleged in this

2  Complaint. In many of the conferences described above, attendees for each conspirator Defendant

3  include individuals with generic drug pricing authority. Their discussions also occurred at lunches,

4  cocktail parties, dinners, and golf outings that would typically accompany these events. Defendants'

5  representatives used these opportunities to discuss and share upcoming bids, generic drug markets,

6  pricing strategies, and contractual pricing terms specific to certain customers. [36]

7                    **2.        Industry Dinners and Private Meetings**

8         286.    Senior executives and sales representatives also frequently gathered in small groups,

9  providing inconspicuous facetime with their competitors where they could discuss sensitive

10 information.

11        287.    Many Defendants are headquartered in close proximity, providing them with easy and

12 frequent access to one another. At least forty-one (41) different generic drug manufacturers are located

13 between New York City and Pennsylvania, including, among others, Actavis, Ascend, Aurobindo,

14 Breckenridge, Citron, Dr. Reddy's, Fougera, Glenmark, Greenstone, Heritage, Hi-Tech, Lannett,

15 Mylan, Par, Perrigo, Pfizer, Sandoz, Sun, Taro, Teva, Wockhardt, and Zydus.

16        288.    Defendants' high-level executives frequently gathered for "industry dinners." In January

17 2014, while generic drug prices were soaring, at least thirteen (13) high-ranking executives, including

18 CEOs, Presidents, and Senior Vice Presidents of various generic drug manufactures, met at a

19 steakhouse in Bridgewater, New Jersey. Executives (including Berthold, Falkin, and Ostaficiuk) from

20 Actavis, Aurobindo, Breckenridge, Dr. Reddy's, Lannett, and Sun, among others, attended this

21 particular dinner.

22        289.    At these dinners, one company is typically responsible for paying the bill for all

23 attendees. For example, in December 2013 a Dr. Reddy's executive joked "[y]ou guys are still buying

24 for Mark and I, right?" Another executive responded "Well…I didn't think the topic would come up so

25 quickly but…we go in alphabetical order b company and [another company] picked up the last

26 bill.…PS.…no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt

27

28 _____
[36] *See, e.g.,* AG Compl. No. 1 at ¶ 79.

1  scotch when they aren't buying."

2      290.    Other groups of competitors routinely gathered for golf outings. One such annual event

3  was organized by a packaging contractor in Kentucky. From September 17-19, 2014, high-level

4  executives from Teva, Apotex, Actavis, Amneal, Lannett, Par, Zydus, and others attended the event at a

5  country club in Bowling Green, Kentucky. Rekenthaler was in attendance. Rekenthaler and Apotex's

6  Vice President of Commercial Operations, US and Latin America, Jeffrey Hampton, actually stayed

7  together in the home of the owner of the packaging company. By the end of the outing, Ostaficiuk sent

8  an e-mail to the other attendees, stating "This is a crazy biz but I am grateful to have friends like all of

9  you!!!! Happy and honored to have you all as 'fraternity brothers.'"

10     291.    Generic drug manufacturer employees also regularly convened for "Girls' Night Out"

11 or "Women in the Industry" meetings and dinners. At these events, generic drug companies' employees

12 met with their competitors and discussed proprietary and competitive information. Upon information

13 and belief, several of these events occurred in May 2015 in Baltimore, Maryland, and in August 2015 in

14 Denver, Colorado.

15     292.    Many "Women in the Industry" dinners were organized by Anne Sather, a salesperson

16 from Heritage. Other participants in these meetings were employees of other generic pharmaceutical

17 manufacturers located in Minnesota or salespeople residing or traveling to the area. In November 2014,

18 Sullivan of Lannett sent Sather (Heritage) a text message asking "[w]hen is your next industry women

19 event? I'm due for a trip out there and I'd love to plan for it if possible…" Sather responded: "There is

20 an Xmas [sic] party at Tanya's house on Dec 6th. Yes that is a Saturday. We do it about once a quarter

21 and usually it is during the week – this was an exception."

22     293.    Dinners were also planned around visits of certain out-of-town competitors. When

23 organizing one of these such dinners, Sather commented "Sorry if the meeting/dinner invite is a little

24 short notice, but Kate Neely of Dr. Reddy's will be in MN on Sept 29th and it would be a great time

25 for everyone to get together! So much has been happening in the Industry too – we can recap all our

26 findings from NACDS over a martini or glass of wine! ☺ Plus the food is super yummy!"

27     294.    Several different GNOs were held in 2015, including (1) at the ECRM conference in

28 February (involving Citron, Dr. Reddy's, Greenstone, Heritage, Lannett, Pfizer, Teva, Upsher-Smith,

and Zydus, among others – including Nailor and Sullivan); (2) in Baltimore in May (involving Citron, Dr. Reddy's, Heritage, Lupin, and Teva, among others); and (3) at the NACDS conference on August 24, 2015 (involving Citron, Dr. Reddy's, and Heritage among others). The Baltimore GNO in May 2015 consisted of a professional baseball game, drinks, and a spa day on May 13, wherein the competitors could discreetly and privately discuss competitively-sensitive information.

**3.     Personal Telephone Calls, E-Mails, and Text Message Communications**

295.     Defendants routinely conferred with one another on bids and pricing strategy. This included forwarding customer bid packages to a competitor, either on the forwarding company's own initiative or at the competitor's request.

296.     Defendants also shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate potentially better prices or terms with their customers, which ultimately harmed consumers like Plaintiff.

297.     Representatives of several Defendants with pricing responsibility had frequent telephone calls with representatives of competitors. Executives at Heritage had at least 513 contacts with executives from Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, and Zydus. And executives at Teva had at least 1,501 contacts with competitors, including from Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Par, Sandoz, and Zydus. Many of these contacts are described in detail below.

**4.     Individual Relationships**

298.     Each of the individuals described below had their own relationships with contacts at competitor companies that they utilized to allocate markets and raise prices on overlap drugs. Many of these relationships are discussed throughout this Complaint.

299.     For example, Teva's Director of Strategic Customer Marketing, Nisha Patel, met Heritage's then-Senior Vice President Malek when she worked at Amerisource Bergen, which was a Heritage customer that Malek managed. When Patel moved to Teva in April 2013, she contacted Malek to determine which generic drugs both Teva and Heritage sold so that they could coordinate pricing. As

1   detailed below, Malek and Patel orchestrated a number of price increases between 2013-present—some

2   led by Teva, others by Heritage.

3          300.   Malek and Patel's relationship was valued and accepted by Malek's supervisors. In April

4   2014, Malek and Glazer met with the CEO (Satish Mehta) and President (Vikas Thapar) of Emcure,

5   Heritage's parent company, to discuss potential price increases for several drugs. During that meeting,

6   Malek told Mehta and Thapar about his Teva contact, Patel. Malek, who had been discussing price

7   increases for Nystatin with Patel since mid-2013, told them that Patel could be a vehicle for

8   communicating with Teva about price increases and customer allocation. Mehta and Thapar approved

9   of Malek's strategy to coordinate prices and allocate customers with Teva.

10          301.   The following sections profile each of these individuals and their primary contacts at

11   competitor Defendants, including cataloging the number of phone calls and/or text messages

12   exchanged between them. The charts that follow are limited to communications with employees at

13   other Defendants and do not include communications these individuals may have had with executives

14   at competitor companies that are not named in this Complaint.

15                          a.   Ara Aprahamian

16          302.   Aprahamian is the Vice President of Sales at Taro and has held that position since he

17   moved to Taro from Actavis in March 2013. Aprahamian regularly communicated with competitors,

18   including with several of his former colleagues at Actavis, and has established relationships with

19   individuals at many of the Defendants. For example, between March 2013 and October 2018,

20   Aprahamian exchanged at least 706 phone calls and text messages with his contacts at Sandoz,

21   Glenmark, Teva, Dr. Reddy's, Actavis, Mylan, Wockhardt, Lannett, Amneal, Greenstone, and

22   Aurobindo. These communications are detailed in the table below:

23

24

25

26

27

28

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| CW-3 (Sandoz) | 190 | 3/19/2013 | 8/18/2016 |
| Grauso, Jim (Glenmark) | 106 | 7/1/2014 | 10/16/2018 |
| Patel, Nisha (Teva) | 100 | 5/22/2013 | 3/3/2016 |
| J.M. (Dr. Reddy's) | 61 | 3/27/2013 | 7/23/2018 |
| M.D. (Actavis) | 52 | 3/19/2013 | 9/2/2016 |
| M.A. (Mylan) | 50 | 4/4/2013 | 2/9/2016 |
| M.C. (Wockhardt) | 26 | 5/7/2013 | 8/20/2017 |
| A.B. (Lannett) | 22 | 11/15/2013 | 12/14/2017 |
| Falkin, Marc (Actavis) | 21 | 4/17/2014 | 3/8/2016 |
| A.B. (Actavis) | 16 | 8/16/2013 | 4/19/2016 |
| S.R. (Amneal) | 13 | 6/6/2014 | 4/29/2016 |
| M.B. (Actavis) | 12 | 5/13/2013 | 8/22/2015 |
| M.B. (Glenmark) | 11 | 5/7/2013 | 3/26/2014 |
| Lannett Pharmaceuticals | 8 | 6/6/2014 | 4/29/2016 |
| A.G. (Actavis) | 4 | 4/23/2013 | 4/30/2013 |
| Rogerson, Rick (Actavis) | 4 | 6/17/2013 | 4/16/2014 |
| R.H. (Greenstone) | 4 | 8/14/2014 | 8/20/2014 |
| T.D. (Actavis) | 3 | 4/12/2013 | 7/10/2013 |
| Grauso, Jim (Aurobindo) | 2 | 1/9/2014 | 1/10/2014 |
| A.S. (Actavis) | 1 | 1/9/2014 | 1/9/2014 |

*b.    David Berthold*

303.    Berthold is the Vice President of Sales at Lupin and has held that position since June 2006. During his tenure at Lupin, Berthold has been the primary person at the company communicating with competitors. Indeed, Berthold has relationships with individuals at many of the Defendants and is one of the most prolific communicators of all the individuals named. For example, between March 2011 and October 2018, Berthold exchanged at least 4,185 phone calls and text messages with his contacts at Aurobindo, Glenmark, Greenstone, Actavis, Wockhardt, Zydus, Teva, Breckenridge, Mylan, Sandoz, Dr. Reddy's, Amneal, and Lannett. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Grauso, Jim (Aurobindo) | 977 | 12/10/2011 | 1/31/2014 |
| Grauso, Jim (Glenmark) | 959 | 2/3/2014 | 10/3/2018 |
| R.H. (Greenstone) | 791 | 3/9/2011 | 7/14/2017 |
| A.G. (Actavis) | 301 | 3/22/2011 | 12/14/2017 |
| K.K. (Wockhardt) | 153 | 12/14/2011 | 7/30/2013 |
| A.T. (Aurobindo) | 123 | 8/15/2012 | 4/28/2013 |
| Green, Kevin (Zydus) | 124 | 11/8/2013 | 10/11/2017 |
| Green, Kevin (Teva) | 118 | 1/26/2012 | 10/9/2013 |
| Patel, Nisha (Teva) | 76 | 5/6/2013 | 4/8/2014 |
| P.G. (Breckenridge) | 76 | 3/10/2013 | 5/20/2016 |
| Nesta, Jim (Mylan) | 68 | 4/21/2013 | 10/13/2014 |
| P.M. (Aurobindo) | 60 | 3/30/2011 | 2/4/2016 |
| Falkin, Marc (Actavis) | 52 | 9/3/2013 | 4/1/2016 |
| Kellum, Armando (Sandoz) | 41 | 1/24/2012 | 8/14/2014 |
| B.R. (Dr. Reddy's) | 37 | 12/9/2011 | 6/13/2012 |
| T.S. (Teva) | 36 | 12/15/2011 | 1/15/2014 |
| V.B. (Dr. Reddy's) | 33 | 12/16/2014 | 9/21/2015 |
| S.R.(2) (Amneal) | 22 | 8/8/2012 | 11/16/2016 |
| P.M. (Teva) | 21 | 3/29/2011 | 1/20/2012 |
| K.R. (Zydus) | 21 | 9/25/2012 | 9/30/2012 |
| Ostaficiuk, Kon (Camber) | 19 | 5/14/2012 | 4/4/2016 |
| Brown, Jim (Glenmark) | 19 | 5/31/2013 | 6/2/2015 |
| S.R.(1) (Amneal) | 11 | 4/16/2013 | 2/13/2015 |
| Rekenthaler, David (Teva) | 9 | 10/14/2013 | 1/16/2014 |
| J.A. (Dr. Reddy's) | 7 | 6/12/2012 | 4/8/2014 |
| K.S. (Lannett) | 4 | 6/20/2014 | 6/23/2014 |
| Nailor, Jill (Greenstone) | 8 | 4/16/2013 | 6/19/2015 |
| S.G. (Sandoz) | 3 | 3/11/2014 | 11/26/2014 |
| L.S. (Zydus) | 3 | 8/23/2012 | 9/19/2013 |
| A.S. (Actavis) | 3 | 2/13/2012 | 5/24/2012 |
| K.S. (Zydus) | 2 | 9/18/2012 | 9/19/2012 |
| CW-3 (Sandoz) | 2 | 2/7/2012 | 10/18/2012 |
| B.M. (Amneal) | 2 | 9/26/2012 | 3/7/2018 |
| B.G. (Sandoz) | 1 | 7/31/2015 | 7/31/2015 |
| Teva Pharmaceuticals | 1 | 1/25/2012 | 1/25/2012 |
| K.A. (Wockhardt) | 1 | 8/25/2012 | 8/25/2012 |
| Zydus Pharmaceuticals | 1 | 1/17/2018 | 1/17/2018 |

*c. Jim Brown*

304. Brown is the Vice President of Sales at Glenmark and has held that position since November 2012. Brown was one of several Glenmark executives that conspired with competitors. Although not as prolific in his communications with competitors as some of the other individuals named, he did communicate when necessary to further the agreements. For example, between June

2012 and August 2018, Brown exchanged at least 395 calls and text messages with his contacts at Actavis, Teva, Lupin, Amneal, Wockhardt, Breckenridge, Lannett, Sandoz, Aurobindo, Zydus, Par, Apotex, and Taro. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 270 | 8/9/2013 | 6/16/2016 |
| Patel, Nisha (Teva) | 36 | 8/6/2013 | 10/15/2014 |
| Berthold, David (Lupin) | 19 | 5/31/2013 | 6/2/2015 |
| S.R.(1) (Amneal) | 16 | 12/18/2013 | 2/22/2018 |
| B.W. (Wockhardt) | 9 | 6/25/2012 | 10/27/2017 |
| D.N. (Breckenridge) | 8 | 11/12/2012 | 3/30/2015 |
| K.S. (Lannett) | 7 | 6/18/2012 | 8/10/2017 |
| CW-3 (Sandoz) | 4 | 6/10/2016 | 6/14/2016 |
| Grauso, Jim (Aurobindo) | 9 | 3/28/2013 | 12/6/2013 |
| Green, Kevin (Zydus) | 4 | 4/12/2018 | 8/21/2018 |
| J.H. (Par) | 2 | 10/1/2013 | 11/1/2013 |
| S.R. (Lupin) | 2 | 11/28/2012 | 11/29/2012 |
| J.H. (Apotex) | 2 | 5/6/2015 | 3/10/2016 |
| L.P. (Taro) | 2 | 12/7/2012 | 12/7/2012 |
| P.M. (Aurobindo) | 1 | 2/28/2014 | 2/28/2014 |
| Breckenridge Pharmaceuticals | 1 | 10/17/2014 | 10/17/2014 |
| P.G. (Breckenridge) | 1 | 6/18/2012 | 6/18/2012 |
| Ostaficiuk, Kon (Camber) | 1 | 10/29/2014 | 10/29/2014 |
| Rekenthaler, David (Teva) | 1 | 3/24/2014 | 3/24/2014 |

  *d.*   *Maureen Cavanaugh*

305.    Cavanaugh was the Senior Vice President and Commercial Officer, North America, at Teva until April 2018. She is currently the Senior Vice President and Chief Commercial Officer at Lannett. During her employment at Teva, Cavanaugh knew that her subordinates were communicating with competitors about pricing and customer allocation. In addition, Cavanaugh maintained her own relationships with certain competitors and coordinated with them directly when necessary to further the agreements. For example, between January 2011 and August 2017, Cavanaugh exchanged at least 612 phone calls and text messages with her contacts at Actavis, Amneal, Zydus, Sandoz, Glenmark, and Greenstone. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 410 | 9/10/2013 | 7/29/2016 |
| A.B. (Actavis) | 113 | 8/12/2015 | 7/25/2016 |
| S.R.(1) (Amneal) | 45 | 1/18/2011 | 11/14/2012 |
| A.S. (Actavis) | 17 | 8/21/2015 | 7/26/2016 |
| K.R. (Zydus) | 10 | 9/16/2013 | 5/20/2016 |
| Green, Kevin (Zydus) | 8 | 5/14/2017 | 8/3/2017 |
| J.K. (Actavis) | 4 | 4/29/2014 | 3/31/2015 |
| R.S. (Sandoz) | 2 | 10/6/2016 | 10/6/2016 |
| M.K. (Zydus) | 1 | 3/15/2011 | 3/15/2011 |
| Grauso, Jim (Glenmark) | 1 | 7/8/2015 | 7/8/2015 |
| Nailor, Jill (Greenstone) | 1 | 12/5/2012 | 12/5/2012 |

       *e.    Marc Falkin*

306.    Falkin was the Vice President of Marketing, Pricing and Contracts at Actavis until Actavis was acquired by Teva in August 2016. For a period of time, Falkin was also the Senior Vice President, US Generic Sales, at Teva. During his employment at Actavis, which is the focus of this Complaint, Falkin was a prolific communicator and had established relationships with executives at many of the Defendants. For example, between August 2013 and July 2016, Falkin exchanged at least 2,562 phone calls and text messages with his contacts at Zydus, Teva, Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Greenstone, Apotex, Taro, Amneal, Sandoz, and Wockhardt. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 550 | 8/3/2013 | 4/13/2016 |
| Rekenthaler, David (Teva) | 433 | 8/7/2013 | 3/25/2015 |
| Cavanaugh, Maureen (Teva) | 410 | 9/10/2013 | 7/29/2016 |
| Brown, Jim (Glenmark) | 270 | 8/9/2013 | 6/16/2016 |
| C.B. (Teva) | 199 | 7/21/2015 | 7/29/2016 |
| K.S. (Lannett) | 181 | 8/1/2013 | 9/29/2015 |
| R.C. (Aurobindo) | 80 | 11/14/2013 | 3/16/2015 |
| Nesta, Jim (Mylan) | 78 | 12/3/2013 | 8/17/2015 |
| Berthold, David (Lupin) | 52 | 9/3/2013 | 4/1/2016 |
| J.H. (Par) | 48 | 9/24/2013 | 8/11/2015 |
| Nailor, Jill (Greenstone) | 41 | 1/6/2014 | 3/14/2016 |
| T.C. (Teva) | 36 | 12/28/2015 | 7/27/2016 |
| Teva Pharmaceuticals | 26 | 5/28/2015 | 7/19/2016 |
| T.K. (Apotex) | 22 | 3/4/2014 | 6/4/2015 |
| CW-5 (Glenmark) | 22 | 11/7/2013 | 2/26/2014 |
| Aprahamian, Ara (Taro) | 21 | 4/17/2014 | 3/8/2016 |
| S.R.(2) (Amneal) | 15 | 10/19/2013 | 11/16/2015 |
| Patel, Nisha (Teva) | 11 | 2/5/2016 | 6/16/2016 |
| J.B. (Teva) | 11 | 11/24/2015 | 6/2/2016 |
| C.D. (Teva) | 11 | 2/8/2016 | 6/22/2016 |
| M.P. (Taro) | 9 | 12/13/2013 | 8/4/2014 |
| J.P. (Teva) | 7 | 9/27/2014 | 3/22/2016 |
| J.H. (Apotex) | 6 | 4/7/2014 | 4/8/2014 |
| K.G. (Teva) | 6 | 1/14/2016 | 5/12/2016 |
| S.G. (Sandoz) | 5 | 4/30/2014 | 6/23/2014 |
| M.K. (Zydus) | 4 | 1/10/2014 | 1/11/2014 |
| M.C. (Wockhardt) | 3 | 5/24/2016 | 5/24/2016 |
| Ostaficiuk, Kon (Camber) | 2 | 9/27/2013 | 12/5/2013 |
| S.R. (Lupin) | 2 | 10/5/2013 | 10/5/2013 |
| B.H. (Apotex) | 1 | 6/10/2014 | 6/10/2014 |

f.   *Jim Grauso*

307.   Grauso was employed as a Senior Vice President of Commercial Operations at Aurobindo until January 2014. In February 2014, Grauso moved to Glenmark and currently holds the position of Executive Vice President, North America, Commercial Operations. Grauso regularly communicated with competitors while he was at Aurobindo and continued those relationships when he transferred to Glenmark. For example, between December 2011 and January 2014, Grauso exchanged at least 1,763 phone calls and text messages with his contacts at Lupin, Teva, Actavis, Taro, Zydus, Amneal, Glenmark, Greenstone, Wockhardt, and Breckenridge. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 977 | 12/10/2011 | 1/31/2014 |
| T.S. (Teva) | 243 | 12/1/2011 | 1/21/2014 |
| Green, Kevin (Teva) | 158 | 12/6/2011 | 10/30/2013 |
| M.P. (Actavis and Taro) | 57 | 12/6/2011 | 1/13/2014 |
| D.L. (Zydus) | 54 | 1/7/2013 | 10/25/2013 |
| Ostaficiuk, Kon (Camber) | 39 | 3/21/2012 | 12/9/2013 |
| S.R.(1) (Amneal) | 32 | 3/27/2012 | 1/3/2014 |
| Brown, Jim (Glenmark) | 31 | 7/19/2012 | 1/6/2014 |
| Nailor, Jill (Greenstone) | 31 | 7/19/2012 | 1/6/2014 |
| M.C. (Wockhardt) | 26 | 12/8/2011 | 1/13/2014 |
| Green, Kevin (Zydus) | 20 | 11/11/2013 | 1/29/2014 |
| B.W. (Wockhardt) | 16 | 12/8/2011 | 1/14/2014 |
| K.K. (Wockhardt) | 11 | 8/6/2013 | 1/13/2014 |
| Patel, Nisha (Teva) | 12 | 5/14/2013 | 7/8/2013 |
| L.S. (Zydus) | 8 | 5/23/2013 | 6/6/2013 |
| M.B. (Taro) | 7 | 12/6/2011 | 3/22/2012 |
| K.S. (Zydus) | 6 | 9/19/2013 | 9/30/2013 |
| Aprahamian, Ara (Actavis) | 6 | 1/20/2012 | 1/27/2012 |
| J.P. (Teva) | 6 | 5/2/2012 | 12/19/2013 |
| S.R. (2) (Amneal) | 4 | 8/20/2012 | 12/4/2013 |
| D.N. (Breckenridge) | 4 | 6/25/2013 | 1/28/2014 |
| D.S. (Taro) | 3 | 8/6/2013 | 8/6/2013 |
| Teva Pharmaceuticals | 3 | 6/20/2012 | 3/21/2013 |
| M.B. (Glenmark) | 3 | 4/12/2013 | 6/17/2013 |
| Aprahamian, Ara (Taro) | 2 | 1/10/2014 | 1/10/2014 |
| Lupin Pharmaceuticals | 2 | 1/24/2013 | 1/24/2013 |
| E.S. (Lupin) | 1 | 9/6/2012 | 9/6/2012 |
| Rekenthaler, David (Teva) | 1 | 12/8/2011 | 12/8/2011 |

308.    Similarly, after moving to Glenmark, Grauso continued to communicate frequently with his contacts at competitor companies, including his former colleagues at Aurobindo. For example, between February 2014 and October 2018, he exchanged at least 2,018 phone calls and text messages with his contacts at Lupin, Aurobindo, Zydus, Teva, Taro, Wockhardt, Sandoz, Greenstone, Dr. Reddy's, Amneal, non-defendant Rising, Par, Breckenridge, Upsher-Smith, and Mylan. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 959 | 2/3/2014 | 10/3/2018 |
| R.C. (Aurobindo) | 215 | 2/3/2014 | 5/31/2017 |
| Green, Kevin (Zydus) | 161 | 2/4/2014 | 6/25/2018 |
| T.S. (Teva) | 128 | 2/3/2014 | 10/4/2018 |
| Aprahamian, Ara (Taro) | 106 | 7/1/2014 | 10/16/2018 |
| B.W. (Wockhardt) | 76 | 2/28/2014 | 10/2/2018 |
| M.P. (Taro) | 59 | 2/10/2014 | 2/3/2018 |
| Taro Pharmaceuticals | 59 | 3/5/2014 | 8/29/2018 |
| J.K. (Aurobindo) | 46 | 3/11/2014 | 10/3/2018 |
| J.J. (Aurobindo) | 36 | 2/19/2014 | 6/17/2018 |
| M.C. (Wockhardt) | 29 | 3/27/2014 | 10/1/2018 |
| J.H. (Sandoz) | 22 | 4/20/2014 | 9/27/2018 |
| R.S. (Sandoz) | 18 | 11/5/2015 | 8/8/2018 |
| Nailor, Jill (Greenstone) | 17 | 1/30/2015 | 5/26/2016 |
| P.S. (Aurobindo) | 10 | 2/20/2014 | 11/10/2017 |
| J.M. (Dr. Reddy's) | 10 | 9/27/2014 | 9/27/2017 |
| S.R.(1) (Amneal) | 9 | 2/3/2014 | 3/14/2018 |
| S.G. (Rising) | 9 | 3/2/2017 | 9/20/2018 |
| M.A. (Par) | 8 | 6/29/2015 | 7/12/2018 |
| Lupin Pharmaceuticals | 8 | 4/15/2014 | 4/10/2018 |
| L.C. (Lupin) | 7 | 4/30/2018 | 9/12/2018 |
| D.N. (Breckenridge) | 6 | 5/4/2018 | 8/10/2018 |
| Patel, Nisha (Teva) | 6 | 2/28/2014 | 1/5/2015 |
| Ostaficiuk, Kon (Camber) | 5 | 7/30/2014 | 10/29/2014 |
| M.M. (Upsher-Smith) | 3 | 10/4/2017 | 10/4/2017 |
| S.S. (Aurobindo) | 1 | 6/15/2017 | 6/15/2017 |
| Cavanaugh, Maureen (Teva) | 1 | 7/8/2015 | 7/8/2015 |
| J.P. (Teva) | 1 | 3/9/2015 | 3/9/2015 |
| L.W. (Lupin) | 1 | 8/22/2015 | 8/22/2015 |
| Teva Pharmaceuticals | 1 | 1/11/2018 | 1/11/2018 |
| Mylan Pharmaceuticals | 1 | 7/9/2018 | 7/9/2018 |

g.   *Kevin Green*

309.    Green worked at Teva as a Director of National Accounts until November 2013 when he took a position with Zydus. Green is currently the Vice President of Sales at Zydus. Green developed a number of relationships with individuals at many of the Defendants. He regularly communicated with competitors while at Teva and then carried those relationships over to his time at Zydus. For example, between January 2010 and October 2013, Green exchanged at least 1,410 phone

calls and text messages with his contacts at Zydus, Mylan, Dr. Reddy's, Aurobindo, Lupin, Sandoz, Greenstone, Breckenridge, Wockhardt, and Lannett. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Nesta, Jim (Mylan) | 461 | 2/21/2012 | 10/4/2013 |
| K.R. (Zydus) | 182 | 4/26/2010 | 10/31/2013 |
| B.R. (Dr. Reddy's) | 139 | 1/28/2010 | 6/29/2012 |
| Grauso, Jim (Aurobindo) | 158 | 12/6/2011 | 10/30/2013 |
| Berthold, David (Lupin) | 118 | 1/26/2012 | 10/9/2013 |
| CW-2 (Sandoz) | 84 | 4/26/2010 | 1/14/2013 |
| M.K. (Zydus) | 73 | 3/18/2010 | 10/28/2013 |
| P.H. (Zydus) | 52 | 3/29/2010 | 6/11/2012 |
| M.F. (Zydus) | 32 | 2/10/2013 | 10/30/2013 |
| R.H. (Greenstone) | 26 | 3/8/2010 | 10/16/2013 |
| P.M. (Aurobindo) | 19 | 9/27/2010 | 10/14/2013 |
| Kellum, Armando (Sandoz) | 14 | 3/21/2012 | 8/14/2013 |
| S.G. (Sandoz) | 9 | 4/25/2010 | 6/19/2013 |
| D.N. (Breckenridge) | 6 | 7/12/2012 | 3/3/2013 |
| M.M. (Wockhardt) | 5 | 2/19/2013 | 6/26/2013 |
| G.R. (Aurobindo) | 5 | 3/17/2010 | 3/24/2010 |
| M.A. (Mylan) | 5 | 10/27/2013 | 10/30/2013 |
| R.T. (Sandoz) | 4 | 5/23/2010 | 5/15/2013 |
| Sullivan, Tracey (Lannett) | 4 | 5/23/2011 | 11/14/2012 |
| Zydus Pharmaceuticals | 3 | 1/30/2013 | 8/20/2013 |
| S.R. (Lupin) | 3 | 10/17/2013 | 10/27/2013 |
| R.C. (Aurobindo) | 3 | 6/4/2012 | 6/29/2012 |
| CW-4 (Sandoz) | 2 | 5/20/2010 | 2/7/2012 |
| J.A. (Dr. Reddy's) | 1 | 7/23/2013 | 7/23/2013 |
| E.P. (Zydus) | 1 | 10/22/2013 | 10/22/2013 |
| K.K. (Wockhardt) | 1 | 7/15/2012 | 7/15/2012 |

310.    Similarly, when Green became employed at Zydus, he continued to communicate frequently with competitors, including with his former colleagues at Teva. For example, between November 2013 and August 2018, Green exchanged at least 969 phone calls and text messages with his contacts at Teva, Glenmark, Mylan, Lupin, Aurobindo, Rising, Amneal, Sandoz, Greenstone, Lannett, and Dr. Reddy's. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Patel, Nisha (Teva) | 184 | 11/8/2013 | 8/31/2016 |
| Grauso, Jim (Glenmark) | 161 | 2/4/2014 | 6/25/2018 |
| Nesta, Jim (Mylan) | 117 | 1/7/2014 | 8/17/2017 |
| Berthold, David (Lupin) | 124 | 11/8/2013 | 10/11/2017 |
| M.A. (Mylan) | 51 | 11/14/2013 | 3/16/2016 |
| P.M. (Aurobindo) | 49 | 11/4/2013 | 7/28/2016 |
| J.P. (Teva) | 44 | 9/15/2014 | 8/20/2017 |
| Rekenthaler, David (Teva) | 42 | 11/8/2013 | 3/30/2015 |
| Teva Pharmaceuticals | 36 | 11/3/2013 | 8/10/2017 |
| T.S. (Teva) | 31 | 1/8/2014 | 8/9/2017 |
| Grauso, Jim (Aurobindo) | 20 | 11/11/2013 | 1/29/2014 |
| CW-2 (Rising and Aurobindo) | 15 | 8/4/2014 | 4/23/2017 |
| L.K. (Amneal) | 14 | 9/15/2014 | 6/27/2018 |
| T.C. (Teva) | 13 | 12/4/2013 | 4/30/2017 |
| S.G. (Sandoz and Rising) | 10 | 6/22/2014 | 11/26/2016 |
| K.G. (Teva) | 9 | 5/3/2017 | 8/17/2017 |
| Cavanaugh, Maureen (Teva) | 8 | 5/14/2017 | 8/3/2017 |
| Kellum, Armando (Sandoz) | 8 | 4/30/2014 | 2/12/2017 |
| S.G. (Teva) | 5 | 11/4/2013 | 11/26/2016 |
| Brown, Jim (Glenmark) | 4 | 4/12/2018 | 8/21/2018 |
| J.L. (Teva) | 4 | 12/13/2016 | 2/20/2017 |
| R.H. (Greenstone) | 4 | 10/12/2014 | 5/14/2017 |
| Sullivan, Tracey (Lannett) | 4 | 2/16/2014 | 2/16/2014 |
| S.R.(2) (Amneal) | 3 | 9/26/2016 | 3/15/2018 |
| M.W. (Mylan) | 3 | 5/15/2018 | 6/11/2018 |
| C.B. (Teva) | 3 | 12/20/2016 | 8/9/2017 |
| S.R. (Lupin) | 1 | 3/24/2014 | 3/24/2014 |
| J.A. (Dr. Reddy's) | 1 | 7/1/2014 | 7/1/2014 |
| T.G. (Aurobindo) | 1 | 7/9/2018 | 7/9/2018 |

*h.    Armando Kellum*

311.    Kellum was the Director of Pricing and Contracts at Sandoz until July 2015. While at Sandoz, Kellum directed his subordinates, including CW-1, CW-2, CW-3, and CW-4, to enter into price fixing and market allocation agreements with competitors. In addition, Kellum had his own relationships with certain competitors and communicated with those contacts directly when necessary to further the agreements. For example, between May 2011 and April 2015, Kellum exchanged at least 182 phone calls and text messages with his contacts at Greenstone, Lupin, Teva, Upsher-Smith, Zydus, Actavis, Rising, Amneal, and Dr. Reddy's. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| R.H. (Greenstone) | 66 | 7/20/2011 | 8/14/2014 |
| Berthold, David (Lupin) | 41 | 1/24/2012 | 8/14/2014 |
| Green, Kevin (Teva) | 14 | 3/21/2012 | 8/14/2013 |
| J.M. (Upsher-Smith) | 10 | 8/7/2014 | 3/5/2015 |
| Nailor, Jill (Greenstone) | 9 | 4/2/2014 | 10/15/2014 |
| Green, Kevin (Zydus) | 8 | 11/7/2013 | 4/30/2015 |
| M.F. (Zydus) | 7 | 7/23/2012 | 1/23/2014 |
| S.H. (Upsher-Smith) | 6 | 9/17/2014 | 3/26/2015 |
| Upsher-Smith Laboratories | 4 | 9/15/2014 | 10/13/2014 |
| Rogerson, Rick (Actavis) | 3 | 5/5/2011 | 9/28/2011 |
| C.P. (Rising) | 3 | 4/28/2014 | 10/24/2014 |
| S.R.(1) (Amneal) | 2 | 5/20/2013 | 12/18/2013 |
| S.R.(2) (Amneal) | 2 | 11/27/2013 | 8/8/2014 |
| M.M. (Upsher-Smith) | 2 | 11/9/2013 | 11/20/2013 |
| E.H. (Upsher-Smith) | 2 | 9/12/2014 | 9/16/2014 |
| N.M. (Dr. Reddy's) | 1 | 7/23/2012 | 7/23/2012 |
| D.C. (Upsher-Smith) | 1 | 4/18/2013 | 4/18/2013 |
| B.L. (Upsher-Smith) | 1 | 9/12/2014 | 9/12/2014 |

       *i.*    *Jill Nailor*

312.     Nailor has worked at Greenstone since August 2010 and is currently the Senior Director of Sales and National Accounts. Nailor directed her subordinate Robin Hatosy, a national account executive, and others at Greenstone to fix prices and allocate customers with competitors on overlap drugs, including with several of the Defendants. She also instructed them to avoid putting any evidence of such communications into writing.

313.     In addition, Nailor regularly communicated directly with competitors herself. For example, between August 2010 and May 2017, Nailor exchanged at least 4,439 phone calls and text messages with her contacts at Amneal, Dr. Reddy's, Actavis, Aurobindo, Mylan, Glenmark, Zydus, Teva, Sandoz, Lupin, Wockhardt, Lannett, Apotex, Upsher-Smith, Par, and Taro. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(1) (Amneal) | 3769 | 8/26/2010 | 5/1/2018 |
| V.B. (Dr. Reddy's) | 125 | 10/16/2014 | 5/8/2017 |
| A.B. (Actavis) | 86 | 9/21/2011 | 7/14/2016 |
| J.P. (Amneal) | 75 | 8/27/2010 | 9/28/2016 |
| T.W. (Dr. Reddy's) | 62 | 8/28/2010 | 5/23/2016 |
| A.T. (Aurobindo) | 46 | 8/26/2012 | 5/12/2013 |
| Falkin, Marc (Actavis) | 41 | 1/6/2014 | 3/14/2016 |
| Nesta, Jim (Mylan) | 40 | 12/5/2012 | 11/13/2015 |
| Grauso, Jim (Aurobindo) | 31 | 7/19/2012 | 1/6/2014 |
| Brown, Jim (Glenmark) | 23 | 9/5/2013 | 8/25/2016 |
| L.S. (Zydus) | 20 | 4/27/2012 | 8/22/2013 |
| Grauso, Jim (Glenmark) | 17 | 1/30/2015 | 5/26/2016 |
| D.C. (Glenmark) | 11 | 5/29/2013 | 7/7/2013 |
| Patel, Nisha (Teva) | 13 | 1/21/2014 | 3/6/2014 |
| Kellum, Armando (Sandoz) | 9 | 4/2/2014 | 10/15/2014 |
| K.S. (Zydus) | 8 | 6/13/2012 | 6/13/2012 |
| Berthold, David (Lupin) | 8 | 4/16/2013 | 6/19/2015 |
| M.C. (Wockhardt) | 7 | 8/9/2016 | 8/9/2016 |
| J.D. (Teva) | 6 | 2/16/2011 | 5/15/2012 |
| Teva Pharmaceuticals | 6 | 2/16/2011 | 1/22/2014 |
| D.S. (Actavis) | 5 | 11/27/2010 | 1/31/2012 |
| S.C. (Actavis) | 5 | 4/18/2012 | 4/22/2012 |
| Rekenthaler, David (Teva) | 4 | 12/12/2013 | 1/22/2014 |
| K.S. (Lannett) | 3 | 12/12/2014 | 1/6/2015 |
| R.C. (Aurobindo) | 3 | 10/8/2013 | 10/18/2013 |
| B.A. (Apotex) | 3 | 6/25/2015 | 6/28/2016 |
| P.M. (Aurobindo) | 2 | 7/22/2014 | 8/13/2014 |
| D.Z. (Upsher-Smith) | 2 | 5/24/2017 | 5/24/2017 |
| J.H. (Par) | 2 | 4/20/2016 | 4/21/2016 |
| Cavanaugh, Maureen (Teva) | 1 | 12/5/2012 | 12/5/2012 |
| CW-3 (Sandoz) | 1 | 5/29/2013 | 5/29/2013 |
| J.H. (Apotex) | 1 | 7/15/2015 | 7/15/2015 |
| Taro Pharmaceuticals | 1 | 3/23/2011 | 3/23/2011 |
| B.R. (Dr. Reddy's) | 1 | 3/15/2012 | 3/15/2012 |
| N.C. (Actavis) | 1 | 1/29/2013 | 1/29/2013 |
| Lupin Pharmaceuticals | 1 | 6/17/2015 | 6/17/2015 |

### j.  James Nesta

314.    Nesta started his employment with Mylan in 2000 and is currently the Vice President of Sales at Mylan. Nesta communicates regularly with his counterparts at many of the Defendants. For

example, between January 2011 and February 2016, Nesta exchanged at least 5,293 phone calls and text messages with his contacts at Greenstone, Amneal, Teva, Dr. Reddy's, Zydus, Aurobindo, Actavis, Lupin, Sandoz, Lannett, Taro, and Par. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| R.H. (Greenstone) | 2310 | 6/9/2011 | 8/24/2015 |
| S.R.(1) (Amneal) | 1079 | 1/3/2012 | 12/17/2015 |
| Green, Kevin (Teva) | 461 | 2/21/2012 | 10/4/2013 |
| B.R. (Dr. Reddy's) | 386 | 1/6/2011 | 6/28/2012 |
| K.R. (Zydus) | 121 | 7/21/2011 | 10/1/2014 |
| Green, Kevin (Zydus) | 117 | 1/7/2014 | 8/17/2017 |
| Rekenthaler, David (Teva) | 102 | 4/5/2012 | 3/17/2015 |
| A.T. (Aurobindo) | 95 | 8/26/2012 | 5/1/2013 |
| Falkin, Marc (Actavis) | 78 | 12/3/2013 | 8/17/2015 |
| J.K. (Aurobindo) | 76 | 10/1/2013 | 1/8/2016 |
| V.B. (Dr. Reddy's) | 71 | 8/7/2014 | 2/2/2016 |
| Berthold, David (Lupin) | 68 | 4/21/2013 | 10/13/2014 |
| CW-4 (Sandoz) | 67 | 9/6/2012 | 10/14/2013 |
| J.A. (Dr. Reddy's) | 52 | 3/9/2011 | 2/27/2014 |
| K.N. (Dr. Reddy's) | 42 | 6/7/2011 | 6/9/2011 |
| Nailor, Jill (Greenstone) | 40 | 12/5/2012 | 11/13/2015 |
| K.S. (Lannett) | 35 | 1/4/2013 | 4/23/2014 |
| T.W. (Dr. Reddy's) | 14 | 1/11/2013 | 2/5/2013 |
| P.M. (Aurobindo) | 13 | 4/5/2013 | 6/19/2013 |
| T.G. (Aurobindo) | 12 | 2/25/2016 | 2/25/2016 |
| S.R.(2) (Amneal) | 11 | 10/1/2014 | 1/15/2015 |
| R.C. (Teva and Aurobindo) | 10 | 7/20/2011 | 11/2/2011 |
| Patel, Nisha (Teva) | 10 | 5/10/2013 | 8/8/2013 |
| Sullivan, Tracy (Lannett) | 7 | 7/21/2014 | 7/22/2014 |
| L.P. (Taro) | 4 | 11/2/2012 | 1/17/2013 |
| B.P. (Zydus) | 4 | 7/21/2011 | 7/21/2011 |
| C.N. (Sandoz) | 3 | 12/2/2012 | 12/17/2012 |
| Teva Pharmaceuticals | 3 | 8/2/2011 | 8/2/2011 |
| J.H. (Par) | 2 | 2/4/2014 | 2/4/2014 |

k.   *Konstantin Ostaficiuk*

315.    Ostaficiuk is the President of Camber and has held that position since 2009. During his tenure at Camber, Ostaficiuk has been the primary person responsible for furthering price fixing and market allocation agreements with his competitors. Indeed, Ostaficiuk regularly communicated with

1  competitors and maintained relationships with executives at many of the Defendants. For example,

2  between March 2011 and August 2017, Ostaficiuk exchanged at least 464 phone calls with his contacts

3  at Amneal, Lannett, Breckenridge, Aurobindo, Lupin, Teva, Rising, Breckenridge, Taro, Glenmark,

4  Zydus, Dr. Reddy's, Wockhardt, Sandoz, and Actavis. These communications are detailed in the table

5  below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(2) (Amneal) | 128 | 3/22/2011 | 6/11/2017 |
| K.S. (Lannett) | 122 | 3/10/2011 | 8/24/2017 |
| S.C. (Breckenridge) | 46 | 3/25/2011 | 7/24/2017 |
| Grauso, Jim (Aurobindo) | 39 | 3/21/2012 | 12/9/2013 |
| Berthold, David (Lupin) | 19 | 5/14/2012 | 4/4/2016 |
| S.R.(1) (Amneal) | 12 | 3/12/2012 | 10/25/2016 |
| R.M. (Lannett) | 10 | 12/15/2011 | 2/14/2012 |
| Rekenthaler, David (Teva) | 10 | 9/22/2014 | 2/19/2015 |
| C.M. (Aurobindo) | 9 | 5/27/2015 | 11/12/2015 |
| K.M. (Rising) | 8 | 7/17/2014 | 6/8/2016 |
| Breckenridge Pharmaceuticals | 7 | 11/9/2011 | 10/29/2014 |
| M.B. (Taro and Glenmark) | 6 | 5/30/2012 | 6/6/2012 |
| Sullivan, Tracy (Lannett) | 6 | 5/19/2011 | 8/28/2012 |
| P.H. (Zydus) | 5 | 5/8/2012 | 5/16/2012 |
| Grauso, Jim (Glenmark) | 5 | 7/30/2014 | 10/29/2014 |
| P.G. (Breckenridge) | 4 | 5/20/2011 | 12/17/2015 |
| M.K. (Zydus) | 4 | 1/5/2015 | 12/30/2015 |
| B.R. (Dr. Reddy's) | 4 | 1/18/2012 | 3/30/2012 |
| K.K. (Wockhardt) | 4 | 10/5/2011 | 2/1/2012 |
| D.P. (Sandoz) | 3 | 7/9/2014 | 7/14/2014 |
| CW-5 (Glenmark) | 3 | 11/19/2013 | 11/19/2013 |
| Falkin, Marc (Actavis) | 2 | 6/6/2013 | 12/5/2013 |
| P.M. (Aurobindo) | 2 | 8/20/2013 | 5/2/2014 |
| B.M. (Amneal) | 1 | 10/3/2011 | 10/3/2011 |
| Brown, Jim (Glenmark) | 1 | 10/29/2014 | 10/29/2014 |
| L.P. (Taro) | 1 | 6/26/2015 | 6/26/2015 |
| D.N. (Breckenridge) | 1 | 4/4/2016 | 4/4/2016 |
| A.T. (Aurobindo) | 1 | 2/1/2013 | 2/1/2013 |
| S.G. (Glenmark) | 1 | 4/27/2011 | 4/27/2011 |

*l.   Nisha Patel*

316.   Patel worked at Teva from April 2013 to December 2016, first as a Director of Strategic

Customer Marketing and then as a Director of National Accounts. As discussed in great detail below,

1   Patel was in frequent communication with her counterparts at the Defendants to fix prices and allocate

2   markets. For example, during her time at Teva, Patel exchanged at least 1,240 phone calls and text

3   messages with her contacts at Zydus, Sandoz, Actavis, Glenmark, Greenstone, Taro, Lupin, Dr.

4   Reddy's, Lannett, Par, Apotex, Aurobindo, Mylan, Amneal, Upsher-Smith, and Breckenridge. As

5   discussed in various sections of this Complaint, Patel also frequently communicated with competitors

6   using Facebook Messenger, LinkedIn messaging, and the encrypted messaging application WhatsApp.

7   The communications detailed in the table below include only telephone calls and text messages:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Green, Kevin (Zydus) | 184 | 11/8/2013 | 8/31/2016 |
| CW-1 (Sandoz) | 183 | 4/26/2013 | 8/9/2016 |
| Rogerson, Rick (Actavis) | 157 | 5/2/2013 | 11/9/2015 |
| CW-5 (Glenmark) | 121 | 5/2/2013 | 3/4/2014 |
| R.H. (Greenstone) | 105 | 5/7/2013 | 10/13/2016 |
| Aprahamian, Ara (Taro) | 100 | 5/22/2013 | 3/3/2016 |
| Berthold, David (Lupin) | 76 | 5/6/2013 | 4/8/2014 |
| J.C. (Glenmark) | 44 | 5/6/2013 | 7/28/2015 |
| Brown, Jim (Glenmark) | 36 | 8/6/2013 | 10/15/2014 |
| V.B. (Dr. Reddy's) | 28 | 6/10/2014 | 9/27/2016 |
| A.B. (Actavis) | 28 | 4/30/2013 | 10/16/2015 |
| A.S. (Actavis) | 28 | 9/16/2015 | 3/10/2016 |
| Nailor, Jill (Greenstone) | 18 | 1/21/2014 | 3/6/2014 |
| Sullivan, Tracy (Lannett) | 17 | 6/12/2014 | 4/6/2016 |
| T.P. (Par) | 16 | 6/26/2014 | 11/10/2014 |
| B.H. (Apotex) | 14 | 5/20/2013 | 6/12/2015 |
| Grauso, Jim (Aurobindo) | 12 | 5/14/2013 | 7/8/2013 |
| Falkin, Marc (Actavis) | 11 | 2/5/2016 | 6/16/2016 |
| Nesta, Jim (Mylan) | 10 | 5/10/2013 | 8/8/2013 |
| A.G. (Actavis) | 9 | 1/27/2015 | 6/9/2016 |
| S.R.(2) (Amneal) | 9 | 9/9/2014 | 5/29/2015 |
| B.L. (Upsher-Smith) | 8 | 4/29/2013 | 9/18/2014 |
| Grauso, Jim (Glenmark) | 6 | 2/28/2014 | 1/5/2015 |
| K.R. (Zydus) | 6 | 10/10/2013 | 9/18/2014 |
| S.G. (Zydus) | 4 | 2/29/2016 | 5/24/2016 |
| M.B. (Actavis) | 3 | 2/26/2016 | 6/6/2016 |
| M.B. (Glenmark) | 3 | 5/10/2013 | 5/23/2013 |
| S.C. (Breckenridge) | 2 | 2/7/2014 | 2/7/2014 |
| S.R.(1) (Amneal) | 2 | 9/9/2014 | 1/6/2015 |

1

        *m.*    *David Rekenthaler*

2        317.    Rekenthaler was the Vice President of Sales, US Generics at Teva until April 2015.

3 Rekenthaler is now the Vice President of Sales at Apotex. During his time at Teva, Rekenthaler knew

4 that his colleagues, including Green and Patel, were colluding with competitors. Indeed, Rekenthaler

5 was also in frequent contact with competitors himself and had relationships with executives at nearly all

6 the Defendants. For example, between January 2011 and March 2015, Rekenthaler exchanged at least

7 1,044 phone calls and text messages with his contacts at Actavis, Mylan, Par, Aurobindo, Apotex,

8 Zydus, Sandoz, Rising, Amneal, Breckenridge, Lupin, Dr. Reddy's, Glenmark, Greenstone, Taro,

9 Lannett, and Wockhardt. These communications are detailed in the table below:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 433 | 8/7/2013 | 3/25/2015 |
| Nesta, Jim (Mylan) | 102 | 4/5/2012 | 3/17/2015 |
| G.B. (Par) | 89 | 1/11/2011 | 2/13/2015 |
| R.C. (Aurobindo) | 75 | 10/6/2011 | 3/24/2015 |
| J.H. (Apotex) | 65 | 5/6/2013 | 3/9/2015 |
| Green, Kevin (Zydus) | 42 | 11/8/2013 | 3/30/2015 |
| A.S. (Actavis) | 26 | 1/11/2012 | 4/1/2013 |
| CW-2 (Sandoz and Rising) | 24 | 11/14/2011 | 11/20/2014 |
| J.H. (Par) | 19 | 9/16/2013 | 3/7/2015 |
| S.G. (Zydus) | 18 | 12/2/2013 | 1/29/2015 |
| B.P. (Mylan) | 18 | 9/12/2011 | 12/23/2013 |
| A.B. (Actavis) | 16 | 4/1/2013 | 9/16/2014 |
| J.K. (Actavis) | 15 | 10/11/2013 | 3/29/2015 |
| S.R.(2) (Amneal) | 13 | 5/8/2013 | 3/12/2015 |
| D.N. (Breckenridge) | 10 | 6/14/2012 | 6/10/2014 |
| Ostaficiuk, Kon (Camber) | 10 | 9/22/2014 | 2/19/2015 |
| Berthold, David (Lupin) | 9 | 10/14/2013 | 1/16/2014 |
| J.K. (Mylan) | 8 | 1/11/2012 | 2/7/2012 |
| K.M. (Rising) | 8 | 4/14/2011 | 1/4/2012 |
| B.R. (Dr. Reddy's) | 7 | 8/11/2011 | 4/16/2012 |
| K.R. (Zydus) | 5 | 10/10/2013 | 12/17/2013 |
| CW-5 (Glenmark) | 4 | 9/27/2013 | 3/11/2014 |
| Nailor, Jill (Greenstone) | 4 | 12/12/2013 | 1/22/2014 |
| E.G. (Taro) | 3 | 5/10/2011 | 3/8/2012 |
| K.S. (Lannett) | 3 | 10/31/2011 | 9/4/2014 |
| C.V. (Greenstone) | 3 | 11/14/2013 | 11/18/2013 |
| T.W. (Dr. Reddy's) | 3 | 7/29/2013 | 5/1/2014 |
| J.J. (Taro) | 2 | 1/31/2011 | 7/2/2012 |
| J.M. (Lannett and Glenmark) | 2 | 4/30/2011 | 11/19/2012 |
| M.B. (Glenmark) | 2 | 2/26/2013 | 2/28/2013 |
| B.W. (Wockhardt) | 2 | 1/5/2012 | 3/10/2014 |
| Brown, Jim (Glenmark) | 1 | 3/24/2014 | 3/24/2014 |
| S.R.(1) (Amneal) | 1 | 8/6/2012 | 8/6/2012 |
| G.R. (Aurobindo) | 1 | 11/1/2011 | 11/1/2011 |
| Grauso, Jim (Aurobindo) | 1 | 12/8/2011 | 12/8/2011 |

*n.   Rick Rogerson*

318.    Rogerson was the Executive Director of Pricing and Business Analytics at Actavis until Actavis was acquired by Teva in August 2016. Rogerson now works at Amneal as a Senior Director of

Marketing and Business Analytics. During his time at Actavis, Rogerson communicated with his contacts at several Defendants. For example, between February 2010 and July 2016, Rogerson exchanged at least 635 phone calls and text messages with his contacts at Wockhardt, Teva, Dr. Reddy's, Sandoz, Lannett, Glenmark, Taro, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.A. (Wockhardt) | 316 | 3/11/2010 | 1/28/2016 |
| Patel, Nisha (Teva) | 157 | 5/2/2013 | 11/9/2015 |
| N.M. (Dr. Reddy's and Sandoz | 43 | 10/15/2013 | 3/6/2018 |
| J.M. (Lannett and Glenmark) | 32 | 6/24/2010 | 1/6/2012 |
| K.G. (Teva) | 29 | 12/15/2015 | 7/29/2016 |
| Teva Pharmaceuticals | 27 | 9/24/2015 | 7/29/2016 |
| C.B. (Teva) | 17 | 2/26/2016 | 7/26/2016 |
| Aprahamian, Ara (Taro) | 4 | 6/17/2013 | 4/16/2014 |
| S.G. (Glenmark) | 3 | 2/8/2010 | 2/8/2010 |
| Kellum, Armando (Sandoz) | 3 | 5/5/2011 | 9/28/2011 |
| Taro Pharmaceuticals | 2 | 6/14/2013 | 11/20/2013 |
| J.W. (Zydus) | 2 | 6/24/2014 | 6/25/2014 |

*o.   Tracy Sullivan*

319.   Tracy Sullivan has been employed at Lannett since 2007 and is currently the Director of National Accounts. Sullivan regularly communicated with competitors and maintained relationships with executives at many of the Defendants. For example, between March 2011 and August 2016, Sullivan exchanged at least 495 phone calls and text messages with her contacts at Zydus, Wockhardt, Teva, Greenstone, Dr. Reddy's, Par, Amneal, Aurobindo, Mylan, and Breckenridge. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 124 | 6/5/2014 | 11/14/2014 |
| K.K. (Wockhardt) | 101 | 4/11/2012 | 1/16/2014 |
| J.P. (Teva) | 50 | 3/26/2014 | 3/3/2016 |
| R.H. (Greenstone) | 37 | 7/29/2011 | 3/14/2016 |
| B.R. (Dr. Reddy's) | 28 | 3/28/2011 | 8/7/2011 |
| J.A. (Dr. Reddy's) | 22 | 4/28/2011 | 5/13/2014 |
| Patel, Nisha (Teva) | 17 | 6/12/2014 | 4/6/2016 |
| L.S. (Zydus) | 16 | 7/30/2011 | 8/15/2013 |
| D.V. (Dr. Reddy's) | 14 | 9/22/2015 | 8/19/2016 |
| K.O. (Par) | 14 | 7/26/2013 | 5/9/2015 |
| J.W. (Zydus) | 11 | 6/3/2014 | 3/7/2016 |
| J.P. (Amneal) | 11 | 5/24/2011 | 5/9/2015 |
| P.M. (Aurobindo) | 10 | 6/5/2013 | 6/10/2013 |
| K.N. (Dr. Reddy's) | 7 | 2/23/2016 | 3/7/2016 |
| Nesta, Jim (Mylan) | 7 | 7/21/2014 | 7/22/2014 |
| Ostaficiuk, Kon (Camber) | 6 | 5/19/2011 | 8/28/2012 |
| D.N. (Breckenridge) | 4 | 9/25/2012 | 9/17/2014 |
| Green, Kevin (Teva) | 4 | 5/23/2011 | 11/14/2012 |
| Green, Kevin (Zydus) | 4 | 2/16/2014 | 2/16/2014 |
| C.M. (Aurobindo) | 3 | 5/9/2015 | 5/9/2015 |
| G.R. (Aurobindo) | 2 | 6/14/2011 | 6/14/2011 |
| P.G. (Breckenridge) | 1 | 9/7/2011 | 9/7/2011 |
| S.K. (Wockhardt) | 1 | 10/6/2011 | 10/6/2011 |
| P.H. (Zydus) | 1 | 7/20/2012 | 7/20/2012 |

**B.    The Overarching Conspiracy Between Generic Drug Manufacturers – Playing Nice in the Sandbox**

320.     As a result of the cozy nature of the industry, sales and marketing executives in the generic pharmaceutical industry are well aware of their competitors' current and future business plans. This reciprocal sharing of inside information greatly facilitates agreements among competitors to allocate markets to avoid price competition.

321.     The overarching conspiracy among generic manufacturers – which ties together all the agreements on the Subject Drugs identified in this Complaint – is an agreed-upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs. That term is generally understood as an approximation of how much market share each competitor is entitled to. "Fair share" is based on the number of competitors in the market, with a potential adjustment based on the timing of entry or the anticompetitive allocation of

buyers amongst similar or the same competitors in another generic drug market. Once a manufacturer has achieved its "fair share," it is generally understood that it will no longer compete for additional business. The common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion, and serve as the basis for further supra-competitive price increases.

322.     This overarching agreement is widespread across the generic drug industry and is broader than the Defendant manufacturers named in this Complaint. Plaintiff focuses here on the role of these named Defendants and their participation in, and agreement with, this overarching conspiracy as applied to the Subject Drugs, as well as how these specific conspiracies are also part of the larger overarching conspiracy.

323.     The exact contours of this "fair share" understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs. These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans. For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendants had the opportunity to meet in person, some of which are described above. These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

324.     As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs. These types of communications occur with great frequency across the industry, including among Defendants.

325.     For example, from January 1, 2013 through December 31, 2013, senior sales executives and other individuals responsible for the pricing, marketing, and sales of generic drugs at Teva spoke to representatives of every significant competitor by phone and/or text on multiple occasions. Phone calls and text messages with several of those key competitors during the 2013 calendar year are set forth below. The following Table, which is conservative because it is based on phone and text message

1   records from only some of the executives and salespeople at issue and therefore shows only some of

2   the phone calls and text messages between the Defendants during that period, illustrates the frequency

3   with which Defendants communicated with each other throughout 2013.

**Teva phone/text communications with other Defendants (by month)**
**January 1, 2013 – December 31, 2013**

|            | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|------------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| Actavis    | 2      | 2      | 0      | 7      | 27     | 1      | 17     | 12     | 15     | 40     | 13     | 47     | 183    |
| Glenmark   | 0      | 3      | 0      | 0      | 26     | 9      | 6      | 8      | 1      | 12     | 14     | 16     | 95     |
| Greenstone | 2      | 0      | 20     | 1      | 4      | 5      | 6      | 1      | 0      | 2      | 7      | 11     | 59     |
| Lupin      | 10     | 5      | 9      | 3      | 33     | 9      | 19     | 9      | 5      | 13     | 6      | 0      | 121    |
| Mylan      | 31     | 47     | 32     | 37     | 33     | 26     | 26     | 16     | 1      | 1      | 0      | 11     | 261    |
| Sandoz     | 17     | 5      | 4      | 4      | 12     | 16     | 18     | 14     | 3      | 0      | 9      | 2      | 104    |
| Taro       | 0      | 0      | 0      | 0      | 2      | 1      | 8      | 11     | 0      | 11     | 1      | 1      | 35     |
| Zydus      | 13     | 23     | 42     | 20     | 30     | 40     | 59     | 21     | 34     | 148    | 58     | 43     | 531    |
| Totals     | 75     | 85     | 107    | 72     | 167    | 107    | 159    | 92     | 59     | 227    | 108    | 131    | 1389   |

Source: State AG Complaint No. 2 (Table 1)

326.   Of the 1,389 calls listed in Table 1, 1,234 of them – or 89% – involved Green, Patel and Rekenthaler of Teva speaking with competitors. Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

327.   Similarly, from January 1, 2014 through December 31, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Teva continued to speak to representatives of every significant competitor by phone and/or text on multiple occasions. Phone calls and text messages with several of those key competitors during the 2014 calendar year are set forth below. The following Table, which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between the Defendants during that period, sheds similar light on the frequency with which Defendants communicated with each other throughout 2014.

**Teva phone/text communications with other Defendants (by month)**
**January 1, 2014 – December 31, 2014**

| | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 31 | 17 | 47 | 42 | 76 | 9 | 38 | 24 | 36 | 23 | 8 | 14 | 365 |
| Glenmark | 4 | 11 | 11 | 7 | 7 | 2 | 9 | 6 | 1 | 6 | 3 | 3 | 70 |
| Greenstone | 17 | 3 | 13 | 3 | 1 | 1 | 6 | 1 | 9 | 0 | 0 | 0 | 54 |
| Lupin | 11 | 5 | 13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| Mylan | 6 | 1 | 1 | 1 | 7 | 2 | 0 | 10 | 13 | 5 | 2 | 9 | 57 |
| Sandoz | 5 | 10 | 7 | 10 | 0 | 1 | 28 | 7 | 4 | 1 | 6 | 3 | 82 |
| Taro | 1 | 1 | 7 | 4 | 17 | 16 | 5 | 2 | 1 | 0 | 0 | 1 | 55 |
| Zydus | 18 | 36 | 44 | 24 | 37 | 14 | 19 | 15 | 5 | 5 | 4 | 4 | 225 |
| Totals | 93 | 84 | 143 | 95 | 145 | 45 | 105 | 65 | 69 | 40 | 23 | 34 | 941 |

Source: State AG Complaint No. 2 (Table 2).

328.    Of the 941 calls listed in Table 2,778 of them – or 83% – involved Patel and Rekenthaler of Teva speaking with competitors (by this time, Green no longer worked at Teva). Many – though not all – of those communications involve the Subject Drugs that are addressed throughout this Complaint. It was not just Teva personnel speaking to their competitors, however. All of these individuals were speaking to each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy, as illustrated in the graphic on page 37 of the State AG Complaint No. 2.

329.    In order to provide some organizational principle around the massive amount of collusive behavior by the Defendants described in this Complaint, certain sections are centered around the relationships between, respectively, Heritage and its purported competitors and Teva and its purported competitors. However, this organization should not imply that the Complaint is solely concerned with bilateral relationships involving Heritage and/or Teva.

330.    The specific drug agreements often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct. For example, to view only a small portion of the interlocking, overlapping web of collusion formed by Defendants: Teva, Taro and Wockhardt discussed amongst themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for Ketoconazole cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ; and Teva, Mylan and Par all communicated with each other in the spring of 2014 concerning the market for Budesonide DR capsules. These are not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling

nature of the Defendants' overarching conspiracy.

331.    Also referred to sometimes as the "rules of engagement" for the generic drug industry, the fair share understanding among Defendants dictates that, when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market. When a third competitor enters, each competitor expects to obtain 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

332.    When a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis, it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market. For example, when Heritage was preparing to launch Zoledronic Acid as the patent on the branded drug was about to expire, O'Mara (Heritage) spoke to Austin (Dr. Reddy's) to "see if he [was] willing to discuss strategy at all." After speaking with Austin, O'Mara stated that "[Austin] views it this way. If [Dr. Reddy's] are first and others come out after, he deserves 60%. If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

333.    Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share. One of the many examples of this occurred in March 2014, when – as discussed more fully below – Lupin entered the Niacin ER market after Teva had previously been exclusive. Patel of Teva and Berthold of Lupin spoke directly by phone a number of times during this period, including three (3) calls on March 24, 2014. That same day, Rekenthaler of Teva sent an internal e-mail to Patel stating: "We should concede Optum then defend everything else. This should be it for Lupin. I believe this should be the 40% we were okay with conceding." Here, Teva's expectation to maintain 60% share in a two-player market, after being the first in that market, was consistent with the overarching conspiracy.

334.    Taro went so far as to create a graphic representation of that understanding, taking into account both the number of competitors and order of entry to estimate what its "fair share" should be in any given market:



**[TARO_000224150.]**

335.    Although these general parameters are well-known, there is no precise method for apportioning "fair share" because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in a given year. The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

336.    This common goal was stated succinctly by Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter." As demonstrated throughout the Complaint, Aprahamian's idea of "responsibility" meant constantly reaching out to competitors in order to coordinate giving up share to reach a "fair" allocation and keep prices high.

337.    This scheme to strangle competition and allocate "fair share" is typically implemented as follows. First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market. Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price. This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct Defendants agreed to.

338.    The "fair share" understanding has been particularly effective when a new competitor enters the market – a time when, in a free-functioning, competitive market for generic drugs, prices

would be expected to go down. In today's generic drug markets, a new competitor will either approach or be approached by existing competitors. Existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid. The new competitor's transition into the market is seamless; the new entrant is ceded market share and immediately charges a supra-competitive price. The competitors then continue this process of dividing up customers until the market reaches a new artificial equilibrium. This is referred to as a "stable" market.

339.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues. If the disruption is temporary, the existing competitors will refrain from taking any action that might upset the market balance. By contrast, if the disruption is for a longer term, the competitors will divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market. For example, in July 2013, a retail pharmacy customer e-mailed Taro stating that one of Mylan's products was on back order and asked Taro to bid for the business. Aprahamian sent an internal e-mail stating "Not inclined to take on new business . . . Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to overreact to this product. Not sure how long Mylan is out."

340.    These rules about "fair share" apply equally to price increases. As long as everyone is playing fair, and the competitors believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules." Indeed, rather than competing for customers in the face of a price increase, competitors often use this as an opportunity to follow with comparable price increases of their own.

341.    For example, in May 2013, after a Glenmark price increase on a number of different drugs (discussed more fully below), Teva was approached by a large retail customer requesting a bid for several drugs. Green immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy should be:

On May 29, 2013, at 11:52 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:

Do you think the Fluconazole Tabs below is due to a recent price increase. I don't have my list here at home. We are in a great inventory position, but not sure I want to steal it on an increase.

342.    Teva declined to bid, after conversations with its competitors confirming that the reason for the request was due to a competitor's price increase.

343.    When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox." For example – as discussed more fully below – in December 2014, Teva was approached by a large retail customer on behalf of Greenstone. The customer indicated that Greenstone was entering the market for Cabergoline and was seeking to target specific customers. The customer specifically requested that Teva give up a large customer to the new entrant and indicated that "Greenstone has promised to play nice in the sandbox." After discussing the matter internally, a Teva representative responded to the customer: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the targeted customer.]"

344.    When a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor. For example, in May 2013, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail to J.G., another Sandoz senior executive, stating "My sense is that Sandoz is viewed by customers and competition as a respectful/responsible player in the market, which we should be proud of and has taken years to develop. I would be very careful to destroy this through behavior that is too aggressive or desperation."

345.    Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles. In internal company presentations throughout 2014, Sandoz consistently referred to Actavis as a "responsible competitor" and Taro as a "very responsible price competitor."

346.    Teva had its own term of art – referring to the competitors it had the most collusive relationships with as "high quality" competitors. As described more fully below, Teva had long-standing relationships with these competitors, including several of the Defendants, which affected nearly every overlapping drug they sold. As just one example, Patel of Teva exchanged seven (7) text messages and had two (2) long phone calls with Aprahamian of Taro on June 3 and 4, 2014. After a

1   lengthy twenty-five (25) minute call with Aprahamian on the morning of June 4, Patel sent an internal

2   e-mail to K.G., a Teva senior marketing executive, stating "[w]e should probably discuss how we want

3   to handle all Taro increase items. Taro is a high quality competitor – I think we need to be responsible

4   where we have adequate market share."

5        347.    Adherence to the rules regarding "fair share" is critical in order to maintain high prices.

6   Indeed, that is the primary purpose of the agreement. If even one competitor does not participate (and,

7   thus behave in accordance with) the larger understanding, it can lead to unwanted competition and

8   lower prices. In the relatively few instances where a competitor prioritizes gaining market share over the

9   larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and is

10   spoken to by other competitors. For example, in March 2015, Upsher-Smith learned that Sandoz had

11   submitted a bid on a product not identified in this Complaint at one of Upsher-Smith's GPO

12   customers. B.P., a senior account manager at Upsher-Smith, forwarded that information internally

13   stating "I can't believe they have chosen to compete against us since we had this business. How does

14   this help us? We play fair and they don't?"

15        348.    "Fair share," "playing nice in the sandbox," "rationalizing the market," and similar

16   terminology have become part of the industry lexicon, and thus part of the larger understanding

17   between Defendants. Generic drug manufacturers actively and routinely monitor their fair share and

18   that of their competitors, as well as discuss customer allocation amongst each other within the context

19   of agreements on specific drugs, as set forth more fully below. For example, in July 2013, L.J., a senior

20   marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not

21   have "fair share" of the market. After some back-and-forth internal joking among Sandoz executives

22   about the idea that Sandoz might actually attempt to compete for business in those markets by driving

23   prices down, Kellum responded by emphasizing the truly industry-wide nature of the agreement:

| From: | Kellum, Armando |
|---|---|
| Sent: | Tuesday, July 02, 2013 12:31 AM |
| To: | ███████████████████████████ |
| Subject: | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

349.     The concept of "fair share" is so well ingrained in the generic pharmaceutical industry that even customers are aware of, and at times facilitate, collusion among generic manufacturers. For example, in June 2013, Dr. Reddy's was entering the market on a product not identified in the Complaint where Par had previously been exclusive. K.N., a senior account executive at Dr. Reddy's, sent an internal e-mail reporting that "[a GPO customer] has indicated that Par will walk away, so we have put together a proposal based on that information."

350.     Similarly, in September 2014, a large wholesale customer reached out to several large generic manufacturers, including Teva, asking them to submit a "Priority Wishlist of items to gain increased volume in the market." The customer reported to Teva that "7 of the global suppliers have created and submitted wishlists and that [the customer] will be reviewing next week and taking a look at how they can move things around. He said they are hoping to be able to horse trade without having to do ROFR [right of first refusal]."

351.     Further, in January 2015, Teva was in discussions with a large retail customer about the possibility of becoming its supplier for Moexipril HCL/HCTZ tablets. The customer stated "Yes, I would like a OTB [One Time Buy]. Can you provide pricing? And yes, we should discuss an ongoing offer as well. I think you are way under your 'fair share' on this one if I remember correctly."

352.     Customers at times also facilitate price increases, asking competitors to "rationalize" a market by raising prices. For example, in November 2013, S.G., a senior account executive at Sandoz, sent an internal e-mail stating "[a large wholesale customer] is indicating that Glenmark and Caraco had taken a price increase on [a drug not identified in the Complaint] in June. [The customer] is asking if Sandoz will be rationalizing the market. . . . Please advise on next steps. Our [lower] pricing is disrupting the market."

353.     The "fair share" agreement is not limited to any one market; these principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across product markets. "Fair share" decisions consider factors across multiple generic drug markets. Customers in one drug market might be traded for customers in another drug market so to create a global "fair share" outcome. Or a putative competitor may decline to complete meaningfully on a bid for one drug in exchange for the opportunity to provide a pre-determined bid for a different drug.

1  Or competitors might avoid challenging a price increase on one generic drug based on a *quid pro quo*

2  arrangement from other competitors on different drugs.

3       354.    Indeed, Defendants understood that to effectuate a successful price-fixing and market

4  allocation agreement on one drug, they would need to effectuate an agreement across each Defendant's

5  portfolio of drugs. If the agreement were limited to one or two drugs, it could easily fall apart. For

6  example, an agreement between two Defendants to raise prices or to allocate market share on one drug

7  would not likely hold where those same two Defendants engaged in vigorous price competition on

8  another drug, or where a third manufacturer not party to that agreement entered the market with an

9  intent to compete on price.

10       355.    There are many examples of Defendants conspiring across drug markets. As detailed

11  below, this is most clearly illustrated by Heritage's attempt to impose industry-wide price increases

12  simultaneously on eighteen drugs, including twelve of the Subject Drugs: Acetazolamide ER, Cidofovir,

13  Doxy Mono, Fosinopril HCL/HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin,

14  Leflunomide, Nystatin, Paromomycin, Theophylline ER, and Verapamil.  This involved reaching out to

15  competitors as to each of the drugs to agree on price increases.

16       356.    Similarly, Teva implemented collusive price increases on several drugs at one time in a

17  series of price increases detailed below and communicated with certain putative competitors as to

18  multiple drugs as part of each such wave of price increases.

19       357.    Defendants also conspired across drug markets to maintain their market allocation

20  scheme. For example, in November 2013, Dr. Reddy's won the "B" slot[37] business at a large wholesale

21  customer on a product not identified in the Complaint. Dr. Reddy's had previously won the "A" slot

22  business at that customer because Mylan had "walked away" from the business. J.A., a senior account

23  executive at Dr. Reddy's, sent an internal e-mail stating "My concern here is that [Mylan] will retaliate

24  somewhere else. I'm unsure of the $ volume, but this would pull somewhere around 4% share from

25  Mylan, and I don't think they would take that lying down."

26

27  [37] Some large customers contract with multiple suppliers – referring to them as primary ("A slot") or
secondary ("B slot") suppliers – so that in the event of a supply disruption for a particular drug, there is
28  a secondary source of supply.

358.     Similarly, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an internal e-mail, including to Kellum, stating that Sandoz had decided not to bid on two drugs not identified in the Complaint at a large retail customer. CW-1 explained his reasoning as follows: "We have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz), and fear blowback if we take any more products at this moment. Trying to be responsible in the sandbox." And in June 2014, Sandoz again chose not to bid at a customer on a product not identified in this Complaint out of concern that Mylan would retaliate. As CW-1 explained, "I do not want to pursue, I believe this is due to a Mylan increase. We have a lot of products crossing with Mylan right now, I do not want to ruffle any feathers." As discussed more fully below, these decisions were made by Sandoz executives as a direct result of communications between the competitors, and in the context of an ongoing understanding between Sandoz and Mylan to fix prices and avoid competition on a number of different drugs, including Nadolol.

359.     A similar scenario occurred in August 2015, when Taro declined to bid on Etodolac ER tablets at a large supermarket chain where Zydus was the incumbent. Taro voiced concerns internally that Zydus might retaliate and take share from them on another product, Warfarin Sodium tablets. As C.L., an analyst at Taro, reasoned in an internal e-mail, Zydus "could hit us on Warfarin. Not worth a fight in the sandbox over 300 annual units for Etodolac." As discussed more fully below, both Etodolac ER and Warfarin Sodium were drugs where Taro had previously agreed with its competitors, including Teva and Zydus, to fix prices and allocate customers in 2014. Taro's focus on playing nice in the sandbox was merely an extension of those already-existing agreements.

360.     As these and other examples alleged below make clear, the interdependence among generic manufacturers transcends product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap and any future markets where they might eventually compete.

361.     In fact, as explained in more detail below, certain Defendants had long-standing agreements with some of their competitors to limit competition on any products on which the companies overlapped. For example, shortly after Patel was hired by Teva in 2013, she reached out to

1  CW-1 and asked how Sandoz handled price increases. Patel explained that she had been hired by Teva

2  to identify products where Teva could increase prices. CW-1 told Patel that Sandoz would follow any

3  Teva price increases and that Sandoz would not poach Teva's customers after Teva increased price.

4  CW-1 reiterated his conversation to Kellum, who understood and approved.

5        362.    As set forth above, generic manufacturers often communicated about, and colluded on,

6  multiple drugs at any given time. For example, in July 2013, Teva increased pricing on a list of 21

7  different products. There was a great deal of internal pressure from management at Sandoz – including

8  from Kellum and CW-1 – to obtain a copy of the Teva price increase list. As a result, CW-2 (then a

9  Sandoz employee) reached out to his former colleague, Rekenthaler, the Vice President of Sales at

10  Teva, to obtain a copy of the full Teva price increase list. Rekenthaler forwarded the list to his own

11  personal e- mail address before then forwarding it to CW-2's personal e-mail address. Upon receiving

12  the list, CW-2 read it to his supervisor – CW-1 – over the phone. Notably, the Teva list included a

13  number of products that Sandoz did not even sell.

14        363.    It was not uncommon for generic manufacturers to communicate with each other about

15  products that they did not sell. For example, Teva, Wockhardt, and Mylan collusively raised pricing on

16  Enalapril Maleate in July 2013 (discussed more fully below). After a lengthy conversation with Patel in

17  the midst of the price increases, Aprahamian of Taro (not in the market for Enalapril Maleate at that

18  time) sent an internal e-mail, including to M.P., a senior Taro executive, stating "[t]here has been some

19  significant changes in the market landscape with this product and I'd like to get product back in Taro

20  label (and fast)." And Taro did move fast. By December 2013, Aprahamian spoke again with Patel,

21  M.A., an account manager at Mylan, and M.C., a senior sales and marketing executive at Wockhardt.

22  Taro then re-entered the Enalapril Maleate market and matched competitor pricing.

23        364.    As another example, on January 1, 2013 – the day before a substantial Mylan price

24  increase on a number of items – Green of Teva spoke five (5) times with Nesta of Mylan. The next day,

25  Green spoke with Kellum of Sandoz. Kellum then sent an internal e-mail to the Sandoz team stating

26  "[j]ust heard from a customer that – Teva and Mylan . . . have raised price on Nadolol to our levels and

27  Mylan took a significant price increase on Levothyroxine. Let's please be cautious on both these

28  products." Despite that fact that Teva did not sell Levothyroxine, Green still conveyed to Sandoz that

1 Mylan raised price on that product.

2       365.    Unlike their branded counterparts, generic drugs are commodities and generic

3 manufacturers are constantly making decisions to enter new markets and leave existing markets. Often

4 these decisions are made, at least in part, based on who the competitors are and how strong the

5 relationship is between the two companies. For example, in July 2013, Sandoz was looking to

6 implement a "Taro Strategy" that involved temporarily delisting ten products that they overlapped on

7 with Taro. This strategy would allow Taro to raise price on these products while Sandoz was out of the

8 market, and then Sandoz could re-enter later at the higher price.

9       366.    This interdependence between generic manufacturers is further demonstrated by the

10 countless examples of companies sharing sensitive information with competitors as a matter of course.

11 The State AGs have gathered evidence going back more than a decade of generic companies routinely

12 communicating and sharing information with each other about bids and pricing strategy. This includes

13 forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a

14 competitor, either on their own initiative, or at the request of a competitor.

15       367.    Defendants and other generic drug manufacturers also share information among

16 themselves regarding the terms of their contracts with customers, including pricing terms, price

17 protection, and rebates. Defendants use this information to negotiate prices or terms that are more

18 favorable to them, often to the ultimate detriment of payors and consumers. For example, in December

19 2013, Teva was negotiating new price increase language in its customer contracts and wanted some

20 comfort that its competitors had similar language. On December 23, 2013, Rekenthaler spoke with

21 Nesta of Mylan three times, including a 13-minute call. Immediately after hanging up the phone with

22 Nesta after the third call, Rekenthaler sent the following e-mail:

23

24                   From:    Dave Rekenthaler
                  Sent:    Mon 12/23/2013 10:41 AM (GMT-05:00)

25                   To:          ▬▬▬▬; Maureen Cavanaugh
                  Cc:        Nisha Patel02
                  Bcc:

26                   Subject: RE: Proposed Price Increase Language

27                   Mylans language is vague.  "Pricing subject to change at Mylan's sole discretion."

28

368.     Defendants were well aware that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy. For example, in May 2014, a large customer of Taro's received a bid on a product not identified in this Complaint and gave Taro an opportunity to bid to retain the business. A.L., a senior contracting executive at Taro, sent an internal e-mail stating "FS ok, will not protect." E.G., a senior managed care executive at Taro, responded "explain FS, (Fair Share)?" Aprahamian replied:

> No emails please. Phone call. ███ let's discuss.

369.     Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017 – after the States' investigation was well underway – read: "Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."

370.     To avoid creating a potentially incriminating paper trail, Kellum of Sandoz routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.

371.     The examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described.

**C.     Generic Drug Price Spikes Since 2013**

372.     Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout at least 2013 and 2014. As Senator Sanders noted, the prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014.[38] An analysis conducted by Sandoz showed that during the calendar years 2013 and 2014, there were 1,487 "large price increases" (increases of the WAC price greater than 100%), of which 12% (178) were increased by greater than 1,000%.

---

[38] Why are Some Generic Drugs Skyrocketing in Price?: Hearing on S. 113-859 Before the S. Comm. on Health, Education, Labor, and Pensions, 113th Cong. 2 (2014) (statement of Sen. Bernie Sanders, Chairman, S. Subcommittee on Primary Health and Aging).

373.     These increases in 2013 and 2014 were staggering compared to prior years. The following table (which contains information about WAC pricing changes through October 2014 only) demonstrates the dramatic surge in the number of large drug price increases per year in 2013 and 2014:

| | Year | Total Number of Increases | Increases Greater than 100% | Increases Greater than 50% |
|---|---|---|---|---|
| | 2010 | 3820 | 125 | 260 |
| | 2011 | 4265 | 255 | 409 |
| | 2012 | 4071 | 223 | 433 |
| | 2013 | 5694 | 739 | 1072 |
| YTD Oct. | 2014 | 4461 | 637 | 1521 |

Source: State AG Complaint No. 2 at p. 51.

374.     A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases.

375.     More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

## VIII.   THE CONSPIRACY

376.     When entering a generic drug market, Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

377.     Illustrative examples of these agreements are set forth below, in most cases organized by company relationship, describing specific examples relating to many of the Subject Drugs.

378.     By 2012 the overarching "fair share" conspiracy was well established in the industry, including among the Defendants. Generic manufacturers replaced competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion. The structure and inner workings of the agreement were well understood and adopted throughout the industry.

379.     Around this time, however, manufacturers began to focus more on price increases than they had in the past. They were no longer satisfied to simply maintain stable prices – there was a

1  concerted effort by many in the industry to significantly raise prices. Manufacturers started
2  communicating with each other about those increases with greater and greater frequency.

3        380.    Starting sometime in 2012 or even earlier, and continuing for several years, competitors
4  would systematically communicate with each other as they were identifying opportunities and planning
5  new price increases, and then again shortly before or at the time of each increase. The purpose of these
6  communications was not only to secure an agreement to raise prices, but also to reinforce the essential
7  tenet underlying the fair share agreement – i.e., that they would not punish a competitor for leading a
8  price increase or steal a competitor's market share on an increase. There was an understanding among
9  many of these generic drug manufacturers – including the Defendants – that a competitor's price
10  increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the
11  competitors who had not increased their prices would, at a minimum, not seek to take advantage of a
12  competitor's price increase by increasing their own market share (unless they had less than "fair share").

13        381.    Generic drug manufacturers could not always follow a competitor's price increase
14  quickly. Various business reasons – including supply disruptions or contractual price protection terms
15  with certain customers that would result in the payment of significant penalties – could cause such
16  delays. In those instances when a co-conspirator manufacturer delayed following a price increase, the
17  underlying fair share understanding operated as a safety net to ensure that the competitor not seek to
18  take advantage of a competitor's price increase by stealing market share.

19        382.    Examples of specific collusive price increases on many of the Subject Drugs are set
20  forth below.

21  IX.    HERITAGE

22        A.  Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion

23        383.    When entering a generic drug market, Defendants routinely sought out their
24  competitors in an effort to reach agreement to allocate market share, maintain high prices, and/or
25  avoid competing on price. These agreements had the effect of artificially maintaining high prices for a
26  large number of generic drugs and creating an appearance of competition where in fact little to none
27  existed.

28

384.     The allegations immediately below focus on Heritage's conduct with respect to market entry, while the allegations in section X.A focus on Teva's conduct in similar circumstances.

### 1.    Nimodipine

#### a.    *The Heritage/Sun Agreement*

385.     As of June 2012, Heritage and Sun, through its division Caraco, were the only two competitors in the market for Nimodipine, as Teva had recently left the market. Heritage saw Teva's departure as an opportunity to raise prices.

386.     In June 2012, Malek asked Anne Sather to contact Caraco to discuss raising the price of Nimodipine.

387.     Sather subsequently exchanged numerous text messages and participated in calls with her Caraco contact throughout June 2012. On June 28, 2012, in an e-mail titled "Caraco", Sather wrote:

> [Sun Senior Sales Manager Susan Knoblauch] brought up nimo[dipine] to her boss [Sun President GP Singh Sachdeva], his only concern was that they get their fair share of the market. She was not so much help on the pricing discussion- because she does not have much control over it. All pricing goes through [GP Singh Sachdeva (Sun)] and [GP Singh Sachdeva (Sun)] sets is. I do not know [GP Singh Sachdeva (Sun)] but [Knoblauch (Sun)] mentioned our discussion with him so I can only hope the ground work has been set. I reiterated that we would like to see $ go up and we would be fair.

388.     Malek responded: "Thanks for the info. Not sure what this means 'his only concern was that they get their fair share of the market.' They are getting their fair share of the market at a price they don't need to go to is what I wanted to communicate to them."

389.     In her e-mail response, Sather agreed:

> That is exactly how I stated it to [Knoblauch] too! She made it almost seem like he did not care about the price of even this product. She admitted she knew nothing about the item – it is not a big/key item for them. I said it is big for us and with only two players it should command more $. I'd like to see if [Knoblauch] can communicate back to [GP Singh Sachdeva (Sun)] and the Nimo[dipine] on the Cardinal RFP (when it gets closer to the close of the RPF) – specifically mentioning the pricing we are going at so that Caraco can bring their price up too. This could demonstrate how communication can and should work between us to get the $ up.

390. The same day Sather sent an analysis of the upcoming Cardinal RFP to Malek and others at Heritage. The notes section regarding Nimodipine reflected that Heritage should "keep price high for Caraco." The plan for Heritage was that it would bid at a high price, which would be communicated to Sun beforehand, and would allow Sun to raise its price and still retain the Cardinal business.

391. Heritage and Caraco were both able to significantly raise prices to other customers as a result of this agreement.

392. On July 20, 2012, Fleming, a Contract Analyst at Heritage, circulated proposed pricing for the Cardinal RFP which included pricing for Nimodipine that was lower than that proposed by Sather. In an e-mail exchange that same day, Sather and Malek discussed raising prices:

> Sather: My only concern is Nimodipine – and situation with Caraco and raising our market pricing. If we don't let them increase pricing here – will it always be a fight to the bottom with them?
>
> Malek: I don't have a problem with it but, we need another account. Who is that account? They took CVS from us and we let it go and now they are getting aggressive at public and at GPO's.
>
> Sather: I understand – I just think the timing is critical if we want to raise our pricing everywhere. This Cardinal RFP was mentioned in previous conversations – and now with NACDS coming – it is a perfect time to have those off-show conversations with the right folks and reiterate the 'plan.' Plus the RFP pricing will not be effective until Oct 1st – we would have time to discuss our pricing with Cardinal (and others) before that final date. Ie: I think we could still lowball the Nimo a little later if necessary.
>
> Malek: If you feel comfortable we can have those conversations and benefit from this then I agree. We can talk off line.
>
> Sather: If I don't continue the conversations now (and at NACDS) and if we lowball right of the gate on the RFP, I think we close the door for a long time.
>
> Malek: Ok, lets give it a shot. So we will increase the price, you should tell them that so they can do the same without any comp.

393. That same day, Sather spoke to Knoblauch. During this and other communications in the succeeding weeks, the two companies reached an understanding about raising the price and

1    avoiding competition for Nimodipine. Pursuant to the agreement, Heritage provided a cover bid so that

2    Sun would be able to significantly raise its price and still retain the Cardinal business.

3         394.    When Malek learned that Sun would potentially be subject to FDA recall on

4    Nimodipine, he directed employees to contact their Sun counterparts to inquire about the recall. A

5    Heritage employee later reported that her contact at Sun was "not aware or [sic] any problems/issues

6    and supply was fine."

7         395.    Then, on April 16, 2013, after an employee reported that Caraco has not been bidding

8    as it was unsure when it would have product, Malek responded "Great feedback, time for next

9    increase!" He later reiterated "to make sure if/when they are back [on the market] they talk to us first

10   so we can be smart about it."

11        396.    On May 23, 2013, Sather again spoke with Knoblauch, who indicated that Caraco may

12   be returning to the market for Nimodipine in June or July. Sather immediately reported this news to

13   Malek: "Caraco's Nimodipine has an estimated ship date of June/July but frankly that looks even too

14   hopeful. And there's a small rumor they may not come back with it. A reminder was provided about

15   our recent changes on that item."

16        397.    This resulted in the following e-mail exchange between the two:

17            Malek: OK...Where did you hear this from!!

18            Sather: Vendor/friend [Knoblauch]

19            Malek: Are they raising theirs?

20            Sather: They are not yet but admit it would be nice to

21            Malek: Well we would follow in one second......

22            Sather: I did say that!

23            Malek: hahahahahahaha

24        398.    During the next year, Caraco did not return to the market. Heritage was able to

25   continue charging the artificially inflated prices previously agreed to by Caraco, and at times higher

26   prices, as a result – knowing that if Caraco did return to the market, the original agreement between the

27   companies would continue.

28

COMPLAINT AND DEMAND FOR JURY TRIAL

b.     *The Heritage/Ascend Agreement*

399.     When the FDA approved Ascend's Nimodipine generic in early April 2014, Malek immediately reached out to Ascend's Executive Vice President of Sales and Marketing, John Dillaway, through LinkedIn, asking if Dillaway had "time to catch up tomorrow afternoon or Thursday morning." Dillaway responded, "I would like to catch up."

400.     On April 22, 2014, Heritage identified Nimodipine as one of eighteen different drugs designated for a price increase. As discussed below, a large majority of the price increases were to be achieved through collusive efforts. During a "Price Increase Discussion" conference call with members of the Heritage sales team, led by Malek, Heritage noted that Ascend was going to launch Nimodipine. Malek took responsibility within Heritage to communicate with Ascend about market shares. Heritage planned to offer Ascend one-third (1/3) market share, so that Ascend would not compete with Heritage on price.

401.     Malek took this responsibility to communicate with Ascend because he already had a relationship with Dillaway. The pair had previously met in February 2013. Malek had also been communicating frequently with Dillaway through the website LinkedIn in the weeks leading up to the April 22, 2014 Price Increase Discussion.

402.     Later in the day after the Heritage "Price Increase Discussion" on April 22, 2014 described below, Malek called Dillaway and the two spoke for nineteen (19) minutes. Upon information and belief, during this conversation they agreed on a plan where Heritage would raise its prices, Ascend would enter the market at a high price to avoid erosion, and in exchange Heritage would walk away from certain accounts that Ascend had targeted so that Ascend could gain market share at favorable pricing.

403.     On May 9, 2014, Heritage had another internal conference to discuss price increases. After obtaining buy-in from Ascend during the April 22 telephone call between Malek and Dillaway, Heritage confirmed that it would be raising prices of Nimodipine across the board. Heritage also identified specific customers that it would "let go" to the "new entrant into market" Ascend.

404.     In June 2014, Malek sought to continue his conversations with Dillaway regarding Nimodipine. He e-mailed Dillaway on June 6, 2014 seeking to arrange a phone call. After they were

1 unable to connect by phone, Dillaway suggested they meet in person and "grab coffee" at the NACDS

2 conference in Boston.

3      405.   At the end of June, Heritage implemented the price increase. Heritage raised the price

4 of Nimodipine to at least twelve customers.

5      406.   Malek e-mailed Dillaway on October 29, 2014, again asking to "catch up." The two

6 spoke by phone for ten minutes the next day. On November 4, 2014, Malek e-mailed Dillaway to "[l]et

7 me know when we re-connect to continue our discussions from the other day." Instead of

8 communicating specifics over e-mail, Malek and Dillaway made plans to have lunch together when

9 Malek returned from India.

10      407.   Two weeks later, on November 18, 2014, Malek e-mailed Dillaway stating "[j]ust sent

11 you a text. Fresh back from India. Wanted to pick up discussions. Let me know if you can chat." On

12 November 25, 2014, Malek e-mailed Dillaway again asking if Dillaway "had a few minutes to connect."

13      408.   On January 22, 2015, Malek asked Heritage employee R.S. to reach out to Ascend to see

14 if Ascend had Nimodipine in its warehouse. Malek stressed that this inquiry should be kept

15 confidential.

16      409.   R.S. reached someone at Ascend. By January 24, 2015, Malek was able to inform his

17 sales team that Ascend had Nimodipine in its warehouse.

18      410.   By May 1, 2015, Ascend had fully launched Nimodipine. Instead of trying to compete

19 with Heritage upon entry, Ascend's WAC price, per tablet, was even higher than Heritage's.

20      411.   Notwithstanding this higher pricing per tablet, Ascend began to gain market share

21 throughout the second half of 2015.

22         **2.**    **Zoledronic Acid**

23      412.   At all relevant times, Dr. Reddy's and Heritage dominated the marketed for Zoledronic

24 Acid.

25      413.   Zoledronic Acid was marketed singularly by the brand manufacturer, Novartis, until the

26 spring of 2013, when it came off patent. It was sold in two formulations: a 4 mg and a 5mg, both

27 injectables. Heritage initially sought only to launch the 5mg formulation.

28

COMPLAINT AND DEMAND FOR JURY TRIAL

414.    In early 2013, Heritage received FDA approval to market Zoledronic Acid in the United States. Heritage began communicating with potential competitors before then to avoid price competition and to carve up market share.

415.    On January 21, 2013, Malek e-mailed O'Mara (Heritage) directing him to reach out to Dr. Reddy's, the only other competitor Malek believed would be marketing Zoledronic Acid. Malek wrote:

> Would like you to have a call with [Austin (Dr. Reddy's)] on Zoledronic.
>
> Right now, only us and DRL have a tentative on the 5mg (reclast).
>
> Need to know if he's going to be there day one and see if he's willing to discuss strategy at all.
>
> This is huge right now if it's only a two player market and we need to lock in our strategy.

416.    In a follow-up communication to O'Mara the next day, Malek outlined what O'Mara should ask Austin:

> OK. Here are the questions if you would.
>
> Are they going to be there day one (March 4)
>
> Have they heard of any others there say [sic] one?
>
> Are they launching the 4mg (Zometa) at risk?
>
> Have they heard of anyone else launching the 4mg at risk?
>
> What's their market share goal?

417.    Through numerous phone calls in late January 2013 between Heritage and Dr. Reddy's sales representatives, an agreement was reached to allocate the market for Zoledronic Acid between Heritage and Dr. Reddy's. As O'Mara described it, "[Austin] views it this way. If they are first and others come out after, he deserves 60%. If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

418.    Communications between the two companies continued in March 2013 in preparation for Heritage's market entry, including communications on March 1, 4, 6, 12, and 13, 2013.

419.     On March 1, O'Mara e-mailed Malek informing him that he had left Austin a message "to have him call me back." He added, "Did not leave anything that would incriminate me—very generic." O'Mara and Austin then spoke for almost eight (8) minutes on March 4, 2013.

420.     The March 6 communication arose from Malek's concern that Dr. Reddy's initial pricing to at least one customer appeared to be lower than he had hoped. Malek e-mailed O'Mara asking, "[a]ny chance you can talk to them and educate them on supply and demand economics?" O'Mara's response was "[y]es, they were working on it yesterday, but [I] will give him a call and discuss."

421.     On March 13, M.E., a Senior National Accounts Manager at Heritage, told Malek that he had called his counterpart at Dr. Reddy's about Zoledronic Acid and they would "talk about it soon." The two spoke on April 3, 2013 and M.E. confirmed that Dr. Reddy's had begun shipping the 5mg product that day and that pricing would be "in the 500 range." The two continued to speak throughout April.

422.     On April 19, 2013, Malek instructed his sales team not to put any collusive discussions on Zoledronic Acid or other drugs in writing to ensure the conspiracy remained hidden: "Team: please hold off on emails regarding zoledronic indication, insert, prescribing, etc. take all questions off line."

423.     Heritage and Dr. Reddy's continued to police their market allocation agreement. For example, in November 2013, Dr. Reddy's offered a lower price for Zoledronic Acid to one of Heritage's customers. When Malek learned of this, he e-mailed M.E., "When you spoke to [your counterpart at Dr. Reddy's], weren't they going to chill on share[?]" M.E. replied. "He told me that he was going to speak to their injectable people and let them know that they should chill."

424.     For most of 2013 and 2014, the market for Zoledronic Acid remained stable with Dr. Reddy's maintaining roughly 60 percent share to Heritage's 40 percent share for the 5mg formulation.

### 3.    Meprobamate

425.     In 2013, Heritage and Dr. Reddy's were the only manufacturers for Meprobamate. The two companies had an agreement in place to allocate market share between them and not compete on price.

426.    On March 21, 2013, Malek e-mailed members of his team that he is "Looking to take a price increase on [mepro]. Only other competition is DRL [Dr. Reddy's]. We don't want to make any waves and we are not looking for additional share, just want to maintain what we have at a minimum of a 4x price. Anyone want to reach out to DRL and communicate to feel out?" His team confirmed that they will touch base with counterparts at Dr. Reddy's.

427.    On a call on March 22, the two companies agreed to set and increase prices on Meprobamate. The agreement was confirmed in an e-mail later that day from a Heritage representative: "DRL is on board with price increase. I will fill you in later."

428.    On March 27, 2013, Heritage received a request for a bid from a national wholesaler on Meprobamate that was a Dr. Reddy's customer. The Heritage employee reported to Malek that "Due to my conversation with [Dr. Reddy's] the other day, I think we should tread lightly or else bid a high price to show them where we are going." Malek replied "Unless [the national wholesaler] calls you and asks for supply, I recommend letting the market dry up a bit and showing DRL we stayed away from their business."

429.    In April 2013, Dr. Reddy's requested Heritage "walk away" from a national pharmacy chain. Heritage then e-mailed the large pharmacy chain that it was increasing Meprobamate prices. The pharmacy replied that it "made a business decision to name another manufacturer as our primary supplier of Meprobamate tablets."

430.    The following month, Malek told his employee to explain to Heritage "we decided to walk away based on the conversation we had two weeks ago. This makes the playing field for market share more even and I assume since you were looking for one more customers that you are good now. Tell him you don't think the team is going to walk from anymore share at this point."

431.    Both Heritage and Dr. Reddy's were able to significantly raise prices across the board, nearly simultaneously, as a result of their agreement, in late April 2013 and early May 2013, respectively.

432.    Over the next several years, the market remained highly stable, but at supracompetitive levels.

4.      **Doxy DR**

a.      *The Heritage/Mylan Agreement*

433.     Mylan served as the exclusive generic in the market for Doxy DR until July 2013 when Heritage entered the market. Mylan and Heritage then dominated the market for Doxy DR until Mayne entered the market in 2014.

434.     While Mylan held exclusivity over the Doxy DR generic market, prices remained high, as would be expected without competition. By 2013, Heritage considered entering the Doxy DR market. Aware that the entrance of a second manufacturer typically drives down prices, Heritage contacted Mylan before entering the market for Doxy DR to coordinate pricing and market share in alignment with their "fair share" agreement to prevent price from eroding when Heritage entered.

435.     In April 2013, Glazer and Malek traveled to India to meet with two executives of Heritage's parent company, Emcure. Glazer and Malek met with Satish Mehta, the CEO of Emcure, and Vikas Thapar, the President of Emcure. The purpose of their trip was to discuss Heritage's plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition. These discussions resulted in a decision to work out an agreement between Heritage and Mylan relating (at least) to Doxy DR. Mehta would reach out to Rajiv Malik, President and Executive Director at Mylan, in order to facilitate subsequent communications between Glazer and Malek and their counterparts at Mylan.

436.     In early May, upon return to the United States, Heritage employees at many levels began to reach out to their counterparts at Mylan to discuss Doxy DR pricing and market allocation.

437.     For instance, On May 3, 2013, Malek asked O'Mara (Heritage) to set up a call between Malek and his counterpart, the Vice President of Sales at Mylan. The next day, Malek learned that the Vice President of Sales had little to do with the National Accounts and O'Mara instead provided Malek with contact information for James Nesta, a Vice President and Executive Director at Mylan. Malek immediately connected with Nesta through LinkedIn. Malek and Nesta communicated by phone on multiple occasions and continued to communicate about various drugs, including Doxy DR.

438.     Additionally, on May 7, 2013, Glazer e-mailed Malik, copying both Mehta and Thapar: "Rajiv [Malik]: Would like to schedule a time for a call to catch up and discuss some recent Heritage

1  news. Please let me know when you are available and we'll pencil it in." Malik responded with a phone

2  number where he could be reached in England and the two spoke the next day.

3      439.    During their May 8, 2013 phone call, Glazer and Malik reached an agreement to refrain

4  from competing in the Doxy DR market. Glazer told Malik that Heritage intended to pursue two of

5  Mylan's large Doxy DR customers (wholesaler McKesson and retail pharmacy CVS), who collectively

6  comprised 30% of the market. Glazer confirmed they would not price aggressively (lower than Mylan)

7  and Malik responded that Mylan would "play fair," agreeing to give up the two accounts to Heritage.

8      440.    Over the course of several discussions, Malik reached an agreement with Glazer

9  whereby Mylan would give up its accounts with McKesson and CVS based on the understanding that

10  Heritage would coordinate with Mylan to keep prices of Doxy DR elevated. Malik made clear that

11  Mylan entered this agreement willingly because Heritage had abided by its "fair share" agreements with

12  Mylan in the past on other drugs by allowing Mylan to enter the market without competition. Malik

13  told Glazer he would inform others at Mylan about their agreement. Similarly, Glazer kept Malek

14  informed on his conversations with Mylan.

15      441.    In the months that followed, Mylan surrendered the McKesson and CVS accounts to

16  Heritage.

17                          *i.*      *Wholesaler A*

18      442.    In June 2013, Malek met with a senior executive from "Wholesaler A" (believed to be

19  McKesson) at an HDMA Conference in Orlando to discuss potential product opportunities, including

20  Doxy DR. Very shortly thereafter, Heritage submitted a detailed product proposal to Wholesaler A and

21  Malek continued to reiterate to them Heritage's strong interest in entering a supply agreement for Doxy

22  DR over the following days.

23      443.    Heritage and Mylan executives remained in touch and continued to discuss their market

24  allocation scheme during this time. On June 11, Michael Aigner, a National Account Manager at Mylan,

25  called O'Mara and spoke for nearly ten minutes. O'Mara then immediately called Malek to report his

26  conversation, initially leaving a voicemail, but connecting 15 minutes later for a 7-minute conversation.

27      444.    On June 18, 2013, a senior manager at Wholesaler A contacted Lance Wyatt, a National

28  Account Manager at Mylan, to inform him of the unsolicited bid he received from a new entrant

(Heritage) on Doxy DR and offer Mylan the opportunity to submit a bid to retain the business by June 21, 2013. This is a customary practice in the industry referred to as "Right of First Refusal" ("ROFR") and if often included in the terms of supply contracts between manufacturers and their customers, allowing the incumbent manufacturer an opportunity to beat a competitor's price and retain the business. Keeping its agreement with Heritage to cede a customer, Mylan failed to submit a bid.

445.    On June 27, 2013, with no counterbid from Mylan, Wholesaler A entered a distribution agreement with Heritage to serve as the wholesaler's primary supplier of Doxy DR. To date, Heritage maintains Wholesaler A's Doxy DR business without any competition from Mylan.

*ii.    The Pharmacy*

446.    In July 2013, Mylan upheld its agreement with Heritage to cede the "Pharmacy" (believed to be CVS) account for Doxy DR.

447.    On July 8, 2013, Heritage submitted a proposal to the Pharmacy to bid for Doxy DR business. The Pharmacy rejected the bid the following morning because the pricing was too high, and Heritage submitted a revised bid on July 11, 2013.

448.    Heritage maintained communications with Emcure, its parent company, throughout the bidding period so that Emcure could communicate with Mylan to ensure they maintained their agreement not to compete. Mehta spoke with Malik on July 18, 2013 and then Thapar followed up by e-mailing Glazer, "Satish spoke to Rajiv.  Call me when free." Glazer spoke with Thapar and then e-mailed Malik asking if he had time for a call that day. Malik responded that he could call Glazer later that evening.

449.    Malik called Glazer, left a voicemail, and Glazer returned the call fifteen minutes later. They had a 4-minute conversation where Glazer conveyed Heritage's strategy and position about the Pharmacy bid and Doxy DR in general. Glazer told Malik that Mylan's reaction to Heritage's bid with the Pharmacy would "set the tone of whether this is a high priced item or more erosion."

450.    Malik immediately spoke to certain Mylan employees and Mylan ultimately walked away from the Pharmacy.

451.    On August 6, 2013, Aigner (Mylan) called O'Mara (Heritage) and had a 13-minute conversation.

452.    On August 15, 2013, an executive at the Pharmacy contacted Gary Tighe, a National Account Manager at Mylan, to inform him it had received an unsolicited bid for Doxy DR business and provide a short window for Mylan to submit a counter bid to retain the business.

453.    In keeping with its agreement with Heritage, Mylan submitted a counter bid, but only lowered its price by $10, knowing the price adjustment would not be enough to retain the business. The pharmacy contacted Tighe again later that day to notify him Mylan's price reduction would not be enough to maintain the business and offer Mylan a second opportunity to lower its price. Tighe responded that he would let the pharmacy know by morning. Mylan declined to submit a revised bid to retain the Doxy DR business at the Pharmacy.

454.    In September 2013, the Pharmacy awarded its Doxy DR business to Heritage. To date, Heritage still maintains the Doxy DR business at the Pharmacy without any competition from Mylan.

                        *iii.    Other Customer Accounts*

455.    Once Heritage entered the market and Mylan allowed Heritage to obtain the business of these two large customers, Heritage maintained their agreement by ensuring the new market share equilibrium remained intact. Heritage walked away or refrained from competing on Mylan customers so as not to upset the balance.

456.    In November 2013, Heritage refrained from competing against Mylan on one of their large retailer accounts for Doxy DR. Malek wanted to check in with Mylan to see if this was an account they intended to keep as part of the market re-allocation agreement before soliciting the business. On November 25, 2013, Malek tasked O'Mara (Heritage) to check in with Mylan. Malek e-mailed O'Mara, "can you reach out?" and O'Mara responded: "I have tried with [Aigner (Mylan)] and nothing. Will try again."

457.    Malek also e-mailed Glazer, suggesting Heritage expected an agreement to transfer one more account from Mylan to Heritage, "Mylan is trying to protect [the one large account at issue]. We should reach out to rajiv [sic.] [Rajiv Malik (Mylan)], we need one more account and we are done." Heritage clearly sought to gain Mylan's permission before taking any action that might disrupt their market share agreement.

458.   After checking in with Mylan, Heritage ultimately declined to pursue the Doxy DR business at the large retailer.

b.   *The Heritage/Mayne Agreement*

459.   In February 2014, a new competitor, Mayne (formerly Midlothian Labs) entered the Doxy DR market. Even before launching their product, Mayne approached Heritage to discuss its plan, recognizing that it would need to establish an agreement to coordinate a re-balancing of market share for each company. On January 7, 2014, Gloria Peluso-Schmidt, a Director of National Accounts for Mayne, called Sather, a National Account Manager at Heritage, for 12 minutes and Mayne agreed not to compete with Heritage in the Doxy DR market.

460.   Mayne's initial strategy was to target Mylan customers because Mylan held approximately 60% of the Doxy DR market at the time. This proved to be difficult, however, without an agreement yet in place with Mylan.

461.   For instance, Mayne bid on a large wholesaler currently held by Mylan. The wholesaler asked Heritage to submit a competing bid as well, but Heritage declined, consistent with their arrangement not to compete against Mayne. Mylan retained the business and Mayne's Executive Vice President of Generic Products, Chris Schneider, provided Peluso-Schmidt his assessment of the situation based on his experience in the industry: "How I read this is Mylan has given up several large customers to Heritage and they are not giving any more. We need to go after business at Heritage also." Peluso-Schmidt replied "Perhaps. . . ."

462.   Paluso-Schmidt maintained conversations with Sather about Doxy DR as she continued to pursue a customer base for Mayne. They spoke by phone on March 13, 2014 and again for 17 minutes on March 17, 2014.

463.   After her conversation with Paluso-Schmidt on March 17th, Sather e-mailed Malek and others at Heritage to recount their latest conversation and the understanding they reached. In an e-mail titled "Midlothian [Mayne] intel on Doxy DR," Sather stated:

> I just spoke with [G.S.] of Midlothian (Mayne Pharma) about Doxy DR. She is the "one-man" show for that company -- she has all accounts including GPOs. She has not been able to get much share on the product yet, so she says.

> She did not bid OneStop, we have that customer. She did not bid Optisource, we have that customer, and she was aware that Rick had no interest in switching.
>
> She has been shut down at WalMart (Walmart said they couldn't go back to Mylan to reduce price again after we bid); and she was shut down at Rite Aid, Cardinal and ABC -- stating Mylan does not seem to want to give up any share. I shared info that we chose not to bid at Cardinal when asked.
>
> She will be bidding it on the HD Smith RFP. She will be targeting M&D now. She may go after NC Mutual but the usage is very small there. She already has some GPO business and they already have Publix and WinnDixie business. (Important for tracking reports). They are nowhere near a contract with WAG yet so she feels like that is not an option.
>
> She is feeling pressure from the Mayne Pharma folks to get some share on this product asap. I let her know what accounts we had locked up -- and I got the impression she would not target those folks.

464.    Malek replied "[t]hanks for the notes below. How well do you know [Paluso-Schmidt]?" And Sather responded, "I know her pretty well from over the years in the industry."

465.    Two weeks later, however, Heritage learned Mayne made an unsolicited bid for Doxy DR to one of Heritage's large retail pharmacy accounts. Malek e-mailed Sather on March 31, 2014, saying Mayne "[t]ook a shot at our doxy dr [at the large pharmacy account]. Can you reach out?" Sather (Heritage) responded "Yes - I can."

466.    On April 1, 2014, Sather spoke with Paluso-Schmidt for 27 minutes, then immediately texted Malek: "[s]poke with [Paluso-Schmidt] of Midlothian. Said she had to go to [the large pharmacy customer]. Just got declined at Walgreens and went back a second time to cardinal and got declined again." Malek replied, insisting that Heritage "can't walk from [the large pharmacy customer]. Tell her to try Walmart."

467.    Paluso-Schmidt and Sather spoke again the next day for 11 minutes. Malek also e-mailed Glazer, relaying the news about Mayne and their status with the pharmacy: "[w]e are going to have to take doxy dr 30% lower at [the large pharmacy customer]. They don't pick up the phone for less than 20% difference. In this case, we spoke with Midlothian and they have struck out completely on getting share. They have gone to wag [Walgreens] and cah [Cardinal Health] twice and mylan won't

1   budge. Please let me know your thoughts."

2      468.   Paluso-Schmidt and Sather spoke again on April 9, 2014 for 3 minutes. Sather then

3   reported their conversation to Malek and O'Mara: "Just got a call from [Paluso-Schmidt] at Midlothian

4   and she said she has offers in to One Stop and Econdisc."

5      469.   On April 10th, 2014, Paluso-Schmidt and Sather exchanged a series of text messages.

6   Sather told Paluso-Schmidt that Heritage would "protect" the accounts they don't currently hold

7   because they are "strategically aligned" with both, implying their ongoing agreement with Mylan:

8          (1:14pm) Sather: Hi! It is [Sather]! Just getting back to you on our
9          discussion yesterday. I don't have either account but my boss said since
           we are strategically aligned with both they will probably not move. We
10         will protect. Sorry – I know it is not the news you wanted to hear.

11         (1:16pm) Paluso-Schmidt: Thanks. Had he given up CVS we would not
           have gone after the other two. We'll just keep going back as soon as we
12         can.

13         (1:18pm) Sather: I am bummed for you. I am keeping my ears open to
           understand the landscape too. I will let you know what I find out. Best
14         bets are the RFPs that are out now.

15
           (1:19pm) Paluso-Schmidt: Need volume. Need one Large account.
16

17      470.   Mayne continued to pursue large customers for the several months and Heritage walked

18   away from one account in May 2014 when Mayne underbid Heritage's price. Upon learning of Mayne's

19   bid, Keith Fleming, Associate Director of Pricing and Contracts at Heritage, asked Malek, "[l]et me

20   know what you want me to do on this. Would like to keep, but at the same time, Midlothian will keep

21   going after accounts." Malek replied, "[w]e will walk."

22      471.   In November 2014, Mayne again placed bids with McKesson One Stop (a wholesaler)

23   and Econdisc Contracting Solutions ("Econdisc") (a GPO that includes Express Scripts, Kroger, and

24   Supervalu). On November 20, 2014, Matthew Edelson, a Senior National Account Manager at

25   Heritage, e-mailed Malek and others at Heritage, conveying that "Midlothian has taken another shot at

26   our business on the Doxy 150mg at Econdisc and we have to respond to this in a timely manner."

27      472.   The next morning, Sather sent a text message to Paluso-Schmidt: "Happy Friday! Do

28   you have a minute to talk about Econdisc?" Paluso-Schmidt (Mayne) responded, "Yes. Call me." Sather

1    called Paluso-Schmidt and the two spoke for 15 minutes.

2        473.    Sather asked Paluso-Schmidt what her goals were for Doxy DR and Paluso-Schmidt

3    responded that Mayne was looking for market share and needed a "big customer like Econdisc." She

4    explained Mayne submitted an offer to McKesson 10 days earlier and Sather suggested that Heritage

5    might be willing to walk from Econdisc if Mayne agreed to withdraw its offer from McKesson and not

6    to price Doxy DR aggressively.

7        474.    Right after her conversation with Paluso-Schmidt, Sather e-mailed Malek with the

8    subject, "spoke with [Paluso-Schmidt]" and saying "[c]an discuss any time." Sather conveyed her

9    conversation to Malek and exchanged several text messages and voicemails with Paluso-Schmidt over

10   the course of the day.

11       475.    Later that afternoon, November 21st, O'Mara e-mailed Malek and others at Heritage,

12   saying "Midlothian coming after us @ McKesson. Will discuss with you on Monday." Malek forwarded

13   the e-mail to Sather, who responded, "[Paluso-Schmidt] and I played phone tag after I had spoken to

14   you for the second time so we will definitely connect Monday."

15       476.    On November 24, 2014, Sather and Paluso-Schmidt connected and spoke for 6

16   minutes. Sather then e-mailed Malek with an update, "Just spoke with her ... can you call me anytime?"

17   After speaking with Malek, Sather formally offered Paluso-Schmidt an agreement via text message: "If

18   you retract McK[esson] - we will give up Econ[disc]. I can talk anytime."

19       477.    On November 25, 2014, Malek e-mailed Sather asking "[d]id you speak with [Paluso-

20   Schmidt]?" Sather responded "Yes -- told her exactly what we talked about. She is on vacation this

21   week but was going to try to rescind McKesson. . . ." Malek ended the conversation by saying "[s]ounds

22   like we know what we need to do."

23       478.    In the weeks following, Glazer confirmed through internal e-mail communications that

24   Heritage was "walking away from one [customer] so pricing would stabilize" and that Heritage "wanted

25   to give Midlothian [market share so they stop eroding" the price for Doxy DR.

26       479.    Communications between Sather and Paluso-Schmidt continued throughout December,

27   including text messages and an in-person meeting at the American Society of Health-System

28   Pharmacists ("ASHP") conference on December 9, 2014.

480.     Econdisc put the Doxy DR business out to bid again in January 2015 and Heritage intentionally bid higher than Mayne, providing a "cover bid" and fulfilling Heritage's agreement to "walk away" from Econdisc. In March 2015, a Heritage employee confirmed this, saying "[w]e basically walked from Doxy DR" at Econdisc.

481.     The agreements between Heritage, Mayne, and Mylan on Doxy DR business and pricing continued and all three companies held the understanding that they would refrain from competing on market share and eroding price. In September 2015, a large nationwide pharmacy chain approached Heritage requesting a bid on Doxy DR. Sather confirmed internally that Heritage had the capacity to bid, but Malek cautioned that "[w]e need to know why this is out to bid and find out who the incumbent is" before providing a response.

482.     Upon learning that Mayne served as the incumbent supplier, Sather contacted Paluso-Schmidt. Paluso-Schmidt conveyed that Mayne had no supply issues and that the pharmacy chain was simply shopping for a better price. Keeping with their agreement, Heritage refused to provide a bid. Sather sent a follow-up text message to Paluso-Schmidt reiterating Heritage's intent to keep their agreement, "Confirming we are not bidding." Paluso-Schmidt replied, "Thank you."

483.     In a competitive market, Heritage and Mayne's entry into the Doxy DR market should have spurred price competition across all customers and lowered market prices. Instead, by allocating large accounts, Mylan and later Heritage were able to stabilize Doxy DR prices across the market at supracompetitive levels.

484.     These Defendants also maintained their communications at trade association events throughout this period, providing them ample opportunity to coordinate pricing and market share agreements in-person. Key pricing executives from Heritage, Mayne, and Mylan all attended the Feb. 20-22, 2013 GPhA Annual Meeting in Orlando, Florida. And key pricing executives from these three companies attended the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland. *See* Exhibit A.

485.     NADAC data confirms that average market prices for Doxy DR increased dramatically between November 2012 and February of 2014 and remained artificially high thereafter. Pricing for various dosages are depicted below.





### 5.    Hydralazine HCL

486.    While not arising in the context of market entry, Heritage engaged in conduct similar to that alleged above in connection with Hydralazine HCL.

487.    Heritage agreed with another generic manufacturer that is not a Defendant in this Complaint to allocate customers for Hydralazine HCL pursuant to the larger fair share agreement alleged throughout this Complaint.

**B.  Agreements to Fix Prices**

488.    In addition to reaching agreements with competitors to allocate markets in connection with entry of a new competitor, Heritage and the other Defendants routinely sought and obtained agreements with competitors to fix and raise prices.

489.    This was often done by "socializing" a competitor to a price increase. This involved a generic manufacturer such as Heritage reaching out to competitors to first raise the possibility of a price increase, and then obtaining an agreement to join the price increase or that the competitor would not take advantage of the proposed price increase by bidding to take the initiating manufacturer's customers. Such an agreement would allow each competitor to maintain its market share and avoid competition despite the price increase.

490.    Often, a generic manufacturer such as Heritage would identify a large group of drugs for which it would like to increase prices, and then seek to socialize its competitors to obtain their agreement as described above for as many of these drugs as possible. Heritage engaged in such collusive multi-drug price increases, as set forth immediately below. Teva also engaged in such collusive multi-drug price increases, as set forth in Section XI.B below.

### 1.    Doxy Mono

491.    In February 2013, Heritage learned from a customer that demand for some Doxycycline products was increasing and wanted to use this as a pretext to raise the prices of Doxy Mono. Heritage reached out to its competitors in the Doxy Mono market – Lannett, Mylan, and Par – to discuss and form agreements on price increases and prevent loss of market share.

492.     On March 7, 2013, Sather spoke to Sullivan, the Director of National Accounts at Lannett, for fourteen minutes.

493.    On March 13, 2013, Sather e-mailed Sullivan, saying "Hi! I just had a question for you on Doxycycline Monohydrate. Would you have a chance to chat today? Or tomorrow? Let me know a convenient time for you…" Later that day, they spoke for five minutes and discussed Heritage's intent to increase Doxy Mono prices.

494.    On March 17, 2013, Malek e-mailed himself a spreadsheet of various items for him to follow-on, including "Price Increases: Take Doxy Mono up more than 3x asap." On March 21,

2013, Malek e-mailed Glazer that he intended to increase the price for Doxy Mono by as much as four times the current price and asked for Glazer's thoughts.

495. On March 25, 2013, Malek e-mailed his sales team, indicating that Heritage would be "taking a price increase in the market this week" for Doxy Mono and another drug. Heritage continued to contact its Doxy Mono competitors throughout 2013. Sather spoke, texted, and met in person with several different Lannett employees during this time.

496. On March 25, 2013, Sullivan e-mailed her boss relaying news of the price increase Heritage intended to institute. The e-mail was titled "Recap" and in it she claimed to be "[w]orking on a WAC & SWP review" for certain drugs, including Doxy Mono, but heard that "there will be a price increase on Doxycycline from Heritage soon. We are waiting to find out when and why." Sullivan and Sather continued to communicate through numerous phone calls, text messages, and in-person meetings over the next several months.

497. On April 25, 2013, Sather called Sullivan and left a message. When Sullivan returned the call the next day, they spoke for approximately eight minutes.

498. In April 2013, as outlined above, Malek and Glazer traveled to India to meet with Mehta and Thapar of Emcure, where they discussed how Heritage could implement price increases without instigating competition, particularly in the Doxy DR market. Afterward, Mehta contacted Malik of Mylan, a competitor in both the Doxy DR and Doxy Mono markets, to facilitate communications between Mylan and Heritage counterparts.

499. Continued communications between Doxy Mono competitors often overlapped with trade association meetings they attended together. For example, on May 13, 2013, Sullivan and Sather spoke for approximately six minutes and the next day, they attended a conference together where they discussed Doxy Mono.

500. On May 14, 2013, Sather and Sullivan exchanged text messages to coordinate time to speak at the conference, which confirmed plans for a "market wide increase," seemingly in Doxy Mono:

> Sather: Meeting in parking lot at Cardinal at 5:45 to carpool over. Can meet you at Cardinal then or at the bar? Should be to bar a little after 6.

Sullivan: I have a conference call in a half hour about a market wide increase. I might have to meet you at the bar.

Sather: Ok sounds good – see u there

Sather: Is it doxy mono?

Sullivan: Headed over now.

501.    On June 4, 2013, Sather reached out to Grace Wilks, Director of National Accounts at Lannett by phone and text message. On June 5, 2013, Sather, Wilks, and Sullivan attended the same conference, during which Sather and Sullivan exchanged numerous calls and text messages. This conference, the HDMA June 2-5 Business and Leadership Conference in Orlando, Florida, was also attended by key executives for generic sales and pricing from Mylan and Par.

502.    Heritage, Lannett, Mylan, and Par agreed to implement their price increases during the summer of 2013 and communicated frequently throughout this period, including the days surrounding Lannett's June 12 Doxy Mono price increase.

503.    On June 11, 2013, O'Mara (Heritage) spoke to Aigner (Mylan) for nearly ten minutes.

504.    Sullivan also communicated regularly with Karen O'Connor, Vice President of National Accounts at Par during this time. They were friends and saw each other frequently at trade shows and customer conferences, discussing anticompetitive information.

505.    O'Connor communicated frequently with Aigner in June and July of 2013, including several phone calls on June 7, 2013 and June 13, 2013.

506.    O'Connor also communicated frequently with Wilks, including through nine text messages exchanged on June 11 and 12, 2013.

507.    Lannett increased its price for Doxy Mono on June 12, 2013. One customer contacted Lannett in July of 2013 to request a lower price for Doxy Mono and a Lannett National Account Manager responded, "We just took a price increase on this item effective 6/12/13. This is our standard pricing across the board going forward. Any pricing you see out there right now will not be that low for long."

508.    Heritage maintained communications with Lannett and other competitors. Due to concerns about supply issues, Heritage was slower to raise its prices. In October 2013, Sather informed

a customer that "[w]e are expecting continued supply issues with" Doxy Mono and that "supply will be tight through Oct and Nov." In a competitive environment, other Doxy Mono competitors would have viewed Heritage's supply problems as opportunities to gain market share. However, Defendants' "fair share" agreement mitigated any customer losses for Heritage. To ensure their market share stability, Heritage kept in frequent communication with their competitors, reaffirming Heritage's commitment to their agreement. For instance, Sather met in person with Sullivan and O'Connor during a conference in Arizona on August 1 and 2, 2013.

509.   A flurry of communications between the four competitors followed throughout August 2013. As Heritage planned its Doxy Mono price increase, Malek asked Sather to obtain specifics regarding Lannett's price increases. Accordingly, Sather and Sullivan, while both attending the NACDS 2013 Total Store Expo August 10-13, exchanged text messages on August 12, 2013:

> Sather: From our conversation, [i]ncreasing WAC too?
>
> Sullivan: Yes
>
> Sather: When are you guys changing WAC or have u already?
>
> Sullivan: Are you free at 4:30?
>
> Sather: Yes—but still need to hang around for 5pm mtg
>
> Sullivan: OK I'll swing by

510.   Notably, Aigner and O'Connor also attended this conference.

511.   On August 13, while still together at the conference, Sather texted Sullivan, saying "Let's connect sometime today—need a little more specifics on the $ we discussed." Sather also exchanged several text messages and phone calls with Lauren Carotenuto, National Accounts Representative for Lannett and another conference attendee. O'Connor, who also attended the conference, received a text message from Wilks the same day.

512.   Later that evening, the Senior Vice President of Generic Sales at Par (likely Jon Holden, who attended the conference) sent an e-mail to Par's Vice President of Marketing and Business Analytics (likely Michael Altamuro, who also attended the conference), reading: "I hear that Lannett is taking a price increase on doxy mono and Heritage will follow." The e-mail was forwarded internally at Par with the instruction: "FYI…we will follow. . . . No new opps until we see where pricing ends up."

513.     On August 20, 2013, Sather e-mailed Malek, confirming that Lannett "tripled WACs and did/will do similar to contract prices."

514.     Mylan and Par announced their price increases for Doxy Mono in the summer of 2013.

515.     By the spring of 2014, Heritage also increased their prices. On January 23, 2014, Sather informed a large supermarket chain customer that "I also wanted to let you [know] that we are looking to take a price increase on all the Doxy Monohydrate skus some time in 2014." In March 2014, Heritage increased its Doxy Mono prices with at least one customer and on April 22, 2014, Malek held a teleconference with Heritage's sales team to discuss strategy for increasing prices on eighteen drugs, including Doxy Mono, which was slated for a "big price increase."

516.     Sather was responsible, among others, for communicating with Lannett about Doxy Mono. Right after the Heritage conference call on April 22, she contacted three different competitors and reached pricing agreements covering Doxy Mono and four other drugs (Glyburide-Metformin, Verapamil, Nystatin, and Paromomycin). One of those communications included a 29-minute phone call with Sullivan about pricing for Doxy Mono.

517.     O'Mara was primarily responsible for communicating with Mylan and contacted Aigner the next day (April 23) to reach an agreement on price increases for Doxy Mono (as well as Glipizide-Metformin and Verapamil). Immediately after his conversation, O'Mara e-mailed Malek and Sather, with the subject line "Mylan:" "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

518.     On May 8, 2014, Malek sent an e-mail to O'Mara asking, "Did you ever to [sic] with [Michael Burton] at Par?" Par was a competitor with Heritage for two of the target drugs on the list, Doxy Mono and Methimazole. O'Mara and Burton spoke on the phone on June 2, 2014.

519.     Malek also e-mailed the entire Heritage sales team on May 8, asking for confirmation on everyone's progress on speaking with their competitor counterparts about price increases. Sather, responsible for communicating with Lannett responded: "Jason: I made contact with all my take aways -- with positive results. I can resend those notes or talk with you on any details."

520.     Sather then attended the MMCAP Conference in Bloomington, Minnesota May 12-15, 2014, where she met in person with numerous competitors to discuss price increases, including with Sullivan regarding Doxy Mono. Sather reported back to Malek via e-mail on her success reaching pricing agreements, including with Lannett: "Hi Jason: At the MMCAP meeting yesterday, spoke with some other industry reps and found similar like minding on the pricing strategies we discussed. Overall, spoke with … Lannett…" Par and Mylan executives also attended this conference, including O'Connor.

521.     Sather continued her outreach to other Doxy Mono competitors through joint attendance at conferences. On June 3, 2014, while attending the HDMA 2014 Business and Leadership Conference in Arizona, Sather met O'Connor and Sullivan for dinner and drinks along with other competitors. Their continued communications during the price hike implementations provided opportunities to re-affirm their collusive agreements and coordinate pricing.

522.     By way of example, Heritage's IMS NSP price for 50mg Doxy Mono tablets more than tripled between February and July 2013. Lannett's IMS NSP price for 75mg tablets steadily increased between February and July 2013, more than doubling during that period. Mylan also increased IMS NSP prices for 75mg tablets in the summer of 2013, as its prices nearly doubled from a low in June to a high in November. Lannett's IMS NSP price for 100mg Doxy Mono tablets approximately doubled between January and August of 2013. Heritage, Mylan, and Par IMS NSP prices for 150mg Doxy Mono tablets all increased significantly between the spring and fall of 2013.

523.     Between the summer of 2013 and spring of 2014, Heritage, Lannett, Mylan, and Par had ample opportunity to coordinate their price increases and market share agreements in person. Key pricing executives from at least Heritage, Mylan, and Par attended the February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida. Key pricing executives from at least Heritage, Lannett, Mylan, and Par attended the June 2-5, 2013 HDMA Business & Leadership Conference in Orlando, Florida; the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland; the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland; the February 23-26, 2014 ECRM Retail Pharmacy EPPS in Amelia Island, Florida; the May 12-15, 2014 MMCAP National Member Conference in

1  Bloomington, Minnesota; the June 1-4, 2014 HDMA Business & Leadership Conference in Phoenix,

2  Arizona; and the June 3-4, 2014 GPhA CMC Workshop in Bethesda, Maryland.

3        **2.**      **Heritage 2014 Price Increases**

4        524.      In early 2014, Malek held a meeting with Heritage pricing executives, Keith Fleming,

5  Associate Director of Pricing and Contracts, and Daniel Lukasiewicz, Heritage's Senior Manager,

6  Marketing Operations, to ask them to begin analyzing the impact of numerous planned price increases.

7        525.      On April 15, 2014, Heritage's Jason Malek called Nisha Patel, Teva's Director of

8  Strategic Customer Marketing, to discuss price increases on Acetazolamide ER, Glipizide-Metformin,

9  Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, Theophylline, and others. On their 17-minute

10  conversation, Patel agreed that if Heritage increased the prices for those drugs, Teva would either

11  follow or not challenge Heritage's price increases by underbidding.

12        526.      Because Teva was already planning a price increase on Nystatin and Theophylline,

13  Malek and Patel agreed Teva would take the lead on those increases. In subsequent months, Malek and

14  Patel spoke several more times on Heritage's price increases and timing.

15        527.      On April 22, 2014, Heritage held a "Price Increase Discussion" teleconference in which

16  Malek identified 18 drugs that Heritage would target for increase. Prior to the call, Malek circulated to

17  his sales team a spreadsheet ("the Heritage list") which listed each drug, the competitors, and their

18  respective market share. The Heritage list included Acetazolamide ER, Doxy Mono (which was slated

19  for a "big price increase," as described above), Fosinopril HCTZ, Glipizide-Metformin, Glyburide,

20  Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline

21  ER, and Verapamil, among others. Malek instructed members of the team to immediately reach out to

22  contacts at each competitor for the drugs on the list and attempt to reach agreement on price increases.

23  Different Heritage employees were identified as being primarily responsible for communication with

24  different competitors.

25        528.      The Heritage sales team promptly began to contact their competitors. For example,

26  Sather communicated with three counterparts at different competitors, reaching agreements with all of

27  them to increase prices. First, she spoke with Knoblauch (Sun/Caraco) for 45 minutes and agreed to

28  increase prices for Nystatin and Paromomycin. Then, she spoke to Michael Dorsey, a National Account

Manager at Actavis for 9 minutes, which led to an agreement to increase prices for Verapamil and Glipizide Metformin. Finally, she spoke to Sullivan (Lannett) for 29 minutes and they agreed to raise the price of Doxy Mono.

529.    Heritage's O'Mara also reached an agreement on April 23 with his Mylan counterpart, Michael Aigner, Director of National Accounts, to increase the prices of Doxy Mono, Verapamil and Glipizide-Metformin. O'Mara summarized in an e-mail to Malek and Sather titled "Mylan": "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

530.    A few days later, Malek sent an e-mail to Heritage employee D.L. titled "bindo" referring to Aurobindo stating: "Let me know when you speak with [Paul McMahon, Senior Director of Commercial Operations at Aurobindo.]" On the Heritage list, D.L. was charged with responsibility for communication on Fosinopril HCTZ, of which Aurobindo was a competitor. Aurobindo was also a competitor with Heritage on Glyburide and Glyburide-Metformin. D.L. exchanged numerous voicemails with McMahon on April 28 and 29, 2014.

531.    In addition to Teva, Malek took responsibility for reaching out to Ascend regarding Nimodipine. Following the market-wide "fair share" agreement, as a new entrant into the Nimodipine market, Ascend agreed to enter at a high price to avoid price erosion as set forth above. In exchange, Heritage agreed to walk away from certain accounts Ascend targeted to help increase Ascend's market share.

532.    On May 8, 2014, Malek sent an e-mail to the Heritage sales team stating:

> Two weeks back we had a teleconference regarding 13 [sic] products where the pricing dynamics may change.
> We each had takeaways, can everyone confirm or not who they have/not spoken with since our call?
> Need to move forward with the plan asap.

533.    Heritage's Matt Edelson, Senior Director of Sales, responded immediately "Spoke with everyone and waiting in [sic] feedback on Mepro[bamate]." Malek tasked Edelson with communication with Dr. Reddy's on Meprobamate. He exchanged six text messages with Jake Austin, Director of National Accounts at Dr. Reddy's, on April 24, 2014, and then spoke with Austin on May 6, 2014.

534.    Sather responded: "Jason, I made contact with all my take aways – with positive results. I can resend those notes or talk with you on any details." Sather had been tasked with communicating with Lannett on Doxy Mono, Actavis on Glyburide-Metformin and Verapamil, and Sun on Nystatin and Paromomycin, among others.

535.    Also on May 8, 2014, D.L. and McMahon held a 16-minute phone call and then an 18-minute phone call on June 25, 2014. They spoke again for 3.5 minutes on July 7, 2014.

536.    On May 9, 2014, Heritage held another teleconference to discuss price hikes during which the sales team shared their results in forming agreements with competitors.

537.    On June 23, 2014, Heritage employees had a "Price Change Call" to discuss the specific percentage amounts by which they would seek to increase the pricing of certain drugs, including drugs for which they had already obtained agreement from all competitors (or potential future competitors), and the strategies for achieving this goal. The drugs discussed on the call included Acetazolamide ER (75% increase); Paromomycin (100% increase); Glyburide (200% increase); Nimodipine (48% increase); Theophylline ER (150% increase); and Nystatin (95% increase).

538.    Two days later, on June 25, 2014, Malek spoke with Patel and informed her that Heritage would shortly be increasing prices for a number of drugs that Teva was a competitor for.

539.    On June 26, 2014, Sather sent a text message to a large wholesaler customer stating:

> As of 7/1 [m]arket wide we are increasing prices on Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTS, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases – you have those letters.

540.    Sather quickly followed up: "Here are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTS 200%, Glip/Met 100%, Glyburide 200%, Theo ER…150%."

541.    On July 1, 2014, Malek e-mailed Heritages sales team:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.

Please send each day until further notice or until all or [sic] accounted for.

Any questions please call me directly.

542. In the following weeks Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices. Heritage was ultimately able to increase prices on at least Acetazolamide ER, Fosinopril HCTZ, Glipizide-Metformin, Glyburide, Leflunomide, Nimodipine, and Nystatin, as well as others, as set forth below.

a. *Acetazolamide*

i. *Acetazolamide tablets*

543. Even before the Heritage 2014 price increase, Acetazolamide in tablet form was the subject of price-fixing and a "fair share" allocation.

544. Acetazolamide tablets are sold in two dosages: 125 mg and 250 mg. In the spring of 2012, Taro was the only manufacturer of 125 mg tablets, but both Taro and Lannett manufactured the more popular 250 mg tablets. Taro and Lannett conspired to increase the price of both 125 mg and 250 mg tablets beginning in April and May of 2012.

545. Prior to the spring of 2012, Taro and Lannett competed on pricing and market share for Acetazolamide tablets. They implemented independent price increases in different amounts at different times. For instance, Taro increased prices in late 2009, but Lannett did not until a year later.

546. In April and May of 2012, Taro and Lannett suddenly imposed 40-50% price increases in unison, bringing their list prices for Acetazolamide 250 mg tablets to identical levels. Taro's 125 mg tablets increased in price simultaneously.

547. In early 2013, Taro slightly increased prices on both Acetazolamide tablets and by the middle of 2013, Taro and Lannett's market share stabilized as a result of their market sharing agreement. Lannett held approximately 56% of the 250 mg tablet market and Taro held approximately 44%. As the only manufacturer at this time, Taro maintained 100% of the market for 125 mg tablets. When market sales for both tablets are evaluated together, Taro and Lannett's dollar sales across both products remained virtually even. The combined market share (total dollar sales) for both 125 mg and 250 mg Acetazolamide tablets is depicted in the graph below.

1

2



3

4

5

6

7

8

9

10

11

12

13    548.    With their respective market shares allocated by agreement, Taro and Lannett were well-

14    positioned to raise prices without losing customers.

15    549.    Between November of 2013 and February of 2014, Taro and Lannett both imposed

16    over 200% price increases on their Acetazolamide tablets, bringing their 250 mg tablets to identical list

17    prices. Taro's 125 mg tablets saw similar price increases and AWP prices for both products increased

18    significantly.

19

20

21

22

23

24

25

26

27

28

550. The price increases imposed by Taro and Lannett, initially in 2012, then by Taro in early 2013, then most significantly in late 2013, can be seen on the graph below.



551. According to NADAC data, the average market price for generic Acetazolamide tablets saw the following price increases from November 2013 to February 2014

Acetazolamide 125mg: increased by 241%

Acetazolamide 250mg: increased by 265%

552. NADAC data shows that average market prices of Acetazolamide tablets remained artificially high thereafter, as depicted below.



553.     Throughout this period, Lannett and Taro had ample opportunity to coordinate their market share agreements and price increases. They both attended the (i) October 1-3, 2012 GPhA Fall Technical Conference in Las Vegas, Nevada; (ii) June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland; and (iii) October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland. *See* Exhibit A.

554.     The lockstep price increases with nearly perfect market share splits by Taro and Lannett contradicts expected pricing behaviors in a competitive market; it is, however, consistent with Defendants' "fair share" agreement.

                          ii.     *Acetazolamide ER capsules*

555.     As of April 2014, Heritage and Teva controlled 78% of the market for Acetazolamide ER capsules. The only other competitor was Zydus.

556.     As part of the market-wide conspiracy to increase generic drug prices, Heritage began communicating with high level executives at Teva, a competitor on seven of the Heritage list drugs. On April 15, 2014, Malek spoke with Nisha Patel, Teva's Director of Strategic Customer Marketing for more than 17 minutes to discuss increasing the price of Acetazolamide ER capsules and other drugs. Patel had already secured Heritage's agreement to support Teva's price increases in Nystatin and Theophylline. During the April 15 call, Patel agreed that if Heritage raised prices for Acetazolamide ER

1 capsules, Teva would follow suit or at minimum refrain from competing for Heritage's accounts. Malek

2 and Patel's conversations would continue through the spring and summer to coordinate and confirm

3 their price increases.

4       557.    After speaking with Malek on April 15, Teva executives reached out to Zydus

5 executives to coordinate the price increases. Between April 16 and 17, 2014, Patel and Kevin Green, the

6 Senior Director of National Accounts at Zydus, spoke twice regarding Acetazolamide ER prices, first

7 for approximately twenty minutes, then for twelve. They communicated frequently over the next

8 several months, along with other Teva and Zydus executives, as outlined below.

9       558.    As set forth above, on April 22, 2014, Malek held a telephone conference call with the

10 Heritage sales team to dictate a pricing strategy that targeted 18 drugs for price increases, including

11 Acetazolamide ER. In order to implement the price increases without losing customers, Heritage

12 coordinated with competitors to form agreements that prevented competition.

13       559.    To coordinate with Zydus, Malek contacted Kristy Ronco, Zydus' Vice President of

14 Sales, on April 24, 2014 through LinkedIn. Malek wrote: "Hi Kristy, I hope this email finds you doing

15 well. I wanted to see if you have a few minutes to chat. Let me know when you are free." Ronco

16 responded that day "Hi Jason – I'm out in Arizona. I can give you a call tomorrow afternoon or call me

17 anytime."

18       560.    Heritage came to agreements with both Teva and Zydus on price increases and market

19 share. In an internal Heritage e-mail, Malek confirmed the Acetazolamide ER price-fixing agreements

20 and reiterated that Heritage needed to refrain from bidding on contracts held by competitors. Malek

21 previously asked Anne Sather to refrain from responding to a large GPO customer that requested a

22 price quote on Acetazolamide ER. In e-mails on May 6 and 7, 2014, Malek told Sather that he formed

23 agreements to raise the price of Acetazolamide ER and not to compete on customers. Malek said, "[w]e

24 have buy in from all to go up…" and Heritage agreed not to reduce its price in response to the request

25 from the GPO customer. As Malek stated: "We are going to pass [on reducing the price] and most

26 likely are taking an increase within the next week."

27

28

561.   Teva and Zydus also remained in close contact during this time as well. On May 14, 2014, Jessica Peters, an Associate Director of National Accounts at Teva, exchanged numerous text messages with Ronco.

562.   Defendants had many opportunities to speak in person about their agreements. On May 12-15, 2014, Sather attended the MMCAP National Member Conference in Bloomington, Minnesota. She used this opportunity to speak in person with a number of different competitors on pricing agreements. Executives from Teva also attended, such as Nick Gerebi, National Account Manager. On June 1-4, 2014, Heritage's Sather, Glazer, and Malek all attended the HDMA Business and Leadership Conference at the JW Marriott Desert Ridge in Phoenix, Arizona, along with Teva's Patel and Gerebi and Zydus' Green, among others. At this conference, Sather met in person for dinner and drinks with O'Connor and Sullivan, as well as Christopher Bihari, Director of National Accounts at Sandoz. Defendants used these meetings as an opportunity to confirm agreements on pricing and market share.

563.   During these months, Heritage avoided soliciting or bidding on Acetazolamide ER customers supplied by Zydus in order to maintain the artificial equilibrium their conspiracy created.

564.   As set forth above, on June 23, 2014, Heritage held a "Price Change Call" to discuss specific price increases on certain drugs and related strategies, including for Acetazolamide ER, which was targeted for a 75% increase. According to the discussion, the increases on the six drugs discussed would amount to an additional $16 million in profit per year for Heritage and assumed no loss in market share.

565.   On June 25, 2014, Malek spoke with Patel for approximately 14 minutes, confirming that Heritage would soon be increasing prices for a number of drugs sold by Teva.

566.   On June 26, 2014, Heritage began sending out price increase notices to customers for nine different drugs, including Acetazolamide ER. Sather sent a text message to a large wholesaler customer:

> As of 7/1, [m]arket wide we are increasing prices on: Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTZ, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases—you have those letters." She followed up with another text moments later, "Here are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTZ 200%, Glip/Met 100%, Glyburide 200%, Theo ER . . . 150%.

120
COMPLAINT AND DEMAND FOR JURY TRIAL

567.     On July 1, 2014, Malek e-mailed the Heritage sales team with the subject "update - price increase" that read:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

568.     By July 9, 2014, Heritage was able to raise Acetazolamide ER prices to at least 17 customers nationwide. Heritage, Teva, and Zydus collectively implemented a successful 75% on prices for Acetazolamide ER.

b.     *Fosinopril HCTZ*

569.     At all relevant times, Heritage, Aurobindo, Citron, Sandoz, and Glenmark dominated the market for Fosinopril HCTZ. By April 2014, Heritage had a 47% market share for this drug.

570.     On May 2, 2014, Edelson (Heritage) contacted Glenmark's Vice President of Sales, Jim Brown via LinkedIn. Heritage's Lukasiewicz spoke with McMahon (Aurobindo) on May 8, 2014 via phone. That same day, McMahon called Glenmark's Executive Vice President of Generics, James Grauso, and they spoke on the phone. On May 9, 2014, Aurobindo's Tim Gustafson spoke with Glenmark's Director of Sales and Marketing, Jeff Johnson. All of these calls were regarding price increases for Fosinopril HCTZ.

571.     That same day, Heritage held another internal call regarding price increases where Fosinopril HCTZ was on the agenda. Within one month, Anne Sather of Heritage spoke to Aurobindo and Sandoz representatives about the Heritage "price increase strategies" for Fosinopril HCTZ and other generics during an MMCAP conference.

572.     After in-person meetings with Aurobindo's Gustafson and Sandoz' National Accounts Executive, Christopher Bihari, on May 14, Sather confirmed to Malek that the three were of "similar like minding on the pricing strategies we discussed." The next day, representatives of Aurobindo and

1  Sandoz spoke numerous times.

2       573.    On June 3, 2014, Sather texted Bihari and invited him to meet with a group of

3  competitors at the Sandbar Restaurant while at an HDMA conference in Phoenix. This initiated a series

4  of communications during the summer of 2014 that included three calls between Gustafson and Bihari

5  and five calls, and multiple texts, between Gustafson and Johnson. Gustafson would have one final call

6  with Johnson on August 26, 2014, before going radio silent until April 8, 2015.

7       574.    Heritage's Lukasiewicz and Aurobindo's McMahon spoke on June 25, 2014 via phone,

8  and again on July 7, 2014.

9       575.    On June 25, 2014, Sather texted Citron's Kaitlin Alexander to find out if Citron was

10  entering the market for Glyburide but found out that Citron was actually entering the market for both

11  Glyburide and Fosinopril HCTZ. Sather informed Alexander of the pricing scheme. Then, on July 1,

12  Citron's Executive Vice President of Sales & Marketing, Karen Strelau called Lukasiewicz, informing

13  him that she had been "looped" in on the pricing plan and that Heritage employees should not contact

14  Citron employees via e-mail. Strelau also told Lukasiewicz that Sather should communicate through

15  Citron's Vice President of Sales, Laura Short, if she had sensitive information about Fosinopril HCTZ

16  or other price increases. The following day, Short and Sather spoke for over 20 minutes. Their

17  conversations continued through July and August 2014.

18       576.    Lukasiewicz also spoke directly with Grauso on July 18, 2014 and July 30, 2014. On July

19  28, 2014, Short called and texted McMahon to discuss Fosinopril HCTZ.

20       577.    On June 26, 2014, Heritage began sending out Price Increase Notices to its Fosinopril

21  HCTZ customers. On June 27, McMahon and Grauso spoke twice.

22       578.    By July 9, 2014, Heritage successfully raised prices on 18 different customers for

23  Fosinopril HCTZ. That same day, Citron confirmed that it was trying to match Heritage's price

24  increases. On July 14, 2014, Strelau and Grauso spoke. The next day, Citron matched Heritage's

25  supracompetitive prices.

26       579.    Sandoz also increased its pricing for Fosinopril HCTZ. By early January 2015, it was

27  charging twice as much for Fosinopril HCTZ than it had been one year earlier.

28

1

                    *c.*     *Glipizide-Metformin*

2         580.    At all relevant times, Heritage, Mylan, and Teva dominated the market for Glipizide-

3 Metformin.

4         581.    On April 15, 2014, Malek discussed with his Teva counterpart their intention and

5 agreement to raise the price of Glipizide-Metformin and other drugs.

6         582.    O'Mara (Heritage) spoke to Mylan's Michael Aigner on April 23, 2014 and reached an

7 agreement to raise prices.

8         583.    To complete the conspiratorial triangle, Teva and Mylan were also in frequent contact

9 with one another, including a May 9, 2014 phone call between a Vice President of Sales at Mylan and a

10 National Accounts Director at Teva.

11         584.    Heritage slated Glipizide-Metformin for a price increase on an internal May 9, 2014 call.

12 Heritage informed customers by the end of June of a 100% price increase on Glipizide-Metformin.

13         585.    By July 9, 2014, Heritage increased the price nationwide to 27 different customers for

14 Glipizide-Metformin. Mylan did not challenge Heritage's price increases, while Teva actually increased

15 its bids to potential customers to protect Heritage's increases. By November 2014, K.S. of Heritage

16 reported to Malek that most of Heritage's price increases "had stuck."

17

                    *d.*     *Glyburide*

18         586.    At all relevant times, Aurobindo, Heritage, and Teva dominated the Glyburide market.

19         587.    On April 15, 2014, Malek spoke with Patel and discussed Heritage's intention to raise

20 prices on Glyburide. Patel agreed that if Heritage raised the price, Teva would follow suit.

21         588.    Heritage also brought Aurobindo into the scheme. On May 8, 2014, Lukasiewicz

22 contacted McMahon (Aurobindo) by phone to discuss Glyburide price increases.

23         589.    On May 9, 2014, Heritage held an internal call on price increases, and included

24 Glyburide on the list of drugs set for an increase.

25         590.    One week later, Heritage and Aurobindo representatives spoke to one another at the

26 MMCAP conference in Minnesota. The Heritage representative reported to Malek that the Aurobindo

27 representative expressed "similar like minding on the pricing strategies we discussed."

28

1       591.    On June 23, 2014, Heritage held a "Price Change Call" where it listed Glyburide for a

2   200% increase.

3       592.    In June 2014, Heritage learned of a potential new competitor in the Glyburide market.

4   Sather texted a Citron employee, Alexander, inquiring into whether Citron would be entering the

5   Glyburide market.

6           Sather: Work question: is Citron launching Glyburide anytime soon?

7           Alexander: Yes we currently have the product in our warehouse.

8           Sather: We are raising the price right now – just letting you know. Teva
            says they will follow.

9
            Sather: Aurobindo agrees too.
10
            Alexander: ?
11
            Alexander: You have micronaise brand equivalent.
12
            Alexander: And are you also raising your wacs?
13
            Sather: Sorry – was on conference call. Ours is Micronaise? Is yours
14          Micro or Diabeta?
15
            Alexander: Micro
16
            Sather: I don't think we are changing WAC – verifying now
17
            Alexander: Okay i talked to [K.S., Executive Vice President, Sales &
18          Marketing at Citron] we are def in to raise pricing…are doing this
            immediately, i know she was mentioning teva can take a while to raise
19          prices
20
            Sather: Teva is slow but conversations have been good.
21
            Sather: No change to WAC for us
22
            Sather: We are raising our customers 200% over current market price.
23
            Alexander: Okay ill make sure the appropriate people find out
24
            Sather: Teva has 66% of mkt – great target for share! By [sic] [t]hey
25          should play fair. Aurobindo and us each have about 18% share. Good
            luck!
26
27          Alexander: Thanks! Is this something you will be doing like this week?
28

COMPLAINT AND DEMAND FOR JURY TRIAL

**Sather:** Letters going out this week! A lot of customers have 30 days notices and price protection so real price will be felt in 30+ days

**Alexander:** Perfect makes sense…Your not going anything with glyb/met pricing right?

**Sather:** Not yet – but is on a short list!

**Sather:** Glyburide and Fosi/HCTZ are increasing too – those are Aurobindo items too

**Alexander:** Okay yeah we have that too…Thanks for the info!

593.    Sather quickly reported to the Heritage sales team. Then, on July 2, 2014, Strelau of Citron called Lukasiewicz confirming Citron's agreement to raise prices and informing him that she had been "looped" in on Heritage's plan. On July 2, a different Citron representative spoke to Sather. They continued to communicate throughout the summer of 2014.

594.    By the end of June, Heritage had cemented its price raising agreements with Aurobindo, Citron, and Teva and notified its customers of the hikes. By July 9, Heritage increased the price for Glyburide on at least 17 customers. When Heritage customers, wary of the price increases, contacted Teva to supply alternative bids, Teva representatives instructed their teams "we will not be bidding. Thanks."

595.    Teva also increased its WAC pricing on Glyburide by July 9, 2014. Not even one week later, on July 15, 2014, Citron raised its WAC and AWP for Glyburide to meet Heritage's levels.

596.    Teva and Aurobindo both declined to provide bids when a Heritage customer, outraged with the price increases, requested bids from both companies. Teva and Aurobindo acted at the direction of Heritage's Malek.

*e.    Glyburide-Metformin*

597.    At all relevant times, Actavis, Aurobindo, Heritage, and Teva dominated the Glyburide-Metformin market. As of April 2014, Heritage had 5% market share and was eager to raise prices.

598.    On April 15, 2014, Malek contacted Patel and discussed Heritage's price increase goals with respect to Glyburide-Metformin, as well as other drugs. Patel agreed that if Heritage raised the price on Glyburide-Metformin, as well as the other drugs, Teva would follow with its own price

increases or would not challenge Heritage's price increases by underbidding on Heritage's accounts. Their communications continued over the next several months.

599. Anne Sather of Heritage called Actavis' Director of National Accounts Michael Dorsey. On an April 4, 2014 telephone call, on information and belief, they reached an agreement to increase the price of Glyburide-Metformin and Verapamil.

600. Shortly thereafter, Dorsey informed the sales and pricing team at Actavis of Heritage's intention to raise prices on these two drugs. In an internal April 28 e-mail, an Actavis pricing manager stated, "[Dorsey] made mention of keeping an eye out for an increase on Glyburide/Met and Verapamil IR."

601. On May 1, 2014, Actavis' Vice President of Marketing, Pricing and Contracts, Marc Falkin, who was a recipient of the e-mail described above, called a Teva counterpart. Their communications continued over the next several months.

602. On May 12, Falkin spoke twice with Aurobindo's CEO. Falkin also exchanged thirty (30) text messages with a Teva representative between May 19 and May 22, 2014.

603. Around this same time, several Heritage employees communicated with their counterparts at Aurobindo about the Glyburide-Metformin price increase.

604. For example, Lukasiewicz made contact with P.M. of Aurobindo by phone on May 8, 2014, and then in person on May 14. He reported that he had "found similar like minding on the pricing strategies we discussed."

605. On May 9, 2014, Heritage slated Glyburide-Metformin for a price increase on an internal call. Heritage continued to plan price increases through the next month.

606. On June 25, 2014, Sather exchanged text messages with a Citron representative about raising prices for Glyburide wherein the Citron representative agreed to raise prices for that drug, and then inquired "Your [sic] not doing anything with glyb/met pricing right?" Sather responded, "Not yet- but is on a short list!" Although Citron had approval to sell Glyburide-Metformin, it was not yet actively selling the drug.

607. Heritage increased its WAC prices for Glyburide-Metformin in July 2014.

608.     In an August 20, 2014 text message exchange with a Sun representative, a Heritage representative admitted that Heritage had reached an agreement with Actavis to increase the prices of Glyburide-Metformin and Verapamil:

> Sun representative: Have you heard anything about an Actavis price increase?
>
> Heritage representative: I heard they were on board with it. What item specifically?
>
> Sun representative: I don't know. I am just hearing about an increase but no details. What product have you heard about
>
> Heritage representative: We were communicating on Glyburide/Metformin and Verapamil

*f.     Leflunomide*

609.     At all relevant times, Apotex, Heritage, and Teva dominated the market for Leflunomide. Heritage held a 61% share by April 2014.

610.     During Heritage's April 2014 "Price Increase Discussion" teleconference as described above, Malek identified Leflunomide as one of the eighteen drugs targeted for a price increase. Malek was responsible for communicating with Teva about the Heritage's price increase on this drug (among others).

611.     On April 15, 2014, Malek called Patel about the drugs on his list and Patel agreed that if Heritage increased its prices, Teva would follow or, at a minimum, would not compete with Heritage by underbidding. In the following months, Malek and Patel spoke frequently and Malek kept her informed on the strategy for price increases.

612.     Heritage's Edelson was tasked with communicating with Apotex regarding the Leflunomide price increase. On May 2, 2014, Edelson called Deborah Viera, a Sales Manager at Apotex, regarding Leflunomide prices and they spoke for more than thirteen minutes.

613.     Also, in May 2014, Heritage learned Teva might be leaving the Leflunomide market. On May 6, 2014, Sather e-mailed Malek that "the Teva discontinuation of Leflunomide has everyone in a fuss! Wow – can we take more share???" Malek responded "we may give some to apotex and follow our strategy we discussed. Will have clarity by tomorrow."

614.    That same day, Edelson had two more phone calls with Viera. Edelson then reported to Malek that Apotex "has taken another shot at our Leflunomide….I am waiting for a callback from the VP of Apotex before we do anything." Malek replied, "Let's walk from leflunomide," confirming the strategy he mentioned to Sather. Beth Hamilton, Vice President of Sales at Apotex, called Edelson. They connected four times in two days – first for nine minutes and shortly thereafter for eight minutes on May 6th; then twice on May 7th. Heritage and Apotex representatives thereafter held four phone calls within two days. Upon information and belief, Heritage and Apotex agreed to avoid competition and increase prices on Leflunomide during these calls.

615.    In response to Malek's May 8 e-mail to the Heritage sales team requesting confirmation on agreements reached with competitors, Edelson responded that he spoke "with everyone" and was only waiting for feedback regarding the drug Meprobamate.

616.    On Heritage's May 9 call on "Price Increases," Leflunomide remained on the list of target drugs.

617.    On May 27, 2014, Heritage learned that Apotex increased prices on Leflunomide and Malek confirmed with Edelson, "we are going to increase." By July 9, 2014, Heritage successfully increased prices on Leflunomide for at least fifteen different customers.

618.    On June 25, 2014, Malek told Patel that Heritage would be increasing prices for several drugs sold by Teva.

619.    By July 2014, Teva began to exit the market. In conformity with its agreement, Teva never challenged Heritage's price increases. This decision countered Teva's self-interest, as it could have benefitted by undercutting the higher prices charged by Apotex and Heritage and thereby gained market share.

620.    NADAC data shows that the average market price for Leflunomide rose dramatically between June 2015 and December 2015 and remained artificially high thereafter:

        Leflunomide (10mg): increased by 730%; and

        Leflunomide (20mg): increased by 617%.

g.    *Methimazole*

621.    Prior to Heritage's April 22, 2014 Price Increase discussion call, Malek circulated a spreadsheet listing all drugs targeted for a price increase, the competitors for each such drug, and their respective market shares. Methimazole was among the drugs listed.

622.    Par was a competitor with Heritage on Methimazole. Neal O'Mara was identified as the Heritage employee primarily responsible for communicating with Par on Methimazole and communicated with a counterpart at Par about a price increase for Methimazole.

h.    *Nystatin*

623.    Various forms of Nystatin were already subject to market allocation and price fixing even before Heritage's 2014 price increase.

624.    During the relevant times, Actavis, Par, Perrigo, Sandoz, and Taro dominated the market for Nystatin cream; Actavis, Perrigo, and Sandoz dominated the market for Nystatin ointment; and Teva, Heritage, and Sun (through Mutual) dominated the market for Nystatin tablets.

i.    *Nystatin Cream*

625.    Actavis, Par, Perrigo, Sandoz, and Taro all experienced fluctuations in their respective market shares for Nystatin cream until these market shares suddenly stabilized in 2013. As detailed below, prices *increased* for all these Defendants, even as those with smaller market shares captured more of the market. This runs counter to economic theory, which dictates that competitors must lower prices

to gain market share.

626.     As late as 2009, Sandoz enjoyed approximately a 50% market share for Nystatin cream, Taro had 40%, Perrigo had approximately 7%, and Par and Actavis controlled the remainder. Through 2009 and into 2010, Sandoz's market share began to decline. By the summer of 2010, Sandoz was effectively out of the market. By this time, Actavis and Par also were effectively out of the market. Although Sandoz, Actavis and Par appear to have continued making *de minimis* sales, they each had a market share of less than 1% by the spring of 2011. By May 2011, Taro had captured as much as 96% of the Nystatin cream market, leaving Perrigo approximately a 4% share.

627.     Beginning in June of 2011, Taro and Perrigo dramatically increased their prices for Nystatin cream largely in unison and Actavis, Par, and Sandoz joined these price increases as their market shares increased.

628.     In June of 2011, Taro initiated a large price increase of more than 600%. Rather than compete on price to gain market share, Perrigo almost immediately followed Taro's increase and raised its own prices to nearly identical levels. Perrigo ramped up production and managed slowly to gain some market share over the next two years, but—as contemplated by the overarching "fair share" agreement—market prices remained elevated and stable.

629.     In August, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to eschew price-competition. Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

630.     In November 2011, Actavis ramped up production of Nystatin cream and re-joined the market. It, too, immediately elevated its prices to match that of Taro, Perrigo and Par, also choosing to forego price competition and the prospect of winning a larger share of the market. Even a fourth entrant into the Nystatin cream market did not cause prices to erode.

631.     Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market. Like Perrigo, Par and Actavis before it, rather than compete on price to regain lost market share, Sandoz priced its Nystatin cream at the same inflated level as its co-conspirators. Prices remained stable and elevated even with a fifth seller in

the market.

632.    WAC prices for each Defendant demonstrate that Nystatin cream prices remained relatively stable prior to May 2011 until they increased dramatically and largely in unison around June of 2011, remaining artificially inflated thereafter.



633.    AWP prices for Nystatin cream show the same trend of dramatically inflated and nearly identical prices.

634.    These price increases followed the March 6-10, 2011 ECRM EPPS Retail Pharmacy Conference, February 2012 ECRM EPPS Retail Pharmacy Conference; October 2012 GPhA Fall Technical Conference in Bethesda, Maryland; and June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland, among others, which representatives from Actavis, Par, Perrigo, Sandoz, and Taro attended.

                    *ii.*    *Nystatin Ointment*

635.    Nystatin external ointment prices followed a similar pattern to those of Nystatin cream. Actavis, Perrigo, and Sandoz increased their prices, often while gaining market share, contrary to economic theory. In 2009, Sandoz had captured approximately 75% of the market, while Perrigo had 20% and Actavis 5%. From that point through the summer of 2011, Actavis and Sandoz drastically reduced production until they were effectively out of the market. By the summer of 2010 Actavis had approximately a 0% market share, though *de minimis* sales appear to have continued. By the summer of 2011, Sandoz had approximately a 5% market share.

636.    Beginning in June of 2011, Actavis, Perrigo, and Sandoz increased their prices dramatically and largely in unison.

637.    In June 2011, after Sandoz and Actavis had all but ceded the Nystatin ointment market, Perrigo implemented a large price increase—more than 300%.

638.    Five months later, Actavis ramped up production of Nystatin ointment. Rather than undercut Perrigo's elevated price to gain market share, Actavis hiked its list prices to nearly identical levels as Perrigo. As intended by the overarching "fair share" agreement among Defendants, the list prices and AWP price for Nystatin ointment remained virtually unchanged, even with the addition of a new seller in the market place.

639.    In the summer of 2012, the pattern repeated itself. Sandoz ramped up its production of Nystatin ointment in June. Rather than compete on price to regain its lost market share, Sandoz raised its list prices to nearly identical levels as Perrigo and Actavis. Even with a third market participant, prices remained unchanged as provided for by Defendants' agreement.

640.    WAC prices demonstrate that Nystatin Cream prices remained relatively stable prior to May 2011 until they increased dramatically and largely in unison around June of 2011, remaining artificially inflated thereafter.



Nystatin External Ointment: WAC per Unit

641. Actavis, Perrigo, and Sandoz had the opportunity to discuss pricing of Nystatin ointment at numerous industry events during the relevant period. For example, representatives of each attended the March 2011 ECRM EPPS Retail Pharmacy Conference, and February 2012 ECRM EPPS Retail Pharmacy Conference, among others.

### iii. *Nystatin Tablets*

642. In 2010 and 2011, the Nystatin tablet market was split between Teva and Sun (sold at least in part through its subsidiary, Mutual). During that time, Teva held approximately 60% of the market, Sun held 40%, and they had nearly identical list prices for Nystatin tablets.

643. In the summer of 2012, Heritage entered the Nystatin tablet market. Rather than undercut Teva and Sun's prices to gain market share, Heritage matched Teva and Sun's prices, consistent with the "fair share" agreement they and the other Defendants maintained throughout the generics market.

644. Sun, through its division Mutual, increased Nystatin tablet prices on April 15, 2013.

645. As detailed below, Patel was hired by Teva in April 2013 to "run the pricing team." On July 9, Patel called Malek and they spoke for 21 minutes. The two spoke again on July 23 (for ten minutes), and twice on July 30, 2013 (once for more than 12 minutes).

646. Between July 23 and July 30, 2013, Anne Sather (Heritage) spoke with Susan Knoblauch, Senior Sales Manager at Sun, for eleven minutes. Heritage remained in close contact with Sun before and after Sun (through Mutual) took its price increase in April 2013. On April 16, 2013 – the day after Mutual increased Nystatin tablet prices – Knoblauch called Sather and they spoke for nearly 40 minutes. The two continued to communicate throughout the summer of 2013.

647. By late July 2013, Teva's "Price Increase Candidates" list, created by Patel, included Nystatin, with the note "Heritage involved; follow Mutual."

648. On August 1, 2013, Malek e-mailed O'Mara (Heritage), Edelson (Heritage), and Sather, saying "Team: Pricing dynamics may be changing for us for Nystatin. Please advise when Mutual/URL/ (now Caraco) took their Nystatin price increase and if they kept it." On August 20th, 2013, Malek e-mailed Fleming (Heritage) and copied Glazer with the subject "PRICE INCREASES,"

1  saying: "We need [to] analyze the following product price increases and understand how much to

2  increase and which customers to extend." Malek provided a list of four drugs, including Nystatin.

3       649.    As described below, Patel was on maternity leave from August 2013 through December

4  2013 and decisions regarding Teva's and Heritage's Nystatin price increases were put on hold.

5       650.    Also, as described below, on February 7, 2014 Patel created a spreadsheet titled "PI

6  Candidates" which included Nystatin. The Nystatin notes read "Shared with Heritage and

7  Mutual/Caraco" and "WAC increase likely." Patel called Malek on February 14, 2014 and the two

8  connected the next day.

9       651.    Malek and Patel continued to talk throughout March and April of 2014. On a 17-minute

10  phone call on April 15, 2014, Malek and Patel came to an agreement on all of the identified drugs

11  involving Teva (at least seven drugs, including Nystatin). They agreed Teva would take the lead on the

12  Nystatin (and Theophylline) price increase, which Heritage would follow and match.

13       652.    On April 4, 2014, Teva announced an increase of more than 100% on Nystatin,

14  doubling WAC price from $47.06 to $100.30.

15       653.    During the April 2014 Heritage "Price Increase Discussion" teleconference, Malek

16  identified Nystatin as one of the eighteen drugs targeted for a price increase. Sather was tasked with

17  reaching out to Sun regarding Nystatin (and other drugs). Immediately after the April call, Sather

18  reached out to Knoblauch. They spoke for 45 minutes and agreed to increase prices for Nystatin (and

19  Paromomycin). Afterward, Sather reported to Malek and Glazer, "Caraco notified and on board."

20  Glazer quickly responded, "No emails please."

21       654.    On the June 23 Heritage "Price Increase Call," Nystatin was designated for a 95% price

22  increase. Heritage's Kate Brodowski, Associate Director of International Sales, noted that Heritage had

23  to increase its WAC pricing for Nystatin because Teva "increased WAC already."

24       655.    On June 25, 2014, Heritage held another internal call regarding "Product Price

25  Changes" and Nystatin again appeared on the list of drugs slated for a price increase. During the call,

26  Sather texted Knoblauch to update Sun on Heritage's anticipated Nystatin price increase:

27           <u>Sather</u>: Work news: we are raising price on Nystatin. Just letting you

28           know. :)

1

2
              Knoblauch: How much

3
              Sather: Double the price

4
              Sather: On conf call- will call you back

5
              Knoblauch: Yes

6
      656.    On June 25, 2014, Malek spoke to Patel again for nearly 14 minutes, explaining Heritage

7
would soon be increasing prices for a number of Teva's drugs.

8
      657.    In June 2014, Heritage announced a price increase of nearly 100% on Nystatin. By July

9
9, 2014, Heritage successfully raised the price for at least fourteen customers nationwide.

10
      658.    Sun implemented a similar price increase by August 2014.

11
      659.    In conformity with their agreement, Teva refused to bid or challenge Heritage's price

12
increases when requested by incumbent Heritage customers.

13
      660.    On July 8, a large retail customer e-mailed Teva requesting a quote for Nystatin tablets

14
because of a recent large price increase instituted by the incumbent supplier. A Teva representative

15
forwarded that e-mail to Patel, asking "Are you aware of the below? Should we engage?" Patel

16
responded that she was aware, and that Heritage would be "following Teva on the Nystatin." She

17
confirmed "we will not be bidding. Thanks."

18
      661.    NADAC data for Nystatin tablets is only available dating back to April 2014. As
depicted on the chart below, the average price for Nystatin 500,000 unit oral tablets continued to

19
increase after the first price increase implemented by Sun in April 2013 and the subsequent price
increases implemented by Heritage, Sun, and Teva around April and June of 2014:

20

21

22

23

24

25

26

27

28

NADAC - NYSTATIN 500,000 UNIT ORAL TAB PRICE AVERAGES

*i.*    *Paromomycin*

662.    At all relevant times, Heritage and Sun, through its division Caraco, dominated the Paromomycin market.

663.    In April 2014, Heritage had approximately 65% of the market. Sun had approximately 35% market share.

664.    On April 22, 2014, a Heritage representative spoke to a Sun counterpart for 45 minutes. Shortly thereafter, the Heritage representative notified her superiors via e-mail that Caraco was on board with price increases, to which a superior responded, "No emails please."

665.    On May 8, 2014 a Heritage employee e-mailed Malek, who had asked for an update on pricing agreement progress, explaining "I made contact with all my take aways – with positive results."

666.    Heritage held another internal pricing call on May 9, 2014. Paromomycin was on the list for a price increase.

667.    On May 20, a Sun employee informed a Heritage employee that Sun would be "temporarily discontinuing" Paromomycin production to transfer its operations to another facility. The employee immediately relayed the information to Malek who responded "Need price increase to go immediately. Jack it up."

COMPLAINT AND DEMAND FOR JURY TRIAL

668.    On a June 23, 2014 internal pricing call, Heritage slated Paromomycin for a 100% increase. By July 9, 2014, Heritage successfully increased prices for over a dozen nationwide customers.

669.    Sun continued to sell the drug through January 2015, maintaining a 40% market share. Despite this, Heritage continued to increase its prices with no fear of losing market share as an agreement was already in place.

j.    *Theophylline ER*

670.    At all relevant times, Heritage and Teva dominated the market for Theophylline ER.

671.    Prior to Heritage's entry into the market for 300mg and 450mg Theophylline ER tablets in late 2011, Teva held nearly 100% of market share.

672.    When Heritage entered the market, rather than price its product below Teva's to gain market share, it listed its products identical to or even slightly above Teva's prices. As a result, Theophylline ER prices remained relatively stable despite the entry of a new competitor and, upon information and belief, Heritage gained market share through collusive agreements in accordance with their market-wide "fair share" agreement.

673.    In early 2014, Teva began to consider raising the price of Theophylline ER. On February 4, 2014, Patel called Malek upon her return from maternity leave and the two spoke for over an hour the next day. On February 7, Patel (Teva) created a spreadsheet titled "PI Candidates," targeting Theophylline for a price increase.

674.    Patel and Malek spoke numerous times in February and March 2014. They came to an agreement that Teva would lead the Theophylline ER price increase and Heritage would follow, matching Teva's pricing.

675.    Effective April 4, 2014, Teva began implementing across-the-board price increases for Theophylline ER. By late April 2014, Teva fully implemented a price increase for Theophylline by approximately 150% and Heritage planned to follow.

676.    On April 24, 2014, shortly after implementing the price increases, Teva received the following e-mail with the subject line "PLIVA.com [Info] Price Gouging":[39]

> I have been a consultant to virtually every major pharma company including Teva and Pliva (before it was acquired and located in E. Hanover). Since retiring I have been asked to participate with a US Senate Special Committee on the issue of pharmaceutical price gouging in the U.S.A. Today, I acquired my usual Rx of Theophylline ER from Costco for which I usually pay $19.01 and was charged $53.28 an increase of almost 200%. Costco Pharmacy confirmed that this increase is correct and was instituted sometime earlier this year (2014.). Before having this listed in our national report as another example of Pharmaceutical Price Gouging, [w]e respectfully request a confirmation response from you, the manufacturer, relative to the accuracy of our data. Please respond to me at the above email address. If you prefer you can respond to Senator Schumer a New York State representative.

677.    A member of Teva's Government Affairs Department received the internally forwarded e-mail and responded: "Can I get some details on the specifics of this product and the price increase. I'm hoping someone increased the price and we had to follow it up. Or, API or something I can give the senate." Patel ultimately received the correspondence and replied, "I don't have a great story. I'll take a closer look."

678.    At the April 22, 2014 Heritage "Price Increase Discussion," Malek instructed his team that Heritage would follow Teva's pricing on Theophylline ER. On May 9, Heritage again slated Theophylline ER for a price increase. On June 23, during a Heritage "Price Change Call," Heritage targeted Theophylline ER for a 150% price increase.

679.    On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before the price increases were to be implemented. On the same day, Malek and Patel spoke for 14 minutes. Malek reported that Heritage would be sending out its price increases in the coming weeks.

680.    Heritage began sending price increase notices to customers the next day. On June 26, 2014, Sather texted a large wholesaler customer that "As of 7/1, [m]arket wide we are increasing prices

---

[39] Teva marketed and/or sold its generic Theophylline ER, at least in part through Pliva, Inc. ("PLIVA"), a wholly-owned subsidiary of Teva USA. Teva USA acquired PLIVA's assets as part of its acquisition of Barr Pharmaceuticals, LLC.

on: …Theophylline ER…" She followed with another text message, "Here are the approximate/average $ increases on the other items: …Theo ER . . . 150%."

681.    On June 30, 2014, Patel e-mailed her team that "[i]t appears that Heritage took an increase to follow Teva. The new pricing looks like it will be effective tomorrow and matches Teva's WACs." She continued that this "will likely trigger some bid requests/activity," but Teva "should not be considering decreases."

682.    By July 9, 2014, Heritage successfully increased prices to at least 20 customers nationwide, following in lock step with Teva.

683.    According to NADAC data, the average market price for generic Theophylline ER saw the following price increases between April 2014 and January 2015:

Theophylline ER 100mg: increases from $0.12 per unit to $0.37 per unit, a 250% increase

Theophylline ER 200mg: increases from $0.16 per unit to $0.40 per unit, a 150% increase

Theophylline ER 300mg: increases from $0.20 per unit to $0.35 per unit, a 75% increase.

684.    NADAC data shows that the average market prices for Theophylline ER were stable prior to April 2014, then rose dramatically and remained artificially high thereafter.



685.    The 300mg dosage of Theophylline ER saw an even larger price increase in 2016, increasing from an average of $0.36 per unit in April 2016 to $2.46 in July 2016, a 580% increase.



k.    *Verapamil*

686.    From 2009 forward, Actavis and Mylan dominated the market for Verapamil. Combined, the two companies enjoyed nearly 100% market share until Heritage began to gain share in 2013.

687.    Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013. When Heritage entered, it announced list (WAC) prices identical to Mylan and slightly higher than Actavis for 80mg tablets. Heritage announced prices slightly higher than both Mylan and Actavis for 120mg tablets. Heritage did not begin to sell 40mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40mg tablets at that time.

688.    In other words, in conformity with the market-wide "fair share" agreement between Defendants, when Heritage entered the market for Verapamil, it set prices at or above competitors Actavis and Mylan. In October 2012, Mylan then increased its tablet prices by approximately 50%, allowing Heritage to gain more than 25% market share. Shortly thereafter, market share between Actavis, Heritage, and Mylan quickly stabilized.

689.    On Heritage's April 2014 "Price Increase Discussion," Verapamil was targeted for a price increase. O'Mara (Heritage) was primarily responsible for communicating with Mylan about Verapamil, among other drugs, and reached out to Aigner (Mylan). On an April 23rd, 2014 phone call, O'Mara and Aigner reached an agreement to raise prices for Verapamil (and two other drugs). O'Mara immediately sent an e-mail to Malek, titled "Mylan," saying "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

690.    Sather was responsible for communicating with Actavis about Verapamil (and another drug). Within hours of the April 22 call, she called Michael Dorsey, Director of National Accounts at Actavis and they spoke for nine minutes, reaching an agreement to raise the price of Verapamil (and Glyburide-Metformin).

691.    Dorsey immediately thereafter called Christina Koleto and Michael Reed, two Senior Pricing Managers at Actavis, to update them on the pricing strategy. In an April 28, 2014 internal e-

mail, an Actavis pricing manager said "[Dorsey] made mention of keeping an eye out for an increase on ... Verapamil IR." Marc Falkin, Actavis' Vice President of Marketing, Pricing, and Contracts, received the e-mail.

692.     On May 6, 2014, Falkin called Nesta (Mylan). The two spoke regularly over the next several months, including a three-minute call on May 7th and a seven-minute call on May 19. They continued to speak regularly for the next several months.

693.     In response to Malek's May 8 e-mail to the Heritage sales team trying to finalize price increase agreements, Sather responded, "Jason: I made contact with all my take aways -- with positive results. I can resend those notes or talk with you on any details." This would have included her conversation with Actavis on Verapamil.

694.     When Heritage held another call about the "Price Increases" on May 9, 2014, Verapamil remained on the list of drugs targeted for increase.

695.     Heritage did not initially increase prices market-wide for Verapamil, but it did raise prices to at least one customer as part of its price increase initiative in July 2014.

696.     Heritage announced its price increase in June 2014, and Actavis and Mylan (along with Epic) soon followed with similar price increases.

697.     On August 20, 2014, Sather exchanged text messages with Knoblauch (Sun) describing the agreements Heritage reached with Actavis to increase the prices of Verapamil (and Glyburide-Metformin):

> Knoblauch: Have you heard anything about an Actavis price increase?"
>
> Sather: I heard they were on board with it. What item specifically?
>
> Knoblauch: I don't know. I am just hearing about an increase but no details. What product have you heard about
>
> Sather: We were communicating on Glyburide/Metformin and Verapamil
>
> Knoblauch: We haven't touched verapamil yet

698.     NADAC data shows that average market prices for Verapamil rose dramatically, with price increases continuing throughout 2016, as depicted below.

**X.    TEVA**

  **A.  Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors**

    699.    Despite Teva's initial attempts to increase its revenues through price increases in 2012 and early 2013, as set forth below, its generic business was struggling as of early 2013. Throughout the first quarter of 2013, Teva realized it needed to do something drastic to increase profitability. On May 2, 2013, Teva publicly announced disappointing first quarter 2013 results. Among other things: (1) net income was down 26% compared to the prior year; (2) total net sales were down 4%; and (3) generic sales declined by 7%.

    700.    By this time, Teva had already started to consider new options to increase its profitability, including more product price increases. Over the next several years, Teva embarked on an aggressive plan to conspire with its competitors to increase and sustain price on many generic drugs – completely turning around the company's fortunes.

    **1.    April 2013: Teva Hires Nisha Patel**

    701.    In April 2013, Teva took a major step toward implementing more significant price increases by hiring Patel as its Director of Strategic Customer Marketing. In that position, her job

---

143
COMPLAINT AND DEMAND FOR JURY TRIAL

1  responsibilities included, among other things: (1) serving as the interface between the marketing

2  (pricing) department and the sales force teams to develop customer programs; (2) establishing pricing

3  strategies for new product launches and in-line product opportunities; and (3) overseeing the customer

4  bid process and product pricing administration at Teva.

5          702.    Most importantly, she was responsible for – in her own words – "product selection,

6  price increase implementation, and other price optimization activities for a product portfolio of over

7  1,000 products." In that role, Patel had 9-10 direct reports in the pricing department at Teva. One of

8  Patel's primary job goals was to effectuate price increases. This was a significant factor in her

9  performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded

10  handsomely by Teva for doing it.

11          703.    Prior to joining Teva, Patel had worked for eight years at a large drug wholesaler, ABC,

12  working her way up to Director of Global Generic Sourcing. During her time at ABC, Patel had routine

13  interaction with representatives from every major generic drug manufacturer and developed and

14  maintained relationships with many of the most important sales and marketing executives at Teva's

15  competitors.

16          704.    Teva hired Patel specifically to identify potential generic drugs for which Teva could

17  raise prices, and then utilize her relationships to effectuate those price increases.

18          705.    Even before Patel started at Teva, she was communicating with potential future

19  competitors about the move, and about her new role. For example, on April 2, 2013 - nearly three

20  weeks before Patel started at Teva - Aprahamian, the Vice President of Sales and Marketing at Taro,

21  sent an e-mail to the Chief Operating Officer ("COO") at Taro stating: "Nisha Going To Teva - Hush

22  Hush for now...." The COO responded by saying "[m]aybe the industry will be better for it. Teva can

23  only improve." Teva had, up to that point, acquired a reputation in the industry for being slow to

24  follow price increases, and the Taro COO viewed Patel as someone who would change that mindset at

25  Teva. Patel had also worked with Aprahamian several years earlier at ABC.

26          706.    Patel's last day at ABC was April 11, 2013 and she started at Teva on April 22, 2013.

27  Patel began communicating with competitors, by phone and text, the day after she left ABC, before she

28  even started at Teva. For example:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 4/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:01:10 |
| 4/13/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:06:05 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |

707. Once Patel began her employment at Teva, her communications with certain competitors became much more systematic and frequent - and focused around market events such as price increases, market entry, customer challenges and loss of exclusivity.

708. When she joined Teva, Patel's highest priority was identifying drugs where Teva could effectively raise price without competition. On May 1, 2013, Patel began creating an initial spreadsheet with a list of "Price Increase Candidates." As part of her process of identifying candidates for price increases, Patel started to look very closely at Teva's relationships with its competitors, and also her own relationships with individuals at those competitors. In a separate tab of the same "Price Increase Candidates" spreadsheet, Patel began ranking Teva's "Quality of Competition" by assigning companies into several categories, including "Strong Leader/Follower," "Lag Follower," "Borderline" and "Stallers."

709. Patel understood – and stressed internally at Teva – that "price increases tend to stick and markets settle quickly when suppliers increase within a short time frame." Thus, it was very important for Patel to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly. Conversely, it was important for Patel to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly. Either way, significant coordination would be required for price increases to be successful – and quality competitors were those who were more willing to coordinate.

710. As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and, therefore, where they should be ranked on the scale. For example, in

one of her first conversations with CW-1 after Patel joined Teva, Patel told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices. She asked CW-1 how Sandoz handled price increases. CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased. Not surprisingly, Sandoz was one of Teva's highest "quality" competitors. Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz over the next several years.

711.     Patel had several different ways of communicating with competitors. This Complaint references various phone calls and text messages that she was exchanging with competitors. But she also communicated with competitors in various other ways, including but not limited to instant messaging through social media platforms such as LinkedIn and Facebook; encrypted messaging through platforms like WhatsApp; and in-person communications. Although the Plaintiff States have been able to obtain some of these communications, many of them have been destroyed by Patel.

712.     Through her communications with her competitors, Patel learned more about their planned price increases and entered into agreements for Teva to follow them. On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis and Sandoz several times:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:15:48 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:39 |

713.     After one of her calls with CW-5 of Glenmark, Patel sent an internal e-mail to one of her subordinates directing him to add six (6) different Glenmark drugs to Teva's "high priority" price increase list: Adapalene gel; Nabumetone; Pravastatin; Ranitidine HCL; Moexipril HCL; and Moexipril HCL/HCTZ. As discussed more fully below, these are all drugs that Glenmark eventually increased prices on two weeks later, on May 16, 2013, and Teva followed with its own price increases shortly thereafter.

## 2. Ranking "Quality of Competition" to Identify Price Increase Candidates

714. By May 6, 2013, Patel had completed her initial ranking of fifty-six (56) different manufacturers in the generic drug market by their "quality." Patel defined "quality" by her assessment of the "strength" of a competitor as a leader or follower for price increases. Ranking was done numerically, from a +3 ranking for the "highest quality" competitor to a -3 ranking for the "lowest quality" competitor. The top ranked competitors at that time included the following companies:

| Strong Leader/Follower | Point Scale |
|---|---|
| Mylan | 3 |
| Mylan Institution | 3 |
| Watson/Actavis | 3 |
| Sandoz/Fougera | 3 |
| Glenmark | 3 |
| Taro | 3 |

715. The lowest ranked competitors were:

| Strong Leader/Follower | Point Scale |
|---|---|
| Apotex | -3 |
| Zydus | -3 |

716. Patel created a formula, which heavily weighted those numerical ratings assigned to each competitor based on their "quality," combined with a numerical score based on the number of competitors in the market and certain other factors including whether Teva would be leading or following the price increase. According to her formula, the best possible candidate for a price increase (aside from a drug where Teva was exclusive) would be a drug where there was only one other competitor in the market, which would be leading an increase, and where the competitor was the highest "quality." Conversely, a Teva price increase in drug market with several "low quality" competitors would not be a good candidate due to the potential that low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share.

717. Notably, the companies with the highest rankings at this time were companies with whom Patel and other executives within Teva had significant relationships. Some of the notable relationships are discussed in more detail below.

### a. The "High Quality" Competitor Relationships

718. The highest quality competitors in Patel's rankings were competitors where Teva had agreements to lead and follow each other's price increases. The agreements and understandings regarding price increases were what made each of those competitors high quality. As part of their understandings, those competitors also agreed that they would not seek to compete for market share after a Teva price increase.

### b. Mylan (+3)

719. Mylan was Teva's highest-ranked competitor by "quality." The relationship between these two competitors was longstanding and deeply engrained. It survived changes in personnel over time and pre-dated Patel's creation of the quality competitor rankings.

720. Green, who was employed by Teva beginning in 2006 through late October 2013, first began communicating with Nesta of Mylan by telephone on February 21, 2012. From that time until the time that Green left Teva, Green and Nesta were in almost constant communication, speaking by phone at least 392 times, and exchanging at least 12 text messages – including at or around every significant price increase taken by either company. This amounts to an average of nearly one call or text message every business day during this period.

721. Shortly after Patel started her employment at Teva, she called Nesta on May 10, 2013 and the two spoke for over five (5) minutes. Because Green had already established a relationship with Mylan, Patel did not need to speak directly with Nesta very often. Typically, Patel would e-mail Green and ask him to obtain market intelligence about certain Mylan drugs; Green would then speak to Nesta – often about a long list of drugs – and report his findings back to Patel. Several examples of these communications are outlined more fully in various sections below.

722. When Green left Teva to join Zydus in late October 2013, the institutional relationship and understanding between Teva and Mylan remained strong. Rekenthaler promptly took over the role of communicating with Nesta. Starting in December 2013, through the time that Rekenthaler left Teva in April, 2015, Rekenthaler spoke to Nesta 100 times. Prior to Green leaving Teva in late-October 2013, Rekenthaler and Nesta had only spoken by phone once, more than a year earlier in 2012.

723.     The relationship between Teva and Mylan even pre-dated the relationship between Green and Nesta. For example, between January 1, 2010 and October 26, 2011, R.C., a senior executive at Teva, communicated with R.P., a senior executive counterpart at Mylan, by phone or text at least 135 times. The pace of communications between the two companies slowed dramatically in November 2011 after R.C. left Teva and before Green began communicating with Nesta – but continued nevertheless as needed during that time through communications between Rekenthaler and R.P. at Mylan.

     *c.     Watson/Actavis (+3)*

724.     Actavis was Teva's next highest quality competitor by ranking. Patel had strong relationships with several executives at Actavis, including Rogerson, the Executive Director of Pricing and Business Analytics, and A.B., a senior sales executive at Actavis. Rekenthaler also communicated frequently with A.S., a senior sales executive at Watson – a relationship that pre-dated Patel joining Teva.

725.     Patel contacted A.B. shortly after she started her employment at Teva, as she was creating the quality competitor rankings. She called him on April 30, 2013, and the two exchanged several text messages the next day, May 1, 2013. But as detailed herein, Patel communicated on a more frequent basis with Rogerson, her counterpart in the pricing department at Actavis. From May 2, 2013 through November 9, 2015, Patel spoke and/or texted with Rogerson 157 times, including calls at or around every significant price increase taken by the respective companies.

726.     In August 2013, Falkin joined Actavis and the relationship between Teva and Actavis grew stronger through his communications with Rekenthaler. From August 7, 2013 through the date that Rekenthaler left Teva in April 2015, Rekenthaler and Falkin communicated by phone or text at least 433 times.

727.     Cavanaugh also had a very strong relationship with Falkin. The two communicated with great frequency. From August 7, 2013 through the end of May 2016, Cavanaugh and Falkin spoke or texted with each other 410 times.

1

                d.    *Sandoz (+3)*

2         728.    Sandoz was also considered a top-quality competitor by Teva. Patel had a very strong

3 relationship with CW-1 at Sandoz.

4         729.    Beginning on April 12, 2013 – the day after Patel's last day at ABC – until August 2016,

5 Patel and CW-1 spoke 185 times by phone, including at or around every significant price increase taken

6 by either company. As detailed above, in one of her initial calls with CW-1 after she joined Teva, Patel

7 asked CW-1 how Sandoz handled price increases. Patel explained that she had been hired at Teva to

8 identify products where Teva could increase prices. CW-1 reassured Patel that Sandoz would follow any

9 Teva price increases on overlapping drugs, and that Sandoz would not poach Teva's customers after

10 Teva increased price.

11         730.    Green and Rekenthaler of Teva also both had a very strong relationship with CW-2,

12 who was – at that time – a senior Sandoz executive. These relationships pre-dated Patel joining Teva.

13

                e.    *Glenmark (+3)*

14         731.    Glenmark was one of Teva's highest-ranked competitors primarily because Patel had

15 very significant relationships with several different individuals at Glenmark, including CW-5, Brown

16 and J.C., a sales and marketing executive at Glenmark.

17         732.    As stated above, Patel began communicating with CW-5 even before she began her

18 employment at Teva. Patel was also communicating frequently with both CW-5 and J.C. during the

19 time she created the quality competitor rankings, and agreed to follow several Glenmark price increases,

20 in May 2013.

21         733.    Patel and CW-5 communicated by phone with great frequency – including at or around

22 the time of every significant price increase affecting the two companies – until CW-5 left Glenmark in

23 March 2014, at which point their communication ceased for nearly six (6) months. After CW-5 left

24 Glenmark, Patel began communicating with Brown with much greater frequency to obtain

25 competitively sensitive information from Glenmark. Patel and Brown had never spoken by phone

26 before Patel started at Teva, according to the phone records produced.

27

28

f.   *Taro (+3)*

734.   Taro was highly rated because of Patel's longstanding relationship with the Vice President of Sales at Taro, Aprahamian. Patel had known Aprahamian for many years, dating back to when Patel had started her professional career as an intern at ABC.

735.   Even though she knew Aprahamian well, they rarely ever spoke or texted by phone until Patel started at Teva. From April 22, 2013 through March 2016, however, Patel and Aprahamian spoke or texted at least 100 times, including calls or text messages at or around the time of every significant price increase affecting the companies during those years.

g.   *Lupin (+2)*

736.   Although initially not the highest ranked competitor, Lupin was assigned a high rating because of Patel's strong relationship with Berthold, the Vice President of Sales at Lupin. The relationship between Teva and Lupin, however, pre-dated Patel. Prior to Patel starting at Teva, Green and others at Teva conspired directly with Berthold. Several of those examples are discussed below. Between January 2012 and October 2013, Berthold and Green, for example, communicated by phone 125 times.

737.   From May 6, 2013 through April 8, 2014, Patel and Berthold communicated by phone 76 times, including at or around the time of every significant drug price increase where the two companies overlapped.

738.   Demonstrating the strength of the relationship between the two companies, the price increase coordination continued between Teva and Lupin even when Green had left Teva and when Patel was out on maternity leave. For example, as discussed more fully below, in October 2013 Lupin was preparing to increase its pricing on the drug Cephalexin oral suspension. Without Green or Patel to communicate with, Berthold instead communicated with Rekenthaler and T.S. of Teva in order to coordinate the price increase.

**B.   Price Increase Hiatus**

739.   Shortly after the August 9, 2013 price increase described below went into effect, Patel left the office for several months while on maternity leave.

740.     This slowed down Teva's plans for its next round of price increases. During the time period while Patel was out on maternity leave, Teva did not implement or plan any additional price increases, instead waiting for Patel to return and continue her work. Patel began to return to the office on a part-time basis beginning in November 2013.

741.     During this time period, Green left Teva to join Zydus as the Associate Vice President of National Accounts. His last day of employment at Teva was October 23, 2013. This prompted Rekenthaler to assume the role of communicating with specific competitors, including Mylan. Rekenthaler also identified and began communicating on a more frequent basis with co-conspirators at different companies to facilitate the price increase process for Teva.

742.     As discussed more fully below, although Patel's absence slowed Teva in its plans for price increases on additional drugs, it did not stop certain competitors – in particular Lupin and Greenstone – from attempting to coordinate with Teva regarding their own price increases. In Patel's absence, they simply communicated through different channels. These communications were conveyed to Patel upon her return and she included the information in her efforts to identify new price increase candidates.

743.     As discussed more fully below, by early 2014 Patel had picked up right where she left off planning for the next round of Teva increases.

**C.     New Relationships Emerge**

744.     By early 2014, the generic drug industry was in the midst of a price increase explosion. In an internal Teva presentation given shortly after the April 2014 price increases – titled "2014 US Pricing Strategy" – Teva reflected on the current state of the industry, noting that the "[c]ompetitive landscape is supportive of price increases." In commenting on the future implications for Teva's pricing strategy, the company stated: "Mature competitors participate in price appreciation; immature competitors are starting to follow."

745.     Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases, specific examples of which are described below.

**D.      Competitors Become "High Quality" After Successfully Colluding With Teva**

746.      A little more than a year after she first circulated her Quality of Competitor List, Patel finalized an updated list on May 9, 2014. This updated list reflected changes in Teva's conspiratorial relationships.

747.      Although certain competitors retained a high-quality ranking throughout the entire relevant time period – like Mylan, Sandoz, Actavis and Taro – other competitors saw their ranking increase (sometimes dramatically) after successfully colluding with Patel or others at Teva on one or more drugs during the prior twelve-month period. These changes demonstrate that Teva's quality competitor rankings were, in reality, a list of co- conspirators that Teva could trust to adhere to the illegal agreements.

**E.      Quality Competitors Collude With Each Other, Sandoz/Mylan**

748.      In addition to conspiring with Teva, the "quality" competitors also colluded with each other on drugs that Teva did not market. Indeed, each of the quality competitors had their own set of relationships with their counterparts at competitor companies that they used to facilitate agreements regarding drugs where they overlapped. The relationship highlighted in this Complaint is the relationship between executives at Sandoz and Mylan. However, to the extent that some of the drugs at issue involve additional competitor companies, those relationships are also discussed.

749.      In September 2012, CW-4 was concerned about her job security at Sandoz and sought to network with executives at competing companies in the hope of obtaining new employment. CW-4 contacted Nesta because she was interested in potentially working at Mylan. CW-4 obtained Nesta's phone number from a mutual contact and called to introduce herself. During that phone call, Nesta immediately started talking about competitively-sensitive information. Although CW-4 was surprised that Nesta was being so blatant, she did not stop him.

750.      In the year that followed, between September 2012 and October 2013, CW-4 and Nesta developed an ongoing understanding that they would not poach each other's customers and would follow each other's price increases. Notably, CW-4 and Nesta were not friends and communicated almost exclusively by phone. Examples of their coordination with respect to specific drugs are discussed in more detail below.

F.      **Commitment to the Overarching Conspiracy**

751.    As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given market. When a competitor was satisfied that it had its "fair share" of a particular drug market, competition waned and prices rose. These "fair share" principles were the foundation upon which the price increases were built. So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price. In short, competition resulted in lower prices; and as far as Defendants were concerned, nobody won in that scenario. Indeed, it was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to punish the party that took the price increase. Often, the competitor would then follow with its own comparable price increase.

752.    There are numerous examples throughout this Complaint of competitors refusing to compete in the face of a price increase so as not to "punish" the leader or "steal" market share. As just one example, when Teva was approached by a large retail customer in May 2013 to bid on a drug for which Greenstone had increased prices, Green expressed caution stating, "not sure I want to steal it on an increase." Teva later declined to bid on the business.

753.    The concept of "fair share" and price increases went hand in hand. For example, as discussed above the ongoing understanding between Teva and Sandoz that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase. The same was true for the understanding between Sandoz and Mylan. As discussed below, Nesta specifically cautioned CW-4 that Mylan did not appreciate having its prices challenged after an increase – i.e., Mylan did not want Sandoz to steal its business by underbidding its customers. Similarly, Aprahamian of Taro often spoke with CW-3 of Sandoz about coordinating price increases between the two companies. Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business" or "don't be stupid."

754.    Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of every price increase, although they often did so anyway. So long as the competitor knew before it was approached by customers that the reason

1  for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to

2  compete for the business. Similarly, the competitor knew it would have the opportunity, which it often

3  took, to follow the increase with a comparable price increase of its own.

4          **G.**    **Low Quality Competitors Comply with the Overarching Conspiracy**

5          755.    As a further demonstration that the fair share understanding was universally accepted

6  and understood in the generic pharmaceutical industry, even companies that Patel and Teva referred to

7  as "low quality competitors" – because they were not viewed as strong leaders or followers for price

8  increases – consistently complied with the principles of "fair share" and "playing nice in the sandbox."

9  Several examples of this with respect to some of the Subject Drugs are alleged below.

10         **H.**    **Teva Profitability Increases Dramatically**

11         756.    As discussed more fully below, from July 3, 2013 through January 28, 2015, Teva

12  conspired with its competitors to raise prices on dozens of different drugs. The impact of these price

13  increases on Teva's profitability was dramatic.

14         757.    After these price increases – on July 30, 2015 – Teva reported strong results and raised

15  its guidance for the full year 2015. Among other things: (1) net income was up 15% compared to the

16  prior year; (2) operating income was up 16% compared to the prior year; and (3) cash flow from

17  operations was up 41% compared to the prior year. Teva reported a gross profit margin of 62.8%,

18  which was up from 58.1% the prior year. Teva's stock prices also soared. By July 2015, Teva's stock

19  price was trading at an all-time high. These significant results were obtained largely as a result of the

20  anticompetitive conduct detailed herein.

21         **I.**    **Teva and its Executives Knowingly Violated the Antitrust Laws**

22         758.    Teva was aware of the antitrust laws and paid them lip service in its Corporate Code of

23  Conduct. For example, Teva's Code of Conduct from the summer of 2013 states specifically:

759.    But high-level executives at Teva were aware that those laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva had reached with its competitors.

760.    For example, when Patel started at Teva in late-April 2013, she immediately began ranking Teva's competitors by their "quality." "Quality" was nothing more than a euphemism for "good co-conspirator," and it was well known internally at Teva that Patel was identifying price increase candidates based on who Teva's competitors were for those drugs, and whether she or others at Teva had an understanding in place. Indeed, Patel already had a short list of price increase candidates in place on the day she started at Teva, which was based at least in part on conversations she had already been having with Teva's competitors before she started, including Aprahamian at Taro.

761.    As Patel was starting to create her ranking of quality competitors and identify candidates for price increases, she sent her very first iteration of the quality competitor ranking to her supervisor, K.G. – a senior marketing executive at Teva – on May 1, 2013. That ranking included, within the category of "Strong Leader/Follower," the following competitors: Mylan, Actavis, Sandoz, Glenmark, Taro and Lupin. The preliminary list of price increase candidates also included the formula that Patel would use to identify price increase candidates using the quality of competitor scores.

762.     With K.G.'s approval of her methodology for identifying price increase candidates, Patel continued communicating with competitors and agreeing to price increases. She also routinely provided K.G. with intelligence that she had received from her communications with competitors. For example, when Patel sent her very first formal "PI Candidates" spreadsheet to K.G. on May 24, 2013, she identified, for example, that the drug Nabumetone was a price increase candidate because, among other things, "Sandoz [was] also bidding high." For the drug Adapalene gel, Patel noted that there were "[r]umors of a Taro increase" – even though Taro had not yet increased its prices for Adapalene gel. Patel had obtained this competitively sensitive information directly from her communications with competitors.

763.     K.G. immediately forwarded that information to Cavanaugh, the Senior Vice President of Sales at Teva, who approved of the price increases based on the reasoning that Patel provided for each drug. As discussed more fully below, Teva raised prices on those drugs (and others) on July 3, 2013.

764.     Cavanaugh was well aware that Patel was communicating with competitors about price increases and making recommendations based on those communications, because Patel told her so directly. For example, during a 2013 meeting of Teva sales and pricing personnel where Cavanaugh was present, Patel was discussing her communications with certain competitors about price increases when Cavanaugh smiled, put her hands over her ears, and pretended that she could not hear what was being said. Not once, however, did Cavanaugh ever tell Patel or anyone else at Teva to stop conspiring with Teva's competitors or rescind the agreements that had been reached.

765.     Patel continued to send intelligence that she had obtained from competitors to her supervisor, K.G. On August 7, 2013, Patel sent to K.G. a summary list of drugs slated for a price increase on August 9, 2013. In the "Reasons for Increase" column, Patel again included specific information that could only have come from her communications with competitors, including:

| Product Category | Reason for Increase |
|---|---|
| ETODOLAC ER TABLETS | Follow Taro (likely to be this week with IR) |
| ETODOLAC TABLETS | Follow Sandoz; Taro likely to follow this week |
| PRAVASTATIN TABLETS | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. |

766.     This time, K.G. – recognizing that it was inappropriate for Teva to have this information in writing – asked Patel to change those references above, to remove the offending language:

Under reasons, I would change to the following:

1. Etodolac ER : Follow Taro
2. Etodolac : Follow Sandoz; Taro increase anticipated.
3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

767.     As discussed more fully below, Teva increased prices on those three drugs two days later. Not once did K.G. ever tell Patel to stop communicating with competitors, or to rescind any of the agreements she had reached on behalf of Teva.

768.     Patel also spoke regularly to both Rekenthaler and Green about their communications with competitors. Patel was aware that both Rekenthaler and Green were communicating with competitors, sometimes at her direction. Green and Rekenthaler, in turn, were also both aware that Patel was communicating with competitors and implementing price increases based on those communications.

769.     Rekenthaler – the Vice President of Sales at Teva – was aware that communicating with competitors about pricing and market allocation was illegal, and took steps to avoid any evidence of his wrongdoing. For example, as discussed more fully above, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at Teva and left a message. Rekenthaler called CW-2 back immediately and they had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all drugs that Teva had recently increased pricing on – not just those drugs where Teva overlapped with Sandoz. Rekenthaler complied. Understanding, however, that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work e-mail account to a personal e-mail account, then forwarded the list from his personal e-mail account to CW-2's personal e-mail account.

XI.    **THE OVERARCHING CONSPIRACY IN OPERATION WITH RESPECT TO THE**
        **SUBJECT DRUGS**

   A.  **Customer and Market Allocation Agreements To Maintain Market Share and Avoid**
        **Price Erosion**

          1.    **Teva/Mylan**

                    *a.    Fenofibrate*

770.    As of the end of 2012, Teva and Lupin were the only major suppliers of generic
Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65% market share and Lupin
having approximately 35% market share.

771.    On February 27, 2013, K.G., a senior marketing executive at Teva, e-mailed multiple
Teva colleagues asking them to provide "any noise you may be hearing in the market relative to
additional competition on Fenofibrate 48mg and 145mg." Specifically, K.G. was seeking "Competitive
Intelligence" on Mylan's potential entry to the market. In order to get this information, Green called
Mylan's Vice President of National Accounts, Nesta. Over the course of that day, Green and Nesta
spoke at least four (4) different times. That same day, Green reported back to K.G. and other Teva
colleagues what he had learned: Mylan planned to launch Fenofibrate 48mg and 145mg sometime
around November 2013.

772.    A few months later, however, Teva learned that Mylan was moving up its launch date
for Fenofibrate. In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the market for
Fenofibrate. On May 8, 2013, Green e-mailed his colleagues at Teva that "Mylan is entering [the market
for Fenofibrate] very soon." To assist in Teva's efforts to allocate the Fenofibrate market, Green asked
a colleague for the "typical data on Fenofibrate". This request for information was reiterated – and its
purpose made clear – the following day when K G. sent an internal e-mail stating that Mylan expected
to launch Fenofibrate 48mg and 145mg tablets "on or around May 14" and that he needed Teva's
Fenofibrate sales and profitability information "to determine who we want to keep and who we want to
concede" to Mylan.

773.    Up to this point, executives for Teva, Mylan, and Lupin had all been in regular contact
by phone. These calls include at least those listed below. On these calls, Teva, Mylan, and Lupin

executives shared information about Mylan's Fenofibrate launch and the plan to allocate market share to Mylan.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/6/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:06 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:18 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:11:12 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:02:53 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Berthold, David (Lupin) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:08:55 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:20 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:03:46 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Incoming | Berthold, David (Lupin) | 0:12:00 |
| 5/9/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:05 |

774.   In one striking example of the coordination between the three companies, Nesta called Green at 2:42 pm on May 7, 2013 and they spoke for more than eleven (11) minutes. Immediately after hanging up the phone – at 2:54 pm – Nesta called Berthold and spoke for nearly three (3) minutes.

775.   On May 10, 2013, K.G. received the Teva sales and profitability information he requested. After having the information for barely a half hour, and before there was even a formal price challenge by Mylan at any of Teva's customers, K.G. concluded that "it is best to concede Econdisc [to Mylan] and try to maintain the balance of our customers . . . ." By conceding Econdisc to Mylan, Teva would walk away from its single biggest customer (in terms of gross profit) for the 48mg tablets and the third largest out of six customers (in terms of gross profit) for the 145mg tablets. Patel, who had been at Teva for only two weeks at that point, said she "want[ed] to understand the logic you [K.G.] use for determining this." The logic was to allocate a customer of sufficient size to Mylan so that Mylan would be comfortable with its "fair share" and not need to compete on price to acquire market share.

776.   Teva executives immediately reached out to executives at Mylan and Lupin through a series of phone calls. These calls include at least those listed below. On these calls, executives of Teva,

Mylan, and Lupin confirmed the market allocation scheme.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:28 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:10:46 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:02:19 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Patel, Nisha (Teva) | 0:05:25 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:17 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:26 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:17:28 |

777.    Teva made good on its agreement to concede Econdisc to Mylan. On May 15, 2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for Fenofibrate 48 mg and 145 mg tablets and asked Teva for a counteroffer to retain Econdisc's business. Less than an hour after receiving the notice of the price challenge, Green recommended conceding Econdisc based on "prior conversations." K.G. later agreed: "this is the customer we should concede on Fenofibrate."

778.    Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times. These calls include at least those listed below. On these calls, executives of Teva, Mylan, and Lupin confirmed that Teva was sticking to the market allocation scheme by conceding Econdisc to Mylan.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:34 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Outgoing | Nesta, Jim (Mylan) | 0:02:21 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:10:06 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:11:50 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:02:23 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:09 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:21 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:12 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:25 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/17/2013 | Text | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:16:02 |

b. *Clonidine TTS*

779.    As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine TTS, with Mylan having approximately 48.4% market share and Teva having approximately 44.4% market share. At the end of 2011 and beginning of 2012, however, Teva began to take more than its "fair share."

780.    In November 2011, Teva took over Mylan's business for Clonidine TTS at Walgreens after Walgreens solicited Teva to provide a bid. Then, in late January 2012, Cardinal Health solicited a bid from Teva for a one-time-buy to cover an alleged short-term "supply disruption" that Mylan was experiencing. A few days after Teva submitted its offer to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine TTS. Believing that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine TTS.

781.    On February 10, 2012, the move of Cardinal's business to Teva prompted K.G. of Teva to order his colleagues to get intelligence on the extent of Mylan's alleged supply issues. That same day, Rekenthaler called B.P., a senior national accounts executive at Mylan, to obtain the information and

1 they spoke for six (6) minutes. Later that day, Rekenthaler reported back to his Teva colleagues that,

2 contrary to Teva's assumptions, "Mylan is back in supply" and cautioned that Teva should "tread

3 carefully." Rekenthaler was concerned that Mylan might retaliate against Teva for taking more than its

4 "fair share" without consulting with Mylan. With the awards from Walgreens and Cardinal, Teva was

5 projected to have between 65%-70% market share for Clonidine TTS.

6       782.    To gain back some market share, Mylan challenged Teva's Clonidine TTS business at

7 McKesson. To de-escalate the situation, Teva "conceded the McKesson business to Mylan." Then, in

8 April 2012, Mylan aggressively challenged Teva's Clonidine TTS business at CVS to gain back market

9 share and further signal its displeasure with Teva for taking the Cardinal business. Internally, Teva

10 lamented that Mylan was "trashing the price in pretty much a two-player market." Ultimately, Teva

11 "conceded [the CVS business] due to price."

12       783.    Teva heard Mylan's retaliatory message loud and clear. On May 4, 2012, just a few days

13 after losing the CVS Clonidine TTS business to Mylan, Teva was approached by Cardinal about a

14 different drug, Doxazosin. At the time, Mylan was the primary supplier for Doxazosin at Cardinal.

15 Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage

16 strengths until the end of June 2012, but Cardinal wanted to move the entire Doxazosin line to Teva.

17 Rather than take this business, K.G. cautioned his colleagues that Teva "will need to be cautious after

18 what happened with Clonidine. I would rather cover them on a short-term basis where they have an

19 issue and revisit if it becomes a more prolonged and extensive event."

20       784.    On July 18, 2012, E.G., a senior Teva product manager, circulated an internal e- mail to

21 Teva's national account managers that the "[m]arket rumor is Mylan may be having Clonidine Patch

22 supply issues." Teva learned of this "rumor" directly from Mylan over the course of at least two calls

23 between Green and Nesta on July 17 and the morning of July 18, 2012. Those calls lasted three (3)

24 minutes and five (5) minutes, respectively.

25       785.    On the morning of September 28, 2012, Nesta and Green spoke by phone at least

26 twice, once for four (4) minutes and once for fourteen (14) minutes. On those calls, Nesta informed

27 Green of Mylan's impending temporary exit from the Clonidine TTS market. As expected, later in the

28 day on September 28, 2012, Teva began getting solicitations from Mylan customers, such as Wal-Mart

and CVS, seeking a bid from Teva for Clonidine TTS because Mylan had just issued a temporary discontinuation notice.

786.    Mylan's exit from the Clonidine TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market. For example, in April 2012, before Mylan had challenged Teva's Clonidine TTS business at CVS, Teva's direct invoice price to CVS for the .1mg, .2mg, and .3mg Clonidine TTS was $22.13, $37.81, and $54.41, respectively. Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17, and $26.51 for those dosages, respectively. Because of Mylan's exit from the market, however, when Teva took back the CVS business in October 2012, Teva was able to charge CVS a direct invoice price of $33.28, $56.08, and $80.76, respectively.

787.    Mylan and Teva maintained regular contact as former Mylan customers came to Teva because of Mylan's supply issues with Clonidine TTS. For example, Teva submitted bids to CVS and Wal-Mart – which were ultimately accepted by those companies – on October 4, 2012 and October 5, 2012, respectively. In the days leading up to those bids, Teva and Mylan representatives had at least the following phone calls:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 10/1/2012 | Voice | Rekenthaler, David (Teva) | Outgoing | B.P. (Mylan) | 0:01:00 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:10 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:06 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:05:00 |
| 10/4/2012 | Voice | Green, Kevin (Teva) | Incoming | Nesta, Jim (Mylan) | 0:11:00 |

788.    Teva and Mylan representatives continued to keep in contact going forward so that if Mylan reentered the Clonidine TTS market, Mylan could regain market share without eroding price through competitive bidding. For example, on October 10, 2012, Green and Nesta spoke for ten (10) minutes. That same day, E.G. of Teva sent an e-mail to Teva national account managers and other senior representatives reiterating that Teva representatives should "advise of any update to this market intelligence."

789.    In or about February 2013, Mylan relaunched Clonidine TTS and began seeking market share. In early March 2013 Mylan sought to secure the Clonidine TTS business at Econdisc. Rather

than competitively bid for the business, Teva's internal documents state that they chose to "concede" Econdisc back to Mylan. By April 2013 Teva also "gave up Rite Aid" and "concede[d]" McKesson to Mylan.

790.    Rekenthaler acknowledged in an internal e-mail dated February 28, 2013 that Teva was "trying to concede the Clonidine business at CVS" to Mylan. Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was higher than Mylan's "previous price prior to their supply problems." For its part, Teva was "not going to make any effort in the form of price concessions to retain the CVS business" if CVS brought Mylan's price challenge to Teva's attention. CVS pushed Mylan to lower its bid in light of its prior prices but, confident that its brinkmanship would work because of Teva's cooperation, Mylan would not do so. Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior pricing. Nonetheless, because Mylan's bid to CVS was not competitive – but rather an effort to allocate the market without eroding price – Teva was able to maintain artificially higher prices at CVS.

791.    To carry out their scheme to allocate the Clonidine TTS market without eroding price, representatives of Teva and Mylan remained in regular contact. In February and March 2013 alone, Teva and Mylan representatives called each other at least 33 different times and spoke for nearly 2 hours and 45 minutes.

792.    By April 2013, Teva had "conceded all customers [it] plan[ned] on conceding." Having successfully allocated the market, however, Mylan and Teva were now conspiring to raise prices on Clonidine TTS. On April 8, 2013, J.L., a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices:

From: ███████
Sent: Tuesday, April 09, 2013 2:24 PM
To: ███████████; Dave Rekenthaler
Cc: █████████████████████████
Subject: Clonidine - Mylan Challenges
Importance: High


Kevin / Dave,


Do we have a target share percentage we want to maintain/concede now that Mylan is back in supply?


We just gave up Rite Aid which was worth ~5% of our business and we also have a challenge from Omnicare which is also worth ~5%.  We received the Omnicare challenge yesterday.


Based on a discussion with Kevin Green, Mylan would follow a price increase.

c.   *Tolterodine* ER

793.     Pfizer is the manufacturer for Detrol LA, the branded name of Tolterodine ER. To resolve patent infringement claims against Teva by Pfizer related to Detrol LA, Teva and Pfizer entered into a settlement agreement under which Teva would distribute an authorized generic of Tolterodine ER. To resolve similar claims, Mylan entered into its own settlement agreement with Pfizer which allowed Mylan to launch its generic version Tolterodine ER. On October 31, 2013, Mylan's ANDA for Tolterodine ER was approved. Under their respective settlement agreements with Pfizer, this triggering event allowed Teva and Mylan to launch their respective generics on January 2, 2014.

794.     Teva planned to launch on January 2, 2014. During the first half of December 2013, Teva was under the impression—based on conversations with potential customers—that Mylan was not in a position to launch until 30 to 60 days after Teva launched. Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch. On December 3, 2013, J.K., a marketing executive at Teva, sent an e-mail to Rekenthaler, K.G., and several other Teva colleagues stating "we prepared for 50-60 share… I am looking into the numbers as far as what this means." To prepare offers and figure out the allocation of customers that would bring Teva its desired 50% to 60% market share, Teva executives were instructed to gather usage from potential customers.

795.     Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch. Teva resisted sending out those offers and instead did not plan to do so until the January 2, 2014 launch date. Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER. Specifically, Teva expected that on January 1, 2014, Pfizer would raise the price of branded Detrol LA. This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

796.     At the end of the day on Friday December 20, 2013, T.C. of Teva learned from D.H. at Cardinal that Mylan intended to launch its Tolterodine ER on January 2, 2014. D.H. further provided T.C. with Mylan's pricing for two dosages, and conveyed that Mylan is "looking for a 40% market share," and that Teva "can figure the rest out."

797.     T.C. informed her Teva colleagues of Mylan's plans. K.G. of Teva then worked over the weekend to turn this information into initial pricing for all of Teva's potential customers and then shared it internally. In a telling admission that Teva had no intention to bid competitively for all accounts, K.G. noted that the next step was "to pick who should receive" bids. The goal in "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals: Teva wanted "50-60 [%] share" while Mylan was only "looking for a 40% market share."

798.     On Monday, December 23, 2013, Rekenthaler, Patel, K.G., T.C., and several others at Teva had a telephone conference scheduled from 8:00am to 9:00am to discuss the Tolterodine ER launch strategy. Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan. Nesta returned Rekenthaler's call at 8:15am, which was during Teva's scheduled Tolterodine ER phone conference. Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for 1 minute, 26 seconds. Immediately after Teva's scheduled Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more times. At 10:22am, Nesta returned Rekenthaler's calls and the pair spoke for an additional 12 minutes, 2 seconds. During these calls, Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual

1    language used in their offers.

2        799.    For example, at 10:33am—while Rekenthaler was still on the phone with Nesta, K.G.

3    sent an e-mail to Rekenthaler and others asking about the appropriate contractual language to use in

4    offers about the potential for price increases. Minutes after Rekenthaler finished his call with Nesta, he

5    replied with the exact language, in quotes, that Mylan was using:

6
7
8
9
10

| | |
|---|---|
| From: | Dave Rekenthaler |
| Sent: | Mon 12/23/2013 10:41 AM (GMT-05:00) |
| To: | ████████; Maureen Cavanaugh |
| Cc: | Nisha Patel02 |
| Bcc: | |
| Subject: | RE: Proposed Price Increase Language |

Mylans language is vague.  "Pricing subject to change at Mylan's sole discretion."

11        800.    Most importantly though, during these calls between Nesta and Rekenthaler, Teva and

12    Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and

13    Mylan could reach their target share without eroding pricing.

14        801.    At 12:12 pm on December 23, 2013, K.G. circulated a revised version of Teva's pricing

15    plan for the Tolterodine ER launch. This new version incorporated Teva and Mylan's plan to allocate

16    the market, including the submission of cover bids and abstention from bidding. Notably, the revised

17    pricing plan included the following chart identifying the major customers (and their associated market

18    share percentage) that Teva would receive to get close to its desired 60% market share while Mylan

19    would get its desired 40% share:

20
21
22
23
24

| | |
|---|---|
| CVS | 18 |
| Wal-Mart | 5 |
| Cardinal | 8 |
| Omnicare | 1 |
| Anda | 2 |
| Rite Aid | 4 |
| Econdisc | 15 |
| McKesson | 6 |
| | 59 |

25    [TUS000654798.]

26        802.    In exchange for Mylan either submitting cover bids or abstaining from bidding on these

27    customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers

28    that Mylan targeted. This is demonstrated by the fact that Teva's newly revised pricing plan now

included considerably higher direct invoice prices for major customers located to Mylan; namely

Walgreens, Cigna, Humana, Optum RX Prime Therapeutics, and Kaiser. The table below includes a

comparison of Teva's pricing plan for these Mylan customers before and after Rekenthaler spoke with

Nesta on December 23, 2013:



Source: State AG Complaint No. 2 at p. 64-65.

803.    In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum RX,

Prime Therapeutics, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as

Publix, Ahold, Hannaford, and PVA Health.

804.    The following day, on December 24, 2013, Rekenthaler and Nesta had two more calls

to confirm and refine Teva and Mylan's market allocation agreement. Those calls lasted for nine (9)

minutes and eight (8) minutes, respectively.

d.    *Capecitabine*

805.    To resolve patent litigation, the brand manufacturer, Roche Pharmaceuticals, entered into settlement agreements with various generic manufacturers—including Teva and Mylan—that would allow those generic manufacturers to sell generic Capecitabine after a certain period of time.

806.    As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine. Part of this planning included the sharing of information so that they could allocate the market between them. For example, in a January 31, 2014 e-mail, J.P., a national accounts executive at Teva, informed K.G., Rekenthaler, and others at Teva that Mylan was courting a specific customer, Armada Health Care, and that "Mylan estimated Armada's share on [Capecitabine] at 37%." Teva incorporated this data it received from Mylan into its own launch plan for Capecitabine.

807.    On February 26, 2014, Nesta of Mylan called Rekenthaler of Teva and the two spoke for sixteen (16) minutes. Nesta informed Rekenthaler that Mylan would not be able to launch on time with Teva. Rekenthaler immediately reported this news internally at Teva.

808.    In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer. Teva remained the exclusive generic Capecitabine manufacturer until Mylan entered in August 2014.

809.    On August 4, 2014, Nesta and Rekenthaler spoke by phone three times. On these calls, Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market.

810.    For example, at 12:46pm that day, Nesta called Rekenthaler and they spoke for a little more than five (5) minutes. Immediately after hanging up the phone, Rekenthaler sent the following e-mail:

From:     Dave Rekenthaler
Sent:     Mon 8/04/2014 12:51 PM (GMT-05:00)
To:       ███████████████        Nisha Patel02
Cc:       Maureen Cavanaugh
Bcc:
Subject:  Capcetibine

Hearing Mylan to get approval this week.  We need to look at our market and discuss defense strategy.

811.    Cavanaugh responded that she would be in the office the next day and wanted to discuss it with Rekenthaler in person.

812.     Less than an hour later, Rekenthaler sent another e-mail, just to Patel, asking her to run a customer report and indicating that Mylan will "be looking at ABC, McKesson, and Econdisc as well as a couple small guys, probably aiming at 35% share." Mylan did seek the business for each of these three companies and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

813.     On August 7, 2014, McKesson informed Teva that it received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business. Patel then sent an e-mail to K.G., Rekenthaler, and C.B. at Teva to ask if they had "[t]houghts in regards to [loss of exclusivity]." C.B., a senior operations executive at Teva, replied that Teva did "have a plan," but C.B. did not want to put the plan in writing. Instead C.B. told Patel she "wi[ll] call" to discuss it. K.G., separately, questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information. Rekenthaler also did not want to put that "additional information" in writing, so he responded: "I'll catch up with you today."

814.     The "plan" was the market allocation scheme previously agreed to by Nesta and Rekenthaler on behalf of Mylan and Teva. The same day that Mylan put a bid in to McKesson – August 7, 2014 –Nesta and Rekenthaler spoke by phone for nearly thirteen (13) minutes. On that call, Rekenthaler and Nesta discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme.

815.     This market allocation "plan" was highlighted in other e-mails as well. On August 10, 2014, C.B. e-mailed Rekenthaler, Patel, and K.G. about the plan. C.B. stated that C.B.'s "notes are showing that are (sic) plan is to concede McKesson, Econdisc, Rite-Aid, and Cardinal," but that C.B. wanted to confirm. Rekenthaler corrected C.B., stating that Mylan is "going after McKesson, ABC (only) and Econdisc," but that Teva "ha[s] not heard from Econdisc yet." Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Nesta had previously discussed it.

816.     The next morning, at 8:30 am on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine and that he was "[c]hecking on shipping status." Five minutes later, Rekenthaler received a call from Nesta. After exchanging

voicemails, the two spoke at 8:52am. The call lasted nearly six (6) minutes. Shortly after hanging up the phone, at approximately 9:02am, Rekenthaler e-mailed K.G., Patel and others at Teva to confirm that Mylan's "primary targets are ABC, McKesson and Econdisc." He added that Teva "may hear from some other smaller guys as well" and that he "do[es]n't expect price to be aggressive."

817.    In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid.

818.    Teva also conceded some of the "smaller guys" as well, pursuant to the agreement. On August 14, 2014, for example, a smaller customer – Cigna – informed Teva that it received a bid for Capecitabine. On August 18, 2014, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna. The pair talked for thirteen (13) minutes. The next day, K.G. circulated an internal e-mail confirming that Teva "will be conceding this business" at Cigna.

## 2.    Teva/Sandoz

### a.    *Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa)*

819.    During the relevant time period, both Teva and Sandoz marketed Ethinyl Estradiol and Levonorgestrel under multiple names – including both Portia and Jolessa.

820.    In or around May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa. Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

821.    On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa. T.C., a senior sales executive at Teva, responded, "We really need to know who is challenging. Sandoz??? Glenmark???" The customer responded that it was Sandoz. T.C. had initially been very reluctant to let Sandoz have the business, candidly remarking to the customer that, "[w]e are not going to let Walmart go to Sandoz [because] we have conceded a number of accounts to Sandoz that were not as strategic to Teva."

822.    After sending out a competitive offer for the sale of three drugs, including Portia and Jolessa, to the customer on May 16, 2012 and an even more competitive offer on May 18 – Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer. The night before

1  this change in plans, on May 22, Green of Teva spoke on the phone with CW-2, then at Sandoz, for

2  five (5) minutes, and agreed to withdraw the offer for Portia and Jolessa. The decision to concede the

3  Walmart business to Sandoz led to a more equal share split between the companies for both Portia and

4  Jolessa. Teva discussed the decision internally and explained that the reason for the "change in plans"

5  was that Teva was "going to concede this business to Sandoz . . .."

6        823.    Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for

7  both Portia and Jolessa. On July 2, 2013, another key customer contacted Teva stating it had received

8  bids on Portia and Jolessa and, in order for Teva to retain the business, Teva would need to submit its

9  "best bids." On July 9, 2013, CW-1 of Sandoz called Patel and left a voicemail. Shortly thereafter, they

10 connected for a sixteen (16) minute call. On July 10, Teva learned that the challenger was Sandoz. At

11 12:16pm, Rekenthaler forwarded an e-mail to Patel and posed the question, "Who's over at Sandoz

12 now?" Patel did not respond by e-mail, but due to the close proximity of their offices she likely related

13 her conversation with CW-1 directly to Rekenthaler.

14       824.    Rekenthaler then called CW-2 at Sandoz at 1:26pm that same day and they spoke for

15 two (2) minutes. CW-2 called Rekenthaler back a few minutes later and they spoke for nine (9) minutes.

16 CW-2 and Rekenthaler would speak once more later that day, at 4:48pm, for seven (7) minutes. Later

17 that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which the

18 customer described as "not aggressive enough" for their primary supply. Teva submitted an

19 intentionally inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award

20 with the customer.

21                     *b.    Temozolomide*

22       825.    The patent on Temodar, the branded version of Temozolomide, was set to expire in

23 early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 –

24 six months prior to the patent expiration. Leading up to the launch of the generic, Teva coordinated

25 with Sandoz to divide up the market.

26       826.    On July 18, 2013, a large retail pharmacy customer ("The Pharmacy") submitted an RFP

27 to Sandoz for Temozolomide. Playing by the rules of the road, Sandoz waited to see what Teva was

28 going to do before submitting their own bid. That same day, CW-1 received a telephone call from Patel.

1   Patel sought information on Sandoz's current customers and discussed options to allocate customers
2   for Temozolomide. Nothing was agreed to on that call.

3          827.    On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out Teva's
4   plans with regard to The Pharmacy: "Please find out if Teva is submitting an offer to them." The next
5   morning, S.G., a national accounts executive at Sandoz, spoke with The Pharmacy and asked The
6   Pharmacy to find out Teva's plans. S.G. summarized his call with The Pharmacy to his team: "I just
7   spoke to [The Pharmacy] regarding Temozolomide. [The Pharmacy] has not yet received an offer from
8   Teva on the product. At this time, [The Pharmacy] is reaching out to Teva to understand their supply
9   and launch status. [The Pharmacy] will be circling back and I will share the feedback we receive with
10  everyone on this email trail."

11         828.    At the same time, CW-1 was reaching out to Teva directly to get more information.
12  CW-1 called Patel at approximately 1:45pm on July 23, 2013. After exchanging voicemails, they spoke
13  for over fourteen (14) minutes that same afternoon.

14         829.    Also on the afternoon of July 23, The Pharmacy replied to Sandoz and cryptically
15  delivered Teva's message regarding its plans for Temozolomide:

16

17         830.    By using The Pharmacy as its intermediary, Teva was able to communicate to Sandoz
18  (a) when it was prepared to launch Temozolomide, (b) that it was not planning to compete aggressively
19  or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to sustain around a
20  50% market share, and (d) an inquiry regarding Sandoz's plans for Temozolomide. Sandoz understood
21  the implications of the communication and understood that "Teva is seeking a ~45-50% share." One
22  Sandoz executive responded internally and exclaimed that this was "[g]reat news . . . !"

23         831.    On July 30, 2013, another customer, CVS Caremark, contacted Teva asking for an offer
24  on Temozolomide. T.C., a senior sales executive at Teva, discussed the matter internally and asked her
25  boss, Rekenthaler, "[i]s the strategy to target CVS[?]" Rekenthaler responded by alluding to the deal that
26  had already been struck with Sandoz: "We'll send offers out to everyone. My instincts tell me Sandoz
27  will end up with them as we'll probably be more focused on [The Pharmacy] on this one. Again, we'll
28  send them out an offer same time as everyone else and respond from there." Rekenthaler most likely

174
COMPLAINT AND DEMAND FOR JURY TRIAL

1    got his information from Patel. Just one day earlier, on July 29, 2013, Patel had called CW-1 at Sandoz

2    and spoke for nine (9) minutes, where the two discussed how to carve up the market for the drug.

3           832.    Teva and Sandoz were also coordinating through other channels. After receiving the

4    RFP from The Pharmacy, S.G. of Sandoz coordinated with T.S., a senior account executive at Teva, on

5    a seven (7) minute call on July 29, 2013 followed by an eleven (11) minute call on July 31, 2013. After

6    those calls, S.G. suggested in an internal e-mail on July 31 that Sandoz cede the business and instead

7    submit a cover bid: "[The Pharmacy] has received an offer from Teva on Temozolomide. They are

8    asking for an offer from Sandoz. Even if we decide not to take this business, I would recommend that

9    we submit an offer."

10          833.    Similarly, on July 29, 2013, Green spoke to CW-2 of Sandoz two (2) times. The two

11   spoke again on July 31, 2013 for six (6) minutes. During those calls, Green told CW-2 about Teva's

12   launch plans and that Teva wanted the The Pharmacy's business. The next day, August 1, 2013, D.P.,

13   another Sandoz executive, e-mailed Kellum, conveying the message from Green:

| From: | ████████ [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=████ ████B108848C-2032-4369-BDD7-5742A8329215] |
|---|---|
| Sent: | 8/1/2013 11:52:29 AM |
| To: | Kellum, Armando [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Kellum, Armando3a1dd060-78e9-4d1c-904b-da70bd48a7c5] |
| CC: | ████████ [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=████████554612fa-c83d-4cef-8dde-6baf08aeaa0f] |
| Subject: | Teva temzol |

AK:

████ just got some intel from a reputable source:

Teva plans to launch on Monday (Aug 12)
Teva sending offers to all customers today
Teva wants ██████

Regards,

22          834.    Teva and Sandoz communicated their future plans with each other for other accounts in

23   addition to The Pharmacy and CVS. On July 31, 2013, D.P. of Sandoz e-mailed an update on

24   Temozolomide to his coworker, stating: "Teva has sent offers to ABC and [The Pharmacy] and is

25   planning to send to Econdisc tomorrow[.]"

26          835.    Going forward, Sandoz and Teva continued to coordinate with respect to

27   Temozolomide. On August 12, 2013, the same day as Teva's launch, CW-2 met in person with

28   Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference.

1    There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva had

2    officially launched and shipped all formulations of the drug.

3        836.    Although Teva initially obtained the CVS account in August 2013 due to Sandoz's

4    inability to supply the 250mg strength of Temozolomide, the companies had agreed that the account

5    would revert to Sandoz once Sandoz could supply that dosage strength. In an internal e-mail dated

6    August 16, 2013, a Teva employee confirmed the plan: "This is perfect I spoke to [a CVS

7    representative] and as soon as Sandoz is available to launch the 250mg we kill the contract."

8        837.    CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding

9    Temozolomide to develop and ensure the appropriate fair share balance between the two competitors.

10                    *c.    Tobramycin*

11       838.    Beginning in October 2013, prior to the first generic launch of Tobramycin (for which

12   Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's

13   exclusivity period. These plans included going after Sandoz's "fair share," but depended on Teva being

14   "rational." A.S., a Sandoz executive responsible for product launches, wrote in an internal e-mail in

15   October 2013: "[w]e will aim to go for our fair share of the market, and exact goals will depend on how

16   Teva goes into the market on day 1, and how rational they behave on day 181."

17       839.    As expected, Teva was "rational" when it came time to give up share to Sandoz.

18   Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing

19   information and coordinating to divide up the market for Tobramycin. Patel exchanged seven (7) calls

20   with CW-1 on July 1, during which they discussed Sandoz's launch plans and how to divide up the

21   market for Tobramycin. Patel conveyed some of this information in an internal Teva e-mail the same

22   day, writing, "[A]s a heads up, I heard that Sandoz plans to ship Tobi [Tobramycin] prior to Akorn.

23   Hearing they are ready to ship once they secure business, and we have been challenged." The next day,

24   Teva made the decision to concede two different accounts for Tobramycin to Sandoz.

25       840.    On July 7, 2014, Patel and CW-1 spoke five more times, including one call lasting eleven

26   (11) minutes. On these calls, CW-1 and Patel discussed how to divide up the market for Tobramycin,

27   including specific accounts that that each would maintain or concede to the other. Patel then

28   memorialized the agreement in an e-mail two days later. The result:  Teva would take Walgreens,

McKesson, Econdisc, ABC, and Omnicare. Teva also planned to concede the Cardinal business to Sandoz.

841.    Patel told CW-1 specifically that Teva would not even submit a bid to CVS. This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high Teva price.

842.    According to plan, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business. Rekenthaler wrote in an internal e-mail, "I notified CVS that we would be conceding their business. [T.C.], never a pleasant call so I figured I'd simply handle it myself." Teva also went through with its plan to concede Cardinal to Sandoz.

843.    CW-1, in turn, told Patel that Sandoz would not pursue business from ABC and Walgreens. CW-1 spoke with Kellum about his conversations with Patel and the agreement to stay away from Walgreens and ABC, and Kellum agreed with the plan. Pursuant to that agreement, Sandoz made no effort to contact those two large customers when it entered the market.

844.    CW-1 and Patel also discussed Sandoz's target market share. CW-1 informed Patel that Sandoz was seeking a 50% share, but Patel thought that was "unrealistic due to Akorn's expected entry." After discussing Sandoz's share goal with Rekenthaler, Patel went back to CW-1 and informed him "that a 25% share was reasonable." Sandoz appeared to comply with that, as Patel observed that Sandoz "appear[s] to be taking a responsible approach."

845.    On July 9, 2014, one of the above allocated customers, Kinney Drugs, approached Teva asking for a lower price on Tobramycin. A Teva analyst stated in an internal e-mail, "[w]e are strategically going to decline to bid on this request per Nisha." A Teva national accounts director was confused by this decision and responded, "Really? Do you have a little more detail? It is such a small qty." The analyst responded and said, "[w]e were given direction from Nisha not to pursue this opportunity. My understanding of this is there is a new market entrant, (Sandoz) and we are trying to keep our current customers instead of picking up new business." Patel's direction had come after she had called CW-1 at Sandoz twice on July 9, 2014 and left him a voicemail. CW-1 then returned her call the same day and the two spoke for four (4) minutes.

d.     *Dexmethylphenidate HCL ER*

846.    As Sandoz was preparing to enter the market on the 40mg strength of Dexmethylphenidate HCL ER in February 2014, Patel of Teva spoke frequently with CW-1 at Sandoz about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price. On February 10, 2014, for example, CW-1 began internal preparations to pursue the Rite Aid account for Dexmethylphenidate HCL ER 40mg. Later that night, CW-1 called Patel and the two spoke for more than thirteen (13) minutes. On February 18, Patel left a voicemail for CW-1. That same day, Teva conceded the Rite Aid account to Sandoz. Patel and CW-1 then spoke again by phone on February 20, 2014.

847.    Similarly, on February 12, 2014, Sandoz submitted a bid to ABC for the 40mg strength of Dexmethylphenidate HCL ER. After Patel spoke with CW-1 on February 10 and again on February 12, 2014, Teva agreed to let Sandoz have the business. In an e-mail to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:

| From: | Nisha Patel02 |
|---|---|
| Sent: | Wed 2/12/2014 6:34 PM (GMT-05:00) |
| To: | █████████████ |
| Cc: | |
| Bcc: | |
| Subject: | Re: ABC Dexmethylphenidate 40mg - Challenge |

We have 100% of the market, so will have to give someone up. ABC is the smallest wholesaler, so it makes sense for this class of trade. Sandoz is being responsible with their pricing. We should be responsible with our share. Plus, between the WBAD members, makes more sense to hold onto Walgreens than ABC, if we were going to lose one of them.

Sent from my iPhone

848.    One of the Teva national account managers on the e-mail responded by confirming that the approach "makes total sense."

849.    On February 14, 2014, Teva also refused to lower its price for Dexmethylphenidate HCL ER when approached by a GPO customer, Anda, even though Sandoz's price was not significantly lower than Teva's – essentially conceding the business to Sandoz.

850.    Further, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmethylphenidate HCL ER, the customer was entitled to certain price protection terms (i.e., a lower purchase price for the drug). Patel spoke to CW-1 the same day for almost twenty-one (21) minutes. The next day, February 21, Patel responded internally

178
COMPLAINT AND DEMAND FOR JURY TRIAL

1   about the customer's request, with additional inside information from Sandoz, stating: "[t]he

2   competitor (Sandoz) has not yet shipped. The new price will become effective on and the price

3   protection should be calculated on the date that Sandoz ships. The expected date is 2/28/14."

4         851.    Also on February 21, 2014, Patel sent a calendar invitation to Rekenthaler and other

5   team members for a meeting on February 24 where one of the topics to be discussed was "Post Launch

6   Strategy" for "Dexmethylphenidate 40mg: Sandoz (AG) entering market." Not surprisingly, she called

7   CW-1 a few days later, on February 27, to further coordinate about Dexmethylphenidate HCL ER.

8         852.    Throughout this time period, Sandoz abided by fair share principles and its ongoing

9   understanding with Teva. In February 2014, Sandoz's target market share for varying strengths of

10  Dexmethylphenidate HCL ER varied by how many manufacturers were in the market. Teva and

11  Sandoz were not alone in allocating customers for certain formulations of Dexmethylphenidate HCL

12  ER. The agreement was also carried out by other manufacturers allowing Sandoz to take share from

13  them. In February 2014, for example, as Sandoz was seeking share on the 15mg dosage strength of

14  Dexmethylphenidate HCL ER, Par "gave up the business to keep the market share even." As Sandoz

15  was entering the market, Rekenthaler of Teva was speaking to M.B., a senior national account executive

16  at Par, right around the same times that Patel had been speaking to CW-1 – including two calls on

17  February 10 (18 and 3 minutes), two (2) calls on February 19 (2 and 22 minutes), and calls on February

18  24 and 25, 2014 – in order to effectuate the scheme.

19        853.    The market allocation scheme between Teva and Sandoz on Dexmethylphenidate HCL

20  ER continued through at least mid-2015. On May 6, 2015, for example, Teva declined to submit a bid

21  to Walgreens for Dexmethylphenidate HCL ER 5mg on the basis that "there is equal share in the

22  market between competitors." Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed

23  Health Care Associates, a large GPO, on Dexmethylphenidate HCL ER 20mg, on the basis that Sandoz

24  already had 57% market share – greater than its sole competitor on this dosage strength, Teva. When a

25  Sandoz national account representative communicated this decision to the customer, he lied and

26  explained that the decision not to bid was based on limited supply.

27

28

3.     **Teva/Lupin**

a.     *Lamivudine/Zidovudine (Combivir)*

854.    Teva launched Lamivudine / Zidovudine (brand name Combivir) in December 2011.

855.    In mid-May 2012, two competitors – Lupin and Aurobindo – received FDA approval for generic Combivir and were preparing to enter the market.

856.    Even before those two companies obtained FDA approval, Teva was communicating with both about how to share the market with the new entrants. Rekenthaler was speaking to R.C., a senior-most executive at Aurobindo, while Green was speaking to Berthold of Lupin and Grauso of Aurobindo.

857.    For example, on April 24, 2012, T.C. of Teva asked her co-workers whether they had heard about any new entrants to the market for generic Combivir. Rekenthaler responded immediately that Aurobindo was entering. When T.C. questioned that information based on her understanding of how quickly the FDA typically approved new product applications, Rekenthaler assured her that the information was coming from a reputable source:

> **From:** Dave Rekenthaler
> **Sent:** Tuesday, April 24, 2012 11:17 AM
> **To:** ████████
> **Subject:** RE: what r you guys hearing on generic combivir?
>
> It was brought up to me last week by our good friend so I'm assuming it's accurate.

858.    That "good friend" was Aurobindo's R.C., who had previously worked with both T.C. and Rekenthaler while at Teva. Rekenthaler was reluctant to identify R.C. in writing as it would evidence conspiratorial communications between the two competitors. To confirm this information, Green also called and spoke to Grauso of Aurobindo that same day for twelve (12) minutes and Berthold of Lupin for four (4) minutes.

859.    After speaking with Berthold, Green responded separately to T.C., providing specific information regarding Lupin's entry plans, including commercially sensitive intelligence about Lupin's anticipated bid at a large wholesaler. Green and Berthold then spoke again the next day, April 25, 2012, for seven (7) minutes.

860.     In early May, with the Lupin and Aurobindo launches just days away, communications among all three competitors accelerated noticeably. Over the four-day period from May 7 to May 10, for example, the three companies spoke at least 32 times, as set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Durati |
|---|---|---|---|---|---|
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:10 |
| 5/7/2012 | Text | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:00 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:41 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:03:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:36 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:02:32 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:17 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:00 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:02:00 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:47 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:31 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:02:29 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Teva) | 0:00:24 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:07:57 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:02 |
| 5/9/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 0:13:00 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:06:07 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:01 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:39 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:07:27 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:03:10 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:10:15 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:05:52 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:13:29 |

861.     During this four-day period, the three individuals were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin and Aurobindo's entry into the generic Combivir market as seamless as possible. The phone records demonstrate several instances during this 4-day period where two of the individuals referenced above (Green, Berthold and/or Grauso) would speak, followed by a phone call by one of those two individuals to the individual that was not part of the original conversation.

COMPLAINT AND DEMAND FOR JURY TRIAL

> *b.   Irbesartan*

862.   Teva received approval to manufacture generic Irbesartan in March 2012.

863.   On March 6, 2012, Teva's K.G. polled the Teva sales team seeking information about competitors that were also making offers to supply Irbesartan.

864.   At 11:27am, J.P., an account manager at Teva responded: "Lupin is promising offers today." Less than twenty minutes later, Green placed a call to Berthold at Lupin. They talked for seventeen (17) minutes. Shortly after hanging up the phone, Green e-mailed his colleagues with the information he obtained:

```
From:     Kevin Green
Sent:     Tue 3/06/2012 12:26 PM (GMT-05:00)
To:                            ; Dave Rekenthaler;
Cc:                       ; Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan


Lupin is looking for a 15% share. They already have ABC. Confirmed Zydus is out. I assume Winthrop id the AG
```

865.   That same day, Rekenthaler informed the group that he still had not received "a call from any other manufacturer on Irbesartan." He received an immediate response from a senior commercial operations executive at Teva, expressing his displeasure:

```
From:
Sent:     Tue 3/06/2012 3:08 PM (GMT-05:00)
To:       Dave Rekenthaler;                          ; Kevin Green;
Cc:                       , Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan


Then work harder....
```

866.   At 10:54am the next day, Green called Berthold again. They spoke for nearly seven (7) minutes. At 12:20pm, K.G. of Teva shared with the sales team the competitively sensitive information Green had obtained. Included were the details Berthold had shared with Green about which competitors were launching/not launching the drug, and the identity of the customers that received offers. K.G. stated that Teva was in a position to take up to a 40% market share when it launched Irbesartan on March 30, 2012.

### c. *Drospirenone and Ethinyl Estradiol (Ocella)*

867.    Barr Pharmaceuticals received approval to market Drospirenone and Ethinyl Estradiol (brand name Ocella) in 2008, and Teva continued to market the drug after the acquisition of Barr in 2011 under the name Gianvi®.

868.    In late 2012, Lupin received approval to market a generic Ocella product.

869.    By April 2013, Lupin was making plans for a summer 2013 entry into the market and contacted Teva to initiate negotiations on how the competitors would allocate fair share between themselves. On April 24, 2013, Berthold of Lupin called Green at Teva. The two spoke for over three (3) minutes. Berthold called Green two more times the following day.

870.    The negotiations intensified the following week among Teva, Lupin, and a third competitor – Actavis. In preparation, on April 29, 2013, K.G. of Teva asked a colleague for current market share figures along with a list of Teva's generic Ocella customers. The colleague responded with a customer list, estimating Teva's current share of the market at 70-75%.

871.    The next day, April 30, A.B., a senior sales and marketing executive at Actavis, and Rekenthaler of Teva spoke twice by phone. That same day, Patel of Teva also called A.B. On May 1, Patel sent A.B. four (4) text messages.

872.    The competitors' communications continued into early May. On May 6, Patel and Berthold spoke twice by phone; the second call lasting twenty-two (22) minutes. Green and Berthold also spoke that same day. On May 7, Patel and Berthold had yet another call, this one lasting over ten (10) minutes. Patel also placed a call to Rogerson at Actavis, which lasted thirty-nine seconds.

873.    Faced with the news it had received from a major customer on May 8 – that Actavis had bid for that customer's business for generic Ocella – Teva doubled down on its efforts to reach a deal with its competitors that would give each its fair share. Patel called Rogerson on May 8, and they spoke for nineteen (19) minutes. On May 9, Green spoke with Berthold twice, for one (1) and twelve (12) minutes, respectively.

874.    The following day, Teva's L.R. complied with Rekenthaler's request for an analysis of the business Teva would lose by conceding its two major customers for this drug to Actavis and/or Lupin. Armed with that analysis, Patel spoke to Berthold three times that afternoon – with one call

1  lasting over seventeen (17) minutes. Patel also called Rogerson at Actavis and the two spoke for more

2  than five (5) minutes.

3        875.    On May 14, 2013, K.G. of Teva recommended to Rekenthaler that Teva concede the

4  business to Actavis. Rekenthaler replied simply: "Agreed."

5        876.    On July 10, 2013, Green spoke to Berthold twice (for more than eight (8) minutes and

6  more than two (2) minutes). After the first of those calls, Green requested specific information from a

7  colleague to help him continue to negotiate with Lupin:

8

9

10

    **From:** Kevin Green
    **Sent:** Wednesday, July 10, 2013 9:46 AM
    **To:** ▮▮▮▮▮▮▮▮▮▮
    **Cc:** ▮▮▮▮▮▮▮▮ ; Nisha Patel02
    **Subject:** Ocella

11

12      Tom,

13

14      Can you run me the normal profitability analysis on all customers with pricing and market share. Lupin is
    entering the market.

15

16        877.    Later that day, Green called and spoke to Patel for more than seven (7) minutes,

17  conveying what he had learned from Berthold. During that call, the two decided that Patel would call

18  Berthold back and confirm the agreement between Teva and Lupin. Patel called Berthold shortly after

19  and the two spoke for more than four (4) minutes. They spoke again first thing the next morning, for

20  nearly one (1) minute.

21        878.    The next day, Patel e-mailed Green, saying: "BTW, Ocella. Check!" Green, confused by

22  the e-mail, responded: "Huh... you are calling....correct?" Patel confirmed that she had indeed called her

23  counterpart at Lupin: "Yes. I was saying it's all done."

24        879.    Discussions between Teva and Lupin continued on July 17, 2013 with a call between

25  Green and Berthold that lasted twenty (20) minutes.

26        880.    On July 29, 2013, Green announced to his colleagues: "Lupin has entered and we need

27  to evaluate."

28

881.     The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take which generic Ocella accounts. On September 5, 2013, for example, Rekenthaler conveyed to a colleague the importance of retaining a particular customer's account, along with his understanding of Green's discussions with Berthold about Lupin's desired market share. Green spoke to Berthold by phone twice the following day to confirm the understanding between the two companies.

882.     On September 9, 2013, K.G. of Teva sent an internal e-mail to his colleagues conveying his thoughts about Lupin's bid for a portion of another customer's generic Ocella business. He informed them that because Teva had secured two other significant customers, "we will likely need to give up some of our formulary position to this new market entrant."

883.     In mid-October 2013, as Teva and Lupin finalized the allocation of accounts between them, K.G. sent a word of caution to a co-worker, reminding her of the parameters of the furtive arrangement. He told her to be careful before conceding large customers on a "bucket basis" rather than drug-by-drug in order to "make sure we are not giving up volume on products where we do not have our fair share."

d.     *Norethindrone/Ethinyl Estradiol*

884.     Teva markets its generic version of Norethindrone/Ethinyl Estradiol under the name Balziva®.

885.     On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business. Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing Norethindrone/Ethinyl Estradiol

886.     Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that "[w]e would lose our current market lead if we were to concede this business."

887.     The discussions about how to share the market with the recent entrant were not limited to internal communications, however. On January 24, 2014, Patel spoke to Berthold at Lupin twice by phone.

888.    Five days later, on January 29, Patel informed Rekenthaler of her recommendation based on her communications with Berthold, to take a cooperative stance towards this competitor, saying: "Kevin and I are in agreement that we should concede part of the business to be responsible in the market."

889.    On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin. That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

### 4.    Teva/Greenstone

#### a.    Oxaprozin

890.    Greenstone entered the market for Oxaprozin 600mg Tablets on March 27, 2013. It entered with the exact same WAC pricing as Teva. In the days and weeks leading up to Greenstone's entry into the market, Green of Teva and Hatosy, an account executive at Greenstone, were in frequent communication by phone and text to coordinate the entry, as set forth in more detail below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/6/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:47:46 | 0:10:57 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 15:24:26 | 0:01:30 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 19:25:44 | 0:02:38 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 18:03:08 | 0:00:36 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 18:44:27 | 0:04:51 |
| 3/20/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 7:59:16 | 0:02:22 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:31:40 | 0:00:00 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 16:42:27 | 0:00:27 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:43:56 | 0:04:04 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:20:36 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:45:41 | 0:00:10 |
| 3/22/2013 | Text | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:51:04 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:56:51 | 0:02:13 |
| 3/27/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 17:26:41 | 0:00:00 |

891.    During these communications, Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

892.    Part of the understanding between the companies was that Teva would concede at least two large customers - CVS and Cardinal - to Greenstone, and that Teva would retain Walmart as a customer. On March 27, 2013, however, Teva learned that Greenstone had either misunderstood the deal or was trying to cheat on the agreement by approaching Walmart.

893.     On March 27, 2013, T.C. of Teva forwarded an e-mail that T.C. had received from Walmart to Green and Rekenthaler. The e-mail from Walmart, sent the same day, requested that Teva provide a more competitive price on Oxaprozin 600mg tablets because Walmart had received a new bid from a competitor (Greenstone).

894.     Rekenthaler's immediate reaction to T.C.'s e-mail was "Great. More idiots in the market…" In subsequent e-mails between T.C. and Rekenthaler, T.C. reminded Rekenthaler that, pursuant to the agreement with Greenstone, "[w]e just conceded at cardinal . . . remember[?]" Rekenthaler corrected T.C., stating that Teva had conceded both Cardinal and CVS to Greenstone. Rekenthaler remarked that "[t]hey should not have gone to Walmart. Poor strategy on their part for sure." In her reply, T.C. made it clear that there was an understanding between Teva and Greenstone:

From: ▉▉▉▉▉▉▉▉▉
Sent:     Wed 3/27/2013 4:36 PM (GMT-05:00)
To:       Dave Rekenthaler; Kevin Green
Cc:
Bcc:
Subject: RE: Oxaprozin 600mg Tab


I thought they said they were done after cardainl.. I am pissed.

895.     Teva took immediate steps to address the situation. That same day – March 27, 2013 – Green called Hatosy at Greenstone at 5:25pm but she did not answer. The next morning, at 8:06am, T.C. sent an e-mail to Walmart stating: "Addressing this morning…" Less than a half hour later, T.C. sent an e-mail to Green, stating: "CALL ME IN MY OFFICE when you get a chance."

896.     After Green spoke to T.C., he immediately called Hatosy at Greenstone. Hatosy relayed the information from Green to her boss, Nailor, in a series of conversations and text messages over the course of that morning, and later in the day, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:57:21 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:09:50 | 0:04:52 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:18 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:39 | 0:01:23 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:22:04 | 0:00:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 12:15:08 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 12:18:28 | 0:04:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 13:38:50 | 0:03:15 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 18:52:14 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:45 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:47 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 19:00:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:31 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:51 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:53 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 23:23:53 | 0:00:00 |

897.     During those conversations, Greenstone agreed to withdraw the offer to Walmart and honor the agreement with Teva.

898.     At 1:22 pm that day, after several of the communications outlined above, Walmart sent an e-mail to T.C. at Teva confirming that Greenstone had in fact withdrawn its offer: "FYI - I just received word from Greenstone that they have met their market share and the proposal has expired. Please see what you can do with pricing." T.C. forwarded the e-mail to Green, with a one-word response making it clear that Teva would not be reducing its price for Oxaprozin: "FUNNY."

899.     Pursuant to the agreement between Greenstone and Teva, there was very little price erosion as a result of Greenstone's entry. A couple of months later, as Dr. Reddy's was preparing to enter the market for Oxaprozin, a Dr. Reddy's representative commented positively that "[p]ricing [is] still high" on Oxaprozin. That same representative had also talked to wholesaler Cardinal about the drug and conveyed that "Cardinal switched to Greenstone. Teva was 'fine' with it!"

*a.     Tolterodine Tartrate*

900.     Greenstone entered the market for Tolterodine tartrate 1mg and 2mg Tablets on January 23, 2014 with the exact same WAC prices as Teva for all formulations. In the days leading up to Greenstone's entry, Hatosy and Nailor of Greenstone were speaking frequently to Patel and

Rekenthaler of Teva to coordinate Greenstone's entry into the market. Those calls and text messages include at least those set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:25 | 0:00:00 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:48 | 0:00:12 |
| 1/21/2014 | Text | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 16:38:41 | 0:00:00 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:11:38 | 0:00:28 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 17:33:42 | 0:03:12 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 17:37:55 | 0:18:09 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:57:37 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:23:09 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:26:58 | 0:00:46 |
| 1/22/2014 | Text | Nailor, Jill (Greenstone) | Incoming | Rekenthaler, David (Teva) | 9:47:36 | 0:00:00 |
| 1/22/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Teva Pharmaceuticals | 11:25:37 | 0:09:53 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:20 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:26 | 0:00:04 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:47 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:49 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:44 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:46 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:00:59 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:01:01 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:26:26 | 0:11:09 |

901.    During these calls and text messages, Teva and Greenstone agreed that Teva would concede business to Greenstone in order to avoid significant price erosion in the market.

902.    The day after Greenstone's entry - January 24, 2014 - in a message to Teva national account managers about how important it was for them to determine and document which competitor was challenging Teva for business in a particular situation (because it would help Teva determine whether to concede or not), Patel stated: "As we've heard, Greenstone is entering the market for Tolterodine. I'm sure we will have to concede somewhere. . . ."

903.    On January 28, 2014, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine tartrate. K.G. of Teva immediately asked: "do we know who this could be?" Rekenthaler responded that it was Greenstone, but did not want to put the details into writing:

1
2
3
4
5
6
7
8
9

> From:    Dave Rekenthaler
> Sent:    Tue 1/28/2014 4:02 PM (GMT-05:00)
> To:      ███████████████
> Cc:      Maureen Cavanaugh; Nisha Patel02
> Bcc:
> Subject: RE: price challenge delphi 10707 cvs tolterdine
>
>
> It's Greenstone, new to market.  We can discuss.

10    904.    The next day, Patel and Hatosy of Greenstone tried to reach each other several times,
11   and were ultimately able to speak once, for more than two (2) minutes.

12    905.    On Monday, February 3, 2014, Patel instructed a colleague at Teva to concede the
13   business at CVS by providing a small price reduction that she knew would not be sufficient to retain
14   the business. T.C. of Teva, who had the customer relationship with CVS, challenged the decision to
15   concede the business. Rekenthaler responded – again not wanting to put the details into writing:

16   > On Feb 3, 2014, at 11:29 AM, "Dave Rekenthaler" <Dave.Rekenthaler@tevapharm.com> wrote:
17   >     ████ I'll discuss the details of this with you later. There was a strategy here and
18   >     you weren't in the office Thursday or Friday so we proceeded. Again, it will make
     >     sense after I discuss with you.
19

20    906.    The next day, Patel called Hatosy at Greenstone and the two spoke for nearly sixteen
21   (16) minutes.

22    907.    After some internal discussions at Teva regarding the CVS business, Teva confirmed its
23   decision to concede CVS to Greenstone. CVS represented more than 20% of Teva's business on
24   Tolterodine tartrate.

25                          b.    Piroxicam

26    908.    On March 3, 2014, Greenstone received FDA approval to market Piroxicam capsules. It
27   entered the market with the exact same WAC pricing as Teva for both the 10mg and 20mg capsules.

28

909.     Greenstone immediately began seeking potential customers. At 10:07am on March 5, 2014, J.L. of Teva sent an e-mail to Patel informing her that Greenstone had just received Piroxicam approval and was challenging Teva on several accounts. J.L. asked Patel: "Do we have any strategy in place for Piroxicam?"

910.     Before responding to that e-mail, Patel sought to negotiate strategy with Greenstone. Patel called Hatosy at Greenstone at 10:55am and they spoke briefly. Shortly after that call, Patel also called Hatosy's boss, Nailor. At 2:14pm that afternoon, Patel and Nailor spoke briefly. Immediately after hanging up with Nailor, Patel responded to J.L.'s e-mail:

From: Nisha Patel02
Sent: Wed 3/05/2014 2:17 PM (GMT-05:00)
To:
Cc:
Bcc:
Subject: RE: Piroxicam CPCs in house

We will need to concede, but either way, will need to understand the value involved. This will help us to determine the share we want to retain v. concede and in order of customers. Please create the concede analysis and customer profitability analysis (the type that ___ did yesterday for Amphetamine IR).

911.     Teva immediately began preparing a strategy to deal with Greenstone's entry into the Piroxicam market. On March 6, 2014, Patel requested a customer profitability and share analysis. During these negotiations with competitors regarding market entry, it was typical for Teva employees to request a "customer profitability and share analysis" (as Patel did here) so they could easily determine which customers to concede when talking to competitors about dividing the market.

912.     That same day, Patel had multiple calls with Nailor and Hatosy at Greenstone to discuss their plans for dividing the Piroxicam market. At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 10:00:22 | 0:00:29 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 10:29:29 | 0:03:23 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:29 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:52 | 0:00:03 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 12:33:08 | 0:01:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 15:07:50 | 0:05:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:18 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:29 | 0:00:43 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:25 | 0:00:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:48 | 0:01:02 |

913.    The next day - March 7, 2014 - after the flurry of phone calls detailed above, Patel sent an e-mail to L.R., a customer marketing manager at Teva, identifying specific customers to concede to Greenstone. Based on her several conversations with Greenstone, and her understanding of the concept of fair share, Patel also noted: "I'm guessing that Greenstone will not stop here since we are the share leader, but for the customers listed below, we should concede. We will review additional challenges as they come, if they come."

914.    Additional challenges did come. On March 12, 2014, Patel learned that Greenstone was challenging Teva at CVS – Teva's largest account for Piroxicam. Teva refused to concede CVS to Greenstone because CVS represented 26.1% of Teva's total market share for that drug. Teva lowered its price by 20%, and the next morning CVS notified Teva that it would retain the account. The same day, after hearing that Teva was not going to back down on the CVS challenge, Hatosy of Greenstone called Patel at 1:41pm and they spoke briefly.

915.    Teva and Greenstone continued to coordinate their allocation over the coming days and weeks. On March 17, 2014, Patel called Hatosy and they spoke briefly. Hatosy called Patel back at 11:35pm that same day and they spoke for fifteen (15) minutes. Immediately after speaking to Patel, Hatosy called Nailor and they spoke for ten (10) minutes. Teva retained the CVS account but conceded other customers (representing less market share) to Greenstone through March and April.

916.    For example, on March 25, 2014 Teva learned of a challenge from Greenstone at Anda, a wholesaler distributor. Following an analysis of its market share, Teva determined that it still had more than its fair share of the market. Pursuant to the understanding among generic manufacturers

alleged above, Teva determined that it would be prudent to concede the Anda business to Greenstone on Piroxicam, in order to alleviate any future challenges from Greenstone. Patel agreed with the decision to concede on April 1, 2014.

c.    *Cabergoline*

917.    In December 2014, as Greenstone was preparing to enter the market for Cabergoline, F.H., a senior executive responsible for generic products at a large joint venture between a retail pharmacy ("The Pharmacy") and a large wholesaler ("The Wholesaler") to pool the companies' drug purchasing globally, approached T.C. of Teva on Greenstone's behalf. In a December 9, 2014 e-mail, F.H. directly sought to facilitate a customer allocation between Greenstone and Teva: "I need to talk to you about Cabergoline. Greenstone is now shipping and they are targeting [The Wholesaler] and 2 small grocery chains. [The Wholesaler] owes Greenstone a favor and would be ok if you walked away from their business. Greenstone has promised to play nice in the sandbox. Let me know if you are available to discuss."

918.    The Wholesaler represented about 13% of Teva's total business for Cabergoline, and about $861,000 in annual net sales.

919.    T.C. of Teva did not respond immediately, asking for a little extra time "to figure something out on our side." F.H. responded: "Of course. I will let G[reen]stone know not to do anything crazy."

920.    The next day, after some internal conversation at Teva, T.C. agreed to the proposed allocation: "Tell Greenstone we are playing nice in the sandbox and we will let them have [The Wholesaler]."

921.    Pursuant to this agreement, Greenstone was able to acquire The Wholesaler as a customer for Cabergoline without any fear that Teva would compete to retain the business. In exchange, Greenstone agreed to "play nice in the sandbox" – i.e., not compete with Teva for other customers and drive prices down in the market.

      **5.**     **Teva/Actavis**

      *a.*    *Amphetamine/Dextroamphetamine* ER

922.    Teva began marketing Amphetamine/Dextroamphetamine ER (sometimes referred to as "Mixed Amphetamine Salts" or "MAS-XR"), after the expiration of brand manufacturer Shire's patent on Adderall XR®.

923.    On April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in "all or some" of its MAS-XR business. A senior Teva sales director, T.C., insisted on knowing the identity of the competitor before deciding what Teva's response would be. The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug.

924.    Teva deferred its decision on pricing until Actavis was in a position to ship the product.

925.    Actavis obtained FDA approval to manufacture various formulations of Amphetamine/Dextroamphetamine ER on June 22, 2012. At 9:58pm that same evening, Rekenthaler instructed Teva employees to find out Actavis' plans regarding its newly-approved generic, including shipping details and inventory levels. At 8:32am the next morning, Teva employee T.S. responded that she had spoken to M.P., a senior Actavis sales and marketing executive, and conveyed to Rekenthaler the details of their conversation:

**From:** ████████
**Sent:** Saturday, June 23, 2012 8:32 AM
**To:** Dave Rekenthaler; ████████ Kevin Green
**Subject:** Re: Actavis Adderall XR

Spoke to ██████. Going after approx 15 share.
1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdisc. NOT Walgreens and CVS.

926.    The customer that had sought a price reduction from Teva in April 2012 was not among those named by Actavis as its targets.

927.    Upon learning which customers Actavis wanted, T.C. warned colleagues that this allocation of market share could be tricky. She cautioned that if Teva decided to concede a particular wholesaler to Actavis, it needed to be "mindful" that the wholesaler also did product warehousing for a different customer whose business Actavis was not soliciting.

928.     One year later, Teva's customer renewed its request for a price reduction on Amphetamine/Dextroamphetamine ER, citing Actavis' desire to gain a share of the customer's business for the drug. On May 7, 2013, T.C. informed the customer that Teva would agree to revise its price in order to retain 100% of the customer's business. T.C. made it clear that Teva had already conceded an appropriate amount of business to its competitor. She stated: " . . . we have plenty of supply and want to keep you [sic] full business [sic] we have already let other customers go to activis [sic] go to help the market dynamites [sic]."

b.     *Amphetamine/Dextroamphetamine IR*

929.     In March 2014, Aurobindo was making plans to enter the market with Amphetamine/Dextroamphetamine IR (sometimes referred to as "Mixed Amphetamine Salts" or "MAS-IR"). On March 18, 2014, Teva's J.P. shared with her colleagues that Aurobindo's market share target for the impending launch was 10%. Teva's senior marketing operations executive, K.G., indicated that Teva was aware that both Aurobindo and Actavis were launching.

930.     A flurry of telephone communications between Teva and these two competitors took place on the days surrounding the foregoing e-mail. The day before, on March 17, 2014, Patel had spoken to Actavis' Director of Pricing, Rick Rogerson, three (3) times. Rekenthaler and Falkin of Actavis also spoke once on that day. On March 18, 2014, the day of the e-mail, Rekenthaler and R.C., a senior-most executive at Aurobindo, had a thirty (30) minute telephone conversation. Rekenthaler and Falkin spoke again seven (7) times on March 20, 2014.

931.     On April 16, 2014, Teva received word from a customer that a new competitor in the market had offered a lower price than Teva's current price for Amphetamine/Dextroamphetamine IR. Patel informed K.G. that the challenge was coming from Actavis and recommended that Teva concede that customer's account. At 1:43pm, she communicated to another colleague that the decision had been made to concede. Apparently closing the loop, she called Rogerson at Actavis at 1:55pm. They spoke for just over four (4) minutes.

c.     *Dextroamphetamine Sulfate ER*

932.     On June 19, 2014, as Actavis was entering the market for Dextroamphetamine Sulfate ER, Patel reviewed a profitability analysis for that drug and asked Rekenthaler what share of the market

1    Actavis was targeting. Rekenthaler responded: "20-25%." Rekenthaler knew Actavis' market share goals

2    because he and Falkin of Actavis had spoken twice by phone that morning – once for more than eleven

3    (11) minutes and again for more than nine (9) minutes.

4          933.    Five days later on June 24, 2014, Teva employee S.B. confirmed to her colleagues in an

5    e-mail that Actavis had entered the market for Dextroamphetamine Sulfate ER. She remarked that

6    Teva had a 72.2% share of this "multi-player market" and thus recommended giving up a large

7    customer to Actavis and reducing Teva's market share to 58.3% – in accordance with the industry

8    understanding to allocate the market, and Teva's ongoing agreement with Actavis. Later internal e-mails

9    confirmed Teva's decision to concede that customer to Actavis because "Actavis is entering the market

10   and seeking share."

11                                     *d.*    *Clonidine TTS*

12         934.    Teva began marketing Clonidine TTS in 2010 after the expiration of brand

13   manufacturer Boehringer Ingelheim's patent on Catapres-TTS®.

14         935.    On May 6, 2014, Actavis was granted approval to market Clonidine TTS. Teva and

15   Actavis immediately commenced an extensive negotiation over price and market share. Rekenthaler and

16   Falkin spoke by phone three times that day for fifteen (15) minutes, one (1) minute, and three (3)

17   minutes, respectively.

18         936.    The next day, Rekenthaler announced to his colleagues that Actavis was entering the

19   market. K.G. of Teva responded by requesting that Patel come up with a recommendation as to which

20   customers Teva should concede to Actavis. At the same time, Teva employees bemoaned Actavis'

21   "ridiculous" low pricing for a new entrant, saying that price "is already eroded here."

22         937.    On May 8, 2014, Teva personnel accelerated their efforts to convince Actavis to revise

23   its pricing and market share plans for Clonidine TTS to more acceptable levels with an even more

24   intensive flurry of phone calls. On that day, Rekenthaler spoke to Falkin three more times (5-, 10-, and

25   8-minute calls). Patel spoke to Rogerson at Actavis four times, the last call coming at 9:54am. At

26   10:02am, she informed her colleagues of the results of the negotiations, instructing them: "Please

27   concede Ahold and HEB."

28

938.     The following day, May 9, 2014, Patel learned from yet another customer of a "competitive price challenge" on this drug. Suspecting the source of the challenge was Actavis, Patel called Rogerson three times. Following those conversations, Patel informed her colleagues that Actavis wanted 25% of the market. She also stated that Actavis would likely want 10%-15% of that share from Teva. During those conversations, she also likely conveyed her displeasure to Rogerson about how low Actavis' pricing was, because not long after those phone calls, she conveyed to her supervisor, K.G., that "I just found out that Actavis rescinded their offer." Shortly after that, Patel also learned that Actavis had "resent all of their offer letters at pricing that is higher than our [Teva's] current."

939.     Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying: "I'm okay with adjusting 15% but we're not going to play any games with them. They take the 15% and I don't want to hear about this product again." Teva's senior sales executive, T.C., cautioned him on the importance of maintaining a cooperative stance towards this competitor, saying: "now, now Mr. Rekenthaler play nice in the sand box …. If history repeats itself activist [sic] is going to be responsible in the market…."

940.     The market share give-and-take between Teva and Actavis continued over the coming weeks, with Teva conceding accounts to the new entrant in order to allow Actavis to achieve its fair share of the market for Clonidine TTS. On May 14, 2014, for example, Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis. On May 17, 2014, Teva conceded a large retailer account to Actavis. On May 20, 2014, Patel again declined to bid at another customer due to the new entrant Actavis, stating: "We are trying to be responsible with share and price."

941.     When L.R., Teva's analytics manager, recommended giving up yet another Clonidine TTS account to Actavis on May 23, 2014, after several conversations between Patel and Rogerson the prior day, K.G. of Teva reluctantly approved, saying: "[o]kay to concede, but we are getting to the point where we will not be able to concede further."

e.    *Budesonide Inhalation*

942.    Teva obtained approval to market Budesonide inhalation in November 2008. Prior to February 2015, Teva controlled virtually the entire market for generic Budesonide inhalation, with other competitors having less than 1% market share.

943.    On February 13, 2015, Rekenthaler informed other Teva employees of Actavis' plans to enter the market, saying: "[i]t appears that Actavis is intending on shipping" Budesonide inhalation. Rekenthaler and Falkin of Actavis had spoken by phone three days earlier on February 10, 2015.

944.    On February 16, 2015, Rekenthaler and Falkin had another lengthy telephone conversation lasting twenty-three (23) minutes. The following morning, Teva's T.C. confirmed to her colleagues that Teva had conceded the Budesonide inhalation accounts of two major customers to Actavis. She explained that Actavis' sense of urgency to obtain the accounts was due to concerns about getting its product into market before it faced legal action from the brand manufacturer. Thus, she explained, she was working with the customers on an "exit strategy" to get Teva's product out of the supply channel, so as to streamline Actavis' entry into the market.

f.    *Celecoxib*

945.    Teva received approval to market Celecoxib in May 2014.

946.    On November 20, 2014, as Teva was preparing to launch its Celecoxib capsules, a customer informed Teva that Actavis was vying for some of the customer's Celecoxib business. The customer indicated that Actavis was preparing for a launch of its own and had advocated its position by pointing out that it was just trying to "get their share" in light of the fact that Teva had already secured over 30% of the market.

947.    Rekenthaler took a cooperative – rather than competitive – stance upon hearing that news, saying: "That's all pretty accurate and hard to argue with."

948.    By December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided. Another customer, a large retail pharmacy chain ("The Pharmacy"), became actively involved in trying to broker an agreement between Teva and Actavis on how much share each company would take upon launch. Actavis reportedly sought 25% of The Pharmacy's Celecoxib business. A representative of The Pharmacy told Teva's T.C. that "he would not move this

1    unless we are all on the same page" and that he did not have an issue with sending Actavis "a message."

2    949.    Rekenthaler's response was consistent with the "fair share" understanding, saying "I

3    don't want to give up anything . . . . We're at 32% and I think that's reasonable."

4    950.    In the days leading up to Teva's December 10, 2014 launch, Teva executives had

5    numerous telephone conversations with their counterparts at Actavis. Rekenthaler had a six (6) minute

6    call with Falkin at Actavis on November 25. The two spoke twice more on December 3 – once for two

7    (2) minutes and another time for one (1) minute. Patel spoke to A.B., a senior sales and marketing

8    executive at Actavis, for over eight (8) minutes on December 5, and for over sixteen (16) minutes on

9    December 8. Rekenthaler and Falkin resumed their communications the day before the Teva launch –

10   December 9 – with a one (1) minute phone call. On the day of the launch – December 10 –

11   Rekenthaler and Falkin spoke three times with calls of one (1) minute, nine (9) minutes, and three (3)

12   minutes in duration.

13          **6.    Teva/Par**

14                *a.    Omega-3-Acid Ethyl Esters*

15   951.    Teva launched Omega-3-Acid Ethyl Esters on April 8, 2014. During this time period,

16   manufacturers of the drug were all experiencing various supply problems, affecting how much market

17   share each would be able to take on.

18   952.    On the morning of June 26, 2014, Patel e-mailed C.B., a senior operations executive at

19   Teva, to inform C.B. that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters.

20   C.B. responded by asking if Par had started shipping that product. Patel replied at 10:24am that she had

21   not heard anything yet but promised to "snoop around."

22   953.    Patel had indeed already started "snooping around." At 9:46am, she had sent a message

23   to T.P., a senior-most executive at Par, through the website LinkedIn, stating:

24

25

26

27

28

1



954.    T.P. did not respond through LinkedIn, but texted Patel on her cell phone later that day, initiating a flurry of ten (10) text messages between them in the late afternoon and early evening of June. That night, Patel followed up with C.B., informing her that the only thing Patel knew at that point was that Par was limited on supply, but that she was "working on getting more . . .."

955.    The next morning, T.P. called Patel and they spoke for nearly thirty (30) minutes. That was the first and only voice call ever between the two according to the phone records. That same morning, Patel informed C.B. that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters and would "fill you in when we speak." Patel also communicated this information to Rekenthaler. At 11:27 am that same morning, Rekenthaler sent an e-mail to T.C., a Teva sales executive, with a veiled – but clear – understanding about Par's bidding and pricing plans:

> "You're aware PAR receive [sic] an approval. I would imagine that CVS is going to receive a one time buy offer from PAR. I'm also assuming the price would be above ours so there should not be a price request (which we would not review anyway). My point in the email is to ensure that you are aware of all of this . . . ."

956.    Par launched Omega-3-Acid Ethyl Esters Capsules the following Monday, June 30, 2014.

957.    After the discussions between Patel and T.P. at Par, Teva proceeded to concede business to Par to ensure Par's smooth entry into the market. As of July 11, 2014, Teva's share of the market for new generic prescriptions had dropped 15.9 points to 84.1% and its share of the total generic market (new prescriptions and refills) had dropped 16.3 points to 83.7%.

958.    As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high. For example, in an internal e-mail on October 2, 2014, Teva's K.G. stated that "[w]e heard that Apotex may be launching with limited supply and at a high price." Rekenthaler had obtained this information through phone calls with J.H., a senior sales executive at Apotex, on September 25 and 27, 2014 – and then conveyed the information internally at Teva.

959.    Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014. On November 10, 2014, Patel and T.P. exchanged five (5) text messages. On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters. T.C. at Teva speculated that the challenge was from Apotex, but Rekenthaler knew better, stating "I'm confident it's Par." Rekenthaler informed T.C. that Teva would not reduce its price to retain the business – thus conceding the business to Par.

960.    By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing. During this time, Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

961.    By April 2015, Apotex had officially entered the market, and consistent with the "fair share" understanding, Teva's market share continued to drop. By April 25, Teva's share of the market for new generic prescriptions for Omega-3-Acid Ethyl Esters had dropped to 68.3% and its share of the total generic market (new prescriptions and refills) had dropped to 66.8%. Rekenthaler was speaking frequently with J.H. at Apotex to coordinate during the time period of Apotex's entry in the market.

            b.    Entecavir

962.    As Teva was preparing to enter the market for Entecavir in August 2014, T.C., a senior sales and business relations executive at Teva, informed an executive at WBAD that Teva was planning on launching Entecavir "shortly" depending on when the FDA approved the drug. T.C. further noted:

1  "We may or may not be alone on the market at launch. Sandoz has a settlement and we do not know

2  their terms. Apotex has recently filed a PIV [Paragraph IV certification] but we invalidated the patent.

3  We are hearing PAR has the [authorized generic] and is stating they will launch after we launch, but

4  there is still a good chance we may be alone in the market for a short time."

5      963.    On August 28, 2014, Rekenthaler informed Teva sales employees that Teva had

6  received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler

7  noted: "[w]e are looking for at least a 60 share. Known competition is Par with an [authorized

8  generic]." Rekenthaler also noted that Teva would be pricing as if they were "exclusive" in the market

9  and expressed concern that customers might react negatively to the launch of this drug "because of our

10  recent price increase [on other drugs]."

11      964.    The same day, August 28, 2014, Rekenthaler had three phone calls with M.B., a senior

12  national account executive at Par. The two spoke two (2) more times the next day, August 29, 2014.

13      965.    On August 29, a Teva sales employee reported that a customer had informed her that

14  Par was launching Entecavir at a lower price point than Teva. The employee inquired whether Teva

15  might consider reducing its price as well. Rekenthaler, after speaking with M.B. at Par several times on

16  August 28 and 29, replied that Teva would remain firm on the price and noted that he was "doubtful

17  PAR will be much lower." Despite Teva's refusal to lower its price, that customer signed an agreement

18  with Teva to purchase Entecavir.

19      966.    Also on August 29, Rekenthaler e-mailed T.C. asking if she had received any feedback

20  from CVS on Entecavir. T.C. replied that she had not and followed up later saying that ABC had

21  indicated that it would sign Teva's offer letter. Rekenthaler replied: "Great, that helps. We may end up

22  conceding our friends up north [CVS] if they make too much fuss." T.C. dismissed that concern: "I

23  think they will work with us really…We need them they need us so we just have to make it work."

24      967.    Teva and Par both launched their respective Entecavir products on September 4, 2014.

25  Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and

26  90.9% of the total generic market (new prescriptions and refills).

27

28

968.   Within a few weeks, however, Teva's share of the market was much more in line with "fair share" principles – 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

969.   On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "help close the gap with current market prices." Teva declined to do so, citing that the "pricing is competitive and in line with the market." Rekenthaler had spoken to M.B. at Par twice on October 2, 2014.

970.   The two-player market for Entecavir remained stable over time. By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2%, and its share of the total generic market (new prescriptions and refills) was 46.7%.

c.   *Budesonide DR*

971.   Teva was preparing to enter the market for Budesonide DR in or about March 2014. At that time, it was a 2-player market: Par had 70% market share and Mylan had the remaining 30%.

972.   Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug. On April 1, 2014, M.B., a senior national account executive at Par, called Rekenthaler at Teva. The two executives spoke for twenty-six (26) minutes. The next day, April 2, 2014 — which happened to be the same day that Teva received FDA approval to market Budesonide DR — Par increased its price for Budesonide DR by over 15%.

973.   That same day, Teva sales employees were advised to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better sense of how to obtain its fair share: "it would be helpful to gather information regarding who is with mylan and who is with par…they are the two players in the mkt…as well as usage."

974.   Par and Mylan were also communicating at this time. On April 3, 2014 – the day after the Par price increase – K.O., a senior account executive at Par, spoke to M.A., a senior account manager at Mylan, for fifteen (15) minutes.

975.   On April 4, 2014, Rekenthaler informed some members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product and he did not yet know when it would do so. Nonetheless,

1   Rekenthaler spoke to both Nesta, the Vice President of Sales at Mylan, and M.B., a similarly high-level

2   executive at Par, that same day.

3       976.    Although Teva did not launch Budesonide DR until approximately June 2016, company

4   executives clearly attempted to coordinate pricing and market share with its competitors in anticipation

5   of its product launch date.

6          **7.**    **Teva/Taro**

7          *a.*    *Enalapril Maleate*

8       977.    In 2009, Taro discontinued its sales of Enalapril Maleate under its own label and

9   effectively exited the market. It continued supplying Enalapril Maleate thereafter only to certain

10  government purchasers under the "TPLI" label.

11      978.    By mid-2013, the Enalapril Maleate market was shared by three players: Mylan with

12  60.3%, Wockhardt with 27.5%, and Teva with 10.7%. Those three companies coordinated a significant

13  anticompetitive price increase for Enalapril Maleate in July 2013.

14      979.    Shortly before the Teva and Wockhardt price increases, on or about July 12, 2013,

15  Aprahamian, the Vice President of Sales and Marketing at Taro, was considering whether to renew or

16  adjust Taro's price on Enalapril Maleate for its national contract (for government purchasers), which

17  was slated to expire in September 2013.

18      980.    In the midst of that coordinated price increase, however, Aprahamian was

19  communicating with both Patel of Teva as well as M.C., a senior sales and marketing executive at

20  Wockhardt, about Enalapril Maleate. As a result of those conversations, Taro's plans changed.

21      981.    On July 17, 2013 – the same day that Teva was taking steps to implement the price

22  increase – Patel called Aprahamian and left a message. He returned the call and the two spoke for

23  almost fourteen (14) minutes. Then, on July 19, 2013 – the day that both Teva and Wockhardt's price

24  increases for Enalapril Maleate became effective – Aprahamian called M.C. at Wockhardt on his office

25  phone and left a message. He then immediately called M.C.'s cell phone, which M.C. answered. They

26  spoke for nearly eleven (11) minutes.

27      982.    On the morning of July 19, Aprahamian sent an internal e-mail to Taro colleagues

28  signaling a change in plans:

From: Ara Aprahamian/US/TARO

To: ████████████████████████████

Cc: ████████████

Date: 07/19/2013 07:19 AM

Subject: Taro Enalapril

Currently if I'm not mistaken we only supply the government with Enalapril in TPLI label (looks like we exited our label in 2009). There has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast).

983.    Aprahamian followed up with another e-mail shortly after, adding that Taro "[w]ould only look for 10-15% MS [market share] but with recent market changes and units on this product, it would be incremental."

984.    In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market.

985.    On July 31, 2013, for example, Patel provided her analysis of the drugs Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets. Enalapril Maleate was one of the drugs where, according to Patel, Teva was "seeking share," so she authorized the submission of a bid. Prior to sending that e-mail, Patel had spoken to Aprahamian on July 30 (11-minute call) and July 31, 2013 (4 minute call). Based on the agreement between the two companies, and in accordance with the industry's "fair share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

986.    Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian emphasized to his colleagues that Taro's final prices would be set largely based on "continued market intelligence to secure share . . . ."

987.    In early December 2013, Taro was fully ready to re-enter the Enalapril Maleate market. On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive, M.A., during conversations of two (2) and eleven (11) minutes.

COMPLAINT AND DEMAND FOR JURY TRIAL

988.    On December 4, 2013, one customer that had recently switched from Wockhardt to Teva expressed an interest in moving its primary business to Taro for the 2.5mg, 5mg, 10mg, and 20mg strengths. At 4:30pm that afternoon, Aprahamian instructed a colleague to prepare a price proposal for that customer for all four products.

989.    Before sending the proposal to the customer, however, Aprahamian sought the input of his competitor, Teva. On December 5, 2013, he and Patel spoke by phone for nearly five (5) minutes.

990.    Taro's fact sheet for the Enalapril Maleate re-launch generated on the day of Aprahamian's call with Teva showed a "[t]arget market share goal" of 15%, with pricing identical to Teva's and nearly identical to Wockhardt's and Mylan's.

991.    Taro began submitting offers on Enalapril Maleate the following day, December 6, 2013. But even with the bidding process underway, Aprahamian made certain to communicate with Mylan's M.A. during a brief phone conversation that afternoon. This particular communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

992.    Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril Maleate market. Aprahamian and M.A. talked for ten (10) minutes on December 11, and for seven (7) minutes on December 12.

993.    Thereafter, and with the likely consent of Mylan, Aprahamian reported on an internal Sales and Marketing call on December 16, 2013, that Taro's prior target Enalapril Maleate market share goal of 15% had been raised to 20%.

994.    Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both. For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer. This caused M.C. of Wockhardt to call Aprahamian on December 31, 2013, to discuss the situation. During the call, M.C. agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to Taro. In an e-mail on January 2, 2014, S.K. of Wockhardt conveyed the details to his colleagues:

| From: | ███████████ |
| Sent: | Thursday, January 2, 2014 10:20 AM |
| To: | ███████████ |
| Subject: | RE: Competitive Offer for Enalapril |

████.

I spoke to ███ on NYE.  Once we confirm we are keeping McKesson, let's yield MoDick.  Call to discuss.

995.     By May 2014 the market was stable, and market share for Enalapril Maleate was reasonably distributed among the companies. As Teva was considering whether to bid on specific drugs for an RFP sent out by a large wholesaler customer, Patel provided the following caution with regard to Enalapril Maleate: "no bid due to potential market/customer disruption, aka strategic reasons." The same day she sent that e-mail – May 14, 2014 – Patel spoke to Aprahamian for more than four (4) minutes and exchanged eight (8) text messages with him.

996.     By June 2014, Taro had obtained 25% market share for Enalapril Maleate in a 4-player market. Mylan and Teva each had approximately 28% market share.

                              *b.     Nortriptyline HCL*

997.     While Taro was approved in May 2000 to market generic Nortriptyline HCL, it subsequently withdrew from the market. As of early 2013, the market was shared by only two players – Teva with a 55% share, and Actavis with the remaining 45%.

998.     By February 2013, Taro personnel had come to believe that they should reclaim a portion of this market, one opining that "…Nortriptyline capsules should be seriously considered for re-launch as soon as possible."

999.     In early November, Taro was formulating re-launch plans, including a "Target Market share goal" for Nortriptyline HCL of 25% that would leave Teva with 42.45% and Actavis with 31.02%.

1000.   On November 6, 2013, Aprahamian pressed his team to "…get some offers on Nortrip[tyline] out . . .." He emphasized the need to find out who currently supplied two particular large customers so that Taro could "determine our course (Cardinal or MCK)".

1001.    Two days later, on November 8, Aprahamian received confirmation that McKesson was a Teva customer.

1002.    Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market. For example, Rekenthaler of Teva and Falkin of Actavis spoke twice by phone on November 10, 2013.

1003.    Then, on November 12, 2013, Taro's Aprahamian called Patel at Teva. Their conversation lasted almost eleven (11) minutes. That same day, Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business with McKesson, saying simply: "Will pass on MCK on Nortrip." Accordingly, he instructed a subordinate to put together an offer for Cardinal instead.

1004.    The discussions of how to accommodate Taro into the Nortriptyline HCL market were far from over, however. Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15 and 18. Falkin also exchanged two text messages with Maureen Cavanaugh of Teva on November 17, and one on November 18, 2014.

1005.    Immediately following this series of discussions, Aprahamian began delivering a new message to his team: Taro had enough offers out on Teva customers – it needed to take the rest of its share from Actavis. On November 19, 2013 when a colleague presented an opportunity to gain business from Teva customer HD Smith, Aprahamian flatly rejected the idea, saying: "Looking for Actavis.. [sic] We have outstanding Teva offers out .. [sic]".

1006.    The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue. Armed with this new information, Aprahamian wasted no time in seeking Actavis' permission, placing a call to M.D., a senior national account executive at Actavis, less than four hours later. They ultimately spoke on November 22, 2013 for more than eleven (11) minutes.

1007.    Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro. On November 21, 2013, Teva informed its customer that "[w]e are going to concede the business with Cardinal."

COMPLAINT AND DEMAND FOR JURY TRIAL

1008.   The competitors continued consulting with each other over the coming months on Nortriptyline HCL. On December 6, 2013, for example, Aprahamian called M.D. at Actavis and the two spoke for over thirteen (13) minutes. On December 10, 2013, a Taro colleague informed Aprahamian that a large customer, HEB, was with Actavis for all but one of the Nortriptyline HCL SKUs, and that HEB was interested in moving the business to Taro.

1009.   Having already cleared the move with Actavis during his December 6 call with M.D., Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

1010.   Aprahamian also continued to coordinate with Teva. He called Patel on January 28, 2014, but she did not pick up. The dialogue continued on February 4, 2014 when Patel called Aprahamian back. The two talked for nearly twenty-four (24) minutes.

1011.   Two days later, on February 6, a potential customer solicited Taro to bid on its business. When a colleague informed Aprahamian of that fact and asked if he wanted to pursue the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

1012.   Over the first ten days of March, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing efforts to work out the details of Taro's re-entry. These calls include at least those listed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

1013.   At the end of this flurry of communications, Teva documented its internal game plan for Nortriptyline HCL. Prior to this time – particularly in early 2014 – Nortriptyline HCL had been listed by Teva as a potential candidate for a price increase. On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she spoke to Aprahamian for more than five (5) minutes), she removed Nortriptyline HCL from contention in order to accommodate Taro's entry. The spreadsheet that she sent to a colleague on that date expressly took into account the negotiations over Taro's entry that had occurred over the past few weeks. With respect to a possible Nortriptyline HCL price increase, it stated: "Delay – Taro (new) seeking share." Teva subsequently raised the price of Nortriptyline HCL on January 28, 2015 – in coordination with both Taro and Actavis.

### 8.   Teva/Zydus

1014.   Green left Teva in November 2013 and moved to Zydus where he took a position as an Associate Vice President of National Accounts. Once at Zydus, Green capitalized on the relationships he had forged with his former Teva colleagues to collude with Teva (and other competitors) on several Teva/Zydus overlap drugs.

1015.   In the spring/early summer of 2014 in particular, Zydus was entering four different product markets that overlapped with Teva. During that time period, Green was in frequent contact with Patel and Rekenthaler, and others, to discuss pricing and the allocation of customers to his new employer, Zydus. Indeed, given the close timing of entry on these four products, Green, Patel, and

Rekenthaler were often discussing multiple products at any given time.

a.   *Fenofibrate*

1016.   Teva colluded with Mylan and Lupin to allocate the Fenofibrate market upon Mylan's entry in May 2013. To effectuate that agreement, Green was in frequent contact with Nesta of Mylan and Berthold of Lupin.

1017.   In February 2014, Zydus was preparing to launch into the Fenofibrate market. Green, now at Zydus, colluded with Patel, Rekenthaler, Nesta, and Berthold to share pricing information and allocate market share to his new employer, Zydus.

1018.   On February 21, 2014, Teva's Patel sent a calendar invite to Rekenthaler and to her supervisor, K.G., Senior Director, Marketing Operations, for a meeting to discuss "Post Launch Strategy (Multiple Products)" on February 24, 2014. One discussion item was Zydus' anticipated entry into the Fenofibrate market. Notably, Zydus did not enter the Fenofibrate market until a few weeks later on March 7, 2014.

1019.   In the days leading up to the meeting, between February 19 and February 24, Patel and Green spoke by phone at least 17 times – including two calls on February 20 lasting twenty-seven (27) minutes and nearly nine (9) minutes, respectively; one call on February 21 lasting twenty-five (25) minutes; and a call on February 24 lasting nearly eight (8) minutes.

1020.   On or about March 7, 2014, Zydus entered the Fenofibrate market at WAC pricing that matched Teva, Mylan, and Lupin. In the days leading up to the launch, individuals from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus. Indeed, between March 3 and March 7, these competitors exchanged at least 26 calls with each other. These calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Rekenthaler, David (Teva) | 0:13:30 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:07 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |
| 3/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:08:15 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:03:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:17:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:07:20 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:12:00 |

1021.   During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes. During those calls they were discussing how to divide up the market for several products where Zydus was entering the market. A half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying "LOE Targets to Keep" for several products on which Teva overlapped with Zydus - including Fenofibrate. With respect to Fenofibrate, Patel recommended "Defend all large customers." Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

1022.   In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached.

1023.   For example, on Friday March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, notifying them that

1    Zydus had submitted an unsolicited bid to a Teva customer, OptiSource. Patel responded that Teva

2    was "Challenged at Humana as well."

3         1024.   That morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a

4    meeting to discuss "Open Challenges-Retain/Concede Plan." One item on the agenda was

5    "Fenofibrate (Zydus at Opti and Humana-propose to concede)."

6         1025.   The following Monday – March 24, 2014 – Patel sent internal e-mails directing that

7    Teva "concede" OptiSource and Humana to Zydus. Patel further stated that Teva provided a "courtesy

8    reduction" to a third customer, NC Mutual, but stated that Teva should "concede if additional

9    reduction is requested." That same day, Patel called Green and they spoke for more than fourteen (14)

10   minutes. She also spoke with Berthold of Lupin for nearly twelve (12) minutes.

11        1026.   In the meantime, Zydus bid at another Teva customer, Ahold. On March 25, 2014,

12   Patel e-mailed Rekenthaler stating "Need to discuss. NC pending, and new request for Ahold. We may

13   not be aligned." Patel then sent an internal e-mail directing that Teva "concede" the Ahold business.

14   Later that day, Patel called Green. He returned the call and they spoke for nearly eight (8) minutes.

15   Patel also called Berthold of Lupin and they spoke for five (5) minutes.

16        1027.   On May 13, 2014, Zydus bid on Fenofibrate at Walgreens, which was also Teva's

17   customer. The next day, on May 14, 2014, Patel forwarded the bid to her supervisor, K.G., and

18   explained "if we concede, we will still be majority share, but only by a few share points. On the other

19   hand, if Zydus is seeking share, they're challenging the right supplier, but the size of the customer is

20   large. What are you[r] thoughts on asking them to divide the volume 25% Zydus and 75% Teva? This

21   way, we've matched, retained majority and will hopefully have satisfied Zydus, and minimize them

22   going elsewhere."

23        1028.   K.G. agreed with the approach and on May 15, 2014, Patel sent an internal e-mail

24   directing that Teva reduce its price to Walgreens but explained that "we will retain 75% of the award.

25   The remainder will go to Zydus. Hopefully, this will satisfy their share targets." Patel emphasized that

26   we "need to be responsible so that Zydus doesn't keep challenging Teva in the market." Later that day,

27   Green called Patel and they spoke for twenty (20) minutes.

28

1029.   On June 2, 2014, Green called Patel and they spoke for nearly six (6) minutes. He also called Rekenthaler, and they spoke for two (2) minutes. Two days later, on June 4, 2014, Zydus submitted an unsolicited bid for Fenofibrate at Anda, a Teva customer.

1030.   On June 10, 2014, T.S., Senior Analyst, Strategic Support at Teva e-mailed J.P., Director of National Accounts, stating "We are going to concede this business to Zydus per upper management." T.S. forwarded the e-mail to K.G., copying Patel and Rekenthaler, asking to "revisit the decision to concede ANDA" because "[w]e need to send Zydus a message to cease going after all of our business." Rekenthaler responded, "At Anda I would suggest you try to keep our product on their formulary in a secondary position and we'll continue to get sales. . . . Zydus has little market share on Fenofibrate that I can tell and they'll continue to chip away at us until they get what they are looking for." A few hours later, J.P. responded that Anda would maintain Teva on secondary and award the primary position to Zydus. Anda was fully aware that Teva was conceding Anda's business to Zydus because it was a new entrant.

1031.   The next day, on June 11, 2014, Green called Rekenthaler and they spoke for eight (8) minutes. Later that day, Patel called Green. He returned the call and they spoke for nearly fifteen (15) minutes.

            *b.*    *Paricalcitol*

1032.   Teva entered the market on Paricalcitol on September 30, 2013. As the first generic to enter the market, it was entitled to 180 days of exclusivity.

1033.   In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede. Teva had advance knowledge that Zydus and another generic manufacturer not named as a defendant in this case planned to enter the market on day 181, which was March 29, 2014.

1034.   In the month leading up to the Zydus launch, Patel and Rekenthaler spoke with Green and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant.

1035.   On February 28, 2014, T.S., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, advising that ABC was requesting bids

on two Zydus overlap drugs – Paricalcitol and Niacin ER. After receiving that e-mail, Rekenthaler called Green. The call lasted less than one (1) minute (likely a voicemail). The next business day, on March 3, 2014, Rekenthaler called Green again and they spoke for twenty (20) minutes. Later that afternoon, Patel also called Green. The two exchanged four calls that day, including one that lasted nearly twenty (20) minutes. On March 4, Patel called Green again and left a voicemail.

1036.   On March 12, 2014, T.S. e-mailed Patel and Rekenthaler stating that Zydus had bid on Paricalcitol at ABC. That same day, Patel sent an internal e-mail asking for a loss of exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's business they represented. This was typically done by Teva employees before calling a competitor to discuss how to divvy up customers in a market.

1037.   On March 13, 2014, Patel directed that Teva retain ABC and match the Zydus pricing. The next day, on March 14, 2014, Patel called Green. A few minutes later, Green returned the call and they spoke for nineteen (19) minutes. Rekenthaler then called Patel and they spoke for eleven (11) minutes.

1038.   During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes. During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market. A half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying "LOE Targets to Keep" for several products on which Teva overlapped with Zydus – including Paricalcitol. With respect to Paricalcitol, Patel recommended that Teva "Keep Walgreens, ABC, One Stop, WalMart, Rite Aid, Omnicare." Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

1039.   Over the next several weeks, Teva would "strategically" concede several customers to the new entrant Zydus.

1040.   For example, on March 27, 2014, Green called Patel. Patel returned the call and they spoke for nearly nine (9) minutes. The next day, on March 28, 2014, OptiSource, one of Teva's GPO customers, notified J.P., a Director of National Accounts at Teva, that it had received a competing offer from Zydus for its Paricalcitol business. J.P. forwarded the OptiSource e-mail to Patel. Within minutes, Patel responded "[w]e should concede."

1041.   That same day, Teva was notified by another customer, Publix, that Zydus had submitted a proposal for its Paricalcitol business. On April 1, 2014, Teva conceded the customer to Zydus and noted in Delphi that the reason for the concession was "Strategic New Market Entrant."

1042.   Also on April 1, 2014, Zydus bid for the Paricalcitol business at NC Mutual, another Teva customer. That same day, Patel called Green and left a 22-second voicemail. The next day, on April 2, 2014, Patel tried Green twice more and they connected on the second call and spoke for nearly ten (10) minutes. Later that evening L.R., an Associate Manager, Customer Marketing at Teva, sent an internal e-mail to T.S., the Teva Director of National Accounts assigned to NC Mutual, copying Patel, asking: "May we please have an extension for this request until tomorrow?" Patel responded, "I apologize for the delay! We should concede."

1043.   On April 15, 2014, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain its business. Two days later, on April 17, 2014, K.G. responded that he thought it might be Zydus. Patel replied, "We have conceded a reasonable amount of business (as planned) to Zydus. I would be surprised if they were going after a customer this big after they've picked up business recently." Later that day, Green called Patel. She returned his call and they spoke for nearly twelve (12) minutes. Later that day, after her discussion with Green, Patel sent an internal e-mail stating "After further review, I believe this is [a company not identified as a defendant in this case]." On April 22, 2014, Patel sent an internal e-mail regarding Walmart directing, "Need to retain. Please send an offer. Thanks."

                          *c.*   *Niacin ER*

1044.   Teva entered the Niacin ER market on September 20, 2013 as the first-to-file generic manufacturer and was awarded 180 days of exclusivity. Teva's exclusivity was set to expire on March 20, 2014.

1045.   Teva had advance knowledge that Lupin planned to enter on March 20, 2014 and that Lupin would have 100 days or until June 28, 2014 before a third generic manufacturer would be allowed to enter. Teva also knew that Zydus planned to enter on June 28, 2014.

1046.   Armed with that knowledge, Teva increased its price on Niacin ER on March 7, 2014 in advance of the competitors' entry. In the days leading up to the price increase, all three competitors

exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin. The communications between Green of Zydus, Patel and Rekenthaler of Teva, and Berthold of Lupin are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |

1047.   Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER. The communications between Green, Rekenthaler, Patel, and Berthold are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:01:00 |
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:05:04 |
| 3/17/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:06:16 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:11:13 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:06:26 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:04:12 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:07:00 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:12:39 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:26:00 |

1048.   In May 2014, Zydus began readying to enter the Niacin ER market. On May 5, 2014, Zydus bid on the Niacin ER business at ABC - a Teva customer. The next day, on May 6, 2014, Green called Rekenthaler and they spoke for three (3) minutes. Less than an hour later, Green called Patel and they spoke for eight (8) minutes. A few minutes later, Green called Patel again and left a twelve-second voicemail. Later that evening, Patel e-mailed K G. reporting what Teva had learned on those calls:

1049.   K.G. responded that Patel should schedule an internal meeting to discuss their strategy for Niacin ER and include Rekenthaler.

1050.   Over the next several days, Patel and Rekenthaler exchanged several calls with Green. Green also exchanged several calls with Berthold of Lupin. These calls are listed below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:08:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:37 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:11:15 |

1051.   Ultimately, the competitors agreed that Teva would retain ABC and concede McKesson, another large wholesaler, to Zydus.

1052.   On May 29, 2014, C.D., an Associate Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, stating: "A customer is reporting that Zydus is soliciting usage for Niacin with an anticipated launch of June 24." After receiving the e-mail, Rekenthaler called Green. The call lasted two (2) minutes. Green returned the call a few minutes later and they spoke for twenty-eight (28) minutes. Later that day, Patel called Green and they spoke for nearly twenty-one (21) minutes.

1053.   On June 2, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail stating "I received a ROFR from McKesson due to Zydus entering the market. They apparently did not secure ABC. They are launching 6/28, but are sending offers early due to Sun entering as well." Patel replied, "Please be sure to consult with [K.G.] on this one. Thanks." Later that morning, Green called Rekenthaler. The call lasted two (2) minutes. Green then called Patel and they spoke for nearly six (6) minutes.

1054.   On June 5, 2014, J.P. sent an internal e-mail regarding "McKesson Niacin" stating "Per Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede this item." J.P. also entered the loss in

1   Teva's internal database – Delphi – and noted that the reason for the concession was "Strategic New
2   Market Entrant."
3       1055.   On June 28, 2014, Zydus formally launched Niacin ER and published WAC pricing that
4   matched the per-unit cost for both Teva and Lupin.
5                       d.   *Etodolac ER*
6       1056.   Prior to Zydus' entry into the Etodolac ER market, Teva and Taro were the only
7   generic suppliers of the product. As described below, Teva and Taro – through Patel and Aprahamian –
8   colluded to significantly raise the price of Etodolac ER in August 2013.
9       1057.   On May 12, 2014, Zydus entered the Etodolac ER market at WAC pricing that matched
10  Teva and Taro's artificially high pricing. Not surprisingly, in the days leading up to the Zydus launch,
11  Patel was relaying communications back and forth between Green and Aprahamian. During these calls,
12  the competitors discussed, among other things, the allocation of market share to the new entrant,
13  Zydus.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:08:00 |
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:12 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:36 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:16:45 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Incoming | Patel, Nisha (Teva) | 0:13:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:07:00 |

27      1058.   On May 14, 2014, Anda – a wholesaler customer of Teva – notified Teva that Zydus
28  had submitted a bid for its Etodolac ER business. That same day, Patel exchanged eight (8) text

1  messages and had a four (4) minute call with Aprahamian. The next day, on May 15, 2014, Green called
2  Patel and they spoke for twenty (20) minutes.

3      1059.   On May 20, 2014, Green called Patel and they spoke for four (4) minutes. That same
4  day, K.R., a senior sales executive at Zydus, also exchanged two (2) text messages and had a 39-second
5  call with Cavanaugh of Teva. The next day – May 21, 2014 – Green called Patel again and they spoke
6  for twenty-eight (28) minutes. That same day, K.R. of Zydus and Cavanaugh of Teva exchanged four
7  (4) text messages.

8      1060.   The next day, on May 22, 2014, T.S., Senior Analyst, Strategic Support at Teva, sent an
9  internal e-mail to certain Teva employees, including Patel, stating: "I have proposed we concede Anda
10 as they are a small percent of market share and we will have to give up some share with a new market
11 entrant. Anda is looking for a response today." Patel responded: "agree with concede."

12     1061.   Similarly, on June 27, 2014, Econdisc, a Teva GPO customer, notified Teva that it had
13 received a competitive offer for its Etodolac ER business. Later that day, Patel spoke with Aprahamian
14 at Taro for fourteen (14) minutes.

15     1062.   On July 2, 2014, Patel called Green and left a voicemail. The next day, on July 3, 2014,
16 Patel sent an internal e-mail advising that "We will concede." Later that day, Teva told Econdisc that it
17 was unable to lower its pricing to retain the business.

18     1063.   When Patel's supervisor, K.G., learned that Teva had lost the Econdisc business, he
19 sent an internal e-mail asking, "Did we choose not to match this?" Patel responded, "Yes. New market
20 entrant – Zydus." K.G. replied, "Okay good. Thank you."

21           **9.**    **Teva/Glenmark**

22              *a.*    *Moexipril HCL*

23     1064.   Glenmark and Teva coordinated with each other to raise pricing on two different
24 formulations of Moexipril HCL between May and July 2013. When Patel colluded with CW-5, a senior-
25 most executive at Glenmark, to raise prices on Moexipril HCL, one of the fundamental tenets of that
26 agreement was that they would not try to poach each other's customers after the increase and the
27 competitors would each maintain their "fair share."

28

1065.   On August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers, ABC. Upon hearing this news, Rekenthaler, the Vice President of Sales at Teva, forwarded an e-mail discussing the Glenmark challenge to Patel, expressing his confusion over why Glenmark would be challenging Teva's business:

**From:** Dave Rekenthaler
**Sent:** Monday, August 05, 2013 7:05 PM
**To:** Nisha Patel02
**Subject:** Fwd: ABC - Loss business on Moexipril

???

Sent from my iPhone

1066.   Rekenthaler forwarded the e-mail only to Patel because he was aware that she had been the person at Teva who had been colluding with Glenmark.

1067.   Five (5) minutes after receiving the e-mail from Rekenthaler, Patel responded:

From:      Nisha Patel02
Sent:      Mon 8/05/2013 7:10 PM (GMT-05:00)
To:        Dave Rekenthaler
Cc:
Bcc:
Subject: RE: ABC - Loss business on Moexipril

I know…made the call already

1068.   The call that Patel had made earlier that day was to CW-5, a senior executive at Glenmark, to find out why Glenmark sought to underbid Teva at ABC.

1069.   Patel spoke to CW-5 three times that day. The following day – August 6, 2013 –Brown, the Vice President of Sales at Glenmark, called Patel at 9:45am but did not reach her. Patel returned Brown's call at 10:08am and the two spoke for approximately thirteen (13) minutes. Later that day, at 1:11pm, the two spoke again for approximately fifteen (15) minutes. During these calls, Patel reminded Brown and CW-5 of their prior agreement not to poach each other's customers after a price increase.

1070.   As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril HCL. Later that same day – August 6, 2013 – T.S. of Teva informed colleagues that "[t]oday is a new day and today…. ABC has now informed me that they will NOT be moving the Moexipril business to Glenmark."

    b.   *Desogestrel/Ethinyl Estradiol (Kariva)*

1071.   Glenmark entered the market for Desogestrel/Ethinyl Estradiol (brand name Kariva) 0.15mg/0.02mg tablets on April 4, 2012 under its own brand name of Viorele.

1072.   During the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for Kariva at Publix, a retail pharmacy purchaser. S.B., an analyst at Teva, e-mailed Patel a list of suggested re-bid prices to send to Publix for various drugs, including generic Kariva. The chart included a suggested re-bid price for Kariva of $76.14 - which was $52.64 higher than the $23.50 price that Glenmark had offered Publix.

1073.   This sparked a flurry of communications that same day between Patel and three different Glenmark representatives - Brown and Grauso, and J.C., a sales and marketing executive at Glenmark - as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Glenmark) | 11:46:15 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 11:47:03 | 0:24:09 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 12:21:00 | 0:12:53 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:08 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:31 | 0:00:26 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 13:50:15 | 0:06:51 |

1074.   After this flurry of communications between the two competitors, Patel decided that Teva would offer Publix a re-bid price with a nominal 10% reduction off the originally proposed re-bid price of $76.14 - virtually guaranteeing that the business would be awarded to Glenmark.

    c.   *Gabapentin*

1075.   Glenmark entered the market for Gabapentin 800mg and 600mg tablets on April 1, 2006.

1076.   On October 13 and 14, 2014, Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of

1  Teva's competitors. The PCMA described its Annual Meeting as "the . . . ideal venue for senior

2  executives from PBMs, specialty pharmacy, payer organizations and pharmaceutical manufacturers to

3  network, conduct business and learn about the most current strategic issues impacting the industry."

4     1077.   Shortly after returning from that meeting, during the morning of October 15, 2014,

5  Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin and

6  suggested that this would be a great opportunity to pick up some market share. The Glenmark increase

7  had not yet been made public and would not be effective until November 13, 2014. Nonetheless, Patel

8  informed her colleagues in an e-mail that same day that there would be a WAC increase by Glenmark

9  effective November 13, and that she had already been able to obtain certain contract price points that

10  Glenmark would be charging to distributors. At around the time she sent the e-mail, Patel exchanged

11  two (2) text messages with Brown of Glenmark.

12     1078.   Having relatively little market share for Gabapentin, Teva discussed whether it should

13  use the Glenmark price increase as an opportunity to pick up some market share. Over the next several

14  weeks, Teva did pick up "a bit of share" to be more in line with fair share principles but cautioned

15  internally that it did not "want to disrupt Glenmark's business too much."

16     **10.   Teva/Lannett**

17     *a.   Baclofen*

18     1079.   Except as set forth below, at all relevant times, Lannett, Par, Teva, and Upsher-Smith

19  have dominated, and continue to dominate, the market for Baclofen.

20     1080.   Baclofen is available in 10mg and 20mg tablets.

21     1081.   According to NADAC data, the average market price for Baclofen remained steady

22  prior to the spring of 2014. From November 2013 through March 2014, the average market price of

23  Baclofen fluctuated by less than $0.003 per unit for 10mg tablets and by less than $0.0065 per unit for

24  20mg tablets.

25     1082.   Beginning around February 2014, however, the overall average market price rose by

26  more than 550%. These price increases affected both dosages of Baclofen, *i.e.* 10mg and 20mg tablets.

27     1083.   According to NADAC data, the average market price for Baclofen increased by the

28  following percentages:

1          Baclofen 10mg tablet: Between March 2014 and April 2014, prices

2          increased 636%; and

3          Baclofen 20mg tablet: Between March 2014 and January 2015, prices

4          increased 437%.

5          1084.    WAC data confirms that Teva and Upsher-Smith both imposed dramatic price increases

6   for Baclofen largely in unison, by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 100ct | Teva | 00172409760 | $0.10 | $0.49 | 4/15/2014 | 420% |
| 1,000ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 1,000ct | Teva | 00172409780 | $0.09 | $0.49 | 4/15/2014 | 447% |

11          1085.    Although WAC data is not available for Par, upon information and belief, it

12   implemented nearly simultaneous and identical price increases as Upsher-Smith and Teva.

13          1086.    Defendants had numerous opportunities to coordinate their price increases. All

14   Baclofen Defendants attended the (i) October 28-30, 2013 GPhA Technical Conference in North

15   Bethesda, Maryland; and executives from at least Par, Teva, and Upsher-Smith attended the (ii)

16   February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida. Shortly thereafter, the average prices

17   for generic Baclofen increased dramatically. *See* Exhibit A.

18          1087.    In June 2014, Lannett was preparing to re-enter the market for Baclofen, but was faced

19   with limited supply. In an internal e-mail sent to his sales staff, K.S., a senior sales executive at Lannett,

20   stated: "Baclofen launch in four weeks, need market intelligence. We can only take a 10% market

21   share." At that time, Teva had a large market share in relation to the existing competitors in the market.

22          1088.    Sullivan, a Director of National Accounts at Lannett and a recipient of the e-mail,

23   promptly communicated with Patel (Teva was a competitor for Baclofen) using Facebook Messenger.

24   On June 12, 2014, Sullivan messaged Patel, stating:

25

26

27

28



The message was sent at 11:16am. At 11:30am, Patel called Sullivan and they spoke for seven (7) minutes. This was the first phone conversation between Sullivan and Patel since Patel had joined Teva in April 2013. During the conversation, Sullivan informed Patel that Lannett would be entering the market for Baclofen shortly. In a follow-up message through Facebook Messenger later that afternoon, Sullivan confirmed:



1089.   True to her word, Sullivan called Patel on July 1, 2014 and left a voicemail. Patel promptly returned the call, and the two spoke for almost seven (7) minutes.

1090.   On July 11, 2014, as Teva was evaluating future forecasting and whether to try and take on additional Baclofen business with a large wholesaler, Patel stated to a Teva colleague: "[n]ot sure if it helps your review, but there is another entrant coming to market (Lannett). I'm not sure about their share targets, but I know it's probably soon." That same day, Patel sent a text message to Sullivan asking "Around?" Sullivan immediately called Patel and left a voicemail. Patel called Sullivan back promptly, and they spoke for more than three (3) minutes. After speaking, Patel sent another text message to Sullivan, stating: "Thank you!!" Sullivan responded: "No prob!"

1091.   Shortly thereafter, on July 22, 2014, Teva was approached by a customer stating "[w]e were contacted by another mfg that is going to be launching Baclofen in the coming weeks." The customer asked whether Teva wanted to exercise its right of first refusal (i.e., offer a lower price to

1    maintain the account). Even though the new manufacturer's price was only slightly below Teva's price,

2    Teva declined to bid. Patel specifically agreed with the decision to concede, stating "I believe this is

3    Lannett." Teva's internal tracking database noted that the customer had been conceded to a "Strategic

4    New Market Entrant."

5        1092.   As set forth above, Teva had significantly increased its price for Baclofen in April 2014

6    (following an Upsher-Smith price increase) and was able to maintain those prices even after Lannett

7    entered the market a few months later. In fact, when Lannett entered the market it came in at the exact

8    same WAC price as Teva.

9                    **11.    Teva/Amneal**

10                        *a.    Norethindrone Acetate*

11       1093.   On September 9, 2014, a customer approached Teva asking if Teva would lower its

12   pricing on certain drugs, including Norethindrone Acetate. One of Teva's competitors for

13   Norethindrone Acetate was Amneal. The same day, Patel received phone calls from two different

14   Amneal employees – S.R.(2), a senior sales executive (call lasting more than three (3) minutes), and

15   S.R.(1), a senior sales and finance executive (almost twenty-five (25) minutes). These were the first calls

16   Patel had with either S.R.(1) or S.R.(2) since she joined Teva in April 2013. That same day, S.R.(1) also

17   spoke several times with Brown, Vice President of Sales at Glenmark – the only other competitor in the

18   market for Norethindrone Acetate.

19       1094.   After speaking with the two Amneal executives, Teva refused to significantly reduce its

20   price to the customer; instead providing only a nominal reduction so as not to disrupt the market. At

21   that time, market share was almost evenly split between the three competitors. When discussing it later,

22   Patel acknowledged internally that Teva had "bid high" at the customer based on its understanding

23   "that it would be an increase candidate for Amneal. They increased shortly after." By bidding high and

24   not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the fair

25   share understanding among the competitors in the market.

26

27

28

1

2

### 12.    Teva/ Dr. Reddy's

*a.    Oxaprozin*

1095.    In early 2013, Dr. Reddy's began having internal discussions about re-launching Oxaprozin in June of that year. In March 2013 – when Teva was still the sole generic in the market – the plan was to target one large retail chain and one large wholesaler in order to obtain at least 30% market share. Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20% after Greenstone and Sandoz both re-launched Oxaprozin.

1096.    On June 13, 2013, members of the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to "discuss launch targets based on the market intelligence gained by the sales team."

1097.    Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva. At the time, Teva had 60% market share. Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier. Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that significant customer.

1098.    Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens. At a July 1, 2013 sales and marketing meeting, there was an internal discussion among Dr. Reddy's employees about "asking to see if Teva would walk away from the business" at Walgreens. Within a week, Dr. Reddy's employees had learned that Teva would defend the Walgreens business and recognized that they would have to "bid aggressively" to obtain that customer.

1099.    Dr. Reddy's did bid aggressively at Walgreens. On or around July 14, 2013, Walgreens informed Green, then a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price. Per Green, Walgreens did not "want to move but obviously want[s] the price."

1100.    While the Dr. Reddy's offer to Walgreens was still pending – on July 23, 2013 – J.A. of Dr. Reddy's called Green. That phone call – the only one ever between the two individuals that is identified in the phone records – lasted for nearly five (5) minutes.

1101.    Two days later, Green noted that "[i]f we give D[r. Reddy's] this business, they may be satisfied. I will see if I can find this out." Green also warned, however, that if Teva decided to defend

1  and keep Walgreens' business, Dr. Reddy's will "just go elsewhere" – meaning Dr. Reddy's would

2  continue to offer unsolicited bids to Teva customers and drive prices down.

3    1102.   While deciding whether to match the Dr. Reddy's offer at Walgreens or concede the

4  business to Dr. Reddy's, Teva engaged in internal discussions about strategy. On July 29, 2013, K.G. at

5  Teva suggested the possibility of keeping the Walgreens business, but conceding Teva's next largest

6  customer for Oxaprozin – Econdisc – to Dr. Reddy's. Eager to avoid any further price erosion from

7  the Dr. Reddy's entry, Rekenthaler immediately asked Patel to "look at our business on Oxaprozin in

8  order to accommodate Dr. Reddy's entry." Rekenthaler's goal was to identify customers other than

9  Walgreens that Teva could concede to Dr. Reddy's in order to satisfy its market share goals.

10    1103.   At 12:33pm that day, Patel asked a colleague to "run the customer volume and

11  profitability analysis for Oxaprozin." It was typical at Teva to run this type of report before negotiating

12  market share with a competitor. At 2:20pm, that colleague provided the information to Patel, copying

13  Rekenthaler and K.G. With this information in hand, less than an hour later Rekenthaler placed a call to

14  T.W., a Senior Director of National Accounts at Dr. Reddy's. The call lasted two (2) minutes and was

15  their only telephone conversation in 2013.

16    1104.   After having this conversation with T.W., Teva decided to maintain the Walgreens

17  business, but concede the Econdisc business to Dr. Reddy's. Teva conceded the Econdisc business on

18  August 7, 2013. Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for

19  conceding the business to Dr. Reddy's.

20    1105.   By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20% share of the

21  Oxaprozin market. At that time, its customers included Econdisc, Keysource, and Premier.

22        *b.   Paricalcitol*

23    1106.   518.   Teva entered the market for Paricalcitol on September 30, 2013 as the first-to-

24  file generic and had 180 days of generic exclusivity.

25    1107.   Following its period of exclusivity, Teva's "goal was to concede business on day 181"

26  but "to retain CVS, Walgreens and ABC. All others are not an automatic concede, but we expect to

27  concede." During March and April 2014, Teva coordinated with and conceded several customers to

28

1  Zydus, as Zydus was entering the market for Paricalcitol. By mid-April 2014, Teva "ha[d] conceded the

2  share [it] planned for" to Zydus.

3      1108.  By May 2014, Dr. Reddy's started preparing to enter the Paricalcitol market. On May 1,

4  2014, T.W. of Dr. Reddy's spoke with Rekenthaler of Teva for nearly eleven (11) minutes.

5      1109.  At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was

6  instructed to find out which customers were currently purchasing Paricalcitol from which

7  manufacturers, and their prices. Dr. Reddy's was targeting a 20% market share. At the time, Teva's

8  share was 73%.

9      1110.  On June 10, 2014 – as Dr. Reddy's was starting to approach certain customers –

10  including a large retail pharmacy customer ("The Pharmacy") – Patel spoke with V.B., the Vice

11  President of Sales for North American Generics at Dr. Reddy's, several times. At 8:50am, Patel called

12  V.B. and left a voicemail. V.B. returned the call at 9:18am, and the two spoke for more than ten (10)

13  minutes. Later that day, at 2:46pm, Dr. Reddy's provided The Pharmacy with a market share report for

14  Paricalcitol indicating that Teva was the market leader at 60% share. A representative of The Pharmacy

15  responded that it "[l]ooks like Teva is the right target." Shortly after this e-mail exchange, at 3:21pm,

16  V.B. called Patel again and the two spoke for nearly nine (9) minutes.

17      1111.  By June 19, 2014, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and The

18  Pharmacy. The internal plan was that if The Pharmacy declined, then Dr. Reddy's would make an offer

19  to CVS. That same day, Teva agreed to concede its Paricalcitol business at Omnicare, dropping its

20  market share by 3%.

21      1112.  Teva also strategically conceded what remained of its Cardinal business (it had

22  previously conceded some of that business to Zydus). After receiving Dr. Reddy's bid, Cardinal

23  approached Teva and asked whether Teva would bid to retain the 4mcg portion of the business. Patel

24  recommended to her boss, K.G., that Teva concede the business: "We have ~70 share and it is ideal to

25  concede here because of the incomplete family." K.G. agreed. Patel then instructed S.B., a customer

26  analyst at Teva, to concede "due to [T]eva's high share." S.B. subsequently e-mailed T.C., Teva's Senior

27  Director of Sales & Trade Relations: "Due to the fact that we have high share and already conceded on

28  the other strengths, we are going to concede on this strength as well." T.C. relayed this statement,

1   word-for-word, to Cardinal.

2       1113.   Dr. Reddy's also submitted a bid to ABC, which was one of the customers that Teva

3   had targeted to keep after losing exclusivity. ABC notified Teva of Dr. Reddy's competitive bid for

4   Paricalcitol on June 26, 2014. In internal e-mails discussing this price challenge, Teva employees noted

5   that Dr. Reddy's was "aggressively seeking market share" and potentially eroding the price of the drug.

6   When asked for his thoughts on this, Rekenthaler remarked:

7
8
9
10
11
12

```
From:    Dave Rekenthaler
Sent:    Tue 7/01/2014 9:42 AM (GMT-05:00)
To:      Nisha Patel02
Cc:
Bcc:
Subject: RE: ABC Paricalcitol CPC #12233 (DRL LAUNCH) -->DUE TODAY <--

My thoughts are that Dr. Reddy is really a pain in my ass.  Have they picked anyone up to date?
```

13      1114.   Despite the pricing challenge, Teva retained the ABC Paricalcitol business. As ABC

14  explained to Dr. Reddy's, "Teva wanted to keep the business and has given us a competitive price."

15      1115.   Dr. Reddy's formally launched Paricalcitol on June 24, 2014. On or around that date, it

16  sent offers to, inter alia, Winn-Dixie, Giant Eagle, and Schnucks. On June 26, 2014, Teva's K.G. told

17  Patel that he was "willing to concede 10-15% share total on Paricalcitol" to Dr. Reddy's.

18      1116.   Winn-Dixie informed Teva that it had received a competing offer for Paricalcitol from

19  Dr. Reddy's. Patel recommended that Teva concede the business. Teva did, and Winn-Dixie informed

20  Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

21      1117.   Giant Eagle informed Teva that it had received a competing offer on Paricalcitol on July

22  10, 2014. That same day, V.B. of Dr. Reddy's called Patel and the two spoke for more than twelve (12)

23  minutes. Shortly after getting off the phone with V.B., Patel responded to a question from a colleague

24  regarding an RFP to another supermarket chain. One of the potential bid items was Paricalcitol. Patel

25  directed her colleague to "bid a little high on Paricalcitol. We should not be aggressive since we are in

26  the process of conceding share due to additional entrants." Her colleague responded: "I will bid higher"

27  on Paricalcitol.

28

230
COMPLAINT AND DEMAND FOR JURY TRIAL

1118.    The next day, Teva conceded the Giant Eagle business to Dr. Reddy's. S.B., a Teva Strategic Customer Analyst, wrote in an internal e-mail, "Due to DRL recent launch and pressure to give up share, we are going to concede." Giant Eagle accepted Dr. Reddy's proposal the next day.

1119.    After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced pricing in order to retain the business. Teva decided internally to concede Paricalcitol at Schnucks "[d]ue to new entrants and having to give up some share." In order to create the appearance of competition with this customer, Teva engaged in what Patel referred to as "fluff pricing," by which it offered Schnucks an inflated price (cover bid) for Paricalcitol to ensure that Teva did not win the business. Indeed, Schnucks was "so insulted" by Teva's price that it moved to Dr. Reddy's the same day it received Teva's offer. When Patel learned of this, she remarked to a Teva salesperson (who she had been discussing "fluff pricing" with recently):

From:      Nisha Patel02
Sent:      Thu 7/17/2014 11:36 AM (GMT-05:00)
To:        ▮▮▮▮▮▮▮▮
Cc:
Bcc:
Subject: RE: Schnucks Paricalcitol CPC (#12201)


Sorry! Had to laugh.  In regards to our recent conversation....this is what we see when we provide fluff pricing.
Can't win!

1120.    Schnucks accepted Dr. Reddy's Paricalcitol proposal on June 30, 2014.

1121.    On July 16, 2014, McKesson informed Teva that it had received a competing bid for Paricalcitol, and that Teva would need to submit its best bid in order to retain the business. Teva initially decided to concede the One Stop portion of McKesson's business only, while retaining the RiteAid portion. Patel wrote internally to her team that "[t]his decision is based on the number of competitors, DRL's potential share target and our current/conceded share. (Dr. Reddy's should be done with challenging our business on this product.)" Patel further added that Teva had been "looking to give up One Stop to be responsible with share" and that "[t]he responsible thing to do is concede some share to DRL but not all."

1122.    On July 18, 2014 – a Friday –Patel called V.B. at Dr. Reddy's at 4:20pm and left a message. V.B. returned the call on Monday morning, and the two spoke for more than four (4) minutes. They spoke again the next morning, July 22, 2014, for more than six minutes. During these calls, Patel

and V.B. agreed that Dr. Reddy's would stop competing for additional market share (and driving price down further) if Teva conceded all of its McKesson business (One Stop and Rite Aid) to Dr. Reddy's. Indeed, Dr. Reddy's confirmed to McKesson (that same day) that it "would be done after this" – meaning it would not compete for additional business because it had attained its fair share. McKesson passed this information along to Teva on July 22.

1123.   The next day, July 23, 2014, Teva conceded its entire McKesson business – both RiteAid and One Stop – to Dr. Reddy's. In its Delphi database, Teva noted that the McKesson Paricalcitol business had been conceded to a "Strategic New Market Entrant." After the fact, former customer McKesson informed Teva that Dr. Reddy's had been "so aggressive because [Teva was] not giving up share."

1124.   By early August 2014, Dr. Reddy's had attained 15-16% of the total Paricalcitol market, which it decided – pursuant to its understanding with Teva – it would "maintain for now."

### 13.   Mylan / Sandoz

#### a.   *Valsartan HCTZ*

1125.   The first drug that CW-4, of Sandoz, and Nesta, of Mylan, coordinated about was Valsartan HCTZ (brand name Diovan).

1126.   Mylan was the first to file an ANDA to market the generic version – Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz manufactured the authorized generic. This meant that Sandoz and Mylan would be the only two manufacturers of the generic for six months.

1127.   Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21, 2012. In the days leading up to the launch, CW-4 and Nesta spoke at least twenty-one (21) times by phone during which they discussed, among other things, allocating market share for this product. These calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:20:01 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:11 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:18 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:43 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:35 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:03 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:22:22 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:35 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:06 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:26 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:19 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:57 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:03:30 |
| 9/14/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:07:36 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:09 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:32 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:40 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:51 |

1128.   During these phone calls, Sandoz and Mylan – through CW-4 and Nesta – agreed to divide up the market so that each competitor obtained roughly a 50% market share.

1129.   Throughout this time, CW-4 also kept Kellum (her supervisor) regularly informed of her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

1130.   On September 21, 2012 – the date of the Valsartan HCTZ launch –  R T., a senior sales and marketing executive at Sandoz, sent an internal e-mail stating "[a]s a cross functional team, we have optimized this launch successfully securing ~52% market share vs. a formidable competitor like Mylan. . . . you should be very proud!"

1131.   That same day, Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ. In an internal series of e-mails reacting to this news, a Sandoz employee remarked: "Fyi, good news, Mylan has 180 days as expected." H.F., a senior-most

executive of Sandoz Germany responded, "…sometimes a little help from our competition is welcome as well." D.D., a senior-most executive of Sandoz North America, replied:

I guess this is what they call "co-opetition".

1132.   Kellum forwarded Mylan's press release announcing the Valsartan launch to the Sandoz pricing and sales teams. S.G., a national account executive at Sandoz, replied "Hallelulah!!!!!!!!!!!!!!!! (sic)."

1133.   On September 25, 2012 – only four days after the launch – ABC contacted Sandoz seeking a price reduction on Valsartan HCTZ. S.G. forwarded the request to CW-1 and Kellum stating "ABC has provided additional information regarding the market pricing on Valsartan HCTZ (specifically to McK [a Mylan customer]). Please review and advise if Sandoz will continue to let the market settle or move in a different direction. Kellum replied, "[n]o price change."

1134.   On November 16, 2012, Sandoz executives met to discuss increasing sales for Valsartan HCTZ. R.T. sent an internal e-mail in advance of the meeting asking, "Are there opportunities with non-Sandoz customers that we should evaluate?" After a colleague responded with a list of potential Mylan customers, Kellum responded, "I'm concerned we are going to disrupt the market. I understand the need for additional sales but we need to be thoughtful here." R.T. then informed the Sandoz team "Do not approach new customers, with[out] me or Armando [Kellum]'s consent."

B.   **Taking the Overarching Conspiracy to a New Level: Price Fixing (2012 – 2015)**

1.   **July 31, 2012 Price Increase**

1135.   Effective July 31, 2012, Teva increased pricing on a number of different drugs. Many were drugs where Teva was exclusive, but several of them were drugs where Teva faced competition, including the following[40]:

---

[40] Watson Phannaceuticals, Inc. ("Watson"), acquired Actavis in or about October 2012. The two companies operated as a single entity, albeit under separate names until January 2013, when Watson announced that it had adopted Actavis, Inc. as its new global name. [See https://www.allergen.com/news/news/thomson-reuters/Watson-pharmaceuticals-inc-is-now-actavis-inc.]

| Drug | Competitors |
|---|---|
| Buspirone Hydrochloride Tablets | Mylan (29.5%); Watson (23.5%) |
| Estradiol Tablets | Mylan (26.7%); Watson (16.4%) |
| Labetalol HCL Tablets | Sandoz (61.4%); Watson (10%) |
| Loperamide HCL Capsules | Mylan (67%) |
| Mimvey (Estradiol/Noreth) Tablets | Breckenridge (66.2%) |
| Nadolol Tablets | Mylan (49.8%); Sandoz (10.3%) |
| Nitrofurantoin MAC Capsules | Mylan (45.3%); Alvogen (7.9%) |
| Tamoxifen Citrate Tablets | Mylan (22.2%); Watson (10.3%) |

1136.   Before raising prices on these drugs, Teva coordinated each of these price increases with its competitors. For every drug on the list above, either Green or Rekenthaler was communicating directly or indirectly with Teva's competitors to coordinate in the days and weeks leading up to the price increase. For example:

   a.   Mylan: Green spoke to Nesta on July 23 (7 minutes), July 24 (2 calls: 4 and 8 minutes); July 25 (4 minutes); July 26 (4 minutes); July 30 (2 calls, including one 8 minutes); and July 31, 2012 (5 calls: 6, 2, 4, 7 and 2 minutes);

   b.   Watson: Rekenthaler spoke to A.S., a senior Watson sales executive, on July 11, 2012 (2 calls: 1 and 9 minutes);

   c.   Sandoz: Green spoke to CW-2 at Sandoz on July 29, 2012 (2 calls: 2 and 4 minutes) and July 31, 2012 (6 minutes).

   d.   Breckenridge: Rekenthaler spoke to D.N. a senior sales executive at Breckenridge on July 17, 2012 (4 minutes);

   e.   Alvogen: Green had several calls with Nesta at Mylan (noted above) on July 31, 2012. After some of those calls between Green and Nesta on July 31, Nesta called B.H., a senior sales and marketing executive at Alvogen.

   *a.   Nadolol*

1137.   As early as 2012, Teva was speaking to competitors about the drug Nadolol.

1138.   In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three companies experienced supply problems of some sort during that time period, but they were in

1   continuous communication to coordinate pricing and market allocation in order to maintain market

2   stability. Nadolol was a high-volume drug and one of the most profitable drugs where Teva, Mylan and

3   Sandoz overlapped, so it was very important that they maintain their coordination.

4   1139.   By 2012, an anticompetitive understanding among Teva, Mylan and Sandoz was firmly

5   entrenched.

6   1140.   Teva raised its price on Nadolol on July 31, 2012. In the days leading up to that

7   increase, Green, at the time in the sales department at Teva, was in frequent communication with

8   executives at both Sandoz and Mylan. Green spoke to CW-2 from Sandoz twice on July 29, 2012, and

9   again on the day of the price increase, July 31, 2012. Similarly, Green was communicating with Nesta of

10   Mylan often in the days leading up to the increase, including five (5) calls on the day of the price

11   increase.

12   1141.   Sandoz followed with its own increase on August 27, 2012. The increases were

13   staggering – varying from 746% to 2,762% depending on the formulation. The day before the Sandoz

14   increase, Kellum, then the Senior Director of Pricing and Contracts at Sandoz, called Green. They had

15   also spoken once earlier in the month, shortly after the Teva increase. CW-2 also called Green twice on

16   August 21, 2012 – the same day that Sandoz requested approval from its Pricing Committee to raise the

17   Nadolol price. The day after the Sandoz increase, Green – acting as the conduit of information between

18   Sandoz and Mylan – called Nesta of Mylan twice, with one call lasting fourteen (14) minutes.

19   1142.   Mylan, which returned to the market after a brief supply disruption, followed and

20   matched the Teva and Sandoz increases on January 4, 2013. The day before the Mylan increase Nesta

21   spoke to Green four (4) times. The next day, Green conveyed the information he had learned from

22   Nesta directly to his counterpart at Sandoz. On January 4, 2013 – the day of the Mylan increase, Green

23   called Kellum twice in the morning, including a six (6) minute call at 9:43am. Shortly after hanging up

24   with Green, Kellum reported internally on what he had learned – but concealing the true source of the

25   information – a convention that was frequently employed by many Sandoz executives to avoid

26   documentation of their covert communications with competitors:

27

28

From: **Kellum, Armando**
Sent: Friday, January 04, 2013 11:28 AM
To: ████████████████████████████████████████████████████
Subject: Levothryoxine and nadolol

Just heard from a customer that

- Teva and Mylan raised have now raised price on Nadolol to our levels

and

Mylan took a significant price increase on Levothryoxine

Let's please be cautious on both of these products.

Thanks

1143. Being "cautious" on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

1144. Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013. At 11:50am the same morning, Green also called CW-2 at Sandoz and they spoke for fifteen (15) minutes.

1145. Significantly, Green was not speaking with his Sandoz contacts solely about Nadolol, the common drug between Teva and Sandoz, but was also conveying information to Sandoz about a Mylan price increase on another drug that Teva did not even sell – Levothyroxine. Such conversations further demonstrate the broad, longstanding agreement among each of these competitors to share market intelligence in order to facilitate the scheme.

1146. To put the Nadolol price increases into context, the Connecticut Attorney General's Office received a complaint from a Connecticut resident who has been prescribed Nadolol for approximately the last 15 years. In or about 2004, that individual paid between $10 and $20 in out-of-pocket costs for a 90-day supply of Nadolol. Today, that same 90-day supply of Nadolol would cost the complainant more than $500.

1147. Teva continued to conspire with Mylan and Sandoz about Nadolol and many other drugs throughout 2013 and into the future.

b.   *Labetalol HCL*

1148.   After Teva increased its pricing on Labetalol HCL on July 31, 2012, it continued to coordinate with its competitors to maintain that supra-competitive pricing for that drug. For example, in October 2012, Teva learned that Sandoz was "no longer having supply issues" but that "Watson is on allocation" (i.e., did not have enough supply to meet all of its demand). In an internal e-mail sent on October 16, 2012, J.L., a senior analyst at Teva, questioned whether Teva should consider lowering "strategic customer pricing" in order to retain its market share.

1149.   That same day, Green spoke to CW-2 of Sandoz two (2) times. After those calls with CW-2, Green responded to the analyst's question:

> Sandoz is back in good supply. They took a 500% price increase several months back, and they are holding firm with their prices.
>
> Stay the course and maintain our higher price

1150.   T.C. of Teva agreed: "We need to stay the TEVA course."

1151.   Rekenthaler was not satisfied, however. In order to confirm that Watson was also still committed to maintain high pricing on Labetalol HCL, Rekenthaler called and spoke to A.S., a senior sales executive at Watson, four (4) times on October 18, 2012.

c.   *Nitrofurantoin MAC*

1152.   Teva's July 31, 2012 price increase on Nitrofurantoin MAC was between 90-95% depending on the dosage and formulation. After that increase, Teva continued to coordinate with Mylan and Alvogen to maintain those high prices.

1153.   For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC because it was having difficulty competing with the prices being charged by the distributor's competitors (i.e., other distributors). At 9:49am on October 10, 2012, K.G. of Teva sent an internal e-mail to the Teva sales team, including Green and Rekenthaler, among others, saying:

Sales Team,

We adjusted our pricing on Nitrofurantoin based on market pricing we had received in the past.  Please confirm current market pricing.

1154.   Immediately after receiving that e-mail, Green reached out to both Nesta at Mylan and B.H., his counterpart at Alvogen. At 10:01am, Green called Nesta and the two spoke for ten (10) minutes. After hanging up – at 10:11am – Green called B.H. at Alvogen for the first of three (3) calls that day, including one call lasting fourteen (14) minutes. To close the loop, Nesta also separately spoke to B.H. two times that same day, including a call lasting almost ten (10) minutes. Teva did not lower its price.

**2.       February – April 2013: Increasing Prices Before A New Competitor Enters the Market: Budesonide Inhalation Suspension**

1155.   As of February 2013, Teva was the only company in the market for generic Budesonide inhalation suspension. Teva knew, however, that a potential legal action challenging the validity of the patent on the brand drug could allow additional competition into the generic market shortly. Before any additional competition could enter the market, effective February 8, 2013, Teva raised the WAC price for its Budesonide inhalation suspension by 9%. Although a very modest increase in percentage terms, the 9% price increase added $51 million to Teva's annual revenues.

1156.   On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid. Actavis immediately began planning to launch the product "at risk," which is when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are formally resolved and there is still a risk that the new generic entrant might ultimately be found to violate the patent. That same day, Rekenthaler of Teva called his counterpart at Actavis, A.B. – a senior sales and marketing executive – and they spoke for two (2) minutes. This was the first-ever phone call between them based on the phone records produced.

1157.   The next day, April 2, 2013, Rekenthaler spoke to A.B two (2) more times, including one call lasting eight (8) minutes. Actavis then immediately began shipping the product. Instead of

1  competing to obtain market share as a new entrant, however, Actavis entered the market with the exact

2  same WAC price as Teva. Indeed, when Teva inquired of a customer that same day to confirm Actavis'

3  pricing, Teva was informed by the customer that Actavis' pricing was "in line with [Teva's] current

4  wholesale pricing."

5       1158.   At some point thereafter, further legal action from the brand manufacturer prevented

6  Actavis from permanently entering the market. In the interim, though, Teva was able to continue to

7  charge the agreed-upon prices. In addition, once Actavis entered the market in 2015, Teva immediately

8  conceded customers to Actavis in accordance with the fair share agreement – after calls between

9  Rekenthaler and Falkin, by then a Vice President at Actavis.

10                    **3.     May 13, 2013 Price Increase – Tizanidine**

11      1159.   As of May 2013, Sandoz, Mylan, and Dr. Reddy's were in the market for Tizanidine. Dr.

12  Reddy's led the increase on this product on May 13, 2013, increasing its WAC price and raising contract

13  pricing tenfold. At that time, Dr. Reddy's was the market leader with 59% market share, while Mylan

14  had 24%, and Sandoz had 17%.

15      1160.   Tizanidine was a drug that had been on the market for many years and whose price had

16  eroded as many competitors entered and exited the market depending on the profitability of the drug.

17  As Dr. Reddy's explained in an internal presentation, "Price needs to be adjusted to incentivize current

18  manufacturers to stay in this product" and stated that Dr. Reddy's assumes "Mylan and Sandoz are

19  responsible players, and they may not be able to pick up the large volumes we currently service."

20      1161.   Sandoz was thrilled when it learned that Dr. Reddy's had increased its price on

21  Tizanidine. For example, on May 10, 2013, S.G., a national account executive at Sandoz, sent an

22  internal e-mail stating that "Giant Eagle just let me know that Dr. Reddy just took a price increase on

23  Tizanidine! Pricing on the 2 & 4 mg 150 ct went from $4.50 to $45.00. . . . We should secure

24  confirmation but if this is true it would be very positive …." Kellum responded, "Wow! Thank you."

25  Kellum then quickly sent out a directive to the team to "[p]lease put the product on strict allocation to

26  forecast. Pricing Team – no new offers."

27

28

1162.    On May 13, 2013, Dr. Reddy's published its new WAC pricing for Tizanidine. That same day, Nesta of Mylan called CW-4 at Sandoz and they spoke for 4 minutes. Two days later, CW-1 of Sandoz sent an internal e-mail to Kellum regarding "Tizanidine" stating "[l]et's discuss."

1163.    On May 24, 2013, Sandoz followed and matched Dr. Reddy's WAC pricing on several formulations, and even exceeded Dr. Reddy's pricing on one formulation. Sandoz's WAC increases were significant - ranging from 248% to 344%, depending on the formulation. In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with both CW-4 of Sandoz and J.A., a national account executive at Dr. Reddy's, to coordinate the price increase regarding Tizanidine. At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 |

1164.    Notably, after this, Nesta would not speak with J.A. again until three months later in August 2013.

1165.    On May 29, 2013, customer Omnicare e-mailed Sandoz and asked whether it wanted to submit a bid for Tizanidine. CW-3 of Sandoz forwarded the request internally to CW-1 and Kellum asking "[a]re we considering additional Tizanidine market share? I'm assuming are [sic] intent is not to be disruptive at this time." A few minutes later, Nesta called CW-4 at Sandoz and they spoke for nearly thirteen (13) minutes. Later that day, CW-1 replied to CW-3's e-mail stating, "[w]e will sit tight for now." CW-3 then responded to Omnicare, stating that "[a]lthough we are not in a back order situation we cannot assume additional usage at this time. If this were to change I will let you know."

1166.    On June 14, 2013, Anda, a wholesale customer, e-mailed J.A. of Dr. Reddy's asking "[d]id mylan follow your increase?" J.A. responded, "We've heard they did." J.A. had learned of Mylan's intent to follow the price increase through his prior communications with Nesta. However, Mylan had

not actually raised its price on Tizanidine at the time of the inquiry and would not do so until July 2, 2013.

1167.   On June 26, 2013, Meijer, a supermarket chain customer, e-mailed Dr. Reddy's requesting a bid for Tizanidine. J.A. forwarded the request to N.M., a marketing executive at Dr. Reddy's, stating: "I'm assuming they got a price increase." N.M. responded: "I think, given the market situation and us leading the price adjustment, I think, we should not go behind additional market share since it will erode the market even further." J.A. replied, "[y]eah, I was just sending it as an FYI, no intention to bid." A few weeks later, Meijer forwarded the same request to Sandoz. Sandoz's response was similar: "[w]e cannot supply unfortunately."

### 4.   May 24, 2013 First List of Price Increases

1168.   When Patel began at Teva, she completed and sent her first formal list of recommended price increases to her supervisor, K.G., on May 24, 2013. She sent the list via e-mail, with an attached spreadsheet entitled "Immediate PI File." The attached list included twelve (12) different drugs where Patel recommended that Teva follow a "high quality" competitor's price increase as soon as possible. The spreadsheet also revealed competitively sensitive information about future pricing and bidding practices of several of Teva's high quality competitors – information that Patel could have only learned through her discussions with those competitors. The relevant columns from that spreadsheet are set forth below:

| Product Category | Competitors | Reason for increase |
|---|---|---|
| NABUMETONE  TABLETS Total | Watson 26, Glenmark 25, Sandoz 5 | Follow 10% below Glenmark. Sandoz also bidding high. |
| RANITIDINE HCL TABLETS Total | Glenmark 1, Amneal 35, Wockhardt 10? | Follow Glenmark and Amneal increase. 3% below Glenmark. |
| MOEXIPRIL HCL TABLETS Total | Glenmark 18, Paddock 16 | Follow Glenmark increase.  5% lower |
| MOEXIPRIL HCL/HCTZ TABLETS Total | Glenmark 78, Paddock 2 | Follow Glenmark increase.  5% lower |
| ADAPALENE GEL Total | Glenmark 13, Taro 45 | Follow Glenmark increase. 5% lower. Rumors of Taro increase |
| CEFDINIR ORAL SUSPENSION Total | Lupin 35, Northstar 5, Sandoz 3 | Follow Lupin. 8-10% lower |
| CEFPROZIL  TABLETS Total | Lupin 42, Northstar 10, Sandoz 18 | Follow Lupin. 8-10% lower |
| CEFDINIR CAPSULES Total | Lupin 49, Sandoz 16, Northstar 7 | Follow Lupin. 8-10% lower |
| FLUOCINONIDE OINTMENT Total | Taro 44, Sandoz 1 | Raise to follow Taro |
| FLUOCINONIDE CREAM E Total | Taro 62, Sandoz 10 | Raise to follow Taro |
| FLUOCINONIDE GEL Total | Taro 63, Sandoz 9 | Raise to follow Taro |
| FLUOCINONIDE CREAM Total | Taro 68, Sandoz 1 | Raise to follow Taro |
| CEFACLOR ER TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEPHALEXIN TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEFADROXIL  TABLETS Total | Westward 41 | EXCLUDE; ERROR IN SOURCE DATA |

1169.   For every one of the relevant drugs on the list, Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013. During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in

the markets for the identified drugs. For some of these drugs – including the four different formulations of Fluocinonide – Patel knew before she even began her employment at Teva that she would be identifying those drugs as price increase candidates because of communications she had already had with Aprahamian of Taro.

1170.   The graphic on page 170 of State AG Complaint No. 2 summarizes some of the calls related to each of the respective competitors leading up to May 24, 2013.

1171.   The "Immediate PI File," including the competitively sensitive information Patel had obtained from competitors, was sent by Patel's supervisor K.G. to Cavanaugh – at that time the Senior Vice President of Sales and Marketing at Teva – on May 27, 2013. Cavanaugh adopted and approved Patel's price increase recommendations on May 28, 2013.

1172.   The Teva price increases for the drugs identified in Patel's May 24, 2013 "Immediate PI File" went into effect on July 3, 2013. Patel went to great lengths to coordinate these price increases with competitors prior to sending the list to K.G. on May 24, 2013. Some illustrative examples of that coordination are set forth below.

                            *a.*   *Glenmark*

1173.   A number of the drugs identified in the "Immediate PI File" were targeted because of a recent Glenmark price increase on May 16, 2013. As soon as Patel started at Teva, she began to identify price increase candidates through her conversations with various sales and marketing executives at Glenmark, including:

    a.   CW-5: 4 calls on 5/2/13 (5:02; 0:06; 7:18 and 11:39), 2 calls on 5/3/13 (1:53 and 0:06); 1 text message on 5/3/13;

    b.   J.C.: 3 calls on 5/6/13 (6:45; 20:44; 8:39); 2 calls on 5/7/13 (7:59 and 1:03); For example, early in the morning on May 2, 2013, Patel informed a colleague that she expected to have some new drugs to add to the price increase list imminently:

From:      Nisha Patel02
Sent:      Thu 5/02/2013 6:49 AM (GMT-05:00)
To:
Cc:
Bcc:
Subject: RE: Price Increases — will you be scheduling time next week to discuss?

When you get in, let's touch base on the high priority items below. Please gather/calculate the shelf stock and any other financial exposure involved. If possible, use an assumption of a 30% increase for now with a variable formula where the percentages can be changed for different scenarios. I also expect to have some high priority items to add to this list. I should have them shortly.

1174.   Less than fifteen minutes later, Patel received a call from CW-5 of Glenmark and the two spoke for just over five (5) minutes. Shortly after that call, at 7:44am, Patel sent a follow-up e-mail where she identified six different "high priority" Glenmark drugs to add to the price increase list, including: Adapalene gel; Nabumetone; Pravastatin; Ranitidine HCL; Moexipril HCL; and Moexipril HCL/HCTZ. Glenmark had not yet increased price on any of those drugs, nor had it sent any notices to customers indicating that it would be doing so (and would not send such notices until May 15, 2013).

1175.   As the Glenmark price increases were approaching, Patel took steps to make sure that Teva did not undermine its competitor's action. During the morning on May 15, 2013, in anticipation of the Glenmark price increases that had not yet been implemented or made public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different drugs that Teva and Glenmark both marketed:

From: ▮▮▮▮▮▮▮▮
Sent: Wed 5/15/2013 7:40 AM (GMT-05:00)
To: ▮▮▮▮▮▮▮▮
Cc: Nisha Patel02
Bcc:
Subject: Various Product Family Requests / RFP

▮▮▮▮▮

Nisha would like to be made aware of any requests (including in-house RFPs) that include the following product families:

Adapalene

Nabumetone

Fluconazole Tabs

Ranitidine

Moexipril

Moexipril HCTZ

Pravastatin

Ondansetron

In the event you are reviewing these products for any request, please make her aware and as a group we can discuss where to price based on market intelligence she has collected.

1176.   In accordance with the fair share understanding outlined above Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

1177.   Patel also spoke to CW-5 of Glenmark for nearly six (6) minutes the next day, May 16, 2013 – the day of the Glenmark price increases. Effective that day, Glenmark increased price on the following drugs where there was an overlap with Teva: Adapalene gel; Nabumetone; Fluconazole tablets; Ranitidine HCL; Moexipril HCL; Moexipril HCL/HCTZ; Pravastatin; and Ondansetron. Patel also spoke to CW-5 and J.C. at Glenmark multiple times on May 17, 2013.

1178.   After Glenmark price increase implementation on May 16, 2013, and before Teva had the opportunity to follow those increases, several customers approached Teva looking for a lower price. Teva refused to bid on most of these solicitations so as to maintain market stability. When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business. As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark drugs: "IF we bid, we need to bid high, or we will disturb the market."

1179.   Patel did not immediately include all of the Glenmark price increase drugs on Teva's price increase list, however, because certain drugs involved non high "quality" competitors. For these

1  drugs, a little more work (and communication) was required before Patel would feel comfortable

2  moving forward with a price increase.

3    1180.   For example, the market for Fluconazole tablets included Greenstone as a competitor

4  (albeit with relatively low market share) in addition to Teva and Glenmark. As of Friday May 17, 2013,

5  Patel had not yet decided whether Teva should follow the Glenmark price increase on Fluconazole,

6  fearing that Greenstone might not be a responsible competitor. In an internal e-mail that day, Patel

7  indicated to colleagues – including her supervisor, K.G. – that she was "[g]athering some revised intel"

8  about Fluconazole in order to determine next steps. The following Monday, May 20, Patel called Robin

9  Hatosy, a national account manager at Greenstone but was unable to connect. Patel was ultimately not

10  able to communicate with Hatosy by phone until May 28, 2013 when the two had a twenty-one (21)

11  minute call. The next day after speaking to Hatosy – May 29, 2013 – Patel promptly added Fluconazole

12  to the Teva price increase list.

13    1181.   Teva followed the Glenmark price increase for Fluconazole tablets on July 3, 2013. That

14  same day, Patel spoke to Hatosy for nearly sixteen (16) minutes and also spoke to CW-5 at Glenmark

15  for almost five (5) minutes. The Teva price increases were a staggering 875% - 1,570%, depending on

16  the dosage strength. Greenstone then followed with an increase of its own on August 16, 2013. Patel

17  coordinated those increases with both Glenmark and Greenstone.

18           *b.   Sandoz*

19    1182.   In her May 24 "Immediate PI File," Patel included competitively sensitive information

20  about the drug Nabumetone, indicating that she was confident following Glenmark's increase because

21  Sandoz was "bidding high" on that drug. In other words, Sandoz would provide cover bids that were

22  too high to be successful, so that Sandoz would not take its competitors' market share even if it did not

23  take its own price increase. Patel had spoken to CW-1 for nearly twenty-five (25) minutes on May 15,

24  2013, and again for more than eighteen (18) minutes on May 20, 2013, during which time she learned

25  this information.

26    1183.   At the same time, Sandoz was internally discussing its "bidding high" strategy for

27  Nabumetone. Two days before Patel sent the "Immediate PI File" to her supervisor, a Sandoz pricing

28  analyst sent the following e-mail to Kellum and CW-1 confirming the strategy:

From:
Sent:           Wednesday, May 22, 2013 4:14 PM
To:             Kellum, Armando;
Subject:        Target RFP Question

AK,

I know we agreed not to bid on potential price increase items, but we bid Nabumetone at a high price.  Are you okay with us bidding on this one?  McKesson does not purchase this product from us.

1184.   Patel continued to coordinate with CW-1 and other competitors about increasing prices for drugs on the list even after she sent it to K.G. on May 24, 2013. For example, at 8:15am on May 30, 2013, Patel spoke to CW-5 at Glenmark for nearly twelve (12) minutes. Immediately after hanging up the phone, Patel called CW-1 at Sandoz to discuss Glenmark's increase on the drug Ranitidine HCL and Teva's plans to follow that increase (Sandoz was also in the market for Ranitidine HCL). She left CW-1 a voicemail, which he returned promptly. Patel and CW-1 then had several substantive telephone calls over the next half hour.

1185.   After these conversations with Patel, at 10:02am, CW-1 sent an e-mail to Kellum indicating that he believed there would be price increases in the pipeline with respect to Ranitidine HCL, and suggesting a potentially substantial increase in Sandoz's price:

From:
Sent: Thursday, May 30, 2013 10:02 AM
To: Kellum, Armando
Cc:
Subject: Ranitidine tabs

I think there might be some price increases in the pipeline.

Per analysource Glenmark just took a WAC increase to $9.53 from $2.70(we are at 4.98) on the 150mg on 5/16.  I wonder if Teva and Amneal will follow?  They are the two dominant players on this molecule

We just bid and I think we are getting the award at a contract price of $1.77.  This contract is negative gross margins but 15% above variable costs.  RAD was at $0.95.  Looking at the competition of Amneal, Teva and Glenmark I thought that this was the best way to go to get into this product, we are currently sitting with a 1.8% share.

RAD is also buying up a lot of our short dated product.

Wonder if there is any way to work with them to revise the cost at a future date if Teva and Amneal go up as well.  I'm thinking we can go from $1.77 to $5 maybe

1186.   The communication between Patel and CW-1 about competitively sensitive information was constant and unrelenting during this period. For example, in June 2013 Teva was "attempting to understand how [its] pricing for Isoniazid compares to the rest of the market." On June 11, 2013, L.R., a Teva marketing representative, asked Patel whether she was "aware of any competitive market intel

for this family?" According to the marketing representative, Sandoz was also in the market for Isoniazid and had "drastically increased their pricing" in January 2013. Patel responded: "I will try to get the scoop on Sandoz pricing tomorrow. When do you need this by?"

1187.   The next day - June 12, 2013 - Patel exchanged at least five (5) calls with CW-1 at Sandoz, including those listed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:19:04 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:20 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:00 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:23 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:09:21 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:25 |

1188.   At 8:27am, after the first two of the phone calls listed above, Patel sent the following e-mail clarifying some of the information that L.R. had provided, reflecting some of the conversations about market share she was having with CW-1:

From: Nisha Patel02
Sent: Wednesday, June 12, 2013 8:27 AM
To:
Cc:
Subject: RE: Isoniazid market pricing

I hope to get intel later today. In the meantime, I am hearing about IMS info that contradicts what we have. I am being told that as of quarter ending March 2013, Sandoz has 62% share, with Teva having about 36% share. The data also indicates that Westward has less than 1% share, which implies that they are not back. I have also heard that Westward makes the product for Versa, so they are out for now as well. You may want to request more current share data from Market Research to verify?

It is my opinion that we could have raised pricing to a higher level, but I also understand that there are several factors to consider in these decisions. Depending on what you plan to include in your response, I would also have supply info handy. I imagine that we could easily have picked up more share at this very low price, but were probably limited by supply...which is why Sandoz is able to maintain business at their high price.

I'll pass on additional info as I receive it. If you have any questions, please feel free to come by to chat.

1189.   Later that day, at 3:21pm, Patel passed along additional information with specific price points she had received from CW-1 at Sandoz:

1
2
3
4
5
6

From:    Nisha Patel02
Sent:    Wed 6/12/2013 3:21 PM (GMT-05:00)
To:      ███████████████
Cc:
Bcc:
Subject: RE: Isoniazid market pricing

███

Wholesaler nets for Sandoz product are around $100 for the 300mg 100s and $80 for 100mg 100s. Our WACs are very low. Let me know if you need anything else.

7   1190.   As discussed more fully below, Teva ultimately increased price on Isoniazid on January

8   28, 2015 – in coordination with Sandoz. Patel spoke to CW-1 for more than sixteen (16) minutes

9   shortly before the increase, on January 22, 2015.

10          *c.*      *Taro*

11   1191.   Patel noted in her May 24, 2013 "Immediate PI File" that for the drug Adapalene Gel,

12   she was confident in following the Glenmark price increase because there were also "[r]umors of a Taro

13   increase" on that drug. In addition to Teva and Glenmark, Taro was the only other competitor in the

14   market for Adapalene gel at that time. Patel had heard the "rumors" about a Taro increase directly from

15   Aprahamian, the Vice President of Sales and Marketing at Taro. During a nearly eleven (11) minute

16   phone conversation between the two on May 22, 2013, the competitors agreed to follow the Glenmark

17   increase. This was the first call between Patel and Aprahamian since Patel joined Teva.

18   1192.   Shortly after the phone call with Patel, Aprahamian made an internal request for a

19   report with specific information about Adapalene gel in order to evaluate a potential Taro increase on

20   the drug, including volume and pricing. Aprahamian indicated that the reason for his request was that

21   the "[r]umor mill has some price changes in the market."

22   1193.   The next day, May 23, 2013, Aprahamian directed a Taro employee to implement a

23   price increase on Adapalene gel:

24
25
26
27
28

From: Ara Aprahamian/US/TARO

To:

Cc: Customer Accounting/US/TARO@TARO, Ara Aprahamian/US/TARO@TARO

Date: 05/23/2013 11:28 PM

Subject: Fw: Adapalene - price changes

_____

please coordinate price adjustment for Adapalene for all the highlighted accounts (distributor price only - most specifically keep Target net price the same but Anda distributor price needs to be raised) to a new net of $97.25....

If you can do today fine, otherwise early next week...

1194.   Exactly one week after the call between Patel and Aprahamian, on May 29, 2013, Taro increased its price on Adapalene gel. As discussed below, Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

**5.      July 3, 2013 Price Increases**

1195.   Teva implemented its first formal set of price increases using Patel's high-quality competitor formula on July 3, 2013, relating to twenty-one (21) different generic drugs. Many of the drugs slated for price increases were from the May 24, 2013 "Immediate PI File," but several others had been added in the interim. Patel scheduled a conference call for the day before the price increases to discuss those increases with members of Teva's sales and pricing departments:

| Price Increase -- Agenda | |
|---|---|
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler; ███████████████████████████████ |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

1) Price increase effective Wednesday, 7/3/2013

2) List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

1196.    Patel and/or Green spoke to every important competitor in the days and weeks leading up to the July 3, 2013 Teva price increase to coordinate the increases and reiterate the understanding already in place with those competitors.

1197.    The graphic on page 180 of the State AG Complaint No. 2 details some of the calls between Teva representatives and Teva's competitors in the days and weeks leading up to the July 3, 2013 price increase.

1198.    The only drugs that Patel or Green did not coordinate with Teva's competitors (those not highlighted in the referenced graphic) were drugs where Teva was exclusive – i.e., had no competitors.

1199.   Patel – and other executives at Teva –went to great efforts to coordinate these price increases with competitors prior to July 3, 2013. Some illustrative examples of generic drugs that were added to the list after May 24, 2013 are set forth in more detail below.

a.   *Upsher-Smith*

1200.   On June 13, 2013, as Patel was in the process of finalizing the Teva price increase list, she learned that Upsher-Smith had increased its listed WAC prices for the drug Oxybutynin Chloride.

1201.   On June 13, 2013, K.G. of Teva sent an e-mail to several Teva employees, including Patel, asking them to "share any competitive intelligence you may have or receive" regarding Oxybutynin Chloride. At that time, Teva had been considering whether to delete the drug from its inventory, due to low supply and profitability. One factor that could potentially change that calculus for Teva was the ability to implement a significant price increase. On June 14, 2013, while considering whether to change Teva's plan to delete the drug, a Teva employee asked Patel whether she could "provide an estimate of the pricing we might secure business at?"

1202.   On June 15, 2013, Patel exchanged six (6) text messages with B.L., a senior national account executive at Upsher-Smith.

1203.   Patel deemed Upsher-Smith a highly-ranked competitor (+2) in large part because of her relationship and understanding with B.L. In the week before she began her employment at Teva (after leaving her previous employment), Patel and B.L. exchanged several text messages. During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes. During these initial communications, the two competitors reached an understanding that Teva and Upsher-Smith would follow each other's price increases. This understanding resulted in Upsher-Smith receiving a +2 "quality competitor" ranking from Patel.

1204.   On June 19, 2013, Teva learned that the other competitor in the market for Oxybutynin Chloride, a company not identified as a defendant in this Complaint, also increased its price for that drug. As a result, a national account executive at Teva sent an e-mail to Patel stating "Did you know about the Oxybutynin? We have small share, but huge increase there!" Patel responded: "Yes, heard late last week. The train is moving so fast, I'm worried we won't get on!" That same day, Patel instructed a

1  colleague to add Oxybutynin Chloride to the Teva price increase list and began taking steps to

2  implement the increase.

3       1205.   On July 3, 2013, Teva implemented a price increase ranging between 1,100 – 1,500%

4  increase on Oxybutynin Chloride, depending on the dosage strength. Like the other drugs on the list,

5  Teva would not have increased its price without first obtaining agreement from competitors that they

6  would not compete with Teva or steal market share after the increase.

7                 *b.*   *Mylan*

8       1206.   Immediately after she began at Teva, Patel began to investigate Mylan drugs as a

9  potential source for coordinated price increases. For example, on May 6, 2013, as she was creating the

10  list of "Immediate PI" candidates, Patel sent Green an e-mail with an attached spreadsheet titled "Price

11  Increase Candidate Competitive Landscape." Patel asked Green to "gather as much market intelligence

12  as possible" for certain, specific items that she had highlighted in blue, including nine (9) Mylan drugs:

13  Tolmetin Sodium capsules; Doxazosin Mesylate tablets; Methotrexate tablets; Diltiazem HCL tablets;

14  Flurbiprofen tablets; Nadolol tablets; Amiloride HCL/HCTZ tablets; Cimetidine tablets; and Estradiol

15  tablets.

16       1207.   The next day, May 7, 2013, Green spoke to Nesta at Mylan three times, including one

17  call lasting more than eleven (11) minutes. Green also called Patel twice that day to report on what he

18  had learned. Green and Nesta also spoke a number of times over the next several days, including on

19  May 8 (3:46), May 9 (4:05) and May 10, 2013 (0:28; 10:46 and 2:19).

20       1208.   On May 14, 2013, Patel asked several Teva national account managers, including Green,

21  to obtain "price points" on certain Mylan drugs including Cimetidine and Nadolol in preparation for a

22  potential price increase. She indicated internally to another Teva colleague that she was expecting

23  "additional Mylan intel" and that she was expecting Mylan "to take an additional increase" on those

24  items. On May 17, 2013, Green spoke to Nesta six (6) times, including calls lasting 11:50, 2:23, 4:25 and

25  16:02.

26       1209.   On May 29, 2013, after a discussion with Cavanaugh Patel added four Mylan drugs to

27  the Teva price increase list: Nadolol, Cimetidine, Prazosin HCL, and Methotrexate.

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1210.   Discussions between Green and Nesta about specific drugs continued into June, as Mylan was also preparing for its own major price increase on a number of drugs. From June 24 through June 28, 2013, for example, Green and Nesta had at least the following telephone calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

1211.   On June 26, 2013, in the midst of this flurry of communications between Teva and Mylan (and the same day that Green and Nesta had a one-hour phone call), one of Patel's colleagues sent her a suggestion with the following list of potential drugs to add to the price increase list:

| **Product** | **Competitors (Mkt Share)** |
|-------------|------------------------------|
| Disopyramide Phosphate Capsules | Actavis (61%) |
| Ketorolac Tablets | Mylan (32%) |
| Ketoprofen Capsules | Mylan (63%) |
| Hydroxyzine Pamoate Capsules | Sandoz (39%); Actavis (9%) |
| Nystatin Tablets | Heritage (35%); Mutual (32%) |

1212.   In response, Patel's supervisor, K.G., commented that "Ketoprofen would have a high likelihood of success." Patel also responded favorably with regard to some of the drugs, alluding to the fact that she had inside information about at least Ketoprofen:

From: Nisha Patel02
Sent: Wednesday, June 26, 2013 1:41 PM
To: ███████████████
Subject: RE: India Transfer Review - Price Increase List Question

███████

I definitely agree on Ketoprofen since there are rumors of activity on this one...From a "quality of competitor" standpoint, I definitely think all, but Nystatin, are strong candidates. We'll gather intel on the rest and factor into the potential items for later. Is there a time constraint and a need for actual numbers, or is this just an inquiry to see if they would be possible in the near future? Sorry for the basic questions. I'm just trying to understand how to look at possible deletions v. any other candidate item.

1213.   Not surprisingly given the "rumors," Mylan raised its price for both Ketorolac Tromethamine and Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2, 2013.

1   Teva then quickly followed with its own price increase for both drugs (and others) on August 9, 2013.

2   As discussed more fully below, those price increases were closely coordinated and agreed to by Teva

3   and Mylan.

4       1214.   At the end of the flurry of phone communications between Teva and Mylan described

5   above – on June 28, 2013 –Green and Nesta had a four (4) minute call starting at 10:59am. Within

6   minutes after that call, Patel sent the following e-mail internally at Teva:

7

8

9

10

11

12

13

14

15

> From:    Nisha Patel02
> Sent:     Fri 6/28/2013 11:22 AM (GMT-05:00)
> To:       ███████████████████
> Cc:       ███████████████████████
> Bcc:
> Subject: Competitor Increase Items
>
> All,
>
> It is my understanding that Mylan is announcing a long list of price increases today, for a Monday effective
> date. As we confirm the items and overlap with Teva, we would add the items to the CM alert list and
> determine what our plan of response is based on various factors (WAC limitation, no WAC limitation, supply,
> etc).
>
> ███████,
>
> Hearing that Ketoprofen is on the list.

16       1215.   Patel obtained this information directly from Green but got one significant point wrong

17   (which confirms that she had advance notice of the Mylan increase). In fact, Mylan did not announce

18   the price increases until the following Monday, July 1, 2013 – with an effective date of July 2, 2013.

19       1216.   Patel consistently used the term "rumors" in e-mails to camouflage that Teva was

20   communicating with competitors about future price increases. She used the term when discussing Taro

21   in the May 24, 2013 "Immediate PI" spreadsheet, after speaking with Aprahamian and before Taro

22   raised its price on Adapalene gel. She used it again on June 26, 2013 – after Green and Nesta spoke

23   several times in advance of Mylan's price increase on Ketoprofen.

24       1217.   Similarly, on July 2, 2013 – the day before Teva's price increases (including for the drug

25   Methotrexate) went into effect, a colleague asked Patel how Teva's competitors' pricing compared with

26   regard to Methotrexate. Patel responded that Mylan's pricing was a little low on that drug, "but we are

27   hearing rumors of them taking another increase," so Teva felt comfortable increasing the price of that

28   drug on July 3, 2013. These "rumors" – which were based on the direct communications between

Green and Nesta noted above – again turned out to be accurate: Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

                         *c.*    *Sandoz*

1218.   After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz sought to obtain a "comprehensive list of items" price-fixed so that it would "not respond to something adversely" by inappropriately competing for market share on any of those drugs. Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase. Sandoz ensured it was aware of every increase taken by both competitors so it could live up to its end of the bargain.

1219.   On July 9, 2013, CW-1 stated in an internal Sandoz e-mail that he would "call around to the [Sandoz directors of national accounts] to try and gather a comprehensive list of items."

1220.   Pursuant to that direction, on July 15, 2013 CW-2 of Sandoz called Rekenthaler at Teva and left a message. Rekenthaler called CW-2 back immediately and the two had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz. Rekenthaler complied. Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to CW-2's personal e-mail account:

From: David Rekenthaler [daverek@verizon.net]
Sent: Monday, July 15, 2013 5:02 PM
To: ████@icloud.com
Subject: Fwd:


Sent from my iPhone

Begin forwarded message:

From: Dave Rekenthaler <Dave.Rekenthaler@tevapharm.com>
Date: July 15, 2013, 4:59:27 PM EDT
To: "daverek@verizon.net" <daverek@verizon.net>

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (net actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPERSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

Best regards,

1221.   CW-2 later called CW-1 and conveyed the information orally to CW-1, who transcribed the information into a spreadsheet.

1222.   One of the drugs that both Teva and Mylan increased the price of in early July 2013 was Nadolol. Sandoz was the only other competitor in that market. Shortly after the Teva increase, CW-1 sent Patel a congratulatory message regarding the increase.

**6.     July 19, 2013 Price Increase – Enalapril Maleate**

1223.   Immediately after the July 3, 2013 price increases, Patel began preparing for what she called "Round 2" – another large set of Teva price increases. In the interim, however, Teva was presented with an opportunity to coordinate a price increase with competitors on a single drug – Enalapril Maleate tablets.

1224.   Mylan previously increased its price for Enalapril Maleate effective July 2, 2013. At that time, there were only three manufacturers in the market: Mylan, Teva and Wockhardt. Enalapril

Maleate was on the list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect (as discussed above).

1225.   Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from a customer for a lower price on Enalapril Maleate. Interestingly, the customer indicated that the request was due to Wockhardt having supply problems, not because of the Mylan increase. K.G. of Teva confirmed that Enalapril Maleate "was on the Mylan increase communicated last week. They took a ~75% increase to WAC."

1226.   The comment from the customer sparked some confusion at Teva, which Teva quickly sought to clarify. That same day, Green and Nesta had two phone calls, including one lasting almost sixteen (16) minutes. The next day, July 11, 2013, Green and Nesta spoke two more times. During these conversations, Nesta explained to Green that Wockhardt had agreed to follow the Mylan price increase on Enalapril Maleate. This information sparked the following e-mail exchange between Green and Patel (starting from the bottom):

> **From:** Kevin Green
> **Sent:** Friday, July 12, 2013 1:12 AM
> **To:** Nisha Patel02
> **Subject:** Re: Enalapril / Wockhardt Supply Constraint
>
> Wockhardt followed Mylan. They are not having supply issues. Just allocating based on the Mylan increase. They make their own API
>
> Sent from my iPhone
>
> On Jul 11, 2013, at 9:54 PM, "Nisha Patel02" <Nisha.Patel02@tevapharm.com> wrote:
>
>> Wockhardt took an increase before Mylan? Then had their supply issue? I thought it was their supply issue plus Mylan increase.
>>
>> Nisha Patel
>>
>> Teva Pharmaceuticals USA
>>
>> Director, Strategic Customer Marketing
>>
>> On Jul 11, 2013, at 10:25 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>>> This is all a result of a wockhardt price increase following a Mylan increase
>>>
>>> Sent from my iPhone

1227.   As it turned out, there must have been a miscommunication between Green and Nesta because although Wockhardt did in fact plan to follow Mylan's price increase, it had not yet had the opportunity to do so as of July 11, 2013.

1228.   On Friday, July 12, 2013, J.P., a national account executive at Teva, asked Patel whether Teva was "planning on increasing [its price for Enalapril]." Patel responded: "I hope to increase, but we're gathering all the facts before making a determination." J.P. then inquired whether Teva would make an offer to the customer, and Patel responded: "Not sure yet. Need some time. We're exploring the possibility of an increase just on this item . . . in the near future. Maybe next week."

1229.   That same day, Patel and Green each started "exploring the possibility" and "gathering the facts" by reaching out to Teva's two competitors for Enalapril Maleate. Patel called Nesta of Mylan directly and they spoke three times, including calls lasting six (6) and five (5) minutes. Patel likely called Nesta directly in this instance because Green was attending the PBA Health Conference at the Sheraton Overland Park, Overland Park, Kansas, where he was participating in a golf outing. Upon information and belief, K.K. – a senior national account executive at Wockhardt – attended the same conference, and likely spoke directly to Green either at the golf outing during the day or the trade show at night, because at 12:40am that evening (now the morning of July 13, 2013) K.K. created a contact on his cell phone with Green's cell phone number in it.

1230.   On Sunday, July 14, 2013, after Green returned home from the conference, Green and Patel spoke three times, including one call lasting twenty-one (21) minutes. During these calls, Green conveyed to Patel what he had learned from K.K.: that Wockhardt planned to follow the Mylan price increase.

1231.   First thing the next morning, on Monday, July 15, 2013, Patel sent an e-mail to a Teva executive stating "new developments…heard that Wockhardt is taking an increase today or tomorrow." At the same time, Wockhardt began planning to raise the price of Enalapril Maleate and sought to confirm specific price points for the increase. Internally, Wockhardt employees understood that K.K. would try to obtain price points from a competitor. That morning, K.K. of Wockhardt called Green for a one (1) minute call; shortly thereafter, Green returned the call and they spoke for two (2) more minutes. At 9:57am that morning, K.K. reported internally the specific price ranges that he had

1  obtained from Green.

2      1232.   Armed with this competitively sensitive information, and the understanding that

3  Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase. On

4  Tuesday, July 16, 2013, Patel sent the following internal e-mail to her supervisor K.G., again using the

5  term "rumors" to obfuscate the true source of her information:

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

From:     Nisha Patel02
Sent:     Tue 7/16/2013 11:08 AM (GMT-05:00)
To:
Cc:
Bcc:
Subject: Enalapril Increase Overview

As you are aware, we are currently preparing the information to hopefully be able to implement a price increase on Enalapril.

This is a 3-player market that we share with Mylan and Wockhardt. Mylan announced a price increase last week. We are hearing rumors that Wockhardt will follow or exceed Mylan sometime this week. It would be ideal if we could follow very soon at a slightly more competitive price, with the intent of picking up some additional share in the market. Current share make up is as follows:

  1. Mylan: 44%
  2. Wockhardt: 43%
  3. Teva: 13%

At this time, we are holding off on responding to a couple of bids in-house since a WAC increase would be required to follow the market. It would be a great opportunity to win this share and hopefully additional business as customers request bids going forward. (I think it would be ideal to capture an additional 10%.)

21      1233.   That same day, Nesta called Patel and left a voicemail.

22      1234.   Patel's July 16, 2013 e-mail referred to above was forwarded to Cavanaugh, who

23  promptly approved the price increase. That same day, July 16, 2013, Patel then scheduled a "Price

24  Increase Discussion" with members of Teva's sales and pricing teams, and sent the following agenda:

25
26
27
28

| Subject | Price Increase Discussion |
|---|---|
| Date and Location | Wednesday, July 17, 2013 10:30 AM - 11:00 AM, Dial In Below/Dave's Office |
| Attendees | Nisha Patel02; ███████████████████████████; Dave Rekenthaler ███████████████████████████████████ ███████████; Kevin Green; |
| Message | Sorry for the re-schedules! We are planning to announce an increase on Enalapril Tablets effective Friday. I would like to do a quick review of the changes and answer any questions you may have. A summary will be sent prior to the meeting. Dial In: 866-225-0660 Access Code: 4075453 |

**Notes**

1) Price increase effective 7/19/2013

2) List of items affected:

| NDC | Generic Name | Strength | Form | Package Size |
|---|---|---|---|---|
| 00093-0026-01 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 100 |
| 00093-0026-10 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 1000 |
| 00093-0027-01 | ENALAPRIL MALEATE | 5 mg | TABLET | 100 |
| 00093-0027-50 | ENALAPRIL MALEATE | 5 mg | TABLET | 5000 |
| 00093-0028-01 | ENALAPRIL MALEATE | 10 mg | TABLET | 100 |
| 00093-0028-10 | ENALAPRIL MALEATE | 10 mg | TABLET | 1000 |
| 00093-0028-50 | ENALAPRIL MALEATE | 10 mg | TABLET | 5000 |
| 00093-0029-01 | ENALAPRIL MALEATE | 20 mg | TABLET | 100 |
| 00093-0029-10 | ENALAPRIL MALEATE | 20 mg | TABLET | 1000 |
| 00093-0029-50 | ENALAPRIL MALEATE | 20 mg | TABLET | 5000 |

- Pricing Overview
  - 400-650% increase in invoice/contract pricing
  - 350-450% increase in WAC
  - 10% increase in SWP

- All customers are affected  (Top Customers: CVS, Rite Aid and Medco)

- Expecting Wockhardt to increase. Please pass on any intelligence you are able to get.

- Additional share target of 10%

1235.    Teva and Wockhardt simultaneously implemented price increases on July 19, 2013.
Although the timing of the price increase was coordinated among the competitors, Patel nevertheless
described the simultaneous increase as a coincidence in an internal e-mail that same day:

From:   Nisha Patel02
Sent:   Fri 7/19/2013 8:10 AM (GMT-05:00)
To:     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dave Rekenthaler; ▮▮▮▮▮▮
Cc:
Bcc:
Subject: RE: Enalapril Competitive Customer Volume

FYI, I heard that Wockhardt announced a price increase yesterday morning (probably effective today). Coincidentally, Teva's increase was announced yesterday afternoon with an effective date of today.

I will pass on any supply information I receive.

1236.   Within a few days after the increases, a customer complained to K.K. at Wockhardt, asking: "What is going on in the market that justifies your price increases?" K.K.'s response to the customer was direct: "Mylan took up first we are just following." Similarly, in early August a different customer asked Wockhardt to reconsider its increase, suggesting that Wockhardt's competitors were offering a lower price point. Knowing this to be untrue, K.K. replied again "we followed Mylan and Teva for the increase."

### 7.   August 9, 2013 Price Increases

1237.   On August 9, 2013, Teva raised prices on twelve (12) different drugs. These increases were again coordinated with a number of Teva's competitors, including Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Apotex.

1238.   Patel began planning for the increase shortly after the July 3 increases were implemented. On July 11, 2013, Patel sent a preliminary draft list of price increase candidates to a colleague for what she referred to as "Round 2." For the drugs on the preliminary list, Patel stated that "this does not guarantee that [they] will end up getting an increase, but at the very least, it will be put through the review process."

1239.   The list included a number of drugs involving the following competitors, primarily: Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan and Sandoz. In the days leading up to July 11, 2013, Patel was communicating directly with executives at nearly all of those competitors, including the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:24 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:21:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:05 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:07 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:16:16 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:04 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:04:26 |
| 7/10/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:54 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:29 |

1240.    Patel was also communicating indirectly with Mylan through Green. For example, on July 10, 2013 – the day before Patel sent the preliminary "Round 2" increase list – Green and Nesta spoke twice. Shortly after the second call, Green called Patel and the two spoke for just over seven (7) minutes. The next day, on July 11, Nesta and Green exchanged several more calls. The timing of those calls is set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:29:50 | 0:15:38 |
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:46:55 | 0:02:18 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 15:59:38 | 0:07:05 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:11:34 | 0:00:08 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:12:47 | 0:00:17 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:38:48 | 0:04:03 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:43:51 | 0:00:00 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:20:15 | 0:01:52 |

1241.    Patel and other Teva executives continued to coordinate with competitors over the next several weeks, refining the list and preparing for the next large Teva price increase.

1242.    By August 7, 2013, Patel had finalized the list. That day she sent an e-mail to her supervisor, K.G., with a "Price Increase Overview" spreadsheet which she had prepared for Cavanaugh, summarizing the increases. As shown below, the spreadsheet included competitively sensitive information about certain competitors' plans regarding future price increases that Patel and/or Green could have only learned from directly colluding with those competitors:

Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase | Reason for Increase | Competitors |
|---|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | 53% | Follow Mylan | Mylan, 95.7% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% | Teva Exclusive, Lead | |
| CLEMASTINE FUMARATE TABLETS | 76% | Lead | Sandoz/Fougera, 10.8% |
| DICLOFENAC TABLETS | 102% | Follow Mylan, Teva share leader | Mylan, 19.4% - Sandoz/Fougera, 19.4% - Apotex, 0.1% |
| DILTIAZEM HCL TABLETS | 90% | Follow Mylan | Mylan, 61.3% |
| DOXAZOSIN MESYLATE TABLETS | 1031% | Follow Mylan and Apotex, Teva share leader | Mylan, 28.1% - Apotex, 2.2% - Dava, 0.4% |
| ETODOLAC ER TABLETS | 108% | Follow Taro (likely to be this week with it) | Taro, 56.9% |
| ETODOLAC TABLETS | 434% | Follow Sandoz, Taro likely to follow this week | Taro, 56.6% - Sandoz/Fougera, 20.8% - Watson/Actavis, 0.5% - Apotex, 0.1% |
| KETOPROFEN CAPSULES | 146% | Follow Mylan | Mylan, 63.4% |
| KETOROLAC TABLETS | 288% | Follow Mylan | Mylan, 61.7% |
| PRAVASTATIN TABLETS | 653% | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. | Glenmark, 23.2% - Apotex, 7.1% - Zydus, 3.8% - Lupin, 3.8% - Dr Reddy, 0.9% |
| TOLMETIN SODIUM CAPSULES | 80% | Follow Mylan; Teva almost exclusive | Mylan, 6.5% |

1243.   K.G. immediately recognized that having such explicit evidence of a competitor's price increase plans in writing would be problematic for Teva. In response to the e-mail, K.G. politely asked Patel to remove some of the incriminating information:

From: ████████
Sent:      Wed 8/07/2013 11:00 AM (GMT-05:00)
To:        Nisha Patel02
Cc:
Bcc:
Subject: RE: PI Overview-MC

Nisha,

Please add Teva share to the competitors commentary and change header to Market Share.

Under reasons, I would change to the following:

1. Etodolac ER : Follow Taro
2. Etodolac : Follow Sandoz; Taro increase anticipated.
3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

1244.   In accordance with the executive's request, Patel deleted the information.

1245.   Patel and Green coordinated the increases with every important competitor in the days and weeks leading up to the increase. The graphic on page 197 of State AG Complaint No. 2 details some of the calls with competitors in the days and weeks leading up to the increases.

1246.   The only drug on the list that Patel and/or Green were not coordinating with competitors on in advance (Clemastine Fumarate oral liquids) was a drug where Teva was exclusive and thus had no competitors. That drug was slated for the lowest increase of all drugs on the list (7%).

1247.   The day before the price increase went into effect - August 8, 2013 - Patel was particularly busy, spending most of her morning reaching out and communicating with several key competitors:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

1248.   As it turned out, Mylan was also in the process of implementing its own price increases on August 9, 2013 on several drugs (including several sold by Teva), and it is likely that Nesta reached out to Patel to coordinate those increases.

    a.    Mylan

1249.   Teva and Mylan were coordinating price increases consistently during this period, including the time leading up to the August 9, 2013 increases. During each step in the process, Teva and Mylan executives kept their co-conspirators apprised of their decisions. The communications were typically initiated by Patel, who asked Green to communicate with Nesta of Mylan and obtain what she referred to as "intel" on many different drugs. But at times Patel communicated directly with Nesta.

1250.   For example, on July 22, 2013, Patel sent Green an e-mail with an attached spreadsheet of "Round 2" increase items. She indicated that she was "seeking intel" for a group of drugs in the attached spreadsheet with a highlighted yellow "x" and included in a column titled "Follow Mylan/Other:"

| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | x |
| Diclofenac Tab | Mylan increase; On historical PI list | x | x |
| Doxazosin Mesylate Tabs | Mylan increase; On historical PI list | | x |
| Enalapril Tab | Mylan increase; On historical PI list--COMPLETED | | x |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | x |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | x |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | x |
| Nystatin | Heritage involved  follow Mutual  deletion candidate  PM related | x | x |
| Pravastatin | Carried over from round 1 | | x |
| Sotalol | Mylan increase; On historical PI list | | x |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | x |
| Verapamil  (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | | x |

A large majority were Mylan drugs.

1251.   The next day – July 23, 2013 – at 4:30pm, Green and Nesta spoke for more than six (6) minutes. Immediately after hanging up the phone, Green called Patel to convey the intel he had obtained from Mylan. The call lasted more than three (3) minutes.

1252.   On July 29, 2013, Green at Teva was approached by a large retail pharmacy asking for bids on several of the drugs that Mylan had increased prices on in early July. Green's first step was to request market share information for those drugs so that Teva could make a decision on how to respond to the customer's inquiry based on the generally accepted understanding regarding fair share:

**From:** Kevin Green
**Sent:** Monday, July 29, 2013 9:49 AM
**To:** ████████
**Cc:** ████████
**Subject:** Walgreens: Items for discussion

████████

From the list of items below, can you pull in current market share. These are new opportunities at Walgreens, and I  want to see what the current market looks like.

1253.   The next day, July 30, 2013, Patel sent Green the "latest" price increase file as an attachment, saying that she "[f]igured it would help since I've changed a few things on you." Patel asked Green to obtain additional "market intel" for a group of seven Mylan drugs, some of which varied slightly from the prior spreadsheet.

1254.   Following the same consistent pattern, Green and Nesta spoke six (6) times over the next two days. After hanging up from the last call between the two on August 1, 2013, Green called Patel and conveyed the results of his conversations. This series of phone calls is detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:10:33 | 0:04:52 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:50:57 | 0:01:09 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:54:39 | 0:03:21 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:59:57 | 0:06:53 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:46:59 | 0:01:27 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:23:47 | 0:05:48 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:21:43 | 0:00:59 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 12:29:55 | 0:02:36 |

1255.   In the midst of the phone calls between Green and Nesta on July 31, 2013, Patel sent the following e-mail with "commentary" about the customer request, with a particular focus on balancing Teva's desire to increase prices against its commitment to adhere to the fair share agreement and how that may affect its market share for certain products sold by Mylan:

From:      Nisha Patel02
Sent:      Wed 7/31/2013 3:23 PM (GMT-05:00)
To:        Kevin Green;                           Dave Rekenthaler
Cc:
Bcc:
Subject:   RE: DELPHI 9429 Walgreens: Items for discussion

My initial commentary…

If we can take on the supply, we can bid on items we have already taken our increase on (bold).

**Enalapril:** seeking share

**Cimetidine: shared with Mylan, but do not have our fair share**

**Prazosin: shared with Mylan, but do not have our fair share**

**Nadolol: can pursue additional share (Mylan) for 3-player market**

Loperamide: consider it added to the PI candidates list

Fluoxetine: no plans to follow Mylan increase, but have high share in a 7 player market

Diltiazem IR: consider it added to the PI candidates list

There are plans to follow Mylan on the rest. Need to determine how we want to respond on these if we haven't implemented an increase by the time we respond. From what I understand, we have some time.

1256. Based on all of these communications between Teva and Mylan (and at times other competitors), Teva was able to successfully increase price on seven different drugs that it overlapped with Mylan on August 9, 2013, as set forth above.

> b. *Pravastatin*

1257. As early as May 2, 2013, Patel engaged in discussions regarding a price increase for Pravastatin with CW-5, a senior executive at Glenmark. Early in the morning of May 2, as she was in the process of formulating her list of "high quality" competitors and the list of price increase candidates, Patel informed a colleague that she expected to have some "priority items" to add to the price increase list "shortly." Within minutes, she received a call from CW-5 and they discussed price increases for a number of different drugs, including Pravastatin. Shortly after that call, Patel sent an e-mail to her Teva colleague directing him to add Pravastatin, and several other Glenmark drugs, to the price increase list. In all, Patel spoke to CW-5 four (4) times throughout the day on May 2, 2013, as set

forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 7:02:23 | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 7:56:12 | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 10:00:09 | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 18:40:29 | 0:11:39 |

1258.    As of May 2013, the market for Pravastatin included five competitors: Glenmark, Teva, Lupin, Zydus and Apotex. The number of competitors made it more difficult to coordinate a price increase. This difficulty stemmed in part because two of those competitors – Zydus and Apotex – were also the two lowest quality competitors in Patel's quality of competition rankings, and any price increase for that drug would require significant coordination and communication before Teva could feel comfortable raising its own price.

1259.    Teva was able to achieve a sufficient level of comfort and substantially raise prices for Pravastatin by systematically communicating and reaching agreement with each and every competitor on that drug over the next several months.

1260.    On May 3, 2013, Green called M.K., a senior executive at Zydus, twice with one call lasting four (4) minutes. Over the next several weeks, Green communicated numerous times with both M.K. and K.R., a senior sales executive at Zydus, to coordinate a Zydus price increase on Pravastatin.

1261.    On May 6 and 7, 2013, Patel communicated with her contacts at Lupin (Berthold) and Glenmark (J.C., a national account executive) multiple times. Those calls are detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:06:45 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:20:44 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:08:39 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 0:08:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:01:03 |

During one or more of her calls with J.C. and/or CW-5 of Glenmark in early May 2013, Patel obtained specific price points from Glenmark for its Pravastatin (and other) price increases – well before the

1   Glenmark increases became public – and documented those price points in her price increase

2   spreadsheet.

3       1262.   By May 8, 2013, Teva executives clearly understood that Glenmark would be leading the

4   Pravastatin price increase and were comfortable enough with the situation that one marketing executive

5   at Teva indicated in an e-mail to Patel that he was hoping to raise price on Pravastatin "if/when

6   Glenmark does."

7       1263.   As the Glenmark increase for Pravastatin was approaching, Patel began preparing. On

8   May 15, 2013 – the day before Glenmark's increase would become effective – a Teva executive sent an

9   e-mail out to the pricing team stating that "Nisha would like to be made aware of any requests

10  (including in-house RFPs) that include" several of the Glenmark product families, including

11  Pravastatin. The Teva executive concluded: "[i]n the event you are reviewing these products for any

12  request, please make her aware and as a group we can discuss where to price based on market

13  intelligence she has collected."

14      1264.   That same day, Glenmark notified its customers that it would substantially raise the

15  price of Pravastatin, effective May 16, 2013.

16      1265.   As was now the practice among co-conspirators, the day before and the day of the

17  Glenmark increase brought a flurry of phone calls among several of the competitors, including Teva

18  executives. At least some of those calls are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:05:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Incoming | M.K. (Zydus) | 0:03:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:16:00 |
| 5/16/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:04:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:05:57 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |

1266.   As of May 16, 2013, Patel was still considering whether Teva should increase its price for Pravastatin, because she was concerned about whether Zydus would act responsibly and follow a price increase. At that time, Patel did not view Zydus as a quality competitor. Patel stated: "I have asked to get Zydus' ability to supply on this. If it's not so great, I would like to add back to the increase list." Patel later indicated that "[t]he only threat was Zydus. Just waiting to hear on their ability to supply."

1267.   Green was responsible for coordinating with Zydus. As seen in the table above, on May 15, 2013, Green spoke with three Zydus employees, including a call with K.R. of Zydus lasting sixteen (16) minutes. The next day, on May 16, Green spoke with M.K. for 4 minutes. Later that day, K.R. called M.K. and the two Zydus executives spoke for more than seventeen (17) minutes. Green also spoke to Rekenthaler and Patel the same day, conveying what he had learned from his communications with the Zydus executives.

1268.   Also on May 16, Patel's supervisor, K.G., sent an internal e-mail to several colleagues, including Patel and Rekenthaler, stating "I think we need to understand additional competitor ability to take on additional share and pricing actions. The volume is huge for us. It would be nice to try to increase our price, but we do not really want to lose a lot of share on this product." In response, Rekenthaler indicated that he was now comfortable with the price increase, but he did not want to put his reasoning in writing:



1269.   The next day – May 17, 2013 – Patel continued to coordinate the price increase with executives at both Glenmark and Lupin. For example, at 12:08pm, Patel called Berthold at Lupin for an eleven (11) minute call. While she was on the phone with Berthold, CW-5 of Glenmark called Patel (at 12:09pm) and left a 23-second voicemail. Immediately after she hung up the phone with Berthold, Patel returned the call to CW-5; they ultimately connected for nearly eight (8) minutes.

1270.   As of this point, Teva executives had spoken to all of their competitors about Pravastatin except Apotex. From May 20-24, Patel had the following series of phone calls with B.H., a senior sales executive at Apotex, during which Apotex agreed to raise its price for Pravastatin:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/20/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:21:56 |
| 5/21/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:11:28 |
| 5/23/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:06:13 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:00:39 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Outgoing | B.H. (Apotex) | 0:12:07 |

These were the first documented phone calls between Patel and B.H. since Patel had joined Teva.

1271.   But even with this agreement in hand, Patel was still hesitant to add Pravastatin to the price increase list until Apotex actually increased its price. For example, when she sent the "Immediate PI" spreadsheet to her supervisor K.G. on May 24, 2013, Pravastatin was still not on the list.

1272.   That would change shortly. On May 28, 2013, Apotex raised its price for Pravastatin. That same day, Green also exchanged six (6) text messages with K.R. at Zydus. The next day, after a conversation with Maureen Cavanaugh, Patel added Pravastatin to the Teva price increase list.

1273.   The day after the Apotex increase, Defend spoke to K.R. at Zydus two more times, and exchanged four (4) more text messages. Zydus then quickly followed with a price increase of its own on June 14, 2013.

1274.   Following the normal pattern, Green spoke to KR. and M.K at Zydus several times in the days leading up to the Zydus increase, including at least the following calls and text messages:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Incoming | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |
| 6/13/2013 | Voice | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:07:11 |

1275.    Teva ultimately followed Glenmark, Apotex and Zydus with a significant (653%) price increase of its own on August 9, 2013. As described in more detail above, in the days and weeks leading up to August 9, Patel and Green were communicating with all of Teva's competitors for Pravastatin to coordinate the increase.

1276.    When Patel sent the "Price Increase Overview" to her supervisor, K G., on August 7, 2009, two days in advance of Teva's price increase, she included one piece of very telling information about the agreement she had in place with Berthold and Lupin: specifically, that Lupin was "waiting on Teva" before implementing its own increase. Based on this representation from Lupin, and Lupin's status as a high-quality competitor, Teva executives felt comfortable implementing the significant price increase.

1277.    A couple of days after Teva implemented its increase, a colleague at Teva asked Patel when Zydus and Apotex implemented their price increases. In her response, Patel confirmed that it was Green ("KGn") who had indeed coordinated the Pravastatin price increase with Zydus:

> Assuming we're talking Prava. Glenmark dud theirs 5/15. Zydus followed right before/after hdma i think. apotex i think was early to mid june? KGn got the Zydus intel...he might know off the top if his head.

1278.    Pursuant to that agreement, shortly after Teva's increase – on August 28, 2013 – Lupin raised its price to follow competitors Glenmark, Apotex, Zydus and Teva.

1279.    The extra work required to implement the Pravastatin price increase was well worth it to Teva. As she was preparing to implement Teva's August 9, 2013 price increases, Patel also calculated the quarterly increase in sales revenues resulting from the price increase taken by Teva on July 3, 2013. The analysis also included the financial impact of the recent Pravastatin increase. The results were staggering.

1280.    According to her analysis, the "Total Net Upside after Credits" as a result of the July 3 price increases, plus Pravastatin and one other drug, was a staggering $937,079,079 (nearly $1 billion) *per quarter* to Teva, as shown below:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

1281.    Patel was rewarded handsomely by Teva for effectuating these price increases. In March 2014, less than a year after starting at Teva, Patel was rewarded with a $37,734 cash bonus, as well as an allocation of 9,500 Teva stock options.

1282.    As a result of the price-fixing agreements set forth above, prices rose more than 500% for Pravastatin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings.

1283.    NADAC data demonstrates that average market prices for Pravastatin remained stable prior to July 2013, then increased dramatically and remained artificially high thereafter. For instance, the average market price for Pravastatin 40mg increased by over 640%, from $0.09 per tablet in July 2013 to $0.67 per tablet by December 2013.



NADAC for Pravastatin Sodium Tablets (40 mg)

NADAC for Pravastatin Sodium Tablets (20 mg)



NADAC for Pravastatin Sodium Tablets (80 mg)

1284.   WAC pricing confirms that Apotex, Lupin, Teva, and Zydus all increased their Pravastatin prices substantially and largely in unison.

| Package Size (10mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Apotex | 60505016809 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 500ct | Apotex | 60505016805 | $0.26 | $0.56 | 5/28/2013 | 119% |
| 90ct | Zydus | 68382007016 | $0.17 | $0.48 | 6/14/2013 | 189% |
| 500ct | Zydus | 68382007005 | $0.15 | $0.48 | 6/14/2013 | 222% |
| 90ct | Teva | 00093077198 | $0.17 | $0.48 | 8/9/2013 | 189% |
| 1,000ct | Teva | 00093077110 | $0.15 | $0.48 | 8/9/2013 | 221% |
| 90ct | Lupin | 68180048509 | $0.17 | $0.48 | 8/28/2013 | 190% |
| 500ct | Lupin | 68180048502 | $0.15 | $0.48 | 8/28/2013 | 222% |

1285.   Although WAC data is not available for Glenmark, upon information and belief, it implemented virtually identical price increases at virtually the same time for its Pravastatin products.

1286.   Prices continued to increase after August of 2013. In the October 2014 letters Senator Sanders and Representative Cummings sent to generic manufacturers as part of their investigation, they outlined the price increase Pravastatin saw between October 2013 and April 2014. They sent letters to

Dr. Reddy's, Apotex, Teva, and Zydus, and depicted the following price increases during that six-month period:

| Drug | Package Size | Avg. Market Price Oct. 2013 | Avg. Market Price April 2014 | Percentage increase: |
|---|---|---|---|---|
| Pravastatin Sodium | 20mg, 1,000ct | $77 | $368 | 377% |
| Pravastatin Sodium | 40mg, 1,000ct | $114 | $540 | 373% |
| Pravastatin Sodium | 10mg, 500ct | $27 | $196 | 625% |
| Pravastatin Sodium | 80mg, 500ct | $59 | $299 | 365% |
| Pravastatin Sodium | 10mg, 90ct | $6 | $34 | 406% |
| Pravastatin Sodium | 20mg, 90ct | $7 | $35 | 400% |
| Pravastatin Sodium | 40mg, 90ct | $9 | $51 | 466% |
| Pravastatin Sodium | 80mg, 90ct | $14 | $52 | 271% |

1287.   These price increases cannot be explained by supply shortages or costs. According to a November 2014 report by the New York Times, a three-month supply of generic pravastatin cost $230 in the United States, but $31.50 for the branded version, Pravachol, in Canada.[41]

c.   *Etodolac*

1288.   As of July 13, 2013, Teva sold both Etodolac and Etodolac ER. Teva's competitors for the standard version of Etodolac were Taro and Sandoz. For Etodolac ER, Teva had only one competitor – Taro.

1289.   When Patel first began planning for "Round 2" of Teva's price increases, Etodolac and Etodolac ER were not slated for increases. For example, when she circulated a long list of potential "Round 2" increases on July 11, 2013 (that would later be cut down substantially) – neither of those drugs was on the list.

1290.   Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July. Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its

_____

[41] http://www.nytimes.com/2014/11/25/us/lawmakers-look-for-wa.vs-to-provide-relief-for-rising-cost-of-generic-drugs.html?_r=0.

customers.

1291.   On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Aprahamian at Taro and they spoke for sixteen (16) minutes. Aprahamian called CW-3 back the next day and the two spoke again for eight (8) minutes. After hanging up the phone with CW-3, Aprahamian immediately called Patel. They exchanged voicemails until they were able to connect later in the day for nearly fourteen (14) minutes. On July 18, 2013, Patel called CW-1 at Sandoz and the two spoke for more than ten (10) minutes.

1292.   During this flurry of phone calls, Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER.

1293.   On July 22, 2013 – before any price increases took effect or were made public, Patel added both Etodolac and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:

| Etodolac | Sandoz* (All strong competitors) |
|---|---|
| Etodolac ER | Could follow IR (Shared with Taro) |

1294.   Based on her conversations with CW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER. During those conversations, Teva agreed to follow both price increases.

1295.   That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases, including for Etodolac. Prior to the conference call on July 23, CW-1 called Patel at Teva. After exchanging voicemails, the two were able to connect for more than fourteen (14) minutes that day. During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac. Similarly, CW-3 of Sandoz called Aprahamian at Taro that same day and the two spoke for more than three (3) minutes.

1296.   The Sandoz price increase for Etodolac was effective July 26, 2013. That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets. After learning of the request, Aprahamian responded swiftly internally: "Not so fast. Why the request? Market just changed on this and not apt to undercut."

1297.   When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:

| | |
|---|---|
| Message | |
| **From:** | ara.aprahamian@taro.com [ara.aprahamian@taro.com] |
| **Sent:** | 7/30/2013 11:14:49 PM |
| **To:** | |
| **CC:** | |
| **Subject:** | Re: Fw: Bid Request - Etodolac |
| **Attachments:** | _.gif; _; _ |

recent market changes, not taking on additional share...

1298.    Also on July 26, Patel sent an e-mail to others at Teva – including her supervisor K.G., Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR (immediate release). She instructed them to "[p]lease watch ordering activity for both, IR and ER. The intent is that we will follow in the near future, but a date has not been determined."

1299.    Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac and Etodolac ER price increases (among other things). Between July 29 and August 2, 2013, for example, Patel engaged in the following series of calls with CW-1 of Sandoz and Aprahamian at Taro:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

1300.    Aprahamian was also speaking to his contact at Sandoz- CW-3 - during this time, including the following calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

1301.   On August 1, 2013 - shortly after speaking with Patel - Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac and Etodolac ER. Aprahamian stated "[w]e need to get these out next week." Not wanting to provide the details in writing, Aprahamian concluded: "Will come over and discuss with you."

1302.   By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac and Etodolac ER. The minutes from a Teva "Marketing Ops" meeting on August 5, 2013 - which Patel attended - reflect the following:

> 4.   Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week.  CIM still monitoring to 100% forecast for all customers.

1303.   When Patel sent the "Price Increase Overview" spreadsheet to her supervisor K.G. on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "this week." K.G. quickly instructed Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

1304.   Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013. Both their AWP and their WAC prices were increased to the exact same price points. The increases were substantial. For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

**8.     July 2013 – January 2014: Competitors Seek to "Follow" Price Increases: Haloperidol and Trifluoperazine HCL, Benazepril HCTZ, Levothyroxine, Clomipramine HCL**

1305.   As detailed above, after Mylan and Teva implemented significant price increases in early July 2013, Sandoz executives sought to obtain a "comprehensive list" of those Teva and Mylan price increases. Sandoz sought this information because it did not want to accidentally compete for market share on any of the Teva or Mylan drugs that overlapped with Sandoz.

1306.   To that end, on July 15, 2013, Sandoz executives held an internal meeting during which CW-1 instructed members of the Sandoz sales team, including CW-2 and CW-4, "to investigate [the] list of Mylan and Teva increase items."

1307.   That same day, as detailed above, CW-2 contacted his counterpart at Teva, Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along with the percentage increases for each. Similarly, on July 16, 2013, CW-4 called her contact at Mylan, Nesta. The call lasted two-and-a-half (2.5) minutes. A half hour later, Nesta returned the call and they spoke for nearly nineteen (19) minutes.

1308.   During those two calls, CW-4 asked Nesta to identify the drugs Mylan had increased prices on so that Sandoz could follow with its own price increase. Nesta provided CW-4 with a list of drugs, highlighting that the Nadolol price increase would be large. Nesta also emphasized that Mylan did not appreciate having its prices challenged and that prices should be kept high. After the phone call ended, CW-4 sent the following e-mail to her superiors (the "July 2013 E-mail"):

> **From:** ████████
> **Sent:** Tuesday, July 16, 2013 6:31 PM
> **To:** ████████ Kellum, Armando; ████████
> **Subject:** Price increases
>
> Here are some of the pricing increases from Mylan I was able to garner. These are reportedly to be BIG increases,
> Bupropion HCL
> Diltiazem HCL
> Haloperidol
> Clomipramine
> Sotalol
> Tizanidine
> Peprhenazine
> Levothyroxine (Lanette followed)
> Nadolol
>
> There were others but ones we don't have. There may be others we have, but this is all I was able to get. Pretty well anything we get from a customer that isn't supply obviously is due to pricing increase.
>
> If a specific product is questionable, let me know and I'll find out about it.
>
> ████████
>
> 1

1309.   For at least one drug on the list – Haloperidol – Mylan had yet to raise price at the time of the July 2013 e-mail. Indeed, Mylan would not raise price on this product until August 9, 2013. On that date, Mylan also raised the price on Levothyroxine – a drug on the list that was also increased by

Mylan in January 2013 – and at least two other Sandoz overlap drugs not on the list – Trifluoperazine HCL and Benazepril HCTZ.

1310.   Over the next several months, and consistent with their understanding, Sandoz declined to bid and take business from Mylan customers (except in one instance where Mylan had more than its fair share) and raised prices to match Mylan on a number of products. Some examples of this conduct are detailed below.

<p style="text-align:center"><em>a.   Haloperidol and Trifluoperazine</em></p>

1311.   Haloperidol, also known by the brand name Haldol, and Trifluoperazine HCL, also known by the brand name Stelazine, are antipsychotic drugs that are used to treat disorders such as schizophrenia and Tourette syndrome.

1312.   On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice. Both calls were less than a minute long. Three days later, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine HCL. For Haloperidol, Mylan increased the WAC price by 250% on several formulations. For Trifluoperazine HCL, Mylan increased the WAC price by 80% on all formulations.

1313.   On August 19, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine HCL and that Sandoz needed to "rationalize the market."

1314.   On August 22, 2013, CW-2 e-mailed Kellum stating that CVS "wanted to know if we will be raising price on Haloperidol and Trifluoperazine. Mylan took substantial increases." Kellum forwarded the request to CW-1 and F.R., a pricing manager at Sandoz. F.R. responded, "I believe the answer is yes?? We bid at current price in RFP and did not go after this business. I would answer yes. Thoughts?" CW-1 replied that he would obtain the pricing data, "but I would imagine we will be fast followers."

1315.   On September 18, 2013, CW-1 e-mailed Kellum with his price increase analyses for Haloperidol and Trifluoperazine HCL. For Haloperidol, CW-1 indicated that Mylan had 72% market share, Sandoz had 15%, and Zydus had 10%. For Trifluoperazine HCL, CW-1 stated that "Mylan has 73% and we have 24%. This is a no brainer."

1316.   On September 25, 2013, Walgreens – a Mylan customer – e-mailed Sandoz asking for bids on Haloperidol and Trifluoperazine HCL. CW-1 sent an internal e-mail explaining that "Mylan took a price increase on this product. That's why he is asking. We are currently evaluating tak[ing] one ourselves."

1317.   On October 2, 2013, CW-1 e-mailed S.G., the Sandoz national account executive assigned to Walgreens, directing S.G. to not only decline to bid at Walgreens, but also lie about the reason for doing so:

From: ██████████████
Sent:     Wednesday, October 02, 2013 6:45 PM
To: ████████████
Cc:       Kellum, Armando
Subject:  Haloperidol and Trifluoperazine - WAGS

Steve,

We discussed internally and decided not to pursue WAGS on these at this point.  We have been running up against Mylan a lot lately(Nadolol, Benaz/Hctz), and fear blowback if we take on any more products at this moment.

Trying to be responsible in the sandbox.

I recommend you blame supply.

████████

1318.   Over the next several days, CW-4 and Nesta spoke by phone several times. These communications are detailed in the table below. Prior to these calls, CW-4 and Nesta had not communicated by phone since August 6, 2013.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:11:19 |

1319.   On October 15, 2013 (the day after the last of the phone calls noted above), CW-1 e-mailed the Sandoz Pricing Committee recommending that Sandoz increase pricing on Haloperidol and Trifluoperazine HCL. After reviewing the e-mail, O.K., a senior executive responsible for business planning at Sandoz, recommended approval of the Haloperidol price increase, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January 2014 because of price protection penalties that would be triggered if Sandoz increased in October 2013. As O.K. explained, "I understand that both price increases have been taken by Mylan in August and we are the followers. We might be sending the wrong signal to Mylan by not following promptly however 1.6m top/bottom-line hit with no upside is too big to swallow."

1320.   Ultimately, Sandoz followed O.K.'s recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013 but waited to follow on Trifluoperazine HCL until January 31, 2014.

b.   *Benazepril HCTZ*

1321.   In July 2013, Sandoz finalized its plan to re-launch Benazepril HCTZ. However, because Sandoz executives knew that Mylan planned to increase price on this product, it chose to wait to re-enter the market until after Mylan increased its price so that Sandoz could enter at the higher price.

1322.   On July 12, 2013, a marketing executive at Sandoz sent an internal e-mail regarding "Benazepril Orders for Cardinal" stating: "[b]efore any release, we are expecting Mylan to raise their price." Similarly, during a Commercial Operations meeting on July 15, 2013, it was confirmed that Sandoz was just waiting for confirmation of a Mylan price increase before re-entering the market.

1323.   The next day, on July 16, 2013, CW-4 spoke with Nesta and sent the July 2013 e-mail outlining the Mylan price increase drugs that Nesta had provided to her (discussed more fully above). That list did not include Benazepril HCTZ. CW-1 forwarded the July 2013 E-mail to Kellum stating "See [CW-4's] note below for Mylan increases....I'm surprised benazepril hctz isn't on the list below for Mylan?" CW-1 then e- mailed CW-4 asking, "Benazepril hctz? Was hoping to see that one."

1324.   Over the next few days, CW-4 and Nesta communicated several times, during which they discussed Benazepril HCTZ. These phone calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 14:32:56 | 0:00:31 |
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 14:41:59 | 0:01:21 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:13:44 | 0:00:04 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:14:20 | 0:01:57 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:24:49 | 0:03:11 |

1325.   On August 2, 2013, CW-1 sent a spreadsheet to Kellum entitled, "Teva increases July 2013." In the e-mail, CW-1 stated: "Mylan is also in there. Be on the lookout for bumetanide and Benazepril/hctz."

1326.   One week later, on August 9, 2013, Mylan increased WAC pricing on Benazepril HCTZ. The increase was large - nearly 334% on all dosage strengths.

1327.   On August 20, 2013, consistent with their agreement to maintain high prices, Sandoz quickly re-entered the Benazepril HCTZ market and essentially matched Mylan's WAC pricing.

1328.   A third competitor – non-Defendant Rising – entered the Benazepril HCTZ market on April 2, 2014 as the authorized generic. When Rising entered, it essentially matched the WAC pricing of Sandoz and Mylan. Both before and after entering the market, CW-2 - then at Rising - communicated with his fo1mer colleagues at Sandoz (CW-1, CW-3, and L.J.) about obtaining market share on Benazepril HCTZ. Through those communications, Sandoz ultimately agreed to relinquish ABC to Rising so that the new entrant could achieve its fair share of the market.

1329.   As a result, prices across the market rose more than 300% for Benazepril HCTZ, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, as depicted in the chart below:

| Dosage | Package Size | October 2013 | July 2014 | Percentage Price Increase |
|--------|-------------|--------------|-----------|---------------------------|
| 12.5-20mg | 100 ct | $34 | $149 | 338% |
| 20-25mg | 100ct | $34 | $149 | 338% |
| 5-6.25mg | 100ct | $34 | $149 | 338% |

1330.   NADAC data shows that average market prices of Benazepril HCTZ remained stable prior to October 2013 but rose dramatically and remained artificially high after that time, as depicted for certain forms and dosages below.



###### c.   Levothyroxine

1331.   Since approximately December 2010, Mylan, Sandoz, and Lannett have dominated the generic Levothyroxine market.

1332.   In the years 2013 and 2014, the three competitors coordinated to significantly raise the price of Levothyroxine. Nesta of Mylan spearheaded the discussions by speaking with K.S., a senior sales executive at Lannett, and with CW-4 of Sandoz. In addition to communicating directly with CW-4 on this drug, Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company –Green of Teva. Notably, Levothyroxine was not a drug that Teva sold.

1333.   As detailed above, Mylan increased prices on a number of drugs on January 4, 2013, including Levothyroxine. The day before the Mylan increase, on January 3, 2013, Nesta of Mylan and Green of Teva spoke at least four times by phone. The next morning – the day of the Mylan price increases – Green spoke twice with Kellum, including a six (6) minute call at 9:34am.

1334.   Shortly after hanging up the phone with Green, Kellum sent an internal e-mail stating, among other things, that he "[j]ust heard from a customer that . . . Mylan took a significant price increase on Levothyroxine" and Kellum advised his team to "please be cautious" on this product. As the phone records demonstrate, Kellum's source for the information was not "a customer," but rather Green of Teva.

1335.   That same morning, K.S. of Lannett called Nesta of Mylan. The phone call lasted 44 seconds. Then, on January 10, 2013, Nesta called K.S. back and they spoke for more than six (6) minutes. That same day, McKesson e-mailed Sandoz and requested a price reduction on Levothyroxine. Kellum responded internally, "This is a no. We just learned that Mylan look a large price increase."

1336.   The following Monday – January 14, 2013 – Lannett raised its WAC pricing for Levothyroxine to match Mylan. Notably, after these phone calls, Nesta would not speak again with K.S. of Lannett until August 6, 2013 – three days before Mylan increased its prices for Levothyroxine a second time.

1337.   On July 16, 2013 – as detailed above – CW-4 spoke with Nesta and sent the July 2013 e-mail identifying the Mylan price increases. The price list included Levothyroxine and noted that Lannett had followed.

1338.   On August 6, 2013, Nesta called CW-4 two times. Both calls lasted less than a minute. A few minutes after the second call, Nesta called K.S. at Lannett. The call lasted 24 seconds (likely a voicemail). Three days later, on August 9, 2013, Mylan increased WAC pricing on Levothyroxine for a

second time.

1339.   On August 10, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail that stated: "Mylan took a 300% price increase on Levothyroxine!!! Based on my intelligence (we will need to confirm), please lock down inventory (strict allocation per AK) and no new product offers until we can clarify the situation." CW-4 replied to S.G.'s e-mail stating, "This is correct based on my info as well."

1340.   Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.

1341.   On August 14, 2013, S.G. sent an e-mail to Kellum, copying CW-1, regarding "Levothyroxine Mylan" and asked "[w]e taking the pricing up?" CW-1 responded: "[w]orking on it." In response, S.G. replied: "Thx. I believe Lannett rationalized the market earlier this week." CW-1 answered "We just noticed that as well."

1342.   On September 5, 2013, Cigna – a Mylan customer – contacted Lannett and requested a bid on Levothyroxine. J.M., a national account manager at Lannett, forwarded the request to K.S. stating "due to Mylan's across the board price increases on a number of products, they are looking for new suppliers wherever there is crossover." J.M. explained that "[t]he volume isn't gigantic on the 1000s so it wouldn't attract much attention from Mylan if it went to us …." Nonetheless, on September 12, 2013, Lannett declined the opportunity and blamed supply issues stating "[a]s much as we'd love to take on the business, we are not in a position to do so at this time."

1343.   During a September 10, 2013 earnings call, Lannett's CEO, A.B., was asked for his reaction to Mylan's Levothyroxine price increase. A.B. responded, "You mean after I sent them a thank you note? I'm just kidding. . . . I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well. . . . So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful."

1344.   On September 13, 2013, Sandoz did indeed act "responsibly" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.

1345.   The three competitors - Mylan, Lannett, and Sandoz - did not stop there. They coordinated again to raise price on Levothyroxine in April/May 2014.

1346.   Consistent with the 2013 increases, Mylan was the first to raise its WAC pricing on Levothyroxine on April 25, 2014. In the two days leading up to the increase, Nesta and K S. of Lannett spoke by phone several times. These calls are listed below. Notably, these calls are the last documented telephone calls between these two executives.

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 18:31:26 | 0:00:03 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 18:59:53 | 0:00:34 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 19:57:39 | 0:00:50 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 21:04:47 | 0:05:07 |

1347.   On April 25, 2014 - the day that Mylan increased its pricing for Levothyroxine - P.C., a sourcing manager at Cardinal Health, sent a text message to Sullivan of Lannett stating: "[n]ot sure if you knew already ... Mylan increasing levos." Sullivan responded: "Thanks for the heads up ... We heard 55% on contract price, can you confnm?" P.C. replied, "[y]es ~50-55%." Sullivan had "heard" about the Mylan increase from her supervisor, K S., who had communicated with Nesta only days prior.

1348.   Lannett quickly followed with a price increase of its own - raising its WAC pricing to match Mylan on April 28, 2014. In accordance with their ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014 and matched the WAC pricing of its competitors.

1349.   These price increases are reflected in WAC data:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|--------------|-----------|-----|---------|---------|------------------|---------------------|
| 1,000ct | Mylan | 00378180310 | $0.18 | $0.27 | 8/9/2013 | 45% |
| 100ct | Lannett | 00527134201 | $0.18 | $0.27 | 8/14/2013 | 46% |
| 1,000ct | Lannett | 00527134210 | $0.18 | $0.27 | 8/14/2013 | 120% |
| 90ct | Sandoz | 00781518192 | $0.12 | $0.27 | 9/13/2013 | 120% |
| 1,000ct | Sandoz | 00781518110 | $0.12 | $0.27 | 9/13/2013 | 54% |
| 1,000ct | Mylan | 00378180310 | $0.27 | $0.41 | 4/25/2014 | 55% |
| 100ct | Lannett | 00527134201 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 1,000ct | Lannett | 00527134210 | $0.27 | $0.41 | 4/28/2014 | 54% |
| 90ct | Sandoz | 00781518192 | $0.27 | $0.41 | 5/23/2014 | 54% |
| 1,000ct | Sandoz | 00781518110 | $0.27 | $0.41 | 5/23/2014 | 54% |

1350.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. In a November 2014 hearing in the United States

Senate HELP Subcommittee, pharmacist Stephen W. Schondelmeyer testified that in the prior year, Levothyroxine experienced a 35-50% price hike. Mr. Schondelmeyer added that Mylan increased its prices for nine different strengths of Levothyroxine by between 44-63%. Pharmacist Robert Frankil also testified that in 2013, Levothyroxine experienced a dramatic price increase.[42]

1351.    In 2015, patients complained of a dramatic price increase for their levothyroxine medication. One patient in Detroit explained they routinely paid $20 for 90 tablets, but their cost skyrocketed to $76.77 from one refill to the next.[43] The Wisconsin Center for Investigative Journalism found that between 2011 and 2016, the price per pill for generic Levothyroxine increased from 14 cents to 46 cents.[44]

<p align="center"><em>d.    Clomipramine HCL</em></p>

1352.    In addition to Sandoz and Mylan, Taro also manufactured Clomipramine HCL. Indeed, it was Taro that led a price increase on this product on May 1, 2013. The price increase was striking – more than a 3,440% increase to Taro's WAC pricing on certain formulations.

1353.    In the weeks leading up to the Taro price increase on Clomipramine HCL, Aprahamian of Taro spoke several times with both CW-3 at Sandoz and M.A., a national account manager at Mylan. In fact, on several occasions during this time period, Aprahamian hung up the phone with one competitor and immediately called the next. At the same time, CW-4 of Sandoz was also speaking with D.S., a senior sales and national account executive at Taro. During these conversations, Taro, Sandoz, and Mylan agreed to raise the price of Clomipramine HCL. Certain of these phone calls are detailed in the table below:

---

[42] Why Are Some Generic Drugs Skyrocketing in Price?: Hearing Before the Subcomm. On Primary Health and Aging of the S. Comm. on Health, Educ., Labor, and Pensions, 113th Cong. 10 (2014) (statement of Stephen W. Schondelmeyer, Director, Prime Institute and statement of Robert Frankil, President, Sellersville Pharmacy, Inc.), available at https://www.gpo.gov/fdsys/pkg/CHRG-113shrg24459/pdf/CHRG-113shrg24459.pdf.
[43] Keith Roach, *Hike in prescription cost can be a hardship*, DETROIT NEWS, Mar. 29, 2015, available at https://www.detroitnews.com/story/life/advice/2015/03/29/keith-roach-health-high-prescription-cost-hardship/70639116/.
[44] Sean Kirby, Dee J. Hall & Bridgit Bowden, WIS. CTR. FOR INVESTIGATIVE JOURNALISM, Nov. 28, 2016, available at https://urbanmilwaukee.com/2016/11/28/prices-of-lifesaving-drugs-skyrocketing/.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:15:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:07:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:00:06 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:11:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:12:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 4/17/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:04:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:09:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:04:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:02:00 |

1354.    1034.    CW-3 of Sandoz also took contemporaneous notes of some of his

conversations with competitors. For example, after speaking with Aprahamian of Taro twice on April

30, 2013, CW-3 made the following notes identifying Clomipramine HCL as one of the products that

Taro planned to increase on May 1st:

Indeed, there are notations in CW-3's notebook that demonstrate that he began communicating with Aprahamian about Taro's May 1 increase as early as April 2, 2013.

1355.   As part of the agreement to raise prices and not poach each other's customers on Clomipramine HCL, Sandoz consistently refused to bid for Taro's customers after Taro raised its price. For example, on April 30, 2013, Publix e-mailed Sandoz stating that it had received a price increase letter from Taro regarding several Sandoz overlap products, including Clomipramine HCL, and asked whether Sandoz wanted to bid for the business. Kellum e-mailed CW-4 stating "I'm not inclined to do anything here as these may be opportunities for us. We can blame supply if these are in fact opps for us." CW-4 replied, "Agreed! Especially the opportunities for us part!"

1356.   Taro did agree to concede one customer to Sandoz so that the competitor could achieve its fair share of the market. On May 1, 2013, Rite Aid e-mailed Sandoz asking for a bid on Clomipramine HCL. Kellum responded: "I want to raise price and perhaps pick up share here if possible. [CW-4] try to keep Rite Aid warm and let them know we are evaluating but need to assess supply etc. . . ."

1357.   The next day, on May 2, 2013, Aprahamian of Taro called CW-3 at Sandoz and they spoke for five (5) minutes. CW-3 hung up the phone and then immediately called Kellum. The two spoke for eight (8) minutes. First thing the next morning – on May 3, 2013 – CW-3 called Aprahamian back and they spoke for another five (5) minutes. Within a half hour, CW-3 again contacted Kellum

and spoke for two (2) minutes. Later that day, CW-4 of Sandoz e-mailed Kellum regarding an upcoming call with Rite Aid stating: "[w]hen we speak to the clomipramine – let's reiterate we need to keep it on the DL from taro as long as possible. . . . like we don't already know the cat's out of the bag."

1358.   Ultimately, Sandoz was awarded the Clomipramine HCL business at Rite Aid. When Rite Aid notified Taro, Aprahamian fo1warded the e-mail to M.P., Chief Commercial Officer at Taro, stating "[a]s expected Rite Aid moving Clomipramine."

1359.   Mylan was the next to increase price on Clomipramine HCL. On May 16, 2013, Mylan increased to the same WAC per unit cost as Taro. In the days leading up to the Mylan price increase, all three competitors were in contact with each other to coordinate efforts. Some of these calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:20 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:06:00 |
| 5/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:04:06 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:02:00 |
| 5/16/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:22:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:01:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:01:00 |

1360.   On July 3, 2013, HEB Pharmacy informed Taro that Mylan was on back order for Clomipramine HCL and asked Taro to bid for the business. Aprahamian responded that he was "[n]ot inclined to take on new business. . . Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to over react to this product. Not sure how long Mylan is out."

1361.   On July 16, 2013, CW-4 of Sandoz sent the July 2013 e-mail identifying Clomipramine HCL as a Mylan price increase product. By this time, Sandoz knew that Mylan had increased its price on this product.

1362.   On July 20, 2013, Taro received a "Watch List" notification that Sandoz was increasing price on Clomipramine HCL. Aprahamian forwarded the notice to M.P. stating: "FYI, Sandoz is in the market (and adjusted price to match oms) now with product as expected. Don't want to alert the reps as they could overreact. They did take Rite Aid as you know. Will see what happens from here."

1363.   Two days later - on July 22, 2013 - Sandoz increased its WAC pricing to match the per unit cost of Taro and Mylan.

1364.   These price increases are illustrated below:

| Package Size (25mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90ct | Taro | 51672401106 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 90ct | Taro | 51672401105 | $0.25 | $8.99 | 5/1/2013 | 3,441% |
| 100ct | Mylan | 378302501 | $0.30 | $8.99 | 5/16/2013 | 2,853% |
| 100ct | Sandoz | 781202701 | $0.31 | $8.99 | 7/22/2013 | 2,778% |

1365.   On August 5, 2013, Walgreens - a Mylan customer - e-mailed Sandoz and requested a bid on Clomipramine HCL. S.G., a national account executive at Sandoz, sent an internal e-mail asking "[s]hould we consider a 25% share of their business?" Kellum responded negatively, based on the agreement in place with Mylan, stating: "[t]hat is tempting but I worry very disruptive." On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice. Both calls lasted less than a minute (likely voicemails). The next day, on August 7, 2013, S.G. replied to Kellum's e-mail, stating: "[b]ased upon your concerns, I will kill this unless I hear otherwise from you."

1366.   In October 2013, CW-4 and Nesta spoke by phone several times. At least some of these calls are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 10/3/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:11:19 |

1367.   After this series of calls, during the morning of October 15, 2013, CW-4 of Sandoz called Kellum. The call lasted one minute. Approximately one-half hour later, Kellum e-mailed McKesson and asked if Sandoz could submit a bid for Clomipramine HCL.

1368.   On October 23, 2013, Sandoz submitted a bid to McKesson and the customer responded that a reduction was needed to bring the pricing in line with their current supplier, Taro. CW-1 was surprised and forwarded the request to CW-4, copying Kellum, stating: "I thought we were taking Mckessons Clomipramine from Mylan? Per below it appears that they have Taro on the 90s." CW-4 responded, "Hey, I'm only as good as my intel . . . which should have been good."

1369.   In December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz had taken in recent months on a whole host of drugs, including Clomipramine HCL and several other drugs at issue in this Complaint. After several conversations with antitrust counsel, Kellum prepared the following response to Bloomberg with regard to Clomipramine HCL:

---

█,

Here are the details on our price increase for Clomipramine.

    1)  On July 22, 2013 We raised WAC by the following %'s
           25mg    2,778%
           50m     2,325%
           75mg    1,778%

    2)  We were not the first to raise the price but rather followed Mylan and Taro when we  learned they had taken a price increase which we first learned from the pricing services we subscribe to "Analysource" (First Databank) and Prospectorrx (Gold Standard).

    3)  We had a very small market share (1%) and have since gained ~15% market share Rite Aid and Mckesson by providing lower prices than their incumbent suppliers (Taro and Mylan/Taro).

---

1370.    As is clear from the above allegations, Kellum's statement was a lie. In reality, Sandoz had raised its prices after coordinating the increases with Taro and Mylan in advance and stayed true to its commitments to keep those prices high.

1371.    In 2015 alone, total sales revenue for Clomipramine spiked to $519 million, which is more than half the total sales revenue for the same products from 2011-2014 combined. This type of revenue growth in a mature market is evidence of Defendants' collusion.

### 9.    March 7, 2014: Price Increases and Overarching Conspiracy Converge (Niacin ER)

#### a.    Niacin ER

1372.    On September 20, 2013, Teva entered the market for Niacin ER as the first-to-file generic manufacturer. As the first-to-file, Teva was awarded 180 days of exclusivity to sell the generic drug before other generic manufacturers could enter the market.

1373.    Teva's period of exclusivity for Niacin ER was scheduled to expire on March 20, 2014. As that date approached, Teva began to plan for loss of its exclusivity. By at least as early as February, Teva learned that Lupin would be the only competitor entering the market on March 20.

1374.    The first thing Teva sought to do – knowing that a high-quality competitor would be the only new entrant – was to raise its price. On February 28, 2014, Cavanaugh instructed K.G. and others at Teva that "[w]e need to do the Niacin ER price increase before Lupin comes to market and sends offers out." K.G. immediately forwarded the e-mail to Patel with the instruction: "Please see comment on Niacin ER. Please make sure you include in your price increase." Later that day, Patel called Berthold at Lupin and the two spoke for nearly seven (7) minutes.

1375.    Within a week, Teva was ready to implement the price increase. On March 5, 2014, Patel sent an e-mail to the Teva pricing group stating "[p]lease prepare for a price increase on Niacin ER, to be communicated [to customers] this Friday for an effective date of Monday." The next day, March 6, Teva notified its customers that it would be implementing a price increase on Niacin ER effective March 7, 2014. The increase was for 10% across the board, on all formulations.

1376.    Once Teva coordinated the price increase, it next began taking the necessary steps to divide up the Niacin ER market with new entrant Lupin to avoid competition that would erode Teva's

high pricing. Patel scheduled a meeting with Rekenthaler for March 6, 2014 to discuss an "LOE Plan" for Niacin ER. "LOE Plan," in Teva parlance, is a plan detailing which customers Teva would concede and which customers it would retain upon Teva's "loss of exclusivity" in a particular generic drug market. Teva's LOE plans were often secretly negotiated directly with competitors as they were entering the market, consistent with the industry understanding of fair share discussed above.

1377.   During the morning of March 6, 2014, Patel called Berthold and they spoke for more than seven (7) minutes. During this and several subsequent calls, discussed in more detail above, Teva and Lupin agreed on which specific customers Teva would concede to Lupin when it entered the market on March 20, 2014. Teva agreed that it would concede 40% of the market to Lupin upon entry.

1378.   When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the same WAC per unit cost as Teva, for every formulation. In the days leading up to Lupin's entry, Patel and Berthold were in frequent communication to coordinate the entry, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:44 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:19 |
| 3/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:06:20 |
| 3/20/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:34 |

1379.   In addition, Lupin entered with customer pricing only 10% below Teva's recently increased pricing - so it was expected that pricing would remain at least at Teva's pre-increase exclusive pricing levels. In other words, there was little or no price erosion as a result of Lupin's anticompetitive entry into the market for Niacin ER.

1380.   Over the next several days, Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers. For example, on March 24, 2014, a Teva executive received an e-mail from Cardinal indicating that Cardinal had received "a competitive offer for the Niacin ER family." Cardinal was one of the customers that Teva had already agreed to concede to Lupin. The Teva executive forwarded the e-mail to several people internally at Teva, including Patel, Rekenthaler and Cavanaugh, confirming the plan:

From: ▮▮▮▮▮▮▮
Sent: Monday, March 24, 2014 2:10 PM
To: ▮▮▮▮▮▮▮ Dave Rekenthaler
Cc: Maureen Cavanaugh; Nisha Patel02; ▮▮▮▮▮▮▮
Subject: FW: Niacin ER

I want to make sure our strategy has not changed> we are conceding correct ?

1381.    That same day, Patel spoke to Berthold at Lupin three times, as shown below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:14 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:04:55 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:49 |

1382.    Patel responded:

From:    Nisha Patel02
Sent:    Mon 3/24/2014 1:13 PM (GMT-05:00)
To:      ▮▮▮▮▮▮▮
Cc:      Maureen Cavanaugh; ▮▮▮▮▮▮▮ Dave Rekenthaler
Bcc:
Subject: RE: Niacin ER

Yes. The plan is to concede. This was re-confirmed earlier today, unless something has changed.

1383.    The next day – March 25, 2014 – K.G. of Teva summarized the status of Teva's LOE Plan and the company's agreement with Lupin on Niacin ER: "With the four concessions (CVS, Cardinal, Optum and Humana), we would be giving up right around 40% share as Dave noted (I calculated 39%) . . . . We need to keep everybody else."

**10.    April 4, 2014 Price Increases**

1384.    On April 4, 2014, Teva raised prices on twenty-two (22) different generic drugs. Nearly all of these increases were coordinated with a number of Teva's high-quality competitors including Sandoz, Taro, Actavis, Mylan, Lupin, and Greenstone. But for this price increase, Teva also began coordinating with some of what it regarded as "lesser-quality" competitors – such as Breckenridge,

1  Heritage, VersaPharm, and non-Defendant Rising – as new sources for anticompetitive agreements.

2  For this price increase, Teva also decided to lead many more price increases – which was riskier for

3  Teva and required even greater coordination with competitors.

4      1385.   Leading more price increases was part of a strategy that Patel memorialized in writing in

5  January of 2014, documenting in many respects the successful strategy that she had implemented in

6  2013, focused on leveraging Teva's collusive relationships with high-quality competitors. This strategy

7  was well known, understood and authorized by individuals at much higher levels at Teva, including

8  Cavanaugh and Rekenthaler, and Patel's direct supervisor K.G. For example, on January 16, 2014, Patel

9  sent a document to K.G. titled "2014 Pricing Strategy Brainstorm," where she outlined her plan for

10  implementing price increases:

11  

**2014 Pricing Strategy Brainstorm**

- Lead more increases
- Candidate Identification:
  - Exclusive items
  - Number of competitors; Target 2-4 total players, where quality of competitor is high
  - Teva has majority share and quality of competitors is high - lead
  - Competitors with long term supply issues
  - Competitors exiting market
  - Low or limited financial exposure
  - Adjust  pricing in accordance with volume (secondary, dual, etc)
- Follow market pricing promptly
  - Delayed reactions erode pricing
  - Teva is the market leader. Ability to react to market changes should be reflective of reputation.

19      1386.   Patel began planning for the next round of Teva price increases in early January 2014,

20  shortly after returning to full-time status from maternity leave. On January 14, 2014, Patel sent K.G. a

21  preliminary draft list of price "Increase Potentials Q1 2014." She stated: "Attached is my list of

22  potential items. Note that they still need to go through the review process."

23      1387.   The initial list contained drugs sold by Actavis, Lupin, and Greenstone, among others.

24  Not surprisingly, Patel was communicating frequently with each of those competitors throughout

25  December 2013 and into early January 2014.

26      1388.   On February 7, 2014, Patel created a formal list of "PI Candidates" in a spreadsheet. In

27  the days leading up to February 7, Patel was feverishly coordinating by phone with a number of

28  different competitors to identify price increase candidates, including at least the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

1389.   Those efforts were successful. By February 26, 2014, Patel had a more refined list of "PI Candidates," which she forwarded to another colleague for his review. That list included the following drugs and notes about each drug:

| Family | Market Notes | Pricing Notes |
|---|---|---|
| Clarithromycin ER | Zydus exiting | Raise non-Cardinal customers in accordance with new Cardinal price |
| OCs | Secondary at ABC | Raise to non-primary pricing/within 10% of primary market sell-refer to Anda intel |
| Cephalexin OS | | Follow Lupin - price points - WS net $14.70, 23.52, 16.75, 25.13 |
| Azith Susp | | Follow GS - price points - WS net $12.50 on all sku's |
| Medroxypro Tabs | | Follow GS - price points - WS net 8.50, 9.50, 10.50 on 100s |
| Nadolol (Econdisc only) | | Raise to originally planned increase price |
| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor | |
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | |
| Cyproheptadine | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract $5.10 |
| Mimvey | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 96.30 |
| BUDESONIDE | Exclusive | PER PRICING INFORMATION FROM DECEMBER |
| NIACIN ER | Exclusive but Lupin entering | PER PRICING INFORMATION FROM DECEMBER |
| Bumetanide | Teva exiting  CHECK SALES FOR % INCREASE | Lead market with potential share loss in mind |
| Diva proex ER | UNPROFITABLE  several competitors | |
| Diflunisal | Shared only with Rising | |
| Ketoconazole Cream | Shared with Taro and Sandoz | |
| Ketoconazole Tab | Shared with Taro, Myl and Apo | |
| Mupirocin Ointment | Shared with Perrigo, GM, Taro, Sandoz | |
| Theophylline Tab | Shared with Heritage, Major and Inwood | |
| Nystatin Tab | Shared with Heritage and Mutual/Caraco | |
| Hydroxyzine Pamoate | Shared with Sandoz and Actavis | |
| Pentoxi ER | Shared with Apo and Mylan | |

1390.   Patel continued to refine the list over the next several weeks.

1391.   On March 17, 2014, Patel sent a near final version of the "PI Candidates" spreadsheet to K.G. with the statement: "Once you verify these are acceptable, we can finalize for the increase." Patel and Rekenthaler both were communicating frequently with competitors- in this case Taro, Lupin,

1  Actavis, Greenstone, Zydus, Heritage, and Rising - to coordinate the price increases in the week before

2  Patel sent the price increase list to K.G. At least some of those communications are reflected in the

3  table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

1392.   Rekenthaler had also previously spoken with his contact at VersaPharm – J.J., a senior national accounts executive – on January 22, 2014 (a five (5) minute call) and March 7, 2014 (a three (3) minute call) to secure VersaPharm's agreement to follow the Teva increase on two drugs. Those were the only two identified telephone calls between Rekenthaler and J.J. since 2012. As discussed more fully below, VersaPharm followed with its own price increase shortly after the Teva increase.

1393.   In the days leading up to the price increase, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully coordinated increases with everyone. On April 1, 2014, Patel responded by providing a list of only those drugs where Teva was leading the price increase – i.e., the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

1394.   Satisfied that Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, on April 4, 2014 Teva increased pricing on various dosage strengths of the following drugs:

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

1395.   These price increases were all coordinated and agreed to between Teva and its competitors. Patel and/or Rekenthaler communicated directly with all of their key competitors in the

days and weeks leading up to the increase. Many of those communications are set forth in the graphic at page 221 of the State AG Complaint No. 2.

1396.   Patel and others at Teva again went to great efforts to coordinate these price increases with competitors prior to April 4, 2014 – including during the time that Patel was out on maternity leave. Some illustrative examples of those efforts are set forth below.

a.   *Cephalexin*

1397.   Throughout 2013, Berthold of Lupin colluded with two different individuals at Teva: Patel and Green. As discussed above, at times Patel and Green would even coordinate with each other regarding who would communicate with Berthold, and take turns doing so.

1398.   As of late October 2013, however, neither of those options was available to Berthold. Patel was out of the office on maternity leave, and Green had left Teva to join Zydus as of October 23, 2013.

1399.   This did not deter Berthold; he merely went further down the Teva organizational chart to find a Teva executive to communicate with. The ongoing understanding between Teva and Lupin was institutional, not dependent upon a relationship between specific individuals. In October 2013, when Lupin decided to raise price on Cephalexin oral suspension – a drug where Teva was the only other competitor in the market –Berthold already knew that Teva would follow the increase.

1400.   On October 14, 2013, Berthold called Rekenthaler at Teva. They ultimately spoke for sixteen (16) minutes that day. Communication was rare between those two executives. Prior to October 14, 2013, the last (and only) time they had spoken by phone was November 21, 2011 according to the phone records produced.

1401.   On October 31, 2013 – the day before Lupin was scheduled to increase its price on Cephalexin oral suspension –Berthold also called T.S., a national account executive at Teva, to notify Teva of the price increase. He called T.S. at 9:18am that morning and left a message. T.S. returned the call at 9:57am, and the two spoke for nearly five (5) minutes.

1402.   Within minutes after hanging up the phone with Berthold, T.S. notified others internally at Teva about the substantial increase Lupin was about to take:

From:
Sent: Thursday, October 31, 2013 10:08 AM
To:                          Dave Rekenthaler
Cc:                                                                                   Nisha Patel02;
Subject: LUPIN PRICE INCREASE - Cephalexin Oral Suspension

I have heard the Lupin is implementing a price increase today on Cephalexin Oral Suspension (4-6 x's current price)

Teva has 59% market share; Lupin has 37% market share.

1403.    The Lupin increase on Cephalexin oral suspension actually became effective the next day, November 1, 2013 – demonstrating that T.S. had advance knowledge of the increase. Shortly thereafter, T.S. followed up her own e-mail with specific price points that Lupin would be charging for Cephalexin.

1404.    K.G. of Teva responded later that day, asking: "Did Lupin increase the Caps as well?" Rekenthaler answered immediately, with information he had learned from Berthold in mid-October: "Lupin did not increase the caps, only the susp[ension]."

1405.    On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase. T.S. forwarded the e-mail from the customer to Rekenthaler and others with the suggestion that, because Teva already had the majority share, it should not bid for the business. K.G. agreed, and simultaneously forwarded the e-mail to Patel stating: "Nisha, let's add this to our list to discuss." Patel called Berthold the same day and left a message.

1406.    When Patel drafted her initial list of possible price increase candidates and forwarded it to K.G. in January 2014, Cephalexin oral suspension was on the list. Patel coordinated the increase consistently with Berthold throughout the period.

1407.    On April 4, 2014, Teva raised its WAC prices on Cephalexin oral suspension to match Lupin's prices exactly. The increases to the WAC price ranged from 90% - 185%, depending on the formulation.

   b.    *Azithromycin and Medroxyprogesterone*

1408.    In November 2013, Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva: Azithromycin oral suspension, Azithromycin suspension

1 and Medroxyprogesterone tablets. Patel and Robin Hatosy, a national account executive at Greenstone,
2 were communicating frequently during that time, including exchanging six (6) text messages on
3 November 16, 2013 and a phone call on November 23, 2013. Because Greenstone was a high-quality
4 competitor, and because the companies had successfully conspired to raise prices previously, it was
5 understood between the two that if Greenstone raised prices Teva would follow and would not seek to
6 poach Greenstone's customers after the increase.

7     1409.   Pfizer was directly involved in the approval process for these price increases. On
8 November 18, 2013 – only two days after Patel and Hatosy exchanged six (6) text messages – a senior
9 pricing executive at Greenstone sent an e-mail to Greenstone's General Manager seeking approval to
10 implement the price increases. The General Manager approved of the price increases the next day, but
11 indicated that he had sent a message to a senior Pfizer executive for sign off, and wanted "to socialize
12 this with him" and let him know that the price increases that Greenstone was seeking to take were
13 consistent with the other price increases currently happening with great frequency in the U.S. generic
14 industry. Part of that socialization process included explaining the strategy behind the price increases.
15 Pfizer approved the price increases on November 22, 2013. The next day, Patel spoke to Hatosy at
16 Greenstone for nearly one (1) minute.

17     1410.   On December 2, 2013 - the same day that Greenstone was slated to send out notices of
18 the price increases to its customers - Patel spoke to Hatosy at Greenstone three times within a span of
19 twenty (20) minutes, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 14:02:54 | 0:00:05 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:10:13 | 0:06:09 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:18:50 | 0:01:37 |

23     1411.   After the last of those three calls, Patel sent an e-mail to several colleagues at Teva
24 notifying them of an impending Greenstone price increase - one that would not be effective for another
25 month:

From: Nisha Patel02
Sent: Mon 12/02/2013 2:23 PM (GMT-05:00)
To:
Cc:                                                                      ; Dave Rekenthaler
Bcc:
Subject: Azithro OS Price Increase

FYI, I'm hearing that Greenstone just announced an increase on Azithromycin Oral Suspensions, effective January 1st. Please take this into consideration for bid requests we may receive.

1412.    On December 5, 2013, Patel continued to communicate with Hatosy about the Greenstone increases, and how Teva would react to unsolicited customer requests for bids – trading two voicemails. The next day, Patel sent another e-mail to K.G. about Azithromycin suspension:



From: Nisha Patel02
Sent: Fri 12/06/2013 11:33 AM (GMT-05:00)
To:
Cc:
Bcc:
Subject: Azithro Susp Question

I mentioned earlier in the week that Greenstone took an increase that is effective January 1st. (As a reminder, I intend to add these items to my list of potential price increases for Q1 2014.)

Since the new pricing requires a WAC increase, I am inclined to decline to bid at this time. Further, in a 2 player market, we have 54% share and this includes a gain of ~4% in June.

Do you agree with the "decline to bid at this time" approach?

1413.    K.G. agreed with Patel's recommendation. Later that day, J.L. of Teva sent the following notice to several Teva colleagues:

**From:** ▮▮▮▮▮
**Sent:** Friday, December 06, 2013 2:27 PM
**To:** ▮▮▮▮▮
**Cc:** ▮▮▮▮▮            Nisha Patel02
**Subject:** RE: Giant Eagle Cephalexin Offer

We've been informed that we will not be pursuing any business at this time on the Azithromycin OS.

As Greenstone recently took a price increase that will not be visible to the market until January, it's been decided to hold off until that time. Once the information is available, we will consider a price increase and then attempt to revisit the opportunities.

The request was left open to see if we could supply for internal purposes only.

Please inform the customer that we are unable to provide an offer at this time.

1414.    That same day, Teva declined to bid on Azithromycin at multiple customers.

1415.    Over the next several months – during the period of time before Teva followed Greenstone's price increases – Teva continued to refuse to bid (and avoid taking Greenstone's market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone tablets. For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin suspension and Medroxyprogesterone due to a "Change in Market Dynamics." After speaking with Hatosy of Greenstone for more than five (5) minutes that same day, Patel agreed with the recommendation not to provide a bid to that customer.

1416.    Similarly, on March 17, 2014 – which was the same day that Patel sent a nearly final price increase list to K.G. – Teva was approached by another wholesaler requesting a lower price for Azithromycin oral suspension. A national account executive at Teva asked Patel: "Can we provide any better pricing than Greenstone? . . . I know we have picked up our target share." Patel had spoken with Hatosy of Greenstone twice earlier that day, including one call lasting more than fifteen (15) minutes. Patel's response to the national account executive was: "Let's talk tomorrow."

1417.    Consistent with the understanding between the two companies, Teva followed Greenstone's price increases for Azithromycin oral suspension, Azithromycin suspension and Medroxyprogesterone tablets on April 4, 2014. Patel spoke twice with Hatosy from Greenstone that

1   same day.

2                                       *c.*   *Clarithromycin* ER

3       1418.   Teva and Actavis were coordinating several drugs Teva price-fixed on April 4, 2014.

4   One of them was Clarithromycin ER tablets. As of December 2013, Teva, Actavis and Zydus were the

5   only generic manufacturers actively selling Clarithromycin ER.

6       1419.   On December 30, 2013, however, Cardinal approached Teva looking for a bid on

7   Clarithromycin ER because Zydus was exiting the market. Teva informed Cardinal that it would not

8   have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal

9   could wait until then for Teva to supply, Teva would make an offer. Cardinal agreed.

10      1420.   The Cardinal bid request was forwarded to Patel on the morning of January 2, 2014. At

11   9:37am that morning, L.R., a customer marketing manager at Teva, suggested providing an offer to

12   Cardinal at "10% under market intel pricing for [the] Watson/Actavis product." L.R. also stated: "[i]f

13   Cardinal is willing to wait until April, I suspect that Actavis isn't interested in picking up a lot of

14   additional share."

15      1421.   Immediately after receiving that e-mail, at 9:40am, Patel called Rogerson at Actavis and

16   the two spoke for more than seventeen (17) minutes. Shortly after hanging up the phone with

17   Rogerson, at 10:12am, Patel responded to the e-mail, saying: "I think we have an opportunity to go

18   higher. Let's aim for around $148 net and request feedback."

19      1422.   On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the higher

20   price. At 9:19am, Patel called Rogerson at Actavis and they spoke for more than six (6) minutes. Shortly

21   after that call, at 9:45am, Patel sent an e- mail internally at Teva stating: "It looks like Cardinal accepted

22   our bid at the higher price. We may have an opportunity to take some increases."

23      1423.   When Patel sent her supervisor the initial list of "Increase Potentials Q1 2014" on

24   January 14, 2014, Clarithromycin ER was on the list.

25      1424.   Similarly, in March 2014, Actavis implemented its own price increase on several other

26   drugs, including some that overlapped with Teva. Consistent with the ongoing understanding between

27   these high-quality competitors, Actavis understood that Teva would follow the increases or, at a

28   minimum, would not poach Actavis customers after the increase.

1425.   At 9:54am on March 14, 2014, Rogerson called Patel and left a message. Patel called Rogerson back at 10:31am, and the two spoke for more than twelve (12) minutes. Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:

> **From:** Nisha Patel02
> **Sent:** Friday, March 14, 2014 10:47 AM
> **To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> **Cc:** Dave Rekenthaler; ▮▮▮▮▮▮▮▮▮▮
> **Subject:** Market Increases
>
>
> NAMs,
>
>
> I'm hearing that Actavis announced a bunch of price increases yesterday. Please share any intel you gather. I believe some of the products, that overlap with Teva, are as follows (not sure if there are any more):
>
>
> Tamoxifen
>
> Mirtazipine
>
> Estazolam

In fact, these increases would not become effective until April 15, 2014, again demonstrating that Teva knew in advance of its competitors' price increase plans.

1426.   Within half an hour of sending that e-mail, Patel instructed colleagues to add the Actavis drugs to the Teva price increase list. She added: "We intend to follow where we can."

1427.   Less than two hours later, at 12:37pm, Patel called Rogerson again. They spoke for more than five (5) minutes. Shortly after hanging up the phone, at 12:51pm, Patel wrote another e-mail to certain colleagues at Teva, stating: "Actavis took an increase. We will follow. We need to review price per my alert list. Let's wait to see what intel we can get and discuss Monday."

1428.   First thing the next business day – which was the following Monday, March 17, 2014 – Patel forwarded the "PI Candidates" list to K.G. at Teva. The list included both Tamoxifen Citrate and Estazolam. Later that morning, Patel called Rogerson. After quickly exchanging voicemails, they spoke for more than nineteen (19) minutes. Rekenthaler of Teva and Falkin of Actavis also exchanged four (4) text messages that day and had one call lasting more than six (6) minutes.

1429.   Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less than three weeks later, on April 4, 2014. Patel and Rogerson spoke twice by phone that day. Rekenthaler and

Falkin also spoke by phone that day. Because Teva was able to follow the price increase so quickly, Teva's increase became effective even before the Actavis price increase for those drugs.

1430.   After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis. For example, on May 14, Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating: "unable to bid (strategic reasons, for internal purposes)." When Patel and her other conspirators at Teva used the term "strategic" in this context, it was code for the fact that there was an understanding in place with a competitor.

1431.   Similarly, on May 21, 2014, Teva received a request from a large customer for a bid on Tamoxifen Citrate. As of that date, Teva had 58.4% of the market, and Actavis had 40.7%. A Teva analyst forwarded the request to Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva not bid "as we are first in a two-player market with good share already." Patel responded: "Agree. We should decline to bid."

d.   Ketoconazole

1432.   Patel identified Ketoconazole cream and Ketoconazole tablets as price increase candidates sometime in February 2014. They were not listed on her original "Increase Potentials" list that she sent to K.G. on January 14, 2014, but they were on the list of "PI Candidates" that she sent to a colleague on February 26, 2014, with the following notes about each:

| Ketoconazole Cream | Shared with Taro and Sandoz |
| Ketoconazole Tab | Shared with Taro, Myl and Apo |

1433.   Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation. For Ketoconazole cream, Teva's competitors were Taro and Sandoz. For Ketoconazole tablets, Teva's competitors were Taro, Mylan and Apotex.

1434.   Teva led the price increases for both drugs but made sure to coordinate with all of its competitors before (and as it was) doing so. On April 4, 2014 – the day of the increases – Patel spoke separately with both Aprahamian of Taro and CW-1 of Sandoz. During each call, she let them know that Teva was increasing the price of Ketoconazole. The same day, Rekenthaler spoke to Nesta of Mylan; he had previously communicated with J.H., a senior sales executive at Apotex, on March 20 and 25, 2014.

1435.   On Ketoconazole cream, co-conspirators at Taro and Sandoz were also communicating directly with each other. On April 4, 2014, for example, Aprahamian spoke to CW-3 at Sandoz for nineteen (19) minutes. They discussed the Teva increase and the fact that Taro would follow. CW-3 then sent an e-mail internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans:

From: █████████
Sent: Friday, April 04, 2014 3:01 PM
To: ████████; Kellum, Armando;
█████████████████████████
Subject: Ketoconazole Cream Price Increase

As an FYI, Teva increased contract price and WAC on Keto Cream yesterday (tripled).  Taro will more than likely follow shortly.  We should determine if Teva had additional increases yesterday as well.

1436.   CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on "strict allocation" until Sandoz determined how to proceed.

1437.   That same day, Aprahamian sent a similar e-mail internally to his colleagues at Taro.

1438.   The following Monday, April 7, 2014, Taro received a request from MMCAP seeking a competitive bid on Ketoconazole tablets due to the Teva price increase. After reviewing the request, a Taro sales executive sent an internal e-mail stating: "we are not going to bid this product. . . . Taro has 27% share in a 4-player market." In a follow-up e-mail, E.G., a Director of Corporate Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about the reason: "Yes, we are declining, but we need to advise its [sic.] due to supply."

1439.   Four days after the Teva increase, on April 8, 2014, Aprahamian called Patel and the two spoke for more than nineteen (19) minutes. Later that same day, he initiated a price increase for all of Taro's customers on both the Ketoconazole cream and tablets. Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

1440.   Although Sandoz immediately understood that it would follow these price increases, it was not able to implement them until October. The delay was because Sandoz had contracts with certain customers that contained price protection terms which would impose substantial penalties on Sandoz if it increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014. At Sandoz, senior management held

monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase. In this case, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.

1441.   In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers. For example, on May 14, 2014, Teva was approached by Cardinal requesting a bid due to the Taro increase. The e-mail from Cardinal was forwarded to Patel, who responded immediately:

> From:     Nisha Patel02
> Sent:     Wed 5/14/2014 10:05 AM (GMT-05:00)
> To:       ███████████
> Cc:       ████████████████████████████
> Bcc:
> Subject:  RE: Cardinal Ketoconazole CR NBO # 11796
>
> Unable to bid at this time. For internal purposes, it is for strategic reasons.

1442.   Shortly before sending the e-mail, Patel exchanged several text messages with Aprahamian at Taro. She would ultimately exchange eight (8) text messages and had one phone call lasting more than four (4) minutes with Aprahamian on that day.

1443.   Later that same day, Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic: "unable to bid (strategic reasons, for internal purposes)."

1444.   Sandoz ultimately followed the Teva and Taro increases for Ketoconazole cream on October 10, 2014. That same day, Patel and CW-1 at Sandoz spoke for more than three (3) minutes.

1445.   The Teva increases on Ketoconazole were significant. For the cream, Teva, Taro and Sandoz all increased the WAC price by approximately 110%. For the tablets, Teva's WAC increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

e.   *Estradiol/Norethindrone Acetate and Cyproheptadine HCL*

1446.   Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases. One of those new co-conspirators was Breckenridge.

Patel already had a relationship with S.C., a senior sales executive at Breckenridge, and Rekenthaler had a relationship with D.N., another senior sales executive at Breckenridge, so Breckenridge was a prime candidate to coordinate pricing.

1447.   On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone Acetate tablets (brand name Mimvey) and Cyproheptadine HCL tablets. Breckenridge had acquired the ANDA for Cyproheptadine HCL tablets in September 2013 from another manufacturer, and immediately sought to raise the prices previously charged by the prior manufacturer as it began to sell the product under its own label. For Cyproheptadine HCL, Breckenridge increased its WAC pricing by as high as 150% and raised its customer contract pricing even higher – 400%. The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.

1448.   In the weeks leading up to those increases – when Patel was still out on maternity leave – Rekenthaler had several phone calls with D.N. at Breckenridge to coordinate the price increases. The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on October 24, 2013. After those calls, they did not speak again until mid- January 2014, when Teva began preparing to implement its increase.

1449.   Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter.

1450.   With respect to Cyproheptadine HCL, Teva had approximately 54% market share in a two-player market. For that drug, Teva consistently refused to bid or take on any additional market share after the Breckenridge increase. For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyproheptadine HCL. When she learned the news, Patel called S.C. at Breckenridge. They ended up speaking twice that day – the first and only phone calls ever between them. After speaking to S.C., Patel sent the following e-mail regarding the customer's request:

From:    Nisha Patel02
Sent:    Fri 2/07/2014 2:46 PM (GMT-05:00)
To:
Cc:
Bcc:
Subject: RE: Possible Indirect Additions - Safeway # 10769, 70, 71 & 72

Let's hold off on providing a bid. We can provide a bid when we are in a position to do so (post increase).

1451.    With regard to Estradiol/Norethindrone Acetate, however, Teva only had 19% market share in a two-player market. For that drug, Teva sought to pick a few customers to level the playing field – before raising its own prices to follow Breckenridge.

1452.    On April 4, 2014, Teva followed the Breckenridge price increases with substantial increases of Estradiol/Norethindrone Acetate (contract increases of as much as 393%) and Cyproheptadine HCL tablets (contract increases of as much as 526%). In addition, Teva increased the WAC price on Estradiol/Norethindrone Acetate by 26% and the WAC price on Cyproheptadine HCL Tablets by as much as 95% — to exactly match Breckenridge's WAC price on both products.

*f.    Diflunisal*

1453.    Non-Defendant Rising became a more appealing potential co-conspirator when CW-2, who had formerly been employed at Sandoz, left to join Rising in August 2013. Rekenthaler had known CW-2 for many years, going back to when they both worked together at Teva several years prior.

1454.    Of the drugs on the Teva April 4, 2014 price increase list, Rising was a competitor on Diflunisal. For that drug, Rising had 21% market share in a two-player market with Teva as of March 2014.

1455.    Rekenthaler spoke to CW-2 of Rising on December 5, 2013 for fourteen (14) minutes. When Patel sent her initial list of "Increase Potentials" to K.G. on January 14, 2014, Diflunisal was on the list, with Teva expecting to lead the increase.

1456.    Teva and Rising continued to coordinate the increase over the next several months. For example, when Patel sent a nearly final list of "PI Candidates" to her supervisor K.G. on March 17, 2014, she included the following notation about Diflunisal:

| Diflunisal | Shared only with Rising |
| --- | --- |

1457.   That same day, Rekenthaler spoke with CW-2 twice. During those calls, CW-2 informed Rekenthaler that Rising was having supply problems for Diflunisal and might be exiting the market at some point in the future. CW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

1458.   Rekenthaler and CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal. On April 4, 2014, Teva increased is WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182% for certain customers.

1459.   Rising ultimately exited the Diflunisal market for a short period of time starting in mid-July 2014. When Rising decided to exit the market, CW-2 called Rekenthaler to let him know. Four months later – when Rising's supply problems were cured – Rising re-entered the market for Diflunisal. Consistent with the fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, CW-2 and Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014. On December 3, 2014, Rising re-entered the market for Diflunisal tablets. Its new pricing exactly matched Teva's WAC price increase from April 2014.

g.     *Ethosuximide*

1460.   On the April 4, 2014 Teva price increase list, VersaPharm was a competitor on two different drugs: Ethosuximide capsules and Ethosuximide oral solution.

1461.   When Patel began creating the price increase list, neither of these drugs was considered a candidate for an increase. For example, when Patel sent her initial "Increase Potentials" list to K.G. in mid-January 2014, neither drug was on the list.

1462.   VersaPharm was not considered a high-quality competitor. When Patel created the quality competitor rankings in May 2013, VersaPharm was given a -2 score in the rankings. That did not stop Rekenthaler, however, from calling J.J., a senior national account executive at VersaPharm, and speaking for five (5) minutes on January 22, 2014. When Patel sent the next "PI Candidate" list to a

colleague on February 26, 2014 – Ethosuximide capsules and oral solution were both on the list, with the following notation:

| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor |
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE |

1463.    Rekenthaler called again and spoke with J.J. at VersaPharm on March 7, 2014. Teva then raised prices on both drugs on April 4, 2014. For Ethosuximide capsules, Teva raised is WAC price by 87%, and its contract prices by up to 322%. For Ethosuximide oral solution, Teva raised its WAC price by 20% and its contract prices by up to 81%.

1464.    On April 9, 2014 – only five days after the Teva increase – VersaPharm increased its pricing on both Ethosuximide capsules and oral solution to a nearly identical price to Teva.

1465.    Following their agreement on those two drugs, and with no reason to speak further, Rekenthaler and J.J. of VersaPharm never spoke by phone again.

**11.    Impact of April 4, 2014 Price Increases to Teva**

1466.    A few weeks after Teva's April 4, 2014 price increases went into effect, Patel calculated the impact to Teva's net sales as a result of the April 4 increase. Based on her analysis, she found that the April 4, 2014 price increases resulted in a net increase in sales to Teva of $214,214,338 per year.

1467.    For those drugs where Teva was leading the price increases on August 28, 2014, several of Teva's competitors followed in short order and those price increases were also coordinated.

1468.    For example, on October 10, 2014 Sandoz followed Teva's price increases on three drugs: (1) Amoxicillin/ Clavulanate chewable tablets; (2) Diclofenac Potassium tablets; and (3) Penicillin VK tablets. Patel of Teva spoke to CW-1 of Sandoz on the day of the Sandoz price increases for more than three (3) minutes.

1469.    Then, on December 19, 2014, Actavis followed the Teva price increase on Desmopressin Acetate tablets. Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21, and November 25, 2014.

1470.    Indeed, even before Actavis followed the Teva price increase, Teva knew that Actavis planned to increase. For example, on October 15, 2014 – approximately six weeks before Actavis raised

1  its price – Teva received a request from a customer asking Teva to reduce its pricing on Desmopressin

2  Acetate because it was no longer offering competitive prices. Patel's initial response to the customer

3  was "[w]e believe the market is still settling on this product. Can you please review in a few days and

4  advise of more current pricing intelligence?" In a subsequent internal discussion, Patel wrote: "I can't

5  quite recall if Actavis followed us or we followed them….but they definitely did not change their WACs

6  recently."

7      1471.    Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on

8  Diclofenac Potassium tablets. Rekenthaler coordinated that price increase with Nesta of Mylan during

9  two phone calls on February 18 and one call on February 19, 2015.

10                    **12.    April 15, 2014 Price Increase (Baclofen)**

11      1472.    Effective February 21, 2014, Upsher-Smith took a significant price increase on

12  Baclofen, ranging from 350 - 420% to the WAC price, depending on the formulation. Prior to the

13  increase, Baclofen was not a profitable drug for Upsher-Smith, and Upsher-Smith was considering

14  whether to exit the market or significantly raise price. It chose the latter.

15      1473.    The primary competitors in the market for Baclofen at this time were Teva (62.4%),

16  Qualitest (22.5%), and Upsher-Smith (6.8%).

17      1474.    Teva initially considered following the Upsher-Smith price increase quickly, as part of its

18  April 4, 2014 price increases – but decided against it. The primary reason was that Qualitest was in the

19  market, and Teva considered Qualitest a "low-quality" competitor. In other words, Qualitest would

20  likely compete for market share if Teva increased its price.

21      1475.    Starting on April 10, 2014, however, Teva learned that Qualitest was having supply

22  problems, and could exit the market for at least 3-4 months, if not permanently.

23      1476.    Upon learning that the only significant remaining competitor in the market would now

24  be Upsher-Smith – a high-quality competitor – Teva immediately decided to follow the price increase.

25  Patel asked one of her direct reports to start working up price increase scenarios for Baclofen that same

26  day.

27      1477.    Upsher-Smith was a highly-ranked competitor by Patel (+2) in large part because of

28  Patel's relationship and understanding with B.L., a national account executive at Upsher-Smith. In the

week before she started her employment at Teva (after leaving her previous employment), Patel and B.L. exchanged several text messages. During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes. During these initial communications, Patel and B.L. reached an understanding that Teva and Upsher-Smith would follow each other's price increases, and not compete for each other's customers after a price increase. Their agreement was further cemented in June and July 2013, when the two competitors agreed to substantially raise the price of Oxybutynin Chloride.

1478.   There was no need for the two competitors to communicate directly in this situation because it was already understood between them that Teva would follow an Upsher- Smith price increase based on Patel's prior conversations with B.L. and based on the history of collusion between the two competitors.

1479.   Effective April 15, 2014, Teva raised its WAC and SWP pricing to match Upsher-Smith's pricing exactly. Teva increased its WAC pricing from 350% – 447%, depending on the dosage strength. Teva would not have increased its prices on Baclofen unless it had an understanding in place with Upsher-Smith.

1480.   Pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher-Smith's increase and before Teva could follow. Even after Teva's increase, when Qualitest customers approached Teva for a bid due to Qualitest's supply problems, Teva deferred to Upsher-Smith. As Patel told K.G. in a June 11, 2014 e-mail: "Dynamics have changed, but I think we need to see if Upsher wants to pick up share. We have an unreasonably high share." K.G. agreed: "I think this is the right thing to do. . . . we should just give them a high bid."

1481.   Upsher-Smith, on the other hand, was able to secure several new customers as a result of the Qualitest exit. In short order, Baclofen became a very profitable product for Upsher-Smith. On April 18, 2014 – only three days after the Teva price increase – J.M., a Senior Director of Sales and Marketing at Upsher-Smtih, made the following pronouncement:

> On Apr 18, 2014, at 3:07 PM, ██████████@upsher-smith.com> wrote:
>
> Qualitest is out. Teva matched our pricing. Bac is our newest ~$20M product.
>
> ██
> Sent from my iPhone
>

1482.    Only two months later, Lannett would enter the market at the same WAC prices as Teva and Upsher-Smith. As discussed more fully above, Teva and Lannett colluded so that Lannett could enter the market seamlessly without significantly eroding the high prices in the market.

1483.    According to NADAC data, the average market price for Baclofen remained steady prior to the spring of 2014. From November 2013 through March 2014, the average market price of Baclofen fluctuated by less than $0.003 per unit for 10mg tablets and by less than $0.0065 per unit for 20mg tablets.

1484.    Beginning around February 2014, however, the overall average market price rose by more than 550%. These price increases affected both dosages of Baclofen, *i.e.* 10mg and 20mg tablets.

1485.    According to NADAC data, the average market price for Baclofen increased by the following percentages:

> Baclofen 10mg tablet: Between March 2014 and April 2014, prices increased 636%; and

> Baclofen 20mg tablet: Between March 2014 and January 2015, prices increased 437%.

1486.    WAC data confirms that Teva and Upsher-Smith both imposed dramatic price increases for Baclofen consistent with the timing of the communications set forth above, by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 100ct | Teva | 00172409760 | $0.10 | $0.49 | 4/15/2014 | 420% |
| 1,000ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 2/21/2014 | 420% |
| 1,000ct | Teva | 00172409780 | $0.09 | $0.49 | 4/15/2014 | 447% |

1    1487.   Although WAC data is not available for Par, upon information and belief, it

2    implemented nearly simultaneous and identical price increases as Upsher-Smith and Teva. And as set

3    forth above, when Lannett entered the market, it came in at the exact same WAC price as Teva.

4           **13.    July 1, 2014 Price Increase (Fluocinonide)**

5    1488.   There are several different formulations of Fluocinonide including, among others:

6    Fluocinonide 0.05% cream, Fluocinonide 0.05% emollient-based cream, Fluocinonide 0.05% gel and

7    Fluocinonide 0.05% ointment. As of June 2014, Teva, Taro, Sandoz, and Fougera were the only three

8    manufacturers actively selling any of the four Fluocinonide formulations mentioned above. On June 11,

9    2014, Teva identified the market-share breakdown for each of the different formulations of those drugs

10   as follows:

| Product Description | Teva Market Share | Market Data |
|---|---|---|
| FLUOCINONIDE CREAM 0.05% 15GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 30GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 60GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM-E 0.05% 15GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 30GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 60GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE GEL 0.05% 60GM | 26.0% | Taro 61.7% |
| FLUOCINONIDE OINTMENT 0.05% 15GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 30GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 60GM | 53.8% | Taro 37.7%; Sandoz 8.5% |

18   1489.   As discussed above, Teva coordinated with Taro and Sandoz to increase the price of all

19   four of those formulations of Fluocinonide in July 2013, based in part on discussions that started

20   between Patel and Aprahamian even before Patel started her employment at Teva. The increases to the

21   WAC prices in 2013 were a modest 10-17%, depending on the formulation.

22   1490.   The second coordinated increase of Fluocinonide was much more significant. Taro

23   raised its prices for all four Fluocinonide formulations effective June 3, 2014. For each, the increases to

24   Taro's WAC prices are set forth below:

25

26

27

28

| Formulation | Percentage Increase to WAC |
|---|---|
| Fluocinonide 0.05% Cream | 206 – 754% |
| Fluocinonide 0.05% Gel | 155 – 255% |
| Fluocinonide 0.05% Ointment | 206 – 483% |
| Fluocinonide Emollient-Based 0.05% Cream | 160 – 430% |

Taro notified its customers of the increases the day before they became effective – June 2, 2014.

1491.   Patel knew of these (and other) Taro increases well in advance and was prepared so that Teva would be able to quickly follow the price increases. Patel was already preparing for the next round of Teva price increases in June 2014; many of which would ultimately be implemented by Teva in August.

1492.   On May 14, 2014, Patel and Aprahamian exchanged eight (8) text messages and had one phone conversation lasting more than four (4) minutes.

1493.   Subsequent to the May 14 communications Patel directed a colleague to create a list of future price increase candidates, based on a set of instructions and data she had given him. On May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase Candidate Analysis." The list included several drugs sold by Taro – including the four formulations of Fluocinonide (plus Carbamazepine and Clotrimazole) – with the notation "Follow/Urgent" listed as the reason for the increase, *even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so*. The relevant portions of that spreadsheet are set forth below:

| Item Description | Product Family | BUCKET |
|---|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 15GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 30GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 60GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 15GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 30GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 60GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE GEL 0.05% 60GM | FLUOCINONIDE TOPICAL GEL | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 15GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 30GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 60GM | FLUOCINONIDE OINTMENT | Follow/Urgent |

1494.   On June 3, 2014 – the day the Taro increases on Fluocinonide became effective – CVS reached out to T.C., a senior sales executive at Teva, indicating that it had an "immediate opportunity" on Fluocinonide 0.05% Cream and Fluocinonide 0.05% Emollient Cream, but did not give a reason for providing that opportunity to Teva. The CVS representative offered to move a significant amount of business from Taro to Teva, stating: "Opportunity knocks." The e-mail was forwarded to Patel, who responded:

> **From:** Nisha Patel02
> **Sent:** Tuesday, June 03, 2014 12:46 PM
> **To:**
> **Subject:** Re: Fluocinonide Cream
>
>
> I suspect a price increase...and we would likely follow.
>
> Sent from my iPhone

1495.   Of course, Patel already knew the bid request was due to a price increase, because she had spoken to Aprahamian in May and included Fluocinonide on her list of price increases with a notation to "Follow/Urgent." But she still needed to determine the specific price points so that Teva could follow quickly.

1496.   T.C. stated that she had not heard about a price increase from anyone else but indicated that she would "snoop around." Patel stated: "OK. Thanks. I'll do the same."

1497.   Patel immediately began snooping around by exchanging five (5) text messages with Aprahamian at Taro. Later that afternoon, she reported that she had "[c]onfirmed that Taro increased," but that she was "still working on intel." K.G. at Teva suggested that it might be a good opportunity to take some share from Taro – the market share leader on several of the Fluocinonide formulations. He asked Patel to provide "guidance" by the next day. Patel responded at 4:23pm, making it clear that she had been talking to Aprahamian not only about Fluocinonide, but other drugs as well:

> I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is a high quality competitor. It's just a matter of who the others are.)

1  Shortly after sending that e-mail Patel called Aprahamian and they spoke for nearly seven (7) minutes.

2  As discussed more fully below, Taro had also increased its prices for Warfarin Sodium and

3  Carbamazepine on June 3. Teva followed those substantial Taro price increases with equally substantial

4  increases of its own in August.

5      1498.   First thing the next morning – June 4, 2014 – Patel exchanged two (2) more text

6  messages with Aprahamian, and then the two spoke on the phone for more than twenty-five (25)

7  minutes. Within minutes after hanging up the phone with Aprahamian, Patel sent the following e-mail

8  to K.G., making it clear that she had obtained additional "intel" that she did not want to put in writing:

```
From:        Nisha Patel02
Sent:        Wed 6/04/2014 10:44 AM (GMT-05:00)
To:          ████████
Cc:
Bcc:
Subject:     Fluo Crm and E Crm Info
Attachments: Analysource_Report_20140604113534(1).xlsx


████,

Per your request, I have added in the plain cream. I know you're working on a lot, so just let me know if you'd
like to discuss further. I have additional intel (I can discuss with you) that will be useful.


We should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor—I
think we need to be responsible where we have adequate market share.


Thanks,

Nisha
```

19     1499.   That same day, Teva received a bid request from another large customer, Walmart.

20  Shortly after that e-mail was forwarded to her, Patel responded by making it clear that Teva would play

21  nice in the sandbox with Taro:

From:      Nisha Patel02
Sent:      Wed 6/04/2014 2:09 PM (GMT-05:00)
To:        ███████████
Cc:
Bcc:
Subject:   RE: Item Questions

███████

(Please consider the Taro items alert items.) Based on quality of competitor, the intention of being responsible in the market, and market share, below is my commentary:

1. Gel: WAC issue. I estimate that WM nets are right around our WAC. Recommend bidding right below WAC, assuming we can supply.
2. Ointment: Should not pursue. We have reasonable share.
3. Cream: Since we are pursuing CVS, and assuming it works out, we should probably not pursue.

After further deliberation, Teva decided not to bid on any of the Walmart business at all.

1500.    On June 23, 2014, as Teva was planning to implement a price increase on Fluocinonide to follow the Taro increase, Patel forwarded a spreadsheet to a subordinate with "intel" she had obtained directly from Aprahamian. That spreadsheet contained specific Taro customer price points for the different formulations of Fluocinonide for each of the various classes of trade (i.e., wholesalers, chain drug stores, mail order and GPO). Prior to sending that "intel," Patel had spoken to Aprahamian on June 17 for fifteen (15) minutes, and June 19 for nearly fourteen (14) minutes. The contract price points obtained by Patel were not otherwise publicly available.

1501.    Sandoz was also a competitor on two formulations of Fluocinonide – Fluocinonide ointment and Fluocinonide gel – but was only actively marketing the gel. Not coincidentally, Aprahamian was having similar communications with his contact at Sandoz, CW-3, during this time period. At least some of those calls are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:10:00 |

During one of the calls on June 20 referenced above, Aprahamian dictated to CW-3 over the telephone specific Taro contract price points for each of the same classes of trade that he had provided to Patel, for Fluocinonide ointment, Fluocinonide gel, and various other drugs that Taro had increased that overlapped with Sandoz. CW-3 took very detailed notes of the pricing information Aprahamian provided, which again were not publicly available. Based on a history and pattern of practice between CW-3 and Aprahamian, it was understood that Sandoz would follow the Taro price increase.

1502.   On June 26, 2014, Teva sent out a calendar notice to a number of sales and pricing employees- including Patel and Rekenthaler - for a 3pm conference call that day. The notice stated: "We will discuss the upcoming price increase for all Fluocinonide products: Fluocinonide Cream, Fluocinonide E-Cream, Fluocinonide Gel, Fluocinonide Ointment. We are targeting an announcement date of Monday, June 30th for an effective date of July 1st." The next morning, at 9:57am, Patel and Aprahamian spoke again for nearly thirteen (13) minutes.

1503.   The Teva price increases on Fluocinonide became effective on July 1, 2014. Teva increased its WAC pricing to match Taro's pricing almost exactly. That same day, Patel spoke to her contact at Sandoz - CW-1 - several times, including at least those calls set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:54:45 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 9:59:38 | 0:01:34 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 15:05:31 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:10:28 | 0:00:11 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:13:36 | 0:01:59 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:21:17 | 0:07:14 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 17:58:19 | 0:19:46 |

During those calls, Patel informed CW-1 of the Teva price increase and provided specific price points to CW-1 so that Sandoz would be able to follow the price increase.

1504.   These price increases are reflected in WAC data:

| Product Cream .05% | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|--------------------|-----------|---------|---------|------------------|---------------------|
| 15gm | Taro | $.79 | $2.43 | June 3, 2014 | 206% |
| 30gm | Taro | $.56 | $2.43 | June 3, 2014 | 337% |
| 60gm | Taro | $.39 | $2.43 | June 3, 2014 | 524% |
| 15gm | Teva | $.79 | $2.43 | July 1, 2014 | 206% |

| 30gm | Teva | $.56 | $2.43 | July 1, 2014 | 337% |
| 60gm | Teva | $.39 | $2.43 | July 1, 2014 | 524% |

1505.   The average market price for Fluocinonide remained artificially high after July 2014, according to NADAC data:





1



2

3

4

5

6

7

8

9

10

11

12   1506.   Sandoz was in the process of exiting the market for Fluocinonide ointment (it had

13   ceased its sales by September 2014 but followed the increase on the gel three months later, on October

14   10, 2014). Sandoz increased its WAC pricing on the gel by 491%. That same day, Patel spoke to CW-1

15   at Sandoz by phone for more than three (3) minutes.

16   1507.   Fougera also sold a formulation of Fluocinonide.

17   1508.   During this time period, Actavis had also started to re-enter the market for

18   Fluocinonide 0.05% cream but had not yet gained any significant market share due to supply problems.

19   Nonetheless, Actavis still followed the Taro and Teva price increases in December 2014 by raising its

20   prices to the exact WAC prices as Teva and Taro. The Actavis price increase on Fluocinonide cream

21   was effective December 19, 2014. Not surprisingly, in the days and weeks leading up to the Actavis

22   price increase, the co-conspirators at Actavis, Taro and Teva were all communicating frequently. At

23   least some of those communications are set forth below:

24

25

26

27

28

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:39 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:06 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:16 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:22 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:07 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:07:59 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:37 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:02:00 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:16:00 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:35 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:08:00 |
| 12/18/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:40 |

### 14.   August 28, 2014 Price Increases

1509.   On August 28, 2014, Teva raised prices on a number of different drugs, including those set forth below:

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (34%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (59%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (5.2%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (54%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (63%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (5.2%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33%); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 83% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Dava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (5.7%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

1510.   In the days and weeks leading up to the price increase, Patel and Rekenthaler were communicating with every high-quality competitor on those drugs to coordinate the increases in

1  advance. At least some of those communications are set forth in the graphic at page 250 of the State

2  AG Complaint No. 2.

3      1511.   The day before the increase became effective – August 27, 2014 – Patel spent most of

4  her morning discussing the price increases with her contacts at Sandoz, Actavis, Taro, Zydus and

5  Glenmark:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

    1512.   In addition to those phone communications noted above, representatives from Teva and every other Defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year. Cavanaugh, Rekenthaler and Patel, along with many other Teva executives, as well as executives from every other Defendant, attended.

        a.   *Enalapril Maleate*

    1513.   With regard to Enalapril Maleate, Patel was speaking to Aprahamian at Taro as shown above. Aprahamian, in turn, spoke to M.C., the Vice President of Sales and Marketing at Wockhardt, on August 8, 2014 for thirteen (13) minutes, and again twice on August 14, 2014, including one call lasting eight (8) minutes.

        b.   *Prochlorperazine*

    1514.   Similarly, with regard to Prochlorperazine, Rekenthaler communicated with Nesta at Mylan on August 7 and August 11, as shown above. Nesta, in turn, communicated with M.D., a senior sales executive at non-Defendant Cadista Pharmaceuticals, on the same days that he had been

1   communicating with Rekenthaler.

2       1515.   A large number of the drugs on Teva's August 28, 2014 price increase list were selected

3   because Teva was following a "high quality" competitor. The coordination between Teva and certain

4   co-conspirators regarding those drugs is discussed more fully below.

5                               c.   *Mylan*

6       1516.   Effective April 17, 2014, Mylan increased its WAC pricing on a number of different

7   drugs, including several that overlapped with Teva. Mylan also increased its contract prices, but at least

8   some of those price increases would not become effective until mid-May 2014.

9       1517.   Pursuant to the established understanding between the two companies, Teva

10  immediately decided that it would follow the Mylan increases. On April 21, 2014, T.S., a national

11  account executive at Teva, forwarded to Patel two spreadsheets with WAC and AWP pricing

12  information for the price increases taken by Mylan. The spreadsheets were created by Mylan personnel.

13      1518.   Patel, in turn, forwarded the e-mail to the Teva sales team and stated: "Our intention is

14  to follow Mylan on this increase. Below, you will see the list of increase items where Teva overlaps with

15  Mylan. Please share any pricing intelligence you are able to obtain. Thank you in advance!" The list that

16  Patel referred to included the following products, several of which had been the subject of coordinated

17  price increases in 2013 as well: Amiloride HCL/HCTZ tablets; Cimetidine tablets; Enalapril Maleate

18  tablets; Fluvastatin Sodium capsules; Loperamide HCL capsules; Prazosin HCL capsules; and Sotalol

19  HCL tablets.

20      1519.   Within days, Teva began receiving requests from its customers for bids due to the

21  Mylan price increases. On April 24, 2014, Patel began to formulate a "Mylan Increase Strategy" in order

22  to respond to those requests but noted that Teva was "still awaiting intel" about the Mylan customer

23  contract price points, which were not publicly available. Previously, Patel had relied on Green to obtain

24  specific Mylan customer price points (referred to as "intel") through his communications with Nesta of

25  Mylan, which she used to follow Mylan's pricing. The next day, in a follow-up e-mail about the Mylan

26  strategy, Patel noted that one of her Mylan increase strategies would not have been appropriate for this

27  situation, and concluded that: "Plus, we really need some intel" about the Mylan contract price points.

28

1520.   Patel continued to push for specific contract price points from Mylan. On April 28, 2014, Patel sent an e-mail to the Teva sales team, stating: "To date, we have no intel on Mylan's recent increases. I realize there is a lot of travel going on, but whatever you can gather and share would be greatly appreciated."

1521.   On May 9, 2014, Patel sent another e-mail:

From:      Nisha Patel02
Sent:      Fri 5/09/2014 9:55 AM (GMT-05:00)
To:        ████████████████████████████████████████████████████████
Cc:        Dave Rekenthaler;
Bcc:
Subject: Mylan Increase Intel


NAMs,


Sorry to be so persistent, but we have not received any Mylan price increase intelligence yet. Whatever you can gather and provide would be greatly appreciated. Our intention is to become better, quicker followers, but without intel, we are unable to do so.


In fact, I cannot see Teva being able to follow in the next round of mass price changes (without any price points) at this point. Of course we can always follow by guessing, but it could cause needless price disruption in the market.


Please send any intel to me and Tom.

1522.   Shortly after receiving that e-mail – at 11:15am that morning – Rekenthaler called Nesta at Mylan and left a message. Nesta returned the call at 11:23am, and the two spoke for nearly eight (8) minutes.

1523.   Separately, and before Rekenthaler was able to convey any information he had obtained, Patel forwarded a customer request from ABC (relating to the Mylan increase items) directly to T.S. at Teva, lamenting the absence of Green to obtain the Mylan intel:

> I am in a really tough spot on these. Please help! There are several requests open for offers, but I have ZERO intel. A little frustrating/discouraging, as we are bound to hear complaints on how long it took to close the Delphi request. Is there anything you are able to get to help when you are back? . . . At some point, I know I'll have to find another source of magic :))

1524.   The next day, T.S. sent Patel an e-mail with an attached spreadsheet listing the Mylan contract price points for all of the recent increases:

```
From:
Sent:          Tue 5/13/2014 1:34 PM (GMT-05:00)
To:            Nisha Patel02
Cc:
Bcc:
Subject:       FW: Dirt
Attachments: Mylan-Price List A.xlsx


FYI
```

1525.   The e-mail was unclear on where T.S. had obtained this "dirt," but the spreadsheet attached to her e-mail was created by a Mylan employee.

1526.   Rekenthaler and Nesta spoke again on May 20, 2014. Armed with this new source of "intel," Patel was more confident that Teva could follow the Mylan price increases exactly, without disrupting the market. That same day, as Patel began to create a new list of Teva price increase candidates, she instructed a colleague to include the Mylan increase drugs – with specific price points – as its own separate tab in the spreadsheet, called "follow." Her colleague provided the list, as requested, on May 21.

1527.   On May 27, 2014, Rekenthaler and Nesta spoke twice, including one call lasting nearly four (4) minutes. By May 28, Teva had a much more comprehensive list of price increase items. On that list, seven of the Mylan items were prominently listed with a "Follow Urgent" notation listed next to each:

| Item Description | BUCKET | Comments |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 100 | Follow/Urgent | Follow Mylan Increase |
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 1000 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 800MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 5000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 1000 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 500 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 1000 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 2MG 1000 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 250 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 500 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 80MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 120MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 160MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 240MG 100 | Follow/Urgent | Follow Mylan Increase |

1528.   Also on the list were three additional Mylan drugs for which Teva would be leading the price increase: Diclofenac Potassium tablets; Flurbiprofen tablets; and Prochlorperazine tablets.

d.   Taro

1529.   Taro also significantly raised its prices on the following drugs which overlapped with Teva: Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, and Warfarin Sodium tablets.

1530.   Patel learned of the prices increases for certain of these drugs in advance, based on her conversations with Aprahamian. It was understood that Teva would follow the Taro price increases

1  based on these and prior conversations. In fact, Teva agreed and made plans to follow them before

2  Taro had even put them into effect.

3      1531.    Specifically, on May 28, 2014, T.S. of Teva sent Patel the then-current version of her

4  "Future Price Increase Candidate" spreadsheet. That list included the following Taro drugs, which had

5  not yet been increased by Taro:

| Item Description | BUCKET |
|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | Follow/Urgent |

10      1532.    Patel likely obtained this information from Aprahamian on May 14, 2014, when the two

11  exchanged eight (8) text messages and spoke for more than four (4) minutes by phone.

12      1533.    On June 3, 2014 – the date of the Taro price increases on Fluocinonide,

13  Carbamazepine, Clotrimazole, Warfarin Sodium and other drugs – Patel and Aprahamian exchanged

14  five (5) text messages. After exchanging those text messages, Patel confirmed to her supervisor K.G.

15  and another Teva representative that Taro had in fact raised its pricing on Fluocinonide. Patel then

16  added: "I expect to provide guidance at some point in the morning. I'm also hearing Warfarin,

17  Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro

18  is a high-quality competitor. It's just a matter of who the others are.)" At 5:08pm that evening, Patel

19  called Aprahamian and the two spoke for nearly seven (7) minutes.

20      1534.    First thing the next morning, Patel and Aprahamian exchanged two (2) text messages.

21  Then, at 9:56am, the two spoke again for almost twenty-six (26) minutes. Shortly after hanging up the

22  phone with Aprahamian, Patel sent an e-mail to K.G. making it clear that she had obtained additional

23  "intel" regarding the Taro price increases that she did not want to put into writing, stating: "I have

24  additional intel (I can discuss with you) that will be useful."

25      1535.    On June 12, 2014, Teva internally discussed future projections regarding Carbamazepine

26  – including the fact that its API supplier might run out of supply sometime in 2015. One of the options

27  discussed was a price increase. K.G. – aware that Patel had been in discussions with Aprahamian and

28  had "intel" regarding the Taro price increase on Carbamazepine (and other drugs) – stated: "Nisha

1  [Patel] would be able to provide guidance relative to [the Carbamazepine] price increase for the analysis

2  being put together." In fact, Patel had communicated with Aprahamian earlier that same day for more

3  than nine (9) minutes.

4        1536.   One of the drugs that Taro increased on June 3, 2014 was Warfarin Sodium tablets.

5        1537.   As of June 2014, there were three competitors in the market for Warfarin Sodium: Teva,

6  Taro and Zydus. Ten days after Taro increased its price, Zydus quickly followed with a price increase of

7  its own on June 13, 2014. In the days between the Taro and Zydus price increases for Warfarin Sodium,

8  Teva, Taro and Zydus coordinated through various phone communications with each other, including

9  at least the following:

10

11
| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/4/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:11:28 | 0:00:00 |
| 6/4/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 9:16:52 | 0:00:00 |
| 6/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:56:52 | 0:25:57 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/12/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:57:50 | 0:09:18 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

15

16        1538.   On June 13, 2014 – the date of the Zydus increase on Warfarin Sodium – Teva was

17  presented with an offer from a customer for a one-time buy on that drug. Patel responded that "[w]e

18  will review, but note that we intend to follow [the] Taro and Zydus increase price." Later that same day,

19  Patel sent an internal e-mail alerting her group, including her supervisor K.G., about a list of drugs on

20  which Teva planned to raise prices. A number of them - including Carbamazepine chewable tablets,

21  Carbamazepine tablets, Clotrimazole topical solution, Fluocinonide cream, emollient cream, gel and

22  ointment, and Warfarin Sodium tablets - included the notation "Follow/Urgent - Taro" as the reason

23  for the increase. For that list of drugs, Patel directed that "we should not provide any decreases on

24  these products." Patel's directive meant that Teva would not seek to compete for market share against

25  Taro or Zydus when approached by customers due to those competitors' price increases.

26        1539.   On June 18, 2014, Patel sent that same list to the entire sales team at Teva, informing

27  them of the status of Teva's next price increase. She noted that Teva had already been "receiving

28  multiple requests on several items that are prioritized as increase candidates." Patel continued: "While

we do not have an exact date of increase, we are taking our increase plans into consideration and are

bidding on new business at the planned increase price where our WAC allows." Finally, Patel stated:

> This is all in consideration of market factors, quality of competitors, current market share (including McK RFP results) and intelligence we have been able to gather. As you know, each situation is unique, but this should provide a high level overview.

1540.   Some of the "intelligence" referred to by Patel was gathered during a phone

conversation she had with Aprahamian of Taro the day before, on June 17, 2014, which lasted more

than fifteen (15) minutes.

1541.   The next day, Patel continued to gather "intelligence" and made concerted efforts to

simultaneously coordinate with both Aprahamian and Green at Zydus. The timing and duration of

those phone calls is set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

1542.   On August 28, 2014, Teva followed the Taro price increases on Carbamazepine

chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, and Warfarin Sodium tablets.

As discussed more fully above, Teva coordinated those increases with Taro (and Zydus) through direct

communications with those competitors in the days leading up to the increase.

>     *e.*    *Zydus*

1543.   In addition to their agreement on Warfarin Sodium, Teva also agreed with Zydus to

raise the price of Topiramate Sprinkle capsules.

1544.   As of June 2014, Zydus and Teva had a large majority of the market share for

Topiramate Sprinkle, while Actavis had just 3% of the market.

1545.    In April 2014, Zydus raised its price for Topiramate Sprinkle capsules. Patel was in frequent communication with Green at the time of the Zydus price increase.

1546.    In the days leading up to the June 13 Zydus price increase on Warfarin Sodium, which is discussed more fully above, Green coordinated with both Patel and Rekenthaler at Teva, as set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 9:33:00 | 0:02:00 |
| 6/2/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 11:25:26 | 0:05:48 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

1547.    Green was likely speaking to Patel and Rekenthaler about both Warfarin and Topiramate Sprinkle capsules during those calls because on June 13 - the same day the Zydus price increase on Warfarin Sodium became effective, and after the conversations noted above - Patel added Topiramate Sprinkle capsules to Teva's price increase list, with a notation: "Follow/Urgent - Zydus." Two days before that - the same day that Green had extensive phone calls with both Rekenthaler and Patel - Rekenthaler also spoke twice with Falkin of Actavis, the only other competitor in the market for Topiramate Sprinkle capsules.

1548.    Teva followed the Zydus price increase for Topiramate Sprinkle capsules on August 28, 2014. As noted above, Teva coordinated that increase with both Zydus and Actavis in the days and weeks before it.

**15.    January 28, 2015 Price Increases**

1549.    Shortly after the August 28, 2014 Teva price increases, Patel accepted a new position at Teva. She left her position in the pricing department to take on the role of Director of National Accounts at Teva. Her new position meant new responsibilities, necessitating more frequent travel to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

1550.    When Patel left the pricing department at Teva her position was not refilled. K.G., Patel's former supervisor, assumed her role and became the executive responsible for identifying price

increase candidates and implementing price increases.

1551.   On January 28, 2015, Teva raised prices on a number of different drugs. Teva's price increase spreadsheet – now maintained by K.G. at Teva, identified the following drugs, among others, along with the price increase strategy and reasons for the increase:

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 193% Increase | Follow Competitor -DRL & Actavis | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead -Semi-Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead -Semi-Exclusive | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor -DRL | Dr. Reddy's (34%); Accord (17%); INT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor -Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead -Limited Competition | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 90% Increase | Lead -Semi-Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead -Semi-Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead- Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor - Actavis | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

1552.   Patel and Rekenthaler communicated with a number of Teva's significant competitors about these drugs in the days and weeks leading up to January 28, 2015. The relevant phone communications between Teva and several of its competitors related to these drugs are set forth in the chart at page 264 of the State AG Complaint No. 2.

1553.   Upon information and belief, Patel also spoke in-person with many of these competitors. For example, in her new role as a Director of National Accounts, Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15: NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round Table, Washington, DC (January 8, 2015). These industry events were all well-attended by Teva's competitors.

1554.   Some specific examples of Teva's coordination with competitors regarding its January 28, 2015 price increases are set forth below.

### a.   Propranolol HCL Tablets

1555.   On January 15, 2015, Actavis sent a notice to its customers informing them of a significant increase to its WAC and Suggested Wholesale Prices (SWP) for Propranolol HCL tablets. The increases would not become effective (and thus publicly visible to the rest of the market) until February 17, 2015.

1556.    In the days before Actavis sent this notice to its customers, Falkin of Actavis and Rekenthaler of Teva spoke frequently. For example:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/8/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 7:18:00 | 0:10:00 |
| 1/13/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:39:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

1557.    Indeed, the day before Actavis sent the price increase notice to its customers, Rekenthaler coordinated the price increase with Falkin and Nesta of Mylan - the other quality competitor in the market for Propranolol HCL tablets, in its own name and/or through its subsidiary, UDL. The timing and duration of those phone calls are set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 3:12:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 5:39:00 | 0:09:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

1558.    On January 16, 2015 - more than a month before the Actavis price increase for Propranolol HCL tablets was disclosed to the public - Rekenthaler forwarded Teva's price increase list to Patel. Propranolol HCL tablets were on the list, with the following explanations about pricing strategy and reasons for the price increase:

| Product Description | Price Increase Strategy | Reason for Increase |
|---|---|---|
| PROPRANOLOL HCL TABLETS 10MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 10MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 60MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 500 | Market Intelligence | Follow Competitor - Actavis |

1559.    Teva raised its pricing for Propranolol HCL tablets on January 28, 2015 – before the Actavis price increase even became effective. As discussed above, Rekenthaler was in constant communication with Falkin of Actavis and Nesta of Mylan in the days leading up to Teva's price increase.

1560.    When the Actavis price increase on Propranolol HCL tablets did become effective – on February 17, 2015 – Rekenthaler and Falkin continued to discuss pricing. For example, the day before those price increases became visible to the public – February 16, 2015 – Rekenthaler and Falkin spoke two times, including one call lasting nearly twenty- three (23) minutes. Rekenthaler then spoke to Nesta twice on February 18, 2015 and again on February 19, 2015.

1561.    Mylan ultimately followed the Teva and Actavis price increases for Propranolol HCL tablets with a price increase of its own on July 10, 2015.

1562.    Heritage and Par / Endo also agreed to these price increases.

1563.    According to NADAC data, various dosage levels of Propranolol HCL tablets saw the following price increases:

> Propranolol HCL 10mg tablets: Between February 18, 2015 and September 23, 2015, the average price increased by 819%;
>
> Propranolol HCL 20mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 892%;
>
> Propranolol HCL 40mg tablets: Between February 18, 2015 and February 17, 2016, the average price increased by 1008%; and
>
> Propranolol HCL 80mg tablets: Between February 18, 2015 and November 18, 2015, the average price increased by 958%.



1564.   The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Propranolol HCL tablets showing simultaneous price increases by Actavis, Heritage, Mylan, Teva, and Par.





b.   *Ciprofloxacin HCL and Glimepiride*

1565.   Dr. Reddy's significantly increased its pricing on both Ciprofloxacin HCL and Glimepiride on August 18, 2014. The increases to the Ciprofloxacin HCL WAC were 201% - 533% depending on the dosage strength. The increases to the Glimepiride WAC were approximately 300% for all dosage strengths.

1566.   In the days and weeks leading up to the Dr. Reddy's price increases for Ciprofloxacin HCL and Glimepiride, V.B., a senior sales executive at Dr. Reddy's, spoke frequently with Patel about the planned price increases. At least some of those phone communications are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 13:28:12 | 0:12:14 |
| 7/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 16:20:45 | 0:00:10 |
| 7/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:51:53 | 0:04:14 |
| 7/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:19:44 | 0:06:33 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 10:31:30 | 0:00:04 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 10:40:28 | 0:04:03 |

1567.   V.B. continued to communicate with Patel after the Dr. Reddy's price increases became effective, in the hope that Teva would quickly follow with its own price increases. The two exchanged four (4) text messages on August 25, 2014 – only three days before Teva's substantial price increase on August 28, 2014 (discussed above).

1568.   Despite Dr. Reddy's best efforts, Teva was unable to add Ciprofloxacin HCL or Glimepiride to its August 28 price increase. On the same day that Teva sent its price increase notices out to its customers, T.W., a senior account executive at Dr. Reddy's, obtained a complete list of Teva's price increases (including a number of drugs not sold by Dr. Reddy's). Although unclear how T.W. obtained this information, the subject line of the e-mail clearly identified the information as "Confidential Teva increases." In her message to several other Dr. Reddy's colleagues, T.W. stated that Teva initiated price increases, but did not include glimepiride:



1569.   J.M., a senior marketing executive at Dr. Reddy's, replied: "Thanks for sending. This was shown in the pricing compendium today. I was a little disappointed. However, some of the price increase[s] were led by other companies more than a month ago. So I am still hopeful they may follow."

1  Dr. Reddy's anticipated that Teva would follow its price increases based on the understanding that had

2  been reached between V.B. and Patel during their various conversations.

3       1570.   In fact, Teva did follow the Dr. Reddy's price increases – on both Ciprofloxacin HCL

4  and Glimepiride – during its next round of price increases on January 28, 2015. In the interim, V.B. and

5  Patel continued to communicate, exchanging four (4) text messages on October 10, 2014.

6       1571.   Actavis – the only other quality competitor in the market for Ciprofloxacin HCL –

7  increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing. In

8  the days leading up to the Actavis price increase, Rekenthaler of Teva spoke to Falkin of Actavis several

9  times to coordinate the increase, including twice on December 17 (including one call lasting nearly nine

10  (9) minutes) and once on December 18, 2014.

11      1572.   When Teva did follow the Dr. Reddy's (and Actavis) price increases on Ciprofloxacin

12  HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr. Reddy's WAC

13  prices exactly. That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase

14  list. That list included many drugs that Dr. Reddy's did not market.

15              *c.   Griseofulvin*

16      1573.   On September 9, 2014, Actavis notified its customers of a price increase on

17  Griseofulvin microsize oral suspension. In the days leading up to September 9, 2014, Patel and

18  Rekenthaler of Teva communicated with Falkin and Rogerson of Actavis to coordinate the increase.

19  Some of those calls are detailed below:

20

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:15:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:21:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:05:00 |
| 9/9/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:04:32 |

27      1574.   The Actavis price increase for Griseofulvin became effective on October 6, 2014.

28

1575.   Teva promptly added Griseofulvin to its own price increase list, with the notation "Follow Competitor- Actavis" as the reason for the price increase.

1576.   Teva followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015. As discussed above, in the days leading up to that price increase Rekenthaler of Teva and Falkin of Actavis coordinated frequently. Teva's price increase for Griseofulvin microsize oral suspension matched Actavis' WAC pricing exactly.

## C.   COMPETITORS BECOME "HIGH QUALITY" AFTER SUCCESSFULLY COLLUDING WITH TEVA

### 1.   Apotex

1577.   Apotex was one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. When Patel updated her Quality Competitor rankings in May 2014, however, Apotex was rated +2 – an increase in five points over that twelve-month period.

1578.   Apotex made this jump in Teva's quality competitor rankings in large part due to Patel's relationship with B.H., a sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate, both of which is discussed above.

1579.   Teva increased its pricing on Doxazosin Mesylate in August 2013. Teva's new, increased price (a 1,053% increase) matched Apotex's (and Mylan's) recent price increases. Apotex itself had increased the price of this drug on July 23, 2013. B.H. of Apotex and Patel of Teva had one conversation the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

1580.   Apotex soared dramatically in the quality competitor rankings for one additional reason: in April 2013, Apotex hired J.H. as a senior executive. Rekenthaler of Teva and J.H. began communicating regularly after J.H. was hired by Apotex. There is no record that they had ever communicated by phone before that.

1581.   That relationship continued through 2014. On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69%. Despite the fact that Apotex was the market leader at that time, Teva chose to lead the price increase on Pentoxifylline. In the weeks leading up to Teva's price increase, Rekenthaler of Teva engaged in numerous communications with J.H. at Apotex. The two spoke twice

on March 7, 2014, for two (2) and three (3) minutes, respectively. They spoke again on March 20 for four (4) minutes, and again on March 25 for two (2) minutes. A week after Teva increased its price – on April 11, 2014 – they spoke again for five (5) minutes. During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to Patel.

1582.   As a result of Patel and Rekenthaler's successful coordination with Apotex executives, Patel dramatically increased Apotex's quality competitor ranking in May 2014.

### 2.   Zydus

1583.   Zydus – like Apotex – had been one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. But, when Patel updated her quality competitor rankings in May 2014, Zydus was rated +2, an increase in five points over a twelve-month period. While Apotex's increase in the ranking was due to Teva's successful collusion with Apotex on several price increases in 2013 and 2014, Zydus' increase was more personnel-oriented: Green, who had himself conspired with a number of competitors while at Teva (at the direction of and in coordination with Patel and Rekenthaler at Teva, among others) moved from Teva to Zydus in November 2013. With Green firmly installed at Zydus, Patel was emboldened to more fully include Zydus in the conspiracy.

1584.   Patel's confidence was well-founded. In the year after Green joined Zydus, the two companies successfully conspired to divide markets and allocate customers relating to Zydus' entry into the market for multiple drugs, including: Fenofibrate (February – March 2014), Paricalcitol (March – April 2014), Niacin ER (May – June 2014), and Etodolac ER (May – July 2014). These agreements are discussed more fully above.

1585.   Teva and Zydus also agreed to increase prices on Topiramate Sprinkles and Warfarin Sodium tablets. Zydus increased the price for both of those drugs on June 13, 2014. Teva followed with an increase on both drugs on August 28, 2014. With respect to the Topiramate Sprinkles, Teva was explicit in its internal communications that its increase was to "follow competitor," namely Zydus.

1586.   In the days leading up to both companies' price increases, Green and Patel communicated frequently to coordinate the price increases. On June 19, 2014 – four days before Zydus increased its prices –Green and Patel spoke four (4) times. And on August 27, 2014 – the day before Teva raised its prices – Green and Patel spoke three (3) times.

1587.   Green was also communicating frequently with Rekenthaler of Teva around the time of the price increases on Topiramate Sprinkles and Warfarin Sodium tablets. On June 11, 2014, the two men spoke for eight (8) minutes. On August 20, the two exchanged an additional pair of phone calls.

1588.   Patel and Rekenthaler did not communicate with Green in isolation. The two Teva executives made sure to keep each other apprised of their conversations with competitors, including Green. In early 2014, Patel and Rekenthaler both worked largely out of Teva's home office. After either one of them engaged in a phone call with a competitor, he or she would be sure to provide an in-person debrief of the communication so as to avoid putting such information in writing.

1589.   Even before Green joined Zydus in November 2013, Teva did have success in coordinating price increases with Zydus with respect to Pravastatin.

### 3.   Heritage

1590.   Heritage, like Apotex and Zydus, was not a highly-ranked competitor when Patel first created the quality of competitor ranking list in May 2013. Initially, Patel gave Heritage a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Heritage received the highest possible ranking of +3.

1591.   The reason for Heritage's significant improvement in Patel's quality competitor rankings was the relationship that Patel established with the Vice President of Heritage, Malek. After moving to Teva, Patel began communicating with Malek by phone as early as July 9, 2013. From that date until July 25, 2014, the two spoke by phone at least 37 times.

1592.   Heritage's successful efforts to coordinate price increases with Teva on seven drugs – Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline ER – are described above.

### 4.   Lupin

1593.   In Patel's initial May 2013 quality competitor ranking list, Lupin was given a ranking of +2. When Patel updated her quality competitor rankings a year later, Lupin received the highest possible rating of +3.

1594.   Lupin was awarded the highest score in the quality competitor ranking in 2014 because Berthold of Lupin earned Patel's trust by consistently agreeing to her price increase plans. From May

2013 through April 2014, for example, Patel and Berthold spoke at least 76 times by phone. Green, while still at Teva, also had a very strong relationship with Berthold. As discussed above, at times Patel and Green would even coordinate with each other regarding which one of them should coordinate a price increase or customer allocation agreement with Berthold.

1595.    As discussed more fully above, in 2013 – after Patel joined Teva – Teva and Lupin conspired to fix and raise prices on at least the following four drugs: Cefdinir oral suspension, Cefdinir capsules, Cefprozil tablets and Pravastatin. Then in early 2014, executives at the two companies coordinated Lupin's entrance into the market for Balziva.

1596.    The relationship was so strong between Teva and Lupin that even when Green left Teva, and Patel was out of the office on maternity leave, Berthold still found other executives at Teva to communicate with regarding a price increase for the drug Cephalexin oral suspension. As discussed above, in October 2013, Berthold called Rekenthaler and T.S., a national account executive at Teva, to coordinate Lupin's November 1, 2013 price increase for Cephalexin oral suspension. When Patel returned from maternity leave and began planning the next round of Teva price increases, she continued these communications with Berthold until Teva followed Lupin's price increase on April 4, 2014.

1597.    Patel and Berthold also coordinated a price increase and market allocation scheme with regard to the drug Niacin ER, as Lupin was entering the market in March 2014. Given the successful track record between the two competitor companies, Lupin warranted a +3 in the quality competitor rankings when Patel updated them in May 2014.

**5.    Par**

1598.    In Patel's initial May 2013 quality competitor ranking list, Par was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Par improved to a ranking of +2.

1599.    Par rose in the rankings largely because of several strong relationships between executives at the two companies. For example, T.S., a national sales executive at Teva, had a strong relationship with R.K., a senior sales executive at Par. The two began communicating by telephone in September 2013. Between September 2013 and May 2014, the two spoke at least twenty-seven (27) times by phone.

1600.    Similarly, Rekenthaler at Teva had a very strong relationship with another senior executive at Par, M.B. Rekenthaler spoke with M.B. frequently throughout 2013 and 2014. From the beginning of 2013 through May 2014, Rekenthaler spoke to M.B. at Par at least thirty-two (32) times by phone.

1601.    Patel was well aware of these strong relationships and relied on the information that T.S. and Rekenthaler obtained from their communications with senior Par executives in order to make pricing or bidding decisions for Teva's drugs. One such example occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on Labetalol HCL tablets. Patel forwarded the e-mail to T.S. with three question marks: "???" T.S. responded immediately: "left message." The message that T.S. had left was for R.K. at Par, and the two executives spoke five (5) times that same day. After these calls with R.K., T.S. responded back to Patel saying "[l]et's speak on Monday. Just received call back with more information."

1602.    The following Monday, Patel also forwarded the original e-mail (discussing the competitive challenge from Par on Labetalol HCL) to Rekenthaler, saying "[n]eed to make a decision quickly." One (1) minute after receiving that e-mail, Rekenthaler called M.B. at Par and the two spoke for eighteen (18) minutes. Shortly after hanging up the phone with M.B., Rekenthaler sent another e-mail to Patel, stating: "[h]old off on this until I get back with you." Rekenthaler spoke to M.B. again later that afternoon for three (3) minutes.

1603.    After these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction to that customer – knowing that this would likely concede the business to Par.

1604.    As discussed more fully above, Teva continued to conspire with Par on various market allocation and price fixing schemes throughout the remainder of 2014 and into 2015.

### 6.    Greenstone

1605.    Greenstone was not a highly-ranked competitor when Patel first created the quality competitor ranking list in May 2013. Patel had, at that time, given Greenstone a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Greenstone improved to a +1 ranking.

1606.   One of the reasons for Greenstone's improvement in the rankings was Patel's developing relationship with Robin Hatosy, a national account executive at Greenstone. Patel and Hatosy were former co-workers at ABC and had a longstanding relationship. From the time Patel started her employment at Teva in April 2013, through the time that she updated the quality competitor rankings in May 2014, Patel and Hatosy communicated by phone or text at least 66 times. Patel also spoke to Hatosy's supervisor, Nailor, numerous times in early 2014 to coordinate Greenstone and Teva price increases and customer allocation agreements.

1607.   Patel and Hatosy of Greenstone spoke consistently at or around the time of every price increase effectuated by either company on drugs where they overlapped, including for example: July 3, 2013 – the day of Teva's price increase on Fluconazole; December 2, 2013 the day that Greenstone sent notices to customers of its price increases on Azithromycin suspension, Azithromycin oral suspension, and Medroxyprogesterone; and April 4, 2014 – the day that Teva followed Greenstone's price increases on Azithromycin suspension, Azithromycin oral suspension, and Medroxyprogesterone.

1608.   Given the willingness of Greenstone's executives to coordinate price increases with Teva, Patel increased Greenstone's quality competitor ranking in May 2014.

### 7.   Amneal

1609.   In Patel's initial May 2013 quality of competitor ranking list, Amneal was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Amneal improved to a ranking of +2.

1610.   One of the reasons why Amneal rose in the rankings was because of several strong relationships between executives at the two companies. For example, Rekenthaler of Teva had a strong relationship with S.R.(2), a senior sales executive at Amneal. From May 2013 to May 2014, they spoke eight (8) times by phone, and attended many trade association meetings and customer conferences together as well. Rekenthaler and S.R.(2) were regular participants in an annual golf outing hosted by a packaging contractor in Kentucky, where – as discussed above – the generic drug manufacturer participants (competitors) played golf by day and gathered socially by night, referring to each other as "friends" and "fraternity brothers." (Green and Ostaficiuk were also participants.)

1611.    Similarly, Patel also developed strong relationships with two Amneal executives: S.R.(1), a senior sales and finance executive at Amneal, and S.R.(2). As discussed above, Patel and S.R.(1) coordinated price increases for the drugs Norethindrone Acetate (September 2014) and Bethanechol Chloride (January 2015).

1612.    Patel also spoke to S.R.(2) regarding Norethindrone Acetate in September 2014, and continued to communicate with S.R.(2) into at least 2015 – sometimes using alternative forms of communication. In addition to their cell phones, the two executives also used Facebook Messenger to coordinate anticompetitive conduct. In the message exchange below (relating to a drug not identified in this Complaint), S.R.(2) informs Patel that Amneal will concede one customer – Econdisc ("E") – so long as Amneal is able to retain another large customer, Red Oak Sourcing ("RO"):



1613.    On the day of this message exchange, Patel and S.R.(2) also spoke by phone for nearly five (5) minutes.

### 8.    Rising

1614.    In Patel's initial May 2013 quality competitor ranking list, non-Defendant Rising was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Rising improved to a ranking of +2.

1615.   Rising improved in the quality competitor rankings because of the relationship between Rekenthaler and CW-2. In 2013, CW-2 left Sandoz to join Rising. At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate. Teva was one of the competitors already in that market. During several calls in early October 2013, CW-2 coordinated with Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

1616.   Later, in March 2014, CW-2 sought to return the favor. At that time, Rising experienced supply problems for Diflunisal tablets – a two-player market involving only Teva and Rising. In an effort to "play nice in the sandbox," and to further the ongoing understanding between the two competitors, CW-2 contacted Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future. The purpose for the call was to alert Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.

1617.   On April 4, 2014, Teva increased the price on Diflunisal tablets by as much as 182%, as well as Hydroxyzine Pamoate by as much as 165%. In the weeks leading up to those price increases, Rekenthaler communicated several times with CW-2 at Rising to coordinate the increases. The two spoke by phone twice on March 17, 2014 and once on March 31.

1618.   When Rising decided to leave the Diflunisal market in mid-July 2014, CW-2 called Rekenthaler to let him know. Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal. CW-2 and Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014. On December 3, 2014, Rising re-entered the market for Diflunisal tablets. Its new pricing matched Teva's WAC price increase from April 2014.

1619.   Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with CW-2 of Rising led Patel to increase Rising's quality competitor ranking in May 2014.

### 9. Breckenridge

1620.   In Patel's initial May 2013 quality competitor ranking list, she gave Breckenridge a ranking of +1. When Patel updated her quality competitor rankings a year later, Breckenridge improved to a ranking of +2.

1621.   Breckenridge improved in the quality competitor rankings largely because of the strong relationship established between Patel and Rekenthaler and certain executives at Breckenridge, which led to several successful price increases.

1622.   For example, on November 14, 2013, Breckenridge increased the WAC pricing of both Estradiol/Norethindrone Acetate and Cyproheptadine HCL tablets. In the weeks leading up to those Breckenridge price increases, Rekenthaler communicated by phone several times with D.N., a sales executive at Breckenridge. The two spoke twice on October 14, 2013 and once on October 24, 2013. The call on October 24 lasted twenty-six (26) minutes.

1623.   On April 4, 2014, Teva followed the Breckenridge price increases on Estradiol/Norethindrone Acetate tablets increasing the WAC pricing by over 100% and Cyproheptadine HCL tablets increasing the WAC pricing by over 90%, to match Breckenridge's WAC pricing on both products. Teva raised prices even higher on its customer contracts. Teva increased the contract pricing of Estradiol/Norethindrone Acetate by as much as 393%, and the contract pricing of Cyproheptadine HCL tablets by as much as 526%, depending on the dosage strength.

1624.   As Patel planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to communicate with their counterparts at Breckenridge. Rekenthaler spoke to D.N. at Breckenridge on January 15, 2014 – the day after Patel sent her first list of "Increase Potentials Q1 2014" to K.G. – for nineteen (19) minutes. Similarly, Patel spoke with S.C. – a sales executive at Breckenridge – two times on February 7, 2014, as she was determining whether Teva should provide a bid to a customer. After her discussions with S.C., Teva declined to bid for the business in order to avoid taking market share away from Breckenridge as a result of the price increases.

1625.   As a result of the successful coordination of these price increases between Teva and Breckenridge, Patel increased Breckenridge's quality competitor ranking in May 2014.

### 10.   Glenmark

1626.   Not every Teva competitor saw its quality competitor ranking increase between 2013 and 2014. Glenmark, for example, declined slightly in the rankings. In Patel's initial May 2013 quality competitor ranking list, Glenmark was given a ranking of +3. When Patel updated her quality competitor rankings a year later, Glenmark was given a ranking of +2.

1627.   The reason that Glenmark declined in the rankings was because Patel lost her most valuable relationship at that company – CW-5. CW-5 left Glenmark in April 2014. In the eleven-month period between Patel joining Teva in late April 2013 and CW-5 leaving Glenmark in April 2014, the two competitors communicated by phone or text message 121 times. They also communicated frequently using an encrypted messaging application, WhatsApp. As discussed more fully above, starting in early May 2013 Teva and Glenmark conspired to fix and raise prices on a number of drugs, including: Adapalene, Nabumetone, Fluconazole tablets, Ranitidine HCL, Moexipril HCL, Moexipril HCL/HCTZ and Pravastatin.

1628.   In addition to CW-5, Patel also had other contacts at Glenmark – which is why Glenmark did not fall dramatically in the quality competitor rankings when CW-5 left the company. For instance, Patel exchanged 44 phone calls or text messages with J.C., a sales and marketing executive at Glenmark, between May 2013 and July 2015. Similarly, Patel exchanged 36 calls with Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014. As discussed more fully above, Patel continued to coordinate with J.C. and Brown throughout 2014 on several drugs, including Desogestrel/Ethinyl Estradiol and Gabapentin tablets – demonstrating that Glenmark remained a quality competitor even after CW-5 left the company.

### 11.   Camber

1629.   When Patel first created the quality of competitor rankings in early May 2013, she gave Camber a ranking of -2. When Patel revised those rankings one year later in May 2014, Camber's ranking did not change. It remained one of the lowest ranked of all of Teva's competitors.

1630.   Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

1631.   This was evident when, in September 2014, Camber entered the market for two different drugs that overlapped with Teva.

1632.   One of those drugs was Raloxifene HCL tablets.

1633.   Teva had begun marketing Raloxifene HCL in March of that year. Actavis had received approval to begin marketing Raloxifene HCL in 2014 as well but had not yet entered by September 2014.

1634.   The other drug was Lamivudine/Zidovudine – a combination medication also known by the brand name Combivir. Camber had received approval to market a generic form of Combivir in February 2014, but as of September 2014 was still in the process of entering the market. Already in the market were competitors Teva, Aurobindo and Lupin. As discussed more fully above, Teva, Lupin, and Aurobindo agreed to divide up the generic Lamivudine/Zidovudine market in 2012 when Teva was losing exclusivity on that drug.

1635.   As the anticipated product launches for Raloxifene HCL approached, the new entrants discussed an allocation strategy with Teva to ensure they each received their fair share of the market. On September 9, 2014, Rekenthaler had a twenty-six (26) minute phone call with A.B., a senior sales and marketing executive at Actavis. A short time later, a Teva executive told colleagues that she had "just heard Camber and Actavis expect to launch 9/24."

1636.   Teva's discussions with Actavis escalated over the coming week. On September 10, Rekenthaler exchanged two calls with Falkin of Actavis lasting fifteen (15) minutes and one (1) minute, respectively. On September 11, the men talked for ten (10) more minutes. On September 16, Rekenthaler spoke by phone a total of six (6) times with different Actavis personnel, including one call with A.B. lasting thirty-four (34) minutes.

1637.   The following morning, in response to an inquiry regarding whether Teva intended to retain a major customer's Raloxifene HCL business, K.G. of Teva replied in the affirmative. Rekenthaler then shared the information he had gathered through his communications with competitors: "I know Actavis will be late. Camber is talking but their [sic] being somewhat unclear as well. I'll know more about them after my trip this week." That same day, on September 17, 2014, Camber sent an offer for Raloxifene HCL to a large Teva customer, Econdisc.

1638.   Rekenthaler and Ostaficiuk, the President of Camber, spent the next three days –
September 17 through September 19 – playing golf during the day and socializing at night at an industry
outing in Kentucky sponsored by a packaging vendor.

1639.   On September 21, 2014, Ostaficiuk called Rekenthaler and the two spoke for two (2)
minutes. The next day, Rekenthaler initiated a series of four (4) phone calls with Ostaficiuk. The two
spoke for a total of thirty (30) minutes that day. Notably, these are the first identified phone calls ever
between the two competitors. As a result, Camber sent a revised offer to its potential customer that
same afternoon, containing modified prices for Raloxifene HCL.

1640.   On September 24, Patel discussed a Raloxifene HCL allocation strategy with her Teva
colleagues in light of Camber's offer to the large Teva customer, Econdisc. She emphasized Camber's
expressed commitment to the overarching conspiracy among the competitors – and conveyed
information she obtained from Rekenthaler during his conversations with Ostaficiuk – stating:
"Camber indicated that they are targeting Econdisc and a small retailer … and then they would be
'done.'"

1641.   As a part of this discussion, K.G. considered whether Teva should just concede
Econdisc to Camber and seek to recover that market share with another customer. At 9:07am that
morning, Patel informed her supervisor K.G. and numerous others at Teva, that Rekenthaler planned
to discuss the matter with Camber:

From:      Nisha Patel02
Sent:      Wed 9/24/2014 9:07 AM (GMT-05:00)
To:
Cc:        Dave Rekenthaler;
Bcc:
Subject:   Re: Econdisc Raloxifene Intel

FYI, Dave is working on verifying the Camber price. Stand by.

Sent from my iPhone

1642.   Indeed, at 9:28am that morning, Rekenthaler called Ostaficiuk and the two spoke for
two (2) minutes. They spoke two more times that day, including one call that lasted eight (8) minutes.

1643.   Some of these calls also related to Camber's entry into the market for Lamivudine/Zidovudine. Teva and Lupin were already in the market for Lamivudine/Zidovudine, and Ostaficiuk was engaging in contemporaneous communications with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into that market. At least some of those calls on September 24, 2014 are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 5:28:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Rekenthaler, David (Teva) | 8:19:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Berthold, David (Lupin) | 8:21:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Berthold, David (Lupin) | 8:23:00 | 0:10:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 10:35:00 | 0:07:00 |

1644.   On that same day, Berthold also spoke with P.M., a senior operations executive at Aurobindo, for more than eighteen (18) minutes, to close the loop on the Lamivudine/Zidovudine communications.

1645.   On September 25, after discussing with his colleagues which customers Teva should concede in order to give Camber its fair share of the Raloxifene HCL market and aimed with the information Rekenthaler had gathered from Camber's President, K.G. concluded: "Okay, we will concede additional smaller customer challenges (particularly distributors) since they are not going to target One Stop." Rekenthaler and Ostaficiuk spoke again twice that day.

1646.   That evening, a Camber executive instructed a colleague to gather market intelligence on possible additional customers for Camber's new Raloxifene HCL product but stressed that the company would not bid on any additional Teva accounts "until we know how we do with Econ[disc]."

1647.   On Friday September 26, 2014, Camber publicly announced that it was launching Raloxifene HCL. Rekenthaler called Ostaficiuk that day, for a short one (1) minute call.

1648.   From those telephone calls, Rekenthaler expressed to Ostaficiuk that Teva did not want Camber challenging for any more of its customers, on Raloxifene HCL or Lamivudine/Zidovudine. As a result of this communication, on Monday September 29, 2014 Ostaficiuk sent the following e-mail to his colleagues at Camber:

```
Message
From:           Kon Ostaficiuk [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Kon
                Ostaficiuk]
on behalf of    Kon Ostaficiuk
Sent:           9/29/2014 5:27:43 PM
To:             [                    ] [/o=Camber Pharma/ou=Exchange Administrative Group
                (FYDIBOHF23SPDLT)/cn=Recipients/cn=[          ] [          ] [/o=Camber Pharma/ou=Exchange
                Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=[          ]
CC:             [          ] [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=[     ]
Subject:        RE: McKesson -- dead net prices for OS w/ Riteaid

Hi Gang,
We do not offer anything to any Teva customers...

Not even a "bad price"!

Please acknowledge...We do not want to upset them more!

Thank you,
Kon
```

1649.    A.R., a senior sales executive at Camber, replied: "We have not made any offers to any Teva Raloxifene accounts since we received the Econ award. Both Sales and Contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer." A.R. also added that "We are also not seeking any Lupin business on Lamo/Zidovudine." Ostaficiuk replied: "Thank you. We don't want to antagonize either of them and start a war…"

1650.    About a week later, on October 7, 2014, a large Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene HCL business. J.P., a Director of National Accounts at Teva, sent an e-mail to certain employees at Teva, including Rekenthaler, notifying them of her conversation with the customer, and expressing surprise given the agreement Teva had previously reached with Camber: "I thought they were done after securing Econdisc?" Based on his prior conversations with Ostaficiuk, Rekenthaler doubted that Camber made an offer to another Teva customer, stating: "You're positive they sent them an offer?"

1651.    J.P. of Teva "relayed 'the message'" to the customer that "the market should be stable at this point" and Teva would be surprised if Camber had intended to make an offer to the customer. After further discussion with the customer, Teva staff learned that it was a misunderstanding. Camber never actually made the offer but had instead complied with its agreement with Teva.

1652.    The fair share agreement continued to govern as usual until mid-December 2014, when Camber learned of supply problems at Teva on Raloxifene HCL. A Camber employee described the prospect of Teva being on backorder for this drug as a "Game changer." Expressing her understanding

of the rules of the conspiracy, she pointed out: "**Fair share only applies when there is not supply constraints.**" Ostaficiuk responded optimistically, but cautiously: "Good luck guys but go fishing and gather information before we commit . . . ."

## XII.   OTHER DRUGS

1653.   Defendants also colluded to allocate markets and fix prices for numerous other drugs, including those listed below.

### A. Albuterol Sulfate

1654.   At all relevant times, Mylan and Sun have dominated market for Albuterol Sulfate.

1655.   Prior to 2013, the effective prices for Albuterol Sulfate were stable.

1656.   Beginning in March 2013, the average NADAC price for Albuterol Sulfate rose dramatically.

1657.   For example, Mylan's 100ct Albuterol Sulfate 2mg increased price by over 4,300% from $0.13 to $5.88 on March 6, 2013. Sun's 100ct Albuterol Sulfate 2mg increased 3,400% from $0.13 to $4.70 on April 15, 2013, as illustrated by WAC data:

| Product 2MG | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 100 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,317% |
| 500 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,549% |
| 100 ct | Sun | $0.13 | $4.70 | April 15, 2013 | 3,485% |
| 500 ct | Sun | $0.12 | $4.70 | April 15, 2013 | 3,674% |

### B.   Amitriptyline

1658.   At all relevant times, Mylan, Par, and Sandoz have dominated the market for Amitriptyline.

1659.   Prior to 2014, the effective prices for Amitriptyline were stable.

1660.   Beginning in May 2014, the average NADAC price for Amitriptyline rose dramatically.

1661.   These price increases followed the (i) April 1, 2014 HDMA Annual CEO Roundtable Fundraiser in New York, New York, which Mylan, Par, and Sandoz attended. *See* Exhibit A.

1662.   The charts below show average price increases for various dosages of Amitriptyline tablets:



1663.   WAC data confirms that Mylan, Par, and Sandoz increased Amitriptyline prices largely

in unison by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Sandoz | 00781148801 | $0.05 | $0.57 | 5/23/2014 | 1,032% |
| 1,000ct | Sandoz | 00781148810 | $0.05 | $0.48 | 5/23/2014 | 945% |
| 100ct | Mylan | 00378265001 | $0.05 | $0.57 | 7/16/2014 | 1,032% |
| 1,000ct | Mylan | 00378265010 | $0.05 | $0.57 | 7/16/2014 | 1,157% |
| 100ct | Par | 00603221421 | | $0.57 | 9/26/2014 | |
| 1,000ct | Par | 00603221432 | | $0.48 | 9/26/2014 | |

1664.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, and market-wide price increases. For example, The *Financial Times* reported on May 12, 2015 that the $1.07 price for a 100 mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[45] The *Boston Globe* similarly reported, in November of the same year, "The cost of the antidepressant drug amitriptyline jumped 2,475 percent, from 4 cents for a 100-milligram pill in 2013 to $1.03 in 2015."[46]

**C.    Clobetasol Propionate**

1665.   In 2009, there were approximately ten Clobetasol Propionate manufacturers. In 2012, Novartis acquired Fougera and in 2013, Akorn acquired Hi-Tech, consolidating the market. By 2014, many Clobetasol Propionate manufacturers exited the market, including Teva and Glenmark.

1666.   Since June 2014, Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt have dominated the market for generic Clobetasol Propionate.

1667.   Prior to June 2014, prices for Clobetasol Propionate were stable.

1668.   Beginning in June 2014, Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, and Wockhardt increased their prices for Clobetasol Propionate abruptly and in unison.

1669.   Collectively, these Defendants raised prices for Clobetasol Propionate by approximately 1,300% between July 2014 and September 2014.

1670.   According to NADAC data, the average market price for generic Clobetasol Propionate saw the following price increases from July 2014 to September 2014, as shown below:

Clobetasol .05% Ointment (15g): increased by 1,852%;

Clobetasol 0.05% Solution (50mL): increased by 1,176%; and

Clobetasol 0.05% Cream (30g): increased by 1,596%.

---

[45] David Crow, *Teva bids for Mylan amid pressure on copycat drugmakers*, FIN. TIMES, May 12, 2015, available at https://www.ft.com/content/8ff2fc5a-f513-11e4-8a42-00144feab7de.

[46] Priyanka Dayal McCluskey, *As competition wanes, prices for generics skyrocket*, BOS. GLOBE, Nov. 6, 2015, available at https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.









Clobetasol 0.05% Ointment
$7.00
$6.00
$5.00
$4.00
$3.00
$2.00
$1.00
$-
NADAC price/unit
11/21/13
1/21/14
3/21/14
5/21/14
7/21/14
9/21/14
11/21/14
1/21/15
3/21/15
5/21/15
7/21/15
9/21/15
11/21/15
1/21/16
3/21/16
5/21/16
7/21/16
9/21/16
11/21/16
Date
15g
30g
45g
60g

Clobetasol 0.05% Solution
$3.00
$2.50
$2.00
$1.50
$1.00
$0.50
$-
NADAC price/unit
11/21/13
1/21/14
3/21/14
5/21/14
7/21/14
9/21/14
11/21/14
1/21/15
3/21/15
5/21/15
7/21/15
9/21/15
11/21/15
1/21/16
3/21/16
5/21/16
7/21/16
9/21/16
11/21/16
Date
25mL
50mL

Clobetasol Emollient 0.05% Cream
$3.50
$3.00
$2.50
$2.00
$1.50
$1.00
$0.50
$-
NADAC price/unit
11/21/13
1/21/14
3/21/14
5/21/14
7/21/14
9/21/14
11/21/14
1/21/15
3/21/15
5/21/15
7/21/15
9/21/15
11/21/15
1/21/16
3/21/16
5/21/16
7/21/16
9/21/16
11/21/16
Date
15g
30g
60g

1671.    WAC data confirms that Actavis, Hi-Tech, Sandoz, and Taro all increased prices in their Clobetasol Propionate cream largely in unison by the following amounts:

| Clobetasol cream .05%: | Defendant: | Old WAC: | New WAC: | Date of Increase: | Percentage Increase: |
|---|---|---|---|---|---|
| 15gm | Taro | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Hi-Tech | $0.37 | $6.84 | 9-Aug-14 | 1732% |
| 15gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1993% |
| 30gm | Sandoz | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Hi-Tech | $0.32 | $6.84 | 9-Aug-14 | 2026% |
| 30gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Hi-Tech | $0.31 | $6.84 | 9-Aug-14 | 2138% |
| 45gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Hi-Tech | $0.29 | $6.12 | 9-Aug-14 | 2016% |
| 60gm | Actavis | * | $6.12 | 10-Mar-15 | * |

1672.    Although WAC data is not available for Akorn, Fougera, Morton Grove, Perrigo, Sandoz, and Wockhardt, upon information and belief, they implemented simultaneous and identical price increases for their Clobetasol Propionate products.

1673.    News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.

1674.   For example, by October 2014, pharmacists expressed outrage at the dramatic price increases. Kushal Patel, a pharmacy manager at Well Future Pharmacy said "Clobetasol, which used to cost $10 for the entire tube, now costs $300. The same exact medication we got one day. Next day, it's an increase of three thousand percent."[47]

1675.   Ascension Health, a hospital system based in Missouri with facilities in 23 states, reported a price increase from $2.89 in 2013 to $198.64 (or 6,773%) in 2014 for a 45-gram tube of generic Clobetasol Propionate cream.[48]

1676.   A dermatologist reported the experience of his patient in Tucson, Arizona in 2015. He expressed shock and dismay when his patient informed him that a 60-gram tube of Clobetasol Propionate cream would now cost him $220. The dermatologist was so surprised that he called around to other local pharmacies, all of whom were pricing the product above $200.[49]

1677.   Patient reports also corroborate the skyrocketing prices for Clobetasol Propionate. In 2014, Millicent Graves of Williamsburg, Virginia paid $35 for her prescription of Clobetasol Propionate solution, but in 2015, it cost $475.88. And just five weeks later, it rose to $627, overall a 1,691% increase over the course of a few months.[50]

1678.   Express Scripts, a PBM company that compiles its own price index for generic drugs, included Clobetasol Propionate in the top four most significant price increases for 2014[51] and in the top ten for 2015.[52]

1679.   An article in the *Boston Globe* described price changes from 2013 to 2015, when one form of Clobetasol Propionate's price spiked 1,496% from $0.23 per gram to $4.15 per gram. In response, Akorn representative Dewey Steadman said that the company simply reacted to price

---

[47] Dorothy Tucker, *Prices Soar For Some Generic Drugs – Why?*, CBS CHICAGO, Oct. 31, 2014, http://chicago.cbslocal.com/2014/10/31/prices-soar-for-some-generic-drugs-why/.
[48] Samantha Liss, *Hospitals and Pharmacies Grapple With Rising Drug Prices*, St. Louis Post-Dispatch, Nov. 16, 2014, http://www.stltoday.com/business/local/hospitals-and-pharmacies-grapple-with-rising-drug-prices/article_c6616678-bf8f-5b0e-8df1-9238df0f6919.html.
[49] Norman Levine, *The Tale of the $200 Tube of Clobetasol Cream*, DERMATOLOGY TIMES, Aug. 5, 2015, http://dermatologytimes.modernmedicine.com/dermatology-times/news/tale-220-tube-Clobetasol-cream-2
[50] *Unprecedented Generic Drug Price Spikes Wreaking Havoc*, THE SENIOR CITIZENS LEAGUE, Jul. 6, 2015, http://seniorsleague.org/unprecedented-generic-drug-price-spikes-wreaking-havoc/.
[51] *The Reality Behind Generic Drug Inflation*, EXPRESS SCRIPTS, Dec. 30, 2014, http://lab.express-scripts.com/lab/insights/drug-options/the-reality-behind-generic-drug-inflation.
[52] 2015 Drug Trend Report, EXPRESS SCRIPTS, March 2016, *available at* http://lab.express-scripts.com/lab/drug-trend-report/previous-reports.

increases by its competitors, Novartis and Taro. In doing so, he invoked the influence of their market dominance and rejected the possibility of outside price factors: "Following price increases by others in this highly competitive market, Akorn brought Clobetasol's price in line with other generic versions of the product."[53]

1680.    Defendants had numerous opportunities to coordinate their price increases. Key pricing executives from at least Actavis, Sandoz, Taro, and Wockhardt attended the (i) June 1-4, 2014 HDMA Business and Leadership Conference in Phoenix, Arizona; and key executives from at least Actavis, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, and Taro attended the (ii) June 3-4, 2014 GPhA Annual CMC Workshop in Bethesda, Maryland. *See* Exhibit A.

### D.    Desonide

1681.    At all relevant times, Actavis, Fougera, Perrigo, Sandoz, and Taro have dominated the market for Desonide.

1682.    Prior to May 2013, the effective prices for Desonide remained stable.

1683.    However, beginning in May 2013, the average NADAC price for Desonide rose dramatically.

1684.    According to NADAC data, the average market price for generic Desonide saw the following price increases:

> Desonide 0.05% cream: between July 11 and July 18, 2013, the average price increased by 442%
>
> Desonide 0.05% ointment: between July 11 and July 18, 2013, the average price increased by 390%

1685.    NADAC data shows that the average market price of Desonide remained stable prior to May 2013, but rose dramatically and remained artificially high after July 2013, as depicted in certain forms and dosages below.

---

[53] Priyanka Dayal McCluskey, *As Competition Wanes, Prices for Generics Skyrocket,* THE BOSTON GLOBE, Nov. 6, 2015, https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.





1686.   WAC data confirms that Perrigo, Taro, and Sandoz all increased their prices in Desonide ointment in lockstep fashion in the following amounts:

| Product Package | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15gm | Taro | 51672128101 | $0.84 | $3.21 | 5/01/2013 | 282% |
| 60gm | Taro | 51672128103 | $0.53 | $3.21 | 5/01/2013 | 501% |
| 15gm | Perrigo | 45802042335 | $1.30 | $3.21 | 5/21/2013 | 146% |
| 60gm | Perrigo | 45802042337 | $0.31 | $3.21 | 5/21/2013 | 932% |
| 15gm | Sandoz | 00168030915 | | $3.21 | 1/17/2014 | |
| 60gm | Sandoz | 00168030960 | | $3.21 | 1/17/2014 | |

1687.   Although WAC data is not available for Actavis or Fougera, upon information and belief, they implemented similar price increases, largely in unison for their Desonide products.

1688.   Actavis entered the Desonide market in August 2013 and set its prices at supracompetitive levels instead of entering at a lower cost and competing for customers. Upon information and belief, Actavis contacted Fougera, Perrigo, Sandoz, and Taro well before August 2013 and explained its intention of market entry. These Defendants then colluded to allocate market share

1   and set supracompetitive prices. This agreement prevented Actavis' entry from eroding the artificial

2   equilibrium these Defendants conspiratorially created.

3       1689.   News reports and testimonials from physicians corroborate these dramatic, immediate,

4   market-wide price increases. For example, dermatologist Alan Rockoff reported in Dermatology News

5   in February 2015:

6           Then this week it happened again. I prescribed hydrocortisone valerate

7           0.2% for a groin rash. The patient left a message asking me for an over-the-counter suggestion, since the prescription was going to cost him

8           $52.70 out of pocket.

9           I asked my secretary to call the pharmacy to get a price for other generic

10          steroid creams. Triamcinolone would cost $14.70. Alclometasone would cost $35.20. And desonide – generic desonide – would cost $111.70. For

11          a 15-g tube. $111.70 for 15 g of a generic cream that's been on the market forever! Does that make any sense?

12      1690.   Defendants had numerous opportunities to coordinate their price increases. Shortly

13  before increasing prices, key pricing executives from at least Actavis, Perrigo, Sandoz, and Taro

14  attended the February 20 -22, 2013 GPhA Annual Meeting in Orlando, Florida and the June 4-5, 2013

15  GPhA CMC Workshop. *See* Exhibit A.

16  **E.**     **Digoxin**

17      1691.   Digoxin was first approved by the FDA in 1975, and forms of it have been on the

18  market in the United States since before the passage of the Federal Food, Drug, and Cosmetic Act in

19  1938. Variants of the drug, which is derived from the Digitalis lanata plant, have been used since the

20  18th century.

21      1692.   In late 2012, Impax and Lannett were the only active domestic manufacturers of

22  Digoxin. Sun, Par and West-Ward re-entered the market in 2014 and Mylan re-entered in 2015. Since

23  that time, Impax, Lannett, Mylan, Par, Sun, and West-Ward have dominated the market for Digoxin.

24      1693.   Prior to October 2013, effective prices for Digoxin were stable.

25      1694.   Beginning in October 2013, Impax and Lannett increased their prices abruptly and in

26  unison. During this period, prices for generic Digoxin rose more than 630%.

27

28

1695.   As a result, prices across the market rose more than 884% for Digoxin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg. Market Price Oct. 2012 | Avg. Market Price June 2014 | Percentage Increase: |
|---|---|---|---|
| Digoxin (single tablet 250mcg) | $0.11 | $1.10 | 884% |

1696.   According to NADAC data, the average market price for generic Digoxin saw the following price increases from November 2013 to February 2014:

Digoxin 125 mcg tablets: 881%

Digoxin 250 mcg tablets: 825%

1697.   These dramatic price increases, initially instituted by Impax and Lannett were maintained even after Par's entry into the market in early 2014, West-Ward's entry soon thereafter, and Mylan's entry in early 2015. In fact, these Defendants including the new entrants continued to increase prices for Digoxin during the first six months of 2014. This is especially telling evidence of collusion, as entry of two (and later three) additional competitors would typically lead to substantial price decreases.

1698.   NADAC data shows that average market prices for Digoxin rose dramatically and remained artificially high after November 2013, as depicted below.



1699.   WAC and AWP data for 0.25mg Digoxin tablets also shows that prices for Digoxin remained relatively stable prior to the November 2013 price increase. This chart was submitted by Dr. Stephen Schondelmeyer, Director of the PRIME Institute at the College of Pharmacy for the University of Minnesota, as part of his testimony at the Senate Hearing on drug price inflation.

**Figure 12. Digoxin 0.25 mg Tablet (Lannett) Price per Day of Therapy:**
**(January 1, 2005 to December 31, 2013)**



1700.   WAC pricing depicted below confirms that Impax, Lannett, Mylan, Par, and West-Ward all increased their Digoxin prices substantially and largely in unison.

| Package size (0.125 mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Lannett | 00527132401 | $0.14 | $1.19 | 10/16/2013 | 734% |
| 1,000ct | Lannett | 00527132410 | $0.12 | $0.99 | 10/16/2013 | 738% |
| 100ct | Impax | 00115981101 | $0.14 | $1.19 | 10/22/2013 | 734% |
| 1,000ct | Impax | 00115981103 | $0.12 | $0.99 | 10/22/2013 | 738% |

| 100ct | Par | 49884051401 | | $1.19 | 1/17/2014 | |
| 1,000 | Par | 49884051410 | | $0.99 | 1/17/2014 | |
| 100ct | West-Ward | 00143124001 | $0.16 | $1.19 | 4/14/2014 | 638% |
| 1,000ct | West-Ward | 00143124010 | $0.13 | $0.99 | 4/14/2014 | 687% |
| 100ct | Mylan | 00378615501 | | $1.19 | 11/17/2014 | |
| 1,000ct | Mylan | 00378615510 | | $0.99 | 11/17/2014 | |

1701.    Although WAC data is not available for Sun, upon information and belief, Sun implemented simultaneous and identical price increases for Digoxin after it re-entered the market.

1702.    News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. Bill Drilling, a pharmacy owner in Sioux City, Iowa, apologized to his customers in December of 2013 because a 3-month supply of digoxin totaled $113.12, ten times its cost in August. Drilling shared in his customer's outrage, adding "I've been doing this since 1985, and the only direction that generics-drug prices have gone is down."[54]

1703.    Rob Frankil, another pharmacist who testified before the Senate in November 2014, offered a similar narrative: "A recent example from my own experience is the price of Digoxin—a drug used to treat heart failure. The price of this medication jumped from about $15 for 90 days' supply, to about $120 for 90 days' supply. That's an increase of 800%. One of my patients had to pay for this drug…The patient called around to try to get the medicine at the old, lower price, but to no avail."

1704.    Defendants had ample opportunity to coordinate their pricing agreements. Shortly before the price increase, key executives from at least Impax, Lannett, Mylan, Par, and Sun attended the October 28-30, 2013 GPhA Fall Technical Conference. *See* Exhibit A.

**F.    Divalproex Sodium ER**

1705.    At all relevant times, Dr. Reddy's, Mylan, Par, and Zydus dominated the market for Divalproex Sodium ER.

1706.    Prior to June 2013, effective prices for Divalproex Sodium ER were stable.

1707.    In June 2013, Dr. Reddy's, Mylan, Par, and Zydus increased their prices for Divalproex Sodium ER dramatically and largely in unison.

---

[54] Alan Katz, BLOOMBERG, *Surprise! Generic-Drug Prices Spike* (Dec. 12, 2013), https://www.bloomberg.com/news/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

1708.   As a result, Divalproex Sodium ER prices rose across the market by more than 700%, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg. Market Price Oct. 2012 | Avg. Market Price June 2014 | Percentage Increase: |
|---|---|---|---|
| Divalproex Sodium ER (bottle of 80, 500 mg tablets ER 24H) | $31 | $234 | 736% |

1709.   NADAC data shows that average market prices of Divalproex Sodium ER remained stable prior to June 2013, but rose dramatically and remained artificially high after September 2013, as depicted in a sample dosage below. For example, the average market price for Divalproex Sodium ER increased 920%, from $0.31 per tablet to $3.18 per tablet between September 12, 2013 and September 19, 2013.



Divalproex ER 500 mg

1710.   These dramatic price increases, initially instituted by Mylan and Par, were maintained even after Dr. Reddy's and Zydus' entry into the market in August 2013. WAC pricing, depicted below, confirms that Mylan and Par increased their prices uniformly and largely in unison and Dr. Reddy's and Zydus joined in the price increase when they entered the market, instead of competing on price as would be expected of new entrants:

| Package Size (500mg ER) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Mylan | 00378047301 | $0.74 | $3.26 | 6/14/2013 | 338% |
| 500ct | Mylan | 00378047305 | $0.71 | $3.26 | 6/14/2013 | 361% |
| 100ct | Par | 10370051110 | $0.74 | $3.26 | 6/26/2013 | 338% |
| 500ct | Par | 10370051150 | $0.71 | $3.26 | 6/26/2013 | 361% |
| 100ct | Zydus | 68382031501 | | $3.26 | 8/14/2013 | |
| 500ct | Zydus | 68382031505 | | $3.26 | 8/14/2013 | |
| 100ct | Dr. Reddy's | 55111053401 | | $3.26 | 8/14/2013 | |
| 500ct | Dr. Reddy's | 55111053405 | | $3.26 | 8/14/2013 | |

1711.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. According to Spalitto's Pharmacy in Missouri, 500 pills of Divalproex Sodium ER cost $122.99 in May of 2013. By August 2013, the same number of pills skyrocketed to $1,629.95, an increase of 1,225%. "We've been doing this for 30 years. We've never seen anything like this," said the third-generation pharmacy owner.[55]

1712.   Industry experts and audit reports echoed this same narrative. In January 2014, a Morgan Stanley analyst report found that "companies have been raising prices on divalproex….aggressively."[56]

1713.   Defendants had numerous opportunities to coordinate their price increases and market share agreements. Shortly before the price increase, key pricing executives from Dr. Reddy's, Mylan, Par, and Zydus all attended the June 2-5, 2013 GPhA CMC Workshop in Bethesda, Maryland. Among others, Burton (Par, Dr. Reddy's), Nesta (Mylan), Tighe (Mylan), Wyatt (Mylan), Aigner (Mylan), Green (Zydus), and Ronco (Zydus) all attended the June GPhA Workshop.

---

[55] Rob Low, *Rising Cost Some of Generic Drugs Set to Shock Consumers*, Fox4 (Aug. 14, 2013), https://fox4kc.com/2013/08/14/rising-cost-some-of-generic-drugs-set-to-shock-consumers/.
[56] Morgan Stanley, *Specialty Pharmaceuticals Rx Trends in Pictures* (Jan. 27, 2014).

1

**G.     Doxy Hyclate**

2

1714.    Prior to October 2012, prices for Doxy Hyclate were stable.

3

1715.    Beginning in October 2012, Actavis, Par, Sun, Teva, and West-Ward increased their

4

prices for Doxy Hyclate abruptly and largely in unison. Collectively, these Defendants raised prices for

5

generic Doxy Hyclate by at least 2,000% (for certain dosages, as much as 8,200%) between November

6

2012 and March 2013.

7

1716.    As a result, prices rose dramatically and largely in unison. According to a report

8

produced by PRIME Institute and presented by Dr. Stephen Schondelmeyer at a Senate hearing in

9

November 2014, Doxy Hyclate prices rose approximately 2,000% between December 2012 and

10

December 2013. Dr. Shondelmeyer's report chronicled the retail prices for West-Ward's Doxy Hyclate

11

prices, depicted in the chart below:

12
13
14
15

| Drug | Dosage | Manufacturer | NDC Code: | Usual Dose/Day | Retail price/day (Median) Dec. 2012 | Retail price/day (Median) Dec. 2013 | Percentage Increase |
|------|--------|--------------|-----------|----------------|-----------------|-----------------|----------------------|
| Doxycycline Hyclate | 100mg tablet | West-Ward | 00143211205 | 2.00 | $0.36154 | $7.21887 | 1,896% |
| Doxycycline Hyclate | 100mg capsule | West-Ward | 00143314205 | 2.00 | $0.34746 | $7.46247 | 2,047% |

19

20

21

22

23

24

25

26

27

28

1717.   NADAC data shows that the average market price for Doxy Hyclate rose dramatically around November 2012 and remained artificially high thereafter, as depicted in the 50mg capsules below:



1718.   WAC and AWP data for West-Ward's 100mg Doxy Hyclate capsules show that prices for Doxy Hyclate remained relatively stable prior to the November 2012 price increase. This chart was also submitted by Dr. Stephen Schondelmeyer, as part of his testimony at the Senate Hearing on drug price inflation.

**Figure 11. Doxycycline Hyclate 100 mg Capsule (West-Ward) Price per Day of Therapy: (January 1, 2005 to December 31, 2013)**



1719.   WAC data confirms that Actavis, Sun, and West-Ward all increased their prices in generic Doxy Hyclate by the following amounts:

| Product | Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|--------------|-----------|-----|---------|---------|-----------------|---------------------|
| 100mg capsule | 50ct | West-Ward | 00143314250 | $0.10 | $4.43 | 1/21/2013 | 4,326% |
| 100mg capsule | 500ct | West-Ward | 00143314205 | $0.10 | $4.43 | 1/21/2013 | 4,370% |
| 100mg capsule | 50ct | Actavis | 00591544050 | $0.10 | $2.74 | 2/1/2013 | 2,515% |

| 100mg capsule | 500ct | Actavis | 00591544005 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
|---|---|---|---|---|---|---|---|
| 100mg capsule | 50ct | Sun | 53489011902 | $0.10 | $4.92 | 2/5/2013 | 4,847% |
| 100mg capsule | 500ct | Sun | 53489011905 | $0.06 | $4.92 | 2/5/2013 | 7,844% |
| 100mg tablet | 50ct | Actavis | 00591555350 | $0.10 | $2.74 | 2/1/2013 | 2,515% |
| 100mg tablet | 500ct | Actavis | 00591555305 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
| 100mg tablet | 50ct | Sun | 53489012002 | $0.09 | $4.92 | 2/5/2013 | 5,631% |
| 100mg tablet | 500ct | Sun | 53489012005 | $0.08 | $4.92 | 2/5/2013 | 6,268% |

1720.   Although WAC data is not available for Par, upon information and belief, Par implemented simultaneous and identical price increases in Doxy products.

1721.   Actavis, Par, Sun, Teva, and West-Ward had ample opportunity to conspire and coordinate their price increases and market share agreements. Shortly before or while implementing the price increase, key pricing executives from at least Actavis, Par, Sun, and Teva attended the October 1-3, 2012 GPhA Technical Conference in Bethesda, Maryland. *See* Exhibit A.

1722.   In May of 2013, after the price increase was implemented, Teva discontinued production of Doxy Hyclate – a product it had manufactured for three decades. This act contradicts Teva's self-interest, but furthered Defendants' conspiracy to coordinate pricing and allocate market share across the entire generic pharmaceutical industry.

1723.   In April 2014, DAVA Pharmaceuticals, Inc. ("DAVA"), a company that Endo acquired in August 2014, launched its Doxy Hyclate. Endo was already in discussions to acquire DAVA as of

1   this time (April 2014). This launch led to litigation between DAVA and Chartwell Therapeutics

2   Licensing, LLC ("Chartwell"). In that litigation, Chartwell alleged that DAVA and Endo refused to take

3   delivery of Doxy Hyclate from Chartwell despite demand in the market and conspired to set Doxy

4   Hyclate at an artificially high price.[57] For example, Chartwell cites to an e-mail dated on or about July

5   11, 2014 where Aram Moezinia[58] e-mailed Chartwell and stated that DAVA's plan was to sell

6   doxycycline "slowly not to disturb pricing." Upon information and belief, all actions taken by DAVA as

7   described in Chartwell's complaint were done at the direction of Endo and targeted at the U.S. market.

8   According to Chartwell, Par and Endo both produced discovery materials to the DOJ and State AGs,

9   whose inquiries focus on at least three drugs that Endo acquired rights to through its acquisition of

10   DAVA, including Doxy Hyclate.

11        1724.   News reports and testimonials from hospitals and pharmacists corroborate these

12   dramatic, immediate, market-wide price increases. Michael O'Neil, pharmacy manager at Vanderbilt

13   University Medical Center, expresses his concern over the dramatic price increase for Doxy Hyclate,

14   which increased from $10 for a 50-count bottle of 100mg tablets, to $250: "It's a change that occurred

15   overnight," he said in the March 2013 report. Dr. Joshua Vaughn, a veterinarian with the Columbia

16   Hospital for Animals, also lamented the dramatic price increase shortly prior to March 2013, when a

17   doxycycline prescription increased from $77 to nearly $3,000.[59]

18      **H.**    **Econazole**

19        1725.   At all relevant times, Fougera, Perrigo, Sandoz, Taro, and Teligent dominated the

20   market for Econazole, controlling approximately 99% of the market.

21        1726.   NADAC data shows that the average market prices for Econazole remained stable prior

22   to June 2014.

23        1727.   Between January 2011 and September 2013, Econazole cost approximately 12 cents for

24   one month's worth of treatment.

25

26

27   [57] See *Dava Pharm., LLC v. Chartwell Therapeutics Licensing, LLC,* Index No. 502775/15 (N.Y. Supreme Court, County of Kings).

28   [58] Aram Moezinia was a Defendant in the litigation and a Director on DAVA's Board at the time of the merger with Endo
[59] http://www.wsmv.com/story/21616095/sudden-increase-in-cost-of-common-drug-concernsmany.

1728.   Starting at least as early as July 2014, Fougera, Perrigo, Sandoz, Taro, and Teligent increased their prices for generic Econazole abruptly and in unison. During this period, prices for generic Econazole rose more than 1,657%.

1729.   In 2015, these Defendants' total revenue from sales of Econazole was approximately $145 million. Two years prior, in 2013, that figure was only $10 million.

1730.   According to NADAC data, the average market price for Econazole saw the following price increases from July 2014 to March 2015:

Econazole 1% Cream (15g): increased by 853%

Econazole 1% Cream (30g): increased by 1,024%

Econazole 1% Cream (85g): increased by 929%



1731.   WAC data depicted below confirms that Perrigo, Teligent, and Taro all increased their prices for Econazole cream between July and November 2014 by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 15gm | Perrigo | 45802046635 | $0.79 | $5.80 | 7/24/2014 | 637% |
| 30gm | Perrigo | 45802046611 | $0.69 | $5.80 | 7/24/2014 | 736% |
| 85gm | Perrigo | 45802046653 | $0.50 | $4.09 | 7/24/2014 | 719% |
| 15gm | Teligent | 52565002215 | $0.82 | $5.80 | 9/1/2014 | 610% |

| 30gm | Teligent | 52565002230 | $0.72 | $5.80 | 9/1/2014 | 704% |
| 85gm | Teligent | 52565002285 | $0.52 | $4.09 | 9/1/2014 | 688% |
| 15gm | Taro | 51672130301 | $0.66 | $5.80 | 11/18/2014 | 779% |
| 30gm | Taro | 51672130302 | $0.59 | $5.80 | 11/18/2014 | 890% |
| 85gm | Taro | 51672130308 | $0.42 | $4.09 | 11/14/2014 | 871% |

1732.   Although WAC data is not available for Fougera, upon information and belief, Fougera implemented simultaneous and identical price increases in their Econazole products.

1733.   No supply shortages or other market events can explain the Econazole price increases. The only significant change was Teligent's market entry in February 2013, which should have, but did not, drive prices down.

1734.   Prior to 2012, Teligent focused its business on contract manufacturing. But in late 2012 it sought to enter the market for numerous topical generic products. By September 2013, Teligent had 12 ANDAs pending.  Teligent currently manufactures 20 topical generics covered by 33 ANDAs. For seventeen of the 20 drugs, Teligent directly competes with Taro, and for fifteen of the drugs, Teligent directly competes with Perrigo. This situation in particular lends itself to the Defendants' "fair share" agreement, as these three Defendants can creatively allocate drugs and market share to maintain an artificial equilibrium

1735.   On February 1, 2013, Teligent obtained an ANDA for Econazole from Prasco LLC. Shortly thereafter, Teligent's CEO, Jason Grenfell-Gardner, attended the 2013 GPhA Annual Meeting on February 20-22, 2013 in Orlando, Florida and the 2013 ECRM EPPS Retail Pharmacy Generics conference on February 24-27, 2013 in Dallas, Texas, along with representatives from Perrigo and Taro. Specifically, the CEOs of Perrigo (Joseph Papa) and Taro (Kal Sundaram) joined Teligent's CEO at the 2013 GPhA Annual Meeting.

1736.   When Teligent launched Econazole under its own ANDA, it irrationally increased effective prices immediately, rather than compete for market share on price.

1737.   Significant price increases shortly followed or occurred at about the time of the following trade conferences: June 1-4, 2014 HDMA 2014 Business and Leadership Conference in

Phoenix, Arizona; June 3-4, 2014 GPhA CMC Workshop in North Bethesda, Maryland; October 27-29, 2014 GPhA Fall Technical Conference in Bethesda, MD; February 9-11, 2015 GPhA Annual Meeting in Miami Beach, FL; and February 22- 25, 2015 ECRM 2015 Retail Pharmacy Generic Pharmaceuticals EPPS in Destin, FL. Key executives from Fougera, Perrigo, Sandoz, Taro, and Teligent all attended. *See* Exhibit A.

**I.      Lidocaine**

1738.    Akorn, Fougera, Hi-Tech, Impax, and Sandoz dominate the market for one popular formulation of Lidocaine, Lidocaine-Prilocaine.

1739.    Prior to March 2014, the effective prices for Lidocaine-Prilocaine were stable.

1740.    Beginning in April 2014, Akorn, Fougera, Hi-Tech, Impax, and Sandoz increased their prices abruptly and largely in unison for Lidocaine-Prilocaine.

1741.    Prices for other forms of Lidocaine also experienced price increases. The GAO Report noted an "extraordinary price increase" for Lidocaine 5% ointment between in 2012-2013 and another "extraordinary price increase" for Lidocaine-Hydrochloride 3% cream in 2011-2012.[60]

1742.    NADAC data shows that average market prices for Lidocaine-Prilocaine increased by almost 300% beginning in April 2014 and remained artificially high thereafter:



---

[60] GAO Report at 41.

1    1743.    These price increases occurred following the February 19-21, 2014 GPhA Annual

2    Meeting in Orlando, Florida, which at least representatives from Hi-Tech, Impax, and Sandoz attended.

3    **J.    Metronidazole**

4    1744.    At all relevant times, G&W, Heritage, Impax, Sandoz, Teva, and Valeant dominated the

5    market for Metronidazole. Heritage entered the market for Metronidazole in May 2013.

6    1745.    G&W, Sandoz, and Teva conspired to increase the price of Metronidazole cream.

7    Throughout the period, G&W, Sandoz, and Teva had ample opportunity to discuss and coordinate

8    pricing of Metronidazole cream at various trade association and industry events including (i) the August

9    30-21, 2010 NACDS Pharmacy and Technology Conference in San Diego, California; (ii) the August

10   27-30, 2011 NACDS Pharmacy and Technology Conference in Boston, Mass. (iii) the April 24-27, 2012

11   NACDS Annual Meeting; (iv) the February 20-22, 2012 GPhA Annual Meeting in Orlando, Florida; (v)

12   the December 3, 2014 NACDS Foundation and Reception Dinner in New York, N.Y.; and (vi) the

13   April 25-28, 2015 NACDS Annual Meeting in Florida.

14   1746.    G&W, Impax, Sandoz, and Teva conspired to increase the price of Metronidazole jelly.

15   The Metronidazole jelly price increase occurred shortly after trade association meetings where

16   representatives from G&W, Impax, Sandoz, and Teva were in attendance, such as: (i) April -May 2011

17   NACDS Annual Meeting; (ii) August 27-30, 2011 NACDS Pharmacy and Technology Conference in

18   Boston; (iii) April 24-27, 2012 NACDS Annual Meeting; and (iv) August 2012 NACDS Pharmacy and

19   Technology Conference.

20   1747.    Sandoz and Teva conspired to increase the price of Metronidazole lotion. The

21   Metronidazole lotion price increase occurred shortly after trade association meetings where

22   representatives from Sandoz and Teva were in attendance such as: (i) August 30-31, 2010 NACDS

23   Pharmacy and Technology Conference in San Diego; (ii) August 27-30, 2011 NACDS Pharmacy and

24   Technology Conference in Boston; (iii) April 24-27, 2012 NACDS Annual Meeting; (iv) February 20-

25   22, 2012 GPhA Annual Meeting in Orlando, Florida; (v) December 3, 2014 NACDS Foundation and

26   Reception Dinner in New York; and (vi) the April 25-28, 2015 NACDS Annual Meeting in Florida.

27   1748.    Sandoz and Valeant conspired to increase the price of Metronidazole vaginal. Valeant

28   manufactures a branded metronidazole gel under the name MetroGel vaginal.

1749.   The Metronidazole vaginal price increase occurred shortly after trade association meetings where representatives from Sandoz and Valeant were in attendance such as: (i) June 2014 HDMA Business and Leadership Conference; (ii) December 3, 2014, NACDS Foundation and Reception Dinner in New York, New York; and (iii) April 2015 NACDS Annual Meeting.

1750.   Notably, the Metronidazole vaginal price increase occurred around the same time Valeant was also dramatically increasing prices of numerous other drugs. At the end of 2012, Valeant acquired Medicis, which originally manufactured brand MetroGel vaginal, and proceeded to engage in a series of price increases on MetroGel vaginal in 2013 and 2014. Such price increases are a well-known business strategy of Valeant.[61] Valeant was among the generic manufacturers that received a letter as part of the Congressional investigation into generic price increases.

### K.   Propranolol HCL capsules

1751.   At all relevant times, Actavis, Breckenridge, and Upsher-Smith have dominated the market for Propranolol HCL capsules.

1752.   Actavis, Breckenridge, and Upsher-Smith collusively increased prices on Propranolol HCL capsules between December 2013 and October 2014.

1753.   According to NADAC data, various dosage levels of Propranolol HCL capsules saw the following average price increases:

Propranolol HCL ER 120mg capsules: increased by 181% between December 2013 and July 2014; and

Propranolol HCL ER 180mg capsules: increased by 174% between December 2013 and October 2014.

---

[61] *See* Sanders and Cummings Press Release (asking Valeant why prices of drugs increased when the only change in the drugs is "the company that owns them").



1754.   Medicaid reimbursement data also confirms that these Defendants increased their prices abruptly and largely in unison. The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Propranolol HCL capsules.





1755.   These price increases followed the October 28-30, 2013 GPhA Technical Conference in North Bethesda, Maryland, which representatives from Actavis, Breckenridge, and Upsher-Smith attended.

**L.      Ursodiol**

1756.   At all relevant times, Actavis, Epic, and Lannett dominated the market for Ursodiol.

1757.   Prior to May 2014, prices for Ursodiol were stable.

1758.   Beginning in May 2014, Actavis, Epic, and Lannett increased their prices for Ursodiol abruptly and largely in unison.

1759.   According to NADAC data, the average market price for generic Ursodiol saw the following price increases from May 2014 to November 2014:

   Ursodiol 300mg Capsules: increased from $0.29 per unit to $4.49 per

   unit, a 1,448% increase.

1760.   NADAC data shows that average market price for Ursodiol rose dramatically and remained artificially high after May 2014, as depicted below.



1761.   WAC pricing confirms that Actavis, Epic, and Lannett all increased their Ursodiol prices substantially and largely in unison.

| Dosage | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|--------|-----------|-----|---------|---------|------------------|---------------------|
| 300mg | Lannett | 00527132601 | | $5.11 | 5/1/2014 | |
| 300mg | Epic | 42806050301 | $0.45 | $5.10 | 5/6/2014 | 1,034% |
| 300mg | Actavis | 00591315901 | $0.77 | $5.11 | 6/24/2014 | 562% |

1762.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, and market-wide price increases. In November 2014, patient Barbara Heller reported that her three-month prescription for Ursodiol increased from $94.50 to $1,212.30 between refills.[62]

## XIII.   CONCIOUSNESS OF GUILT

1763.   The Defendants were aware that their conduct was illegal. They all made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made. There are numerous examples, discussed throughout this Complaint, where Teva employees indicated that they could not talk by e-mail, but had additional

---

[62] Jonathan Lapook, Why some generic drug prices are skyrocketing, CBS News (Nov. 12, 2014), *available at* http://www.cbsnews.com/news/generic-drug-prices-skyrocketing/.

1    information that they could only convey personally. This was part of a consistent effort by these

2    individuals, as well as individuals at other Defendants, to avoid putting incriminating information in

3    writing, in order to evade detection.

4         1764.    Going back to at least 2012, for example, Heritage executives took overt steps to

5    conceal their illegal activity and destroy evidence of wrongdoing.

6         1765.    None of the e-mail accounts maintained by Heritage had any document retention policy

7    associated with them. Heritage executives were aware of this and utilized the lack of a company

8    retention policy to routinely destroy e-mails that memorialized their illegal conduct. Heritage executives

9    were aware that in order to permanently destroy an e-mail, however, the e-mail had to be deleted from

10   more than just the recipient's in-box. For example, on June 27, 2012, Heritage CEO Glazer sent an e-

11   mail to Malek titled "Email" instructing: "Clean your sent file out as well."

12        1766.    Glazer continued to remind Malek not to put any evidence of his illegal conduct into

13   writing. In a text message dated June 26, 2014, Glazer sternly warned Malek about his use of e-mail:

14   "No emails about products, price and competitors."

15        1767.    That same day, in an e-mail to the entire sales team at Heritage, Glazer made the point

16   as clearly as possible: "We don't talk about pricing dynamics and competition on emails. If you have

17   questions – you can call JM or me directly and then punch yourself in the face."

18        1768.    Heritage was not alone in its efforts to conceal its illegal activity. For example, in June

19   2014, shortly after a text message exchange between K.A. of Citron and Anne Sather from Heritage

20   wherein the two competitors discussed and agreed to raise the price of Glyburide, K.S. from Citron

21   called D.L. at Heritage, informing him that she had been "looped" in on Heritage's plan. According to

22   Sather's notes, K.S. told D.L. that Heritage employees should not communicate with Citron through e-

23   mail, but should instead call L.S., the Vice President of Sales at Citron, if they had information to

24   convey.

25        1769.    As another example, when Green wanted to speak with a particular competitor, he

26   would routinely send a text message to that competitor, saying only "call me." Again, this was done to

27   avoid putting any potentially incriminating communications in writing. Patel learned this technique

28

1  from Green, shortly after starting at Teva, and adopted a similar strategy for communicating with

2  competitors.

3      1770.   Kellum of Sandoz was also aware that what he and others at Sandoz were doing was

4  illegal. Kellum had received antitrust training and knew that conspiring with competitors to fix or raise

5  prices, or to allocate customers or markets, was a violation of the antitrust laws. Kellum would routinely

6  admonish Sandoz employees for putting anything incriminating into e-mails, and voiced concern that

7  the conduct they were engaging in – if discovered – could result in significant liability. As a result of

8  Kellum's admonishments, Sandoz employees (including Kellum himself) routinely lied in e-mails about

9  the sources of their information to camouflage their conduct, claiming they learned the information

10 from a customer instead of a competitor.

11     1771.   Similarly, Nailor of Greenstone instructed her subordinates to avoid putting any

12 sensitive market intelligence in writing.

13     1772.   As Defendants became more aware that they were under state and federal investigation,

14 there was even more urgency to avoid detection. For example, on June 2, 2015, after it had become

15 public that Connecticut and the DOJ were investigating the industry, Malek sent Sather a text message

16 stating: "Just got your email on meprobamate. Let's avoid emailing about other manufacturers and

17 having discussions with them. Can be misconstrued based on what we are hearing elsewhere…."

18 Heritage did not produce the referenced e-mail in response to Connecticut's subpoena, even though the

19 subpoena sought all such documents. Upon information and belief, the referenced e-mail has, along

20 with other relevant documents, been deleted by Heritage.

21     1773.   As further evidence that the price increases discussed above were not the result of

22 normal market factors, the massive price spikes that were occurring in the industry in 2013 and 2014

23 slowed dramatically after the State of Connecticut commenced its antitrust investigation in July 2014.

24 This was not a coincidence. Generic drug manufacturers in the industry – including the Defendants in

25 this case – understood that they were under scrutiny and did not want to draw further attention to

26 themselves.

27     1774.   In January 2015, Sandoz conducted an analysis of the price increases in the generic drug

28 industry in 2013 and 2014, with an early look toward 2015. In its report, Sandoz found that "For the

1    years 2013 and 2014, there were 1,487 SKU 'large price increases' (WAC increase greater than 100%)[;]

2    of this 12% (178 SKUs) were increased by more than 1000%." The number of "large price increases,"

3    however, began to decline after the Plaintiff States commenced their investigation.  Even so, the

4    already-high prices for most of these drugs did not go down but remain at significantly inflated, anti-

5    competitive levels.

6    **XIV.    SPOILATION OF EVIDENCE**

7            1775.    Many of the individuals named above, and other employees of the various Defendants,

8    took active steps to delete their conspiratorial communications with competitors, and destroy evidence

9    of their illegal behavior.

10           1776.    As set forth above, Heritage failed to maintain a document retention policy and took

11   active steps to have e-mails destroyed. Furthermore, upon information and belief, Glazer, Malek and

12   certain other Heritage employees also deleted all text messages from their company iPhones regarding

13   their illegal communications with competitors.

14           1777.    As another example, Patel produced text messages – in response to the States' subpoena

15   – going back as far as early 2014. Prior to producing those text messages, however, Patel had deleted all

16   of her text communications with competitors from the same time period, including many text messages

17   with Aprahamian, Brown, Cavanaugh, Grauso, Green, Nailor, Rekenthaler and Sullivan; and many

18   other text messages with employees of Dr. Reddy's, Glenmark (including CW-5), Greenstone

19   (including Robin Hatosy), Par, Sandoz, Upsher-Smith and Zydus.

20           1778.    Patel deleted these text messages after a conversation with Rekenthaler in early 2015,

21   when Rekenthaler warned Patel to be careful about communicating with competitors. Rekenthaler was

22   aware of the government investigations that had been commenced and told Patel that the government

23   was showing up on people's doorsteps. Sometime after that, Patel deleted her text messages with

24   competitors.

25           1779.    G.S. of Mayne, realizing the illegal nature of the agreements she entered into, also

26   deleted from her cell phone several of the most incriminating text messages between her and Sather

27   before the data on her phone was imaged and produced to Connecticut.

28

1780.   Apotex also destroyed an entire custodial file for one of its key employees (B.H., a senior sales executive), after the States requested it through an investigatory subpoena in July 2017. As discussed above, B.H. was involved in coordinating two significant price increases with Patel of Teva in 2013, which resulted in Apotex soaring in the quality competitor rankings. After the States' subpoena was issued, Apotex destroyed B.H.'s custodial file – and did not inform the States that it had done so for over a year.

## XV.   OBSTRUCTION OF JUSTICE

1781.   Many of the Defendants have been coordinating consistently to obstruct the ongoing government investigations and to limit any potential response. This coordination goes back at least as far as October 2014, when Congress first started investigating price increases in the generic drug industry.

1782.   When the federal government executed a search warrant against Patel at her home on June 21, 2017, she immediately called Rekenthaler (from another phone because her phone had been seized) even though Rekenthaler was no longer employed at Teva and was by that point the Vice President of Sales at Apotex. Rekenthaler then immediately called Cavanaugh and C.B., another senior Teva executive. Rekenthaler spoke several times to Cavanaugh before then calling his own attorney and speaking twice. Later that day, Patel called Rekenthaler two more times to coordinate her response to the government.

1783.   Other Defendants took similar action in response to events in the States' investigation. Several were speaking frequently at or around the time a subpoena was issued, or when the States were engaging in substantive discussions with their counsel. As just one example, on July 17, 2018 the States sent a subpoena to Grauso, through his counsel. That same day, Grauso spoke to Aprahamian for more than twelve (12) minutes. The States then set up a conference call with Grauso's counsel for July 25, 2018. The day before that call – July 24, 2018 –Aprahamian spoke to his lawyer, and then shortly thereafter called Grauso. The next day, shortly after a conversation between the States and counsel for Grauso, Aprahamian and Grauso spoke again, this time for nearly seven (7) minutes.

1  XVI.  **PLAINTIFF'S PURCHASES AND ANTITRUST INJURY**

2    1784.   Because of Defendants' illegal conduct, Plaintiff has been compelled to pay artificially-

3  inflated prices for each of the Subject Drugs listed above. Those prices have been substantially higher

4  than the prices that Plaintiff would have paid for the Subject Drugs but for Defendants' collusion.

5    1785.   Economic theory dictates that overcharges at higher levels of the distribution chain

6  generally get passed down thorugh the distribution chain resuling in higher prices at every level below.

7  This is particularly true given the structure of the pharmaceutical drug industry.

8    1786.   Consequently, Plaintiff has sustained substantial losses and damages to its business and

9  property in the form of overcharges. The full amount, forms, and components of such damages will be

10 determined after discovery and upon proof at trial.

11    1787.   Defendants' unlawful conduct has successfully eliminated competition in the market,

12 and Plaintiff has sustained, and continues to sustain, significant losses in the form of artificially inflated

13 prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon

14 proof at trial.

15    1788.   Defendants, through their unlawful acts, reduced competition in the United States

16 market for the Subject Drugs, increased prices, and caused antitrust injury to Plaintiff.

17    1789.   Prices for the Subject Drugs have been and will continue to be inflated as a direct and

18 foreseeable result of Defendants' anticompetitive conduct. The inflated prices that Plaintiff has paid,

19 and will continue to pay, are traceable to, and the foreseeable result of, Defendants' unlawful conduct.

20 Plaintiff therefore seeks injunctive relief as well as damages for all injuries proximately caused by the

21 unlawful conduct.

22 XVII.  **INTERSTATE TRADE AND COMMERCE**

23    1790.   Defendants are the leading manufacturers and suppliers of the Subject Drugs sold in the

24 United States. At all material times, the Subject Drugs were manufactured and sold by Defendants,

25 directly or through one of more of their affiliates, throughout the United States in a continuous and

26 uninterrupted flow through interstate commerce, including through and into this District.

27

28

1791.   Between at least 2012 and the present, in connection with the purchase and sale of the Subject Drugs, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

1792.   Defendants' and their co-conspirators' activities were within the flow of interstate commerce, intending to have and having a substantial effect on interstate commerce in the United States.

1793.   Defendants' and their co-conspirators' conduct, including the marketing and sale of the Subject Drugs, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce in the United States.

1794.   The conspiracy alleged herein has directly and substantially affected interstate commerce; Defendants deprived Plaintiff and others of the benefit of free and open competition in the purchase of the Subject Drugs within the United States.

1795.   Defendants' agreement to increase, fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of the Subject Drugs, and their actual inflating, fixing, maintaining, or artificially stabilizing prices of the Subject Drugs, were intended to have, and have had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## XVIII. TOLLING AND FRAUDULENT CONCEALMENT

1796.   The claims asserted in this Complaint have been tolled as Defendants engaged in affirmative and fraudulent concealment of the conspiracies alleged in this Complaint.

1797.   Defendants knew their actions were illegal and consistently took overt steps to conceal their illegal conduct and destroy evidence of their agreements.

1798.   Among other things, as alleged in the State AG Complaint No. 2, Defendants' executives took affirmative steps to conceal and destroy evidence of their wrongdoing since as early as 2012. These steps included failing to maintain a document retention policy, instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withholding documents subject to subpoenas, and deleting text messages from their telephones, as alleged in paragraphs 158, 546, 647, 1117, among others, of the State AG Complaint No. 2, which is incorporated by reference.

1799.   Furthermore, Defendants spoke and met in secret to conceal the conspiracies, often under the pretext of legitimate trade association and industry activities as set forth above and took steps (beyond those alleged above) to ensure that communications relating to the conspiracies were not recoded in writing. In some cases, as alleged above, price increases were staggered to conceal the existence of the price-fixing agreements. Also, as alleged above, Defendants engaged in bid coordination and straw bidding activity, which were intended to, and did, give a false impression of competition among Defendants.

1800.   Plaintiff acted with due diligence at all relevant times by, among other things, monitoring available prices for the Subject Drugs and seeking to obtain the most competitive prices possible, efforts that were hindered by Defendants' concealment. As a result, Plaintiff did not know or reasonably suspect the existence of the claims alleged in this Complaint more than four years before the filing of this Complaint, nor was Plaintiff aware of any facts more than four years before filing this Complaint that would have put it on reasonable notice of its claims.

## XIX.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

1801.   Discovery is necessary to determine the full scope of Defendants' conspiracy, including years, products, and participants. Plaintiff reserves all rights to amend or supplement this Complaint to add additional Defendants, claims, years, products, or other allegations based upon discovery and further investigation.

## XX.   CAUSES OF ACTION

### COUNT I

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

1802.   Molina incorporates by reference the preceding allegations.

1803.   Heritage knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Heritage Drugs"). This conspiracy was *per se* unlawful price-fixing.

Acetazolamide ER

Doxycycline

Fosinopril HCTZ

Glipizide-Metformin

Glyburide

Glyburide-Metformin

Hydralazine HCL

Leflunomide

Meprobamate

Methimazole

Metronidazole

Nimodipine

Nystatin

Paromomycin

Propranolol

Theophylline ER

Verapamil

Zoledronic Acid

1804.   Heritage has committed at least one overt act to further the conspiracy alleged in this Complaint. Heritage's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Heritage Drugs throughout the United States.

1805.   The conspiracy realized its intended effect; Heritage has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Heritage Drugs.

1806.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Heritage Drugs;

b.   Molina was deprived of the benefits of free and open competition in the sale of the Heritage Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Heritage Drugs was unlawfully restrained, suppressed, or eliminated.

1807.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Heritage Drugs until the market achieves a steady state.

1808.   As a direct and proximate result of Heritage's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Heritage Drugs than it would have paid in the absence of Heritage's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1809.   There is no legitimate, non-pretextual, pro-competitive business justification for Heritage's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1810.   Heritage's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1811.   Heritage's conduct violated the following state antitrust or competition practices laws:

a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

1812.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Heritage's unlawful activities.

1813.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

1814.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

1815.    For these additional reasons, Heritage's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT II

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

1816.   Molina incorporates by reference the preceding allegations.

1817.   Heritage engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Heritage's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Heritage Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1818.   There was and is a gross disparity between the price for the Molina Purchases of Heritage Drugsand the value received, given that more cheaply priced Heritage Drugs should have been available, and would have been available, absent Heritage's illegal conduct.

1819.   By engaging in the foregoing conduct, Heritage engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

**COUNT III**

**UNJUST ENRICHMENT UNDER STATE LAW**

**(As to Heritage and All Other Defendants Under Joint and Several Liability)**

1820.   Molina incorporates by reference the preceding allegations.

1821.   Heritage has benefitted from artificial prices in the sale of the Heritage Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1822.   Heritage's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Heritage Drugs by Molina.

1823.   Molina has conferred upon Heritage an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

1824.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Heritage Drugs.

1825.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Heritage Drugs, as it is not liable and would not compensate Molina for the impact of Heritage's unlawful conduct.

1826.   The economic benefit of overcharges derived by Heritage through charging supracompetitive and artificially inflated prices for the Heritage Drugs is a direct and proximate result of Heritage's unlawful conduct.

1827.   The economic benefits derived by Heritage rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Heritage.

1828.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Heritage to be permitted to retain any of the overcharges for the Heritage Drugs derived from Heritage's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1829.   Heritage is aware of and appreciates the benefits bestowed upon it by Molina.

1830.   Heritage should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

1831.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Heritage traceable to Molina.

## COUNT IV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Heritage and All Other Defendants Under Joint and Several Liability)

1832.   Molina incorporates by reference the preceding allegations.

1833.   Heritage knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Heritage Drugs. Heritage injured Molina through this conduct.

1834.   But for Heritage's scheme to inflate the price of the Heritage Drugs, Molina would have purchased lower-priced Heritage Drugs.

1835.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Heritage Drugs than it would have paid absent Heritage's continuing anticompetitive conduct.

1836.   Molina has purchased substantial amounts of the Heritage Drugs during the relevant period.

1837.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Heritage's conduct violates Sections 1 and 2 of the Sherman Act.

1838.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by

1  Heritage's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not

2  recur.

3  **COUNT V**

4  **FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

5  **OF TRADE UNDER STATE LAWS**

6  **(As to Teva and All Other Defendants Under Joint and Several Liability)**

7  1839.   Molina incorporates by reference the preceding allegations.

8  1840.   Teva knowingly, intentionally, and conspiratorially engaged in anticompetitive

9  agreements designed to drive up the cost of at least the drugs listed below in the United States (the

10  "Teva Drugs"). This conspiracy was *per se* unlawful price-fixing.

11  Acetazolamide

12  Adapalene

13  Amiloride HCL/HCTZ

14  Amoxicillin/Clavulanate

15  Amphetamine/Dextroamphetamine ER & IR

16  Azithromycin

17  Baclofen

18  Bethanechol Chloride

19  Budesonide

20  Bumetanide

21  Buspirone HCL

22  Cabergoline

23  Capecitabine

24  Carbamazepine

25  Cefdinir

26  Cefprozil

27  Celecoxib

28  Cephalexin

1      Cimetidine

2      Ciprofloxacin HCL

3      Clarithromycin ER

4      Clemastine Fumarate

5      Clonidine TTS

6      Clotrimazole

7      Cyproheptadine HCL

8      Desmopressin Acetate

9      Desogestrel/Ethinyl Estradiol (Kariva)

10     Dexmethylphenidate HCL ER

11     Dextroamphetamine Sulfate ER

12     Diclofenac Potassium

13     Dicloxacillin Sodium

14     Diflunisal

15     Diltiazem HCL

16     Disopyramide Phosphate

17     Doxazosin Mesylate

18     Doxycycline

19     Drospirenone and Ethinyl Estradiol (Ocella)

20     Enalapril Maleate

21     Entecavir

22     Epitol

23     Estazolam

24     Estradiol Tablets

25     Estradiol/Norethindrone Acetate (Mimvey)

26     Ethinyl Estradiol/Levonorgestrel (Portia and Jolessa)

27     Ethinyl Estradiol/Norethindrone (Balziva)

28     Ethosuximide

| | |
|---|---|
| 1 | Etodolac |
| 2 | Fenofibrate |
| 3 | Fluconazole |
| 4 | Fluocinonide |
| 5 | Fluoxetine HCL |
| 6 | Flurbiprofen |
| 7 | Flutamide |
| 8 | Fluvastatin Sodium |
| 9 | Gabapentin |
| 10 | Glimepiride |
| 11 | Glipizide-Metformin |
| 12 | Glyburide |
| 13 | Glyburide-Metformin |
| 14 | Griseofulvin |
| 15 | Hydroxyurea |
| 16 | Hydroxyzine Pamoate |
| 17 | Irbesartan |
| 18 | Isoniazid |
| 19 | Ketoconazole |
| 20 | Ketoprofen |
| 21 | Ketorolac Tromethamine |
| 22 | Labetalol HCL |
| 23 | Lamivudine/Zidovudine (Combivir) |
| 24 | Leflunomide |
| 25 | Loperamide HCL |
| 26 | Medroxyprogesterone |
| 27 | Methotrexate |
| 28 | Metronidazole |

| | |
|---|---|
| 1 | Moexipril HCL |
| 2 | Moexipril HCL/HCTZ |
| 3 | Nabumetone |
| 4 | Nadolol |
| 5 | Niacin ER |
| 6 | Nitrofurantoin MAC |
| 7 | Norethindrone Acetate |
| 8 | Nortriptyline HCL |
| 9 | Nystatin |
| 10 | Omega-3-Acid Ethyl Esters |
| 11 | Oxaprozin |
| 12 | Oxybutynin Chloride |
| 13 | Paricalcitol |
| 14 | Penicillin VK |
| 15 | Pentoxifylline |
| 16 | Piroxicam |
| 17 | Pravastatin |
| 18 | Prazosin HCL |
| 19 | Prochlorperazine |
| 20 | Propranolol HCL |
| 21 | Raloxifene HCL |
| 22 | Ranitidine HCL |
| 23 | Tamoxifen Citrate |
| 24 | Temozolomide |
| 25 | Theophylline ER |
| 26 | Tobramycin |
| 27 | Tolmetin Sodium |
| 28 | Tolterodine |

Topiramate Sprinkle

Warfarin Sodium

1841.   Teva has committed at least one overt act to further the conspiracy alleged in this Complaint. Teva's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Teva Drugs throughout the United States.

1842.   The conspiracy realized its intended effect; Teva has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Teva Drugs.

1843.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.  Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teva Drugs;

      b.  Molina was deprived of the benefits of free and open competition in the sale of the Teva Drugs in the United States market; and

      c.  Competition in establishing the prices paid for the Teva Drugs was unlawfully restrained, suppressed, or eliminated.

1844.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Teva Drugs until the market achieves a steady state.

1845.   As a direct and proximate result of Teva's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Teva Drugs than it would have paid in the absence of Teva's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1846.   There is no legitimate, non-pretextual, pro-competitive business justification for Teva's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1847.   Teva's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1848.   Teva's conduct violated the following state antitrust or competition practices laws:

      a.  Ala. Code §6-5-60, with respect to purchases in Alabama.

b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

1849.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Teva's unlawful activities.

1850.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

1851.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

1852.    For these additional reasons, Teva's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

**COUNT VI**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Teva and All Other Defendants Under Joint and Several Liability)**

1853.   Molina incorporates by reference the preceding allegations.

1854.   Teva engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Teva's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct,

Molina was deprived of the opportunity to purchase the Teva Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1855.   There was and is a gross disparity between the price for the Molina Purchases of Teva Drugs, and the value received, given that more cheaply priced Teva Drugs should have been available, and would have been available, absent Teva's illegal conduct.

1856.   By engaging in the foregoing conduct, Teva engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.      Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.      815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.      Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.      Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.      Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.      N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.      N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.      S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT VII

### UNJUST ENRICHMENT UNDER STATE LAW

### (As to Teva and All Other Defendants Under Joint and Several Liability)

1857.   Molina incorporates by reference the preceding allegations.

1858.   Teva has benefitted from artificial prices in the sale of the Teva Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1859.   Teva's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Teva Drugs by Molina.

1860.    Molina has conferred upon Teva an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

1861.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Teva Drugs.

1862.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Teva Drugs, as it is not liable and would not compensate Molina for the impact of Teva's unlawful conduct.

1863.    The economic benefit of overcharges derived by Teva through charging supracompetitive and artificially inflated prices for the Teva Drugs is a direct and proximate result of Teva's unlawful conduct.

1864.    The economic benefits derived by Teva rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Teva.

1865.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Teva to be permitted to retain any of the overcharges for the Teva Drugs derived from Teva's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1866.    Teva is aware of and appreciates the benefits bestowed upon it by Molina.

1867.    Teva should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

1868.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Teva traceable to Molina.

**COUNT VIII**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

**(As to Teva and All Other Defendants Under Joint and Several Liability)**

1869.    Molina incorporates by reference the preceding allegations.

1870.    Teva knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Teva Drugs. Teva injured Molina through this conduct.

1871.   But for Teva's scheme to inflate the price of the Teva Drugs, Molina would have purchased lower-priced Teva Drugs.

1872.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Teva Drugs than it would have paid absent Teva's continuing anticompetitive conduct.

1873.   Molina has purchased substantial amounts of the Teva Drugs during the relevant period.

1874.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Teva's conduct violates Sections 1 and 2 of the Sherman Act.

1875.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Teva's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

<div align="center">

**COUNT IX**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

**OF TRADE UNDER STATE LAWS**

**(As to Actavis and All Other Defendants Under Joint and Several Liability)**

</div>

1876.   Molina incorporates by reference the preceding allegations.

1877.   Actavis knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Actavis Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amphetamine/Dextroamphetamine ER & IR
>
> Budesonide
>
> Buspirone HCL
>
> Celecoxib
>
> Ciprofloxacin HCL
>
> Clarithromycin ER
>
> Clobetasol Propionate
>
> Clonidine TTS

1    Desmopressin Acetate

2    Desonide

3    Dextroamphetamine Sulfate ER

4    Disopyramide Phosphate

5    Doxycycline

6    Drospirenone and Ethinyl Estradiol (Ocella)

7    Estazolam

8    Estradiol

9    Fluocinonide

10   Flutamide

11   Glyburide-Metformin

12   Griseofulvin

13   Hydroxyzine Pamoate

14   Nabumetone

15   Nortriptyline HCL

16   Nystatin

17   Propranolol HCL

18   Tamoxifen Citrate

19   Topiramate Sprinkle

20   Ursodiol

21   Verapamil

22

23   1878.   Actavis has committed at least one overt act to further the conspiracy alleged in this

24   Complaint. Actavis' anticompetitive acts had a substantial and foreseeable effect on commerce by

25   raising and fixing prices of the Actavis Drugs throughout the United States.

26   1879.   The conspiracy realized its intended effect; Actavis has benefited, and continues to

27   benefit, from its anticompetitive agreements which has artificially inflated the prices of the Actavis

28   Drugs.

1880.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

     a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Actavis Drugs;

     b.   Molina was deprived of the benefits of free and open competition in the sale of the Actavis Drugs in the United States market; and

     c.   Competition in establishing the prices paid for the Actavis Drugs was unlawfully restrained, suppressed, or eliminated.

1881.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Actavis Drugs until the market achieves a steady state.

1882.    As a direct and proximate result of Actavis' unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Actavis Drugs than it would have paid in the absence of Actavis' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1883.    There is no legitimate, non-pretextual, pro-competitive business justification for Actavis' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1884.    Actavis' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1885.    Actaivis's conduct violated the following state antitrust or competition practices laws:

     a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

     b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

     c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

     d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

     e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

     f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

     g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

     h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

1886.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Actavis' unlawful activities.

1887.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

1888.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

1889.    For these additional reasons, Actavis' conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT X

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

1890.   Molina incorporates by reference the preceding allegations.

1891.   Actavis engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Actavis' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Actavis Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1892.   There was and is a gross disparity between the price for the Molina Purchases of Actavis Drugs, and the value received, given that more cheaply priced Actavis Drugs should have been available, and would have been available, absent Actavis' illegal conduct.

1893.   By engaging in the foregoing conduct, Actavis engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.     Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.     Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.     Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.     N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.     N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.     S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.     Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.     Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.     Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XI

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

1894.   Molina incorporates by reference the preceding allegations.

1895.   Actavis has benefitted from artificial prices in the sale of the Actavis Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1896.   Actavis' financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Actavis Drugs by Molina.

1897.   Molina has conferred upon Actavis an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

1898.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Actavis Drugs.

1899.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Actavis Drugs, as it is not liable and would not compensate Molina for the impact of Actavis' unlawful conduct.

1900.   The economic benefit of overcharges derived by Actavis through charging supracompetitive and artificially inflated prices for the Actavis Drugs is a direct and proximate result of Actavis' unlawful conduct.

1901.   The economic benefits derived by Actavis rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Actavis.

1902.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Actavis to be permitted to retain any of the overcharges for the Actavis Drugs derived from Actavis' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1903.   Actavis is aware of and appreciates the benefits bestowed upon it by Molina.

1904.   Actavis should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

1905.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Actavis traceable to Molina.

## COUNT XII

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

**(As to Actavis and All Other Defendants Under Joint and Several Liability)**

1906.   Molina incorporates by reference the preceding allegations.

1907.   Actavis knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Actavis Drugs. Actavis injured Molina through this conduct.

1908.   But for Actavis' scheme to inflate the price of the Actavis Drugs, Molina would have purchased lower-priced Actavis Drugs.

1909.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Actavis Drugs than it would have paid absent Actavis' continuing anticompetitive conduct.

1910.   Molina has purchased substantial amounts of the Actavis Drugs during the relevant period.

1911.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Actavis' conduct violates Sections 1 and 2 of the Sherman Act.

1912.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Actavis' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XIII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT

## OF TRADE UNDER STATE LAWS

### (As to Akorn and All Other Defendants Under Joint and Several Liability)

1913.   Molina incorporates by reference the preceding allegations.

1914.   Akorn knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Akorn Drugs"). This conspiracy was *per se* unlawful price-fixing.

Clobetasol Propionate

Lidocaine

1915.   Akorn has committed at least one overt act to further the conspiracy alleged in this Complaint. Akorn's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Akorn Drugs throughout the United States.

1916.   The conspiracy realized its intended effect; Akorn has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Akorn Drugs.

1917.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Akorn Drugs;

b.    Molina was deprived of the benefits of free and open competition in the sale of the Akorn Drugs in the United States market; and

c.    Competition in establishing the prices paid for the Akorn Drugs was unlawfully restrained, suppressed, or eliminated.

1918.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Akorn Drugs until the market achieves a steady state.

1919.    As a direct and proximate result of Akorn's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Akorn Drugs than it would have paid in the absence of Akorn's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1920.    There is no legitimate, non-pretextual, pro-competitive business justification for Akorn's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1921.    Akorn's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1922.    Akorn's conduct violated the following state antitrust or competition practices laws:

a.    Ala. Code §6-5-60, with respect to purchases in Alabama.

b.    Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.    Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.    Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.    N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.    N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.    10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.    R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.    Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.    Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

1923.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Akorn's unlawful activities.

1924.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

1925.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

1926.    For these additional reasons, Akorn's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XIV

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Akorn and All Other Defendants Under Joint and Several Liability)

1927.   Molina incorporates by reference the preceding allegations.

1928.   Akorn engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Akorn's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Akorn Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1929.   There was and is a gross disparity between the price for the Molina Purchases of Akorn Drugs, and the value received, given that more cheaply priced Akorn Drugs should have been available, and would have been available, absent Akorn's illegal conduct.

1930.   By engaging in the foregoing conduct, Akorn engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

      a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      b.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

      c.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.      Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.      Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.      N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.      N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.      S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XV

### UNJUST ENRICHMENT UNDER STATE LAW

### (As to Akorn and All Other Defendants Under Joint and Several Liability)

1931.   Molina incorporates by reference the preceding allegations.

1932.   Akorn has benefitted from artificial prices in the sale of the Akorn Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1933.   Akorn's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Akorn Drugs by Molina.

1934.   Molina has conferred upon Akorn an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

1935.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Akorn Drugs.

1936.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Akorn Drugs, as it is not liable and would not compensate Molina for the impact of Akorn's unlawful conduct.

1937.   The economic benefit of overcharges derived by Akorn through charging supracompetitive and artificially inflated prices for the Akorn Drugs is a direct and proximate result of Akorn's unlawful conduct.

1938.   The economic benefits derived by Akorn rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Akorn.

1939.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Akorn to be permitted to retain any of the overcharges for the Akorn Drugs derived from Akorn's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1940.   Akorn is aware of and appreciates the benefits bestowed upon it by Molina.

1941.   Akorn should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

1942.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Akorn traceable to Molina.

## COUNT XVI

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Akorn and All Other Defendants Under Joint and Several Liability)

1943.   Molina incorporates by reference the preceding allegations.

1944.   Akorn knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Akorn Drugs. Akorn injured Molina through this conduct.

1945.   But for Akorn's scheme to inflate the price of the Akorn Drugs, Molina would have purchased lower-priced Akorn Drugs.

1946.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Akorn Drugs than it would have paid absent Akorn's continuing anticompetitive conduct.

1947.   Molina has purchased substantial amounts of the Akorn Drugs during the relevant period.

1948.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Akorn's conduct violates Sections 1 and 2 of the Sherman Act.

1949.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by

1  Akorn's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not

2  recur.

3                                         **COUNT XVII**

4                     **FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

5                              **OF TRADE UNDER STATE LAWS**

6             **(As to Amneal and All Other Defendants Under Joint and Several Liability)**

7         1950.   Molina incorporates by reference the preceding allegations.

8         1951.   Amneal knowingly, intentionally, and conspiratorially engaged in anticompetitive

9  agreements designed to drive up the cost of at least the drugs listed below in the United States (the

10 "Amneal Drugs"). This conspiracy was *per se* unlawful price-fixing.

11                         Bethanechol Chloride

12                         Norethindrone Acetate

13                         Ranitidine HCL

14        1952.   Amneal has committed at least one overt act to further the conspiracy alleged in this

15 Complaint. Amneal's anticompetitive acts had a substantial and foreseeable effect on commerce by

16 raising and fixing prices of the Amneal Drugs throughout the United States.

17        1953.   The conspiracy realized its intended effect; Amneal has benefited, and continues to

18 benefit, from its anticompetitive agreements which has artificially inflated the prices of the Amneal

19 Drugs.

20        1954.   The contract, combination, or conspiracy had the following direct, substantial, and

21 reasonably foreseeable effects on United States commerce:

22             a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or

23                  stabilized prices at supracompetitive levels for the Amneal Drugs;

24             b.   Molina was deprived of the benefits of free and open competition in the sale of the

25                  Amneal Drugs in the United States market; and

26             c.   Competition in establishing the prices paid for the Amneal Drugs was unlawfully

27                  restrained, suppressed, or eliminated.

28

1955.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Amneal Drugs until the market achieves a steady state.

1956.   As a direct and proximate result of Amneal's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Amneal Drugs than it would have paid in the absence of Amneal's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1957.   There is no legitimate, non-pretextual, pro-competitive business justification for Amneal's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1958.   Amneal's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1959.   Amneal's conduct violated the following state antitrust or competition practices laws:

  a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

  b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

  c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

  d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

  e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

  f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

  g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

  h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

  i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

  j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

  k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

1960.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Amneal's unlawful activities.

1961.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

1962.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

1963.    For these additional reasons, Amneal's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Amneal and All Other Defendants Under Joint and Several Liability)

1964.    Molina incorporates by reference the preceding allegations.

1965.    Amneal engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Amneal's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Amneal Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1966.    There was and is a gross disparity between the price for the Molina Purchases of Amneal Drugs, and the value received, given that more cheaply priced Amneal Drugs should have been available, and would have been available, absent Amneal's illegal conduct.

1967.    By engaging in the foregoing conduct, Amneal engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.    Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.    S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.     Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.     Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.     Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XIX

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Amneal and All Other Defendants Under Joint and Several Liability)**

1968.   Molina incorporates by reference the preceding allegations.

1969.   Amneal has benefitted from artificial prices in the sale of the Amneal Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1970.   Amneal's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Amneal Drugs by Molina.

1971.   Molina has conferred upon Amneal an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

1972.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Amneal Drugs.

1973.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Amneal Drugs, as it is not liable and would not compensate Molina for the impact of Amneal's unlawful conduct.

1974.   The economic benefit of overcharges derived by Amneal through charging supracompetitive and artificially inflated prices for the Amneal Drugs is a direct and proximate result of Amneal's unlawful conduct.

1975.   The economic benefits derived by Amneal rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Amneal.

1976.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Amneal to be permitted to retain any of the overcharges for the Amneal Drugs derived from Amneal's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1977.   Amneal is aware of and appreciates the benefits bestowed upon it by Molina.

1978. Amneal should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

1979. A constructive trust should be imposed upon all unlawful or inequitable sums received by Amneal traceable to Molina.

## COUNT XX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

1980. Molina incorporates by reference the preceding allegations.

1981. Amneal knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Amneal Drugs. Amneal injured Molina through this conduct.

1982. But for Amneal's scheme to inflate the price of the Amneal Drugs, Molina would have purchased lower-priced Amneal Drugs.

1983. Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Amneal Drugs than it would have paid absent Amneal's continuing anticompetitive conduct.

1984. Molina has purchased substantial amounts of the Amneal Drugs during the relevant period.

1985. Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Amneal's conduct violates Sections 1 and 2 of the Sherman Act.

1986. Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Amneal's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXI

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

1

2        **(As to Apotex and All Other Defendants Under Joint and Several Liability)**

3        1987.    Molina incorporates by reference the preceding allegations.

4        1988.    Apotex knowingly, intentionally, and conspiratorially engaged in anticompetitive

5    agreements designed to drive up the cost of at least the drugs listed below in the United States (the

6    "Apotex Drugs"). This conspiracy was *per se* unlawful price-fixing.

7                 Carbamazepine

8                 Doxazosin Mesylate

9                 Epitol

10               Leflunomide

11               Pentoxifylline

12               Pravastatin

13       1989.    Apotex has committed at least one overt act to further the conspiracy alleged in this

14   Complaint. Apotex's anticompetitive acts had a substantial and foreseeable effect on commerce by

15   raising and fixing prices of the Apotex Drugs throughout the United States.

16       1990.    The conspiracy realized its intended effect; Apotex has benefited, and continues to

17   benefit, from its anticompetitive agreements which has artificially inflated the prices of the Apotex

18   Drugs.

19       1991.    The contract, combination, or conspiracy had the following direct, substantial, and

20   reasonably foreseeable effects on United States commerce:

21               a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or

22                     stabilized prices at supracompetitive levels for the Apotex Drugs;

23               b.    Molina was deprived of the benefits of free and open competition in the sale of the

24                     Apotex Drugs in the United States market; and

25               c.    Competition in establishing the prices paid for the Apotex Drugs was unlawfully

26                     restrained, suppressed, or eliminated.

27       1992.    Even after free and open competition begins, Molina will continue to pay

28   supracompetitive prices for the Apotex Drugs until the market achieves a steady state.

COMPLAINT AND DEMAND FOR JURY TRIAL

1993.   As a direct and proximate result of Apotex's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Apotex Drugs than it would have paid in the absence of Apotex's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1994.   There is no legitimate, non-pretextual, pro-competitive business justification for Apotex's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1995.   Apotex's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1996.   Apotex's conduct violated the following state antitrust or competition practices laws:

     a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

     b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

     c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

     d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

     e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

     f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

     g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

     h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

     i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

     j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

     k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

1997.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Apotex's unlawful activities.

1998.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

1999.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2000.   For these additional reasons, Apotex's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XXII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

2001.   Molina incorporates by reference the preceding allegations.

2002.   Apotex engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Apotex's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Apotex Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2003.   There was and is a gross disparity between the price for the Molina Purchases of Apotex Drugs, and the value received, given that more cheaply priced Apotex Drugs should have been available, and would have been available, absent Apotex's illegal conduct.

2004.   By engaging in the foregoing conduct, Apotex engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

      a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

      c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

      d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

      e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

      f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

      g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

      h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.       Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.       Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.       Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XXIII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

2005.   Molina incorporates by reference the preceding allegations.

2006.   Apotex has benefitted from artificial prices in the sale of the Apotex Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2007.   Apotex's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Apotex Drugs by Molina.

2008.   Molina has conferred upon Apotex an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2009.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Apotex Drugs.

2010.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Apotex Drugs, as it is not liable and would not compensate Molina for the impact of Apotex's unlawful conduct.

2011.   The economic benefit of overcharges derived by Apotex through charging supracompetitive and artificially inflated prices for the Apotex Drugs is a direct and proximate result of Apotex's unlawful conduct.

2012.   The economic benefits derived by Apotex rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Apotex.

2013.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Apotex to be permitted to retain any of the overcharges for the Apotex Drugs derived from Apotex's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2014.   Apotex is aware of and appreciates the benefits bestowed upon it by Molina.

2015.    Apotex should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2016.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Apotex traceable to Molina.

## COUNT XXIV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

2017.    Molina incorporates by reference the preceding allegations.

2018.    Apotex knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Apotex Drugs. Apotex injured Molina through this conduct.

2019.    But for Apotex's scheme to inflate the price of the Apotex Drugs, Molina would have purchased lower-priced Apotex Drugs.

2020.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Apotex Drugs than it would have paid absent Apotex's continuing anticompetitive conduct.

2021.    Molina has purchased substantial amounts of the Apotex Drugs during the relevant period.

2022.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Apotex's conduct violates Sections 1 and 2 of the Sherman Act.

2023.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Apotex's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXV

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT

## OF TRADE UNDER STATE LAWS

1

2       **(As to Ascend and All Other Defendants Under Joint and Several Liability)**

3       2024.    Molina incorporates by reference the preceding allegations.

4       2025.    Ascend knowingly, intentionally, and conspiratorially engaged in anticompetitive

5 agreements designed to drive up the cost of at least the drugs listed below in the United States (the

6 "Ascend Drug"). This conspiracy was *per se* unlawful price-fixing.

7                     Nimodipine

8       2026.    Ascend has committed at least one overt act to further the conspiracy alleged in this

9 Complaint. Ascend's anticompetitive acts had a substantial and foreseeable effect on commerce by

10 raising and fixing prices of the Ascend Drug throughout the United States.

11       2027.    The conspiracy realized its intended effect; Ascend has benefited, and continues to

12 benefit, from its anticompetitive agreements which has artificially inflated the prices of the Ascend

13 Drug.

14       2028.    The contract, combination, or conspiracy had the following direct, substantial, and

15 reasonably foreseeable effects on United States commerce:

16            a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or

17                stabilized prices at supracompetitive levels for the Ascend Drug;

18            b.   Molina was deprived of the benefits of free and open competition in the sale of the

19                Ascend Drug in the United States market; and

20            c.   Competition in establishing the prices paid for the Ascend Drug was unlawfully

21                restrained, suppressed, or eliminated.

22       2029.    Even after free and open competition begins, Molina will continue to pay

23 supracompetitive prices for the Ascend Drug until the market achieves a steady state.

24       2030.    As a direct and proximate result of Ascend's unlawful conduct, Molina has been injured

25 in its business and property in that it has paid more for the Ascend Drug than it would have paid in the

26 absence of Ascend's unlawful conduct. The full amount of such damages is presently unknown and will

27 be determined after discovery and upon proof at trial.

28

2031.    There is no legitimate, non-pretextual, pro-competitive business justification for Ascend's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2032.    Ascend's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2033.    Ascend's conduct violated the following state antitrust or competition practices laws:

      a.    Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.    Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.    Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

      e.    Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

      f.    N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

      g.    N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

      h.    10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

      i.    R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

      j.    Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

      k.    Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2034.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Ascend's unlawful activities.

2035.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2036.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2037.    For these additional reasons, Ascend's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XXVI

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

2038.   Molina incorporates by reference the preceding allegations.

2039.   Ascend engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Ascend's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Ascend Drug at prices restrained by competition and forced to pay artificially inflated prices.

2040.   There was and is a gross disparity between the price for the Molina Purchases of Ascend Drug, and the value received, given that more cheaply priced Ascend Drug should have been available, and would have been available, absent Ascend's illegal conduct.

2041.   By engaging in the foregoing conduct, Ascend engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.        Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.        815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.        Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.        Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.        Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.        N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.        N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.        S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.        Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.        Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.        Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XXVII

### UNJUST ENRICHMENT UNDER STATE LAW

#### (As to Ascend and All Other Defendants Under Joint and Several Liability)

2042.    Molina incorporates by reference the preceding allegations.

2043.    Ascend has benefitted from artificial prices in the sale of the Ascend Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

2044.    Ascend's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Ascend Drug by Molina.

2045.    Molina has conferred upon Ascend an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2046.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Ascend Drug.

2047.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Ascend Drug, as it is not liable and would not compensate Molina for the impact of Ascend's unlawful conduct.

2048.    The economic benefit of overcharges derived by Ascend through charging supracompetitive and artificially inflated prices for the Ascend Drug is a direct and proximate result of Ascend's unlawful conduct.

2049.    The economic benefits derived by Ascend rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Ascend.

2050.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Ascend to be permitted to retain any of the overcharges for the Ascend Drug derived from Ascend's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2051.    Ascend is aware of and appreciates the benefits bestowed upon it by Molina.

2052.    Ascend should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2053.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Ascend traceable to Molina.

## COUNT XXVIII

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Ascend and All Other Defendants Under Joint and Several Liability)

2054.   Molina incorporates by reference the preceding allegations.

2055.   Ascend knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Ascend Drug. Ascend injured Molina through this conduct.

2056.   But for Ascend's scheme to inflate the price of the Ascend Drug, Molina would have purchased lower-priced Ascend Drug.

2057.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Ascend Drug than it would have paid absent Ascend's continuing anticompetitive conduct.

2058.   Molina has purchased substantial amounts of the Ascend Drug during the relevant period.

2059.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Ascend's conduct violates Sections 1 and 2 of the Sherman Act.

2060.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Ascend's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXIX

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

2061.   Molina incorporates by reference the preceding allegations.

2062.    Aurobindo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Aurobindo Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amphetamine/Dextroamphetamine IR
>
> Fosinopril HCTZ
>
> Glyburide
>
> Glyburide-Metformin
>
> Lamivudine/Zidovudine (Combivir)
>
> Penicillin VK

2063.    Aurobindo has committed at least one overt act to further the conspiracy alleged in this Complaint. Aurobindo's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Aurobindo Drugs throughout the United States.

2064.    The conspiracy realized its intended effect; Aurobindo has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Aurobindo Drugs.

2065.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Aurobindo Drugs;

b.    Molina was deprived of the benefits of free and open competition in the sale of the Aurobindo Drugs in the United States market; and

c.    Competition in establishing the prices paid for the Aurobindo Drugs was unlawfully restrained, suppressed, or eliminated.

2066.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Aurobindo Drugs until the market achieves a steady state.

2067.    As a direct and proximate result of Aurobindo's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Aurobindo Drugs than it would

1  have paid in the absence of Aurobindo's unlawful conduct. The full amount of such damages is

2  presently unknown and will be determined after discovery and upon proof at trial.

3      2068.   There is no legitimate, non-pretextual, pro-competitive business justification for

4  Aurobindo's conspiracy that outweighs its harmful effect. Even if there were some conceivable

5  justification, the conspiracy is broader than necessary to achieve such purpose.

6      2069.   Aurobindo's unlawful conduct as alleged herein poses a significant and continuing

7  threat of antitrust injury.

8      2070.   Aurobindo's conduct violated the following state antitrust or competition practices laws:

9        a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

10        b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

11        c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

12        d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

13        e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

14        f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

15        g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

16        h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

17        i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

18        j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

19        k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

20      2071.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade

21  and commerce in California (both intrastate and interstate) as a result of Aurobindo's unlawful

22  activities.

23      2072.   A substantial number of significant events to the conspiracy took place and were

24  performed in California, including communications in furtherance of the conspiracy that were sent

25  from or received in California.

26      2073.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately

27  financially responsible for the financial performance of all state health plans.  MHI is the assignee of

28  claims from Molina's subsidiary state health plans as described in paragraph 154.

2074.    For these additional reasons, Aurobindo's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

<div align="center">

**COUNT XXX**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Aurobindo and All Other Defendants Under Joint and Several Liability)**

</div>

2075.    Molina incorporates by reference the preceding allegations.

2076.    Aurobindo engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Aurobindo's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Aurobindo Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2077.    There was and is a gross disparity between the price for the Molina Purchases of Aurobindo Drugs, and the value received, given that more cheaply priced Aurobindo Drugs should have been available, and would have been available, absent Aurobindo's illegal conduct.

2078.    By engaging in the foregoing conduct, Aurobindo engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.    Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.    S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.    Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XXXI

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

2079.   Molina incorporates by reference the preceding allegations.

2080.   Aurobindo has benefitted from artificial prices in the sale of the Aurobindo Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2081.   Aurobindo's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Aurobindo Drugs by Molina.

2082.   MOLINA has conferred upon Aurobindo an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2083.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Aurobindo Drugs.

2084.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Aurobindo Drugs, as it is not liable and would not compensate Molina for the impact of Aurobindo's unlawful conduct.

2085.   The economic benefit of overcharges derived by Aurobindo through charging supracompetitive and artificially inflated prices for the Aurobindo Drugs is a direct and proximate result of Aurobindo's unlawful conduct.

2086.   The economic benefits derived by Aurobindo rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Aurobindo.

2087.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Aurobindo to be permitted to retain any of the overcharges for the Aurobindo Drugs derived from Aurobindo's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2088.   Aurobindo is aware of and appreciates the benefits bestowed upon it by Molina.

2089.   Aurobindo should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2090.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Aurobindo traceable to Molina.

## COUNT XXXII

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

2091.   Molina incorporates by reference the preceding allegations.

2092.   Aurobindo knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Aurobindo Drugs. Aurobindo injured Molina through this conduct.

2093.   But for Aurobindo's scheme to inflate the price of the Aurobindo Drugs, Molina would have purchased lower-priced Aurobindo Drugs.

2094.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Aurobindo Drugs than it would have paid absent Aurobindo's continuing anticompetitive conduct.

2095.   Molina has purchased substantial amounts of the Aurobindo Drugs during the relevant period.

2096.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Aurobindo's conduct violates Sections 1 and 2 of the Sherman Act.

2097.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Aurobindo's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXXIII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT

### OF TRADE UNDER STATE LAWS

#### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

2098.   Molina incorporates by reference the preceding allegations.

2099.    Breckenridge knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Breckenridge Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Cyproheptadine HCL
>
> Estradiol/Norethindrone Acetate (Mimvey)
>
> Propranolol HCL

2100.    Breckenridge has committed at least one overt act to further the conspiracy alleged in this Complaint. Breckenridge's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Breckenridge Drugs throughout the United States.

2101.    The conspiracy realized its intended effect; Breckenridge has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Breckenridge Drugs.

2102.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Breckenridge Drugs;

   b.   Molina was deprived of the benefits of free and open competition in the sale of the Breckenridge Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Breckenridge Drugs was unlawfully restrained, suppressed, or eliminated.

2103.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Breckenridge Drugs until the market achieves a steady state.

2104.    As a direct and proximate result of Breckenridge's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Breckenridge Drugs than it would have paid in the absence of Breckenridge's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2105.    There is no legitimate, non-pretextual, pro-competitive business justification for Breckenridge's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2106.    Breckenridge's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2107.    Breckenridge's conduct violated the following state antitrust or competition practices laws:

      a.    Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.    Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.    Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

      e.    Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

      f.    N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

      g.    N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

      h.    10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

      i.    R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

      j.    Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

      k.    Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2108.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Breckenridge's unlawful activities.

2109.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2110.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2111.   For these additional reasons, Breckenridge's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XXXIV

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

2112.   Molina incorporates by reference the preceding allegations.

2113.   Breckenridge engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Breckenridge's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Breckenridge Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2114.   There was and is a gross disparity between the price for the Molina Purchases of Breckenridge Drugs, and the value received, given that more cheaply priced Breckenridge Drugs should have been available, and would have been available, absent Breckenridge's illegal conduct.

2115.   By engaging in the foregoing conduct, Breckenridge engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.    Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.    S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.    Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

**COUNT XXXV**

**UNJUST ENRICHMENT UNDER STATE LAW**

**(As to Breckenridge and All Other Defendants Under Joint and Several Liability)**

2116.    Molina incorporates by reference the preceding allegations.

2117.    Breckenridge has benefitted from artificial prices in the sale of the Breckenridge Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2118.    Breckenridge's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Breckenridge Drugs by Molina.

2119.    Molina has conferred upon Breckenridge an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2120.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Breckenridge Drugs.

2121.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Breckenridge Drugs, as it is not liable and would not compensate Molina for the impact of Breckenridge's unlawful conduct.

2122.    The economic benefit of overcharges derived by Breckenridge through charging supracompetitive and artificially inflated prices for the Breckenridge Drugs is a direct and proximate result of Breckenridge's unlawful conduct.

2123.    The economic benefits derived by Breckenridge rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Breckenridge.

2124.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Breckenridge to be permitted to retain any of the overcharges for the Breckenridge Drugs derived from Breckenridge's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2125.    Breckenridge is aware of and appreciates the benefits bestowed upon it by Molina.

2126.    Breckenridge should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2127.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Breckenridge traceable to Molina.

## COUNT XXXVI

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

2128.   Molina incorporates by reference the preceding allegations.

2129.   Breckenridge knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Breckenridge Drugs. Breckenridge injured Molina through this conduct.

2130.   But for Breckenridge's scheme to inflate the price of the Breckenridge Drugs, Molina would have purchased lower-priced Breckenridge Drugs.

2131.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Breckenridge Drugs than it would have paid absent Breckenridge's continuing anticompetitive conduct.

2132.   Molina has purchased substantial amounts of the Breckenridge Drugs during the relevant period.

2133.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Breckenridge's conduct violates Sections 1 and 2 of the Sherman Act.

2134.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Breckenridge's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXXVII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT

## OF TRADE UNDER STATE LAWS

### (As to Camber and All Other Defendants Under Joint and Several Liability)

2135.   Molina incorporates by reference the preceding allegations.

2136.    Camber knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Camber Drugs"). This conspiracy was *per se* unlawful price-fixing.

Lamivudine/Zidovudine (Combivir)

Raloxifene HCL

2137.    Camber has committed at least one overt act to further the conspiracy alleged in this Complaint. Camber's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Camber Drugs throughout the United States.

2138.    The conspiracy realized its intended effect; Camber has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Camber Drugs.

2139.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.    MOLINA has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Camber Drugs;

   b.    MOLINA was deprived of the benefits of free and open competition in the sale of the Camber Drugs in the United States market; and

   c.    Competition in establishing the prices paid for the Camber Drugs was unlawfully restrained, suppressed, or eliminated.

2140.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Camber Drugs until the market achieves a steady state.

2141.    As a direct and proximate result of Camber's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Camber Drugs than it would have paid in the absence of Camber's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2142.    There is no legitimate, non-pretextual, pro-competitive business justification for Camber's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2143. Camber's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2144. Camber's conduct violated the following state antitrust or competition practices laws:

    a.  Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.  Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.  Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.  N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.  N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.  Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.  Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2145. In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Camber's unlawful activities.

2146. A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2147. All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2148.  For these additional reasons, Camber's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XXXVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Camber and All Other Defendants Under Joint and Several Liability)

2149. Molina incorporates by reference the preceding allegations.

2150.    Camber engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Camber's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Camber Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2151.    There was and is a gross disparity between the price for the Molina Purchases of Camber Drugs, and the value received, given that more cheaply priced Camber Drugs should have been available, and would have been available, absent Camber's illegal conduct.

2152.    By engaging in the foregoing conduct, Camber engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

      a.      Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      b.      815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

      c.      Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

      d.      Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

      e.      Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

      f.      N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

      g.      N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

      h.      S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

      i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

      j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

      k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT XXXIX

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Camber and All Other Defendants Under Joint and Several Liability)**

2153.    Molina incorporates by reference the preceding allegations.

2154.    Camber has benefitted from artificial prices in the sale of the Camber Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2155.   Camber's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Camber Drugs by Molina.

2156.   Molina has conferred upon Camber an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2157.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Camber Drugs.

2158.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Camber Drugs, as it is not liable and would not compensate Molina for the impact of Camber's unlawful conduct.

2159.   The economic benefit of overcharges derived by Camber through charging supracompetitive and artificially inflated prices for the Camber Drugs is a direct and proximate result of Camber's unlawful conduct.

2160.   The economic benefits derived by Camber rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Camber.

2161.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Camber to be permitted to retain any of the overcharges for the Camber Drugs derived from Camber's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2162.   Camber is aware of and appreciates the benefits bestowed upon it by Molina.

2163.   Camber should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2164.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Camber traceable to Molina.

### COUNT XL

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Camber and All Other Defendants Under Joint and Several Liability)

2165.   Molina incorporates by reference the preceding allegations.

2166.    Camber knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Camber Drugs. Camber injured Molina through this conduct.

2167.    But for Camber's scheme to inflate the price of the Camber Drugs, Molina would have purchased lower-priced Camber Drugs.

2168.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Camber Drugs than it would have paid absent Camber's continuing anticompetitive conduct.

2169.    Molina has purchased substantial amounts of the Camber Drugs during the relevant period.

2170.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Camber's conduct violates Sections 1 and 2 of the Sherman Act.

2171.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Camber's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

<div align="center">

**COUNT XLI**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

**OF TRADE UNDER STATE LAWS**

**(As to Citron and All Other Defendants Under Joint and Several Liability)**

</div>

2172.    Molina incorporates by reference the preceding allegations.

2173.    Citron knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Citron Drugs"). This conspiracy was *per se* unlawful price-fixing.

        Fosinopril HCTZ

        Glyburide

2174.   Citron has committed at least one overt act to further the conspiracy alleged in this Complaint. Citron's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Citron Drugs throughout the United States.

2175.   The conspiracy realized its intended effect; Citron has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Citron Drugs.

2176.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Citron Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Citron Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Citron Drugs was unlawfully restrained, suppressed, or eliminated.

2177.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Citron Drugs until the market achieves a steady state.

2178.   As a direct and proximate result of Citron's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Citron Drugs than it would have paid in the absence of Citron's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2179.   There is no legitimate, non-pretextual, pro-competitive business justification for Citron's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2180.   Citron's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2181.   Citron's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2182.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Citron's unlawful activities.

2183.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2184.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2185.    For these additional reasons, Citron's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XLII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Citron and All Other Defendants Under Joint and Several Liability)

2186.   Molina incorporates by reference the preceding allegations.

2187.   Citron engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Citron's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Citron Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2188.   There was and is a gross disparity between the price for the Molina Purchases of Citron Drugs, and the value received, given that more cheaply priced Citron Drugs should have been available, and would have been available, absent Citron's illegal conduct.

2189.   By engaging in the foregoing conduct, Citron engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

   a. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   b. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

   c. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

   d. Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

   e. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

   f. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

   g. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

   h. S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

   i. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

   j. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

   k. Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XLIII

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Citron and All Other Defendants Under Joint and Several Liability)**

2190.   Molina incorporates by reference the preceding allegations.

2191.   Citron has benefitted from artificial prices in the sale of the Citron Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2192.   Citron's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Citron Drugs by Molina.

2193.   MOLINA has conferred upon Citron an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2194.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Citron Drugs.

2195.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Citron Drugs, as it is not liable and would not compensate Molina for the impact of Citron's unlawful conduct.

2196.   The economic benefit of overcharges derived by Citron through charging supracompetitive and artificially inflated prices for the Citron Drugs is a direct and proximate result of Citron's unlawful conduct.

2197.   The economic benefits derived by Citron rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Citron.

2198.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Citron to be permitted to retain any of the overcharges for the Citron Drugs derived from Citron's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2199.   Citron is aware of and appreciates the benefits bestowed upon it by Molina.

2200.   Citron should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2201.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Citron traceable to Molina.

## COUNT XLIV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Citron and All Other Defendants Under Joint and Several Liability)

2202.   Molina incorporates by reference the preceding allegations.

2203.   Citron knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Citron Drugs. Citron injured Molina through this conduct.

2204.   But for Citron's scheme to inflate the price of the Citron Drugs, Molina would have purchased lower-priced Citron Drugs.

2205.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Citron Drugs than it would have paid absent Citron's continuing anticompetitive conduct.

2206.   Molina has purchased substantial amounts of the Citron Drugs during the relevant period.

2207.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Citron's conduct violates Sections 1 and 2 of the Sherman Act.

2208.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Citron's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

<div align="center">

**COUNT XLV**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

**OF TRADE UNDER STATE LAWS**

**(As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)**

</div>

2209.   Molina incorporates by reference the preceding allegations.

2210.   Dr. Reddy's knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Dr. Reddy's Drugs"). This conspiracy was *per se* unlawful price-fixing.

Ciprofloxacin HCL

Divalproex Sodium ER

Glimepiride

Meprobamate

Oxaprozin

Paricalcitol

Tizanidine

Zoledronic Acid

2211.    Dr. Reddy's has committed at least one overt act to further the conspiracy alleged in this Complaint. Dr. Reddy's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Dr. Reddy's Drugs throughout the United States.

2212.    The conspiracy realized its intended effect; Dr. Reddy's has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Dr. Reddy's Drugs.

2213.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Dr. Reddy's Drugs;

    b.    Molina was deprived of the benefits of free and open competition in the sale of the Dr. Reddy's Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Dr. Reddy's Drugs was unlawfully restrained, suppressed, or eliminated.

2214.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Dr. Reddy's Drugs until the market achieves a steady state.

2215.    As a direct and proximate result of Dr. Reddy's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Dr. Reddy's Drugs than it would have paid in the absence of Dr. Reddy's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2216.    There is no legitimate, non-pretextual, pro-competitive business justification for Dr. Reddy's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2217.    Dr. Reddy's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2218.    Dr. Reddy's conduct violated the following state antitrust or competition practices laws:

    a.    Ala. Code §6-5-60, with respect to purchases in Alabama.

b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2219.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Dr. Reddy's unlawful activities.

2220.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2221.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2222.   For these additional reasons, Dr. Reddy's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XLVI

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

2223.   Molina incorporates by reference the preceding allegations.

2224.   Dr. Reddy's engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Dr. Reddy's anticompetitive, deceptive, unfair, unconscionable, and

fraudulent conduct, Molina was deprived of the opportunity to purchase the Dr. Reddy's Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2225.   There was and is a gross disparity between the price for the Molina Purchases of Dr. Reddy's Drugs, and the value received, given that more cheaply priced Dr. Reddy's Drugs should have been available, and would have been available, absent Dr. Reddy's illegal conduct.

2226.   By engaging in the foregoing conduct, Dr. Reddy's engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.     Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.     Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.     Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.     N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.     N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.     S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.     Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.     Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.     Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

<div align="center">

**COUNT XLVII**

**UNJUST ENRICHMENT UNDER STATE LAW**

**(As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)**

</div>

2227.   Molina incorporates by reference the preceding allegations.

2228.   Dr. Reddy's has benefitted from artificial prices in the sale of the Dr. Reddy's Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2229.   Dr. Reddy's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Dr. Reddy's Drugs by Molina.

2230.   MOLINA has conferred upon Dr. Reddy's an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2231.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Dr. Reddy's Drugs.

2232.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Dr. Reddy's Drugs, as it is not liable and would not compensate Molina for the impact of Dr. Reddy's unlawful conduct.

2233.   The economic benefit of overcharges derived by Dr. Reddy's through charging supracompetitive and artificially inflated prices for the Dr. Reddy's Drugs is a direct and proximate result of Dr. Reddy's unlawful conduct.

2234.   The economic benefits derived by Dr. Reddy's rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Dr. Reddy's.

2235.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Dr. Reddy's to be permitted to retain any of the overcharges for the Dr. Reddy's Drugs derived from Dr. Reddy's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2236.   Dr. Reddy's is aware of and appreciates the benefits bestowed upon it by Molina.

2237.   Dr. Reddy's should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2238.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Dr. Reddy's traceable to Molina.

### COUNT XLVIII

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

2239.   Molina incorporates by reference the preceding allegations.

2240. Dr. Reddy's knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Dr. Reddy's Drugs. Dr. Reddy's injured Molina through this conduct.

2241. But for Dr. Reddy's scheme to inflate the price of the Dr. Reddy's Drugs, Molina would have purchased lower-priced Dr. Reddy's Drugs.

2242. Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Dr. Reddy's Drugs than it would have paid absent Dr. Reddy's continuing anticompetitive conduct.

2243. Molina has purchased substantial amounts of the Dr. Reddy's Drugs during the relevant period.

2244. Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Dr. Reddy's conduct violates Sections 1 and 2 of the Sherman Act.

2245. Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Dr. Reddy's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

<div align="center">

**COUNT XLIX**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

**OF TRADE UNDER STATE LAWS**

**(As to Emcure and All Other Defendants Under Joint and Several Liability)**

</div>

2246. Molina incorporates by reference the preceding allegations.

2247. Emcure knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Emcure Drug"). This conspiracy was *per se* unlawful price-fixing.

Doxycycline

2248.   Emcure has committed at least one overt act to further the conspiracy alleged in this Complaint. Emcure's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Emcure Drug throughout the United States.

2249.   The conspiracy realized its intended effect; Emcure has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Emcure Drug.

2250.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Emcure Drug;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the Emcure Drug in the United States market; and

      c.   Competition in establishing the prices paid for the Emcure Drug was unlawfully restrained, suppressed, or eliminated.

2251.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Emcure Drug until the market achieves a steady state.

2252.   As a direct and proximate result of Emcure's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Emcure Drug than it would have paid in the absence of Emcure's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2253.   There is no legitimate, non-pretextual, pro-competitive business justification for Emcure's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2254.   Emcure's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2255.   Emcure's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2256.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Emcure's unlawful activities.

2257.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2258.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2259.    For these additional reasons, Emcure's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

**COUNT L**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Emcure and All Other Defendants Under Joint and Several Liability)**

2260.   Molina incorporates by reference the preceding allegations.

2261.   Emcure engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Emcure's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Emcure Drug at prices restrained by competition and forced to pay artificially inflated prices.

2262.   There was and is a gross disparity between the price for the Molina Purchases of the Emcure Drug, and the value received, given that more cheaply priced Emcure Drug should have been available, and would have been available, absent Emcure's illegal conduct.

2263.   By engaging in the foregoing conduct, Emcure engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.     Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.     Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.     Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.     N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.     N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.     S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.     Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.     Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.     Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT LI

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Emcure and All Other Defendants Under Joint and Several Liability)**

2264.   Molina incorporates by reference the preceding allegations.

2265.   Emcure has benefitted from artificial prices in the sale of the Emcure Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

2266.   Emcure's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Emcure Drug by Molina.

2267.   Molina has conferred upon Emcure an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2268.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Emcure Drug.

2269.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Emcure Drug, as it is not liable and would not compensate Molina for the impact of Emcure's unlawful conduct.

2270.   The economic benefit of overcharges derived by Emcure through charging supracompetitive and artificially inflated prices for the Emcure Drug is a direct and proximate result of Emcure's unlawful conduct.

2271.   The economic benefits derived by Emcure rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Emcure.

2272.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Emcure to be permitted to retain any of the overcharges for the Emcure Drug derived from Emcure's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2273.   Emcure is aware of and appreciates the benefits bestowed upon it by Molina.

2274.   Emcure should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2275.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Emcure traceable to Molina.

## COUNT LII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Emcure and All Other Defendants Under Joint and Several Liability)

2276.   Molina incorporates by reference the preceding allegations.

2277.   Emcure knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Emcure Drug. Emcure injured Molina through this conduct.

2278.   But for Emcure's scheme to inflate the price of the Emcure Drug, Molina would have purchased lower-priced Emcure Drugs.

2279.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Emcure Drug than it would have paid absent Emcure's continuing anticompetitive conduct.

2280.   Molina has purchased substantial amounts of the Emcure Drug during the relevant period.

2281.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Emcure's conduct violates Sections 1 and 2 of the Sherman Act.

2282.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Emcure's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

<div align="center">

**COUNT LIII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

**OF TRADE UNDER STATE LAWS**

**(As to Endo and All Other Defendants Under Joint and Several Liability)**

</div>

2283.   Molina incorporates by reference the preceding allegations.

2284.   Endo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Endo Drugs"). This conspiracy was *per se* unlawful price-fixing.

Doxycycline

Propranolol

2285.   Endo has committed at least one overt act to further the conspiracy alleged in this Complaint. Endo's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Endo Drugs throughout the United States.

2286.   The conspiracy realized its intended effect; Endo has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Endo Drugs.

2287.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

        a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Endo Drugs;

        b.   Molina was deprived of the benefits of free and open competition in the sale of the Endo Drugs in the United States market; and

        c.   Competition in establishing the prices paid for the Endo Drugs was unlawfully restrained, suppressed, or eliminated.

2288.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Endo Drugs until the market achieves a steady state.

2289.   As a direct and proximate result of Endo's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Endo Drugs than it would have paid in the absence of Endo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2290.   There is no legitimate, non-pretextual, pro-competitive business justification for Endo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2291.   Endo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2292.   Endo's conduct violated the following state antitrust or competition practices laws:

        a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

        b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

        c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

        d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

        e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2293.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Endo's unlawful activities.

2294.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2295.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2296.    For these additional reasons, Endo's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LIV

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Endo and All Other Defendants Under Joint and Several Liability)

2297.   Molina incorporates by reference the preceding allegations.

2298.   Endo engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Endo's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Endo Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2299.   There was and is a gross disparity between the price for the Molina Purchases of Endo Drugs, and the value received, given that more cheaply priced Endo Drugs should have been available, and would have been available, absent Endo's illegal conduct.

2300.   By engaging in the foregoing conduct, Endo engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

**COUNT LV**

**UNJUST ENRICHMENT UNDER STATE LAW**

**(As to Endo and All Other Defendants Under Joint and Several Liability)**

2301.   Molina incorporates by reference the preceding allegations.

2302.   Endo has benefitted from artificial prices in the sale of the Endo Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2303.   Endo's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Endo Drugs by Molina.

2304.   Molina has conferred upon Endo an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2305.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Endo Drugs.

2306.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Endo Drugs, as it is not liable and would not compensate Molina for the impact of Endo's unlawful conduct.

2307.   The economic benefit of overcharges derived by Endo through charging supracompetitive and artificially inflated prices for the Endo Drugs is a direct and proximate result of Endo's unlawful conduct.

2308.   The economic benefits derived by Endo rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Endo.

2309.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Endo to be permitted to retain any of the overcharges for the Endo Drugs derived from Endo's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2310.   Endo is aware of and appreciates the benefits bestowed upon it by Molina.

2311.   Endo should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2312.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Endo traceable to Molina.

## COUNT LVI

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Endo and All Other Defendants Under Joint and Several Liability)

2313.   Molina incorporates by reference the preceding allegations.

2314.   Endo knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Endo Drugs. Endo injured Molina through this conduct.

2315.   But for Endo's scheme to inflate the price of the Endo Drugs, Molina would have purchased lower-priced Endo Drugs.

2316.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Endo Drugs than it would have paid absent Endo's continuing anticompetitive conduct.

2317.    Molina has purchased substantial amounts of the Endo Drugs during the relevant period.

2318.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Endo's conduct violates Sections 1 and 2 of the Sherman Act.

2319.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Endo's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LVII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT

## OF TRADE UNDER STATE LAWS

### (As to Epic and All Other Defendants Under Joint and Several Liability)

2320.    Molina incorporates by reference the preceding allegations.

2321.    Epic knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Epic Drug"). This conspiracy was *per se* unlawful price-fixing.

Ursodiol

2322.    Epic has committed at least one overt act to further the conspiracy alleged in this Complaint. Epic's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Epic Drug throughout the United States.

2323.    The conspiracy realized its intended effect; Epic has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Epic Drug.

2324.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or
        stabilized prices at supracompetitive levels for the Epic Drug;

b.  Molina was deprived of the benefits of free and open competition in the sale of the Epic Drug in the United States market; and

c.  Competition in establishing the prices paid for the Epic Drug was unlawfully restrained, suppressed, or eliminated.

2325.  Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Epic Drug until the market achieves a steady state.

2326.  As a direct and proximate result of Epic's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Epic Drug than it would have paid in the absence of Epic's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2327.  There is no legitimate, non-pretextual, pro-competitive business justification for Epic's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2328.  Epic's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2329.  Epic's conduct violated the following state antitrust or competition practices laws:

a.  Ala. Code §6-5-60, with respect to purchases in Alabama.

b.  Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.  Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.  N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.  N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.  Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.  Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2330.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Epic's unlawful activities.

2331.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2332.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2333.   For these additional reasons, Epic's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

<div align="center">

**COUNT LVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Epic and All Other Defendants Under Joint and Several Liability)**

</div>

2334.   Molina incorporates by reference the preceding allegations.

2335.   Epic engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Epic's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Epic Drug at prices restrained by competition and forced to pay artificially inflated prices.

2336.   There was and is a gross disparity between the price for the Molina Purchases of Epic Drug, and the value received, given that more cheaply priced Epic Drug should have been available, and would have been available, absent Epic's illegal conduct.

2337.   By engaging in the foregoing conduct, Epic engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.      Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.      Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.      N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.      N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.      S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Epic and All Other Defendants Under Joint and Several Liability)

2338.   Molina incorporates by reference the preceding allegations.

2339.   Epic has benefitted from artificial prices in the sale of the Epic Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

2340.   Epic's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Epic Drug by Molina.

2341.   MOLINA has conferred upon Epic an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2342.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Epic Drug.

2343.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Epic Drug, as it is not liable and would not compensate Molina for the impact of Epic's unlawful conduct.

2344.   The economic benefit of overcharges derived by Epic through charging supracompetitive and artificially inflated prices for the Epic Drug is a direct and proximate result of Epic's unlawful conduct.

2345.   The economic benefits derived by Epic rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Epic.

2346.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Epic to be permitted to retain any of the overcharges for the Epic Drug derived from Epic's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2347.   Epic is aware of and appreciates the benefits bestowed upon it by Molina.

2348.   Epic should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2349.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Epic traceable to Molina.

## COUNT LX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Epic and All Other Defendants Under Joint and Several Liability)

2350.   Molina incorporates by reference the preceding allegations.

2351.   Epic knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Epic Drug. Epic injured Molina through this conduct.

2352.   But for Epic's scheme to inflate the price of the Epic Drug, Molina would have purchased lower-priced Epic Drug.

2353.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Epic Drug than it would have paid absent Epic's continuing anticompetitive conduct.

2354.   Molina has purchased substantial amounts of the Epic Drug during the relevant period.

2355.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Epic's conduct violates Sections 1 and 2 of the Sherman Act.

2356.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Epic's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LXI**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

**OF TRADE UNDER STATE LAWS**

**(As to Fougera and All Other Defendants Under Joint and Several Liability)**

2357.    Molina incorporates by reference the preceding allegations.

2358.    Fougera knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Fougera Drugs"). This conspiracy was *per se* unlawful price-fixing.

Clobetasol Propionate

Desonide

Econazole

Fluocinonide

Lidocaine

2359.    Fougera has committed at least one overt act to further the conspiracy alleged in this Complaint. Fougera's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Fougera Drugs throughout the United States.

2360.    The conspiracy realized its intended effect; Fougera has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Fougera Drugs.

2361.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Fougera Drugs;

    b.    Molina was deprived of the benefits of free and open competition in the sale of the Fougera Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Fougera Drugs was unlawfully restrained, suppressed, or eliminated.

2362.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Fougera Drugs until the market achieves a steady state.

2363.   As a direct and proximate result of Fougera's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Fougera Drugs than it would have paid in the absence of Fougera's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2364.   There is no legitimate, non-pretextual, pro-competitive business justification for Fougera's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2365.   Fougera's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2366.   Fougera's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

      e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

      f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

      g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

      h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

      i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

      j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

      k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2367.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Fougera's unlawful activities.

2368.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2369.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2370.   For these additional reasons, Fougera's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LXII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Fougera and All Other Defendants Under Joint and Several Liability)

2371.   Molina incorporates by reference the preceding allegations.

2372.   Fougera engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Fougera's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Fougera Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2373.   There was and is a gross disparity between the price for the Molina Purchases of Fougera Drugs, and the value received, given that more cheaply priced Fougera Drugs should have been available, and would have been available, absent Fougera's illegal conduct.

2374.   By engaging in the foregoing conduct, Fougera engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

<div align="center">

**COUNT LXIII**

**UNJUST ENRICHMENT UNDER STATE LAW**

**(As to Fougera and All Other Defendants Under Joint and Several Liability)**

</div>

2375.   Molina incorporates by reference the preceding allegations.

2376.   Fougera has benefitted from artificial prices in the sale of the Fougera Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2377.   Fougera's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Fougera Drugs by Molina.

2378.   Molina has conferred upon Fougera an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2379.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Fougera Drugs.

2380.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Fougera Drugs, as it is not liable and would not compensate Molina for the impact of Fougera's unlawful conduct.

2381.   The economic benefit of overcharges derived by Fougera through charging supracompetitive and artificially inflated prices for the Fougera Drugs is a direct and proximate result of Fougera's unlawful conduct.

2382.   The economic benefits derived by Fougera rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Fougera.

2383.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Fougera to be permitted to retain any of the overcharges for the Fougera Drugs derived from Fougera's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2384.   Fougera is aware of and appreciates the benefits bestowed upon it by Molina.

2385.   Fougera should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2386.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Fougera traceable to Molina.

## COUNT LXIV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Fougera and All Other Defendants Under Joint and Several Liability)

2387.   Molina incorporates by reference the preceding allegations.

2388.   Fougera knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Fougera Drugs. Fougera injured Molina through this conduct.

2389.   But for Fougera's scheme to inflate the price of the Fougera Drugs, Molina would have purchased lower-priced Fougera Drugs.

2390.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Fougera Drugs than it would have paid absent Fougera's continuing anticompetitive conduct.

2391.   Molina has purchased substantial amounts of the Fougera Drugs during the relevant period.

2392.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Fougera's conduct violates Sections 1 and 2 of the Sherman Act.

2393.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Fougera's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXV

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to G&W and All Other Defendants Under Joint and Several Liability)**

2394. Molina incorporates by reference the preceding allegations.

2395. G&W knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "G&W Drug"). This conspiracy was *per se* unlawful price-fixing.

Metronidazole

2396. G&W has committed at least one overt act to further the conspiracy alleged in this Complaint. G&W's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the G&W Drug throughout the United States.

2397. The conspiracy realized its intended effect; G&W has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the G&W Drug.

2398. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a. Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the G&W Drug;

   b. Molina was deprived of the benefits of free and open competition in the sale of the G&W Drug in the United States market; and

   c. Competition in establishing the prices paid for the G&W Drug was unlawfully restrained, suppressed, or eliminated.

2399. Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the G&W Drug until the market achieves a steady state.

2400. As a direct and proximate result of G&W's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the G&W Drug than it would have paid in the absence of G&W's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2401. There is no legitimate, non-pretextual, pro-competitive business justification for G&W's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2402.   G&W's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2403.   G&W's conduct violated the following state antitrust or competition practices laws:

a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2404.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of G&W's unlawful activities.

2405.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2406.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2407.   For these additional reasons, G&W's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

### COUNT LXVI

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to G&W and All Other Defendants Under Joint and Several Liability)

2408.   Molina incorporates by reference the preceding allegations.

2409.    G&W engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of G&W's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the G&W Drug at prices restrained by competition and forced to pay artificially inflated prices.

2410.    There was and is a gross disparity between the price for the Molina Purchases of G&W Drug, and the value received, given that more cheaply priced G&W Drug should have been available, and would have been available, absent G&W's illegal conduct.

2411.    By engaging in the foregoing conduct, G&W engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.     Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.     Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.     Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.     N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.     N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.     S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.     Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.     Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.     Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT LXVII

### UNJUST ENRICHMENT UNDER STATE LAW

### (As to G&W and All Other Defendants Under Joint and Several Liability)

2412.    Molina incorporates by reference the preceding allegations.

2413.    G&W has benefitted from artificial prices in the sale of the G&W Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

2414.   G&W's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the G&W Drug by Molina.

2415.   MOLINA has conferred upon G&W an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2416.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the G&W Drug.

2417.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the G&W Drug, as it is not liable and would not compensate Molina for the impact of G&W's unlawful conduct.

2418.   The economic benefit of overcharges derived by G&W through charging supracompetitive and artificially inflated prices for the G&W Drug is a direct and proximate result of G&W's unlawful conduct.

2419.   The economic benefits derived by G&W rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting G&W.

2420.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for G&W to be permitted to retain any of the overcharges for the G&W Drug derived from G&W's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2421.   G&W is aware of and appreciates the benefits bestowed upon it by Molina.

2422.   G&W should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2423.   A constructive trust should be imposed upon all unlawful or inequitable sums received by G&W traceable to Molina.

## COUNT LXVIII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to G&W and All Other Defendants Under Joint and Several Liability)

2424.   Molina incorporates by reference the preceding allegations.

2425.   G&W knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the G&W Drug. G&W injured Molina through this conduct.

2426.   But for G&W's scheme to inflate the price of the G&W Drug, Molina would have purchased lower-priced G&W Drug.

2427.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the G&W Drug than it would have paid absent G&W's continuing anticompetitive conduct.

2428.   Molina has purchased substantial amounts of the G&W Drug during the relevant period.

2429.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that G&W's conduct violates Sections 1 and 2 of the Sherman Act.

2430.   Molina A seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by G&W's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXIX

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT
## OF TRADE UNDER STATE LAWS

### (As to Generics Bidco and All Other Defendants Under Joint and Several Liability)

2431.   Molina incorporates by reference the preceding allegations.

2432.   Generics Bidco knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Generics Bidco Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Baclofen
>
> Propranolol HCL

2433.   Generics Bidco has committed at least one overt act to further the conspiracy alleged in this Complaint. Generics Bidco's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Generics Bidco Drugs throughout the United States.

2434.   The conspiracy realized its intended effect; Generics Bidco has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Generics Bidco Drugs.

2435.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Generics Bidco Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Generics Bidco Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Generics Bidco Drugs was unlawfully restrained, suppressed, or eliminated.

2436.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Generics Bidco Drugs until the market achieves a steady state.

2437.   As a direct and proximate result of Generics Bidco's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Generics Bidco Drugs than it would have paid in the absence of Generics Bidco's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2438.   There is no legitimate, non-pretextual, pro-competitive business justification for Generics Bidco's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2439.   Generics Bidco's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2440.   Generics Bidco's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2441.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Generics Bidco's unlawful activities.

2442.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2443.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2444.   For these additional reasons, Generics Bidco's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LXX

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Generics Bidco and All Other Defendants Under Joint and Several Liability)

2445.   Molina incorporates by reference the preceding allegations.

2446.   Generics Bidco engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Generics Bidco's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Generics Bidco Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2447. There was and is a gross disparity between the price for the Molina Purchases of Generics Bidco Drugs, and the value received, given that more cheaply priced Generics Bidco Drugs should have been available, and would have been available, absent Generics Bidco's illegal conduct.

2448. By engaging in the foregoing conduct, Generics Bidco engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d. Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h. S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k. Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LXXI

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Generics Bidco and All Other Defendants Under Joint and Several Liability)**

2449. Molina incorporates by reference the preceding allegations.

2450. Generics Bidco has benefitted from artificial prices in the sale of the Generics Bidco Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2451. Generics Bidco's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Generics Bidco Drugs by Molina.

2452. Molina has conferred upon Generics Bidco an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2453.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Generics Bidco Drugs.

2454.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Generics Bidco Drugs, as it is not liable and would not compensate Molina for the impact of Generics Bidco's unlawful conduct.

2455.   The economic benefit of overcharges derived by Generics Bidco through charging supracompetitive and artificially inflated prices for the Generics Bidco Drugs is a direct and proximate result of Generics Bidco's unlawful conduct.

2456.   The economic benefits derived by Generics Bidco rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Generics Bidco.

2457.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Generics Bidco to be permitted to retain any of the overcharges for the Generics Bidco Drugs derived from Generics Bidco's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2458.   Generics Bidco is aware of and appreciates the benefits bestowed upon it by Molina.

2459.   Generics Bidco should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2460.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Generics Bidco traceable to Molina.

## COUNT LXXII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Generics Bidco and All Other Defendants Under Joint and Several Liability)

2461.   Molina incorporates by reference the preceding allegations.

2462.   Generics Bidco knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Generics Bidco Drugs. Generics Bidco injured Molina through this conduct.

2463.   But for Generics Bidco's scheme to inflate the price of the Generics Bidco Drugs, Molina would have purchased lower-priced Generics Bidco Drugs.

2464.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Generics Bidco Drugs than it would have paid absent Generics Bidco's continuing anticompetitive conduct.

2465.   Molina has purchased substantial amounts of the Generics Bidco Drugs during the relevant period.

2466.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Generics Bidco's conduct violates Sections 1 and 2 of the Sherman Act.

2467.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Generics Bidco's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXIII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

#### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

2468.   Molina incorporates by reference the preceding allegations.

2469.   Glenmark knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Glenmark Drugs"). This conspiracy was *per se* unlawful price-fixing.

               Adapalene

               Desogestrel/Ethinyl Estradiol (Kariva)

               Fluconazole

               Fosinopril HCTZ

               Gabapentin

               Moexipril HCL

               Moexipril HCL/HCTZ

Nabumetone

Norethindrone Acetate

Pravastatin

Ranitidine HCL

2470.   Glenmark has committed at least one overt act to further the conspiracy alleged in this Complaint. Glenmark's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Glenmark Drugs throughout the United States.

2471.   The conspiracy realized its intended effect; Glenmark has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Glenmark Drugs.

2472.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Glenmark Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Glenmark Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Glenmark Drugs was unlawfully restrained, suppressed, or eliminated.

2473.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Glenmark Drugs until the market achieves a steady state.

2474.   As a direct and proximate result of Glenmark's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Glenmark Drugs than it would have paid in the absence of Glenmark's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2475.   There is no legitimate, non-pretextual, pro-competitive business justification for Glenmark's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2476.   Glenmark's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2477.   Glenmark's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

      e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

      f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

      g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

      h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

      i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

      j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

      k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2478.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Glenmark's unlawful activities.

2479.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2480.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2481.    For these additional reasons, Glennmark's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

<div align="center">

**COUNT LXXIV**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Glenmark and All Other Defendants Under Joint and Several Liability)**

</div>

2482.   Molina incorporates by reference the preceding allegations.

2483.   Glenmark engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Glenmark's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Glenmark Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2484.   There was and is a gross disparity between the price for the Molina Purchases of Glenmark Drugs, and the value received, given that more cheaply priced Glenmark Drugs should have been available, and would have been available, absent Glenmark's illegal conduct.

2485.   By engaging in the foregoing conduct, Glenmark engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.     Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.     Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.     Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.     N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.     N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.     S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.     Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.     Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.     Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

<div align="center">

**COUNT LXXV**

**UNJUST ENRICHMENT UNDER STATE LAW**

**(As to Glenmark and All Other Defendants Under Joint and Several Liability)**

</div>

2486.   Molina incorporates by reference the preceding allegations.

2487.   Glenmark has benefitted from artificial prices in the sale of the Glenmark Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2488.   Glenmark's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Glenmark Drugs by Molina.

2489.   Molina has conferred upon Glenmark an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2490.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Glenmark Drugs.

2491.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Glenmark Drugs, as it is not liable and would not compensate Molina for the impact of Glenmark's unlawful conduct.

2492.   The economic benefit of overcharges derived by Glenmark through charging supracompetitive and artificially inflated prices for the Glenmark Drugs is a direct and proximate result of Glenmark's unlawful conduct.

2493.   The economic benefits derived by Glenmark rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Glenmark.

2494.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Glenmark to be permitted to retain any of the overcharges for the Glenmark Drugs derived from Glenmark's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2495.   Glenmark is aware of and appreciates the benefits bestowed upon it by Molina.

2496.   Glenmark should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2497.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Glenmark traceable to Molina.

## COUNT LXXVI

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

2498.   Molina incorporates by reference the preceding allegations.

2499.   Glenmark knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Glenmark Drugs. Glenmark injured Molina through this conduct.

2500.   But for Glenmark's scheme to inflate the price of the Glenmark Drugs, Molina would have purchased lower-priced Glenmark Drugs.

2501.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Glenmark Drugs than it would have paid absent Glenmark's continuing anticompetitive conduct.

2502.   Molina has purchased substantial amounts of the Glenmark Drugs during the relevant period.

2503.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Glenmark's conduct violates Sections 1 and 2 of the Sherman Act.

2504.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Glenmark's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

### (As to Hi-Tech and All Other Defendants Under Joint and Several Liability)

2505.   Molina incorporates by reference the preceding allegations.

2506.   Hi-Tech knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Hi-Tech Drugs"). This conspiracy was *per se* unlawful price-fixing.

Clobetasol Propionate

Lidocaine

2507.    Hi-Tech has committed at least one overt act to further the conspiracy alleged in this Complaint. Hi-Tech's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Hi-Tech Drugs throughout the United States.

2508.    The conspiracy realized its intended effect; Hi-Tech has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Hi-Tech Drugs.

2509.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Hi-Tech Drugs;

    b.    Molina was deprived of the benefits of free and open competition in the sale of the Hi-Tech Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Hi-Tech Drugs was unlawfully restrained, suppressed, or eliminated.

2510.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Hi-Tech Drugs until the market achieves a steady state.

2511.    As a direct and proximate result of Hi-Tech's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Hi-Tech Drugs than it would have paid in the absence of Hi-Tech's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2512.    There is no legitimate, non-pretextual, pro-competitive business justification for Hi-Tech's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2513.    Hi-Tech's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2514.    Hi-Tech's conduct violated the following state antitrust or competition practices laws:

    a.    Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.    Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.  Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.  N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.  N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.  Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.  Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2515.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Hi-Tech's unlawful activities.

2516.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2517.    All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2518.     For these additional reasons, Hi-Tech's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LXXVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Hi-Tech and All Other Defendants Under Joint and Several Liability)

2519.    Molina incorporates by reference the preceding allegations.

2520.    Hi-Tech engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Hi-Tech's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Hi-Tech Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2521.    There was and is a gross disparity between the price for the Molina Purchases of Hi-Tech Drugs, and the value received, given that more cheaply priced Hi-Tech Drugs should have been available, and would have been available, absent Hi-Tech's illegal conduct.

2522.    By engaging in the foregoing conduct, Hi-Tech engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.    Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.    S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.    Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

**COUNT LXXIX**

**UNJUST ENRICHMENT UNDER STATE LAW**

**(As to Hi-Tech and All Other Defendants Under Joint and Several Liability)**

2523.    Molina incorporates by reference the preceding allegations.

2524.    Hi-Tech has benefitted from artificial prices in the sale of the Hi-Tech Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2525.    Hi-Tech's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Hi-Tech Drugs by Molina.

2526.    Molina has conferred upon Hi-Tech an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2527.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Hi-Tech Drugs.

2528.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Hi-Tech Drugs, as it is not liable and would not compensate Molina for the impact of Hi-Tech's unlawful conduct.

2529.   The economic benefit of overcharges derived by Hi-Tech through charging supracompetitive and artificially inflated prices for the Hi-Tech Drugs is a direct and proximate result of Hi-Tech's unlawful conduct.

2530.   The economic benefits derived by Hi-Tech rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Hi-Tech.

2531.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Hi-Tech to be permitted to retain any of the overcharges for the Hi-Tech Drugs derived from Hi-Tech's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2532.   Hi-Tech is aware of and appreciates the benefits bestowed upon it by Molina.

2533.   Hi-Tech should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2534.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Hi-Tech traceable to Molina.

## COUNT LXXX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Hi-Tech and All Other Defendants Under Joint and Several Liability)

2535.   Molina incorporates by reference the preceding allegations.

2536.   Hi-Tech knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Hi-Tech Drugs. Hi-Tech injured Molina through this conduct.

2537. But for Hi-Tech's scheme to inflate the price of the Hi-Tech Drugs, Molina would have purchased lower-priced Hi-Tech Drugs.

2538. Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Hi-Tech Drugs than it would have paid absent Hi-Tech's continuing anticompetitive conduct.

2539. Molina has purchased substantial amounts of the Hi-Tech Drugs during the relevant period.

2540. Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Hi-Tech's conduct violates Sections 1 and 2 of the Sherman Act.

2541. Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Hi-Tech's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

### COUNT LXXXI

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT

### OF TRADE UNDER STATE LAWS

### (As to Impax and All Other Defendants Under Joint and Several Liability)

2542. Molina incorporates by reference the preceding allegations.

2543. Impax knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Impax Drugs"). This conspiracy was *per se* unlawful price-fixing.

Digoxin

Lidocaine

Metronidazole

2544. Impax has committed at least one overt act to further the conspiracy alleged in this Complaint. Impax's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Impax Drugs throughout the United States.

2545.   The conspiracy realized its intended effect; Impax has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Impax Drugs.

2546.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Impax Drugs;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the Impax Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Impax Drugs was unlawfully restrained, suppressed, or eliminated.

2547.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Impax Drugs until the market achieves a steady state.

2548.   As a direct and proximate result of Impax's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Impax Drugs than it would have paid in the absence of Impax's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2549.   There is no legitimate, non-pretextual, pro-competitive business justification for Impax's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2550.   Impax's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2551.   Impax's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

      e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2552.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Impax's unlawful activities.

2553.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2554.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2555.   For these additional reasons, Impax's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

### COUNT LXXXII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Impax and All Other Defendants Under Joint and Several Liability)

2556.   Molina incorporates by reference the preceding allegations.

2557.   Impax engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Impax's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Impax Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2558.   There was and is a gross disparity between the price for the Molina Purchases of Impax Drugs, and the value received, given that more cheaply priced Impax Drugs should have been available, and would have been available, absent Impax's illegal conduct.

2559.   By engaging in the foregoing conduct, Impax engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LXXXIII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Impax and All Other Defendants Under Joint and Several Liability)

2560.   Molina incorporates by reference the preceding allegations.

2561.   Impax has benefitted from artificial prices in the sale of the Impax Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2562.   Impax's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Impax Drugs by Molina.

2563.   MOLINA has conferred upon Impax an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2564.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Impax Drugs.

2565.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Impax Drugs, as it is not liable and would not compensate Molina for the impact of Impax's unlawful conduct.

2566.   The economic benefit of overcharges derived by Impax through charging supracompetitive and artificially inflated prices for the Impax Drugs is a direct and proximate result of Impax's unlawful conduct.

2567.   The economic benefits derived by Impax rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Impax.

2568.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Impax to be permitted to retain any of the overcharges for the Impax Drugs derived from Impax's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2569.   Impax is aware of and appreciates the benefits bestowed upon it by Molina.

2570.   Impax should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2571.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Impax traceable to Molina.

**COUNT LXXXIV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

**(As to Impax and All Other Defendants Under Joint and Several Liability)**

2572.   Molina incorporates by reference the preceding allegations.

2573.   Impax knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Impax Drugs. Impax injured Molina through this conduct.

2574.   But for Impax's scheme to inflate the price of the Impax Drugs, Molina would have purchased lower-priced Impax Drugs.

2575.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Impax Drugs than it would have paid absent Impax's continuing anticompetitive conduct.

2576.   Molina has purchased substantial amounts of the Impax Drugs during the relevant period.

2577.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Impax's conduct violates Sections 1 and 2 of the Sherman Act.

2578.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Impax's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXXV

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT

## OF TRADE UNDER STATE LAWS

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

2579.   Molina incorporates by reference the preceding allegations.

2580.   Lannett knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Lannett Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Acetazolamide
>
> Baclofen
>
> Digoxin
>
> Doxycycline
>
> Levothyroxine
>
> Ursodiol

2581.   Lannett has committed at least one overt act to further the conspiracy alleged in this Complaint. Lannett's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Lannett Drugs throughout the United States.

2582.   The conspiracy realized its intended effect; Lannett has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Lannett Drugs.

2583.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lannett Drugs;

   b.   Molina was deprived of the benefits of free and open competition in the sale of the Lannett Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Lannett Drugs was unlawfully restrained, suppressed, or eliminated.

2584.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Lannett Drugs until the market achieves a steady state.

2585.   As a direct and proximate result of Lannett's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Lannett Drugs than it would have paid in the absence of Lannett's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2586.   There is no legitimate, non-pretextual, pro-competitive business justification for Lannett's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2587.   Lannett's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2588.   Lannett's conduct violated the following state antitrust or competition practices laws:

   a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

   b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

     c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

     d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

     e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

     f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

     g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

     h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

     i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

     j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

     k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2589.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Lannett's unlawful activities.

2590.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2591.   All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2592.    For these additional reasons, Lannett's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

**COUNT LXXXVI**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Lannett and All Other Defendants Under Joint and Several Liability)**

2593.   Molina incorporates by reference the preceding allegations.

2594.   Lannett engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Lannett's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Lannett Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2595.   There was and is a gross disparity between the price for the Molina Purchases of Lannett Drugs, and the value received, given that more cheaply priced Lannett Drugs should have been available, and would have been available, absent Lannett's illegal conduct.

2596.   By engaging in the foregoing conduct, Lannett engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.      Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.      815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.      Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.      Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.      Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.      N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.      N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.      S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT LXXXVII

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Lannett and All Other Defendants Under Joint and Several Liability)**

2597.   Molina incorporates by reference the preceding allegations.

2598.   Lannett has benefitted from artificial prices in the sale of the Lannett Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2599.   Lannett's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Lannett Drugs by Molina.

2600.   MOLINA has conferred upon Lannett an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2601.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Lannett Drugs.

2602.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Lannett Drugs, as it is not liable and would not compensate Molina for the impact of Lannett's unlawful conduct.

2603.   The economic benefit of overcharges derived by Lannett through charging supracompetitive and artificially inflated prices for the Lannett Drugs is a direct and proximate result of Lannett's unlawful conduct.

2604.   The economic benefits derived by Lannett rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Lannett.

2605.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Lannett to be permitted to retain any of the overcharges for the Lannett Drugs derived from Lannett's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2606.   Lannett is aware of and appreciates the benefits bestowed upon it by Molina.

2607.   Lannett should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2608.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Lannett traceable to Molina.

## COUNT LXXXVIII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

2609.   Molina incorporates by reference the preceding allegations.

2610.   Lannett knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Lannett Drugs. Lannett injured Molina through this conduct.

2611. But for Lannett's scheme to inflate the price of the Lannett Drugs, Molina would have purchased lower-priced Lannett Drugs.

2612. Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Lannett Drugs than it would have paid absent Lannett's continuing anticompetitive conduct.

2613. Molina has purchased substantial amounts of the Lannett Drugs during the relevant period.

2614. Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Lannett's conduct violates Sections 1 and 2 of the Sherman Act.

2615. Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Lannett's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXXIX

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Lupin and All Other Defendants Under Joint and Several Liability)**

2616. Molina incorporates by reference the preceding allegations.

2617. Lupin knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Lupin Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Cefdinir
>
> Cefprozil
>
> Cephalexin
>
> Drospirenone and Ethinyl Estradiol (Ocella)
>
> Ethinyl Estradiol/Norethindrone (Balziva)
>
> Fenofibrate
>
> Irbesartan

Lamivudine/Zidovudine (Combivir)

Niacin ER

Pravastatin

2618.   Lupin has committed at least one overt act to further the conspiracy alleged in this Complaint. Lupin's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Lupin Drugs throughout the United States.

2619.   The conspiracy realized its intended effect; Lupin has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Lupin Drugs.

2620.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lupin Drugs;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the Lupin Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Lupin Drugs was unlawfully restrained, suppressed, or eliminated.

2621.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Lupin Drugs until the market achieves a steady state.

2622.   As a direct and proximate result of Lupin's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Lupin Drugs than it would have paid in the absence of Lupin's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2623.   There is no legitimate, non-pretextual, pro-competitive business justification for Lupin's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2624.   Lupin's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2625.   Lupin's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2626.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Lupin's unlawful activities.

2627.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2628.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2629.   For these additional reasons, Lupin's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

<div align="center">

**COUNT XC**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Lupin and All Other Defendants Under Joint and Several Liability)**

</div>

2630.   Molina incorporates by reference the preceding allegations.

2631.   Lupin engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and

proximate result of Lupin's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Lupin Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2632.   There was and is a gross disparity between the price for the Molina Purchases of Lupin Drugs, and the value received, given that more cheaply priced Lupin Drugs should have been available, and would have been available, absent Lupin's illegal conduct.

2633.   By engaging in the foregoing conduct, Lupin engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.     Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.     Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.     Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.     N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.     N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.     S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.     Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.     Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.     Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT XCI

### UNJUST ENRICHMENT UNDER STATE LAW

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

2634.   Molina incorporates by reference the preceding allegations.

2635.   Lupin has benefitted from artificial prices in the sale of the Lupin Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2636.   Lupin's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Lupin Drugs by Molina.

2637.   Molina has conferred upon Lupin an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2638.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Lupin Drugs.

2639.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Lupin Drugs, as it is not liable and would not compensate Molina for the impact of Lupin's unlawful conduct.

2640.   The economic benefit of overcharges derived by Lupin through charging supracompetitive and artificially inflated prices for the Lupin Drugs is a direct and proximate result of Lupin's unlawful conduct.

2641.   The economic benefits derived by Lupin rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Lupin.

2642.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Lupin to be permitted to retain any of the overcharges for the Lupin Drugs derived from Lupin's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2643.   Lupin is aware of and appreciates the benefits bestowed upon it by Molina.

2644.   Lupin should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2645.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Lupin traceable to Molina.

### COUNT XCII

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Lupin and All Other Defendants Under Joint and Several Liability)

2646.   Molina incorporates by reference the preceding allegations.

2647.   Lupin knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Lupin Drugs. Lupin injured Molina through this conduct.

2648.    But for Lupin's scheme to inflate the price of the Lupin Drugs, Molina would have purchased lower-priced Lupin Drugs.

2649.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Lupin Drugs than it would have paid absent Lupin's continuing anticompetitive conduct.

2650.    Molina has purchased substantial amounts of the Lupin Drugs during the relevant period.

2651.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Lupin's conduct violates Sections 1 and 2 of the Sherman Act.

2652.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Lupin's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XCIII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT
## OF TRADE UNDER STATE LAWS

### (As to Mayne and All Other Defendants Under Joint and Several Liability)

2653.    Molina incorporates by reference the preceding allegations.

2654.    Mayne knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Mayne Drug"). This conspiracy was *per se* unlawful price-fixing.

Doxycycline

2655.    Mayne has committed at least one overt act to further the conspiracy alleged in this Complaint. Mayne's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Mayne Drug throughout the United States.

2656.    The conspiracy realized its intended effect; Mayne has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Mayne Drug.

2657.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Mayne Drug;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the Mayne Drug in the United States market; and

      c.   Competition in establishing the prices paid for the Mayne Drug was unlawfully restrained, suppressed, or eliminated.

2658.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Mayne Drug until the market achieves a steady state.

2659.   As a direct and proximate result of Mayne's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Mayne Drug than it would have paid in the absence of Mayne's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2660.   There is no legitimate, non-pretextual, pro-competitive business justification for Mayne's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2661.   Mayne's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2662.   Mayne's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

      e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

      f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

      g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

      h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.  Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.  Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2663.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Mayne's unlawful activities.

2664.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2665.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2666.   For these additional reasons, Mayne's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

**COUNT XCIV**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Mayne and All Other Defendants Under Joint and Several Liability)**

2667.   Molina incorporates by reference the preceding allegations.

2668.   Mayne engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Mayne's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Mayne Drug at prices restrained by competition and forced to pay artificially inflated prices.

2669.   There was and is a gross disparity between the price for the Molina Purchases of Mayne Drug, and the value received, given that more cheaply priced Mayne Drug should have been available, and would have been available, absent Mayne's illegal conduct.

2670.   By engaging in the foregoing conduct, Mayne engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.      Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.      815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.      Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.      Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.      Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.      N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.      N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.      S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XCV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Mayne and All Other Defendants Under Joint and Several Liability)

2671.   Molina incorporates by reference the preceding allegations.

2672.   Mayne has benefitted from artificial prices in the sale of the Mayne Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

2673.   Mayne's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Mayne Drug by Molina.

2674.   MOLINA has conferred upon Mayne an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2675.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Mayne Drug.

2676.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Mayne Drug, as it is not liable and would not compensate Molina for the impact of Mayne's unlawful conduct.

2677.   The economic benefit of overcharges derived by Mayne through charging supracompetitive and artificially inflated prices for the Mayne Drug is a direct and proximate result of Mayne's unlawful conduct.

2678.   The economic benefits derived by Mayne rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Mayne.

2679.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Mayne to be permitted to retain any of the overcharges for the Mayne Drug derived from Mayne's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2680.   Mayne is aware of and appreciates the benefits bestowed upon it by Molina.

2681.   Mayne should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2682.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Mayne traceable to Molina.

## COUNT XCVI

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Mayne and All Other Defendants Under Joint and Several Liability)

2683.   Molina incorporates by reference the preceding allegations.

2684.   Mayne knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Mayne Drug. Mayne injured Molina through this conduct.

2685.   But for Mayne's scheme to inflate the price of the Mayne Drug, Molina would have purchased lower-priced Mayne Drug.

2686.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Mayne Drug than it would have paid absent Mayne's continuing anticompetitive conduct.

2687.    Molina has purchased substantial amounts of the Mayne Drug during the relevant period.

2688.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Mayne's conduct violates Sections 1 and 2 of the Sherman Act.

2689.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Mayne's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

<div align="center">

**COUNT XCVII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

**OF TRADE UNDER STATE LAWS**

**(As to Morton Grove and All Other Defendants Under Joint and Several Liability)**

</div>

2690.    Molina incorporates by reference the preceding allegations.

2691.    Morton Grove knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Morton Grove Drug"). This conspiracy was *per se* unlawful price-fixing.

<div align="center">

Clobetasol Propionate

</div>

2692.    Morton Grove has committed at least one overt act to further the conspiracy alleged in this Complaint. Morton Grove's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Morton Grove Drug throughout the United States.

2693.    The conspiracy realized its intended effect; Morton Grove has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Morton Grove Drug.

2694.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Morton Grove Drug;

b. Molina was deprived of the benefits of free and open competition in the sale of the Morton Grove Drug in the United States market; and

c. Competition in establishing the prices paid for the Morton Grove Drug was unlawfully restrained, suppressed, or eliminated.

2695.  Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Morton Grove Drug until the market achieves a steady state.

2696.  As a direct and proximate result of Morton Grove's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Morton Grove Drug than it would have paid in the absence of Morton Grove's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2697.  There is no legitimate, non-pretextual, pro-competitive business justification for Morton Grove's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2698.  Morton Grove's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2699.  Morton Grove's conduct violated the following state antitrust or competition practices laws:

a. Ala. Code §6-5-60, with respect to purchases in Alabama.

b. Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d. Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e. Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f. N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g. N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j. Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k. Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2700.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Morton Grove's unlawful activities.

2701.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2702.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2703.    For these additional reasons, Morton Grove's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XCVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Morton Grove and All Other Defendants Under Joint and Several Liability)

2704.    Molina incorporates by reference the preceding allegations.

2705.    Morton Grove engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Morton Grove's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Morton Grove Drug at prices restrained by competition and forced to pay artificially inflated prices.

2706.    There was and is a gross disparity between the price for the Molina Purchases of Morton Grove Drug, and the value received, given that more cheaply priced Morton Grove Drug should have been available, and would have been available, absent Morton Grove's illegal conduct.

2707.    By engaging in the foregoing conduct, Morton Grove engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.      Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.      Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.      Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.      N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.      N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.      S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XCIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Morton Grove and All Other Defendants Under Joint and Several Liability)

2708.   Molina incorporates by reference the preceding allegations.

2709.   Morton Grove has benefitted from artificial prices in the sale of the Morton Grove Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

2710.   Morton Grove's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Morton Grove Drug by Molina.

2711.   MOLINA has conferred upon Morton Grove an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2712.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Morton Grove Drug.

2713.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Morton Grove Drug, as it is not liable and would not compensate Molina for the impact of Morton Grove's unlawful conduct.

2714.   The economic benefit of overcharges derived by Morton Grove through charging supracompetitive and artificially inflated prices for the Morton Grove Drug is a direct and proximate result of Morton Grove's unlawful conduct.

2715.   The economic benefits derived by Morton Grove rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Morton Grove.

2716.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Morton Grove to be permitted to retain any of the overcharges for the Morton Grove Drug derived from Morton Grove's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2717.   Morton Grove is aware of and appreciates the benefits bestowed upon it by Molina.

2718.   Morton Grove should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2719.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Morton Grove traceable to Molina.

**COUNT C**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

**(As to Morton Grove and All Other Defendants Under Joint and Several Liability)**

2720.   Molina incorporates by reference the preceding allegations.

2721.   Morton Grove knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Morton Grove Drug. Morton Grove injured Molina through this conduct.

2722.   But for Morton Grove's scheme to inflate the price of the Morton Grove Drug, Molina would have purchased lower-priced Morton Grove Drug.

2723.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Morton Grove Drug than it would have paid absent Morton Grove's continuing anticompetitive conduct.

2724.   Molina has purchased substantial amounts of the Morton Grove Drug during the relevant period.

2725.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Morton Grove's conduct violates Sections 1 and 2 of the Sherman Act.

2726.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Morton Grove's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CI

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT

## OF TRADE UNDER STATE LAWS

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

2727.   Molina incorporates by reference the preceding allegations.

2728.   Mylan knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Mylan Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Albuterol Sulfate
>
> Amiloride HCL/HCTZ
>
> Amitriptyline
>
> Benazepril HCTZ
>
> Budesonide
>
> Buspirone HCL
>
> Capecitabine
>
> Cimetidine
>
> Clomipramine
>
> Clonidine TTS
>
> Diclofenac Potassium
>
> Digoxin
>
> Diltiazem HCL
>
> Divalproex Sodium ER

| | |
|---|---|
| 1 | Doxazosin Mesylate |
| 2 | Doxycycline |
| 3 | Enalapril Maleate |
| 4 | Estradiol |
| 5 | Fenofibrate |
| 6 | Fluoxetine HCL |
| 7 | Flurbiprofen |
| 8 | Fluvastatin Sodium |
| 9 | Glipizide-Metformin |
| 10 | Haloperidol |
| 11 | Ketoconazole |
| 12 | Ketoprofen |
| 13 | Ketorolac Tromethamine |
| 14 | Levothyroxine |
| 15 | Loperamide HCL |
| 16 | Methotrexate |
| 17 | Nadolol |
| 18 | Nitrofurantoin MAC |
| 19 | Pentoxifylline |
| 20 | Prazosin HCL |
| 21 | Prochlorperazine |
| 22 | Propranolol HCL |
| 23 | Tamoxifen Citrate |
| 24 | Tizanidine |
| 25 | Tolmetin Sodium |
| 26 | Tolterodine |
| 27 | Trifluoperazine HCL |
| 28 | Valsartan HCTZ |

Verapamil

2729.   Mylan has committed at least one overt act to further the conspiracy alleged in this Complaint. Mylan's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Mylan Drugs throughout the United States.

2730.   The conspiracy realized its intended effect; Mylan has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Mylan Drugs.

2731.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

        a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Mylan Drugs;

        b.   Molina was deprived of the benefits of free and open competition in the sale of the Mylan Drugs in the United States market; and

        c.   Competition in establishing the prices paid for the Mylan Drugs was unlawfully restrained, suppressed, or eliminated.

2732.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Mylan Drugs until the market achieves a steady state.

2733.   As a direct and proximate result of Mylan's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Mylan Drugs than it would have paid in the absence of Mylan's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2734.   There is no legitimate, non-pretextual, pro-competitive business justification for Mylan's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2735.   Mylan's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2736.   Mylan's conduct violated the following state antitrust or competition practices laws:

        a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

     b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

     c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

     d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

     e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

     f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

     g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

     h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

     i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

     j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

     k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2737.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Mylan's unlawful activities.

2738.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2739.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2740.   For these additional reasons, Mylan's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

<div align="center">

**COUNT CII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Mylan and All Other Defendants Under Joint and Several Liability)**

</div>

2741.   Molina incorporates by reference the preceding allegations.

2742.   Mylan engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Mylan's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct,

Molina was deprived of the opportunity to purchase the Mylan Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2743.   There was and is a gross disparity between the price for the Molina Purchases of Mylan Drugs, and the value received, given that more cheaply priced Mylan Drugs should have been available, and would have been available, absent Mylan's illegal conduct.

2744.   By engaging in the foregoing conduct, Mylan engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d.    Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.    S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.    Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT CIII

### UNJUST ENRICHMENT UNDER STATE LAW

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

2745.   Molina incorporates by reference the preceding allegations.

2746.   Mylan has benefitted from artificial prices in the sale of the Mylan Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2747.   Mylan's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Mylan Drugs by Molina.

2748.   Molina has conferred upon Mylan an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2749.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Mylan Drugs.

2750.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Mylan Drugs, as it is not liable and would not compensate Molina for the impact of Mylan's unlawful conduct.

2751.   The economic benefit of overcharges derived by Mylan through charging supracompetitive and artificially inflated prices for the Mylan Drugs is a direct and proximate result of Mylan's unlawful conduct.

2752.   The economic benefits derived by Mylan rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Mylan.

2753.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Mylan to be permitted to retain any of the overcharges for the Mylan Drugs derived from Mylan's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2754.   Mylan is aware of and appreciates the benefits bestowed upon it by Molina.

2755.   Mylan should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2756.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Mylan traceable to Molina.

**COUNT CIV**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

**(As to Mylan and All Other Defendants Under Joint and Several Liability)**

2757.   Molina incorporates by reference the preceding allegations.

2758.   Mylan knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Mylan Drugs. Mylan injured Molina through this conduct.

2759.   But for Mylan's scheme to inflate the price of the Mylan Drugs, Molina would have purchased lower-priced Mylan Drugs.

2760.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Mylan Drugs than it would have paid absent Mylan's continuing anticompetitive conduct.

2761.   Molina has purchased substantial amounts of the Mylan Drugs during the relevant period.

2762.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Mylan's conduct violates Sections 1 and 2 of the Sherman Act.

2763.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Mylan's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CV

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT

## OF TRADE UNDER STATE LAWS

### (As to Par and All Other Defendants Under Joint and Several Liability)

2764.   Molina incorporates by reference the preceding allegations.

2765.   Par knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Par Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amitriptyline
>
> Baclofen
>
> Budesonide
>
> Digoxin
>
> Divalproex Sodium ER
>
> Doxycycline
>
> Entecavir

1               Fluoxetine HCL

2               Flutamide

3               Hydroxyurea

4               Labetalol HCL

5               Nystatin

6               Methimazole

7               Omega-3-Acid Ethyl Esters

8               Propranolol HCL

2766.   Par has committed at least one overt act to further the conspiracy alleged in this Complaint. Par's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Par Drugs throughout the United States.

2767.   The conspiracy realized its intended effect; Par has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Par Drugs.

2768.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

        a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Par Drugs;

        b.   Molina was deprived of the benefits of free and open competition in the sale of the Par Drugs in the United States market; and

        c.   Competition in establishing the prices paid for the Par Drugs was unlawfully restrained, suppressed, or eliminated.

2769.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Par Drugs until the market achieves a steady state.

2770.   As a direct and proximate result of Par's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Par Drugs than it would have paid in the absence of Par's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2771.    There is no legitimate, non-pretextual, pro-competitive business justification for Par's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2772.    Par's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2773.    Par's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2774.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Par's unlawful activities.

2775.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2776.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2777.     For these additional reasons, Par's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

# COUNT CVI

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Par and All Other Defendants Under Joint and Several Liability)

2778.   Molina incorporates by reference the preceding allegations.

2779.   Par engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Par's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Par Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2780.   There was and is a gross disparity between the price for the Molina Purchases of Par Drugs, and the value received, given that more cheaply priced Par Drugs should have been available, and would have been available, absent Par's illegal conduct.

2781.   By engaging in the foregoing conduct, Par engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

   a.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   b.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

   c.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

   d.  Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

   e.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

   f.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

   g.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

   h.  S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

   i.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

   j.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

   k.  Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CVII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Par and All Other Defendants Under Joint and Several Liability)

2782.    Molina incorporates by reference the preceding allegations.

2783.    Par has benefitted from artificial prices in the sale of the Par Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2784.    Par's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Par Drugs by Molina.

2785.    Molina has conferred upon Par an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2786.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Par Drugs.

2787.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Par Drugs, as it is not liable and would not compensate Molina for the impact of Par's unlawful conduct.

2788.    The economic benefit of overcharges derived by Par through charging supracompetitive and artificially inflated prices for the Par Drugs is a direct and proximate result of Par's unlawful conduct.

2789.    The economic benefits derived by Par rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Par.

2790.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Par to be permitted to retain any of the overcharges for the Par Drugs derived from Par's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2791.    Par is aware of and appreciates the benefits bestowed upon it by Molina.

2792.    Par should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2793.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Par traceable to Molina.

## COUNT CVIII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Par and All Other Defendants Under Joint and Several Liability)

2794.   Molina incorporates by reference the preceding allegations.

2795.   Par knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Par Drugs. Par injured Molina through this conduct.

2796.   But for Par's scheme to inflate the price of the Par Drugs, Molina would have purchased lower-priced Par Drugs.

2797.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Par Drugs than it would have paid absent Par's continuing anticompetitive conduct.

2798.   Molina has purchased substantial amounts of the Par Drugs during the relevant period.

2799.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Par's conduct violates Sections 1 and 2 of the Sherman Act.

2800.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Par's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CIX

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT

## OF TRADE UNDER STATE LAWS

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

2801.   Molina incorporates by reference the preceding allegations.

2802.   Perrigo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Perrigo Drugs"). This conspiracy was *per se* unlawful price-fixing.

Clobetasol Propionate

Desonide

Econazole

Nystatin

2803.   Perrigo has committed at least one overt act to further the conspiracy alleged in this Complaint. Perrigo's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Perrigo Drugs throughout the United States.

2804.   The conspiracy realized its intended effect; Perrigo has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Perrigo Drugs.

2805.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

       a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Perrigo Drugs;

       b.   Molina was deprived of the benefits of free and open competition in the sale of the Perrigo Drugs in the United States market; and

       c.   Competition in establishing the prices paid for the Perrigo Drugs was unlawfully restrained, suppressed, or eliminated.

2806.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Perrigo Drugs until the market achieves a steady state.

2807.   As a direct and proximate result of Perrigo's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Perrigo Drugs than it would have paid in the absence of Perrigo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2808.   There is no legitimate, non-pretextual, pro-competitive business justification for Perrigo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2809.   Perrigo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2810.   Perrigo's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2811.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Perrigo's unlawful activities.

2812.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2813.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2814.    For these additional reasons, Perrigo's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CX

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

2815.   Molina incorporates by reference the preceding allegations.

2816.   Perrigo engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Perrigo's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Perrigo Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2817.   There was and is a gross disparity between the price for the Molina Purchases of Perrigo Drugs, and the value received, given that more cheaply priced Perrigo Drugs should have been available, and would have been available, absent Perrigo's illegal conduct.

2818.   By engaging in the foregoing conduct, Perrigo engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT CXI

### UNJUST ENRICHMENT UNDER STATE LAW

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

2819.   Molina incorporates by reference the preceding allegations.

2820.   Perrigo has benefitted from artificial prices in the sale of the Perrigo Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2821.   Perrigo's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Perrigo Drugs by Molina.

2822.   Molina has conferred upon Perrigo an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2823.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Perrigo Drugs.

2824.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Perrigo Drugs, as it is not liable and would not compensate Molina for the impact of Perrigo's unlawful conduct.

2825.   The economic benefit of overcharges derived by Perrigo through charging supracompetitive and artificially inflated prices for the Perrigo Drugs is a direct and proximate result of Perrigo's unlawful conduct.

2826.   The economic benefits derived by Perrigo rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Perrigo.

2827.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Perrigo to be permitted to retain any of the overcharges for the Perrigo Drugs derived from Perrigo's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2828.   Perrigo is aware of and appreciates the benefits bestowed upon it by Molina.

2829.   Perrigo should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2830.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Perrigo traceable to Molina.

## COUNT CXII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

2831.   Molina incorporates by reference the preceding allegations.

2832.   Perrigo knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Perrigo Drugs. Perrigo injured Molina through this conduct.

2833.   But for Perrigo's scheme to inflate the price of the Perrigo Drugs, Molina would have purchased lower-priced Perrigo Drugs.

2834.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Perrigo Drugs than it would have paid absent Perrigo's continuing anticompetitive conduct.

2835.   Molina has purchased substantial amounts of the Perrigo Drugs during the relevant period.

2836.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Perrigo's conduct violates Sections 1 and 2 of the Sherman Act.

2837.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Perrigo's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXIII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT

### OF TRADE UNDER STATE LAWS

#### (As to Pfizer/Greenstone and All Other Defendants Under Joint and Several Liability)

2838.   Molina incorporates by reference the preceding allegations.

2839.   Pfizer/Greenstone knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Pfizer/Greenstone Drugs"). This conspiracy was *per se* unlawful price-fixing.

Azithromycin

Cabergoline

Fluconazole

Medroxyprogesterone

Oxaprozin

Penicillin VK

Piroxicam

Tolterodine

2840.   Pfizer/Greenstone has committed at least one overt act to further the conspiracy alleged in this Complaint. Pfizer/Greenstone's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Pfizer/Greenstone Drugs throughout the United States.

2841.   The conspiracy realized its intended effect; Pfizer/Greenstone has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Pfizer/Greenstone Drugs.

2842.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Pfizer/Greenstone Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Pfizer/Greenstone Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Pfizer/Greenstone Drugs was unlawfully restrained, suppressed, or eliminated.

2843.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Pfizer/Greenstone Drugs until the market achieves a steady state.

2844.   As a direct and proximate result of Pfizer/Greenstone's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Pfizer/Greenstone Drugs than it would have paid in the absence of Pfizer/Greenstone's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2845.   There is no legitimate, non-pretextual, pro-competitive business justification for Pfizer/Greenstone's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2846.   Pfizer/Greenstone's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2847.   Pfizer/Greenstone's conduct violated the following state antitrust or competition practices laws:

        a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

        b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

        c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

        d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

        e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

        f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

        g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

        h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

        i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

        j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

        k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2848.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Pfizer/Greenstone's unlawful activities.

2849.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2850.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2851.    For these additional reasons, Pfizer/Greenstone's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXIV

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

1

2       **(As to Pfizer/Greenstone and All Other Defendants Under Joint and Several Liability)**

3          2852.   Molina incorporates by reference the preceding allegations.

4          2853.   Pfizer/Greenstone engaged in unfair competition or unfair, unconscionable, deceptive,

5   or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a

6   direct and proximate result of Pfizer/Greenstone's anticompetitive, deceptive, unfair, unconscionable,

7   and fraudulent conduct, Molina was deprived of the opportunity to purchase the Pfizer/Greenstone

8   Drugs at prices restrained by competition and forced to pay artificially inflated prices.

9          2854.   There was and is a gross disparity between the price for the Molina Purchases of

10  Pfizer/Greenstone Drugs, and the value received, given that more cheaply priced Pfizer/Greenstone

11  Drugs should have been available, and would have been available, absent Pfizer/Greenstone's illegal

12  conduct.

13         2855.   By engaging in the foregoing conduct, Pfizer/Greenstone engaged in unfair competition

14  or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the

15  following state laws:

16              a.      Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

17              b.      815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

18              c.      Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

19              d.      Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

20              e.      Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

21              f.      N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

22              g.      N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

23              h.      S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

24              i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

25              j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

26              k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

27

28

**COUNT CXV**

**UNJUST ENRICHMENT UNDER STATE LAW**

**(As to Pfizer/Greenstone and All Other Defendants Under Joint and Several Liability)**

2856.    Molina incorporates by reference the preceding allegations.

2857.    Pfizer/Greenstone has benefitted from artificial prices in the sale of the Pfizer/Greenstone Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2858.    Pfizer/Greenstone's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Pfizer/Greenstone Drugs by Molina.

2859.    Molina has conferred upon Pfizer/Greenstone an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2860.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Pfizer/Greenstone Drugs.

2861.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Pfizer/Greenstone Drugs, as it is not liable and would not compensate Molina for the impact of Pfizer/Greenstone's unlawful conduct.

2862.    The economic benefit of overcharges derived by Pfizer/Greenstone through charging supracompetitive and artificially inflated prices for the Pfizer/Greenstone Drugs is a direct and proximate result of Pfizer/Greenstone's unlawful conduct.

2863.    The economic benefits derived by Pfizer/Greenstone rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Pfizer/Greenstone.

2864.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Pfizer/Greenstone to be permitted to retain any of the overcharges for the Pfizer/Greenstone Drugs derived from Pfizer/Greenstone's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2865.    Pfizer/Greenstone is aware of and appreciates the benefits bestowed upon it by MOLINA.

2866.   Pfizer/Greenstone should be compelled to disgorge in a common fund for the benefit of MOLINA all unlawful or inequitable proceeds it received.

2867.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Pfizer/Greenstone traceable to Molina.

## COUNT CXVI

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Pfizer/Greenstone and All Other Defendants Under Joint and Several Liability)**

2868.   Molina incorporates by reference the preceding allegations.

2869.   Pfizer/Greenstone knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Pfizer/Greenstone Drugs. Pfizer/Greenstone injured Molina through this conduct.

2870.   But for Pfizer/Greenstone's scheme to inflate the price of the Pfizer/Greenstone Drugs, Molina would have purchased lower-priced Pfizer/Greenstone Drugs.

2871.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Pfizer/Greenstone Drugs than it would have paid absent Pfizer/Greenstone's continuing anticompetitive conduct.

2872.   Molina has purchased substantial amounts of the Pfizer/Greenstone Drugs during the relevant period.

2873.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Pfizer/Greenstone's conduct violates Sections 1 and 2 of the Sherman Act.

2874.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Pfizer/Greenstone's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXVII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT

## OF TRADE UNDER STATE LAWS

**(As to Sandoz and All Other Defendants Under Joint and Several Liability)**

2875.    Molina incorporates by reference the preceding allegations.

2876.    Sandoz knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Sandoz Drugs"). This conspiracy was *per se* unlawful price-fixing.

Amitriptyline

Amoxicillin/Clavulanate

Benazepril HCTZ

Bumetanide

Cefdinir

Cefprozil

Clemastine Fumarate

Clobetasol Propionate

Clomipramine

Desonide

Dexmethylphenidate HCL ER

Diclofenac Potassium

Dicloxacillin Sodium

Ethinyl Estradiol/Levonorgestrel (Portia and Jolessa)

Econazole

Etodolac

Fluocinonide

Fosinopril HCTZ

Haloperidol

Isoniazid

Hydroxyzine Pamoate

Ketoconazole

Labetalol HCL

Levothyroxine

Lidocaine

Metronidazole

Nabumetone

Nadolol

Nystatin

Penicillin VK

Prochlorperazine

Ranitidine HCL

Temozolomide

Tizanidine

Tobramycin

Trifluoperazine HCL

Valsartan HCTZ

2877.   Sandoz has committed at least one overt act to further the conspiracy alleged in this Complaint. Sandoz's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Sandoz Drugs throughout the United States.

2878.   The conspiracy realized its intended effect; Sandoz has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Sandoz Drugs.

2879.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sandoz Drugs;

b.   Molina was deprived of the benefits of free and open competition in the sale of the Sandoz Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Sandoz Drugs was unlawfully restrained, suppressed, or eliminated.

2880.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Sandoz Drugs until the market achieves a steady state.

2881.   As a direct and proximate result of Sandoz's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Sandoz Drugs than it would have paid in the absence of Sandoz's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2882.   There is no legitimate, non-pretextual, pro-competitive business justification for Sandoz's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2883.   Sandoz's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2884.   Sandoz's conduct violated the following state antitrust or competition practices laws:

a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2885.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Sandoz's unlawful activities.

2886.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2887.   All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2888.   For these additional reasons, Sandoz's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

### COUNT CXVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

2889.   Molina incorporates by reference the preceding allegations.

2890.   Sandoz engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Sandoz's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Sandoz Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2891.   There was and is a gross disparity between the price for the Molina Purchases of Sandoz Drugs, and the value received, given that more cheaply priced Sandoz Drugs should have been available, and would have been available, absent Sandoz's illegal conduct.

2892.   By engaging in the foregoing conduct, Sandoz engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.     Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.      Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.      Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.      N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.      N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.      S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXIX

### UNJUST ENRICHMENT UNDER STATE LAW

#### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

2893.   Molina incorporates by reference the preceding allegations.

2894.   Sandoz has benefitted from artificial prices in the sale of the Sandoz Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2895.   Sandoz's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Sandoz Drugs by Molina.

2896.   Molina has conferred upon Sandoz an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2897.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Sandoz Drugs.

2898.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Sandoz Drugs, as it is not liable and would not compensate Molina for the impact of Sandoz's unlawful conduct.

2899.   The economic benefit of overcharges derived by Sandoz through charging supracompetitive and artificially inflated prices for the Sandoz Drugs is a direct and proximate result of Sandoz's unlawful conduct.

2900.   The economic benefits derived by Sandoz rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Sandoz.

2901.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Sandoz to be permitted to retain any of the overcharges for the Sandoz Drugs derived from Sandoz's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2902.   Sandoz is aware of and appreciates the benefits bestowed upon it by Molina.

2903.   Sandoz should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2904.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Sandoz traceable to Molina.

## COUNT CXX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

2905.   Molina incorporates by reference the preceding allegations.

2906.   Sandoz knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Sandoz Drugs. Sandoz injured MOLINA through this conduct.

2907.   But for Sandoz's scheme to inflate the price of the Sandoz Drugs, MOLINA would have purchased lower-priced Sandoz Drugs.

2908.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Sandoz Drugs than it would have paid absent Sandoz's continuing anticompetitive conduct.

2909.   Molina has purchased substantial amounts of the Sandoz Drugs during the relevant period.

2910.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Sandoz's conduct violates Sections 1 and 2 of the Sherman Act.

2911.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by

1  Sandoz's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not

2  recur.

3  **COUNT CXXI**

4  **FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

5  **OF TRADE UNDER STATE LAWS**

6  **(As to Sun and All Other Defendants Under Joint and Several Liability)**

7  2912.   Molina incorporates by reference the preceding allegations.

8  2913.   Sun knowingly, intentionally, and conspiratorially engaged in anticompetitive

9  agreements designed to drive up the cost of at least the drugs listed below in the United States (the

10  "Sun Drugs"). This conspiracy was *per se* unlawful price-fixing.

11  Albuterol Sulfate

12  Digoxin

13  Doxycycline

14  Nimodipine

15  Nystatin

16  Paromomycin

17  2914.   Sun has committed at least one overt act to further the conspiracy alleged in this

18  Complaint. Sun's anticompetitive acts had a substantial and foreseeable effect on commerce by raising

19  and fixing prices of the Sun Drugs throughout the United States.

20  2915.   The conspiracy realized its intended effect; Sun has benefited, and continues to benefit,

21  from its anticompetitive agreements which has artificially inflated the prices of the Sun Drugs.

22  2916.   The contract, combination, or conspiracy had the following direct, substantial, and

23  reasonably foreseeable effects on United States commerce:

24  a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or

25  stabilized prices at supracompetitive levels for the Sun Drugs;

26  b.   Molina was deprived of the benefits of free and open competition in the sale of the

27  Sun Drugs in the United States market; and

28

c.    Competition in establishing the prices paid for the Sun Drugs was unlawfully restrained, suppressed, or eliminated.

2917.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Sun Drugs until the market achieves a steady state.

2918.   As a direct and proximate result of Sun's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Sun Drugs than it would have paid in the absence of Sun's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2919.   There is no legitimate, non-pretextual, pro-competitive business justification for Sun's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2920.   Sun's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2921.   Sun's conduct violated the following state antitrust or competition practices laws:

a.    Ala. Code §6-5-60, with respect to purchases in Alabama.

b.    Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.    Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.    Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.    N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.    N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.    10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.    R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.    Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.    Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2922.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Sun's unlawful activities.

2923.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2924.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2925.    For these additional reasons, Sun's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXXII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Sun and All Other Defendants Under Joint and Several Liability)

2926.    Molina incorporates by reference the preceding allegations.

2927.    Sun engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Sun's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Sun Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2928.    There was and is a gross disparity between the price for the Molina Purchases of Sun Drugs, and the value received, given that more cheaply priced Sun Drugs should have been available, and would have been available, absent Sun's illegal conduct.

2929.    By engaging in the foregoing conduct, Sun engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

      a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      b.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

      c.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

      d.    Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

      e.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.     N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.     N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.     S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.     Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.     Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.     Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT CXXIII

### UNJUST ENRICHMENT UNDER STATE LAW

#### (As to Sun and All Other Defendants Under Joint and Several Liability)

2930.   Molina incorporates by reference the preceding allegations.

2931.   Sun has benefitted from artificial prices in the sale of the Sun Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2932.   Sun's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Sun Drugs by Molina.

2933.   Molina has conferred upon Sun an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2934.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Sun Drugs.

2935.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Sun Drugs, as it is not liable and would not compensate Molina for the impact of Sun's unlawful conduct.

2936.   The economic benefit of overcharges derived by Sun through charging supracompetitive and artificially inflated prices for the Sun Drugs is a direct and proximate result of Sun's unlawful conduct.

2937.   The economic benefits derived by Sun rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Sun.

2938.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for

1   Sun to be permitted to retain any of the overcharges for the Sun Drugs derived from Sun's unfair and

2   unconscionable methods, acts, and trade practices alleged in this Complaint.

3       2939.   Sun is aware of and appreciates the benefits bestowed upon it by Molina.

4       2940.   Sun should be compelled to disgorge in a common fund for the benefit of Molina all

5   unlawful or inequitable proceeds it received.

6       2941.   A constructive trust should be imposed upon all unlawful or inequitable sums received

7   by Sun traceable to Molina.

8   **COUNT CXXIV**

9   **DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON**

10   **ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

11   **(As to Sun and All Other Defendants Under Joint and Several Liability)**

12       2942.   Molina incorporates by reference the preceding allegations.

13       2943.   Sun knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme

14   designed to artificially inflate prices of the Sun Drugs. Sun injured Molina through this conduct.

15       2944.   But for Sun's scheme to inflate the price of the Sun Drugs, Molina would have

16   purchased lower-priced Sun Drugs.

17       2945.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of

18   paying higher prices for the Sun Drugs than it would have paid absent Sun's continuing anticompetitive

19   conduct.

20       2946.   Molina has purchased substantial amounts of the Sun Drugs during the relevant period.

21       2947.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28

22   U.S.C. § 2201(a) ruling that Sun's conduct violates Sections 1 and 2 of the Sherman Act.

23       2948.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act,

24   15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by

25   Sun's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

26

27

28

**COUNT CXXV**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

**OF TRADE UNDER STATE LAWS**

**(As to Taro and All Other Defendants Under Joint and Several Liability)**

2949.    Molina incorporates by reference the preceding allegations.

2950.    Taro knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Taro Drugs"). This conspiracy was *per se* unlawful price-fixing.

Acetazolamide

Adapalene

Carbamazepine

Clobetasol Propionate

Clomipramine

Clotrimazole

Desonide

Econazole

Enalapril Maleate

Epitol

Etodolac

Fluocinonide

Ketoconazole

Nortriptyline HCL

Nystatin

Warfarin Sodium

2951.    Taro has committed at least one overt act to further the conspiracy alleged in this Complaint. Taro's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Taro Drugs throughout the United States.

2952.   The conspiracy realized its intended effect; Taro has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Taro Drugs.

2953.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Taro Drugs;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the Taro Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Taro Drugs was unlawfully restrained, suppressed, or eliminated.

2954.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Taro Drugs until the market achieves a steady state.

2955.   As a direct and proximate result of Taro's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Taro Drugs than it would have paid in the absence of Taro's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2956.   There is no legitimate, non-pretextual, pro-competitive business justification for Taro's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2957.   Taro's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2958.   Taro's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

      e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

      f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.  N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.  Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.  Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2959.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Taro's unlawful activities.

2960.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2961.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2962.    For these additional reasons, Taro's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXXVI

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Taro and All Other Defendants Under Joint and Several Liability)

2963.   Molina incorporates by reference the preceding allegations.

2964.   Taro engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Taro's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Taro Drugs at prices restrained by competition and forced to pay artificially inflated prices.

2965.   There was and is a gross disparity between the price for the Molina Purchases of Taro Drugs, and the value received, given that more cheaply priced Taro Drugs should have been available, and would have been available, absent Taro's illegal conduct.

2966.    By engaging in the foregoing conduct, Taro engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.       Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.       815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.       Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.       Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.       Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.       N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.       N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.       S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.       Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.       Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.       Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXXVII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Taro and All Other Defendants Under Joint and Several Liability)

2967.    Molina incorporates by reference the preceding allegations.

2968.    Taro has benefitted from artificial prices in the sale of the Taro Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

2969.    Taro's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Taro Drugs by Molina.

2970.    Molina has conferred upon Taro an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

2971.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Taro Drugs.

2972.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Taro Drugs, as it is not liable and would not compensate Molina for the impact of Taro's unlawful conduct.

2973.   The economic benefit of overcharges derived by Taro through charging supracompetitive and artificially inflated prices for the Taro Drugs is a direct and proximate result of Taro's unlawful conduct.

2974.   The economic benefits derived by Taro rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Taro.

2975.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Taro to be permitted to retain any of the overcharges for the Taro Drugs derived from Taro's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2976.   Taro is aware of and appreciates the benefits bestowed upon it by Molina.

2977.   Taro should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

2978.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Taro traceable to Molina.

**COUNT CXXVIII**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

**(As to Taro and All Other Defendants Under Joint and Several Liability)**

2979.   Molina incorporates by reference the preceding allegations.

2980.   Taro knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Taro Drugs. Taro injured Molina through this conduct.

2981.   But for Taro's scheme to inflate the price of the Taro Drugs, Molina would have purchased lower-priced Taro Drugs.

2982.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Taro Drugs than it would have paid absent Taro's continuing anticompetitive conduct.

2983.    Molina has purchased substantial amounts of the Taro Drugs during the relevant period.

2984.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Taro's conduct violates Sections 1 and 2 of the Sherman Act.

2985.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Taro's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXXIX

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT

## OF TRADE UNDER STATE LAWS

### (As to Teligent and All Other Defendants Under Joint and Several Liability)

2986.    Molina incorporates by reference the preceding allegations.

2987.    Teligent knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Teligent Drug"). This conspiracy was *per se* unlawful price-fixing.

Econazole

2988.    Teligent has committed at least one overt act to further the conspiracy alleged in this Complaint. Teligent's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Teligent Drug throughout the United States.

2989.    The conspiracy realized its intended effect; Teligent has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Teligent Drug.

2990.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teligent Drug;

b.   Molina was deprived of the benefits of free and open competition in the sale of the Teligent Drug in the United States market; and

c.   Competition in establishing the prices paid for the Teligent Drug was unlawfully restrained, suppressed, or eliminated.

2991.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Teligent Drug until the market achieves a steady state.

2992.   As a direct and proximate result of Teligent's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Teligent Drug than it would have paid in the absence of Teligent's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

2993.   There is no legitimate, non-pretextual, pro-competitive business justification for Teligent's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

2994.   Teligent's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

2995.   Teligent's conduct violated the following state antitrust or competition practices laws:

a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2996.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Teligent's unlawful activities.

2997.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

2998.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

2999.    For these additional reasons, Teligent's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXXX

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Teligent and All Other Defendants Under Joint and Several Liability)

3000.   Molina incorporates by reference the preceding allegations.

3001.   Teligent engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Teligent's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Teligent Drug at prices restrained by competition and forced to pay artificially inflated prices.

3002.   There was and is a gross disparity between the price for the Molina Purchases of Teligent Drug, and the value received, given that more cheaply priced Teligent Drug should have been available, and would have been available, absent Teligent's illegal conduct.

3003.   By engaging in the foregoing conduct, Teligent engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.    Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.    S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.    Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXXXI

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Teligent and All Other Defendants Under Joint and Several Liability)

3004.    Molina incorporates by reference the preceding allegations.

3005.    Teligent has benefitted from artificial prices in the sale of the Teligent Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

3006.    Teligent's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Teligent Drug by Molina.

3007.    Molina has conferred upon Teligent an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3008.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Teligent Drug.

3009.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Teligent Drug, as it is not liable and would not compensate Molina for the impact of Teligent's unlawful conduct.

3010.    The economic benefit of overcharges derived by Teligent through charging supracompetitive and artificially inflated prices for the Teligent Drug is a direct and proximate result of Teligent's unlawful conduct.

3011.   The economic benefits derived by Teligent rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Teligent.

3012.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Teligent to be permitted to retain any of the overcharges for the Teligent Drug derived from Teligent's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3013.   Teligent is aware of and appreciates the benefits bestowed upon it by Molina.

3014.   Teligent should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3015.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Teligent traceable to Molina.

## COUNT CXXXII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Teligent and All Other Defendants Under Joint and Several Liability)

3016.   Molina incorporates by reference the preceding allegations.

3017.   Teligent knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Teligent Drug. Teligent injured Molina through this conduct.

3018.   But for Teligent's scheme to inflate the price of the Teligent Drug, Molina would have purchased lower-priced Teligent Drug.

3019.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Teligent Drug than it would have paid absent Teligent's continuing anticompetitive conduct.

3020.   Molina has purchased substantial amounts of the Teligent Drug during the relevant period.

3021.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Teligent's conduct violates Sections 1 and 2 of the Sherman Act.

3022.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Teligent's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXXXIII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT

## OF TRADE UNDER STATE LAWS

## (As to UDL and All Other Defendants Under Joint and Several Liability)

3023.    Molina incorporates by reference the preceding allegations.

3024.    UDL knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "UDL Drug"). This conspiracy was *per se* unlawful price-fixing.

Propranolol HCL

3025.    UDL has committed at least one overt act to further the conspiracy alleged in this Complaint. UDL's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the UDL Drug throughout the United States.

3026.    The conspiracy realized its intended effect; UDL has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the UDL Drug.

3027.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the UDL Drug;

b.    Molina was deprived of the benefits of free and open competition in the sale of the UDL Drug in the United States market; and

c.    Competition in establishing the prices paid for the UDL Drug was unlawfully restrained, suppressed, or eliminated.

3028.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the UDL Drug until the market achieves a steady state.

3029.   As a direct and proximate result of UDL's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the UDL Drug than it would have paid in the absence of UDL's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3030.   There is no legitimate, non-pretextual, pro-competitive business justification for UDL's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3031.   UDL's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3032.   UDL's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

3033.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of UDL's unlawful activities.

3034.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

3035.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

3036.    For these additional reasons, UDL's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

### COUNT CXXXIV

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to UDL and All Other Defendants Under Joint and Several Liability)

3037.   Molina incorporates by reference the preceding allegations.

3038.   UDL engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of UDL's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the UDL Drug at prices restrained by competition and forced to pay artificially inflated prices.

3039.   There was and is a gross disparity between the price for the Molina Purchases of UDL Drug, and the value received, given that more cheaply priced UDL Drug should have been available, and would have been available, absent UDL's illegal conduct.

3040.   By engaging in the foregoing conduct, UDL engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

      a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

      c.     Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

      d.     Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

      e.     Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

      f.     N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

      g.     N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

      h.     S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXXXV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to UDL and All Other Defendants Under Joint and Several Liability)

3041.    Molina incorporates by reference the preceding allegations.

3042.    UDL has benefitted from artificial prices in the sale of the UDL Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

3043.    UDL's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the UDL Drug by Molina.

3044.    Molina has conferred upon UDL an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3045.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the UDL Drug.

3046.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the UDL Drug, as it is not liable and would not compensate Molina for the impact of UDL's unlawful conduct.

3047.    The economic benefit of overcharges derived by UDL through charging supracompetitive and artificially inflated prices for the UDL Drug is a direct and proximate result of UDL's unlawful conduct.

3048.    The economic benefits derived by UDL rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting UDL.

3049.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for UDL to be permitted to retain any of the overcharges for the UDL Drug derived from UDL's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3050.    UDL is aware of and appreciates the benefits bestowed upon it by Molina.

3051.   UDL should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3052.   A constructive trust should be imposed upon all unlawful or inequitable sums received by UDL traceable to Molina.

## COUNT CXXXVI

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to UDL and All Other Defendants Under Joint and Several Liability)

3053.   Molina incorporates by reference the preceding allegations.

3054.   UDL knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the UDL Drug. UDL injured Molina through this conduct.

3055.   But for UDL's scheme to inflate the price of the UDL Drug, Molina would have purchased lower-priced UDL Drug.

3056.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the UDL Drug than it would have paid absent UDL's continuing anticompetitive conduct.

3057.   Molina has purchased substantial amounts of the UDL Drug during the relevant period.

3058.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that UDL's conduct violates Sections 1 and 2 of the Sherman Act.

3059.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by UDL's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT

### OF TRADE UNDER STATE LAWS

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

3060.   Molina incorporates by reference the preceding allegations.

3061.   Upsher-Smith knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Upsher-Smith Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Baclofen
>
> Oxybutynin Chloride
>
> Propranolol HCL

3062.   Upsher-Smith has committed at least one overt act to further the conspiracy alleged in this Complaint. Upsher-Smith's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Upsher-Smith Drugs throughout the United States.

3063.   The conspiracy realized its intended effect; Upsher-Smith has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Upsher-Smith Drugs.

3064.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Upsher-Smith Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Upsher-Smith Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Upsher-Smith Drugs was unlawfully restrained, suppressed, or eliminated.

3065.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Upsher-Smith Drugs until the market achieves a steady state.

3066.   As a direct and proximate result of Upsher-Smith's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Upsher-Smith Drugs than it would have paid in the absence of Upsher-Smith's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3067.   There is no legitimate, non-pretextual, pro-competitive business justification for Upsher-Smith's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3068.   Upsher-Smith's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3069.   Upsher-Smith's conduct violated the following state antitrust or competition practices laws:

        a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

        b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

        c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

        d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

        e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

        f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

        g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

        h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

        i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

        j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

        k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

3070.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Upsher-Smith's unlawful activities.

3071.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

3072.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

3073.    For these additional reasons, Upsher-Smith's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

<div align="center">

**COUNT CXXXVIII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)**

</div>

3074.    Molina incorporates by reference the preceding allegations.

3075.    Upsher-Smith engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Upsher-Smith's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Upsher-Smith Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3076.    There was and is a gross disparity between the price for the Molina Purchases of Upsher-Smith Drugs, and the value received, given that more cheaply priced Upsher-Smith Drugs should have been available, and would have been available, absent Upsher-Smith's illegal conduct.

3077.    By engaging in the foregoing conduct, Upsher-Smith engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.    Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.    S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.    Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

**COUNT CXXXIX**

**UNJUST ENRICHMENT UNDER STATE LAW**

**(As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)**

3078.    Molina incorporates by reference the preceding allegations.

3079.    Upsher-Smith has benefitted from artificial prices in the sale of the Upsher-Smith Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3080.    Upsher-Smith's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Upsher-Smith Drugs by Molina.

3081.    Molina has conferred upon Upsher-Smith an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3082.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Upsher-Smith Drugs.

3083.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Upsher-Smith Drugs, as it is not liable and would not compensate Molina for the impact of Upsher-Smith's unlawful conduct.

3084.    The economic benefit of overcharges derived by Upsher-Smith through charging supracompetitive and artificially inflated prices for the Upsher-Smith Drugs is a direct and proximate result of Upsher-Smith's unlawful conduct.

3085.    The economic benefits derived by Upsher-Smith rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Upsher-Smith.

3086.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Upsher-Smith to be permitted to retain any of the overcharges for the Upsher-Smith Drugs derived from Upsher-Smith's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3087.    Upsher-Smith is aware of and appreciates the benefits bestowed upon it by Molina.

3088.    Upsher-Smith should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3089.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Upsher-Smith traceable to Molina.

## COUNT CXL

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

3090.   Molina incorporates by reference the preceding allegations.

3091.   Upsher-Smith knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Upsher-Smith Drugs. Upsher-Smith injured Molina through this conduct.

3092.   But for Upsher-Smith's scheme to inflate the price of the Upsher-Smith Drugs, Molina would have purchased lower-priced Upsher-Smith Drugs.

3093.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Upsher-Smith Drugs than it would have paid absent Upsher-Smith's continuing anticompetitive conduct.

3094.   Molina has purchased substantial amounts of the Upsher-Smith Drugs during the relevant period.

3095.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Upsher-Smith's conduct violates Sections 1 and 2 of the Sherman Act.

3096.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Upsher-Smith's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXLI

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

3097.   Molina incorporates by reference the preceding allegations.

3098.    Valeant knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Valeant Drug"). This conspiracy was *per se* unlawful price-fixing.

<center>Metronidazole</center>

3099.    Valeant has committed at least one overt act to further the conspiracy alleged in this Complaint. Valeant's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Valeant Drug throughout the United States.

3100.    The conspiracy realized its intended effect; Valeant has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Valeant Drug.

3101.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Valeant Drug;

      b.    Molina was deprived of the benefits of free and open competition in the sale of the Valeant Drug in the United States market; and

      c.    Competition in establishing the prices paid for the Valeant Drug was unlawfully restrained, suppressed, or eliminated.

3102.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Valeant Drug until the market achieves a steady state.

3103.    As a direct and proximate result of Valeant's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Valeant Drug than it would have paid in the absence of Valeant's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3104.    There is no legitimate, non-pretextual, pro-competitive business justification for Valeant's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3105. Valeant's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3106. Valeant's conduct violated the following state antitrust or competition practices laws:

    a. Ala. Code §6-5-60, with respect to purchases in Alabama.

    b. Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d. Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e. Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f. N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g. N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j. Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k. Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

3107. In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Valeant's unlawful activities.

3108. A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

3109. All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans. MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

3110. For these additional reasons, Valeant's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXLII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

3111. Molina incorporates by reference the preceding allegations.

3112.    Valeant engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Valeant's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Valeant Drug at prices restrained by competition and forced to pay artificially inflated prices.

3113.    There was and is a gross disparity between the price for the Molina Purchases of Valeant Drug, and the value received, given that more cheaply priced Valeant Drug should have been available, and would have been available, absent Valeant's illegal conduct.

3114.    By engaging in the foregoing conduct, Valeant engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

         a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

         b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

         c.     Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

         d.     Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

         e.     Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

         f.     N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

         g.     N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

         h.     S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

         i.     Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

         j.     Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

         k.     Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT CXLIII

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Valeant and All Other Defendants Under Joint and Several Liability)**

3115.    Molina incorporates by reference the preceding allegations.

3116.    Valeant has benefitted from artificial prices in the sale of the Valeant Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

3117.   Valeant's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Valeant Drug by Molina.

3118.   Molina has conferred upon Valeant an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3119.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Valeant Drug.

3120.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Valeant Drug, as it is not liable and would not compensate Molina for the impact of Valeant's unlawful conduct.

3121.   The economic benefit of overcharges derived by Valeant through charging supracompetitive and artificially inflated prices for the Valeant Drug is a direct and proximate result of Valeant's unlawful conduct.

3122.   The economic benefits derived by Valeant rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Valeant.

3123.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Valeant to be permitted to retain any of the overcharges for the Valeant Drug derived from Valeant's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3124.   Valeant is aware of and appreciates the benefits bestowed upon it by Molina.

3125.   Valeant should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3126.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Valeant traceable to Molina.

## COUNT CXLIV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Valeant and All Other Defendants Under Joint and Several Liability)

3127.   Molina incorporates by reference the preceding allegations.

3128.    Valeant knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Valeant Drug. Valeant injured Molina through this conduct.

3129.    But for Valeant's scheme to inflate the price of the Valeant Drug, Molina would have purchased lower-priced Valeant Drug.

3130.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Valeant Drug than it would have paid absent Valeant's continuing anticompetitive conduct.

3131.    Molina has purchased substantial amounts of the Valeant Drug during the relevant period.

3132.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Valeant's conduct violates Sections 1 and 2 of the Sherman Act.

3133.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Valeant's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXLV

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Versapharm and All Other Defendants Under Joint and Several Liability)**

3134.    Molina incorporates by reference the preceding allegations.

3135.    Versapharm knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Versapharm Drug"). This conspiracy was *per se* unlawful price-fixing.

Ethosuximide

3136.    Versapharm has committed at least one overt act to further the conspiracy alleged in this Complaint. Versapharm's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Versapharm Drug throughout the United States.

3137.    The conspiracy realized its intended effect; Versapharm has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Versapharm Drug.

3138.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Versapharm Drug;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the Versapharm Drug in the United States market; and

      c.   Competition in establishing the prices paid for the Versapharm Drug was unlawfully restrained, suppressed, or eliminated.

3139.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Versapharm Drug until the market achieves a steady state.

3140.    As a direct and proximate result of Versapharm's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Versapharm Drug than it would have paid in the absence of Versapharm's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3141.    There is no legitimate, non-pretextual, pro-competitive business justification for Versapharm's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3142.    Versapharm's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3143.    Versapharm's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

3144.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Versapharm's unlawful activities.

3145.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

3146.   All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

3147.    For these additional reasons, Versapharm's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

<div align="center">

**COUNT CXLVI**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Versapharm and All Other Defendants Under Joint and Several Liability)**

</div>

3148.   Molina incorporates by reference the preceding allegations.

3149.   Versapharm engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Versapharm's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Versapharm Drug at prices restrained by competition and forced to pay artificially inflated prices.

3150.   There was and is a gross disparity between the price for the Molina Purchases of Versapharm Drug, and the value received, given that more cheaply priced Versapharm Drug should have been available, and would have been available, absent Versapharm's illegal conduct.

3151.   By engaging in the foregoing conduct, Versapharm engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.     Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.     Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.     Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.     N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.     N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.     S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.     Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.     Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.     Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXLVII

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Versapharm and All Other Defendants Under Joint and Several Liability)**

3152.   Molina incorporates by reference the preceding allegations.

3153.   Versapharm has benefitted from artificial prices in the sale of the Versapharm Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

3154.   Versapharm's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Versapharm Drug by Molina.

3155.   Molina has conferred upon Versapharm an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3156.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Versapharm Drug.

3157.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Versapharm Drug, as it is not liable and would not compensate Molina for the impact of Versapharm's unlawful conduct.

3158.   The economic benefit of overcharges derived by Versapharm through charging supracompetitive and artificially inflated prices for the Versapharm Drug is a direct and proximate result of Versapharm's unlawful conduct.

3159.   The economic benefits derived by Versapharm rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Versapharm.

3160.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Versapharm to be permitted to retain any of the overcharges for the Versapharm Drug derived from Versapharm's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3161.   Versapharm is aware of and appreciates the benefits bestowed upon it by Molina.

3162.   Versapharm should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3163.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Versapharm traceable to Molina.

**COUNT CXLVIII**

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

**(As to Versapharm and All Other Defendants Under Joint and Several Liability)**

3164.   Molina incorporates by reference the preceding allegations.

3165.   Versapharm knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Versapharm Drug. Versapharm injured Molina through this conduct.

3166.   But for Versapharm's scheme to inflate the price of the Versapharm Drug, Molina would have purchased lower-priced Versapharm Drug.

3167.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Versapharm Drug than it would have paid absent Versapharm's continuing anticompetitive conduct.

3168.   Molina has purchased substantial amounts of the Versapharm Drug during the relevant period.

3169.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Versapharm's conduct violates Sections 1 and 2 of the Sherman Act.

3170.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Versapharm's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

<div align="center">

**COUNT CXLIX**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

**OF TRADE UNDER STATE LAWS**

**(As to West-Ward and All Other Defendants Under Joint and Several Liability)**

</div>

3171.   Molina incorporates by reference the preceding allegations.

3172.   West-Ward knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "West-Ward Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Digoxin
>
> Doxycycline

3173.   West-Ward has committed at least one overt act to further the conspiracy alleged in this Complaint. West-Ward's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the West-Ward Drugs throughout the United States.

3174.   The conspiracy realized its intended effect; West-Ward has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the West-Ward Drugs.

3175.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the West-Ward Drugs;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the West-Ward Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the West-Ward Drugs was unlawfully restrained, suppressed, or eliminated.

3176.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the West-Ward Drugs until the market achieves a steady state.

3177.   As a direct and proximate result of West-Ward's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the West-Ward Drugs than it would have paid in the absence of West-Ward's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3178.   There is no legitimate, non-pretextual, pro-competitive business justification for West-Ward's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3179.   West-Ward's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3180.   West-Ward's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

1      e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

2      f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

3      g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

4      h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

5      i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

6      j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

7      k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

8      3181.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade

9  and commerce in California (both intrastate and interstate) as a result of West-Ward's unlawful

10 activities.

11      3182.   A substantial number of significant events to the conspiracy took place and were

12 performed in California, including communications in furtherance of the conspiracy that were sent

13 from or received in California.

14      3183.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately

15 financially responsible for the financial performance of all state health plans.  MHI is the assignee of

16 claims from Molina's subsidiary state health plans as described in paragraph 154.

17      3184.    For these additional reasons, West-Ward's conduct violated Cal. Bus. & Prof. Code §§

18 16700, et seq.

**COUNT CL**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to West-Ward and All Other Defendants Under Joint and Several Liability)**

22      3185.   Molina incorporates by reference the preceding allegations.

23      3186.   West-Ward engaged in unfair competition or unfair, unconscionable, deceptive, or

24 fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a

25 direct and proximate result of West-Ward's anticompetitive, deceptive, unfair, unconscionable, and

26 fraudulent conduct, Molina was deprived of the opportunity to purchase the West-Ward Drugs at

27 prices restrained by competition and forced to pay artificially inflated prices.

28

3187.   There was and is a gross disparity between the price for the Molina Purchases of West-Ward Drugs, and the value received, given that more cheaply priced West-Ward Drugs should have been available, and would have been available, absent West-Ward's illegal conduct.

3188.   By engaging in the foregoing conduct, West-Ward engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

        a.      Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

        b.      815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

        c.      Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

        d.      Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

        e.      Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

        f.      N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

        g.      N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

        h.      S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

        i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

        j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

        k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CLI

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to West-Ward and All Other Defendants Under Joint and Several Liability)

3189.   Molina incorporates by reference the preceding allegations.

3190.   West-Ward has benefitted from artificial prices in the sale of the West-Ward Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3191.   West-Ward's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the West-Ward Drugs by Molina.

3192.   Molina has conferred upon West-Ward an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3193. It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the West-Ward Drugs.

3194. It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the West-Ward Drugs, as it is not liable and would not compensate Molina for the impact of West-Ward's unlawful conduct.

3195. The economic benefit of overcharges derived by West-Ward through charging supracompetitive and artificially inflated prices for the West-Ward Drugs is a direct and proximate result of West-Ward's unlawful conduct.

3196. The economic benefits derived by West-Ward rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting West-Ward.

3197. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for West-Ward to be permitted to retain any of the overcharges for the West-Ward Drugs derived from West-Ward's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3198. West-Ward is aware of and appreciates the benefits bestowed upon it by Molina.

3199. West-Ward should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3200. A constructive trust should be imposed upon all unlawful or inequitable sums received by West-Ward traceable to Molina.

## COUNT CLII

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

**(As to West-Ward and All Other Defendants Under Joint and Several Liability)**

3201. Molina incorporates by reference the preceding allegations.

3202. West-Ward knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the West-Ward Drugs. West-Ward injured Molina through this conduct.

3203.    But for West-Ward's scheme to inflate the price of the West-Ward Drugs, Molina would have purchased lower-priced West-Ward Drugs.

3204.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the West-Ward Drugs than it would have paid absent West-Ward's continuing anticompetitive conduct.

3205.    Molina has purchased substantial amounts of the West-Ward Drugs during the relevant period.

3206.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that West-Ward's conduct violates Sections 1 and 2 of the Sherman Act.

3207.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by West-Ward's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

<div align="center">

**COUNT CLIII**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

**OF TRADE UNDER STATE LAWS**

**(As to Wockhardt and All Other Defendants Under Joint and Several Liability)**

</div>

3208.    Molina incorporates by reference the preceding allegations.

3209.    Wockhardt knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Wockhardt Drugs"). This conspiracy was *per se* unlawful price-fixing.

<div align="center">

Clobetasol Propionate

Enalapril Maleate

</div>

3210.    Wockhardt has committed at least one overt act to further the conspiracy alleged in this Complaint. Wockhardt's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Wockhardt Drugs throughout the United States.

3211.   The conspiracy realized its intended effect; Wockhardt has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Wockhardt Drugs.

3212.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Wockhardt Drugs;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the Wockhardt Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Wockhardt Drugs was unlawfully restrained, suppressed, or eliminated.

3213.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Wockhardt Drugs until the market achieves a steady state.

3214.   As a direct and proximate result of Wockhardt's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Wockhardt Drugs than it would have paid in the absence of Wockhardt's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3215.   There is no legitimate, non-pretextual, pro-competitive business justification for Wockhardt's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3216.   Wockhardt's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3217.   Wockhardt's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

3218.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Wockhardt's unlawful activities.

3219.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

3220.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

3221.    For these additional reasons, Wockhardt's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

**COUNT CLIV**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Wockhardt and All Other Defendants Under Joint and Several Liability)**

3222.   Molina incorporates by reference the preceding allegations.

3223.   Wockhardt engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Wockhardt's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Wockhardt Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3224.   There was and is a gross disparity between the price for the Molina Purchases of Wockhardt Drugs, and the value received, given that more cheaply priced Wockhardt Drugs should have been available, and would have been available, absent Wockhardt's illegal conduct.

3225.   By engaging in the foregoing conduct, Wockhardt engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

      a.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      b.     815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

      c.     Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

      d.     Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

      e.     Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

      f.     N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

      g.     N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

      h.     S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

      i.     Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

      j.     Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

      k.     Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT CLV

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Wockhardt and All Other Defendants Under Joint and Several Liability)**

3226.   Molina incorporates by reference the preceding allegations.

3227.   Wockhardt has benefitted from artificial prices in the sale of the Wockhardt Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3228.   Wockhardt's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Wockhardt Drugs by Molina.

3229.   Molina has conferred upon Wockhardt an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3230.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Wockhardt Drugs.

3231.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Wockhardt Drugs, as it is not liable and would not compensate Molina for the impact of Wockhardt's unlawful conduct.

3232.    The economic benefit of overcharges derived by Wockhardt through charging supracompetitive and artificially inflated prices for the Wockhardt Drugs is a direct and proximate result of Wockhardt's unlawful conduct.

3233.    The economic benefits derived by Wockhardt rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Wockhardt.

3234.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Wockhardt to be permitted to retain any of the overcharges for the Wockhardt Drugs derived from Wockhardt's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3235.    Wockhardt is aware of and appreciates the benefits bestowed upon it by Molina.

3236.    Wockhardt should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3237.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Wockhardt traceable to Molina.

<div align="center">COUNT CLVI</div>

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

**(As to Wockhardt and All Other Defendants Under Joint and Several Liability)**

3238.    Molina incorporates by reference the preceding allegations.

3239.    Wockhardt knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Wockhardt Drugs. Wockhardt injured Molina through this conduct.

1    3240.   But for Wockhardt's scheme to inflate the price of the Wockhardt Drugs, Molina would

2 have purchased lower-priced Wockhardt Drugs.

3    3241.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of

4 paying higher prices for the Wockhardt Drugs than it would have paid absent Wockhardt's continuing

5 anticompetitive conduct.

6    3242.   Molina has purchased substantial amounts of the Wockhardt Drugs during the relevant

7 period.

8    3243.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28

9 U.S.C. § 2201(a) ruling that Wockhardt's conduct violates Sections 1 and 2 of the Sherman Act.

10    3244.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act,

11 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by

12 Wockhardt's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not

13 recur.

14                              **COUNT CLVII**

15          **FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

16                    **OF TRADE UNDER STATE LAWS**

17      **(As to Zydus and All Other Defendants Under Joint and Several Liability)**

18    3245.   Molina incorporates by reference the preceding allegations.

19    3246.   Zydus knowingly, intentionally, and conspiratorially engaged in anticompetitive

20 agreements designed to drive up the cost of at least the drugs listed below in the United States (the

21 "Zydus Drugs"). This conspiracy was *per se* unlawful price-fixing.

22              Acetazolamide

23              Clarithromycin ER

24              Divalproex Sodium ER

25              Etodolac

26              Fenofibrate

27              Niacin ER

28              Paricalcitol

Pravastatin

Topiramate Sprinkle

Warfarin Sodium

3247.   Zydus has committed at least one overt act to further the conspiracy alleged in this Complaint. Zydus' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Zydus Drugs throughout the United States.

3248.   The conspiracy realized its intended effect; Zydus has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Zydus Drugs.

3249.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Zydus Drugs;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the Zydus Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Zydus Drugs was unlawfully restrained, suppressed, or eliminated.

3250.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Zydus Drugs until the market achieves a steady state.

3251.   As a direct and proximate result of Zydus' unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Zydus Drugs than it would have paid in the absence of Zydus' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3252.   There is no legitimate, non-pretextual, pro-competitive business justification for Zydus' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3253.   Zydus' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3254.   Zydus' conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

3255.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Zydus' unlawful activities.

3256.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

3257.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

3258.    For these additional reasons, Zydus' conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

### COUNT CLVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

3259.   Molina incorporates by reference the preceding allegations.

3260.   Zydus engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and

proximate result of Zydus' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Zydus Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3261.   There was and is a gross disparity between the price for the Molina Purchases of Zydus Drugs, and the value received, given that more cheaply priced Zydus Drugs should have been available, and would have been available, absent Zydus' illegal conduct.

3262.   By engaging in the foregoing conduct, Zydus engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

   a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

   c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

   d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

   e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

   f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

   h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

   i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

   j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

   k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT CLIX

### UNJUST ENRICHMENT UNDER STATE LAW

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

3263.   Molina incorporates by reference the preceding allegations.

3264.   Zydus has benefitted from artificial prices in the sale of the Zydus Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3265.   Zydus' financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Zydus Drugs by Molina.

3266.   Molina has conferred upon Zydus an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3267.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Zydus Drugs.

3268.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Zydus Drugs, as it is not liable and would not compensate Molina for the impact of Zydus' unlawful conduct.

3269.   The economic benefit of overcharges derived by Zydus through charging supracompetitive and artificially inflated prices for the Zydus Drugs is a direct and proximate result of Zydus' unlawful conduct.

3270.   The economic benefits derived by Zydus rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Zydus.

3271.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Zydus to be permitted to retain any of the overcharges for the Zydus Drugs derived from Zydus' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3272.   Zydus is aware of and appreciates the benefits bestowed upon it by Molina.

3273.   Zydus should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3274.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Zydus traceable to Molina.

## COUNT CLX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Zydus and All Other Defendants Under Joint and Several Liability)

3275.   Molina incorporates by reference the preceding allegations.

3276.   Zydus knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Zydus Drugs. Zydus injured Molina through this conduct.

3277.   But for Zydus' scheme to inflate the price of the Zydus Drugs, Molina would have purchased lower-priced Zydus Drugs.

3278.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Zydus Drugs than it would have paid absent Zydus' continuing anticompetitive conduct.

3279.   Molina has purchased substantial amounts of the Zydus Drugs during the relevant period.

3280.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Zydus' conduct violates Sections 1 and 2 of the Sherman Act.

3281.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Zydus' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

<div align="center">

**COUNT CLXI**

**FOR CONSPIRACY AND COMBINATION IN RESTRAINT**

**OF TRADE UNDER STATE LAWS (ALL SUBJECT DRUGS)**

**(As to All Defendants)**

</div>

3282.   Molina incorporates by reference the preceding allegations.

3283.   Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

3284.   Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Subject Drug prices throughout the United States.

3285.   The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

3286.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a. Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

b. Molina was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

c. Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

3287. Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

3288. As a direct and proximate result of Defendants' unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Subject Drugs than it would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3289. There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3290. Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3291. Defendants' conduct violated the following state antitrust or competition practices laws:

a. Ala. Code §6-5-60, with respect to purchases in Alabama.

b. Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d. Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e. Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f. N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g. N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j. Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

1        k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

2        3292.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade

3    and commerce in California (both intrastate and interstate) as a result of Defendants' unlawful

4    activities.

5        3293.   A substantial number of significant events to the conspiracy took place and were

6    performed in California, including communications in furtherance of the conspiracy that were sent

7    from or received in California.

8        3294.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately

9    financially responsible for the financial performance of all state health plans.  MHI is the assignee of

10   claims from Molina's subsidiary state health plans as described in paragraph 154.

11       3295.    For these additional reasons, Defendants' conduct violated Cal. Bus. & Prof. Code §§

12   16700, et seq.

13

14                                   **COUNT CLXII**

15       **UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

16                                (ALL SUBJECT DRUGS)

17                               (As to All Defendants)

18       3296.   Molina incorporates by reference the preceding allegations.

19       3297.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or

20   fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a

21   direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and

22   fraudulent conduct, Molina was deprived of the opportunity to purchase the Subject Drugs at prices

23   restrained by competition and forced to pay artificially inflated prices.

24       3298.   There was and is a gross disparity between the price for the Molina Purchases of the

25   Subject Drugs, and the value received, given that more cheaply priced generic drugs should have been

26   available, and would have been available, absent Defendants' illegal conduct.

27

28

3299.    By engaging in the foregoing conduct, Defendants engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.      Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.      815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.      Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.      Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.      Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.      N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.      N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.      S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.      Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.      Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.      Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

**COUNT CLXIII**

**UNJUST ENRICHMENT UNDER STATE LAW (ALL SUBJECT DRUGS)**

**(As to All Defendants)**

3300.    Molina incorporates by reference the preceding allegations.

3301.    Defendants have benefitted from artificial prices in the sale of the Subject Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3302.    Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for the Subject Drugs by Molina.

3303.    Molina has conferred upon Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3304.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Subject Drugs.

3305.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Subject Drugs, as it is not liable and would not compensate Molina for the impact of Defendants' unlawful conduct.

3306.   The economic benefit of overcharges derived by Defendants through charging supracompetitive and artificially inflated prices for the Subject Drugs is a direct and proximate result of Defendants' unlawful conduct.

3307.   The economic benefits derived by Defendants rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant periods, benefiting Defendants.

3308.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for the Subject Drugs derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3309.   Defendants are aware of and appreciate the benefits bestowed upon them by Molina.

3310.   Defendants should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds they received.

3311.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Molina.

## COUNT CLXIV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)

### (As to All Defendants)

3312.   Molina incorporates by reference the preceding allegations.

3313.   Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Subject Drugs. Defendants injured Molina through this conduct.

3314.   But for Defendants' scheme to inflate the price of the Subject Drugs, Molina would have purchased lower-priced Subject Drugs.

3315.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Subject Drugs than it would have paid absent Defendants' continuing anticompetitive conduct.

3316.   Molina has purchased substantial amounts of the Subject Drugs during the relevant periods.

3317.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

3318.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## XXI.   DEMAND FOR JUDGMENT

WHEREFORE, Molina demands judgment against Defendants, as follows:

A.  Declaring the acts alleged herein to constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. §§ 1-2;

B.  Judgment against Defendants, jointly and severally, awarding Molina actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre-judgment and post-judgment interest at the statutory rates;

C.  Awarding Molina its reasonable costs and expenses, including attorneys' fees; and

D.  Awarding all other legal or equitable relief as the Court deems just and proper.

## XXII.  JURY DEMAND

Molina demands a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: December 27, 2019                    Respectfully submitted:

By: _/s/ Todd M. Schneider_
Todd M. Schneider
Jason H. Kim
Kyle G. Bates

1                                   SCHNEIDER WALLACE COTTRELL

KONECKY WOTKYNS LLP

2000 Powell Street, Suite 1400

Emeryville, California 94608

Tel. 415-421-7100

tschneider@schneiderwallace.com

jkim@schneiderwallace.com

kbates@schneiderwallace.com

Peter D. St. Phillip

Jennifer Risener

Lee Yun Kim

LOWEY DANNENBERG, P.C.

44 South Broadway, Suite 1100

White Plains, New York 10601

Tel. 914-997-0500

PStPhillip@lowey.com

JRisener@lowey.com

LKim@lowey.com

Laura K. Mummert

LOWEY DANNEBERG, P.C.

One Tower Bridge

100 Front Street, Suite 520

West Conshohocken, Pennsylvania 19428

Tel: 215-399-4770

LMummert@lowey.com

*Counsel for Plaintiff*

---

COMPLAINT AND DEMAND FOR JURY TRIAL