REDACTED – PUBLIC VERSION

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MOLINA HEALTHCARE, INC., | | Civil Action No. 16-MD-2724 |
| | Plaintiff, | |
| | | HON. CYNTHIA M. RUFE |
| v. | | |
| | | Individual Case No. 2:20-cv-00695-CMR |
| ACTAVIS ELIZABETH, LLC; | | |
| ACTAVIS HOLDCO US, INC.; | | |
| ACTAVIS PHARMA, INC.; | | AMENDED COMPLAINT |
| AKORN, INC.; | | |
| ALVOGEN, INC.; | | JURY TRIAL DEMANDED |
| AMNEAL PHARMACEUTICALS, LLC; | | |
| APOTEX CORP.; | | |
| ASCEND LABORATORIES, LLC; | | |
| AUROBINDO PHARMA USA, INC.; | | |
| BARR PHARMACEUTICALS, LLC; | | |
| BAUSCH HEALTH AMERICAS, INC. F/K/A VALEANT PHARMACEUTICALS INTERNATIONAL, INC.; | | |
| BAUSCH HEALTH US, LLC F/K/A VALEANT PHARMACEUTICALS NORTH AMERICA LLC; | | |
| BRECKENRIDGE PHARMACEUTICAL, INC.; | | |
| CAMBER PHARMACEUTICALS, INC.; | | |
| CITRON PHARMA, LLC; | | |
| DAVA PHARMACEUTICALS, LLC; | | |
| DR. REDDY'S LABORATORIES INC.; | | |
| EMCURE PHARMACEUTICALS, LTD.; | | |
| ENDO INTERNATIONAL PLC; | | |
| EPIC PHARMA, LLC; | | |
| FOUGERA PHARMACEUTICALS INC.; | | |
| G&W LABORATORIES, INC.; | | |
| GENERICS BIDCO I, LLC; | | |
| GLENMARK PHARMACEUTICALS INC., USA; | | |
| GREENSTONE LLC; | | |
| HERITAGE PHARMACEUTICALS INC.; | | |
| HIKMA PHARMACEUTICALS USA INC. F/K/A WEST-WARD PHARMACEUTICALS CORP.; | | |
| HI-TECH PHARMACAL CO., INC.; | | |
| IMPAX LABORATORIES, LLC F/K/A/ IMPAX LABORATORIES, INC.; | | |
| JUBILANT CADISTA PHARMACEUTICALS INC.; | | |
| LANNETT COMPANY, INC.; | | |
| LUPIN PHARMACEUTICALS, INC.; | | |
| MAYNE PHARMA, INC.; | | |
| MORTON GROVE PHARMACEUTICALS, INC.; | | |
| MUTUAL PHARMACEUTICAL COMPANY, INC.; | | |

REDACTED – PUBLIC VERSION

MYLAN, INC.;
MYLAN, N.V.;
MYLAN PHARMACEUTICALS, INC.;
OCEANSIDE PHARMACEUTICALS, INC.;
PAR PHARMACEUTICAL COMPANIES, INC.;
PAR PHARMACEUTICAL, INC.;
PERRIGO COMPANY PLC;
PERRIGO NEW YORK, INC.;
PFIZER, INC.;
PLIVA, INC.;
SANDOZ, INC.;
STRIDES PHARMA, INC.;
SUN PHARMACEUTICAL INDUSTRIES, INC.;
TARO PHARMACEUTICALS INDUSTRIES LTD;
TARO PHARMACEUTICALS USA, INC.;
TELIGENT, INC. F/K/A IGI LABORATORIES, INC.;
TEVA PHARMACEUTICALS USA, INC.;
TORRENT PHARMA INC.;
UDL LABORATORIES INC.;
UPSHER-SMITH LABORATORIES, LLC;
URL PHARMA, INC.;
VERSAPHARM, INC.;
WOCKHARDT USA LLC; AND
ZYDUS PHARMACEUTICALS (USA) INC.,

Defendants.

REDACTED – PUBLIC VERSION

## TABLE OF CONTENTS

I.     NATURE OF THE CASE                                                                                   2

II.    THE DRUGS SUBJECT TO THE CONSPIRACY                                                 7

III.   JURISDICTION AND VENUE                                                                          31

IV.    THE PARTIES                                                                                               32

    A.    Plaintiff ..................................................................................................32

    B.    Defendants ...........................................................................................33

    C.    Co-Conspirators ...................................................................................48

V.     REGULATORY AND ECONOMIC BACKGROUND                                          49

    A.    Generic Drugs Should Provide Lower-Priced Options for Purchasers ......................49

    B.    The Prescription Drug Market .............................................................51

    C.    The Prescription Drug Distribution System ........................................52

    D.    The Market for Generic Drugs is Highly Susceptible to Collusion ............................54

VI.    GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY                          57

    A.    Congress Launched an Investigation into Generic Price Hikes ....................57

    B.    The DOJ Investigates Criminal Generic Drug Collusion ...................60

    C.    State Attorneys General Launch Their Own Investigation .................67

VII.   THE GENERIC DRUG MARKET                                                                  70

    A.    The Cozy Nature of the Industry and Opportunities for Collusion ............................70

        1.    Trade Association Meetings and Conferences ...........................71

            a.    National Association of Chain Drug Stores .......................73

            b.    Generic Pharmaceutical Association ....................................73

            c.    Healthcare Distribution Management Association .............................76

            d.    Efficient Collaborative Retail Marketing ...........................77

            e.    Minnesota Multistate Contracting Pharmacy Alliance ......................78

REDACTED – PUBLIC VERSION

    f.   Healthcare Supply Chain Association .................................................78

  2.   Industry Dinners and Private Meetings .................................................79

  3.   Personal Telephone Calls, E-Mails, and Text Message Communications ......82

 B. The Overarching Conspiracy Between Generic Drug Manufacturers – Playing Nice in the Sandbox ..................................................................................................83

 C. Generic Drug Price Spikes Since 2013 ............................................................99

VIII. THE CONSPIRACY         100

IX. HERITAGE         102

 A. Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion .............................................................................................................. 102

  1.   Nimodipine ............................................................................... 102

    a.   The Heritage/Sun Agreement ............................................... 102

    b.   The Heritage/Ascend Agreement .......................................... 106

  2.   Zoledronic Acid ....................................................................... 108

  3.   Meprobamate .......................................................................... 111

  4.   Doxy DR ................................................................................. 112

    a.   The Heritage/Mylan Agreement ........................................... 112

      i.   Wholesaler A    114

      ii.   The Pharmacy    115

      iii.   Other Customer Accounts    117

    b.   The Heritage/Mayne Agreement .......................................... 117

  5.   Hydralazine HCL ...................................................................... 125

 A. Agreements to Fix Prices .............................................................................. 125

  1.   Doxy Mono .............................................................................. 125

  2.   Heritage 2014 Price Increases .................................................... 132

    a.   Acetazolamide .................................................................... 136

REDACTED – PUBLIC VERSION

|   |   |   | i. | Acetazolamide tablets | 136 |
|---|---|---|---|---|---|
|   |   |   | ii. | Acetazolamide ER capsules | 145 |
|   |   | b. | Fosinopril HCTZ ................................................... | | 148 |
|   |   | c. | Glipizide-Metformin ................................................ | | 150 |
|   |   | d. | Glyburide ............................................................. | | 151 |
|   |   | e. | Glyburide-Metformin .............................................. | | 153 |
|   |   | f. | Leflunomide ......................................................... | | 155 |
|   |   | g. | Methimazole ......................................................... | | 157 |
|   |   | h. | Nystatin .............................................................. | | 160 |
|   |   |   | i. | Nystatin Cream | 160 |
|   |   |   | ii. | Nystatin Ointment | 162 |
|   |   |   | iii. | Nystatin Tablets | 167 |
|   |   | i. | Paromomycin ....................................................... | | 171 |
|   |   | j. | Theophylline ER.................................................... | | 172 |
|   |   | k. | Verapamil............................................................. | | 176 |
| X. | TEVA | | | | 179 |
|   | A. | Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors ... | | | 179 |
|   |   | 1. | April 2013: Teva Hires Nisha Patel.................................... | | 180 |
|   |   | 2. | Ranking "Quality of Competition" to Identify Price Increase Candidates . | | | 183 |
|   |   |   | a. | The "High Quality" Competitor Relationships ................................. | 184 |
|   |   |   | b. | Mylan (+3) ................................................. | 185 |
|   |   |   | c. | Watson/Actavis (+3) ...................................... | 186 |
|   |   |   | d. | Sandoz (+3) ................................................ | 187 |
|   |   |   | e. | Glenmark (+3) ............................................. | 187 |
|   |   |   | f. | Taro (+3) ................................................... | 188 |

iii

        g.      Lupin (+2) ........................................................................................ 188

B.     Price Increase Hiatus.................................................................................... 189

C.     New Relationships Emerge.......................................................................... 190

D.    Competitors Become "High Quality" After Successfully Colluding With Teva...... 190

E.     Quality Competitors Collude With Each Other, Sandoz/Mylan ............................. 191

F.     Commitment to the Overarching Conspiracy ..................................................... 191

G.    Low Quality Competitors Comply with the Overarching Conspiracy ..................... 193

H.    Individual Relationships ................................................................................ 193

      1.      Ara Aprahamian ..................................................................... 194

      2.      David Berthold ....................................................................... 194

      3.      Jim Brown ............................................................................. 196

      4.      Maureen Cavanaugh ............................................................... 197

      5.      Marc Falkin .......................................................................... 197

      6.      Jim Grauso ........................................................................... 199

      7.      Kevin Green .......................................................................... 202

      8.      Armando Kellum ................................................................... 204

      9.      Jill Nailor ............................................................................. 205

      10.     James Nesta ........................................................................... 207

      11.     Konstantin Ostaficiuk ............................................................. 208

      12.     Nisha Patel ............................................................................ 209

      13.     David Rekenthaler .................................................................. 210

      14.     Rick Rogerson ....................................................................... 212

      15.     Tracy Sullivan ....................................................................... 212

I.      Teva Profitability Increases Dramatically........................................................ 213

J.     Teva and its Executives Knowingly Violated the Antitrust Laws ............................ 214

K.     Price Increases Slow Dramatically After Government Investigations Commence . 217

XI.     TOPICAL DRUGS CONSPIRACY     219

A.     Overview of the Topical Drugs Conspiracy.................................................. 219

1.     The Early Days—Collusion From 2009 To Early 2012 ............................... 231

a.     Key Relationships Among Generic Topical Manufacturers ........... 231

i.     Fougera/Perrigo/Taro     232

ii.     Actavis and Taro/Perrigo     233

iii.     Sandoz/Taro     234

b.     Long-Standing Competitor Relationships Lead to Collusion.......... 235

i.     Clotrimazole Betamethasone Dipropionate Cream and Lotion     235

(a)     March And April 2011 - Actavis Raises Prices And Fougera And Taro Follow     235

(b)     Taro Increases Prices On CBD Cream In April 2012 While Actavis And Fougera Play Nice In The Sandbox     239

(c)     Fougera And Taro Raise CBD Lotion  Prices In Late 2012/Early 2013     240

ii.     Erythromycin Base/Ethyl Alcohol Solution     242

c.     G&W And Its Relationships.................................................. 250

i.     G&W/Fougera     250

(a)     *Calcipotriene Solution*     252

*ii.*     *G&W/Glenmark*     253

d.     Additional Collusive Relationships..................................... 254

2.     Focus On Price Increases Intensifies – Collusion From Late 2012 - 2016. 254

a.     Shifts In The Market Foster Collusion ................................ 254

b.     Post-Fougera Acquisition, Sandoz Sales Executives Feel Pressure To Demonstrate Their Value ................................ 256

REDACTED – PUBLIC VERSION

c.     Key Relationships Emerge And Existing Relationships Strengthen ..................................................................................... 257

     i.     Sandoz/Taro     258

          (a)     CW-3's Relationships With Aprahamian And H.M. Of Taro     258

          (b)     CW-4's Relationship With D.S. Of Taro     261

          (c)     CW-3's Relationship With T.P. Of Perrigo     262

          (d)     Perfetto's Relationship With Boothe Of Perrigo     263

          (e)     Sandoz Management Knew Of, And Encouraged, The Collusion With Competitors     264

3.     Taro Emerges As A Leader Among Generic Topical Manufacturers ......... 265

     a.     Increased Focus On Fair Share And Price Increases ...................... 265

          i.     Setting the Stage For Future Collusion—Aprahamian And CW-3 Collude On Products Where Sandoz And Actavis Competed     270

          ii.     Aprahamian Moves To Taro And Immediately Begins Colluding With CW-3 On Products On Which Sandoz And Taro Overlap     270

          iii.     Aprahamian And Perfetto Orchestrate And Lead Price Increases On A Number Of Key Products In May 2013     270

          *iv.*     ***Aprahamian And Perfetto Communicate And Coordinate With Their Competitors In Advance Of The May 2013 Increases***     271

          v.     Taro's Competitors Uniformly Declined To Bid On Taro Customers And Followed The May 2013 Increases     277

     b.     Building Upon Early Successes—Taro's Continued Collusion Over The Ensuing Years ............................................................... 283

          vi.     Taro's June 2014 Price Increases     284

4.     Sandoz And Its Other Relationships ................................................. 290

     a.     Collusion Between Sandoz And Perrigo ............................. 292

          i.     Calcipotriene Betamethasone Dipropionate Ointment     292

REDACTED – PUBLIC VERSION

|  |  |  |  |  |
|---|---|---|---|---|
| | | ii. | Tacrolimus Ointment | 300 |
| | | iii. | Methazolamide Tablets | 303 |
| | b. | Collusion Between Sandoz And Glenmark | | 306 |
| | | i. | Fluticasone Propionate | 307 |
| | | ii. | Desoximetasone Ointment | 314 |
| | | | (a) | Sandoz Entry (September 2012) | 314 |
| | | | (b) | Glenmark Entry (September 2013) | 317 |
| | c. | Collusion Between Sandoz And Aurobindo | | 320 |
| | | i. | Oxacillin Sodium and Nafcillin Sodium Injectable Vials | 321 |
| | | ii. | Cefpodoxime Proxetil Oral Suspension and Tablets | 323 |
| | d. | Collusion Between Sandoz and non-defendant Rising | | 329 |
| 5. | G&W And Its Other Relationships | | | 329 |
| | a. | Collusion Between G&W And Perrigo | | 332 |
| | | i. | Hydrocortisone Acetate Suppositories | 333 |
| | b. | Collusion Between G&W And Actavis | | 338 |
| | | i. | Promethazine HCL Suppositories | 339 |
| | c. | Collusion Between G&W And Glenmark | | 346 |
| | | i. | Mometasone Furoate | 346 |
| | d. | Collusion Between G&W And Lupin | | 351 |
| | | i. | Ethambutol HCL Tablets | 351 |
| B. | The Defendants' Profitability Increases Dramatically As A Result Of Collusive Conduct | | | 355 |
| 1. | Taro And Perrigo's Profits Increased Over 1300% From 2008 To Early 2016 | | | 356 |
| | a. | Taro | | 356 |
| | b. | Perrigo | | 358 |

**REDACTED – PUBLIC VERSION**

2. Other Defendants' Revenues And Profits Also Multiply From 2008 To Early 2016 ................................................................................................ 359

XII. THE OVERARCHING CONSPIRACY IN OPERATION WITH RESPECT TO THE SUBJECT DRUGS                                                                          361

A. Customer and Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion.............................................................................. 361

1. Teva/Mylan.............................................................................................. 361

a. Fenofibrate .................................................................................. 361

b. Clonidine TTS.............................................................................. 364

c. Tolterodine ER ............................................................................ 369

d. Capecitabine ............................................................................... 373

2. Teva/Sandoz ............................................................................................ 376

a. Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa) ............. 376

b. Temozolomide............................................................................. 377

c. Tobramycin ................................................................................. 381

d. Dexmethylphenidate HCL ER ...................................................... 383

3. Teva/Lupin .............................................................................................. 385

a. Lamivudine/Zidovudine (Combivir) ............................................. 385

b. Irbesartan.................................................................................... 389

c. Drospirenone and Ethinyl Estradiol (Ocella) ................................. 390

d. Norethindrone/Ethinyl Estradiol.................................................. 393

4. Teva/Greenstone ..................................................................................... 394

a. Oxaprozin................................................................................... 394

b. Tolterodine Tartrate .................................................................... 398

c. Piroxicam.................................................................................... 400

d. Cabergoline................................................................................. 403

5. Teva/Actavis ........................................................................................... 404

**REDACTED – PUBLIC VERSION**

|   |   |   |   |
|---|---|---|---|
| | a. | Amphetamine/Dextroamphetamine ER | 404 |
| | b. | Amphetamine/Dextroamphetamine IR | 405 |
| | c. | Dextroamphetamine Sulfate ER | 407 |
| | d. | Clonidine TTS | 410 |
| | e. | Budesonide inhalation | 412 |
| | f. | Celecoxib | 413 |
| 6. | Teva/Par | | 415 |
| | a. | Omega-3-Acid Ethyl Esters | 415 |
| | b. | Entecavir | 417 |
| | c. | Budesonide DR | 419 |
| 7. | Teva/Taro | | 420 |
| | a. | Enalapril Maleate | 420 |
| | b. | Nortriptyline HCL | 428 |
| 8. | Teva/Zydus | | 432 |
| | a. | Fenofibrate | 432 |
| | b. | Paricalcitol | 436 |
| | c. | Niacin ER | 439 |
| | d. | Etodolac ER | 442 |
| 9. | Teva/Glenmark | | 444 |
| | a. | Moexipril HCL | 444 |
| | b. | Desogestrel/Ethinyl Estradiol (Kariva) | 446 |
| | c. | Gabapentin | 447 |
| 10. | Teva/Amneal | | 448 |
| | a. | Norethindrone Acetate | 448 |
| 11. | Teva/ Dr. Reddy's | | 449 |

**REDACTED – PUBLIC VERSION**

|  |  | a. | Oxaprozin | 449 |
|  |  | b. | Paricalcitol | 451 |
|  | 12. | Mylan / Sandoz | 456 |
|  |  | a. | Valsartan HCTZ | 456 |
| B. |  | Taking the Overarching Conspiracy to a New Level: Price Fixing (2012 – 2015) | 459 |
|  | 1. | July 31, 2012 Price Increase | 459 |
|  |  | a. | Nadolol | 460 |
|  |  | b. | Labetalol HCL | 462 |
|  |  | c. | Nitrofurantoin MAC | 465 |
|  | 2. | February – April 2013: Increasing Prices Before a New Competitor Enters the Market: Budesonide Inhalation Suspension | 465 |
|  | 3. | May 13, 2013 Price Increase – Tizanidine | 466 |
|  | 4. | May 24, 2013 First List of Price Increases | 469 |
|  |  | a. | Glenmark | 471 |
|  |  | b. | Sandoz | 474 |
|  |  | c. | Taro | 477 |
|  | 5. | July 3, 2013 Price Increases | 478 |
|  |  | a. | Upsher-Smith | 480 |
|  |  | b. | Mylan | 481 |
|  |  | c. | Sandoz | 486 |
|  | 6. | Impact of July 3, 2013 Price Increases on Teva | 487 |
|  | 7. | July 19, 2013 Price Increase – Enalapril Maleate | 488 |
|  | 8. | August 9, 2013 Price Increases | 493 |
|  |  | a. | Mylan | 497 |
|  |  | b. | Etodolac | 500 |
|  |  | c. | Niacin ER | 505 |

**REDACTED – PUBLIC VERSION**

9.      July 2013 – January 2014: Competitors Seek to "Follow" Price Increases: Haloperidol and Trifluoperazine HCL .......................................................... 508

10.     April 4, 2014 Price Increases ....................................................................... 512

        a.      Cephalexin ........................................................................................ 518

        b.      Azithromycin and Medroxyprogesterone ........................................... 520

        c.      Clarithromycin ER ........................................................................... 523

        d.      Ketoconazole ................................................................................... 526

        e.      Estradiol/Norethindrone Acetate and Cyproheptadine HCL.......... 529

        f.      Diflunisal.......................................................................................... 531

        g.      Ethosuximide ................................................................................... 532

11.     Impact of April 4, 2014 Price Increases to Teva.......................................... 533

12.     August 28, 2014 Price Increases ................................................................. 535

        a.      Enalapril Maleate ............................................................................. 536

        b.      Prochlorperazine .............................................................................. 536

        c.      Mylan............................................................................................... 537

        d.      Taro ................................................................................................. 541

        e.      Zydus................................................................................................ 544

13.     January 28, 2015 Price Increases................................................................. 545

        a.      Ciprofloxacin HCL and Glimepiride................................................ 547

        b.      Griseofulvin Microsize Oral Suspension ........................................... 549

C.      Competitors Become "High Quality" After Successfully Colluding With Teva...... 550

1.      Apotex ........................................................................................................ 550

2.      Zydus .......................................................................................................... 551

3.      Heritage ...................................................................................................... 553

        a.      Albuterol Sulfate.............................................................................. 557

        b.      Fosinopril HCTZ ............................................................................. 558

**REDACTED – PUBLIC VERSION**

       c.       Glipizide-Metformin ................................................................ 560

       d.       Glyburide ............................................................................... 561

       e.       Glyburide-Metformin ............................................................ 563

       f.       Hydralazine HCL .................................................................. 566

       g.       Meprobamate ......................................................................... 567

       h.       Methimazole .......................................................................... 569

       i.       Metronidazole ....................................................................... 571

       j.       Nimodipine ........................................................................... 586

           i.       The Heritage/Sun Agreement       586

           ii.       The Heritage/Ascend Agreement       589

       k.       Paromomycin ......................................................................... 591

       l.       Zoledronic Acid .................................................................... 592

   4.       Lupin ............................................................................................... 594

   5.       Par .................................................................................................. 596

   6.       Greenstone .................................................................................... 597

   7.       Amneal .......................................................................................... 598

   8.       Rising ............................................................................................. 600

   9.       Breckenridge ................................................................................. 601

   10.     Glenmark ...................................................................................... 602

   11.     Camber .......................................................................................... 603

D.      Other Examples of Price Fixing and Customer Allocation ............... 608

   1.       Adapalene Cream .......................................................................... 608

   2.       Albuterol Sulfate .......................................................................... 618

   3.       Alclometasone Dipropionate ...................................................... 618

   4.       Allopurinol .................................................................................... 624

REDACTED – PUBLIC VERSION

5.       Amantadine HCL ................................................................................ 626

6.       Amitriptyline ..................................................................................... 627

7.       Atenolol Chlorthalidone ..................................................................... 629

8.       Atropine Sulfate Ophthalmic Solution ............................................... 630

9.       Balsalazide Disodium ........................................................................ 631

10.      Betamethasone Dipropionate .............................................................. 633

11.      Betamethasone Dipropionate Clotrimazole .......................................... 635

12.      Betamethasone Valerate ..................................................................... 641

13.      Bromocriptine Mesylate ..................................................................... 648

14.      Butorphanol Tartrate ......................................................................... 654

15.      Captopril .......................................................................................... 655

16.      Carbamazepine .................................................................................. 656

17.      Carisoprodol tablets ........................................................................... 663

18.      Cefuroxime Axetil ............................................................................. 664

19.      Chlorpromazine HCL ......................................................................... 665

20.      Cholestyramine .................................................................................. 667

21.      Ciclopirox ......................................................................................... 669

22.      Clindamycin Phosphate ...................................................................... 681

         a.       The First Coordinated Price Increase (60ml Solution – Fougera
                  and Greenstone) ...................................................................... 681

         b.       The Second Coordinated Increase (October 2012 – All
                  Formulations – Sandoz and Greenstone) ................................... 683

         c.       New Entrants on Clindamycin Solution – Actavis, Perrigo and
                  Taro – Do Not Significantly Erode Pricing ............................... 687

         d.       The Third Coordinated Price Increase (2014 – All Formulations
                  Except Solution – Sandoz and Greenstone) ............................... 696

23.      Clobetasol Propionate ........................................................................ 698

24.     Clotrimazole Cream ............................................................................ 706

25.     Desonide .............................................................................................. 709

26.     Digoxin ................................................................................................ 719

27.     Diphenoxylate Atropine ...................................................................... 722

28.     Divalproex Sodium ER ....................................................................... 723

29.     Doxy Hyclate ....................................................................................... 726

30.     Econazole ............................................................................................ 730

31.     Exemestane tablets .............................................................................. 735

32.     Fluocinolone Acetonide ...................................................................... 736

33.     Fluocinonide ........................................................................................ 741

34.     Griseofulvin Microsize Tablets .......................................................... 757

35.     Halobetasol Propionate ....................................................................... 764

        a.      The September 2012 Price Increase ....................................... 764

        b.      The March/April 2013 Price Increase ..................................... 767

        c.      Sandoz Launches Halobetasol Cream ..................................... 768

        d.      Taro Launches Halobetasol Cream and Ointment .................. 774

36.     Hydrocodone Acetaminophen tablets ................................................. 776

37.     Hydrocortisone Valerate ..................................................................... 778

38.     Latanoprost ophthalmic solution ........................................................ 779

39.     Isosorbide Dinitrate ............................................................................ 786

40.     Lidocaine HCL .................................................................................... 788

41.     Metformin ER ...................................................................................... 794

42.     Methadone HCL ................................................................................... 795

43.     Methylphenidate .................................................................................. 796

44.     Methylprednisolone ............................................................................ 806

45.   Metronidazole ................................................................................... 808

46.   Naproxen Sodium .............................................................................. 810

47.   Neomycin Polymyxin Hydrocortisone ............................................. 811

48.   Nystatin Triamcinolone cream and ointment .................................... 812

49.   Oxycodone Acetaminophen ............................................................... 813

50.   Oxycodone HCL oral solution and tablets ........................................ 816

51.   Permethrin ......................................................................................... 818

52.   Perphenazine ..................................................................................... 820

53.   Pentoxifylline .................................................................................... 821

54.   Phenytoin Sodium .............................................................................. 823

55.   Pilocarpine HCL ................................................................................ 828

56.   Potassium Chloride ............................................................................ 829

57.   Prednisone .......................................................................................... 832

58.   Prednisolone Acetate ......................................................................... 834

59.   Prochlorperazine Maleate Suppositories ........................................... 835

60.   Prochlorperazine Maleate Tablets ..................................................... 838

61.   Propranolol HCL capsules ................................................................. 838

62.   Silver Sulfadiazine cream ................................................................. 840

63.   Spironolactone HCTZ ....................................................................... 841

64.   Triamcinolone Acetonide .................................................................. 842

65.   Timolol Maleate ................................................................................ 847

66.   Tobramycin Dexamethasone ............................................................. 848

67.   Trazodone HCL .................................................................................. 849

68.   Triamterene HCTZ ............................................................................ 850

E.   Involvement of Distributors in the Overarching Conspiracy .................... 852

**REDACTED - PUBLIC VERSION**

1.     Introduction ..................................................................................... 852

2.     ABC ................................................................................................ 857

     a.     Buprenorphine ....................................................................... 857

     b.     Dextroamphetamine Amphetamine IR ............................. 858

     c.     Loperamide ........................................................................... 859

     d.     Modafinil ............................................................................... 860

     e.     Pioglitazone Metformin HCL IR Tablets ......................... 862

3.     Cardinal .......................................................................................... 869

     a.     Imiquimod ............................................................................. 870

4.     H.D. Smith ..................................................................................... 881

     a.     Acyclovir ............................................................................... 882

     b.     Valganciclovir ....................................................................... 883

5.     Harvard .......................................................................................... 886

     a.     Eplerenone ............................................................................ 887

     b.     Metoprolol Succinate ER ................................................... 889

6.     McKesson ...................................................................................... 889

     a.     Amikacin ............................................................................... 890

     b.     Lamotrigine ER .................................................................... 891

7.     Morris & Dickson ........................................................................ 894

     a.     Eszopiclone ........................................................................... 895

8.     Walgreens / WBAD ...................................................................... 897

     a.     Disulfiram ............................................................................. 898

     b.     Isotretinoin ........................................................................... 898

     c.     Montelukast Sodium ........................................................... 899

     d.     Omeprazole Sodium Bicarbonate ..................................... 900

REDACTED - PUBLIC VERSION

        e.        Progesterone and Vancomycin............................................................ 901

        f.        Sumatriptan ......................................................................... 902

XIII.   CONCIOUSNESS OF GUILT             903

XIV.   SPOILATION OF EVIDENCE            906

XV.    OBSTRUCTION OF JUSTICE            907

XVI.   PLAINTIFF'S PURCHASES AND ANTITRUST INJURY     908

XVII.  INTERSTATE TRADE AND COMMERCE        909

XVIII. TOLLING AND FRAUDULENT CONCEALMENT      910

XIX.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY   911

XX.    CAUSES OF ACTION            911

XXI.   DEMAND FOR JUDGMENT           1169

XXII.  JURY DEMAND            1169

**REDACTED – PUBLIC VERSION**

Plaintiff Molina Healthcare, Inc. ("Molina" or "Plaintiff") files this Complaint against Defendants Actavis Elizabeth, LLC, Actavis Holdco US, Inc., Actavis Pharma, Inc., Akorn, Inc., Alvogen, Inc., Amneal Pharmaceuticals, LLC, Apotex Corp., Ascend Laboratories, LLC, Aurobindo Pharma USA, Inc., Barr Pharmaceuticals, LLC, Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International, Inc., Bausch Health US, Llc f/k/a Valeant Pharmaceuticals North America LLC, Breckenridge Pharmaceutical, Inc., Camber Pharmaceuticals, Inc., Citron Pharma, LLC, Dava Pharmaceuticals, LLC, Dr. Reddy's Laboratories Inc., Emcure Pharmaceuticals, Ltd., Endo International, plc, Epic Pharma, LLC, Fougera Pharmaceuticals Inc., G&W Laboratories, Inc., Generics Bidco I, LLC, Glenmark Pharmaceuticals Inc., USA, Greenstone LLC, Heritage Pharmaceuticals Inc., Hikma Pharmaceuticals USA Inc. f/k/a West-Ward Pharmaceuticals Corp., Hi-Tech Pharmacal Co., Inc., Impax Laboratories, LLC f/k/a/ Impax Laboratories, Inc., Jubilant Cadista Pharmaceuticals Inc., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Mayne Pharma, Inc., Morton Grove Pharmaceuticals, Inc., Mutual Pharmaceutical Company, Inc., Mylan, Inc., Mylan, N.V., Mylan Pharmaceuticals, Inc., Oceanside Pharmaceuticals, Inc., Par Pharmaceutical Companies, Inc., Par Pharmaceuticals, Inc., Perrigo Company PLC, Perrigo New York, Inc., Pfizer, Inc., Pliva, Inc., Sandoz, Inc., Strides Pharma, Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceutical Industries, Ltd., Taro Pharmaceuticals USA, Inc., Teligent, Inc., Teva Pharmaceuticals USA, Inc., Torrent Pharma Inc., UDL Laboratories Inc., Upsher-Smith Laboratories, LLC, URL Pharma, Inc., VersaPharm, Inc., Wockhardt USA LLC,  and Zydus Pharmaceuticals (USA) Inc., (collectively "Defendants") and alleges based on personal knowledge as to the facts pertaining to it and information made public during ongoing government investigations of Defendants and other generic drug companies, and upon information and belief as to all other matters, as follows:

REDACTED – PUBLIC VERSION

## I.    NATURE OF THE CASE

1.      Plaintiff brings this action to recover damages it incurred from egregious overcharges it paid for certain widely-used generic drugs, arising from a far-reaching conspiracy among Defendants and others to blatantly fix the price of such drugs. This conspiracy increased the Defendants' profits, and that of others working with them, at the expense of Plaintiff, a private health benefit provider, as well as consumers and the government.

2.      In the pharmaceutical industry, generic drug entry predictably and typically results in increased price competition, which reduces the price of drugs for wholesalers, retailers, consumers, and third-party payers ("TPPs") like Plaintiff. Defendants here, however, along with other generic drug manufacturers, conspired to manipulate the relevant markets, allocate these markets amongst themselves, and obstruct generic competition in an ongoing scheme to fix, increase, stabilize, and/or maintain the price of the drugs identified in Section II below (the "Subject Drugs"). The Defendants' scheme continues to affect the generic drug markets for the Subject Drugs. While this Complaint alleges facts as to the Subject Drugs, this scheme and conspiracy extends to other generic drugs.

3.      Defendants orchestrated their conspiracy through secret communications and meetings, both at private and public events, like trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (n/k/a Association for Accessible Medicines), the Healthcare Distribution Management Association ("HDMA") (n/k/a Healthcare Distribution Alliance), the Efficient Collaborative Retail Marketing organization ("ECRM"), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), and the Healthcare Supply Chain Association ("HSCA"), among others.

4.      The conspiracy, which infected the entire generic marketplace, was designed to evade detection. Pursuant to a "fair share" scheme, Defendants predetermined market share, fixed prices,

and rigged bids on the over 200 Subject Drugs listed below, as well as additional drugs. This fair share understanding was often referred to by Defendants as the "rules of engagement" for the generic drug industry and permeated every segment of the industry. The modus operandi was to avoid competition among generic manufacturers that would normally result in significant price erosion and significant savings for purchasers, particularly insurers – like Plaintiff – responsible for paying the bulk of the prescription drug costs in the United States. This overarching conspiracy, effectuated by a series of drug-specific conspiracies, thwarted competition across the generic drug industry

5.      Predictably, the results of the conspiracy were severe. The prices of generic drugs skyrocketed at unprecedented rates, some by more than 1000%., like for example, Albuterol (3,400%), Amitriptyline (2,400%), Clobetasol Propionate (1,800%), Clomipramine (2,600%), Doxazosin Mesylate (1053%), Doxycycline (8,000%), Fluconazole (1,570%), Leflunomide (1,300%), Nadolol (2,762%), Oxybutynin Chloride (between 1,100 and 1,500%), Propranolol HCL (1,000%), and Ursodiol (1,000%).

6.      These price increases are consistent with Medicare Part D price increases found by the Government Accountability Office ("GAO") for many of the Subject Drugs, including Acetazolamide ER, Acyclovir, Alclometasone Dipropionate, Allopurinol, Amantadine HCL, Amiloride HCL/HCTZ, Amitriptyline, Atenolol Chlorthalidone, Baclofen, Benazepril HCTZ, Betamethasone Dipropionate, Betamethasone Dipropionate Augmented, Betamethasone Dipropionate Clotrimazole, Betamethasone Valerate, Bumetanide, Butorphanol Tartrate, Carbamazepine, Cefuroxime Axetil, Cephalexin, Chlorpromazine HCL, Cimetidine, Ciprofloxacin HCL, Clarithromycin ER, Clindamycin Phosphate, Clobetasol Propionate, Clomipramine, Clotrimazole, Desonide, Dextroamphetamine Sulfate, Digoxin, Diltiazem HCL, Divalproex Sodium ER, Doxazosin Mesylate, Doxycycline Hyclate, Econazole, Enalapril Maleate, Ethosuximide,

Etodolac, Fluconazole, Fluocinolone Acetonide, Fluocinonide, Fluoxetine HCL, Halobetasol

Propionate, Haloperidol, Hydrocortisone Valerate, Isosorbide Dinitrate, Ketoconazole, Labetalol

HCL, Lidocaine, Methadone HCL, Methotrexate, Methylprednisolone, Nadolol, Nitrofurantoin

MAC, Nystatin, Oxaprozin, Oxybutynin Chloride, Permethrin, Pilocarpine HCL ER, Piroxicam,

Potassium Chloride, Pravastatin, Prazosin HCL, Prednisone, Prochlorperazine, Ranitidine HCL,

Theophylline ER, Timolol Maleate, Tobramycin, Triamcinolone Acetonide, Trifluoperazine HCL,

and Ursodiol.[1]

       7.     By 2012, Heritage Pharmaceuticals, Inc. ("Heritage"), Teva Pharmaceuticals USA

Inc. ("Teva"), and their co-conspirators embarked on one of the most egregious and massive price-

fixing conspiracies in the history of the United States. They leveraged the culture of cronyism in the

generic drug industry to avoid price erosion, increase prices for targeted products, and maintain

artificially-inflated prices across their respective product portfolios without triggering a "fight to the

bottom" among competitors. While Heritage and Teva spearheaded the particular conspiracies that

are the subject of this Complaint, these conspiracies are part of an even larger, overarching

conspiracy and understanding of how the generic manufacturers fix prices and allocate markets to

suppress competition.

       8.     Defendants routinely and systematically communicated with one another to

determine and agree on how much market share, and which customers, each conspirator was

entitled to. They effectuated their market allocation by either refusing to bid for particular customers

or providing outrageously high cover bids. This created an artificial equilibrium that enabled the

conspirators to then collectively raise and/or maintain prices for a particular generic drug.

---

[1] Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had
Extraordinary Price Increases, GAO-16-706 (August 2016) ("the GAO Report").

9.      Defendants understood and acted upon an underlying code of conduct widespread in the generic drug industry: any time a competitor enters a particular drug market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high. While different drugs may involve different competitors, this understanding remains constant and is the backbone of the industry wide conspiracy.

10.     As one example of this conspiracy, Teva selected a core group of "High Quality" conspirators that it had existing conspiratorial relationships with, and targeted drugs that Teva and High Quality competitors overlapped on for price increases. Teva and the High Quality competitors understood that they would lead and follow each other's price increases, and did so frequently and successfully.

11.     The market for each of the Subject Drugs was small enough to foster collusion, but still large enough that prices should have remained at their historical, near marginal cost levels. Defendants overcame this obstacle and produced extraordinary price increases, as reflected in industry-wide data, by engaging in a concerted effort to grow their conspiracy and dominate the market for the Subject Drugs.

12.     This industry-wide data is consistent with the substantial price increases Plaintiff suffered for the Subject Drugs.

13.     At the peak of the collusive activity involving Teva, during a 19-month period from July 2013 through January 2015, Teva significantly raised prices on dozens of different generic drugs. Teva colluded with High Quality conspirators on most of them.

14.     Similarly, Heritage around this same time significantly raised prices on 15 drugs in collusion with many of the Defendants.

15.     ` Defendants knew their conduct was unlawful. They limited their communications to in-person meetings, or mobile phone calls, to avoid creating a record of their conduct. When communications were reduced to writing or text messages, Defendants often destroyed the evidence of those communications.

16.     Executives and others at the highest levels in many of Defendant companies, including among others, Ara Aprahamian (Actavis/Watson, Sun/Taro), David Berthold (Lupin), Mitchell Blashinsky (Glenmark, Sun/Taro), Douglas Boothe (Actavis, Perrigo), James (Jim) Brown (Dr. Reddy's, Glenmark), Maureen Cavanaugh (Teva), Tracy Sullivan DiValerio (Lannett), Marc Falkin (Actavis/Teva), James (Jim) Grauso (Aurobindo, Glenmark, G&W), Kevin Green (Teva, Zydus), Walter Kaczmarek (Fougera, Mallinckrodt), Armando Kellum (Fougera/Sandoz), Rajiv Malik (Mylan, Ranbaxy, Sandoz), Satish Mehta (Emcure/Heritage), Jill Nailor (Greenstone), James (Jim) Nesta (Mylan), Kurt Orlofsky (G&W),  Konstantin (Kon) Ostaficiuk (Camber), Nisha Patel (Teva), Michael Perfetto (Actavis, Sun/Taro), David Rekenthaler (Apotex, Teva), Richard (Rick) Rogerson (Actavis/Teva), Erika Vogel-Baylor (G&W), and John Wesolowski (Perrigo) conceived, directed, and ultimately benefitted from these schemes.

17.     This scheme to fix and maintain prices, allocate markets, and otherwise stifle competition caused, and continues to cause, significant harm to the United States healthcare system. Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and various state antitrust and unfair competition laws, as alleged herein. As a result of the conspiracy, Plaintiff paid substantially inflated and anticompetitive prices for generic pharmaceutical drugs, and Defendants illegally profited as a result.

18.     Plaintiff seeks treble damages and injunctive relief on account of Defendants' unlawful scheme to fix, maintain, and stabilize prices for the Subject Drugs.

## II.     THE DRUGS SUBJECT TO THE CONSPIRACY

19.     Acetazolamide. Acetazolamide is an extended release anhydrase inhibitor medicine used to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure. It may be sold in an extended release ("ER") formulation.

20.     Acyclovir. Acyclovir is an antiviral drug used to treat herpes, chickenpox, shingles, and post-transplant viral infections by preventing the viruses from using human host cells to replicate their DNA.

21.     Adapalene. Adapalene is a topical retinoid used to treat acne and other skin conditions. Adapalene comes in different forms including gels and creams.

22.     Albuterol Sulfate. Albuterol sulfate is a bronchodilator that targets the β-2 receptor of the lungs to relax muscles in the airways to increase pulmonary airflow. It is used to treat shortness of breath caused by asthma and chronic obstructive pulmonary disease. It was first discovered in the 1960s and is listed as an "Essential Medicine" by the World Health Organization ("WHO").

23.     Alclometasone Dipropionate. Alclometasone dipropionate is used to treat the inflammation and itching caused by a number of skin conditions such as allergic reactions, eczema, and psoriasis.

24.     Allopurinol. Allopurinol is a xanthine oxidase inhibitor used to treat gout and certain kinds of kidney stones. It is included on the WHO's list of Essential Medicines.

25.     Amantadine HCL. Amantadine hydrochloride is an antiviral drug used to prevent or treat symptoms of infections caused by strains of the Influenza A virus. It is also used to treat Parkinson's Disease and similar conditions.

26.     Amikacin. Amikacin is an antibiotic used to treat multi-drug resistant bacterial infections. It is included on the WHO's list of Essential Medicines.

27.     Amiloride HCL/HCTZ. Amiloride hydrochloride ("HCL") and amiloride hydrochlorothiazide ("HCTZ") are diuretics typically used in combination to treat hypertension, heart failure, or extra fluid in the body (edema). They also help to treat or prevent low potassium levels. Both medications are included on the WHO's list of Essential Medicines.

28.     Amitriptyline. Amitriptyline is a tricyclic antidepressant. Amitriptyline is included on the WHO's list of Essential Medicines.

29.     Ammonium Lactate. Ammonium lactate is a topical medication used to treat dry or scaly skin and ichithyosis vulgaris, a hereditary dry skin condition.

30.     Amoxicillin/Clavulanate. Amoxicillin/clavulanate is an antibiotic consisting of amoxicillin and clavulanate potassium. Amoxicillin is an antibiotic used to treat bacterial infections such as middle ear infections, strep throat, pneumonia, skin infections, urinary tract infections, and others. Clavulanate potassium is an inhibitor to bacterial resistance. Amoxicillin/clavulanate is included on the WHO's list of Essential Medicines.

31.     Amphetamine/Dextroamphetamine. Amphetamine/dextroamphetamine is a combination stimulant used to treat attention deficit hyperactivity disorder (ADHD) and narcolepsy. The medication comes in both ER and instant release (IR) forms.

32.     Atenolol Chlorthalidone. Atenolol chlorthalidone is a combination beta blocker used to treat hypertension.

33.     Atropine Sulfate. Atropine sulfate is an antimuscarinic agent used to treat bradycardia.

34.     Azithromycin. Azithromycin is an antibiotic used to treat bacterial infections, sexually-transmitted infections, and malaria. It is included on the WHO's list of Essential Medicines.

35.     Baclofen. Baclofen is a muscle relaxant and an anti-spastic agent. It is used to treat muscle symptoms caused by multiple sclerosis, including spasms, pain, and stiffness. It is also used to treat muscle spasms in people with spinal injury or disease.

36.     Balsalazide Disodium. Balsalazide disodium is an anti-inflammatory drug used in the treatment of ulcerative colitis and inflammatory bowel disease.

37.     Benazepril HCTZ. Benazepril hydrochlorothiazide is an angiotensin converting enzyme ("ACE") inhibitor. It is used to treat hypertension (high blood pressure).

38.     Betamethasone Dipropionate. Betamethasone dipropionate is a topical corticosteroid used to treat redness, itching, swelling, or other discomforts caused by a variety of skin conditions such as eczema, dermatitis, allergies, and rash.

39.     Betamethasone Dipropionate Augmented. Betamethasone dipropionate augmented is a topical corticosteroid used to treat itching, redness, and swelling caused by certain skin conditions. It is a form of betamethasone dipropionate that penetrates the skin more rapidly and is therefore more potent.

40.     Betamethasone Dipropionate Clotrimazole. Betamethasone dipropionate clotrimazole is a combination of betamethasone dipropionate with clotrimazole, a topical anti-fungal mediation. It is used to treat fungal skin infections such as ringworm, jock itch, and athlete's foot.

41.     Betamethasone Valerate. Betamethasone valerate is a topical corticosteroid used to help relieve redness, itching, swelling, or other discomfort caused by a variety of skin conditions such as eczema, dermatitis, allergies, and rash.

42.     Bethanechol Chloride. Bethanechol chloride is used to treat dry mouth and bladder problems such as the inability to urinate or empty the bladder completely.

43.    <u>Bromocriptine Mesylate</u>. Bromocriptine mesylate is used to treat certain hormone imbalances by inhibiting the secretion of prolactin. It is also used to treat Parkinson's Disease, Acromegaly, and certain tumors.

44.    <u>Budesonide</u>. Budesonide is a Buspirone HCL corticosteroid. The inhaled form is used for long-term management of asthma and chronic obstructive pulmonary disease. It can also be used to treat allergic rhinitis and nasal polyps. The pill form is delayed release (DR) and is used to treat inflammatory bowel diseases including Crohn's disease, ulcerative colitis, and microscopic colitis. Budesonide is included on the WHO's list of Essential Medicines.

45.    <u>Bumetanide</u>. Bumetanide is a diuretic used to treat swelling as a result of heart failure, liver failure, or kidney problems. It is also be used to treat high blood pressure.

46.    <u>Buprenorphine</u>. Buprenorphine is an opioid used to treat chronic and acute pain. It is also used to treat addiction to opioids.

47.    <u>Buspirone Hydrochloride</u>. Buspirone hydrochloride is used for the short-term treatment of anxiety disorders, particularly generalized anxiety disorders.

48.    <u>Butorphanol Tartrate</u>. Butorphanol tartrate is an opioid pain reliever used to treat moderate to severe pain, including pain from surgery, muscle pain, and migraine headaches.

49.    <u>Cabergoline</u>. Cabergoline is a dopamine receptor agonist used in the management of prolactinomas. It is also used as an antidepressant and lactation suppressor.

50.    <u>Calcipotriene</u>. Calcipotriene is a topical form of Vitamin D used to treat psoriasis.

51.    <u>Calcipotriene Betamethasone Dipropionate</u>. Calcipotriene betamethasone dipropionate is a combination topical medication consisting of calcipotriene as described above and a topical corticosteroid used to treat psoriasis.

52.    <u>Capecitabine</u>. Capecitabine is a chemotherapy medication used to treat breast cancer, gastric cancer, and colorectal cancer. It is included on the WHO's list of Essential Medicines.

REDACTED – PUBLIC VERSION

53.     <u>Captopril</u>. Captopril is an angiotensin-converting enzyme (ACE) inhibitor used to treat hypertension and some types of congestive heart failure.

54.     <u>Carbamazepine</u>. Carbamazepine.is an anticonvulsant medication used to treat epilepsy and neuropathic pain. It is also used to treat schizophrenia and bipolar disorder. It is included on the WHO's list of Essential Medicines.

55.     <u>Carbidopa Levodopa</u>. Carbidopa levodopa is a combination of carbidopa, a decarboxylase inhibitor, and levodopa, a central nervous system agent that causes the production of dopamine used to treat Parkinson's disease and other conditions that cause symptoms similar to those of Parkinson's disease.

56.     <u>Carisoprodol</u>. Carisoprodol is a muscle relaxer used to treat skeletal muscle injuries and conditions.

57.     <u>Cefdinir</u>. Cefdinir is an antibiotic used to treat pneumonia, otitis media, strep throat, and cellulitis.

58.     <u>Cefpodoxime Proxetil</u>. Cefpodoxime proxetil is used to treat a variety of bacterial infections.

59.     <u>Cefprozil</u>. Cefprozil is a cephalosporin antibiotic used to treat ear infections, skin infections, and other bacterial infections.

60.     <u>Cefuroxime Axetil</u>. Cefuroxime axetil is an antibiotic used to treat a wide variety of bacterial infections.

61.     <u>Celecoxib</u>. Celecoxib is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain and inflammation from osteoarthritis, acute pain in adults, rheumatoid arthritis, ankylosing spondylitis, painful menstruation, juvenile rheumatoid arthritis, and to reduce the number of colon and rectal polyps in people with familial adenomatous polyposis.

62.     <u>Cephalexin.</u> Cephalexin is a cephalosporin antibiotic used to treat bacterial infections including otitis media, streptococcal pharyngitis, bone and joint infections, pneumonia, cellulitis, and urinary tract infections. It is included on the WHO's list of Essential Medicines.

63.     <u>Chlorpromazine HCL</u>. Chlorpromazine hydrochloride is an antipsychotic medication used to treat schizophrenia, psychotic disorders, bipolar disorder, and severe behavioral disorders. It is included on the WHO'S list of Essential Medicines.

64.     <u>Cholestyramine</u>. Cholestyramine is a bile acid-binding resin used to lower cholesterol and to treat itching in individuals with partial biliary obstruction.

65.     <u>Ciclopirox</u>. Ciclopirox is a topical medication used to treat fungal infections, such as in the nails.

66.     <u>Cimetidine</u>. Cimetidine is a histamine receptor antagonist that inhibits stomach acid production and is used to treat heartburn and peptic ulcers.

67.     <u>Ciprofloxacin HCL</u>. Ciprofloxacin hydrochloride is an antibiotic used to treat bacterial infections including bone and joint infections, intra-abdominal infections, infectious diarrhea, respiratory tract infections, skin infections, typhoid fever, and urinary tract infections. It is included on the WHO's list of Essential Medicines.

68.     <u>Clarithromycin ER</u>. Clarithromycin is an antibiotic used to treat bacterial infections including strep throat, pneumonia, skin infections, h. pylori infection, and Lyme disease, among others. It can be taken in extended release tablet form. It is included on the WHO's list of Essential Medicines.

69.     <u>Clemastine Fumarate</u>. Clemastine fumarate is an antihistaminic compound used to treat hay fever and allergy symptoms including sneezing, runny nose, red itchy tearing eyes, and to relieve the itching and swelling of hives.

70.     <u>Clindamycin Phosphate</u>. Clindamycin phosphate is an antibiotic used to treat certain serious bacterial infections, including acne vulgaris.

71.     <u>Clobetasol Propionate</u>. Clobetasol propionate is a steroid and anti-inflammatory agent. It is used to treat inflammation and itching caused by several skin conditions, such as allergic reactions, eczema, and psoriasis. Clobetasol propionate is one of the most prescribed dermatological drugs in the United States. It comes in a variety of forms, including a cream, foam, gel, lotion, ointment, shampoo, solution, and spray.

72.     <u>Clomipramine</u>. Clomipramine is a tricyclic antidepressant. It is used to treat symptoms of obsessive-compulsive disorder. It is included on the WHO's list of Essential Medicines.

73.     <u>Clonidine TTS</u>. Clonidine transdermal therapeutic system ("TTS") is used to treat high blood pressure, ADHD, drug withdrawal (alcohol, opioids, or tobacco), menopausal flushing, diarrhea, and certain pain conditions. Clonidine TTS is sold in transdermal patches.

74.     <u>Clotrimazole</u>. Clotrimazole is an antifungal medication used to treat vaginal yeast infections, oral thrush, diaper rash, pityriasis versicolor, and types of ringworm including athlete's foot and jock itch. Clotrimazole is sold as a topical solution applied as a cream at various doses. It is included on the WHO's list of Essential Medicines.

75.     <u>Cyproheptadine HCL</u>. Cyproheptadine hydrochloride is an antihistamine used to relieve allergy symptoms such as watery eyes, runny nose, itching eyes and nose, sneezing, hives, and itching.

76.     <u>Danazol</u>. Danazol is an androgen used to treat endometriosis, fibrocystic breast disease, and hereditary angioedema.

REDACTED – PUBLIC VERSION

77.    <u>Desmopressin Acetate</u>. Desmopressin acetate is used to treat diabetes insipidus, bedwetting, hemophilia a., von Willebrand disease, and high blood urea levels. It is included on the WHO's list of Essential Medicines.

78.    <u>Desogestrel/Ethinyl Estradiol (Kariva)</u>. Desogestrel/ethinyl estradiol, brand name Kariva, is a progestin medication used in birth control pills for women and also for treatment of menopausal symptoms in women.

79.    <u>Desonide</u>. Desonide, which includes .05% topical ointment and .05% topical cream, is a topical corticosteroid anti-inflammatory used to treat skin disorders including eczema, psoriasis, and dermatitis. It is a low-potency medication and, therefore, is more commonly prescribed for children or for adults to use in sensitive areas like the eyelids.

80.    <u>Desoximetasone</u>. Desoximetasone is a topical medication used to treat a variety of skin conditions including eczema, dermatitis, allergies, and rash.

81.    <u>Dexmethylphenidate HCL ER</u>. Dexmethylphenidate hydrochloride is a central nervous system ("CNS") stimulant used to treat ADHD. It can be taken in an extended release form.

82.    <u>Dextroamphetamine Sulfate ER</u>. Dextroamphetamine sulfate is a CNS stimulant and amphetamine enantiomer used to treat ADHD and narcolepsy. It can be taken in an extended release form.

83.    <u>Diclofenac Potassium</u>. Diclofenac potassium is an NSAID used to treat pain, inflammatory disorders, and dysmenorrhea.

84.    <u>Dicloxacillin Sodium</u>. Dicloxacillin sodium is an antibiotic of the penicillin class used to treat mild-to-moderate staphylococcal infections.

85.    <u>Diflunisal</u>. Diflunisal is an NSAID used to treat mild to moderate pain, osteoarthritis, and rheumatoid arthritis.

86.     <u>Digoxin</u>. Digoxin is a cardiotonic glycoside. It is used to treat heart failure and atrial fibrillation (irregular and/or rapid heart rate). It is included on the WHO's list of Essential Medicines.

87.     <u>Diltiazem HCL</u>. Diltiazem hydrochloride is a calcium channel blocker used to treat hypertension, angina, and heart arrhythmias.

88.     <u>Diphenoxylate Atropine</u>. Diphenoxylate atropine is an anticholinergic used to treat acute diarrhea.

89.     <u>Disopyramide Phosphate</u>. Disopyramide phosphate is an antiarrhythmic medication used to treat ventricular tachycardia.

90.     <u>Disulfiram</u>. Disulfiram is an alcohol antagonist used to treat alcoholism by blocking the processing of alcohol by the body.

91.     <u>Divalproex Sodium ER</u>. Divalproex sodium extended release is used to treat various types of seizure disorders, to treat manic episodes related to bipolar disorder, and to prevent migraine headaches. It works by restoring the balance of neurotransmitters in the brain.

92.     <u>Doxazosin Mesylate</u>. Doxazosin mesylate is used to treat symptoms of an enlarged prostate and hypertension.

93.     <u>Doxycycline</u>. Doxycycline is a tetracycline antibiotic. It is used to treat bacterial infections, such as acne, urinary tract infections, intestinal infections, eye infections, gonorrhea, chlamydia, and periodontitis. It is also used to treat symptoms of rosacea. It is included on the WHO's list of Essential Medicines. Doxycycline hyclate ("Doxy Hyclate") is a water-soluble form of doxycycline that absorbs quickly into the bloodstream. A delayed release version of doxycycline hyclate ("Doxy DR") is used to treat acne. Doxycycline monohydrate ("Doxy Mono") is significantly less water soluble and absorbs more slowly than Doxy Hyclate. It is also used to prevent malaria.

REDACTED – PUBLIC VERSION

94.     <u>Drospirenone and Ethinyl Estradiol (Ocella)</u>. Drospirenone and ethinyl estradiol, brand name Ocella, is a progestin medication used in birth control pills and menopausal hormone therapy.

95.     <u>Econazole</u>. Econazole refers to econazole nitrate cream 1%. Econazole is a topical antifungal agent used to treat skin infections caused by fungus or yeast, including ringworm, tinea versicolor, and yeast infections. Econazole is available in topical cream, ointment, emollient-cream, or gel form.

96.     <u>Enalapril Maleate</u>. Enalapril maleate is used to treat hypertension, symptomatic heart failure, asymptomatic left ventricular dysfunction, and diabetic kidney disease.

97.     <u>Entecavir</u>. Entecavir is an antiviral medication used to treat hepatitis B virus infection. It is included on the WHO's list of Essential Medicines.

98.     <u>Epitol</u>. Epitol is a branded generic form of Carbamazepine, described above.

99.     <u>Eplerenone</u>. Eplerenone is an aldosterone receptor blocker used to treat hypertension, high blood pressure, and congestive heart failure after a heart attack.

100.    <u>Erythromycin Base Ethyl Alcohol</u>. Erythromycin base ethyl alcohol is a topical antibiotic medication combined with alcohol to dry oils from the skin used to treat acne.

101.    <u>Estazolam</u>. Estazolam is a benzodiazepine used to treat sleep disorders.

102.    <u>Estradiol</u>. Estradiol is used in menopausal hormone therapy to prevent and treat moderate to severe menopausal symptoms such as hot flashes, vaginal dryness, and atrophy. It is also used to treat osteoporosis.

103.    <u>Estradiol/Norethindrone Acetate (Mimvey)</u>. Estradiol/norethindrone acetate, brand name Mimvey, is a combination estradiol and norethisterone acetate used to treat vasomotor symptoms, vulvar and vaginal atrophy, and osteoporosis associated with menopause.

104.    <u>Eszopiclone</u>. Eszopiclone is a sedative-hypnotic drug used to treat insomnia.

16

105.   <u>Ethambutol HCL</u>. Ethambutol hydrochloride is an antibiotic used to treat tuberculosis. It is included on the WHO's list of Essential Medicines.

106.   <u>Ethinyl Estradiol/Levonorgestrel (Portia and Jolessa)</u>. Ethinyl estradiol/levonorgestrel, brand names Portia and Jolessa, is a combined birth control pill comprised of ethinyl estradiol, an estrogen, and levonorgestrel, a progestin. It is also used to treat symptoms of menstruation and endometriosis, and for emergency contraception. It is included on the WHO's list of Essential Medicines.

107.   <u>Ethinyl Estradiol/Norethindrone (Balziva)</u>. Ethinyl estradiol/norethindrone, brand name Balziva, is a combination of ethinyl estradiol, an estrogen, and norethisterone, a progestin. It is used for birth control, and to treat menstruation symptoms, endometriosis, and menopausal symptoms. It is included on the WHO's list of Essential Medicines.

108.   <u>Ethosuximide</u>. Ethosuximide is used for absence seizures. It is included on the WHO's list of Essential Medicines.

109.   <u>Etodolac</u>. Etodolac is an NSAID used for the management of mild to moderate pain, fever, and inflammation.

110.   <u>Exemestane</u>. Exemestane is an aromatase inhibitor used to treat breast cancer.

111.   <u>Fenofibrate</u>. Fenofibrate is used to treat abnormal blood lipid levels. It also used to treat high cholesterol to reduce the risk of cardiovascular disease and diabetic retinopathy in those with diabetes mellitus.

112.   <u>Fluconazole</u>. Fluconazole is an antifungal medication used to treat fungal infections including candidiasis, blastomycosis, coccidioidomycosis, cryptococcosis, histoplasmosis, dermatophytosis, and pityriasis versicolor. It is included on the WHO's list of Essential Medicines.

113. <u>Fluocinolone Acetonide</u>. Fluocinolone acetonide is a topical corticosteroid used to treat a variety of skin conditions such as itching and inflammation caused by eczema, dermatitis, allergies, and rash.

114. <u>Fluocinonide</u>. Fluocinonide, which includes 0.05% and 0.1% topical cream, 0.05% topical ointment, and 0.05% topical gel, is a topical glucocorticoid used to treat psoriasis and eczema. It reduces the swelling, itching, and redness that can occur in these types of skin irritations.

115. <u>Fluoxetine HCL</u>. Fluoxetine hydrochloride is an antidepressant of the selective serotonin reuptake inhibitor (SSRI) class used for treatment of major depressive disorder, obsessive-compulsive disorder, bulimia nervosa, panic disorder, and premenstrual dysphoric disorder. It is included on the WHO's list of Essential Medicines.

116. <u>Flurbiprofen</u>. Flurbiprofen is an NSAID primarily used as a pre-operative antibiotic as well as for arthritis or dental pain.

117. <u>Flutamide</u>. Flutamide is a nonsteroidal antiandrogen used to treat prostate cancer. It is also used to treat androgen-dependent conditions such as acne, excessive hair growth, and high androgen levels in women.

118. <u>Fluticasone Propionate</u>. Fluticasone propionate is a topical corticosteroid used to treat a variety of skin conditions including eczema, psoriasis, allergies, and rash.

119. <u>Fluvastatin Sodium</u>. Fluvastatin sodium is a statin used to treat high cholesterol and to prevent cardiovascular disease.

120. <u>Fosinopril HCTZ</u>. Fosinopril hydrochlorothiazide is a combination of an ACE drug with a diuretic used to treat hypertension and heart failure.

121. <u>Gabapentin</u>. Gabapentin is an anticonvulsant medication used to treat seizures, neuropathic pain, hot flashes, and restless pain syndrome. Some doctors also prescribe it to treat anxiety disorders, insomnia, and bipolar disorder.

122.    <u>Glimepiride</u>. Glimepiride is used to treat diabetes mellitus type 2 by controlling high blood sugar.

123.    <u>Glipizide-Metformin</u>. Glipizide-metformin is a combination of glipizide (a sulfonylurea that stimulates the body's natural insulin production) with metformin (a biguanide that reduces the body's absorption of sugar) that works to control blood sugar in patients with type-2 diabetes.

124.    <u>Glyburide</u>. Glyburide is an oral medication used to control blood sugar in patients with type-2 diabetes.

125.    <u>Glyburide-Metformin</u>. Glyburide-metformin is a combination medication used to control blood sugar in patients with type-2 diabetes.

126.    <u>Griseofulvin</u>. Griseofulvin is an antifungal medication used to treat dermatophytosis (ringworm). It is included on the WHO's list of Essential Medicines.

127.    <u>Halobetasol Propionate</u>. Halobetasol propionate is as high-potency topical corticosteroid used to treat a variety of skin conditions such as itching and inflammation caused by eczema, dermatitis, psoriasis, and rash.

128.    <u>Haloperidol</u>. Haloperidol is an antipsychotic used to treat schizophrenia, tics in Tourette syndrome, mania in bipolar disorder, nausea and vomiting, delirium, agitation, acute psychosis, and hallucinations caused by alcohol withdrawal.  It is included on the WHO's list of Essential Medicines.

129.    <u>Hydralazine HCL</u>. Hydralazine hydrochloride is a vasodilator used to treat hypertension and heart failure.

130.    <u>Hydrocodone Acetaminophen</u>. Hydrocodone acetaminophen is a combination medication consisting of an opioid and non-opioid used to treat moderate to severe pain.

131.    <u>Hydrocortisone Acetate</u>. Hydrocortisone acetate is a topical corticosteroid. In rectal suppository form, it is used to treat hemorrhoids and itching and swelling in the rectum and anus.

132.    <u>Hydrocortisone Valerate</u>. Hydrocortisone valerate is a topical corticosteroid used to relieve redness, itching, swelling, or other discomfort caused by skin conditions.

133.    <u>Hydroxyurea</u>. Hydroxyurea is used to treat sickle-cell disease, chronic myelogenous leukemia, cervical cancer, polycythemia vera, and psoriasis. It is included on the WHO's list of Essential Medicines.

134.    <u>Hydroxyzine Pamoate</u>. Hydroxyzine pamoate is an antihistamine used to treat itchiness, anxiety, and nausea due to motion sickness.

135.    <u>Imiquimod</u>. Imiquimod is a topical cream used to treat certain types of actinic keratoses, superficial basal cell carcinoma, and warts on the skin.

136.    <u>Irbesartan</u>. Irbesartan is used to treat hypertension, heart failure, and diabetic kidney disease.

137.    <u>Isoniazid</u>. Isoniazid is an antibiotic used to treat tuberculosis and atypical mycobacterial infections. It is included on the WHO's list of Essential Medicines.

138.    <u>Isosorbide Dinitrate</u>. Isosorbide dinitrate is used to treat angina by dilating blood vessels, making it easier for blood to flow through them and easier for the heart to pump. It is included on the WHO's list of Essential Medicines.

139.    <u>Isotretinoin</u>. Isotretinoin is a retinoid used to prevent severe acne and treat skin cancers.

140.    <u>Ketoconazole</u>. Ketoconazole is an antifungal medication used to treat fungal infections such as tinea, cutaneous candidiasis, pityriasis versicolor, dandruff, and seborrheic dermatitis. It is also used to treat excessive hair growth and Cushing's syndrome.

REDACTED – PUBLIC VERSION

141.　Ketoprofen. Ketoprofen is a propionic NSAID that has analgesic and antipyretic effects. It is used to treat arthritis-related inflammatory pains, severe toothaches, musculoskeletal pain, and nerve pain.

142.　Ketorolac Tromethamine. Ketorolac tromethamine is an NSAID used for the management of moderate to severe pain.

143.　Labetalol HCL. Labetalol hydrochloride is used to treat hypertension and for the long-term management of angina.

144.　Lamivudine/Zidovudine (Combivir). Lamivudine/zidovudine, brand name Combivir, is a combination antiretroviral medication used to treat human immunodeficiency virus (HIV) / acquired immunodeficiency syndrome (AIDS). It is included in the WHO's list of Essential Medicines.

145.　Lamotrigine ER. Lamotrigine extended release is an anticonvulsant drug that treats or prevents epileptic seizures.

146.　Latanoprost. Latanoprost is a prostaglandin analog used to treat glaucoma and ocular hypertension. It is included on the WHO's List of Essential Medicines.

147.　Leflunomide. Leflunomide is an immunosuppressive and anti-inflammatory agent. It is used to reduce inflammation that causes pain and swelling in patients with rheumatoid arthritis.

148.　Levothyroxine. Levothyroxine is a manufactured, synthetic form of the thyroid hormone, thyroxine. It is used to treat hypothyroidism, a condition in which the thyroid gland fails to produce enough hormone. It is also used to treat goiter (enlarged thyroid gland), thyroid cancer, and cretinism (congenital hypothyroidism). First manufactured in 1927, levothyroxine is included on the WHO's list of Essential Medicines. Levothyroxine was, by number of prescriptions, the second most popular prescription drug in the United States in the first quarter of 2016. Over 120 million

REDACTED – PUBLIC VERSION

prescriptions are written, per annum, for levothyroxine in the U.S, treating 15% of Americans over the age of 55.

149.    Lidocaine. Lidocaine is a local anesthetic agent. It is used to numb an area of the body to reduce pain or discomfort caused by invasive medical procedures. It is sold in several formulations and combinations, including lidocaine-prilocaine and lidocaine HCL.

150.    Loperamide HCL. Loperamide hydrochloride is used to treat diarrhea caused by gastroenteritis, inflammatory bowel disease, or short bowel syndrome. It is included on the WHO's list of Essential Medicines.

151.    Medroxyprogesterone. Medroxyprogesterone is a progestin used to treat conditions such as absent or irregular menstrual periods and abnormal uterine bleeding. It is also used with estrogens to decrease the risk of endometrial hyperplasia. A derivative, medroxyprogesterone acetate, is a progestin used as a method of birth control and in menopausal hormone therapy. It is also used to treat endometriosis, abnormal uterine bleeding, abnormal sexuality in males, and certain types of cancer. It is included on the WHO's list of Essential Medicines.

152.    Meprobamate. Meprobamate is an oral tranquilizer used to treat short term anxiety, tension, and insomnia.

153.    Metformin ER. Metformin extended release (F) is a medication used to improve blood sugar control and control hypertension in adults with type 2 diabetes mellitus.

154.    Methadone HCL. Methadone hydrochloride is an opioid pain reliever used to treat severe ongoing pain. It is also used to treat addiction to opioids. It is included on the WHOs list of Essential Medicines.

155.    Methazolamide. Methazolamide is a carbonic anhydrase inhibitor used to treat glaucoma.

156.    Methimazole. Methimazole is an oral medication used to treat hyperthyroidism.

157.     <u>Methotrexate</u>. Methotrexate is a chemotherapy agent and immune system suppressant used to treat cancer, autoimmune diseases, and ectopic pregnancy, and also for medical abortions. It is used to treat cancers such as breast cancer, leukemia, lung cancer, lymphoma, and osteosarcoma, and autoimmune diseases such as psoriasis, rheumatoid arthritis, and Crohn's disease. It is included on the WHO's list of Essential Medicines.

158.     <u>Methyldopa</u>. Methyldopa is an antihypertensive used to treat high blood pressure. It is included on the WHO's List of Essential Medicines.

159.     <u>Methylphenidate.</u> Methylphenidate is used to treat ADHD and narcolepsy.

160.     <u>Methylprednisolone</u>. Methylprednisolone is a corticosteroid hormone that decreases the immune system's inflammation response. It is used to treat arthritis, blood disorders, severe allergic reactions, certain cancers, eye conditions, diseases of the skin, kidney, intestines, and lungs, and immune system disorders. It is included on the WHO's list of Essential Medicines.

161.     <u>Metoprolol Succinate ER</u>. Metoprolol succinate extended release is a beta blocker used to treat high blood pressure, chest pain, and heart failure. It can also be used to lower the risk of death after a heart attack.

162.     <u>Metronidazole</u>. Metronidazole is an antibiotic available in cream, jelly, and lotion form. It is used to treat vaginal infections, among other infections.

163.     <u>Modafinil</u>. Modafinil is used to treat sleep disorders including narcolepsy and obstructive sleep apnea.

164.     <u>Moexipril HCL</u>. Moexipril hydrochloride is an ACE inhibitor used to treat hypertension and congestive heart failure.

165.     <u>Moexipril HCL/HCTZ</u>. Moexipril hydrochlorothiazide is a combination of moexipril HCL, as described above, and hydrochlorothiazide, a diuretic.

166.     Mometasone Furoate. Mometasone furoate is a topical corticosteroid used to treat a variety of skin conditions including eczema, psoriasis, allergies, and rash.

167.     Montelukast Sodium. Montelukast sodium is used to treat wheezing and shortness of breath caused by asthma and to prevent asthma attacks. It is also used to treat symptoms of hay fever and allergic rhinitis.

168.     Nabumetone. Nabumetone is an NSAID used to treat pain and inflammation.

169.     Nadolol. Nadolol is used to treat hypertension and for long-term treatment of angina pectoris. It is also used for heart rate control in people with atrial fibrillation, prevention of migraine headaches, prevention of bleeding veins in people with cirrhosis, and to treat people with high levels of thyroid hormone.

170.     Nafcillin Sodium. Nafcillin sodium is an antibiotic used to treat staphylococci and other bacterial infections.

171.     Naproxen Sodium. Naproxen sodium is an NSAID used to treat pain, menstrual cramps, inflammatory diseases such as rheumatoid arthritis, and fever.

172.     Neomycin Polymyxin Hydrocortisone. Neomycin polymyxin hydrocortisone is a combination medication consisting of two antibiotics and a corticosteroid used to treat outer ear infections caused by bacteria.

173.     Niacin ER. Niacin is an organic compound that is a form of vitamin B3. It is an essential human nutrient and the extended release form is used to treat high blood cholesterol and niacin deficiency.

174.     Nimodipine. Nimodipine is a dihydropyridine calcium channel blocker used to manage and reduce problems caused by bleeding blood vessels in the brain.

175.     Nitrofurantoin MAC. Nitrofurantoin microcrystal ("MAC") is an antibiotic used to treat bladder infections. It is included on the WHO's list of Essential Medicines.

176.   Norethindrone Acetate. Norethindrone acetate is a progestin used in birth control pills, menopausal hormone therapy, and for treatment of gynecological disorders such as abnormal uterine bleeding.

177.   Nortriptyline HCL. Nortriptyline hydrochloride is used to treat depression, neuropathic pain, ADHD, and anxiety and is also used for smoking cessation.

178.   Nystatin. Nystatin is an antifungal medication. It is used to treat yeast infections, diaper rash, thrush, and esophageal candidiasis. It is included on the WHO's list of Essential Medicines.

179.   Nystatin Triamcinolone. Nystatin triamcinolone is a combination topical drug consisting of nystatin, an antifungal medication, and triamcinolone, an anti-inflammatory corticosteroid. It is used to treat fungal skin infections.

180.   Omega-3-Acid Ethyl Esters. Omega-3 acid ethyl esters are the omega-3 fatty acids eicosapentaenoic acid (EPA) and docosahexaenoic acid (DHA) found in fish oil. The combination is used to reduce triglyceride levels in adults with severe hypertriglyceridemia.

181.   Omeprazole Sodium Bicarbonate. Omeprazole sodium bicarbonate is a combination medication consisting of a proton pump inhibitor and an antacid. It is used to treat gastroesophageal reflux disease.

182.   Ondansetron. Ondansetron is used to prevent nausea and vomiting that may be caused by surgery, chemotherapy, or radiation treatment. It is included on the WHO's List of Essential Medicines.

183.   Oxacillin Sodium. Oxacillin sodium is an antibiotic used to treat staphylococci and other bacterial infections.

184.   Oxaprozin. Oxaprozin is an NSAID used to relieve inflammation, swelling, stiffness, and join pain associated with osteoarthritis and rheumatoid arthritis.

185.   <u>Oxybutynin Chloride</u>. Oxybutynin chloride is used to treat an overactive bladder. It is also used to treat bed wetting in children and excessive sweating.

186.   <u>Oxycodone Acetaminophen</u>. Oxycodone acetaminophen is a combination medication consisting of an opioid pain reliever and a non-opioid pain reliever used to treat moderate to severe pain.

187.   <u>Oxycodone HCL</u>. Oxycodone hydrochloride is an opioid used to treat moderate to severe pain.

188.   <u>Paricalcitol</u>. Paricalcitol is used for the prevention and treatment of secondary hyperparathyroidism associated with chronic kidney disease.

189.   <u>Paromomycin</u>. Paromomycin is a broad-spectrum oral antibiotic. It is used to treat parasitic infections in the intestines and complications of liver disease. It is included on the WHO's list of Essential Medicines.

190.   <u>Penicillin VK</u>. Penicillin VK potassium ("VK") is an antibiotic used to treat bacterial infections including strep throat, otitis media, and cellulitis. It is also used to treat rheumatic fever and to prevent infections following removal of the spleen. It is included on the WHO's list of Essential Medicines.

191.   <u>Pentoxifylline</u>. Pentoxifylline is a xanthine derivative used to treat muscle pain, cramping, numbness, or weakness in people with peripheral artery disease. It is also used for the treatment of chronic venous leg ulcers and alcoholic hepatitis.

192.   <u>Permethrin</u>. Permethrin is a topical insecticide used to treat scabies and lice. It is included on the WHO's list of Essential Medicines.

193.   <u>Perphenazine</u>. Perphenazine is an antipsychotic medication used to treat schizophrenia, bipolar disorder, and schizoaffective disorder.

194.    Phenytoin Sodium. Phenytoin sodium is an anticonvulsant medication used to prevent and control seizures. It is included on the WHO's list of Essential Medicines.

195.    Pilocarpine HCL. Pilocarpine hydrochloride is a cholinergic agonist used to treat dryness of the mouth and throat caused by a decrease in the amount of saliva that may occur after radiation treatment for cancer.

196.    Pioglitazone Metformin HCL IR. Pioglitazone-metformin instant release is a combination drug used to improve blood sugar control in adults with type-2 diabetes who do not use daily insulin injections.

197.    Piroxicam. Piroxicam is an NSAID used to treat rheumatoid arthritis and osteoarthritis, primary dysmenorrhea, and post-operative pain, and is also used as an analgesic in the treatment of inflammatory conditions.

198.    Potassium Chloride. Potassium chloride is used to prevent and to treat hypokalemia (low potassium). It is included on the WHO's list of Essential Medicines.

199.    Pravastatin. Pravastatin is statin used to lower cholesterol and triglycerides in the blood. Pravastatin was, by number of prescriptions, the twenty-third most popular prescription drug in the United States in the first quarter of 2016.

200.    Prazosin HCL. Prazosin hydrochloride is used to treat hypertension, symptoms of an enlarged prostate, and posttraumatic stress disorder.

201.    Prednisolone Acetate. Prednisolone acetate is a synthetic glucocorticoid corticosteroid used to treat swelling, redness, and itching in the eyes due to inflammation or injury.

202.    Prednisone. Prednisone is a corticosteroid used to treat conditions such as arthritis, blood disorders, breathing problems, severe allergies, skin diseases, cancer, eye problems, and immune system disorders.

203.  <u>Prochlorperazine</u>. Prochlorperazine is used to treat nausea, schizophrenia, migraines, and anxiety.

204.  <u>Progesterone</u>. Progesterone is a female sex hormone produced by the human body that is also available as a drug to treat amenorrhea, abnormal uterine bleeding, severe symptoms of premenstrual syndrome, and conditions relating to pregnancy.

205.  <u>Promethazine HCL</u>. Promethazine hydrochloride is an antihistamine used to treat allergy symptoms, nausea, and vomiting caused by a reaction to anesthesia or motion sickness.

206.  <u>Propranolol HCL</u>. Propranolol hydrochloride is a beta-blocker used to treat hypertension, heart rhythm disorders, tremors, and other heart and circulatory conditions, and to prevent heart attacks, migraine headaches, and angina. Propranolol is available as a capsule, a tablet, an oral liquid solution, and an injection. It is included on the WHO's list of Essential Medicines.

207.  <u>Raloxifene HCL</u>. Raloxifene hydrochloride is used to prevent and treat osteoporosis in postmenopausal women and those on glucocorticoids. It is also used for reduction of risk and treatment of invasive breast cancer and to reduce breast density.

208.  <u>Ranitidine HCL</u>. Ranitidine hydrochloride is used to treat peptic ulcer disease, gastroesophageal reflux disease, Zollinger-Ellison syndrome, and hives. It is included on the WHO's list of Essential Medicines.

209.  <u>Silver Sulfadiazine</u>. Silver sulfadiazine is a topical antibiotic used to prevent and treat infections of burns. It is included on the WHO's List of Essential Medicines.

210.  <u>Sotalol HCL</u>. Sotalol hydrochloride is a beta blocker used to treat tachycardia and other fast and/or irregular heartbeats.

211.  <u>Spironolactone HCTZ</u>. Spironolactone hydrochlorothiazide is a diuretic used to treat hypertension, heart failure, and edema.

212.     <u>Sumatriptan</u>. The Sumatriptan autoinjector is a spring-loaded syringe delivering a selective serotonin receptor agonist used to treat symptoms of migraine headaches.

213.     <u>Tacrolimus</u>. Tacrolimus is a topical calcineurin inhibitor used to treat eczema.

214.     <u>Tamoxifen Citrate</u>. Tamoxifen citrate is used to prevent and treat breast cancer. It is included on the WHO's list of Essential Medicines.

215.     <u>Temozolomide</u>. Temozolomide is an oral chemotherapy drug used to treat some brain cancers, astrocytoma, and glioblastoma multiforme.

216.     <u>Terconazole</u>. Terconazole is a topical antifungal medication used to treat yeast infections.

217.     <u>Theophylline ER</u>. Theophylline ER is used to treat asthma and airway constriction associated with long-term asthma and other lung problems including chronic bronchitis and emphysema.

218.     <u>Timolol Maleate</u>. Timolol maleate is a beta blocker ophthalmic medication that lowers pressure inside the eyes due to glaucoma or other eye diseases such as ocular hypertension. It is included on the WHO's list of Essential Medicines.

219.     <u>Tizanidine</u>. Tizanidine is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

220.     <u>Tobramycin</u>. Tobramycin is an antibiotic used to treat various bacterial infections, particularly gram-negative infections.

221.     <u>Tobramycin Dexamethasone</u>. Tobramycin dexamethasone is a combination medication consisting of an antibiotic and a corticosteroid used to treat bacterial infections in the eye.

222.     <u>Tolmetin Sodium</u>. Tolmetin sodium is an NSAID used to reduce hormones that cause pain, swelling, tenderness, and stiffness in conditions such as osteoarthritis, rheumatoid arthritis, and juvenile rheumatoid arthritis.

223.     <u>Tolterodine</u>. Tolterodine is used to treat frequent urination, urinary incontinence, and urinary urgency. It is sold in extended release form and as tolterodine tartrate.

224.     <u>Topiramate Sprinkle</u>. Topiramate sprinkle is used to treat epilepsy and alcohol dependence and to prevent migraines.

225.     <u>Trazodone HCL</u>. Trazodone hydrochloride is a tetracyclic antidepressant used to treat depression and anxiety disorders.

226.     <u>Triamcinolone Acetonide</u>. Triamcinolone acetonide is a topical corticosteroid used to treat inflammation caused by conditions such as allergic reactions, eczema, dermatitis, and psoriasis.

227.     <u>Triamterene HCTZ</u>. Triamterene hydrochlorothiazide is a diuretic medication used to treat water retention and high blood pressure.

228.     <u>Trifluoperazine HCL</u>. Trifluoperazine hydrochloride is an antipsychotic used to treat schizophrenia and for the short-term treatment of generalized anxiety disorder.

229.     <u>Ursodiol</u>. Ursodiol is a naturally-occurring bile acid that is manufactured and sold as a prescription medication to dissolve gallstones made of cholesterol in patients whose gallbladders do not need to be removed or where surgery is not an option. It is also used to prevent the formation of gallstones and to treat primary biliary cirrhosis (an autoimmune disease in which the bile ducts in the liver are destroyed). Ursodiol can also be used to prevent organ rejection in liver transplant patients.

230.     <u>Valganciclovir</u>. Valganciclovir is an antiviral drug used to treat cytomegalovirus infections in people with HIV/AIDS or patients having received an organ transplant.

REDACTED – PUBLIC VERSION

231.    <u>Valsartan HCTZ</u>. Valsartan hydrochlorothiazide is used to treat hypertension, heart failure, and diabetic kidney disease.

232.    <u>Vancomycin HCL</u>. Vancomycin hydrochloride is an antibiotic used to treat bacterial infections in the intestines, such as colitis. It is included on the WHO's list of Essential Medicines,

233.    <u>Verapamil</u>. Verapamil is a calcium channel blocker. It is used to treat hypertension, angina, and certain heart rhythm disorders. It is included on the WHO's list of Essential Medicines.

234.    <u>Warfarin Sodium</u>. Warfarin sodium is an anticoagulant used to treat blood clots such as deep vein thrombosis and pulmonary embolism. It is also used to prevent stroke in people who have atrial fibrillation, valvular heart disease, or artificial heart valves. It is included on the WHO's list of Essential Medicines.

235.    <u>Zoledronic Acid.</u> Zoledronic acid is a biphosphate used to prevent bone fractures in cancer patients. It is included on the WHO's list of Essential Medicines.

## III.    JURISDICTION AND VENUE

236.    This Court has jurisdiction over this action pursuant to 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337. Plaintiff asserts claims for relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over the state law claims alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal antitrust claims as to form part of the same case or controversy.

237.    This Court has personal jurisdiction over Defendants because each Defendant transacted business throughout the United States (including in this District), sold and distributed one or more of the Subject Drugs throughout the United States (including in this District), has registered agents in the United States (including in this District), may be found in the United States (including in this District), engaged in an unlawful conspiracy to artificially increase prices for one or more of the Subject Drugs that was directed at and had the intended effect of causing injury to persons

residing in, located in, or doing business throughout the United States (including in this District), and is otherwise subject to the service of process provisions of 15 U.S.C. § 22.

238.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b)-(d). Defendants transact business within this District, have agents and can be found in this District, and the relevant interstate trade and commerce is carried out, in substantial part, in this District.

239.    Defendants sold and distributed generic pharmaceuticals in a continuous and uninterrupted flow of interstate commerce, which included sales of the Subject Drugs in the United States (including in this District). Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States (including in this District).

## IV.    THE PARTIES

### A.    Plaintiff

240.    Molina Healthcare Inc. is a publicly traded healthcare management organization headquartered in Long Beach, CA.  Molina provides health care services to families and individuals who qualify for government-sponsored programs like Medicaid. Molina is driven by the belief that each person deserves quality care.

241.    Molina Healthcare was founded in 1980 by Dr. C. David Molina, an emergency room physician, who recognized that many low-income patients were coming to the emergency room for treatment for common illnesses because they did not have family doctors to provide care and information. Dr. Molina established a network of primary care clinics with the goal of treating this underserved community.

242.    In 1996, as the need to more effectively manage and deliver health care services to low-income populations grew, Molina became a licensed health plan in California.  Subsequently, Molina expanded to numerous other states across the nation, operating through state-licensed

subsidiaries.  Molina currently serves approximately 3.3 million members across 14 states and Puerto Rico.

243.    Molina Healthcare Inc. ("MHI") is the parent company, and assignee of the claims, of subsidiaries and affiliates that provide health insurance that cover medical expenses incurred by the plan's beneficiaries.  These assignor subsidiaries include:  Molina Healthcare of California, Molina Healthcare of California Partner Plan, Inc., Molina Healthcare of Florida, Inc., Molina Healthcare of Illinois, Inc., Molina Healthcare of Kentucky, Inc., Molina Healthcare of Michigan, Inc., Molina Healthcare of Mississippi, Inc., Molina Healthcare of Missouri, Inc., Molina Healthcare of New Mexico, Inc., Molina Healthcare of New York, Inc., Molina Healthcare of Ohio, Inc., Molina Healthcare of Puerto Rico, Inc., Molina Healthcare of South Carolina, Inc., Molina Healthcare of Texas, Inc., Molina Healthcare of Texas Insurance Company, Molina Healthcare of Utah, Inc. (d/b/a Molina Healthcare of Utah and Molina Healthcare of Idaho), Molina Healthcare of Virginia, Inc., Molina Healthcare of Washington, Inc., and Molina Healthcare of Wisconsin, Inc. Collectively, the purchases of these entities are referred to as the "Molina Purchases."

244.    The benefits for these health plans include prescription drug coverage under which claims for the Subject Drugs have been, and continue to be, submitted and paid. Under Molina's prescription drug coverage, if a provider orders a brand name drug and there is a generic available, Molina will cover the generic medication.

**B.      Defendants**

245.    Defendant Actavis Holdco US, Inc. ("Actavis Holdco") is a Delaware corporation with a principal place of business in Parsippany, New Jersey. In March 2015, Actavis plc, the then-parent company of Defendants Actavis Elizabeth, LLC and Actavis Pharma, Inc., merged with Allergan, Inc. and changed its name to Allergan plc ("Allergan"). In August 2016, Teva Pharmaceutical Industries Ltd., the Israeli parent company of Defendant Teva Pharmaceuticals

USA, Inc., purchased Allergan's generics business, which included Defendants Actavis Elizabeth, LLC and Actavis Pharma, Inc. The assets and liabilities of Allergan's generics business were transferred to the newly-formed Actavis Holdco. Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc.

246.    Defendant Actavis Elizabeth, LLC ("Actavis Elizabeth") is a Delaware limited liability company with a principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a research and development and manufacturing entity for the Actavis generics operations.

247.    Defendant Actavis Pharma, Inc., is a Delaware corporation with a principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic pharmaceuticals.

248.    Actavis Holdco, Actavis Elizabeth, and Actavis Pharma, Inc. are collectively referred to herein as "Actavis." At all times relevant to the Complaint, Actavis marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

249.    Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business in Lake Forest, Illinois. Akorn is the parent company of Defendant Hi-Tech Pharmacal Co., Inc. At all times relevant to the Complaint, Akorn marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

250.    On May 20, 2010, Akorn filed for bankruptcy and on September 4, 2020, the United States Bankruptcy Court for the District of Delaware entered its Order conferring the Modified Joint Chapter 11 Plan of Akorn, Inc. and its Debtor Affiliates (including Hi-Tech and VersaPharm) ("Order"). By this Amended Complaint, Molina is not seeking to commence or continue this action as to Akorn and its Debtor Affiliates except as to treat them as a nominal defendant or to take any

action that would violate the Injunction entered by the Order. Furthermore, Akorn and its Debtor Affiliates are not named as a Defendant with respect to those claims that have been added by amendment to this complaint (even where Akorn and its Debtor Affiliates are referenced as a co-conspirators as to these added claims) and Molina does not seek to hold Akorn and its Debtor Affiliates accountable for those claims either arising from their own conduct or from joint and several liability based on the conduct of their co-conspirators.

251.    Defendant Alvogen, Inc. ("Alvogen") is a Delaware corporation with a principal place of business in Pine Brook, New Jersey. It is a privately held company that was founded in 2009 by a former CEO of Actavis. On March 7, 2016, Alvogen acquired County Line Pharmaceuticals ("County Line") and is the successor in interest to County Line. Unless addressed individually, Alvogen and County Line are collectively referred to as "Alvogen." At all times relevant to the Complaint, Alvogen marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

252.    Defendant Amneal Pharmaceuticals LLC ("Amneal") is a Delaware limited liability company with a principal place of business in Bridgewater, New Jersey. At all times relevant to the Complaint, Amneal marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

253.    Defendant Apotex Corp. ("Apotex") is a Delaware corporation with a principal place of business in Weston, Florida. At all times relevant to the Complaint, Apotex marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

254.    Defendant Ascend Laboratories, LLC ("Ascend") is a New Jersey limited liability company with a principal place of business in Parsippany, New Jersey. At all times relevant to the Complaint, Ascend marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

255.     Defendant Aurobindo Pharma USA, Inc., ("Aurobindo") is a Delaware corporation with a principal place of business in Dayton, New Jersey. At all times relevant to this Complaint, Aurobindo marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

256.     Defendant Barr Pharmaceuticals, LLC ("Barr") is a Delaware limited liability company with a principal place of business in North Wales, Pennsylvania. Barr is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., which acquired Barr (then called Barr Pharmaceuticals, Inc.) in 2008. Prior to its acquisition by Teva Pharmaceutical Industries Ltd., Barr was a holding company that operated through its principal subsidiaries Barr Laboratories, Inc., Duramed Pharmaceuticals, Inc., and PLIVA, d.d. (a Croatian corporation with its headquarters in Zagreb, Croatia). At all times relevant to the Complaint, Barr marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

257.     Defendant Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International, Inc. is a Delaware corporation with US headquarters located in Bridgewater, New Jersey. Bausch Health Americas, Inc. is the parent company of Defendant Bausch Health US, LLC.

258.     Defendant Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC is a Delaware limited liability company with a principal place of business in Bridgewater, New Jersey.

259.     Unless addressed individually, Bausch Health Americas, Inc. and Bausch Health US, LLC, together with Defendant Oceanside Pharmaceuticals, Inc., described below, are collectively referred to as "Valeant." At all times relevant to the Complaint, Valeant marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

260.     Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with a principal place of business in Fairfield, New Jersey. At all times relevant to the

Complaint, Breckenridge marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

261.    Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with a principal place of business in Piscataway, New Jersey. At all times relevant to the Complaint, Camber marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

262.    Defendant Citron Pharma, LLC ("Citron") is a Delaware limited liability company with a principal place of business in East Brunswick, New Jersey. At all times relevant to the Complaint, Citron marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

263.    Defendant DAVA Pharmaceuticals, LLC ("DAVA") is a Delaware limited liability company with a principal place of business in Fort Lee, New Jersey. Defendants Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., Generics Bidco I, LLC, and DAVA are wholly-owned subsidiaries of Defendant Endo International plc ("Endo"), as described below. At all times relevant to the Complaint, DAVA marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

264.    Defendant Dr. Reddy's Laboratories Inc. ("Dr. Reddy's") is a New Jersey corporation with a principal place of business in Princeton, New Jersey. Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian company with its principal place of business in Hyderabad, India. At all times relevant to the Complaint, Dr. Reddy's marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

265.    Defendant Emcure Pharmaceuticals, Ltd., ("Emcure") is an Indian corporation with its principal place of business in Pune, India. Emcure is the parent company of Defendant Heritage Pharmaceuticals, Inc. and Emcure Pharmaceuticals USA, Inc., both of which have a principal place

of business in East Brunswick, New Jersey. Emcure participated in and at times directed the

business activities of Heritage Pharmaceuticals, Inc. At all times relevant to the Complaint, Emcure

participated in the alleged conspiracy, and marketed and sold one or more of the Subject Drugs in

this District and throughout the United States.

266.    Defendant Endo International plc ("Endo") is an Irish company with global

headquarters in Dublin, Ireland, and U.S. headquarters in Malvern, Pennsylvania. Endo is the parent

company of Defendants Par Pharmaceutical, Inc., and Par Pharmaceutical Companies, Inc.,

Generics Bidco I, LLC, and DAVA. In August 2014, Endo's subsidiary, Generics International (US),

Inc. d/b/a Qualitest Pharmaceuticals, acquired DAVA. In September 2015, Endo completed the

acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Par Pharmaceutical,

Inc. and Par Pharmaceutical Companies, Inc., and merged Par's business with Endo's subsidiary co-

conspirator Qualitest Pharmaceuticals, Inc. ("Qualitest"), naming the segment Par Pharmaceutical,

Inc. Par is thus the successor in interest to both DAVA and Qualitest. At all times relevant to the

Complaint, Endo marketed and sold generic pharmaceuticals in this District and throughout the

United States, and also participated in and directed the business activities of its subsidiaries as listed

above.

267.    Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with

its principal place of business in Laurelton, New York. At all times relevant to the Complaint, Epic

marketed and sold one or more of the Subject Drugs in this District and throughout the United

States.

268.    Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation

with a principal place of business in Melville, New York. It is under common ownership with

Defendant Sandoz, Inc., as both are wholly-owned subsidiaries of Novartis AG ("Novartis").

Fougera specializes in the production, marketing, and sale of dermatological products. At all times

relevant to the Complaint, Fougera marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

269.    Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with a principal place of business in South Plainfield, New Jersey. At all times relevant to the Complaint, G&W marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

270.    Defendant Generics Bidco I, LLC ("Generics Bidco") is a Delaware limited liability company with its principal place of business in Huntsville, Alabama, and formerly conducted business as Qualitest. Generics Bidco is a wholly-owned subsidiary of Endo, and affiliate of Par (defined below). At all times relevant to the Complaint, Generics Bidco marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

271.    Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with a principal place of business in Mahwah, New Jersey. At all times relevant to the Complaint, Glenmark marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

272.    Defendant Greenstone LLC, ("Greenstone") is a limited liability company with a principle plae of business in Peapack, New Jersey. Greenstone is a wholly-owned subsidiary of Defendant Pfizer, Inc. ("Pfizer"), a global pharmaceutical company headquartered in New York, New York, and has at all relevant times operated as the generic drug division of Pfizer. Greenstone operates out of Pfizer's Peakpack, New Jersey campus, and a majority of Greenstone's employees are also employees of Pfizer's Essential Health Division, including Greenstone's President, and use an @pfizer.com e-mail address. Greenstone employees also use Pfizer for financial analysis, human resources, and employee benefit purposes, making the two companies essentially interchangeable. At all times relevant to the Complaint, Greenstone marketed and sold one or more of the Subject

Drugs in this District and throughout the United States under the direction and control of Pfizer.

Unless individually addressed, Greenstone and Pfizer are collectively referred to as "Greenstone."

273.     Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation

with a principal place of business in Eatontown, New Jersey. Heritage is a wholly-owned subsidiary

of Emcure. At all times relevant to the Complaint, Heritage marketed and sold one or more of the

Subject Drugs in this District and throughout the United States.

274.     Defendant Hikma Pharmaceuticals USA Inc. (f/k/a West-Ward Pharmaceuticals

Corp.) ("West-Ward") is a Delaware corporation with a principal place of business in Eatontown,

New Jersey. West-Ward is the United States agent and subsidiary of Hikma Pharmaceuticals PLC, a

London-based global pharmaceutical company. At all times relevant to the Complaint, West-Ward

marketed and sold one or more of the Subject Drugs in this District and throughout the United

States.

275.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with

its principal place of business in Amityville, New York. Hi-Tech is a wholly-owned subsidiary of

Defendant Akorn. Upon information and belief, in or around 2009, Defendant Hi-Tech obtained 5

generic ANDA applications from DFB Pharmaceuticals, Inc. At all times relevant to the Complaint,

Hi-Tech marketed and sold one or more of the Subject Drugs in this District and throughout the

United States.

276.     As set forth above, on May 20, 2020, Akorn, Inc. and certain of its subsidiaries,

including Akorn Sales, Inc., Hi-Tech Pharmacal Co., Inc., and VersaPharm, Inc. filed voluntary

petitions for relief under 11 U.S.C. §§ 101-1532 in the United States Bankruptcy Court for the

District of Delaware and on September 4, 2020, the United States Bankruptcy Court for the District

of Delaware entered its Order conferring the Modified Joint Chapter 11 Plan of Akorn, Inc. and its

Debtor Affiliates.

277.    Defendant Impax Laboratories, LLC f/k/a Impax Laboratories, Inc. ("Impax") is a Delaware limited liability company with a principal place of business in Hayward, California. At all times relevant to the Complaint, Impax marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

278.    Defendant Jubilant Cadista Pharmaceuticals Inc. ("Cadista") is a Delaware corporation with a principal place of business in Salisbury, Maryland. It is a wholly-owned subsidiary of Jubilant Life Sciences Company, an Indian pharmaceutical company. At all times relevant to the Complaint, Cadista marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

279.    Defendant Lannett Company, Inc. ("Lannett") is a Delaware corporation with a principal place of business in Philadelphia, Pennsylvania. At all times relevant to the Complaint, Lannett marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

280.    Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with a principal place of business in Baltimore, Maryland. Lupin is a wholly-owned subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India. At all times relevant to this Complaint, Lupin marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

281.    Defendant Mayne Pharma Inc. ("Mayne") is a Delaware corporation with a principal place of business in Paramus, New Jersey. Mayne is a wholly-owned subsidiary of Mayne Pharma Group Limited, an Australian company with a principal place of business in Salisbury, Australia. In 2012, Mayne acquired Metrics, Inc. and its division Midlothian Laboratories ("Midlothian") and has operated under the name Midlothian since that time. At all times relevant to the Complaint, Mayne

marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

282.    Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with a principal place of business in Morton Grove, Illinois. Morton Grove is a wholly-owned subsidiary of Defendant Wockhardt, Ltd. At all times relevant to this Complaint, Morton Grove marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

283.    Defendant Mutual Pharmaceutical Company, Inc. ("Mutual") is a Delaware corporation with a principal place of business in Philadelphia, Pennsylvania. As described below, Mutual and its parent, Defendant URL Pharma, Inc., are owned by Defendant Sun Pharmaceutical Industries, Inc. At all times relevant to the Complaint, Mutual marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

284.    Defendant Mylan Inc. is a Pennsylvania corporation with a principal place of business in Canonsburg, Pennsylvania. It is the parent company of Defendant Mylan Pharmaceuticals, Inc.

285.    Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with a principal place of business in Morgantown, West Virginia.

286.    Defendant Mylan N.V. is a Dutch company with a principal place of business and global headquarters in Canonsburg, Pennsylvania. Mylan N.V. is the direct parent of Mylan Inc. and the ultimate parent of Mylan Pharmaceuticals, Inc. and UDL Laboratories Inc.

287.    Mylan Inc., Mylan Pharmaceuticals, Inc., Mylan N.V., and UDL are collectively referred to as "Mylan." At all times relevant to this Complaint, Mylan marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

288.     Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with a principal place of business in Aliso Viejo, California. Oceanside is a wholly-owned subsidiary of Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC.

289.     Defendant Par Pharmaceutical Companies, Inc., is a Delaware corporation with a principal place of business in Chestnut Ridge, New York.

290.     Defendant Par Pharmaceutical, Inc. is a New York corporation with a principal place of business in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a direct subsidiary of Par Pharmaceutical Companies, Inc.

291.     Unless addressed individually, Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc., along with Endo, Generics Bidco I, and DAVA, discussed above, are collectively referred to herein as "Par." At all times relevant to the Complaint, Par marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

292.     Defendant Perrigo Company plc ("Perrigo plc") is an Irish company with a principal place of business in Dublin, Ireland. Perrigo plc's North American base of operations is located in Allegan, Michigan. Perrigo plc's prescription drug business focuses primarily on the manufacture and sale of extended topical prescription pharmaceuticals.

293.     Defendant Perrigo New York, Inc. ("Perrigo New York") is a Delaware corporation with a principal place of business in Bronx, New York. Perrigo New York is a wholly-owned subsidiary of Perrigo plc.

294.     Perrigo plc and Perrigo New York are collectively referred to as "Perrigo." During the relevant time period, Perrigo marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

295.     Defendant Pfizer, Inc., ("Pfizer") is a Delaware corporation with its principal place of business in New York, N.Y. Pfizer is a global biopharmaceutical company and is the corporate

parent of Defendant Greenstone. At all times relevant to the Complaint, Pfizer has participated in and directed the business activities of Defendant Greenstone.

296.    Defendant PLIVA, Inc. ("PLIVA") is a New Jersey corporation with a principal place of business in East Hanover, New Jersey. PLIVA is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., which acquired the PLIVA assets as part of the Barr acquisition, as described above. At all times relevant to the Complaint, PLIVA marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

297.    Defendant Sandoz, Inc., ("Sandoz") is a Colorado corporation with a principal place of business in Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. At all times relevant to the Complaint, Sandoz marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

298.    Defendants Strides Pharma, Inc. ("Strides") is a New Jersey corporation with its principle place of business in East Brunswick, New Jersey. Strides is the U.S. subsidiary and sales agent of Strides Pharma Science Limited, an Indian pharmaceutical conglomerate. At all times relevant to the Complaint, Strides marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

299.    Defendant Sun Pharmaceuticals Industries, Inc. ("Sun") is a Michigan corporation with a principal place of business in Cranbury, New Jersey. Until February 2011, Sun was known as Caraco Pharmaceutical Laboratories, Ltd. Since 2011, Sun has been a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian company with a principal place of business in Mumbai, India, which also owns, and owned throughout the relevant period, a large majority stake of Defendants Taro Pharmaceutical Industries Ltd. and Taro Pharmaceuticals USA, Inc. In late 2012, Sun acquired Defendant URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical

Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, Pennsylvania. Sun also does business under the name Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997. Unless addressed individually, Sun, URL, Mutual and Caraco are collectively referred to herein as "Sun." At all times relevant to the Complaint, Sun marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

300.     Defendant Taro Pharmaceutical Industries Ltd. is an Israeli company with a principal place of business in Haifa Bay, Israel. Throughout the relevant time period, the Indian parent company of Defendant Sun has owned a large majority stake of Taro Pharmaceutical Industries Ltd. At all times relevant to the Complaint, Taro Pharmaceutical Industries Ltd. participated in and directed the business activities of Defendant Taro Pharmaceuticals USA, Inc.

301.     Defendant Taro Pharmaceuticals USA, Inc. is a New York corporation with a principal place of business in Hawthorne, New York.

302.     Taro Pharmaceutical Industries Ltd. and Taro Pharmaceuticals USA, Inc. are collectively referred to herein as "Taro." At all times relevant to the Complaint, Taro marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

303.     Defendant Teligent, Inc. f/k/a IGI Laboratories, Inc. ("Teligent") is a Delaware corporation with a principal place of business in Buena, New Jersey. At all times relevant to the Complaint, Teligent marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

304.     Defendant Teva Pharmaceuticals USA, Inc., ("Teva") is a Delaware corporation with a principal place of business in North Wales, Pennsylvania. Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli corporation with its principal place of business in Petah Tikva Israel. Unless addressed individually, Teva, Barr, and Pliva, discussed above, are

collectively referred to herein as "Teva." At all times relevant to the Complaint, Teva marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

305.    Defendant Torrent Pharma Inc. ("Torrent") is a Delaware corporation with a principal place of business in Basking Ridge, New Jersey. Torrent is a wholly-owned subsidiary of Torrent Pharmaceuticals Ltd., an Indian pharmaceutical company. At all times relevant to the Complaint, Torrent marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

306.    Defendant UDL Laboratories Inc. ("UDL") is an Illinois corporation with its principal place of business in Rockford, Illinois. UDL is a subsidiary of Defendant Mylan Inc. At all times relevant to the Complaint, UDL marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

307.    Defendant Upsher-Smith Laboratories, LLC, ("Upsher-Smith") is a Minnesota limited liability company with a principal place of business in Maple Grove, Minnesota. Upsher-Smith is a subsidiary of Sawaii Pharmaceutical Co., Ltd., a large generics company in Japan. At all times relevant to the Complaint, Upsher-Smith marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

308.    Defendant URL Pharma, Inc. ("URL") is a Delaware corporation with a principal place of business in Philadelphia, Pennsylvania. It is a subsidiary of Sun Pharmaceutical Industries Ltd. At all times relevant to the Complaint, URL marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

309.    246.    Defendant VersaPharm, Inc. ("VersaPharm") is a Georgia corporation with its principal place of business in Marietta, Georgia. On August 12, 2014, Akorn, Inc. acquired VPI Holdings Corp., the parent company of VersaPharm. At all times relevant to the Complaint,

VersaPharm marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

310.     As set forth above, on May 20, 2020, Akorn, Inc. and certain of its subsidiaries, including Akorn Sales, Inc., Hi-Tech Pharmacal Co., Inc., and VersaPharm, Inc. filed voluntary petitions for relief under 11 U.S.C. §§ 101-1532 in the United States Bankruptcy Court for the District of Delaware and on September 4, 2020, the United States Bankruptcy Court for the District of Delaware entered its Order conferring the Modified Joint Chapter 11 Plan of Akorn, Inc. and its Debtor Affiliates.

311.     Defendant Wockhardt USA LLC, ("Wockhardt") is a Delaware limited liability company with a principal place of business in Parsippany, New Jersey. Unless addressed individually, Wockhardt and Morton Grove, discussed above, are collectively referred to herein as "Wockhardt."At all times relevant to the Complaint, Wockhardt marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

312.     Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a New Jersey corporation with a principal place of business in Pennington, New Jersey. At all times relevant to the Complaint, Zydus marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

313.     When any allegation of the Complaint refers to any representation, act, or transaction of Defendants, or any agent, employee, or representative thereof, such allegation shall be deemed to mean that such principals, officers, directors, employees, agents, or representatives of Defendants acted within the scope of their actual or apparent authority, and performed such representations, acts, or transactions on behalf of Defendants.

## C.    Co-Conspirators

314.    Various other persons, firms, entities, and corporations not named as defendants in this Complaint have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

315.    Kavod Pharmaceuticals LLC, f/k/a Rising Pharmaceuticals, LLC and Rising Pharmaceuticals, Inc. (collectively "Rising") is a Delaware limited liability company with a principal place of business in Saddle Brook, New Jersey. On December 3, 2019, Rising admitted to fixing prices and allocating customers for Benazepril-HCTZ. It has been charged with one count of a felony conspiracy in restraint of trade and agreed to a deferred prosecution agreement with the Department of Justice. Rising sold and conspired regarding drugs other than Benazepril-HCTZ. At all times relevant to the Complaint, Rising marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

316.    On February 19, 2019, Rising and certain of its affiliated entities filed voluntary petitions for relief under 11 U.S.C. §§ 101-1532 in the United States Bankruptcy Court for the District of New Jersey.

317.    Mallinckrodt Inc. is a Delaware corporation with a principal place of business in Webster Groves, Missouri.

318.    Mallinckrodt LLC is a Delaware limited liability company with its principal place of business in St. Louis, Missouri.

319.    Mallinckrodt PLC is an Irish public limited company. It is the parent company of Mallinckrodt Inc., Mallinckrodt LLC, and Defendant SpecGx LLC.

320.    SpexGx LLC is a Delaware limited liability company with its principal place of business in Webster Groves, Missouri. It is a subsidiary of Mallinckrodt PLC.

REDACTED – PUBLIC VERSION

321.     Mallinckrodt Inc., Mallinckrodt LLC, Mallinckrodt PLC, and SpecGx LLC are collectively referred to as "Mallinckrodt." At all times relevant to the Complaint, Mallinckrodt marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

322.      On October 12, 2020, Mallinckrodt plc and certain of its affiliated entities, including Mallinckrodt LLC and SpexGx LLC, filed voluntary petitions for relief under 11 U.S.C. §§ 101-1532 in the United States Bankruptcy Court for the District of Delaware.

323.     The true names of additional co-conspirators are presently unknown to Plaintiff. Plaintiff may amend this Complaint to allege the true names of additional co-conspirators as they are discovered.

324.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## V.     REGULATORY AND ECONOMIC BACKGROUND

### A.     Generic Drugs Should Provide Lower-Priced Options for Purchasers

325.     Generic drugs provide a lower-cost but therapeutically equivalent substitute for brand-name drugs. Congress enacted the Hatch-Waxman Act ("Hatch-Waxman") in 1984 to encourage the production and sale of cheaper generic drugs by simplifying the regulatory hurdles that generic pharmaceutical manufacturers must clear to market and sell their drug products.[2]

---

[2] Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

326.     To obtain marketing approval for a generic drug, an Abbreviated New Drug Application ("ANDA") must be filed with the Food and Drug Administration's ("FDA") Center for Drug Evaluation and Research's ("CDER"), Office of Generic Drugs ("OGD").

327.     When the FDA approves an ANDA, that generic drug receives an "AB" rating from the FDA. This signifies the generic drug is therapeutically equivalent to a reference listed drug ("RLD"). RLD can either be a brand-name drug or a generic drug if the brand is not currently marketed. Therapeutic equivalence indicates the generic is both pharmaceutically equivalent (having the same active ingredient(s), same dosage form and route of administration, and identical strength or concentration) and bioequivalent (no significant difference in the rate and extent of absorption of the active pharmaceutical ingredient) to the RLD.

328.     Typically, AB-rated generic versions of brand-name drugs are priced significantly below their brand-name counterparts. The only material difference between a generic and its brand name counterparts is price. When multiple generic manufacturers enter the market, prices erode, sometimes by as much as 90%, as price competition increases. An FDA study recently noted that "generic competition is associated with lower drug prices, with the entry of the second generic competitor being associated with the largest price reduction." Because of this, AB-rated generic drugs gain market share rapidly. As more generic drugs enter the market, the price of those drugs should progressively decrease, resulting in lower costs for purchasers, like Molina. These cost reductions were the intent of Hatch-Waxman's expedited generic approval pathway.

329.     Because each generic of the same RLD is readily substitutable for another generic, the products behave like commodities; price is the only differentiating feature, and the basis for competition.[3] Generic competition, therefore, when functioning in a market undisturbed by

---

[3]  *See, e.g.,* Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact,* at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and

anticompetitive forces, reduces drug costs by driving prices down for AB-rated generic versions of brand-name drugs. Predictably, the longer generic drugs remain on the market, the lower their prices will become, ever nearing closer to a manufacturer's marginal costs.

330.    In the United States, a prescription drug may be dispensed to a patient only by a licensed pharmacist pursuant to a doctor's prescription that identifies the drug. The prescription may only be filled with either the brand-name drug identified or an AB-rated generic version. Pharmacists may (and, in most states, must) substitute an AB-rated generic for the brand-name drug, without seeking or obtaining permission from the prescribing doctor (unless the prescribing physician indicated "dispense as written" on the prescription).

331.    Generic competition enables purchasers like Molina to purchase a generic version of a brand-name drug at substantially lower prices. In fact, studies have shown that use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[4]

### B.    The Prescription Drug Market

332.    The United States is a venue ripe for illegal anticompetitive exploitation of prescription drug prices due to laws that regulate how prescription drugs are prescribed and filled.

333.    For most consumer products, the person responsible for paying for the product selects the product. When the payer is also the user of the product, the price of the product plays an

---

drugstores primarily on the basis of price."), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

[4]  GPhA, *Generic Drug Savings in the U.S.* (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

appropriate role in the person's choice. This incentivizes manufacturers to lower the price of their product. The pharmaceutical marketplace departs from this norm.

334.    In most instances, a pharmacist dispenses a prescription pursuant to a doctor's prescription, and the patient and his/her health insurer pay for the prescription drug. The pharmacist may dispense only the brand-name drug named in the prescription or its AB-rated, FDA-approved generic equivalent, as set forth above.

335.    Therefore, the doctor's prescription defines the relevant product market, because it limits the consumer's (and the pharmacist's) choice to the drug named therein.

336.    Brand pharmaceutical sellers exploit this departure from consumer norms by employing "detailing" teams that persuade doctors to prescribe the branded product without advising the doctor on the cost of the product. The most important tool that insurers, like Molina, who bear the overwhelming majority of the cost of these prescription drugs, have is the availability of generic drugs in a competitive market. When drug manufacturers begin selling AB-rated generic drugs, insurers, along with others in the distribution chain, are able to substantially drive down the prices paid for those drugs.

337.    For example, TPP health insurers, like Molina, have complex formulary structures that incentivize doctors, pharmacists and insureds to prescribe, dispense, and fill AB-rated generic drugs when available.

### C.    The Prescription Drug Distribution System

338.    Drug manufacturers supply drug products. Rather than develop new drugs, generic manufacturers focus on manufacturing drugs that can be substituted for the brand drug product. Generic drugs can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments, creams, solutions, emollients, and gels. A manufacturer seeking to sell a

**REDACTED – PUBLIC VERSION**

drug in the United States must obtain FDA approval. The FDA typically evaluates whether the drug is safe and efficacious, the manufacturing process, labelling and quality control.

339.    Generic manufacturers operate facilities and compete with one another to sell the drugs they produce to wholesalers, distributors, retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health insurance plans. Competition among generic drug manufacturers is dictated by price and supply; as such generic manufacturers do not differentiate their products. Consequently, generic drugs are usually marketed only by the name of the active ingredient.

340.    Drug suppliers include the manufacturers or other companies that contract with a manufacturer to sell a drug product made by the manufacturer. Drug manufacturers typically sell their products through supply agreements negotiated with wholesalers, distributors, pharmacy benefit managers, mail-order or specialty pharmacies.

341.     Generic manufacturers report list prices for each generic drug that they offer, including the average wholesale price ("AWP") and wholesale acquisition cost ("WAC"). The WAC represents the manufacturers' list price, and typically does not represent discounts that may be provided. Manufacturers may supply the same generic drug at several different prices depending on the customer or type of customer.

342.    Generic manufacturers must also report their average manufacturer prices ("AMP") to the Centers for Medicare and Medicaid if they enter into a Medicaid rebate agreement. AMP is the average price paid to the manufacturer for the drug in the United States by (a) wholesalers for drugs distributed to retail community pharmacies and (b) retail community pharmacies that purchase drugs directly from the manufacturer.

343.    Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers. Wholesalers and distributors pay lower prices to acquire generics than the corresponding branded drug.

344.    Pharmacies purchase drugs, either directly from manufacturers or from wholesalers/distributors. Pharmacies may be traditional retail pharmacies, specialty pharmacies, or mail-order pharmacies. Pharmacies also pay lower prices to acquire generic drugs than to acquire the corresponding branded drug.

345.    Finally, insurers and insureds purchase the prescribed drug, typically in some type of cost sharing arrangement, depending on an insurer's formulary placement, among other things.

346.    To combat rising costs, some third-party payers and PBMs have implemented Maximum Allowable Costs ("MACs") that set the upper limit on what they will pay for a generic drug. TPPs and PBMs set MACs based on a variety of factors, including the lowest acquisition cost in the market for that generic drug. MAC pricing effectively requires pharmacies, retailers, and PBMs to purchase the lowest-price version of a generic drug on the market, regardless of WAC. As a result, a manufacturer should not, in a properly functioning market, be able to significantly increase its price without incurring the loss of a significant volume of sales. A manufacturer can only raise its price in the presence of MAC pricing if it knows it is conspiring with competitors to raise their prices too.

**D.**    **The Market for Generic Drugs is Highly Susceptible to Collusion**

347.    Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act, as it constitutes a conspiracy to fix prices and allocate markets and customers. As such, Molina is not required to define relevant markets. However, there are certain features characteristic of the market for generic drugs which indicate that it is susceptible to collusion and that collusion caused the price increases.

348.    Factors showing that a market is susceptible to collusion include:

a.    High level of industry concentration: A small number of competitors control roughly 100% of the market for each of the Subject Drugs. Beginning in 2005, the generic pharmaceutical market has undergone remarkable and extensive consolidation, rendering it ripe for collusion. As a result, for most of the Subject Drugs, there were between two and four manufacturers providing that drug for sale in the United States during the relevant time period, rendering each market sufficiently concentrated to carry on collusive activities.

b.    Sufficient numbers to drive competition: While the market for each of the Subject Drugs had a small enough number of competitors to foster collusion, the number of sellers or potential sellers was large enough that prices should have remained at their historical, near marginal cost levels absent collusion.

c.    High barriers to entry: The high costs of manufacturing, developing, testing, securing regulatory approval, and oversight are among the barriers to entry in the generic drug market. The Defendants here control virtually all of the market for the Subject Drugs and sell those drugs pursuant to FDA approvals granted years before the price hikes began in 2012. Any potential new entrant would have to go through the lengthy ANDA approval process before commercially marketing its product. This type of barrier to entry increases a market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

d.    High inelasticity of demand and lack of substitutes: Each of the Subject Drugs are generally a necessity for each patient it is prescribed, regardless of price. Substituting non-AB rated drugs presents challenges, and both patients and physicians are

unwilling to sacrifice patient wellbeing for cost savings. For many patients, the particular Subject Drug they are prescribed is the only effective treatment.

e.     Commoditized market: Defendants' products are fully interchangeable because they are bioequivalent. Thus, pharmacists may freely substitute one for another. The only differentiating feature, and therefore the only way a Defendant can gain market share, is by competing on price.

f.     Absence of departures from the market: There were no departures from the market during the relevant period that could explain the drastic price increases.

g.     Absence of non-conspiring competitors: Defendants have maintained all or virtually all of the market share for each of the Subject Drugs between 2010 and the present. Thus, Defendants have market power in the market for each of the Subject Drugs, which enables them to increase prices without loss of market share to non-conspirators.

h.     Opportunities for contact and communication among competitors: Defendants participate in the committees and events of the GPhA, HDMA, ECRM, MMCAP, HSCA, and other industry groups, as set forth below, which provide and promote opportunities to communicate. The grand jury subpoenas to Defendants targeting inter-Defendant communications further support the existence of communication lines between competitors with respect to generic pricing and market allocation.

i.     Size of Price Increases: The magnitude of the price increases involved in this case further differentiates it from examples of parallelism. Oligopolists testing price boundaries must take a measured approach. But the increases are not 5% or even 10% jumps— they are of far greater magnitude. A rational company would not implement such large increases unless it was certain that its conspirator-competitors would follow.

j.      Reimbursement of Generic Drugs: The generic market has institutional features that inhibit non-collusive, parallel price increases. These features include MAC pricing, insurers' formulary placements, and required substitution at the pharmacy level. As a result, the usual hesitance of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system.

## VI.   GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY

349.    Defendants' and other generic drug manufacturers' conduct has resulted in extensive and widespread scrutiny by federal and state regulators, including the United States Department of Justice Antitrust Division, the United States Senate, the United States House of Representatives, and the Attorneys General of 46 states, the District of Columbia, and Puerto Rico ("the State AGs").

350.    The DOJ's and State AG's investigations followed a Congressional hearing and investigation, which itself was prompted by a January 2014 letter from the National Community Pharmacists Association ("NCPA") to the United States Senate Committee on Health, Education, Labor, and Pensions ("Senate HELP Cmte.") and the United States House Energy and Commerce Committee highlighting nationwide spikes in prices for generic drugs.

### A.     Congress Launched an Investigation into Generic Price Hikes

351.    In January 2014, the NCPA urged the Senate Help Cmte. and the House Energy and Commerce Committee to hold hearings on significant generic pharmaceutical price spikes, citing surveys and data from over 1,000 community pharmacists who reported price hikes on essential generic pharmaceuticals exceeding 1,000%.

352.    On October 2, 2014, Senator Bernie Sanders, then Chair of the Subcommittee on Primary Health and Retirement Security of the Senate HELP Cmte. and Representative Elijah E. Cummings, Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers, including Defendants Actavis, Apotex, Dr. Reddy's, Endo,

Heritage, Lannett, Mylan, Par, Sun, Teva, West-Ward and Zydus, requesting information about the escalating prices of generic drugs.[5] More recently on August 13, 2019, Senator Sanders and Rep. Cummings sent letters to executives of Mylan and Teva – companies that did not produce documents in response to the 2014 letters – asking for drug pricing information as part of their ongoing probe into the rising cost of generics.

353.     Senator Sanders and Rep. Cummings issued a joint press release, advising that "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses." They noted the "huge upswings in generic drug prices that are hurting patients" and having a "very significant" impact, threatening pharmacists' ability to remain in business.[6]

354.     On February 24, 2015, Senator Sanders and Rep. Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[7] The OIG responded to the request on April 13, 2015, advising it would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [AMP] exceeded the specified inflation factor."[8]

---

[5] Press Release, U.S. Senator Bernie Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[6] *Id.*

[7] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[8] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, United States Senator (Apr. 13, 2015), *available at* https://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

355.     In August 2016, the OIG issued the GAO Report, a study examining Medicare Part D prices for 1,441 generic drugs between 2010 and 2015. The study found that 300 of the 1,441 drugs experienced at least one "extraordinary price increase" of 100% or more. Among the drugs with extraordinary price increases were 72 of the Subject Drugs: Acetazolamide ER, Acyclovir, Alclometasone Dipropionate, Allopurinol, Amantadine HCL, Amiloride HCL/HCTZ, Amitriptyline, Atenolol Chlorthalidone, Baclofen, Benazepril HCTZ, Betamethasone Dipropionate, Betamethasone Dipropionate Augmented, Betamethasone Dipropionate Clotrimazole, Betamethasone Valerate, Bumetanide, Butorphanol Tartrate, Carbamazepine, Cefuroxime Axetil, Cephalexin, Chlorpromazine HCL, Cimetidine, Ciprofloxacin HCL, Clarithromycin ER, Clindamycin Phosphate, Clobetasol Propionate, Clomipramine, Clotrimazole, Desonide, Dextroamphetamine Sulfate, Digoxin, Diltiazem HCL, Divalproex Sodium ER, Doxazosin Mesylate, Doxycycline Hyclate, Econazole, Enalapril Maleate, Ethosuximide, Etodolac, Fluconazole, Fluocinolone Acetonide, Fluocinonide, Fluoxetine HCL, Halobetasol Propionate, Haloperidol, Hydrocortisone Valerate, Isosorbide Dinitrate, Ketoconazole, Labetalol HCL, Lidocaine, Methadone HCL, Methotrexate, Methylprednisolone, Nadolol, Nitrofurantoin MAC, Nystatin, Oxaprozin, Oxybutynin Chloride, Permethrin, Pilocarpine HCL ER, Piroxicam, Potassium Chloride, Pravastatin, Prazosin HCL, Prednisone, Prochlorperazine, Ranitidine HCL, Theophylline ER, Timolol Maleate, Tobramycin, Triamcinolone Acetonide, Trifluoperazine HCL, and Ursodiol.[9]

_____

[9] GAO Report at Appx. III.

### B. The DOJ Investigates Criminal Generic Drug Collusion

356.    The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry in 2014 that initially focused on just two drugs.[10] Most of the Defendants here have come under DOJ scrutiny.

357.    The DOJ first charged Heritage executives Jeffrey Glazer and Jason Malek with criminal counts related to price collusion for generic doxycycline hyclate and glyburide. The two pleaded guilty to violating Section 1 of the Sherman Act for their participating in conspiracies to fix prices, rig bids, and allocate customers for generic drugs, including Glyburide and Doxycycline.

358.    The Hon. Barclay Surrick of this Court determined that there was a factual basis for both Glazer's and Malek's pleas, and convicted each individual of a felony violation of the Sherman Act. Sentencing for both Glazer and Malek was originally set for April 2017, but both sentencings have been repeatedly rescheduled as Glazer and Malek continue to cooperate with the DOJ.

359.    Defendants Actavis, Aurobindo, Dr. Reddy's, Endo, Fougera (through Sandoz), Lannett, Mylan, Par, Sandoz, Sun, Taro, and Teva admitted to receiving grand jury subpoenas from the DOJ. The DOJ executed a search warrant on Mylan in the fall of 2016. In 2017, Perrigo disclosed that its offices were searched as well.[11] DOJ also executed a search warrant against Aceto Corporation (which purchased Citron's generic drugs business in December 2016).

---

[10] Joshua Sisco, *DoJ believes collusion over generic drug prices widespread-source*, POLICY AND REGULATORY REPORT (June 26, 2015), available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf; David McLaughlin and Caroline Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG MARKETS (Nov. 3, 2016), available at https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[11] A search warrant will only be issued if DOJ was able to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan.

REDACTED – PUBLIC VERSION

360.    Upon information and belief, the DOJ has granted conditional amnesty to one Defendant.

361.    Information disclosed by some Defendants evidence the broad scope of the conspiracy.

362.    In Lannett's November 3, 2014 quarterly report filed with the Securities and Exchange Commission ("SEC"), it disclosed that its "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[12] Lannett added that "[t]he subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[13]

363.    Mylan has also disclosed that it received DOJ subpoenas relating to various generic drugs, and that DOJ executed search warrants in connection thereto.[14] Defendants Actavis, Sandoz, Par, Taro, and Teva also received DOJ subpoenas relating to their marketing and pricing of generic pharmaceuticals, and communications with competitors.[15] It is also believed that Aurobindo, Citron, Dr. Reddy's, Greenstone/Pfizer, Heritage, Impax, Lupin, Mallinckrodt, Mayne, Perrigo, Rising, Sun, West-Ward and Zydus received subpoenas.

---

[12] Lannett Company, Inc., Quarterly Report (Form 10-Q) at 16 (Nov. 6, 2014).

[13] Id.

[14] Mylan Inc., Annual Report (Form 10-K) at 160 (Feb. 16, 2016); Mylan Inc., Quarterly Report (Form 10-Q) at 58 (Nov. 9, 2016).

[15] Novartis, 2016 ANNUAL REPORT at 217, available at https://www.novartis.com/sites/www.novartis.com/files/novartis-20-f-2016.pdf; Par Pharmaceutical Companies, Inc., Annual Report (Form 10-K) at 37 (Mar. 12, 2015); Taro Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) (Sept. 9, 2016); Teva Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) at 33 (Nov. 15, 2016).

364.     A DOJ grand jury subpoena is significant; it indicates "staff [ ] considered the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[16]

365.     The DOJ has intervened in numerous civil antitrust actions that are now part of the consolidated and coordinated proceedings styled *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724 (E.D. Pa.), stating that these cases overlap with the DOJ's ongoing criminal investigation.

366.     On May 31, 2019, the DOJ released a statement that Heritage admitted that it "conspired to fix prices, rig bids, and allocate customers for glyburide," and agreed to pay $7 million in criminal penalty and civil damages, and to cooperate fully with ongoing parallel investigations into the generics industry. In that agreement, Heritage admitted, accepted, and acknowledged that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information. Jason Malek and Jeffrey Glazer are two of the "officers, directors, employees, and agents" whose acts for which Heritage admitted, acknowledged, and accepted responsibility.

367.     On December 3, 2019, Rising was charged by the DOJ with conspiring to fix prices and allocate customers for one generic drug.[17] The DOJ and Rising entered into a deferred prosecution agreement resolving the charge against Rising, under which the company admits that it conspired to fix prices and allocate customers for Benazepril HCTZ with a competing manufacturer of generic drugs and its executives from about April 2014 until at least September 2015.

---

[16] DOJ, ANTITRUST DIV. MANUAL (5th ed. 2015) at III-82.

[17] Press release, Department of Justice Office of Public Affairs, Second Pharmaceutical Company Admits to Price Fixing, Resolves Related False Claims Act Violations, Rising Pharmaceuticals Agrees to Pay Over $3 Million in Criminal Penalty, Restitution, and Civil Damages (December 3, 2019), *available at* https://www.justice.gov/opa/pr/second-pharmaceutical-company-admits-price-fixing-resolves-related-false-claims-act.

REDACTED – PUBLIC VERSION

368.    Rising agreed to pay $1,543,207 as restitution to victims of the charged conduct. In light of the separate civil penalties that Rising agreed to pay, the deferred prosecution agreement called for an offset of Rising's restitution, to $438,066.  The agreement also required Rising to pay a $1.5 million monetary penalty, reduced from the fine of approximately $3.6 million called for under the U.S. Sentencing Guidelines, due to Rising's financial condition and liquidation. Under the deferred prosecution agreement, Rising agreed to cooperate fully with the DOJ's ongoing criminal investigation.

369.    On February 4, 2020, the DOJ charged Ara Aprahamian, a former top executive at Taro, with participating in conspiracies to fix the prices and allocate the market for generic drugs, including Carbamazepine, Carbamazepine ER, Clobetasol (multiple formulations), Clotrimazole (cream and topical solution 1%), Desonide ointment, Etodolac IR and ER tablets, Fluocinonide (cream, emollient cream, gel, and ointment), Lidocaine ointment, Nystatin Triamcinolone (cream and ointment), and Warfarin. [18] Aprahamian was also charged with making false statements to the FBI.

370.    On February 14, 2020, Hector Armando Kellum, a former senior executive at Sandoz, pled guilty to conspiring to fix prices, rig bids, and allocate customers for generic drugs including, but not limited to, Clobetasol and Nystatin Triamcinolone cream. [19] As part of Kellum's plea deal, he agreed to cooperate with the DOJ's ongoing investigation into criminal antitrust violations in the generic drug industry.

---

[18] Press release, Department of Justice Office of Public Affairs, Generic Drug Executive Indicted on Antitrust and False Statement Charges (Feb. 4, 2020), *available at* https://www.justice.gov/opa/pr/generic-drug-executive-indicted-antitrust-and-false-statement-charges.

[19] Press release, Department of Justice Office of Public Affairs, Former Generic Pharmaceutical Executive Pleads Guilty for Role in Criminal Antitrust Conspiracy, Fourth Executive to Be Charged in Ongoing Investigation (Feb. 14, 2020), *available at* https://www.justice.gov/opa/pr/former-generic-pharmaceutical-executive-pleads-guilty-role-criminal-antitrust-conspiracy.

371.     On March 2, 2020, Sandoz was charged by the DOJ with conspiring to allocate customers, rig bids, and fix prices for five generic drugs.[20] The DOJ charged Sandoz with participating in four criminal antitrust conspiracies, each with a competing manufacturer of generic drugs and various individuals. Count One charged Sandoz for its role in a conspiracy, with a generic drug company based in New York and other individuals, relating to drugs including Desonide ointment, Nystatin triamcinolone cream, and multiple formulations of Clobetasol. The second count charged Sandoz for its role in a conspiracy with Rising to allocate customers and fix prices of Benazepril HCTZ. The third count charged Sandoz for its role in a conspiracy with a generic drug company, based in Michigan, relating to drugs that included Desonide ointment. The fourth count charged Sandoz for its role in a conspiracy with a generic drug company, based in Pennsylvania, relating to drugs including Tobramycin inhalation solution.

372.     The DOJ also announced a deferred prosecution agreement resolving the charges against Sandoz, under which the company agreed to pay a $195 million criminal penalty and admitted that its sales affected by the charged conspiracies exceeded $500 million. Under the deferred prosecution agreement, Sandoz admitted to conspiring with others to suppress and eliminate competition by allocating customers, rigging bids, and increasing and/or maintaining prices for certain generic drugs, including Benazepril HCTZ, Clobetasol (cream, emollient cream, gel, ointment, and solution), Desonide ointment, Nystatin Triamcinolone cream, and Tobramycin inhalation solution. It also agreed to cooperate fully with the ongoing criminal investigation.

---

[20] Press release, Department of Justice Office of Public Affairs, Major Generic Pharmaceutical Company Admits to Antitrust Crimes, Sandoz Inc. Agrees to Pay a $195 Million Criminal Penalty, the Largest for a Domestic Antitrust Case (March 2, 2020), *available at* https://www.justice.gov/opa/pr/major-generic-pharmaceutical-company-admits-antitrust-crimes.

REDACTED – PUBLIC VERSION

373.     On May 7, 2020, Apotex was charged by the DOJ with fixing the price of one

generic drug.[21] The DOJ brought a one-count felony charge alleging Apotex and other generic drug

companies agreed to increase and maintain the price of Pravastatin beginning in May 2013 and

continuing through December 2015. The single count charged that Apotex communicated with

competitors about the price increase and subsequently refrained from submitting competitive bids to

customers that previously purchased Pravastatin from a competing company

374.     The DOJ also announced a deferred prosecution agreement resolving the charge

against Apotex.  The company agreed to pay a $24.1 million criminal penalty and admit that it

conspired with other generic drug sellers to artificially raise the price of Pravastatin. Under the

deferred prosecution agreement, Apotex agreed to cooperate fully with the DOJ's ongoing criminal

investigation.

375.     On July 14, 2020 and August 25, 2020, a grand jury indicted Glenmark on charges

that it conspired to increase and maintain prices of Pravastatin and other generic drugs[22], beginning

in or around May 2013 and continuing until at least in or around December 2015. Apotex and Teva

were specifically identified as being involved in the conspiracy.

376.     On July 23, 2020, Taro was charged by the DOJ with participating in two criminal

antitrust conspiracies[23], each with a competing manufacturer of generic drugs and various

---

[21] Press release, Department of Justice Office of Public Affairs, Generic Pharmaceutical Company Admits to Fixing Price of Widely Used Cholesterol Medication (May 7, 2020), *available at* https://www.justice.gov/opa/pr/generic-pharmaceutical-company-admits-fixing-price-widely-used-cholesterol-medication.

[22] Press release, Department of Justice Office of Public Affairs, Fifth Pharmaceutical Company Charged In Ongoing Criminal Antitrust Investigation (June 30, 2020), *available at* https://www.justice.gov/opa/pr/fifth-pharmaceutical-company-charged-ongoing-criminal-antitrust-investigation.

[23] Press release, Department of Justice Office of Public Affairs, Sixth Pharmaceutical Company Charged In Ongoing Criminal Antitrust Investigation (July 23, 2020), *available at*

executives, to fix prices, allocate customers, and rig bids for numerous generic drugs between 2013 and 2015. One of the two charged conspiracies involved Sandoz, former Taro Vice President of Sales and Marketing Ara Aprahamian, and other individuals.

377.    The Antitrust Division also announced a deferred prosecution agreement resolving the charges against Taro, under which the company agreed to pay a $205,653,218 criminal penalty and admitted that its sales affected by the charged conspiracies was in excess of $500 million. Under the DPA, Taro U.S.A. has agreed to cooperate fully with the Antitrust Division's ongoing criminal investigation.

378.    On August 25, 2020, Teva was indicted by the grand jury for conspiring to fix prices, rig bids, and allocate customers for generic drugs[24] by participating in three conspiracies from at least as early as May 2013 until at least in or around Dec. 2015. The first count charged Teva for its role in a conspiracy that included Glenmark, Apotex, and unnamed co-conspirators agreeing to increase prices for pravastatin and other generic drugs. The second count charged Teva for its role in a conspiracy with Taro U.S.A., its former executive Ara Aprahamian, and others agreeing to increase prices, rig bids, and allocate customers for generic drugs including, but not limited to, drugs used to treat and manage arthritis, seizures, pain, skin conditions, and blood clots. The third count charges Teva for its role in a conspiracy with Sandoz Inc. and others agreeing to increase prices, rig bids, and allocate customers for generic drugs including, but not limited to, drugs used to treat brain cancer, cystic fibrosis, arthritis, and hypertension.

---

https://www.justice.gov/opa/pr/sixth-pharmaceutical-company-charged-ongoing-criminal-antitrust-investigation.

[24] Press release, Department of Justice Office of Public Affairs, Seventh Generic Drug Manufacturer Is Charged In Ongoing Criminal Antitrust Investigation (August 25, 2020), *available at* https://www.justice.gov/opa/pr/seventh-generic-drug-manufacturer-charged-ongoing-criminal-antitrust-investigation.

REDACTED – PUBLIC VERSION

### C.     State Attorneys General Launch Their Own Investigation

379.     In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. Based on evidence procured through their own subpoena-power, the State AGs filed a civil action alleging a wide-ranging series of conspiracies implicating numerous generic drugs and manufacturers. *The Connecticut Mirror* reported that the State AGs "suspected fraud on a broader, nearly unimaginable scale," that "new subpoenas are going out, and the investigation is growing beyond the companies named in the suit."[25] Then-CTAG George Jepsen called the evidence obtained in that investigation "mind-boggling."[26]

380.     Mr. Jepsen confirmed the scope of the State AGs' action in a press release in December 2016:

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States. . . While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers - and, indeed, our healthcare system as a whole - who paid for these actions through artificially high prices for generic drugs.[27]

381.     In their consolidated amended complaint filed on June 18, 2018, the State AGs broadened their case to include fifteen drugs, many of which are Subject Drugs in this Complaint.

---

[25] Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, THE CONN. MIRROR (Jan. 27, 2017), available at https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/. *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the CTAG issued its first subpoena. Id.

[26] *Id.*

[27] Press Release, Attorney General George Jepsen, Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies (Dec. 15, 2016), available at https://portal.ct.gov/AG/Press-Releases/2016-Press-Releases/Connecticut-Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.

REDACTED – PUBLIC VERSION

At the time, CTAG Jepsen stated that "[t]he issues we're investigating go way beyond the two drugs and six companies. Way beyond…We're learning new things every day."[28] According to a recent interview with Joseph Nielsen, the court-appointed Liaison Counsel for the State AGs in these consolidated MDL proceedings, "[t]his is most likely the largest cartel in the history of the United States."[29]

382.    On May 10, 2019 the State AGs filed a new complaint, as amended on November 1, 2019, focusing on a conspiratorial web Teva constructed with various other Defendant generic drug manufacturers, named herein, that led to either artificial stabilization or price increases on over 100 generic drug products ("State AG Complaint No. 2").[30] The allegations in the State AG Complaint No. 2 were based on "(1) the review of many thousands of documents produced by dozens of companies throughout the generic pharmaceutical industry, (2) an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of Defendant companies and other generic manufacturers, and (3) information provided by several as-of-yet unidentified cooperating witnesses who were directly involved in the conduct alleged…"[31] Many of the drugs identified in that complaint are the subject of this Complaint.

---

[28] Kaiser Health News, *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices,* THE DAILY BEAST, Dec. 21, 2016, http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices?source=twitter&via=desktop.

[29] Christopher Rowland, *Investigation of Generic "Cartel" Expands to 300 Drugs,* THE WASHINGTON POST, December 9, 2018, available at https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to-300-drugs/2018/12/09/fb900e80-f708-11e8-863c-9e2f864d47e7_story.html?utm_term=.a838a7f671cd.

[30] *Connecticut, et al v. Teva Pharmaceuticals USA, Inc.,* No. 2:19-cv-02407 (E.D. Pa.).

[31] State AG Complaint No. 2 at ¶4. The State AGs detail their extensive investigatory efforts in State AG Complaint No. 2. They have compiled over 7 million documents, issued more than 300 subpoenas to telephone carriers, issued over 30 subpoenas to generic drug manufacturers and examined the names and contact information of over 600 drug manufacturer employees, giving the State AGs a "unique perspective to know who in the industry was talking to who, and when" *Id.*

383.     On June 10, 2020, the State AGs filed a new complaint focusing on rampant collusion among various Defendant generic drug manufacturers, named herein, of topical products that led to either artificial stabilization or price increases additional generic drug products ("State AG Complaint No. 3). Many of the drugs identified in that complaint are the subject of this Complaint.

384.     During the course of their investigation, the States AGs obtained cooperation from a number of individuals. The expected testimony from certain of those individuals will directly support and corroborate the allegations throughout the State AG Complaint No. 2 and this Complaint. Some of those cooperating witnesses include:

   a.     A former pricing executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-1];

   b.     A former sales and marketing executive at Rising and Sandoz during the time period relevant to this Complaint [referred to herein as CW-2];

   c.     A former senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-3];

   d.     A former senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-4];

   e.     A former senior executive at Glenmark during the time period relevant to this Complaint [referred to herein as CW-5]; and

   f.     Jason Malek ("Malek"), former Vice President of Commercial Operations at Heritage.

385.     In addition, Teva has, at all times relevant to the Complaint, maintained a live database that it refers to as Delphi where it has catalogued nearly every decision it has made

---

¶¶ 64-65. The State AGs have also corroborated these allegations through cooperating witnesses, including senior executives and employees of many Defendants named here.

regarding the products it sells, including those decisions that were made collusively – which Teva often referred to as "strategic" decisions. Although the State AGs do not have full access to that database, they have obtained static images of the database that were internally disseminated over time by Teva, which were referred to as Market Intel Reports. Through its review and investigation of some of those reports, in combination with the phone records, the State AGs have, to date, identified over 300 instances of collusion where Teva spoke to competitors shortly before or at the time it made what the company referred to as a "strategic" market decision. A number of those instances are detailed throughout this Complaint.

## VII.    THE GENERIC DRUG MARKET

### A.    The Cozy Nature of the Industry and Opportunities for Collusion

386.    The collusion alleged herein infested the generic drug industry.

387.    At all relevant times, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning the Subject Drugs, along with other drugs, which had the actual and intended effect of causing Molina to pay artificially inflated prices at supracompetitive rates.

388.    In formulating and effectuating their conspiracy, Defendants engaged in various forms of anticompetitive conduct, including but not limited to:

> a.    Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of the Subject Drugs in the United States;
>
> b.    Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with

co-conspirators to engage in market and customer allocation or bid-rigging for the Subject Drugs sold in the United States;

c.      Agreeing during those meetings, conversations, and communications to engage in price increases, market and customer allocation, and/or bid-rigging for the Subject Drugs sold in the United States;

d.      Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers with respect to the Subject Drugs sold in the United States;

e.      Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

f.      Selling the Subject Drugs in the United States at collusive and noncompetitive prices; and

g.      Accepting payment for the Subject Drugs sold in the United States at collusive and noncompetitive prices.

389.    The Defendants ensured that all conspirators were adhering to their collective scheme by communicating (1) at trade association meetings and conferences; (2) at private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers; and (3) through individual, private communications between and among Defendants' employees by use of the telephone, electronic messaging, and similar means.

**1.     Trade Association Meetings and Conferences**

390.    Throughout the year, many healthcare entities within the generic drug industry hold multi-day conferences wherein generic manufacturers are invited to attend. Further, Defendants and other generic drug manufacturers attend various trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution

Management Association ("HDMA")(now the Healthcare Distribution Alliance), the Generic

Pharmaceutical Association ("GPhA") (now the Association of Accessible Medicine), Efficient

Collaborative Retail Marketing ("ECRM"), the Minnesota Multistate Contracting Pharmacy Alliance

("MMCAP"), and the Healthcare Supply Chain Association ("HSCA"). Between February 20, 2013

and December 20, 2014, there were at least forty-four different tradeshows or customer conferences

where Defendants had the opportunity to, and actually did, meet in person, which gave rise to the

opportunity to reach these agreements without fear of detection.

391.    At the various trade shows and conferences, Defendants' employees interacted with

one another and discussed their respective businesses. Many of these events included social and

recreational outings such as golf, lunch, cocktail parties, and dinners that provided additional

opportunities to meet with competitors. Defendants used these opportunities to share

competitively-sensitive information concerning upcoming bids, specific generic drug markets,

pricing strategies and pricing terms in their contracts with customers, and in turn to implement

schemes that unreasonably restrain competition in the United States' market for generic drugs.

392.    In fact, in the Association for Accessible Medicine's Antitrust Compliance Policy

Manual updated in January 2018 (well after litigation and investigation surrounding generic drug

pricing conspiracies began), the trade association explicitly stated, "Meetings, communications and

contacts that touch on antitrust matters present special challenges. A simple example will illustrate

this. Suppose that competitors were to discuss their prices at a meeting or in a document, and that

their prices increased shortly afterward. A jury might view this as evidence that their discussions led

to an agreement on pricing, and thus violated the antitrust laws." It went on to warn "Do not

discuss any subjects that might raise antitrust concerns (including prices, market allocations, refusals

to deal, and the like) unless you have received specific clearance from counsel in advance." The

Association also warns members to avoid creating written records, and "avoid language that might

be misinterpreted to suggest that the Association condones or is involved in anticompetitive behavior."

### a.  National Association of Chain Drug Stores

393.  NACDS "advances a pro-patient and pro-pharmacy agenda. For the ultimate benefit of the customers served by NACDS members, the mission of NACDS is to advance the interests and objectives of the chain community pharmacy industry, by fostering its growth and promoting its role as a provider of healthcare services and consumer products."

394.  NACDS hosts an Annual Meeting, attended only by member companies' executives, that it claims is "the industry's most prestigious gathering of its most influential leaders. It is the classic 'Top-to-Top' business conference, attended by industry decision makers." It boasts that it will give companies "a unique opportunity to gain new insights into today's changing marketplace and set your course for the future," and the "opportunity to meet and discuss strategic issues with key trading partners" to "set [] the stage for profitable business."

395.  NACDS also hosts a Total Store Expo annually, which similarly boasts that is it "the industry's largest gathering of its most influential leaders. It will give you and your company a unique opportunity to gain new insights into today's evolving marketplace and set your course for the future."

396.  NACDS members include Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Lannett, Lupin, Mylan, Par, Sandoz, Taro, Teva, Upsher-Smith, Wockhardt, and Zydus.

### b.  Generic Pharmaceutical Association

397.  GPhA is the "nation's leading trade association for manufacturers and distributors of generic prescription drugs…"[32] GPhA was created in 2000 from the merger of three industry trade

---

[32] GPhA, Membership, available at http://web.archive.org/web/2015041303008/http://www.gphaonline.org:80/about/membership.

associations: the Generic Pharmaceutical Industry Association, the National Association of

Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance. Regular members are

"corporations, partnerships or other legal entities whose primary U.S. business derives the majority

of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as

authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[33]

398.     GPhA's website offers members the opportunity to "participate in shaping the

policies that govern the generic industry." GPhA's "member companies supply approximately 90

percent of the generic prescription drugs dispensed in the U.S. each year." It boasts networking

opportunities as one of the cornerstone benefits of membership: "GPhA provides valuable

membership services, such as business networking opportunities, educational forums, access to

lawmakers and regulators, and peer-to-peer connections."[34]

399.     Actavis, Amneal, Apotex, Dr. Reddy's, Glenmark, Heritage, Impax, Lupin, non-

defendant Mallinckrodt, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, Wockhardt, and Zydus

are regular members of GPhA, and have been since 2013. Furthermore, executives of these

companies frequently attend GPhA meetings and events.

400.     Executives from Actavis, Amneal, Apotex, Impax, Lupin, Mylan, Par, Perrigo,

Sandoz, Sun, Teva, West-Ward, and Zydus served on GPhA's Board of Directors during

overlapping times at various points both prior to and after 2013, including:

    a.   2011 Board of Directors: Debra Barrett, Senior Vice President Global Affairs

        and Public Policy, Teva; Douglas S. Boothe, CEO, Actavis; Don DeGolyer,

        President and CEO, Sandoz; Tony Mauro, President, Mylan North America, as

        Vice-Chair; Pat LePore, CEO, Par; and Joe Renner, CEO, US Division, Zydus.

---

[33] *Id.*

[34] *Id.*

b.  2012 Board of Directors: Charlie Mayr, Senior Vice President Watson Pharmaceuticals, now a division of Teva; Joe Renner, CEO, US Division, Zydus; Douglas S. Boothe, CEO, Actavis; Debra Barrett, Senior Vice President Global Affairs and Public Policy, Teva; Don DeGolyer, President and CEO, Sandoz; Tony Mauro, President, Mylan North America as Chair; and Chirag Patel, President, Amneal.

c.  2013 Board of Directors[35]: Tony Mauro, President, Mylan North America, as Chair; Don DeGolyer, President and CEO, Sandoz, as Vice Chair; Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Pharmaceuticals; Carole Ben-Maimon, President, Global Pharmaceuticals (div.) of Impax[36]; Charlie Mayr, Chief Communications Officer - Global, Actavis Inc.; Doug Boothe, Executive Vice President & General Manager, Perrigo Company; Jeffrey Glazer, President and CEO, Heritage; Joseph Renner, President & CEO, Zydus; Chirag Patel, President, Amneal; and Jeff Watson, President, Apotex.

d.  2014 Board of Directors[37]: Carole Ben-Maimon, President, Global Pharmaceuticals (div.) of Impax; Doug Boothe, Executive Vice President & General Manager, Perrigo Company; Peter Goldschmidt, President, Sandoz US; Jeffrey Glazer, President and CEO, Heritage; Tony Mauro, President, Mylan Inc.; Allan Oberman, CEO and President, Teva Americas Generics; Joseph

---

[35] GPhA Announces 2013 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2013-board-of-directors.

[36] In 2016, Ben-Maimon joined Teligent's Board of Directors. She also previously held positions at Qualitest and Teva. While at Global Pharmaceuticals at Impax, she worked with Teligent's Grenfell-Gardner on a development, supply, and marketing agreement for another generic topical drug.

[37] GPhA Announces 2014 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2014-board-of-directors.

Renner, President & CEO, Zydus; Jeff Watson, President, Apotex; and Paul McGarty, President, Lupin, as at-large director.

e.   2015 Board of Directors[38]: Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Americas; Doug Boothe, Executive Vice President & General Manager, Perrigo Company; Peter Goldschmidt, President, Sandoz US; Jim Kedrowski, Executive Vice President, Sun; Marcie McClintic Coates, Head of Global Regulatory Affairs, Mylan Inc.; Marcy Macdonald, Vice President of Regulatory Affairs, Impax; Paul McGarty, President, Lupin; Jeffrey Glazer, President and CEO, Heritage; Tony Pera, President, Par Pharmaceuticals; Joseph Renner, President & CEO, Zydus; and Jeff Watson, President, Apotex.

f.   2016 Board of Directors: Debra Barrett, Senior Vice President, Global Government Affairs & Public Policy, Teva Americas; Heather Bresch, CEO, Mylan N.V. as Chair; Peter Goldschmidt, President, Sandoz US; Marcy Macdonald, Vice President of Regulatory Affairs, Impax; Jim Kedrowski, Executive Vice President, Sun; Paul McGarty, President, Lupin; Tony Pera, President, Par Pharmaceuticals as Secretary-Treasurer; Joseph Renner, President & CEO, Zydus; Richard Stec, Vice President, Perrigo Company; and Jeff Watson, President, Apotex as Vice Chair.

c.   **Healthcare Distribution Management Association**

401.   HDMA, now called HDA, is a national trade association that represents "primary pharmaceutical distributors," connecting the nation's drug manufacturers to over 200,000

---

[38] GPhA Announces 2015 Board of Directors, ASS'N FOR ACCESSIBLE MEDS., https://www.gphaonline.org/gpha-media/press/gpha-announces-2015-board-of-directors/.

pharmacies, hospitals, long-term care facilities, and clinics.[39] HDMA holds regular conferences at which its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.

402.    Several Defendants were members of HDMA at overlapping times between 2013 and the present. For instance, as of July 2015, HDMA's manufacturer membership list included Amneal, Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Lupin, non-defendant Mallinckrodt, Mayne, Mylan, Par, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, and Zydus, as well as Allergan, now a division of Actavis.[40] As of March 2016, HDMA's manufacturer membership list included Amneal, Apotex, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, and Zydus, as well as Allergan.[41]

### d.    Efficient Collaborative Retail Marketing

403.    ECRM hosts strategic events and offers innovative technology solutions to help buyers and manufacturers improve sales, reduce expenses, and enter the market faster and more efficiently.[42] It conducts "Efficient Program Planning Sessions" ("EPPS"), in which generic drug manufacturers, purchasers, and other industry professionals meet "to discuss new business

---

[39] *About*, HAD, https://healthcaredistribution.org/about.

[40] *Manufacturer Members*, HDMA,
https://web.archive.org/web/20150715222616/http://www.healthcaredistribution.org:80/about/membership/manufacturer/manufacturer-members#.Wrj50y7wZpg.

[41] *Manufacturer Members,* HDMA,
https://web.archive.org/web/20160329122456/http://www.healthcaredistribution.org:80/about/membership/manufacturer/manufacturer-members

[42] *See* Company Overview of Efficient Collaborative Retail Marketing Company, LLC, Bloomberg , https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=106996762; *See also Alkaline Water Co. Enjoys Valued Participation at National Retail Marketing Trade Show*, The Alkaline Water Co., http://thealkalinewaterco.com/2013/08/06/alkaline-water-co-enjoys-valued-participation-national-retail-marketing-trade-show/.

REDACTED – PUBLIC VERSION

opportunities, review contracting strategies, and future business planning activities."[43] Sessions include one-on-one strategic meetings meant to maximize time, grow sales, and uncover trends.

404.    At annual meetings organized by ECRM, generic drug manufacturers schedule meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independent pharmacies.

### e.  Minnesota Multistate Contracting Pharmacy Alliance

405.    MMCAP hosts various meetings and conferences throughout the year that are regularly attended by Defendants' representatives with price setting capabilities. According to its website, MMCAP is a "free, voluntary group purchasing organization [("GPO")] for government facilities that provide healthcare services. MMCAP has been delivering pharmacy and healthcare value to members since 1985. MMCAP's membership extends across nearly every state in the nation, delivering volume buying power. Members receive access to a full range of pharmaceuticals and other healthcare products and service; such as medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

### f.  Healthcare Supply Chain Association

406.    HSCA is a trade association that represents leading healthcare GPOs, including for-profit and not-for-profit corporations, purchasing groups, associations, multi-hospital systems and healthcare provider alliances. According to its website, "HSCA and its member GPOs are committed to delivering the best products at the best value to healthcare providers, to increasing competition and innovation in the market, and to being supply chain leaders in transparency and accountability."  HSCA's annual event, the National Pharmacy Forum, connects supply chain professionals, pharmaceutical industry representatives, including generic drug manufacturers and

---

[43] ECRM, Health System/Institutional Pharmacy EPPS,
https://ecrm.marketgate.com/Sessions/2019/06/HospitalAlternateSitePharmacyPharmaceuticals.

suppliers, and others to provide "top-level educational opportunities coupled with one-to-one networking and business-building opportunities."

407.     GPhA, HDMA, ECRM, MMCAP, and HSCA frequently held meetings and events between 2012 and the present, and high-level representatives and corporate officers from Defendants, including employees with price-setting authority, attended these meetings. A list of those meetings and attendees is attached as Exhibit A.

408.     At these various conferences and trade shows, Defendants' employees and representatives, as well as representatives of other generic drug manufacturers, discussed their respective businesses and customers, and discussed the conspiratorial price increases alleged in this Complaint. In many of the conferences described above, attendees for each conspirator Defendant include individuals with generic drug pricing authority. Their discussions also occurred at lunches, cocktail parties, dinners, and golf outings that would typically accompany these events. Defendants' representatives used these opportunities to discuss and share upcoming bids, generic drug markets, pricing strategies, and contractual pricing terms specific to certain customers. [44]

### 2.     Industry Dinners and Private Meetings

409.     Senior executives and sales representatives also frequently gathered in small groups, providing inconspicuous facetime with their competitors where they could discuss sensitive information.

410.     Many Defendants are headquartered in close proximity, providing them with easy and frequent access to one another. At least forty-one (41) different generic drug manufacturers are located between New York City and Pennsylvania, including, among others, Actavis, Ascend,

---

[44] *See, e.g.,* AG Compl. at ¶ 79.

Aurobindo, Breckenridge, Citron, Dr. Reddy's, Fougera, Glenmark, Heritage, Lannett, Mylan, Par, Perrigo, Sandoz, Sun, Taro, Teva, Wockhardt, and Zydus.

411.     Defendants' high-level executives frequently gathered for "industry dinners." In January 2014, while generic drug prices were soaring, at least thirteen (13) high-ranking executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufactures, met at a steakhouse in Bridgewater, New Jersey. Executives (including Berthold, Falkin, and Ostaficiuk) from Actavis, Aurobindo, Breckenridge, Dr. Reddy's, Lannett, and Sun among others, attended this particular dinner.

412.     At these dinners, one company is typically responsible for paying the bill for all attendees. For example, in December 2013 a Dr. Reddy's executive joked "[y]ou guys are still buying for Mark and I, right?" Another executive responded "Well…I didn't think the topic would come up so quickly but…we go in alphabetical order by company and [another company] picked up the last bill.…PS.…no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

413.     Other groups of competitors routinely gathered for golf outings. One such annual event was organized by a packaging contractor in Kentucky. From September 17-19, 2014, high-level executives from Teva, Apotex, Actavis, Amneal, Lannett, Par, Zydus, and others attended the event at a country club in Bowling Green, Kentucky. Rekenthaler was in attendance. Rekenthaler and Apotex' Vice President of Commercial Operations, US and Latin America, Jeffrey Hampton, actually stayed together in the home of the owner of the packaging company. By the end of the outing, Ostaficiuk sent an email to the other attendees, stating "This is a crazy biz but I am grateful to have friends like all of you!!!! Happy and honored to have you all as 'fraternity brothers.'"

414.     Generic drug manufacturer employees also regularly convened for "Girls' Night Out" or "Women in the Industry" meetings and dinners. At these events, generic drug companies'

employees met with their competitors and discussed proprietary and competitive information. Upon information and belief, several of these events occurred in May 2015 in Baltimore, Maryland, and in August 2015 in Denver, Colorado.

415.    Many "Women in the Industry" dinners were organized by Anne Sather, a salesperson from Heritage. Other participants in these meetings were employees of other generic pharmaceutical manufacturers located in Minnesota or salespeople residing or traveling to the area. In November 2014, Sullivan of Lannett sent Sather (Heritage) a text message asking "[w]hen is your next industry women event? I'm due for a trip out there and I'd love to plan for it if possible…" Sather responded: "There is an Xmas [sic] party at Tanya' house on Dec 6th. Yes that is a Saturday. We do it about once a quarter and usually it is during the week – this was an exception."

416.    Dinners were also planned around visits of certain out-of-town competitors. When organizing one of these such dinners, Sather commented "Sorry if the meeting/dinner invite is a little short notice, but Kate Neely of Dr. Reddy's will be in MN on Sept 29th and it would be a great time for everyone to get together! So much has been happening in the Industry too – we can recap all our findings from NACDS over a martini or glass of wine! 😊 Plus the food is super yummy!"

417.    Several different GNOs were held in 2015, including (1) at the ECRM conference in February (involving Citron, Dr. Reddy's, Heritage, Lannett, Teva, Upsher-Smith, and Zydus, among others); (2) in Baltimore in May (involving Citron, Dr. Reddy's, Heritage, Lupin, and Teva, among others); and (3) at the NACDS conference on August 24, 2015 (involving Citron, Dr. Reddy's, and Heritage, among others). The Baltimore GNO in May 2015 consisted of a professional baseball game, drinks, and a spa day on May 13, wherein the competitors could discreetly and privately discuss competitively-sensitive information.

### 3. Personal Telephone Calls, E-Mails, and Text Message Communications

418.    Defendants routinely conferred with one another on bids and pricing strategy. This included forwarding customer bid packages to a competitor, either on the forwarding company's own initiative or at the competitor's request.

419.    Defendants also shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate potentially better prices or terms with their customers, which ultimately harmed consumers like Molina.

420.    Representatives of several Defendants with pricing responsibility had frequent telephone calls with representatives of competitors. For example, executives at Teva had at least 1,501 contacts with competitors, including from Actavis, Apotex, Ascend, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Par, Sandoz, and Zydus. Further, executives at Heritage had at least 513 contacts with executives from would-be competitors including from Actavis, Apotex, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, and Zydus.

421.    For example, Teva's Director of Strategic Customer Marketing, Nisha Patel, met Heritage's then-Senior Vice President Malek when she worked at Amerisource Bergen, which was a Heritage customer that Malek managed. When Patel moved to Teva in April 2013, she contacted Malek to determine which generic drugs both Teva and Heritage sold so that they could coordinate pricing. As detailed below, Malek and Patel orchestrated a number of price increases between 2013-present—some led by Teva, others by Heritage.

422.    Malek and Patel's relationship was valued and accepted by Malek's supervisors. For example, in April 2014, Malek and Glazer (Heritage) met with Mehta and President Vikas Thapar of Emcure, Heritage's parent company, to discuss potential price increases for several drugs. During that meeting, Malek told Mehta and Thapar about Patel. Malek, who had been discussing price

increases for Nystatin with Patel since mid-2013, told them that Patel could be a vehicle for communicating with Teva about price increases and customer allocation. Mehta and Thapar approved of Malek's strategy to coordinate prices and allocate customers with Teva.

B.     **The Overarching Conspiracy Between Generic Drug Manufacturers – Playing Nice in the Sandbox**

423.     As a result of the cozy nature of the industry, sales and marketing executives in the generic pharmaceutical industry are well aware of their competitors' current and future business plans. This reciprocal sharing of inside information greatly facilitates agreements among competitors to allocate markets to avoid price competition.

424.     The overarching conspiracy among generic manufacturers – which ties together all of the agreements on the Subject Drugs identified in this Complaint – is an agreed- upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs. That term is generally understood as an approximation of how much market share each competitor is entitled to. Fair share is based on the number of competitors in the market, with a potential adjustment based on the timing of entry or the anticompetitive allocation of buyers amongst similar or the same competitors in another generic drug market. Once a manufacturer has achieved its "fair share," it is generally understood that it will no longer compete for additional business. The common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion, and serve as the basis for further supra-competitive price increases.

425.     This overarching agreement is widespread across the generic drug industry and is broader than the Defendant manufacturers named in this Complaint. Molina focuses here on the role of these named Defendants and their participation in, and agreement with, this overarching conspiracy as applied to the sale of the Subject Drugs, as well as how these specific conspiracies are also part of the larger overarching conspiracy.

REDACTED – PUBLIC VERSION

426.     The exact contours of this "fair share" understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs. These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans. For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendants had the opportunity to meet in person, some of which are described above. These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

427.     As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs. These types of communications occur with great frequency across the industry, including among Defendants.

428.     For example, from January 1, 2013 through December 31, 2013, senior sales executives and other individuals responsible for the pricing, marketing, and sales of generic drugs at Teva spoke to representatives of every significant competitor by phone and/or text on multiple occasions. Phone calls and text messages with several of those key competitors during the 2013 calendar year are set forth below. The following Table, which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue and therefore shows only some of the phone calls and text messages between the Defendants during that period, illustrates the frequency with which Defendants communicated with each other throughout 2013.

REDACTED – PUBLIC VERSION

**Teva phone/text communications with other Defendants (by month)**
**January 1, 2013 – December 31, 2013**

| | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 2 | 2 | 0 | 7 | 27 | 1 | 17 | 12 | 15 | 40 | 13 | 47 | 183 |
| Glenmark | 0 | 3 | 0 | 0 | 26 | 9 | 6 | 8 | 1 | 12 | 14 | 16 | 95 |
| Greenstone | 2 | 0 | 20 | 1 | 4 | 5 | 6 | 1 | 0 | 2 | 7 | 11 | 59 |
| Lupin | 10 | 5 | 9 | 3 | 33 | 9 | 19 | 9 | 5 | 13 | 6 | 0 | 121 |
| Mylan | 31 | 47 | 32 | 37 | 33 | 26 | 26 | 16 | 1 | 1 | 0 | 11 | 261 |
| Sandoz | 17 | 5 | 4 | 4 | 12 | 16 | 18 | 14 | 3 | 0 | 9 | 2 | 104 |
| Taro | 0 | 0 | 0 | 0 | 2 | 1 | 8 | 11 | 0 | 11 | 1 | 1 | 35 |
| Zydus | 13 | 23 | 42 | 20 | 30 | 40 | 59 | 21 | 34 | 148 | 58 | 43 | 531 |
| Totals | 75 | 85 | 107 | 72 | 167 | 107 | 159 | 92 | 59 | 227 | 108 | 131 | 1389 |

Source: State AG Complaint No. 2 (Table 1).

429.    Of the 1,389 calls listed in Table 1, 1,234 of them – or 89% – involved Green, Patel and Rekenthaler of Teva speaking with competitors. Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

430.    Similarly, from January 1, 2014 through December 31, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Teva continued to speak to representatives of every significant competitor by phone and/or text on multiple occasions. Phone calls and text messages with several of those key competitors during the 2014 calendar year are set forth below. The following Table, which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between the Defendants during that period, sheds similar light on the frequency with which Defendants communicated with each other throughout 2014.

REDACTED – PUBLIC VERSION

**Teva phone/text communications with other Defendants (by month)**
**January 1, 2014 – December 31, 2014**

| | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 31 | 17 | 47 | 42 | 76 | 9 | 38 | 24 | 36 | 23 | 8 | 14 | 365 |
| Glenmark | 4 | 11 | 11 | 7 | 7 | 2 | 9 | 6 | 1 | 6 | 3 | 3 | 70 |
| Greenstone | 17 | 3 | 13 | 3 | 1 | 1 | 6 | 1 | 9 | 0 | 0 | 0 | 54 |
| Lupin | 11 | 5 | 13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| Mylan | 6 | 1 | 1 | 1 | 7 | 2 | 0 | 10 | 13 | 5 | 2 | 9 | 57 |
| Sandoz | 5 | 10 | 7 | 10 | 0 | 1 | 28 | 7 | 4 | 1 | 6 | 3 | 82 |
| Taro | 1 | 1 | 7 | 4 | 17 | 16 | 5 | 2 | 1 | 0 | 0 | 1 | 55 |
| Zydus | 18 | 36 | 44 | 24 | 37 | 14 | 19 | 15 | 5 | 5 | 4 | 4 | 225 |
| Totals | 93 | 84 | 143 | 95 | 145 | 45 | 105 | 65 | 69 | 40 | 23 | 34 | 941 |

Source: State AG Complaint No. 2 (Table 2).

431.     Of the 941 calls listed in Table 2, 778 of them – or 83% – involved Patel and

Rekenthaler of Teva speaking with competitors (by this time, Green no longer worked at Teva).

Many – though not all – of those communications involve the Subject Drugs that are addressed

throughout this Complaint. It was not just Teva personnel speaking to their competitors, however.

All of these individuals were speaking to each other, when needed, hundreds or even thousands of

times to ensure adherence to the overarching conspiracy, as illustrated in the graphic on page 37 of

the State AG Complaint No. 2.

432.     In order to provide some organizational principle around the massive amount of

collusive behavior by the Defendants described in this Complaint, certain sections are centered

around the relationship between Teva and another conspirator. However, this convenience should

not imply that the Complaint is solely concerned with bilateral relationships involving Teva.

433.     The specific drug agreements often involve overlapping sets of Defendants in

communication with each other, all following their agreed-upon "fair share" code of conduct. For

example, to view only a small portion of the interlocking, overlapping web of collusion formed by

Defendants: Teva, Taro and Wockhardt discussed amongst themselves the allocation of the

Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for

Ketoconazole cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ; and

Teva, Mylan and Par all communicated with each other in the spring of 2014 concerning the market

for Budesonide DR capsules. These are not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling nature of the Defendants' overarching conspiracy.

434.     Referred to sometimes as the "rules of engagement" for the generic drug industry, the fair share understanding among Defendants dictates that, when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market. When a third competitor enters, each competitor expects to obtain 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

435.     When a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis, it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market. For example, when Dr. Reddy's was about to enter the market for a drug in January 2013, the Vice President of Sales and Marketing explained during negotiations with his competitor that "he views it this way. If they [Dr. Reddy's] are first and others come out after, he deserves 60%. If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

436.     Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share. One of the many examples of this occurred in March 2014, when – as discussed more fully below – Lupin entered the Niacin ER market after Teva had previously been exclusive. Patel (Teva) and Berthold (Lupin) spoke directly by phone a number of times during this period, including three (3) calls on March 24, 2014. That same day, Rekenthaler (Teva) sent an internal e-mail to Patel stating: "We should concede Optum then defend everything else. This should be it for Lupin. I believe this should be the 40% we were okay with conceding." Here, Teva's expectation to maintain 60% share in a two-player market, after being the first in that market, was consistent with the overarching conspiracy.

437.     Taro went so far as to create a graphic representation of that understanding, taking into account both the number of competitors and order of entry to estimate what its "fair share" should be in any given market:



438.     Although these general parameters are well-known, there is no precise method for apportioning "fair share" because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in a given year. The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

439.     This common goal was stated succinctly by Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter." Ironically, it was this exact greed that inspired this conspiracy. As demonstrated throughout the Complaint, Aprahamian's idea of "responsibility" meant constantly reaching out to competitors in order to coordinate giving up share to reach a "fair" allocation and keep prices high.

440.     This scheme to strangle competition and allocate "fair share" is typically implemented as follows. First, Defendants allocate the market for an individual drug based on the

number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market. Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price. This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct Defendants agreed to.

441.    The "fair share" understanding has been particularly effective when a new competitor enters the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down. In today's generic drug markets, a new competitor will either approach or be approached by existing competitors. Existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid. The new competitor's transition into the market is seamless; the new entrant is ceded market share and immediately charges a supra-competitive price. The competitors then continue this process of dividing up customers until the market reaches a new artificial equilibrium. This is referred to as a "stable" market.

442.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues. If the disruption is temporary, the existing competitors will refrain from taking any action that might upset the market balance. By contrast, if the disruption is for a longer term, the competitors will divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market. For example, in July 2013, a retail pharmacy customer e-mailed Taro stating that one of Mylan's products was on back order and asked Taro to bid for the business. Aprahamian sent an internal e-mail stating "Not inclined to take on new business . . . Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to overreact to this product. Not sure how long Mylan is out."

443.     These rules about "fair share" apply equally to price increases. As long as everyone is playing fair, and the competitors believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules." Indeed, rather than competing for customers in the face of a price increase, competitors often use this as an opportunity to follow with comparable price increases of their own.

444.     For example, in May 2013, after a Glenmark price increase on a number of different drugs (discussed more fully below), Teva was approached by a large retail customer requesting a bid for several drugs. Green immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy should be:

> On May 29, 2013, at 11:52 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>
> Do you think the  Fluconazole Tabs below is due to a recent price increase. I don't have my list here at home. We are in a great inventory position, but not sure I want to steal it on an increase.

445.     Teva declined to bid, after conversations with its competitors confirming that the reason for the request was due to a competitor's price increase.

446.     When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox." For example – as discussed more fully below – in December 2014, Teva was approached by a large retail customer on behalf of Greenstone. The customer indicated that Greenstone was entering the market for Cabergoline and was seeking to target specific customers. The customer specifically requested that Teva give up a large customer to the new entrant and indicated that "Greenstone has promised to play nice in the sandbox." After discussing the matter internally, a Teva representative responded to the customer: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the targeted customer.]"

447.     Similarly, when a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor. For instance, in May 2013, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail to J.G., another Sandoz senior executive, stating "My sense is that Sandoz is viewed by customers and competition as a respectful/responsible player in the market, which we should be proud of and has taken years to develop. I would be very careful to destroy this through behavior that is too aggressive or desperation."

448.     Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles. For example, in internal company presentations throughout 2014, Sandoz consistently referred to Actavis as a "responsible competitor" and Taro as a "very responsible price competitor."

449.     Teva had its own term of art – referring to the competitors it had the most collusive relationships with as "high quality" competitors. As explored more fully below, Teva had long-standing relationships with these competitors, including several of the Defendants, which affected nearly every overlapping drug they sold. As just one example, Patel (Teva) exchanged seven (7) text messages and had two (2) long phone calls with Aprahamian (Taro) on June 3 and 4, 2014. After a lengthy twenty-five (25) minute call with Aprahamian on the morning of June 4, Patel sent an internal e-mail to K.G., a Teva senior marketing executive, stating "[w]e should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor – I think we need to be responsible where we have adequate market share."

450.     Adherence to the rules regarding "fair share" is critical in order to maintain high prices. Indeed, that is the primary purpose of the agreement. If even one competitor does not participate (and, thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritizes gaining

market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and is spoken to by other competitors. For example, in March 2015, Upsher-Smith learned that Sandoz had submitted a bid on a product not identified in this Complaint at one of Upsher-Smith's GPO customers. B.P., a senior account manager at Upsher-Smith, forwarded that information internally stating "I can't believe they have chosen to compete against us since we had this business. How does this help us? We play fair and they don't?"

451. "Fair share," "playing nice in the sandbox," "rationalizing the market," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding between Defendants. Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs, as well as allocation spanning across numerous drugs. For example, in July 2013, L.J., a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have "fair share" of the market. After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Kellum responded by emphasizing the truly industry-wide nature of the agreement:

| | |
|---|---|
| **From:** | Kellum, Armando |
| **Sent:** | Tuesday, July 02, 2013 12:31 AM |
| **To:** | ██████████████████ |
| **Subject:** | Re: Product Sales and Market Share Performance_v17 (3).xls |
| | |
| Fair Share for all!!! | |

452. The concept of "fair share" is so well ingrained in the generic pharmaceutical industry that even customers are aware of, and at times facilitate, collusion among generic manufacturers. For example, in June 2013, Dr. Reddy's was entering the market on a product not

identified in the Complaint where Par had previously been exclusive. K.N., a senior account executive at Dr. Reddy's, sent an internal e-mail reporting that "[a GPO customer] has indicated that Par will walk away, so we have put together a proposal based on that information."

453.    Similarly, in September 2014, a large wholesale customer reached out to several large generic manufacturers, including Teva, asking them to submit a "Priority Wishlist of items to gain increased volume in the market." The customer reported to Teva that "7 of the global suppliers have created and submitted wishlists and that [the customer] will be reviewing next week and taking a look at how they can move things around. He said they are hoping to be able to horse trade without having to do ROFR [right of first refusal]."

454.    Further, in January 2015, Teva was in discussions with a large retail customer about the possibility of becoming its supplier for Moexipril HCL/HCTZ tablets. The customer stated "Yes, I would like a OTB [One Time Buy]. Can you provide pricing? And yes, we should discuss an ongoing offer as well. I think you are way under your 'fair share' on this one if I remember correctly."

455.    Customers at times also facilitate price increases, asking competitors to "rationalize" a market by raising prices. For example, in November 2013, S.G., a senior account executive at Sandoz, sent an internal e-mail stating "[a large wholesale customer] is indicating that Glenmark and Caraco had taken a price increase on [a drug not identified in the Complaint] in June. [The customer] is asking if Sandoz will be rationalizing the market. . . . Please advise on next steps. Our [lower] pricing is disrupting the market."

456.    The "fair share" agreement is not limited to any one market; these principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across product markets. "Fair share" decisions consider factors across multiple generic drug markets. Customers in one drug market might be traded for customers in

another drug market so to create a global "fair share" outcome. Or a putative competitor may decline to complete meaningfully on a bid for one drug in exchange for the opportunity to provide a pre-determined bid for a different drug. Or competitors might avoid challenging a price increase on one generic drug based on a *quid pro quo* arrangement from other competitors on different drugs.

457.    Indeed, Defendants understood that to effectuate a successful price-fixing and market allocation agreement on one drug, they would need to effectuate an agreement across each Defendant's portfolio of drugs. If the agreement were limited to one or two drugs, it could easily fall apart. For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price.

458.    There are many examples of Defendants conspiring across drug markets. As set forth below, Teva implemented collusive price increases on several drugs at a time in a series of price increases detailed below and communicated with certain putative competitors as to multiple drugs as part of each such wave of price increases.

459.    Defendants also conspired across drug markets to maintain their market allocation scheme. For example, in November 2013, Dr. Reddy's won the "B" slot[45] business at a large wholesale customer on a product not identified in the Complaint. Dr. Reddy's had previously won the "A" slot business at that customer because Mylan had "walked away" from the business. J.A., a senior account executive at Dr. Reddy's, sent an internal e-mail stating "My concern here is that

---

[45] Some large customers contract with multiple suppliers – referring to them as primary ("A slot") or secondary ("B slot") suppliers – so that in the event of a supply disruption for a particular drug, there is a secondary source of supply.

[Mylan] will retaliate somewhere else. I'm unsure of the $ volume, but this would pull somewhere around 4% share from Mylan, and I don't think they would take that lying down."

460.     Similarly, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an internal e-mail, including to Kellum, stating that Sandoz had decided not to bid on two drugs not identified in the Complaint at a large retail customer. CW-1 explained his reasoning as follows: "We have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz), and fear blowback if we take any more products at this moment. Trying to be responsible in the sandbox." And in June 2014, Sandoz again chose not to bid at a customer on a product not identified in this Complaint out of concern that Mylan would retaliate. As CW-1 explained, "I do not want to pursue, I believe this is due to a Mylan increase. We have a lot of products crossing with Mylan right now, I do not want to ruffle any feathers." As discussed more fully below, these decisions were made by Sandoz executives as a direct result of communications between the competitors, and in the context of an ongoing understanding between Sandoz and Mylan to fix prices and avoid competition on a number of different drugs, including Nadolol.

461.     A similar scenario occurred in August 2015, when Taro declined to bid on Etodolac ER tablets at a large supermarket chain where Zydus was the incumbent. Taro voiced concerns internally that Zydus might retaliate and take share from them on another product, Warfarin Sodium tablets. As C.L., an analyst at Taro, reasoned in an internal e-mail, Zydus "could hit us on Warfarin. Not worth a fight in the sandbox over 300 annual units for Etodolac." As discussed more fully below, both Etodolac ER and Warfarin Sodium were drugs where Taro had previously agreed with its competitors, including Teva and Zydus, to fix prices and allocate customers in 2014. Taro's focus on playing nice in the sandbox was merely an extension of those already-existing agreements.

462.     As these and other examples alleged below make clear, the interdependence among generic manufacturers transcends product markets as these companies make decisions not only

based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap and any future markets where they might eventually compete.

463.    In fact, as explained in more detail below, certain Defendants had long-standing agreements with some of their competitors to limit competition on any products on which the companies overlapped. For example, shortly after Patel was hired by Teva in 2013, she reached out to CW-1 and asked how Sandoz handled price increases. Patel explained that she had been hired by Teva to identify products where Teva could increase prices. CW-1 told Patel that Sandoz would follow any Teva price increases and that Sandoz would not poach Teva's customers after Teva increased price. CW-1 reiterated his conversation to Kellum, who understood and approved.

464.    As set forth above, generic manufacturers often communicated about, and colluded on, multiple drugs at any given time. For example, in July 2013, Teva increased pricing on a list of 21 different products. There was a great deal of internal pressure from management at Sandoz – including from Kellum and CW-1 – to obtain a copy of the Teva price increase list. As a result, CW-2 (then a Sandoz employee) reached out to his former colleague, Rekenthaler, (Teva), to obtain a copy of the full Teva price increase list. Rekenthaler forwarded the list to his own personal e- mail address before then forwarding it to CW-2's personal e-mail address. Upon receiving the list, CW-2 read it to his supervisor – CW-1 – over the phone. Notably, the Teva list included a number of products that Sandoz did not even sell.

465.    It was not uncommon for generic manufacturers to communicate with each other about products that they did not sell. As another example, Teva, Wockhardt, and Mylan collusively raised pricing on Enalapril Maleate in July 2013 (discussed more fully below). After a lengthy conversation with Patel in the midst of the price increases, Aprahamian (Taro) (not in the market for Enalapril Maleate at that time) sent an internal e-mail, including to M.P., a senior Taro executive,

stating "[t]here has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast)." And Taro did move fast. By December 2013, Aprahamian spoke again with Patel, M.A., an account manager at Mylan, and M.C., a senior sales and marketing executive at Wockhardt. Taro then re-entered the Enalapril Maleate market and matched competitor pricing.

466.    As another example, on January 1, 2013 – the day before a substantial Mylan price increase on a number of items –Green (Teva) spoke five (5) times with Nesta (Mylan). The next day, Green spoke with Kellum (Sandoz). Kellum then sent an internal e-mail to the Sandoz team stating "[j]ust heard from a customer that – Teva and Mylan . . . have raised price on Nadolol to our levels and Mylan took a significant price increase on Levothyroxine. Let's please be cautious on both these products." Despite that fact that Teva did not sell Levothyroxine, Green still conveyed to Sandoz that Mylan raised price on that product.

467.    Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets. Often these decisions are made, at least in part, based on who the competitors are and how strong the relationship is between the two companies. For example, in July 2013, Sandoz was looking to implement a "Taro Strategy" that involved temporarily delisting ten products that they overlapped on with Taro. This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price.

468.    This interdependence between generic manufacturers is further demonstrated by the countless examples of companies sharing sensitive information with competitors as a matter of course. The State AGs have gathered evidence going back more than a decade of generic companies routinely communicating and sharing information with each other about bids and pricing strategy.

REDACTED – PUBLIC VERSION

This includes forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, or at the request of a competitor.

469.     Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection, and rebates. Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of payors and consumers. For example, in December 2013, Teva was negotiating new price increase language in its customer contracts and wanted some comfort that its competitors had similar language. On December 23, 2013, Rekenthaler spoke with Nesta (Mylan) three times, including a 13-minute call. Immediately after hanging up the phone with Nesta after the third call, Rekenthaler sent the following e-mail:

| | |
|---|---|
| From: | Dave Rekenthaler |
| Sent: | Mon 12/23/2013 10:41 AM (GMT-05:00) |
| To: | ▮▮▮▮▮▮▮; Maureen Cavanaugh |
| Cc: | Nisha Patel02 |
| Bcc: | |
| Subject: | RE: Proposed Price Increase Language |

Mylans language is vague.  "Pricing subject to change at Mylan's sole discretion."

470.     Defendants were well aware that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy. For example, in May 2014, a large customer of Taro's received a bid on a product not identified in this Complaint and gave Taro an opportunity to bid to retain the business. A.L., a senior contracting executive at Taro, sent an internal e-mail stating "FS ok, will not protect." E.G., a senior managed care executive at Taro, responded "explain FS, (Fair share)?" Aprahamian replied:

No emails please. Phone call. ▮▮▮▮ let's discuss.

471.     Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017 – after the States' investigation was well underway – read: "Avoid Fair share terminology on slides – underdeveloped or overdeveloped is better."

472.     To avoid creating a potentially incriminating paper trail, Kellum (Sandoz) routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.

473.     The examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described. Indeed, to date, many of the Defendants have made no document productions in connection with the State AGs' investigation, including Amneal, Apotex, Breckenridge, Glenmark, Lupin, and Zydus, and several other Defendants have made only limited productions focused on particular drugs or custodians, including Actavis, Mylan, Par, and Wockhardt. Even Teva, the central figure in this Complaint, has to date only produced documents from two custodians to the State AGs.

C.     **Generic Drug Price Spikes Since 2013**

474.     Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout at least 2013 and 2014. As Senator Sanders noted, the prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014.[46] An analysis conducted by Sandoz showed that during the calendar years 2013 and 2014, there were 1,487 "large price increases" (increases of the WAC price greater than 100%), of which 12% (178) were increased by greater than 1,000%.

---

[46] Why are Some Generic Drugs Skyrocketing in Price?: Hearing on S. 113-859 Before the S. Comm. on Health, Education, Labor, and Pensions, 113th Cong. 2 (2014) (statement of Sen. Bernie Sanders, Chairman, S. Subcommittee on Primary Health and Aging).

475.     These increases in 2013 and 2014 were staggering compared to prior years. The following table (which contains information about WAC pricing changes through October 2014 only) demonstrates the dramatic surge in the number of large drug price increases per year in 2013 and 2014:

| | Year | Total Number of Increases | Increases Greater than 100% | Increases Greater than 50% |
|---|---|---|---|---|
| | 2010 | 3820 | 125 | 260 |
| | 2011 | 4265 | 255 | 409 |
| | 2012 | 4071 | 223 | 433 |
| | 2013 | 5694 | 739 | 1072 |
| YTD Oct. | 2014 | 4461 | 637 | 1521 |

476.     A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases.

477.     More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

## VIII.   THE CONSPIRACY

478.     When entering a generic drug market, Teva and the other Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

479.     Illustrative examples of these agreements are set forth below, organized by company relationship and describing specific examples relating to many of the Subject Drugs.

480.     By 2012 the overarching "fair share" conspiracy was well established in the industry, including among the Defendants. Generic manufacturers replaced competition with coordination in

REDACTED – PUBLIC VERSION

order to maintain their fair share of a given generic drug market and avoid price erosion. The structure and inner workings of the agreement were well understood and adopted throughout the industry.

481.    Around this time, however, manufacturers began to focus more on price increases than they had in the past. They were no longer satisfied to simply maintain stable prices – there was a concerted effort by many in the industry to significantly raise prices. Manufacturers started communicating with each other about those increases with greater and greater frequency.

482.    Starting sometime in 2012 or even earlier, and continuing for several years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase. The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement – i.e., that they would not punish a competitor for leading a price increase or steal a competitor's market share on an increase. There was an understanding among many of these generic drug manufacturers – including the Defendants – that a competitor's price increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share (unless they had less than "fair share").

483.    Generic drug manufacturers could not always follow a competitor's price increase quickly. Various business reasons – including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties – could cause such delays. In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

484.     Examples of specific collusive price increases on many of the Subject Drugs are set forth below.

## IX.     HERITAGE

### A.     Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion

485.     When entering a generic drug market, Defendants routinely sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices, and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

486.     The allegations immediately below focus on Heritage's conduct with respect to market entry, while the allegations in section XI.A focus on Teva's conduct in similar circumstances.

#### 1.     Nimodipine

##### a.     The Heritage/Sun Agreement

487.      As of June 2012, Heritage and Sun, through its division Caraco, were the only two competitors in the market for Nimodipine, as Teva had recently left the market. Heritage saw Teva's departure as an opportunity to raise prices.

488.     In June 2012, Malek asked Anne Sather to contact Caraco to discuss raising the price of Nimodipine.

489.     Sather subsequently exchanged numerous text messages and participated in calls with her Caraco contact throughout June 2012. On June 28, 2012, in an e-mail titled "Caraco", Sather wrote:

> [Sun Senior Sales Manager Susan Knoblauch] brought up nimo[dipine] to her boss
> [Sun President GP Singh Sachdeva], his only concern was that they get their fair
> share of the market. She was not so much help on the pricing discussion- because

she does not have much control over it. All pricing goes through [GP Singh Sachdeva (Sun)] and [GP Singh Sachdeva (Sun)] sets is. I do not know [GP Singh Sachdeva (Sun)] but [Knoblauch (Sun)] mentioned our discussion with him so I can only hope the ground work has been set. I reiterated that we would like to see $ go up and we would be fair.

490.   Malek responded: "Thanks for the info. Not sure what this means 'his only concern was that they get their fair share of the market.' They are getting their fair share of the market at a price they don't need to go to is what I wanted to communicate to them."

491.   In her e-mail response, Sather agreed:

That is exactly how I stated it to [Knoblauch] too! She made it almost seem like he did not care about the price of even this product. She admitted she knew nothing about the item – it is not a big/key item for them. I said it is big for us and with only two players it should command more $. I'd like to see if [Knoblauch] can communicate back to [GP Singh Sachdeva (Sun)] and the Nimo[dipine] on the Cardinal RFP (when it gets closer to the close of the RPF) – specifically mentioning the pricing we are going at so that Caraco can bring their price up too. This could demonstrate how communication can and should work between us to get the $ up.

492.   The same day Sather sent an analysis of the upcoming Cardinal RFP to Malek and others at Heritage. The notes section regarding Nimodipine reflected that Heritage should "keep price high for Caraco." The plan for Heritage was that it would bid at a high price, which would be communicated to Sun beforehand, and would allow Sun to raise its price and still retain the Cardinal business.

493.     Heritage and Caraco were both able to significantly raise prices to other customers as a result of this agreement.

494.     On July 20, 2012, Fleming, a Contract Analyst at Heritage, circulated proposed pricing for the Cardinal RFP which included pricing for Nimodipine that was lower than that proposed by Sather. In an e-mail exchange that same day, Sather and Malek discussed raising prices:

> <u>Sather:</u> My only concern is Nimodipine – and situation with Caraco and raising our market pricing. If we don't let them increase pricing here – will it always be a fight to the bottom with them?

> <u>Malek:</u> I don't have a problem with it but, we need another account. Who is that account? They took CVS from us and we let it go and now they are getting aggressive at public and at GPO's.

> <u>Sather:</u> I understand – I just think the timing is critical if we want to raise our pricing everywhere. This Cardinal RFP was mentioned in previous conversations – and now with NACDS coming – it is a perfect time to have those off-show conversations with the right folks and reiterate the 'plan.' Plus the RFP pricing will not be effective until Oct 1st – we would have time to discuss our pricing with Cardinal (and others) before that final date. Ie: I think we could still lowball the Nimo a little later if necessary.

> <u>Malek:</u> If you feel comfortable we can have those conversations and benefit from this then I agree. We can talk off line.

<u>Sather:</u> If I don't continue the conversations now (and at NACDS) and if we lowball right of the gate on the RFP, I think we close the door for a long time.

<u>Malek:</u> Ok, lets give it a shot. So we will increase the price, you should tell them that so they can do the same without any comp.

495.    That same day, Sather spoke to Knoblauch. During this and other communications in the succeeding weeks, the two companies reached an understanding about raising the price and avoiding competition for Nimodipine. Pursuant to the agreement, Heritage provided a cover bid so that Sun would be able to significantly raise its price and still retain the Cardinal business.

496.    When Malek learned that Sun would potentially be subject to FDA recall on Nimodipine, he directed employees to contact their Sun counterparts to inquire about the recall. A Heritage employee later reported that her contact at Sun was "not aware or [sic] any problems/issues and supply was fine."

497.    Then, on April 16, 2013, after an employee reported that Caraco has not been bidding as it was unsure when it would have product, Malek responded "Great feedback, time for next increase!" He later reiterated "to make sure if/when they are back [on the market] they talk to us first so we can be smart about it."

498.    On May 23, 2013, Sather again spoke with Knoblauch, who indicated that Caraco may be returning to the market for Nimodipine in June or July. Sather immediately reported this news to Malek: "Caraco's Nimodipine has an estimated ship date of June/July but frankly that looks even too hopeful. And there's a small rumor they may not come back with it. A reminder was provided about our recent changes on that item."

499.    This resulted in the following e-mail exchange between the two:

> Malek: OK...Where did you hear this from!!
>
> Sather: Vendor/friend [Knoblauch]
>
> Malek: Are they raising theirs?
>
> Sather: They are not yet but admit it would be nice to
>
> Malek: Well we would follow in one second……
>
> Sather: I did say that!
>
> Malek: hahahahahahaha

500.    During the next year, Caraco did not return to the market. Heritage was able to continue charging the artificially inflated prices previously agreed to by Caraco, and at times higher prices, as a result – knowing that if Caraco did return to the market, the original agreement between the companies would continue.

### b.    The Heritage/Ascend Agreement

501.    When the FDA approved Ascend's Nimodipine generic in early April 2014, Malek immediately reached out to Ascend's Executive Vice President of Sales and Marketing, John Dillaway, through LinkedIn, asking if Dillaway had "time to catch up tomorrow afternoon or Thursday morning." Dillaway responded, "I would like to catch up."

502.    On April 22, 2014, Heritage identified Nimodipine as one of eighteen different drugs designated for a price increase. As discussed below, a large majority of the price increases were to be achieved through collusive efforts. During a "Price Increase Discussion" conference call with members of the Heritage sales team, led by Malek, Heritage noted that Ascend was going to launch Nimodipine. Malek took responsibility within Heritage to communicate with Ascend about market shares. Heritage planned to offer Ascend one-third (1/3) market share, so that Ascend would not compete with Heritage on price.

503.     Malek took this responsibility to communicate with Ascend because he already had a relationship with Dillaway. The pair had previously met in February 2013. Malek had also been communicating frequently with Dillaway through the website LinkedIn in the weeks leading up to the April 22, 2014 Price Increase Discussion.

504.     Later in the day after the Heritage "Price Increase Discussion" on April 22, 2014 described below, Malek called Dillaway and the two spoke for nineteen (19) minutes. Upon information and belief, during this conversation they agreed on a plan where Heritage would raise its prices, Ascend would enter the market at a high price to avoid erosion, and in exchange Heritage would walk away from certain accounts that Ascend had targeted so that Ascend could gain market share at favorable pricing.

505.     On May 9, 2014, Heritage had another internal conference to discuss price increases. After obtaining buy-in from Ascend during the April 22 telephone call between Malek and Dillaway, Heritage confirmed that it would be raising prices of Nimodipine across the board. Heritage also identified specific customers that it would "let go" to the "new entrant into market" Ascend.

506.     In June 2014, Malek sought to continue his conversations with Dillaway regarding Nimodipine. He e-mailed Dillaway on June 6, 2014 seeking to arrange a phone call. After they were unable to connect by phone, Dillaway suggested they meet in person and "grab coffee" at the NACDS conference in Boston.

507.     At the end of June, Heritage implemented the price increase. Heritage raised the price of Nimodipine to at least twelve customers.

508.     Malek e-mailed Dillaway on October 29, 2014, again asking to "catch up." The two spoke by phone for ten minutes the next day. On November 4, 2014, Malek e-mailed Dillaway to "[l]et me know when we re-connect to continue our discussions from the other day." Instead of

communicating specifics over e-mail, Malek and Dillaway made plans to have lunch together when Malek returned from India.

509.     Two weeks later, on November 18, 2014, Malek e-mailed Dillaway stating "[j]ust sent you a text. Fresh back from India. Wanted to pick up discussions. Let me know if you can chat." On November 25, 2014, Malek e-mailed Dillaway again asking if Dillaway "had a few minutes to connect."

510.     On January 22, 2015, Malek asked Heritage employee R.S. to reach out to Ascend to see if Ascend had Nimodipine in its warehouse. Malek stressed that this inquiry should be kept confidential.

511.     R.S. reached someone at Ascend. By January 24, 2015, Malek was able to inform his sales team that Ascend had Nimodipine in its warehouse.

512.     By May 1, 2015, Ascend had fully launched Nimodipine. Instead of trying to compete with Heritage upon entry, Ascend's WAC price, per tablet, was even higher than Heritage's.

513.     Notwithstanding this higher pricing per tablet, Ascend began to gain market share throughout the second half of 2015.

## 2.    Zoledronic Acid

514.     At all relevant times, Dr. Reddy's and Heritage dominated the marketed for Zoledronic Acid.

515.     Zoledronic Acid was marketed singularly by the brand manufacturer, Novartis, until the spring of 2013, when it came off patent. It was sold in two formulations: a 4 mg and a 5mg, both injectables. Heritage initially sought only to launch the 5mg formulation.

516.     In early 2013, Heritage received FDA approval to market Zoledronic Acid in the United States. Heritage began communicating with potential competitors before then to avoid price competition and to carve up market share.

517.     On January 21, 2013, Malek e-mailed O'Mara (Heritage) directing him to reach out

to Dr. Reddy's, the only other competitor Malek believed would be marketing Zoledronic Acid.

Malek wrote:

> Would like you to have a call with [Austin (Dr. Reddy's)] on Zoledronic.
>
> Right now, only us and DRL have a tentative on the 5mg (reclast).
>
> Need to know if he's going to be there day one and see if he's willing to discuss strategy at all.
>
> This is huge right now if it's only a two player market and we need to lock in our strategy.

518.     In a follow-up communication to O'Mara the next day, Malek outlined what O'Mara

should ask Austin:

> OK. Here are the questions if you would.
>
> Are they going to be there day one (March 4)
>
> Have they heard of any others there say [sic] one?
>
> Are they launching the 4mg (Zometa) at risk?
>
> Have they heard of anyone else launching the 4mg at risk?
>
> What's their market share goal?

519.     Through numerous phone calls in late January 2013 between Heritage and Dr.

Reddy's sales representatives, an agreement was reached to allocate the market for Zoledronic Acid

between Heritage and Dr. Reddy's. As O'Mara described it, "[Austin] views it this way. If they are first and others come out after, he deserves 60%. If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

520.     Communications between the two companies continued in March 2013 in preparation for Heritage's market entry, including communications on March 1, 4, 6, 12, and 13, 2013.

521.     On March 1, O'Mara e-mailed Malek informing him that he had left Austin a message "to have him call me back." He added, "Did not leave anything that would incriminate me—very generic." O'Mara and Austin then spoke for almost eight (8) minutes on March 4, 2013.

522.     The March 6 communication arose from Malek's concern that Dr. Reddy's initial pricing to at least one customer appeared to be lower than he had hoped. Malek e-mailed O'Mara asking, "[a]ny chance you can talk to them and educate them on supply and demand economics?" O'Mara's response was "[y]es, they were working on it yesterday, but [I] will give him a call and discuss."

523.     On March 13, M.E., a Senior National Accounts Manager at Heritage, told Malek that he had called his counterpart at Dr. Reddy's about Zoledronic Acid and they would "talk about it soon." The two spoke on April 3, 2013 and M.E. confirmed that Dr. Reddy's had begun shipping the 5mg product that day and that pricing would be "in the 500 range." The two continued to speak throughout April.

524.     On April 19, 2013, Malek instructed his sales team not to put any collusive discussions on Zoledronic Acid or other drugs in writing to ensure the conspiracy remained hidden: "Team: please hold off on emails regarding zoledronic indication, insert, prescribing, etc. take all questions off line."

525.     Heritage and Dr. Reddy's continued to police their market allocation agreement. For example, in November 2013, Dr. Reddy's offered a lower price for Zoledronic Acid to one of Heritage's customers. When Malek learned of this, he e-mailed M.E., "When you spoke to [your counterpart at Dr. Reddy's], weren't they going to chill on share[?]" M.E. replied. "He told me that he was going to speak to their injectable people and let them know that they should chill."

526.     For most of 2013 and 2014, the market for Zoledronic Acid remained stable with Dr. Reddy's maintaining roughly 60 percent share to Heritage's 40 percent share for the 5mg formulation.

### 3.     Meprobamate

527.     In 2013, Heritage and Dr. Reddy's were the only manufacturers for Meprobamate. The two companies had an agreement in place to allocate market share between them and not compete on price.

528.     On March 21, 2013, Malek e-mailed members of his team that he is "Looking to take a price increase on [mepro]. Only other competition is DRL [Dr. Reddy's]. We don't want to make any waves and we are not looking for additional share, just want to maintain what we have at a minimum of a 4x price. Anyone want to reach out to DRL and communicate to feel out?" His team confirmed that they will touch base with counterparts at Dr. Reddy's.

529.     On a call on March 22, the two companies agreed to set and increase prices on Meprobamate. The agreement was confirmed in an e-mail later that day from a Heritage representative: "DRL is on board with price increase. I will fill you in later."

530.     On March 27, 2013, Heritage received a request for a bid from a national wholesaler on Meprobamate that was a Dr. Reddy's customer. The Heritage employee reported to Malek that "Due to my conversation with [Dr. Reddy's] the other day, I think we should tread lightly or else bid a high price to show them where we are going." Malek replied "Unless [the national wholesaler] calls

you and asks for supply, I recommend letting the market dry up a bit and showing DRL we stayed away from their business."

531.    In April 2013, Dr. Reddy's requested Heritage "walk away" from a national pharmacy chain. Heritage then e-mailed the large pharmacy chain that it was increasing Meprobamate prices. The pharmacy replied that it "made a business decision to name another manufacturer as our primary supplier of Meprobamate tablets."

532.    The following month, Malek told his employee to explain to Heritage "we decided to walk away based on the conversation we had two weeks ago. This makes the playing field for market share more even and I assume since you were looking for one more customers that you are good now. Tell him you don't think the team is going to walk from anymore share at this point."

533.    Both Heritage and Dr. Reddy's were able to significantly raise prices across the board, nearly simultaneously, as a result of their agreement, in late April 2013 and early May 2013, respectively.

534.    Over the next several years, the market remained highly stable, but at supracompetitive levels.

### 4.    Doxy DR

#### a.    The Heritage/Mylan Agreement

535.    Mylan served as the exclusive generic in the market for Doxy DR until July 2013 when Heritage entered the market. Mylan and Heritage then dominated the market for Doxy DR until Mayne entered the market in 2014.

536.    While Mylan held exclusivity over the Doxy DR generic market, prices remained high, as would be expected without competition. By 2013, Heritage considered entering the Doxy DR market. Aware that the entrance of a second manufacturer typically drives down prices, Heritage

contacted Mylan before entering the market for Doxy DR to coordinate pricing and market share in alignment with their "fair share" agreement to prevent price from eroding when Heritage entered.

537.    In April 2013, Glazer and Malek traveled to India to meet with two executives of Heritage's parent company, Emcure. Glazer and Malek met with Satish Mehta, the CEO of Emcure, and Vikas Thapar, the President of Emcure. The purpose of their trip was to discuss Heritage's plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition. These discussions resulted in a decision to work out an agreement between Heritage and Mylan relating (at least) to Doxy DR. Mehta would reach out to Rajiv Malik, President and Executive Director at Mylan, in order to facilitate subsequent communications between Glazer and Malek and their counterparts at Mylan.

538.    In early May, upon return to the United States, Heritage employees at many levels began to reach out to their counterparts at Mylan to discuss Doxy DR pricing and market allocation.

539.    For instance, On May 3, 2013, Malek asked O'Mara (Heritage) to set up a call between Malek and his counterpart, the Vice President of Sales at Mylan. The next day, Malek learned that the Vice President of Sales had little to do with the National Accounts and O'Mara instead provided Malek with contact information for James Nesta, a Vice President and Executive Director at Mylan. Malek immediately connected with Nesta through LinkedIn. Malek and Nesta communicated by phone on multiple occasions and continued to communicate about various drugs, including Doxy DR.

540.    Additionally, on May 7, 2013, Glazer e-mailed Malik, copying both Mehta and Thapar: "Rajiv [Malik]: Would like to schedule a time for a call to catch up and discuss some recent Heritage news. Please let me know when you are available and we'll pencil it in." Malik responded with a phone number where he could be reached in England and the two spoke the next day.

541.     During their May 8, 2013 phone call, Glazer and Malik reached an agreement to refrain from competing in the Doxy DR market. Glazer told Malik that Heritage intended to pursue two of Mylan's large Doxy DR customers (wholesaler McKesson and retail pharmacy CVS), who collectively comprised 30% of the market. Glazer confirmed they would not price aggressively (lower than Mylan) and Malik responded that Mylan would "play fair," agreeing to give up the two accounts to Heritage.

542.     Over the course of several discussions, Malik reached an agreement with Glazer whereby Mylan would give up its accounts with McKesson and CVS based on the understanding that Heritage would coordinate with Mylan to keep prices of Doxy DR elevated. Malik made clear that Mylan entered this agreement willingly because Heritage had abided by its "fair share" agreements with Mylan in the past on other drugs by allowing Mylan to enter the market without competition. Malik told Glazer he would inform others at Mylan about their agreement. Similarly, Glazer kept Malek informed on his conversations with Mylan.

543.     In the months that followed, Mylan surrendered the McKesson and CVS accounts to Heritage.

                                    i.     *Wholesaler A*

544.     In June 2013, Malek met with a senior executive from "Wholesaler A" (believed to be McKesson) at an HDMA Conference in Orlando to discuss potential product opportunities, including Doxy DR. Very shortly thereafter, Heritage submitted a detailed product proposal to Wholesaler A and Malek continued to reiterate to them Heritage's strong interest in entering a supply agreement for Doxy DR over the following days.

545.     Heritage and Mylan executives remained in touch and continued to discuss their market allocation scheme during this time. On June 11, Michael Aigner, a National Account Manager at Mylan, called O'Mara and spoke for nearly ten minutes. O'Mara then immediately called

Malek to report his conversation, initially leaving a voicemail, but connecting 15 minutes later for a 7-minute conversation.

546.     On June 18, 2013, a senior manager at Wholesaler A contacted Lance Wyatt, a National Account Manager at Mylan, to inform him of the unsolicited bid he received from a new entrant (Heritage) on Doxy DR and offer Mylan the opportunity to submit a bid to retain the business by June 21, 2013. This is a customary practice in the industry referred to as "Right of First Refusal" ("ROFR") and if often included in the terms of supply contracts between manufacturers and their customers, allowing the incumbent manufacturer an opportunity to beat a competitor's price and retain the business. Keeping its agreement with Heritage to cede a customer, Mylan failed to submit a bid.

547.     On June 27, 2013, with no counterbid from Mylan, Wholesaler A entered a distribution agreement with Heritage to serve as the wholesaler's primary supplier of Doxy DR. To date, Heritage maintains Wholesaler A's Doxy DR business without any competition from Mylan.

*ii.*     *The Pharmacy*

548.     In July 2013, Mylan upheld its agreement with Heritage to cede the "Pharmacy" (believed to be CVS) account for Doxy DR.

549.     On July 8, 2013, Heritage submitted a proposal to the Pharmacy to bid for Doxy DR business. The Pharmacy rejected the bid the following morning because the pricing was too high, and Heritage submitted a revised bid on July 11, 2013.

550.     Heritage maintained communications with Emcure, its parent company, throughout the bidding period so that Emcure could communicate with Mylan to ensure they maintained their agreement not to compete. Mehta spoke with Malik on July 18, 2013 and then Thapar followed up by e-mailing Glazer, "Satish spoke to Rajiv.  Call me when free." Glazer spoke with Thapar and then

e-mailed Malik asking if he had time for a call that day. Malik responded that he could call Glazer later that evening.

551.    Malik called Glazer, left a voicemail, and Glazer returned the call fifteen minutes later. They had a 4-minute conversation where Glazer conveyed Heritage's strategy and position about the Pharmacy bid and Doxy DR in general. Glazer told Malik that Mylan's reaction to Heritage's bid with the Pharmacy would "set the tone of whether this is a high priced item or more erosion."

552.    Malik immediately spoke to certain Mylan employees and Mylan ultimately walked away from the Pharmacy.

553.    On August 6, 2013, Aigner (Mylan) called O'Mara (Heritage) and had a 13-minute conversation.

554.    On August 15, 2013, an executive at the Pharmacy contacted Gary Tighe, a National Account Manager at Mylan, to inform him it had received an unsolicited bid for Doxy DR business and provide a short window for Mylan to submit a counter bid to retain the business.

555.    In keeping with its agreement with Heritage, Mylan submitted a counter bid, but only lowered its price by $10, knowing the price adjustment would not be enough to retain the business. The pharmacy contacted Tighe again later that day to notify him Mylan's price reduction would not be enough to maintain the business and offer Mylan a second opportunity to lower its price. Tighe responded that he would let the pharmacy know by morning. Mylan declined to submit a revised bid to retain the Doxy DR business at the Pharmacy.

556.    In September 2013, the Pharmacy awarded its Doxy DR business to Heritage. To date, Heritage still maintains the Doxy DR business at the Pharmacy without any competition from Mylan.

### iii.    *Other Customer Accounts*

557.    Once Heritage entered the market and Mylan allowed Heritage to obtain the business of these two large customers, Heritage maintained their agreement by ensuring the new market share equilibrium remained intact. Heritage walked away or refrained from competing on Mylan customers so as not to upset the balance.

558.    In November 2013, Heritage refrained from competing against Mylan on one of their large retailer accounts for Doxy DR. Malek wanted to check in with Mylan to see if this was an account they intended to keep as part of the market re-allocation agreement before soliciting the business. On November 25, 2013, Malek tasked O'Mara (Heritage) to check in with Mylan. Malek e-mailed O'Mara, "can you reach out?" and O'Mara responded: "I have tried with [Aigner (Mylan)] and nothing. Will try again."

559.    Malek also e-mailed Glazer, suggesting Heritage expected an agreement to transfer one more account from Mylan to Heritage, "Mylan is trying to protect [the one large account at issue]. We should reach out to rajiv [sic.] [Rajiv Malik (Mylan)], we need one more account and we are done." Heritage clearly sought to gain Mylan's permission before taking any action that might disrupt their market share agreement.

560.    After checking in with Mylan, Heritage ultimately declined to pursue the Doxy DR business at the large retailer.

### b.    **The Heritage/Mayne Agreement**

561.    In February 2014, a new competitor, Mayne (formerly Midlothian Labs) entered the Doxy DR market. Even before launching their product, Mayne approached Heritage to discuss its plan, recognizing that it would need to establish an agreement to coordinate a re-balancing of market share for each company. On January 7, 2014, Gloria Peluso-Schmidt, a Director of National

Accounts for Mayne, called Sather, a National Account Manager at Heritage, for 12 minutes and Mayne agreed not to compete with Heritage in the Doxy DR market.

562.    Mayne's initial strategy was to target Mylan customers because Mylan held approximately 60% of the Doxy DR market at the time. This proved to be difficult, however, without an agreement yet in place with Mylan.

563.    For instance, Mayne bid on a large wholesaler currently held by Mylan. The wholesaler asked Heritage to submit a competing bid as well, but Heritage declined, consistent with their arrangement not to compete against Mylan. Mylan retained the business and Mayne's Executive Vice President of Generic Products, Chris Schneider, provided Peluso-Schmidt his assessment of the situation based on his experience in the industry: "How I read this is Mylan has given up several large customers to Heritage and they are not giving any more. We need to go after business at Heritage also." Peluso-Schmidt replied "Perhaps. . . ."

564.    Paluso-Schmidt maintained conversations with Sather about Doxy DR as she continued to pursue a customer base for Mayne. They spoke by phone on March 13, 2014 and again for 17 minutes on March 17, 2014.

565.    After her conversation with Paluso-Schmidt on March 17th, Sather e-mailed Malek and others at Heritage to recount their latest conversation and the understanding they reached. In an e-mail titled "Midlothian [Mayne] intel on Doxy DR," Sather stated:

> I just spoke with [G.S.] of Midlothian (Mayne Pharma) about Doxy DR. She is the "one-man" show for that company -- she has all accounts including GPOs. She has not been able to get much share on the product yet, so she says.
>
> She did not bid OneStop, we have that customer. She did not bid Optisource, we have that customer, and she was aware that Rick had no interest in switching.

She has been shut down at WalMart (Walmart said they couldn't go back to Mylan to reduce price again after we bid); and she was shut down at Rite Aid, Cardinal and ABC -- stating Mylan does not seem to want to give up any share. I shared info that we chose not to bid at Cardinal when asked.

She will be bidding it on the HD Smith RFP. She will be targeting M&D now. She may go after NC Mutual but the usage is very small there. She already has some GPO business and they already have Publix and WinnDixie business. (Important for tracking reports). They are nowhere near a contract with WAG yet so she feels like that is not an option.

She is feeling pressure from the Mayne Pharma folks to get some share on this product asap. I let her know what accounts we had locked up -- and I got the impression she would not target those folks.

566.     Malek replied "[t]hanks for the notes below. How well do you know [Paluso-Schmidt]?" And Sather responded, "I know her pretty well from over the years in the industry."

567.     Two weeks later, however, Heritage learned Mayne made an unsolicited bid for Doxy DR to one of Heritage's large retail pharmacy accounts. Malek e-mailed Sather on March 31, 2014, saying Mayne "[t]ook a shot at our doxy dr [at the large pharmacy account]. Can you reach out?" Sather (Heritage) responded "Yes - I can."

568.     On April 1, 2014, Sather spoke with Paluso-Schmidt for 27 minutes, then immediately texted Malek: "[s]poke with [Paluso-Schmidt] of Midlothian. Said she had to go to [the

large pharmacy customer]. Just got declined at Walgreens and went back a second time to cardinal and got declined again." Malek replied, insisting that Heritage "can't walk from [the large pharmacy customer]. Tell her to try Walmart."

569.    Paluso-Schmidt and Sather spoke again the next day for 11 minutes. Malek also e-mailed Glazer, relaying the news about Mayne and their status with the pharmacy: "[w]e are going to have to take doxy dr 30% lower at [the large pharmacy customer]. They don't pick up the phone for less than 20% difference. In this case, we spoke with Midlothian and they have struck out completely on getting share. They have gone to wag [Walgreens] and cah [Cardinal Health] twice and mylan won't budge. Please let me know your thoughts."

570.    Paluso-Schmidt and Sather spoke again on April 9, 2014 for 3 minutes. Sather then reported their conversation to Malek and O'Mara: "Just got a call from [Paluso-Schmidt] at Midlothian and she said she has offers in to One Stop and Econdisc."

571.    On April 10th, 2014, Paluso-Schmidt and Sather exchanged a series of text messages. Sather told Paluso-Schmidt that Heritage would "protect" the accounts they don't currently hold because they are "strategically aligned" with both, implying their ongoing agreement with Mylan:

> (1:14pm) Sather: Hi! It is [Sather]! Just getting back to you on our discussion yesterday. I don't have either account but my boss said since we are strategically aligned with both they will probably not move. We will protect. Sorry – I know it is not the news you wanted to hear.

> (1:16pm) Paluso-Schmidt: Thanks. Had he given up CVS we would not have gone after the other two. We'll just keep going back as soon as we can.

(1:18pm) <u>Sather</u>: I am bummed for you. I am keeping my ears open to understand the landscape too. I will let you know what I find out. Best bets are the RFPs that are out now.

(1:19pm) <u>Paluso-Schmidt</u>: Need volume. Need one Large account.

572.    Mayne continued to pursue large customers for the several months and Heritage walked away from one account in May 2014 when Mayne underbid Heritage's price. Upon learning of Mayne's bid, Keith Fleming, Associate Director of Pricing and Contracts at Heritage, asked Malek, "[l]et me know what you want me to do on this. Would like to keep, but at the same time, Midlothian will keep going after accounts." Malek replied, "[w]e will walk."

573.    In November 2014, Mayne again placed bids with McKesson One Stop (a wholesaler) and Econdisc Contracting Solutions ("Econdisc") (a GPO that includes Express Scripts, Kroger, and Supervalu). On November 20, 2014, Matthew Edelson, a Senior National Account Manager at Heritage, e-mailed Malek and others at Heritage, conveying that "Midlothian has taken another shot at our business on the Doxy 150mg at Econdisc and we have to respond to this in a timely manner."

574.    The next morning, Sather sent a text message to Paluso-Schmidt: "Happy Friday! Do you have a minute to talk about Econdisc?" Paluso-Schmidt (Mayne) responded, "Yes. Call me." Sather called Paluso-Schmidt and the two spoke for 15 minutes.

575.    Sather asked Paluso-Schmidt what her goals were for Doxy DR and Paluso-Schmidt responded that Mayne was looking for market share and needed a "big customer like Econdisc." She explained Mayne submitted an offer to McKesson 10 days earlier and Sather suggested that Heritage

might be willing to walk from Econdisc if Mayne agreed to withdraw its offer from McKesson and not to price Doxy DR aggressively.

576.     Right after her conversation with Paluso-Schmidt, Sather e-mailed Malek with the subject, "spoke with [Paluso-Schmidt]" and saying "[c]an discuss any time." Sather conveyed her conversation to Malek and exchanged several text messages and voicemails with Paluso-Schmidt over the course of the day.

577.     Later that afternoon, November 21st, O'Mara e-mailed Malek and others at Heritage, saying "Midlothian coming after us @ McKesson. Will discuss with you on Monday." Malek forwarded the e-mail to Sather, who responded, "[Paluso-Schmidt] and I played phone tag after I had spoken to you for the second time so we will definitely connect Monday."

578.     On November 24, 2014, Sather and Paluso-Schmidt connected and spoke for 6 minutes. Sather then e-mailed Malek with an update, "Just spoke with her ... can you call me anytime?" After speaking with Malek, Sather formally offered Paluso-Schmidt an agreement via text message: "If you retract McK[esson] - we will give up Econ[disc]. I can talk anytime."

579.     On November 25, 2014, Malek e-mailed Sather asking "[d]id you speak with [Paluso-Schmidt]?" Sather responded "Yes -- told her exactly what we talked about. She is on vacation this week but was going to try to rescind McKesson. . . ." Malek ended the conversation by saying "[s]ounds like we know what we need to do."

580.     In the weeks following, Glazer confirmed through internal e-mail communications that Heritage was "walking away from one [customer] so pricing would stabilize" and that Heritage "wanted to give Midlothian [market share so they stop eroding" the price for Doxy DR.

581.     Communications between Sather and Paluso-Schmidt continued throughout December, including text messages and an in-person meeting at the American Society of Health-System Pharmacists ("ASHP") conference on December 9, 2014.

582.     Econdisc put the Doxy DR business out to bid again in January 2015 and Heritage intentionally bid higher than Mayne, providing a "cover bid" and fulfilling Heritage's agreement to "walk away" from Econdisc. In March 2015, a Heritage employee confirmed this, saying "[w]e basically walked from Doxy DR" at Econdisc.

583.     The agreements between Heritage, Mayne, and Mylan on Doxy DR business and pricing continued and all three companies held the understanding that they would refrain from competing on market share and eroding price. In September 2015, a large nationwide pharmacy chain approached Heritage requesting a bid on Doxy DR. Sather confirmed internally that Heritage had the capacity to bid, but Malek cautioned that "[w]e need to know why this is out to bid and find out who the incumbent is" before providing a response.

584.     Upon learning that Mayne served as the incumbent supplier, Sather contacted Paluso-Schmidt. Paluso-Schmidt conveyed that Mayne had no supply issues and that the pharmacy chain was simply shopping for a better price. Keeping with their agreement, Heritage refused to provide a bid. Sather sent a follow-up text message to Paluso-Schmidt reiterating Heritage's intent to keep their agreement, "Confirming we are not bidding." Paluso-Schmidt replied, "Thank you."

585.     In a competitive market, Heritage and Mayne's entry into the Doxy DR market should have spurred price competition across all customers and lowered market prices. Instead, by allocating large accounts, Mylan and later Heritage were able to stabilize Doxy DR prices across the market at supracompetitive levels.

586.     These Defendants also maintained their communications at trade association events throughout this period, providing them ample opportunity to coordinate pricing and market share agreements in-person. Key pricing executives from Heritage, Mayne, and Mylan all attended the Feb. 20-22, 2013 GPhA Annual Meeting in Orlando, Florida. And key pricing executives from these

three companies attended the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland. *See* Exhibit A.

587.    NADAC data confirms that average market prices for Doxy DR increased dramatically between November 2012 and February of 2014 and remained artificially high thereafter. Pricing for various dosages are depicted below.





### 5. Hydralazine HCL

588.    While not arising in the context of market entry, Heritage engaged in conduct similar to that alleged above in connection with Hydralazine HCL.

589.    Heritage agreed with another generic manufacturer that is not a Defendant in this Complaint to allocate customers for Hydralazine HCL pursuant to the larger fair share agreement alleged throughout this Complaint.

### A.    Agreements to Fix Prices

590.    In addition to reaching agreements with competitors to allocate markets in connection with entry of a new competitor, Heritage and the other Defendants routinely sought and obtained agreements with competitors to fix and raise prices.

591.    This was often done by "socializing" a competitor to a price increase. This involved a generic manufacturer such as Heritage reaching out to competitors to first raise the possibility of a price increase, and then obtaining an agreement to join the price increase or that the competitor would not take advantage of the proposed price increase by bidding to take the initiating manufacturer's customers. Such an agreement would allow each competitor to maintain its market share and avoid competition despite the price increase.

592.    Often, a generic manufacturer such as Heritage would identify a large group of drugs for which it would like to increase prices, and then seek to socialize its competitors to obtain their agreement as described above for as many of these drugs as possible. Heritage engaged in such collusive multi-drug price increases, as set forth immediately below. Teva also engaged in such collusive multi-drug price increases, as set forth in Section XI.B below.

### 1.    Doxy Mono

593.    In February 2013, Heritage learned from a customer that demand for some Doxycycline products was increasing and wanted to use this as a pretext to raise the prices of Doxy

Mono. Heritage reached out to its competitors in the Doxy Mono market – Lannett, Mylan, and Par – to discuss and form agreements on price increases and prevent loss of market share.

594.     On March 7, 2013, Sather spoke to Tracy Sullivan, the Director of National Accounts at Lannett, for fourteen minutes.

595.     On March 13, 2013, Sather e-mailed Sullivan, saying "Hi! I just had a question for you on Doxycycline Monohydrate. Would you have a chance to chat today? Or tomorrow? Let me know a convenient time for you…" Later that day, they spoke for five minutes and discussed Heritage's intent to increase Doxy Mono prices.

596.     On March 17, 2013, Malek e-mailed himself a spreadsheet of various items for him to follow-up on, including "Price Increases: Take Doxy Mono up more than 3x asap." On March 21, 2013, Malek e-mailed Glazer that he intended to increase the price for Doxy Mono by as much as four times the current price and asked for Glazer's thoughts.

597.     On March 25, 2013, Malek e-mailed his sales team, indicating that Heritage would be "taking a price increase in the market this week" for Doxy Mono and another drug. Heritage continued to contact its Doxy Mono competitors throughout 2013. Sather spoke, texted, and met in person with several different Lannett employees during this time.

598.     On March 25, 2013, Sullivan e-mailed her boss relaying news of the price increase Heritage intended to institute. The e-mail was titled "Recap" and in it she claimed to be "[w]orking on a WAC & SWP review" for certain drugs, including Doxy Mono, but heard that "there will be a price increase on Doxycycline from Heritage soon. We are waiting to find out when and why." Sullivan and Sather continued to communicate through numerous phone calls, text messages, and in-person meetings over the next several months.

599.     On April 25, 2013, Sather called Sullivan and left a message. When Sullivan returned the call the next day, they spoke for approximately eight minutes.

600.     In April 2013, as outlined above, Malek and Glazer traveled to India to meet with Mehta and Thapar of Emcure, where they discussed how Heritage could implement price increases without instigating competition, particularly in the Doxy DR market. Afterward, Mehta contacted Malik of Mylan, a competitor in both the Doxy DR and Doxy Mono markets, to facilitate communications between Mylan and Heritage counterparts.

601.     Continued communications between Doxy Mono competitors often overlapped with trade association meetings they attended together. For example, on May 13, 2013, Sullivan and Sather spoke for approximately six minutes and the next day, they attended a conference together where they discussed Doxy Mono.

602.     On May 14, 2013, Sather and Sullivan exchanged text messages to coordinate time to speak at the conference, which confirmed plans for a "market wide increase," seemingly in Doxy Mono:

> Sather: Meeting in parking lot at Cardinal at 5:45 to carpool over. Can meet you at Cardinal then or at the bar? Should be to bar a little after 6.
>
> Sullivan: I have a conference call in a half hour about a market wide increase. I might have to meet you at the bar.
>
> Sather: Ok sounds good – see u there
>
> Sather: Is it doxy mono?
>
> Sullivan: Headed over now.

603.     On June 4, 2013, Sather reached out to Grace Wilks, Director of National Accounts at Lannett by phone and text message. On June 5, 2013, Sather, Wilks, and Sullivan attended the same conference, during which Sather and Sullivan exchanged numerous calls and text messages. This conference, the HDMA June 2-5 Business and Leadership Conference in Orlando, Florida, was also attended by key executives for generic sales and pricing from Mylan and Par.

604.     Heritage, Lannett, Mylan, and Par agreed to implement their price increases during the summer of 2013 and communicated frequently throughout this period, including the days surrounding Lannett's June 12 Doxy Mono price increase.

605.     On June 11, 2013, O'Mara (Heritage) spoke to Aigner (Mylan) for nearly ten minutes.

606.     Sullivan also communicated regularly with Karen O'Connor, Vice President of National Accounts at Par during this time. They were friends and saw each other frequently at trade shows and customer conferences, discussing anticompetitive information.

607.     O'Connor communicated frequently with Aigner in June and July of 2013, including several phone calls on June 7, 2013 and June 13, 2013.

608.     O'Connor also communicated frequently with Wilks, including through nine text messages exchanged on June 11 and 12, 2013.

609.     Lannett increased its price for Doxy Mono on June 12, 2013. One customer contacted Lannett in July of 2013 to request a lower price for Doxy Mono and a Lannett National Account Manager responded, "We just took a price increase on this item effective 6/12/13. This is our standard pricing across the board going forward. Any pricing you see out there right now will not be that low for long."

610.     Heritage maintained communications with Lannett and other competitors. Due to concerns about supply issues, Heritage was slower to raise its prices. In October 2013, Sather informed a customer that "[w]e are expecting continued supply issues with" Doxy Mono and that "supply will be tight through Oct and Nov." In a competitive environment, other Doxy Mono competitors would have viewed Heritage's supply problems as opportunities to gain market share. However, Defendants' "fair share" agreement mitigated any customer losses for Heritage. To ensure their market share stability, Heritage kept in frequent communication with their competitors,

reaffirming Heritage's commitment to their agreement. For instance, Sather met in person with Sullivan and O'Connor during a conference in Arizona on August 1 and 2, 2013.

611.     A flurry of communications between the four competitors followed throughout August 2013. As Heritage planned its Doxy Mono price increase, Malek asked Sather to obtain specifics regarding Lannett's price increases. Accordingly, Sather and Sullivan, while both attending the NACDS 2013 Total Store Expo August 10-13, exchanged text messages on August 12, 2013:

> Sather: From our conversation, [i]ncreasing WAC too?
>
> Sullivan: Yes
>
> Sather: When are you guys changing WAC or have u already?
>
> Sullivan: Are you free at 4:30?
>
> Sather: Yes—but still need to hang around for 5pm mtg
>
> Sullivan: OK I'll swing by

612.     Notably, Aigner and O'Connor also attended this conference.

613.     On August 13, while still together at the conference, Sather texted Sullivan, saying "Let's connect sometime today—need a little more specifics on the $ we discussed." Sather also exchanged several text messages and phone calls with Lauren Carotenuto, National Accounts Representative for Lannett and another conference attendee. O'Connor, who also attended the conference, received a text message from Wilks the same day.

614.     Later that evening, the Senior Vice President of Generic Sales at Par (likely Jon Holden, who attended the conference) sent an e-mail to Par's Vice President of Marketing and Business Analytics (likely Michael Altamuro, who also attended the conference), reading: "I hear that Lannett is taking a price increase on doxy mono and Heritage will follow." The e-mail was forwarded internally at Par with the instruction: "FYI…we will follow. . . . No new opps until we see where pricing ends up."

REDACTED – PUBLIC VERSION

615.   On August 20, 2013, Sather e-mailed Malek, confirming that Lannett "tripled WACs and did/will do similar to contract prices."

616.   Mylan and Par announced their price increases for Doxy Mono in the summer of 2013.

617.   By the spring of 2014, Heritage also increased their prices. On January 23, 2014, Sather informed a large supermarket chain customer that "I also wanted to let you [know] that we are looking to take a price increase on all the Doxy Monohydrate skus some time in 2014." In March 2014, Heritage increased its Doxy Mono prices with at least one customer and on April 22, 2014, Malek held a teleconference with Heritage's sales team to discuss strategy for increasing prices on eighteen drugs, including Doxy Mono, which was slated for a "big price increase."

618.   Sather was responsible, among others, for communicating with Lannett about Doxy Mono. Right after the Heritage conference call on April 22, she contacted three different competitors and reached pricing agreements covering Doxy Mono and four other drugs (Glyburide-Metformin, Verapamil, Nystatin, and Paromomycin). One of those communications included a 29-minute phone call with Sullivan about pricing for Doxy Mono.

619.   O'Mara was primarily responsible for communicating with Mylan and contacted Aigner the next day (April 23) to reach an agreement on price increases for Doxy Mono (as well as Glipizide-Metformin and Verapamil). Immediately after his conversation, O'Mara e-mailed Malek and Sather, with the subject line "Mylan:" "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

620.   On May 8, 2014, Malek sent an e-mail to O'Mara asking, "Did you ever to [sic] with [Michael Burton] at Par?" Par was a competitor with Heritage for two of the target drugs on the list, Doxy Mono and Methimazole. O'Mara and Burton spoke on the phone on June 2, 2014.

REDACTED – PUBLIC VERSION

621.    Malek also e-mailed the entire Heritage sales team on May 8, asking for confirmation on everyone's progress on speaking with their competitor counterparts about price increases. Sather, responsible for communicating with Lannett responded: "Jason: I made contact with all my take aways -- with positive results. I can resend those notes or talk with you on any details."

622.    Sather then attended the MMCAP Conference in Bloomington, Minnesota May 12-15, 2014, where she met in person with numerous competitors to discuss price increases, including with Sullivan regarding Doxy Mono. Sather reported back to Malek via e-mail on her success reaching pricing agreements, including with Lannett: "Hi Jason: At the MMCAP meeting yesterday, spoke with some other industry reps and found similar like minding on the pricing strategies we discussed. Overall, spoke with … Lannett…" Par and Mylan executives also attended this conference, including O'Connor.

623.    Sather continued her outreach to other Doxy Mono competitors through joint attendance at conferences. On June 3, 2014, while attending the HDMA 2014 Business and Leadership Conference in Arizona, Sather met O'Connor and Sullivan for dinner and drinks along with other competitors. Their continued communications during the price hike implementations provided opportunities to re-affirm their collusive agreements and coordinate pricing.

624.    By way of example, Heritage's IMS NSP price for 50mg Doxy Mono tablets more than tripled between February and July 2013. Lannett's IMS NSP price for 75mg tablets steadily increased between February and July 2013, more than doubling during that period. Mylan also increased IMS NSP prices for 75mg tablets in the summer of 2013, as its prices nearly doubled from a low in June to a high in November. Lannett's IMS NSP price for 100mg Doxy Mono tablets approximately doubled between January and August of 2013. Heritage, Mylan, and Par IMS NSP prices for 150mg Doxy Mono tablets all increased significantly between the spring and fall of 2013.

625.     Between the summer of 2013 and spring of 2014, Heritage, Lannett, Mylan, and Par had ample opportunity to coordinate their price increases and market share agreements in person. Key pricing executives from at least Heritage, Mylan, and Par attended the February 20-22, 2013 GPhA Annual Meeting in Orlando, Florida. Key pricing executives from at least Heritage, Lannett, Mylan, and Par attended the June 2-5, 2013 HDMA Business & Leadership Conference in Orlando, Florida; the June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland; the October 28-30, 2013 GPhA Fall Technical Conference in Bethesda, Maryland; the February 23-26, 2014 ECRM Retail Pharmacy EPPS in Amelia Island, Florida; the May 12-15, 2014 MMCAP National Member Conference in Bloomington, Minnesota; the June 1-4, 2014 HDMA Business & Leadership Conference in Phoenix, Arizona; and the June 3-4, 2014 GPhA CMC Workshop in Bethesda, Maryland.

### 2.     Heritage 2014 Price Increases

626.     In early 2014, Malek held a meeting with Heritage pricing executives, Keith Fleming, Associate Director of Pricing and Contracts, and Daniel Lukasiewicz, Heritage's Senior Manager, Marketing Operations, to ask them to begin analyzing the impact of numerous planned price increases.

627.     On April 15, 2014, Heritage's Jason Malek called Nisha Patel, Teva's Director of Strategic Customer Marketing, to discuss price increases on Acetazolamide ER, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, Theophylline, and others. On their 17-minute conversation, Patel agreed that if Heritage increased the prices for those drugs, Teva would either follow or not challenge Heritage's price increases by underbidding.

628.     Because Teva was already planning a price increase on Nystatin and Theophylline, Malek and Patel agreed Teva would take the lead on those increases. In subsequent months, Malek and Patel spoke several more times on Heritage's price increases and timing.

629.    On April 22, 2014, Heritage held a "Price Increase Discussion" teleconference in which Malek identified 18 drugs that Heritage would target for increase. Prior to the call, Malek circulated to his sales team a spreadsheet ("the Heritage list") which listed each drug, the competitors, and their respective market share. The Heritage list included Acetazolamide ER, Doxy Mono (which was slated for a "big price increase," as described above), Fosinopril HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline ER, and Verapamil, among others. Malek instructed members of the team to immediately reach out to contacts at each competitor for the drugs on the list and attempt to reach agreement on price increases. Different Heritage employees were identified as being primarily responsible for communication with different competitors.

630.    The Heritage sales team promptly began to contact their competitors. For example, Sather communicated with three counterparts at different competitors, reaching agreements with all of them to increase prices. First, she spoke with Knoblauch (Sun/Caraco) for 45 minutes and agreed to increase prices for Nystatin and Paromomycin. Then, she spoke to Michael Dorsey, a National Account Manager at Actavis for 9 minutes, which led to an agreement to increase prices for Verapamil and Glipizide Metformin. Finally, she spoke to Sullivan (Lannett) for 29 minutes and they agreed to raise the price of Doxy Mono.

631.    Heritage's O'Mara also reached an agreement on April 23 with his Mylan counterpart, Michael Aigner, Director of National Accounts, to increase the prices of Doxy Mono, Verapamil and Glipizide-Metformin. O'Mara summarized in an e-mail to Malek and Sather titled "Mylan": "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

632.     A few days later, Malek sent an e-mail to Heritage employee D.L. titled "bindo" referring to Aurobindo stating: "Let me know when you speak with [Paul McMahon, Senior Director of Commercial Operations at Aurobindo.]" On the Heritage list, D.L. was charged with responsibility for communication on Fosinopril HCTZ, of which Aurobindo was a competitor. Aurobindo was also a competitor with Heritage on Glyburide and Glyburide-Metformin. D.L. exchanged numerous voicemails with McMahon on April 28 and 29, 2014.

633.     In addition to Teva, Malek took responsibility for reaching out to Ascend regarding Nimodipine. Following the market-wide "fair share" agreement, as a new entrant into the Nimodipine market, Ascend agreed to enter at a high price to avoid price erosion as set forth above. In exchange, Heritage agreed to walk away from certain accounts Ascend targeted to help increase Ascend's market share.

634.     On May 8, 2014, Malek sent an e-mail to the Heritage sales team stating:

> Two weeks back we had a teleconference regarding 13 [sic] products where the pricing dynamics may change.
>
> We each had takeaways, can everyone confirm or not who they have/not spoken with since our call?
>
> Need to move forward with the plan asap.

635.     Heritage's Matt Edelson, Senior Director of Sales, responded immediately "Spoke with everyone and waiting in [sic] feedback on Mepro[bamate]." Malek tasked Edelson with communication with Dr. Reddy's on Meprobamate. He exchanged six text messages with Jake Austin, Director of National Accounts at Dr. Reddy's, on April 24, 2014, and then spoke with Austin on May 6, 2014.

636.     Sather responded: "Jason, I made contact with all my take aways – with positive results. I can resend those notes or talk with you on any details." Sather had been tasked with

communicating with Lannett on Doxy Mono, Actavis on Glyburide-Metformin and Verapamil, and Sun on Nystatin and Paromomycin, among others.

637.     Also on May 8, 2014, D.L. and McMahon held a 16-minute phone call and then an 18-minute phone call on June 25, 2014. They spoke again for 3.5 minutes on July 7, 2014.

638.     On May 9, 2014, Heritage held another teleconference to discuss price hikes during which the sales team shared their results in forming agreements with competitors.

639.     On June 23, 2014, Heritage employees had a "Price Change Call" to discuss the specific percentage amounts by which they would seek to increase the pricing of certain drugs, including drugs for which they had already obtained agreement from all competitors (or potential future competitors), and the strategies for achieving this goal. The drugs discussed on the call included Acetazolamide ER (75% increase); Paromomycin (100% increase); Glyburide (200% increase); Nimodipine (48% increase); Theophylline ER (150% increase); and Nystatin (95% increase).

640.     Two days later, on June 25, 2014, Malek spoke with Patel and informed her that Heritage would shortly be increasing prices for a number of drugs that Teva was a competitor for.

641.     On June 26, 2014, Sather sent a text message to a large wholesaler customer stating:

> As of 7/1 [m]arket wide we are increasing prices on Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTS, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases – you have those letters.

642.     Sather quickly followed up: "Here are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTS 200%, Glip/Met 100%, Glyburide 200%, Theo ER…150%."

643.     On July 1, 2014, Malek e-mailed Heritages sales team:

> Team:

> Looks like you are making good traction with our July 1 price increase.

> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

644.     In the following weeks Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices. Heritage was ultimately able to increase prices on at least Acetazolamide ER, Fosinopril HCTZ, Glipizide-Metformin, Glyburide, Leflunomide, Nimodipine, and Nystatin, as well as others, as set forth below.

a.     **Acetazolamide**

i.     *Acetazolamide tablets*

645.     Even before the Heritage 2014 price increase, Acetazolamide in tablet form was the subject of price-fixing and a "fair share" allocation.

646.     Acetazolamide tablets are sold in two dosages: 125 mg and 250 mg.

647.     Since at least 2010, Taro and Lannett have been the only major suppliers of Acetazolamide Tablets. Taro and Lannett both supply the 250mg dosage and Taro is the only major supplier of the 125mg dosage.

648.     Since 2010, Taro and Lannett have coordinated three lockstep price increases on Acetazolamide: in December 2010, April 2012, and late fall 2013. The graph below shows both the lockstep nature of the price increases and their growth in size:



649.    Since at least 2010, each time Taro increased the WAC price of its 250mg dosage of Acetazolamide, it also increased the WAC of its 125mg dosage. At the start of 2010, Taro and Lannett's WAC prices for the 250mg dosage of Acetazolamide were $34.21 and $32.70, respectively. These prices remained unchanged until December 2010 when Taro and Lannett raised their prices to almost identical levels within two days of each other. On December 6, 2010, Taro increased its WAC price for the 250mg dosage by 15% to $40.48. Two days later, on December 8, 2010, Lannett increased its WAC by 24.26% to $40.75.

650.    The day that Taro increased its prices, December 6, 2010, J.F., a member of Lannett's Board of Directors and an executive at a generics wholesaler, e-mailed K.S., a senior sales and marketing executive at Lannett, about the ▮▮▮▮▮ that ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. K.S. responded early the next morning stating, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮.

137

651.     By April 2012, Taro and Lannett were ready to impose a larger price increase. On April 3, 2012 at 7:37 in the morning, Defendant Blashinsky, then a senior Taro marketing executive, called K.S. at Lannett. The call lasted one (1) minute. That same day, Taro increased its WAC price for the 250mg dosage by 44.5% to $61.43. Lannett followed and matched Taro's increase two (2) days later on April 5, 2012. M.B. and K.S. would not speak again until May 9, 2012.

652.     The day of the Taro increase, a Cardinal representative called D.S., a sales executive at Taro, and told him that the customer would be putting Acetazolamide Tablets, as well as other Taro products, out to bid unless the company agreed not to increase prices on those products. D.S. summarized the call in an e-mail to Blashinsky and asked him how to respond. Blashinsky replied that Acetazolamide was one of several ██████████ and that the pricing on the product should ██████████ What Defendant Blashinsky meant was that Taro had an understanding with Lannett that Lannett would follow Taro's price increase and it would not poach any of Taro's customers. On April 10, 2012, Taro submitted reduced pricing to Cardinal for several of the products, but the price of Acetazolamide remained unchanged.

653.     Also on April 3, 2012, Tracy Sullivan., a Lannett sales executive, e-mailed her supervisor, K.S., about bidding on a Target RFP and listed several products including Acetazolamide for which Taro was the current supplier. Consistent with the ongoing agreement with Taro, K.S. directed Sullivan not to bid on the Acetazolamide business. The next day, April 4, 2013, Lannett submitted a response to the Target RFP that did not include Acetazolamide.

654.     In early 2013, Taro slightly increased prices on both Acetazolamide tablets and by the middle of 2013, Taro and Lannett's market share stabilized as a result of their market sharing agreement. Lannett held approximately 56% of the 250 mg tablet market and Taro held approximately 44%. As the only manufacturer at this time, Taro maintained 100% of the market for 125 mg tablets. When market sales for both tablets are evaluated together, Taro and Lannett's dollar

sales across both products remained virtually even. The combined market share (total dollar sales) for both 125 mg and 250 mg Acetazolamide tablets is depicted in the graph below.



655.    With their respective market shares allocated by agreement, Taro and Lannett were well-positioned to raise prices without losing customers.

656.    In March 2013, Taro hired Defendant Aprahamian as a senior sales and marketing executive. Aprahamian and A.B., a senior-most executive officer at Lannett, had a social relationship that preceded Aprahamian's tenure at Taro. The two men met up for meals, contemplated joining a horse racing investment group, and did other favors for each other.

657.    Shortly after Aprahamian began working at Taro, in the late fall of 2013, that relationship became collusive and Taro and Lannett coordinated to again raise the price of Acetazolamide – this time by raising it more than 220%.

658.    In the months leading up to the increases, representatives of Taro and Lannett had the opportunity to discuss and coordinate the late fall 2013 price increases in person at trade association meetings and other social occasions.

659.     For example, from August 10 to August 13, 2013, the NACDS held its Total Store

Expo in Las Vegas, Nevada. Representatives from Taro, including Defendant Aprahamian and D.S.,

and representatives from Lannett, including Sullivan, K.S., A.B., and M.B., a Lannett business and

development manager, attended the conference. Further, representatives from Sun Pharmaceuticals,

Taro's parent company, also attended, including G.S., a senior executive, and S.K., a sales executive.

660.     After the conference, on August 16, 2013, M.B. of Lannett and J.F., a Lannett Board

member, had dinner with G.S. and S.K. of Sun. M.B. of Lannett followed up by e-mail a few days

later thanking G.S. for dinner and also ████████████████████████████████████████

████████ M.B. further noted that ███████████████████████████████████████

██████████████████████████████████

661.     Representatives from Taro and Lannett also attended the GPhA Fall Technical

Conference in Bethesda, Maryland from October 28 through October 30, 2013.

662.     Approximately two weeks later, on November 15, 2013, A.B. of Lannett called

Aprahamian twice. Both calls lasted two (2) minutes. A.B. called Aprahamian again the next day, on

November 16, 2013. The call lasted one (1) minute. According to available phone records, the calls

on November 15, 2013 were the first calls between the two competitors since August 22, 2012, as

well as the first time that they had spoken by phone since Aprahamian joined Taro.

663.     Shortly after these calls, on November 26, 2013, Lannett raised its WAC price on

Acetazolamide by 275.5% to $230.65.

664.     Following the increase, Lannett customers reached out to Taro asking the

competitor to bid on Acetazolamide. Consistent with its ongoing understanding with Lannett, Taro

turned the business away.

665.     For example, Wal-Mart, a Lannett customer, e-mailed D.S. of Taro on November

26, 2013, asking if Taro was interested in bidding on its Acetazolamide business. In response,

Aprahamian sent an internal e-mail to D.S., and others at Taro, instructing them ██████████

████████████████████████████ Aprahamian further advised that they should

██████████████████████████████████

666.    Later that same day, another Lannett customer, Meijer, reached out to S.B., a Taro

sales executive, asking for a bid on Acetazolamide. S.B. responded, ████████████████████

███████████████████████████████████████████████████████████

████████████ But that explanation was a lie; Taro was not having supply issues at that time.

667.    Following Lannett's increase, Taro's customers, including Cardinal, McKesson, and

Morris & Dickson, tried to increase their Acetazolamide orders with Taro at the lower pricing,

anticipating that Taro might try to raise its prices as well. Aprahamian told Taro's supply chain

personnel to monitor these increased orders and cut them to historical levels. He explained that ██

████████████████████████████████████████████████████████████

███

668.    On December 4, 2013, Econdisc, a GPO customer, asked Sullivan of Lannett why

the company had increased its pricing on Acetazolamide, noting ██████████████████████

██████████████ Sullivan drafted a response that blamed the increases on general market

conditions and higher costs of production and forwarded the draft to R.F., a Lannett marketing

manager, asking ████████████ R.F. responded:



669.     Later that day, Sullivan replied to Econdisc stating that Lannett raised the price on Acetazolamide because ███████████████████████████████████████████ ███████████████████████████████████████

670.     At the same time customers were reacting to Lannett's increase, Taro was in the midst of implementing its own price increase. On December 1, 2013, Aprahamian e-mailed pricing information for the Acetazolamide increase to the Taro sales team and asked them to coordinate getting Taro's price increase letters out. Taro sent the letters to its customers on December 11 and December 12, 2013.

671.     On December 13, 2013, Taro raised its WAC price on the Acetazolamide 250mg dosage by 226.5% to match Lannett's pricing at $230.65.

672.     The next day, on December 14, 2013, Aprahamian called A.B. of Lannett. The call lasted two (2) minutes. Aprahamian and A.B. would not speak again until April 8, 2014, according to available phone records.

673.    Taro held firm to its increase even when a large distributor, McKesson, asked for a price reduction. In support of a price reduction, McKesson noted that one of Taro's competitors could sell Acetazolamide for 18.42% below McKesson's current contract price. Aprahamian responded that ███████████████████████████████████████████████ ████████████████████████████████████████ and suggested that the McKesson representative ████████████████████ McKesson subsequently closed the issue.

674.    Similarly, on December 16, 2013, Taro's customer MMCAP e-mailed asking why Taro had increased pricing on Acetazolamide. L.R., a business analyst at Taro, forwarded the request to M.L., a Taro pricing executive, asking for advice on how to respond. M.L. instructed L.R. to tell MMCAP the increase was ██████████████████████

675.    That same day, on December 16, 2013, in a Sales and Marketing conference call, Aprahamian noted to the invitees, including M.L., that the Acetazolamide pricing adjustments ██ ████████████████

676.    Taro's and Lannett's revenue from Acetazolamide grew substantially with the coordinated price increases. In 2012, total sales for Acetazolamide were $16,480,000. Revenue from sales in 2013 rose to $21,270,000 and, in 2014 after the late fall 2013 price increases, total sales of Acetazolamide reached $60,680,000.

677.    Throughout the period of the price increases referenced above, Lannett and Taro maintained a virtually even split of the 250mg market, with each having around 50% of the market. Overall, combining the markets for the 125mg dosage and 250mg dosage, Taro had approximately 56% of the total market and Lannett had 43%. The price increases imposed by Taro and Lannett, initially in 2012, then by Taro in early 2013, then most significantly in late 2013, can be seen on the graph below.

**REDACTED – PUBLIC VERSION**



678.     According to NADAC data, the average market price for generic Acetazolamide tablets saw the following price increases from November 2013 to February 2014

     Acetazolamide 125mg: increased by 241%

     Acetazolamide 250mg: increased by 265%

679.     NADAC data shows that average market prices of Acetazolamide tablets remained artificially high thereafter, as depicted below.



680.     The lockstep price increases with nearly perfect market share splits by Taro and

Lannett contradicts expected pricing behaviors in a competitive market; it is, however, consistent

with Defendants' "fair share" agreement.

*ii.     Acetazolamide* ER *capsules*

681.     As of April 2014, Heritage and Teva controlled 78% of the market for

Acetazolamide ER capsules. The only other competitor was Zydus.

682.     As part of the market-wide conspiracy to increase generic drug prices, Heritage

began communicating with high level executives at Teva, a competitor on seven of the Heritage list

drugs. On April 15, 2014, Malek spoke with Nisha Patel, Teva's Director of Strategic Customer

Marketing for more than 17 minutes to discuss increasing the price of Acetazolamide ER capsules

and other drugs. Patel had already secured Heritage's agreement to support Teva's price increases in

Nystatin and Theophylline. During the April 15 call, Patel agreed that if Heritage raised prices for

Acetazolamide ER capsules, Teva would follow suit or at minimum refrain from competing for

Heritage's accounts. Malek and Patel's conversations would continue through the spring and summer to coordinate and confirm their price increases.

683.     After speaking with Malek on April 15, Teva executives reached out to Zydus executives to coordinate the price increases. Between April 16 and 17, 2014, Patel and Kevin Green, the Senior Director of National Accounts at Zydus, spoke twice regarding Acetazolamide ER prices, first for approximately twenty minutes, then for twelve. They communicated frequently over the next several months, along with other Teva and Zydus executives, as outlined below.

684.     As set forth above, on April 22, 2014, Malek held a telephone conference call with the Heritage sales team to dictate a pricing strategy that targeted 18 drugs for price increases, including Acetazolamide ER. In order to implement the price increases without losing customers, Heritage coordinated with competitors to form agreements that prevented competition.

685.     To coordinate with Zydus, Malek contacted Kristy Ronco, Zydus' Vice President of Sales, on April 24, 2014 through LinkedIn. Malek wrote: "Hi Kristy, I hope this email finds you doing well. I wanted to see if you have a few minutes to chat. Let me know when you are free." Ronco responded that day "Hi Jason – I'm out in Arizona. I can give you a call tomorrow afternoon or call me anytime."

686.     Heritage came to agreements with both Teva and Zydus on price increases and market share. In an internal Heritage e-mail, Malek confirmed the Acetazolamide ER price-fixing agreements and reiterated that Heritage needed to refrain from bidding on contracts held by competitors. Malek previously asked Anne Sather to refrain from responding to a large GPO customer that requested a price quote on Acetazolamide ER. In e-mails on May 6 and 7, 2014, Malek told Sather that he formed agreements to raise the price of Acetazolamide ER and not to compete on customers. Malek said, "[w]e have buy in from all to go up…" and Heritage agreed not

### REDACTED – PUBLIC VERSION

to reduce its price in response to the request from the GPO customer. As Malek stated: "We are going to pass [on reducing the price] and most likely are taking an increase within the next week."

687.    Teva and Zydus also remained in close contact during this time as well. On May 14, 2014, Jessica Peters, an Associate Director of National Accounts at Teva, exchanged numerous text messages with Ronco.

688.    Defendants had many opportunities to speak in person about their agreements. On May 12-15, 2014, Sather attended the MMCAP National Member Conference in Bloomington, Minnesota. She used this opportunity to speak in person with a number of different competitors on pricing agreements. Executives from Teva also attended, such as Nick Gerebi, National Account Manager. On June 1-4, 2014, Heritage's Sather, Glazer, and Malek all attended the HDMA Business and Leadership Conference at the JW Marriott Desert Ridge in Phoenix, Arizona, along with Teva's Patel and Gerebi and Zydus' Green, among others. At this conference, Sather met in person for dinner and drinks with O'Connor and Sullivan, as well as Christopher Bihari, Director of National Accounts at Sandoz. Defendants used these meetings as an opportunity to confirm agreements on pricing and market share.

689.    During these months, Heritage avoided soliciting or bidding on Acetazolamide ER customers supplied by Zydus in order to maintain the artificial equilibrium their conspiracy created.

690.    As set forth above, on June 23, 2014, Heritage held a "Price Change Call" to discuss specific price increases on certain drugs and related strategies, including for Acetazolamide ER, which was targeted for a 75% increase. According to the discussion, the increases on the six drugs discussed would amount to an additional $16 million in profit per year for Heritage and assumed no loss in market share.

691.    On June 25, 2014, Malek spoke with Patel for approximately 14 minutes, confirming that Heritage would soon be increasing prices for a number of drugs sold by Teva.

692.     On June 26, 2014, Heritage began sending out price increase notices to customers for nine different drugs, including Acetazolamide ER. Sather sent a text message to a large wholesaler customer:

> As of 7/1, [m]arket wide we are increasing prices on: Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTZ, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases—you have those letters." She followed up with another text moments later, "Here are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTZ 200%, Glip/Met 100%, Glyburide 200%, Theo ER . . . 150%.

693.     On July 1, 2014, Malek e-mailed the Heritage sales team with the subject "update - price increase" that read:

> Team:
>
> Looks like you are making good traction with our July 1 price increase.
>
> Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.
>
> Please send each day until further notice or until all or [sic] accounted for.
>
> Any questions please call me directly.

694.     By July 9, 2014, Heritage was able to raise Acetazolamide ER prices to at least 17 customers nationwide. Heritage, Teva, and Zydus collectively implemented a successful 75% on prices for Acetazolamide ER.

### b.  **Fosinopril HCTZ**

695.     At all relevant times, Heritage, Aurobindo, Citron, Sandoz, and Glenmark dominated the market for Fosinopril HCTZ. By April 2014, Heritage had a 47% market share for this drug.

696.     On May 2, 2014, Edelson (Heritage) contacted Glenmark's Vice President of Sales, Jim Brown via LinkedIn. Heritage's Lukasiewicz spoke with McMahon (Aurobindo) on May 8, 2014 via phone. That same day, McMahon called Glenmark's Executive Vice President of Generics,

James Grauso, and they spoke on the phone. On May 9, 2014, Aurobindo's Tim Gustafson spoke with Glenmark's Director of Sales and Marketing, Jeff Johnson. All of these calls were regarding price increases for Fosinopril HCTZ.

697.    That same day, Heritage held another internal call regarding price increases where Fosinopril HCTZ was on the agenda. Within one month, Anne Sather of Heritage spoke to Aurobindo and Sandoz representatives about the Heritage "price increase strategies" for Fosinopril HCTZ and other generics during an MMCAP conference.

698.    After in-person meetings with Aurobindo's Gustafson and Sandoz' National Accounts Executive, Christopher Bihari, on May 14, Sather confirmed to Malek that the three were of "similar like minding on the pricing strategies we discussed." The next day, representatives of Aurobindo and Sandoz spoke numerous times.

699.    On June 3, 2014, Sather texted Bihari and invited him to meet with a group of competitors at the Sandbar Restaurant while at an HDMA conference in Phoenix. This initiated a series of communications during the summer of 2014 that included three calls between Gustafson and Bihari and five calls, and multiple texts, between Gustafson and Johnson. Gustafson would have one final call with Johnson on August 26, 2014, before going radio silent until April 8, 2015.

700.    Heritage's Lukasiewicz and Aurobindo's McMahon spoke on June 25, 2014 via phone, and again on July 7, 2014.

701.    On June 25, 2014, Sather texted Citron's Kaitlin Alexander to find out if Citron was entering the market for Glyburide but found out that Citron was actually entering the market for both Glyburide and Fosinopril HCTZ. Sather informed Alexander of the pricing scheme. Then, on July 1, Citron's Executive Vice President of Sales & Marketing, Karen Strelau called Lukasiewicz, informing him that she had been "looped" in on the pricing plan and that Heritage employees should not contact Citron employees via e-mail. Strelau also told Lukasiewicz that Sather should

communicate through Citron's Vice President of Sales, Laura Short, if she had sensitive information about Fosinopril HCTZ or other price increases. The following day, Short and Sather spoke for over 20 minutes. Their conversations continued through July and August 2014.

702.    Lukasiewicz also spoke directly with Grauso on July 18, 2014 and July 30, 2014. On July 28, 2014, Short called and texted McMahon to discuss Fosinopril HCTZ.

703.    On June 26, 2014, Heritage began sending out Price Increase Notices to its Fosinopril HCTZ customers. On June 27, McMahon and Grauso spoke twice.

704.    By July 9, 2014, Heritage successfully raised prices on 18 different customers for Fosinopril HCTZ. That same day, Citron confirmed that it was trying to match Heritage's price increases. On July 14, 2014, Strelau and Grauso spoke. The next day, Citron matched Heritage's supracompetitive prices.

705.    Sandoz also increased its pricing for Fosinopril HCTZ. By early January 2015, it was charging twice as much for Fosinopril HCTZ than it had been one year earlier.

c.    **Glipizide-Metformin**

706.    At all relevant times, Heritage, Mylan, and Teva dominated the market for Glipizide-Metformin.

707.    On April 15, 2014, Malek discussed with his Teva counterpart their intention and agreement to raise the price of Glipizide-Metformin and other drugs.

708.    O'Mara (Heritage) spoke to Mylan's Michael Aigner on April 23, 2014 and reached an agreement to raise prices.

709.    To complete the conspiratorial triangle, Teva and Mylan were also in frequent contact with one another, including a May 9, 2014 phone call between a Vice President of Sales at Mylan and a National Accounts Director at Teva.

710.     Heritage slated Glipizide-Metformin for a price increase on an internal May 9, 2014 call. Heritage informed customers by the end of June of a 100% price increase on Glipizide-Metformin.

711.     By July 9, 2014, Heritage increased the price nationwide to 27 different customers for Glipizide-Metformin. Mylan did not challenge Heritage's price increases, while Teva actually increased its bids to potential customers to protect Heritage's increases. By November 2014, K.S. of Heritage reported to Malek that most of Heritage's price increases "had stuck."

d.     **Glyburide**

712.     At all relevant times, Aurobindo, Heritage, and Teva dominated the Glyburide market.

713.     On April 15, 2014, Malek spoke with Patel and discussed Heritage's intention to raise prices on Glyburide. Patel agreed that if Heritage raised the price, Teva would follow suit.

714.     Heritage also brought Aurobindo into the scheme. On May 8, 2014, Lukasiewicz contacted McMahon (Aurobindo) by phone to discuss Glyburide price increases.

715.     On May 9, 2014, Heritage held an internal call on price increases, and included Glyburide on the list of drugs set for an increase.

716.     One week later, Heritage and Aurobindo representatives spoke to one another at the MMCAP conference in Minnesota. The Heritage representative reported to Malek that the Aurobindo representative expressed "similar like minding on the pricing strategies we discussed."

717.     On June 23, 2014, Heritage held a "Price Change Call" where it listed Glyburide for a 200% increase.

718.     In June 2014, Heritage learned of a potential new competitor in the Glyburide market. Sather texted a Citron employee, Alexander, inquiring into whether Citron would be entering the Glyburide market.

Sather: Work question: is Citron launching Glyburide anytime soon?

Alexander: Yes we currently have the product in our warehouse.

Sather: We are raising the price right now – just letting you know. Teva says they will follow.

Sather: Aurobindo agrees too.

Alexander: ?

Alexander: You have micronaise brand equivalent.

Alexander: And are you also raising your wacs?

Sather: Sorry – was on conference call. Ours is Micronaise? Is yours Micro or Diabeta?

Alexander: Micro

Sather: I don't think we are changing WAC – verifying now

Alexander: Okay i talked to [K.S., Executive Vice President, Sales & Marketing at Citron] we are def in to raise pricing…are doing this immediately, i know she was mentioning teva can take a while to raise prices

Sather: Teva is slow but conversations have been good.

Sather: No change to WAC for us

Sather: We are raising our customers 200% over current market price.

Alexander: Okay ill make sure the appropriate people find out

Sather: Teva has 66% of mkt – great target for share! By [sic] [t]hey should play fair. Aurobindo and us each have about 18% share. Good luck!

Alexander: Thanks! Is this something you will be doing like this week?

Sather: Letters going out this week! A lot of customers have 30 days notices and price protection so real price will be felt in 30+ days

Alexander: Perfect makes sense…Your not going anything with glyb/met pricing right?

Sather: Not yet – but is on a short list!

> Sather: Glyburide and Fosi/HCTZ are increasing too – those are
> Aurobindo items too
>
> Alexander: Okay yeah we have that too…Thanks for the info!

719.     Sather quickly reported to the Heritage sales team. Then, on July 2, 2014, Strelau of

Citron called Lukasiewicz confirming Citron's agreement to raise prices and informing him that she

had been "looped" in on Heritage's plan. On July 2, a different Citron representative spoke to

Sather. They continued to communicate throughout the summer of 2014.

720.     By the end of June, Heritage had cemented its price raising agreements with

Aurobindo, Citron, and Teva and notified its customers of the hikes. By July 9, Heritage increased

the price for Glyburide on at least 17 customers. When Heritage customers, wary of the price

increases, contacted Teva to supply alternative bids, Teva representatives instructed their teams "we

will not be bidding. Thanks."

721.     Teva also increased its WAC pricing on Glyburide by July 9, 2014. Not even one

week later, on July 15, 2014, Citron raised its WAC and AWP for Glyburide to meet Heritage's

levels.

722.     Teva and Aurobindo both declined to provide bids when a Heritage customer,

outraged with the price increases, requested bids from both companies. Teva and Aurobindo acted

at the direction of Heritage's Malek.

### e.     **Glyburide-Metformin**

723.     At all relevant times, Actavis, Aurobindo, Heritage, and Teva dominated the

Glyburide-Metformin market. As of April 2014, Heritage had 5% market share and was eager to

raise prices.

724.     On April 15, 2014, Malek contacted Patel and discussed Heritage's price increase

goals with respect to Glyburide-Metformin, as well as other drugs. Patel agreed that if Heritage

raised the price on Glyburide-Metformin, as well as the other drugs, Teva would follow with its own

price increases or would not challenge Heritage's price increases by underbidding on Heritage's accounts. Their communications continued over the next several months.

725.     Anne Sather of Heritage called Actavis' Director of National Accounts Michael Dorsey. On an April 4, 2014 telephone call, on information and belief, they reached an agreement to increase the price of Glyburide-Metformin and Verapamil.

726.     Shortly thereafter, Dorsey informed the sales and pricing team at Actavis of Heritage's intention to raise prices on these two drugs. In an internal April 28 e-mail, an Actavis pricing manager stated, "[Dorsey] made mention of keeping an eye out for an increase on Glyburide/Met and Verapamil IR."

727.     On May 1, 2014, Actavis' Vice President of Marketing, Pricing and Contracts, Marc Falkin, who was a recipient of the e-mail described above, called a Teva counterpart. Their communications continued over the next several months.

728.     On May 12, Falkin spoke twice with Aurobindo's CEO. Falkin also exchanged thirty (30) text messages with a Teva representative between May 19 and May 22, 2014.

729.     Around this same time, several Heritage employees communicated with their counterparts at Aurobindo about the Glyburide-Metformin price increase.

730.     For example, Lukasiewicz made contact with P.M. of Aurobindo by phone on May 8, 2014, and then in person on May 14. He reported that he had "found similar like minding on the pricing strategies we discussed."

731.     On May 9, 2014, Heritage slated Glyburide-Metformin for a price increase on an internal call. Heritage continued to plan price increases through the next month.

732.     On June 25, 2014, Sather exchanged text messages with a Citron representative about raising prices for Glyburide wherein the Citron representative agreed to raise prices for that drug, and then inquired "Your [sic] not doing anything with glyb/met pricing right?" Sather

responded, "Not yet- but is on a short list!" Although Citron had approval to sell Glyburide-Metformin, it was not yet actively selling the drug.

733.   Heritage increased its WAC prices for Glyburide-Metformin in July 2014.

734.   In an August 20, 2014 text message exchange with a Sun representative, a Heritage representative admitted that Heritage had reached an agreement with Actavis to increase the prices of Glyburide-Metformin and Verapamil:

> Sun representative: Have you heard anything about an Actavis price increase?
>
> Heritage representative: I heard they were on board with it. What item specifically?
>
> Sun representative: I don't know. I am just hearing about an increase but no details. What product have you heard about
>
> Heritage representative: We were communicating on Glyburide/Metformin and Verapamil

### f.   **Leflunomide**

735.   At all relevant times, Apotex, Heritage, and Teva dominated the market for Leflunomide. Heritage held a 61% share by April 2014.

736.   During Heritage's April 2014 "Price Increase Discussion" teleconference as described above, Malek identified Leflunomide as one of the eighteen drugs targeted for a price increase. Malek was responsible for communicating with Teva about the Heritage's price increase on this drug (among others).

737.   On April 15, 2014, Malek called Patel about the drugs on his list and Patel agreed that if Heritage increased its prices, Teva would follow or, at a minimum, would not compete with Heritage by underbidding. In the following months, Malek and Patel spoke frequently and Malek kept her informed on the strategy for price increases.

738.     Heritage's Edelson was tasked with communicating with Apotex regarding the Leflunomide price increase. On May 2, 2014, Edelson called Deborah Viera, a Sales Manager at Apotex, regarding Leflunomide prices and they spoke for more than thirteen minutes.

739.     Also, in May 2014, Heritage learned Teva might be leaving the Leflunomide market. On May 6, 2014, Sather e-mailed Malek that "the Teva discontinuation of Leflunomide has everyone in a fuss! Wow – can we take more share???" Malek responded "we may give some to apotex and follow our strategy we discussed. Will have clarity by tomorrow."

740.     That same day, Edelson had two more phone calls with Viera. Edelson then reported to Malek that Apotex "has taken another shot at our Leflunomide….I am waiting for a callback from the VP of Apotex before we do anything." Malek replied, "Let's walk from leflunomide," confirming the strategy he mentioned to Sather. Beth Hamilton, Vice President of Sales at Apotex, called Edelson. They connected four times in two days – first for nine minutes and shortly thereafter for eight minutes on May 6th; then twice on May 7th. Heritage and Apotex representatives thereafter held four phone calls within two days. Upon information and belief, Heritage and Apotex agreed to avoid competition and increase prices on Leflunomide during these calls.

741.     In response to Malek's May 8 e-mail to the Heritage sales team requesting confirmation on agreements reached with competitors, Edelson responded that he spoke "with everyone" and was only waiting for feedback regarding the drug Meprobamate.

742.     On Heritage's May 9 call on "Price Increases," Leflunomide remained on the list of target drugs.

743.     On May 27, 2014, Heritage learned that Apotex increased prices on Leflunomide and Malek confirmed with Edelson, "we are going to increase." By July 9, 2014, Heritage successfully increased prices on Leflunomide for at least fifteen different customers.

744.    On June 25, 2014, Malek told Patel that Heritage would be increasing prices for several drugs sold by Teva.

745.    By July 2014, Teva began to exit the market. In conformity with its agreement, Teva never challenged Heritage's price increases. This decision countered Teva's self-interest, as it could have benefitted by undercutting the higher prices charged by Apotex and Heritage and thereby gained market share.

746.    NADAC data shows that the average market price for Leflunomide rose dramatically between June 2015 and December 2015 and remained artificially high thereafter:

Leflunomide (10mg): increased by 730%; and

Leflunomide (20mg): increased by 617%.



g.    **Methimazole**

747.    Starting in late 2013, Defendants Heritage, Par, and Sandoz—with non-Defendant Qualitest joining in 2014—colluded to maintain supracompetitive prices and prevent further price erosion that had been occurring in the market for Methimazole since Heritage aggressively entered the market in February 2012.

748.     In August 2013, a large wholesaler received a price challenge from Sandoz and was

██████████████████████ Instead of soliciting a competitive bid from Heritage, it

███████████████ that Heritage ████████████████████████████████████████████

██████████████ Heritage understood the communication to come from Sandoz, as retaliation

for the aggressive prices Heritage had adopted when entering the market the year before. Three days

later, Malek sent an email with the subject line ██████████ instructing K.F. simply to ████████

████████████ to which K.F. responded ████████████ This low price at the wholesaler caused other

customers to approach Heritage for price reductions, which it declined to do.

749.     When another customer requested a price reduction at the end of August 2013,

Jason Malek instructed a Heritage employee to collude with non-Defendant Boca Pharmacal, Inc.

("Boca") stating, █████████████████████████████ However, Heritage ultimately

backed off from this strategy because of a lack of personal relationships with employees at Boca.

750.     In winter 2013-14, however, two events occurred that facilitated greater collusion.

First, Qualitest announced its acquisition of Boca, a small manufacturer that had been aggressively

pursuing share and lacked the personal relationships with the other manufacturers that facilitated

collusion. Second, Sandoz went into extended backorder on Methimazole from January to May of

2014, allowing prices to rebound. The competitors saw a renewed opportunity to halt price erosion.

When Qualitest employees took over sales and marketing of Methimazole in February from Boca, it

sought to leverage its relationships to keep Methimazole prices high. On February 25, a Senior

Director of National Accounts at Qualitest called Defendant Armando Kellum at Sandoz and the

two spoke for thirteen minutes. The two spoke again frequently in late April, on April 23, 25, 27,

and 29, as Sandoz grew ready to reenter the market following their extended backorder.

751.     Heritage learned of Sandoz's backorder in January. Instead of challenging Sandoz's

share, Heritage saw an opportunity to cooperate. Prior to Heritage's April 22, 2014 Price Increase

discussion call, Malek circulated a spreadsheet listing all drugs targeted for a price increase, the competitors for each such drug, and their respective market shares. Methimazole was among the drugs listed.

752.     Malek identified Heritage employees to reach out to the two biggest competitors in the market, Par and Sandoz. N.O. was identified as the Heritage employee primarily responsible for communicating with Par on Methimazole, with A.S. identified as the Heritage employee primarily responsible for communicating with Sandoz.

753.     In mid-May, 2014, A.S. attended the MMCAP conference and met with K.O. of Par and C.B. of Sandoz. On May 15, A.S. emailed Malek from MMCAP reporting that she had "Spoke with Sandoz today at the MMCAP meeting yesterday (they have methimazole and [another overlapping drug])," and that Sandoz had agreed to follow any price increase and to refrain from targeting Heritage customers. Specifically, A.S. reported that "our pricing strategies are well received" and that Sandoz "react[s] slowly as a company to market conditions but our work will be well received and fairly played."

754.     With this agreement in place, Heritage declined to provide a price adjustment to a small customer seeking a price reduction on Methimazole the following week, with Malek instructing his team to "Deny Methimazole for now."

755.     From June 1st to 4th, relevant employees from the four competitors attended the HDMA 2014 Business and Leadership Conference. While there, N.O. (Heritage) called a Senior Director of National Accounts at Par on June 2. Furthermore, Sandoz—which had been in communication with Qualitest through Kellum—communicated further with Heritage. A.S. (Heritage) and C.B. (Sandoz) texted on June 3 before both meeting with K.O. of Par at the Sandbar Restaurant.

756.     Following these communications, the competitors were able to arrest and/or markedly slow down further price erosion by agreeing not to compete for customers and stabilizing the market at supracompetitive levels above those seen in August 2013. Collusion continued even after corporate acquisitions changed the composition of the market. For instance, following Endo's acquisition of Par, resulting in the merger of Qualitest and Par, Methimazole was divested to Non-Defendant Rising Pharmaceuticals, transferring at the end of September 2015. Immediately upon taking over Methimazole, the Vice President of Sales at Rising called C.B. of Sandoz, speaking on September 29 as well as four times on October 1, and again on October 2 for eight minutes.

h.     **Nystatin**

757.     Various forms of Nystatin were already subject to market allocation and price fixing even before Heritage's 2014 price increase.

758.     During the relevant times, Actavis, Par, Perrigo, Sandoz, and Taro dominated the market for Nystatin cream; Actavis, Perrigo, and Sandoz dominated the market for Nystatin ointment; and Teva, Heritage, and Sun (through Mutual) dominated the market for Nystatin tablets.

*i.     Nystatin Cream*

759.     Actavis, Par, Perrigo, Sandoz, and Taro all experienced fluctuations in their respective market shares for Nystatin cream until these market shares suddenly stabilized in 2013. As detailed below, prices *increased* for all these Defendants, even as those with smaller market shares captured more of the market. This runs counter to economic theory, which dictates that competitors must lower prices to gain market share.

760.     As late as 2009, Sandoz enjoyed approximately a 50% market share for Nystatin cream, Taro had 40%, Perrigo had approximately 7%, and Par and Actavis controlled the remainder. Through 2009 and into 2010, Sandoz's market share began to decline. By the summer of 2010, Sandoz was effectively out of the market. By this time, Actavis and Par also were effectively out of

the market. Although Sandoz, Actavis and Par appear to have continued making *de minimis* sales, they each had a market share of less than 1% by the spring of 2011. By May 2011, Taro had captured as much as 96% of the Nystatin cream market, leaving Perrigo approximately a 4% share.

761.     Beginning in June of 2011, Taro and Perrigo dramatically increased their prices for Nystatin cream largely in unison and Actavis, Par, and Sandoz joined these price increases as their market shares increased.

762.     In June of 2011, Taro initiated a large price increase of more than 600%. Rather than compete on price to gain market share, Perrigo almost immediately followed Taro's increase and raised its own prices to nearly identical levels. Perrigo ramped up production and managed slowly to gain some market share over the next two years, but—as contemplated by the overarching "fair share" agreement—market prices remained elevated and stable.

763.     In August, although it had only approximately 1% of the market, Par followed the Taro and Perrigo price increase in lockstep, also choosing to eschew price-competition. Par also managed to grow its market share over the next couple of years, but it did so without eroding the elevated prices imposed by Taro and Perrigo, just as the "fair share" agreement intended.

764.     In November 2011, Actavis ramped up production of Nystatin cream and re-joined the market. It, too, immediately elevated its prices to match that of Taro, Perrigo and Par, also choosing to forego price competition and the prospect of winning a larger share of the market. Even a fourth entrant into the Nystatin cream market did not cause prices to erode.

765.     Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market. Like Perrigo, Par and Actavis before it, rather than compete on price to regain lost market share, Sandoz priced its Nystatin cream at the same inflated level as its co-conspirators. Prices remained stable and elevated even with a fifth seller in the market.

766.    WAC prices for each Defendant demonstrate that Nystatin cream prices remained relatively stable prior to May 2011 until they increased dramatically and largely in unison around June of 2011, remaining artificially inflated thereafter.



767.    AWP prices for Nystatin cream show the same trend of dramatically inflated and nearly identical prices.

768.    These price increases followed the March 6-10, 2011 ECRM EPPS Retail Pharmacy Conference, February 2012 ECRM EPPS Retail Pharmacy Conference; October 2012 GPhA Fall Technical Conference in Bethesda, Maryland; and June 4-5, 2013 GPhA CMC Workshop in Bethesda, Maryland, among others, which representatives from Actavis, Par, Perrigo, Sandoz, and Taro attended.

ii.    *Nystatin Ointment*

769.    In early 2011, Fougera and Perrigo were the only players in the market for generic Nystatin Ointment.

770.    On February 7, 2011, J.E., a Fougera sales executive, circulated internally a list of products and their potential for price increases. While Nystatin Ointment was one of the products

deemed worthy of consideration, the initial conclusion was that its ███████████████

███████████

771.    Undaunted, key Fougera employees turned to rival Perrigo for a creative solution to

the problem of low prices and low profits on Nystatin Ointment. Between February 7 and February

28, 2011, CW-6 of Fougera and T.P. of Perrigo were in frequent communication with each other,

exchanging twenty-seven (27) calls and three (3) text messages, with eleven (11) of the calls taking

place on February 28, 2011. During these calls, the competitors hatched a plan for Fougera to leave

the market temporarily, allowing Perrigo to significantly raise prices, at which point Fougera would

return to the market at that new, higher pricing.

772.    By March 1, 2011, word of the plan formulated during those phone calls had begun

to spread into the market, reaching J.E. at Fougera by way of a customer. Perplexed, J.E. e-mailed

Defendant Kaczmarek, asking: ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

███████████████████████

773.    Defendant Kaczmarek responded in the affirmative: ██████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ In fact, other Fougera personnel were

already preparing a draft letter announcing the discontinuation of the product.

774.    Fougera subsequently discontinued Nystatin Ointment effective March 15, 2011.

775.    By late March 2011, numerous large customers including Meijer, Morris & Dickson,

Rite Aid, Giant Eagle, and NC Mutual, had switched their Nystatin Ointment business to the only

remaining alternative in the market – Perrigo.

776.    With essentially the entire market transferred to Perrigo, and customers left with no

alternative suppliers, the stage was set for the next phase of the plan. On June 1, 2011, Perrigo

instituted a large WAC price increase on Nystatin Ointment. Indeed, the price of a 15gm tube increased by 493%, and the price of a 30gm tube increased by 269%.

777.    That same day, CW-6 of Fougera called T.P. of Perrigo. The two competitors spoke for six (6) minutes. Nine days later, on June 10, 2011, CW-6 and T.P.'s discussions intensified with the two competitors exchanging seven calls that day.

778.    As those phone calls were taking place – and less than three months after it had discontinued the product – Fougera was taking the first steps towards re-launch by starting to market the remaining inventory of Nystatin Ointment that it had on hand when it discontinued the product.

779.    On June 12, 2011, senior Fougera executive D.K. requested an update on discontinued items that the company might want to bring permanently back into its product line. J.S., a Fougera marketing executive, sent back a list the next morning, calling special attention to Nystatin Ointment: ███████████████████████████████████████████ ███████████████ Recognizing the lucrative opportunity presented by following Perrigo's price hike, D.K. replied, ██████████████████████████████████████████████ ██████████████████████

780.    But Fougera was not the only company that was motivated by the size of the price increase that Perrigo had managed to implement. Late in the evening on June 14, 2011, Defendant Perfetto, then a senior sales and marketing executive at Actavis, sent an e-mail to Defendant Aprahamian and other Actavis colleagues with the subject line: ████████████████████ ██████████████████████████████ The text that followed was simple and clear: ██████ ██████████████

781.    The next day, Actavis marketing executive J.M. responded with some projections on the financial implications of Actavis entering the Nystatin market. The recent sharp WAC increase

by Perrigo made the prospect of entry surprisingly irresistible. J.M. wrote: ███████████

████████████████████████████████████████████████████████████████

███████████ J.M. estimated that if Actavis secured a 30% share of the current two-player market,

the company would realize more than $3.8 million in sales. Aprahamian agreed that the time was

right to capitalize on the Perrigo price hike, saying: ████████████████████████████████

████████████████████████████████████████████████████████████████

██████

782.    Meanwhile, Fougera continued selling off its previously stockpiled inventory of

Nystatin Ointment and made plans to fully re-enter the market at the new higher WAC prices. On

June 27, 2011, D.K. of Fougera e-mailed Kaczmarek asking: ████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████

783.    Actavis made its move in early November 2011. On November 4, 2011, just days

before the launch, Actavis executive D.M. opined in an e-mail to Aprahamian, Perfetto and other

colleagues that conditions were favorable for a very successful launch, including the 187% increase

in the price of Nystatin Ointment over the past year, and the fact that Fougera had not re-entered

the market as yet. Aprahamian inquired how much share Actavis could handle. In response, D.M.,

mindful of the fair share rules of the game, replied: ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

784.    On November 7, 2011, Actavis re-entered the market with WAC prices that exactly

matched Perrigo's.

785.    On the day of the Actavis launch, the phone lines among the three competitors were

alive with activity. In the morning, T.P. at Perrigo placed two calls to CW-6 at Fougera to discuss the

Actavis development. After the second call, T.P. called M.D., an Actavis sales executive, setting off a chain of three more calls back and forth between them totaling more than twenty-three (23) minutes collectively. During these calls, the competitors discussed which customers Actavis should target to obtain its market share goals without eroding the high prices currently in the market.

786.    In the coming weeks, having coordinated its entry with market leader Perrigo, Actavis began collecting its share of accounts, winning business at Omnicare, Publix, and Rite Aid, among others.

787.    Meanwhile, unable to gear up its production for an immediate re-launch, Fougera set its sights on a June 2012 re-launch date for Nystatin Ointment.

788.    On June 15, 2012, a Fougera marketing executive provided Kaczmarek with WAC pricing data for Perrigo and Actavis and asked what Fougera's re-launch WAC prices would be. The competitors' prices were identical to the penny with each charging $14.00 for a 15gm tube, and $21.00 for a 30gm tube. Later that day, Kaczmarek announced to his colleagues that Fougera would also fall in line, saying: ██████████████████████████████████████████

789.    On June 21, 2012, Kaczmarek instructed CW-6 to gather intelligence on price points and ███████████ for Nystatin Ointment. CW-6 initially e-mailed Cardinal asking for contract pricing, emphasizing that Fougera did not ██████████████████████ Knowing that the most accurate source of competitor intelligence was the competitors themselves, however, CW-6 reached out directly to T.P. at Perrigo, initiating a call that lasted two (2) minutes that morning.

790.    The competitors moved forward to claim the market shares to which they had agreed each was entitled, all the while taking great care not to erode the lucrative market pricing. On June 22, 2012, for example, Aprahamian at Actavis rejected a colleague's suggestion to offer a competitive price on Nystatin Ointment to one customer by saying, ██████████████████ ████████████████████████ On the same day, CW-6 sent the following message to another

customer: ███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████

791.     On June 25, 2012, CW-6 asked Kaczmarek for Fougera's market share goal for Nystatin Ointment. Kaczmarek's reply acknowledged the importance of playing by the rules of the competitors' agreement: ███████████████████████

792.     That same day, CW-6 called T.P. at Perrigo, and they spoke for ten (10) minutes. Immediately after hanging up with T.P., CW-6 called Kaczmarek, and they spoke for three (3) minutes

793.     With all decisions made and cleared with its competitors, Fougera re-entered the Nystatin Ointment market on June 29, 2012 at WAC prices identical to its competitors. Consistent with the fair share understanding in place between the three competitors, Fougera proceeded to claim its share of accounts over the coming weeks, including business at HEB, Giant Eagle, and Cardinal Health.

### *iii.*     *Nystatin Tablets*

794.     In 2010 and 2011, the Nystatin tablet market was split between Teva and Sun (sold at least in part through its subsidiary, Mutual). During that time, Teva held approximately 60% of the market, Sun held 40%, and they had nearly identical list prices for Nystatin tablets.

795.     In the summer of 2012, Heritage entered the Nystatin tablet market. Rather than undercut Teva and Sun's prices to gain market share, Heritage matched Teva and Sun's prices, consistent with the "fair share" agreement they and the other Defendants maintained throughout the generics market.

796.     Sun, through its division Mutual, increased Nystatin tablet prices on April 15, 2013.

797.     As detailed below, Patel was hired by Teva in April 2013 to "run the pricing team." On July 9, Patel called Malek and they spoke for 21 minutes. The two spoke again on July 23 (for ten minutes), and twice on July 30, 2013 (once for more than 12 minutes).

798.     Between July 23 and July 30, 2013, Anne Sather (Heritage) spoke with Susan Knoblauch, Senior Sales Manager at Sun, for eleven minutes. Heritage remained in close contact with Sun before and after Sun (through Mutual) took its price increase in April 2013. On April 16, 2013 – the day after Mutual increased Nystatin tablet prices – Knoblauch called Sather and they spoke for nearly 40 minutes. The two continued to communicate throughout the summer of 2013.

799.     By late July 2013, Teva's "Price Increase Candidates" list, created by Patel, included Nystatin, with the note "Heritage involved; follow Mutual."

800.     On August 1, 2013, Malek e-mailed O'Mara (Heritage), Edelson (Heritage), and Sather, saying "Team: Pricing dynamics may be changing for us for Nystatin. Please advise when Mutual/URL/ (now Caraco) took their Nystatin price increase and if they kept it." On August 20th, 2013, Malek e-mailed Fleming (Heritage) and copied Glazer with the subject "PRICE INCREASES," saying: "We need [to] analyze the following product price increases and understand how much to increase and which customers to extend." Malek provided a list of four drugs, including Nystatin.

801.     As described below, Patel was on maternity leave from August 2013 through December 2013 and decisions regarding Teva's and Heritage's Nystatin price increases were put on hold.

802.     Also, as described below, on February 7, 2014 Patel created a spreadsheet titled "PI Candidates," which included Nystatin. The Nystatin notes read "Shared with Heritage and Mutual/Caraco" and "WAC increase likely." Patel called Malek on February 14, 2014 and the two connected the next day.

803.     Malek and Patel continued to talk throughout March and April of 2014. On a 17-minute phone call on April 15, 2014, Malek and Patel came to an agreement on all of the identified drugs involving Teva (at least seven drugs, including Nystatin). They agreed Teva would take the lead on the Nystatin (and Theophylline) price increase, which Heritage would follow and match.

804.     On April 4, 2014, Teva announced an increase of more than 100% on Nystatin, doubling WAC price from $47.06 to $100.30.

805.     During the April 2014 Heritage "Price Increase Discussion" teleconference, Malek identified Nystatin as one of the eighteen drugs targeted for a price increase. Sather was tasked with reaching out to Sun regarding Nystatin (and other drugs). Immediately after the April call, Sather reached out to Knoblauch. They spoke for 45 minutes and agreed to increase prices for Nystatin (and Paromomycin). Afterward, Sather reported to Malek and Glazer, "Caraco notified and on board." Glazer quickly responded, "No emails please."

806.     On the June 23 Heritage "Price Increase Call," Nystatin was designated for a 95% price increase. Heritage's Kate Brodowski, Associate Director of International Sales, noted that Heritage had to increase its WAC pricing for Nystatin because Teva "increased WAC already."

807.     On June 25, 2014, Heritage held another internal call regarding "Product Price Changes" and Nystatin again appeared on the list of drugs slated for a price increase. During the call, Sather texted Knoblauch to update Sun on Heritage's anticipated Nystatin price increase:

> Sather: Work news: we are raising price on Nystatin. Just letting you know. :)
>
> Knoblauch: How much
>
> Sather: Double the price
>
> Sather: On conf call- will call you back
>
> Knoblauch: Yes

808.     On June 25, 2014, Malek spoke to Patel again for nearly 14 minutes, explaining Heritage would soon be increasing prices for a number of Teva's drugs.

809.     In June 2014, Heritage announced a price increase of nearly 100% on Nystatin. By July 9, 2014, Heritage successfully raised the price for at least fourteen customers nationwide.

810.     Sun implemented a similar price increase by August 2014.

811.     In conformity with their agreement, Teva refused to bid or challenge Heritage's price increases when requested by incumbent Heritage customers.

812.     On July 8, a large retail customer e-mailed Teva requesting a quote for Nystatin tablets because of a recent large price increase instituted by the incumbent supplier. A Teva representative forwarded that e-mail to Patel, asking "Are you aware of the below? Should we engage?" Patel responded that she was aware, and that Heritage would be "following Teva on the Nystatin." She confirmed "we will not be bidding. Thanks."

813.     NADAC data for Nystatin tablets is only available dating back to April 2014. As depicted on the chart below, the average price for Nystatin 500,000 unit oral tablets continued to increase after the first price increase implemented by Sun in April 2013 and the subsequent price increases implemented by Heritage, Sun, and Teva around April and June of 2014:



i.     **Paromomycin**

814.    At all relevant times, Heritage and Sun, through its division Caraco, dominated the Paromomycin market.

815.    In April 2014, Heritage had approximately 65% of the market. Sun had approximately 35% market share.

816.    On April 22, 2014, a Heritage representative spoke to a Sun counterpart for 45 minutes. Shortly thereafter, the Heritage representative notified her superiors via e-mail that Caraco was on board with price increases, to which a superior responded, "No emails please."

817.    On May 8, 2014 a Heritage employee e-mailed Malek, who had asked for an update on pricing agreement progress, explaining "I made contact with all my take aways – with positive results."

818.    Heritage held another internal pricing call on May 9, 2014. Paromomycin was on the list for a price increase.

819.     On May 20, a Sun employee informed a Heritage employee that Sun would be "temporarily discontinuing" Paromomycin production to transfer its operations to another facility. The employee immediately relayed the information to Malek who responded "Need price increase to go immediately. Jack it up."

820.     On a June 23, 2014 internal pricing call, Heritage slated Paromomycin for a 100% increase. By July 9, 2014, Heritage successfully increased prices for over a dozen nationwide customers.

821.     Sun continued to sell the drug through January 2015, maintaining a 40% market share. Despite this, Heritage continued to increase its prices with no fear of losing market share as an agreement was already in place.

j.     **Theophylline ER**

822.     At all relevant times, Heritage and Teva dominated the market for Theophylline ER.

823.      Prior to Heritage's entry into the market for 300mg and 450mg Theophylline ER tablets in late 2011, Teva held nearly 100% of market share.

824.     When Heritage entered the market, rather than price its product below Teva's to gain market share, it listed its products identical to or even slightly above Teva's prices. As a result, Theophylline ER prices remained relatively stable despite the entry of a new competitor and, upon information and belief, Heritage gained market share through collusive agreements in accordance with their market-wide "fair share" agreement.

825.     In early 2014, Teva began to consider raising the price of Theophylline ER. On February 4, 2014, Patel called Malek upon her return from maternity leave and the two spoke for over an hour the next day. On February 7, Patel (Teva) created a spreadsheet titled "PI Candidates," targeting Theophylline for a price increase.

826.     Patel and Malek spoke numerous times in February and March 2014. They came to an agreement that Teva would lead the Theophylline ER price increase and Heritage would follow, matching Teva's pricing.

827.     Effective April 4, 2014, Teva began implementing across-the-board price increases for Theophylline ER. By late April 2014, Teva fully implemented a price increase for Theophylline by approximately 150% and Heritage planned to follow.

828.     On April 24, 2014, shortly after implementing the price increases, Teva received the following e-mail with the subject line "PLIVA.com [Info] Price Gouging":[47]

> I have been a consultant to virtually every major pharma company including Teva and Pliva (before it was acquired and located in E. Hanover). Since retiring I have been asked to participate with a US Senate Special Committee on the issue of pharmaceutical price gouging in the U.S.A. Today, I acquired my usual Rx of Theophylline ER from Costco for which I usually pay $19.01 and was charged $53.28 an increase of almost 200%. Costco Pharmacy confirmed that this increase is correct and was instituted sometime earlier this year (2014.). Before having this listed in our national report as another example of Pharmaceutical Price Gouging, [w]e respectfully request a confirmation response from you, the manufacturer, relative to the accuracy of our data. Please respond to me at the above email address. If you prefer you can respond to Senator Schumer a New York State representative.

829.     A member of Teva's Government Affairs Department received the internally forwarded e-mail and responded: "Can I get some details on the specifics of this product and the price increase. I'm hoping someone increased the price and we had to follow it up. Or, API or something I can give the senate." Patel ultimately received the correspondence and replied, "I don't have a great story. I'll take a closer look."

---

[47] Teva marketed and/or sold its generic Theophylline ER, at least in part through Pliva, Inc. ("PLIVA"), a wholly-owned subsidiary of Teva USA. Teva USA acquired PLIVA's assets as part of its acquisition of Barr Pharmaceuticals, LLC.

830.     At the April 22, 2014 Heritage "Price Increase Discussion," Malek instructed his team that Heritage would follow Teva's pricing on Theophylline ER. On May 9, Heritage again slated Theophylline ER for a price increase. On June 23, during a Heritage "Price Change Call," Heritage targeted Theophylline ER for a 150% price increase.

831.     On June 25, 2014, Heritage held one last call regarding "Product Price Changes" before the price increases were to be implemented. On the same day, Malek and Patel spoke for 14 minutes. Malek reported that Heritage would be sending out its price increases in the coming weeks.

832.     Heritage began sending price increase notices to customers the next day. On June 26, 2014, Sather texted a large wholesaler customer that "As of 7/1, [m]arket wide we are increasing prices on: …Theophylline ER…" She followed with another text message, "Here are the approximate/average $ increases on the other items: …Theo ER . . . 150%."

833.     On June 30, 2014, Patel e-mailed her team that "[i]t appears that Heritage took an increase to follow Teva. The new pricing looks like it will be effective tomorrow and matches Teva's WACs." She continued that this "will likely trigger some bid requests/activity," but Teva "should not be considering decreases."

834.     By July 9, 2014, Heritage successfully increased prices to at least 20 customers nationwide, following in lock step with Teva.

835.     According to NADAC data, the average market price for generic Theophylline ER saw the following price increases between April 2014 and January 2015:

> Theophylline ER 100mg: increases from $0.12 per unit to $0.37 per unit, a 250% increase
>
> Theophylline ER 200mg: increases from $0.16 per unit to $0.40 per unit, a 150% increase
>
> Theophylline ER 300mg: increases from $0.20 per unit to $0.35 per unit, a 75% increase.

836.    NADAC data shows that the average market prices for Theophylline ER were stable prior to April 2014, then rose dramatically and remained artificially high thereafter.



REDACTED – PUBLIC VERSION

837.    The 300mg dosage of Theophylline ER saw an even larger price increase in 2016, increasing from an average of $0.36 per unit in April 2016 to $2.46 in July 2016, a 580% increase.



k.    **Verapamil**

838.    From 2009 forward, Actavis and Mylan dominated the market for Verapamil. Combined, the two companies enjoyed nearly 100% market share until Heritage began to gain share in 2013.

839.    Heritage entered the Verapamil tablet market in the second half of 2011, but its share remained around 5% until 2013. When Heritage entered, it announced list (WAC) prices identical to Mylan and slightly higher than Actavis for 80mg tablets. Heritage announced prices slightly higher than both Mylan and Actavis for 120mg tablets. Heritage did not begin to sell 40mg Verapamil tablets until the second half of 2015, at which point it set list prices identical to Actavis, the only seller of 40mg tablets at that time.

840.    In other words, in conformity with the market-wide "fair share" agreement between Defendants, when Heritage entered the market for Verapamil, it set prices at or above competitors

Actavis and Mylan. In October 2012, Mylan then increased its tablet prices by approximately 50%, allowing Heritage to gain more than 25% market share. Shortly thereafter, market share between Actavis, Heritage, and Mylan quickly stabilized.

841.     On Heritage's April 2014 "Price Increase Discussion," Verapamil was targeted for a price increase. O'Mara (Heritage) was primarily responsible for communicating with Mylan about Verapamil, among other drugs, and reached out to Aigner (Mylan). On an April 23rd, 2014 phone call, O'Mara and Aigner reached an agreement to raise prices for Verapamil (and two other drugs). O'Mara immediately sent an e-mail to Malek, titled "Mylan," saying "Just let me know a day before we price adjust on the three Mylan products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products."

842.     Sather was responsible for communicating with Actavis about Verapamil (and another drug). Within hours of the April 22 call, she called Michael Dorsey, Director of National Accounts at Actavis and they spoke for nine minutes, reaching an agreement to raise the price of Verapamil (and Glyburide-Metformin).

843.     Dorsey immediately thereafter called Christina Koleto and Michael Reed, two Senior Pricing Managers at Actavis, to update them on the pricing strategy. In an April 28, 2014 internal e-mail, an Actavis pricing manager said "[Dorsey] made mention of keeping an eye out for an increase on … Verapamil IR." Marc Falkin, Actavis' Vice President of Marketing, Pricing, and Contracts, received the e-mail.

844.     On May 6, 2014, Falkin called Nesta (Mylan). The two spoke regularly over the next several months, including a three-minute call on May 7th and a seven-minute call on May 19. They continued to speak regularly for the next several months.

845.     In response to Malek's May 8 e-mail to the Heritage sales team trying to finalize price increase agreements, Sather responded, "Jason: I made contact with all my take aways -- with

positive results. I can resend those notes or talk with you on any details." This would have included her conversation with Actavis on Verapamil.

846.    When Heritage held another call about the "Price Increases" on May 9, 2014, Verapamil remained on the list of drugs targeted for increase.

847.    Heritage did not initially increase prices market-wide for Verapamil, but it did raise prices to at least one customer as part of its price increase initiative in July 2014.

848.    Heritage announced its price increase in June 2014, and Actavis and Mylan (along with Epic) soon followed with similar price increases.

849.    On August 20, 2014, Sather exchanged text messages with Knoblauch (Sun) describing the agreements Heritage reached with Actavis to increase the prices of Verapamil (and Glyburide-Metformin):

> Knoblauch: Have you heard anything about an Actavis price increase?"
>
> Sather: I heard they were on board with it. What item specifically?
>
> Knoblauch: I don't know. I am just hearing about an increase but no details. What product have you heard about
>
> Sather: We were communicating on Glyburide/Metformin and Verapamil
>
> Knoblauch: We haven't touched verapamil yet

850.    NADAC data shows that average market prices for Verapamil rose dramatically, with price increases continuing throughout 2016, as depicted below.



## X.    TEVA

### A.    Early 2013 Teva Business Strategies, Hiring of Patel, and Ranking Competitors

851.    Despite Teva's initial attempts to increase its revenues through price increases in 2012 and early 2013, as set forth below, its generic business was struggling as of early 2013. Throughout the first quarter of 2013, Teva realized it needed to do something drastic to increase profitability. On May 2, 2013, Teva publicly announced disappointing first quarter 2013 results. Among other things: (1) net income was down 26% compared to the prior year; (2) total net sales were down 4%; and (3) generic sales declined by 7%.

852.    By this time, Teva had already started to consider new options to increase its profitability, including more product price increases. Over the next several years, Teva embarked on an aggressive plan to conspire with its competitors to increase and sustain price on many generic drugs – completely turning around the company's fortunes.

1.    **April 2013: Teva Hires Nisha Patel**

853.    In April 2013, Teva took a major step toward implementing more significant price increases by hiring Patel as its Director of Strategic Customer Marketing. In that position, her job responsibilities included, among other things: (1) serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs; (2) establishing pricing strategies for new product launches and in-line product opportunities; and (3) overseeing the customer bid process and product pricing administration at Teva.

854.    Most importantly, she was responsible for – in her own words – "product selection, price increase implementation, and other price optimization activities for a product portfolio of over 1,000 products." In that role, Patel had 9-10 direct reports in the pricing department at Teva. One of Patel's primary job goals was to effectuate price increases. This was a significant factor in her performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded handsomely by Teva for doing it.

855.    Prior to joining Teva, Patel had worked for eight years at a large drug wholesaler, ABC, working her way up to Director of Global Generic Sourcing. During her time at ABC, Patel had routine interaction with representatives from every major generic drug manufacturer and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

856.    Teva hired Patel specifically to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships to effectuate those price increases.

857.    Even before Patel started at Teva, she was communicating with potential future competitors about the move, and about her new role. For example, on April 2, 2013 - nearly three weeks before Patel started at Teva - Aprahamian (Taro) sent an e-mail to the Chief Operating Officer ("COO") at Taro stating: "Nisha Going To Teva - Hush Hush for now...." The COO

responded by saying "[m]aybe the industry will be better for it. Teva can only improve." Teva had, up to that point, acquired a reputation in the industry for being slow to follow price increases, and the Taro COO viewed Patel as someone who would change that mindset at Teva. Patel had also worked with Aprahamian several years earlier at ABC.

858.    Patel's last day at ABC was April 11, 2013 and she started at Teva on April 22, 2013. Patel began communicating with competitors, by phone and text, the day after she left ABC, before she even started at Teva. For example:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 4/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:01:10 |
| 4/13/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:06:05 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |

859.    Once Patel began her employment at Teva, her communications with certain competitors became much more systematic and frequent - and focused around market events such as price increases, market entry, customer challenges and loss of exclusivity.

860.    When she joined Teva, Patel's highest priority was identifying drugs where Teva could effectively raise price without competition. On May 1, 2013, Patel began creating an initial spreadsheet with a list of "Price Increase Candidates." As part of her process of identifying candidates for price increases, Patel started to look very closely at Teva's relationships with its competitors, and also her own relationships with individuals at those competitors. In a separate tab of the same "Price Increase Candidates" spreadsheet, Patel began ranking Teva's "Quality of

Competition" by assigning companies into several categories, including "Strong Leader/Follower," "Lag Follower," "Borderline" and "Stallers."

861.     Patel understood – and stressed internally at Teva – that "price increases tend to stick and markets settle quickly when suppliers increase within a short time frame." Thus, it was very important for Patel to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly. Conversely, it was important for Patel to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly. Either way, significant coordination would be required for price increases to be successful – and quality competitors were those who were more willing to coordinate.

862.     As she was creating the list, Patel was talking to competitors to determine their willingness to increase prices and, therefore, where they should be ranked on the scale. For example, in one of her first conversations with CW-1 after Patel joined Teva, Patel told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices. She asked CW-1 how Sandoz handled price increases. CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased. Not surprisingly, Sandoz was one of Teva's highest "quality" competitors. Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz over the next several years.

863.     Patel had several different ways of communicating with competitors. This Complaint references various phone calls and text messages that she was exchanging with competitors. But she also communicated with competitors in various other ways, including but not limited to instant messaging through social media platforms such as LinkedIn and Facebook; encrypted messaging through platforms like WhatsApp; and in-person communications. Although the Plaintiff States have been able to obtain some of these communications, many of them have been destroyed by Patel.

864.     Through her communications with her competitors, Patel learned more about their planned price increases and entered into agreements for Teva to follow them. On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis and Sandoz several times:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:15:48 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:39 |

865.     After one of her calls with CW-5 of Glenmark, Patel sent an internal e-mail to one of her subordinates directing him to add six (6) different Glenmark drugs to Teva's "high priority" price increase list: Adapalene gel; Nabumetone; Pravastatin; Ranitidine HCL; Moexipril HCL; and Moexipril HCL/HCTZ. As discussed more fully below, these are all drugs that Glenmark increased prices on two weeks later, on May 16, 2013. Teva followed with its own price increases shortly thereafter.

### 2.     Ranking "Quality of Competition" to Identify Price Increase Candidates

866.     By May 6, 2013, Patel had completed her initial ranking of fifty-six (56) different manufacturers in the generic drug market by their "quality." Patel defined "quality" by her assessment of the "strength" of a competitor as a leader or follower for price increases. Ranking was done numerically, from a +3 ranking for the "highest quality" competitor to a -3 ranking for the "lowest quality" competitor. The top ranked competitors at that time included the following companies:

| Strong Leader/Follower | Point Scale |
|---|---|
| Mylan | 3 |
| Mylan Institution | 3 |
| Watson/Actavis | 3 |
| Sandoz/Fougera | 3 |
| Glenmark | 3 |
| Taro | 3 |

867.     The lowest ranked competitors were:

| Strong Leader/Follower | Point Scale |
|---|---|
| Apotex | -3 |
| Zydus | -3 |

868.     Patel created a formula, which heavily weighted those numerical ratings assigned to each competitor based on their "quality," combined with a numerical score based on the number of competitors in the market and certain other factors including whether Teva would be leading or following the price increase. According to her formula, the best possible candidate for a price increase (aside from a drug where Teva was exclusive) would be a drug where there was only one other competitor in the market, which would be leading an increase, and where the competitor was the highest "quality." Conversely, a Teva price increase in drug market with several "low quality" competitors would not be a good candidate due to the potential that low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share.

869.     Notably, the companies with the highest rankings at this time were companies with whom Patel and other executives within Teva had significant relationships. Some of the notable relationships are discussed in more detail below.

> a.     **The "High Quality" Competitor Relationships**

870.     The highest quality competitors in Patel's rankings were competitors where Teva had agreements to lead and follow each other's' price increases. The agreements and understandings

regarding price increases were what made each of those competitors high quality. As part of their understandings, those competitors also agreed that they would not seek to compete for market share after a Teva price increase.

>   b.   **Mylan (+3)**

871.   Mylan was Teva's highest-ranked "quality" competitor. The relationship between these two competitors was longstanding and deeply engrained. It survived changes in personnel over time and pre-dated Patel's creation of the quality competitor rankings.

872.   Green, who was employed by Teva beginning in 2006 through late October 2013, first began communicating with Nesta of Mylan by telephone on February 21, 2012. From that time until the time Green left Teva, Green and Nesta were in almost constant communication, speaking by phone at least three-hundred and ninety-two (392) times, and exchanging at least twelve (12) text messages – including at or around every significant price increase taken by either company. This amounts to an average of nearly one call or text message every business day during this period.

873.   Shortly after Patel started her employment at Teva, she called Nesta on May 10, 2013 and the two spoke for over five (5) minutes. Because Green had already established a relationship with Mylan, Patel did not need to speak directly with Nesta very often. Typically, Patel would e-mail Green and ask him to obtain market intelligence about certain Mylan drugs; Green would then speak to Nesta – often about a long list of drugs – and report his findings back to Patel. Several examples of these communications are outlined more fully in various sections below.

874.   When Green left Teva to join Zydus in late October 2013, the institutional relationship and understanding between Teva and Mylan remained strong. Rekenthaler promptly took over the role of communicating with Nesta. Starting in December 2013, through the time that Rekenthaler left Teva in April 2015, Rekenthaler spoke to Nesta one hundred (100) times. Prior to

Green leaving Teva in late-October 2013, Rekenthaler and Nesta had only spoken by phone once, more than a year earlier in 2012.

875.     The relationship between Teva and Mylan even pre-dated the relationship between Green and Nesta. For example, between January 1, 2010 and October 26, 2011, R.C., a senior executive at Teva, communicated with R.P., a senior executive counterpart at Mylan, by phone or text at least one hundred and thirty-five (135) times. The pace of communications between the two companies slowed dramatically in November 2011 after R.C. left Teva and before Green began communicating with Nesta – but continued as needed through communications between Rekenthaler and R.P. at Mylan.

### c.     Watson/Actavis (+3)

876.     Actavis was Teva's next highest quality competitor by ranking. Patel had strong relationships with several executives at Actavis, including Rogerson, the Executive Director of Pricing and Business Analytics, and A.B., a senior sales executive at Actavis. Rekenthaler also communicated frequently with A.S., a senior sales executive at Watson – a relationship that pre-dated Patel joining Teva.

877.     Patel contacted A.B. shortly after she started her employment at Teva, as she was creating the quality competitor rankings. She called him on April 30, 2013, and the two exchanged several text messages the next day, May 1, 2013. But as detailed herein, Patel communicated on a more frequent basis with Rogerson, her counterpart in the pricing department at Actavis. From May 2, 2013 through November 9, 2015, Patel spoke and/or texted with Rogerson 157 times, including calls at or around every significant price increase taken by the respective companies.

878.     In August 2013, Falkin joined Actavis and the relationship between Teva and Actavis grew stronger through his communications with Rekenthaler. From August 7, 2013 through the date

that Rekenthaler left Teva in April 2015, Rekenthaler and Falkin communicated by phone or text at least four hundred and thirty-three (433) times.

879.     Cavanaugh also had a very strong relationship with Falkin. The two communicated with great frequency. From August 7, 2013 through the end of May 2016, Cavanaugh and Falkin spoke or texted with each other four hundred and ten (410) times.

### d.    Sandoz (+3)

880.     Teva also considered Sandoz a top-quality competitor. Patel had a very strong relationship with CW-1 at Sandoz.

881.     Beginning on April 12, 2013 – the day after Patel's last day at ABC – until August 2016, Patel and CW-1 spoke one hundred and eighty-five (185) times by phone, including at or around every significant price increase taken by either company. As detailed above, in one of her initial calls with CW-1 after she joined Teva, Patel asked CW-1 how Sandoz handled price increases. Patel explained that she had been hired at Teva to identify products where Teva could increase prices. CW-1 reassured Patel that Sandoz would follow any Teva price increases on overlapping drugs, and that Sandoz would not poach Teva's customers after Teva increased price.

882.     Green and Rekenthaler of Teva also both had a very strong relationship with CW-2, who was – at that time – a senior Sandoz executive. These relationships pre-dated Patel joining Teva.

### e.    Glenmark (+3)

883.     Glenmark was one of Teva's highest-ranked competitors primarily because Patel had very significant relationships with several different individuals at Glenmark, including CW-5, Brown and J.C., a sales and marketing executive at Glenmark.

884.     As stated above, Patel began communicating with CW-5 even before she began her employment at Teva. Patel was also communicating frequently with both CW-5 and J.C. during the

time she created the quality competitor rankings, and agreed to follow several Glenmark price increases, in May 2013.

885.    Patel and CW-5 communicated by phone with great frequency – including at or around the time of every significant price increase affecting the two companies – until CW-5 left Glenmark in March 2014, at which point their communication ceased for nearly six (6) months. After CW-5 left Glenmark, Patel began communicating with Brown with much greater frequency to obtain competitively sensitive information from Glenmark. Patel and Brown had never spoken by phone before Patel started at Teva, according to the phone records produced.

### f.    Taro (+3)

886.    Taro was highly rated because of Patel's longstanding relationship with the Vice President of Sales at Taro, Aprahamian. Patel had known Aprahamian for many years, dating back to when Patel had started her professional career as an intern at ABC.

887.    Even though she knew Aprahamian well, they rarely ever spoke or texted by phone until Patel started at Teva. From April 22, 2013 through March 2016, however, Patel and Aprahamian spoke or texted at least one hundred (100) times, including calls or text messages at or around the time of every significant price increase affecting the companies during those years.

### g.    Lupin (+2)

888.    Although initially not the highest ranked competitor, Lupin was assigned a high rating because of Patel's strong relationship with Berthold, the Vice President of Sales at Lupin. The relationship between Teva and Lupin, however, pre-dated Patel. Prior to Patel starting at Teva, Green and others at Teva conspired directly with Berthold. Several of those examples are discussed below. Between January 2012 and October 2013, Berthold and Green, for example, communicated by phone one hundred and twenty-five (125) times.

889.     From May 6, 2013 through April 8, 2014, Patel and Berthold communicated by phone 76 times, including at or around the time of every significant drug price increase where the two companies overlapped.

890.     Demonstrating the strength of the relationship between the two companies, the price increase coordination continued between Teva and Lupin even when Green had left Teva and when Patel was out on maternity leave. For example, as discussed more fully below, in October 2013 Lupin was preparing to increase its pricing on the drug Cephalexin oral suspension. Without Green or Patel to communicate with, Berthold instead communicated with Rekenthaler and T.S. of Teva in order to coordinate the price increase.

**B.      Price Increase Hiatus**

891.     Shortly after the August 9, 2013 price increase described below went into effect, Patel left the office for several months while on maternity leave.

892.     This slowed down Teva's plans for its next round of price increases. During the time period while Patel was out on maternity leave, Teva did not implement or plan any additional price increases, instead waiting for Patel to return and continue her work. Patel began to return to the office on a part-time basis beginning in November 2013.

893.     During this time period, Green left Teva to join Zydus as the Associate Vice President of National Accounts. His last day of employment at Teva was October 23, 2013. This prompted Rekenthaler to assume the role of communicating with specific competitors, including Mylan. Rekenthaler also identified and began communicating on a more frequent basis with co-conspirators at different companies to facilitate the price increase process for Teva.

894.     As discussed more fully below, although Patel's absence slowed Teva in its plans for price increases on additional drugs, it did not stop certain competitors – in particular Lupin and Greenstone – from attempting to coordinate with Teva regarding their own price increases. In

Patel's absence, they communicated through different channels. These communications were conveyed to Patel upon her return and she included the information in her efforts to identify new price increase candidates.

895.    By early 2014 Patel had picked up right where she left off planning for the next round of Teva increases.

### C.    New Relationships Emerge

896.    By early 2014, the generic drug industry was in the midst of a price increase explosion. In an internal Teva presentation given shortly after the April 2014 price increases – titled "2014 US Pricing Strategy" – Teva reflected on the current state of the industry, noting that the "[c]ompetitive landscape is supportive of price increases." In commenting on the future implications for Teva's pricing strategy, the company stated: "Mature competitors participate in price appreciation; immature competitors are starting to follow."

897.    Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases, specific examples of which are described below.

### D.    Competitors Become "High Quality" After Successfully Colluding With Teva

898.    A little more than a year after she first circulated her Quality of Competitor List, Patel finalized an updated list on May 9, 2014. This updated list reflected changes in Teva's conspiratorial relationships.

899.    Although certain competitors retained a high-quality ranking throughout the entire relevant time period – like Mylan, Sandoz, Actavis and Taro – other competitors saw their ranking increase (sometimes dramatically) after successfully colluding with Patel or others at Teva on one or more drugs during the prior twelve-month period. These changes demonstrate that Teva's quality

competitor rankings were, in reality, a list of co- conspirators that Teva could trust to adhere to the illegal agreements.

### E. Quality Competitors Collude With Each Other, Sandoz/Mylan

900.    In addition to conspiring with Teva, the "quality" competitors also colluded with each other on drugs that Teva did not market. Indeed, each of the quality competitors had their own set of relationships with their counterparts at competitor companies that they used to facilitate agreements regarding drugs where they overlapped. The relationship highlighted in this section is the relationship between executives at Sandoz and Mylan. However, to the extent that some of the drugs at issue involve additional competitor companies, those relationships are also discussed.

901.    In September 2012, CW-4, concerned about her job security at Sandoz, sought to network with executives at competing companies in the hope of obtaining new employment. CW-4 contacted Nesta because she was interested in potentially working at Mylan. CW-4 obtained Nesta's phone number from a mutual contact and called to introduce herself. During that phone call, Nesta immediately started talking about competitively-sensitive information. Although CW-4 was surprised that Nesta was being so blatant, she did not stop him.

902.    In the year that followed, between September 2012 and October 2013, CW-4 and Nesta developed an ongoing understanding that they would not poach each other's customers and would follow each other's price increases. Notably, CW-4 and Nesta were not friends and communicated almost exclusively by phone. Examples of their coordination with respect to specific drugs are discussed in more detail below.

### F. Commitment to the Overarching Conspiracy

903.    As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given market. When a competitor was satisfied that it had its "fair share" of a particular drug market, competition waned

REDACTED – PUBLIC VERSION

and prices rose. These "fair share" principles were the foundation upon which the price increases were built. So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price. In short, competition resulted in lower prices; and as far as Defendants were concerned, nobody won in that scenario. Indeed, it was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to punish the party that took the price increase. Often, the competitor would then follow with its own comparable price increase.

904.    There are numerous examples throughout this Complaint of competitors refusing to compete in the face of a price increase so as not to "punish" the leader or "steal" market share. As just one example, when Teva was approached by a large retail customer in May 2013 to bid on a drug for which Greenstone had increased prices, Green expressed caution stating, "not sure I want to steal it on an increase." Teva later declined to bid on the business.

905.    The concept of "fair share" and price increases went hand in hand. For example, as discussed above the ongoing understanding between Teva and Sandoz that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase. The same was true for the understanding between Sandoz and Mylan. As discussed below, Nesta specifically cautioned CW-4 that Mylan did not appreciate having its prices challenged after an increase – i.e., Mylan did not want Sandoz to steal its business by underbidding its customers. Similarly, Aprahamian (Taro) often spoke with CW-3 (Sandoz) about coordinating price increases between the two companies. Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business" or "don't be stupid."

906.    Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of every price increase, although they often did so anyway. So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business. Similarly, the competitor knew it would have the opportunity, which it often took, to follow the increase with its own comparable price increase.

### G.    Low Quality Competitors Comply with the Overarching Conspiracy

907.    As a further demonstration that the fair share understanding was universally accepted and understood in the generic pharmaceutical industry, even companies that Patel and Teva referred to as "low quality competitors" – because they were not viewed as strong leaders or followers for price increases – consistently complied with the principles of "fair share" and "playing nice in the sandbox." Several examples of this with respect to some of the Subject Drugs are alleged below.

### H.    Individual Relationships

908.    The relationship between CW-4 and Nesta discussed above is just one example of two competitors capitalizing on their relationship to fix prices and allocate markets on drugs that both companies manufactured. Each of the individuals identified below had their own relationships with contacts at competitor companies that they utilized to allocate markets and raise prices on overlapping drugs. Many of these relationships are discussed throughout this Complaint.

909.    The following sections profile each of these individuals and their primary contacts at competitor Defendants, including cataloging the number of phone calls and/or text messages exchanged between them. The charts that follow are limited to communications with employees at other Defendants and do not include communications these individuals may have had with executives at competitor companies that are not named in this Complaint.

REDACTED – PUBLIC VERSION

### 1.   Ara Aprahamian

910.    Aprahamian is the Vice President of Sales at Taro and has held that position since he moved to Taro from Actavis in March 2013. Aprahamian regularly communicated with competitors, including with several of his former colleagues at Actavis, and has established relationships with individuals at many of the Defendants and other pharmaceutical companies. For example, between March 2013 and October 2018, Aprahamian exchanged at least seven hundred and six (706) phone calls and text messages with his contacts at Actavis, Amneal, Aurobindo, Dr. Reddy's, Glenmark, Greenstone, Lannett, Mylan, Sandoz, Teva, and Wockhardt. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| CW-3 (Sandoz) | 190 | 3/19/2013 | 8/18/2016 |
| Grauso, Jim (Glenmark) | 106 | 7/1/2014 | 10/16/2018 |
| Patel, Nisha (Teva) | 100 | 5/22/2013 | 3/3/2016 |
| J.M. (Dr. Reddy's) | 61 | 3/27/2013 | 7/23/2018 |
| M.D. (Actavis) | 52 | 3/19/2013 | 9/2/2016 |
| M.A. (Mylan) | 50 | 4/4/2013 | 2/9/2016 |
| M.C. (Wockhardt) | 26 | 5/7/2013 | 8/20/2017 |
| A.B. (Lannett) | 22 | 11/15/2013 | 12/14/2017 |
| Falkin, Marc (Actavis) | 21 | 4/17/2014 | 3/8/2016 |
| A.B. (Actavis) | 16 | 8/16/2013 | 4/19/2016 |
| S.R. (Amneal) | 13 | 6/6/2014 | 4/29/2016 |
| M.B. (Actavis) | 12 | 5/13/2013 | 8/22/2015 |
| M.B. (Glenmark) | 11 | 5/7/2013 | 3/26/2014 |
| Lannett Pharmaceuticals | 8 | 6/6/2014 | 4/29/2016 |
| A.G. (Actavis) | 4 | 4/23/2013 | 4/30/2013 |
| Rogerson, Rick (Actavis) | 4 | 6/17/2013 | 4/16/2014 |
| R.H. (Greenstone) | 4 | 8/14/2013 | 8/20/2014 |
| T.D. (Actavis) | 3 | 4/12/2013 | 7/10/2013 |
| Grauso, Jim (Aurobindo) | 2 | 1/9/2014 | 1/10/2014 |
| A.S. (Actavis) | 1 | 1/9/2014 | 1/9/2014 |

### 2.   David Berthold

911.    Berthold is the Vice President of Sales at Lupin and has held that position since June 2006. During his tenure at Lupin, Berthold has been the primary person at the company communicating with competitors. Indeed, Berthold has relationships with individuals at many of the Defendants and other pharmaceutical companies and is one of the most prolific communicators of all the individuals identified in this Complaint. For example, between March 2011 and October

2018, Berthold exchanged at least four thousand one hundred and eighty-five (4,185) phone calls and text messages with his contacts at Actavis, Amneal, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Mylan, Sandoz, Teva, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Grauso, Jim (Aurobindo) | 977 | 12/10/2011 | 1/31/2014 |
| Grauso, Jim (Glenmark) | 959 | 2/3/2014 | 10/3/2018 |
| R.H. (Greenstone) | 791 | 3/9/2012 | 7/14/2017 |
| A.G. (Actavis) | 301 | 3/22/2011 | 12/14/2017 |
| K.K. (Wockhardt) | 153 | 12/14/2011 | 7/30/2013 |
| A.T. (Aurobindo) | 123 | 8/15/2012 | 4/28/2013 |
| Green, Kevin (Zydus) | 124 | 11/8/2013 | 10/11/2017 |
| Green, Kevin (Teva) | 118 | 1/26/2012 | 10/9/2014 |
| Patel, Nisha (Teva) | 76 | 5/6/2013 | 4/8/2014 |
| P.G. (Breckenridge) | 76 | 3/10/2013 | 5/20/2016 |
| Nesta, Jim (Mylan) | 68 | 4/21/2013 | 10/13/2014 |
| P.M. (Aurobindo) | 60 | 3/30/2011 | 2/4/2016 |
| Falkin, Marc (Actavis) | 52 | 9/3/2013 | 4/1/2016 |
| Kellum, Armando (Sandoz) | 41 | 1/24/2012 | 8/14/2014 |
| B.R. (Dr. Reddy's) | 37 | 12/9/2011 | 6/13/2012 |
| T.S. (Teva) | 36 | 12/15/2011 | 1/15/2013 |
| V.B. (Dr. Reddy's) | 33 | 12/16/2014 | 9/21/2015 |
| S.R.(2) (Amneal) | 22 | 8/8/2012 | 11/16/2016 |
| P.M. (Teva) | 21 | 3/29/2011 | 1/20/2012 |
| K.R. (Zydus) | 21 | 9/25/2012 | 9/30/2012 |
| Ostaficiuk, Kon (Camber) | 19 | 5/14/2012 | 4/4/2016 |
| Brown, Jim (Glenmark) | 19 | 5/31/2013 | 6/2/2015 |
| S.R.(1) (Amneal) | 11 | 4/16/2013 | 2/13/2015 |
| Rekenthaler, David (Teva) | 9 | 10/14/2013 | 1/16/2014 |
| J.A. (Dr. Reddy's) | 7 | 6/12/2012 | 4/8/2014 |
| K.S. (Lannett) | 4 | 6/20/2014 | 6/23/2014 |
| Nailor, Jill (Greenstone) | 8 | 4/16/2013 | 6/19/2015 |
| S.G. (Sandoz) | 3 | 3/11/2014 | 11/26/2014 |
| L.S. (Zydus) | 3 | 8/23/2012 | 9/19/2013 |
| A.S. (Actavis) | 3 | 2/13/2012 | 5/24/2012 |
| K.S. (Zydus) | 2 | 9/18/2012 | 9/19/2012 |
| CW-3 (Sandoz) | 2 | 2/7/2012 | 10/18/2012 |
| B.M. (Amneal) | 2 | 9/26/2012 | 3/7/2018 |
| B.G. (Sandoz) | 1 | 7/31/2015 | 7/31/2015 |
| Teva Pharmaceuticals | 1 | 1/25/2012 | 1/25/2012 |
| K.A. (Wockhardt) | 1 | 8/25/2012 | 8/25/2012 |
| Zydus Pharmaceuticals | 1 | 1/17/2018 | 1/17/2018 |

### 3.  Jim Brown

912.    Brown is the Vice President of Sales at Glenmark and has held that position since

November 2012. Brown was one of several Glenmark executives that conspired with competitors.

Although not as prolific in his communications with competitors as some of the other individuals

identified in this Complaint, he did communicate when necessary to further the agreements. For

example, between June 2012 and August 2018, Brown exchanged at least three hundred and ninety-

five (395) calls and text messages with his contacts at Actavis, Amneal, Apotex, Aurobindo,

Breckenridge, Lannett, Lupin, Par, Sandoz, Taro, Teva, Wockhardt, and Zydus. These

communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 270 | 8/9/2013 | 6/16/2016 |
| Patel, Nisha (Teva) | 36 | 8/6/2013 | 10/15/2014 |
| Berthold, David (Lupin) | 19 | 5/31/2013 | 6/2/2015 |
| S.R.(1) (Amneal) | 16 | 12/18/2013 | 2/22/2018 |
| B.W. (Wockhardt) | 9 | 6/25/2012 | 10/27/2017 |
| D.N. (Breckenridge) | 8 | 11/12/2012 | 3/30/2015 |
| K.S. (Lannett) | 7 | 6/18/2012 | 8/10/2017 |
| CW-3 (Sandoz) | 4 | 6/10/2016 | 6/14/2016 |
| Grauso, Jim (Aurobindo) | 9 | 3/28/2013 | 12/6/2013 |
| Green, Kevin (Zydus) | 4 | 4/12/2018 | 8/21/2018 |
| J.H. (Par) | 2 | 10/1/2013 | 11/1/2013 |
| S.R. (Lupin) | 2 | 11/28/2012 | 11/29/2012 |
| J.H. (Apotex) | 2 | 5/6/2015 | 3/10/2016 |
| L.P. (Taro) | 2 | 12/7/2012 | 12/7/2012 |
| P.M. (Aurobindo) | 1 | 2/28/2014 | 2/28/2014 |
| Breckenridge Pharmaceuticals | 1 | 10/17/2014 | 10/17/2014 |
| P.G. (Breckenridge) | 1 | 6/18/2012 | 6/18/2012 |
| Ostaficiuk, Kon (Camber) | 1 | 10/29/2014 | 10/29/2014 |
| Rekenthaler, David (Teva) | 1 | 3/24/2014 | 3/24/2014 |

### 4. Maureen Cavanaugh

913.   Cavanaugh was the Senior Vice President and Commercial Officer, North America, at Teva until April 2018. She is currently the Senior Vice President and Chief Commercial Officer at Lannett. During her employment at Teva, Cavanaugh knew that her subordinates were communicating with competitors about pricing and customer allocation. In addition, Cavanaugh maintained her own relationships with certain competitors and coordinated with them directly when necessary to further the agreements. For example, between January 2011 and August 2017, Cavanaugh exchanged at least six hundred and twelve (612) phone calls and text messages with her contacts at Actavis, Amneal, Glenmark, Greenstone, Sandoz, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 410 | 9/10/2013 | 7/29/2016 |
| A.B. (Actavis) | 113 | 8/12/2015 | 7/25/2016 |
| S.R.(1) (Amneal) | 45 | 1/18/2011 | 11/14/2012 |
| A.S. (Actavis) | 17 | 8/21/2015 | 7/26/2016 |
| K.R. (Zydus) | 10 | 9/16/2013 | 5/20/2016 |
| Green, Kevin (Zydus) | 8 | 5/14/2017 | 8/3/2017 |
| J.K. (Actavis) | 4 | 4/29/2014 | 3/31/2015 |
| R.S. (Sandoz) | 2 | 10/6/2016 | 10/6/2016 |
| M.K. (Zydus) | 1 | 3/15/2011 | 3/15/2011 |
| Grauso, Jim (Glenmark) | 1 | 7/8/2015 | 7/8/2015 |
| Nailor, Jill (Greenstone) | 1 | 12/5/2012 | 12/5/2012 |

### 5. Marc Falkin

914.   Falkin was the Vice President of Marketing, Pricing and Contracts at Actavis until Actavis was acquired by Teva in August 2016. For a period of time, Falkin was also the Senior Vice President, US Generic Sales, at Teva. During his employment at Actavis, which is the focus of this Complaint, Falkin was a prolific communicator and had established relationships with executives at many of the Defendants and other pharmaceutical companies. For example, between August 2013 and July 2016, Falkin exchanged at least two thousand five hundred and sixty-two (2,562) phone

calls and text messages with his contacts at Amneal, Apotex, Aurobindo, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Sandoz, Taro, Teva, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 550 | 8/3/2013 | 4/13/2016 |
| Rekenthaler, David (Teva) | 433 | 8/7/2013 | 3/25/2015 |
| Cavanaugh, Maureen (Teva) | 410 | 9/10/2013 | 7/29/2016 |
| Brown, Jim (Glenmark) | 270 | 8/9/2013 | 6/16/2016 |
| C.B. (Teva) | 199 | 7/21/2015 | 7/29/2016 |
| K.S. (Lannett) | 181 | 8/1/2013 | 9/29/2015 |
| R.C. (Aurobindo) | 80 | 11/14/2013 | 3/16/2015 |
| Nesta, Jim (Mylan) | 78 | 12/3/2013 | 8/17/2015 |
| Berthold, David (Lupin) | 52 | 9/3/2013 | 4/1/2016 |
| J.H. (Par) | 48 | 9/24/2013 | 8/11/2015 |
| Nailor, Jill (Greenstone) | 41 | 1/6/2014 | 3/14/2016 |
| T.C. (Teva) | 36 | 12/28/2015 | 7/27/2016 |
| Teva Pharmaceuticals | 26 | 5/28/2015 | 7/19/2016 |
| T.K. (Apotex) | 22 | 3/4/2014 | 6/4/2015 |
| CW-5 (Glenmark) | 22 | 11/7/2013 | 2/26/2014 |
| Aprahamian, Ara (Taro) | 21 | 4/17/2014 | 3/8/2016 |
| S.R.(2) (Amneal) | 15 | 10/19/2013 | 11/16/2015 |
| Patel, Nisha (Teva) | 11 | 2/5/2016 | 6/16/2016 |
| J.B. (Teva) | 11 | 11/24/2015 | 6/2/2016 |
| C.D. (Teva) | 11 | 2/8/2016 | 6/22/2016 |
| M.P. (Taro) | 9 | 12/13/2013 | 8/4/2014 |
| J.P. (Teva) | 7 | 9/27/2014 | 3/22/2016 |
| J.H. (Apotex) | 6 | 4/7/2014 | 4/8/2014 |
| K.G. (Teva) | 6 | 1/14/2016 | 5/12/2016 |
| S.G. (Sandoz) | 5 | 4/30/2014 | 6/23/2016 |
| M.K. (Zydus) | 4 | 1/10/2014 | 1/11/2014 |
| M.C. (Wockhardt) | 3 | 5/24/2016 | 5/24/2016 |
| Ostaficiuk, Kon (Camber) | 2 | 9/27/2013 | 12/5/2013 |
| S.R. (Lupin) | 2 | 10/5/2013 | 10/5/2013 |
| B.H. (Apotex) | 1 | 6/10/2014 | 6/10/2014 |

REDACTED – PUBLIC VERSION

### 6.    Jim Grauso

915.    Grauso was employed as a Senior Vice President of Commercial Operations at Aurobindo until January 2014. In February 2014, Grauso moved to Glenmark and currently holds the position of Executive Vice President, North America, Commercial Operations. Grauso regularly communicated with competitors while he was at Aurobindo and continued those relationships when he transferred to Glenmark. For example, between December 2011 and January 2014, Grauso exchanged at least one thousand seven hundred and sixty-three (1,763) phone calls and text messages with his contacts at Actavis, Amneal, Breckenridge, Glenmark, Greenstone, Lupin, Taro, Teva, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 977 | 12/10/2011 | 1/31/2014 |
| T.S. (Teva) | 243 | 12/1/2011 | 1/21/2014 |
| Green, Kevin (Teva) | 158 | 12/6/2011 | 10/30/2013 |
| M.P. (Actavis and Taro) | 57 | 12/6/2011 | 1/13/2014 |
| D.L. (Zydus) | 54 | 1/7/2013 | 10/25/2013 |
| Ostaficiuk, Kon (Camber) | 39 | 3/21/2012 | 12/9/2013 |
| S.R.(1) (Amneal) | 32 | 3/27/2012 | 1/3/2014 |
| Brown, Jim (Glenmark) | 31 | 7/19/2012 | 1/6/2014 |
| Nailor, Jill (Greenstone) | 31 | 7/19/2012 | 1/6/2014 |
| M.C. (Wockhardt) | 26 | 12/8/2011 | 1/13/2014 |
| Green, Kevin (Zydus) | 20 | 11/11/2013 | 1/29/2014 |
| B.W. (Wockhardt) | 16 | 12/8/2011 | 1/14/2014 |
| K.K. (Wockhardt) | 11 | 8/6/2013 | 1/13/2014 |
| Patel, Nisha (Teva) | 12 | 5/14/2013 | 7/8/2013 |
| L.S. (Zydus) | 8 | 5/23/2013 | 6/6/2013 |
| M.B. (Taro) | 7 | 12/6/2011 | 3/22/2012 |
| K.S. (Zydus) | 6 | 9/19/2013 | 9/30/2013 |
| Aprahamian, Ara (Actavis) | 6 | 1/20/2012 | 1/27/2012 |
| J.P. (Teva) | 6 | 5/2/2012 | 12/19/2013 |
| S.R. (2) (Amneal) | 4 | 8/20/2012 | 12/4/2013 |
| D.N. (Breckenridge) | 4 | 6/25/2013 | 1/28/2014 |
| D.S. (Taro) | 3 | 8/6/2013 | 8/6/2013 |
| Teva Pharmaceuticals | 3 | 6/20/2012 | 3/21/2013 |
| M.B. (Glenmark) | 3 | 4/12/2013 | 6/17/2013 |
| Aprahamian, Ara (Taro) | 2 | 1/10/2014 | 1/10/2014 |
| Lupin Pharmaceuticals | 2 | 1/24/2013 | 1/24/2013 |
| E.S. (Lupin) | 1 | 9/6/2012 | 9/6/2012 |
| Rekenthaler, David (Teva) | 1 | 12/8/2011 | 12/8/2011 |

916.     Similarly, after moving to Glenmark, Grauso continued to communicate frequently with his contacts at competitor companies, including his former colleagues at Aurobindo. For example, between February 2014 and October 2018, he exchanged at least two thousand and eighteen (2,018) phone calls and text messages with his contacts at Amneal, Aurobindo,

REDACTED – PUBLIC VERSION

Breckenridge, Dr. Reddy's, Greenstone, Lupin, Mylan, Par, Rising, Sandoz, Taro, Teva, Upsher-Smith, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 959 | 2/3/2014 | 10/3/2018 |
| R.C. (Aurobindo) | 215 | 2/3/2014 | 5/31/2017 |
| Green, Kevin (Zydus) | 161 | 2/4/2014 | 6/25/2018 |
| T.S. (Teva) | 128 | 2/3/2014 | 10/4/2018 |
| Aprahamian, Ara (Taro) | 106 | 7/1/2014 | 10/16/2018 |
| B.W. (Wockhardt) | 76 | 2/28/2014 | 10/2/2018 |
| M.P. (Taro) | 59 | 2/10/2014 | 2/3/2018 |
| Taro Pharmaceuticals | 59 | 3/5/2014 | 8/29/2018 |
| J.K. (Aurobindo) | 46 | 3/11/2014 | 10/3/2018 |
| J.J. (Aurobindo) | 36 | 2/19/2014 | 6/17/2018 |
| M.C. (Wockhardt) | 29 | 3/27/2014 | 10/1/2018 |
| J.H. (Sandoz) | 22 | 4/20/2018 | 9/27/2018 |
| R.S. (Sandoz) | 18 | 11/5/2015 | 8/8/2018 |
| Nailor, Jill (Greenstone) | 17 | 1/30/2015 | 5/26/2016 |
| P.S. (Aurobindo) | 10 | 2/20/2014 | 11/10/2017 |
| J.M. (Dr. Reddy's) | 10 | 9/27/2014 | 9/27/2017 |
| S.R.(1) (Amneal) | 9 | 2/3/2014 | 3/14/2018 |
| S.G. (Rising) | 9 | 3/2/2017 | 9/20/2018 |
| M.A. (Par) | 8 | 6/29/2015 | 7/12/2018 |
| Lupin Pharmaceuticals | 8 | 4/15/2014 | 4/10/2018 |
| L.C. (Lupin) | 7 | 4/30/2018 | 9/12/2018 |
| D.N. (Breckenridge) | 6 | 5/4/2018 | 8/10/2018 |
| Patel, Nisha (Teva) | 6 | 2/28/2014 | 1/5/2015 |
| Ostaficiuk, Kon (Camber) | 5 | 7/30/2014 | 10/29/2014 |
| M.M. (Upsher-Smith) | 3 | 10/4/2017 | 10/4/2017 |
| S.S. (Aurobindo) | 1 | 6/15/2017 | 6/15/2017 |
| Cavanaugh, Maureen (Teva) | 1 | 7/8/2015 | 7/8/2015 |
| J.P. (Teva) | 1 | 3/9/2015 | 3/9/2015 |
| L.W. (Lupin) | 1 | 8/22/2015 | 8/22/2015 |
| Teva Pharmaceuticals | 1 | 1/11/2018 | 1/11/2018 |
| Mylan Pharmaceuticals | 1 | 7/9/2018 | 7/9/2018 |

### 7.    Kevin Green

917.    Green worked at Teva as a Director of National Accounts until November 2013 when he took a position with Zydus, where he is still employed as the Vice President of Sales. Green developed a number of relationships with individuals at many of the Defendants and other pharmaceutical companies. He regularly communicated with competitors while at Teva and then carried those relationships over to his time at Zydus. For example, between January 2010 and October 2013, Green exchanged at least one thousand four hundred and ten (1,410) phone calls and text messages with his contacts at Aurobindo, Breckenridge, Dr. Reddy's, Greenstone, Lannett, Lupin, Mylan, Sandoz, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Nesta, Jim (Mylan) | 461 | 2/21/2012 | 10/4/2013 |
| K.R. (Zydus) | 182 | 4/26/2010 | 10/31/2013 |
| B.R. (Dr. Reddy's) | 139 | 1/28/2010 | 6/29/2012 |
| Grauso, Jim (Aurobindo) | 158 | 12/6/2011 | 10/30/2013 |
| Berthold, David (Lupin) | 118 | 1/26/2012 | 10/9/2013 |
| CW-2 (Sandoz) | 84 | 4/26/2010 | 1/14/2013 |
| M.K. (Zydus) | 73 | 3/18/2010 | 10/28/2013 |
| P.H. (Zydus) | 52 | 3/29/2010 | 6/11/2012 |
| M.F. (Zydus) | 32 | 2/10/2013 | 10/30/2013 |
| R.H. (Greenstone) | 26 | 3/8/2010 | 10/16/2013 |
| P.M. (Aurobindo) | 19 | 9/27/2010 | 10/14/2013 |
| Kellum, Armando (Sandoz) | 14 | 3/21/2012 | 8/14/2013 |
| S.G. (Sandoz) | 9 | 4/25/2010 | 6/19/2013 |
| D.N. (Breckenridge) | 6 | 7/12/2012 | 3/3/2013 |
| M.M. (Wockhardt) | 5 | 2/19/2013 | 6/26/2013 |
| G.R. (Aurobindo) | 5 | 3/17/2010 | 3/24/2010 |
| M.A. (Mylan) | 5 | 10/27/2013 | 10/30/2013 |
| R.T. (Sandoz) | 4 | 5/23/2010 | 5/15/2013 |
| Sullivan, Tracey (Lannett) | 4 | 5/23/2011 | 11/14/2012 |
| Zydus Pharmaceuticals | 3 | 1/30/2013 | 8/20/2013 |
| S.R. (Lupin) | 3 | 10/17/2013 | 10/27/2013 |
| R.C. (Aurobindo) | 3 | 6/4/2012 | 6/29/2012 |
| CW-4 (Sandoz) | 2 | 5/20/2010 | 2/7/2012 |
| J.A. (Dr. Reddy's) | 1 | 7/23/2013 | 7/23/2013 |
| E.P. (Zydus) | 1 | 10/22/2013 | 10/22/2013 |
| K.K. (Wockhardt) | 1 | 7/15/2012 | 7/15/2012 |

918.     Similarly, when Green became employed at Zydus, he continued to communicate frequently with competitors, including with his former colleagues at Teva. For example, between November 2013 and August 2018, Green exchanged at least nine hundred and sixty-nine (969) phone calls and text messages with his contacts at Amneal, Aurobindo, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Rising, Sandoz, and Teva. These communications are detailed in the table below:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Patel, Nisha (Teva) | 184 | 11/8/2013 | 8/31/2016 |
| Grauso, Jim (Glenmark) | 161 | 2/4/2014 | 6/25/2018 |
| Nesta, Jim (Mylan) | 117 | 1/7/2014 | 8/17/2017 |
| Berthold, David (Lupin) | 124 | 11/8/2013 | 10/11/2017 |
| M.A. (Mylan) | 51 | 11/14/2013 | 3/16/2016 |
| P.M. (Aurobindo) | 49 | 11/4/2013 | 7/28/2016 |
| J.P. (Teva) | 44 | 9/15/2014 | 8/20/2017 |
| Rekenthaler, David (Teva) | 42 | 11/8/2013 | 3/30/2015 |
| Teva Pharmaceuticals | 36 | 11/3/2013 | 8/10/2017 |
| T.S. (Teva) | 31 | 1/8/2014 | 8/9/2017 |
| Grauso, Jim (Aurobindo) | 20 | 11/11/2013 | 1/29/2014 |
| CW-2 (Rising and Aurobindo) | 15 | 8/4/2014 | 4/23/2017 |
| L.K. (Amneal) | 14 | 9/15/2014 | 6/27/2018 |
| T.C. (Teva) | 13 | 12/4/2013 | 4/30/2017 |
| S.G. (Sandoz and Rising) | 10 | 6/22/2014 | 11/26/2016 |
| K.G. (Teva) | 9 | 5/3/2017 | 8/17/2017 |
| Cavanaugh, Maureen (Teva) | 8 | 5/14/2017 | 8/3/2017 |
| Kellum, Armando (Sandoz) | 8 | 4/30/2014 | 2/12/2017 |
| S.G. (Teva) | 5 | 11/4/2013 | 11/26/2013 |
| Brown, Jim (Glenmark) | 4 | 4/12/2018 | 8/21/2018 |
| J.L. (Teva) | 4 | 12/13/2016 | 2/20/2017 |
| R.H. (Greenstone) | 4 | 10/12/2014 | 5/14/2017 |
| Sullivan, Tracey (Lannett) | 4 | 2/16/2014 | 2/16/2014 |
| S.R.(2) (Amneal) | 3 | 9/26/2016 | 3/15/2018 |
| M.W. (Mylan) | 3 | 5/15/2018 | 6/11/2018 |
| C.B. (Teva) | 3 | 12/20/2016 | 8/9/2017 |
| S.R. (Lupin) | 1 | 3/24/2014 | 3/24/2014 |
| J.A. (Dr. Reddy's) | 1 | 7/1/2014 | 7/1/2014 |
| T.G. (Aurobindo) | 1 | 7/9/2018 | 7/9/2018 |

8.    **Armando Kellum**

919.    Kellum was the Director of Pricing and Contracts at Sandoz until July 2015. While at

Sandoz, Kellum directed his subordinates, including CW-1, CW-2, CW-3, and CW-4, to enter into

price fixing and market allocation agreements with competitors. In addition, Kellum had his own

relationships with certain competitors and communicated with those contacts directly when

necessary to further the agreements. For example, between May 2011 and April 2015, Kellum

exchanged at least one hundred and eighty-two (182) phone calls and text messages with his contacts

at Actavis, Amneal, Dr. Reddy's, Greenstone, Lupin, non-defendant Rising, Teva, Upsher-Smith,

and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| R.H. (Greenstone) | 66 | 7/20/2011 | 8/14/2014 |
| Berthold, David (Lupin) | 41 | 1/24/2012 | 8/14/2014 |
| Green, Kevin (Teva) | 14 | 3/21/2012 | 8/14/2013 |
| J.M. (Upsher-Smith) | 10 | 8/7/2014 | 3/5/2015 |
| Nailor, Jill (Greenstone) | 9 | 4/2/2014 | 10/15/2014 |
| Green, Kevin (Zydus) | 8 | 11/7/2013 | 4/30/2015 |
| M.F. (Zydus) | 7 | 7/23/2012 | 1/23/2014 |
| S.H. (Upsher-Smith) | 6 | 9/17/2014 | 3/26/2015 |
| Upsher-Smith Laboratories | 4 | 9/15/2014 | 10/13/2014 |
| Rogerson, Rick (Actavis) | 3 | 5/5/2011 | 9/28/2011 |
| C.P. (Rising) | 3 | 4/28/2014 | 10/24/2014 |
| S.R.(1) (Amneal) | 2 | 5/20/2013 | 12/18/2013 |
| S.R.(2) (Amneal) | 2 | 11/27/2013 | 8/8/2014 |
| M.M. (Upsher-Smith) | 2 | 11/9/2013 | 11/20/2013 |
| E.H. (Upsher-Smith) | 2 | 9/12/2014 | 9/16/2014 |
| N.M. (Dr. Reddy's) | 1 | 7/23/2012 | 7/23/2012 |
| D.C. (Upsher-Smith) | 1 | 4/18/2013 | 4/18/2013 |
| B.L. (Upsher-Smith) | 1 | 9/12/2014 | 9/12/2014 |

### 9.    Jill Nailor

920.    Nailor has worked at Greenstone since August 2010 and is currently the Senior Director of Sales and National Accounts. Nailor directed her subordinate R.H., a national account executive, and others at Greenstone to fix prices and allocate customers with competitors on overlapping drugs, including with several of the Defendants. She also instructed them to avoid putting any evidence of such communications into writing.

921.    In addition, Nailor regularly communicated directly with competitors herself. For example, between August 2010 and May 2017, Nailor exchanged at least four thousand four hundred and thirty-nine (4,439) phone calls and text messages with her contacts at Actavis, Amneal, Apotex, Aurobindo, Dr. Reddy's, Glenmark, Lupin, Lannett, Mylan, Par, Sandoz, Taro, Teva, Upsher-Smith, Wockhardt, and Zydus. These communications are detailed in the table below:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(1) (Amneal) | 3769 | 8/26/2010 | 5/1/2018 |
| V.B. (Dr. Reddy's) | 125 | 10/16/2014 | 5/8/2017 |
| A.B. (Actavis) | 86 | 9/21/2011 | 7/14/2016 |
| J.P. (Amneal) | 75 | 8/27/2010 | 9/28/2016 |
| T.W. (Dr. Reddy's) | 62 | 8/28/2010 | 5/23/2016 |
| A.T. (Aurobindo) | 46 | 8/26/2012 | 5/12/2013 |
| Falkin, Marc (Actavis) | 41 | 1/6/2014 | 3/14/2016 |
| Nesta, Jim (Mylan) | 40 | 12/5/2012 | 11/13/2015 |
| Grauso, Jim (Aurobindo) | 31 | 7/19/2012 | 1/6/2014 |
| Brown, Jim (Glenmark) | 23 | 9/5/2013 | 8/25/2016 |
| L.S. (Zydus) | 20 | 4/27/2012 | 8/22/2013 |
| Grauso, Jim (Glenmark) | 17 | 1/30/2015 | 5/26/2016 |
| D.C. (Glenmark) | 11 | 5/29/2013 | 7/7/2013 |
| Patel, Nisha (Teva) | 13 | 1/21/2014 | 3/6/2014 |
| Kellum, Armando (Sandoz) | 9 | 4/2/2014 | 10/15/2014 |
| K.S. (Zydus) | 8 | 6/13/2012 | 6/13/2012 |
| Berthold, David (Lupin) | 8 | 4/16/2013 | 6/19/2015 |
| M.C. (Wockhardt) | 7 | 8/9/2016 | 8/9/2016 |
| J.D. (Teva) | 6 | 2/16/2011 | 5/15/2012 |
| Teva Pharmaceuticals | 6 | 2/16/2011 | 1/22/2014 |
| D.S. (Actavis) | 5 | 11/27/2010 | 1/31/2012 |
| S.C. (Actavis) | 5 | 4/18/2012 | 4/22/2012 |
| Rekenthaler, David (Teva) | 4 | 12/12/2013 | 1/22/2014 |
| K.S. (Lannett) | 3 | 12/12/2014 | 1/6/2015 |
| R.C. (Aurobindo) | 3 | 10/8/2013 | 10/18/2013 |
| B.A. (Apotex) | 3 | 6/25/2015 | 6/28/2016 |
| P.M. (Aurobindo) | 2 | 7/22/2014 | 8/13/2014 |
| D.Z. (Upsher-Smith) | 2 | 5/24/2017 | 5/24/2017 |
| J.H. (Par) | 2 | 4/20/2016 | 4/21/2016 |
| Cavanaugh, Maureen (Teva) | 1 | 12/5/2012 | 12/5/2012 |
| CW-3 (Sandoz) | 1 | 5/29/2013 | 5/29/2013 |
| J.H. (Apotex) | 1 | 7/15/2015 | 7/15/2015 |
| Taro Pharmaceuticals | 1 | 3/23/2011 | 3/23/2011 |
| B.R. (Dr. Reddy's) | 1 | 3/15/2012 | 3/15/2012 |
| N.C. (Actavis) | 1 | 1/29/2013 | 1/29/2013 |
| Lupin Pharmaceuticals | 1 | 6/17/2015 | 6/17/2015 |

### 10. James Nesta

922.    Nesta started his employment with Mylan in 2000 and is currently the Vice President of Sales at Mylan. Nesta communicates regularly with his counterparts at many of the Defendants and other pharmaceutical companies. For example, between January 2011 and February 2016, Nesta exchanged at least five thousand two hundred and ninety-three (5,293) phone calls and text messages with his contacts at Actavis, Amneal, Aurobindo, Greenstone, Dr. Reddy's, Lannett, Lupin, Par, Sandoz, Taro, Teva, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| R.H. (Greenstone) | 2310 | 6/9/2011 | 8/24/2015 |
| S.R.(1) (Amneal) | 1079 | 1/3/2011 | 12/17/2015 |
| Green, Kevin (Teva) | 461 | 2/21/2012 | 10/4/2013 |
| B.R. (Dr. Reddy's) | 386 | 1/6/2011 | 6/28/2012 |
| K.R. (Zydus) | 121 | 7/21/2011 | 10/1/2014 |
| Green, Kevin (Zydus) | 117 | 1/7/2014 | 8/17/2017 |
| Rekenthaler, David (Teva) | 102 | 4/5/2012 | 3/17/2015 |
| A.T. (Aurobindo) | 95 | 8/26/2012 | 5/1/2013 |
| Falkin, Marc (Actavis) | 78 | 12/3/2013 | 8/17/2015 |
| J.K. (Aurobindo) | 76 | 10/1/2013 | 1/8/2016 |
| V.B. (Dr. Reddy's) | 71 | 8/7/2014 | 2/2/2016 |
| Berthold, David (Lupin) | 68 | 4/21/2013 | 10/13/2014 |
| CW-4 (Sandoz) | 67 | 9/6/2012 | 10/14/2013 |
| J.A. (Dr. Reddy's) | 52 | 3/9/2011 | 2/27/2014 |
| K.N. (Dr. Reddy's) | 42 | 6/7/2011 | 6/9/2011 |
| Nailor, Jill (Greenstone) | 40 | 12/5/2012 | 11/13/2015 |
| K.S. (Lannett) | 35 | 1/4/2013 | 4/23/2014 |
| T.W. (Dr. Reddy's) | 14 | 1/11/2013 | 2/5/2013 |
| P.M. (Aurobindo) | 13 | 4/5/2013 | 6/19/2013 |
| T.G. (Aurobindo) | 12 | 2/25/2016 | 2/25/2016 |
| S.R.(2) (Amneal) | 11 | 10/1/2014 | 1/15/2015 |
| R.C. (Teva and Aurobindo) | 10 | 7/20/2011 | 11/2/2011 |
| Patel, Nisha (Teva) | 10 | 5/10/2013 | 8/8/2013 |
| Sullivan, Tracy (Lannett) | 7 | 7/21/2014 | 7/22/2014 |
| L.P. (Taro) | 4 | 11/2/2012 | 1/17/2013 |
| B.P. (Zydus) | 4 | 7/21/2011 | 7/21/2011 |
| C.N. (Sandoz) | 3 | 12/2/2012 | 12/17/2012 |
| Teva Pharmaceuticals | 3 | 8/2/2011 | 8/2/2011 |
| J.H. (Par) | 2 | 2/4/2014 | 2/4/2014 |

### 11. Konstantin Ostaficiuk

923.    Ostaficiuk is the President of Camber and has held that position since 2009. During his tenure at Camber, Ostaficiuk has been the primary person responsible for furthering price fixing and market allocation agreements with his competitors. Indeed, Ostaficiuk regularly communicated with competitors and maintained relationships with executives at many of the Defendants and other pharmaceutical manufacturers. For example, between March 2011 and August 2017, Ostaficiuk exchanged at least four hundred and sixty-four (464) phone calls with his contacts at Actavis, Amneal, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Lannett, Lupin, Rising, Sandoz, Taro, Teva, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(2) (Amneal) | 128 | 3/22/2011 | 6/11/2017 |
| K.S. (Lannett) | 122 | 3/10/2011 | 8/24/2017 |
| S.C. (Breckenridge) | 46 | 3/25/2011 | 7/24/2017 |
| Grauso, Jim (Aurobindo) | 39 | 3/21/2012 | 12/9/2013 |
| Berthold, David (Lupin) | 19 | 5/14/2012 | 4/4/2016 |
| S.R.(1) (Amneal) | 12 | 3/12/2012 | 10/25/2016 |
| R.M. (Lannett) | 10 | 12/15/2011 | 2/14/2012 |
| Rekenthaler, David (Teva) | 10 | 9/22/2014 | 2/19/2015 |
| C.M. (Aurobindo) | 9 | 5/27/2013 | 11/12/2015 |
| K.M. (Rising) | 8 | 7/17/2014 | 6/8/2016 |
| Breckenridge Pharmaceuticals | 7 | 11/9/2011 | 10/29/2014 |
| M.B. (Taro and Glenmark) | 6 | 5/30/2012 | 6/6/2012 |
| Sullivan, Tracy (Lannett) | 6 | 5/19/2012 | 8/28/2012 |
| P.H. (Zydus) | 5 | 5/8/2012 | 5/16/2012 |
| Grauso, Jim (Glenmark) | 5 | 7/30/2014 | 10/29/2014 |
| P.G. (Breckenridge) | 4 | 5/20/2011 | 12/17/2015 |
| M.K. (Zydus) | 4 | 1/5/2015 | 12/30/2015 |
| B.R. (Dr. Reddy's) | 4 | 1/18/2012 | 3/30/2012 |
| K.K. (Wockhardt) | 4 | 10/5/2011 | 2/1/2012 |
| D.P. (Sandoz) | 3 | 7/9/2014 | 7/14/2014 |
| CW-5 (Glenmark) | 3 | 11/19/2013 | 11/19/2013 |
| Falkin, Marc (Actavis) | 2 | 6/6/2013 | 12/5/2013 |
| P.M. (Aurobindo) | 2 | 8/20/2013 | 5/2/2014 |
| B.M. (Amneal) | 1 | 10/3/2011 | 10/3/2011 |
| Brown, Jim (Glenmark) | 1 | 10/29/2014 | 10/29/2014 |
| L.P. (Taro) | 1 | 6/26/2015 | 6/26/2015 |
| D.N. (Breckenridge) | 1 | 4/4/2016 | 4/4/2016 |
| A.T. (Aurobindo) | 1 | 2/1/2013 | 2/1/2013 |
| S.G. (Glenmark) | 1 | 4/27/2011 | 4/27/2011 |

REDACTED – PUBLIC VERSION

### 12.    Nisha Patel

924.    Patel worked at Teva from April 2013 to December 2016, first as a Director of Strategic Customer Marketing and then as a Director of National Accounts. As discussed in great detail throughout this Complaint, Patel was in frequent communication with her counterparts at the Defendants and other pharmaceutical companies to fix prices and allocate markets. For example, during her time at Teva, Patel exchanged at least one thousand two hundred and forty (1,240) phone calls and text messages with her contacts at Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Sandoz, Taro, Upsher-Smith, and Zydus. As discussed in this Complaint, Patel also frequently communicated with competitors using Facebook Messenger, LinkedIn messaging, and the encrypted messaging application WhatsApp. The communications detailed in the table below include only telephone calls and text messages:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Green, Kevin (Zydus) | 184 | 11/8/2013 | 8/31/2016 |
| CW-1 (Sandoz) | 183 | 4/26/2013 | 8/9/2016 |
| Rogerson, Rick (Actavis) | 157 | 5/2/2013 | 11/9/2015 |
| CW-5 (Glenmark) | 121 | 5/2/2013 | 3/4/2014 |
| R.H. (Greenstone) | 105 | 5/7/2013 | 10/13/2016 |
| Aprahamian, Ara (Taro) | 100 | 5/22/2013 | 3/3/2016 |
| Berthold, David (Lupin) | 76 | 5/6/2013 | 4/8/2014 |
| J.C. (Glenmark) | 44 | 5/6/2013 | 7/28/2015 |
| Brown, Jim (Glenmark) | 36 | 8/6/2013 | 10/15/2014 |
| V.B. (Dr. Reddy's) | 28 | 6/10/2014 | 9/27/2016 |
| A.B. (Actavis) | 28 | 4/30/2013 | 10/16/2015 |
| A.S. (Actavis) | 28 | 9/16/2015 | 3/10/2016 |
| Nailor, Jill (Greenstone) | 18 | 1/21/2014 | 3/6/2014 |
| Sullivan, Tracy (Lannett) | 17 | 6/12/2014 | 4/6/2016 |
| T.P. (Par) | 16 | 6/26/2014 | 11/10/2014 |
| B.H. (Apotex) | 14 | 5/20/2013 | 6/12/2015 |
| Grauso, Jim (Aurobindo) | 12 | 5/14/2013 | 7/8/2013 |
| Falkin, Marc (Actavis) | 11 | 2/5/2016 | 6/16/2016 |
| Nesta, Jim (Mylan) | 10 | 5/10/2013 | 8/8/2013 |
| A.G. (Actavis) | 9 | 1/27/2015 | 6/9/2016 |
| S.R.(2) (Amneal) | 9 | 9/9/2014 | 5/29/2015 |
| B.L. (Upsher-Smith) | 8 | 4/29/2013 | 9/18/2014 |
| Grauso, Jim (Glenmark) | 6 | 2/28/2014 | 1/5/2015 |
| K.R. (Zydus) | 6 | 10/10/2013 | 9/18/2014 |
| S.G. (Zydus) | 4 | 2/29/2016 | 5/24/2016 |
| M.B. (Actavis) | 3 | 2/26/2016 | 6/6/2016 |
| M.B. (Glenmark) | 3 | 5/10/2013 | 5/23/2013 |
| S.C. (Breckenridge) | 2 | 2/7/2014 | 2/7/2014 |
| S.R.(1) (Amneal) | 2 | 9/9/2014 | 1/6/2015 |

### 13.     David Rekenthaler

925.     Rekenthaler was the Vice President of Sales, US Generics at Teva until April 2015. Rekenthaler is now the Vice President of Sales at Apotex. During his time at Teva, Rekenthaler knew that his colleagues, including Green and Patel, were colluding with competitors. Indeed, Rekenthaler was also in frequent contact with competitors himself and had relationships with executives at nearly all the Defendants and other pharmaceutical companies. For example, between January 2011 and March 2015, Rekenthaler exchanged at least one thousand and forty-four (1,044) phone calls and text messages with his contacts at Actavis, Amneal, Apotex, Aurobindo,

REDACTED – PUBLIC VERSION

Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Rising, Sandoz,

Taro, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 433 | 8/7/2013 | 3/25/2015 |
| Nesta, Jim (Mylan) | 102 | 4/5/2012 | 3/17/2015 |
| G.B. (Par) | 89 | 1/11/2011 | 2/13/2015 |
| R.C. (Aurobindo) | 75 | 10/6/2011 | 3/24/2015 |
| J.H. (Apotex) | 65 | 5/6/2013 | 3/9/2015 |
| Green, Kevin (Zydus) | 42 | 11/8/2013 | 3/30/2015 |
| A.S. (Actavis) | 26 | 1/11/2012 | 4/1/2013 |
| CW-2 (Sandoz and Rising) | 24 | 11/14/2011 | 11/20/2014 |
| J.H. (Par) | 19 | 9/16/2013 | 3/7/2015 |
| S.G. (Zydus) | 18 | 12/2/2013 | 1/29/2015 |
| B.P. (Mylan) | 18 | 9/12/2011 | 12/23/2013 |
| A.B. (Actavis) | 16 | 4/1/2013 | 9/16/2014 |
| J.K. (Actavis) | 15 | 10/11/2013 | 3/29/2015 |
| S.R.(2) (Amneal) | 13 | 5/8/2013 | 3/12/2015 |
| D.N. (Breckenridge) | 10 | 6/14/2012 | 6/10/2014 |
| Ostaficiuk, Kon (Camber) | 10 | 9/22/2014 | 2/19/2015 |
| Berthold, David (Lupin) | 9 | 10/14/2013 | 1/16/2014 |
| J.K. (Mylan) | 8 | 1/11/2012 | 2/7/2012 |
| K.M. (Rising) | 8 | 4/14/2011 | 1/4/2012 |
| B.R. (Dr. Reddy's) | 7 | 8/11/2011 | 4/16/2012 |
| K.R. (Zydus) | 5 | 10/10/2013 | 12/17/2013 |
| CW-5 (Glenmark) | 4 | 9/27/2013 | 3/11/2014 |
| Nailor, Jill (Greenstone) | 4 | 12/12/2013 | 1/22/2014 |
| E.G. (Taro) | 3 | 5/10/2011 | 3/8/2012 |
| K.S. (Lannett) | 3 | 10/31/2011 | 9/4/2014 |
| C.V. (Greenstone) | 3 | 11/14/2013 | 11/18/2013 |
| T.W. (Dr. Reddy's) | 3 | 7/29/2013 | 5/1/2014 |
| J.J. (Taro) | 2 | 1/31/2011 | 7/2/2012 |
| J.M. (Lannett and Glenmark) | 2 | 4/30/2011 | 11/19/2012 |
| M.B. (Glenmark) | 2 | 2/26/2013 | 2/28/2013 |
| B.W. (Wockhardt) | 2 | 1/5/2012 | 3/10/2014 |
| Brown, Jim (Glenmark) | 1 | 3/24/2014 | 3/24/2014 |
| S.R.(1) (Amneal) | 1 | 8/6/2012 | 8/6/2012 |
| G.R. (Aurobindo) | 1 | 11/1/2011 | 11/1/2011 |
| Grauso, Jim (Aurobindo) | 1 | 12/8/2011 | 12/8/2011 |

### 14.    Rick Rogerson

926.    Rogerson was the Executive Director of Pricing and Business Analytics at Actavis until Actavis was acquired by Teva in August 2016. Rogerson now works at Amneal as a Senior Director of Marketing and Business Analytics. During his time at Actavis, Rogerson communicated with his contacts at several Defendants. For example, between February 2010 and July 2016, Rogerson exchanged at least six hundred and thirty-five (635) phone calls and text messages with his contacts at Dr. Reddy's, Glenmark, Lannett, Sandoz, Taro, Teva, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.A. (Wockhardt) | 316 | 3/11/2010 | 1/28/2016 |
| Patel, Nisha (Teva) | 157 | 5/2/2013 | 11/9/2015 |
| N.M. (Dr. Reddy's and Sandoz | 43 | 10/15/2013 | 3/6/2018 |
| J.M. (Lannett and Glenmark) | 32 | 6/24/2010 | 1/6/2012 |
| K.G. (Teva) | 29 | 12/15/2015 | 7/29/2016 |
| Teva Pharmaceuticals | 27 | 9/24/2015 | 7/29/2016 |
| C.B. (Teva) | 17 | 2/26/2016 | 7/26/2016 |
| Aprahamian, Ara (Taro) | 4 | 6/17/2013 | 4/16/2014 |
| S.G. (Glenmark) | 3 | 2/8/2010 | 2/8/2010 |
| Kellum, Armando (Sandoz) | 3 | 5/5/2011 | 9/28/2011 |
| Taro Pharmaceuticals | 2 | 6/14/2013 | 11/20/2013 |
| J.W. (Zydus) | 2 | 6/24/2014 | 6/25/2014 |

### 15.    Tracy Sullivan

927.    Tracy Sullivan has been employed at Lannett since 2007 and is currently the Director of National Accounts. Sullivan regularly communicated with competitors and maintained relationships with executives at many of the Defendants and other pharmaceutical companies. For example, between March 2011 and August 2016, Sullivan exchanged at least four hundred and ninety-five (495) phone calls and text messages with her contacts at Amneal, Aurobindo,

REDACTED – PUBLIC VERSION

Breckenridge, Dr. Reddy's, Greenstone, Mylan, Par, Teva, Wockhardt, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 124 | 6/5/2011 | 11/14/2014 |
| K.K. (Wockhardt) | 101 | 4/11/2012 | 1/16/2014 |
| J.P. (Teva) | 50 | 3/26/2014 | 3/3/2016 |
| R.H. (Greenstone) | 37 | 7/29/2011 | 3/14/2016 |
| B.R. (Dr. Reddy's) | 28 | 3/28/2011 | 8/7/2011 |
| J.A. (Dr. Reddy's) | 22 | 4/28/2011 | 5/13/2014 |
| Patel, Nisha (Teva) | 17 | 6/12/2014 | 4/6/2016 |
| L.S. (Zydus) | 16 | 7/30/2011 | 8/15/2013 |
| D.V. (Dr. Reddy's) | 14 | 9/22/2015 | 8/19/2016 |
| K.O. (Par) | 14 | 7/26/2013 | 5/9/2015 |
| J.W. (Zydus) | 11 | 6/3/2014 | 3/7/2016 |
| J.P. (Amneal) | 11 | 5/24/2011 | 5/9/2015 |
| P.M. (Aurobindo) | 10 | 6/5/2013 | 6/10/2013 |
| K.N. (Dr. Reddy's) | 7 | 2/23/2016 | 3/7/2016 |
| Nesta, Jim (Mylan) | 7 | 7/21/2014 | 7/22/2014 |
| Ostaficiuk, Kon (Camber) | 6 | 5/19/2011 | 8/28/2012 |
| D.N. (Breckenridge) | 4 | 9/25/2012 | 9/17/2014 |
| Green, Kevin (Teva) | 4 | 5/23/2011 | 11/14/2012 |
| Green, Kevin (Zydus) | 4 | 2/16/2014 | 2/16/2014 |
| C.M. (Aurobindo) | 3 | 5/9/2015 | 5/9/2015 |
| G.R. (Aurobindo) | 2 | 6/14/2011 | 6/14/2011 |
| P.G. (Breckenridge) | 1 | 9/7/2011 | 9/7/2011 |
| S.K. (Wockhardt) | 1 | 10/6/2011 | 10/6/2011 |
| P.H. (Zydus) | 1 | 7/20/2012 | 7/20/2012 |

## I.      Teva Profitability Increases Dramatically

928.     As discussed more fully below, from July 3, 2013 through January 28, 2015, Teva conspired with its competitors to raise prices on dozens of different drugs. The impact of these price increases on Teva's profitability was dramatic.

929.     After these price increases – on July 30, 2015 – Teva reported strong results and raised its guidance for the full year 2015. Among other things: (1) net income was up 15% compared to the prior year; (2) operating income was up 16% compared to the prior year; and (3) cash flow from operations was up 41% compared to the prior year. Teva reported a gross profit margin of 62.8%, which was up from 58.1% the prior year. Teva's stock prices also soared. By July 2015,

Teva's stock price was trading at an all-time high. These significant results were obtained largely as a result of the anticompetitive conduct detailed herein.

**J.      Teva and its Executives Knowingly Violated the Antitrust Laws**

930.    Teva was aware of the antitrust laws and paid them lip service in its Corporate Code of Conduct. For example, Teva's Code of Conduct from the summer of 2013 states specifically:



931.    But high-level executives at Teva were aware that those laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva reached with its competitors.

932.    For example, when Patel started at Teva in late-April 2013, she immediately began ranking Teva's competitors by their "quality." It was well known internally at Teva that Patel was identifying price increase candidates based on who Teva's competitors were for those drugs, and whether she or others at Teva had an understanding in place. Indeed, Patel already had a short list of price increase candidates in place on the day she started at Teva, which was based at least in part on

REDACTED – PUBLIC VERSION

conversations she had already been having with Teva's competitors before she started, including Aprahamian at Taro.

933.    As Patel was starting to create her ranking of quality competitors and identify price increase candidates, she sent her very first iteration of the quality competitor ranking to her supervisor, K.G. – a senior marketing executive at Teva – on May 1, 2013. That ranking included, within the category of "Strong Leader/Follower," the following competitors: Mylan, Actavis, Sandoz, Glenmark, Taro, and Lupin. The preliminary list of price increase candidates also included the formula that Patel would use to identify price increase candidates using the quality of competitor scores.

934.    With K.G.'s approval of her methodology for identifying price increase candidates, Patel continued communicating with competitors and agreeing to price increases. She also routinely provided K.G. with intelligence that she had received from her communications with competitors. For example, when Patel sent her very first formal "PI Candidates" spreadsheet to K.G. on May 24, 2013, she identified, for example, that the drug Nabumetone was a price increase candidate because, among other things, "Sandoz [was] also bidding high." For the drug Adapalene gel, Patel noted that there were "[r]umors of a Taro increase" – even though Taro had not yet increased its prices for Adapalene gel. Patel had obtained this competitively sensitive information directly from her communications with competitors.

935.    K.G. immediately forwarded that information to Cavanaugh (Teva), who approved of the price increases based on the reasoning that Patel provided for each drug. As discussed more fully below, Teva raised prices on those drugs (and others) on July 3, 2013.

936.    Cavanaugh was well aware that Patel was communicating with competitors about price increases and making recommendations based on those communications, because Patel told her so directly. For example, during a 2013 meeting of Teva sales and pricing personnel where

Cavanaugh was present, Patel was discussing her communications with certain competitors about price increases when Cavanaugh smiled, put her hands over her ears, and pretended that she could not hear what was being said. Not once, however, did Cavanaugh ever tell Patel or anyone else at Teva to stop conspiring with Teva's competitors or rescind the agreements that had been reached.

937.    Patel continued to send intelligence that she had obtained from competitors to her supervisor, K.G. On August 7, 2013, Patel sent to K.G. a summary list of drugs slated for a price increase on August 9, 2013. In the "Reasons for Increase" column, Patel again included specific information that could only have come from her communications with competitors, including:

| Product Category | Reason for Increase |
|---|---|
| ETODOLAC ER TABLETS | Follow Taro (likely to be this week with IR) |
| ETODOLAC TABLETS | Follow Sandoz; Taro likely to follow this week |
| PRAVASTATIN TABLETS | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. |

938.    This time, K.G. – recognizing that it was inappropriate for Teva to have this information in writing – asked Patel to change those references above, to remove the offending language:

> Under reasons, I would change to the following:
>
> 1. Etodolac ER : Follow Taro
> 2. Etodolac : Follow Sandoz; Taro increase anticipated.
> 3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

939.    As discussed more fully below, Teva increased prices on those three drugs two days later. Not once did K.G. ever tell Patel to stop communicating with competitors, or to rescind any of the agreements she had reached on behalf of Teva.

940.    Patel also spoke regularly to both Rekenthaler and Green about their communications with competitors. Patel was aware that both Rekenthaler and Green were

communicating with competitors, sometimes at her direction. Green and Rekenthaler, in turn, were also both aware that Patel was communicating with competitors and implementing price increases based on those communications.

941.    Rekenthaler – the Vice President of Sales at Teva – was aware that communicating with competitors about pricing and market allocation was illegal and took steps to avoid any evidence of his wrongdoing. For example, as discussed more fully above, on July 15, 2013 CW-2 (Sandoz) called Rekenthaler (Teva) and left a message. Rekenthaler called CW-2 back immediately and they had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all drugs that Teva had recently increased pricing on – not just those drugs where Teva overlapped with Sandoz. Rekenthaler complied. Understanding, however, that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work e-mail account to a personal e-mail account, then forwarded the list from his personal e-mail account to CW-2's personal e-mail account.

## K.    Price Increases Slow Dramatically After Government Investigations Commence

942.    As further evidence that the price increases discussed above were not the result of normal market factors, the massive price spikes that were occurring in the industry in 2013 and 2014 slowed dramatically after the State of Connecticut commenced its antitrust investigation in July 2014. This was not a coincidence. Generic drug manufacturers in the industry – including the Defendants in this case – understood that they were under scrutiny and did not want to draw further attention to themselves.

943.    In January 2015, Sandoz conducted an analysis of the price increases in the generic drug industry in 2013 and 2014, with an early look toward 2015. In its report, Sandoz found that "[g]eneric drug price increases in 2013 and 2014 were very common." Specifically, the report stated:

REDACTED – PUBLIC VERSION

"For the years 2013 and 2014, there were 1,487 SKU 'large price increases' (WAC increase greater than 100%)[;] of this 12% (178 SKUs) were increased by more than 1000%."

944.    The report went on to state that "[t]he number and level of price increases declined noticeably in 4Q 2014." The following graphic, which was included in the Sandoz report, demonstrates that the number of price increases started to decline dramatically after the second quarter of 2014 – the same time that the Plaintiff States commenced their investigation:



945.    The massive price spikes in the industry may have declined, but the already-high prices for most of these drugs did not go down. To date, prices for many of these drugs remain at significantly inflated, anti-competitive levels.

## XI.    TOPICAL DRUGS CONSPIRACY

### A.    Overview of the Topical Drugs Conspiracy

946.    Going back many years–from at least 2009 through early 2016–collusion has been rampant among manufacturers of generic topical products. Topical products include any drug that is administered by means of contact, most often with an external body surface. Such products typically face higher barriers to entry because technical hurdles associated with demonstrating bioequivalence to branded products are more time consuming and expensive, and manufacturing costs are high, compared to other types of generic drugs.

947.    The greater barriers to entry generally associated with topical products limit the number of competitors in any particular topical product market, creating an environment that is ripe for collusion. Many topical products have only two or three competitors. As a result, the sales and pricing executives at these companies know each other well and have used those business and personal relationships as a means to collude to limit competition, allocate customers, and significantly raise prices on dozens of generic topical products.

948.    Indeed, the larger and more prominent topical manufacturers—including Taro, Perrigo, Fougera (now Sandoz), and Actavis—had long-standing agreements over the course of several years not to compete for each other's customers and to follow each other's price increases. To maintain these unlawful agreements, the competitors stayed in nearly constant communication— meeting regularly at trade shows and customer conferences and communicating frequently by phone and text message to reinforce their understandings. This Complaint is replete with examples demonstrating how these understandings manifested themselves with respect to specific products over a period of many years.

949.    These understandings were not limited to just the largest manufacturers of generic topical products, however.  The other manufacturers of those products—including all the Defendants

named in this Complaint—understood the rules of the road and took the necessary steps to limit competition among them.

950. As set forth above, for many years, the larger generic pharmaceutical industry has operated pursuant to an overarching understanding to avoid competing with each other and to instead settle for what these competitors refer to as their "fair share." This understanding has permeated every segment of the industry, and the purpose of the agreement was to avoid competition among generic manufacturers that would normally result in lower prices and greater savings to the ultimate consumer.

951. Nowhere was this understanding more pronounced than with regard to the sale of generic topical products, where the competition is limited and the product overlap extensive. Indeed, companies recognized that reality and celebrated the fact that they operated in this segment of the industry. For example, G&W remarked in an internal e-mail from May 2013 ███████████████ ████████████████████████████████████████████████████████████████ ████████████

952. Since at least 2007, the top three manufacturers, by sales, of generic topical products have consistently been Taro, Perrigo, and Fougera (now Sandoz). Between 2007 and 2014, these three companies controlled approximately two-thirds of the topical market segment. Several other manufacturers make up the remaining third, including Actavis, G&W, Glenmark, Mylan and others, as discussed throughout this Complaint. The following graphic shows the market share breakdown on generic topical products for June 2007 through June 2012:

REDACTED – PUBLIC VERSION



954.     Once the competitors had their "fair share" of a particular drug market, it was time to increase prices. Indeed, it was generally understood that when a competitor increased prices, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to take advantage of the price increase. Typically, the competitor would then follow with a comparable price increase of its own.

955.     Although manufacturers of generic topical products have been colluding on price increases since at least 2009, the size and frequency of those increases grew exponentially in 2013 and 2014. During that time period, the prices of hundreds of generic drugs—including many at issue in this Complaint—skyrocketed without explanation, sparking outrage from politicians, payers, and consumers across the country whose costs have doubled, tripled, or even increased by 1,000% or more. Generic drug manufacturers argued publicly that the significant price increases were due to a myriad of lawful factors, such as industry consolidation, FDA- mandated plant closures, or elimination of unprofitable generic drug product lines.

956.     However, these reasons were far from the truth. In reality, there were several structural and personnel changes among generic topical manufacturers in late 2012 and early 2013 that fostered and facilitated collusion in that segment of the industry. These changes increased opportunities for coordination between competitors—and coordinate they did.

957.     First, in July 2012, Sandoz finalized its purchase of Fougera, a niche dermatology manufacturer, making Sandoz a much more prominent manufacturer of generic topical products. Sandoz publicly touted that the purchase positioned it "as the new #1 in generic dermatology medicines both globally and in the U.S."

958.     As a result of the acquisition, all of Fougera's sales executives lost their jobs, except for one executive who is now cooperating with the Plaintiff States (referred to herein as CW-3). Because of Sandoz's size, and the fact that it was an active participant in many different product

markets, many competitors reached out to CW-3 when they learned he had transitioned to Sandoz because they viewed it as a strategic opportunity to collude on overlapping products. For example, Blashinsky, then a senior executive at Glenmark approached CW-3 at an industry event August 2012 and told ██████████████████████████ and ███████████████████████.

959.     Over the ensuing years, CW-3 would leverage his competitor relationships—including his contacts at many of the Defendants—to prove his worth to Sandoz management by using those relationships to allocate customers and increase prices on dozens of products. His competitor contacts included Blashinsky, Aprahamian, and Kaczmarek, but there were many others. Indeed, CW-3 took contemporaneous notes to keep track of all the different prices and products he was discussing at any given time. CW-3 maintained this direct evidence of anticompetitive conduct in a notebook (of which there are two volumes) that his colleague, referred to hereafter as CW-1, coined the ███████████ ██████████ as described more fully below. Various excerpts from the notebooks are referred to throughout this Complaint to support the allegations herein.

960.     Second, in the months following the Fougera acquisition, three key Actavis executives—Boothe, Perfetto, and Aprahamian—left Actavis to assume senior-level positions at competitor companies that were also prominent manufacturers of topical products. Boothe became an executive at Perrigo and Perfetto and Aprahamian became executives at Taro. These former colleagues turned competitors would use their longstanding relationships and new high-level positions as an opportunity to collude with their key competitors on overlap products.

961.     Perfetto and Aprahamian, in particular, wasted no time working together to implement changes designed to improve Taro's financial bottom line and firmly position the company as a price increase leader. Although Taro had been successful in implementing price increases in the past, the increases taken by Taro in 2013 and 2014 would be much more significant. These increases caught the attention of other generic drug manufacturers across the industry. Indeed, one sales executive at a

generic manufacturer not named in this Complaint remarked in an internal e-mail that ██████

████████████████████████████████████████████████████████████████

███████████████████████ To that, his colleague responded ████████████████

████████████████████████████████████████████

962.    For example, in June 2014, Taro initiated significant price increases on more than a dozen different drug products. As a result of the June 2014 increases, Credit Suisse analysts increased their price target for Taro and its parent company, Sun, from $85 to $150 per share. As justification for the increase, Credit Suisse emphasized that Taro's competitors had consistently followed the increases and prices remained high:



REDACTED – PUBLIC VERSION

963.    Taro's success in implementing price increases depended, in large part, on the strength of the ongoing collusive relationships that Perfetto and Aprahamian had fostered with their contacts at competitor companies—both with manufacturers of topical products and beyond. These included Boothe, Blashinsky, Orlofski, and Vogel-Baylor, but there were others. Numerous examples of how this collusion unfolded with respect to specific products are discussed in detail below.

964.    The price increases taken by generic topical manufacturers during this time period resulted in the accrual of significant profits. Between 2008 and 2016, Taro and Perrigo both saw their profits from the sale of generic topical products increased by over 1300%. The other Defendants profited handsomely from this conduct as well.

965.    As set forth above, the Plaintiff States have obtained contemporaneous handwritten notes taken by CW-3 during the time period relevant to this Complaint, containing direct evidence of his collusion with several competitors. CW-3 maintained these notes in a two-volume notebook that his colleague, CW-1, referred to as the "Diary of Collusion" (referred to herein as the "Notebook"). The Notebook contains CW-3's notes from internal Sandoz meetings, as well as some, but not all, of his phone calls with competitors. CW-3 took these notes chronologically between 2009 and 2015. In 2012 and 2013, the notes are fairly comprehensive; however, the Notebook is less comprehensive starting in 2014 because CW-3 changed his note-taking practices. CW-3 took notes because he was discussing many different prices and products with competitors and he could not keep track of it all without notes. CW-3 generally traveled with the Notebook and did not hide it from people, including competitors. Indeed, competitors often joked with him about his "little black books." References to the Notebook will be discussed throughout this Complaint to support the allegations alleged herein.

966.    Certain Defendants had separate long-standing agreements with some of their key competitors in the dermatology sector to limit competition on any products on which the companies overlapped. For instance, Sandoz had agreements going back many years with Taro and Perrigo that

they would not poach each other's customers and would follow each other's price increases on overlap products.

967.    G&W had similar understandings with its key competitors Taro and Perrigo. For example, in February 2012, Vogel-Baylor exchanged e-mails with her supervisor, Orlofski, regarding responding to the annual McKesson One Stop RFP. Vogel-Baylor stated that she was waiting for McKesson ████████████████████████████████████████████ Once she confirmed the incumbents, she conveyed that information to Orlofski who replied: ████████ ████████████████████████████████████████████████████████ ████████████████████████ As discussed in more detail below, shortly thereafter, Vogel-Baylor would strike up relationship with CW-5, a senior executive at Glenmark, and begin communicating and colluding with that company in earnest as well.

968.    Further, in June 2014, Sandoz created a ████████████████████ that was specifically designed to track Sandoz's market share with respect to dermatology products. As T.O., a Sandoz marketing executive, described in an internal e-mail: ████████████████████ ████████████████████████████████████████ Similarly, in November 2015, Sandoz compiled a spreadsheet containing various product opportunities that contained comments demonstrating its agreements with certain competitors, such as: ████████████ ████████ and ██████████████ or ██████████████

969.    It was also common for these manufacturers to communicate about, and collude on, multiple products at any given time, regardless of whether the competitors were currently in the market for those products. For example, in April 2013, while speaking with T.P., a sales executive at Perrigo, CW-3, a Sandoz senior sales executive, took the following notes in his Notebook concerning nine (9) different products that Perrigo had recently increased prices on:



CW-3 later conveyed that information to Kellum in an e-mail stating: ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Notably, this list included several products that Sandoz did not sell at that time, including Halobetasol Propionate cream.

970.    Similarly, in April 2013, Orlofski of G&W asked his colleague Vogel-Baylor to run a report listing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Vogel-Baylor responded: ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Orlofsky answered: ▮▮▮▮▮▮▮▮

971.    Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets. Often these decisions are made, at least in part, on who the competitors are and how strong the relationship is between the two companies. As one example, in July 2013, Sandoz was looking to implement a ▮▮▮▮▮▮▮ that involved temporarily delisting ten (10) products on which it overlapped with

REDACTED – PUBLIC VERSION

Taro. This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price.

972.     This interdependence between generic manufacturers is further demonstrated by the countless examples of generic manufacturers sharing sensitive information with competitors as a matter of course.

973.     For example, in June 2012, Grauso, then a senior executive at Aurobindo, forwarded a customer's bid request for multiple products to Orlofski, his former colleague at G&W. The request included Prochlorperazine Maleate suppositories—a product that G&W manufactured, but Aurobindo did not.

974.     Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection, and rebates. Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of payors and consumers.  For example, in August 2010, CW-6, then a senior sales executive at Fougera, sent the following e-mail regarding ███ ████████ to his supervisor, Kaczmarek:



975.     Before sending this e-mail, CW-6 had spoken that same day with his contacts at several

of the competitors listed, including Grauso, then a senior sales executive at G&W, T.P., a sales

executive at Perrigo, D.C., a sales executive at Glenmark, M.R., a sales executive at West-Ward

Pharmaceuticals, and V.M., a sales executive at Core Pharma LLC. These calls are detailed in the chart

below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 9:55:28 | 0:01:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 10:27:49 | 0:00:06 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:30:30 | 0:07:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:40:34 | 0:03:31 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:18:51 | 0:00:16 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:25:37 | 0:00:00 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 11:34:56 | 0:03:29 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:39:05 | 0:26:34 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 12:10:54 | 0:00:05 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | V.M. (Core Pharma) | 12:38:57 | 0:00:24 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | V.M. (Core Pharma) | 12:41:09 | 0:12:30 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 12:58:48 | 0:04:08 |

976.     Defendants understood that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy. For example, in May 2014, a large customer received a bid on Betamethasone Dipropionate lotion and gave Taro an opportunity to bid to retain the business. A.L., a pricing executive at Taro, sent an internal e-mail stating: "FS ok, will not protect." E.G., a Taro sales executive, responded, "explain FS, (Fair Share)?"  Aprahamian replied:

> No emails please. Phone call. ████ let's discuss.

977.     To avoid creating a potentially incriminating paper trail, Kellum routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved. Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017—after the Plaintiff States' investigation was well underway—read: "Avoid Fair Share terminology on slides—underdeveloped or overdeveloped is better."

978.     The examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described. Indeed, to date, many of the Defendants have made only limited document productions to the Plaintiff States, including Actavis, Amneal, Glenmark, Greenstone, Lannett, Mylan, Perrigo, and Wockhardt.

979.     As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given product market. Once the competitors were satisfied that they had their "fair share," they often turned to increasing prices. So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price. It was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the

REDACTED – PUBLIC VERSION

business or would bid high so as not to take advantage of the price increase. Often, the competitor would then follow with a comparable price increase of its own.

980.    The concept of "fair share" and price increases went hand in hand. For example, and as discussed in more detail below, Sandoz's ongoing understandings with Taro and Perrigo that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase. Aprahamian often spoke with CW-3 of Sandoz about coordinating price increases between the two companies. Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business," or "don't be stupid."

981.    Because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of a price increase, although they often did so anyway. So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business. Similarly, the competitor knew it would have the opportunity, which it often took, to follow the increase with a comparable price increase of its own.

### 1.    The Early Days—Collusion From 2009 To Early 2012

#### a.    Key Relationships Among Generic Topical Manufacturers

982.    The key manufacturers of generic topical products during this early time period—Fougera (and later Sandoz), Perrigo, Taro, and Actavis—had ongoing understandings going back many years not to poach each other's customers and to follow each other's price increases. These competitors met with each other regularly at trade shows and customer conferences—in addition to speaking frequently by phone—and specifically discussed and agreed on allocating customers and coordinating price increases on the products they had in common. The following section focuses on

these relationships and provides illustrative examples of how these ongoing understandings manifested themselves with respect to the Subject Drugs and other drugs.

### i. *Fougera/Perrigo/Taro*

983.    CW-6 was a senior sales executive at Fougera between October 2004 and August 2012 and a central player in the collusion taking place among generic topical manufacturers at that time. Prior to working at Fougera, CW-6 was a lead buyer in the generics group at Cardinal Health where he developed extensive contacts in the industry.

984.    Upon moving to Fougera, CW-6 was instructed by his supervisor, Kaczmarek, a senior Fougera executive, to reach out to his contacts at competitor companies to discuss market allocation, price increases, and other commercially sensitive topics. If CW-6 did not have a contact at a competitor, Kaczmarek directed him to pass messages to that competitor through his contacts that did. This practice—facilitating anticompetitive conduct through a third competitor—was pervasive throughout the industry. During his tenure at Fougera, CW-6 frequently attended trade shows and customer conferences. At these events, he would regularly discuss competitively sensitive topics with his competitors. CW-6 was also a prolific communicator by phone and exchanged thousands of calls and text messages with his competitors. After speaking with a competitor, CW-6 would often report the competitive intelligence back to his supervisor, Kaczmarek, and Fougera would use that information to make competitive decisions, including which customers to give up to a competitor or what pricing actions to take and when.

985.    CW-6 had a particularly collusive relationship with T.P., a sales executive at Perrigo, dating back to at least 2010. CW-6 and T.P. were not social friends. If the two were communicating, it was to coordinate behavior on products where Fougera and Perrigo overlapped. CW-6 and T.P. regularly met at trade shows and customer conferences and discussed competitively sensitive topics. The goal of these conversations was always to keep prices as high as possible. CW-6 and T.P. also

spoke often by phone. For example, between February 2010 and August 7, 2012, CW-6 and T.P. exchanged at least three hundred and two (302) phone calls.

986.     CW-6 also had a collusive relationship with H.M., a sales executive at Taro, dating back to at least 2011. CW-6 spoke with H.M. in person at trade shows and customer conferences, as well as by phone. During these conversations, the competitors coordinated customer allocation and price increases on products where Fougera and Taro overlapped. Between January 2011 and August 2012, CW-6 and H.M. exchanged at least eighty-six (86) phone calls.

987.     There were several products where all three companies—Fougera, Perrigo, and Taro—sold a particular drug. In these instances, CW-6 would facilitate the communications, passing messages from one competitor to the other to ensure the anticompetitive agreement was understood by all three competitors. This was necessary because T.P. and H.M. did not have an independent relationship and depended on CW-6 to serve as a conduit to effectuate their collusion on overlapping products.

988.     During this early time period, T.P. and H.M. were acting at all times at the direction of, or with approval from, their superiors, including Wesolowski of Perrigo and Blashinsky of Taro.

ii.      *Actavis and Taro/Perrigo*

989.     Perfetto, then a senior sales and marketing executive at Actavis, had a collusive relationship with Blashinsky, then a senior marketing executive at Taro. Between January 2011 and May 2012, when Blashinsky moved to Glenmark, the competitors exchanged at least one hundred and twenty (120) phone calls.

990.     Similarly, M.D., a sales executive at Actavis, had a collusive relationship with T.P. of Perrigo going back many years. The two discussed market allocation and coordinated price increases on products where Actavis and Perrigo overlapped. Between August 2011 and December 2013, the two competitors exchanged at least eighty-three (83) phone calls.

991.     During this early time period, M.D. was acting at all times at the direction of, or with approval from, his superiors at Actavis, including Perfetto.

### iii.     Sandoz/Taro

992.     CW-4 worked as a senior sales executive at Sandoz for many years, including during this early time period (between 2009 and early 2012). At Sandoz, CW-4 was evaluated based on her ability to acquire competitive intelligence. Competitive intelligence included information concerning product launches, customer alignment, price increases, and supply disruptions.

993.     CW-4 obtained competitive intelligence from customers as well as competitors with whom she had relationships. CW-4 viewed providing this information as a way to demonstrate value to the company. CW-4 reported competitive intelligence to superiors, including Kellum and CW-1, both senior pricing executives at Sandoz. When CW-4 felt pressure from superiors to deliver useful information, she tended to engage in more anticompetitive conduct.

994.     CW-4 had a longstanding relationship with D.S., a sales executive at Taro. CW-4 first met D.S. when he was a buyer at a large grocery chain. The two developed a friendly relationship, in addition to a professional one.

995.     In 2009, shortly after D.S. joined Taro, he and CW-4 met in person at an industry event and had a high-level discussion about Taro's and Sandoz's philosophies with respect to market share and pricing. The two competitors agreed that both of their employers believed in price increases and maintaining higher pricing. D.S. explained that companies that compete on price to get more market share were bad for the market because they brought prices down. CW-4 agreed and the two discussed the importance of maintaining a fair share balance, not being greedy about market share, and following price increases on overlapping products.

996.     After this conversation, CW-4 and D.S. were confident that they had a consistent understanding, and that neither Sandoz nor Taro would compete aggressively against the other. This

conversation paved the way for them to work cooperatively in orchestrating Sandoz's and Taro's movements on several drugs in the coming years.

997.    In addition to communicating frequently in-person, CW-4 and D.S. also spoke often by phone. Between January 2011 (which is as far back as the Plaintiff States have phone records) and October 2013 (when D.S. left Taro), the two exchanged at least seventy-three (73) phone calls.

998.    During this early time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors including Kellum of Sandoz and Blashinsky of Taro

### b.    **Long-Standing Competitor Relationships Lead to Collusion.**

999.    The following Sections will discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding the Subject Drugs and other drugs between 2009 and early 2012.

#### i.    *Clotrimazole Betamethasone Dipropionate Cream and Lotion*

1000.    Clotrimazole Betamethasone Dipropionate ("CBD") comes in both a cream ("CBD Cream") and a lotion ("CBD Lotion"). In 2013, annual sales of CBD Cream and Lotion in the United States exceeded $150 million.

(a)    March And April 2011 - Actavis Raises Prices And Fougera And Taro Follow

1001.    In early 2011, the competitors in the generic market for CBD Cream were Fougera, Taro, and Actavis and the competitors in the generic market for CBD Lotion were Fougera and Taro.

1002.    On March 9, 2011, J.R., a senior Actavis pricing executive, circulated internally a proposed price increase plan for four products, including CBD Cream, to take effect on March 28, 2011. Actavis planned to raise WAC prices for CBD Cream by 227% and to increase contract prices to customers by as much as 1100%. Notably, Actavis had not yet conveyed the proposed increases to its customers. In fact, in that March 9, 2011 e-mail, J.R. specifically told his colleagues ███████

██████████████████

REDACTED – PUBLIC VERSION

1003.   Even though Actavis had not yet told its customers of these substantial price increases, its competitors, Fougera and Taro, were already aware. On March 9, 2011—the same day that J.R. circulated the price increase proposal internally at Actavis—D.H., a Fougera sales executive, sent a National Accounts Monthly Recap report for February 2011 to Kaczmarek. In that recap, D.H. reported that for CBD ███████████████████████████ Further, D.H. reported: ███████ ████████████████████ The reference to ███████████ is a reference to all of Taro's betamethasone products, including CBD Cream and CBD Lotion. Taro had not yet raised its prices on those products.

1004.   Fougera was already aware of its competitors' price increases for CBD products because, in the preceding month, representatives of Actavis, Fougera, and Taro were in contact with one another to ensure that each competitor would follow the other's price increases.

1005.   For example, from February 1, 2011 to March 9, 2011, Perfetto, then a senior Actavis sales and marketing executive, spoke with Blashinsky, then a senior Taro marketing executive, eight (8) times for a total of approximately fifty-two (52) minutes. During that same time, H.M., a Taro sales executive, spoke with CW-6 of Fougera three (3) times for a total of approximately fifteen (15) minutes.

1006.   On March 25, 2011, Actavis informed its customers of the price increases for CBD Cream. By chance, just days before the announcement, Actavis learned that its API costs for CBD Cream would increase. Actavis immediately recognized that it could use this news to mislead its customers and provide cover for its illegal price-fixing conspiracy.

1007.   Before the announcements went out, Perfetto e-mailed the Actavis sales executives, telling them to ███████████ and to stick to the story that the price increase is ███████████ ███████████████████████ One sales executive even went so far as to tell Econdisc that the increase was necessary because Actavis's ███████████████ In reality, Actavis

**REDACTED – PUBLIC VERSION**

knew the API ███████████████████████████████████████████ and were ██████

██████ for the pricing of prescription medications such as CBD Cream.

1008.   In furtherance of their conspiracy to raise prices, Actavis, Taro, and Fougera remained

in contact during the days leading up to Actavis's formal price increase announcement on March 25,

2011, including calls between the following individuals:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:03:40 | 0:01:44 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:50:22 | 0:00:00 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:51:24 | 0:00:34 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:27:28 | 0:02:38 |
| 3/22/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 15:26:45 | 0:02:00 |
| 3/23/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:31:15 | 0:00:24 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 12:44:00 | 0:09:00 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 13:07:00 | 0:15:00 |
| 3/24/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:49:00 | 0:15:00 |

1009.   On March 30, 2011—just three business days after Actavis sent out its price increase

notices for CBD Cream—Fougera sent out notices to its customers stating that it was raising prices

for CBD Cream. Those increases, which took effect April 1, 2011, increased Fougera's WAC prices

for CBD Cream by 54% and increased contract prices across the board, in some cases by over 1200%.

The day after Fougera announced those price increases, CW-6 of Fougera and H.M. of Taro spoke

three separate times for a total of eighteen (18) minutes.

1010.   Within days, on April 4, 2011, Taro implemented its own substantial price increases

across the board for both CBD Cream and CBD Lotion. For some customers, Taro raised prices for

CBD Cream by approximately 1350% and raised prices for CBD Lotion by approximately 960%. The

next day, H.M. called CW-6 and they spoke for eighteen (18) minutes.

1011.   On April 14, 2011, Fougera followed Taro with a price increase on CBD Lotion raising

its WAC by 71% and increasing its contract prices across the board, in some cases by over 900%. At

the time, Fougera's gross profit margin on CBD Lotion was already 67%, yet, with this price increase,

their gross profit percentage would soar to 96%. Fougera estimated that these increases accounted for an extra $1.8 million in profit for the rest of 2011 alone.

1012.   In furtherance of the conspiracy, Fougera refrained multiple times from taking customers that approached it for bids. For example, after Taro's increase, Wal-Mart, a Taro customer for CBD Cream and Lotion, asked Fougera to bid for that business. Kaczmarek cautioned ████ ████████████████████████████████████ In an effort to conceal the reason for not bidding, Kaczmarek instructed his colleagues that the ████████████████████████████████████ ██████████████████ Likewise, when Rite-Aid approached Fougera, Fougera did not even consider making a competitive offer. Instead, a Fougera employee asked internally: "Do we bid high or tell them we can't supply?" Kaczmarek determined that Fougera should opt for the latter.

1013.   Shortly after pulling off one massive coordinated price increase, Taro wasted no time planning the next. In an e-mail to Kaczmarek on May 6, 2011, D.K., a senior Fougera executive, detailed how Taro had already approached Fougera about raising CBD prices again:



(b)     *Taro Increases Prices On CBD Cream In April 2012 While Actavis And Fougera Play Nice In The Sandbox*

1014.   By March 5, 2012, Taro reignited its desire to raise prices on CBD Cream. Over the next several weeks, representatives of Taro spoke several times with their contacts at Actavis and Fougera. During these calls, Taro conveyed to its competitors its intentions to increase prices and secured their commitments not to poach Taro's customers.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/7/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:29:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |
| 3/9/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 7:37:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 9:42:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 9:49:00 | 0:02:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 15:34:00 | 0:01:00 |
| 3/16/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 4:51:00 | 0:10:00 |
| 3/17/2012 | Voice | D.S. (Taro) | Outgoing | K.K. (Fougera) | 11:08:00 | 0:02:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:11:00 | 0:05:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:29:00 | 0:01:00 |
| 3/22/2012 | Voice | CW-3 (Fougera) | Outgoing | Aprahamian, Ara (Actavis) | 7:32:00 | 0:13:00 |
| 3/29/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 8:49:00 | 0:05:00 |
| 3/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 10:58:00 | 0:05:00 |

1015.   The day after the final calls detailed above, on March 30, 2012, Taro increased its WAC prices for CBD Cream by approximately 7% and its contract prices by 15% for most of its existing customers.

1016.   In May 2012, McKesson twice asked Taro to reduce its price based on comparable sales by competitors. Both times Taro declined, comfortable that its competitors would not poach its business. Taro's confidence was well placed.

1017.   On May 23, 2012, McKesson contacted L.P., an Actavis sales executive, asking if Actavis's recent RFP bid still stood because ███████████████████████████████████ ████████████   At 5:02 p.m., L.P. forwarded McKesson's request to Perfetto and Aprahamian, then a senior pricing executive at Actavis. Perfetto said he was ███████████████████████

████ and that Actavis █████████████ Aprahamian replied, ████████████████

██████████ The following day, Perfetto exchanged three calls with Blashinsky of Taro, including one call lasting fourteen (14) minutes. Following his calls with Blashinsky, Perfetto instructed Aprahamian to call him. Aprahamian called Perfetto the next morning on May 25, 2012. After that call, an Actavis employee suggested that Actavis should stick by their RFP price and take the business because it was ██████████████████████████████████ Aprahamian, however, responded simply and directly: "[n]o bid"

> (c) *Fougera And Taro Raise CBD Lotion Prices In Late 2012/Early 2013*

1018.    In the fall of 2012, a fourth competitor (Prasco) was entering the CBD Cream market. However, Taro and Sandoz (which acquired Fougera in July 2012) were still the only competitors in the CBD Lotion market. Facing new competition on CBD Cream, Sandoz and Taro sought to maximize profits by raising the price of CBD Lotion.

1019.    Starting in late August 2012, Sandoz began planning a 100% price increase on CBD Lotion to take place in October, which—assuming ████████████████████████ would bring in an estimated additional $3.9 million to Sandoz annually. In the weeks leading up to its planned increase, Sandoz made repeated overtures to Taro to secure that ████████ behavior, including the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/20/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:13:00 | 0:17:00 |
| 9/21/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 8:18:00 | 0:03:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 9:54:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:11:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:04:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:27:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:53:00 | 0:01:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:25:00 | 0:02:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:49:00 | 0:21:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:11:00 | 0:02:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:12:00 | 0:03:00 |
| 10/8/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 10:32:00 | 0:09:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:00:00 | 0:01:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/12/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:01:00 |

1020.   On October 18, 2012, Sandoz increased prices for CBD Lotion, doubling WAC price (from $61.90 to $123.80) as well as its contract prices. As expected, Taro did not attempt to poach Sandoz's customers. For example, when MMCAP e-mailed Taro on October 26, 2012 to request a bid from Taro for a dual award in light of Sandoz's increase, Taro did not even respond to the customer's request.

1021.   Taro also made plans to follow the Sandoz price increase. On January 4, 2013, J.J., a senior Taro sales executive, instructed Taro sales executives, including H.M. and D.S., to gather competitive intelligence on CBD Lotion in anticipation of Taro's planned price increase. That same day, H.M. spoke with CW-3 of Sandoz for five (5) minutes. The pair spoke again on January 7, 2013 for thirteen (13) more minutes. Three days later, on January 10, 2013, D.S. spoke with CW-4 of Sandoz for twenty-three (23) minutes.

1022.   On February 12, 2013, Taro instituted its price increase on CBD Lotion, raising WAC by approximately 80% and contract prices by approximately 60%.

1023.   After Taro's increase was issued, news of it spread throughout Sandoz. One Sandoz employee remarked ████████████████████████ Just as Taro did not poach Sandoz's customers when Sandoz raised CBD Lotion prices, Sandoz was careful not to poach Taro's customers. In fact, CW-1, a Sandoz senior pricing executive, specifically instructed Sandoz employees to ████ ████████████████ for CBD Lotion bids, because ██████████████████████

### ii.     Erythromycin Base/Ethyl Alcohol Solution

1024.   In the summer of 2011, Fougera and Wockhardt were the only two competitors in the market for Erythromycin Base/Ethyl Alcohol solution ("Erythromycin Solution"). However, both manufacturers would experience intermittent supply issues that would require their exit from the market for periods of time. Because of these supply problems, extensive coordination was necessary between competitors to maintain a stable market.

1025.   Between May 17 and May 19, 2011, Perrigo discussed internally whether to re-enter the Erythromycin Solution market. The next day, May 20, 2011, T.P. of Perrigo called CW-6 of Fougera and they spoke for seven (7) minutes. Immediately after that call, T.P. called his supervisor, Wesolowski, and they spoke for three (3) minutes. The following Monday, on May 23, 2011, Wesolowski gave the green light to move forward with Perrigo's plans to re-launch the product within six months.

1026.   On August 5, 2011, CW-3 of Fougera e-mailed his supervisor, Kaczmarek, stating,

████████████████████████████████████████████████████

████████████████████████████████████

1027.   Thereafter, on August 9, 2011, CW-6 of Fougera called M.C., a Wockhardt sales executive, three times, including one call lasting ten (10) minutes. Notably, these were the first phone calls ever between the two competitors according to available phone records. CW-6 and M.C. were

not friends and did not socialize together. If they did speak, it was to coordinate anticompetitive conduct relating to products on which Fougera and Wockhardt overlapped.

1028.   Over the next week, CW-6 exchanged several calls with M.C. of Wockhardt and T.P. of Perrigo, the prospective new entrant. Because T.P. and M.C. did not have an independent relationship, CW-6 acted as the go-between—relaying information between the two. After speaking with his competitors, CW-6 called his supervisor, Kaczmarek, to report back what he had learned. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |
| 8/15/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 7:31:00 | 0:02:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 7:39:00 | 0:06:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:50:00 | 0:01:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:11:37 | 0:11:55 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:53:00 | 0:09:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:58:18 | 0:10:00 |
| 8/17/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:48:00 | 0:05:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |

1029.   On August 19, 2011, after the final call listed above, Fougera held an internal meeting to discuss Erythromycin Solution and the intelligence that CW-6 had gained from phone calls with competitors.

1030.   On November 15, 2011, Wesolowski of Perrigo sent an internal e-mail to the Perrigo sales team, including to T.P., stating that Perrigo planned to launch Erythromycin Solution the following month in December 2011. Wesolowski stated, ███████████████████████████ ████████████████████ Beginning that day, and over the next few days, T.P. exchanged several calls with CW-6 of Fougera. At the same time, CW-6 was speaking with M.C. of Wockhardt. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:57:00 | 0:07:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 11:23:00 | 0:06:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:29:00 | 0:02:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:37:00 | 0:01:00 |
| 11/17/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 11:38:00 | 0:01:00 |

1031.   The next day, on November 18, 2011, K.K., another Wockhardt sales executive, called CW-3 of Fougera. The call lasted two (2) minutes. Later, CW-3 sent the following e-mail to his supervisor, Kaczmarek:



1032.   It was CW-3's customary practice to state that he learned information from a customer when he actually learned it from a competitor because he wanted to keep that information out of writing. In response to CW-3's e-mail, Kaczmarek stated simply: ▮▮▮▮▮▮▮▮▮

1033.   On November 30, 2011, M.C. of Wockhardt called CW-6 and they spoke for four (4) minutes. Later that same day, CW-6 sent the following e-mail to Kaczmarek regarding Erythromycin Solution:



1034.    Kaczmarek forwarded the e-mail along internally to A.R., a Fougera operations manager. A.R. reminded Kaczmarek that Fougera was also having supply issues and had temporarily exited the market.

1035.    A few weeks later, on December 19, 2011, Perrigo entered the Erythromycin Solution market and set WAC pricing that was significantly higher—about 200%--than the market WAC pricing at that time.

1036.    CW-6 of Fougera exchanged several calls with T.P. of Perrigo in the weeks leading up to, and surrounding, Perrigo's launch, including on the date of the launch itself. On these calls, the competitors discussed pricing and the allocation of market share to the new entrant, Perrigo. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 4:40:00 | 0:04:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:05:00 | 0:01:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:13:00 | 0:01:00 |
| 12/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:10:00 | 0:05:00 |
| 12/20/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:03:00 |
| 12/21/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |

1037.    Several months later, between April 24 and April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Fougera, Perrigo, and Wockhardt attended, including CW-6 and CW-3 of Fougera, Wesolowski of Perrigo, and M.C. of Wockhardt.

1038.    At that time, Fougera was readying to re-enter the Erythromycin Solution market. Shortly after the NACDS annual meeting, on April 30, 2012, Kaczmarek e-mailed his sales team stating, █████████████████████████████████████████████

CW-3 responded with the following e-mail:

REDACTED – PUBLIC VERSION



1039.   Fougera's re-launch caused a flurry of communications among the three competitors on May 1 and May 2, 2013. Following his consistent practice, CW-6 reported these conversations back to his boss, Kaczmarek. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 6:56:00 | 0:02:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Incoming | CW-3 (Fougera) | 10:04:00 | 0:03:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:07:00 | 0:02:00 |
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 13:12:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:20:00 | 0:04:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:24:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:25:00 | 0:01:00 |

1040.   The next day, on May 3, 2012, Fougera re-entered the market and matched Perrigo's increased WAC pricing. That morning, Kaczmarek sent the following e-mail to his sales team:



1041.   That same day, CW-3 of Sandoz spoke with K.K. of Wockhardt for five (5) minutes and called A.F., a sales executive at Perrigo. Further, CW-6 called his contact at Perrigo, T.P., and the

two competitors spoke for fifteen (15) minutes. Immediately after hanging up with T.P., CW-6 again called his supervisor, Kaczmarek, and they spoke for five (5) minutes.

1042.   The following Monday, on May 7, 2012, Wesolowski of Perrigo sent the following e-mail regarding Erythromycin Solution to other Perrigo executives:



1043.   On that same day, Kaczmarek circulated a proposed customer pricing grid for Erythromycin Solution to the Fougera sales team. Kaczmarek advised: ███████████████ ████████████████████████████ As he explained, blanketing the market with offers is ███████████████████████████

1044.   Over the next several days, CW-3 and CW-6 exchanged calls with their respective contacts at Perrigo, A.F. and T.P. As was his practice, after hanging up with T.P., CW-6 immediately reported back to Kaczmarek what he had learned. These calls are detailed in the chart below:

REDACTED – PUBLIC VERSION

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:06:00 | 0:01:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:08:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 7:10:41 | 0:01:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Incoming | CW-3 (Fougera) | 7:12:36 | 0:00:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 8:05:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 8:52:56 | 0:10:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 9:29:30 | 0:01:34 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:09:00 | 0:05:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 5:13:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 8:24:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:26:00 | 0:11:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:38:00 | 0:02:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:10:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 12:39:00 | 0:02:00 |
| 5/14/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 13:09:00 | 0:02:00 |

1045.   On May 14, 2012, the date of the last calls detailed above, Kaczmarek sent the following internal e-mail to his sales team, lying about the source of his information to avoid putting evidence of illegal conduct into writing:



1046.   Less than two months later, on June 7, 2012, Fougera recalled Erythromycin Solution and again placed the product on back order. By that time, Fougera had approached and secured approximately 12% market share on the product, including several customers on its target list such as Rite Aid, Cardinal, Optisource, and SUPERVALU.

1047. By August 2012, Fougera had resolved those supply issues. Around this same time, Sandoz had completed its acquisition of Fougera. As Fougera (now Sandoz) prepared to re-enter the Erythromycin Solution market, the company set an internal market share goal of 20% on the product.

1048. After the Fougera acquisition was completed, CW-6 left the company for another position. At some point before he left Fougera, CW-6 introduced CW-3—who would be remaining at Sandoz after the acquisition—to T.P. at Perrigo. This was the beginning of a collusive relationship that would last several years and will be discussed in detail in subsequent Sections of this Complaint.

1049. The first ever phone calls between CW-3 and T.P., according to the available phone records, were on August 8, 2012. They spoke two times that day. The competitors spoke again on August 21, 2012, as Sandoz was preparing to re-enter the market for Erythromycin Solution.

1050. On September 5, 2012, S.G., a Sandoz sales executive, e-mailed CW-3 and Kellum to advise them that Sandoz had an opportunity to bid on Erythromycin Solution at Walgreens. Kellum responded, ██████████████████████ On September 6, 2010, CV-3 called T.P. of Perrigo and they spoke for eleven (11) minutes.

1051. The next day, on September 7, 2012, CW-3 sent an internal e-mail including to CW-1, a Sandoz senior pricing executive, recommending that Sandoz target the same customers that Fougera had targeted when it re-launched Erythromycin Solution in May 2012. Not wanting to have a discussion in writing, CW-1 responded to CW-3 directly, stating, ████████████████

1052. On September 13, 2012, CW-3 called T.P. of Perrigo and they spoke for three (3) minutes. CW-3 hung up and called R.T., a senior sales and marketing executive at Sandoz. The call lasted one (1) minute. Later that day, CW-3 called K.K. of Wockhardt. The call lasted one (1) minute.

1053. The following Monday, on September 17, 2012, CW-1 instructed CW-3 to put together offers for Cardinal and Wal-Mart and advised that they would be the only customers Sandoz

would be bidding on at this time. That same day, K.K. of Wockhardt called CW-3 and they spoke for four (4) minutes.

1054.    Between September 20 and September 21, 2012, CW-3 and T.P. of Perrigo exchanged six (6) calls, including two calls lasting eight (8) minutes and seven (7) minutes, respectively. By October 2012, Perrigo had conceded the Erythromycin Solution business at Cardinal and Wal-Mart to Sandoz.

### c.    G&W And Its Relationships

1055.    Although G&W is not a large company and does not manufacture as many topical products as some of the larger generic manufacturers discussed above, G&W has actively conspired with its competitors in the topical space for many years. During this early time period, G&W had anticompetitive relationships with Fougera and Glenmark and used those relationships to allocate markets and fix prices on a number of products on which those companies overlapped. These relationships, as well as some illustrative examples of how these relationships manifested themselves regarding specific products, are discussed in detail below.

### i.    *G&W/Fougera*

1056.    Grauso, then a senior sales and marketing executive at G&W, had a relationship with CW-6 of Fougera. Although Grauso and CW-6 were social friends, they also had an ongoing understanding, on behalf of the companies they represented, not to poach each other's customers and to follow each other's price increases. The two competitors conspired with regard to several products on which G&W and Fougera overlapped, one example of which are discussed below.

1057.    Grauso was a prolific communicator who frequently engaged in anticompetitive conduct with his contacts at competitor companies. When CW-6 of Fougera needed to communicate with a competitor at which he did not have a contact, but Grauso did, Kaczmarek, CW-6's supervisor

at Fougera, would direct him to call Grauso and ask him to convey the message to that competitor on behalf of Fougera.

1058.   One example of this involved Grauso's relationship with Perfetto, then a senior sales and marketing executive at Actavis. Between January 1, 2010 and December 28, 2011, the two competitors exchanged at least eighty-nine (89) phone calls. Because CW-6 did not have a contact at Actavis, he used Grauso's relationship with Perfetto to collude on products that Fougera and Actavis overlapped on.

1059.   During this early time period, Grauso was acting at all times at the direction of, or with approval from, his superior Orlofski.

1060.   Grauso left G&W in December 2011 to take a position as a senior executive at Aurobindo. With Grauso's departure, CW-6 no longer had a contact at G&W and it became necessary for him to use Grauso to convey messages to Grauso's former colleagues, Orlofski and Vogel-Baylor. Orlofski was the President of G&W and Vogel-Baylor assumed Grauso's role as Vice President of Sales and Marketing after his departure.

1061.   This worked well for the first few months of 2012. However, soon Orlofski believed it prudent to cut out the middleman and communicate directly with CW-6. Berthold, the Vice President of Sales at Lupin, introduced Orlofski to CW-6 and they set up a dinner meeting at an industry conference, which was also attended by Vogel-Baylor.

1062.   At dinner, the competitors engaged in a high-level discussion to ensure that both companies continued to "play nice in the sandbox" and minimize competition with each other even though Grauso had left. No specific products were discussed at the meeting. The focus was to ensure that the competitors stayed the course and continued to coordinate customer allocation and price increases on products that G&W and Fougera overlapped on.

1063.    After the dinner, Vogel-Baylor began to communicate directly with CW-6. Between May 2012 and May 2013, when CW-6 left the industry, the two exchanged at least one hundred and thirty-three (133) phone calls and text messages. During this time period, Vogel-Baylor was acting at all times at the direction of, or with approval from, her superior Orlofski.

1064.    The following sections discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding particular products between 2010 and early 2012.

(a)    *Calcipotriene Solution*

1065.    In early 2010, the market for Calcipotriene was shared by Fougera, Hi-Tech Pharmacal Co. Inc. ("Hi-Tech"), and Impax Pharmaceuticals, Inc. ("Impax"). Even with three competitors in the market, pricing remained high and the product was "hugely profitable" for the sellers.

1066.    On July 23, 2010, however, Hi-Tech received a warning letter from the FDA detailing numerous violations found during a recent manufacturing facility inspection. Even though G&W was not in the Calcipotriene market at the time, Grauso knew his contact at Fougera would be interested in the information. On July 28, 2010, he forwarded a copy of the FDA letter to CW-6 at Fougera. Pleased with the news, CW-6 replied: ████████████████

1067.    By the end of July 2010, Hi-Tech had discontinued the product, leaving its approximate 35% market share open for competitors to claim.

1068.    One year later, on June 6 and 7, 2011, CW-6 and Grauso exchanged several phone calls, with one call lasting eight (8) minutes. During those calls, Grauso informed CW-6 that G&W would soon be launching its own Calcipotriene. Shortly after speaking with Grauso, CW-6 e-mailed Kaczmarek and other colleagues at Fougera sharing the news that he had just learned from his competitor—G&W was launching that week.

REDACTED – PUBLIC VERSION

1069.    G&W did, indeed, launch Calcipotriene that week, on June 10, 2011. As G&W was entering the market, CW-6 and Grauso continued to speak, including exchanging two calls on June 23, 2011 and one call on June 24, 2011 lasting sixteen (16) minutes.

1070.    A few months later, between November 10 and November 17, 2011, CW-6 and Grauso exchanged at least seven separate phone calls. The topic of conversation during these calls was a G&W price increase that was about to become effective for Calcipotriene.

1071.    At the end of this series of phone communications between Grauso and CW-6, G&W instituted a 54% price increase on Calcipotriene, effective November 18, 2011. Grauso sent an internal e-mail advising the team to ████████████████████████████████████████████████ ████████████████████████████████████████

1072.    Shortly after the G&W price increase became effective, on November 21, 2011, CW-6 of Fougera called his supervisor, Kaczmarek. Immediately upon hanging up, CW-6 called Grauso and they spoke for five (5) minutes. Within minutes after that call ended, CW-6 called Kaczmarek again to report the results of his call with the competitor. Almost simultaneously, Grauso was also reporting the substance of his conversation with CW-6 to his G&W colleagues, by placing calls to Orlofski and Vogel-Baylor.

1073.    Fougera acted quickly. Just two days later, it followed G&W's price increase. Fougera's new WAC price on Calcipotriene went into effect on November 23, 2011.

### ii.    G&W/Glenmark

1074.    In addition to colluding with CW-6 at Fougera, Vogel-Baylor at G&W also had a collusive relationship during these early days with CW-5, a senior executive at Glenmark. Although G&W and Glenmark did not overlap on a large number of products, Vogel-Baylor and CW-5 capitalized on their relationship to collude and enter into anticompetitive agreements on those products that they did have in common.

REDACTED – PUBLIC VERSION

1075.    Vogel-Baylor and CW-5 first met at a Rite Aid event in Las Vegas, Nevada in March 2012. In the months that followed, the two stayed in constant communication through e-mails, text messages, and phone calls, while also meeting in person at various trade shows and customer conferences. Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls in April 2012 alone. Between April 2012 and the end of that year, Vogel-Baylor and CW-5 exchanged at least 2,037 phone calls and text messages.

1076.    A later Section of this Complaint will address additional collusion between the two competitors in March 2013 regarding various formulations of Mometasone Furoate.

### d.    **Additional Collusive Relationships**

1077.    The key relationships discussed above are examples and are not meant to be an exhaustive list of all the collusive relationships that the Defendants had with each other during this time period. Indeed, even if a company was not a prominent manufacturer of topical products, if there were product overlaps and a relationship, there was an opportunity to collude.

1078.    The relationship between CW-6 of Fougera and E.B., a senior sales executive at Hi-Tech, is a good example. During his tenure at Fougera, CW-6 had only eight (8) calls with E.B., according to available phone records. However, Fougera overlapped with Hi-Tech on the product—Lidocaine Ointment—and CW-6 used his connection with E.B. to significantly raise price on that product prior to Hi-Tech's entry in early 2012.

### 2.    **Focus On Price Increases Intensifies – Collusion From Late 2012 - 2016**

### a.    **Shifts In The Market Foster Collusion**

1079.    In late 2012 and early 2013, there were several changes in and among various manufacturers of topical products—at both the corporate and personnel levels—that facilitated and fostered a heightened focus on collusion among many of these competitors.

1080.   For example, in July 2012 Sandoz finalized its purchase of Fougera, a specialty dermatology company, making Sandoz a much more prominent manufacturer of topical products. Sandoz publicly touted that the purchase positioned it "as the new #1 in generic dermatology medicines both globally and in the U.S."

1081.   As a result of the acquisition, most Fougera executives, including Kaczmarek and CW-6, eventually lost their jobs. Out of the five Fougera sales executives in place prior to the acquisition, CW-3 was the only one to retain a long-term position with Sandoz.

1082.   Because of Sandoz's size and the fact that it manufactured and sold a large number of generic drugs, many competitors reached out to CW-3 when they learned he had transitioned to Sandoz because they viewed this as a strategic opportunity to collude on more overlapping products. In turn, and as discussed in further detail below, CW-3 would use these contacts to his own advantage by engaging in anticompetitive conduct in order to prove his worth to Sandoz management.

1083.   Further, in the months following the Fougera acquisition, three key Actavis executives—Boothe, Perfetto, and Aprahamian—left Actavis to assume senior-level positions with competitors.  In December 2012, Boothe became the Executive Vice President and General Manager of Perrigo. One month later, in January 2013, Perfetto became the Chief Commercial Officer of Taro. And, in March 2013, Aprahamian followed his colleague Perfetto to Taro and assumed the role of Vice President of Sales and Marketing.

1084.   As discussed below, these former colleagues—now competitors—would use their longstanding relationships and new high-level corporate positions to collude with their key competitors on many overlapping products.

1085.   During this time, multiple waves of price increases were initiated and followed by various competitors. As part of the overarching fair share conspiracy, Teva led an effort with

Actavis, Amneal, Dr. Reddy's, Heritage, Lannett, Mylan, Par, Sandoz, and Taro to anticompetitively increase prices on numerous drugs, as well as allocate market shares amongst the manufacturers.

1086.   On January 28, 2015, Teva raised prices on a number of different drugs, including the drugs Carbidopa/Levodopa, Danazol, and Methyldopa, detailed in a spreadsheet found in a Teva Excel file. Nisha Patel or David Rekenthaler arranged these price increases on calls with Defendants Actavis, Amneal, Dr. Reddy's, Heritage, Lannett, Mylan, Par, Sandoz, and Taro.  A May 29, 2015 version of the spreadsheet contained additional notes on the coordinated price increases led by Teva: for example, on Danazol capsules (90% increase), someone had noted "Lannett followed February 2015".

1087.   Following the same pattern, Patel also spoke to CW-5 of Glenmark to coordinate on a list of price incases implemented on May 16, 2013.  Effective that day, Glenmark increased price on several drugs where there was an overlap with Teva, including Ondansetron.  Patel also spoke to her contacts at Glenmark multiple times on May 17. After the implementation of the Glenmark price increases, and before Teva had the opportunity to follow those increases, Teva was approached by several customers looking for a lower price.  Teva refused to bid on most of these solicitations in order to maintain market stability.  When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business.  As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark increase drugs: "IF we bid, we need to bid high, or we will disturb the market."

> b.   **Post-Fougera Acquisition, Sandoz Sales Executives Feel Pressure To Demonstrate Their Value**

1088.   As a result of the Fougera acquisition, Sandoz had more dermatology products than anyone else. Although Teva and Mylan were comparable in size to Sandoz, they had fewer topical products. The other key players in the topical space, Perrigo and Taro, were smaller companies.

1089.   Sandoz moved at a much faster pace than Fougera and sold many more products. At the time, the company was also launching several high-value products and bringing even more new products to market. CW-3 was thrown into the position and spent a lot of time learning about new (to him) oral solid products. The mindset at Sandoz was not to celebrate work accomplishments, but to move quickly from one launch to the next. As a result, CW-3 experienced a significant amount of culture shock and felt stressed and overwhelmed with his new circumstances.

1090.   In addition to his regular job duties and responsibilities, CW-3 was also required to participate in an informal working group created by Sandoz management to evaluate the profitability of the Fougera product line. Shortly after the acquisition, it quickly became apparent that Fougera sales were lagging below Sandoz's initial financial projections. As the lone holdover from Fougera, CW-3 felt a great deal of pressure from Sandoz management to come up with a plan to make the Fougera product line more profitable. CW-3 was responsible for identifying areas to help Sandoz meet its numbers, including recommending where to increase prices or where to increase market share.

1091.   Other Sandoz sales executives were also feeling anxieties resulting from the Fougera acquisition. For example, CW-4, a longtime Sandoz senior sales executive, was required to re-interview for her position and felt an immense amount of pressure to perform. Although she ultimately retained her job, CW-4 continued to feel nervous about having to learn a whole new line of topical products and to prove her value to Sandoz management.

c.      <strong>Key Relationships Emerge And Existing Relationships Strengthen</strong>

1092.   The pressures that the Sandoz sales executives were experiencing translated into the emergence of new collusive relationships, and the strengthening of existing relationships, among many of the competitors for topical products. For example, just as his predecessor CW-6 had done, CW-3 would forge ongoing understandings over the next several years with his key competitors—Taro and Perrigo – with regard to overlapping products. Similarly, Perfetto would capitalize on his relationship

REDACTED – PUBLIC VERSION

with his former colleague Boothe to collude with respect to products on which Taro and Perrigo overlapped. Lastly, CW-4 would find solace in her existing relationship with D.S. of Taro who provided confirmation that the companies' understanding would continue unchanged despite the Fougera acquisition. Each of these relationships is explored in greater detail below.

### i.    Sandoz/Taro

#### (a)    CW-3's Relationships With Aprahamian And H.M. Of Taro

1093.    Around the time of the Fougera acquisition, CW-3 was approached by Aprahamian, then a senior pricing executive at Actavis. CW-3 and Aprahamian had known each other since 2006, when CW-3 worked at Cardinal and Aprahamian worked at ABC. The two men had lost touch over the years as they changed jobs, but they still saw each other throughout the years at trade shows and customer conferences.

1094.    Once CW-3 became a Sandoz employee, he and Aprahamian started communicating regularly again. Although they had exchanged only two (2) calls in 2011 according to available phone records, CW-3 and Aprahamian exchanged at least two hundred and thirty-five (235) phone calls between April 2012 and August 2016 (when CW-3 left Sandoz to take a sales position with a competitor). CW-3 and Aprahamian almost always communicated by phone and rarely met in person.

1095.    CW-3 and Aprahamian engaged in anticompetitive conduct with regard to several products that Sandoz and Actavis overlapped on while Aprahamian was still at Actavis. Once Aprahamian moved to Taro in March 2013, the extent of the product overlap between the two competitors increased significantly, and so did their collusion.

1096.    Aprahamian's move to Taro was a promotion. As Vice President of Sales and Marketing, Aprahamian had the power to set prices. Similarly, when Aprahamian told CW-3 that Taro would give up a customer, CW-3 was confident, given Aprahamian's senior role, that he could rely on that representation.

1097.   Over the years, Sandoz and Taro, primarily through CW-3 and Aprahamian, developed an ongoing understanding not to poach each other's customers and to follow each other's price increases. Every time that Taro increased prices on a product for which Sandoz was a competitor, Aprahamian informed CW-3 about the increases in advance and provided him with specific price points. CW-3 would write this information down and then pass the information along to his superiors, CW-1 and Kellum. The expectation was always that Sandoz would follow the increases—and Sandoz did.

1098.   When there were other competitors in the market beyond Taro and Sandoz, CW-3 understood that Aprahamian was also coordinating with those competitors as he was coordinating with him. Many examples of this are discussed below in subsequent sections of this Complaint.

1099.   Although Sandoz consistently followed Taro's price increases, the company could not always do so right away. This did not mean that there was not an agreement to follow. Because price increases could trigger price protection penalties from customers, Sandoz would sometimes push the increases to the next quarter to ensure it hit its financial targets. In the meantime, Kellum would order that Sandoz place the product on strict allocation—meaning that Sandoz would allocate product to a customer based on regular usage—so that there was not a run on Sandoz's inventory resulting from a competitor's increase.

1100.   Further, when Taro increased prices, Aprahamian typically warned CW-3 not to take Taro's customers. Aprahamian was very animated and would say things like: "Don't take my f***ing customers," "Don't take my business," or "Don't be stupid." CW-3 understood these warnings to mean that if a Taro customer asked for an offer in response to a Taro price increase, Sandoz should not compete for the business.

1101.   Aprahamian and CW-3 also coordinated on product launches. For a Taro launch into a Sandoz market, Aprahamian would share with CW-3 the customers Taro was targeting. CW-3 would

REDACTED – PUBLIC VERSION

then pass that information along to CW-1 and Kellum, and then subsequently report their responses back to Aprahamian.

1102.    For a Sandoz launch into a Taro market, which was more often the case because Taro was a smaller company and did not launch as many new products, Aprahamian would give CW-3 specific contract price points for customers that Taro agreed to relinquish. Aprahamian provided these price points so that Sandoz did not launch at too low a price. Typically, when Aprahamian told CW-3 that Taro would give up a customer, it did.

1103.    CW-3 also colluded with H.M. of Taro. Shortly after the Fougera acquisition, CW-6—who would not be staying at Sandoz—provided CW-3 with H.M.'s contact information. Although CW-3 and H.M. had met each other at a supplier meeting several years earlier, they did not actively start conspiring with one another until after CW-3 moved to Sandoz. According to available phone records, the two men spoke for the first time by phone in September 2012 and then exchanged at least fifty-one (51) phone calls and text messages through March 2014, when H.M. left Taro. CW-3 and H.M. were not social friends. If they were communicating by phone, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Taro overlapped.

1104.    While at Taro, H.M. shared price points with CW-3 and Sandoz used that information to inform Sandoz's product launches and to obtain market share without significantly eroding prices. CW-3 considered H.M.'s information to be reliable. However, once Aprahamian moved to Taro, he told CW-3 not to bother calling H.M anymore and to simply call him directly because he was responsible for pricing.

1105.    During this time period, CW-3 and H.M. were acting at all times at the direction of, or with approval from, their superiors, including CW-1 and Kellum of Sandoz and Aprahamian and Perfetto of Taro. In turn, Aprahamian was acting at the direction of, or with approval from, his superior, Perfetto.

(b)      *CW-4's Relationship With D.S. Of Taro*

1106.    As detailed above, CW-4 of Sandoz and D.S. of Taro had an ongoing understanding going back to at least 2009 that Taro and Sandoz would behave responsibly in the market and not compete on overlapping products. However, CW-4 was unsure what impact the Fougera acquisition might have on that understanding and felt uneasy about having to learn a whole new product line.

1107.    CW-4 reached out to D.S. to calm her nerves and the two competitors had several conversations—both in person and over the phone—during which they discussed which manufacturers of topical products were responsible and which were not. D.S. reiterated what he had conveyed to CW-4 previously – that ███████████████████ CW-4 understood this to mean that Taro wanted to maintain a fair market-share balance and keep prices high. Both CW-4 and D.S. concurred (again) that this was the smart way of doing business.

1108.    After these conversations, CW-4 felt more secure and less anxious about her new circumstances. CW-4 understood that she and D.S. would continue to be resources for each other and collude on overlapping products as they had in the past.

1109.    During this time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors, including Kellum of Sandoz and Perfetto and Aprahamian of Taro.

1110.    Soon after the Fougera acquisition, CW-4 learned from Sandoz management that the company was looking to increase market share and take price increases on certain drugs in the Fougera product line to improve the profitability of the Fougera portfolio. At this time, there were several products where Fougera had less than its fair share.

1111.    Shortly thereafter, CW-4 conveyed this information to D.S. at Taro. CW-4 wanted to make sure that if Sandoz tried to take a Taro customer, D.S. would not be alarmed and would understand that it was only because Sandoz was looking for its "fair share" on that product. Similarly,

REDACTED – PUBLIC VERSION

CW-4 wanted to signal to D.S. and Taro that if Sandoz took a price increase, Taro should follow, or vice versa. D.S. listened to what CW-4 said and did not disagree.

(c)      *CW-3's Relationship With T.P. Of Perrigo*

1112.   Just as CW-6 had provided H.M.'s contact information to CW-3 shortly after the Fougera acquisition, he also introduced CW-3 to T.P. of Perrigo. The two competitors spoke for the first time by phone in August 2012 and then exchanged at least eighty-one (81) phone calls through the end of 2014.

1113.   CW-3 and T.P. were not social friends. If they were communicating, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Perrigo overlapped. CW-3 and T.P. generally spoke only by phone. They did not exchange e-mails or text messages because T.P. did not want to create a written record of their communications. T.P. also did not like receiving voicemails. On one occasion, CW-3 left a voicemail for T.P. on his office phone. T.P. thereafter called CW-3 to admonish him, demanding that CW-3 not call his office phone but instead only call him on his personal cell phone.

1114.   CW-3 continued the ongoing understanding that his predecessor, CW-6, had in place with T.P.—that the competitors would not poach each other's customers and would follow each other's price increases.

1115.   Conversations between CW-3 of Sandoz and T.P. of Perrigo about price increases were intended to encourage the other side to follow. Sandoz was typically a price-increase follower. Neither company wanted to disrupt the market or do anything to lower prices. CW-3 and T.P. provided each other with information about price increases with the understanding that the other company would not use the price increase as an opportunity to compete for market share and take the other's customers.

1116.    Similarly, when Sandoz was launching into a Perrigo market, T.P. would provide CW-3 with a list of customers to target. T.P. also had access to Perrigo's pricing file. The file was searchable by customer and included non-public information such as contract pricing, dead nets, and cost of goods sold. T.P. provided pricing information to CW-3 when he requested it. However, on occasion, T.P. had to first check with his boss, Wesolowski, before he did so.

1117.    When T.P. provided CW-3 with information, he typically cautioned that CW-3 should be "smart" with the information; meaning that Sandoz should not use the information against Perrigo. CW-3 could generally rely on the pricing and customer alignment information that T.P. provided to him.

1118.    During this time period, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Boothe and Wesolowski.

(d)    *Perfetto's Relationship With Boothe Of Perrigo*

1119.    Prior to Sandoz's acquisition of Fougera, H.M. of Taro and T.P. of Perrigo used CW-6 as a conduit to collude on overlapping products because the two competitors did not have an independent relationship. That changed when former Actavis executives, Perfetto and Boothe, moved to Taro and Perrigo, respectively.   As a result of these moves, the two competitors could now communicate directly to coordinate their anticompetitive conduct with regard to products on which Taro and Perrigo overlapped.

1120.    Between January 2013 and January 2016 (when Boothe left Perrigo), the competitors exchanged at least one hundred and nineteen (119) phone calls. During this time period, the two former colleagues colluded on numerous overlapping products. Some examples of these products are discussed in detail below.

REDACTED – PUBLIC VERSION

(e)     *Sandoz Management Knew Of, And Encouraged, The Collusion With Competitors*

1121.   Early on after the Fougera acquisition, CW-3 had a conversation with Kellum informing him that he could provide competitive intelligence on the Fougera product line. Shortly thereafter, CW-3 began providing Kellum and CW-1 with competitive intelligence he obtained from competitors regarding price increases, product launches, and customer allocation. Kellum and CW-1, Sandoz senior pricing executives, both knew that CW-3 obtained this information directly from competitors because he told them he did.

1122.   CW-3 conveyed competitive intelligence to Kellum and CW-1 through e-mails and phone calls. When communicating by e-mail, CW-3 would disguise the true source of his information by stating that he had received it from a customer. When CW-3 had truly learned the information from a customer, it was always from a customer that he worked with, and he referred to that customer by name in his e-mail. CW-1 and Kellum understood that when CW-3 referred to hearing from a "customer" without identifying that customer—or if CW-3 provided information relating to customers that he did not have responsibility for—it meant that CW-3 had gotten that information from a competitor.

1123.   As detailed above, CW-3's strongest relationships were with Aprahamian of Taro and T.P. of Perrigo, although he engaged in anticompetitive conduct with many others. These other relationships are explored in greater detail in subsequent sections of this Complaint. Wherever possible, CW-3 leveraged his relationships with competitors to demonstrate his value to Sandoz management.

1124.   For example, due to the strength of CW-3's relationship with Aprahamian, Sandoz management created what it referred to as a ███████████ in July 2013 to collude on products where Taro was a competitor. The ███████████ had a two-pronged approach: (1) implement concerted price increases on products where Sandoz and Taro were the only competitors in the market; and

(2) exit the market for certain other products to allow Taro to raise prices and then Sandoz could re-enter the market later at the higher price.

1125.   Although Kellum and CW-1 knew what they were doing was illegal, they continued to encourage and approve of the collusion with competitors. They did, however, seek to avoid documenting their illegal behavior. Kellum routinely admonished Sandoz employees for putting information that was too blatant into e-mails. At one point, Kellum told CW-1 ███████████████ █████████████████████████████████████████████████ Similarly, as time went on, CW-3 became increasingly anxious about his behavior and said to CW-1 ████████████████████████████████ CW-1 agreed with him.

### 3.   Taro Emerges As A Leader Among Generic Topical Manufacturers

#### a.   Increased Focus On Fair Share And Price Increases

1126.   As detailed above, in early 2013 Perfetto and Aprahamian left their positions at Actavis to take executive-level positions at Taro. The two men wasted no time working together to implement changes at Taro designed to improve the company's bottom line.

1127.   First, Perfetto and Aprahamian focused their efforts on ensuring that Taro had its fair share of the market on the products it manufactured. To that end, the executives took steps to formalize internal processes for seeking and tracking competitive intelligence obtained by sales executives at the field level. This included compiling intelligence from not only customers, but from competitors as well.

1128.   For example, in January 2013, at Perfetto's request, J.J., a senior Taro sales executive, e-mailed the sales team asking them to obtain competitive intelligence relating to a list of priority products where █████████████████████████ Taro then used that information to inform which products to bid on, at which customers, and at what price points to meet its fair share targets without eroding the market price.

1129.   Second, Perfetto and Aprahamian positioned Taro as a price-increase leader and implemented significant price increases on a substantial portion of Taro's product portfolio in 2013 and 2014. Although Taro had had success implementing price increases in the past, the increases in these years would be much larger than they had been in past years.

1130.   For example, in February 2013, Taro took increases on several products, including Nystatin Triamcinolone—its highest grossing product. When an executive at Dr. Reddy's, a generic manufacturer not named as a Defendant in this Complaint, learned of the news, he sent an e-mail stating: ███████████████████████████████████████████████████████████ ███████████████████████████████ To that, a senior sales and marketing executive at Dr. Reddy's responded, ███████████████████████████████████████ ███████████████████████████████████████

1131.   Similarly, in June 2014, Taro took simultaneous, significant price increases on more than a dozen different products. The chart below, which was included in a Credit Suisse investor report, details some of the products that Taro increased prices on in the summer of 2014, the percentage of Taro's sales implicated, and the size of the increases.



1132.   As a result of these June 2014 increases, Credit Suisse increased its target pricing for Taro and its parent company Sun Pharmaceuticals from $85 to $150 per share. As justification for the

REDACTED – PUBLIC VERSION

increase, Credit Suisse emphasized that there had been zero rollbacks of Taro price increases in recent years:



1133.   These price increases, and others taken by Taro in 2013 and 2014, resulted in the accrual of significant profits to Taro. Between 2008 and 2016, Taro's profits increased by an astounding 1300%. As the graph below demonstrates, Taro's financial growth experienced a sharp uptick in 2013, when Perfetto and Aprahamian began at Taro and positioned the company as a price-increase leader.



1134.   Taro's success in implementing these increases—and in obtaining its fair share on the products it manufactured—depended, in large part, on the strength of the ongoing collusive relationships that Perfetto and Aprahamian had with their contacts at competitor companies. Some of these relationships have been detailed above, but there were many more.

1135.   For example, between March 2013 and October 2018, Aprahamian exchanged at least six hundred and eighteen (618) phone calls and text messages with his contacts at Sandoz, Glenmark, Actavis, Mylan, G&W, Wockhardt, Lannett, Amneal, non-defendant Hi-Tech, and Perrigo. These communications are detailed in the table below:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| CW-3 (Sandoz) | 190 | 3/19/2013 | 8/18/2016 |
| Grauso, Jim (Glenmark) | 106 | 7/1/2014 | 10/16/2018 |
| M.D. (Actavis) | 50 | 3/19/2013 | 9/2/2016 |
| M.A. (Mylan) | 50 | 4/4/2013 | 2/9/2016 |
| Orlofski, Kurt (G&W) | 45 | 7/24/2013 | 6/10/2016 |
| M.C. (Wockhardt) | 27 | 5/7/2013 | 8/20/2017 |
| A.B. (Lannett) | 23 | 11/15/2013 | 12/14/2017 |
| Falkin, Marc (Actavis) | 21 | 4/17/2014 | 3/8/2016 |
| A.B. (Actavis) | 16 | 8/16/2013 | 4/19/2016 |
| M.B. (Actavis) | 13 | 5/13/2013 | 8/22/2015 |
| S.R. (Amneal) | 12 | 6/6/2014 | 4/29/2016 |
| M.B. (Glenmark) | 11 | 5/7/2013 | 3/26/2014 |
| E.B. (Hi-Tech) | 10 | 6/6/2014 | 7/11/2014 |
| Lannett Pharmaceuticals | 8 | 6/6/2014 | 4/29/2016 |
| Vogel-Baylor, Erika (G&W) | 6 | 3/27/2014 | 9/24/2015 |
| Boothe, Doug (Perrigo) | 6 | 11/15/2016 | 8/23/2017 |
| A.G. (Actavis) | 4 | 4/23/2013 | 4/30/2013 |
| Rogerson, Rick (Actavis) | 4 | 6/17/2013 | 4/16/2014 |
| G&W Labs | 4 | 1/8/2014 | 3/6/2017 |
| R.H. (Greenstone) | 3 | 8/14/2014 | 8/20/2014 |
| T.D. (Actavis) | 3 | 4/12/2013 | 7/10/2013 |
| Grauso, Jim (Aurobindo) | 2 | 1/9/2014 | 1/10/2014 |
| Wesolowski, John (Perrigo) | 2 | 5/9/2014 | 5/9/2014 |
| A.S. (Actavis) | 1 | 1/9/2014 | 1/9/2014 |
| Glenmark Pharmaceuticals | 1 | 10/17/2018 | 10/17/2018 |

1136.   Similarly, between January 2013 and February 2018, Perfetto exchanged at least six hundred and ninety (690) phone calls and text messages with his contacts at G&W, Perrigo, Actavis, Glenmark, Aurobindo, Wockhardt, non-defendant Greenstone, Amneal, and Lannett. These communications are detailed in the table below:

1137.   Aprahamian and Perfetto capitalized on the foregoing relationships to set Taro apart as a leader in the topical space. Some examples of how these relationships manifested themselves regarding specific products are described in detail below.

REDACTED – PUBLIC VERSION

i.  *Setting the Stage For Future Collusion—Aprahamian And CW-3 Collude On Products Where Sandoz And Actavis Competed*

1138.   The collusive relationship between Aprahamian and CW-3 dated back to Aprahamian's days at Actavis. Two of the first examples of collusion between the two competitors involved market allocation agreements on Ciclopirox Shampoo and Betamethasone Valerate Ointment—both products where Sandoz was entering the market and Actavis, acting through Aprahamian, agreed to cede share to the new entrant. A third product—Desonide Lotion—involved Sandoz increasing price while Actavis was out of the market and Actavis re-entering later at the higher price, in coordination with Sandoz. These agreements set the stage for how collusion would work between the two competitors when Aprahamian moved to Taro. The collusion on these products is discussed in greater detail later in this Complaint in Section XII.D.

ii.  *Aprahamian Moves To Taro And Immediately Begins Colluding With CW-3 On Products On Which Sandoz And Taro Overlap*

1139.   In March 2013, Aprahamian followed his former colleague, Perfetto, to Taro and assumed a senior sales and marketing position. The product overlap between Sandoz and Taro was much greater than it was between Sandoz and Actavis, thereby allowing the collusion between CW-3 and Aprahamian to become systematic and routine.

1140.   Indeed, immediately upon moving to Taro, and even before Aprahamian and CW-3 began colluding on several products on which Sandoz and Taro overlapped – Nystatin Triamcinolone Cream and Ointment, Fluocinonide Ointment, and Lidocaine Ointment. The collusion on these productis is discussed in greater detail later in this Complaint in Section XII.D.

iii.  *Aprahamian And Perfetto Orchestrate And Lead Price Increases On A Number Of Key Products In May 2013*

1141.   In addition to coordinating with Sandoz to allocate the market on several products on which the two competitors overlapped as detailed above, Aprahamian and Perfetto also began

**REDACTED – PUBLIC VERSION**

planning significant price increases on a number of products starting in early 2013, including two of the Subject Drugs. Aprahamian and Perfetto focused their efforts on increasing prices on those products where they had strong relationships and ongoing understandings with individuals at the competitor companies. The two men capitalized on these relationships to coordinate price increases and avoid competing with each other in the markets for those overlap drugs.

1142.   One early example occurred in May 2013, when Taro increased its pricing on twelve (12) different products (the "May 2013 Increases"). As result of these price increases, Taro anticipated approximately $110 million in additional revenue. These products, their corresponding WAC increases, and Taro's competitors for each product are detailed in the chart below:

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Alclometasone Dipropionate 0.05% Topical Cream | 223% | Sandoz, Glenmark |
| Ammonium Lactate 12% Topical Cream | 97% | Perrigo, Actavis |
| Ammonium Lactate 12% Topical Lotion | 88% | Perrigo, Actavis |
| Betamethasone Dipropionate (Augmented) 0.05% Topical Lotion | 29% | Sandoz |
| Betamethasone Dipropionate 0.05% Topical Cream | 10% | Sandoz, Actavis |
| Betamethasone Valerate 0.1% Topical Cream | 44% | Sandoz, Actavis |
| Carbamazepine 400mg Extended-Release Tablet | 43% | Sandoz |
| Carbamazepine 100mg/5ml Suspension | 18% | Wockhardt |
| Clomipramine Hydrochloride 75mg Capsule | 3441% | Sandoz, Mylan |
| Desonide 0.05% Topical Cream | 703% | Perrigo, Actavis (entered in Aug. 2013) |
| Desonide 0.05% Topical Ointment | 501% | Perrigo, Sandoz (entered in Jan. 2014) |
| Terconazole 3 Day 0.8% Vaginal Cream | 55% | Sandoz, Actavis |

> iv.   *Aprahamian And Perfetto Communicate And Coordinate With Their Competitors In Advance Of The May 2013 Increases*

1143.   In advance of the May 2013 Increases, Aprahamian and Perfetto spoke with their competitors on those products–Sandoz, Perrigo, Actavis, Mylan, and Glenmark—to discuss the increases and limit competition between them. Taro began communicating with competitors, and formulating its list of products for the increases, as early as April 2, 2013.

**REDACTED – PUBLIC VERSION**

1144.   For example, on April 2, 2013, Aprahamian spoke with CW-3 of Sandoz for six (6) minutes. During that call, the two competitors discussed the price increases that Taro was planning for May 2013 and CW-3 took the following contemporaneous notes in his Notebook:



1145.   Immediately upon hanging up with Aprahamian, CW-3 called another competitor, T.P. of Perrigo, and they spoke for five (5) minutes. During that call, CW-3 discussed the May 2013 Increases with T.P. and T.P. told CW-3 that he already knew about them. When CW-3 hung up with T.P., he immediately called Aprahamian back. The call lasted one (1) minute. A few minutes after hanging up with Aprahamian, CW-3 called his superior Kellum. Later that morning, Aprahamian called CW-3 and they spoke for another six (6) minutes.

1146.   Two days later, on April 4, 2013, Aprahamian called M.A. of Mylan and the two competitors spoke for fifteen (15) minutes. Immediately upon hanging up, Aprahamian called CW-3 of Sandoz and they spoke for six (6) minutes.  Mylan and Sandoz were competitors with Taro on the product Clomipramine HCL Capsules ("Clomipramine"), one of the May 2013 Increase products.

1147.   The following Monday, April 8, 2013, Mylan circulated a list of products that it wanted to focus on to increase its market share.  For Clomipramine, Mylan noted:



1148.   The fact that Clomipramine was a ▮▮▮▮▮▮▮▮▮▮ had come directly from

M.A.'s conversation with Aprahamian, because Taro had not yet publicly announced its price increase

on this product and would not do so for several more weeks.

1149.   At the same time, Taro was communicating with Blashinsky of Glenmark.  On both

April 2, 2013 and April 9, 2013, a Taro employee—likely Perfetto—called Blashinsky from his office

phone. The calls lasted twenty-eight (28) minutes and twenty-three (23) minutes, respectively. Also on

April 9, 2013, Aprahamian exchanged two calls with CW-3 of Sandoz, including one call lasting seven

(7) minutes. Sandoz and Glenmark were competitors with Taro on the product Alclometasone

Dipropionate Cream ("Alclometasone Cream"), one of Taro's May 2013 Increase products.

1150.   Further, on April 15, 2013 and April 16, 2013, CW-3 exchanged several calls with

Aprahamian and Blashinsky. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:26:00 | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 5:49:00 | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:58:00 | 0:09:00 |
| 4/16/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 6:29:00 | 0:01:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 10:38:00 | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:11:00 |

1151.   During these calls, the three competitors discussed, among other things, Taro's

planned price increase on Alclometasone Cream. During at least one of those calls, CW-3 recorded

the following contemporaneous notes in his Notebook:



1152.    At the same time, Perfetto and Aprahamian were communicating frequently with their contacts at Perrigo and Actavis. Further, Perrigo and Actavis were also speaking directly with each other during this time period. Perrigo and Actavis had at least two May 2013 Increase products in common that overlapped with Taro, Ammonium Lactate Cream and Lotion. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/5/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:36:00 | 0:30:00 |
| 4/9/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | M.D. (Actavis) | 14:50:00 | 0:19:00 |
| 4/11/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:35:34 | 0:00:29 |
| 4/12/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 13:02:12 | 0:00:56 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:12:00 | 0:25:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:59:00 | 0:01:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:00:00 | 0:08:00 |

1153.    While the competitors were communicating with each other, they kept their colleagues apprised of their communications with competitors. For example, after several of CW-3's calls with competitors, he immediately called Kellum or CW-1 to inform them of what he had learned. A few of these examples are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:50:00 | 0:01:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:51:00 | 0:07:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 5:58:00 | 0:02:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:58:00 | 0:09:00 |
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:07:00 | 0:01:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:46:00 | 0:05:00 |

1154.   By April 17, 2013, Aprahamian and Perfetto had finalized their list of products for the May 2013 Increases. That same day, S.G., a sales executive at Sandoz, sent an internal e-mail, including to CW-3 and CW-4, regarding potential supply issues on Carbamazepine ER Tablets—a drug on Taro's list.  S.G. stated, ███████████████████████████████████████████████████ ████████████████████████████████████████████

1155.   After receiving the e-mail, CW-4 and D.S. of Taro spoke twice, with the calls lasting twelve (12) minutes and two (2) minutes, respectively. On those calls, D.S. explained that Taro did not have any long-term supply issues. After hanging up with D.S. for the second time, CW-4 responded to S.G.'s e-mail stating: ████████████████████████████████████

1156.   At the same time, CW-3 forwarded S.G.'s request regarding Carbamazepine ER directly to Kellum in a separate e-mail stating, ████████████████████████████████ ████—likely referring to the impending Taro price increase. To that, Kellum responded simply, ████

1157.   In the days leading up to the May 2013 Increases, the competitors continued to communicate with each other in order to coordinate the price increases. Some of these communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:28:00 | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 10:41:00 | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:13:00 | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:30:00 | 0:09:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 5:12:00 | 0:01:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 7:24:00 | 0:01:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 10:44:00 | 0:02:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:48:00 | 0:02:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 11:49:00 | 0:02:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 5:43:00 | 0:04:00 |
| 4/22/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 7:00:00 | 0:01:00 |
| 4/22/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:42:00 | 0:08:00 |
| 4/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 11:51:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:42:00 | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 7:52:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:34:00 | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:43:00 | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:30:00 | 0:08:00 |

1158.   Also, between April 20 and April 23, 2013, the NACDS held its annual meeting at the Sands Convention Center in Palm Beach, Florida. Representatives from Taro, Sandoz, Perrigo, Actavis, Mylan, and Glenmark were all in attendance. The attendees included Aprahamian and Perfetto of Taro, A.B., a senior-most executive at Actavis, and Blashinsky of Glenmark.

1159.   One week later, on April 29 and April 30, 2013, Taro sent notices to its customers informing them of the May 2013 Increases. The next day, on May 1, 2013, Taro published increased WAC pricing for the affected products.

1160.   During this time, Aprahamian and Perfetto continued to communicate with their competitors. For example, on April 30, 2013, Aprahamian and CW-3 exchanged two calls lasting fourteen (14) minutes and two (2) minutes, respectively. During those calls, Aprahamian and CW-3 discussed the May 2013 Increases and the seven Sandoz products that Taro had increased prices on. CW-3's notes from those phone calls are detailed below. The notes also include references to the other competitors on these products. For example, CW-3 listed "Alclo Cream – T & G," which stood for Taro and Glenmark:

**REDACTED – PUBLIC VERSION**



After each call with Aprahamian, CW-3 hung up and immediately called Kellum to inform him of what he had learned from Aprahamian.

1161.   At the same time, Aprahamian and Perfetto were also communicating with other competitors about the May 2013 Increases. Some of these calls, which surround the calls with CW-3, are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 6:30:00 | 0:01:00 |
| 4/30/2013 | Voice | Perfetto, Mike (Taro) | Incoming | A.B. (Actavis) | 7:14:00 | 0:10:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:24:23 | 0:00:06 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 12:44:00 | 0:15:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:37:00 | 0:02:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 9:32:00 | 0:01:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Incoming | Blashinsky, Mitchell (Glenmark) | 9:43:00 | 0:21:00 |
| 5/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:35:00 | 0:11:00 |

> *v.*      *Taro's Competitors Uniformly Declined To Bid On Taro Customers And Followed The May 2013 Increases*

1162.   Consistent with their ongoing understandings, Taro's competitors uniformly declined opportunities to bid on Taro's customers after the May 2013 Increases. Taro's competitors understood that to do so would violate the "rules of the road" and would disrupt the market-share balance that

they had worked so hard to achieve. Indeed, rather than compete, these competitors began working on implementing price increases of their own.

1163.   For example, on April 30, 2013, Publix e-mailed Sandoz stating that Taro had increased pricing on a number of Sandoz overlap products and asked whether Sandoz wanted to bid on them. The products included Betamethasone Dipropionate Lotion, Clomipramine, and Carbamazepine ER. Kellum e-mailed CW-4 stating, ███████████████████████████ ████████████████████████████████████████████████████ CW-4 replied: ████████████████████████████ By ███████████ Kellum and CW-4 both meant that this was a chance for Sandoz to raise its prices on these products as well.

1164.   That same day, April 30, 2013, Publix e-mailed Actavis to notify it that Taro had raised pricing on Terconazole Cream and asked whether Actavis wanted to bid for the business. Two days later, and after several calls between Aprahamian and Perfetto and their former Actavis colleagues, M.B., a sales executive at Actavis, also refused to bid, stating: ██████████████████ ███████████████████████████████████████████████

1165.   Similarly, on May 7, 2013, CVS asked Sandoz if they would be interested in bidding on several of the May 2013 Increase products. C.P., a pricing analyst at Sandoz, responded internally stating, ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████

1166.   At the same time, Taro was confident based on its conversations with competitors that its increases would stick. For example, when Kaiser gave Taro push back on the May 2013 Increases, including asking for ████████████████████████████████████████ Aprahamian saw no need for explanation and in an internal e-mail responded simply, ██████████

███████████████████████████ Ultimately, Aprahamian's approach yielded results and Taro retained the business at the higher pricing.

1167.   Similarly, on May 8, 2013, Cardinal e-mailed D.S. of Taro stating that regarding Desonide, ████████████████████████████████████████████████████████ ██████████████████ D.S. forwarded the e-mail internally and Aprahamian responded, ██████ ████████████████████████████████████████████████████████ ████████████████ Perfetto added, ████████

1168.   Further, by the time the May 2013 Increases were publicly announced, Taro's competitors were already well on their way to implementing comparable price increases of their own. For example, by May 1, 2013, the day that Taro published its increased WAC pricing, Actavis had already conducted its own price increase analysis for Terconazole Cream and had revised its contract pricing to follow the Taro increase.

1169.   Similarly, one day later on May 2, 2013, Kellum e-mailed the Sandoz Pricing Committee recommending that Sandoz increase prices on six of the seven Sandoz products on Taro's May 2013 Increase list. The power point presentation that Kellum submitted to the Committee contained no detailed price increase analysis and noted simply that Sandoz should increase because Taro had raised prices on those products:



1170.   Over the next several months, and consistent with their ongoing understandings, Taro's competitors—Sandoz, Perrigo, Actavis, Mylan, and Glenmark—followed Taro's May 2013 Increases with increases of their own. Several of these competitor price increases, and their corresponding dates, are detailed in the chart below:[48]

| Drug | Competitors | Lead/Followed | Date |
|---|---|---|---|
| Alclometasone Diproprionate Cream | Sandoz | Followed | 5/10/13 |
|  | Glenmark | Followed | 5/16/13 |
| Ammonium Lactate Cream | Actavis | Followed | 6/25/13 |
|  | Perrigo | Followed | 7/30/13 |
| Ammonium Lactate Lotion | Actavis | Followed | 6/25/13 |
|  | Perrigo | Followed | 7/30/13 |
| Betamethasone Diproprionate Lotion | Sandoz | Followed | 7/26/13 |
| Betamethasone Diproprionate Cream | Sandoz | Followed | 7/26/13 |
| Betamethasone Valerate Cream | Sandoz | Followed | 7/26/13 |
| Carbamazepine Extended Release Tablets | Sandoz | Followed | 5/10/13 |
| Clomipramine Hydrochloride Capsules | Mylan | Followed | 5/16/13 |
|  | Sandoz | Followed | 7/22/13 |
| Desonide Cream | Perrigo | Followed | 5/21/13 |
|  | Actavis | Re-entered and Matched | 8/15/13 |
| Desonide Ointment | Perrigo | Followed | 5/21/13 |
|  | Sandoz | Re-entered and Matched | 1/17/14 |
| Terconazole Cream | Actavis | Followed | 6/5/2013 |

---

[48] This list is likely not exhaustive and is based on the information available to the Plaintiff States to date.

REDACTED – PUBLIC VERSION

1171.   Consistent with past practice, the competitors also often spoke before they followed with a price increase.  By way of example, and as detailed in the chart above, Sandoz followed Taro's price increases on Alclometasone Cream and Carbamazepine ER with its own price increases on May 10, 2013, and Glenmark followed Taro's and Sandoz's price increases on Alclometasone Cream shortly thereafter, on May 16, 2013. The following chart details the competitor calls surrounding those increases:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:01:00 |
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:32:00 | 0:01:00 |
| 5/7/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:01:00 | 0:07:00 |
| 5/8/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 2:44:00 | 0:02:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:09:00 | 0:08:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:30:00 | 0:09:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:42:00 | 0:02:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:45:00 | 0:01:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 4:51:00 | 0:07:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 5:29:00 | 0:01:00 |
| 5/13/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 13:10:00 | 0:01:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:01:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 4:00:00 | 0:18:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 5:23:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:56:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:27:00 | 0:05:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:49:00 | 0:05:00 |

1172.   Similarly, Sandoz followed the Taro price increases on Betamethasone Dipropionate Cream and Lotion and Betamethasone Valerate Cream on July 28, 2013. In the days leading up to the Sandoz price increase, Aprahamian exchanged several calls with CW-3, including a call on July 23, 2013 that lasted three (3) minutes. During that call, CW-3 conveyed to Aprahamian that Sandoz would be increasing prices on several Taro products, including the Betamethasone products. CW-3's contemporaneous notes from that call are detailed below:



1173.   Lastly, Perrigo followed the Taro price increases on Desonide Cream and Ointment on May 21, 2013 and Actavis re-entered the Desonide Cream market and matched the competitors' pricing on August 15, 2013. The chart below details at least some of the communications between the three competitors in the days surrounding these market events:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:38:00 | 0:02:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | T.D. (Actavis) | 4:41:00 | 0:11:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:56:00 | 0:17:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:22:00 | 0:02:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:32:20 | 0:00:19 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 12:46:00 | 0:14:00 |
| 5/23/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 11:01:47 | 0:24:02 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:47:00 | 0:02:00 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 10:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Falkin, Marc (Actavis) | 14:52:00 | 0:11:00 |
| 8/8/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 6:32:00 | 0:06:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:24:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 9:25:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:28:00 | 0:05:00 |
| 8/9/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 10:39:00 | 0:03:00 |
| 8/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.B. (Actavis) | 7:13:00 | 0:09:00 |

1174.   Consistent with their ongoing understandings, Taro exercised restraint, just as its competitors had done, and did not poach customers from its competitors after they followed with price increases of their own.  For example, on May 23, 2013, Econdisc reached out to Taro asking for

a bid on Alclometasone Cream. Aprahamian asked D.S., a Taro sales executive, why Econdisc was looking for a bid and D.S. replied: ██████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████ Aprahamian responded: ████████████████████

███ Consistent with Aprahamian's directive, Taro subsequently declined to bid on the business.

1175.   The competitors continued to communicate about the May 2013 Increase products even after the competitors had followed the increases. These open lines of communication were important to ensure that the competitors did not run afoul of the delicate market share balance they had achieved with each other.

1176.   For example, in September 2013, D.S. of Taro called CW-4 of Sandoz to tell her that Taro's Carbamazepine ER product was being held up at the border. As a result, Sandoz would likely be receiving requests from Taro customers for the product. By conveying this to CW-4, D.S. was sending the message that Taro would lose customers if Sandoz sold too much and Taro would have no choice but to compete to get its market share back. This would disrupt the market and cause prices to deteriorate across the board.

1177.   After speaking with D.S., CW-4 sent an internal e-mail, including to Kellum, stating:

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████ Kellum responded in agreement: ██████████████

██████████████████████████████████████████

        b.     **Building Upon Early Successes—Taro's Continued Collusion Over The Ensuing Years**

1178.   Over the next several years—indeed into at least early January 2016—Aprahamian and Perfetto continued to use their contacts at competitor companies to collude on overlapping products and improve Taro's bottom line. During these years, Aprahamian and Perfetto expanded their efforts

to allocate markets and fix prices on additional products—including several non-topical products—and to collude with additional competitors. Although the Taro executives continued to collude with their key competitors—Sandoz, Perrigo, Actavis, Mylan, and Glenmark—they also coordinated with their contacts at other companies including non-defendant Rising, Lannett, Wockhardt, Amneal, and G&W. By 2016, a large majority of the company's business was implicated by the executives' anticompetitive conduct.

*vi.*      *Taro's June 2014 Price Increases*

1179.   Building on its successes in 2013, Taro set its sights even higher in 2014, implementing a number of significant price increases, including several of the largest WAC increases across the industry that year. As they had done in the past, Aprahamian and Perfetto focused their efforts on increasing prices on those products where they had strong relationships and ongoing understandings with individuals at competitor companies.

1180.   For example, in April 2014 Taro capitalized on its relationships with Teva and Sandoz to significantly raise prices on Ketoconazole Cream and Tablets. Defendant Aprahamian coordinated with Nisha Patel of Teva and CW-3 of Sandoz, while CW-1 of Sandoz also communicated directly with Patel.

1181.   In June 2014, Taro increased pricing on several different products (the "June 2014 Increases"). Some of these products had also been the subject of coordinated increases in 2013—including Carbamazepine ER Tablets (with Sandoz) and Hydrocortisone Valerate Cream (with Perrigo). As a result of these increases, Taro expected approximately $289 million in additional revenues—more than 2 ½ times what Taro had expected from the May 2013 Increases. Several of these products, their corresponding WAC increases, and Taro's competitors are detailed in the chart below:

REDACTED – PUBLIC VERSION

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Carbamazepine Tablet | 2337% | Teva, Torrent, Apotex |
| Carbamazepine Chewable Tablet | 392% | Teva, Torrent |
| Carbamazepine Extended Release Tablet | 23% | Sandoz |
| Clobetasol Proprionate Cream | 2138% | Sandoz, Hi-Tech, Actavis (entered in Mar 2015) |
| Clobetasol Proprionate Emollient Cream | 1011% | Sandoz, Hi-Tech |
| Clobetasol Proprionate Gel | 2008% | Sandoz, Hi-Tech, Perrigo |
| Clobetasol Proprionate Ointment | 2316% | Sandoz, Hi-Tech |
| Clobetasol Proprionate Solution | 953% | Sandoz, Hi-Tech, Wockhardt |
| Clobetasol Proprionate Lotion | 65% | Actavis, Perrigo |
| Clotrimazole Topical Solution | 208% | Teva |
| Fluocinonide Cream .05% | 754% | Teva |
| Fluocinonide Emollient Cream | 430% | Teva |
| Fluocinonide Gel | 491% | Teva, Sandoz |
| Fluocinonide Ointment | 483% | Teva |
| Hydrocortisone Valerate Cream | 44% | Perrigo |
| Phenytoin Sodium Extended Release Capsule | 210% | Amneal, Mylan, Sun |
| Warfarin Sodium Tablet | 220% | Teva, Zydus, Upsher-Smith |

1182.   As it had done in the past, Taro communicated with several of its competitors in advance of the June 2014 Increases and, consistent with their ongoing understandings, the competitors agreed to follow with comparable price increases of their own.

1183.   For example, on May 14, 2014, Taro had finalized its list of products to include in the June 2014 Increases and Aprahamian forwarded the list to K.S., a senior executive at Taro, for his review and approval. That same day, Aprahamian exchanged eight (8) text messages and one five (5) minute phone call with Patel of Teva. Taro overlapped with Teva on seven (7) of the June 2014 Increase products – including Fluocinonide, Carbamazepine, Clotrimazole, and Warfarin.

1184.   After speaking with Aprahamian, Patel directed a colleague to create a list of future Teva price increase candidates, based on a set of instructions and data she had given to her Teva colleague. On May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase Candidate Analysis." The list included several drugs from Taro's June 2014 Price Increase list – with the notation "Follow/Urgent" listed as the reason for the increase. Notably, however, Taro had not yet increased prices on those drugs or notified its customers that it would be doing so. The relevant portions of that spreadsheet are set forth below:



| Item Description | Product Family | BUCKET |
|---|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 15GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 30GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 60GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 15GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 30GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 60GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE GEL 0.05% 60GM | FLUOCINONIDE TOPICAL GEL | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 15GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 30GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 60GM | FLUOCINONIDE OINTMENT | Follow/Urgent |

1185.   Similarly, on Friday May 15, 2014, the day after Taro finalized its June 2014 Increase list, Aprahamian called CW-3 of Sandoz and the two competitors spoke for fifteen (15) minutes. Taro overlapped with Sandoz on seven of the June 2014 Increase products—including Carbamazepine ER Tablets and various formulations of Clobetasol Propionate. The following Monday, on May 19, 2014, CW-3 sent an internal e-mail, including to Kellum and CW-1, advising them of the Taro increases:

Notably, the source of the information was not "a customer," but his competitor, Aprahamian. Further, Taro had not yet increased pricing on these products and would not do so for another several weeks.  Later that day, CW-3 called Aprahamian.  The call lasted one (1) minute.

1186.   Further, on May 27, 2014, Aprahamian exchanged three calls with M.C., a sales executive at Wockhardt, including one call lasting nine (9) minutes. Taro overlapped with Wockhardt on one June 2014 Increase product—Clobetasol Solution. That same day, ABC reached out to C.U., a sales executive at Taro, asking for a bid on Clobetasol Solution because Wockhardt was having issues with the FDA. Having spoken with M.C. earlier in the day and knowing that the competitors had discussed coordinating a price increase on the product, Aprahamian responded, █████████████ ████████████████████████████████████████████████████████████

1187.   On June 2, 2014, Taro sent letters to its customers notifying them of the June 2014 Increases. The next day, on June 3, 2014, Taro published new WAC pricing for the affected products. In the days leading up to these actions by Taro, and in the days that followed, Aprahamian and Perfetto reached out to their competitors—Sandoz, Perrigo, Actavis, Teva, Hi-Tech, Wockhardt, Mylan, and Amneal—to discuss the increases and limit competition between them. These communications are detailed in the chart below:

1188.   After receiving notification of the increases, several customers complained to Taro about the size of the increases. However, confident in their strategy and the strength of the ongoing understandings they had with their competitors, Aprahamian advised his colleagues that Taro should stay the course and stick with the plan.

1189.   For example, on June 24, 2014, McKesson e-mailed Taro stating, ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████ E.G., a Taro sales executive, forwarded McKesson's e- mail to Aprahamian who responded, █████████████████████████████████████████ E.G. replied, ████████████████████████ and Aprahamian state, ████████████████ ████████████████████

**REDACTED – PUBLIC VERSION**

1190.   Similarly, on June 27, 2014, ABC sent out a request for bids on multiple products, including several that Taro had increased prices on, and cited the reason as including several that Taro had increased prices on, and cited the reason as ███████████████ C.U., a sales executive at Taro, forwarded the ABC request along internally, stating that he had left a message with the ABC representative to discuss the request. A.L., a Taro pricing executive, responded: ████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ To that, Aprahamian replied: ████████████████████████████████████████ ████████████████████

1191.   Sandoz also received the ABC request on June 27, 2014. Kellum forwarded it along internally, including to CW-1, stating simply: ██████████ Although CW-1 already knew that Taro had increased prices, he responded to Kellum's e-mail asking, ████████████████ Kellum replied, █████ and CW-1 quickly answered, ████████████████████ Kellum responded sarcastically: ██████████████ Of course, and consistent with past practice and the ongoing understanding between the two competitors, Kellum and CW-1 did not want bid at CVS. Further, on July 1, 2014, Kellum e-mailed the larger Sandoz team about the ABC request stating, ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████

1192.   Not surprisingly given Taro's understandings with its competitors, on July 11, 2014, ABC e-mailed C.U. to advise him that Taro had retained all of its business at ABC because ████████ ██████████████████ C.U. forwarded the e-mail along to Aprahamian, stating excitedly, ████ ████ Aprahamian then forwarded the e-mail to Perfetto stating: ██████████████████

REDACTED – PUBLIC VERSION

1193.   Consistent with past practice, and their ongoing understandings, the competitors uniformly followed the July 2014 Increases and matched Taro's increased WAC pricing. These competitor price increases, and their corresponding dates, are detailed in the chart below:

| Drug | Competitor | Lead/Follower | Date Action |
|---|---|---|---|
| Carbamazepine Tablet | Apotex | Followed | 7/11/14 |
| | Teva | Followed | 8/28/14 |
| | Torrent | Followed | 9/12/14 |
| Carbamazepine Chewable Tablet | Teva | Followed | 8/28/14 |
| | Torrent | Followed | 9/12/14 |
| Carbamazepine Extended Release Tablet | Sandoz | Followed | 8/26/14 |
| Clobetasol Proprionate Cream | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Emollient Cream | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Gel | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Ointment | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Solution | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| | Wockhardt | Followed | 9/2/14 |
| Clotrimazole Solution | Teva | Followed | 8/28/14 |
| Fluocinonide Cream .05% | Teva | Followed | 7/1/14 |
| Fluocinonide Emollient Cream | Teva | Followed | 7/1/14 |
| Fluocinonide Gel | Teva | Followed | 7/1/14 |
| | Sandoz | Followed | 10/10/14 |
| Fluocinonide Ointment | Teva | Followed | 7/1/14 |
| Hydrocortisone Valerate Cream | Perrigo | Followed | 7/24/14 |
| Phenytoin Sodium Extended Release Tablets | Sun | Followed | 7/14/14 |
| | Mylan | Followed | 7/16/14 |
| | Amneal | Followed | 9/1/14 |
| Warfarin Sodium Tablet | Zydus | Followed | 6/13/14 |
| | Teva | Followed | 8/28/14 |

### 4.      Sandoz And Its Other Relationships

1194.   CW-3 colluded extensively with Aprahamian and H.M. of Taro on products that Sandoz and Taro overlapped on and had an ongoing understanding going back many years not to poach each other's customers and to follow each other's price increases. In addition, CW-3 was a prolific communicator who regularly colluded with many other competitors.

1195.   Between June 2011 and August 2016, when he left Sandoz, CW-3 exchanged at least one thousand one hundred (1,100) phone calls and text messages with his contacts at Taro, non-defendant Mallinckrodt, Perrigo, Aurobindo, Actavis, Glenmark, G&W, Wockhardt, Mylan, Lannett, Lupin, non-defendant Greenstone, and non-defendant Rising. These communications are detailed in the chart below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Aprahamian, Ara (Taro) | 187 | 3/15/2013 | 8/18/2016 |
| Kaczmarek, Walt (Mallinckrodt) | 146 | 11/14/2012 | 7/13/2016 |
| K.K. (Mallinckrodt) | 158 | 12/3/2012 | 6/20/2016 |
| T.P. (Perrigo) | 95 | 8/8/2012 | 2/4/2016 |
| CW-6 (Aurobindo) | 90 | 8/16/2012 | 5/10/2013 |
| CW-2 (Rising) | 80 | 8/2/2013 | 5/11/2016 |
| H.M. (Taro) | 53 | 9/6/2012 | 3/11/2014 |
| Aprahamian, Ara (Actavis) | 52 | 8/17/2011 | 3/11/2013 |
| Blashinsky, Mitchell (Glenmark) | 49 | 8/28/2012 | 10/9/2013 |
| S.G. (Rising) | 37 | 6/4/2015 | 6/15/2016 |
| K.K. (G&W) | 30 | 2/6/2014 | 3/30/2015 |
| A.F. (Perrigo) | 27 | 6/30/2011 | 7/19/2013 |
| K.K. (Wockhardt) | 25 | 7/29/2011 | 5/23/2013 |
| B.G. (Lannett) | 22 | 3/18/2016 | 8/19/2016 |
| T.G. (Aurobindo) | 20 | 3/11/2014 | 10/19/2015 |
| L.W. (Mylan) | 14 | 9/21/2012 | 7/23/2013 |
| Berthold, David (Lupin) | 3 | 2/7/2012 | 10/18/2012 |
| Grauso, Jim (Aurobindo) | 3 | 6/28/2012 | 7/16/2012 |
| Perfetto, Mike (Taro) | 2 | 8/11/2016 | 8/11/2016 |
| K.S. (Lannett) | 2 | 5/10/2012 | 5/15/2012 |
| D.C. (Glenmark) | 1 | 8/22/2013 | 8/22/2013 |
| A.G. (Actavis) | 1 | 8/22/2013 | 8/22/2013 |
| Nailor, Jill (Greenstone) | 1 | 5/29/2013 | 5/29/2013 |
| Taro Pharmaceuticals | 1 | 8/11/2016 | 8/11/2016 |
| Sullivan, Tracy (Lannett) | 1 | 5/8/2012 | 5/8/2012 |

1196.   As detailed above, when CW-3 was coordinating with competitors, he was acting at all times at the direction of, or with approval from, his superiors, including CW-1 and Kellum.

REDACTED – PUBLIC VERSION

1197.    Several of CW-3's relationships—including with Perrigo, Glenmark, Aurobindo, and non-defendants Rising and Mallinckrodt—as well as other relationships between various Sandoz executives and certain competitors, are explored in greater detail in the following Sections.

### a.    Collusion Between Sandoz And Perrigo

1198.    As detailed above, Sandoz and Perrigo had an ongoing understanding over many years not to poach each other's customers and to follow each other's price increases. This understanding was implemented primarily through communications between CW-3 of Sandoz and T.P. of Perrigo. CW-3 continued the relationship with T.P. after his predecessor, CW-6, left Fougera in August 2012. CW-3 and T.P. of Perrigo were not social friends.  If they were communicating with each other, it was to coordinate anticompetitive conduct with regard to drugs on which Sandoz and Perrigo overlapped.

1199.    During this time period, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Boothe and Wesolowski.

1200.    Several examples of CW-3's coordination with T.P. on specific products are discussed in detail in the following Sections.

### i.    *Calcipotriene Betamethasone Dipropionate Ointment*

1201.    Calcipotriene Betamethasone Dipropionate Ointment ("CBD Ointment" or "Cal Beta") is available in 60gm and 100gm dosages.

1202.    In early 2014, both Sandoz and Perrigo were preparing to launch CBD Ointment. Sandoz was preparing to launch as the first-to-file generic and Perrigo was preparing to launch as the authorized generic (the "AG"). Under the agreement that Perrigo had reached with the brand manufacturer, Perrigo could not launch until Sandoz, the first filer, entered the market. Typically, a first filer interested in gaining a competitive advantage would want to keep its launch date a secret from the company launching the AG so that the first filer could catch the AG by surprise and maintain market exclusivity for a longer period of time. But that was not the case with regard to CBD Ointment.

1203.   T.P., a sales executive at Perrigo, and CW-3, a senior sales executive at Sandoz, exchanged two calls in late February 2014. On those calls, T.P. told CW-3 that Perrigo would be launching the AG of CBD Ointment and asked CW-3 when Sandoz planned to launch its generic version.

1204.   When first approached by T.P. about CBD Ointment, CW-3 was not aware that Sandoz was planning to launch it. After being approached by T.P., CW-3 reached out to others at Sandoz to find out what Sandoz's plans were. On March 4, 2014, A.S., a senior Sandoz launch executive, confirmed to CW-3 that Sandoz would be launching CBD Ointment. Within minutes of receiving A.S.'s confirmation the night of March 4, 2014, CW-3 e-mailed Kellum, stating: ███████ ████████████

1205.   The next day, on March 5, 2014, Sandoz held an internal ██████████████████ teleconference to discuss its plans. Kellum, A.S., CW-1, a Sandoz senior pricing executive, and other members of the sales and launch teams attended the call. Additional meetings were held on March 10 and March 13, 2014 to coordinate the CBD Ointment launch.

1206.   Also on March 13, 2014, CW-3 called T.P. two (2) times, with one of the calls lasting twelve (12) minutes. That same day, Perrigo scheduled its own teleconference for the following day to discuss its CBD Ointment launch. T.P., his supervisor Wesolowski, a senior executive at Perrigo, and over twenty (20) other Perrigo sales and launch team members attended the call. On the call, the Perrigo sales executives were directed to go after only six (6) select customer accounts, and no others. These accounts were referred to as ████████████████████

1207.   Promptly following the call, J.B., a Perrigo marketing executive, circulated a document that was discussed on the call. The document was internally prepared at Perrigo and indicated that Sandoz may launch on March 31, 2014 and that Perrigo's ████████ was 50% of the market. Perrigo's information was accurate. Sandoz ultimately launched the 100gm size on March 31, 2014

and the 60gm size on April 1, 2014. In harmony with Perrigo's target share goal of 50%, internal Sandoz e-mail correspondence circulated prior to launch stated that Sandoz also had a target market share of 50% for CBD Ointment.

1208.   While Perrigo planned to approach a small, select group of potential customers, Sandoz was deciding which large customers to go after. Sandoz initially planned to target Walgreens and ABC for CBD Ointment. However, Sandoz remained involved in ongoing business disputes with Walgreens and ABC in the middle of March 2014. Sandoz was concerned that Walgreens and ABC would not award Sandoz their CBD Ointment business if the disputes were not resolved prior to launch.

1209.   On the night of Friday, March 14, 2014, A.S. e-mailed P.G., the President of Sandoz US, stating that resolving the ABC and Walgreens disputes would be a ███████████████ for the CBD Ointment launch. P.G. responded by directing A.S. to look for CBD Ointment business ███████████████ and to ███████████████████████████████

1210.   A.S. forwarded his e-mail correspondence with P.G. to Kellum and others at Sandoz on the afternoon of March 16, 2014. Consistent with P.G.'s direction, A.S., Kellum, CW-3 and CW-1 immediately began to strategize how Sandoz could reach its market share target of 50% without Walgreens and ABC. A.S. determined that in order to reach that goal, Sandoz would need to have CVS as a customer. At an in-person meeting in Sandoz's Princeton offices, Kellum told CW-3 and CW-1 that he also wanted McKesson and Rite Aid as customers.

1211.   On the next day, March 17, 2014, CW-3 called T.P. at Perrigo to resume their discussions about customer allocation and to exchange pricing information. Between March 17 and March 20, 2014, CW-3 and T.P. exchanged more than ten phone calls, with one call lasting eleven (11) minutes and another call lasting seventeen (17) minutes. Further, T.P. reported the substance of these calls to his supervisor, Wesolowski, seeking direction from him on how to respond to CW-3. T.P.

often spoke with Wesolowski between calls with CW-3, sometimes even calling him immediately after hanging up with CW-3. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:38:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 8:56:00 | 0:11:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 9:08:00 | 0:12:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 12:42:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:49:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:13:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:22:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 13:48:00 | 0:08:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:56:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:00:00 | 0:03:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 15:30:00 | 0:04:00 |
| 3/19/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 16:20:00 | 0:17:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 8:37:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 8:40:00 | 0:03:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 12:37:00 | 0:08:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:18:00 | 0:07:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:24:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:08:00 | 0:03:00 |

1212.   Although most of T.P. and CW-3's calls were just between the two of them, occasionally other colleagues would join them. For example, CW-3 made a call early in the week of March 17, 2014 to T.P. from A.S.'s office in Princeton, and Kellum and CW-1 also joined the call.

1213.   As noted above, over the course of these calls, T.P. and CW-3 discussed market pricing and customer allocation. In a call early in the week of March 17, 2014, T.P. shared Perrigo's proposed WAC pricing and AWP pricing for different types of customers. During that call, CW-3 took the following contemporaneous notes in his Notebook:



1214.   When Perrigo launched CBD Ointment about two weeks later, its WAC and AWP matched those price points. The two rows of WAC prices in the Notebook represent the different pricing for the 60gm and 100gm sizes. Sandoz's WAC prices at launch were close but slightly higher than Perrigo's, at $657.45 for the 60gm size and $968.40 for the 100gm size.

1215.   T.P. also shared with CW-3 what Perrigo's non-public, "dead net" pricing would be for its customers. Perrigo ranked its customers into five "tiers." Customers in the same tier were typically sold a drug at the same "dead net" price. T.P. communicated the CBD Ointment pricing tiers to CW-3 by giving examples of the types of customers in a tier, such as large wholesalers like ABC and Cardinal or regional wholesalers like HD Smith or Optisource, and what the corresponding "dead net" pricing would be for that type of customer. CW-3's contemporaneous notes regarding Perrigo's dead net pricing for CBD Ointment are below:



**REDACTED – PUBLIC VERSION**

1216.   The pricing tiers T.P. gave to CW-3 matched the pricing tiers Perrigo planned to use. The following rows are from an internally prepared spreadsheet that shows Perrigo's main pricing tiers for the two different sizes of CBD Ointment:



1217.   Moreover, Perrigo's offers to customers were in step with the "dead net" pricing noted above. For example, Perrigo made offers to Wal-Mart and Meijer, both so-called "tier 2" customers, that resulted in Wal-Mart and Meijer having "dead net" pricing of $426.31 and $627.94 for the 60g and 100g sizes respectively and offers to Optisource and Morris Dickson, both so-called "tier 3" customers, that resulted in Morris Dickson and Optisource having "dead net" pricing of $448.75 and 660.99 for the 60g and 100g sizes respectively.

1218.   As noted earlier, T.P. and CW-3 did not just use these calls to share pricing information in anticipation of their launches. They also used them to allocate the customers that would be in the market. When CW-3 and T.P. spoke on calls early in the week of March 17, 2014, each shared his respective company's position on how customers should be divided between them to achieve "fair share."  CW-3 told T.P. that Sandoz wanted McKesson, Rite Aid, Econdisc, CVS, Cardinal, Omnicare and Kaiser. CW-3 documented this in his Notebook:



1219.    T.P. responded that Perrigo wanted Anda, Walgreens, ABC, Wal-Mart, Rite Aid and McKesson. CW-3 documented this in his Notebook:



The purpose of reaching agreement on the list of customers was to avoid competing with one another as both companies entered the market simultaneously.

1220.    As the lists above show, with the exception of Rite Aid and McKesson, Sandoz and Perrigo were aligned on how significant customers should be allocated. In March 2014, Rite Aid was purchasing generic drugs through McKesson's "OneStop Generics" program, so Perrigo and Sandoz viewed these customers as a package or, put another way, whoever got McKesson also got Rite Aid as a customer. Both of the competitors wanted that business.

1221.    As the negotiations continued, Sandoz recognized that the list of customers it wanted for CBD Ointment was more than its fair share of the market. However, in keeping with its general strategic preference for selling to a smaller number of large customers, Sandoz did not want to give up McKesson, Rite Aid, CVS, or Cardinal. To resolve the issue, Kellum, CW-3 and CW-1 brainstormed a list of other customers that, when combined, would have about the same market share as Rite Aid and McKesson and that Sandoz was willing to give up to Perrigo. Ultimately, the list of customers that Sandoz created included Optisource, Publix, Morris & Dickson (MD), PBA Health (PBA), Meijer, and Kaiser.

1222.    Thereafter, CW-3 called T.P. and proposed that Sandoz give up these customers to Perrigo in exchange for McKesson and Rite Aid.  CW-3 documented this in his Notebook:

Perrigo agreed.

1223.   Following the plan, Perrigo submitted offers to the customers listed above and was awarded the business at Optisource, Publix, Morris & Dickson, Meijer, and Kaiser. In addition, and as planned, Perrigo bid on and won Anda, Walgreens, ABC and Wal-Mart, while Sandoz bid on and won McKesson, Rite Aid, CVS, Cardinal, and Omnicare.

1224.   While Wesolowski encouraged the Perrigo sales team to go after their assigned customers, he was also careful to make sure they adhered to the agreement reached with Sandoz. For example, on March 21, 2014, Omnicare reached out to Perrigo asking for a bid on CBD Ointment. Omnicare was a customer allocated to Sandoz. P.H., a Perrigo sales executive, forwarded the request to Wesolowski who responded, ████████████████████████████ Consistent with Wesolowski's direction, P.H. told Omnicare that Perrigo was ███████████████████ even though Perrigo was actively sending offers to other potential customers at that time.

1225.   On March 31, 2014, CW-3 called T.P. The call lasted two (2) minutes. That same day, Sandoz officially launched the 100gm package size of CBD Ointment and Perrigo launched both the 100gm and 60gm package sizes. The next day, on April 1, 2014, Sandoz launched the 60gm size. Early in the morning of April 1, 2014, M.A., a Sandoz marketing executive, e-mailed Kellum and A.S. to advise that she received an alert that Perrigo had increased prices on CBD Ointment. She noted that she was ████████████████████████

1226.   On April 7, 2014, D.A., a Sandoz launch executive, noted in an internal e-mail that Sandoz ███████████████████████████ At the end of April 2014, Sandoz and Perrigo had a virtually even split of the market for that product.

<em>ii.      Tacrolimus Ointment</em>

1227.   Tacrolimus Ointment ("Tacrolimus") is available in 30gm, 60gm and 100gm dosages. Recent annual sales of Tacrolimus Ointment in the United States exceeded $100 million.

1228.   In August 2014, Sandoz and Perrigo were both preparing to launch Tacrolimus. Sandoz was the first-to-file generic and Perrigo was the authorized generic (the "AG").

1229.   On August 13, 2014 at 3:57 p.m., E.D., a Sandoz launch executive, sent an internal e-mail asking if anyone knew whether there would be an AG for Tacrolimus or if any other competitors planned to enter the market. At 5:11 p.m. that same day, CW-3, a Sandoz senior sales executive, called T.P., a Perrigo sales executive, and they spoke for fifteen (15) minutes. Prior to this call, CW-3 and T.P. had not spoken since June 18, 2014. Within a half hour of hanging up with T.P., CW-3 sent the following e-mail responding to E.D.'s questions:



1230.   On September 8, 2014, Sandoz held a Commercial Operations meeting during which they discussed the Tacrolimus launch. That same day, CW-3 called T.P. four times, with one call lasting eleven (11) minutes and another six (6) minutes. On those calls, CW-3 and T.P. discussed the

Tacrolimus launch and decided to model it after the CBD Ointment launch. As discussed above in the previous section, in the spring of 2014 CW-3 and T.P. had colluded on CBD Ointment when Sandoz was entering as the first-to-file generic and Perrigo as the AG. By using CBD Ointment as a model, the competitors would not have to spend significant time negotiating the allocation of customers for Tacrolimus.

1231.   That same day, on September 8, 2014, CW-3 sent the following e-mail to Sandoz launch executives, E.D. and A.S., with a copy to CW-1, a Sandoz senior pricing executive:



1232.   Two days later, on September 10, 2014, CW-3 called T.P. and they spoke for fifteen (15) minutes. During that call, the competitors again talked about the Tacrolimus launch. Specifically, they discussed the allocation of certain customers to Sandoz and Perrigo so that each competitor could reach 50% market share. Further, T.P. provided CW-3 with Perrigo's WAC and AWP pricing for the three dosage sizes, and the dead net pricing that Perrigo was contemplating for various classes of customers. CW-3's contemporaneous notes from that call are pictured below:



1233.   In his notes, CW-3 recorded that the competitors would ▮▮▮▮▮▮▮▮▮▮ and listed the customers that they agreed to allocate to each other. Sandoz planned to target the customers listed in the box in the bottom right hand corner of the note, and Perrigo planned to target the customers listed above it.

1234.   On November 10, 2014, A.F., a Perrigo sales executive, e-mailed Wesolowski, a senior Perrigo executive, to advise that a customer told her Sandoz was launching Tacrolimus that day. In turn, Wesolowski e-mailed T.P. and others at Perrigo asking them if the launch could be confirmed. That same day, T.P. and CW-3 spoke two times, with one call lasting two (2) minutes and the second

lasting three (3) minutes. During those calls, CW-3 told T.P. that Sandoz had not yet formally launched the product or started shipping to customers. Later that afternoon, T.P. reported back to Wesolowski:

In order to avoid any written evidence of his illegal activity, T.P. referred to his source as a "customer" even though it was actually his competitor, CW-3

1235.   On November 19, 2014, Sandoz launched Tacrolimus and Perrigo launched on the following day, November 20, 2014. Consistent with the competitors' plans, Sandoz was awarded CVS, Cardinal, Omnicare, and Econdisc, among other customers. As planned, Perrigo won Walgreens, Walmart, ABC (secondary), Anda, Optisource, and Publix.

1236.   On November 20, 2014, Boothe, a senior Perrigo executive, sent around a congratulatory e-mail to the Perrigo team that worked on the Tacrolimus launch. He specifically congratulated C.V., a Perrigo business development executive, and Wesolowski for ▮▮▮▮▮▮ ▮▮▮▮ A few days later, in response to a request from the Tacrolimus brand manufacturer on how sales were going, C.V. replied, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### iii.   *Methazolamide Tablets*

1237.   Methazolamide tablets are available in 25mg and 50mg dosages.

1238.   By the fall of 2013, there were two manufacturers marketing Methazolamide—Sandoz and non-defendant Fera Pharmaceuticals, Inc. ("Fera"). Both competitors had posted nearly identical WAC pricing for the 25mg and 50mg dosage sizes, respectively.

1239.   In early 2014, Sandoz began experiencing issues with its API supplier and was forced to temporarily withdraw from the market. At that time, Sandoz expected that its supply problems would be resolved in June 2014 and it would re-enter then.

1240.   At the same time that Sandoz was experiencing supply problems, Perrigo acquired Fera's right to distribute Methazolamide. As a result of Perrigo's acquisition, Fera left the Methazolamide market.

1241.   On March 6, 2014, Perrigo formally launched Methazolamide. Perrigo knew prior to its launch that Sandoz, its only competitor, was out of the market and was not expected to re-enter until the summer of 2014. Perrigo leveraged its temporary position as the only manufacturer with the ability to supply by implementing a large price increase. Perrigo's WAC pricing when it entered was 136% higher than Sandoz's. An internal Perrigo document circulated approximately one month prior to the launch indicated that Perrigo's target share for Methazolamide was ██████████████████ ████████████████████████████

1242.   On June 17, 2014, Perrigo learned from a customer that Sandoz was back in the Methazolamide market. That same day, T.P. of Perrigo called CW-3, a Sandoz senior sales executive. The call lasted one (1) minute. After that call, T.P. called his supervisor, Wesolowski, and they spoke for three (3) minutes. The next day, on June 18, 2014, T.P. and CW-3 exchanged two more calls, with one call lasting three (3) minutes.  On Monday, June 23, 2014, T.P. e-mailed Wesolowski the following:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

1243.   Indeed, Sandoz had re-entered the market for the 25mg with a WAC price of $129.84—which was significantly lower than Perrigo's WAC price of $306.47.  Wesolowski was upset that Sandoz did not reach out to Perrigo before re-entering the market. Had it done so, Sandoz would

have known to raise its price, and to what level.  Wesolowski forwarded T.P.'s e-mail above to Boothe, a senior Perrigo executive, and others at Perrigo with the following cover note:



1244.    In the meantime, Perrigo would make sure that Sandoz did its ▇▇▇▇▇▇ before re-entering on the 50mg, and that it would correct its prior mistake on the 25mg.

1245.    On October 21, 2014, CW-3 and T.P. spoke for fifteen (15) minutes. During that call, T.P. provided CW-3 with Perrigo's increased WAC pricing for the 25mg and 50mg package sizes of Methazolamide to ensure that Sandoz would match those prices when it re-entered the market. CW-3's contemporaneous notes from that call are pictured below:



1246.    Shortly after the call, in early November 2014, Sandoz began ramping up for its re-entry into the Methazolamide market. On November 3, 2014, Sandoz held a Commercial Operations meeting during which Sandoz discussed its plans for the Methazolamide re-launch, including implementing significant price increases to align with Perrigo's pricing.

1247.    The next day, on November 4, 2014, CW-1, a senior Sandoz pricing executive, sent an internal e-mail asking his colleague P.C. to evaluate the ██████████████████ if Sandoz raised its WAC pricing to match Perrigo. The next day, CW-3 called T.P at Perrigo and the two competitors spoke for twelve (12) minutes. Also on that day, CW-1 directed the Sandoz pricing team to remove Methazolamide from any existing contracts. CW-1 explained that ████████████████████ ████████████████████████████████████████████

1248.    The two competitors continued to coordinate over the next several weeks as Sandoz made final preparations to re-enter the market and raise prices. On November 10, 2014, CW-3 called T.P. twice with one call lasting two (2) minutes and the other call lasting three (3) minutes.

1249.    On December 4, 2014, CW-3 e-mailed Kellum, CW-1, and others at Sandoz regarding Methazolamide, providing them with specific, non-public pricing information he had learned from his competitor:

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Internal Perrigo documents confirm that its so-called "dead net" pricing for group purchasing organizations (GPOs) at that time was approximately $250 for the 25mg and $500 for the 50mg. This pricing information was not publicly available.

1250.    On December 5, 2014, Sandoz re-launched its 50mg dosage with a WAC price of $612.97, which matched Perrigo's WAC price. At the same time, Sandoz increased the WAC price on its 25mg dosage by 136% to match Perrigo's pricing.

b.    **Collusion Between Sandoz And Glenmark**

1251.    In August 2012, not long after Sandoz acquired Fougera, Blashinsky, who had just recently joined Glenmark as its Vice President of Sales and Marketing, approached CW-3 of Sandoz at the NACDS conference in Denver, Colorado. During their conversation over breakfast at the

Marriot Hotel, Blashinsky told CW-3, among other things, ██████████████ and █
██████████

1252.   Over the next two years, the two competitors did "work together" on both market allocation and pricing—speaking at least fifty (50) times. Their communications were all collusive in nature. The two competitors were not friends and had no other reason to speak except to coordinate anticompetitive conduct. During that time period, Sandoz and Glenmark conspired to fix prices and allocate markets on at least two products: (1) Fluticasone Propionate Lotion (60ml) and (2) Desoximetasone Ointment.

*i.*     *Fluticasone Propionate*

1253.   Glenmark was the first generic manufacturer to enter the market for Fluticasone Propionate Lotion ("Fluticasone") on March 26, 2012. As the first generic manufacturer to file an approved ANDA, Glenmark enjoyed a 180-day period of exclusivity during which time no other competitors could sell the product. Even before Glenmark launched, Sandoz (then Fougera) was planning to enter the market for Fluticasone after Glenmark's exclusivity period ended in September 2012 and understood that Perrigo was also planning to enter at the same time. Over the course of several months, Fougera—in particular CW-6, at the direction of Kaczmarek—coordinated with Glenmark frequently about Fluticasone, including market share targets and pricing, to prepare for its eventual Fluticasone launch.

1254.   After the Sandoz acquisition of Fougera in July 2012, as the end of Glenmark's 180-day exclusivity period approached, Sandoz continued to stay in communication with Glenmark and Perrigo about Fluticasone. As part of its launch strategy, Sandoz planned to obtain 33% of the market. Perrigo, however, only anticipated taking about one-quarter of the market.

1255.   By mid-August 2012, Sandoz learned that its launch of Fluticasone would be delayed until the end of November 2012 because of production problems. As a result of this delay, Kellum

was concerned that Perrigo would be able to launch earlier than Sandoz and wanted to learn more about Perrigo's launch strategy. On August 21, 2012, Kellum sent an e-mail to his sales team asking about ██████████████████ Within minutes of receiving the e-mail, CW-3 reached out to T.P., his contact at Perrigo, by phone.

1256.   CW-3 also sent a message to Perrigo through a customer. That same day, the customer sent an e-mail to a Perrigo sales executive, stating: ████████████████████████████ ██████████████████ The Perrigo sales executive informed the customer that Perrigo's Fluticasone launch had now been ████████ to the first quarter of 2013. The customer then forwarded that e-mail directly to CW-3 at Sandoz, who reported the information directly to Kellum and others at Sandoz the next day.

1257.   Around this same time, Sandoz also began preparing to have conversations with "customers" about its Fluticasone launch while at the NACDS Conference in Denver in late August 2012. It was at that same conference where CW-3 first spoke to Blashinsky at Glenmark about working ████████ and making ████████████ In an internal e-mail to the Sandoz sales team on August 25, 2012, in advance of the NACDS Conference, R.T., a senior Sandoz sales and marketing executive, instructed his team on the current strategy which aligned with the larger "fair share" understanding:

████████████████████████████████████████████████████████████████

████████████████████████████████████████

1258.   As its launch date for Fluticasone approached, Sandoz began to think more critically about which customers to target and began to communicate directly with Glenmark on the subject. On November 26, 2012, Sandoz scheduled an internal meeting to discuss which customers it should approach as part of its Fluticasone launch. That same day, CW-3 of Sandoz spoke to Blashinsky of Glenmark twice, with one call lasting five (5) minutes. After the second call with Blashinsky, CW-3 e-mailed his Sandoz colleagues a list of six (6) customers he thought Sandoz should target. That list

would later grow to eight (8) customers. CW-3 also made it known to his Sandoz colleagues that Glenmark was planning a potential price increase on Fluticasone at some point in the future.

1259.   The next day, November 27, 2012, a senior Sandoz marketing executive asked CW-3 to get Fluticasone ███████ for the customers Sandoz had agreed to target.  CW-3 responded that he was ██████████████████████████ As promised, the next morning (November 28) CW-3 called Blashinsky of Glenmark. The two spoke four (4) times that day, including one call lasting eight (8) minutes. Later that same day, CW-3 was again asked if he had been able to ██████ ████████████████████████████ CW-3 responded: ████████████ ████████████████████████

1260.   The next morning, CW-3 sent an updated list of nine (9) customers that Sandoz should target for Fluticasone—based on his conversations with Blashinsky—but did not include the pricing information that had been requested. The senior Sandoz marketing executive responded immediately: ██████ CW-3 countered by referring to a then-popular song, suggesting that his boss should call him instead of asking for the information in writing:



1261.   As Sandoz continued to prepare for its imminent launch, it also began to evaluate the usage expected from the nine customers that it had agreed with Glenmark to target. Sandoz found that those nine customers would not allow the company to reach its desired market share goals. As a result, on November 30, 2012 a senior Sandoz marketing executive suggested that Sandoz approach two large wholesaler customers, instead of one as originally agreed. CW-3 responded immediately,

saying ███████████████████████ CW-3 then stated that ██████████

████████████████████████████████████████████████████████████

███████████████ A few hours later, CW-3 called Blashinsky and left a message. Blashinsky promptly returned the call and the competitors spoke for three (3) minutes. Later that day, CW-3 also called and spoke to his contact at Perrigo, T.P., twice.

1262. Sandoz officially entered the market for Fluticasone on December 3, 2012, matching Glenmark's WAC pricing exactly. That same day, CW-3 of Sandoz called Blashinsky of Glenmark and they had a two (2) minute call. Also that day, Blashinsky directed the sales team to relinquish the Publix and Optisource accounts to Sandoz, two of the nine customers that Glenmark had agreed to give up to the new entrant.

1263. Sandoz continued to coordinate with Glenmark to make sure that it was targeting the appropriate customers and minimizing price erosion as it entered the Fluticasone market. For example, on December 13, 2012, a large wholesaler that Sandoz had agreed not to target approached Sandoz looking for an offer. That same day, CW-3 spoke to Blashinsky twice. When Sandoz refused to respond to the customer, the customer followed up again on December 21, 2012. Following the same pattern, CW-3 spoke to Blashinsky twice that day, including one call lasting four (4) minutes.

1264. Although Sandoz made sure to coordinate extensively with Glenmark, it had initial difficulty meeting its market share goal, in part because some of the customers already had a significant amount of inventory on hand. On January 9, 2013, CW-3 had a conversation with Blashinsky where the two competitors walked through a list of customers, identifying those that Sandoz should target and those which it should not. CW-3 took detailed contemporaneous notes of the conversation. Later in the day, after reviewing the list, CW-3 of Sandoz began to suspect that Glenmark may have oversold to certain customers in advance of Sandoz's entry, stating in an e-mail that he had ██████████████

███████████████

REDACTED – PUBLIC VERSION

1265.   By January 11, 2013, CW-1 of Sandoz sent around a summary of ███████ ███████ stating that ███████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████ In response, R.T. of Sandoz indicated that he was ████ ███████████ but that 21.8% market share was ██████████ and that Sandoz should continue to press for its original market share goal.

1266.   During an internal Commercial Operations meeting on January 21, 2013, Sandoz decided to approach another customer, CVS, in order to obtain additional market share. But before doing so Sandoz wanted to confirm that this was acceptable with Glenmark. In his contemporaneous notes of the meeting, CW-3 recorded in his Notebook that he was supposed to ███████ ██████████████████ and let him know that Sandoz was ██████████

1267.   Sandoz subsequently learned why Glenmark was reluctant to give up more market share to Sandoz. There was a discrepancy between the two competitors about how much market share Sandoz had already obtained. On January 29, 2013, a senior Sandoz marketing executive reported that ██████████████████████████████████████████████ ███████████████████████ Two days later, on January 31, 2013, CW-3 and Blashinsky spoke two more times, for five (5) minutes each.

1268.   Over the next several months, Sandoz and Glenmark continued to coordinate about Fluticasone, including about a Glenmark price increase on that drug. For example, on April 16, 2013, as Glenmark was preparing for a large-scale price increase on several different drugs (in coordination with several different competitors), CW-3 of Sandoz had two separate calls with Blashinsky of Glenmark, including one call lasting thirteen (13) minutes. They talked about several things, including Glenmark's potential entry and market share targets on a different drug, Alclometasone, as well as a price increase on Fluticasone, as recorded by CW-3 in his contemporaneous notes of the call:



1269.   Blashinsky called CW-3 again on May 6, 2013, in advance of the Glenmark price increase. He also called CW-3 on May 17, 2013—the day after the Glenmark price increase on Fluticasone became effective. In all, the two competitors spoke three times on May 17, 2013, including two separate five (5) minute calls.

1270.   Throughout this time period, Sandoz also kept in close communication with Perrigo about the details of Perrigo's anticipated entry into the Fluticasone market. In early April 2013 CW-3 of Sandoz spoke to T.P. of Perrigo multiple times, including calls lasting seventeen (17) and five (5) minutes, respectively. CW-3 subsequently reported to his colleagues at Sandoz that Perrigo would be delayed in entering the Fluticasone market ███████████████████████ On April 9, 2013, a colleague at Sandoz followed up asking CW-3 for additional information about whether Perrigo planned to enter ████████████████ The next day, CW-3 communicated directly with Perrigo to obtain the answer, calling and speaking with T.P. two (2) times.

1271.   On May 21, 2013, as Perrigo was beginning to plan its entry into the market, a Perrigo executive asked T.P. to obtain ████████ for Fluticasone. Two days later, on May 23, 2013, T.P.

called CW-3 at Sandoz. They ended up speaking twice that day, for five (5) and three (3) minutes, respectively. Immediately after their second call, CW-3 called Blashinsky at Glenmark—the other competitor on Fluticasone—and the two spoke for four (4) minutes.

1272.   Similarly, on May 28, 2013 a senior Sandoz executive requested additional ███ ███████ about Perrigo's entry timing on Fluticasone. That same day, CW-3 called T.P. at Perrigo and they spoke for four (4) minutes. The next day, T.P. called CW-3 back and they spoke again for two (2) minutes.

1273.   By July 2013, Perrigo finally began preparing in earnest to enter the Fluticasone market. As of that time Sandoz had been able to obtain 30% market share, reaching its initial target goal for a three-player market with Glenmark and Perrigo. Sandoz understood that, because Glenmark still had a significant majority of the market share, Perrigo would target Glenmark customers as it entered.

1274.   In the days and weeks leading up to Perrigo's launch, Perrigo was in frequent communication with Sandoz, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 11:13:00 | 0:01:00 |
| 7/10/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:14:00 | 0:01:00 |
| 7/15/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:06:00 | 0:01:00 |
| 7/16/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 9:22:00 | 0:01:00 |
| 7/17/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 11:22:00 | 0:19:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 10:27:00 | 0:01:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:11:00 | 0:01:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 10:09:00 | 0:13:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:32:00 | 0:01:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:05:00 |

1275.   Perrigo held an internal meeting to discuss its Fluticasone launch on July 16, 2013. As can be seen in the table above, on the day of the meeting T.P. of Perrigo called CW-3 at Sandoz and left a message. He called CW-3 again the next day, and they were able to speak for nineteen (19) minutes. During these conversations, T.P. informed CW-3 that, consistent with the "fair share"

understanding, Perrigo was targeting specific Glenmark customers and looking for approximately 25%

market share. CW-3 took contemporaneous notes of his conversation with T.P., as set forth below:



1276.   On July 30, 2013, Perrigo received FDA approval to begin selling Fluticasone. That

same day, T.P. of Perrigo spoke to CW-3 of Sandoz for thirteen (13) minutes. Perrigo then formally

launched the product on August 1, 2013, with the same exact WAC pricing as Glenmark and Sandoz.

T.P. and CW-3 also spoke twice that day.

1277.   As Perrigo entered the market it planned only a "limited launch," targeting only $1

million per year in sales. In accordance with the fair share understanding and the previous

communications between the competitors, Perrigo targeted—and Glenmark conceded—multiple

customers immediately.

*ii.*        *Desoximetasone Ointment*

1278.   As of the summer of 2012, Taro was the only manufacturer of Desoximetasone

Ointment.

(a)        *Sandoz Entry (September 2012)*

1279.   Starting in August 2012, Sandoz began making plans to enter the Desoximetasone

market. Because it would be a 2-player market upon Sandoz's entry, and because Sandoz was the

second manufacturer to enter the market, Sandoz initially decided—consistent with the "fair share"

understanding outlined above—to target 40% market share.

1280.   On the evening of August 21, 2012, Sandoz held an internal meeting to discuss its ███████ and ████████████ regarding Desoximetasone. Shortly after the meeting, a Sandoz executive sent an initial list of eight (8) customers that Sandoz should consider approaching. The executive indicated that Sandoz's success would depend ███████████████████ and that more research was necessary regarding one of the larger customers, because approaching such a ████ customer could cause ████████.

1281.   First thing the next morning, Sandoz began to coordinate with Taro. K.K., a national account executive at Sandoz, called D.S., a senior sales executive at Taro, and the two spoke for nine (9) minutes.

1282.   On August 30, 2012, Sandoz held another internal meeting to discuss its Desoximetasone launch. That same day, K.K. of Sandoz spoke again to D.S. of Taro, this time for two (2) minutes. The day after this internal Sandoz meeting and the phone conversation with Taro, on August 31, 2012, CW-1 of Sandoz sent Kellum a ████████ for Desoximetasone, which included specific pricing ████ and a more refined list of customers that would provide Sandoz with its target market share.

1283.   As the Sandoz launch date approached, CW-3 of Sandoz also began speaking to H.M., an account executive at Taro, to coordinate Sandoz's entry into the market. The two competitors were not friends, and nearly all their conversations were collusive in nature. According to phone records, the first ever call between the two competitors was on September 6, 2012. They spoke again on September 21, 2012, as Sandoz was finalizing its launch plan. During these calls, H.M. provided CW-3 with Taro price points for various customers so that Sandoz could bid as high as possible and avoid price erosion, while still obtaining new customers as it entered the market. CW-3 passed that pricing information and list of customer targets on to CW-1 and Kellum at Sandoz. That same day, H.M. also

sent an e-mail to J.M., a sales executive at Taro, relaying a ▮▮▮▮▮ that Sandoz would be entering the Desoximetasone market ▮▮▮▮▮▮▮▮▮▮▮▮ and suggesting six accounts as possible targets.

1284.   Sandoz received FDA approval and formally launched Desoximetasone on September 28, 2012, matching Taro's WAC pricing exactly. That same day, CW-3 of Sandoz also called H.M. at Taro and left a message; H.M. returned the call almost immediately, leaving CW-3 a voicemail.

1285.   Based on the conversations with Taro, Sandoz decided to take a ▮▮▮▮▮▮▮▮▮ in targeting customers, so ▮▮▮▮▮▮▮▮▮▮▮▮ with its competitor. In an internal Sandoz e-mail on October 1, CW-1 indicated that Sandoz's initial ▮▮▮▮▮▮▮▮ for this product had now been adjusted slightly lower based on ▮▮▮▮▮▮▮▮▮▮.

1286.   Shortly after receiving approval, on October 1, 2012, Sandoz began approaching a limited set of customers, per its agreement with Taro. That same day, CW-4 of Sandoz reached out to D.S. at Taro—with whom CW-4 had colluded with in the past—and spoke two times, including one call lasting twenty-one (21) minutes.

1287.   Consistent with the understanding in place between the two competitors, Taro immediately started conceding customers to Sandoz. For example, on October 11, 2012, a high-ranking Taro executive sent an internal e-mail discussing Sandoz's launch of Desoximetasone. In the e-mail, the executive indicated that Taro had been aware of Sandoz's launch ▮▮▮▮▮▮▮ and that Taro had just conceded two large customers to Sandoz, with the expectation of relinquishing ▮▮▮▮ ▮▮▮▮▮▮▮▮▮ going forward. That same day, H.M. of Taro called CW-3 of Sandoz, likely to let him know that the customers had been conceded and confirm the plan moving forward. They spoke twice that day, including one call lasting more than six (6) minutes.

1288.   Sandoz was able to obtain most of its targeted market share quickly, without any market disruption. By October 12, 2012, for example, R.T., a senior sales and marketing executive at Sandoz, provided a summary of the Desoximetasone launch, stating ▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████████████████

████████████████████████████████

1289.   At that point, Sandoz decided it needed to obtain at least one more customer to meet its fair share goals. Internally, Sandoz discussed sending a message to Taro that ████████████ ████████████████ On October 23, 2012, CW-1, CW-3 and Kellum scheduled a conference call to discuss which customers to approach to ████████████████████ That same day, CW-3 called H.M. at Taro and the two competitors spoke several times, including two separate fifteen (15) minute calls.

1290.   As a result of these conversations, Taro agreed to relinquish additional customers to Sandoz. By February 2013, Sandoz had captured its original goal of 40% of the Desoximetasone market, without any significant disruption.

(b)   *Glenmark Entry (September 2013)*

1291.   Glenmark received FDA approval to sell Desoximetasone on September 20, 2013. In the days and weeks leading up to the Glenmark launch, Glenmark, Taro and Sandoz were speaking frequently to coordinate Glenmark's entry, including at least the following calls and text messages:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/15/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahamian, Ara (Taro) | 13:33:00 | 0:08:00 |
| 8/20/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahamian, Ara (Taro) | 9:40:00 | 0:02:00 |
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:45:00 | 0:01:00 |
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:56:00 | 0:02:00 |
| 8/21/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 11:37:00 | 0:07:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:54:00 | 0:03:00 |
| 8/27/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 17:48:00 | 0:03:00 |
| 8/28/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 13:29:00 | 0:01:00 |
| 8/28/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:36:00 | 0:15:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:08:00 | 0:01:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:26:00 | 0:01:00 |
| 9/5/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 15:29:00 | 0:03:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 11:05:00 | 0:01:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 11:07:00 | 0:10:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 11:24:00 | 0:01:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 12:35:00 | 0:01:00 |

At the same time, Perfetto of Taro was also communicating with T.C., a senior-most executive at Glenmark, through e-mail.

1292.   Glenmark's approval came on Friday, September 20, 2013. The following Monday, there was a flurry of additional communications between the three competitors to coordinate Glenmark's entry.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/23/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 9:15:00 | 0:02:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:40:00 | 0:01:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 11:41:00 | 0:01:00 |
| 9/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:24:00 | 0:01:00 |
| 9/23/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 13:50:00 | 0:04:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 13:55:00 | 0:01:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 14:22:00 | 0:03:00 |

The day after that, September 24, CW-3 of Sandoz spoke to Aprahamian at Taro again for fifteen (15) minutes.  CW-3 then sent an e-mail to his superiors, including CW-1 and Kellum, alerting them to the situation: ████████████████████████

1293.   On September 26th, there was another torrent of phone calls between Glenmark, Taro and Sandoz:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:45:00 | 0:04:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:35:00 | 0:06:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:22:00 | 0:15:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:32:00 | 0:02:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:44:00 | 0:01:00 |

During these calls, the competitors reached an understanding about which customers Glenmark would target and what prices it would offer in order to avoid price erosion. That same day, September 26, 2013, CW-5, a senior executive at Glenmark, described Glenmark's launch strategy as a ████████ ███████████████████████████████.

1294.   Because Taro still had a majority of the market share, it understood pursuant to the "fair share" understanding that it would be the primary target of Glenmark and would have to relinquish market share to Glenmark as it entered. Internally, Taro executives commented that it ████████████████████████████████████████████████████████████████████████.

1295.   Taro began to concede customers to Glenmark immediately. By October 17, 2013, CW-5 reported internally that Glenmark had already been able to obtain 30% market share for Desoximetasone.

1296.   Because of the discussions between the competitors in advance, and because prices remained high, Taro was not upset about conceding this business to Glenmark. Taro executives continued to stress that ████████████████████████████████████████████████████ ████████████████████████████████.

1297.   In early November 2013, Taro was approached by a customer to bid on Desoximetasone as part of an RFP. In deciding whether to provide a bid, Taro executives noted that the company had already ████████████████████ so that Glenmark could obtain market share. Nonetheless, Taro still decided not to bid, stating ████████████████████████████ ████████████████████████████████.

### c.   Collusion Between Sandoz And Aurobindo

1298.   As a result of Sandoz's acquisition of Fougera, CW-6 left his job at Fougera in August 2012 and took a position as a sales executive at Aurobindo. CW-6 followed his former friend and colleague, Grauso, who moved to Aurobindo in December 2011 to assume a senior executive role.

1299.   As detailed above, CW-6 had a long-standing, collusive relationship with Grauso dating back to when he worked at Fougera and Grauso worked at G&W. Further, the two had continued that relationship even after Grauso left G&W—with Grauso serving as a conduit to communicate messages between his former G&W colleagues, Orlofski and Vogel-Baylor, and CW-6 at Fougera.

1300.   Because many of CW-6's key contacts worked at generic competitors that focused primarily on topical products, his move to Aurobindo—a company focused on oral solids—was a difficult transition. Without many of those prior relationships to rely on, CW-6 was concerned that he might not be able to prove his value at Aurobindo. Indeed, CW-3 at Sandoz was one of the few people that CW-6 knew who worked for a company that also manufactured a significant number of oral solids.

1301.   For that reason, when Aurobindo sold a product that overlapped with Sandoz, CW-6 used his relationship with CW-3 to collude on that product. Although CW-6 and CW-3 were former colleagues, they were not social friends. When CW-6 called CW-3 during this time period, they were engaging in anticompetitive conduct. Between August 2012, when CW-6 began at Aurobindo, and May 2013, when CW-6 left the industry, he exchanged at least one hundred and nine (109) phone calls with CW-3.

1302.   During this time period, CW-6 was acting at all times at the direction of, or with approval from, his superiors, including Grauso.

1303.   The following section will focus on the anticompetitive conduct engaged in by CW-3 and CW-6 with regard to several products on which Sandoz and Aurobindo overlapped during this time period.

### i.     *Oxacillin Sodium and Nafcillin Sodium Injectable Vials*

1304.   Oxacillin Sodium ("Oxacillin") and Nafcillin Sodium ("Nafcillin") are separately marketed antibiotics used to treat similar conditions.

1305.   In 2012, non-defendant Sagent Pharmaceuticals and Sandoz were the primary generic suppliers of Oxacillin and Nafcillin. However, in December 2012, Aurobindo began making plans to enter the Nafcillin and Oxacillin markets as a third entrant.

1306.   In advance of Aurobindo's entry into those markets, on December 26, 2012 for Nafcillin and January 22, 2013 for Oxacillin, CW-6 and CW-3 spoke several times to discuss pricing and the allocation of market share to the new entrant, Aurobindo. All the while, CW-6 kept his supervisor, Grauso, informed of his conversations with CW-3.

1307.   On December 12, 2012, CW-6 called Grauso and they spoke for five (5) minutes. That set off a flurry of phone calls between CW-6 and CW-3, with nearly constant reporting back by CW-6 to his supervisor, Grauso, as the two competitors orchestrated how to avoid competition upon Aurobindo's entry. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:21:00 | 0:05:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:25:00 | 0:01:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:26:00 | 0:03:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:28:00 | 0:02:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 11:41:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:05:00 |

1308.   Two weeks later, on December 26, 2012, Aurobindo received FDA approval to market Nafcillin and published WAC pricing that essentially matched Sandoz's WAC pricing. On the date

**REDACTED – PUBLIC VERSION**

that Aurobindo received approval, and in the days surrounding the launch, CW-6 spoke several more times with CW-3 during which they discussed the launch. As he had done before, CW-6 reported back to Grauso what they had discussed. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 9:29:00 | 0:03:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:46:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 12:26:00 | 0:08:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:49:00 | 0:02:00 |
| 12/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 16:49:00 | 0:02:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Aurobindo Pharma | 3:19:00 | 0:13:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:39:00 | 0:11:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:24:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:51:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:32:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 8:01:00 | 0:04:00 |

1309.   The calls between the competitors continued into January 2013. On January 3, 2013, CW-6 spoke with Grauso three times for a total of twenty-five (25) minutes. Twenty minutes later, CW-3 called CW-6. The call lasted two (2) minutes. The next morning, CW-6 spoke with Grauso for four (4) minutes. That same morning, CW-6 called CW-3 of Sandoz twice, with one call lasting three (3) minutes.

1310.   Two days later, on January 6, 2013, Sandoz put together a Monthly Business review regarding its key products, including Nafcillin and Oxacillin. Regarding Oxacillin, Sandoz noted that Aurobindo was ▮▮▮▮▮ to be entering the market. Sandoz stated that its ▮▮▮▮▮▮▮ ▮▮▮▮▮ were to ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮

322

REDACTED – PUBLIC VERSION

1311.   Over the next several days, between January 7, 2013 and January 11, 2013, CW-6 and

CW-3 spoke several more times by phone. After those calls, CW-6 promptly called Grauso to keep

him apprised of his discussions. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:44:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:06:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:00:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:11:00 | 0:14:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:37:00 | 0:06:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:32:00 | 0:08:00 |

1312.   Two weeks later, on January 22, 2013, Aurobindo entered the Oxacillin market and

again published WAC pricing that essentially matched Sandoz's WAC pricing. That same day, CW-6

spoke with Grauso for ten (10) minutes. Ten minutes after hanging up, CW-6 called CW-3 of Sandoz.

The call lasted one (1) minute. Over the next two days, CW-6 and CW-3 shared five (5) more phone

call.

1313.   In an e-mail dated January 30, 2013, Sandoz noted that it had ▓▓▓▓▓▓▓ its

Oxacillin contract at Walgreens to the entrant, Aurobindo. That same day, CW-3 and CW-6 spoke by

phone for four (4) minutes.

        *ii.*     *Cefpodoxime Proxetil Oral Suspension and Tablets*

1314.   Cefpodoxime Proxetil ("Cefpodoxime") is sold in both oral suspension and tablet

form.

1315.    On January 3, 2013, CW-3 of Sandoz called CW-6 of Aurobindo. The call lasted two

(2) minutes. The next day, on January 4, 2013, CW-6 called CW-3 twice, with one call lasting three (3)

minutes. A few minutes after hanging up, CW-3 called Kellum and they spoke for nine (9) minutes.

After that call, Kellum sent the following e-mail to R.T., a senior sales and marketing executive at

Sandoz:



R.T. responded, ⬛⬛⬛⬛⬛⬛⬛⬛ to which Kellum replied, ⬛⬛⬛⬛

1316.    The following business day, on January 7, 2013, CW-6 of Aurobindo and CW-3 of

Sandoz exchanged three calls, including one lasting six (6) minutes. On these calls, CW-6 confirmed

that Aurobindo planned to launch both formulations of Cefpodoxime that week. CW-3 told CW-6

that Sandoz planned to increase pricing on both formulations by 20%. CW-6 advised that Aurobindo

was looking for 40% share and would start by targeting Cardinal and CVS. In turn, CW-3 gave his

competitor specific non-public contract price points that Sandoz was charging to those customers.

CW-6 then stated: ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ CW-3's contemporaneous notes from

this call are below:

**REDACTED – PUBLIC VERSION**



1317.   Shortly after speaking with each other, CW-6 called Grauso and CW-3 called Kellum

to report back what they had discussed. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:44:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:06:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 4:53:00 | 0:07:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:00:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:11:00 | 0:14:00 |

1318.    On January 9, 2013 and January 11, 2013, the day that Sandoz increased WAC pricing

on Cefpodoxime, CW-3 and CW-6 exchanged three more calls. After speaking with each other, CW-

3 called Kellum and CW-6 called Grauso to report back what they had discussed. This call pattern is

detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:47:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:38:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |

1319.    Due to an issue at its manufacturing facility, Aurobindo's launch of Cefpodoxime was

delayed and the company was unable to launch in January 2013 as planned.

1320.    Between February 24 and February 27, 2013, ECRM held its annual Retail Pharmacy

Generic Pharmaceuticals Conference in Dallas, Texas. Representatives from Aurobindo and Sandoz

were in attendance, including CW-6 and Grauso of Aurobindo and Kellum, CW-3, and CW-2 of

Sandoz.

1321.    On February 26, 2013, CW-2, a Sandoz senior sales executive, while still at the ECRM

conference, sent the following e-mail to his Sandoz colleagues:

REDACTED – PUBLIC VERSION



1322.    On April 17, 2013, CW-6 of Aurobindo called CW-3 of Sandoz. The call lasted two (2) minutes. Less than an hour later, CW-3 called CW-6 back and they spoke for six (6) minutes. The next day, on April 18, 2013, CW-6 called CW-3 and they spoke for ten (10) minutes. That same day, Aurobindo launched both formulations of Cefpodoxime and matched Sandoz's increased WAC pricing.

1323.    On April 30, 2013, CW-3 and CW-6 exchanged three phone calls, including one call lasting three (3) minutes. On these calls, the competitors again discussed Aurobindo's launch of Cefpodoxime Tablets, including that Aurobindo was looking for 40-50% market share. The competitors also discussed specific customers that Aurobindo was targeting. CW 3's contemporaneous notes from these calls are pictured below:

REDACTED – PUBLIC VERSION

[black redaction block]

1324.   In accordance with the plan, on May 22, 2013, Aurobindo made an offer to CVS for Cefpodoxime Tablets and the customer accepted that offer the very next day on May 23, 2013.

1325.   Similarly, on August 29, 2013, Aurobindo made an offer to ABC for Cefpodoxime Tablets. The next day, on August 30, 2013, ABC e-mailed Sandoz to advise that it had received a competitive offer and asked whether Sandoz wanted to bid to retain the business. On September 4, 2013, S.G., a Sandoz sales executive, responded to ABC and declined the opportunity stating, █████ ███████████████████████████████ Later that same day, ABC awarded the business to Aurobindo.

1326.   Aurobindo would also win awards for Cefpodoxime Tablets at McKesson and several other smaller customers, without substantially eroding the high pricing in the market.

1327.   On September 9, 2013, P.S., an Aurobindo sales and marketing executive, pushed Grauso to submit a bid for Wal-Mart's Cefpodoxime business. Grauso balked at the request stating, ██████████████████████████████ P.S. responded, ████████████████ ████████████████████████████████████████████████████ ██████ Given the market share breakdown, Grauso gave his approval to submit a bid to Wal-Mart.

Thereafter, on September 30, 2013, the customer accepted the bid and awarded Aurobindo its business.

1328.   Later, in December 2013, when Sandoz was looking to identify additional products to supply to Wal-Mart, Kellum noted with respect to Cefpodoxime: ███████████████████████████ ████████████████████████████████████████████████████

### d.   Collusion Between Sandoz and non-defendant Rising

1329.   CW-3 and CW-2 worked together as senior sales executives at Sandoz until August 2013 when CW-2 left Sandoz to become a senior sales and marketing executive at Rising. While at Sandoz, the two were close friends. CW-2 was responsible for Walmart and helped transition the account to CW-3 when he moved to Rising.

1330.   Beginning in 2013, and beyond, these former colleagues turned competitors used their relationship to collude with regard to products on which Rising and Sandoz overlapped.

### 5.   G&W And Its Other Relationships

1331.   Earlier sections of this Complaint discuss in detail G&W's collusion with several competitors between 2010 and July 2012, when Sandoz acquired Fougera—including collusion with Fougera, Perrigo, and Glenmark. Another section focuses on collusion between Taro and G&W in late 2015 and early 2016 on several products that G&W purchased from Teva.

1332.   However, G&W's illegal behavior goes well-beyond those examples. During the time period relevant to this Complaint, the vast majority of G&W's business was implicated by its anticompetitive conduct.  Much of this collusion was spearheaded by Orlofski and Vogel-Baylor. Both were prolific communicators that used their many relationships with competitors to collude on overlap products.

1333.   Between January 2011 and December 2016, when he left G&W, Orlofski exchanged at least one thousand eight hundred and sixty-three (1,863) phone calls and text messages with his

contacts at Lupin, Aurobindo, Amneal, Wockhardt, Taro, Glenmark, Perrigo, Fougera, Actavis, and Sandoz. These communications are detailed in the chart below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 589 | 4/4/2011 | 10/13/2016 |
| Grauso, Jim (Aurobindo) | 406 | 12/28/2011 | 1/20/2014 |
| S.R.(1) (Amneal) | 265 | 8/29/2011 | 4/8/2016 |
| M.C. (Wockhardt) | 238 | 4/19/2011 | 12/27/2016 |
| Perfetto, Mike (Taro) | 136 | 1/25/2013 | 9/1/2016 |
| Grauso, Jim (Glenmark) | 66 | 2/12/2014 | 10/27/2016 |
| S.K. (Perrigo) | 56 | 1/20/2011 | 4/24/2012 |
| Aprahamian, Ara (Taro) | 45 | 7/24/2013 | 6/10/2016 |
| Boothe, Douglas (Perrigo) | 19 | 1/25/2013 | 1/8/2015 |
| K.K. (Wockhardt) | 11 | 8/29/2011 | 8/30/2011 |
| Taro Pharmaceuticals | 11 | 3/22/2012 | 8/5/2014 |
| Kaczmarek, Walt (Fougera) | 4 | 2/8/2012 | 2/10/2012 |
| Boyer, Andy (Actavis) | 4 | 9/7/2012 | 7/22/2013 |
| D.P. (Sandoz) | 3 | 8/13/2013 | 8/13/2013 |
| Wesolowski, John (Perrigo) | 3 | 9/16/2014 | 9/16/2014 |
| CW-6 (Aurobindo) | 3 | 10/31/2012 | 5/25/2013 |
| CW-6 (Fougera) | 2 | 2/1/2012 | 2/1/2012 |
| B.S. (Taro) | 1 | 4/24/2012 | 11/15/2012 |
| C.V. (Perrigo) | 1 | 6/1/2016 | 6/1/2016 |

1334.    Similarly, between July 2011 and February 2017, Vogel-Baylor exchanged at least nine thousand two hundred and seventy-four (9,274) phone calls and text messages with her contacts at Aurobindo, Glenmark, non-defendant Greenstone, Wockhardt, Actavis, Lupin, Amneal, Perrigo, Fougera, Valeant, Taro, and Mylan. These communications are detailed in the chart below:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Grauso, Jim (Aurobindo) | 2120 | 12/29/2011 | 1/30/2014 |
| CW-5 (Glenmark) | 2061 | 3/30/2012 | 2/21/2014 |
| Hatosy, Robin (Greenstone) | 1294 | 3/28/2012 | 4/22/2016 |
| M.M. (Wockhardt) | 1158 | 7/31/2011 | 10/22/2013 |
| K.K. (Wockhardt) | 868 | 7/29/2011 | 1/31/2014 |
| Grauso, Jim (Glenmark) | 692 | 2/4/2014 | 7/18/2016 |
| Rogerson, Rick (Actavis) | 438 | 8/8/2012 | 2/8/2017 |
| Berthold, David (Lupin) | 159 | 8/28/2011 | 4/16/2014 |
| CW-6 (Aurobindo) | 121 | 8/26/2012 | 5/3/2013 |
| J.P. (Amneal) | 113 | 3/26/2014 | 12/6/2016 |
| T.P. (Perrigo) | 94 | 7/8/2013 | 4/29/2016 |
| Brown, Jim (Glenmark) | 56 | 5/7/2013 | 10/2/2015 |
| S.R.(1) (Amneal) | 24 | 5/15/2012 | 5/16/2013 |
| S.K. (Wockhardt) | 16 | 9/14/2011 | 9/24/2012 |
| M.C. (Wockhardt) | 13 | 8/28/2011 | 6/13/2012 |
| CW-6 (Fougera) | 12 | 5/18/2012 | 8/7/2012 |
| B.P. (Valeant) | 9 | 11/20/2013 | 11/25/2015 |
| Aprahamian, Ara (Taro) | 6 | 3/27/2014 | 9/24/2015 |
| Aurobindo Pharma | 6 | 1/17/2012 | 6/15/2012 |
| J.K. (Aurobindo) | 6 | 6/4/2013 | 7/17/2013 |
| Glenmark Pharmaceuticals | 2 | 3/14/2014 | 9/9/2015 |
| D.I. (Glenmark) | 2 | 3/3/2014 | 3/7/2014 |
| Perfetto, Mike (Taro) | 2 | 3/21/2014 | 3/21/2014 |
| C.U. (Taro) | 1 | 1/6/2016 | 1/6/2016 |
| M.A. (Mylan) | 1 | 5/20/2014 | 5/20/2014 |

1335.    At all relevant times herein, Vogel-Baylor was acting at the direction of her supervisor, Orlofski.  Orlofski was very much aware of her collusion with competitors and encouraged her to do it. The Complaint is replete with examples of Vogel-Baylor communicating with a competitor and then immediately calling Orlofski to report back what she had learned. Indeed, Vogel-Baylor was evaluated, at least in part, based on the strength of her competitive relationships.

1336.    Vogel-Baylor also directed her subordinates to collude with competitors. For example, in February 2014, G&W hired K.K., previously a sales executive at Wockhardt. Immediately upon his arrival, K.K. began colluding in earnest with his contact at Sandoz, CW-3. Up to that point, no G&W employee had a relationship with anyone at Sandoz. Although there had been a relationship with CW-

6 of Fougera prior to the Sandoz acquisition, his departure from the company left a gap. K.K.'s relationship with CW-3 filled this void.

1337.  Although it was a smaller company, G&W celebrated the fact that it was selling topical products, where it was able to form anticompetitive agreements with most of its primary competitors. For example, in May 2013, Vogel-Baylor was asked to put together a report for management regarding G&W's sales goals for the coming year. After listing out a number of G&W's price increases from 2012—all of which were the subject of collusion and many of which are discussed at various points throughout this Complaint—Vogel-Baylor concluded: ████████████████████████ ████████████████████████████████████████████████

1338.  The following Sections focus on G&W's relationships with Perrigo, Actavis, Glenmark, and Lupin, and discuss specific examples of how those anticompetitive relationships manifested themselves with respect to particular products.

### a.  Collusion Between G&W And Perrigo

1339.  As detailed above, after Sandoz's acquisition of Fougera in July 2012, CW-6 left Fougera and took a sales position at Aurobindo. Although Vogel-Baylor could no longer use CW-6 to collude with regard to products on which G&W and Fougera overlapped, she knew that CW-6 had a contact at another one of G&W's key competitors, T.P. at Perrigo. Over the next year, Vogel-Baylor and T.P. would use CW-6 as a conduit to pass information between them and reach anticompetitive agreements with regard to a number of products on which G&W and Perrigo overlapped.

1340.  This collusive relationship was critical because G&W overlapped with Perrigo on more products than any other competitor during this time period.

1341.  In May 2013, CW-6 suffered an illness and left the industry. With CW-6 no longer available to serve as middleman, Vogel-Baylor had no choice but to collude directly with T.P. of Perrigo. In July 2013, she placed her first calls ever to T.P. according to the available phone records.

Over the ensuing years, Vogel-Baylor and T.P. colluded on several products that are discussed in detail below.

*i.*      *Hydrocortisone Acetate Suppositories*

1342.   Hydrocortisone Acetate Suppositories ("Hydrocortisone Acetate") is also known by the G&W brand name Anucort-HC.

1343.   During the time period relevant to this Complaint, Hydrocortisone Acetate was G&W's top-selling product. As of January 2016, the 25mg formulation of Hydrocortisone Acetate accounted for nearly half of all of G&W's annual sales, totaling more than $119.7 million. Similarly, Hydrocortisone Acetate was Perrigo's second-best selling product. During that same time period, Perrigo's moving annual sales for the 25mg and 30mg formulations accounted for approximately $78.3 million of Perrigo's total sales.

1344.   In 2013, the Hydrocortisone Acetate market was split between G&W with 41% market share, Perrigo with 32%, and non-defendant County Line Pharmaceuticals ("County Line") with 25%. However, by late June 2013, County Line made the decision to exit the market for Hydrocortisone Acetate.

1345.   County Line's exit created an opportunity for Perrigo and G&W to collude to significantly raise the price of Hydrocortisone Acetate in July 2013, and then again one year later in July 2014.

1346.   On June 25, 2013, Vogel-Baylor of G&W e-mailed Wal-Mart, a County Line customer, stating that she had heard that County Line was discontinuing Hydrocortisone Acetate and asked whether Wal-Mart was interested in a new supplier.

1347.   Similarly, on June 26, 2013, ABC, also a County Line customer, e-mailed G&W requesting a bid on Hydrocortisone Acetate due to a ███████████████████ Vogel-Baylor forwarded the request to her supervisor, Orlofski, explaining: ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████

1348.   Between June 27 and June 30, 2013, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Venetian hotel in Las Vegas, Nevada.

1349.   While at the trade show, on June 27, 2013, Vogel-Baylor received a call from S.S., a sales executive at Perrigo. The call lasted approximately one (1) minute. A few hours later, Vogel-Baylor called Orlofski and they spoke for nearly fifteen (15) minutes. Shortly thereafter, Vogel-Baylor sent an internal e-mail to her team notifying them that G&W would be implementing a price increase for Hydrocortisone Acetate and requesting that they draft customer notifications to that effect. The price increase included a 200% increase to WAC and would result in an estimated $27.9 million in increased sales for G&W.

1350.   J.G., an operations manager at G&W, responded to Vogel-Baylor's e-mail stating, ██ ████████████████████████████████████████████████████ To which Vogel-Bayler responded: ██████████

1351.   The next day, on June 28, 2013, Vogel-Baylor contacted Orlofski three more times from the trade show, including exchanging two (2) text messages and one call lasting more than nineteen (19) minutes.

1352.   On July 8, 2013, T.P. of Perrigo and Vogel-Baylor exchanged two (2) calls and then connected for a call lasting more than seven (7) minutes, during which they coordinated their price increases on Hydrocortisone Acetate. After that call, both T.P. of Perrigo and Vogel-Baylor reported the substance of their conversations back to their supervisors. Immediately upon hanging up with

REDACTED – PUBLIC VERSION

T.P., Vogel-Baylor called Orlofski and they spoke for more than six (6) minutes. Similarly, T.P. called Wesolowski three (3) times after speaking with Vogel-Baylor, including two calls lasting one (1) minute and a third lasting six (6) minutes. The G&W price increases on Hydrocortisone Acetate went into effect on July 9. That same day, Perrigo issued a product announcement notifying its customers that it was also increasing its pricing on Hydrocortisone Acetate effective July 11, 2013. Perrigo increased its WAC by 473% on the 25mg formulation to essentially match G&W's WAC. That same day, July 11, 2013, T.P. of Perrigo called Vogel-Baylor.  The call lasted one (1) minute.

1353.   Also on July 11, 2013, ABC e-mailed Vogel-Baylor asking G&W to lower its dead net pricing for Hydrocortisone Acetate to match Perrigo's slightly lower dead net pricing. Vogel-Baylor forwarded the request to Orlofski who responded: ███████     Vogel-Baylor replied, ███████ ███████  Later that day, Vogel-Baylor responded to ABC and declined to lower its pricing.

1354.   On July 19, 2013, Harvard Drug Group e-mailed Vogel-Baylor asking why G&W was increasing its price on Hydrocortisone Acetate. Vogel-Baylor replied ████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████

1355.   Several months later, on April 9, 2014, K.K., a G&W sales executive, e-mailed Vogel-Baylor regarding bidding on several products at Kaiser, including Hydrocortisone Acetate. Vogel-Baylor responded that G&W could not disrupt the market and pursue the customer, reasoning that Kaiser ███████████████████████████████████████████████ ███████████

1356.   On June 11, 2014, Vogel-Baylor e-mailed Orlofski recommending that G&W increase McKesson's contract pricing for Hydrocortisone Acetate. That same day, Vogel-Baylor called T.P. of

Perrigo. The call lasted less than one (1) minute. Two days later, on June 13, 2014, Vogel-Baylor tried to reach T.P. again by phone. The call lasted less than one (1) minute.

1357.   Less than a week later, on June 26, 2014, Perrigo generated its own internal price increase analysis for Hydrocortisone Acetate. The analysis assumed zero percent unit loss as a result of the planned increase.

1358.   On July 22, 2014, Perrigo notified its customers that it was increasing pricing on a list of products, including Hydrocortisone Acetate. This included a 235% increase to WAC for its 25mg formulation, effective on July 24, 2014.

1359.   At the time the increase was announced, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Gaylord Palms Hotel in Orlando, FL. Over the next several days, G&W heard from multiple customers that Perrigo had increased pricing on Hydrocortisone Acetate.

1360.   In accordance with their ongoing understanding to follow each other's price increases, and consistent with past practice on this product and others, G&W went to work implementing a comparable price increase of its own.

1361.   On July 29 and July 30, 2014, Vogel-Baylor and Orlofski exchanged e-mails finalizing the details of the price increase for Hydrocortisone Acetate. The increase included an increase to WAC for the 25mg, 12-count bottle that essentially matched Perrigo pricing.

1362.   Also on July 30, 2014, Vogel-Baylor learned of pricing that Perrigo had offered to Schnucks and sent a text message to her superiors: ███████████████████████████████████
████████████████████████████████████████████████

1363.   The next day, on July 31, 2014, A.G., a senior G&W executive, e-mailed Vogel-Baylor stating: ████████████████████████████████████████████████
████████████████████████████████████████████████

Vogel-Baylor responded, █████████████████████████████████████████████

████████████████████████████████████████████████

1364.   The next day, on August 1, 2014, G&W began notifying its customers of the price increase on Hydrocortisone Acetate. Vogel-Baylor sent an internal e-mail advising the team that, ███

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ G&W sent out a second wave of letters to additional customers on August 5, 2014.

1365.   The increase included a 200% increase to WAC for all three package sizes. According to an internal analysis, G&W projected an increase in Hydrocortisone Acetate sales from $41.3 million to $111.3 million as a result of the increase, or a total of $70 million in sales.

1366.   The two competitors continued to coordinate after the price increases. On August 11, 2014, T.P. of Perrigo called Vogel-Baylor and they spoke for more than sixteen (16) minutes. One week later, on August 18, 2014, Vogel-Baylor called T.P. and they spoke for more than ten (10) minutes.

1367.   Several customers did not react kindly to the increase. For example, when Vogel-Baylor e-mailed Econdisc to notify the customer of the price increase, Econdisc responded by stating that G&W's conduct was ██████████████████████ Similarly, after learning of the increase, Schnucks sent the following e-mail to Vogel-Baylor:



b.   **Collusion Between G&W And Actavis**

1368.   Vogel-Baylor met Rick Rogerson, a senior pricing executive at Actavis, while attending

the NACDS Pharmacy and Technology Conference in Denver, Colorado, from August 25 to August

28, 2012.

1369.   After returning from the NACDS conference, Rogerson sent Vogel-Baylor an e-mail

on August 30, 2012, stating:

1370.   Later that same day, on August 30, 2012, Vogel-Baylor called Rogerson and they spoke for seventeen (17) minutes. Over the ensuing months, the two competitors stayed in regular contact and colluded to raise prices on Promethazine HCL Suppositories twice—once in late 2012 and again in 2013. The collusion on this product is discussed in detail below.

### i.   *Promethazine HCL Suppositories*

1371.   In late 2012 and early 2013, the competitors in the market for Promethazine HCL were Actavis, Perrigo, and G&W.

1372.   Starting in late August 2012—around the same time that Vogel-Baylor first met Rogerson at Actavis—G&W began planning a price increase for Promethazine HCL. Prior to implementing that increase, and as it had done on other products, G&W reached out to its competitors to coordinate plans.

1373.   On September 18, 2012, Vogel-Baylor sent an internal e-mail to M.S., a sales analyst at G&W, asking her to prepare a spreadsheet containing Promethazine sales data for the price increase. That same day, Vogel-Baylor also responded to a request from her boss, Orlofski, asking who the incumbent manufacturers were for the major wholesalers. Vogel-Baylor stated that G&W was the incumbent at ABC and Cardinal and Actavis supplied McKesson. The next day, on September 19, 2012, Orlofski replied: ███████████████████████████████████

1374.   Meanwhile, Vogel-Baylor was actively communicating with Rogerson of Actavis regarding the increases. On September 18, 2012 alone, Vogel-Baylor exchanged thirty-four (34) text messages with Rogerson.

1375.   Similarly, on September 19, 2012, Vogel-Baylor used her contact at Aurobindo, CW-6, as a conduit to communicate with T.P. of Perrigo, the other competitor on Promethazine HCL. This call pattern is detailed in the chart below. Notably, these are the same calls that Vogel-Baylor

REDACTED – PUBLIC VERSION

used to convey information regarding the price increase on Halobetasol, another product on which Perrigo and G&W overlapped, which was happening at the same time.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

1376.   After speaking with CW-6 for the final time on September 19, 2012, Vogel-Baylor immediately called her boss, Orlofski, and spoke to him for thirteen (13) minutes.

1377.   While Vogel-Baylor was communicating with T.P. of Perrigo through her contact CW-6, T.P. was also communicating directly with M.D., a sales executive at Actavis, and reporting that information back to his superior, Wesolowski. This call pattern, including the calls between T.P. and CW-6, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:38:00 | 0:11:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:58:00 | 0:02:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:59:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Aurobindo) | 13:02:00 | 0:02:00 |

1378.   Over the next week, G&W worked to finalize its price increase for Promethazine HCL. On September 21, 2012, Vogel-Baylor forwarded her initial price increase analysis to Orlofski and scheduled a one-on-one meeting to discuss it on September 24, 2012. Two days later, on September 26, 2012, Vogel-Baylor e-mailed a revised price increase analysis to Orlofski and, after obtaining his approval, e-mailed that analysis to the team on September 28, 2012. In her e-mail, Vogel-Baylor

informed the team that they were to send out their price increase notices to customers on October 5, 2013.

1379.   Throughout this time period, Vogel-Baylor stayed in constant communication with Rogerson at Actavis. Between September 25, 2012 and October 5, 2012—the day the price increase notices were sent—Vogel-Baylor exchanged thirty-eight (38) text messages with Rogerson. Vogel-Baylor also continued to keep T.P. of Perrigo informed of G&W's plans through her conduit CW-6. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |
| 10/5/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 5:30:01 | 0:01:41 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 5:38:00 | 0:02:00 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 5:39:00 | 0:06:00 |

1380.   On October 8, 2012, G&W published increased WAC pricing for Promethazine HCL, which included an 18% increase on the 25mg dosage and a 35% increase on the 12.5mg dosage.

1381.   Perrigo followed suit on December 4, 2012, when it notified customers that it would be increasing contract pricing on Promethazine HCL effective January 5, 2013.  On February 12, 2013 and April 3, 2013, Actavis also followed and increased its WAC pricing to match G&W on the 12.5mg and 25mg dosages, respectively. On February 12, 2013, Rogerson called Vogel-Baylor and they spoke for nearly twenty-two (22) minutes. Knowing now that all three competitors were on board to increase prices, they began contemplating a second increase on Promethazine HCL—and this time, it would be much larger.

REDACTED – PUBLIC VERSION

1382.   On March 25, 2013, M.S., a sales analyst at G&W, forwarded Vogel-Baylor updated sales data for Promethazine HCL. That same day, Orlofski of G&W sent a text message to Boothe, an executive at Perrigo. The next day, on March 26, 2013, Boothe called Orlofski back and they spoke for six (6) minutes. Similarly, Vogel-Baylor continued to communicate with T.P. of Perrigo through her conduit, CW-6, about Promethazine HCL. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:59:51 | 0:00:15 |
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:21:57 | 0:06:46 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:28:00 | 0:01:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 17:33:00 | 0:02:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:36:00 | 0:01:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 20:04:10 | 0:00:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 20:05:10 | 0:01:37 |
| 3/28/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 18:19:55 | 0:00:03 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 18:41:00 | 0:05:00 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 18:46:00 | 0:01:00 |

1383.   On March 28, 2013, the same day as the last calls listed above, Vogel-Baylor finalized a price increase analysis for Promethazine HCL and, on April 1, 2013, she forwarded that information to Orlofski. Vogel-Baylor and Orlofski discussed some revisions to the analysis and, on April 10, 2013, Vogel-Baylor sent the revised analysis to Orlofski. G&W planned to implement the price increase on April 15, 2013, but ultimately sent the notices on April 16, 2013.

1384.   Meanwhile, all three competitors continued to coordinate their plans on Promethazine HCL. Vogel-Baylor of G&W was speaking with Rogerson at Actavis, while T.P. at Perrigo was speaking to M.D. at Actavis. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/1/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 15:11:49 | 0:00:26 |
| 4/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:41 | 0:00:00 |
| 4/4/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:55:41 | 0:01:30 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 17:33:07 | 0:00:00 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 19:32:16 | 0:00:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 7:35:00 | 0:01:00 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:12:00 | 0:25:00 |

**REDACTED – PUBLIC VERSION**

1385.   At the same time, Vogel-Baylor continued to use CW-6 as a conduit to communicate with T.P. of Perrigo regarding Promethazine HCL. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/4/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:37:55 | 0:07:00 |
| 4/5/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:25:00 | 0:01:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:30:28 | 0:00:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:36:07 | 0:00:00 |
| 4/5/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 16:44:00 | 0:01:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 11:59:40 | 0:00:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:00:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:03:00 | 0:01:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:18:02 | 0:00:03 |
| 4/8/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:23:18 | 0:00:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:36:24 | 0:00:03 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:53:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:26:00 | 0:02:00 |
| 4/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 11:08:00 | 0:04:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:50:56 | 0:00:29 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:00:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 14:09:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 16:52:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 16:59:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 17:05:00 | 0:02:00 |

1386.   According to the plan, on April 17, 2013 G&W published new WAC pricing for Promethazine HCL, increasing WAC from $38.99 to $116.97—an approximately 200% increase.

1387.   Around the time of the increase, G&W received an e-mail from a potential new customer seeking pricing on a list of products, including Promethazine HCL. M.S. forwarded the request to Vogel-Baylor who responded, ██████████████████████████████ ████████████████████████████████████████ ████████████████████

1388.   A few weeks later, Actavis followed G&W's price increase on Promethazine HCL and, on June 5, 2013, published WAC pricing that matched G&W. Prior to increasing its price, and as it had now done several times before, Actavis spoke with both G&W and Perrigo. These calls are detailed in the chart below:

**REDACTED – PUBLIC VERSION**

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/29/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 9:09:00 | 0:01:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:12:00 | 0:02:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:14:00 | 0:05:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:19:00 | 0:02:00 |
| 5/31/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 4:04:00 | 0:09:00 |
| 5/31/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 8:38:00 | 0:07:00 |
| 6/3/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 12:00:52 | 0:14:17 |
| 6/4/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 11:10:30 | 0:12:16, |

1389.   On June 26, 2013, Vogel-Baylor e-mailed Orlofski to advise him that G&W had received Cardinal's 2013 RFP. Vogel-Baylor explained, ██████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████ The next day, Vogel-Baylor received a short phone call from S.S., a sales executive at Perrigo. Several hours later, Vogel-Baylor placed a phone call to Orlofski.

1390.   G&W had no reason to fear because a few weeks later, on July 30, 2013, Perrigo notified its customers that it was increasing price on a list of products, including Promethazine HCL, with an effective date of August 1, 2013. This included an increase to its WAC pricing that matched G&W and Actavis. In the days leading up to Perrigo's price increase, the three competitors again spoke several times by phone. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 7/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 0:01:11 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 0:03:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Outgoing | Vogel-Baylor, Erika (G&W) | 0:01:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:02:33 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | T.P. (Perrigo) | 0:00:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:09:06 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 0:21:00, |

1391.   Several months later, the collusion continued for Promethazine HCL. On March 5, 2014, K.K., a G&W sales executive, informed Vogel-Baylor that Walgreens had received an offer from

Actavis for a one time buy on the 25mg dosage at a significantly discounted price of $42.08. G&W would later learn that Actavis had made the offer because it had an excess of short-dated inventory on the 25mg dosage. This information stunned Vogel-Baylor, who asked ███████████████████ ██████

1392.   Despite her initial surprise, Vogel-Baylor confidently reported to Orlofski: ██████████ ████████████████████████████████████████████████████████████████████

To make good on her promise, Vogel-Baylor placed a call to Rogerson fifteen (15) minutes later. The two competitors continued to trade phone calls over the next several days, including a call on March 6, 2014 that lasted eleven (11) minutes.

1393.   Apparently, Vogel-Baylor's communications with Rogerson did yield a solution to her problem. On March 18, 2014, she e-mailed Walgreens to advise the customer that G&W lowered its price on Promethazine HCL. Aware that the details of her interactions with Rogerson would be incriminating if reduced to writing, Vogel-Baylor offered only a vague statement to the customer: ████████████████████████████████████████

1394.   Over the next several months, G&W would continue to decline to bid on new opportunities for Promethazine HCL so as not to upset the market share balance it had achieved with its competitors.

1395.   For example, on May 5, 2014, L.C., a sales executive at G&W, summed up G&W's commitment to playing nice in the sandbox when she told a customer, PBA Health, that she wanted to identify opportunities for Promethazine HCL (and other drugs) only if she could do so ████████ ████████████████████████ Similarly, on May 30, 2014, Vogel-Baylor instructed M.S. not to bid on the Promethazine HCL business at another customer, IPC, because ██████████████████████████ ████████████████████████████ Further, on August 8, 2014, Vogel-Baylor told K.K. that, prior to bidding on Promethazine HCL at Humana, G&W would need to know who the

incumbent was and whether there was a right of first refusal, reasoning it was ███████████

███████████████████

1396.   Lastly, on August 25, 2014, McKesson—an Actavis customer—e-mailed K.K. asking if G&W would like to bid on Promethazine HCL. K.K. knew that G&W would not bid but, in an effort to get the story straight, asked Vogel-Baylor if he should provide the pre-textual justification that G&W was at capacity. Vogel-Baylor approved that messaging in a response on August 28, 2014 stating: ████████████████████████████████████████████

████████████████

c.   **Collusion Between G&W And Glenmark**

1397.   As detailed above in an earlier section, Vogel-Baylor of G&W had a long-standing relationship with CW-5, a senior executive at Glenmark, and the competitors used that relationship to fix prices on Ciclopirox Cream in April 2012.

1398.   One year later, on May 16, 2013, Glenmark increased pricing on at least eighteen (18) different products, including Ciclopirox Cream and various formulations of Mometasone Furoate that were also manufactured by G&W.[49] The anticompetitive conduct relating to the latter product is discussed in further detail below.

i.   *Mometasone Furoate*

1399.   Mometasone Furoate ("Mometasone") is available in several forms, including cream, ointment, and solution.

1400.   As of May 2013, three competitors—Glenmark, Perrigo, and G&W—controlled a majority of the market share on the various formulations of Mometasone.

---

[49]   Notably, while Glenmark was colluding with G&W on these products, CW-5 and his colleagues were also colluding with competitors on other products on its price increase list.  For example, several of the products—Moexipril HCL Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, Pravastatin Sodium Tablets, and Ranitidine Tablets—overlapped with Teva.

REDACTED – PUBLIC VERSION

1401.    Beginning as early as May 2, 2013, Glenmark began communicating with its competitors, including G&W, to coordinate its May 2013 price increases. Over the next several weeks, CW-5 and Jim Brown, a senior sales executive at Glenmark, had multiple calls with Vogel-Baylor of G&W during which they discussed and agreed to increase prices on Ciclopirox Cream and the various formulations of Mometasone. Prior to these calls, Vogel-Baylor had never spoken to Brown before, according to the available phone records. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/2/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 18:10:31 | 0:00:33 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 9:00:46 | 0:00:00 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 9:00:48 | 0:00:51 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 13:57:00 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 15:27:37 | 0:02:50 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:01:30 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:05:56 | 0:03:42 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:27:03 | 0:00:55 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:13 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:14 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 18:26:47 | 0:00:00 |
| 5/14/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 11:18:55 | 0:00:40 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:04:27 | 0:00:14 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:05:28 | 0:05:07 |
| 5/16/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:12:12 | 0:06:33 |

1402.    Similarly, Vogel-Baylor, as she had done in the past, used her contact, CW-6—then at Aurobindo—to communicate with T.P. of Perrigo regarding the increases. As discussed above, CW-6 had formerly worked at Fougera and developed relationships with Vogel-Baylor and T.P. of Perrigo during his tenure there. At this time, G&W and Aurobindo had no products that overlapped, and CW-6 and Vogel-Baylor were not social friends. These communications are detailed in the chart below:

**REDACTED – PUBLIC VERSION**

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:43:12 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:45:35 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:47:58 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:50:22 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:52:45 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:55:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:05:32 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:18:21 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:20:44 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:23:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:25:31 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:27:54 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:30:19 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:40:42 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:50:48 | 0:00:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:47:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:48:00 | 0:02:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:50:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 13:02:00 | 0:07:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:09:00 | 0:06:00 |

1403.    As a result of these conversations, Glenmark increased prices on Mometasone Cream, Ointment, and Solution on May 16, 2013. Soon thereafter, G&W would follow with comparable increases of its own on the various formulations of Mometasone. Over the next several weeks, G&W consistently declined opportunities to reduce pricing on the various formulations of Mometasone so as not to take advantage of the Glenmark price increases.

1404.    For example, on May 15, 2013—the day before the Glenmark price increases would become effective and publicly visible—C.M., a G&W sales executive, e-mailed Vogel-Baylor to inform her that ANDA was requesting decreased pricing on several products because the prices were higher than their competitors. The list included Mometasone Solution and listed Glenmark's pre-increase pricing for Cardinal as the comparison price point. Knowing that Glenmark was increasing pricing on this product, Vogel-Baylor advised C.M. that G&W would not lower its pricing.

1405.    Similarly, on May 17, 2013, the day after the Glenmark increases became effective, McKesson sent G&W a request for a bid on Mometasone Ointment because it ███████████

**REDACTED – PUBLIC VERSION**

███████████████████████ Vogel-Baylor asked the customer who its incumbent was, and McKesson responded that it was Glenmark. Immediately upon receiving this response, Vogel-Baylor called CW-5 of Glenmark. The call lasted less than one (1) minute. She then hung up and called Brown of Glenmark. That call lasted less than one (1) minute. Fifteen minutes later, Brown called Vogel-Baylor back and they spoke for twelve (12) minutes. Later that day, Vogel-Baylor responded to McKesson and declined the opportunity, stating █████████████████████████ ████████████████████████

      1406.   The next business day, on May 20, 2013, C.M. e-mailed Vogel-Baylor asking, ███████ ████████████████████████████████████████████ ███████████████████████ Vogel-Baylor responded by sending the following e-mail to C.M. and others on the sales team:

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

1407.    On May 23, 2013, Vogel-Baylor e-mailed price increase analyses for Ciclopirox Cream and the Mometasone line to her supervisor, Orlofski. The next day, May 24, 2013, Vogel-Baylor called CW-5 at Glenmark twice.  The calls lasted less than one (1) minute each.

1408.    On May 29, 2013, Target e-mailed C.M. of G&W stating that the customer had received a 250% price increase on another drug, Halobetasol, and asking whether C.M. could provide any insight into why. C.M. responded, ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████

1409.    On May 30 and May 31, 2013, Brown called Vogel-Baylor twice. The calls lasted four (4) minutes and less than one (1) minute, respectively.

1410.    On June 4, 2013, G&W sent price increase notifications to its customers regarding the various Mometasone formulations. That same day, Vogel-Baylor called Brown. The call lasted less than one (1) minute.

1411.    On June 5, 2013, Pharmacy Select e-mailed C.M. regarding the notification and asked him to provide new WAC pricing for the Mometasone line of products. C.M. forwarded the request to Vogel-Baylor asking, ███████████████████████ Vogel-Baylor responded, ███████████ ████████████████████████████████████

1412.    G&W and Glenmark continued to coordinate even after their price increases. For example, on June 5, 2013, Rite Aid, a G&W customer for Mometasone, asked Glenmark whether it wanted to bid for the business because G&W had increased price. The next day, on June 6, 2013, Brown of Glenmark called Vogel-Baylor and they spoke for six (6) minutes. On June 7, 2013, Vogel-Baylor called Brown back. The call lasted less than one (1) minute. That same day, CW-5 e-mailed his colleagues Brown and Blashinsky regarding the Rite Aid opportunity stating ███████████████████ ███ Brown responded: ████████████████████████████████

REDACTED – PUBLIC VERSION

1413.   After preparing the bid for Rite Aid, Brown e-mailed CW-5 and Blashinsky on Saturday, June 8, 2013 stating: ██████████████████████████████ The following Monday, on June 10, 2013, Brown called Vogel-Baylor. Vogel-Baylor returned the call and they spoke for more than six (6) minutes. Within ten (10) minutes of hanging up, and having confirmed the pricing with his competitor, Brown e-mailed his colleagues with specific price points that Glenmark should use to bid high and not take the Rite Aid business from G&W.

### d.   Collusion Between G&W And Lupin

1414.   Orlofski of G&W had a long-standing relationship with Berthold, a senior sales executive at Lupin.  As detailed above, it was Berthold who introduced Orlofski and Vogel-Baylor to CW-6 of Fougera. This connection allowed G&W and Fougera to continue their collusive relationship even after CW-6's contact, Grauso, had left G&W to take a senior position at Aurobindo.

1415.   Notably, G&W and Lupin only overlapped on one product—Ethambutol HCL Tablets—during the time period relevant to this Complaint. This collusion is discussed in further detail below.

### i.   *Ethambutol HCL Tablets*

1416.   In 2012, G&W marketed the authorized generic of Ethambutol HCL Tables ("Ethambutol") for the manufacturer, STI Pharma ("STI"), and Lupin, VersaPharm, and Teva sold the generic version.

1417.   By late 2012 and early 2013, both VersaPharm and Teva were experiencing supply issues on Ethambutol. Viewing this as an opportunity, Lupin and G&W colluded to significantly raise price on the product while their competitors were out of the market.

1418.   In November and December 2012, Orlofski and Vogel-Baylor of G&W exchanged several calls with Berthold of Lupin to discuss Ethambutol. At the same time, Berthold was keeping Kevin Green, a sales executive at Teva, apprised of his discussions with G&W.

1419.   On November 15, 2012, Orlofski exchanged at least eight (8) text messages with Berthold. The next day, on November 16, 2012, Orlofski and Berthold spoke for nearly twelve (12) minutes. Shortly thereafter, Berthold spoke three separate times with Green, with the calls lasting five (5) minutes, ten (10) minutes, and five (5) minutes, respectively. That same day, G&W reached out to several VersaPharm customers, including Econdisc, HealthTrust, and FW Kerr, to inquire whether they were interested in a new supplier for Ethambutol due to VersaPharm's supply issues.

1420.   Over the next month, Berthold would continue to exchange numerous calls and text messages with Vogel-Baylor and Orlofski during which they discussed a coordinated price increase on Ethambutol. These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:29 | 0:00:00 |
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:33 | 0:00:00 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 12:55:26 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:24:13 | 0:07:55 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:31:57 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:57:55 | 0:03:11 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:34 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:36 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:04 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:08 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:11:15 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:19 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:46 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:48 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:28 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:33 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:44 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:45 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:03 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:08 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:21:48 | 0:00:00 |
| 12/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:22:36 | 0:00:03 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:57:26 | 0:00:00 |

1421.   On December 9, 2012, the day after the final call listed above, J.G., a finance executive at Lupin, e-mailed Berthold at 3:41 p.m. stating: ██████████████████████ ████████████████████████████████████████████████████████ Three minutes later, at 3:44 p.m., Berthold called Orlofski. The call lasted less than one (1) minute. The next

day, on December 11, 2012, Berthold called Vogel-Baylor and they spoke for nearly six (6) minutes. A short time later, Orlofski sent a text message to Berthold and the two competitors exchanged two (2) more calls that day, including one lasting nearly six (6) minutes.

1422.   On December 17, 2012, K.W., a Lupin sales executive, sent an internal e-mail including Berthold, attaching the price increase letters for Ethambutol that Lupin planned to send on December 18, 2012. Between December 17, 2012 and December 19, 2012, Berthold again exchanged several calls and text messages with Orlofski and Vogel-Baylor. These are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/17/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:32:53 | 0:00:14 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:48:43 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:51:13 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:44 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:48 | 0:00:00 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 8:19:40 | 0:00:02 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:54:06 | 0:00:25 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 11:56:05 | 0:00:58 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:12:46 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 15:13:09 | 0:00:07 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:56:16 | 0:13:10 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 16:56:44 | 0:04:12 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:06:52 | 0:04:52 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:25:24 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:30:08 | 0:04:19 |

1423.   On January 2, 2013, Orlofski e-mailed Vogel-Baylor suggesting that they discuss the Ethambutol price increase during their meeting scheduled for the next day. That same day, Vogel-Baylor called Berthold and they spoke for eleven (11) minutes. Later that evening, Vogel-Baylor e-mailed Orlofski a price increase analysis for Ethambutol.

1424.   The next day, January 3, 2013, a customer, HEB, e-mailed C.M., a sales executive at G&W, to advise him that VersaPharm was out of the market. C.M. responded that he was aware and stated: ███████████████████████████████ That same day, Vogel-Baylor exchanged at least four (4) calls with Berthold, including one lasting more than four (4) minutes.

353

1425.     On January 14, 2013, another customer, Morris & Dickson, e-mailed Lupin asking for a bid on Ethambutol. The customer explained that both VersaPharm and Teva were having supply issues. That same day, Orlofski sent a text message to Berthold. Berthold also called Green of Teva and they spoke for nine (9) minutes.

1426.     On January 28, 2013, the manufacturer of G&W's authorized generic, STI, e-mailed Vogel-Baylor to inform her that it would be shipping Ethambutol to G&W the following day stating: ████████████████████████████████████████ Vogel-Baylor then forwarded the e-mail to Orlofski as an ██████████ Later that day, Vogel-Baylor sent her Ethambutol price increase analysis to the sales team and asked them to draft letters to their customers advising them of the increases. The next day, on January 29, 2014, Orlofski sent a text message to Berthold and Berthold spoke two times with Green of Teva by phone, with calls lasting three (3) minutes and more than five (5) minutes, respectively.

1427.     On January 31, 2013, Vogel-Baylor called Berthold and they spoke for three (3) minutes. The next day, on February 1, 2013, Vogel-Baylor called Berthold again. Berthold returned the call and they spoke for five (5) minutes. The following Monday, on February 4, 2013, Vogel-Baylor e-mailed Orlofski to inform him that G&W planned to send the Ethambutol price increase letters on February 7, 2013 and would call customers in advance to advise that they would be coming.

1428.     Consistent with the plan, on February 6, 2013, G&W reached out to its customers to advise them of the Ethambutol increases. As Vogel-Baylor explained in her e-mail to Wal-Mart:

████████████████████████████████████████████████████

████████████████████████████████████████

1429.     Berthold continued to communicate with Orlofski and Vogel-Baylor over the next several weeks. On February 19, 2013, Vogel-Baylor and Berthold had a joint dinner with representatives from two customers—ABC and Kroger.

1430.    On April 1, 2013, STI began notifying customers that it was terminating its relationship with G&W regarding Ethambutol. STI advised that it would be taking over the marketing and distribution of the product effective April 15, 2013. Between April 2, 2013 and April 15, 2013, Berthold exchanged several calls with Orlofski and Vogel-Baylor. The calls are detailed in the chart below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 10:38:29 | 0:00:03 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 10:38:57 | 0:03:49 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:48:27 | 0:00:07 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:19 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:18 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 20:47:56 | 0:00:04 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:04:58 | 0:03:24 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:24:05 | 0:00:08 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:24:29 | 0:02:27 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:33:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:35:51 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:48:32 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:49:08 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:49:40 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:50:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:50:42 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:51:24 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:37:55 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:38:21 | 0:00:00 |

1431.    After April 15, 2013, the date of the last two text messages listed above, Berthold and Vogel-Baylor would never communicate by phone again, according to the phone records available to the Plaintiff States.

**B.    The Defendants' Profitability Increases Dramatically As A Result Of Collusive Conduct**

1432.    As discussed more fully above, between 2009 and early 2016, the Defendants colluded to allocate markets and raise prices on several generic drugs. The impact of this anticompetitive conduct on the Defendants' profitability was dramatic.

REDACTED – PUBLIC VERSION

1.      **Taro And Perrigo's Profits Increased Over 1300% From 2008 To Early 2016**

1433.   Both Taro and Perrigo's Prescription (Rx) Pharmaceuticals segment saw profits increase over 1300% between 2008 and early 2016. Taro often led price increases and Perrigo's Prescription (Rx) Pharmaceuticals segment reported revenues and profits for generic dermatology drugs disaggregated from other operations. Accordingly, the profits of these two companies are instructive in showing the dramatic profits the Defendants made from their collusive conduct.

a.      **Taro**

1434.   By early 2016, Taro's operating income was 1303%, or more than thirteen (13) times, higher than it was in 2008. Similarly, in 2016, Taro's net income was 1673%, or more than sixteen (16) times higher than it was in 2008. Indeed, in 2016, Taro's net sales revenue reached nearly $1 billion, which was $600 million more than it made in 2008.

1435.   The graph below shows Taro's consistent financial growth from 2008 through early 2016 and highlights how the timing dovetails with Taro's price increases on products at issue in this and other Complaints.



[1] As discussed in earlier Sections of this Complaint, in May 2013 Taro raised its prices on 12 products.
[2] As discussed in earlier Sections of this Complaint, in June 2014 Taro raised its prices on 17 products.

1436.   As depicted above, as Taro increased prices, its profits increased. Consistent with the allegations in the Complaint, Taro's profits grew steadily from 2010 through 2011, during the early days of collusion, and then increased exponentially from late 2012 through 2015 when price increases intensified across the industry.

1437.   In SEC filings, Taro repeatedly attributed its increases in sales revenue and gross profits to price adjustments. For example, in its 2011 annual filing, Taro stated that its revenues and gross profits increased in the United States "primarily due to price increases on select products."

REDACTED – PUBLIC VERSION

Similarly, in its 2013 annual filing, Taro stated that approximately $27 million of its increased sales in the first quarter of 2012 "resulted from price increases on seven dermatological topical products."

<b>b.</b>    <b>Perrigo</b>

1438.   Perrigo's profits also grew significantly as a result of its collusive conduct. As noted above, this analysis focuses on the profits of Perrigo's Prescription (Rx) Pharmaceuticals segment, which covers its U.S. generic drug sales, with a strong focus on extended topicals.

1439.   In its fiscal year 2015, Perrigo's Prescription (Rx) Pharmaceuticals segment's operating income was 1648%, or over sixteen (16) times, higher than it was in 2008. The segment's net sales revenue was just over $1 billion in 2015, which was over $800 million more than it made in 2008.

1440.   Perrigo's Prescription (Rx) Pharmaceuticals segment was the growth driver for Perrigo during this time period. Perrigo's other operations grew much slower by comparison. While the segment's operating income grew 1648%, Perrigo's operating income for all its operations when combined grew only 278%. Similarly, while the segment's net sales revenue grew 521%, Perrigo's net sales revenue for all its operations when combined was only 153%.

1441.   The graph below shows Perrigo's consistent financial growth from 2008 through 2015 and highlights how the timing dovetails with Perrigo's price increases on products at issue in this and other Complaints.



[1] As discussed in earlier Sections of this Complaint, on July 24, 2014 Perrigo increased its prices on Econazole Nitrate Cream, Hydrocortisone Acetate Suppositories, and Hydrocortisone Valerate Cream.
[2] As discussed in earlier Sections of this Complaint, on August 1, 2013 Perrigo increased it prices on Ciclopirox Solution, Hydrocortisone Valerate Cream, and Promethazine HCL Tablets.

1442.    As depicted above, as Perrigo increased prices, the company profited handsomely. Further, and consistent with Taro's financial picture, Perrigo's profits from generic drug sales grew steadily during the early days of collusion, between 2010 and 2011, and then accelerated around 2012 when the industry began to focus more intensely on price increases.

## 2.    Other Defendants' Revenues And Profits Also Multiply From 2008 To Early 2016

1443.    The other Defendants also profited from their collusive conduct. For example, G&W and Actavis's revenues multiplied as their focus on price increases intensified. G&W's sales tripled

**REDACTED – PUBLIC VERSION**

from 2011 to 2014, increasing by over 30% each year during that period. In 2014, G&W's revenue from sales, at over $290 million, broke $200 million for the first time ever.

1444. Similarly, Actavis's global generics business saw its revenues grow between 2008 and 2013 from just over $1.4 billion to approximately $6.35 billion. Over that same time period, the company's profits from its generics business also grew from $416 million in 2008 to nearly $2 billion in 2013.

1445. Fougera and Sandoz also profited from their collusive conduct. In 2010 and 2011, during the early days of collusion, and prior to its acquisition by Sandoz, Fougera had gross profits of approximately $217 million and $304 million, respectively. Similarly, in 2010, Sandoz had over $1 billion of operating income and, in 2011, the company reported the highest operating income in its history at that time, just over $1.4 billion.

1446. After acquiring Fougera, Sandoz's sales in the United States rose steadily each year from 2012, which had sales of over $2.7 billion, through 2016, when sales reached $3.7 billion. Sandoz's operating income continued to exceed $1 billion each year during this period and, following years of collusive activity, in 2016 Sandoz's operating income exceeded the 2011 record and reached approximately $1.45 billion, the highest in Sandoz's history to date.

1447. Sandoz executives wrote about the significant positive impact that the Fougera business had on Sandoz's profits. For example, Sandoz noted in internal documents that a ███████ ████████████████████ was a driver of US sales growth in 2013, in October 2104 the Fougera team ████████████████████████████ and in 2015 ████████████████ ██████████████████████

REDACTED – PUBLIC VERSION

XII.  **THE OVERARCHING CONSPIRACY IN OPERATION WITH RESPECT TO THE SUBJECT DRUGS**

A.  **Customer and Market Allocation Agreements to Maintain Market Share and Avoid Price Erosion**

1.  **Teva/Mylan**

a.  **Fenofibrate**

1448.  As of the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65% market share and Lupin having approximately 35% market share.

1449.  On February 27, 2013, K.G. (Teva) e-mailed multiple Teva colleagues asking them to provide "any noise you may be hearing in the market relative to additional competition on Fenofibrate 48mg and 145mg." Specifically, K.G. was seeking "Competitive Intelligence" on Mylan's potential entry to the market. In order to get this information, Green called Mylan's Vice President of National Accounts, Nesta. Over the course of that day, Green and Nesta spoke at least four (4) different times. That same day, Green reported back to K.G. and other Teva colleagues what he had learned: Mylan planned to launch Fenofibrate 48mg and 145mg sometime around November 2013.

1450.  A few months later, however, Teva learned that Mylan was moving up its launch date for Fenofibrate. In advance of this launch, Teva, Lupin, Mylan, and Perrigo conspired to allocate the market for Fenofibrate.

1451.  On May 8, 2013, Green (Teva) e-mailed his colleagues at Teva that "Mylan is entering [the market for Fenofibrate] very soon." To assist in Teva's efforts to allocate the Fenofibrate market, Green asked a colleague for the "typical data on Fenofibrate". This request for information was reiterated – and its purpose made clear – the following day when K.G. sent an internal e-mail stating that Mylan expected to launch Fenofibrate 48mg and 145mg tablets "on or

around May 14" and that he needed Teva's Fenofibrate sales and profitability information "to determine who we want to keep and who we want to concede" to Mylan.

1452.   Up to this point, executives for Teva, Mylan, and Lupin had all been in regular contact by phone. These calls include at least those listed below. On these calls, Teva, Mylan, and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to allocate market share to Mylan.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/6/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:06 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:18 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:11:12 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:02:53 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Berthold, David (Lupin) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:08:55 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:20 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:03:46 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Incoming | Berthold, David (Lupin) | 0:12:00 |
| 5/9/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:05 |

1453.   In one striking example of the coordination between the three companies, Nesta called Green at 2:42 pm on May 7, 2013 and they spoke for more than eleven (11) minutes. Immediately after hanging up the phone – at 2:54 pm – Nesta called Berthold and spoke for nearly three (3) minutes.

1454.   On May 10, 2013, K.G. received the Teva sales and profitability information he requested. After having the information for barely a half hour, and before there was even a formal price challenge by Mylan at any of Teva's customers, K.G. concluded that "it is best to concede

Econdisc [to Mylan] and try to maintain the balance of our customers . . . ." By conceding Econdisc to Mylan, Teva would walk away from its single biggest customer (in terms of gross profit) for the 48mg tablets and the third largest out of six customers (in terms of gross profit) for the 145mg tablets. Patel, who had been at Teva for only two weeks at that point, said she "want[ed] to understand the logic you [K.G.] use for determining this." The logic was to allocate a customer of sufficient size to Mylan so that Mylan would be comfortable with its "fair share" and not need to compete on price to acquire market share.

1455.   Teva executives immediately reached out to executives at Mylan and Lupin through a series of phone calls. These calls include at least those listed below. On these calls, executives of Teva, Mylan, and Lupin confirmed the market allocation scheme.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:28 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:10:46 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:02:19 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Patel, Nisha (Teva) | 0:05:25 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:17 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:26 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:17:28 |

1456.   Teva made good on its agreement to concede Econdisc to Mylan. On May 15, 2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for Fenofibrate 48 mg and 145 mg tablets and asked Teva for a counteroffer to retain Econdisc's business. Less than an hour after receiving the notice of the price challenge, Green recommended conceding Econdisc based on "prior conversations." K.G. later agreed: "this is the customer we should concede on Fenofibrate."

1457.   Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times. These calls include at least

those listed below. On these calls, executives of Teva, Mylan, and Lupin confirmed that Teva was sticking to the market allocation scheme by conceding Econdisc to Mylan.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:34 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Outgoing | Nesta, Jim (Mylan) | 0:02:21 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:10:06 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:11:50 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:02:23 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:09 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:21 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:12 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:25 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/17/2013 | Text | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:16:02 |

b.    **Clonidine TTS**

1458.    As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine TTS. Mylan had approximately 48.4% market share and Teva had approximately 44.4% market share. At the end of 2011 and beginning of 2012, however, Teva began to take more than its "fair share."

1459.    In November 2011, Teva took over Mylan's business for Clonidine TTS at Walgreens after Walgreens solicited Teva to provide a bid. Then, in late January 2012, Cardinal Health solicited a bid from Teva for a one-time-buy to cover an alleged short-term "supply disruption" that Mylan was experiencing. A few days after Teva submitted its offer to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine TTS.

Believing that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine TTS.

1460.    On February 10, 2012, Cardinal's move to Teva prompted K.G. (Teva) to order his colleagues to gather intelligence on the extent of Mylan's alleged supply issues. That same day, Rekenthaler called B.P., a senior national accounts executive at Mylan, to obtain the information and they spoke for six (6) minutes. Later that day, Rekenthaler reported back to his Teva colleagues that, contrary to Teva's assumptions, "Mylan is back in supply" and cautioned that Teva should "tread carefully." Rekenthaler was concerned that Mylan might retaliate against Teva for taking more than its "fair share" without consulting with Mylan. With the awards from Walgreens and Cardinal, Teva was projected to have between 65%-70% market share for Clonidine TTS.

1461.    To gain back some market share, Mylan challenged Teva's Clonidine TTS business at McKesson. To de-escalate the situation, Teva "conceded the McKesson business to Mylan." Then, in April 2012, Mylan aggressively challenged Teva's Clonidine TTS business at CVS to gain back market share and further signal its displeasure with Teva for taking the Cardinal business. Internally, Teva lamented that Mylan was "trashing the price in pretty much a two-player market." Ultimately, Teva "conceded [the CVS business] due to price."

1462.    Teva heard Mylan's retaliatory message loud and clear. On May 4, 2012, just a few days after losing the CVS Clonidine TTS business to Mylan, Teva was approached by Cardinal about a different drug, Doxazosin. At the time, Mylan was the primary supplier for Doxazosin at Cardinal. Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June 2012, but Cardinal wanted to move the entire Doxazosin line to Teva. Rather than take this business, K.G. cautioned his colleagues that Teva "will need to be cautious after what happened with Clonidine. I would rather cover them on a short-term basis where they have an issue and revisit if it becomes a more prolonged and extensive event."

1463.    On July 18, 2012, E.G., a senior Teva product manager, circulated an internal e- mail to Teva's national account managers that the "[m]arket rumor is Mylan may be having Clonidine Patch supply issues." Teva learned of this "rumor" directly from Mylan over the course of at least two calls between Green and Nesta on July 17 and the morning of July 18, 2012. Those calls lasted three (3) minutes and five (5) minutes, respectively.

1464.    On the morning of September 28, 2012, Nesta and Green spoke by phone at least twice, once for four (4) minutes and once for fourteen (14) minutes. On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine TTS market. As expected, later in the day on September 28, 2012, Teva began getting solicitations from Mylan customers, such as Wal-Mart and CVS, seeking a bid from Teva for Clonidine TTS because Mylan had just issued a temporary discontinuation notice.

1465.    Mylan's exit from the Clonidine TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market. For example, in April 2012, before Mylan had challenged Teva's Clonidine TTS business at CVS, Teva's direct invoice price to CVS for the .1mg, .2mg, and .3mg Clonidine TTS was $22.13, $37.81, and $54.41, respectively. Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17, and $26.51 for those dosages, respectively. Because of Mylan's exit from the market, however, when Teva took back the CVS business in October 2012, Teva was able to charge CVS a direct invoice price of $33.28, $56.08, and $80.76, respectively.

1466.    Mylan and Teva maintained regular contact as former Mylan customers came to Teva because of Mylan's supply issues with Clonidine TTS. For example, Teva submitted bids to CVS and Wal-Mart—which were ultimately accepted by those companies—on October 4, 2012 and October 5, 2012, respectively. In the days leading up to those bids, Teva and Mylan representatives had at least the following phone calls:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 10/1/2012 | Voice | Rekenthaler, David (Teva) | Outgoing | B.P. (Mylan) | 0:01:00 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:10 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:06 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:05:00 |
| 10/4/2012 | Voice | Green, Kevin (Teva) | Incoming | Nesta, Jim (Mylan) | 0:11:00 |

1467.   Teva and Mylan representatives continued to keep in contact going forward so that if Mylan reentered the Clonidine TTS market, it could regain market share without eroding price through competitive bidding. For example, on October 10, 2012, Green (Teva) and Nesta (Mylan) spoke for ten (10) minutes. That same day, E.G. (Teva) sent an e-mail to Teva national account managers and other senior representatives reiterating that Teva representatives should "advise of any update to this market intelligence."

1468.   In or about February 2013, Mylan relaunched Clonidine TTS and began seeking market share. In early March 2013 Mylan sought to secure the Clonidine TTS business at Econdisc. Rather than competitively bid for the business, Teva's internal documents state that they chose to "concede" Econdisc back to Mylan. By April 2013 Teva also "gave up Rite Aid" and "concede[d]" McKesson to Mylan.

1469.   Rekenthaler (Teva) acknowledged in an internal e-mail dated February 28, 2013 that Teva was "trying to concede the Clonidine business at CVS" to Mylan. Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was higher than Mylan's "previous price prior to their supply problems." For its part, Teva was "not going to make any effort in the form of price concessions to retain the CVS business" if CVS brought Mylan's price challenge to Teva's attention. CVS pushed Mylan to lower its bid in light of its prior prices but, confident that its brinkmanship would work because of Teva's cooperation, Mylan refused. Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior

pricing. Nonetheless, because Mylan's bid to CVS was not competitive—but rather an effort to allocate the market without eroding price—Teva was able to maintain artificially higher prices at CVS.

1470.   To carry out their scheme to allocate the Clonidine TTS market without eroding price, representatives of Teva and Mylan remained in regular contact. In February and March 2013 alone, Teva and Mylan representatives called each other at least thirty-three (33) different times and spoke for nearly 2 hours and 45 minutes.

1471.   By April 2013, Teva had "conceded all customers [it] plan[ned] on conceding." Having successfully allocated the market, however, Mylan and Teva were now conspiring to raise prices on Clonidine TTS. On April 8, 2013, J.L., a marketing manager at Teva, reported internally to his Teva colleagues, including Rekenthaler, that Mylan had agreed to raise prices:



> **From:** ██████████
> **Sent:** Tuesday, April 09, 2013 2:24 PM
> **To:** █████████; Dave Rekenthaler
> **Cc:** ████████████████████████████
> **Subject:** Clonidine - Mylan Challenges
> **Importance:** High
>
> Kevin / Dave,
>
> Do we have a target share percentage we want to maintain/concede now that Mylan is back in supply?
>
> We just gave up Rite Aid which was worth ~5% of our business and we also have a challenge from Omnicare which is also worth ~5%. We received the Omnicare challenge yesterday.
>
> Based on a discussion with Kevin Green, Mylan would follow a price increase.

1472.   Green knew that Mylan would follow a price increase on Clonidine-TTS because earlier that day, Green had two phone calls with Nesta (Mylan), with one lasting one minute and the other lasting eight minutes. In a follow up call the following day between Green and Nesta lasting

eleven minutes, Mylan and Teva reconfirmed their agreement that Mylan would follow a Teva price increase on Clonidine-TTS.

c.   **Tolterodine ER**

1473.   Tolterodine Extended Release ("Tolterodine ER") is the generic of the brand name medication Detrol LA.

1474.   Teva planned to launch on January 2, 2014. During the first half of December 2013, Teva was under the impression—based on conversations with potential customers—that Mylan was not in a position to launch until 30 to 60 days after Teva launched. Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch. On December 3, 2013, J.K., a marketing executive at Teva, sent an e-mail to Rekenthaler (Teva), K.G. (Teva), and several other Teva colleagues stating "we prepared for 50-60 share… I am looking into the numbers as far as what this means." To prepare offers and figure out the allocation of customers that would bring Teva its desired 50% to 60% market share, Teva executives were instructed to gather usage from potential customers.

1475.   Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the launch. Teva resisted sending out those offers and instead did not plan to do so until the January 2, 2014 launch date. Teva's delay in putting together pricing for potential customers was part of a plan to drive up the amount it could charge for Tolterodine ER. Specifically, Teva expected that on January 1, 2014, the price of Detrol LA was going to increase. This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

1476.   At the end of the day on Friday, December 20, 2013, T.C. (Teva) learned from D.H. (Cardinal) that Mylan intended to launch its Tolterodine ER on January 2, 2014. D.H. (Cardinal)

further provided T.C. (Teva) with Mylan's pricing for two dosages, and conveyed that Mylan is "looking for a 40% market share," and that Teva "can figure the rest out."

1477.   T.C. (Teva) informed her Teva colleagues of Mylan's plans. K.G. (Teva) then worked over the weekend to turn this information into initial pricing for all of Teva's potential customers and then shared it internally. In a telling admission that Teva had no intention to bid competitively for all accounts, K.G. (Teva) noted that the next step was "to pick who should receive" bids. The goal in "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals: Teva wanted "50-60 [%] share" while Mylan was only "looking for a 40% market share."

1478.   On Monday, December 23, 2013, Rekenthaler, Patel, K.G., T.C., and several others at Teva had a telephone conference scheduled from 8:00am to 9:00am to discuss the Tolterodine ER launch strategy. Just minutes before the meeting was to start, Rekenthaler tried calling Nesta at Mylan. Nesta returned Rekenthaler's call at 8:15am, which was during Teva's scheduled Tolterodine ER phone conference. Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for 1 minute, 26 seconds. Immediately after Teva's scheduled Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more times. At 10:22am, Nesta returned Rekenthaler's calls and the pair spoke for an additional 12 minutes, 2 seconds. During these calls, Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

1479.   For example, at 10:33am – while Rekenthaler was still on the phone with Nesta, K.G. sent an e-mail to Rekenthaler and others asking about the appropriate contractual language to use in offers about the potential for price increases. Minutes after Rekenthaler finished his call with Nesta, he replied with the exact language, in quotes, that Mylan was using:

From: Dave Rekenthaler
Sent: Mon 12/23/2013 10:41 AM (GMT-05:00)
To: ███████, Maureen Cavanaugh
Cc: Nisha Patel02
Bcc:
Subject: RE: Proposed Price Increase Language

Mylans language is vague. "Pricing subject to change at Mylan's sole discretion."

1480.   Most importantly though, during these calls between Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

1481.   At 12:12 pm on December 23, 2013, K.G. circulated a revised version of Teva's pricing plan for the Tolterodine ER launch. This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. Notably, the revised pricing plan included the following chart identifying the major customers (and their associated market share percentage) that Teva would receive to reach its desired 60% market share while Mylan would get its desired 40% share:

| | |
|---|---|
| CVS | 18 |
| Wal-Mart | 5 |
| Cardinal | 8 |
| Omnicare | 1 |
| Anda | 2 |
| Rite Aid | 4 |
| Econdisc | 15 |
| McKesson | 6 |
| | 59 |

1482.   In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers that Mylan targeted. This is demonstrated by the fact that Teva's newly revised pricing plan now included considerably higher direct invoice prices for major customers allocated to Mylan; namely Walgreens, Cigna, Humana, Optum RX Prime Therapeutics, and Kaiser. The table below

includes a comparison of Teva's pricing plan for these Mylan customers before and after

Rekenthaler spoke with Nesta on December 23, 2013:



1483.   In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum RX,

Prime Therapeutics, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as

Publix, Ahold, Hannaford, and PVA Health.

1484.   The following day, on December 24, 2013, Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement. Those calls lasted for nine (9) minutes and eight (8) minutes, respectively.

d.   **Capecitabine**

1485.   To resolve patent litigation, the brand manufacturer, Roche Pharmaceuticals, entered into settlement agreements with various generic manufacturers—including Teva and Mylan—that would allow those generic manufacturers to sell generic Capecitabine after a certain period of time.

1486.   As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine. Part of this planning included the sharing of information so that they could allocate the market between them. For example, in a January 31, 2014 e-mail, J.P., a national accounts executive at Teva, informed K.G., Rekenthaler, and others at Teva that Mylan was courting a specific customer, Armada Health Care, and that "Mylan estimated Armada's share on [Capecitabine] at 37%." Teva incorporated this data it received from Mylan into its own launch plan for Capecitabine.

1487.   On February 26, 2014, Nesta of Mylan called Rekenthaler of Teva and the two spoke for sixteen (16) minutes. Nesta informed Rekenthaler that Mylan would not be able to launch on time with Teva. Rekenthaler immediately reported this news internally at Teva.

1488.   In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer. Teva remained the exclusive generic Capecitabine manufacturer until Mylan entered in August 2014.

1489.   On August 4, 2014, Nesta and Rekenthaler spoke by phone three times. On these calls, Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market.

REDACTED – PUBLIC VERSION

1490.   For example, at 12:46pm that day, Nesta called Rekenthaler and they spoke for a little more than five (5) minutes. Immediately after hanging up the phone, Rekenthaler sent the following e-mail:

> From:   Dave Rekenthaler
> Sent:   Mon 8/04/2014 12:51 PM (GMT-05:00)
> To:     ███████████████████████ Nisha Patel02
> Cc:     Maureen Cavanaugh
> Bcc:
> Subject: Capcetibine
>
> Hearing Mylan to get approval this week.  We need to look at our market and discuss defense strategy.

1491.   Cavanaugh (Teva) responded that she would be in the office the next day and wanted to discuss it with Rekenthaler in person.

1492.   Less than an hour later, Rekenthaler sent another e-mail, just to Patel, asking her to run a customer report and indicating that Mylan will "be looking at ABC, McKesson, and Econdisc as well as a couple small guys, probably aiming at 35% share." Mylan did seek the business for each of these three companies and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

1493.   On August 7, 2014, McKesson informed Teva that it received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business. Patel then sent an e-mail to K.G., Rekenthaler, and C.B. at Teva to ask if they had "[t]houghts in regards to [loss of exclusivity]." C.B., a senior operations executive at Teva, replied that Teva did "have a plan," but C.B. did not want to put the plan in writing. Instead C.B. told Patel she "wi[ll] call" to discuss it. K.G., separately, questioned whether the competitive bid was coming from Mylan, and asked Rekenthaler whether he had any additional information. Rekenthaler also did not want to put that "additional information" in writing, so he responded: "I'll catch up with you today."

1494.   The "plan" was the market allocation scheme previously agreed to by Nesta and Rekenthaler on behalf of Mylan and Teva. The same day that Mylan put a bid in to McKesson – August 7, 2014 –Nesta and Rekenthaler spoke by phone for nearly thirteen (13) minutes. On that call, Rekenthaler and Nesta discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme.

1495.   This market allocation "plan" was highlighted in other e-mails as well. On August 10, 2014, C.B. e-mailed Rekenthaler, Patel, and K.G. about the plan. C.B. stated that C.B.'s "notes are showing that are (sic) plan is to concede McKesson, Econdisc, Rite Aid, and Cardinal," but that C.B. wanted to confirm. Rekenthaler corrected C.B., stating that Mylan is "going after McKesson, ABC (only) and Econdisc," but that Teva "ha[s] not heard from Econdisc yet." Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Nesta had previously discussed it.

1496.   The next morning, at 8:30 am on August 11, 2014, Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine and that he was "[c]hecking on shipping status." Five minutes later, Rekenthaler received a call from Nesta. After exchanging voicemails, the two spoke at 8:52am. The call lasted nearly six (6) minutes. Shortly after hanging up the phone, at approximately 9:02am, Rekenthaler e-mailed K.G., Patel and others at Teva to confirm that Mylan's "primary targets are ABC, McKesson and Econdisc." He added that Teva "may hear from some other smaller guys as well" and that he "do[es]n't expect price to be aggressive."

1497.   In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite Aid.

1498.   Teva also conceded some of the "smaller guys" as well, pursuant to the agreement. On August 14, 2014, for example, a smaller customer – Cigna – informed Teva that it received a bid for Capecitabine. On August 18, 2014, Rekenthaler called Nesta to discuss the market allocation

scheme and Mylan's bid to Cigna. The pair talked for thirteen (13) minutes. The next day, K.G. circulated an internal e-mail confirming that Teva "will be conceding this business" at Cigna.

### 2.      Teva/Sandoz

#### a.      Ethinyl Estradiol and Levonorgestrel (Portia and Jolessa)

1499.    During the relevant time period, both Teva and Sandoz marketed Ethinyl Estradiol and Levonorgestrel under multiple names – including both Portia and Jolessa.

1500.    In or around May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa. Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

1501.    On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa. T.C., a senior sales executive at Teva, responded, "We really need to know who is challenging. Sandoz??? Glenmark???" The customer responded that it was Sandoz. T.C. had initially been very reluctant to let Sandoz have the business, candidly remarking to the customer that, "[w]e are not going to let Walmart go to Sandoz [because] we have conceded a number of accounts to Sandoz that were not as strategic to Teva."

1502.    After sending out a competitive offer for the sale of three drugs, including Portia and Jolessa, to the customer on May 16, 2012 and an even more competitive offer on May 18 – Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer. The night before this change in plans, on May 22, Green (Teva) spoke on the phone with CW-2, then at Sandoz, for five (5) minutes, and agreed to withdraw the offer for Portia and Jolessa. The decision to concede the Walmart business to Sandoz led to a more equal share split between the companies for both Portia and Jolessa. Teva discussed the decision internally and explained that the reason for the "change in plans" was that Teva was "going to concede this business to Sandoz . . .."

1503.    Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for both Portia and Jolessa. On July 2, 2013, another key customer contacted Teva stating it had received bids on Portia and Jolessa and in order for Teva to retain the business, Teva would need to submit its "best bids." On July 9, 2013, CW-1 (Sandoz) called Patel and left a voicemail. Shortly thereafter, they connected for a sixteen (16) minute call. On July 10, Teva learned that the challenger was Sandoz. At 12:16pm, Rekenthaler forwarded an e-mail to Patel and posed the question, "Who's over at Sandoz now?" Patel did not respond by e-mail, but due to the close proximity of their offices she likely related her conversation with CW-1 directly to Rekenthaler.

1504.    Rekenthaler then called CW-2 (Sandoz) at 1:26pm that same day and they spoke for two (2) minutes. CW-2 called Rekenthaler back a few minutes later and they spoke for nine (9) minutes. CW-2 and Rekenthaler would speak once more later that day, at 4:48pm, for seven (7) minutes. Later that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which the customer described as "not aggressive enough" for their primary supply. Teva submitted an intentionally inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award with the customer.

### b.    Temozolomide

1505.    The patent on Temodar, the branded version of Temozolomide, was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 – six months prior to the patent expiration. Leading up to the launch of the generic, Teva coordinated with Sandoz to divide up the market.

1506.    On July 18, 2013, a large retail pharmacy customer ("The Pharmacy") submitted an RFP to Sandoz for Temozolomide. Playing by the rules of the road, Sandoz waited to see what Teva was going to do before submitting their own bid. That same day, CW-1 received a telephone call

from Patel. Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide. Nothing was agreed to on that call.

1507.   On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out Teva's plans with regard to The Pharmacy: "Please find out if Teva is submitting an offer to them." The next morning, S.G., a national accounts executive at Sandoz, spoke with The Pharmacy and asked The Pharmacy to find out Teva's plans. S.G. summarized his call with The Pharmacy to his team: "I just spoke to [The Pharmacy] regarding Temozolomide. [The Pharmacy] has not yet received an offer from Teva on the product. At this time, [The Pharmacy] is reaching out to Teva to understand their supply and launch status. [The Pharmacy] will be circling back and I will share the feedback we receive with everyone on this email trail."

1508.   At the same time, CW-1 was reaching out to Teva directly to get more information. CW-1 called Patel at approximately 1:45pm on July 23, 2013. After exchanging voicemails, they spoke for over fourteen (14) minutes that same afternoon.

1509.   Also on the afternoon of July 23, The Pharmacy replied to Sandoz and cryptically delivered Teva's message regarding its plans for Temozolomide:

**From:** ████████████████████████████████
**Sent:** Tuesday, July 23, 2013 3:26 PM
**To:** Greenstein, Steven
**Subject:**

8/11 launch

Looking to play nice in 2 player market

Have supply for that share.

What are your plans?

1510.   By using The Pharmacy as its intermediary, Teva was able to communicate to Sandoz (a) when it was prepared to launch Temozolomide, (b) that it was not planning to compete

aggressively or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to sustain around a 50% market share, and (d) an inquiry regarding Sandoz's plans for Temozolomide. Sandoz understood the implications of the communication and understood that "Teva is seeking a ~45-50% share." One Sandoz executive responded internally and exclaimed that this was "[g]reat news . . . !"

1511.   On July 30, 2013, another customer, CVS Caremark, contacted Teva asking for an offer on Temozolomide. T.C. (Teva), discussed the matter internally and asked her boss, Rekenthaler, "[i]s the strategy to target CVS[?]" Rekenthaler responded by alluding to the deal that had already been struck with Sandoz: "We'll send offers out to everyone. My instincts tell me Sandoz will end up with them as we'll probably be more focused on [The Pharmacy] on this one. Again, we'll send them out an offer same time as everyone else and respond from there." Rekenthaler most likely got his information from Patel. Just one day earlier, on July 29, 2013, Patel had called CW-1 (Sandoz) and spoke for nine (9) minutes, where the two discussed how to carve up the market for the drug.

1512.   Teva and Sandoz were also coordinating through other channels. After receiving the RFP from The Pharmacy, S.G. of Sandoz coordinated with T.S., a senior account executive at Teva, on a seven (7) minute call on July 29, 2013 followed by an eleven (11) minute call on July 31, 2013. After those calls, S.G. (Sandoz) suggested in an internal e-mail on July 31 that Sandoz cede the business and instead submit a cover bid: "[The Pharmacy] has received an offer from Teva on Temozolomide. They are asking for an offer from Sandoz. Even if we decide not to take this business, I would recommend that we submit an offer."

1513.   Similarly, on July 29, 2013, Green (Teva) spoke to CW-2 (Sandoz) two (2) times. The two spoke again on July 31, 2013 for six (6) minutes. During those calls, Green told CW-2 about

REDACTED – PUBLIC VERSION

Teva's launch plans and that Teva wanted the The Pharmacy's business. The next day, August 1,

2013, D.P., another Sandoz executive, e-mailed Kellum, conveying the message from Green:



> From: ▮▮▮▮ [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=▮▮▮▮ ▮▮▮B108848C-2032-4369-BDD7-5742A8329215]
> Sent:     8/1/2013 11:52:29 AM
> To:       Kellum, Armando [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Kellum, Armando3a1dd060-78e9-4d1c-904b-da70bd48a7c5]
> CC:       ▮▮▮▮ [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=▮▮▮▮ ▮▮▮554612fa-c83d-4cef-8dde-6baf08aeaa0f]
> Subject:  Teva temzol
>
> AK:
>
> ▮▮▮ just got some intel from a reputable source:
>
> Teva plans to launch on Monday (Aug 12)
> Teva sending offers to all customers today
> Teva wants ▮▮▮▮
>
> Regards,

1514.    Teva and Sandoz communicated their future plans with each other for other

accounts in addition to The Pharmacy and CVS. On July 31, 2013, D.P. (Sandoz) e-mailed an update

on Temozolomide to his coworker, stating: "Teva has sent offers to ABC and [The Pharmacy] and

is planning to send to Econdisc tomorrow[.]"

1515.    Going forward, Sandoz and Teva continued to coordinate with respect to

Temozolomide. On August 12, 2013, the same day as Teva's launch, CW-2 met in person with

Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference.

There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva

had officially launched and shipped all formulations of the drug.

1516.    Although Teva initially obtained the CVS account in August 2013 due to Sandoz's

inability to supply the 250mg strength of Temozolomide, the companies had agreed that the account

would revert back to Sandoz once Sandoz could supply that dosage strength. In an internal e-mail

dated August 16, 2013, a Teva employee confirmed the plan: "This is perfect I spoke to [a CVS

representative] and as soon as Sandoz is available to launch the 250mg we kill the contract."

1517.   CW-1 spoke to Patel both before and after Sandoz sent out any offers regarding Temozolomide in an effort to develop and ensure the appropriate fair share balance between the two competitors.

### c.   Tobramycin

1518.   Beginning in October 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's exclusivity period. These plans included going after Sandoz's "fair share," but depended on Teva being "rational." A.S., a Sandoz executive responsible for product launches, wrote in an internal e-mail in October 2013: "[w]e will aim to go for our fair share of the market, and exact goals will depend on how Teva goes into the market on day 1, and how rational they behave on day 181."

1519.   As expected, Teva was "rational" when it came time to give up share to Sandoz. Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin. Patel exchanged seven (7) calls with CW-1 on July 1, during which they discussed Sandoz's launch plans and how to divide up the market for Tobramycin. Patel conveyed some of this information in an internal Teva e-mail the same day, writing, "[A]s a heads up, I heard that Sandoz plans to ship Tobi [Tobramycin] prior to Akorn. Hearing they are ready to ship once they secure business, and we have been challenged." The next day, Teva made the decision to concede two different accounts for Tobramycin to Sandoz.

1520.   On July 7, 2014, Patel and CW-1 spoke five more times, including one call lasting eleven (11) minutes. On these calls, CW-1 and Patel discussed how to divide up the market for Tobramycin, including specific accounts that that each would maintain or concede to the other. Patel then memorialized the agreement in an e-mail two days later. The result: Teva would take

Walgreens, McKesson, Econdisc, ABC, and Omnicare. Teva also planned to concede the Cardinal business to Sandoz.

1521.    Patel told CW-1 specifically that Teva would not even submit a bid to CVS. This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high Teva price.

1522.    According to plan, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business. Rekenthaler wrote in an internal e-mail, "I notified CVS that we would be conceding their business. [T.C.], never a pleasant call so I figured I'd simply handle it myself." Teva also went through with its plan to concede Cardinal to Sandoz.

1523.    CW-1, in turn, told Patel that Sandoz would not pursue business from ABC and Walgreens. CW-1 spoke with Kellum about his conversations with Patel and the agreement to stay away from Walgreens and ABC, and Kellum agreed with the plan. Pursuant to that agreement, Sandoz made no effort to contact those two large customers when it entered the market.

1524.    CW-1 and Patel also discussed Sandoz's target market share. CW-1 informed Patel that Sandoz was seeking a 50% share, but Patel thought that was "unrealistic due to Akorn's expected entry." After discussing Sandoz's share goal with Rekenthaler, Patel went back to CW-1 and informed him "that a 25% share was reasonable." Sandoz appeared to comply with that, as Patel observed that Sandoz "appear[s] to be taking a responsible approach."

1525.    On July 9, 2014, one of the above allocated customers, Kinney Drugs, approached Teva asking for a lower price on Tobramycin. A Teva analyst stated in an internal e-mail, "[w]e are strategically going to decline to bid on this request per Nisha." A Teva national accounts director was confused by this decision and responded, "Really? Do you have a little more detail? It is such a small qty." The analyst responded and said, "[w]e were given direction from Nisha not to pursue this

REDACTED – PUBLIC VERSION

opportunity. My understanding of this is there is a new market entrant, (Sandoz) and we are trying to keep our current customers instead of picking up new business." Patel's direction had come after she had called CW-1 (Sandoz) twice on July 9, 2014 and left him a voicemail. CW-1 then returned her call the same day and the two spoke for four (4) minutes.

### d.     Dexmethylphenidate HCL ER

1526.   As Sandoz was preparing to enter the market on the 40mg strength of Dexmethylphenidate HCL ER in February 2014, Patel (Teva) spoke frequently with CW-1 (Sandoz) about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price. On February 10, 2014, for example, CW-1 began internal preparations to pursue the Rite Aid account for Dexmethylphenidate HCL ER 40mg. Later that night, CW-1 called Patel and the two spoke for more than thirteen (13) minutes. As Patel explained in a February 12 internal email reflecting the understanding reached between Teva and Sandoz, ███████████████████ ███████████████████████████████████████ On February 18, Patel left a voicemail for CW-1. That same day, Teva conceded the Rite Aid account to Sandoz. Patel and CW-1 then spoke again by phone on February 20, 2014.

1527.   Similarly, on February 12, 2014, Sandoz submitted a bid to ABC for the 40mg strength of Dexmethylphenidate HCL ER. After Patel spoke with CW-1 on February 10 and again on February 12, 2014, Teva agreed to let Sandoz have the business. In an e-mail to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:

<table>
<tr><td>From:</td><td>Nisha Patel02</td></tr>
<tr><td>Sent:</td><td>Wed 2/12/2014 6:34 PM (GMT-05:00)</td></tr>
<tr><td>To:</td><td>████████████</td></tr>
<tr><td>Cc:</td><td></td></tr>
<tr><td>Bcc:</td><td></td></tr>
<tr><td>Subject:</td><td>Re: ABC Dexmethylphenidate 40mg - Challenge</td></tr>
</table>

We have 100% of the market, so will have to give someone up. ABC is the smallest wholesaler, so it makes sense for this class of trade. Sandoz is being responsible with their pricing. We should be responsible with our share. Plus, between the WBAD members, makes more sense to hold onto Walgreens than ABC, if we were going to lose one of them.

Sent from my iPhone

REDACTED – PUBLIC VERSION

1528.    One of the Teva national account managers on the e-mail responded by confirming that the approach "makes total sense."

1529.    On February 14, 2014, Teva also refused to lower its price for Dexmethylphenidate HCL ER when approached by a GPO customer, Anda, even though Sandoz's price was not significantly lower than Teva's – essentially conceding the business to Sandoz.

1530.    Further, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmethylphenidate HCL ER, the customer was entitled to certain price protection terms (i.e., a lower purchase price for the drug). Patel spoke to CW-1 the same day for almost twenty-one (21) minutes. The next day, February 21, Patel responded internally about the customer's request, with additional inside information from Sandoz, stating: "[t]he competitor (Sandoz) has not yet shipped. The new price will become effective on and the price protection should be calculated on the date that Sandoz ships. The expected date is 2/28/14."

1531.    Also on February 21, 2014, Patel sent a calendar invite to Rekenthaler and other team members for a meeting on February 24 where one of the topics to be discussed was "Post Launch Strategy" for "Dexmethylphenidate 40mg: Sandoz (AG) entering market." Not surprisingly, she called CW-1 a few days later, on February 27, to further coordinate about Dexmethylphenidate HCL ER.

1532.    Throughout this time period, Sandoz abided by fair share principles and its ongoing understanding with Teva. In February 2014, Sandoz's target market share for varying strengths of Dexmethylphenidate HCL ER varied by how many manufacturers were in the market.

1533.    Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmethylphenidate HCL ER. The agreement was also carried out by other manufacturers allowing Sandoz to take share from them. In February 2014, for example, as Sandoz was seeking share on the

15mg dosage strength of Dexmethylphenidate HCL ER, Par "gave up the business to keep the market share even." As Sandoz was entering the market, Rekenthaler (Teva) was speaking to M.B., a senior national account executive at Par, right around the same times that Patel had been speaking to CW-1 – including two calls on February 10 (18 and 3 minutes), two (2) calls on February 19 (2 and 22 minutes), and calls on February 24 and 25, 2014 – in order to effectuate the scheme.

1534.   The market allocation scheme between Teva and Sandoz on Dexmethylphenidate HCL ER continued through at least mid-2015. On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for Dexmethylphenidate HCL ER 5mg on the basis that "there is equal share in the market between competitors." Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on Dexmethylphenidate HCL ER 20mg, on the basis that Sandoz already had 57% market share – greater than its sole competitor on this dosage strength, Teva. When a Sandoz national account representative communicated this decision to the customer, he lied and explained that the decision not to bid was based on limited supply.

### 3.   Teva/Lupin

#### a.   Lamivudine/Zidovudine (Combivir)

1535.   Teva launched Lamivudine / Zidovudine (brand name Combivir) in December 2011.

1536.   In mid-May 2012, two competitors – Lupin and Aurobindo – received FDA approval for generic Combivir and were preparing to enter the market.

1537.   Even before those two companies obtained FDA approval, Teva was communicating with both about how to share the market with the new entrants. Rekenthaler was speaking to R.C., a senior-most executive at Aurobindo, while Green was speaking to Berthold of Lupin and Grauso of Aurobindo.

REDACTED – PUBLIC VERSION

1538.   For example, on April 24, 2012, T.C. (Teva) asked her co-workers whether they had heard about any new entrants to the market for generic Combivir. Rekenthaler responded immediately that Aurobindo was entering. When T.C. questioned that information based on her understanding of how quickly the FDA typically approved new product applications, Rekenthaler assured her that the information was coming from a reputable source:

---

**From:** Dave Rekenthaler
**Sent:** Tuesday, April 24, 2012 11:17 AM
**To:** ▮▮▮▮▮▮▮
**Subject:** RE: what r you guys hearing on generic combivir?

It was brought up to me last week by our good friend so I'm assuming it's accurate.

---

1539.   That "good friend" was Aurobindo's R.C., who had previously worked with both T.C. and Rekenthaler while at Teva. Rekenthaler was reluctant to identify R.C. in writing as it would evidence conspiratorial communications between the two competitors. To confirm this information, Green also called and spoke to Grauso (Aurobindo) that same day for twelve (12) minutes and Berthold (Lupin) for four (4) minutes.

1540.   After speaking with Berthold, Green responded separately to T.C., providing specific information regarding Lupin's entry plans, including commercially sensitive intelligence about Lupin's anticipated bid at a large wholesaler. Green and Berthold then spoke again the next day, April 25, 2012, for seven (7) minutes.

1541.   In early May, with the Lupin and Aurobindo launches just days away, communications among all three competitors accelerated noticeably. Over the four-day period from May 7 to May 10, for example, the three companies spoke at least thirty-two (32) times, as set forth in the table below:

REDACTED – PUBLIC VERSION

| Date | Call Typ | Target Name | Direction | Contact Name | Durati |
|---|---|---|---|---|---|
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:10 |
| 5/7/2012 | Text | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:00 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:41 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:03:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:36 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:02:32 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:17 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:00 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:02:00 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:47 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:31 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:02:29 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Teva) | 0:00:24 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:07:57 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:02 |
| 5/9/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 0:13:00 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:06:07 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:01 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:39 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:07:27 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:03:10 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:10:15 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:05:52 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:13:29 |

1542.   During this four-day period, the three individuals were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin and Aurobindo's entry into the generic Combivir market as seamless as possible. The phone records demonstrate several instances during this 4-day period where two of the individuals referenced above (Green, Berthold and/or Grauso) would speak, followed by a phone call by one of those two individuals to the individual that was not part of the original conversation.

REDACTED – PUBLIC VERSION

1543.   On May 10, 2012, at the conclusion of this four-day period of intensive communications, K.G. of Teva informed his colleagues of the results. He confirmed that "Lupin and Aurobindo anticipate approval and launch." Importantly, he went on to list the specific accounts that Teva had negotiated to retain in order to hold on to a 40% market share in generic Combivir. K.G. also identified the specific accounts that Teva would concede to its competitors Aurobindo and Lupin.

1544.   Even before the negotiations with Aurobindo and Lupin were finalized, K.G. made it clear to the sales team that Teva would be cooperating with its competitors to provide them with their fair share of the generic Combivir market. On May 9, 2012, when a major customer was pressing Teva for a bid, K.G. instructed T.C. that Teva did not plan to keep that customer. When T.C. asked if she should provide any bid at all, K.G. directed her to provide a sham bid, saying:

| | |
|---|---|
| From: | ▓▓▓▓▓▓▓ |
| Sent: | Wed 5/09/2012 2:54 PM (GMT-05:00) |
| To: | ▓▓▓▓▓ |
| Cc: | |
| Bcc: | |
| Subject: | RE: Combivir - Multisource Strategy |

We can send them a proposal that will not work.

1545.   Three days later, when preparing the bid for that customer, T.C. pushed back on K.G.'s directive on price, asking: "Can we send something that at least looks like we are trying?" But K.G. refused, responding that they could not go any lower or else Teva might risk actually winning the business. He concluded: "We really need to concede this business with the accounts we have kept."

1546.   In a separate e-mail exchange with T.C. on that same day, May 11, 2012, K.G. told T.C. that another of her major customers was not on the list for Teva to retain with respect to

generic Combivir. He reminded her of the goal of the overarching conspiracy, stating that Teva should concede that customer "... in order to preserve market pricing as much as possible." K.G. pointed out that such a move would give Teva its fair share as the first entrant: "40-45% market share in a three player market." T.C. then informed that customer that Teva would not compete for its business because "we need to concede some share."

1547.   Lupin was able to enter the market for generic Combivir and obtain more than a 30% market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market.

b.   **Irbesartan**

1548.   Teva received approval to manufacture generic Irbesartan in March 2012.

1549.   On March 6, 2012, Teva's K.G. polled the Teva sales team seeking information about competitors that were also making offers to supply Irbesartan.

1550.   At 11:27am, J.P., an account manager at Teva responded: "Lupin is promising offers today." Less than twenty minutes later, Green placed a call to Berthold at Lupin. They talked for seventeen (17) minutes. Shortly after hanging up the phone, Green e-mailed his colleagues with the information he obtained:

| | |
|---|---|
| From: | Kevin Green |
| Sent: | Tue 3/06/2012 12:26 PM (GMT-05:00) |
| To: | ██████████████; Dave Rekenthaler; ██████████████ |
| Cc: | █████████; Maureen Cavanaugh |
| Bcc: | |
| Subject: | RE: Irbesartan |

Lupin is looking for a 15% share. They already have ABC. Confirmed Zydus is out. I assume Winthrop id the AG

1551.   That same day, Rekenthaler informed the group that he still had not received "a call from any other manufacturer on Irbesartan." He received an immediate response from a senior commercial operations executive at Teva, expressing his displeasure:

From: ▮
Sent: Tue 3/06/2012 3:08 PM (GMT-05:00)
To: Dave Rekenthaler; ▮; Kevin Green; ▮
Cc: ▮, Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan

Then work harder....

1552.    At 10:54am the next day, Green called Berthold again. They spoke for nearly seven

(7) minutes. At 12:20pm, K.G. (Teva) shared with the sales team the competitively sensitive

information Green had obtained. Included were the details Berthold had shared with Green about

which competitors were launching/not launching the drug, and the identity of the customers that

received offers. K.G. stated that Teva was in a position to take up to a 40% market share when it

launched Irbesartan on March 30, 2012.

### c.    Drospirenone and Ethinyl Estradiol (Ocella)

1553.    Barr Pharmaceuticals received approval to market Drospirenone and Ethinyl

Estradiol (brand name Ocella) in 2008, and Teva continued to market the drug after the acquisition

of Barr in 2011 under the name Gianvi®.

1554.    In late 2012, Lupin received approval to market a generic Ocella product.

1555.    By April 2013, Lupin was making plans for a summer 2013 entry into the market and

contacted Teva to initiate negotiations on how the competitors would allocate fair share between

themselves. On April 24, 2013, Berthold of Lupin called Green at Teva. The two spoke for over

three (3) minutes. Berthold called Green two more times the following day.

1556.    The negotiations intensified the following week among Teva, Lupin, and a third

competitor – Actavis. In preparation, on April 29, 2013, K.G. of Teva asked a colleague for current

market share figures along with a list of Teva's generic Ocella customers. The colleague responded with a customer list, estimating Teva's current share of the market at 70-75%.

1557.   The next day, April 30, A.B., a senior sales and marketing executive at Actavis, and Rekenthaler of Teva spoke twice by phone. That same day, Patel of Teva also called A.B. On May 1, Patel sent A.B. four (4) text messages.

1558.   The competitors' communications continued into early May. On May 6, Patel and Berthold spoke twice by phone; the second call lasting twenty-two (22) minutes. Green and Berthold also spoke that same day. On May 7, Patel and Berthold had yet another call, this one lasting over ten (10) minutes. Patel also placed a call to Rogerson at Actavis, which lasted thirty-nine seconds.

1559.   Faced with the news it had received from a major customer on May 8 – that Actavis had bid for that customer's business for generic Ocella – Teva doubled down on its efforts to reach a deal with its competitors that would give each its fair share. Patel called Rogerson on May 8, and they spoke for nineteen (19) minutes. On May 9, Green spoke with Berthold twice, for one (1) and twelve (12) minutes, respectively.

1560.   The following day, Teva's L.R. complied with Rekenthaler's request for an analysis of the business Teva would lose by conceding its two major customers for this drug to Actavis and/or Lupin. Armed with that analysis, Patel spoke to Berthold three times that afternoon – with one call lasting over seventeen (17) minutes. Patel also called Rogerson at Actavis and the two spoke for more than five (5) minutes.

1561.   On May 14, 2013, K.G. of Teva recommended to Rekenthaler that Teva concede the business to Actavis. Rekenthaler replied simply: "Agreed."

1562.   On July 10, 2013, Green spoke to Berthold twice (for more than eight (8) minutes and more than two (2) minutes). After the first of those calls, Green requested specific information from a colleague to help him continue to negotiate with Lupin:

**From:** Kevin Green
**Sent:** Wednesday, July 10, 2013 9:46 AM
**To:** █████████
**Cc:** █████████; Nisha Patel02
**Subject:** Ocella

Tom,

Can you run me the normal profitability analysis on all customers with pricing and market share. Lupin is entering the market.

1563.    Later that day, Green called and spoke to Patel for more than seven (7) minutes, conveying what he had learned from Berthold. During that call, the two decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin. Patel called Berthold shortly after and the two spoke for more than four (4) minutes. They spoke again first thing the next morning, for nearly one (1) minute.

1564.    The next day, Patel e-mailed Green, saying: "BTW, Ocella. Check!" Green, confused by the e-mail, responded: "Huh... you are calling....correct?" Patel confirmed that she had indeed called her counterpart at Lupin: "Yes. I was saying it's all done."

1565.    Discussions between Teva and Lupin continued on July 17, 2013 with a call between Green and Berthold that lasted twenty (20) minutes.

1566.    On July 29, 2013, Green announced to his colleagues: "Lupin has entered and we need to evaluate."

1567.    The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take which generic Ocella accounts. On September 5, 2013, for example, Rekenthaler conveyed to a colleague the importance of retaining a particular customer's account, along with his understanding

of Green's discussions with Berthold about Lupin's desired market share. Green spoke to Berthold by phone twice the following day to confirm the understanding between the two companies.

1568.   On September 9, 2013, K.G. (Teva) sent an internal e-mail to his colleagues conveying his thoughts about Lupin's bid for a portion of another customer's generic Ocella business. He informed them that because Teva had secured two other significant customers, "we will likely need to give up some of our formulary position to this new market entrant."

1569.   In mid-October 2013, as Teva and Lupin finalized the allocation of accounts between them, K.G. sent a word of caution to a co-worker, reminding her of the parameters of the furtive arrangement. He told her to be careful before conceding large customers on a "bucket basis" rather than drug-by-drug in order to "make sure we are not giving up volume on products where we do not have our fair share."

### d.   Norethindrone/Ethinyl Estradiol

1570.   Teva markets its generic version of Norethindrone/Ethinyl Estradiol under the name Balziva®.

1571.   On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business. Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing Norethindrone/Ethinyl Estradiol

1572.   Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that "[w]e would lose our current market lead if we were to concede this business."

1573.   The discussions about how to share the market with the recent entrant were not limited to internal communications, however. On January 24, 2014, Patel spoke to Berthold (Lupin) twice by phone.

1574. Five days later, on January 29, Patel informed Rekenthaler of her recommendation based on her communications with Berthold, to take a cooperative stance towards this competitor, saying: "Kevin and I are in agreement that we should concede part of the business to be responsible in the market."

1575. On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin. That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

### 4. Teva/Greenstone

#### a. Oxaprozin

1576. Oxaprozin, also known by the brand name Daypro, is a nonsteroidal anti-inflammatory drug (NSAID). It is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

1577. Prior to July 2012, Teva and Dr. Reddy's dominated the Oxaprozin market. However, between July 2012 and March 2013, two additional competitors entered the market, yet the price of the drug went up more than 500% in the process.

1578. Sandoz entered the market in July 2012. Prior to Sandoz's entry into the market, Teva raised its prices by approximately 500%.

1579. This price increase was made possible by the fair share agreement, as Teva knew that it would not lose market share by raising prices, even with Sandoz's pending entry into the market. Indeed, when Sandoz did enter the market in July 2012, it matched Teva's higher prices and was still able to gain its "fair share" of the market.

1580. Greenstone entered the market for Oxaprozin 600mg Tablets on March 27, 2013. It entered with the exact same WAC pricing as Teva. In the days and weeks leading up to Greenstone's

entry into the market, Green (Teva) and R.H., an account executive at Greenstone, were in frequent

communication by phone and text to coordinate the entry, as set forth in more detail below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/6/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:47:46 | 0:10:57 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 15:24:26 | 0:01:30 |
| 3/11/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 19:25:44 | 0:02:38 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 18:03:08 | 0:00:36 |
| 3/18/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 18:44:27 | 0:04:51 |
| 3/20/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 7:59:16 | 0:02:22 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:31:40 | 0:00:00 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 16:42:27 | 0:00:27 |
| 3/21/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 16:43:56 | 0:04:04 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:20:36 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:45:41 | 0:00:10 |
| 3/22/2013 | Text | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:51:04 | 0:00:00 |
| 3/22/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 10:56:51 | 0:02:13 |
| 3/27/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 17:26:41 | 0:00:00 |

1581.   During these communications, Teva agreed to concede specific customers to

Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

1582.   Part of the understanding between the companies was that Teva would concede at

least two large customers - CVS and Cardinal - to Greenstone, and that Teva would retain Walmart

as a customer. On March 27, 2013, however, Teva learned that Greenstone had either

misunderstood the deal or was trying to cheat on the agreement by approaching Walmart.

1583.   On March 27, 2013, T.C. (Teva) forwarded an e-mail that T.C. had received from

Walmart to Green and Rekenthaler. The e-mail from Walmart, sent the same day, requested that

Teva provide a more competitive price on Oxaprozin 600mg tablets because Walmart had received a

new bid from a competitor (Greenstone).

1584.   Rekenthaler's immediate reaction to T.C.'s e-mail was "Great. More idiots in the

market…" In subsequent e-mails between T.C. and Rekenthaler, T.C. reminded Rekenthaler that,

pursuant to the agreement with Greenstone, "[w]e just conceded at cardinal . . . remember[?]"

Rekenthaler corrected T.C., stating that Teva had conceded both Cardinal and CVS to Greenstone.

REDACTED – PUBLIC VERSION

Rekenthaler remarked that "[t]hey should not have gone to Walmart. Poor strategy on their part for sure." In her reply, T.C. made it clear that there was an understanding between Teva and Greenstone:

From: █████████
Sent:      Wed 3/27/2013 4:36 PM (GMT-05:00)
To:        Dave Rekenthaler; Kevin Green
Cc:
Bcc:
Subject: RE: Oxaprozin 600mg Tab

I thought they said they were done after cardainl.. I am pissed.

1585.   Teva took immediate steps to address the situation. That same day – March 27, 2013 – Green called R.H. at Greenstone at 5:25pm but she did not answer. The next morning, at 8:06am, T.C. sent an e-mail to Walmart stating: "Addressing this morning…" Less than a half hour later, T.C. sent an e-mail to Green, stating: "CALL ME IN MY OFFICE when you get a chance."

1586.   After Green spoke to T.C., he immediately called R.H. at Greenstone. R.H. relayed the information from Green to her boss, Nailor, in a series of conversations and text messages over the course of that morning, and later in the day, as set forth below:

REDACTED – PUBLIC VERSION

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 8:57:21 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:09:50 | 0:04:52 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:18 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:39 | 0:01:23 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:22:04 | 0:00:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Incoming | Green, Kevin (Teva) | 12:15:08 | 0:00:00 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 12:18:28 | 0:04:45 |
| 3/28/2013 | Voice | R.H. (Greenstone) | Outgoing | Green, Kevin (Teva) | 13:38:50 | 0:03:15 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 18:52:14 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:45 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:47 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 19:00:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:29 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:31 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:51 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:53 | 0:00:00 |
| 3/28/2013 | Text | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 23:23:53 | 0:00:00 |

1587.   During those conversations, Greenstone agreed to withdraw the offer to Walmart and honor the agreement with Teva.

1588.   At 1:22 pm that day, after several of the communications outlined above, Walmart sent an e-mail to T.C. at Teva confirming that Greenstone had in fact withdrawn its offer: "FYI - I just received word from Greenstone that they have met their market share and the proposal has expired. Please see what you can do with pricing." T.C. forwarded the e-mail to Green, with a one-word response making it clear that Teva would not be reducing its price for Oxaprozin: "FUNNY."

1589.   Pursuant to the agreement between Greenstone and Teva, there was very little price erosion as a result of Greenstone's entry. A couple of months later, as Dr. Reddy's was preparing to enter the market for Oxaprozin, a Dr. Reddy's representative commented positively that "[p]ricing [is] still high" on Oxaprozin. That same representative had also talked to wholesaler Cardinal about the drug and conveyed that "Cardinal switched to Greenstone. Teva was 'fine' with it!"

REDACTED – PUBLIC VERSION

b.    **Tolterodine Tartrate**

1590.    Greenstone entered the market for Tolterodine 1mg and 2mg Tablets on January 23, 2014 with the exact same WAC prices as Teva for all formulations. In the days leading up to Greenstone's entry, R.H. and Nailor of Greenstone were speaking frequently to Patel and Rekenthaler of Teva to coordinate Greenstone's entry into the market. Those calls and text messages include at least those set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:25 | 0:00:00 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:48 | 0:00:12 |
| 1/21/2014 | Text | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 16:38:41 | 0:00:00 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:11:38 | 0:00:28 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 17:33:42 | 0:03:12 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 17:37:55 | 0:18:09 |
| 1/21/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:57:37 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:23:09 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:26:58 | 0:00:46 |
| 1/22/2014 | Text | Nailor, Jill (Greenstone) | Incoming | Rekenthaler, David (Teva) | 9:47:36 | 0:00:00 |
| 1/22/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Teva Pharmaceuticals | 11:25:37 | 0:09:53 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:20 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:26 | 0:00:04 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:47 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:49 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:44 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:46 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:00:59 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:01:01 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:26:26 | 0:11:09 |

1591.    During these calls and text messages, Teva and Greenstone agreed that Teva would concede business to Greenstone in order to avoid significant price erosion in the market.

1592.    The day after Greenstone's entry – January 24, 2014 - in a message to Teva national account managers about how important it was for them to determine and document which competitor was challenging Teva for business in a particular situation (because it would help Teva determine whether to concede or not), Patel stated: "As we've heard, Greenstone is entering the market for Tolterodine. I'm sure we will have to concede somewhere. . . ."

1593.   On January 28, 2014, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine. K.G. of Teva immediately asked: "do we know who this could be?" Rekenthaler responded that it was Greenstone, but did not want to put the details into writing:



> From:   Dave Rekenthaler
> Sent:   Tue 1/28/2014 4:02 PM (GMT-05:00)
> To:     ███████████████
> Cc:     Maureen Cavanaugh; Nisha Patel02
> Bcc:
> Subject: RE: price challenge delphi 10707 cvs tolterdine
>
>
> It's Greenstone, new to market.  We can discuss.

1594.   The next day, Patel and R.H. (Greenstone) tried to reach each other several times, and were ultimately able to speak once, for more than two (2) minutes.

1595.   On Monday, February 3, 2014, Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business. T.C. (Teva), who had the customer relationship with CVS, challenged the decision to concede the business. Rekenthaler responded – again not wanting to put the details into writing:

> On Feb 3, 2014, at 11:29 AM, "Dave Rekenthaler" <Dave.Rekenthaler@tevapharm.com> wrote:
>
>     ███ I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded. Again, it will make sense after I discuss with you.

1596.   The next day, Patel called R.H. (Greenstone) and the two spoke for nearly sixteen (16) minutes.

1597.    After some internal discussions at Teva regarding the CVS business, Teva confirmed

its decision to concede CVS to Greenstone. CVS represented more than 20% of Teva's business on

Tolterodine.

c.    <strong>Piroxicam</strong>

1598.    Piroxicam, also known by the brand name Feldene, is a nonsteroidal anti-

inflammatory drug (NSAID). Piroxicam is used to treat rheumatoid arthritis, osteoarthritis, and

juvenile rheumatoid arthritis. During the period relevant to this Complaint, Greenstone, Teva, and

Mylan were the primary manufacturers of Piroxicam.

1599.    Prior to 2010, prices for Piroxicam cost pennies per dose. However, in April 2010,

Rekenthaler of Teva and J.K. of Mylan coordinated to increase prices by approximately 3000%. The

two spoke by phone on April 27, 2010, and again on May 14, 2014.

1600.    On March 3, 2014, Greenstone received FDA approval to market Piroxicam

capsules. It entered the market with the exact same WAC pricing as Teva for both the 10mg and

20mg capsules.

1601.    Greenstone immediately began seeking potential customers. At 10:07am on March 5,

2014, J.L. (Teva) sent an e-mail to Patel informing her that Greenstone had just received Piroxicam

approval and was challenging Teva on several accounts. J.L. asked Patel: "Do we have any strategy

in place for Piroxicam?"

1602.    Before responding to that e-mail, Patel sought to negotiate strategy with Greenstone.

Patel called R.H. (Greenstone) at 10:55am and they spoke briefly. Shortly after that call, Patel also

called R.H.'s boss, Nailor. At 2:14pm that afternoon, Patel and Nailor spoke briefly. Immediately

after hanging up with Nailor, Patel responded to J.L.'s e-mail:

REDACTED – PUBLIC VERSION



From:     Nisha Patel02
Sent:     Wed 3/05/2014 2:17 PM (GMT-05:00)
To:       █████████████████████████████
Cc:
Bcc:
Subject:  RE: Piroxicam CPCs in house

█████

We will need to concede, but either way, will need to understand the value involved. This will help us to determine the share we want to retain v. concede and in order of customers. Please create the concede analysis and customer profitability analysis (the type that █████ did yesterday for Amphetamine IR).

1603.    Teva immediately began preparing a strategy to deal with Greenstone's entry into the Piroxicam market. On March 6, 2014, Patel requested a customer profitability and share analysis. During these negotiations with competitors regarding market entry, it was typical for Teva employees to request a "customer profitability and share analysis" (as Patel did here) so they could easily determine which customers to concede when talking to competitors about dividing the market.

1604.    That same day, Patel had multiple calls with Nailor and R.H. at Greenstone to discuss their plans for dividing the Piroxicam market. At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 10:00:22 | 0:00:29 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 10:29:29 | 0:03:23 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:29 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:52 | 0:00:03 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 12:33:08 | 0:01:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Incoming | Patel, Nisha (Teva) | 15:07:50 | 0:05:10 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:18 | 0:00:00 |
| 3/6/2014 | Voice | R.H. (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:29 | 0:00:43 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:25 | 0:00:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:48 | 0:01:02 |

1605.    The next day - March 7, 2014 - after the flurry of phone calls detailed above, Patel sent an e-mail to L.R., a customer marketing manager at Teva, identifying specific customers to

concede to Greenstone. Based on her several conversations with Greenstone, and her understanding of the concept of fair share, Patel also noted: "I'm guessing that Greenstone will not stop here since we are the share leader, but for the customers listed below, we should concede. We will review additional challenges as they come, if they come."

1606.   Additional challenges did come. On March 12, 2014, Patel learned that Greenstone was challenging Teva at CVS – Teva's largest account for Piroxicam. Teva refused to concede CVS to Greenstone because CVS represented 26.1% of Teva's total market share for that drug. Teva lowered its price by 20%, and the next morning CVS notified Teva that it would retain the account. The same day, after hearing that Teva was not going to back down on the CVS challenge, R.H. (Greenstone) called Patel at 1:41pm and they spoke briefly.

1607.   Mylan, Teva and Greenstone continued to coordinate their allocation over the coming days and weeks. On March 11, 2014, M.A. of Mylan spoke with R.H. twice by phone. On March 17, 2014, Patel and R.H. spoke briefly early in the day. R.H. also called Patel at 11:35pm that same day and they spoke for fifteen (15) minutes. Immediately after speaking to Patel, R.H. called Nailor and they spoke for ten (10) minutes. The following day, March 18, R.H. spoke with M.A. of Mylan twice. Teva retained the CVS account but conceded other customers (representing less market share) to Greenstone through March and April.

1608.   For example, on March 25, 2014 Teva learned of a challenge from Greenstone at Anda, a wholesaler distributor. Following an analysis of its market share, Teva determined that it still had more than its fair share of the market. Pursuant to the understanding among generic manufacturers alleged above, Teva determined that it was obligated under the unwritten rules of the fair share agreement to concede the Anda business to Greenstone on Piroxicam. J.P. of Teva spoke with R.H. by phone briefly the next day. Patel agreed with the decision to concede on April 1, 2014. R.H. then had a number of calls with M.A., Nesta, and Patel between April 2, and April 4.

d.    **Cabergoline**

1609.    In December 2014, as Greenstone was preparing to enter the market for

Cabergoline, F.H., a senior executive responsible for generic products at a large joint venture

between a retail pharmacy ("The Pharmacy") and a large wholesaler ("The Wholesaler") to pool the

companies' drug purchasing globally, approached T.C. (Teva) on Greenstone's behalf. In a

December 9, 2014 e-mail, F.H. directly sought to facilitate a customer allocation between

Greenstone and Teva:

> I need to talk to you about Cabergoline. Greenstone is now shipping
> and they are targeting [The Wholesaler] and 2 small grocery chains.
> [The Wholesaler] owes Greenstone a favor and would be ok if you
> walked away from their business. Greenstone has promised to play
> nice in the sandbox. Let me know if you are available to discuss.

1610.    The Wholesaler represented about 13% of Teva's total business for Cabergoline, and

about $861,000 in annual net sales.

1611.    T.C. (Teva) did not respond immediately, asking for a little extra time "to figure

something out on our side." F.H. responded: "Of course. I will let G[reen]stone know not to do

anything crazy."

1612.    The next day, after some internal conversation at Teva, T.C. agreed to the proposed

allocation: "Tell Greenstone we are playing nice in the sandbox and we will let them have [The

Wholesaler]."

1613.    Pursuant to this agreement, Greenstone was able to acquire The Wholesaler as a

customer for Cabergoline without any fear that Teva would compete to retain the business. In

exchange, Greenstone agreed to "play nice in the sandbox" – i.e., not compete with Teva for other

customers and drive prices down in the market.

     **5.**     **Teva/Actavis**

     a.     **Amphetamine/Dextroamphetamine ER**

1614.  During the relevant time frame, Defendants Teva, Impax and Actavis were the primary manufacturers of Amphetamine/Dextroamphetamine ER (sometimes referred to as "Mixed Amphetamine Salts" or "MAS-XR") capsules.

1615.  Teva began marketing MAS-XR, after the expiration of the brand manufacturer's patent on Adderall XR®.

1616.  On April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest in "all or some" of its MAS-XR business. A senior Teva sales director, T.C., insisted on knowing the identity of the competitor before deciding what Teva's response would be. The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug.

1617.  Teva deferred its decision on pricing until Actavis was in a position to ship the product.

1618.  Actavis obtained FDA approval to manufacture various formulations of Amphetamine/Dextroamphetamine ER on June 22, 2012. At 9:58pm that same evening, Rekenthaler instructed Teva employees to find out Actavis' plans regarding its newly-approved generic, including shipping details and inventory levels. At 8:32am the next morning, Teva employee T.S. responded that she had spoken to M.P., a senior Actavis sales and marketing executive, and conveyed to Rekenthaler the details of their conversation:

> **From:** ███████
> **Sent:** Saturday, June 23, 2012 8:32 AM
> **To:** Dave Rekenthaler; ████████████  Kevin Green
> **Subject:** Re: Actavis Adderall XR
>
>
> Spoke to ███████. Going after approx 15 share.
> 1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdisc. NOT Walgreens and CVS.

1619.    The customer that had sought a price reduction from Teva in April 2012 was not among those named by Actavis as its targets.

1620.    Upon learning which customers Actavis wanted, T.C. warned colleagues that this allocation of market share could be tricky. She cautioned that if Teva decided to concede a particular wholesaler to Actavis, it needed to be "mindful" that the wholesaler also did product warehousing for a different customer whose business Actavis was not soliciting.

1621.    One year later, Teva's customer renewed its request for a price reduction on Amphetamine/Dextroamphetamine ER, citing Actavis' desire to gain a share of the customer's business for the drug. On May 7, 2013, T.C. informed the customer that Teva would agree to revise its price in order to retain 100% of the customer's business. T.C. made it clear that Teva had already conceded an appropriate amount of business to its competitor. She stated: " . . . we have plenty of supply and want to keep you [sic] full business [sic] we have already let other customers go to activis [sic] go to help the market dynamites [sic]."

b.    **Amphetamine/Dextroamphetamine IR**

1622.    During the relevant time frame, Defendants Teva, Sandoz and Impax[50] were the primary manufacturers of MAS-IR tablets. Defendants Aurobindo and Mallinckrodt joined the MAS-IR tablet market and conspiracy in 2014.

---

[50] The relevant entity at the time of the MAS-IR price increase (summer 2011) was Corepharma, which was acquired by Impax in October 2014.

1623.    Defendants also communicated and coordinated shares in the MAS-IR market. For example, Teva announced its list (WAC) price increase on August 17 and Sandoz followed on August 24, 2011. Teva's Kevin Green spoke to P.K., Sandoz Director of National Accounts, on August 3, 9, 16, 17 and 18.

1624.    On January 24, 2014, as Mallinckrodt was preparing to enter the MAS-IR market, K.K., the National Account Director at Mallinckrodt (who was a former National Account Executive at Sandoz) called C.B., a former colleague and National Account Executive at Sandoz. The two spoke for approximately 25 minutes. They spoke again for approximately 19 minutes on February 10. Mallinckrodt entered the market at high prices the next week. Also, in internal documents, Teva acknowledged that it had willingly conceded a number of accounts to Mallinckrodt, the new competitor, which was wholly consistent with the fair share agreement.

1625.    In March 2014, Aurobindo was making plans to enter the market with Amphetamine/Dextroamphetamine IR (sometimes referred to as "Mixed Amphetamine Salts" or "MAS-IR"). On March 11 and 12, 2014,  T.G., a Director of National Accounts at Aurobindo, spoke to C.B., a National Accounts Manager at Sandoz. On March 18, 2014, Teva's J.P. shared with her colleagues that Aurobindo's market share target for the impending launch was 10%. Teva's senior marketing operations executive, K.G., indicated that Teva was aware that both Aurobindo and Actavis were launching.

1626.    A flurry of telephone communications between Teva and these two competitors took place on the days surrounding the foregoing e-mail. The day before, on March 17, 2014, Patel had spoken to Actavis' Director of Pricing, Rick Rogerson, three (3) times. Rekenthaler and Falkin of Actavis also spoke once on that day. On March 18, 2014, the day of the e-mail, Rekenthaler and R.C. (Aurobindo) had a thirty (30) minute telephone conversation. Rekenthaler and Falkin spoke

again seven (7) times on March 20, 2014. On March 21, 2014, Teva's Patel spoke with M.V., the Associate Director of Pricing at Sandoz.

1627.    On April 16, 2014, Teva received word from a customer that a new competitor in the market had offered a lower price than Teva's current price for Amphetamine/Dextroamphetamine IR. Patel informed K.G. that the challenge was coming from Actavis and recommended that Teva concede that customer's account. At 1:43pm, she communicated to another colleague that the decision had been made to concede. Apparently closing the loop, she called Rogerson at Actavis at 1:55pm. They spoke for just over four (4) minutes.

1628.    Teva, Sandoz, Impax, Aurobindo and Mallinckrodt continued to communicate and to monitor Fair Shares in the MAS-IR market and acted accordingly. For example, in 2014, Teva declined to bid on one of Impax's major customers because it did not ███████████████████ ████████████████████████████ Yet again, in March 2016, Teva passed on a large customer because ██████████████████████████████████████████████████

### c.    **Dextroamphetamine Sulfate ER**

1629.    Dextroamphetamine Sulfate Extended Release, also known by the brand name Dexedrine® and sometimes referred to as "Dex Sulfate XR," is a medication used to stimulate the central nervous system in the treatment of hyperactivity and impulse control.

1630.    During the relevant time period, Actavis, Teva, Impax, and non-Defendant Mallinckrodt dominated the market for Dex Sulfate XR capsules, with Teva having by far the largest share as the first generic entrant. Additionally, during the period relevant to this Complaint, Aurobindo, Teva, and Mallinckrodt were the primary manufacturers of Dex Sulfate XR tablets.

1631.    Impax prepared to enter the capsules market in August 2011 and communicated these plans to Teva, which allowed Teva to increase prices substantially even prior to Impax's entry.

Consistent with the fair share rules, Impax then entered the market at the supracompetitive prices established by Teva.

1632.    In 2012, as Mallinckrodt entered the market for both capsules and tablets, internal Teva documents acknowledged that Teva had ██████████ (i.e., willingly) conceded a large number of accounts for the drug to Mallinckrodt solely because it was entering the market and sought to add share. Moreover, with respect to tablets, Teva increased prices substantially in advance of Mallinckrodt's entry, based on the assurances it received from Mallinckrodt that it comply with the fair share rules. Indeed, internal Teva documents indicate that it repeatedly conceded share to Mallinckrodt between 2012 and 2014, in order to ensure that Mallinckrodt supported the conspiracy pricing.

1633.    In January 2013, Teva was confronted with a request for pricing from a large customer that had been approached by Mallinckrodt. This prompted Teva to assess Fair Shares of the tablet market. Teva's David Rekenthaler pointed out that Teva was expecting to cede share to Mallinckrodt: ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████ Teva's Director of Marketing responded, ████████████████████████ ████████████████████████ Ultimately, however, Teva's Senior Director of Sales signed off, ████████████████ By ceding customers, Teva ensured that each manufacturer obtained a Fair Share of the market, and all manufacturers ensured that prices for Dextroamphetamine Sulfate remained high.

1634.    Similarly, in February 2014, Teva again recognized the need to walk away from business in order to maintain Fair Shares and higher prices. In an internal analysis describing the Dextroamphetamine Sulfate market, Teva noted: ████████████████████████████████ The conclusion was to: ████████████ And the explanation: ████████████████████████

The underlying premise of the Fair Share agreement—less sales but higher prices—continued to work throughout the period. That same month, Teva confirmed in an internal document that it would not be seeking additional business: ████████████████████████████████ ████████████████████████████████

1635.    Throughout this period, Teva, Mallinckrodt, Impax, Actavis and Aurobindo met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Dextroamphetamine Sulfate and the Fair Share agreement.

1636.    For example, representatives from Teva and Impax attended the NACDS 2011 Pharmacy & Technology Meeting in Boston on August 27 to 30, 2011, shortly before Impax entered the Dextroamphetamine Sulfate ER capsule market in September 2011 at the inflated prices that Teva had recently imposed.

1637.    Similarly, representatives of Mallinckrodt and Teva attended the HDMA 2012 Business and Leadership Conference in San Antonio on June 13, 2012, not long before Teva announced list (WAC) price increases on Dextroamphetamine Sulfate tablets in July that Mallinckrodt quickly followed.

1638.    Defendants also communicated directly with each other by phone to coordinate pricing. For example, in January and February 2014—when Aurobindo was entering the market for Dextroamphetamine Sulfate tablets, Teva's Rekenthaler spoke to R.C., the CEO of Aurobindo multiple times.

1639.    On June 19, 2014, as Actavis was entering the market for Dextroamphetamine Sulfate ER, Patel reviewed a profitability analysis for that drug and asked Rekenthaler what share of the market Actavis was targeting. Rekenthaler responded: "20-25%." Rekenthaler knew Actavis' market share goals because he and Falkin (Actavis) had spoken twice by phone that morning – once for more than eleven (11) minutes and again for more than nine (9) minutes.

1640.   Five days later on June 24, 2014, Teva employee S.B. confirmed to her colleagues in an e-mail that Actavis had entered the market for Dextroamphetamine Sulfate ER. She remarked that Teva had a 72.2% share of this "multi-player market" and thus recommended giving up a large customer to Actavis and reducing Teva's market share to 58.3% – in accordance with the industry understanding to allocate the market, and Teva's ongoing agreement with Actavis. Later internal e-mails confirmed Teva's decision to concede that customer to Actavis because "Actavis is entering the market and seeking share."

1641.   Once again, when Aurobindo entered the market for tablets in mid-2014, Teva again conceded share to the new entrant, and communicated to Aurobindo which customers it would concede. Moreover, these communications with Aurobindo overlapped with collusion between the two companies (and others) with respect to Glyburide and other drugs during this same timeframe.

### d.   Clonidine TTS

1642.   Teva began marketing Clonidine TTS in 2010 after the expiration of the brand manufacturer's patent on Catapres-TTS®.

1643.   On May 6, 2014, Actavis was granted approval to market Clonidine TTS. Teva and Actavis immediately commenced an extensive negotiation over price and market share. Rekenthaler and Falkin spoke by phone three times that day: for fifteen (15) minutes, one (1) minute, and three (3) minutes, respectively.

1644.   The next day, Rekenthaler announced to his colleagues that Actavis was entering the market. K.G. (Teva) responded by requesting that Patel come up with a recommendation as to which customers Teva should concede to Actavis. At the same time, Teva employees bemoaned Actavis' "ridiculous" low pricing for a new entrant, saying that price "is already eroded here."

1645.   On May 8, 2014, Teva personnel accelerated their efforts to convince Actavis to revise its pricing and market share plans for Clonidine TTS to more acceptable levels with an even

more intensive flurry of phone calls. On that day, Rekenthaler spoke to Falkin three more times (5-, 10-, and 8-minute calls). Patel spoke to Rogerson at Actavis four times, the last call coming at 9:54am. At 10:02am, she informed her colleagues of the results of the negotiations, instructing them: "Please concede Ahold and HEB."

1646.   The following day, May 9, 2014, Patel learned from yet another customer of a "competitive price challenge" on this drug. Suspecting the source of the challenge was Actavis, Patel called Rogerson three times. Following those conversations, Patel informed her colleagues that Actavis wanted 25% of the market. She also stated that Actavis would likely want 10%-15% of that share from Teva. During those conversations, she also likely conveyed her displeasure to Rogerson about how low Actavis' pricing was, because not long after those phone calls, she conveyed to her supervisor, K.G., that "I just found out that Actavis rescinded their offer." Shortly after that, Patel also learned that Actavis had "resent all of their offer letters at pricing that is higher than our [Teva's] current."

1647.   Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying: "I'm okay with adjusting 15% but we're not going to play any games with them. They take the 15% and I don't want to hear about this product again." Teva's senior sales executive, T.C., cautioned him on the importance of maintaining a cooperative stance towards this competitor, saying: "now, now Mr. Rekenthaler play nice in the sand box …. If history repeats itself activist [sic] is going to be responsible in the market…."

1648.   The market share give-and-take between Teva and Actavis continued over the coming weeks, with Teva conceding accounts to the new entrant in order to allow Actavis to achieve its fair share of the market for Clonidine TTS. On May 14, 2014, for example, Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis. On May 17, 2014, Teva conceded a large retailer account to Actavis. On May 20, 2014, Patel again declined

to bid at another customer due to the new entrant Actavis, stating: "We are trying to be responsible with share and price."

1649.   When L.R., Teva's analytics manager, recommended giving up yet another Clonidine TTS account to Actavis on May 23, 2014, after several conversations between Patel and Rogerson the prior day, K.G. (Teva) reluctantly approved, saying: "[o]kay to concede, but we are getting to the point where we will not be able to concede further."

<strong>e.   Budesonide inhalation</strong>

1650.   Teva obtained approval to market Budesonide inhalation in November 2008. Prior to February 2015, Teva controlled virtually the entire market for generic Budesonide inhalation, with other competitors having less than 1% market share.

1651.   Teva knew, however, that a potential legal action challenging the validity of the patent on the brand drug could allow additional competition into the generic market shortly. So before any additional competition could enter the market, effective February 8, 2013, Teva raised the WAC price for its Budesonide Inhalation Suspension by 9%. Although a very modest increase in percentage terms, the 9% price increase added $51 million to Teva's annual revenues.

1652.   On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid. That same day, David Rekenthaler of Teva called his counterpart at Actavis, A.B. – a senior sales and marketing executive – and they spoke for two minutes.

1653.   The next day, April 2, 2013, Rekenthaler spoke to A.B. of Actavis two more times, including one call lasting eight minutes. Actavis then immediately began shipping the product. Instead of competing to obtain market share as a new entrant, however, Actavis entered the market with the exact same WAC price as Teva.

1654.   At some point thereafter, further legal action from the brand manufacturer prevented Actavis from permanently entering the market, but in the interim Teva was able to continue to charge the agreed-upon prices. In addition, once Actavis entered the market in 2015, Teva immediately conceded customers to Actavis in accordance with the fair share agreement – after calls between Rekenthaler and Falkin, by then a Vice President at Actavis.

1655.   On February 13, 2015, Rekenthaler informed other Teva employees of Actavis' plans to enter the market, saying: "[i]t appears that Actavis is intending on shipping" Budesonide inhalation. Rekenthaler and Falkin of Actavis had spoken by phone three days earlier on February 10, 2015.

1656.   On February 16, 2015, Rekenthaler and Falkin had another lengthy telephone conversation lasting twenty-three (23) minutes. The following morning, Teva's T.C. confirmed to her colleagues that Teva had conceded the Budesonide inhalation accounts of two major customers to Actavis. She explained that Actavis' sense of urgency to obtain the accounts was due to concerns about getting its product into market before it faced legal action from the brand manufacturer. Thus, she explained, she was working with the customers on an "exit strategy" to get Teva's product out of the supply channel, so as to streamline Actavis' entry into the market.

1657.   In late July 2015, Sandoz entered the market at the elevated prices established by Teva and Actavis. Teva – which still had more than its fair share of the market – quickly conceded several large accounts to Sandoz so that it could get its fair share. And because Actavis and Teva communicated to Sandoz which accounts to target, Sandoz was able to add market share without decreasing the market price, in accordance with the fair share rules.

f.   **Celecoxib**

1658.   Teva received approval to market Celecoxib in May 2014.

1659.    On November 20, 2014, as Teva was preparing to launch its Celecoxib capsules, a customer informed Teva that Actavis was vying for some of the customer's Celecoxib business. The customer indicated that Actavis was preparing for a launch of its own and had advocated its position by pointing out that it was just trying to "get their share" in light of the fact that Teva had already secured over 30% of the market.

1660.    Rekenthaler took a cooperative – rather than competitive – stance upon hearing that news, saying: "That's all pretty accurate and hard to argue with."

1661.    By December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided. Another customer, a large retail pharmacy chain ("The Pharmacy"), became actively involved in trying to broker an agreement between Teva and Actavis on how much share each company would take upon launch. Actavis reportedly sought 25% of The Pharmacy's Celecoxib business. A representative of The Pharmacy told Teva's T.C. that "he would not move this unless we are all on the same page" and that he did not have an issue with sending Actavis "a message."

1662.    Rekenthaler's response was consistent with the "fair share" understanding, saying "I don't want to give up anything . . . . We're at 32% and I think that's reasonable."

1663.    In the days leading up to Teva's December 10, 2014 launch, Teva executives had numerous telephone conversations with their counterparts at Actavis. Rekenthaler had a six (6) minute call with Falkin at Actavis on November 25. The two spoke twice more on December 3 – once for two (2) minutes and another time for one (1) minute. Patel spoke to A.B., a senior sales and marketing executive at Actavis, for over eight (8) minutes on December 5, and for over sixteen (16) minutes on December 8. Rekenthaler and Falkin resumed their communications the day before the Teva launch – December 9 – with a one (1) minute phone call. On the day of the launch –

December 10 – Rekenthaler and Falkin spoke three times with calls of one (1) minute, nine (9) minutes, and three (3) minutes in duration.

### 6.     Teva/Par

#### a.     Omega-3-Acid Ethyl Esters

1664.    Teva launched Omega-3-Acid Ethyl Esters on April 8, 2014. During this time period, manufacturers of the drug were all experiencing various supply problems, affecting how much market share each would be able to take on.

1665.    On the morning of June 26, 2014, Patel e-mailed C.B., a senior operations executive at Teva, to inform C.B. that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters. C.B. responded by asking if Par had started shipping that product. Patel replied at 10:24am that she had not heard anything yet but promised to "snoop around."

1666.    Patel had indeed already started "snooping around." At 9:46am, she had sent a message to T.P., a senior-most executive at Par, through the website LinkedIn, stating:



1667.   T.P. did not respond through LinkedIn, but texted Patel on her cell phone later that day, initiating a flurry of ten (10) text messages between them in the late afternoon and early evening of June. That night, Patel followed up with C.B., informing her that the only thing Patel knew at that point was that Par was limited on supply, but that she was "working on getting more . . .."

1668.   The next morning, T.P. called Patel and they spoke for nearly thirty (30) minutes. That was the first and only voice call ever between the two according to the phone records. That same morning, Patel informed C.B. that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters and would "fill you in when we speak." Patel also communicated this information to Rekenthaler. At 11:27am that same morning, Rekenthaler sent an e-mail to T.C., a Teva sales executive, with a veiled – but clear – understanding about Par's bidding and pricing plans:

> "You're aware PAR receive [sic] an approval. I would imagine that CVS is going to receive a one time buy offer from PAR. I'm also assuming the price would be above ours so there should not be a price request (which we would not review anyway). My point in the email is to ensure that you are aware of all of this . . . ."

1669.   Par launched Omega-3-Acid Ethyl Esters Capsules the following Monday, June 30, 2014.

1670.   After the discussions between Patel and T.P. (Par), Teva proceeded to concede business to Par to ensure Par's smooth entry into the market. As of July 11, 2014, Teva's share of the market for new generic prescriptions had dropped 15.9 points to 84.1% and its share of the total generic market (new prescriptions and refills) had dropped 16.3 points to 83.7%.

1671.   As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high. For example, in an internal e-mail on October 2, 2014, Teva's K.G. stated that "[w]e heard that Apotex may be launching with limited supply and at a high price." Rekenthaler had obtained this information through phone calls with J.H., a senior sales executive at Apotex, on September 25 and 27, 2014 – and then conveyed the information internally at Teva.

1672.    Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014. On November 10, 2014, Patel and T.P. exchanged five (5) text messages. On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters. T.C. at Teva speculated that the challenge was from Apotex, but Rekenthaler knew better, stating "I'm confident it's Par." Rekenthaler informed T.C. that Teva would not reduce its price to retain the business – thus conceding the business to Par.

1673.    By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing. During this time, Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

1674.    By April 2015, Apotex had officially entered the market, and consistent with the "fair share" understanding, Teva's market share continued to drop. By April 25, Teva's share of the market for new generic prescriptions for Omega-3-Acid Ethyl Esters had dropped to 68.3% and its share of the total generic market (new prescriptions and refills) had dropped to 66.8%. Rekenthaler was speaking frequently with J.H. (Apotex) to coordinate during the time period of Apotex's entry in the market.

b.    **Entecavir**

1675.    As Teva was preparing to enter the market for Entecavir in August 2014, T.C. (Teva), informed an executive at WBAD that Teva was planning on launching Entecavir "shortly" depending on when the FDA approved the drug. T.C. further noted: "We may or may not be alone on the market at launch. Sandoz has a settlement and we do not know their terms. Apotex has recently filed a PIV [Paragraph IV certification] but we invalidated the patent. We are hearing PAR has the [authorized generic] and is stating they will launch after we launch, but there is still a good chance we may be alone in the market for a short time."

REDACTED – PUBLIC VERSION

1676.    On August 28, 2014, Rekenthaler informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler noted: "[w]e are looking for at least a 60 share. Known competition is Par with an [authorized generic]." Rekenthaler also noted that Teva would be pricing as if they were "exclusive" in the market and expressed concern that customers might react negatively to the launch of this drug "because of our recent price increase [on other drugs]."

1677.    The same day, August 28, 2014, Rekenthaler had three phone calls with M.B., a senior national account executive at Par. The two spoke two (2) more times the next day, August 29, 2014.

1678.    On August 29, a Teva sales employee reported that a customer had informed her that Par was launching Entecavir at a lower price point than Teva. The employee inquired whether Teva might consider reducing its price as well. Rekenthaler, after speaking with M.B. (Par) several times on August 28 and 29, replied that Teva would remain firm on the price and noted that he was "doubtful PAR will be much lower." Despite Teva's refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

1679.    Also on August 29, Rekenthaler e-mailed T.C. asking if she had received any feedback from CVS on Entecavir. T.C. replied that she had not and followed up later saying that ABC had indicated that it would sign Teva's offer letter. Rekenthaler replied: "Great, that helps. We may end up conceding our friends up north [CVS] if they make too much fuss." T.C. dismissed that concern: "I think they will work with us really…We need them they need us so we just have to make it work."

1680.    Teva and Par both launched their respective Entecavir products on September 4, 2014. Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills).

1681.    Within a few weeks, however, Teva's share of the market was much more in line with fair share principles – 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

1682.    On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "help close the gap with current market prices." Teva declined to do so, citing that the "pricing is competitive and in line with the market." Rekenthaler had spoken to M.B. (Par) twice on October 2, 2014.

1683.    The two-player market for Entecavir remained stable over time. By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2%, and its share of the total generic market (new prescriptions and refills) was 46.7%.

c.    **Budesonide DR**

1684.    Teva was preparing to enter the market for Budesonide DR in or about March 2014. At that time, it was a 2-player market: Par had 70% market share and Mylan had the remaining 30%.

1685.    Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug. On April 1, 2014, M.B. (Par) called Rekenthaler (Teva). The two executives spoke for twenty-six (26) minutes. The next day, April 2, 2014 — which happened to be the same day that Teva received FDA approval to market Budesonide DR — Par increased its price for Budesonide DR by over 15%.

1686.    That same day, Teva sales employees were advised to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better sense of how to obtain its fair share: "it would be helpful to gather information regarding who is with mylan and who is with par…they are the two players in the mkt…as well as usage."

1687.    Par and Mylan were also communicating at this time. On April 3, 2014 – the day after the Par price increase – K.O., a senior account executive at Par, spoke to M.A., a senior account manager at Mylan, for fifteen (15) minutes.

1688.    On April 4, 2014, Rekenthaler informed members of Teva's sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product and he did not yet know when it would do so. Nonetheless, Rekenthaler spoke to both Nesta, the Vice President of Sales at Mylan, and M.B., a similarly high-level executive at Par, that same day.

1689.    Although Teva did not launch Budesonide DR until approximately June 2016, company executives attempted to coordinate pricing and market share with its competitors in anticipation of its product launch date.

### 7.    Teva/Taro

#### a.    Enalapril Maleate

1690.    In 2009, Taro discontinued its sales of Enalapril Maleate under its own label and effectively exited the market. It continued supplying Enalapril Maleate thereafter only to certain government purchasers under the "TPLI" label.

1691.    By mid-2013, the Enalapril Maleate market was shared by three players: Mylan with 60.3%, Wockhardt with 27.5%, and Teva with 10.7%. Those three companies coordinated a significant anticompetitive price increase for Enalapril Maleate in July 2013.

1692.    Mylan increased its list (WAC) price for Enalapril effective July 2, 2013. Enalapril was on a list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect. Teva quickly followed Mylan's increase, announcing its own list (WAC) price increases on July 19, 2013. Wockhardt, quickly followed the increases as well, raising list (WAC) prices for its Enalapril on August 13, 2013. Taro, which was in

the process of re-entering the market in mid-2013, joined the price increases. Rather than offer

better prices to gain market share, Taro raised its list (WAC) prices

1693.    Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from

a customer for a lower price on Enalapril. Interestingly, the customer indicated that the request was

due to Wockhardt having supply problems, not because of the Mylan increase. K.G. of Teva

confirmed that Enalapril "was on the Mylan increase communicated last week. They took a ~75%

increase to WAC."

1694.    The comment from the customer sparked some confusion at Teva, which Teva

quickly sought to clarify. That same day, Green and Nesta had two phone calls, including one lasting

almost sixteen minutes. The next day, July 11, 2013, Green and Nesta spoke two more times. During

these conversations, Nesta explained to Green that Wockhardt had agreed to follow the Mylan price

increase on Enalapril. This information sparked the following e-mail exchange between Green and

Patel (starting from the bottom):

| | |
|---|---|
| From: | Kevin Green |
| Sent: | Friday, July 12, 2013 1:12 AM |
| To: | Nisha Patel02 |
| Subject: | Re: Enalapril / Wockhardt Supply Constraint |

Wockhardt followed Mylan. They are not having supply issues. Just allocating based on the Mylan increase. They make their own API

Sent from my iPhone

On Jul 11, 2013, at 9:54 PM, "Nisha Patel02" <Nisha.Patel02@tevapharm.com> wrote:

> Wockhardt took an increase before Mylan? Then had their supply issue? I thought it was their supply issue plus Mylan increase.
>
> Nisha Patel
> Teva Pharmaceuticals USA
> Director, Strategic Customer Marketing
>
> On Jul 11, 2013, at 10:25 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>
>> This is all a result of a wockhardt price increase following a Mylan increase
>>
>> Sent from my iPhone

1695.   As it turned out, there must have been a miscommunication between Green and Nesta because although Wockhardt did in fact plan to follow Mylan's price increase, it had not yet had the opportunity to do so as of July 11, 2013.

1696.   On Friday, July 12, 2013, J.P., a national account executive at Teva, asked Patel whether Teva was "planning on increasing [its price for Enalapril]?" Patel responded: "I hope to increase, but we're gathering all the facts before making a determination." J.P. then inquired whether Teva would make an offer to the customer, and Patel responded: "Not sure yet. Need some time. We're exploring the possibility of an increase just on this item ... in the near future. Maybe next week."

1697.   That same day, Patel and Green each started "exploring the possibility" and "gathering the facts" by reaching out to Teva's two competitors for Enalapril. Patel called Nesta of Mylan directly and they spoke three times, including calls lasting six and five minutes. Patel likely called Nesta directly in this instance because Green was attending the PBA Health Conference at the Sheraton Overland Park, Overland Park, Kansas, where he was participating in a golf outing. Upon information and belief, K.K. – a senior national account executive at Wockhardt – attended the same conference, and likely spoke directly to Green either at the golf outing during the day or the trade show at night, because at 12:40 a.m. that evening (now the morning of July 13, 2013) K.K. created a contact on his cell phone with Green's cell phone number in it.

1698.   On Sunday, July 14, 2013, after Green returned home from the conference, Green and Patel spoke three times, including one call lasting twenty-one minutes. During these calls, Green conveyed to Patel what he had learned from K.K.: that Wockhardt planned to follow the Mylan price increase.

1699.   First thing the next morning, on Monday, July 15, 2013, Patel sent an e-mail to a Teva executive stating: "new developments … heard that Wockhardt is taking an increase today or

tomorrow." At the same time, Wockhardt began planning to raise the price of Enalapril and sought to confirm specific price points for the increase. Internally, Wockhardt employees understood that K.K. would try to obtain price points from a competitor. That morning, K.K. of Wockhardt called Green for a one minute call; shortly thereafter, Green returned the call and they spoke for two more minutes. At 9:57 a.m. that morning, K.K. reported internally the specific price ranges that he had obtained from Green.

1700.   Armed with this competitively sensitive information, and the understanding that Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase. On Tuesday, July 16, 2013, Patel sent the following internal e-mail to her supervisor K.G., again using the term "rumors" to obfuscate the true source of her information:



From: Nisha Patel02
Sent: Tue 7/16/2013 11:08 AM (GMT-05:00)
To:
Cc:
Bcc:
Subject: Enalapril Increase Overview

As you are aware, we are currently preparing the information to hopefully be able to implement a price increase on Enalapril.

This is a 3-player market that we share with Mylan and Wockhardt. Mylan announced a price increase last week. We are hearing rumors that Wockhardt will follow or exceed Mylan sometime this week. It would be ideal if we could follow very soon at a slightly more competitive price, with the intent of picking up some additional share in the market. Current share make up is as follows:

1. Mylan: 44%
2. Wockhardt: 43%
3. Teva: 13%

At this time, we are holding off on responding to a couple of bids in-house since a WAC increase would be required to follow the market. It would be a great opportunity to win this share and hopefully additional business as customers request bids going forward. (I think it would be ideal to capture an additional 10%.)

The same day, Nesta called Patel and left a voice mail.

1701.   Patel's July 16, 2013 e-mail referred to above was forwarded to Cavanaugh, who promptly approved the price increase.

1702.   Teva and Wockhardt simultaneously implemented price increases on July 19, 2013.

1703.    Also, on or about July 12, 2013, Aprahamian, the Vice President of Sales and Marketing at Taro, was considering whether to renew or adjust Taro's price on Enalapril Maleate for its national contract (for government purchasers), which was slated to expire in September 2013. However, Aprahamian was also communicating with both Patel of Teva as well as M.C., a senior sales and marketing executive at Wockhardt, about Enalapril Maleate. As a result of those conversations, Taro's plans changed.

1704.    On July 17, 2013 – the same day that Teva was taking steps to implement the price increase –Patel called Aprahamian and left a message. He returned the call and the two spoke for almost fourteen (14) minutes. Then, on July 19, 2013 – the day that both Teva and Wockhardt's price increases for Enalapril Maleate became effective –Aprahamian called M.C. at Wockhardt on his office phone and left a message. He then immediately called M.C.'s cell phone, which M.C. answered. They spoke for nearly eleven (11) minutes.

1705.    On the morning of July 19, Aprahamian sent an internal e-mail to Taro colleagues signaling a change in plans:

From: Ara Aprahamian/US/TARO
To:
Cc:
Date: 07/19/2013 07:19 AM
Subject: Taro Enalapril

Currently if I'm not mistaken we only supply the government with Enalapril in TPU label (looks like we exited our label in 2009). There has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast).

1706.    Aprahamian followed up with another e-mail shortly after, adding that Taro "[w]ould only look for 10-15% MS [market share] but with recent market changes and units on this product, it would be incremental."

1707.   In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market.

1708.   On July 31, 2013, for example, Patel provided her analysis of the drugs Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets. Enalapril Maleate was one of the drugs where, according to Patel, Teva was "seeking share," so she authorized the submission of a bid. Prior to sending that e-mail, Patel had spoken to Aprahamian on July 30 (11 minute call) and July 31, 2013 (4 minute call). Based on the agreement between the two companies, and in accordance with the industry's "fair share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

1709.   Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian emphasized to his colleagues that Taro's final prices would be set largely based on "continued market intelligence to secure share . . .."

1710.   In early December 2013, Taro was fully ready to re-enter the Enalapril Maleate market. On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive, M.A., during conversations of two (2) and eleven (11) minutes.

1711.   On December 4, 2013, one customer that had recently switched from Wockhardt to Teva expressed an interest in moving its primary business to Taro for the 2.5mg, 5mg, 10mg, and 20mg strengths. At 4:30pm that afternoon, Aprahamian instructed a colleague to prepare a price proposal for that customer for all four products.

1712.   Before sending the proposal to the customer, however, Aprahamian sought the input of his competitor, Teva. On December 5, 2013, he and Patel spoke by phone for nearly five (5) minutes.

1713.   Taro's fact sheet for the Enalapril Maleate re-launch generated on the day of Aprahamian's call with Teva showed a "[t]arget market share goal" of 15%, with pricing identical to Teva's and nearly identical to Wockhardt's and Mylan's.

1714.   Taro began submitting offers on Enalapril Maleate the following day, December 6, 2013. But even with the bidding process underway, Aprahamian made certain to communicate with Mylan's M.A. during a brief phone conversation that afternoon. This particular communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

1715.   Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril Maleate market. Aprahamian and M.A. talked for ten (10) minutes on December 11, and for seven (7) minutes on December 12.

1716.   Thereafter, and with the likely consent of Mylan, Aprahamian reported on an internal Sales and Marketing call on December 16, 2013, that Taro's prior target Enalapril Maleate market share goal of 15% had been raised to 20%.

1717.   Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both. For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer. This caused M.C. (Wockhardt) to call Aprahamian on December 31, 2013, to discuss the situation. During the call, M.C. agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to Taro. In an e-mail on January 2, 2014, S.K. (Wockhardt) conveyed the details to his colleagues:

| From: | ████████ |
|---|---|
| Sent: | Thursday, January 2, 2014 10:20 AM |
| To: | ████████ |
| Subject: | RE: Competitive Offer for Enalapril |

████.

I spoke to ████ on NYE.  Once we confirm we are keeping McKesson, let's yield MoDick.  Call to discuss.

1718.    By May 2014 the market was stable, and market share for Enalapril Maleate was reasonably distributed among the companies. As Teva was considering whether to bid on specific drugs for an RFP sent out by a large wholesaler customer, Patel provided the following caution with regard to Enalapril Maleate: "no bid due to potential market/customer disruption, aka strategic reasons." The same day she sent that e-mail – May 14, 2014 – Patel spoke to Aprahamian for more than four (4) minutes and exchanged eight (8) text messages with him.

1719.    By June 2014, Taro had obtained 25% market share for Enalapril Maleate in a 4-player market. Mylan and Teva each had approximately 28% market share.

1720.    Also in the spring of 2014, Mylan led another even more extreme round of price increases. In April 2014, it increased list (WAC) prices again, by approximately 300%. Teva followed the increase—announcing identical WAC prices—in August. Taro did exactly the same in October. And Wockhardt raised its list (WAC) prices again in December.

1721.    After Mylan, Teva, Wockhardt and Taro had completed their second round of coordinated price increases, Valeant appeared to enter the market. Rather than offer better prices to win new customers, Valeant matched the list (WAC) prices of the other sellers, and NSP prices that were the same or even higher.

1722.    In January 2015, Aprahamian conducted a market analysis of Enalapril and noted that Teva might be leaving the market, but that Valeant would be "entering." In reality, Valeant had always sold a small amount of Enalapril, with a market share of less than 1%. But Valeant was able

to get word to Aprahamian in January 2015 of its future plans, even though it did not ramp up production of the drug until December 2015. Leveraging Teva's exit from the market, the competitors allowed Valeant to take the share forfeited by Teva, and in December 2015, Valeant sold more Enalapril tablets than either Mylan or Taro, despite the fact that its market share was less than 1% just a few months prior. Additionally, Valeant was able to ramp up production substantially without disturbing price because it knew from its competitors which accounts to target. Moreover, upon ramping up production, Valeant began charging prices that were higher than the other competitors.

1723.    Moreover, as discussed below with respect to Captopril, Mylan agreed to concede market share to Wockhardt for Enalapril after it exited the Captopril market, and as a result, Wockhardt received the largest market share on Enalapril. Accordingly, as a result of the fair share conspiracy, Defendants were able to charge supracompetitive pricing on Enalapril tablets (and also other drugs).

### b.    Nortriptyline HCL

1724.    While Taro was approved in May 2000 to market generic Nortriptyline HCL, it subsequently withdrew from the market. As of early 2013, the market was shared by only two players – Teva with a 55% share, and Actavis with the remaining 45%.

1725.    By February 2013, Taro personnel had come to believe that they should reclaim a portion of this market, one opining that "…Nortriptyline capsules should be seriously considered for re-launch as soon as possible."

1726.    In early November, Taro was formulating re-launch plans, including a "Target Market share goal" for Nortriptyline HCL of 25% that would leave Teva with 42.45% and Actavis with 31.02%.

1727.   On November 6, 2013, Aprahamian pressed his team to "…get some offers on Nortrip[tyline] out . . .." He emphasized the need to find out who currently supplied two particular large customers so that Taro could "determine our course (Cardinal or MCK)".

1728.   Two days later, on November 8, Aprahamian received confirmation that McKesson was a Teva customer.

1729.   Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market. For example, Rekenthaler (Teva) and Falkin (Actavis) spoke twice by phone on November 10, 2013.

1730.   Then, on November 12, 2013, Taro's Aprahamian called Patel (Teva). Their conversation lasted almost eleven (11) minutes. That same day, Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business with McKesson, saying simply: "Will pass on MCK on Nortrip." Accordingly, he instructed a subordinate to put together an offer for Cardinal instead.

1731.   The discussions of how to accommodate Taro into the Nortriptyline HCL market were far from over, however. Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15 and 18. Falkin also exchanged two text messages with Cavanaugh (Teva) on November 17, and one on November 18, 2014.

1732.   Immediately following this series of discussions, Aprahamian began delivering a new message to his team: Taro had enough offers out on Teva customers – it needed to take the rest of its share from Actavis. On November 19, 2013 when a colleague presented an opportunity to gain business from Teva customer HD Smith, Aprahamian flatly rejected the idea, saying: "Looking for Actavis.. [sic] We have outstanding Teva offers out .. [sic]".

1733.   The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue. Armed with this new information, Aprahamian wasted no

time in seeking Actavis' permission, placing a call to M.D., a senior national account executive at Actavis, less than four hours later. They ultimately spoke on November 22, 2013 for more than eleven (11) minutes.

1734.    Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro. On November 21, 2013, Teva informed its customer that "[w]e are going to concede the business with Cardinal."

1735.    The competitors continued consulting with each other over the coming months on Nortriptyline HCL. On December 6, 2013, for example, Aprahamian called M.D. at Actavis and the two spoke for over thirteen (13) minutes. On December 10, 2013, a Taro colleague informed Aprahamian that a large customer, HEB, was with Actavis for all but one of the Nortriptyline HCL SKUs, and that HEB was interested in moving the business to Taro.

1736.    Having already cleared the move with Actavis during his December 6th call with M.D., Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

1737.    Aprahamian also continued to coordinate with Teva. He called Patel on January 28, 2014, but she did not pick up. The dialogue continued on February 4, 2014 when Patel called Aprahamian back. The two talked for nearly twenty-four (24) minutes.

1738.    Two days later, on February 6, a potential customer solicited Taro to bid on its business. When a colleague informed Aprahamian of that fact and asked if he wanted to pursue the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued:



1739.   Over the first ten days of March, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing efforts to work out the details of Taro's re-entry. These calls include at least those listed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

1740.   At the end of this flurry of communications, Teva documented its internal game plan for Nortriptyline HCL. Prior to this time - particularly in early 2014 – Nortriptyline HCL had been listed by Teva as a potential candidate for a price increase. On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she spoke to Aprahamian for more than five (5) minutes), she removed Nortriptyline HCL from contention in order to

accommodate Taro's entry. The spreadsheet that she sent to a colleague on that date expressly took into account the negotiations over Taro's entry that had occurred over the past few weeks. With respect to a possible Nortriptyline HCL price increase, it stated: "Delay – Taro (new) seeking share." Teva subsequently raised the price of Nortriptyline HCL on January 28, 2015 – in coordination with both Taro and Actavis.

1741.    In mid-2015, Valeant entered the market for Enalapril at higher prices than the existing competitors were charging. Valeant did so because it knew that the existing competitors would concede to Valeant its fair share of the market, and this is precisely what happened.

### 8.    Teva/Zydus

1742.    Green left Teva in November 2013 and moved to Zydus where he took a position as an Associate Vice President of National Accounts. Once at Zydus, Green capitalized on the relationships he had forged with his former Teva colleagues to collude with Teva (and other competitors) on several Teva/Zydus overlap drugs.

1743.    In the spring/early summer of 2014 in particular, Zydus was entering four different product markets that overlapped with Teva. During that time period, Green was in frequent contact with Patel and Rekenthaler, and others, to discuss pricing and the allocation of customers to his new employer, Zydus. Indeed, given the close timing of entry on these four products, Green, Patel, and Rekenthaler were often discussing multiple products at any given time.

### a.    Fenofibrate

1744.    Teva colluded with Mylan and Lupin to allocate the Fenofibrate market upon Mylan's entry in May 2013. To effectuate that agreement, Green was in frequent contact with Nesta of Mylan and Berthold of Lupin.

1745.    In February 2014, Zydus was preparing to launch into the Fenofibrate market. Green, now at Zydus, colluded with Patel, Rekenthaler, Nesta, Berthold, and Perrigo's T.P. to share pricing information and allocate market share for his new employer, Zydus.

1746.    On February 21, 2014, Teva's Patel sent a calendar invite to Rekenthaler and to her supervisor, K.G., Senior Director, Marketing Operations, for a meeting to discuss "Post Launch Strategy (Multiple Products)" on February 24, 2014. One discussion item was Zydus' anticipated entry into the Fenofibrate market. Notably, Zydus did not enter the Fenofibrate market until a few weeks later on March 7, 2014.

1747.    In the days leading up to the meeting, between February 19 and February 24, Patel and Green spoke by phone at least 17 times – including two calls on February 20 lasting twenty-seven (27) minutes and nearly nine (9) minutes, respectively; one call on February 21 lasting twenty-five (25) minutes; and a call on February 24 lasting nearly eight (8) minutes.

1748.    On or about March 7, 2014, Zydus entered the Fenofibrate market at WAC pricing that matched Teva, Mylan, and Lupin. In the days leading up to the launch, individuals from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus. Indeed, between March 3 and March 7, these competitors exchanged at least twenty-six (26) calls with each other. These calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Rekenthaler, David (Teva) | 0:13:30 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:07 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |
| 3/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:08:15 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:03:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:17:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:07:20 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:12:00 |

1749.   During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes. During those calls they were discussing how to divide the market for several products Zydus was entering the market for. A half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying "LOE Targets to Keep" for several products on which Teva overlapped with Zydus - including Fenofibrate. With respect to Fenofibrate, Patel recommended "Defend all large customers." Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

1750.   In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached.

1751.   For example, on Friday March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource. Patel responded that Teva was "Challenged at Humana as well."

1752.   That morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a meeting to discuss "Open Challenges-Retain/Concede Plan." One item on the agenda was "Fenofibrate (Zydus at Opti and Humana-propose to concede)."

1753.   The following Monday – March 24, 2014 – Patel sent internal e-mails directing that Teva "concede" OptiSource and Humana to Zydus. Patel further stated that Teva provided a "courtesy reduction" to a third customer, NC Mutual, but stated that Teva should "concede if additional reduction is requested." That same day, Patel called Green and they spoke for more than fourteen (14) minutes. She also spoke with Berthold of Lupin for nearly twelve (12) minutes.

1754.   In the meantime, Zydus bid at another Teva customer, Ahold. On March 25, 2014, Patel e-mailed Rekenthaler stating "Need to discuss. NC pending, and new request for Ahold. We may not be aligned." Patel then sent an internal e-mail directing that Teva "concede" the Ahold business. Later that day, Patel called Green. He returned the call and they spoke for nearly eight (8) minutes. Patel also called Berthold of Lupin and they spoke for five (5) minutes.

1755.   On May 13, 2014, Zydus bid on Fenofibrate at Walgreens, which was also Teva's customer. The next day, on May 14, 2014, Patel forwarded the bid to her supervisor, K.G., and explained "if we concede, we will still be majority share, but only by a few share points. On the other hand, if Zydus is seeking share, they're challenging the right supplier, but the size of the customer is large. What are you[r] thoughts on asking them to divide the volume 25% Zydus and 75% Teva? This way, we've matched, retained majority and will hopefully have satisfied Zydus, and minimize them going elsewhere."

1756.   K.G. agreed with the approach and on May 15, 2014, Patel sent an internal e-mail directing that Teva reduce its price to Walgreens but explained that "we will retain 75% of the award. The remainder will go to Zydus. Hopefully, this will satisfy their share targets." Patel emphasized that we "need to be responsible so that Zydus doesn't keep challenging Teva in the market." Later that day, Green called Patel and they spoke for twenty (20) minutes.

1757.   On June 2, 2014, Green called Patel and they spoke for nearly six (6) minutes. He also called Rekenthaler, and they spoke for two (2) minutes. Two days later, on June 4, 2014, Zydus submitted an unsolicited bid for Fenofibrate at Anda, a Teva customer.

1758.   On June 10, 2014, T.S., Senior Analyst, Strategic Support at Teva e-mailed J.P., Director of National Accounts, stating "We are going to concede this business to Zydus per upper management." T.S. forwarded the e-mail to K.G., copying Patel and Rekenthaler, asking to "revisit the decision to concede ANDA" because "[w]e need to send Zydus a message to cease going after all of our business." Rekenthaler responded, "At Anda I would suggest you try to keep our product on their formulary in a secondary position and we'll continue to get sales. . . . Zydus has little market share on Fenofibrate that I can tell and they'll continue to chip away at us until they get what they are looking for." A few hours later, J.P. responded that Anda would maintain Teva on secondary and award the primary position to Zydus. Anda was fully aware that Teva was conceding Anda's business to Zydus because it was a new entrant.

1759.   The next day, on June 11, 2014, Green called Rekenthaler and they spoke for eight (8) minutes. Later that day, Patel called Green. He returned the call and they spoke for nearly fifteen (15) minutes.

b.      **Paricalcitol**

1760.   Teva entered the market on Paricalcitol on September 30, 2013. As the first generic to enter the market, it was entitled to 180 days of exclusivity.

1761.    In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede. Teva had advance knowledge that Zydus and another generic manufacturer not named as a defendant in this case planned to enter the market on day 181, which was March 29, 2014.

1762.    In the month leading up to the Zydus launch, Patel and Rekenthaler spoke with Green and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant.

1763.    On February 28, 2014, T.S., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, advising that ABC was requesting bids on two Zydus overlap drugs – Paricalcitol and Niacin ER. After receiving that e-mail, Rekenthaler called Green. The call lasted less than one (1) minute (likely a voicemail). The next business day, on March 3, 2014, Rekenthaler called Green again and they spoke for twenty (20) minutes. Later that afternoon, Patel also called Green. The two exchanged four calls that day, including one that lasted nearly twenty (20) minutes. On March 4, Patel called Green again and left a voicemail.

1764.    On March 12, 2014, T.S. e-mailed Patel and Rekenthaler stating that Zydus had bid on Paricalcitol at ABC. That same day, Patel sent an internal e-mail asking for a loss of exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's business they represented. This was typically done by Teva employees before calling a competitor to discuss how to divvy up customers in a market.

1765.    On March 13, 2014, Patel directed that Teva retain ABC and match the Zydus pricing. The next day, on March 14, 2014, Patel called Green. A few minutes later, Green returned the call and they spoke for nineteen (19) minutes. Rekenthaler then called Patel and they spoke for eleven (11) minutes.

1766.   During the morning of March 17, 2014, Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes. During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market. A half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying "LOE Targets to Keep" for several products on which Teva overlapped with Zydus – including Paricalcitol. With respect to Paricalcitol, Patel recommended that Teva "Keep Walgreens, ABC, One Stop, WalMart, Rite Aid, Omnicare." Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

1767.   Over the next several weeks, Teva would "strategically" concede several customers to the new entrant Zydus.

1768.   For example, on March 27, 2014, Green called Patel. Patel returned the call and they spoke for nearly nine (9) minutes. The next day, on March 28, 2014, OptiSource, one of Teva's GPO customers, notified J.P., a Director of National Accounts at Teva, that it had received a competing offer from Zydus for its Paricalcitol business. J.P. forwarded the OptiSource e-mail to Patel. Within minutes, Patel responded "[w]e should concede."

1769.   That same day, Teva was notified by another customer, Publix, that Zydus had submitted a proposal for its Paricalcitol business. On April 1, 2014, Teva conceded the customer to Zydus and noted in Delphi that the reason for the concession was "Strategic New Market Entrant."

1770.   Also on April 1, 2014, Zydus bid for the Paricalcitol business at NC Mutual, another Teva customer. That same day, Patel called Green and left a 22-second voicemail. The next day, on April 2, 2014, Patel tried Green twice more and they connected on the second call and spoke for nearly ten (10) minutes. Later that evening L.R., an Associate Manager, Customer Marketing at Teva, sent an internal e-mail to T.S., the Teva Director of National Accounts assigned to NC Mutual,

copying Patel, asking: "May we please have an extension for this request until tomorrow?" Patel responded, "I apologize for the delay! We should concede."

1771.   On April 15, 2014, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain its business. Two days later, on April 17, 2014, K.G. responded that he thought it might be Zydus. Patel replied, "We have conceded a reasonable amount of business (as planned) to Zydus. I would be surprised if they were going after a customer this big after they've picked up business recently." Later that day, Green called Patel. She returned his call and they spoke for nearly twelve (12) minutes. Later that day, after her discussion with Green, Patel sent an internal e-mail stating "After further review, I believe this is [a company not identified as a defendant in this case]." On April 22, 2014, Patel sent an internal e-mail regarding Walmart directing, "Need to retain. Please send an offer. Thanks."

### c.   Niacin ER

1772.   Teva entered the Niacin ER market on September 20, 2013 as the first- to-file generic manufacturer and was awarded 180 days of exclusivity. Teva's exclusivity was set to expire on March 20, 2014.

1773.   Teva had advance knowledge that Lupin planned to enter on March 20, 2014 and that Lupin would have 100 days or until June 28, 2014 before a third generic manufacturer would be allowed to enter. Teva also knew that Zydus planned to enter on June 28, 2014.

1774.   Armed with that knowledge, Teva increased its price on Niacin ER on March 7, 2014 in advance of the competitors' entry. In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin. The communications between Green (Zydus), Patel and Rekenthaler (Teva), and Berthold (Lupin) are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |

1775.    Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER. The communications between Green, Rekenthaler, Patel, and Berthold are detailed in the chart below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:01:00 |
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:05:04 |
| 3/17/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:06:16 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:11:13 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:06:26 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:04:12 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:07:00 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:12:39 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:26:00 |

1776.    In May 2014, Zydus began readying to enter the Niacin ER market. On May 5, 2014, Zydus bid on the Niacin ER business at ABC - a Teva customer. The next day, on May 6, 2014, Green called Rekenthaler and they spoke for three (3) minutes. Less than an hour later, Green called Patel and they spoke for eight (8) minutes. A few minutes later, Green called Patel again and left a twelve-second voicemail. Later that evening, Patel e-mailed K G. reporting what Teva had learned on those calls:

-----Original Message-----
From: Nisha Patel02
Sent: Tuesday, May 06, 2014 4:26 PM
To: [REDACTED]
Subject: RE: LIFO-niacin er
Importance: High

I have the share info and LOE tracker ready...I was getting mixed messages on the plan of action, so I did not send out or set up a meeting to discuss. Here's what I have picked up:

--Zydus responded in accordance with ABC's bid request. Offer is in writing.
--Zydus shipping either 6/18 or 6/28
--Zydus is the AG
--We are considering retaining ABC. My thought is that we need to concede due to the amount of erosion, but...
--Christine has indicated that we have direction to retain any and all share at any cost
  --This may be unrealistic
  --Several competitors entering
  --Should we agree that we will need to concede share, and determine retention/concession targets, I think we should consider conceding ABC --I have asked Liz to calculate the financials, including WAG and CVS exposure --LIFO buy in play
  --ABC needs commitment on a price, even though not yet valid.
  --LIFO is significant impact that is visible at ALL levels within ABC
  --There were talks of Teva providing a response with caveats (that ABC is open to), that I would like to review/suggest, since I am familiar with the triggers as well as LIFO

1777.   K.G. responded that Patel should schedule an internal meeting to discuss their strategy for Niacin ER and include Rekenthaler.

1778.   Over the next several days, Patel and Rekenthaler exchanged several calls with Green. Green also exchanged several calls with Berthold (Lupin). These calls are listed below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:08:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:37 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:11:15 |

1779.   Ultimately, the competitors agreed that Teva would retain ABC and concede McKesson, another large wholesaler, to Zydus.

1780.   On May 29, 2014, C.D., an Associate Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Patel and Rekenthaler, stating: "A customer is reporting that Zydus is soliciting usage for Niacin with an anticipated launch of June 24." After receiving the e-mail, Rekenthaler called Green. The call lasted two (2) minutes. Green returned the call a few minutes later and they spoke for twenty-eight (28) minutes. Later that day, Patel called Green and they spoke for nearly twenty-one (21) minutes.

1781.   On June 2, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail stating "I received a ROFR from McKesson due to Zydus entering the market. They apparently did not secure ABC. They are launching 6/28, but are sending offers early due to Sun entering as well." Patel replied, "Please be sure to consult with [K.G.] on this one. Thanks." Later that morning, Green called Rekenthaler. The call lasted two (2) minutes. Green then called Patel and they spoke for nearly six (6) minutes.

1782.   On June 5, 2014, J.P. sent an internal e-mail regarding "McKesson Niacin" stating "Per Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede this item." J.P. also entered the loss in Teva's internal database – Delphi – and noted that the reason for the concession was "Strategic New Market Entrant."

1783.   On June 28, 2014, Zydus formally launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

            d.      **Etodolac ER**

1784.   Prior to Zydus' entry into the Etodolac ER market, Teva and Taro were the only generic suppliers of the product. As described below, Teva and Taro -through Patel and Aprahamian- colluded to significantly raise the price of Etodolac ER in August 2013.

1785.   On May 12, 2014, Zydus entered the Etodolac ER market at WAC pricing that matched Teva and Taro's artificially high pricing. Not surprisingly, in the days leading up to the

Zydus launch, Patel was relaying communications back and forth between Green and Aprahamian. During these calls, the competitors discussed, among other things, the allocation of market share to the new entrant, Zydus.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:08:00 |
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:12 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:36 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:16:45 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Incoming | Patel, Nisha (Teva) | 0:13:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:07:00 |

    1786.   On May 14, 2014, Anda- a wholesaler customer of Teva- notified Teva that Zydus had submitted a bid for its Etodolac ER business. That same day, Patel exchanged eight (8) text messages and had a four (4)-minute call with Aprahamian. The next day, on May 15, 2014, Green called Patel and they spoke for twenty (20) minutes.

    1787.   On May 20, 2014, Green called Patel and they spoke for four (4) minutes. That same day, K.R., a senior sales executive at Zydus, also exchanged two (2) text messages and had a brief call with Cavanaugh (Teva). The next day – May 21, 2014 – Green called Patel again and they spoke for twenty-eight (28) minutes. That same day, K.R. (Zydus) and Cavanaugh (Teva) exchanged four (4) text messages.

1788.   The next day, on May 22, 2014, T.S., Senior Analyst, Strategic Support at Teva, sent an internal e-mail to certain Teva employees, including Patel, stating: "I have proposed we concede Anda as they are a small percent of market share and we will have to give up some share with a new market entrant. Anda is looking for a response today." Patel responded: "agree with concede."

1789.   Similarly, on June 27, 2014, Econdisc, a Teva GPO customer, notified Teva that it had received a competitive offer for its Etodolac ER business. Later that day, Patel spoke with Aprahamian at Taro for fourteen (14) minutes.

1790.   On July 2, 2014, Patel called Green and left a voicemail. The next day, on July 3, 2014, Patel sent an internal e-mail advising that "We will concede." Later that day, Teva told Econdisc that it was unable to lower its pricing to retain the business.

1791.   When Patel's supervisor, K.G., learned that Teva had lost the Econdisc business, he sent an internal e-mail asking "Did we choose not to match this?" Patel responded, "Yes. New market entrant – Zydus." K.G. replied, "Okay good. Thank you."

### 9.   Teva/Glenmark

#### a.   Moexipril HCL

1792.   Glenmark and Teva coordinated with each other to raise pricing on two different formulations of Moexipril HCL between May and July 2013. When Patel colluded with CW-5, a senior-most executive at Glenmark, to raise prices on Moexipril HCL, one of the fundamental tenets of that agreement was that they would not try to poach each other's customers after the increase and the competitors would each maintain their "fair share."

1793.   On August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers, ABC. Upon hearing this news, Rekenthaler (Teva) forwarded an e-mail discussing the Glenmark challenge to Patel, expressing his confusion over why Glenmark would be challenging Teva's business:

REDACTED – PUBLIC VERSION

**From:** Dave Rekenthaler
**Sent:** Monday, August 05, 2013 7:05 PM
**To:** Nisha Patel02
**Subject:** Fwd: ABC - Loss business on Moexipril


???

Sent from my iPhone

1794.   Rekenthaler forwarded the e-mail only to Patel because he was aware that she had been the person at Teva who had been colluding with Glenmark.

1795.   Five (5) minutes after receiving the e-mail from Rekenthaler, Patel responded:

From:     Nisha Patel02
Sent:      Mon 8/05/2013 7:10 PM (GMT-05:00)
To:         Dave Rekenthaler
Cc:
Bcc:
Subject: RE: ABC - Loss business on Moexipril


I know…made the call already

1796.   The call that Patel had made earlier that day was to CW-5, a senior executive at Glenmark, to find out why Glenmark sought to underbid Teva at ABC.

1797.   Patel spoke to CW-5 three times that day. The following day – August 6, 2013 – Brown, the Vice President of Sales at Glenmark, called Patel at 9:45am but did not reach her. Patel returned Brown's call at 10:08am and the two spoke for approximately thirteen (13) minutes. Later that day, at 1:11pm, the two spoke again for approximately fifteen (15) minutes. During these calls, Patel reminded Brown and CW-5 of their prior agreement not to poach each other's customers after a price increase.

1798.    As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril HCL. Later that same day – August 6, 2013 – T.S. (Teva) informed colleagues that "[t]oday is a new day and today…. ABC has now informed me that they will NOT be moving the Moexipril business to Glenmark."

### b.  Desogestrel/Ethinyl Estradiol (Kariva)

1799.    Desogestrel and Ethinyl Estradiol, also known by the brand names Kariva and Mircette, is an oral contraceptive.

1800.    During the relevant time frame, Teva, Actavis and Glenmark were the primary manufacturers of Desogestrel and Ethinyl Estradiol.

1801.    Glenmark entered the market for Desogestrel/Ethinyl Estradiol 0.15mg/0.02mg tablets on April 4, 2012 under its own brand name of Viorele.

1802.    During the morning of May 19, 2014, Patel learned that Glenmark had bid a low price for Kariva at Publix, a retail pharmacy purchaser. S.B., an analyst at Teva, e-mailed Patel a list of suggested re-bid prices to send to Publix for various drugs, including generic Kariva. The chart included a suggested re-bid price for generic Kariva of $76.14 - which was $52.64 higher than the $23.50 price that Glenmark had offered Publix.

1803.    This sparked a flurry of communications that same day between Patel and three different Glenmark representatives - Brown and Grauso, and J.C., a sales and marketing executive at Glenmark - as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Glenmark) | 11:46:15 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 11:47:03 | 0:24:09 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 12:21:00 | 0:12:53 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:08 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:31 | 0:00:26 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 13:50:15 | 0:06:51 |

1804.   Patel also spoke with Rogerson at Actavis that same day (May 19). In fact, Patel was regularly in contact with Rogerson throughout May. The two spoke on at least May 8, 9, 12, 19 and 22.

1805.   After this flurry of communications with Glenmark and Actavis, Patel decided that Teva would offer Publix a re-bid price with a nominal 10% reduction off the originally proposed re-bid price of $76.14 - virtually guaranteeing that the business would be awarded to Glenmark.

c.   **Gabapentin**

1806.   During the time period relevant to this Complaint, Teva, Glenmark, and Aurobindo dominated the market for Gabapentin 600mg and 800mg tablets.

1807.   In October 2014, Teva, Glenmark and Aurobindo met and communicated for the purposes of fixing the prices of Gabapentin tablets.

1808.   Jim Grauso of Glenmark was speaking frequently with R.C., the CEO of Aurobindo, directly by phone on October 3, 14, 26, 29 and 31. He also communicated with the Vice President of Commercial operations at Aurobindo on October 7, 27, and 28.

1809.   Grauso (Glenmark) also communicated directly by phone with a National Account Manager at Teva on October 3, 10, and 23.

1810.   For his part, in addition to communicating directly with Glenmark during this period, the CEO of Aurobindo was in direct contact with Teva as well. He communicated by phone with Teva's Rekenthaler on October 17, 22 and 24. He also communicated with a National Account

Manager at Teva multiple times on October 23 (the same day that the Teva NAM communicated with Grauso of Glenmark).

1811.   On October 13 and 14, 2014, Patel, along with a number of Defendants' employees, attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors. The PCMA described its Annual Meeting as "the . . . ideal venue for senior executives from PBMs, specialty pharmacy, payer organizations and pharmaceutical manufacturers to network, conduct business and learn about the most current strategic issues impacting the industry."

1812.   Shortly after returning from that meeting, during the morning of October 15, 2014, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin and suggested that this would be a great opportunity to pick up some market share. The Glenmark increase had not yet been made public and would not be effective until November 13, 2014. Nonetheless, Patel informed her colleagues in an e-mail that same day that there would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors. At around the time she sent the e-mail, Patel exchanged two (2) text messages with Brown (Glenmark).

1813.   Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share. Over the next several weeks, Teva did pick up "a bit of share" to be more in line with fair share principles but cautioned internally that it did not "want to disrupt Glenmark's business too much."

### 10.   Teva/Amneal

#### a.   Norethindrone Acetate

1814.   On September 9, 2014, a customer approached Teva asking if Teva would lower its pricing on certain drugs, including Norethindrone Acetate. One of Teva's competitors for

REDACTED – PUBLIC VERSION

Norethindrone Acetate was Amneal. The same day, Patel received phone calls from two different Amneal employees – the first, a three-minute call from S.R.(2), a senior sales executive, and the second from S.R.(1), a senior sales and finance executive for almost twenty-five (25) minutes. These were the first calls Patel had with either S.R.(1) or S.R.(2) since she joined Teva in April 2013. That same day, S.R.(1) also spoke several times with Brown, Vice President of Sales at Glenmark – the only other competitor in the market for Norethindrone Acetate.

1815.   After speaking with the two Amneal executives, Teva refused to significantly reduce its price to the customer; instead providing only a nominal reduction so as not to disrupt the market. At that time, market share was almost evenly split between the three competitors. When discussing it later, Patel acknowledged internally that Teva had "bid high" at the customer based on its understanding "that it would be an increase candidate for Amneal. They increased shortly after." By bidding high and not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the fair share understanding among the competitors in the market.

## 11.     Teva/ Dr. Reddy's

### a.     Oxaprozin

1816.   In early 2013, Dr. Reddy's began having internal discussions about re-launching Oxaprozin in June of that year. In March 2013 – when Teva was still the sole generic in the market – the plan was to target one large retail chain and one large wholesaler in order to obtain at least 30% market share. Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20% after Greenstone and Sandoz both re-launched Oxaprozin.

1817.   On June 13, 2013, members of the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to "discuss launch targets based on the market intelligence gained by the sales team."

REDACTED – PUBLIC VERSION

1818.   Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva. At the time, Teva had 60% market share. Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier. Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that significant customer.

1819.   Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens. At a July 1, 2013 sales and marketing meeting, there was an internal discussion among Dr. Reddy's employees about "asking to see if Teva would walk away from the business" at Walgreens. Within a week, Dr. Reddy's employees had learned that Teva would defend the Walgreens business and recognized that they would have to "bid aggressively" to obtain that customer.

1820.   Dr. Reddy's did bid aggressively at Walgreens. On or around July 14, 2013, Walgreens informed Green, then a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price. Per Green, Walgreens did not "want to move but obviously want[s] the price."

1821.   While the Dr. Reddy's offer to Walgreens was still pending – on July 23, 2013 – J.A. of Dr. Reddy's called Green. That phone call – the only one ever between the two individuals that is identified in the phone records – lasted for nearly five (5) minutes.

1822.   Two days later, Green noted that "[i]f we give D[r. Reddy's] this business, they may be satisfied. I will see if I can find this out." Green also warned, however, that if Teva decided to defend and keep Walgreens' business, Dr. Reddy's will "just go elsewhere" – meaning Dr. Reddy's would continue to offer unsolicited bids to Teva customers and drive prices down.

1823.   While deciding whether to match the Dr. Reddy's offer at Walgreens or concede the business to Dr. Reddy's, Teva engaged in internal discussions about strategy. On July 29, 2013, K.G. at Teva suggested the possibility of keeping the Walgreens business, but conceding Teva's next largest customer for Oxaprozin – Econdisc – to Dr. Reddy's. Eager to avoid any further price

erosion from the Dr. Reddy's entry, Rekenthaler immediately asked Patel to "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry." Rekenthaler's goal was to identify customers other than Walgreens that Teva could concede to Dr. Reddy's in order to satisfy its market share goals.

1824.   At 12:33pm that day, Patel asked a colleague to "run the customer volume and profitability analysis for Oxaprozin." It was typical at Teva to run this type of report before negotiating market share with a competitor. At 2:20pm, that colleague provided the information to Patel, copying Rekenthaler and K.G. With this information in hand, less than an hour later Rekenthaler placed a call to T.W., a Senior Director of National Accounts at Dr. Reddy's. The call lasted two (2) minutes and was their only telephone conversation in 2013.

1825.   After having this conversation with T.W., Teva decided to maintain the Walgreens business, but concede the Econdisc business to Dr. Reddy's. Teva conceded the Econdisc business on August 7, 2013. Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.

1826.   By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20% share of the Oxaprozin market. At that time, its customers included Econdisc, Keysource, and Premier.

### b.   Paricalcitol

1827.   518.   Teva entered the market for Paricalcitol on September 30, 2013 as the first-to-file generic and had 180 days of generic exclusivity.

1828.   Following its period of exclusivity, Teva's "goal was to concede business on day 181" but "to retain CVS, Walgreens and ABC. All others are not an automatic concede, but we expect to concede." During March and April 2014, Teva coordinated with and conceded several customers to Zydus, as Zydus was entering the market for Paricalcitol. By mid-April 2014, Teva "ha[d] conceded the share [it] planned for" to Zydus.

1829.    By May 2014, Dr. Reddy's started preparing to enter the Paricalcitol market. On May 1, 2014, T.W. of Dr. Reddy's spoke with Rekenthaler of Teva for nearly eleven (11) minutes.

1830.    At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was instructed to find out which customers were currently purchasing Paricalcitol from which manufacturers, and their prices. Dr. Reddy's was targeting a 20% market share. At the time, Teva's share was 73%.

1831.    On June 10, 2014 – as Dr. Reddy's was starting to approach certain customers – including a large retail pharmacy customer ("The Pharmacy") –Patel spoke with V.B., the Vice President of Sales for North American Generics at Dr. Reddy's, several times. At 8:50am, Patel called V.B. and left a voicemail. V.B. returned the call at 9:18am, and the two spoke for more than ten (10) minutes. Later that day, at 2:46pm, Dr. Reddy's provided The Pharmacy with a market share report for Paricalcitol indicating that Teva was the market leader at 60% share. A representative of The Pharmacy responded that it "[l]ooks like Teva is the right target." Shortly after this e-mail exchange, at 3:21pm, V.B. called Patel again and the two spoke for nearly nine (9) minutes.

1832.    By June 19, 2014, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and The Pharmacy. The internal plan was that if The Pharmacy declined, then Dr. Reddy's would make an offer to CVS. That same day, Teva agreed to concede its Paricalcitol business at Omnicare, dropping its market share by 3%.

1833.    Teva also strategically conceded what remained of its Cardinal business (it had previously conceded some of that business to Zydus). After receiving Dr. Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the 4mcg portion of the business. Patel recommended to her boss, K.G., that Teva concede the business: "We have ~70 share and it is ideal to concede here because of the incomplete family." K.G. agreed. Patel then instructed S.B., a customer analyst at Teva, to concede "due to [T]eva's high share." S.B. subsequently e-mailed T.C.,

REDACTED – PUBLIC VERSION

Teva's Senior Director of Sales & Trade Relations: "Due to the fact that we have high share and already conceded on the other strengths, we are going to concede on this strength as well." T.C. relayed this statement, word-for-word, to Cardinal.

1834.    Dr. Reddy's also submitted a bid to ABC, which was one of the customers that Teva had targeted to keep after losing exclusivity. ABC notified Teva of Dr. Reddy's competitive bid for Paricalcitol on June 26, 2014. In internal e-mails discussing this price challenge, Teva employees noted that Dr. Reddy's was "aggressively seeking market share" and potentially eroding the price of the drug. When asked for his thoughts on this, Rekenthaler remarked:



> From:     Dave Rekenthaler
> Sent:     Tue 7/01/2014 9:42 AM (GMT-05:00)
> To:       Nisha Patel02
> Cc:
> Bcc:
> Subject: RE: ABC Paricalcitol CPC #12233 (DRL LAUNCH) -->DUE TODAY <--
>
> My thoughts are that Dr. Reddy is really a pain in my ass. Have they picked anyone up to date?

1835.    Despite the pricing challenge, Teva retained the ABC Paricalcitol business. As ABC explained to Dr. Reddy's, "Teva wanted to keep the business and has given us a competitive price."

1836.    Dr. Reddy's formally launched Paricalcitol on June 24, 2014. On or around that date, it sent offers to, *inter alia*, Winn-Dixie, Giant Eagle, and Schnucks. On June 26, 2014, Teva's K.G. told Patel that he was "willing to concede 10-15% share total on Paricalcitol" to Dr. Reddy's.

1837.    Winn-Dixie informed Teva that it had received a competing offer for Paricalcitol from Dr. Reddy's. Patel recommended that Teva concede the business. Teva did, and Winn-Dixie informed Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

1838.    Giant Eagle informed Teva that it had received a competing offer on Paricalcitol on July 10, 2014. That same day, V.B. of Dr. Reddy's called Patel and the two spoke for more than twelve (12) minutes. Shortly after getting off the phone with V.B., Patel responded to a question

from a colleague regarding an RFP to another supermarket chain. One of the potential bid items was Paricalcitol. Patel directed her colleague to "bid a little high on Paricalcitol. We should not be aggressive since we are in the process of conceding share due to additional entrants." Her colleague responded: "I will bid higher" on Paricalcitol.

1839.    The next day, Teva conceded the Giant Eagle business to Dr. Reddy's. S.B., a Teva Strategic Customer Analyst, wrote in an internal e-mail, "Due to DRL recent launch and pressure to give up share, we are going to concede." Giant Eagle accepted Dr. Reddy's proposal the next day.

1840.    After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced pricing in order to retain the business. Teva decided internally to concede Paricalcitol at Schnucks "[d]ue to new entrants and having to give up some share." In order to create the appearance of competition with this customer, Teva engaged in what Patel referred to as "fluff pricing," by which it offered Schnucks an inflated price (cover bid) for Paricalcitol to ensure that Teva did not win the business. Indeed, Schnucks was "so insulted" by Teva's price that it moved to Dr. Reddy's the same day it received Teva's offer. When Patel learned of this, she remarked to a Teva salesperson (who she had been discussing "fluff pricing" with recently):

| | |
|---|---|
| From: | Nisha Patel02 |
| Sent: | Thu 7/17/2014 11:36 AM (GMT-05:00) |
| To: | ▬▬▬▬▬ |
| Cc: | |
| Bcc: | |
| Subject: | RE: Schnucks Paricalcitol CPC (#12201) |

Sorry! Had to laugh.  In regards to our recent conversation....this is what we see when we provide fluff pricing.  Can't win!

1841.    Schnucks accepted Dr. Reddy's Paricalcitol proposal on June 30, 2014.

1842.    On July 16, 2014, McKesson informed Teva that it had received a competing bid for Paricalcitol, and that Teva would need to submit its best bid in order to retain the business. Teva initially decided to concede the One Stop portion of McKesson's business only, while retaining the

RiteAid portion. Patel wrote internally to her team that "[t]his decision is based on the number of competitors, DRL's potential share target and our current/conceded share. (Dr. Reddy's should be done with challenging our business on this product.)" Patel further added that Teva had been "looking to give up One Stop to be responsible with share" and that "[t]he responsible thing to do is concede some share to DRL but not all."

1843.   On July 18, 2014 – a Friday –Patel called V.B. at Dr. Reddy's at 4:20pm and left a message. V.B. returned the call on Monday morning, and the two spoke for more than four (4) minutes. They spoke again the next morning, July 22, 2014, for more than six minutes. During these calls, Patel and V.B. agreed that Dr. Reddy's would stop competing for additional market share (and driving price down further) if Teva conceded all of its McKesson business (One Stop and Rite Aid) to Dr. Reddy's. Indeed, Dr. Reddy's confirmed to McKesson (that same day) that it "would be done after this" – meaning it would not compete for additional business because it had attained its fair share. McKesson passed this information along to Teva on July 22.

1844.   The next day, July 23, 2014, Teva conceded its entire McKesson business – both RiteAid and One Stop – to Dr. Reddy's. In making this decision, Defendant Patel noted: "NOW, DRL should be done." In its Delphi database, Teva noted that the McKesson Paricalcitol business had been conceded to a "Strategic New Market Entrant." After the fact, former customer McKesson informed Teva that Dr. Reddy's had been "so aggressive because [Teva was] not giving up share."

1845.   By early August 2014, Dr. Reddy's had attained 15-16% of the total Paricalcitol market, which it decided – pursuant to its understanding with Teva – it would "maintain for now."

### 12. Mylan / Sandoz

#### a. Valsartan HCTZ

1846.    The first drug that CW-4 (Sandoz) and Nesta (Mylan) coordinated about was Valsartan HCTZ (brand name Diovan HCT).

1847.    Mylan was the first to file an ANDA to market the generic version – Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz manufactured the authorized generic. This meant that Sandoz and Mylan would be the only two manufacturers of the generic for six months.

1848.    Mylan and Sandoz launched Valsartan HCTZ on the same day – September 21, 2012. In the days leading up to the launch, CW-4 and Nesta spoke at least twenty-one (21) times by phone during which they discussed, among other things, allocating market share for this product. These calls are detailed in the table below:

REDACTED – PUBLIC VERSION

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:20:01 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:11 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:18 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:43 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:35 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:03 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:22:22 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:35 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:06 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:26 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:19 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:57 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:03:30 |
| 9/14/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:07:36 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:09 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:32 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:40 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:51 |

1849.   During these phone calls, Sandoz and Mylan- through CW-4 and Nesta - agreed to divide up the market so that each competitor obtained roughly a 50% market share.

1850.   Throughout this time, CW-4 also kept Kellum (her supervisor) regularly informed of her discussions with Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

1851.   On September 21, 2012 - the date of the Valsartan HCTZ launch - R T., a senior sales and marketing executive at Sandoz, sent an internal e-mail stating "[a]s a cross functional team, we have optimized this launch successfully securing ~52% market share vs. a formidable competitor like Mylan. . . . you should be very proud!"

1852.   That same day, Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ. In an internal series of e-mails reacting to this news, a Sandoz employee remarked: "Fyi, good news, Mylan has 180 days as expected." H.F., a senior-most executive of Sandoz Germany responded, "…sometimes a little help from our competition is welcome as well." D.D., a senior-most executive of Sandoz North America, replied:

> I guess this is what they call "co-opetition".

1853.   Kellum forwarded Mylan's press release announcing the Valsartan launch to the Sandoz pricing and sales teams. S.G., a national account executive at Sandoz, replied "Hallelulah!!!!!!!!!!!!!!! (sic)."

1854.   On September 25, 2012 – only four days after the launch – ABC contacted Sandoz seeking a price reduction on Valsartan HCTZ. S.G. forwarded the request to CW-1 and Kellum stating "ABC has provided additional information regarding the market pricing on Valsartan HCTZ (specifically to McK [a Mylan customer]). Please review and advise if Sandoz will continue to let the market settle or move in a different direction. Kellum replied, "[n]o price change."

1855.   On November 16, 2012, Sandoz executives met to discuss increasing sales for Valsartan HCTZ. R.T. sent an internal e-mail in advance of the meeting asking "Are there opportunities with non-Sandoz customers that we should evaluate?" After a colleague responded with a list of potential Mylan customers, Kellum responded, "I'm concerned we are going to disrupt the market. I understand the need for additional sales but we need to be thoughtful here." R.T. then informed the Sandoz team "Do not approach new customers, with[out] me or Armando [Kellum]'s consent."

**B.   Taking the Overarching Conspiracy to a New Level: Price Fixing (2012 – 2015)**

**1.   July 31, 2012 Price Increase**

1856.   Effective July 31, 2012, Teva increased pricing on a number of different drugs. Many were drugs where Teva was exclusive, but several of them were drugs where Teva faced competition, including the following[51]:

| Drug | Competitors |
|------|-------------|
| Buspirone Hydrochloride Tablets | Mylan (29.5%); Watson (23.5%) |
| Estradiol Tablets | Mylan (26.7%); Watson (16.4%) |
| Labetalol HCL Tablets | Sandoz (61.4%); Watson (10%) |
| Loperamide HCL Capsules | Mylan (67%) |
| Mimvey (Estradiol/Noreth) Tablets | Breckenridge (66.2%) |
| Nadolol Tablets | Mylan (49.8%); Sandoz (10.3%) |
| Nitrofurantoin MAC Capsules | Mylan (45.3%); Alvogen (7.9%) |
| Tamoxifen Citrate Tablets | Mylan (22.2%); Watson (10.3%) |

1857.   Before raising prices on these drugs, Teva coordinated each of these price increases with its competitors. For every drug on the list above, either Green or Rekenthaler was communicating directly or indirectly with Teva's competitors to coordinate in the days and weeks leading up to the price increase. For example:

    a.   <u>Mylan</u>: Green spoke to Nesta on July 23 (7 minutes), July 24 (2 calls: 4 and 8 minutes); July 25 (4 minutes); July 26 (4 minutes); July 30 (2 calls, including one 8 minutes); and July 31, 2012 (5 calls: 6, 2, 4, 7 and 2 minutes);

    b.   <u>Watson</u>: Rekenthaler spoke to A.S., a senior Watson sales executive, on July 11, 2012 (2 calls: 1 and 9 minutes);

---

[51] Watson Phannaceuticals, Inc. ("Watson"), acquired Actavis in or about October 2012. The two companies operated as a single entity, albeit under separate names until January 2013, when Watson announced that it had adopted Actavis, Inc. as its new global name. [See https://www.allergen.com/news/news/thomson-reuters/Watson-pharmaceuticals-inc-is-now-actavis-inc.]

REDACTED – PUBLIC VERSION

   c. <u>Sandoz</u>: Green spoke to CW-2 (Sandoz) on July 29, 2012 (2 calls: 2 and 4 minutes) and July 31, 2012 (6 minutes).

   d. <u>Breckenridge</u>: Rekenthaler spoke to D.N. a senior sales executive at Breckenridge on July 17, 2012 (4 minutes);

   e. <u>Alvogen</u>: Green had several calls with Nesta (Mylan) (noted above) on July 31, 2012. After some of those calls between Green and Nesta on July 31, Nesta called B.H., a senior sales and marketing executive at Alvogen.

### a. **Nadolol**

1858.   As early as 2012, Teva was speaking to competitors about the drug Nadolol.

1859.   In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three companies experienced supply problems of some sort during that time period, but they were in continuous communication to coordinate pricing and market allocation in order to maintain market stability. Nadolol was a high-volume drug and one of the most profitable drugs where Teva, Mylan and Sandoz overlapped, so it was very important that they maintain their coordination.

1860.   By 2012, an anticompetitive understanding among Teva, Mylan and Sandoz was firmly entrenched.

1861.   Teva raised its price on Nadolol on July 31, 2012. In the days leading up to that increase, Green, at the time in the sales department at Teva, was in frequent communication with executives at both Sandoz and Mylan. Green spoke to CW-2 from Sandoz twice on July 29, 2012, and again on the day of the price increase, July 31, 2012. Similarly, Green was communicating with Nesta of Mylan often in the days leading up to the increase, including five (5) calls on the day of the price increase.

1862.   Sandoz followed with its own increase on August 27, 2012. The increases were staggering – varying from 746% to 2,762% depending on the formulation. The day before the Sandoz increase, Kellum, then the Senior Director of Pricing and Contracts at Sandoz, called Green. They had also spoken once earlier in the month, shortly after the Teva increase. CW-2 also called

Green twice on August 21, 2012 – the same day that Sandoz requested approval from its Pricing Committee to raise the Nadolol price. The day after the Sandoz increase, Green – acting as the conduit of information between Sandoz and Mylan – called Nesta (Mylan) twice, with one call lasting fourteen (14) minutes.

1863.    Mylan, which returned to the market after a brief supply disruption, followed and matched the Teva and Sandoz increases on January 4, 2013. The day before the Mylan increase Nesta spoke to Green four (4) times. The next day, Green conveyed the information he had learned from Nesta directly to his counterpart at Sandoz. On January 4, 2013 – the day of the Mylan increase, Green called Kellum twice in the morning, including a six (6) minute call at 9:43am. Shortly after hanging up with Green, Kellum reported internally on what he had learned – but concealing the true source of the information – a convention that was frequently employed by many Sandoz executives to avoid documentation of their covert communications with competitors:

**From:** Kellum, Armando
**Sent:** Friday, January 04, 2013 11:28 AM
**To:** ███████████████████████████████████████
**Subject:** Levothryoxine and nadolol

Just heard from a customer that

- Teva and Mylan raised have now raised price on Nadolol to our levels

and

Mylan took a significant price increase on Levothryoxine

Let's please be cautious on both of these products.

Thanks

1864.    Being "cautious" on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

1865.   Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013. At 11:50am the same morning, Green also called CW-2 at Sandoz and they spoke for fifteen (15) minutes.

1866.   Significantly, Green was not speaking with his Sandoz contacts solely about Nadolol, the common drug between Teva and Sandoz, but was also conveying information to Sandoz about a Mylan price increase on another drug that Teva did not even sell – Levothyroxine. Such conversations further demonstrate the broad, longstanding agreement among each of these competitors to share market intelligence in order to facilitate the scheme.

1867.   To put the Nadolol price increases into context, the Connecticut Attorney General's Office received a complaint from a Connecticut resident who has been prescribed Nadolol for approximately the last 15 years. In or about 2004, that individual paid between $10 and $20 in out-of-pocket costs for a 90-day supply of Nadolol. Today, that same 90-day supply of Nadolol would cost the complainant more than $500.

1868.   Teva continued to conspire with Mylan and Sandoz about Nadolol and many other drugs throughout 2013 and into the future.

b.     **Labetalol HCL**

1869.   During the relevant time frame, Defendants Sandoz, Teva, Actavis and Par were the primary manufacturers of Labetalol. County Line Pharmaceuticals joined the Labetalol HCL market and the Labetalol HCL conspiracy in late 2014/early 2015.

1870.   For years, the prices of Labetalol HCL tablets were relatively low and stable. For example, list prices for 200 mg tablets sold by Sandoz, Teva, and Actavis were all below 25 cents. Then, between May and July, 2012, all three more than doubled their list prices. Around the same time Par entered the market at nearly identical list prices. And when County Line entered the market in late 2014, it too matched the existing market list prices. (The same pattern held for other dosages

of Labetalol HCL tablets as well.)  Rather than compete for share by offering lower prices, all manufacturers abided by their Fair Share agreement, the result of which was higher prices for all purchasers of Labetalol HCL tablets.

1871.    Throughout this period, Teva, Sandoz, Actavis, Par, and County Line met at trade conferences, including the August 2014 NACDS Annual meeting and the October 27-29, 2014 GPhA Fall Technical conference, and communicated directly with each other in furtherance of their price-fixing agreements on Labetalol HCL and their Fair Share agreement.

1872.    Before raising its price, Teva coordinated with its competitors. For example, Rekenthaler spoke to A.S., a senior Actavis/Watson sales executive on July 11, 2012 (2 calls); and Green spoke to a contact at Sandoz on July 29, 2012 (2 calls) and July 31, 2012.

1873.    After Teva increased its pricing on Labetalol HCL on July 31, 2012, it continued to coordinate with its competitors to maintain that supra-competitive pricing for that drug. For example, in October 2012, Teva learned that Sandoz was "no longer having supply issues" but that "Watson is on allocation" (i.e., did not have enough supply to meet all of its demand). In an internal e-mail sent on October 16, 2012, J.L., a senior analyst at Teva, questioned whether Teva should consider lowering "strategic customer pricing" in order to retain its market share.

1874.    That same day, Green spoke to CW-2 of Sandoz two (2) times. After those calls with CW-2, Green responded to the analyst's question:

> Sandoz is back in good supply. They took a 500% price increase several months back, and they are holding firm with their prices.
>
> Stay the course and maintain our higher price

1875.    T.C. (Teva) agreed: "We need to stay the TEVA course."

REDACTED – PUBLIC VERSION

1876.   Rekenthaler was not satisfied, however. In order to confirm that Watson was also still committed to maintain high pricing on Labetalol HCL, Rekenthaler called and spoke to A.S., a senior sales executive at Watson, four (4) times on October 18, 2012.

1877.   As Par and County Line entered the market, Teva, Sandoz and Actavis incorporated them into the Labetalol price-fixing agreement. For example, when Teva learned of a competitive challenge from Par on Labetalol HCL tablets in February 2014, it promptly called Par to coordinate a response. T.S., a National Account Manager at Teva, spoke to R.K., a Senior Vice President of Sales at Par, three times on February 7, 2014, and days later, Rekenthaler called G.B., Vice President of National Accounts at Par, twice to work out the details.

1878.   After these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction so that customer, knowing that this would likely result in Par gaining the customer, and building its Fair Share of the Labetalol market.

1879.   As Alvogen prepared to enter the market in late 2014, Michael Dorsey, a National Account Manager at Actavis and M.F., County Line's Vice President of Sales and Marketing spoke by phone on October 27, 2014 for 35 minutes. Michael Dorsey (Actavis) also spoke with J.R., County Line's Executive VP and Founder, several times in August, October and December 2014.

1880.   Interestingly, at the time of Michael Dorsey and M.F.'s call, the October 2014 GPhA Fall Technical Conference at which Actavis, Teva, Sandoz and Par each attended, was occurring. Not long after the conference and Dorsey and M.F's call, County Line announced on December 1, 2014, identical WAC pricing for 100 mg, 200 mg, and 300 mg labetalol tablets to the WAC pricing of Teva, Actavis, Sandoz, and Par.

REDACTED – PUBLIC VERSION

c.     **Nitrofurantoin MAC**

1881.   Teva's July 31, 2012 price increase on Nitrofurantoin MAC was between 90-95% depending on the dosage and formulation. After that increase, Teva continued to coordinate with Mylan and Alvogen to maintain those high prices.

1882.   For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC because it was having difficulty competing with the prices being charged by the distributor's competitors (i.e., other distributors). At 9:49am on October 10, 2012, K.G. (Teva) sent an internal e-mail to the Teva sales team, including Green and Rekenthaler, among others, saying:

> Sales Team,
>
> We adjusted our pricing on Nitrofurantoin based on market pricing we had received in the past.  Please confirm current market pricing.

1883.   Immediately after receiving that e-mail, Green reached out to both Nesta at Mylan and B.H., his counterpart at Alvogen. At 10:01am, Green called Nesta and the two spoke for ten (10) minutes. After hanging up – at 10:11am – Green called B.H. at Alvogen for the first of three (3) calls that day, including one call lasting fourteen (14) minutes. To close the loop, Nesta also separately spoke to B.H. two times that same day, including a call lasting almost ten (10) minutes. Teva did not lower its price.

**2.     February – April 2013: Increasing Prices Before a New Competitor Enters the Market: Budesonide Inhalation Suspension**

1884.   As of February 2013, Teva was the only company in the market for generic Budesonide inhalation suspension. Teva knew, however, that a potential legal action challenging the validity of the patent on the brand drug could allow additional competition into the generic market shortly. Before any additional competition could enter the market, effective February 8, 2013, Teva

465

raised the WAC price for its Budesonide inhalation suspension by 9%. Although a very modest increase in percentage terms, the 9% price increase added $51 million to Teva's annual revenues.

1885.   On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid. Actavis immediately began planning to launch the product "at risk," which is when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are formally resolved and there is still a risk that the new generic entrant might ultimately be found to violate the patent. That same day, Rekenthaler called his counterpart at Actavis, A.B. – a senior sales and marketing executive – and they spoke for two (2) minutes. This was the first-ever phone call between them based on the phone records produced.

1886.   The next day, April 2, 2013, Rekenthaler spoke to A.B two (2) more times, including one call lasting eight (8) minutes. Actavis then immediately began shipping the product. Instead of competing to obtain market share as a new entrant, however, Actavis entered the market with the exact same WAC price as Teva. Indeed, when Teva inquired of a customer that same day to confirm Actavis' pricing, Teva was informed by the customer that Actavis' pricing was "in line with [Teva's] current wholesale pricing."

1887.   At some point thereafter, further legal action from the brand manufacturer prevented Actavis from permanently entering the market. In the interim, though, Teva was able to continue to charge the agreed-upon prices. In addition, once Actavis entered the market in 2015, Teva immediately conceded customers to Actavis in accordance with the fair share agreement – after calls between Rekenthaler and Falkin, by then a Vice President at Actavis.

### 3.      May 13, 2013 Price Increase – Tizanidine

1888.   Tizanidine, also known by the brand name Zanaflex, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

REDACTED – PUBLIC VERSION

1889.   Tizanidine was a drug that had been on the market for many years and whose price had eroded as many competitors entered and exited the market depending on the profitability of the drug. As of May 2013, Defendants Apotox, Sun, Sandoz, Mylan, and Dr. Reddy's were in the market for Tizanidine. Dr. Reddy's led the increase on this product on May 13, 2013, increasing its WAC price and raising contract pricing tenfold, and by July 2013, Apotex, Mylan, Sandoz, and Sun each followed the price increase.

1890.   Sandoz was thrilled when it learned that Dr. Reddy's had increased its price on Tizanidine. For example, on May 10, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that "Giant Eagle just let me know that Dr. Reddy just took a price increase on Tizanidine! Pricing on the 2 & 4 mg 150 ct went from $4.50 to $45.00. . . . We should secure confirmation but if this is true it would be very positive …." Kellum responded, "Wow! Thank you." Kellum then quickly sent out a directive to the team to "[p]lease put the product on strict allocation to forecast. Pricing Team – no new offers."

1891.   On May 13, 2013, Dr. Reddy's published its new WAC pricing for Tizanidine. That same day, Nesta of Mylan called CW-4 at Sandoz and they spoke for 4 minutes. Two days later, CW-1 of Sandoz sent an internal e-mail to Kellum regarding "Tizanidine" stating "[l]et's discuss."

1892.   On May 24, 2013, Sandoz followed and matched Dr. Reddy's WAC pricing on several formulations, and even exceeded Dr. Reddy's pricing on one formulation. Sandoz's WAC increases were significant - ranging from 248% to 344%, depending on the formulation. In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with both CW-4 of Sandoz and J.A., a national account executive at Dr. Reddy's, to coordinate the price increase regarding Tizanidine. At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 |

1893.    Notably, after this, Nesta would not speak with J.A. again until three months later in August 2013.

1894.    On May 29, 2013, customer Omnicare e-mailed Sandoz and asked whether it wanted to submit a bid for Tizanidine. CW-3 of Sandoz forwarded the request internally to CW-1 and Kellum asking "[a]re we considering additional Tizanidine market share? I'm assuming are[sic] intent is not to be disruptive at this time." A few minutes later, Nesta called CW-4 at Sandoz and they spoke for nearly thirteen (13) minutes. Later that day, CW-1 replied to CW-3's e-mail stating, "[w]e will sit tight for now." CW-3 then responded to Omnicare, stating that "[a]lthough we are not in a back order situation we cannot assume additional usage at this time. If this were to change I will let you know."

1895.    On June 11, 2013, V.B., the VP of National Accounts at Dr. Reddy's, spoke to T.B., a National Accounts Manager at Apotex. Upon information and belief, the purpose of this call was to confirm that Apotex would support the "fair share" agreement and follow Dr. Reddy's price increase (which Apotex subsequently did).

1896.    On June 14, 2013, Anda, a wholesale customer, e-mailed J.A. (Dr. Reddy's) asking "[d]id mylan follow your increase?" J.A. responded, "We've heard they did." J.A. had learned of Mylan's intent to follow the price increase through his prior communications with Nesta. However,

Mylan had not actually raised its price on Tizanidine at the time of the inquiry and would not do so until July 2, 2013.

1897.    On June 26, 2013, Meijer, a supermarket chain customer, e-mailed Dr. Reddy's requesting a bid for Tizanidine. J.A. forwarded the request to N.M., a marketing executive at Dr. Reddy's, stating: "I'm assuming they got a price increase." N.M. responded: "I think, given the market situation and us leading the price adjustment, I think, we should not go behind additional market share since it will erode the market even further." J.A. replied, "[y]eah, I was just sending it as an FYI, no intention to bid." Dr. Reddy's informed Sun's Marketing Director that it would not bid for Meijer's business two days later. A few weeks later, Meijer forwarded the same request to Sandoz. Sandoz's response was similar: "[w]e cannot supply unfortunately."

### 4.    May 24, 2013 First List of Price Increases

1898.    When Patel began at Teva, she completed and sent her first formal list of recommended price increases to her supervisor, K.G., on May 24, 2013. She sent the list via e-mail, with an attached spreadsheet entitled "Immediate PI File." The attached list included twelve (12) different drugs where Patel recommended that Teva follow a "high quality" competitor's price increase as soon as possible. The spreadsheet also revealed competitively sensitive information about future pricing and bidding practices of several of Teva's high quality competitors – information that Patel could have only learned through her discussions with those competitors. The relevant columns from that spreadsheet are set forth below:

| Product Category | Competitors | Reason for increase |
|---|---|---|
| NABUMETONE TABLETS Total | Watson 26, Glenmark 25, Sandoz 5 | Follow 10% below Glenmark. Sandoz also bidding high. |
| RANITIDINE HCL TABLETS Total | Glenmark 1, Amneal 35, Wockhardt 10? | Follow Glenmark and Amneal increase. 3% below Glenmark. |
| MOEXIPRIL HCL TABLETS Total | Glenmark 18, Paddock 16 | Follow Glenmark increase.  5% lower |
| MOEXIPRIL HCL/HCTZ TABLETS Total | Glenmark 78, Paddock 2 | Follow Glenmark increase.  5% lower |
| ADAPALENE GEL Total | Glenmark 13, Taro 45 | Follow Glenmark increase. 5% lower. Rumors of Taro increase |
| CEFDINIR ORAL SUSPENSION Total | Lupin 35, Northstar 5, Sandoz 3 | Follow Lupin. 8-10% lower |
| CEFPROZIL TABLETS Total | Lupin 42, Northstar 10, Sandoz 18 | Follow Lupin. 8-10% lower |
| CEFDINIR CAPSULES Total | Lupin 49, Northstar 16, Northstar 7 | Follow Lupin. 8-10% lower |
| FLUOCINONIDE OINTMENT Total | Taro 44, Sandoz 1 | Raise to follow Taro |
| FLUOCINONIDE CREAM E Total | Taro 62, Sandoz 10 | Raise to follow Taro |
| FLUOCINONIDE GEL Total | Taro 63, Sandoz 9 | Raise to follow Taro |
| FLUOCINONIDE CREAM Total | Taro 68, Sandoz 1 | Raise to follow Taro |
| CEFACLOR ER TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEPHALEXIN TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEFADROXIL TABLETS Total | Westward 41 | EXCLUDE; ERROR IN SOURCE DATA |

1899.    For every one of the relevant drugs on the list, Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013. During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs. For some of these drugs – including the four different formulations of Fluocinonide – Patel knew before she even began her employment at Teva that she would be identifying those drugs as price increase candidates because of communications she had already had with Aprahamian of Taro.

1900.    The graphic on page 170 of AG Complaint No. 2 summarizes some of the calls related to each of the respective competitors leading up to May 24, 2013.

1901.    The "Immediate PI File," including the competitively sensitive information Patel had obtained from competitors, was sent by Patel's supervisor, K.G., to Cavanaugh – at that time the Senior Vice President of Sales and Marketing at Teva – on May 27, 2013. Cavanaugh adopted and approved Patel's price increase recommendations on May 28, 2013.

1902.    The Teva price increases for the drugs identified in Patel's May 24, 2013 "Immediate PI File" went into effect on July 3, 2013. Patel went to great lengths to coordinate these price increases with competitors prior to sending the list to K.G. on May 24, 2013. Some illustrative examples of that coordination are set forth below.

a.      **Glenmark**

1903.    A number of the drugs identified in the "Immediate PI File" were targeted because of a recent Glenmark price increase on May 16, 2013. As soon as Patel started at Teva, she began to identify price increase candidates through her conversations with various sales and marketing executives at Glenmark, including:

a.    CW-5: four (4) calls on May 2, 2013 (5:02; 0:06; 7:18 and 11:39), two (2) calls on May 3, 2013 (1:53 and 0:06); one (1) text message on May 3, 2013;

b.    J.C.: three (3) calls on May 6, 2013 (6:45; 20:44; 8:39); two (2) calls on May 7, 2013 (7:59 and 1:03).

1904.    For example, early in the morning on May 2, 2013, Patel informed a colleague that she expected to have some new drugs to add to the price increase list imminently:

| |
|---|
| From:    Nisha Patel02 |
| Sent:     Thu 5/02/2013 6:49 AM (GMT-05:00) |
| To:       ████████ |
| Cc: |
| Bcc: |
| Subject: RE: Price Increases — will you be scheduling time next week to discuss? |
| |
| When you get in, let's touch base on the high priority items below. Please gather/calculate the shelf stock and any other financial exposure involved. If possible, use an assumption of a 30% increase for now with a variable formula where the percentages can be changed for different scenarios. I also expect to have some high priority items to add to this list. I should have them shortly. |

1905.    Less than fifteen minutes later, Patel received a call from CW-5 (Glenmark) and the two spoke for just over five (5) minutes. Shortly after that call, at 7:44am, Patel sent a follow-up e-mail where she identified six different "high priority" Glenmark drugs to add to the price increase list, including: Adapalene gel; Nabumetone; Pravastatin; Ranitidine HCL; Moexipril HCL; and Moexipril HCL/HCTZ. Glenmark had not yet increased price on any of those drugs, nor had it sent any notices to customers indicating that it would be doing so (and would not send such notices until May 15, 2013).

1906.    As the Glenmark price increases were approaching, Patel took steps to make sure that Teva did not undermine its competitor's action. During the morning on May 15, 2013, in

anticipation of the Glenmark price increases that had not yet been implemented or made public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different drugs that Teva and Glenmark both marketed:



```
From:        ████████████
Sent:        Wed 5/15/2013 7:40 AM (GMT-05:00)
To:          ████████████
Cc:          Nisha Patel02
Bcc:
Subject: Various Product Family Requests / RFP


         ██████


Nisha would like to be made aware of any requests (including in-house RFPs) that include the following
product families:


Adapalene

Nabumetone

Fluconazole Tabs

Ranitidine

Moexipril

Moexipril HCTZ

Pravastatin

Ondansetron


In the event you are reviewing these products for any request, please make her aware and as a group we can
discuss where to price based on market intelligence she has collected.
```

1907.    In accordance with the fair share understanding outlined above Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

1908.    Patel also spoke to CW-5 (Glenmark) for nearly six (6) minutes the next day, May 16, 2013 – the day of the Glenmark price increases. Effective that day, Glenmark increased price on the following drugs where there was an overlap with Teva: Adapalene gel; Nabumetone; Fluconazole tablets; Ranitidine HCL; Moexipril HCL; Moexipril HCL/HCTZ; Pravastatin; and Ondansetron. Patel also spoke to CW-5 and J.C. (Glenmark) multiple times on May 17, 2013.

1909.    After the Glenmark price increase implementation on May 16, 2013, and before Teva had the opportunity to follow those increases, several customers approached Teva looking for a lower price. Teva refused to bid on most of these solicitations so to maintain market stability.

When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business. As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark drugs: "IF we bid, we need to bid high, or we will disturb the market."

1910.   Patel did not immediately include all of the Glenmark price increase drugs on Teva's price increase list, however, because certain drugs involved non high "quality" competitors. For these drugs, a little more work (and communication) was required before Patel would feel comfortable moving forward with a price increase.

1911.   For example, the market for Fluconazole tablets included Greenstone as a competitor (albeit with relatively low market share) in addition to Teva and Glenmark. As of Friday May 17, 2013, Patel had not yet decided whether Teva should follow the Glenmark price increase on Fluconazole, fearing that Greenstone might not be a responsible competitor. In an internal e-mail that day, Patel indicated to colleagues – including her supervisor, K.G. – that she was "[g]athering some revised intel" about Fluconazole in order to determine next steps. The following Monday, May 20, Patel called R.H., a national account manager at Greenstone but was unable to connect. Patel was ultimately not able to communicate with R.H. by phone until May 28, 2013 when the two had a twenty-one (21) minute call. The next day after speaking to R.H. – May 29, 2013 –Patel promptly added Fluconazole to the Teva price increase list.

1912.   Teva followed the Glenmark price increase for Fluconazole tablets on July 3, 2013. That same day, Patel spoke to R.H. for nearly sixteen (16) minutes and also spoke to CW-5 (Glenmark) for almost five (5) minutes. The Teva price increases were a staggering 875% - 1,570%, depending on the dosage strength. Greenstone then followed with an increase of its own on August 16, 2013. Patel coordinated those increases with both Glenmark and Greenstone.

1913.   The price increase on Fluconazole Tablets is also reflective of how the overarching conspiracy operating. The massive price increase on Fluconazole Tablets led to two additional

market entrants: Citron and Dr. Reddy's. When both of these competitors entered the market for Fluconazole Tablets, they spoke with the existing entrants to arrange for their "fair share" and to prevent competition for the drug. For example, L.S. and K.S. (both senior sales executives at Citron) spoke with T.C. of Teva and Jim Grauso of Glenmark to coordinate Citron's entry into the market. Similarly, Nisha Patel spoke with V.B. (a senior sales executive at Dr. Reddy's) to coordinate Dr. Reddy's entry. As a result of these communications and the overarching fair share agreement, the market for Fluconazole Tablets went from three competitors to five, but the supracompetitive pricing remained in effect.

### b.   Sandoz

1914.   In her May 24 "Immediate PI File," Patel included competitively sensitive information about the drug Nabumetone, indicating that she was confident following Glenmark's increase because Sandoz was "bidding high" on that drug. In other words, Sandoz would provide cover bids that were too high to be successful, so that Sandoz would not take its competitors' market share even if it did not take its own price increase. Patel had spoken to CW-1 for nearly twenty-five (25) minutes on May 15, 2013, and again for more than eighteen (18) minutes on May 20, 2013, during which time she learned this information.

1915.   Patel also likely gained comfort from the fact that Sandoz had, one year earlier, colluded with Dr. Reddy's to increase prices on Ranitidine HCL capsules, when J.R. of Sandoz and J.A. of Dr. Reddy's twice in March 2012, just after the companies had announced 50% price increases on that drug. Thus, Sandoz's collusion with another competitor helped facilitate collusion between Sandoz and Teva on Nabumetone and Ranitidine HCL.

1916.   In May 2013, Sandoz was internally discussing its "bidding high" strategy for Nabumetone. Two days before Patel sent the "Immediate PI File" to her supervisor, a Sandoz pricing analyst sent the following e-mail to Kellum and CW-1 confirming the strategy:

> **From:** ████
> **Sent:** Wednesday, May 22, 2013 4:14 PM
> **To:** Kellum, Armando; ████
> **Subject:** Target RFP Question
>
> AK,
>
> I know we agreed not to bid on potential price increase items, but we bid Nabumetone at a high price.  Are you okay with us bidding on this one?  McKesson does not purchase this product from us.

1917.    Patel continued to coordinate with CW-1 and other competitors about increasing prices for drugs on the list even after she sent it to K.G. on May 24, 2013. For example, at 8:15am on May 30, 2013, Patel spoke to CW-5 at Glenmark for nearly twelve (12) minutes. Immediately after hanging up the phone, Patel called CW-1 at Sandoz to discuss Glenmark's increase on the drug Ranitidine HCL and Teva's plans to follow that increase (Sandoz was also in the market for Ranitidine HCL). She left CW-1 a voicemail, which he returned promptly. Patel and CW-1 then had several substantive telephone calls over the next half hour.

1918.    After these conversations with Patel, at 10:02am, CW-1 sent an e-mail to Kellum indicating that he believed there would be price increases in the pipeline with respect to Ranitidine HCL, and suggesting a potentially substantial increase in Sandoz's price:

> **From:** ████
> **Sent:** Thursday, May 30, 2013 10:02 AM
> **To:** Kellum, Armando
> **Cc:** ████
> **Subject:** Ranitidine tabs
>
> I think there might be some price increases in the pipeline.
>
> Per analysource Glenmark just took a WAC increase to $9.53 from $2.70(we are at 4.98) on the 150mg on 5/16.  I wonder if Teva and Amneal will follow?  They are the two dominant players on this molecule
>
> We just bid and I think we are getting the award at a contract price of $1.77.  This contract is negative gross margins but 15% above variable costs.  RAD was at $0.95.  Looking at the competition of Amneal, Teva and Glenmark I thought that this was the best way to go to get into this product, we are currently sitting with a 1.8% share.
>
> RAD is also buying up a lot of our short dated product.
>
> Wonder if there is any way to work with them to revise the cost at a future date if Teva and Amneal go up as well.  I'm thinking we can go from $1.77 to $5 maybe

1919.    Concurrent to Patel's outreach to Sandoz and Glenmark, Rekenthaler reached out to his friend S.R., the VP of sales at Amneal to confirm that it would also follow Glenmark's price

increase on Ranitidine HCL capsules. Rekenthaler received confirmation from Amneal that it was also on board in late May 2013.

1920.   The communication between Patel and CW-1 about competitively sensitive information was constant and unrelenting during this period. For example, in June 2013 Teva was "attempting to understand how [its] pricing for Isoniazid compares to the rest of the market." On June 11, 2013, L.R., a Teva marketing representative, asked Patel whether she was "aware of any competitive market intel for this family?" According to the marketing representative, Sandoz was also in the market for Isoniazid and had "drastically increased their pricing" in January 2013. Patel responded: "I will try to get the scoop on Sandoz pricing tomorrow. When do you need this by?"

1921.   The next day - June 12, 2013 - Patel exchanged at least five (5) calls with CW-1 at Sandoz, including those listed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:19:04 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:20 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:00 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:23 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:09:21 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:25 |

1922.   At 8:27am, after the first two of the phone calls listed above, Patel sent the following e-mail clarifying some of the information that L.R. had provided, reflecting some of the conversations about market share she was having with CW-1:

From: Nisha Patel02
Sent: Wednesday, June 12, 2013 8:27 AM
To: ▮
Cc: ▮
Subject: RE: Isoniazid market pricing

▮:

I hope to get intel later today. In the meantime, I am hearing about IMS info that contradicts what we have. I am being told that as of quarter ending March 2013, Sandoz has 62% share, with Teva having about 36% share. The data also indicates that Westward has less than 1% share, which implies that they are not back. I have also heard that Westward makes the product for Versa, so they are out for now as well. You may want to request more current share data from Market Research to verify?

It is my opinion that we could have raised pricing to a higher level, but I also understand that there are several factors to consider in these decisions. Depending on what you plan to include in your response, I would also have supply info handy. I imagine that we could easily have picked up more share at this very low price, but were probably limited by supply...which is why Sandoz is able to maintain business at their high price.

I'll pass on additional info as I receive it. If you have any questions, please feel free to come by to chat.

1923.   Later that day, at 3:21pm, Patel passed along additional information with specific price points she had received from CW-1 at Sandoz:



From:   Nisha Patel02
Sent:   Wed 6/12/2013 3:21 PM (GMT-05:00)
To:
Cc:     ▮
Bcc:
Subject: RE: Isoniazid market pricing

▮,

Wholesaler nets for Sandoz product are around $100 for the 300mg 100s and $80 for 100mg 100s. Our WACs are very low. Let me know if you need anything else.

1924.   As discussed more fully below, Teva ultimately increased price on Isoniazid on January 28, 2015 – in coordination with Sandoz. Patel spoke to CW-1 for more than sixteen (16) minutes shortly before the increase, on January 22, 2015.

c.   **Taro**

1925.   Patel noted in her May 24, 2013 "Immediate PI File" that for the drug Adapalene Gel, she was confident in following the Glenmark price increase because there were also "[r]umors of a Taro increase" on that drug. In addition to Teva and Glenmark, Taro was the only other

competitor in the market for Adapalene gel at that time. Patel had heard the "rumors" about a Taro increase directly from Aprahamian, the Vice President of Sales and Marketing at Taro. During a nearly eleven (11) minute phone conversation between the two on May 22, 2013, the competitors agreed to follow the Glenmark increase. This was the first call between Patel and Aprahamian since Patel joined Teva.

1926.    Shortly after the phone call with Patel, Aprahamian made an internal request for a report with specific information about Adapalene gel in order to evaluate a potential Taro increase on the drug, including volume and pricing. Aprahamian indicated that the reason for his request was that the "[r]umor mill has some price changes in the market."

1927.    The next day, May 23, 2013, Aprahamian directed a Taro employee to implement a price increase on Adapalene gel:



From: Ara Aprahamian/US/TARO

To:

Cc: Customer Accounting/US/TARO@TARO, Ara Aprahamian/US/TARO@TARO.

Date: 05/23/2013 11:28 PM

Subject: Fw: Adapalene - price changes

_____ please coordinate price adjustment for Adapalene for all the highlighted accounts (distributor price only - most specifically keep Target net price the same but Anda distributor price needs to be raised) to a new net of $97.25....

If you can do today fine, otherwise early next week...

1928.    Exactly one week after the call between Patel and Aprahamian, on May 29, 2013, Taro increased its price on Adapalene gel. As discussed below, Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

### 5.    July 3, 2013 Price Increases

1929.    Teva implemented its first formal set of price increases using Patel's high-quality competitor formula on July 3, 2013, relating to twenty-one (21) different generic drugs. Many of the drugs slated for price increases were from the May 24, 2013 "Immediate PI File," but several others

REDACTED – PUBLIC VERSION

had been added in the interim. Patel scheduled a conference call for the day before the price

increases to discuss those increases with members of Teva's sales and pricing departments:



|  | Price Increase -- Agenda |
| --- | --- |
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.  Dial In: 866-225-0660  Access Code: 4075453 |

1) Price increase effective Wednesday, 7/3/2013

2) List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
| --- | --- | --- | --- | --- |
| ADAPALENE GEL Total | All | yes |  | 95% |
| CEFACLOR ER TABLETS Total | All | yes |  | 25% |
| CEFADROXIL TABLETS Total | All |  |  | 25% |
| CEFDINIR CAPSULES Total | All |  |  | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All |  |  | 520-620% |
| CEFPROZIL TABLETS Total | All |  |  | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All |  | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All |  | yes | 10% |
| FLUOCINONIDE CREAM Total | All |  | yes | 15% |
| FLUOCINONIDE GEL Total | All |  | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All |  | yes | 17% |
| METHOTREXATE TABLETS Total | All |  | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All |  | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All |  | yes | 70-175% |
| NABUMETONE TABLETS Total | All |  | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All |  | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All |  | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

1930.   Patel and/or Green spoke to every important competitor in the days and weeks

leading up to the July 3, 2013 Teva price increase to coordinate the increases and reiterate the

understanding already in place with those competitors.

1931.   The graphic on page 180 of the State AG Complaint No. 2 details some of the calls

between Teva representatives and Teva's competitors in the days and weeks leading up to the July 3,

2013 price increase; color coded to show the calls with specific competitors relating to each drug:

1932.   The only drugs that Patel or Green did not coordinate with Teva's competitors (those not highlighted in the referenced graphic) were drugs where Teva was exclusive – i.e., had no competitors.

1933.   Patel – and other executives at Teva –went to great efforts to coordinate these price increases with competitors prior to July 3, 2013. Some illustrative examples of generic drugs that were added to the list after May 24, 2013 are set forth in more detail below.

### a.   Upsher-Smith

1934.   On June 13, 2013, as Patel was in the process of finalizing the Teva price increase list, she learned that Upsher-Smith had increased its listed WAC prices for the drug Oxybutynin Chloride.

1935.   Apotex, Par, Teva, and Upsher-Smith dominated the market for Oxybutynin Chloride during the time period relevant to this Complaint.

1936.   On June 13, 2013, K.G. (Teva) sent an e-mail to several Teva employees, including Patel, asking them to "share any competitive intelligence you may have or receive" regarding Oxybutynin Chloride. At that time, Teva had been considering whether to delete the drug from its inventory, due to low supply and profitability. One factor that could potentially change that calculus for Teva was the ability to implement a significant price increase. On June 14, 2013, while considering whether to change Teva's plan to delete the drug, a Teva employee asked Patel whether she could "provide an estimate of the pricing we might secure business at?"

1937.   On June 15, 2013 Patel exchanged six (6) text messages with B.L., a senior national account executive at Upsher-Smith. Around this same time, K.O. – a Vice President of Sales at Par – was in contact with Beth Pannier, the Senior National Accounts Manager at Upsher-Smith.

1938.   Patel deemed Upsher-Smith a highly-ranked competitor (+2) in large part because of her relationship and understanding with B.L. In the week before she began her employment at Teva

(after leaving her previous employment), Patel and B.L. exchanged several text messages. During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes. During these initial communications, the two competitors reached an understanding that Teva and Upsher-Smith would follow each other's price increases. This understanding resulted in Upsher-Smith receiving a +2 "quality competitor" ranking from Patel.

1939.    On June 19, 2013, Teva learned that the other competitor in the market for Oxybutynin Chloride, a company not identified as a defendant in this Complaint, also increased its price for that drug. As a result, a national account executive at Teva sent an e-mail to Patel stating "Did you know about the Oxybutynin? We have small share, but huge increase there!" Patel responded: "Yes, heard late last week. The train is moving so fast, I'm worried we won't get on!" That same day, Patel instructed a colleague to add Oxybutynin Chloride to the Teva price increase list and began taking steps to implement the increase.

1940.    On July 3, 2013, Teva implemented a price increase ranging between 1,100 – 1,500% increase on Oxybutynin Chloride, depending on the dosage strength. Like the other drugs on the list, Teva would not have increased its price without first obtaining agreement from competitors that they would not compete with Teva or steal market share after the increase.

b.    **Mylan**

1941.    Immediately after she began at Teva, Patel began to investigate Mylan drugs as a potential source for coordinated price increases. For example, on May 6, 2013, as she was creating the list of "Immediate PI" candidates, Patel sent Green an e-mail with an attached spreadsheet titled "Price Increase Candidate Competitive Landscape." Patel asked Green to "gather as much market intelligence as possible" for certain, specific items that she had highlighted in blue, including nine (9) Mylan drugs: Tolmetin Sodium capsules; Doxazosin Mesylate tablets; Methotrexate tablets;

Diltiazem HCL tablets; Flurbiprofen tablets; Nadolol tablets; Amiloride HCL/HCTZ tablets; Cimetidine tablets; and Estradiol tablets.

1942.   The next day, May 7, 2013, Green spoke to Nesta at Mylan three times, including one call lasting more than eleven (11) minutes. Green also called Patel twice that day to report on what he had learned. Green and Nesta also spoke a number of times over the next several days, including on May 8 (3:46), May 9 (4:05) and May 10, 2013 (0:28; 10:46 and 2:19).

1943.   On May 14, 2013, Patel asked several Teva national account managers, including Green, to obtain "price points" on certain Mylan drugs including Cimetidine and Nadolol in preparation for a potential price increase. She indicated internally to another Teva colleague that she was expecting "additional Mylan intel" and that she was expecting Mylan "to take an additional increase" on those items. On May 17, 2013, Green spoke to Nesta six (6) times, including calls lasting over eleven (11), two (2), four (4), and sixteen (16) minutes.

1944.   On May 29, 2013, after a discussion with Cavanaugh Patel added four Mylan drugs to the Teva price increase list: Nadolol, Cimetidine, Prazosin HCL, and Methotrexate.

1945.   For Methotrexate, Par had already increased its prices in February 2013 and West-Ward followed this price increase on May 15, 2013. Consistent with the "fair share" agreement, Par knew it could lead this price increase without losing market share, and West-Ward knew that it could follow Par's increase without losing share to Mylan or Teva as well.

1946.   Discussions between Green and Nesta about specific drugs continued into June, as Mylan was also preparing for its own major price increase on a number of drugs. From June 24 through June 28, 2013, for example, Green and Nesta had at least the following telephone calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

1947.   On June 26, 2013, in the midst of this flurry of communications between Teva and Mylan (and the same day that Green and Nesta had a one-hour phone call), one of Patel's colleagues sent her a suggestion with the following list of potential drugs to add to the price increase list:

| **Product** | **Competitors (Mkt Share)** |
|-------------|------------------------------|
| Disopyramide Phosphate Capsules | Actavis (61%) |
| Ketorolac Tablets | Mylan (32%) |
| Ketoprofen Capsules | Mylan (63%) |
| Hydorxyzine Pamoate Capsules | Sandoz (39%); Actavis (9%) |
| Nystatin Tablets | Heritage (35%); Mutual (32%) |

1948.   In response, Patel's supervisor, K.G., commented that "Ketoprofen would have a high likelihood of success." Patel also responded favorably with regard to some of the drugs, alluding to the fact that she had inside information about at least Ketoprofen:



From: Nisha Patel02
Sent: Wednesday, June 26, 2013 1:41 PM
To:
Subject: RE: India Transfer Review - Price Increase List Question

I definitely agree on Ketoprofen since there are rumors of activity on this one...From a "quality of competitor" standpoint, I definitely think all, but Nystatin, are strong candidates. We'll gather intel on the rest and factor into the potential items for later. Is there a time constraint and a need for actual numbers, or is this just an inquiry to see if they would be possible in the near future? Sorry for the basic questions. I'm just trying to understand how to look at possible deletions v. any other candidate item.

1949.   At that time, Nystatin was not considered a strong candidate for a price increase because of the quality of the competitors in the market. Those dynamics would later change after Defendant Patel struck up a collusive relationship with a high-level executive at Heritage.

1950.   Not surprisingly given the "rumors," Mylan raised its price for both Ketorolac Tromethamine and Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2, 2013. Teva then quickly followed with its own price increase for both drugs (and others) on August 9, 2013. As discussed more fully below, those price increases were closely coordinated and agreed to by Teva and Mylan.

1951.   At the end of the flurry of phone communications between Teva and Mylan described above – on June 28, 2013 –Green and Nesta had a four (4) minute call starting at 10:59am. Within minutes after that call, Patel sent the following e-mail internally at Teva:

| From: | Nisha Patel02 |
| Sent: | Fri 6/28/2013 11:22 AM (GMT-05:00) |
| To: | ████████████████████████ |
| Cc: | ████████████████████████ |
| Bcc: | |
| Subject: | Competitor Increase Items |

All,

It is my understanding that Mylan is announcing a long list of price increases today, for a Monday effective date. As we confirm the items and overlap with Teva, we should add the items to the CM alert list and determine what our plan of response is based on various factors (WAC limitation, no WAC limitation, supply, etc).


████,

Hearing that Ketoprofen is on the list.

1952.   Patel obtained this information directly from Green but got one significant point wrong (which confirms that she had advance notice of the Mylan increase). In fact, Mylan did not announce the price increases until the following Monday, July 1, 2013 – with an effective date of July 2, 2013.

1953.    Patel consistently used the term "rumors" in e-mails to camouflage that Teva was communicating with competitors about future price increases. She used the term when discussing Taro in the May 24, 2013 "Immediate PI" spreadsheet, after speaking with Aprahamian and before Taro raised its price on Adapalene gel. She used it again on June 26, 2013 – after Green and Nesta spoke several times in advance of Mylan's price increase on Ketoprofen.

1954.    Similarly, on July 2, 2013 – the day before Teva's price increases (including for the drug Methotrexate) went into effect, a colleague asked Patel how Teva's competitors' pricing compared with regard to Methotrexate. Patel responded that Mylan's pricing was a little low on that drug, "but we are hearing rumors of them taking another increase," so Teva felt comfortable increasing the price of that drug on July 3, 2013. These "rumors" – which were based on the direct communications between Green and Nesta noted above – again turned out to be accurate: Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

1955.    Moreover, this collusion between Teva and Mylan – two of the largest generic manufacturers in the country – facilitated collusion with smaller companies as well. At the same time that senior executives from Teva and Mylan were speaking, both companies were also coordinating with other competitors (and potential competitors) for the drugs being allocated between Teva and Mylan. For example, Rekenthaler of Teva spoke a number of times with M.B. of Par at the same time that Patel and Green were discussing the Doxazosin Mesylate price increase with Nesta of Mylan. When Par – which already had an ANDA for the drug – reentered the market in early 2014, it matched the supracompetitive pricing set by Teva, Mylan, and Apotex. Similarly, M.A. of Mylan coordinated Greenstone's entry into the market through discussions with R.H. of Greenstone. The two spoke a number of times between April and July 2014, in advance of Greenstone's August 2014 entry into the Doxazosin Mesylate market.

1956.    And in both instances, this coordination between Mylan and Teva allowed the new competitors to enter the market and gain market share without disturbing the supracompetitive pricing.

c.    **Sandoz**

1957.    After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz sought to obtain a "comprehensive list of items" price-fixed so that it would "not respond to something adversely" by inappropriately competing for market share on any of those drugs. Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase. Sandoz ensured it was aware of every increase taken by both competitors so it could live up to its end of the bargain.

1958.    On July 9, 2013, CW-1 stated in an internal Sandoz e-mail that he would "call around to the [Sandoz directors of national accounts] to try and gather a comprehensive list of items."

1959.    Pursuant to that direction, on July 15, 2013 CW-2 (Sandoz) called Rekenthaler (Teva) and left a message. Rekenthaler called CW-2 back immediately and the two had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz. Rekenthaler complied. Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to CW-2's personal e-mail account:

From: David Rekenthaler [daverek@verizon.net]
Sent: Monday, July 15, 2013 5:02 PM
To: ▉▉▉▉@icloud.com
Subject: Fwd:

Sent from my iPhone

Begin forwarded message:

From: Dave Rekenthaler <Dave.Rekenthaler@tevapharm.com>
Date: July 15, 2013, 4:59:27 PM EDT
To: "daverek@verizon.net" <daverek@verizon.net>

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase [not actual inc] |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econodisc | yes | | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLET | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

Best regards,

1960.   CW-2 later called CW-1 and conveyed the information orally to CW-1, who transcribed the information into a spreadsheet.

1961.   One of the drugs that both Teva and Mylan increased the price of in early July 2013 was Nadolol. Sandoz was the only other competitor in that market. Shortly after the Teva increase, CW-1 sent Patel a congratulatory message regarding the increase.

**6.    Impact of July 3, 2013 Price Increases on Teva**

1962.   As she was preparing to implement Teva's August 9, 2013 price increases described below, Patel also calculated the quarterly increase in sales revenues resulting from the price increase taken by Teva on July 3, 2013. The analysis also included the financial impact of the recent Pravastatin increase. The results were staggering.

**REDACTED – PUBLIC VERSION**

1963.   According to her analysis, the "Total Net Upside after Credits" as a result of the July 3 price increases, plus Pravastatin and one other drug, was a staggering $937,079,079 (nearly $1 billion) *per quarter* to Teva, as shown below:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

1964.   Teva handsomely rewarded Patel for effectuating these price increases. In March 2014, less than a year after starting at Teva, Patel was rewarded with a $37,734 cash bonus, as well as an allocation of 9,500 Teva stock options.

### 7.   July 19, 2013 Price Increase – Enalapril Maleate

1965.   Immediately after the July 3, 2013 price increases, Patel began preparing for what she called "Round 2" – another large set of Teva price increases. In the interim, however, Teva was presented with an opportunity to coordinate a price increase with competitors on a single drug – Enalapril Maleate tablets.

1966.   Mylan previously increased its price for Enalapril Maleate effective July 2, 2013. At that time, there were only three manufacturers in the market: Mylan, Teva, and Wockhardt. Enalapril Maleate was on the list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect (as discussed above).

1967.   Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from a customer for a lower price on Enalapril Maleate. Interestingly, the customer indicated that the request was due to Wockhardt having supply problems, not because of the Mylan increase. K.G. of

Teva confirmed that Enalapril Maleate "was on the Mylan increase communicated last week. They took a ~75% increase to WAC."

1968.   The comment from the customer sparked some confusion at Teva, which Teva quickly sought to clarify. That same day, Green and Nesta had two phone calls, including one lasting almost sixteen (16) minutes. The next day, July 11, 2013, Green and Nesta spoke two more times. During these conversations, Nesta explained to Green that Wockhardt had agreed to follow the Mylan price increase on Enalapril Maleate. This information sparked the following e-mail exchange between Green and Patel (starting from the bottom):

> **From:** Kevin Green
> **Sent:** Friday, July 12, 2013 1:12 AM
> **To:** Nisha Patel02
> **Subject:** Re: Enalapril / Wockhardt Supply Constraint
>
> Wockhardt followed Mylan. They are not having supply issues. Just allocating based on the Mylan increase. They make their own API
>
> Sent from my iPhone
>
> On Jul 11, 2013, at 9:54 PM, "Nisha Patel02" <Nisha.Patel02@tevapharm.com> wrote:
>
>> Wockhardt took an increase before Mylan? Then had their supply issue? I thought it was their supply issue plus Mylan increase.
>>
>> Nisha Patel
>>
>> Teva Pharmaceuticals USA
>>
>> Director, Strategic Customer Marketing
>>
>> On Jul 11, 2013, at 10:25 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>>
>>> This is all a result of a wockhardt price increase following a Mylan increase
>>>
>>> Sent from my iPhone

1969.   As it turned out, there must have been a miscommunication between Green and Nesta because although Wockhardt did in fact plan to follow Mylan's price increase, it had not yet had the opportunity to do so as of July 11, 2013.

1970.   On Friday, July 12, 2013, J.P., a national account executive at Teva, asked Patel whether Teva was planning on increasing its price for Enalapril. Patel responded: "I hope to

increase, but we're gathering all the facts before making a determination." J.P. then inquired whether Teva would make an offer to the customer, and Patel responded: "Not sure yet. Need some time. We're exploring the possibility of an increase just on this item . . . in the near future. Maybe next week."

1971.   That same day, Patel and Green each started "exploring the possibility" and "gathering the facts" by reaching out to Teva's two competitors for Enalapril Maleate. Patel called Nesta of Mylan directly and they spoke three times, including calls lasting six (6) and five (5) minutes. Patel likely called Nesta directly in this instance because Green was attending the PBA Health Conference at the Sheraton Overland Park, Overland Park, Kansas, where he was participating in a golf outing. Upon information and belief, K.K. – a senior national account executive at Wockhardt – attended the same conference, and likely spoke directly to Green either at the golf outing during the day or the trade show at night, because at 12:40am that evening (now the morning of July 13, 2013) K.K. created a contact on his cell phone with Green's cell phone number in it.

1972.   On Sunday, July 14, 2013, after Green returned home from the conference, Green and Patel spoke three times, including one call lasting twenty-one (21) minutes. During these calls, Green conveyed to Patel what he had learned from K.K.: that Wockhardt planned to follow the Mylan price increase.

1973.   First thing the next morning, on Monday, July 15, 2013, Patel sent an e-mail to a Teva executive stating "new developments…heard that Wockhardt is taking an increase today or tomorrow." At the same time, Wockhardt began planning to raise the price of Enalapril Maleate and sought to confirm specific price points for the increase. Internally, Wockhardt employees understood that K.K. would try to obtain price points from a competitor. That morning, K.K. of Wockhardt called Green for a one (1) minute call; shortly thereafter, Green returned the call and

REDACTED – PUBLIC VERSION

they spoke for two (2) more minutes. At 9:57am that morning, K.K. reported internally the specific

price ranges that he had obtained from Green.

1974.   Armed with this competitively sensitive information, and the understanding that

Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase. On

Tuesday, July 16, 2013, Patel sent the following internal e-mail to her supervisor K.G., again using

the term "rumors" to obfuscate the true source of her information:

From:      Nisha Patel02
Sent:      Tue 7/16/2013 11:08 AM (GMT-05:00)
To:        ▮▮▮▮▮▮▮▮▮▮
Cc:
Bcc:
Subject: Enalapril Increase Overview

▮▮▮▮▮

As you are aware, we are currently preparing the information to hopefully be able to implement a price increase
on Enalapril.

This is a 3-player market that we share with Mylan and Wockhardt. Mylan announced a price increase last
week. We are hearing rumors that Wockhardt will follow or exceed Mylan sometime this week. It would be
ideal if we could follow very soon at a slightly more competitive price, with the intent of picking up some
additional share in the market. Current share make up is as follows:

1. Mylan: 44%
2. Wockhardt: 43%
3. Teva: 13%

At this time, we are holding off on responding to a couple of bids in-house since a WAC increase would be
required to follow the market. It would be a great opportunity to win this share and hopefully additional
business as customers request bids going forward. (I think it would be ideal to capture an additional 10%.)

1975.   That same day, Nesta called Patel and left a voice mail.

1976.   Patel's July 16, 2013 e-mail referred to above was forwarded to Cavanaugh, who

promptly approved the price increase. That same day, July 16, 2013, Patel then scheduled a "Price

Increase Discussion" with members of Teva's sales and pricing teams, and sent the following

agenda:



| Subject | Price Increase Discussion |
|---|---|
| Date and Location | Wednesday, July 17, 2013 10:30 AM - 11:00 AM, Dial In Below/Dave's Office |
| Attendees | Nisha Patel02; ███████████████████████Dave Rekenthaler████████████████████████████████████████; Kevin Green; ███████ |
| Message | Sorry for the re-schedules!<br><br>We are planning to announce an increase on Enalapril Tablets effective Friday. I would like to do a quick review of the changes and answer any questions you may have. A summary will be sent prior to the meeting.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

**Notes**

1) Price increase effective 7/19/2013

2) List of items affected:

| NDC | Generic Name | Strength | Form | Package Size |
|---|---|---|---|---|
| 00093-0026-01 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 100 |
| 00093-0026-10 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 1000 |
| 00093-0027-01 | ENALAPRIL MALEATE | 5 mg | TABLET | 100 |
| 00093-0027-50 | ENALAPRIL MALEATE | 5 mg | TABLET | 5000 |
| 00093-0028-01 | ENALAPRIL MALEATE | 10 mg | TABLET | 100 |
| 00093-0028-10 | ENALAPRIL MALEATE | 10 mg | TABLET | 1000 |
| 00093-0028-50 | ENALAPRIL MALEATE | 10 mg | TABLET | 5000 |
| 00093-0029-01 | ENALAPRIL MALEATE | 20 mg | TABLET | 100 |
| 00093-0029-10 | ENALAPRIL MALEATE | 20 mg | TABLET | 1000 |
| 00093-0029-50 | ENALAPRIL MALEATE | 20 mg | TABLET | 5000 |

- Pricing Overview
  - 400-650% increase in invoice/contract pricing
  - 350-450% increase in WAC
  - 10% increase in SWP

- All customers are affected  (Top Customers: CVS, Rite Aid and Medco)

- Expecting Wockhardt to increase. Please pass on any intelligence you are able to get.

- Additional share target of 10%

1977.   Teva and Wockhardt simultaneously implemented price increases on July 19, 2013.

Although the timing of the price increase was coordinated among the competitors, Patel

nevertheless described the simultaneous increase as a coincidence in an internal e-mail that same

day:

From:     Nisha Patel02
Sent:     Fri 7/19/2013 8:10 AM (GMT-05:00)
To:       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
                                              Dave Rekenthaler; ▮▮▮▮▮▮▮▮
Cc:
Bcc:
Subject:  RE: Enalapril Competitive Customer Volume

FYI, I heard that Wockhardt announced a price increase yesterday morning (probably effective today). Coincidentally, Teva's increase
was announced yesterday afternoon with an effective date of today.


I will pass on any supply information I receive.

1978.    Within a few days after the increases, a customer complained to K.K. (Wockhardt),
asking: "What is going on in the market that justifies your price increases?" K.K.'s response to the
customer was direct: "Mylan took up first we are just following." Similarly, in early August a
different customer asked Wockhardt to reconsider its increase, suggesting that Wockhardt's
competitors were offering a lower price point. Knowing this to be untrue, K.K. replied again "we
followed Mylan and Teva for the increase."

### 8.    August 9, 2013 Price Increases

1979.    On August 9, 2013, Teva raised prices on twelve (12) different drugs. These
increases were again coordinated with a number of Teva's competitors, including Mylan, Sandoz,
Taro, Lupin, Glenmark, Zydus and Apotex.

1980.    Patel began planning for the increase shortly after the July 3 increases were
implemented. On July 11, 2013, Patel sent a preliminary draft list of price increase candidates to a
colleague for what she referred to as "Round 2." For the drugs on the preliminary list, Patel stated
that "this does not guarantee that [they] will end up getting an increase, but at the very least, it will
be put through the review process."

1981.    The list included a number of drugs involving the following competitors, primarily:
Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan, and Sandoz. In the days leading up to July

11, 2013, Patel was communicating directly with executives at nearly all of those competitors, including the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:24 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:21:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:05 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:07 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:16:16 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:04 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:04:26 |
| 7/10/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:54 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:29 |

1982.    Patel was also communicating indirectly with Mylan through Green. For example, on July 10, 2013 - the day before Patel sent the preliminary "Round 2" increase list - Green and Nesta spoke twice. Shortly after the second call, Green called Patel and the two spoke for just over seven (7) minutes. The next day, on July 11, Nesta and Green exchanged several more calls. The timing of those calls is set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:29:50 | 0:15:38 |
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:46:55 | 0:02:18 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 15:59:38 | 0:07:05 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:11:34 | 0:00:08 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:12:47 | 0:00:17 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:38:48 | 0:04:03 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:43:51 | 0:00:00 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:20:15 | 0:01:52 |

1983.    Patel and other Teva executives continued to coordinate with competitors over the next several weeks, refining the list and preparing for the next large Teva price increase.

REDACTED – PUBLIC VERSION

1984.   By August 7, 2013, Patel had finalized the list. That day she sent an e- mail to her supervisor, K.G., with a "Price Increase Overview" spreadsheet which she had prepared for Cavanaugh, summarizing the increases. As shown below, the spreadsheet included competitively sensitive information about certain competitors' plans regarding future price increases that Patel and/or Green could have only learned from directly colluding with those competitors:

Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase | Reason for Increase | Competitors |
|---|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | 53% | Follow Mylan | Mylan, 96.7% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% | Teva Exclusive, Lead | |
| CLEMASTINE FUMARATE TABLETS | 76% | Lead | Sandoz/Fougera, 10.8% |
| DICLOFENAC TABLETS | 103% | Follow Mylan; Teva share leader | Mylan, 19.4% - Sandoz/Fougera, 19.4% - Apotex, 0.3% |
| DILTIAZEM HCL TABLETS | 90% | Follow Mylan | Mylan, 61.3% |
| DOXAZOSIN MESYLATE TABLETS | 1031% | Follow Mylan and Apotex; Teva share leader | Mylan, 28.1% - Apotex, 2.2% - Dava, 0.4% |
| ETODOLAC ER TABLETS | 158% | Follow Taro (likely to be this week with it) | Taro, 56.9% |
| ETODOLAC TABLETS | 414% | Follow Sandoz; Taro likely to follow this week | Taro, 56.6% - Sandoz/Fougera, 20.8% - Watson/Actavis, 0.5% - Apotex, 0.2% |
| KETOPROFEN CAPSULES | 146% | Follow Mylan | Mylan, 63.4% |
| KETOROLAC TABLETS | 208% | Follow Mylan | Mylan, 81.7% |
| PRAVASTATIN TABLETS | 653% | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. | Glenmark, 21.2% - Apotex, 7.1% - Zydus, 3.8% - Lupin, 4.8% - Dr Reddy, 0.9% |
| TOLMETIN SODIUM CAPSULES | 80% | Follow Mylan; Teva almost exclusive | Mylan, 6.5% |

1985.   K.G. immediately recognized that having such explicit evidence of a competitor's price increase plans in writing would be problematic for Teva. In response to the e-mail, K.G. politely asked Patel to remove some of the incriminating information:

REDACTED – PUBLIC VERSION

From: ████████
Sent: Wed 8/07/2013 11:00 AM (GMT-05:00)
To: Nisha Patel02
Cc:
Bcc:
Subject: RE: PI Overview-MC

Nisha,

Please add Teva share to the competitors commentary and change header to Market Share.

Under reasons, I would change to the following:

1. Etodolac ER : Follow Taro
2. Etodolac : Follow Sandoz; Taro increase anticipated.
3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

1986. In accordance with the executive's request, Patel deleted the information.

1987. Patel and Green coordinated the increases with every important competitor in the days and weeks leading up to the increase. The graphic on page 195 of the State AG Complaint No. 2, details some of the calls with competitors in the days and weeks leading up to the increases.

1988. The only drug on the list that Patel and/or Green were not coordinating with competitors on in advance (Clemastine Fumarate oral liquids) was a drug where Teva was exclusive and thus had no competitors. That drug was slated for the lowest increase of all drugs on the list (7%).

1989. The day before the price increase went into effect - August 8, 2013 - Patel was particularly busy, spending most of her morning reaching out and communicating with several key competitors:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

1990.    As it turned out, Mylan was also in the process of implementing its own price increases on August 9, 2013 on several drugs (including several sold by Teva), and it is likely that Nesta reached out to Patel to coordinate those increases.

a.    **Mylan**

1991.    Teva and Mylan were coordinating price increases consistently during this period, including the time leading up to the August 9, 2013 increases. During each step in the process, Teva and Mylan executives kept their co-conspirators apprised of their decisions. The communications were typically initiated by Patel, who asked Green to communicate with Nesta of Mylan and obtain what she referred to as "intel" on many different drugs. But at times Patel communicated directly with Nesta.

1992.    For example, on July 22, 2013, Patel sent Green an e-mail with an attached spreadsheet of "Round 2" increase items. She indicated that she was "seeking intel" for a group of drugs in the attached spreadsheet with a highlighted yellow "x" and included in a column titled "Follow Mylan/Other:"

| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | x |
| Diclofenac Tab | Mylan increase; On historical PI list | x | x |
| Doxazosin Mesylate Tabs | Mylan increase; On historical PI list | | x |
| Enalapril Tab | Mylan increase; On historical PI list--COMPLETED | | x |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | x |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | x |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | x |
| Nystatin | Heritage involved  follow Mutual  deletion candidate  PM related | x | x |
| Pravastatin | Carried over from round 1 | | x |
| Sotalol | Mylan increase; On historical PI list | | x |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | x |
| Verapamil  (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | | x |

A large majority were Mylan drugs.

1993.   The next day – July 23, 2013 – at 4:30pm, Green and Nesta spoke for more than six (6) minutes. Immediately after hanging up the phone, Green called Patel to convey the intel he had obtained from Mylan. The call lasted more than three (3) minutes.

1994.   On July 29, 2013, Green (Teva) was approached by a large retail pharmacy asking for bids on several of the drugs that Mylan had increased prices on in early July. Green's first step was to request market share information for those drugs so that Teva could make a decision on how to respond to the customer's inquiry based on the generally accepted understanding regarding fair share:

**From:** Kevin Green
**Sent:** Monday, July 29, 2013 9:49 AM
**To:**
**Cc:**
**Subject:** Walgreens: Items for discussion

From the list of items below, can you pull in current market share. These are new opportunities at Walgreens, and I  want to see what the current market looks like.

1995.   The next day, July 30, 2013, Patel sent Green the "latest" price increase file as an attachment, saying that she "[f]igured it would help since I've changed a few things on you." Patel asked Green to obtain additional "market intel" for a group of seven Mylan drugs, some of which varied slightly from the prior spreadsheet.

1996.   Following the same consistent pattern, Green and Nesta spoke six (6) times over the next two days. After hanging up from the last call between the two on August 1, 2013, Green called Patel and conveyed the results of his conversations. This series of phone calls is detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:10:33 | 0:04:52 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:50:57 | 0:01:09 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:54:39 | 0:03:21 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:59:57 | 0:06:53 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:46:59 | 0:01:27 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:23:47 | 0:05:48 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:21:43 | 0:00:59 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 12:29:55 | 0:02:36 |

1997.   In the midst of the phone calls between Green and Nesta on July 31, 2013, Patel sent the following e-mail with "commentary" about the customer request, with a particular focus on balancing Teva's desire to increase prices against its commitment to adhere to the fair share agreement and how that may affect its market share for certain products sold by Mylan:

From:    Nisha Patel02
Sent:    Wed 7/31/2013 3:23 PM (GMT-05:00)
To:      Kevin Green;                                              Dave Rekenthaler
Cc:
Bcc:
Subject: RE: DELPHI 9429 Walgreens: Items for discussion


My initial commentary…


If we can take on the supply, we can bid on items we have already taken our increase on (bold).


**Enalapril:** seeking share

**Cimetidine:** shared with Mylan, but do not have our fair share

**Prazosin:** shared with Mylan, but do not have our fair share

**Nadolol: can pursue additional share (Mylan) for 3-player market**

Loperamide: consider it added to the PI candidates list

Fluoxetine: no plans to follow Mylan increase, but have high share in a 7 player market

Diltiazem IR: consider it added to the PI candidates list


There are plans to follow Mylan on the rest. Need to determine how we want to respond on these if we haven't implemented an increase by the time we respond. From what I understand, we have some time.

1998.   Based on all of these communications between Teva and Mylan (and at times other competitors), Teva was able to successfully increase price on seven different drugs that it overlapped with Mylan, on August 9, 2013, as set forth above.

b.   **Etodolac**

1999.   Etodolac, also known by the brand name Lodine, is a medication known as a nonsteroidal anti-inflammatory drug (NSAID). It is used to reduce pain, swelling and joint stiffness from arthritis. It works by blocking the body's production of certain natural substances that cause inflammation. An extended release version of Etodolac – Etodolac ER –also known by the brand name Lodine XL, is also available.

2000.    Apotex, Taro, Teva and Sandoz dominated the market for Etodolac tablets; Teva,

Taro, and Zydus dominated the market for Etodolac ER tablets; and Apotex, Teva, and Taro

dominated the market for Etodolac capsules.

2001.    In early 2012, Apotex (which had received an ANDA to market Etodolac capsules in

2000) was planning to re-enter the market for the drug while Teva was planning to exit the market.

Although the number of competitors in the market would remain the same, Apotex and Taro were

able to coordinate a large price increase due to the overarching fair share Agreement.

2002.    As a result of this coordination, Taro was able to lead a price increase that more than

tripled its previous price for Etodolac capsules from early 2012, while Apotex was able to enter the

market at the higher price and gain its "fair share." As a result, between May and August of 2012,

Taro and Apotex were able to coordinate to increase prices by more 200%.

2003.    As of July 13, 2013, Teva sold both Etodolac and Etodolac ER. Teva's competitors

for the standard version of Etodolac were Taro and Sandoz. For Etodolac ER, Teva had only one

competitor – Taro.

2004.    When Patel first began planning for "Round 2" of Teva's price increases, Etodolac

and Etodolac ER were not slated for increases. For example, when she circulated a long list of

potential "Round 2" increases on July 11, 2013 (that would later be cut down substantially) – neither

of those drugs was on the list.

2005.    Around that time, Sandoz began identifying a list of drugs where it believed it could

increase price by the end of July. Etodolac was on the list, primarily because Sandoz would be able

to implement a substantial increase without incurring significant price protection penalties from its

customers.

2006.    On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to

Aprahamian (Taro) and they spoke for sixteen (16) minutes. Aprahamian called CW-3 back the next

day and the two spoke again for eight (8) minutes. After hanging up the phone with CW-3, Aprahamian immediately called Patel. They exchanged voicemails until they were able to connect later in the day for nearly fourteen (14) minutes. On July 18, 2013, Patel called CW-1 (Sandoz) and the two spoke for more than ten (10) minutes.

2007.   During this flurry of phone calls, Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER.

2008.   On July 22, 2013 – before any price increases took effect or were made public, Patel added both Etodolac and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:

| Etodolac | Sandoz* (All strong competitors) |
|----------|----------------------------------|
| Etodolac ER | Could follow IR (Shared with Taro) |

2009.   Based on her conversations with CW-1 and Aprahamian, Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER. During those conversations, Teva agreed to follow both price increases.

2010.   That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases, including for Etodolac. Prior to the conference call on July 23, CW-1 called Patel at Teva. After exchanging voice mails, the two were able to connect for more than fourteen (14) minutes that day. During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac. Similarly, CW-3 (Sandoz) called Aprahamian (Taro) that same day and the two spoke for more than three (3) minutes.

2011.   The Sandoz price increase for Etodolac was effective July 26, 2013. That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets. After

learning of the request, Aprahamian responded swiftly internally: "Not so fast. Why the request? Market just changed on this and not apt to undercut."

2012.   When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:

| Message | |
|---|---|
| **From:** | ara.aprahamian@taro.com [ara.aprahamian@taro.com] |
| **Sent:** | 7/30/2013 11:14:49 PM |
| **To:** | ███████████████████████ |
| **CC:** | |
| **Subject:** | Re: Fw: Bid Request - Etodolac |
| **Attachments:** | _.gif; _; _ |

recent market changes, not taking on additional share...

2013.   Also on July 26, Patel sent an e-mail to others at Teva – including her supervisor K.G., Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR (immediate release). She instructed them to "[p]lease watch ordering activity for both, IR and ER. The intent is that we will follow in the near future, but a date has not been determined."

2014.   Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac and Etodolac ER price increases (among other things). Between July 29 and August 2, 2013, for example, Patel engaged in the following series of calls with CW-1 (Sandoz) and Aprahamian (Taro):

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

2015.    Aprahamian was also speaking to his contact at Sandoz- CW-3 - during this time, including the following calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

2016.    On August 1, 2013 - shortly after speaking with Patel - Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac and Etodolac ER. Aprahamian stated "[w]e need to get these out next week." Not wanting to provide the details in writing, Aprahamian concluded: "Will come over and discuss with you."

2017.    By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac and Etodolac ER. The minutes from a Teva "Marketing Ops" meeting on August 5, 2013 - which Patel attended - reflect the following:



4.  Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week.  CIM still monitoring to 100% forecast for all customers.

2018.    When Patel sent the "Price Increase Overview" spreadsheet to her supervisor K.G. on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "this week." K.G. quickly instructed Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

2019.    Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013. Both their AWP and their WAC prices were increased to the exact same price points. The increases were substantial. For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

### c.    Niacin ER

2020.    On September 20, 2013, Teva entered the market for Niacin ER as the first-to-file generic manufacturer. As the first-to-file, Teva was awarded 180 days of exclusivity to sell the generic drug before other generic manufacturers could enter the market.

2021.    Teva's period of exclusivity for Niacin ER was scheduled to expire on March 20, 2014. As that date approached, Teva began to plan for loss of its exclusivity. By at least as early as February, Teva learned that Lupin would be the only competitor entering the market on March 20.

2022.    The first thing Teva sought to do – knowing that a high-quality competitor would be the only new entrant – was to raise its price. On February 28, 2014, Cavanaugh instructed K.G. and others at Teva that "[w]e need to do the Niacin ER price increase before Lupin comes to market and sends offers out." K.G. immediately forwarded the e-mail to Patel with the instruction: "Please see comment on Niacin ER. Please make sure you include in your price increase." Later that day, Patel called Berthold at Lupin and the two spoke for nearly seven (7) minutes.

REDACTED – PUBLIC VERSION

2023.   Within a week, Teva was ready to implement the price increase. On March 5, 2014, Patel sent an e-mail to the Teva pricing group stating "[p]lease prepare for a price increase on Niacin ER, to be communicated [to customers] this Friday for an effective date of Monday." The next day, March 6, Teva notified its customers that it would be implementing a price increase on Niacin ER effective March 7, 2014. The increase was for 10% across the board, on all formulations.

2024.   Once Teva coordinated the price increase, it next began taking the necessary steps to divide up the Niacin ER market with new entrant Lupin so as to avoid competition that would erode Teva's high pricing. Patel scheduled a meeting with Rekenthaler for March 6, 2014 to discuss an "LOE Plan" for Niacin ER. "LOE Plan," in Teva parlance, is a plan detailing which customers Teva would concede and which customers it would retain upon Teva's "loss of exclusivity" in a particular generic drug market. Teva's LOE plans were often secretly negotiated directly with competitors as they were entering the market, consistent with the industry understanding of fair share discussed above.

2025.   During the morning of March 6, 2014, Patel called Berthold and they spoke for more than seven (7) minutes. During this and several subsequent calls, discussed in more detail above, Teva and Lupin agreed on which specific customers Teva would concede to Lupin when it entered the market on March 20, 2014. Teva agreed that it would concede 40% of the market to Lupin upon entry.

2026.   When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the same WAC per unit cost as Teva, for every formulation. In the days leading up to Lupin's entry, Patel and Berthold were in frequent communication to coordinate the entry, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:44 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:19 |
| 3/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:06:20 |
| 3/20/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:34 |

2027.   In addition, Lupin entered with customer pricing only 10% below Teva's recently increased pricing - so it was expected that pricing would remain at least at Teva's pre-increase exclusive pricing levels. In other words, there was little or no price erosion as a result of Lupin's anticompetitive entry into the market for Niacin ER.

2028.   Over the next several days, Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers. For example, on March 24, 2014, a Teva executive received an e-mail from Cardinal indicating that Cardinal had received "a competitive offer for the Niacin ER family." Cardinal was one of the customers that Teva had already agreed to concede to Lupin. The Teva executive forwarded the e-mail to several people internally at Teva, including Patel, Rekenthaler, and Cavanaugh, confirming the plan:



2029.   That same day, Patel spoke to Berthold at Lupin three times, as shown below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:14 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:04:55 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:49 |

2030.   Patel responded:



From:      Nisha Patel02
Sent:      Mon 3/24/2014 1:13 PM (GMT-05:00)
To:        ▉▉▉▉▉▉
Cc:        Maureen Cavanaugh; ▉▉▉▉▉▉▉▉▉▉▉ Dave Rekenthaler
Bcc:
Subject: RE: Niacin ER

Yes. The plan is to concede. This was re-confirmed earlier today, unless something has changed.

2031.   The next day – March 25, 2014 – K.G. (Teva) summarized the status of Teva's LOE Plan and the company's agreement with Lupin on Niacin ER: "With the four concessions (CVS, Cardinal, Optum and Humana), we would be giving up right around 40% share as Dave noted (I calculated 39%) . . . . We need to keep everybody else."

### 9.   July 2013 – January 2014: Competitors Seek to "Follow" Price Increases: Haloperidol and Trifluoperazine HCL

2032.   As detailed above, after Mylan and Teva implemented significant price increases in early July 2013, Sandoz executives sought to obtain a "comprehensive list" of those Teva and Mylan price increases. Sandoz sought this information because it did not want to accidentally compete for market share on any of the Teva or Mylan drugs that overlapped with Sandoz.

2033.   To that end, on July 15, 2013, Sandoz executives held an internal meeting during which CW-1 instructed members of the Sandoz sales team, including CW-2 and CW-4, "to investigate [the] list of Mylan and Teva increase items."

2034.   That same day, as detailed above, CW-2 contacted his counterpart at Teva, Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along with the percentage increases for each. Similarly, on July 16, 2013, CW-4 called her contact at Mylan, Nesta. The call lasted two-and-a-half (2.5) minutes. A half hour later, Nesta returned the call and they spoke for nearly nineteen (19) minutes.

2035.    During those two calls, CW-4 asked Nesta to identify the drugs Mylan had increased prices on so that Sandoz could follow with its own price increase. Nesta provided CW-4 with a list of drugs, highlighting that the Nadolol price increase would be large. Nesta also emphasized that Mylan did not appreciate having its prices challenged and that prices should be kept high. After the phone call ended, CW-4 sent the following e-mail to her superiors (the "July 2013 E-mail"):

---

**From:** ▮▮▮▮▮▮
**Sent:** Tuesday, July 16, 2013 6:31 PM
**To:** ▮▮▮▮▮▮▮▮, Kellum, Armando; ▮▮▮▮▮▮▮▮▮
**Subject:** Price increases

Here are some of the pricing increases from Mylan I was able to garner. These are reportedly to be BIG increases,
Bupropion HCL
Diltiazem HCL
Haloperidol
Clomipramine
Sotalol
Tizanidine
Peprhenazine
Levothyroxine (Lanette followed)
Nadolol

There were others but ones we don't have. There may be others we have, but this is all I was able to get. Pretty well anything we get from a customer that isn't supply obviously is due to pricing increase.

If a specific product is questionable, let me know and I'll find out about it.

▮▮▮▮▮▮

1

---

2036.    For at least one drug on the list – Haloperidol – Mylan had yet to raise price at the time of the July 2013 E-mail. Indeed, Mylan would not raise price on this product until August 9, 2013. On that date, Mylan also raised the price on Levothyroxine – a drug on the list that was also increased by Mylan in January 2013 – and at least two other Sandoz overlap drugs not on the list – Trifluoperazine HCL and Benazepril HCTZ.

2037.    Over the next several months, and consistent with their understanding, Sandoz declined to bid and take business from Mylan customers (except in one instance where Mylan had more than its fair share) and raised prices to match Mylan on a number of products.

2038.   Additionally, consistent with the overarching conspiracy's fair share principles, the price increases attracted new market entrants without any resulting price competition. For example, Zydus entered the market for Haloperidol in late 2014, and Kevin Green communicated frequently with Nesta to ensure that Zydus obtained market share without eroding market pricing.

2039.   On August 6, 2013, Nesta of Mylan called CW-4 at Sandoz twice. Both calls were less than a minute long. Three days later, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine HCL. For Haloperidol, Mylan increased the WAC price by 250% on several formulations. For Trifluoperazine HCL, Mylan increased the WAC price by 80% on all formulations.

2040.   On August 19, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine HCL and that Sandoz needed to "rationalize the market."

2041.   On August 22, 2013, CW-2 e-mailed Kellum stating that CVS "wanted to know if we will be raising price on Haloperidol and Trifluoperazine. Mylan took substantial increases." Kellum forwarded the request to CW-1 and F.R., a pricing manager at Sandoz. F.R. responded, "I believe the answer is yes?? We bid at current price in RFP and did not go after this business. I would answer yes. Thoughts?" CW-1 replied that he would obtain the pricing data, "but I would imagine we will be fast followers."

2042.   On September 18, 2013, CW-1 e-mailed Kellum with his price increase analyses for Haloperidol and Trifluoperazine HCL. For Haloperidol, CW-1 indicated that Mylan had 72% market share, Sandoz had 15%, and Zydus had 10%. For Trifluoperazine HCL, CW-1 stated that "Mylan has 73% and we have 24%. This is a no brainer."

2043.   On September 25, 2013, Walgreens – a Mylan customer – e-mailed Sandoz asking for bids on Haloperidol and Trifluoperazine HCL. CW-1 sent an internal e-mail explaining that

"Mylan took a price increase on this product. That's why he is asking. We are currently evaluating tak[ing] one ourselves."

2044.   On October 2, 2013, CW-1 e-mailed S.G., the Sandoz national account executive assigned to Walgreens, directing S.G. to not only decline to bid at Walgreens, but also lie about the reason for doing so:



2045.   Over the next several days, CW-4 and Nesta spoke by phone several times. These communications are detailed in the table below. Prior to these calls, CW-4 and Nesta had not communicated by phone since August 6, 2013.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:11:19 |

2046.   On October 15, 2013 (the day after the last of the phone calls noted above), CW-1 e-mailed the Sandoz Pricing Committee recommending that Sandoz increase pricing on Haloperidol and Trifluoperazine HCL. After reviewing the e-mail, O.K., a senior executive responsible for business planning at Sandoz, recommended approval of the Haloperidol price increase, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January 2014 because of price protection penalties that would be triggered if Sandoz increased in October 2013. As O.K. explained, "I understand that both price increases have been taken by Mylan in August and we are the followers. We might be sending the wrong signal to Mylan by not following promptly however 1.6m top/bottom-line hit with no upside is too big to swallow."

2047.   Ultimately, Sandoz followed O.K.'s recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013 but waited to follow on Trifluoperazine HCL until January 31, 2014.

### 10.   April 4, 2014 Price Increases

2048.   On April 4, 2014, Teva raised prices on twenty-two (22) different generic drugs. Nearly all of these increases were coordinated with a number of Teva's high-quality competitors including Sandoz, Taro, Actavis, Mylan, Lupin, and Greenstone. But for this price increase, Teva also began coordinating with some of what it regarded as "lesser-quality" competitors – such as Breckenridge, Heritage, VersaPharm and non-defendant Rising – as new sources for anticompetitive agreements. For this price increase, Teva also decided to lead many more price increases – which was riskier for Teva and required even greater coordination with competitors.

2049.   Leading more price increases was part of a strategy that Patel memorialized in writing in January of 2014, documenting in many respects the successful strategy that she had implemented in 2013, focused on leveraging Teva's collusive relationships with high-quality competitors. This strategy was well known, understood and authorized by individuals at much

REDACTED – PUBLIC VERSION

higher levels at Teva, including Cavanaugh and Rekenthaler, and Patel's direct supervisor K.G. For example, on January 16, 2014, Patel sent a document to K.G. titled "2014 Pricing Strategy Brainstorm," where she outlined her plan for implementing price increases:

---

**2014 Pricing Strategy Brainstorm**

- Lead more increases
- Candidate Identification:
  - Exclusive items
  - Number of competitors; Target 2-4 total players, where quality of competitor is high
  - Teva has majority share and quality of competitors is high - lead
  - Competitors with long term supply issues
  - Competitors exiting market
  - Low or limited financial exposure
  - Adjust pricing in accordance with volume (secondary, dual, etc)
- Follow market pricing promptly
  - Delayed reactions erode pricing
  - Teva is the market leader. Ability to react to market changes should be reflective of reputation.

---

2050.    Patel began planning for the next round of Teva price increases in early January 2014, shortly after returning to full-time status from maternity leave. On January 14, 2014, Patel sent K.G. a preliminary draft list of price "Increase Potentials Q1 2014." She stated: "Attached is my list of potential items. Note that they still need to go through the review process."

2051.    The initial list contained drugs sold by Actavis, Lupin, and Greenstone, among others. Not surprisingly, Patel was communicating frequently with each of those competitors throughout December 2013 and into early January 2014.

2052.    On February 7, 2014, Patel created a formal list of "PI Candidates" in a spreadsheet. In the days leading up to February 7, Patel was feverishly coordinating by phone with a number of different competitors to identify price increase candidates, including at least the following:

**REDACTED – PUBLIC VERSION**

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

2053.   Those efforts were successful. By February 26, 2014, Patel had a more refined list of "PI Candidates," which she forwarded to another colleague for his review. That list included the following drugs and notes about each drug:

| Family | Market Notes | Pricing Notes |
|---|---|---|
| Clarithromycin ER | Zydus exiting | Raise non-Cardinal customers in accordance with new Cardinal price |
| OCs | Secondary at ABC | Raise to non-primary pricing/within 10% of primary market sell-refer to Anda intel |
| Cephalexin OS | | Follow Lupin - price points - WS net $14.70, 23.52, 16.75, 25.13 |
| Azith Susp | | Follow GS - price points - WS net $12.50 on all sku's |
| Medroxypro Tabs | | Follow GS - price points - WS net 8.50, 9.50, 10.50 on 100s |
| Nadolol (Econdisc only) | | Raise to originally planned increase price |
| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor | |
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | |
| Cyproheptadine | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 55.10 |
| Mimvey | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 96.30 |
| BUDESONIDE | Exclusive | PER PRICING INFORMATION FROM DECEMEBER |
| NIACIN ER | Exclusive but Lupin entering | PER PRICING INFORMATION FROM DECEMEBER |
| Bumetanide | Teva exiting  CHECK SALES FOR % INCREASE | Lead market with potential share loss in mind |
| Divalproex ER | UNPROFITABLE  several competitors | |
| Diflunisal | Shared only with Rising | |
| Ketoconazole Cream | Shared with Taro and Sandoz | |
| Ketoconazole Tab | Shared with Taro, Myl and Apo | |
| Mupirocin Ointment | Shared with Perrigo, GM, Taro, Sandoz | |
| Theophylline Tab | Shared with Heritage, Major and Inwood | |
| Nystatin Tab | Shared with Heritage and Mutual/Caraco | |
| Hydroxyzine Pamoate | Shared with Sandoz and Actavis | |
| Pentoxi ER | Shared with Apo and Mylan | |

2054.   Patel continued to refine the list over the next several weeks.

514

**REDACTED – PUBLIC VERSION**

2055.    On March 17, 2014, Patel sent a near final version of the "PI Candidates"
spreadsheet to K.G. with the statement: "Once you verify these are acceptable, we can finalize for
the increase." Patel and Rekenthaler both were communicating frequently with competitors- in this
case Taro, Lupin, Actavis, Greenstone, Zydus, Heritage, and Rising - to coordinate the price
increases in the week before Patel sent the price increase list to K.G. At least some of those
communications are reflected in the table below:

REDACTED – PUBLIC VERSION

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

2056.   Rekenthaler had also previously spoken with his contact at VersaPharm – J.J., a senior national accounts executive – on January 22, 2014 for five (5) minutes and March 7, 2014 for three (3) minutes to secure VersaPharm's agreement to follow the Teva increase on two drugs.

REDACTED – PUBLIC VERSION

Those were the only two identified telephone calls between Rekenthaler and J.J. since 2012. As discussed more fully below, VersaPharm followed with its own price increase shortly after the Teva increase.

2057.   In the days leading up to the price increase, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully coordinated increases with everyone. On April 1, 2014, Patel responded by providing a list of only those drugs where Teva was leading the price increase – i.e., the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

2058.   Satisfied that Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, on April 4, 2014 Teva increased pricing on various dosage strengths of the following drugs:

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

2059.   These price increases were all coordinated and agreed to between Teva and its competitors. Patel and/or Rekenthaler communicated directly with all of their key competitors in

517

the days and weeks leading up to the increase. Many of those communications are set forth in the graphic at page 220 of the State AG Complaint No. 2.

2060.   Patel and others at Teva again went to great efforts to coordinate these price increases with competitors prior to April 4, 2014 – including during the time that Patel was out on maternity leave. Some illustrative examples of those efforts are set forth below.

a.      **Cephalexin**

2061.   Throughout 2013, Berthold of Lupin colluded with two different individuals at Teva: Patel and Green. As discussed above, at times Patel and Green would even coordinate with each other regarding who would communicate with Berthold, and take turns doing so.

2062.   As of late October 2013, however, neither of those options was available to Berthold. Patel was out of the office on maternity leave, and Green had left Teva to join Zydus as of October 23, 2013.

2063.   This did not deter Berthold; he merely went further down the Teva organizational chart to find a Teva executive to communicate with. The ongoing understanding between Teva and Lupin was institutional, not dependent upon a relationship between specific individuals. In October 2013, when Lupin decided to raise price on Cephalexin oral suspension – a drug where Teva was the only other competitor in the market –Berthold already knew that Teva would follow the increase.

2064.   On October 14, 2013, Berthold called Rekenthaler at Teva. They ultimately spoke for sixteen (16) minutes that day. Communication was rare between those two executives. Prior to October 14, 2013, the last (and only) time they had spoken by phone was November 21, 2011 according to the phone records produced.

2065.   On October 31, 2013 – the day before Lupin was scheduled to increase its price on Cephalexin oral suspension –Berthold also called T.S., a national account executive at Teva, to notify

Teva of the price increase. He called T.S. at 9:18am that morning and left a message. T.S. returned the call at 9:57am, and the two spoke for nearly five (5) minutes.

2066.   Within minutes after hanging up the phone with Berthold, T.S. notified others internally at Teva about the substantial increase Lupin was about to take:



2067.   The Lupin increase on Cephalexin oral suspension actually became effective the next day, November 1, 2013 – demonstrating that T.S. had advance knowledge of the increase. Shortly thereafter, T.S. followed up her own e-mail with specific price points that Lupin would be charging for Cephalexin.

2068.   K.G. (Teva) responded later that day, asking: "Did Lupin increase the Caps as well?" Rekenthaler answered immediately, with information he had learned from Berthold in mid-October: "Lupin did not increase the caps, only the susp[ension]."

2069.   On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase. T.S. forwarded the e-mail from the customer to Rekenthaler and others with the suggestion that, because Teva already had the majority share, it should not bid for the business. K.G. agreed, and simultaneously forwarded the e-mail to Patel stating: "Nisha, let's add this to our list to discuss." Patel called Berthold the same day and left a message.

2070.   When Patel drafted her initial list of possible price increase candidates and forwarded it to K.G. in January 2014, Cephalexin oral suspension was on the list. Patel coordinated the increase consistently with Berthold throughout the period.

2071.   On April 4, 2014, Teva raised its WAC prices on Cephalexin oral suspension to match Lupin's prices exactly. The increases to the WAC price ranged from 90% - 185%, depending on the formulation.

### b.   Azithromycin and Medroxyprogesterone

2072.   In November 2013, Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva: Azithromycin oral suspension, Azithromycin suspension, and Medroxyprogesterone tablets. Patel and R.H., a national account executive at Greenstone, were communicating frequently during that time, including exchanging six (6) text messages on November 16, 2013 and a phone call on November 23, 2013. Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.

2073.   On November 18, 2013 – only two days after Patel and R.H. exchanged six (6) text messages – a senior pricing executive at Greenstone sent an e-mail to Greenstone's General Manager seeking approval to implement the price increases. The General Manager approved of the price increases the next day. Then, on November 23, 2013 Patel spoke to R.H. (Greenstone) for nearly one (1) minute.

2074.   On December 2, 2013 - the same day that Greenstone was slated to send out notices of the price increases to its customers - Patel spoke to R.H. (Greenstone) three times within a span of twenty (20) minutes, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 14:02:54 | 0:00:05 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:10:13 | 0:06:09 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 14:18:50 | 0:01:37 |

2075.    After the last of those three calls, Patel sent an e-mail to several colleagues at Teva notifying them of an impending Greenstone price increase - one that would not be effective for another month:

From:    Nisha Patel02
Sent:    Mon 12/02/2013 2:23 PM (GMT-05:00)
To:
Cc:                              ; Dave Rekenthaler
Bcc:
Subject: Azithro OS Price Increase

FYI, I'm hearing that Greenstone just announced an increase on Azithromycin Oral Suspensions, effective January 1st. Please take this into consideration for bid requests we may receive.

2076.    On December 5, 2013, Patel continued to communicate with R.H. about the Greenstone increases, and how Teva would react to unsolicited customer requests for bids – trading two voicemails. The next day, Patel sent another e-mail to K.G. about Azithromycin suspension:

From:   Nisha Patel02
Sent:   Fri 12/06/2013 11:33 AM (GMT-05:00)
To:
Cc:
Bcc:
Subject: Azithro Susp Question

I mentioned earlier in the week that Greenstone took an increase that is effective January 1st. (As a reminder, I intend to add these items to my list of potential price increases for Q1 2014.)

Since the new pricing requires a WAC increase, I am inclined to decline to bid at this time. Further, in a 2 player market, we have 54% share and this includes a gain of ~4% in June.

Do you agree with the "decline to bid at this time"
approach?

2077.    K.G. agreed with Patel's recommendation. Later that day, J.L. of Teva sent the

following notice to several Teva colleagues:

From:
Sent: Friday, December 06, 2013 2:27 PM
To:
Cc:                               Nisha Patel02
Subject: RE: Giant Eagle Cephalexin Offer

We've been informed that we will not be pursuing any business at this time on the Azithromycin OS.

As Greenstone recently took a price increase that will not be visible to the market until January, it's been decided to hold off until that time.  Once the information is available, we will consider a price increase and then attempt to revisit the opportunities.

The request was left open to see if we could supply for internal purposes only.

Please inform the customer that we are unable to provide an offer at this time.

2078.    That same day, Teva declined to bid on Azithromycin at multiple customers.

2079.    Over the next several months – during the period of time before Teva followed

Greenstone's price increases – Teva continued to refuse to bid (and avoid taking Greenstone's

522

market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone tablets. For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin suspension and Medroxyprogesterone due to a "Change in Market Dynamics." After speaking with R.H. (Greenstone) for more than five (5) minutes that same day, Patel agreed with the recommendation not to provide a bid to that customer.

2080.    Similarly, on March 17, 2014 – which was the same day that Patel sent a nearly final price increase list to K.G. – Teva was approached by another wholesaler requesting a lower price for Azithromycin oral suspension. A national account executive at Teva asked Patel: "Can we provide any better pricing than Greenstone? . . . I know we have picked up our target share." Patel had spoken with R.H. (Greenstone) twice earlier that day, including one call lasting more than fifteen (15) minutes. Patel's response to the national account executive was: "Let's talk tomorrow."

2081.    Consistent with the understanding between the two companies, Teva followed Greenstone's price increases for Azithromycin oral suspension, Azithromycin suspension, and Medroxyprogesterone tablets on April 4, 2014. Patel spoke twice with R.H. (Greenstone) that same day.

c.    **Clarithromycin ER**

2082.    Teva and Actavis were coordinating on several drugs Teva price-fixed on April 4, 2014. One of them was Clarithromycin ER tablets. As of December 2013, Teva, Actavis, and Zydus were the only generic manufacturers actively selling Clarithromycin ER.

2083.    On December 30, 2013, however, Cardinal approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market. Teva informed Cardinal that it would not have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal could wait until then for Teva to supply, Teva would make an offer. Cardinal agreed.

2084.    The Cardinal bid request was forwarded to Patel on the morning of January 2, 2014. At 9:37am that morning, L.R., a customer marketing manager at Teva, suggested providing an offer to Cardinal at "10% under market intel pricing for [the] Watson/Actavis product." L.R. also stated: "[i]f Cardinal is willing to wait until April, I suspect that Actavis isn't interested in picking up a lot of additional share."

2085.    Immediately after receiving that e-mail, at 9:40am, Patel called Rogerson at Actavis and the two spoke for more than seventeen (17) minutes. Shortly after hanging up the phone with Rogerson, at 10:12am, Patel responded to the e-mail, saying: "I think we have an opportunity to go higher. Let's aim for around $148 net and request feedback."

2086.    On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the higher price. At 9:19am, Patel called Rogerson at Actavis and they spoke for more than six (6) minutes. Shortly after that call, at 9:45am, Patel sent an e-mail internally at Teva stating: "It looks like Cardinal accepted our bid at the higher price. We may have an opportunity to take some increases."

2087.    When Patel sent her supervisor the initial list of "Increase Potentials Q1 2014" on January 14, 2014, Clarithromycin ER was on the list.

2088.    Similarly, in March 2014, Actavis implemented its own price increase on several other drugs, including some that overlapped with Teva. Consistent with the ongoing understanding between these high-quality competitors, Actavis understood that Teva would follow the increases or, at a minimum, would not poach Actavis customers after the increase.

2089.    At 9:54 am on March 14, 2014, Rogerson called Patel and left a message. Patel called Rogerson back at 10:31am, and the two spoke for more than twelve (12) minutes. Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:

REDACTED – PUBLIC VERSION

---

**From:** Nisha Patel02
**Sent:** Friday, March 14, 2014 10:47 AM
**To:** ████████████████████████████████
**Cc:** Dave Rekenthaler; ████████████████
**Subject:** Market Increases

NAMs,

I'm hearing that Actavis announced a bunch of price increases yesterday. Please share any intel you gather. I believe some of the products, that overlap with Teva, are as follows (not sure if there are any more):

Tamoxifen

Mirtazipine

Estazolam

---

In fact, these increases would not become effective until April 15, 2014, again demonstrating that Teva knew in advance of its competitors' price increase plans.

2090.    Within half an hour of sending that e-mail, Patel instructed colleagues to add the Actavis drugs to the Teva price increase list. She added: "We intend to follow where we can."

2091.    Less than two hours later, at 12:37pm, Patel called Rogerson again. They spoke for more than five (5) minutes. Shortly after hanging up the phone, at 12:51pm, Patel wrote another e-mail to certain colleagues at Teva, stating: "Actavis took an increase. We will follow. We need to review price per my alert list. Let's wait to see what intel we can get and discuss Monday."

2092.    First thing the next business day – which was the following Monday, March 17, 2014 – Patel forwarded the "PI Candidates" list to K.G. (Teva). The list included both Tamoxifen Citrate and Estazolam. Later that morning, Patel called Rogerson. After quickly exchanging voicemails, they spoke for more than nineteen (19) minutes. Rekenthaler (Teva) and Falkin (Actavis) also exchanged four (4) text messages that day and had one call lasting more than six (6) minutes.

2093.    Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less than three weeks later, on April 4, 2014. Patel and Rogerson spoke twice by phone that day.

Rekenthaler and Falkin also spoke by phone that day. Because Teva was able to follow the price increase so quickly, Teva's increase became effective even before the Actavis price increase for those drugs.

2094.   After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis. For example, on May 14, Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating: "unable to bid (strategic reasons, for internal purposes)." When Patel and her other conspirators at Teva used the term "strategic" in this context, it was code for the fact that there was an understanding in place with a competitor.

2095.   Similarly, on May 21, 2014, Teva received a request from a large customer for a bid on Tamoxifen Citrate. As of that date, Teva had 58.4% of the market, and Actavis had 40.7%. A Teva analyst forwarded the request to Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva not bid "as we are first in a two-player market with good share already." Patel responded: "Agree. We should decline to bid."

### d.  Ketoconazole

2096.   Patel identified Ketoconazole cream and Ketoconazole tablets as price increase candidates sometime in February 2014. They were not listed on her original "Increase Potentials" list that she sent to K.G. on January 14, 2014, but they were on the list of "PI Candidates" that she sent to a colleague on February 26, 2014, with the following notes about each:

| Ketoconazole Cream | Shared with Taro and Sandoz |
|---|---|
| Ketoconazole Tab | Shared with Taro, Myl and Apo |

2097.   Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation. For Ketoconazole cream, Teva's competitors were Taro and Sandoz. For Ketoconazole tablets, Teva's competitors were Taro, Mylan, and Apotex.

2098.   Teva led the price increases for both drugs but made sure to coordinate with all of its competitors before (and as it was) doing so. On April 4, 2014 – the day of the increases – Patel spoke separately with both Aprahamian (Taro) and CW-1 (Sandoz). During each call, she let them know that Teva was increasing the price of Ketoconazole. The same day, Rekenthaler spoke to Nesta (Mylan); he had previously communicated with J.H., a senior sales executive at Apotex, on March 20 and 25, 2014.

2099.   On Ketoconazole cream, co-conspirators at Taro and Sandoz were also communicating directly with each other. On April 4, 2014, for example, Aprahamian spoke to CW-3 at Sandoz for nineteen (19) minutes. They discussed the Teva increase and the fact that Taro would follow. CW-3 then sent an e-mail internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans:

> **From:** ▮▮▮▮▮▮▮▮
> **Sent:** Friday, April 04, 2014 3:01 PM
> **To:** ▮▮▮▮▮▮; Kellum, Armando; ▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮
> **Subject:** Ketoconazole Cream Price Increase
>
> As an FYI, Teva increased contract price and WAC on Keto Cream yesterday (tripled).  Taro will more than likely follow shortly.  We should determine if Teva had additional increases yesterday as well.

2100.   CW-1 (Sandoz) immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on "strict allocation" until Sandoz determined how to proceed.

2101.   That same day, Aprahamian sent a similar e-mail internally to his colleagues at Taro.

2102.   The following Monday, April 7, 2014, Taro received a request from MMCAP seeking a competitive bid on Ketoconazole tablets due to the Teva price increase. After reviewing the request, a Taro sales executive sent an internal e-mail stating: "we are not going to bid this product. . . . Taro has 27% share in a 4-player market." In a follow-up e-mail, E.G., a Director of Corporate

Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about the reason: "Yes, we are declining, but we need to advise its [sic.] due to supply."

2103.   Four days after the Teva increase, on April 8, 2014, Aprahamian called Patel and the two spoke for more than nineteen (19) minutes. Later that same day, he initiated a price increase for all of Taro's customers on both the Ketoconazole cream and tablets. Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

2104.   Although Sandoz immediately understood that it would follow these price increases, it was not able to implement them until October. The delay was because Sandoz had contracts with certain customers that contained price protection terms which would impose substantial penalties on Sandoz if it increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014. At Sandoz, senior management held monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase. In this case, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.

2105.   In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers. For example, on May 14, 2014, Teva was approached by Cardinal requesting a bid due to the Taro increase. The e-mail from Cardinal was forwarded to Patel, who responded immediately:

From:     Nisha Patel02
Sent:     Wed 5/14/2014 10:05 AM (GMT-05:00)
To:       ███████████
Cc:       ████████████████████████
Bcc:
Subject: RE: Cardinal Ketoconazole CR NBO # 11796


Unable to bid at this time. For internal purposes, it is for strategic reasons.

2106.    Shortly before sending the e-mail, Patel exchanged several text messages with Aprahamian (Taro). She would ultimately exchange eight (8) text messages and had one phone call lasting more than four (4) minutes with Aprahamian on that day.

2107.    Later that same day, Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic: "unable to bid (strategic reasons, for internal purposes)."

2108.    Sandoz ultimately followed the Teva and Taro increases for Ketoconazole cream on October 10, 2014. That same day, Patel and CW-1 (Sandoz) spoke for more than three (3) minutes.

2109.    The Teva increases on Ketoconazole were significant. For the cream, Teva, Taro, and Sandoz all increased the WAC price by approximately 110%. For the tablets, Teva's WAC increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

### e.    Estradiol/Norethindrone Acetate and Cyproheptadine HCL

2110.    Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases. One of those new co-conspirators was Breckenridge. Patel already had a relationship with S.C., a senior sales executive at Breckenridge, and Rekenthaler had a relationship with D.N., another senior sales executive at Breckenridge, so Breckenridge was a prime candidate to coordinate pricing.

2111.    On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone Acetate tablets (brand name Mimvey) and Cyproheptadine HCL tablets. Breckenridge had acquired the ANDA for Cyproheptadine HCL tablets in September 2013 from another manufacturer, and immediately sought to raise the prices previously charged by the prior manufacturer as it began to sell the product under its own label. For Cyproheptadine HCL, Breckenridge increased its WAC pricing by as high as 150% and raised its customer contract pricing

even higher – 400%. The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.

2112.   In the weeks leading up to those increases – when Patel was still out on maternity leave – Rekenthaler had several phone calls with D.N. at Breckenridge to coordinate the price increases. The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on October 24, 2013. After those calls, they did not speak again until mid- January 2014, when Teva began preparing to implement its increase.

2113.   Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter.

2114.   With respect to Cyproheptadine HCL, Teva had approximately 54% market share in a two-player market. For that drug, Teva consistently refused to bid or take on any additional market share after the Breckenridge increase. For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyproheptadine HCL. When she learned the news, Patel called S.C. at Breckenridge. They ended up speaking twice that day – the first and only phone calls ever between them. After speaking to S.C., Patel sent the following e-mail regarding the customer's request:



> From:   Nisha Patel02
> Sent:   Fri 2/07/2014 2:46 PM (GMT-05:00)
> To:     ██████████
> Cc:
> Bcc:
> Subject: RE: Possible Indirect Additions - Safeway # 10769, 70, 71 & 72
>
> Let's hold off on providing a bid. We can provide a bid when we are in a position to do so (post increase).

2115.   With regard to Estradiol/Norethindrone Acetate, however, Teva only had 19% market share in a two- player market. For that drug, Teva sought to pick a few customers to level the playing field – before raising its own prices to follow Breckenridge.

2116.    On April 4, 2014, Teva followed the Breckenridge price increases with substantial

increases of Estradiol/Norethindrone Acetate (contract increases of as much as 393%) and

Cyproheptadine HCL tablets (contract increases of as much as 526%). In addition, Teva increased

the WAC price on Estradiol/Norethindrone Acetate by 26% and the WAC price on

Cyproheptadine HCL Tablets by as much as 95% — to exactly match Breckenridge's WAC price on

both products.

2117.    Further demonstrating both Teva and Breckenridge's adherence to the fair share

rules, when Impax entered the market in mid-2015, Teva and Breckenridge both coordinated to

concede market share to the new entrant, and Impax was able to enter the market at the same

supracompetitive WAC prices and net prices as those charged by Teva and Breckenridge. Once

again, S.C. (Breckenridge) brokered Impax's entrance through a series of texts with M.G. (a senior

sales executive from Impax) on July 20, 2015. On July 31, 2015, Impax announced list (WAC) prices

even higher than those of Teva or Breckenridge.

f.    **Diflunisal**

2118.    Rising became a more appealing potential co-conspirator when CW-2, who had

formerly been employed at Sandoz, left to join Rising in August 2013. Rekenthaler had known CW-

2 for many years, going back to when they both worked together at Teva several years prior.

2119.    Of the drugs on the Teva April 4, 2014 price increase list, Rising was a competitor

on Diflunisal. For that drug, Rising had 21% market share in a two-player market with Teva as of

March 2014.

2120.    Rekenthaler spoke to CW-2 of Rising on December 5, 2013 for fourteen (14)

minutes. When Patel sent her initial list of "Increase Potentials" to K.G. on January 14, 2014,

Diflunisal was on the list, with Teva expecting to lead the increase.

2121.    Teva and Rising continued to coordinate the increase over the next several months. For example, when Patel sent a nearly final list of "PI Candidates" to her supervisor K.G. on March 17, 2014, she included the following notation about Diflunisal:

| Diflunisal | Shared only with Rising |
|---|---|

2122.    That same day, Rekenthaler spoke with CW-2 twice. During those calls, CW-2 informed Rekenthaler that Rising was having supply problems for Diflunisal and might be exiting the market at some point in the future. CW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

2123.    Rekenthaler and CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal. On April 4, 2014, Teva increased is WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182% for certain customers.

2124.    Rising ultimately exited the Diflunisal market for a short period of time starting in mid-July 2014. When Rising decided to exit the market, CW-2 called Rekenthaler to let him know. Four months later – when Rising's supply problems were cured – Rising re- entered the market for Diflunisal. Consistent with the fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, CW-2 and Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014. On December 3, 2014, Rising re-entered the market for Diflunisal tablets. Its new pricing exactly matched Teva's WAC price increase from April 2014.

g.      **Ethosuximide**

2125.    On the April 4, 2014 Teva price increase list, VersaPharm was a competitor on two different drugs: Ethosuximide capsules and Ethosuximide oral solution.

REDACTED – PUBLIC VERSION

2126.    When Patel began creating the price increase list, neither of these drugs was considered a candidate for an increase. For example, when Patel sent her initial "Increase Potentials" list to K.G. in mid-January 2014, neither drug was on the list.

2127.    VersaPharm was not considered a high-quality competitor. When Patel created the quality competitor rankings in May 2013, VersaPharm was given a -2 score in the rankings. That did not stop Rekenthaler, however, from calling J.J., a senior national account executive at VersaPharm, and speaking for five (5) minutes on January 22, 2014. When Patel sent the next "PI Candidate" list to a colleague on February 26, 2014 – Ethosuximide capsules and oral solution were both on the list, with the following notation:

| Ethosuximide Liquid | Shared only with Versa; test quality of competitor |
| Ethosuximide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE |

2128.    Rekenthaler called again and spoke with J.J. at VersaPharm on March 7, 2014. Teva then raised prices on both drugs on April 4, 2014. For Ethosuximide capsules, Teva raised is WAC price by 87%, and its contract prices by up to 322%. For Ethosuximide oral solution, Teva raised its WAC price by 20% and its contract prices by up to 81%.

2129.    On April 9, 2014 – only five days after the Teva increase – VersaPharm increased its pricing on both Ethosuximide capsules and oral solution to a nearly identical price to Teva.

2130.    Following their agreement on those two drugs, and with no reason to speak further, Rekenthaler and J.J. of VersaPharm never spoke by phone again.

**11.    Impact of April 4, 2014 Price Increases to Teva**

2131.    A few weeks after Teva's April 4, 2014 price increases went into effect, Patel calculated the impact to Teva's net sales as a result of the April 4 increase. Based on her analysis, she found that the April 4, 2014 price increases resulted in a net increase in sales to Teva of $214,214,338 per year.

REDACTED – PUBLIC VERSION

2132.   For those drugs where Teva was leading the price increases on August 28, 2014, several of Teva's competitors followed in short order and those price increases were also coordinated.

2133.   For example, on October 10, 2014 Sandoz followed Teva's price increases on three drugs: (1) Amoxicillin/ Clavulanate chewable tablets; (2) Diclofenac Potassium tablets; and (3) Penicillin VK tablets. Patel of Teva spoke to CW-1 (Sandoz) on the day of the Sandoz price increases for more than three (3) minutes.

2134.   Then, on December 19, 2014, Actavis followed the Teva price increase on Desmopressin Acetate tablets. Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21, and November 25, 2014.

2135.   Indeed, even before Actavis followed the Teva price increase, Teva knew that Actavis planned to increase. For example, on October 15, 2014 – approximately six weeks before Actavis raised its price – Teva received a request from a customer asking Teva to reduce its pricing on Desmopressin Acetate because it was no longer offering competitive prices. Patel's initial response to the customer was "[w]e believe the market is still settling on this product. Can you please review in a few days and advise of more current pricing intelligence?" In a subsequent internal discussion, Patel wrote: "I can't quite recall if Actavis followed us or we followed them….but they definitely did not change their WACs recently."

2136.   Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac Potassium tablets. Rekenthaler coordinated that price increase with Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

### 12.    August 28, 2014 Price Increases

2137.    On August 28, 2014, Teva raised prices on a number of different drugs, including those set forth below:

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (34%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (5.9%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (5.2%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (5.4%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (43%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (5.2%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33%); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 32% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Clava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (5.7%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

2138.    In the days and weeks leading up to the price increase, Patel and Rekenthaler were communicating with every high-quality competitor on those drugs to coordinate the increases in advance. At least some of those communications are set forth in the graphic at page 250 of the State AG Complaint No. 2.

2139.    The day before the increase became effective – August 27, 2014 – Patel spent most of her morning discussing the price increases with her contacts at Sandoz, Actavis, Taro, Zydus, and Glenmark:

REDACTED – PUBLIC VERSION

.

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

2140.   In addition to those phone communications noted above, representatives from Teva and almost every other Defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year. Cavanaugh, Rekenthaler, and Patel, along with many other Teva executives, as well as executives from every other corporate Defendant, attended.

a.      **Enalapril Maleate**

2141.   With regard to Enalapril Maleate, Patel was speaking to Aprahamian at Taro as shown above. Aprahamian, in turn, spoke to M.C., the Vice President of Sales and Marketing at Wockhardt, on August 8, 2014 for thirteen (13) minutes, and again twice on August 14, 2014, including one call lasting eight (8) minutes.

b.      **Prochlorperazine**

2142.   Similarly, with regard to Prochlorperazine, Rekenthaler communicated with Nesta at Mylan on August 7 and August 11, as shown above. Nesta, in turn, communicated with M.D., a senior sales executive at Cadista, on the same days that he had been communicating with Rekenthaler.

2143.   A large number of the drugs on Teva's August 28, 2014 price increase list were selected because Teva was following a "high quality" competitor. The coordination between Teva and certain co-conspirators regarding those drugs is discussed more fully below.

### c.   Mylan

2144.   Effective April 17, 2014, Mylan increased its WAC pricing on a number of different drugs, including several that overlapped with Teva. Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

2145.   Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases. On April 21, 2014, T.S., a national account executive at Teva, forwarded to Patel two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan. The spreadsheets were created by Mylan personnel.

2146.   Patel, in turn, forwarded the e-mail to the Teva sales team and stated: "Our intention is to follow Mylan on this increase. Below, you will see the list of increase items where Teva overlaps with Mylan. Please share any pricing intelligence you are able to obtain. Thank you in advance!" The list that Patel referred to included the following products, several of which had been the subject of coordinated price increases in 2013 as well: Amiloride HCL/HCTZ tablets; Cimetidine tablets; Enalapril Maleate tablets; Fluvastatin Sodium capsules; Loperamide HCL capsules; Prazosin HCL capsules; and Sotalol HCL tablets.

2147.   Within days, Teva began receiving requests from its customers for bids due to the Mylan price increases. On April 24, 2014, Patel began to formulate a "Mylan Increase Strategy" in order to respond to those requests but noted that Teva was "still awaiting intel" about the Mylan customer contract price points, which were not publicly available. Previously, Patel had relied on Green to obtain specific Mylan customer price points (referred to as "intel") through his

communications with Nesta of Mylan, which she used to follow Mylan's pricing. The next day, in a follow-up e-mail about the Mylan strategy, Patel noted that one of her Mylan increase strategies would not have been appropriate for this situation, and concluded that: "Plus, we really need some intel" about the Mylan contract price points.

2148.    Patel continued to push for specific contract price points from Mylan. On April 28, 2014, Patel sent an e-mail to the Teva sales team, stating: "To date, we have no intel on Mylan's recent increases. I realize there is a lot of travel going on, but whatever you can gather and share would be greatly appreciated."

2149.    On May 9, 2014, Patel sent another e-mail:



From:     Nisha Patel02
Sent:     Fri 5/09/2014 9:55 AM (GMT-05:00)
To:
Cc:       Dave Rekenthaler;
Bcc:
Subject: Mylan Increase Intel


NAMs,


Sorry to be so persistent, but we have not received any Mylan price increase intelligence yet. Whatever you can gather and provide would be greatly appreciated.  Our intention is to become better, quicker followers, but without intel, we are unable to do so.


In fact, I cannot see Teva being able to follow in the next round of mass price changes (without any price points) at this point. Of course we can always follow by guessing, but it could cause needless price disruption in the market.


Please send any intel to me and Tom.

2150.    Shortly after receiving that e-mail – at 11:15am that morning –Rekenthaler called Nesta (Mylan) and left a message. Nesta returned the call at 11:23am, and the two spoke for nearly eight (8) minutes.

2151.    Separately, and before Rekenthaler was able to convey any information he had obtained, Patel forwarded a customer request from ABC (relating to the Mylan increase items) directly to T.S. (Teva), lamenting the absence of Green to obtain the Mylan intel:

> I am in a really tough spot on these. Please help! There are several requests open for offers, but I have ZERO intel. A little frustrating/discouraging, as we are bound to hear complaints on how long it took to close the Delphi request. Is there anything you are able to get to help when you are back? . . . At some point, I know I'll have to find another source of magic :))

2152.    The next day, T.S. sent Patel an e-mail with an attached spreadsheet listing the Mylan contract price points for all of the recent increases:

| From: | ▮▮▮▮▮▮▮▮▮ |
|---|---|
| Sent: | Tue 5/13/2014 1:34 PM (GMT-05:00) |
| To: | Nisha Patel02 |
| Cc: | |
| Bcc: | |
| Subject: | FW: Dirt |
| Attachments: | Mylan-Price List A.xlsx |

FYI

2153.    The e-mail was unclear on where T.S. had obtained this "dirt," but the spreadsheet attached to her e-mail was created by a Mylan employee.

2154.    Rekenthaler and Nesta spoke again on May 20, 2014. Armed with this new source of "intel," Patel was more confident that Teva could follow the Mylan price increases exactly, without disrupting the market. That same day, as Patel began to create a new list of Teva price increase candidates, she instructed a colleague to include the Mylan increase drugs – with specific price points – as its own separate tab in the spreadsheet, called "follow." Her colleague provided the list, as requested, on May 21.

2155.    On May 27, 2014, Rekenthaler and Nesta spoke twice, including one call lasting nearly four (4) minutes. By May 28, Teva had a much more comprehensive list of price increase items. On that list, seven of the Mylan items were prominently listed with a "Follow Urgent" notation listed next to each:

REDACTED – PUBLIC VERSION

| Item Description | BUCKET | Comments |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 100 | Follow/Urgent | Follow Mylan Increase |
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 1000 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 800MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 5000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 1000 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 500 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 1000 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 2MG 1000 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 250 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 500 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 80MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 120MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 160MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 240MG 100 | Follow/Urgent | Follow Mylan Increase |

2156.   Also on the list were three additional Mylan drugs for which Teva would be leading the price increase: Diclofenac Potassium tablets; Flurbiprofen tablets; and Prochlorperazine tablets.

2157.   With the list firmly squared away at the end of May, Rekenthaler and Nesta had no need to speak again until August, when Teva was preparing to implement the price increases. In the weeks leading up to the August 28, 2014 Teva price increases, Rekenthaler and Nesta spoke several times to coordinate, including at least the calls set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/7/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:02:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:13:00 |
| 8/21/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:06:00 |

### d. **Taro**

2158.   Taro also significantly raised its prices on the following drugs which overlapped with Teva: Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, and Warfarin Sodium tablets.

2159.   Patel learned of the prices increases for certain of these drugs in advance, based on her conversations with Aprahamian. It was understood that Teva would follow the Taro price increases based on these and prior conversations. In fact, Teva agreed and made plans to follow them before Taro had even put them into effect.

2160.   Specifically, on May 28, 2014, T.S. (Teva) sent Patel the then-current version of her "Future Price Increase Candidate" spreadsheet. That list included the following Taro drugs, which had not yet been increased by Taro:

| Item Description | BUCKET |
|------------------|--------|
| CARBAMAZEPINE TABLETS 200MG 100 | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | Follow/Urgent |

2161.   Patel likely obtained this information from Aprahamian on May 14, 2014, when the two exchanged eight (8) text messages and spoke for more than four (4) minutes by phone.

2162.   On June 3, 2014 – the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin Sodium and other drugs –Patel and Aprahamian exchanged five (5) text messages. After exchanging those text messages, Patel confirmed to her supervisor K.G. and another Teva representative that Taro had in fact raised its pricing on Fluocinonide. Patel then added: "I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is a high-quality competitor. It's just a matter of who the others are.)" At 5:08pm that evening, Patel called Aprahamian and the two spoke for nearly seven (7) minutes.

2163.   First thing the next morning, Patel and Aprahamian exchanged two (2) text messages. Then, at 9:56am, the two spoke again for almost twenty-six (26) minutes. Shortly after hanging up the phone with Aprahamian, Patel sent an e-mail to K.G. making it clear that she had obtained additional "intel" regarding the Taro price increases that she did not want to put into writing, stating: "I have additional intel (I can discuss with you) that will be useful."

2164.   On June 12, 2014, Teva internally discussed future projections regarding Carbamazepine – including the fact that its API supplier might run out of supply sometime in 2015. One of the options discussed was a price increase. K.G. – aware that Patel had been in discussions with Aprahamian and had "intel" regarding the Taro price increase on Carbamazepine (and other drugs) – stated: "Nisha [Patel] would be able to provide guidance relative to [the Carbamazepine] price increase for the analysis being put together." In fact, Patel had communicated with Aprahamian earlier that same day for more than nine (9) minutes.

2165.   One of the drugs that Taro increased on June 3, 2014 was Warfarin Sodium tablets.

2166.   As of June 2014, there were three competitors in the market for Warfarin Sodium: Teva, Taro, and Zydus. Ten days after Taro increased its price, Zydus quickly followed with a price increase of its own on June 13, 2014. In the days between the Taro and Zydus price increases for

Warfarin Sodium, Teva, Taro, and Zydus coordinated through various phone communications with each other, including at least the following:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/4/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:11:28 | 0:00:00 |
| 6/4/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 9:16:52 | 0:00:00 |
| 6/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:56:52 | 0:25:57 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/12/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:57:50 | 0:09:18 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

2167.   On June 13, 2014 - the date of the Zydus increase on Warfarin Sodium – Teva was presented with an offer from a customer for a one-time buy on that drug. Patel responded that "[w]e will review, but note that we intend to follow [the] Taro and Zydus increase price." Later that same day, Patel sent an internal e-mail alerting her group, including her supervisor K.G., about a list of drugs on which Teva planned to raise prices. A number of them - including Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, Fluocinonide cream, emollient cream, gel and ointment, and Warfarin Sodium tablets - included the notation "Follow/Urgent - Taro" as the reason for the increase. For that list of drugs, Patel directed that "we should not provide any decreases on these products." Patel's directive meant that Teva would not seek to compete for market share against Taro or Zydus when approached by customers due to those competitors' price increases.

2168.   On June 18, 2014, Patel sent that same list to the entire sales team at Teva, informing them of the status of Teva's next price increase. She noted that Teva had already been "receiving multiple requests on several items that are prioritized as increase candidates." Patel continued: "While we do not have an exact date of increase, we are taking our increase plans into consideration and are bidding on new business at the planned increase price where our WAC allows." Finally, Patel stated:

> This is all in consideration of market factors, quality of competitors, current market share (including McK RFP results) and intelligence we have been able to gather. As you know, each situation is unique, but this should provide a high level overview.

2169.   Some of the "intelligence" referred to by Patel was gathered during a phone conversation she had with Aprahamian (Taro) the day before, on June 17, 2014, which lasted more than fifteen (15) minutes.

2170.   The next day, Patel continued to gather "intelligence" and made concerted efforts to simultaneously coordinate with both Aprahamian (Taro) and Green (Zydus). The timing and duration of those phone calls is set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

2171.   On August 28, 2014, Teva followed the Taro price increases on Carbamazepine chewable tablets, Carbamazepine tablets, Clotrimazole topical solution, and Warfarin Sodium tablets. As discussed more fully above, Teva coordinated those increases with Taro (and Zydus) through direct communications with those competitors in the days leading up to the increase.

e.      **Zydus**

2172.   In addition to their agreement on Warfarin Sodium, Teva also agreed with Zydus to raise the price of Topiramate Sprinkle capsules.

2173.   As of June 2014, Zydus and Teva had a large majority of the market share for Topiramate Sprinkle, while Actavis had just 3% of the market.

2174.    In April 2014, Zydus raised its price for Topiramate Sprinkle capsules. Patel was in frequent communication with Green at the time of the Zydus price increase.

2175.    In the days leading up to the June 13 Zydus price increase on Warfarin Sodium, which is discussed more fully above, Green coordinated with both Patel and Rekenthaler at Teva, as set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/2/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 9:33:00 | 0:02:00 |
| 6/2/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 11:25:26 | 0:05:48 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

2176.    Green was likely speaking to Patel and Rekenthaler about both Warfarin and Topiramate Sprinkle capsules during those calls because on June 13 - the same day the Zydus price increase on Warfarin Sodium became effective, and after the conversations noted above - Patel added Topiramate Sprinkle capsules to Teva's price increase list, with a notation: "Follow/Urgent - Zydus." Two days before that - the same day that Green had extensive phone calls with both Rekenthaler and Patel - Rekenthaler also spoke twice with Falkin of Actavis, the only other competitor in the market for Topiramate Sprinkle capsules.

2177.    Teva followed the Zydus price increase for Topiramate Sprinkle capsules on August 28, 2014. As noted above, Teva coordinated that increase with both Zydus and Actavis in the days and weeks before it.

### 13.    January 28, 2015 Price Increases

2178.    Shortly after the August 28, 2014 Teva price increases, Patel accepted a new position at Teva. She left her position in the pricing department to take on the role of Director of National Accounts at Teva. Her new position meant new responsibilities, necessitating more frequent travel

to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

2179.   When Patel left the pricing department at Teva her position was not re- filled. K.G., Patel's former supervisor, assumed her role and became the executive responsible for identifying price increase candidates and implementing price increases.

2180.   On January 28, 2015, Teva raised prices on a number of different drugs. Teva's price increase spreadsheet – now maintained by K.G. at Teva, identified the following drugs, among others, along with the price increase strategy and reasons for the increase:

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor -Amneal | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 193% Increase | Follow Competitor -DRL & Actavis | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead -Semi -Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead -Semi -Exclusive | Actavis (12.3%); Mylan (8.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor -DRL | Dr. Reddy's (34%); Accord (17%); INT labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor -Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead -Limited Competition | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 90% Increase | Lead -Semi -Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead -Semi -Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead- Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor - Actavis | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

2181.   Patel and Rekenthaler communicated with a number of Teva's significant competitors about these drugs in the days and weeks leading up to January 28, 2015. The relevant phone communications between Teva and several of its competitors related to these drugs are set forth in the chart at page 264 of the State AG Complaint No. 2.

2182.   Upon information and belief, Patel also spoke in-person with many of these competitors. For example, in her new role as a Director of National Accounts, Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15: NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis, MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29, 2014); and the HDMA Round

Table, Washington, DC (January 8, 2015). These industry events were all well-attended by Teva's competitors.

2183.    Some specific examples of Teva's coordination with competitors regarding its January 28, 2015 price increases are set forth below.

a.    **Ciprofloxacin HCL and Glimepiride**

2184.    Dr. Reddy's significantly increased its pricing on both Ciprofloxacin HCL and Glimepiride on August 18, 2014. The increases to the Ciprofloxacin HCL WAC were 201% - 533% depending on the dosage strength. The increases to the Glimepiride WAC were approximately 300% for all dosage strengths.

2185.    In the days and weeks leading up to the Dr. Reddy's price increases for Ciprofloxacin HCL and Glimepiride, V.B., a senior sales executive at Dr. Reddy's, spoke frequently with Patel about the planned price increases. At least some of those phone communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 13:28:12 | 0:12:14 |
| 7/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 16:20:45 | 0:00:10 |
| 7/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:51:53 | 0:04:14 |
| 7/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:19:44 | 0:06:33 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 10:31:30 | 0:00:04 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 10:40:28 | 0:04:03 |

2186.    V.B. continued to communicate with Patel after the Dr. Reddy's price increases became effective, in the hope that Teva would quickly follow with its own price increases. The two exchanged four (4) text messages on August 25, 2014 - only three days before Teva's substantial price increase on August 28, 2014 (discussed above).

2187.    Despite Dr. Reddy's best efforts, Teva was unable to add Ciprofloxacin HCL or Glimepiride to its August 28 price increase. On the same day that Teva sent its price increase notices

out to its customers, T.W., a senior account executive at Dr. Reddy's, obtained a complete list of

Teva's price increases (including a number of drugs not sold by Dr. Reddy's). Although unclear how

T.W. obtained this information, the subject line of the e-mail clearly identified the information as

"Confidential Teva increases." In her message to several other Dr. Reddy's colleagues, T.W. stated

that Teva initiated price increases, but did not include glimepiride:

> On Aug 28, 2014, at 4:11 PM, ██████████████████ > wrote:
>
> Hi All,
> Teva had price increases today.  No glimepiride though!
> See products below.
> Thanks,
> ████

2188.   J.M., a senior marketing executive at Dr. Reddy's, replied: "Thanks for sending. This

was shown in the pricing compendium today. I was a little disappointed. However, some of the price

increase[s] were led by other companies more than a month ago. So I am still hopeful they may

follow." Dr. Reddy's anticipated that Teva would follow its price increases based on the

understanding that had been reached between V.B. and Patel during their various conversations.

2189.   In fact, Teva did follow the Dr. Reddy's price increases – on both Ciprofloxacin

HCL and Glimepiride – during its next round of price increases on January 28, 2015. In the interim,

V.B. and Patel continued to communicate, exchanging four (4) text messages on October 10, 2014.

2190.   Actavis – the only other quality competitor in the market for Ciprofloxacin HCL –

increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing.

In the days leading up to the Actavis price increase, Rekenthaler (Teva) spoke to Falkin (Actavis)

several times to coordinate the increase, including twice on December 17 (including one call lasting

nearly nine (9) minutes) and once on December 18, 2014.

2191.   When Teva did follow the Dr. Reddy's (and Actavis) price increases on

Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr.

Reddy's WAC prices exactly. That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase list. That list included many drugs that Dr. Reddy's did not market.

<strong>b.  Griseofulvin Microsize Oral Suspension</strong>

2192.   Throughout 2013, Rising had a virtual monopoly on the Griseofulvin tablet market, with Valeant Pharmaceuticals maintaining only a small percentage of the share. On October 1 2013, Sandoz began planning its launch into the tablet market. On October 1 and October 2, CW-2 of Rising exchanged several calls with CW-3 and Luis Jorge, a Sandoz sales executive, during which they discussed pricing for Griseofulvin and the allocation of market share to the new entrant, Sandoz. So that Sandoz could get its fair share, Rising ultimately agreed to concede Cardinal, CVS, McKesson, and Wal-Mart. After Rising conceded the Cardinal account in late November, CW-2 and CW-3 spoke again Sandoz confirmed that it would not seek additional share.

2193.   On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin microsize oral suspension. In the days leading up to September 9, 2014, Patel and Rekenthaler of Teva communicated with Falkin and Rogerson of Actavis to coordinate the increase. Some of those calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:15:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:21:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:05:00 |
| 9/9/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:04:32 |

2194.   The Actavis price increase for Griseofulvin became effective on October 6, 2014.

2195.   Teva promptly added Griseofulvin to its own price increase list, with the notation "Follow Competitor- Actavis" as the reason for the price increase.

2196.   Teva followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015. As discussed above, in the days leading up to that price increase Rekenthaler of Teva and Falkin of Actavis coordinated frequently. Teva's price increase for Griseofulvin microsize oral suspension matched Actavis' WAC pricing exactly.

2197.   Additionally, Sandoz and Rising coordinated a price increase on Griseofulvin tablets at the same time as Teva and Actavis were coordinating the increase on the suspension formulation. Rising increased its prices in October 2014, and CW-2 communicated this to CW-3. Although Sandoz did not follow the price increase until August 2015 due to price protection penalties in certain contracts, it complied with the fair share agreement and did not take market share from Rising after it announced the price increase.

### C.   Competitors Become "High Quality" After Successfully Colluding With Teva

#### 1.   Apotex

2198.   Apotex was one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. When Patel updated her Quality Competitor rankings in May 2014, however, Apotex was rated +2 – an increase in five points over that twelve-month period.

2199.   Apotex made this jump in Teva's quality competitor rankings in large part due to Patel's relationship with B.H., a sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate, the latter of which is discussed above.

2200.   Teva increased its pricing on Doxazosin Mesylate in August 2013. Teva's new, increased price (a 1,053% increase) matched Apotex's (and Mylan's) recent price increases. Apotex itself had increased the price of this drug on July 23, 2013. B.H. of Apotex and Patel of Teva had

one conversation the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

2201.   Apotex soared dramatically in the quality competitor rankings for one additional reason: in April 2013, Apotex hired J.H. as a senior executive. Rekenthaler (Teva) and J.H. began communicating regularly after J.H. was hired by Apotex. There is no record that they had ever communicated by phone before that.

2202.   That relationship continued through 2014. On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69%. Despite the fact that Apotex was the market leader at that time, Teva chose to lead the price increase on Pentoxifylline. In the weeks leading up to Teva's price increase, Rekenthaler (Teva) engaged in numerous communications with J.H. (Apotex). The two spoke twice on March 7, 2014, for two (2) and three (3) minutes, respectively. They spoke again on March 20 for four (4) minutes, and again on March 25 for two (2) minutes. A week after Teva increased its price – on April 11, 2014 – they spoke again for five (5) minutes. During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to Patel.

2203.   As a result of Patel and Rekenthaler's successful coordination with Apotex executives, Patel dramatically increased Apotex's quality competitor ranking in May 2014.

## 2.   Zydus

2204.   Zydus – like Apotex – had been one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. But, when Patel updated her quality competitor rankings in May 2014, Zydus was rated +2, an increase in five points over a twelve-month period. While Apotex's increase in the ranking was due to Teva's successful collusion with Apotex on several price increases in 2013 and 2014, Zydus' increase was more personnel-oriented: Green, who had himself conspired with a number of competitors while at Teva (at the direction of and in coordination with Patel and

Rekenthaler at Teva, among others) moved from Teva to Zydus in November 2013. With Green firmly installed at Zydus, Patel was emboldened to more fully include Zydus in the conspiracy.

2205.    Patel's confidence was well-founded. In the year after Green joined Zydus, the two companies successfully conspired to divide markets and allocate customers relating to Zydus' entry into the market for multiple drugs, including: Fenofibrate (February – March 2014), Paricalcitol (March – April 2014), Niacin ER (May – June 2014), and Etodolac ER (May – July 2014). These agreements are discussed more fully above.

2206.    Teva and Zydus also agreed to increase prices on Topiramate Sprinkles and Warfarin Sodium tablets. Zydus increased the price for both of those drugs on June 13, 2014. Teva followed with an increase on both drugs on August 28, 2014. With respect to the Topiramate Sprinkles, Teva was explicit in its internal communications that its increase was to "follow competitor," namely Zydus.

2207.    In the days leading up to both companies' price increases, Green and Patel communicated frequently to coordinate the price increases. On June 19, 2014 – four days before Zydus increased its prices –Green and Patel spoke four (4) times. And on August 27, 2014 – the day before Teva raised its prices – Green and Patel spoke three (3) times.

2208.    Green was also communicating frequently with Rekenthaler of Teva around the time of the price increases on Topiramate Sprinkles and Warfarin Sodium tablets. On June 11, 2014, the two men spoke for eight (8) minutes. On August 20, the two exchanged an additional pair of phone calls.

2209.    Patel and Rekenthaler did not communicate with Green in isolation. The two Teva executives made sure to keep each other apprised of their conversations with competitors, including Green. In early 2014, Patel and Rekenthaler both worked largely out of Teva's home office. After

either one of them engaged in a phone call with a competitor, he or she would be sure to provide an in-person debrief of the communication so as to avoid putting such information in writing.

2210.   Even before Green joined Zydus in November 2013, Teva did have success in coordinating price increases with Zydus with respect to Pravastatin.

### 3.   Heritage

2211.   Heritage, like Apotex and Zydus, was not a highly-ranked competitor when Patel first created the quality of competitor ranking list in May 2013. Initially, Patel gave Heritage a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Heritage received the highest possible ranking of +3.

2212.   The reason for Heritage's significant improvement in Patel's quality competitor rankings was the relationship that Patel established with the Vice President of Heritage, Malek. After moving to Teva, Patel began communicating with Malek by phone as early as July 9, 2013. From that date until July 25, 2014, the two spoke by phone at least thirty-seven (37) times.

2213.   Heritage's successful effort to coordinate price increases with Teva and other conspirators on four drugs – Acetazolamide, Leflunomide, Nystatin, and Theophylline. Heritage's efforts to coordinate price increases with Teva and other conspirators on Albuterol Sulfate, Fosinopril HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Meprobamate, Metronidazole, Nimodipine, Paromomycin, and Zoledronic Acid are described more fully, below.

2214.   In early 2014, Malek (Heritage) held a meeting with Heritage pricing executives, Keith Fleming, Associate Director of Pricing and Contracts, and Daniel Lukasiewicz, Heritage's Senior Manager, Marketing Operations, to ask them to begin analyzing the impact of numerous planned price increases.

2215.   On April 15, 2014, Malek (Heritage) called Patel to discuss price increases on Glipizide-Metformin, Glyburide, Glyburide-Metformin, and others. On their 17-minute

conversation, Patel agreed that if Heritage increased the prices for those drugs, Teva would either follow or not challenge Heritage's price increases by underbidding.

2216.   Because Teva was already planning a price increase on Nystatin and Theophylline ER, Malek (Heritage) and Patel agreed Teva would take the lead on those increases. In subsequent months, Malek (Heritage) and Patel spoke several more times on the price increases and timing.

2217.   On April 22, 2014, Heritage held a "Price Increase Discussion" teleconference in which Malek (Heritage) identified 18 drugs that Heritage would target for increase. Prior to the call, Malek (Heritage) circulated to his sales team a spreadsheet ("the Heritage list") which listed each drug, the competitors, and their respective market share. The Heritage list included Fosinopril HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Meprobamate, Methimazole, Nimodipine, and Paromomycin, among others. Malek (Heritage) instructed members of the team to immediately reach out to contacts at each competitor for the drugs on the list and attempt to reach agreement on price increases. Different Heritage employees were identified as being primarily responsible for communication with different competitors.

2218.   The Heritage sales team promptly began to contact their competitors. For example, Sather (Heritage) communicated with three counterparts at different competitors, reaching agreements with all of them to increase prices. First, she spoke with Sun Senior Sales Manager, Susan Knoblauch for forty-five (45) minutes and agreed to increase prices for Paromomycin. Then, she spoke to Michael Dorsey, a National Account Manager at Actavis for nine (9) minutes, which led to an agreement to increase prices for Glipizide-Metformin.

2219.   Neal O'Mara (Heritage) also reached an agreement on April 23 with his Mylan counterpart, Michael Aigner, Director of National Accounts, to increase the price of Glipizide-Metformin, among others. O'Mara (Heritage) summarized in an e-mail to Malek (Heritage) and Sather (Heritage) titled "Mylan": "Just let me know a day before we price adjust on the three Mylan

products and they will put the word out to the reps to leave us alone. They are looking at price increases as well on a number of products." O'Mara was also responsible for communicating with Heritage's Methimazole competitor Par on pricing.

2220.   A few days later, Malek (Heritage) sent an e-mail to Lukasiewicz (Heritage), titled "bindo" referring to Aurobindo stating: "Let me know when you speak with [Paul McMahon, Senior Director of Commercial Operations at Aurobindo.]" On the Heritage list, Lukasiewicz (Heritage) was charged with responsibility for communication on Fosinopril–HCTZ, on which Aurobindo was a competitor. Aurobindo was also a competitor with Heritage on Glyburide and Glyburide-Metformin. Lukasiewicz (Heritage) exchanged numerous voice mails with McMahon (Aurobindo) on April 28 and 29, 2014.

2221.   In addition to Teva, Malek (Heritage) took responsibility for reaching out to Ascend regarding Nimodipine. Following the market-wide "fair share" agreement, as a new entrant into the Nimodipine market, Ascend agreed to enter at a high price to avoid price erosion. In exchange, Heritage agreed to walk away from certain accounts Ascend targeted to help increase Ascend's market share.

2222.   On May 8, 2014, Malek (Heritage) sent an e-mail to the Heritage sales team stating:

> Two weeks back we had a teleconference regarding 13 [sic] products where the pricing dynamics may change.
>
> We each had takeaways, can everyone confirm or not who they have/not spoken with since our call?
>
> Need to move forward with the plan asap.

2223.   Heritage's Matt Edelson, Senior Director of Sales, and directly responsible for Heritage's Humana business, responded immediately "Spoke with everyone and waiting in [sic] feedback on Mepro[bamate]." Malek (Heritage) tasked Edelson (Heritage) with communication with

Dr. Reddy's on Meprobamate. He exchanged six text messages with Austin (Dr. Reddy's) on April 24, 2014, and then spoke with Austin (Dr. Reddy's) on May 6, 2014.

2224.   Sather (Heritage) responded: "Jason, I made contact with all my take aways – with positive results. I can resend those notes or talk with you on any details." Sather (Heritage) had been tasked with communicating with Actavis on Glyburide-Metformin and Sun on Paromomycin, among others.

2225.   Also on May 8, 2014, Lukasiewicz (Heritage) and McMahon (Aurobindo) held a sixteen (16) minute phone call and then an eighteen (18) minute phone call on June 25, 2014. They spoke again for over three (3) minutes on July 7, 2014.

2226.   On May 9, 2014, Heritage held another teleconference to discuss price hikes during which the sales team shared their results in forming agreements with competitors.

2227.   On June 23, 2014, Heritage employees had a "Price Change Call" to discuss the percentage amounts by which they would seek to increase the pricing of certain drugs, including drugs for which they had already obtained agreement from all competitors (or potential future competitors), and the strategies for achieving this goal. The drugs discussed on the call included Paromomycin (100% increase); Glyburide (200% increase); and Nimodipine (48% increase).

2228.   Two days later, on June 25, 2014, Malek (Heritage) spoke with Patel and informed her that Heritage would be increasing prices for a number of drugs that Teva was a competitor for.

2229.   On June 26, 2014, Sather (Heritage) sent a text message to a large wholesaler customer stating:

> "As of 7/1 [m]arket wide we are increasing prices on Paromomycin, Nimodipine, Acetazolamide ER, Fosi/HCTS, Glip/Met, Glyburide and Theophylline ER. You will see only the Paro and Nimo increases – you have those letters."

2230.   On July 1, 2014, Malek (Heritage) e-mailed Heritages sales team:

Team:

REDACTED – PUBLIC VERSION

Looks like you are making good traction with our July 1 price increase.

Going forward, send a summary to [K.F.] and me at each cob of who is not yet signed with a status and plan.

Please send each day until further notice or until all or [sic] accounted for.

Any questions please call me directly.

2231.   In the following weeks Heritage employees continued to reach out to their competitors to obtain additional agreements to raise prices. Heritage was ultimately able to increase prices on at least Fosinopril-HCTZ, Glipizide-Metformin, Glyburide, and Nimodipine, as well as others.

2232.   Sather (Heritage) quickly followed up: "Here are the approximate/average $ increases on the other items: Acetazolamide 75% increase, Fosi/HCTS 200%, Glip/Met 100%, Glyburide 200%, Theo ER…150%."

2233.   Additional allegations as to other Subject Drugs, most of which involve Heritage, are set forth below.

a.   **Albuterol Sulfate**

2234.   At all relevant times, Mylan and Sun dominated the market for Albuterol Sulfate.

2235.   Prior to 2013, the effective prices for Albuterol Sulfate were stable.

2236.   Beginning in March 2013, the average NADAC price for Albuterol Sulfate rose dramatically.

2237.   For example, Mylan's 100ct Albuterol Sulfate 2mg increased price by over 4,300% from $.13 to $5.88 on March 6, 2013. Sun's 100ct Albuterol Sulfate 2mg increased 3,400% from $.13 to $4.70 on April 15, 2013, as illustrated by WAC data. These price increases effected multiple doses of Albuterol Sulfate.

| Product 2MG | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
| --- | --- | --- | --- | --- | --- |

| 100 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,317% |
| 500 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,549% |
| 100 ct | Sun | $0.13 | $4.70 | April 15, 2013 | 3,485% |
| 500 ct | Sun | $0.12 | $4.70 | April 15, 2013 | 3,674% |

### b.   Fosinopril HCTZ

2238.   At all relevant times, Heritage, Aurobindo, Citron, Sandoz, and Glenmark dominated and continue to dominate the market for Fosinopril HCTZ. By April 2014, Heritage had a 47% market share for Fosinopril HCTZ.

2239.   On May 2, 2014, Edelson (Heritage) contacted Glenmark's Vice President of Sales, Jim Brown via LinkedIn. Lukasiewicz (Heritage) spoke with McMahon (Aurobindo) on May 8, 2014 via phone. That same day, McMahon (Aurobindo) called Glenmark's Executive Vice President of Generics, James Grauso, and they spoke on the phone. On May 9, 2014, Aurobindo's Tim Gustafson spoke with Glenmark's Director of Sales and Marketing, Jeff Johnson. All of these calls were regarding price increases for Fosinopril HCTZ.

2240.   That same day, Heritage held another internal call regarding price increases where Fosinopril HCTZ was on the agenda. Within one month, Sather (Heritage) spoke to Aurobindo and Sandoz representatives about the Heritage "price increase strategies" for Fosinopril HCTZ and other generics during an MMCAP conference.

2241.   After in-person meetings with Gustafson (Aurobindo) and Christopher Bihari (a Sandoz Director of National Accounts) on May 14, Sather (Heritage) confirmed to Malek that the three were of "similar like minding on the pricing strategies we discussed." The next day, representatives of Aurobindo and Sandoz spoke numerous times.

2242.    On June 3, 2014, Sather (Heritage) texted Bihari (Sandoz) and invited him to meet with a group of competitors at the Sandbar Restaurant while at an HDMA conference in Phoenix. This initiated a series of communications during the summer of 2014 that included three calls between Gustafson (Aurobindo) and Bihari (Sandoz) and five calls, and multiple texts, between Gustafson (Aurobindo) and Johnson (Glenmark). Gustafson (Aurobindo) would have one final call with Johnson (Glenmark) on August 26, 2014, before going radio silent until April 8, 2015.

2243.    Lukasiewicz (Heritage) and McMahon (Aurobindo) spoke on June 25, 2014 via phone, and again on July 7, 2014.

2244.    On June 25, 2014, Sather (Heritage) texted Citron's Kaitlin Alexander to find out if Citron was entering the market for Glyburide but found out that Citron was actually entering the market for both Glyburide and Fosinopril HCTZ. Sather (Heritage) informed Alexander (Citron) of the pricing scheme. Then, on July 1, Citron's Executive Vice President of Sales & Marketing, Karen Strelau called Lukasiewicz (Heritage), informing him that she had been "looped" in on the pricing plan and that Heritage employees should not contact Citron employees via e-mail. Strelau (Citron) also told Lukasiewicz (Heritage) that Sather (Heritage) should communicate through Citron's Vice President of Sales, Laura Short, if she had sensitive information about Fosinopril HCTZ or other price increases. The following day, Short (Citron) and Sather (Heritage) spoke for over 20 minutes. Their conversations continued through July and August 2014.

2245.    Lukasiewicz (Heritage) also spoke directly with Grauso (Glenmark) on July 18, 2014 and July 30, 2014. On July 28, 2014, Short (Citron) called and texted McMahon (Aurobindo) to discuss Fosinopril HCTZ.

2246.    On June 26, 2014, Heritage began sending out Price Increase Notices to its Fosinopril HCTZ customers. On June 27, McMahon (Aurobindo) and Grauso (Glenmark) spoke twice.

REDACTED – PUBLIC VERSION

2247.   By July 9, 2014, Heritage successfully raised prices on 18 different customers for Fosinopril HCTZ. That same day, Citron confirmed that it was trying to match Heritage's price increases. On July 14, 2014, Strelau (Citron) and Grauso (Glenmark) spoke. The next day, Citron matched Heritage's supracompetitive prices.

2248.   Sandoz also increased its pricing for Fosinopril HCTZ. By early January 2015, it was charging twice as much for Fosinopril HCTZ than it had been one year earlier.

### c.    Glipizide-Metformin

2249.   At all relevant times, Heritage, Mylan, and Teva dominated the market for Glipizide-Metformin.

2250.   On April 15, 2014, Malek (Heritage) discussed with his Teva counterpart their intention and agreement to raise the price of Glipizide-Metformin and other drugs.

2251.   O'Mara (Heritage) spoke to Aigner (Mylan) on April 23, 2014 and reached an agreement to raise prices.

2252.   To complete the conspiratorial triangle, Teva and Mylan were also in frequent contact with one another, including a May 9, 2014 phone call between a Vice President of Sales at Mylan and a National Accounts Director at Teva.

2253.   Heritage slated Glipizide-Metformin for a price increase on an internal May 9, 2014 call. Heritage informed customers by the end of June of a 100% price increase on Glipizide-Metformin.

2254.   By July 9, 2014, Heritage increased the price nationwide to 27 different customers for Glipizide-Metformin. Mylan did not challenge Heritage's price increases, while Teva actually increased its bids to potential customers to protect Heritage's increases. By November 2014, a Heritage employee reported to Malek that most of Heritage's price increases "had stuck."

d.      **Glyburide**

2255.    Aurobindo, Heritage, and Teva dominated the Glyburide market at all relevant times.

2256.    On April 15, 2014, Malek (Heritage) spoke with Patel and discussed Heritage's intention to raise prices on Glyburide. Patel agreed that if Heritage raised the price, Teva would follow suit.

2257.    Heritage also brought Aurobindo into the scheme. On May 8, 2014, Lukasiewicz (Heritage) contacted McMahon (Aurobindo) by phone to discuss Glyburide price increases.

2258.    On May 9, 2014, Heritage held an internal call on price increases, and included Glyburide on the list of drugs set for an increase.

2259.    One week later, Heritage and Aurobindo representatives spoke to one another at the MMCAP conference in Minnesota. The Heritage representative reported to Malek (Heritage) that the Aurobindo representative expressed "similar like minding on the pricing strategies we discussed."

2260.    On June 23, 2014, Heritage held a "Price Change Call" where it listed Glyburide for a 200% increase.

2261.    In June 2014, Heritage learned of a potential new competitor in the Glyburide market. Sather (Heritage) texted Alexander (Citron) inquiring into whether Citron would be entering the Glyburide market.

Sather (Heritage): "Work question: is Citron launching Glyburide anytime soon?"

Alexander (Citron): "Yes we currently have the product in our warehouse."

Sather (Heritage): "We are raising the price right now – just letting you know. Teva says they will follow."

Sather (Heritage): "Aurobindo agrees too."

Alexander (Citron): "?"

**REDACTED – PUBLIC VERSION**

Alexander (Citron): "You have micronaise brand equivalent."

Alexander (Citron): "And are you also raising your wacs?"

Sather (Heritage): "Sorry – was on conference call. Ours is Micronaise? Is yours Micro or Diabeta?"

Alexander (Citron): "Micro"

Sather (Heritage): "I don't think we are changing WAC – verifying now"

Alexander (Citron): "Okay i talked to [K.S., Executive Vice President, Sales & Marketing at Citron] we are def in to raise pricing…are doing this immediately, i know she was mentioning teva can take a while to raise prices"

Sather (Heritage): Teva is slow but conversations have been good."

Sather (Heritage): "No change to WAC for us"

Sather (Heritage): "We are raising our customers 200% over current market price."

Alexander (Citron): "Okay ill make sure the appropriate people find out"

Sather (Heritage): "Teva has 66% of mkt – great target for share! By [sic] [t]hey should play fair. Aurobindo and us each have about 18% share. Good luck!"

Alexander (Citron): "Thanks! Is this something you will be doing like this week?"

Sather (Heritage): "Letters going out this week! A lot of customers have 30 days notices and price protection so real price will be felt in 30+ days"

Alexander (Citron): "Perfect makes sense…Your not going anything with glyb/met pricing right?"

Sather (Heritage): "Not yet – but is on a short list!"

Sather (Heritage): "Glyburide and Fosi/HCTZ are increasing too – those are Aurobindo items too"

Alexander (Citron): "Okay yeah we have that too…Thanks for the info!"

REDACTED – PUBLIC VERSION

2262.    Sather (Heritage) quickly reported to the Heritage sales team. Then, on July 2, 2014, Strelau (Citron) called Lukasiewicz (Heritage) confirming Citron's agreement to raise prices and informing him that she had been "looped" in on Heritage's plan. On July 2, a different Citron representative spoke to Sather (Heritage). They continued to communicate throughout the summer of 2014.

2263.    By the end of June, Heritage had cemented its price raising agreements with Aurobindo, Citron, and Teva and notified its customers of the hikes. By July 9, Heritage increased the price for Glyburide on at least 17 customers. When Heritage customers, wary of the price increases, contacted Teva to supply alternative bids, Teva representatives instructed their teams "we will not be bidding. Thanks."

2264.    Teva also increased its WAC pricing on Glyburide by July 9, 2014. Not even one week later, on July 15, 2014, Citron raised its WAC and AWP for Glyburide to meet Heritage's levels.

2265.    Teva and Aurobindo both declined to provide bids when a Heritage customer, outraged with the price increases, requested bids from both companies. Teva and Aurobindo acted at the direction of Malek (Heritage).

e.    **Glyburide-Metformin**

2266.    Actavis, Aurobindo, Citron, and Heritage, and Teva dominated the Glyburide-Metformin market at all relevant times. As of April 2014, Heritage had 5% market share and was eager to raise prices.

2267.    On April 15, 2014, Malek (Heritage) contacted Patel and discussed Heritage's price increase goals. Patel agreed that if Heritage raised the price on Glyburide-Metformin, as well as other drugs, Teva would follow with its own price increases. Their communications continued over the next several months.

563

2268.    On April 22, 2014, Heritage held an internal call during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide-Metformin. After the call, Malek assigned D.L. to contact Aurobindo about Glyburide-Metformin, and A.S. was assigned to Actavis to discuss Glyburide-Metformin.

2269.    After the internal conference call, A.S. (Heritage) called M.D. (Actavis) on April 22, 2014 about the Glyburide-Metformin price increase. They reached an agreement to increase the price of Glyburide-Metformin and Verapamil.

2270.    Shortly thereafter, M.D. (Actavis) informed the sales and pricing team at Actavis of Heritage's intention to raise prices on these two drugs. In an internal April 28 email, an Actavis pricing manager stated, "[M.D.] made mention of keeping an eye out for an increase on Glyburide/Met and Verapamil IR."

2271.    On May 1, 2014, Falkin (Actavis), who was a recipient of the email described above, called a Teva counterpart regarding the scheme. Their communications continued over the next several months.

2272.    On May 12, Falkin (Actavis) spoke twice with Aurobindo's CEO regarding price increases. Falkin (Actavis) also exchanged thirty (30) text messages with a Teva representative between May 19 and May 22, 2014.

2273.    Around this same time, several Heritage employees communicated with their counterparts at Aurobindo about the Glyburide-Metformin price increase.

2274.    For example, D.L. (Heritage) made contact with Aurobindo by phone on May 8, 2014, and then in person on May 14. He reported that he had "found similar like minding on the pricing strategies we discussed."

2275.    On May 9, 2014, Heritage slated Glyburide-Metformin for a price increase on an internal call. Heritage continued to plan price increase through the next month.

2276.   Heritage also communicated the terms of the agreement to Citron and Sun. Because Citron had agreed to increase prices of Glyburide, Heritage sought to ensure that Citron (which had authority to market Glyburide-Metformin, but did not actively manufacture the drug at that time) did not take any steps that would undermine or reveal the collusion on Glyburide-Metformin. Accordingly, a Heritage sales executive discussed the Glyburide-Metformin price agreement by text.

2277.   On June 25, 2014, Sather (Heritage) exchanged text messages with a Citron representative about raising prices for Glyburide-Metformin wherein Citron agreed to raise prices, and then inquired "Your [Heritage] [sic] not doing anything with glyb/met pricing right?" Sather (Heritage) responded "Not yet- but is on a short list!" Although Citron had approval to sell Glyburide-Metformin, it was not yet actively selling the drug.

2278.   In Summer 2014, Aurobindo, Actavis, Heritage, and Teva increased their WAC pricing on Glyburide-Metformin. Citron also agreed to "match their price increases."

2279.   To facilitate collusion on other drugs, Heritage informed Sun through a chain of text messages sent in August 2014 about the successful price increases on Glyburide-Metformin and Verapamil. In an August 20, 2014 text message exchange, a Heritage representative admitted that Heritage had reached an agreement with Actavis to increase the prices of Glyburide-Metformin and Verapamil.

Sun representative: "Have you heard anything about an Actavis price increase?"

Heritage representative: "I heard they were on board with it. What item specifically?"

Sun representative: "I don't know. I am just hearing about an increase but no details. What product have you heard about"

Heritage representative: "We were communicating on Glyburide/Metformin and Verapamil"

Sun representative: "We haven't touched verapamil yet"

2280.    By September 2014, Citron had mobilized to enter the Glyburide-Metformin market. Instead of undercutting the prices of Actavis, Aurobindo, Heritage, and Teva in an effort to gain market share, Citron announced list prices higher than all of them.

2281.    This agreement between Heritage, Teva, Citron, Aurobindo, and Actavis was part of an overarching conspiracy of the Defendants to unreasonably restrain trade in the generic pharmaceutical market.

f.    **Hydralazine HCL**

2282.    Hydralazine HCL is a drug used to treat high blood pressure. It is also known by the brand names Apresoline and Dralzine.

2283.    During the relevant time period, Teva, Par, Heritage, Strides, Camber, and Glenmark dominated the market for Hydralazine tablets.

2284.    In approximately August 2014, Defendants applied the "fair share" understanding to the market for Hydralazine in order to prevent any price erosion for the drug.

2285.    As of August 2014, Defendant Strides was in the process of ramping back up its domestic operations, following its 2013 sale of its specialty injectable business to Defendant Mylan. As a result of this ramp up, Strides sought to obtain its "fair share" of the Hydralazine market, consistent with the principles of Defendants' fair share agreement. As a company with more share for Hydralazine than the market allocation scheme allowed, it was up to Heritage to concede business to Strides.

2286.    L.S. joined Defendant Heritage as VP of Marketing on August 1, 2014. One of his first acts of business for Heritage was to facilitate an agreement to allow Defendant Strides to obtain market share for Hydralazine.

2287.    In early August 2014, L.S. spoke to S.R., an executive working with co-conspirator TruPharma, who relayed the message that Strides would submit an unsolicited bid to Morris &

Dickson, a wholesaler, for its Hydralazine business. Through Randazzo, Strides requested that Heritage concede the business.

2288.    On August 20, 2014, L.S. informed Malek that Strides wanted Morris & Dickson's Hydralazine business. L.S. advised Malek that Heritage should concede this business to Strides. Malek also looped in A.S., who was responsible for the Morris & Dickson account.

2289.    On September 5, Morris & Dickson informed A.S. that it had received a competing bid for its Hydralazine business and asked for Heritage to provide a better price for Hydralazine.

2290.    Consistent with the fair share understanding, Heritage declined to match Strides' bid and instead conceded the Morris & Dickson business to Strides.

2291.    Upon information and belief, Heritage's decision to concede this business to Strides was communicated to Teva, Par, Camber, and Glenmark, so that each of these Defendants would know that Heritage was complying with the fair share agreement for the benefit of each Defendant.

2292.    As a result of the overarching fair share agreement, Defendants have been able to maintain the market allocation agreement for Hydralazine tablets since at least August 2014, which has allowed them to sell Hydralazine at supracompetitive prices to Plaintiffs and other.

g.      **Meprobamate**

2293.    In 2013, Heritage and Dr. Reddy's were the only manufacturers for Meprobamate. The two companies had an agreement in place to allocate market share between them and not compete on price.

2294.    On March 21, 2013, Malek (Heritage) e-mailed members of his team that he is "Looking **to** take a price increase on [mepro]. Only other competition is DRL. We don't want to make any waves and we are not looking for additional share, just want to maintain what we have at a minimum of a 4x price. Anyone want to reach out to DRL [Dr. Reddy's] and communicate to feel out?" His team confirmed that they will touch base with counterparts at Dr. Reddy's.

2295.   On a call on March 22, the two companies agreed to set and increase prices on Meprobamate. The agreement was confirmed in an e-mail later that day from a Heritage representative: "DRL is on board with price increase. I will fill you in later."

2296.   On March 27, 2013, Heritage received a request for a bid from a national wholesaler on Meprobamate that was a Dr. Reddy's customer. The Heritage employee reported to Malek (Heritage) that "Due to my conversation with [Dr. Reddy's] the other day, I think we should tread lightly or else bid a high price to show them where we are going." Malek (Heritage) replied "Unless [the national wholesaler] calls you and asks for supply, I recommend letting the market dry up a bit and showing DRL we stayed away from their business."

2297.   In April 2013, Dr. Reddy's requested Heritage "walk away" from a national pharmacy chain. Heritage then e-mailed the large pharmacy chain that it was increasing Meprobamate prices. The pharmacy replied that it "made a business decision to name another manufacturer as our primary supplier of Meprobamate tablets."

2298.   The following month, Malek (Heritage) told his employee to explain to Heritage "we decided to walk away based on the conversation we had two weeks ago. This makes the playing field for market share more even and I assume since you were looking for one more customers that you are good now. Tell him you don't think the team is going to walk from anymore share at this point."

2299.   Both Heritage and Dr. Reddy's were able to significantly raise prices across the board, nearly simultaneously, as a result of their agreement, in late April 2013 and early May 2013, respectively.

2300.   Over the next several years, the market remained highly stable, but at supracompetitive levels.

### h.   Methimazole

2301.   Starting in late 2013, Defendants Heritage, Par, and Sandoz—with non-Defendant Qualitest joining in 2014—colluded to maintain supracompetitive prices and prevent further price erosion that had been occurring in the market for Methimazole since Heritage aggressively entered the market in February 2012.

2302.   In August 2013, a large wholesaler received a price challenge from Sandoz and was  Instead of soliciting a competitive bid from Heritage, it ▮▮▮▮▮▮▮▮▮ that Heritage ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Heritage understood the communication to come from Sandoz, as retaliation for the aggressive prices Heritage had adopted when entering the market the year before. Three days later, Malek sent an email with the subject line ▮▮▮▮▮▮▮ instructing K.F. simply to ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ to which K.F. responded ▮▮▮▮▮▮▮" This low price at the wholesaler caused other customers to approach Heritage for price reductions, which it declined to do.

2303.   When another customer requested a price reduction at the end of August 2013, Jason Malek instructed a Heritage employee to collude with non-Defendant Boca Pharmacal, Inc. ("Boca") stating, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ However, Heritage ultimately backed off from this strategy because of a lack of personal relationships with employees at Boca.

2304.   In winter 2013-14, however, two events occurred that facilitated greater collusion. First, Qualitest announced its acquisition of Boca, a small manufacturer that had been aggressively pursuing share and lacked the personal relationships with the other manufacturers that facilitated collusion. Second, Sandoz went into extended backorder on Methimazole from January to May of 2014, allowing prices to rebound. The competitors saw a renewed opportunity to halt price erosion. When Qualitest employees took over sales and marketing of Methimazole in February from Boca, it sought to leverage its relationships to keep Methimazole prices high. On February 25, a Senior

Director of National Accounts at Qualitest called Defendant Armando Kellum at Sandoz and the two spoke for thirteen minutes. The two spoke again frequently in late April, on April 23, 25, 27, and 29, as Sandoz grew ready to reenter the market following their extended backorder.

2305.   Heritage learned of Sandoz's backorder in January. Instead of challenging Sandoz's share, Heritage saw an opportunity to cooperate. Prior to Heritage's April 22, 2014 Price Increase discussion call, Malek circulated a spreadsheet listing all drugs targeted for a price increase, the competitors for each such drug, and their respective market shares. Methimazole was among the drugs listed.

2306.   Malek identified Heritage employees to reach out to the two biggest competitors in the market, Par and Sandoz. N.O. was identified as the Heritage employee primarily responsible for communicating with Par on Methimazole, with A.S. identified as the Heritage employee primarily responsible for communicating with Sandoz.

2307.   In mid-May, 2014, A.S. attended the MMCAP conference and met with K.O. of Par and C.B. of Sandoz. On May 15, A.S. emailed Malek from MMCAP reporting that she had ███████ ████████████████████████████████████████████████████████████████████ ███████████████ and that Sandoz had agreed to follow any price increase and to refrain from targeting Heritage customers. Specifically, A.S. reported that ███████████████████████ ████████ and that Sandoz ████████████████████████████████████████████ ████████████████████████

2308.   With this agreement in place, Heritage declined to provide a price adjustment to a small customer seeking a price reduction on Methimazole the following week, with Malek instructing his team to ████████████████████

2309.   From June 1st to 4th, relevant employees from the four competitors attended the HDMA 2014 Business and Leadership Conference. While there, N.O. (Heritage) called a Senior

Director of National Accounts at Par on June 2. Furthermore, Sandoz—which had been in communication with Qualitest through Kellum—communicated further with Heritage. A.S. (Heritage) and C.B. (Sandoz) texted on June 3 before both meeting with K.O. of Par at the Sandbar Restaurant.

2310.    Following these communications, the competitors were able to arrest and/or markedly slow down further price erosion by agreeing not to compete for customers and stabilizing the market at supracompetitive levels above those seen in August 2013. Collusion continued even after corporate acquisitions changed the composition of the market. For instance, following Endo's acquisition of Par, resulting in the merger of Qualitest and Par, Methimazole was divested to Non-Defendant Rising Pharmaceuticals, transferring at the end of September 2015. Immediately upon taking over Methimazole, the Vice President of Sales at Rising called C.B. of Sandoz, speaking on September 29 as well as four times on October 1, and again on October 2 for eight minutes.

i.    **Metronidazole**

2311.    Metronidazole Cream and Lotion. During the period relevant to this Complaint, Defendants Sandoz and Actavis were the primary generic manufacturers of Metronidazole Lotion in 2011, and Sandoz, G&W, and Actavis dominated the market for Metronidazole Cream.

2312.    Beginning in early July 2011, Actavis initiated its plan to raise the prices of both products by reaching out to its rival G&W. On July 6, 2011, Mike Perfetto, then a senior sales and marketing executive at Actavis, called Grauso at G&W twice. The calls lasted four minutes and twenty-one minutes. The next day, on July 7, 2011, the conversation continued, with Perfetto initiating a six minute call to Grauso.

2313.    Confident that at least G&W was on board with the planned increase, Actavis raised the price of Metro Cream and Lotion effective July 22, 2011. The new WAC price for Metro Cream

was $153.33 for a 45gm tube, an increase of 278%. The WAC price for Metro Lotion increased by 189% to $208.03 for a 59ml bottle.

2314.   That same day, M.A., a Fougera marketing executive, e-mailed several colleagues, including Kaczmarek, with the precise details of the Actavis increase. Kaczmarek began at once assessing how Fougera would follow, mindful of the fair share rules and the agreement among the competitors. He inquired of her about G&W's current share of the market, saying: ████████

████████████████████████████████

2315.   The next morning, on Saturday July 23, 2011, Fougera utilized one of its most reliable sources of information – the relationship between Fougera's CW-6 and Grauso at G&W. CW-6 called Grauso and the two competitors spoke for four minutes. A few minutes later, CW-6 called Grauso again and they spoke for fourteen minutes. Just after 9:00 a.m. on Monday, July 25, 2011, Kaczmarek cautioned his team at Fougera to consult with management before quoting a price to any customer on Metro Cream or Metro Lotion, saying: ████████████████████

████████████████████████████████████████████

2316.   By 10:31 a.m. that morning, Kaczmarek had already decided on the exact amount by which Fougera should increase its price on these products to stay in lockstep with Actavis. He told his colleagues: █████████████████████████████████████████

████████████████████████████████████████████

████████████████   By early afternoon, a price increase announcement letter had already been drafted and circulated for comment, incorporating Kaczmarek's ████████ formula.

2317.   Meanwhile, CW-6 and Grauso continued their discussions that same morning. CW-6 initiated calls to Grauso at 9:55 a.m. and 12:21 p.m. Less than twenty minutes after the second call with Grauso ended, CW-6 called his boss, Kaczmarek, to report the information he had obtained. A

total of eight calls were exchanged between CW-6 and Kaczmarek on the afternoon and early evening of July 25, 2011.

2318.   During those calls – only 3 days after the Actavis increase and before G&W had even been able to follow – Kaczmarek informed the Fougera team that ███████████████ ███████████████████████

2319.   In the early afternoon of Monday, July 25, 2011, a large customer reached out to CW-6 at Fougera seeking a new source of supply for Metro Lotion and another product. CW-6 asked whether the request was the result of supply issues or ██████████████████ The buyer, tongue-in-cheek, asked which answer would yield the better price. CW-6, following Kaczmarek's earlier instructions replied: █████████████████████████████

2320.   That same day, Fougera informed its customers that it was increasing its pricing for both Metro Cream and Metro Lotion effective July 26, 2011, closely tracking Actavis's new prices. The new WAC price for Metro Cream was $151.80 for a 45gm tube. The new WAC price for Metro Lotion was $205.95 for a 59ml bottle.

2321.   Customers quickly began to complain to Fougera about the sharp price increase, prompting one Fougera customer service representative to ask Kaczmarek for help in framing a response to a disgruntled customer that e-mailed protesting that the roughly 150% price hike was █████████

2322.   Undaunted by the obvious dissatisfaction of its customers, Fougera's singular focus was on ensuring that the competitors all followed the price increases. In response to yet another customer inquiry about the price spike, Kaczmarek virtually disregarded the news of the customer's displeasure, saying instead: ████████████████████████

2323.   Kaczmarek did not have to worry for long, however, as G&W's plans to follow the Actavis and Fougera price increases on Metro Cream were already in full swing. On July 26, 2011 –

the day of the Fougera increase – Grauso of G&W called CW-6 of Fougera. The call lasted one minute. CW-6 hung up and immediately called Kaczmarek.

2324.    Meanwhile, less than ten minutes after ending his call with CW-6, Grauso brought Actavis into the conversation, initiating a two minute call to Perfetto. Orlofski of G&W similarly followed up with a text message to Perfetto at Actavis roughly a half hour after that. Grauso called CW-6 at Fougera again a few hours later, and the resulting call lasted seven minutes. Within five minutes of the end of that call, Grauso had placed yet another call to Perfetto at Actavis, this one lasting five minutes.

2325.    By that evening, Grauso had spoken to Perfetto by phone for thirty-five more minutes, and had sent him a text message, while CW-6 of Fougera had conferred twice more with his boss, Kaczmarek. Over the next two days, July 27 and July 28, 2011, Grauso spoke to Perfetto at Actavis four more times and to CW-6 at Fougera six more times.

2326.    With its competitors fully apprised, G&W raised the price of Metro Cream on July 28, 2011, following close on the heels of the Actavis and Fougera increases.

2327.    As the news of yet another Metro Cream price increase hit the market, customers again scrambled to find more reasonably priced sources of supply. One large customer reached out to Fougera and Actavis on the same day as the G&W increase seeking quotes. Fougera sales executive K.K. contacted Kaczmarek about the request, surmising both that the customer was currently supplied by G&W and that G&W must be implementing a price increase.

2328.    Despite over a week of receiving nearly constant updates from G&W through CW-6, Kaczmarek remained coy about his knowledge of G&W's increase, saying: ████████████████ Then, to ensure that K.K. did not try to compete for the business, he added: ███████████ ████████████████

2329.    Finally, just four days later on August 1, 2011, the remaining competitor, Harris (a co-conspirator), fell in line with an increase of its own on Metro Cream. The new Harris WAC price was $135.00, an increase of 437%.

2330.    On August 2, 2011, a customer informed G&W that its increase would bump G&W from its primary position on Metro Cream, but only by a small margin considering the market wide increases. Vogel-Baylor promised the customer a slight price adjustment in order to maintain the primary position.

2331.    Metronidazole Gel. G&W, Impax, Sandoz, and Teva conspired to increase the price of Metronidazole jelly. The Metronidazole jelly price increase occurred shortly after trade association meetings where representatives from G&W, Impax, Sandoz, and Teva were in attendance, such as: (i) April -May 2011 NACDS Annual Meeting; (ii) August 27-30, 2011 NACDS Pharmacy and Technology Conference in Boston; (iii) April 24-27, 2012 NACDS Annual Meeting; and (iv) August 2012 NACDS Pharmacy and Technology Conference.

2332.    Metronidazole Gel ("Metro Gel" also known by the brand name Metrogel) is a topical antibiotic prescribed for the treatment of skin lesions in patients suffering from rosacea. Defendants G&W, Sandoz, Taro, and Teva were the primary manufacturers of the gel formulation in 2011. Impax entered the market in 2012.

2333.    Beginning around July 2011, G&W, Sandoz/Fougera, and Taro engaged in price increases of Metronidazole Gel of more than 400%. When Impax entered the market in 2012, it did not disturb the artificially inflated pricing because it adhered to the fair share understanding.

2334.    In the summer of 2011, Sandoz was seeking opportunities to increase prices on its products. In pursuit of that goal, on July 6, 2011, James Park, a product manager at Sandoz, sent an internal e-mail asking for information on any recent price increases instituted by rivals Taro and Fougera on a list of products on which the companies overlapped. The list included Metro Gel

.75%. Park urged that obtaining such information would ███████████████████████

███████████████████████████

2335.    That same day, July 6, 2011, CW-4, a senior sales executive at Sandoz, exchanged

three calls with D.S. at Taro, including one call lasting sixteen minutes. During these calls, D.S.

informed CW-4, among other things, that Taro would be raising prices on Metro Gel .75%. Based

on their prior conversations and understanding, CW-4 knew that Sandoz was expected to follow the

price increase.

2336.    Later that day, CW-4 responded to Park's e-mail stating ███████████████

███████████████   She then listed out the competitive intelligence she had just gathered from

D.S. Regarding Metro Gel .75%, she included the notation ████████████████

2337.    Over the coming months, Sandoz kept watch on the market, waiting to follow Taro's

expected price increase on Metro Gel .75%. In the interim, on July 20, 2011, a fourth competitor,

G&W, entered the Metro Gel .75% market. Despite only recently entering the market, G&W quickly

got to work coordinating a price increase on Metro Gel .75%. For the increase to succeed, G&W

would need to ensure that the other competitors in the market would follow – and follow they did.

2338.    From January 29 to February 1, 2012, the ECRM held its Retail Pharmacy Generic

Pharmaceuticals Conference in Atlanta, Georgia. Representatives from all four competitors in the

Metro Gel .75% market – Fougera, Sandoz, Taro, and G&W – were in attendance. These

representatives included CW-6 and Kaczmarek of Fougera, CW-4 of Sandoz, D.S. of Taro, and

Vogel-Baylor and Orlofski of G&W. Grauso, then at Aurobindo, was also in attendance.

2339.    On February 2, 2012, the day after the conference concluded, G&W generated a

price increase analysis for Metro Gel .75%, which included a 245% increase to the WAC price from

$39.99 to $137.99. That same day, Vogel-Baylor used her former colleague Grauso (then at

Aurobindo) to convey information to CW-6 at Fougera regarding the Metro Gel .75% price increase.

2340.   For example, on February 2, 2012, Vogel-Baylor called Grauso and they spoke for eight minutes. Grauso hung up and immediately called CW-6 of Fougera. The two men spoke for four minutes. Immediately upon hanging up, Grauso called Vogel-Baylor back and they spoke for eleven minutes. Grauso then called CW-6 again and spoke to him for five minutes. Grauso hung up, received a call from Orlofski at G&W, and the two men spoke for thirteen minutes. These calls, which all occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 9:29:00 | 0:08:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 9:36:00 | 0:04:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:40:00 | 0:11:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 10:14:00 | 0:05:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Orlofski, Kurt (G&W) | 10:19:00 | 0:13:00 |

2341.   Later that evening, CW-6 e-mailed his boss at Fougera, Kaczmarek, asking him to give him a call. CW-6 and Kaczmarek spoke by phone three times the following day.

2342.   On February 7, 2012, Vogel-Baylor e-mailed Orlofski her latest price increase analysis for Metro Gel .75%. The next day, on February 8, 2012, Orlofski called Kaczmarek at Fougera. The two competitors exchanged two more calls over the next few days and finally connected on February 10, 2012 for a twenty-five minute call.

2343.   The communications intensified on February 14, 2012 as G&W made final preparations for its price increase announcement. As they had done previously, Vogel-Baylor and CW-6 used Grauso as the conduit to coordinate their plans on Metro Gel .75%. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 8:42:00 | 0:25:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 11:34:00 | 0:02:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 11:56:00 | 0:13:00 |

| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Orlofski, Kurt (G&W) | 12:09:00 | 0:01:00 |
|---|---|---|---|---|---|---|
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:10:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 12:19:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:04:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 12:26:30 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Grauso, Jim (Aurobindo) | 13:25:08 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 13:25:59 | 0:00:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:40:00 | 0:05:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 13:44:00 | 0:06:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:49:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 13:55:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 14:39:00 | 0:08:00 |

2344.    Similarly, the next day, on February 15, 2012, Vogel-Baylor called Grauso and they spoke for eleven minutes. Less than ten minutes later, Grauso called Vogel-Baylor back and they spoke for forty-one minutes. Grauso hung up the phone and immediately called CW-6 at Fougera. That call lasted one minute. The next day, Vogel-Baylor instructed her team to generate price increase letters for Metro Gel .75%, and to issue them by 1:00 p.m. on February 17, 2012.

2345.    Even before G&W notified its customers of the increase, other competitors in the market knew that G&W would be increasing price and planned to do the same. For example, on February 15, 2012, two days before G&W sent its notice letters to its customers, Blashinsky, then a senior marketing executive at Taro, informed his colleagues that prices had ███████████████ for Metro Gel .75% and one other product. ███████████████ he added. B.S., a senior executive at Taro, responded: ████████████████████████████ ████████████████████

2346.    On February 17, 2012, Orlofski e-mailed Blashinsky of Taro asking if he was going to the annual GPhA industry conference the following week. Orlofski stated, ███████████ ██████████████ Blashinsky responded, ███████████████████ ████████ The next day, Orlofski e-mailed B.S., a senior Taro executive, asking ████████ ██████████████████████████████ ████████ B.S. replied, ██████████████████████████

2347.   On February 17, 2012, G&W sent out letters notifying its customers of the Metro Gel .75% price increase. That same day, Grauso called Vogel-Baylor and they spoke for sixteen minutes. Following the now normal pattern, Grauso hung up and called CW-6 at Fougera. The two men spoke for five minutes. Immediately upon hanging up, Grauso called Vogel-Baylor again. That call lasted two minutes.

2348.   On February 18, 2012, a GPO customer e-mailed Vogel-Baylor after receiving the Metro Gel .75% notice asking, ███████████████████████████████████████████████ ███████████████████████████████████████████ Vogel-Baylor responded, ███████████████████████████████████████████████ ██████████████████████████ Of course, Vogel-Baylor already knew that her competitors would follow G&W's price increase, but she could not tell the customer that. Ultimately, the customer negotiated a 45-day notice period and noted, ██████████████ █████████████ On February 20, 2012, Blashinsky reiterated to his colleagues that █████ █████ were taking place in the Metro Gel .75% market, and that Taro ███████████████████

2349.   From February 22 to February 24, 2012, the GPhA held its annual meeting in Orlando, Florida. Senior executives from all four competitors in the Metro Gel .75% market – Fougera, Sandoz, Taro, and G&W – were in attendance. These representatives included Kaczmarek and D.K., a senior executive at Fougera, Tremonte of Sandoz, B.S. of Taro, and Orlofski of G&W. During the conference, the competitors were actively discussing and agreeing on the details of the Metro Gel .75% price increase.

2350.   On February 22, 2012, the first day of the GPhA meeting, Orlofski e- mailed B.S. again, stating ██████████████████████████████████████████████ ███████████████████████ B.S. replied, ████████████████████████████

2351.    Immediately after meeting with Orlofski on February 22, B.S. e-mailed Blashinsky regarding Metro Gel .75% stating: ███████████████████████████████████

Blashinsky responded, ████████  B.S. replied, █████████████████ to which Blashinsky answered, ██████████████████  B.S. further inquired, █████████████ ████████████  and Blashinsky replied, █████████████████████████ Of course, Fougera and Sandoz had not increased their Metro Gel .75% pricing yet – but B.S. of Taro understood that they would from his conversation with Orlofski.

2352.    Similarly, that same evening, on February 22, 2012, Kaczmarek of Fougera (who was also at the GPhA conference) sent an e-mail to the Fougera Pricing Committee stating: ████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████

2353.    On March 9, 2012, Rite Aid e-mailed Sandoz asking for a bid on Metro Gel .75%. CW-4 of Sandoz forwarded the invitation to Kellum with the simple comment ██████████████ Kellum wasted no time in telling his colleagues that Sandoz should stay clear of the Rite Aid bid, as Sandoz intended to follow the price increase that he believed spawned the opportunity, saying: ███████████████████████████

2354.    One week later, when Rite Aid pressed again for a Sandoz bid, CW-4 contacted Kellum to verify that the decision was to decline. Kellum not only confirmed that fact, but also suggested a pretext: ███████████████████ Consistent with this instruction, CW-4 responded to Rite Aid: ████████████████████████████████████████ ████████████████████

2355.    Within the next several weeks, all three competitors followed G&W's increase on Metro Gel .75% as agreed and essentially matched G&W's WAC pricing. Fougera increased on March 16, 2012, Taro increased on March 23, 2012, and Sandoz increased on April 6, 2012. On March 22, 2012, the day before Taro increased its price, Orlofski at G&W received two phone calls from a Taro employee lasting twelve minutes and two minutes, respectively. Customers began to react immediately to the dramatic price hikes by seeking price quotes from the competitors. The competitors, however, refused to break ranks. On April 3, 2012, for example, Fougera received a request from a Taro customer to bid on Metro Gel .75% in light of the Taro increase. CW-6 relayed the information to Kaczmarek, saying: ███████████████ Kaczmarek responded simply: ████ ████

2356.    The following day, on April 4, 2012, CW-6 sent Kaczmarek an updated market share breakdown for the Metro Gel .75% market. CW-6 expressed satisfaction that the market had arrived at an appropriate equilibrium in accordance with fair share principles, saying: ██████████████ ████████████████████████████████████████████████

2357.    Two years later, in June 2014, Taro began making plans to enter the market for Metro Gel 1% and, on July 1, 2014, Taro launched the product and matched Sandoz's WAC pricing.

2358.    In the days leading up to the launch, CW-3 of Sandoz and Aprahamian of Taro exchanged several calls during which they discussed the launch and Sandoz's allocation of customers to the new entrant, Taro. Further, during these calls, Aprahamian told CW-3 that Taro was targeting

35% market share and identified the customers that it planned to target. Immediately upon hanging

up with Aprahamian, CW-3 reported this information back to his superiors, CW-1 and Kellum. This

call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:44:00 | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:03:00 | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:18:00 | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 9:55:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:40:00 | 0:02:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:42:00 | 0:01:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:43:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:56:00 | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:40:00 | 0:10:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:50:00 | 0:01:00 |
| 6/25/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:02:00 | 0:13:00 |
| 6/25/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 13:15:00 | 0:01:00 |
| 6/25/2014 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 13:18:00 | 0:01:00 |

2359.    On June 18, 2014, Aprahamian sent an internal e-mail to A.L., a pricing executive at

Taro, stating ██████████████████████████████████████████████████████████

████████ WBAD is a GPO that purchases generic drugs on behalf of its members, including ABC

and Walgreens. On June 25, 2014, Taro submitted an offer to Walgreens. A few days later, on June

30, 2014, Taro submitted a separate offer to ABC.

2360.    On the same day that ABC received the offer from Taro, the customer notified

Sandoz that it had received a competitive bid from Taro and asked whether Sandoz would lower its

price to retain the business. S.G., a sales executive at Sandoz, forwarded the request along internally,

including to CW-1 and Kellum. CW-1 responded to S.G. stating: ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Kellum

agreed: █████████████████████

2361.   The next day, July 1, 2014, Anuj Hasija, a sales executive at Sandoz, sent an internal e-mail stating that Taro was ███████████████████████████████████ Kellum responded, ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████ CW-1 replied: ██████████████████████████████

██████████████████

2362.   Walgreens accepted Taro's bid on July 2, 2014 and ABC accepted Taro's bid on July 7, 2014. WBAD (including ABC and Walgreens) represented approximately 20% of Sandoz's volume and sales for Metro Gel 1%.

2363.   On July 8, 2014, Taro also submitted a bid to Wal-Mart for Metro Gel 1%. That same day, Aprahamian called CW-3 of Sandoz twice. Both calls lasted one minute. Two days later, on July 10, 2014, Aprahamian e-mailed Elizabeth Guerrero, a Taro sales executive, asking her to follow up with Wal-Mart regarding the offer. The next day, on July 11, 2014, CW-3 and Aprahamian exchanged four calls. After the last call, CW-3 hung up and immediately called Kellum. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:31:00 | 0:01:00 |
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:49:00 | 0:01:00 |
| 7/11/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:05:00 | 0:03:00 |
| 7/11/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:52:00 | 0:05:00 |
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:57:00 | 0:01:00 |

2364.   The following Monday, on July 14, 2014, Wal-Mart notified Sandoz that it had received a competitive bid on Metro Gel 1% that was 10% lower than Sandoz's pricing and asked whether it would bid to retain the business.

2365.   On July 18, 2014, B.G., a pricing executive at Sandoz, forwarded the request internally, including to CW-1 and Kellum, stating ████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████ CW-1 responded by recommending that Sandoz

relinquish Wal-Mart and stating, ████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████ Kellum then replied, ███████

2366.   Notably, after sending this e-mail, someone at Sandoz changed the language in the

earlier e-mail string from ████████████████████████ to ██████████████████████

████████ Sandoz made this change to avoid documenting the fact that the competitively

sensitive information came directly from its competitor, Taro.

2367.   Although Sandoz gave up the business, Wal-Mart was unexpectedly reluctant to stop

ordering Metro Gel 1% from Sandoz. On August 7, 2014, L.B., a sales executive at Sandoz, sent an

internal e-mail advising that Wal-Mart was still ordering and stating, █████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ B.G. of Sandoz replied, ████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████

2368.   On August 4, 2014, McKesson also notified Sandoz that it had received an

unsolicited bid for the Rite Aid portion of its Metro Gel 1% business and gave Sandoz the

opportunity to bid to retain the business. Kellum responded that ██████████████████████

███████████████████████████████████████████ After some internal

discussion, Sandoz decided to cede the Rite Aid portion of the business to Taro.

2369.   As P.C., a pricing executive at Sandoz, explained in an internal e-mail on August 8,

2014: ████████████████████████████████████████████████████████

████████

2370.    On August 11, 2014, McKesson awarded the Rite Aid portion of its Metro Gel 1% business to Taro. Two days later, on August 13, 2014, Aprahamian called CW-3 and they spoke again for seven minutes.

2371.    Metronidazole Vaginal. Sandoz and Valeant conspired to increase the price of Metronidazole vaginal. Valeant manufactures a brand metronidazole drug under the name MetroGel vaginal.

2372.    Prior to January 2015, prices for Metronidazole Vaginal remained stable for years.

2373.    Beginning in around February 2015, Defendants Sandoz and Valeant engaged in price increases of more than 300%.

2374.    Notably, the Metronidazole vaginal price increase occurred around the same time Valeant was also dramatically increasing prices of numerous other drugs. At the end of 2012, Valeant acquired Medicis, which originally manufactured brand MetroGel vaginal, and proceeded to engage in a series of price increases on MetroGel vaginal in 2013 and 2014. Such price increase is a well-known business strategy of Valeant.[52] Valeant was among the generic manufacturers that received a letter as part of the Congressional investigation into generic price increases.

2375.    These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions. There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

2376.    Upon information and belief, the agreement to increase prices on all formulations of Metronidazole was the result of collusive communications between and among Defendants, and this agreement to increase prices was facilitated because each Defendant adhered to the overarching market allocation agreement in the generic drug industry. The collusive agreement to increase prices

---

[52] See Sanders and Cummings Press Release (asking Valeant why prices of drugs increased when the only change in the drugs is "the company that owns them").

on Metronidazole was furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those described below.

2377.   The Metronidazole vaginal price increase occurred shortly after trade association meetings where representatives from Sandoz and Valeant were in attendance such as: (i) June 2014 HDMA Business and Leadership Conference; (ii) December 3, 2014, NACDS Foundation and Reception Dinner in New York, New York; and (iii) April 2015 NACDS Annual Meeting.

### j.   **Nimodipine**

#### i.   *The Heritage/Sun Agreement*

2378.   As of June 2012, Heritage and Sun, through its division Caraco, were the only two competitors in the market for Nimodipine, as Teva had recently left the market. Heritage saw Teva's departure as an opportunity to raise prices.

2379.   In June 2012, Malek (Heritage) asked Sather (Heritage) to contact Caraco to discuss raising the price of Nimodipine.

2380.   Sather (Heritage) subsequently exchanged numerous text messages and participated in calls with her Caraco contact throughout June 2012. On June 28, 2012, in an e-mail titled "Caraco", Sather (Heritage) wrote:

> [Knoblauch (Sun)] brought up nimo[dipine] to her boss [Sun President GP Singh Sachdeva], his only concern was that they get their fair share of the market. She was not so much help on the pricing discussion- because she does nothave muhc control over it. All pricing goes through [Sachdeva (Sun)] and [Sachdeva (Sun)] sets is. I do not know [Sachdeva (Sun)] but [Knoblauch (Sun)] mentioned our discussion with him so I can only hope the ground work has been set. I reiterated that we would like to see $ go up and we would be fair.

2381.   Malek (Heritage) responded: "Thanks for the info. Not sure what this means 'his only concern was that they get their fair share of the market.' They are getting their fair share of the market at a price they don't need to go to is what I wanted to communicate to them."

2382.   In her e-mail response, Sather (Heritage) agreed:

That is exactly how I stated it to [Knoblauch (Sun)] too! She made it almost seem like he did not care about the price of even this product. She admitted she knew nothing about the item – it is not a big/key item for them. I said it is big for us and with only two players it should command more $. I'd like to see if [Knoblauch (Sun)] can communicate back to [Sachdeva (Sun)] and the Nimo[dipine] on the Cardinal RFP (when it gets closer to the close of the RPF) – specifically mentioning the pricing we are going at so that Caraco can bring their price up too. This could demonstrate how communication can and should work between us to get the $ up.

2383.    The same day Sather (Heritage) sent an analysis of the upcoming Cardinal RFP to Malek (Heritage) and others at Heritage. The notes section regarding Nimodipine reflected that Heritage should "keep price high for Caraco." The plan for Heritage was that it would bid at a high price, which would be communicated to Sun beforehand, and would allow Sun to raise its price and still retain the Cardinal business.

2384.    Heritage and Caraco were both able to significantly raise prices to other customers as a result of this agreement.

2385.    On July 20, 2012, Fleming (Heritage) circulated proposed pricing for the Cardinal RFP which included pricing for Nimodipine that was lower than that proposed by Sather (Heritage). In an e-mail exchange that same day, Sather (Heritage) and Malek (Heritage) discussed raising prices:

> Sather (Heritage): "My only concern is Nimodipine – and situation with Caraco and raising our market pricing. If we don't let them increase pricing here – will it always be a fight to the bottom with them?"
> Malek (Heritage): "I don't have a problem with it but, we need another account. Who is that account? They took CVS from us and we let it go and now they are getting aggressive at public and at GPO's."
>
> Sather (Heritage): "I understand – I just think the timing is critical if we want to raise our pricing everywhere. This Cardinal RFP was mentioned in previous conversations – and now with NACDS coming – it is a perfect time to have those off-show conversations with the right folks and reiterate the 'plan.' Plus the RFP pricing will not be effective until Oct 1st – we would have time to discuss our pricing with Cardinal (and others) before that final date. Ie: I think we could still lowball the Nimo a little later if necessary."
>
> Malek (Heritage): "If you feel comfortable we can have those conversations and benefit from this then I agree. We can talk off line."
>
> Sather (Heritage): "If I don't continue the conversations now (and at NACDS) and if we lowball right of the gate on the RFP, I think we close the door for a long time."

Malek (Heritage): "Ok, lets give it a shot. So we will increase the price, you should tell them that so they can do the same without any comp."

2386.   That same day, Sather (Heritage) spoke to Knoblauch (Sun). During this and other communications in the succeeding weeks, the two companies reached an understanding about raising the price and avoiding competition for Nimodipine. Pursuant to the agreement, Heritage provided a cover bid so that Sun would be able to significantly raise its price and still retain the Cardinal business.

2387.   When Malek (Heritage) learned that Sun would potentially be subject to FDA recall on Nimodipine, he directed employees to contact their Sun counterparts to inquire about the recall. A Heritage employee later reported that her contact at Sun was "not aware or [sic] any problems/issues and supply was fine."

2388.   Then, on April 16, 2013, after an employee reported that Caraco has not been bidding as it was unsure when it would have product, Malek (Heritage) responded "Great feedback, time for next increase!" He later reiterated "to make sure if/when they are back [on the market] they talk to us first so we can be smart about it."

2389.   On May 23, 2013, Sather (Heritage) again spoke with Knoblauch (Sun), who indicated that Caraco may be returning to the market for Nimodipine in June or July. Sather (Heritage) immediately reported this news to Malek (Heritage): "Caraco's Nimodipine has an estimated ship date of June/July but frankly that looks even too hopeful. And there's a small rumor they may not come back with it. A reminder was provided about our recent changes on that item."

2390.   This resulted in the following e-mail exchange between the two:

Malek (Heritage): OK...Where did you hear this from!!

Sather (Heritage): Vendor/friend [Knoblauch (Sun)]

Malek (Heritage): Are they raising theirs?

Sather (Heritage): They are not yet but admit it would be nice to

<u>Malek (Heritage):</u> Well we would follow in one second……

<u>Sather (Heritage):</u> I did say that!

<u>Malek (Heritage):</u> hahahahahahaha

2391.    During the next year, Caraco did not return to the market. Heritage was able to continue charging the artificially inflated prices previously agreed to by Caraco, and at times higher prices, as a result – knowing that if Caraco did return to the market, the original agreement between the companies would continue.

*ii.*    *The Heritage/Ascend Agreement*

2392.    When the FDA approved Ascend's Nimodipine generic in early April 2014, Malek (Heritage) immediately reached out to Ascend's Executive Vice President of Sales and Marketing, John Dillaway, through LinkedIn, asking if Dillaway (Ascend) had "time to catch up tomorrow afternoon or Thursday morning." Dillaway (Ascend) responded "I would like to catch up."

2393.    On April 22, 2014, Heritage identified Nimodipine as one of eighteen different drugs designated for a price increase. A large majority of the price increases were to be achieved through collusive efforts. During a "Price Increase Discussion" conference call with members of the Heritage sales team, led by Malek (Heritage), Heritage noted that Ascend was going to launch Nimodipine. Malek (Heritage) took responsibility within Heritage to communicate with Ascend about market shares. Heritage planned to offer Ascend one-third (1/3) market share, so that Ascend would not compete with Heritage on price.

2394.    Malek (Heritage) took this responsibility to communicate with Ascend because he already had a relationship with Dillaway (Ascend). The pair had previously met in February 2013. Malek (Heritage) had also been communicating frequently with Dillaway (Ascend) through the website LinkedIn in the weeks leading up to the April 22, 2014 Price Increase Discussion.

2395.   Later in the day after the Heritage "Price Increase Discussion" on April 22, 2014, Malek (Heritage) called Dillaway (Ascend) and the two spoke for nineteen (19) minutes. Upon information and belief, during this conversation they agreed on a plan where Heritage would raise its prices, Ascend would enter the market at a high price to avoid erosion, and in exchange Heritage would walk away from certain accounts that Ascend had targeted so that Ascend could gain market share at favorable pricing.

2396.   On May 9, 2014 Heritage had another internal conference to discuss price increases. After obtaining buy-in from Ascend during the April 22 telephone call between Malek (Heritage) and Dillaway (Ascend), Heritage confirmed that it would be raising prices of Nimodipine across the board. Heritage also identified specific customers that it would "let go" to the "new entrant into market" Ascend.

2397.   In June 2014, Malek (Heritage) sought to continue his conversations with Dillaway (Ascend) regarding Nimodipine. He e-mailed Dillaway (Ascend) on June 6, 2014 seeking to arrange a phone call. After they were unable to connect by phone, Dillaway (Ascend) suggested they meet in person and "grab coffee" at the NACDS conference in Boston.

2398.   At the end of June, Heritage implemented the price increase. Heritage raised the price of Nimodipine to at least twelve customers.

2399.   Malek (Heritage) e-mailed Dillaway (Ascend) on October 29, 2014, again asking to "catch up." The two spoke by phone for ten minutes the next day. On November 4, 2014, Malek (Heritage) e-mailed Dillaway (Ascend) to "[l]et me know when we re-connect to continue our discussions from the other day." Instead of communicating specifics over e-mail, Malek (Heritage) and Dillaway (Ascend) made plans to have lunch together when Malek (Heritage) returned from India.

2400.    Two weeks later, on November 18, 2014, Malek (Heritage) e-mailed Dillaway (Ascend) stating "[Dillaway (Ascend)], [j]ust sent you a text. Fresh back from India. Wanted to pick up discussions. Let me know fi you can chat." On November 25, 2014, Malek (Heritage) e-mailed Dillaway (Ascend) again asking if Dillaway (Ascend) "had a few minutes to connect."

2401.    On January 22, 2015, Malek (Heritage) asked Heritage employee R.S. to reach out to Ascend to see if Ascend had Nimodipine in its warehouse. Malek (Heritage) stressed that this inquiry should be kept confidential.

2402.    R.S. (Heritage) reached someone as Ascend. By January 24, 2015, Malek (Heritage) was able to inform his sales team that Ascend had Nimodipine in its warehouse.

2403.    By May 1, 2015, Ascend had fully launched Nimodipine. Instead of trying to compete with Heritage upon entry, Ascend's WAC price, per tablet, was even higher than Heritage's.

2404.    Notwithstanding this higher pricing per tablet, Ascend began to gain market share throughout the second half of 2015.

### k.    **Paromomycin**

2405.    Heritage and Sun, through its division Caraco, dominated the Paromomycin market at all relevant times.

2406.    In April 2014, Heritage had approximately 65% of the market. Sun had approximately 35% market share.

2407.    On April 22, 2014, Heritage's representative spoke to a Sun counterpart for 45 minutes. Shortly thereafter, the Heritage representative notified her superiors via e-mail that Caraco was on board with price increases, to which a superior responded, "No e-mails please."

2408.    On May 8, 2014 a Heritage employee e-mailed Malek (Heritage), who had asked for an update on pricing agreement progress, explaining "I made contact with all my take aways – with positive results."

2409.   Heritage held another internal pricing call on May 9, 2014. Paromomycin was on the list for a price increase.

2410.   On May 20, a Sun employee informed a Heritage employee that Sun would be "temporarily discontinuing" Paromomycin production to transfer its operations to another facility. The employee immediately relayed the information to Malek who responded "Need price increase to go immediately. Jack it up."

2411.   On a June 23, 2014 internal pricing call, Heritage slated Paromomycin for a 100% increase. By July 9, 2014, Heritage successfully increased prices for over a dozen nationwide customers.

2412.   Sun continued to sell the drug through January 2015, maintaining a 40% market share. Despite this, Heritage continued to increase its prices with no fear of losing market share as an agreement was already in place.

### l.   **Zoledronic Acid**

2413.   At all relevant times, Dr. Reddy's and Heritage dominated the marketed for Zoledronic Acid.

2414.   Zoledronic Acid was marketed singularly by the brand manufacturer, Novartis, until the spring of 2013, when it came off patent. It was sold in two formulations: a 4 mg and a 5mg, both injectables. Heritage initially sought only to launch the 5mg formulation.

2415.   In early 2013, Heritage received FDA approval to market Zoledronic Acid in the United States. Heritage began communicating with potential competitors before then to avoid price competition and to carve up market share.

2416.   On January 21, 2013, Malek (Heritage) e-mailed O'Mara (Heritage) directing him to reach out to Dr. Reddy's, the only other competitor Malek (Heritage) believed would be marketing Zoledronic Acid. Malek (Heritage) wrote:

Would like you to have a call with [Austin (Dr. Reddy's)] on Zoledronic.

Right now, only us and DRL have a tentative on the 5mg (reclast).

Need to know if he's going to be there day one and see if he's willing to discuss strategy at all.

This is huge right now if it's only a two player market and we need to lock in our strategy.

2417.    In a follow-up communication to O'Mara (Heritage) the next day, Malek (Heritage) outlined what O'Mara (Heritage) should ask Austin (Dr. Reddy's):

OK. Here are the questions if you would.

Are they going to be there day one (March 4)

Have they heard of any others there say [sic] one?

Are they launching the 4mg (Zometa) at risk?

Have they heard of anyone else launching the 4mg at risk?

What's their market share goal?

2418.    Communications between the two companies continued in March 2013 in preparation for Heritage' market entry, including communications on March 1, 4, 6, 12, and 13, 2013.

2419.    On March 1, O'Mara (Heritage) emailed Malek (Heritage) informing him that he had left Austin (Dr. Reddy's) a message "to have him call me back." He added, "Did not leave anything that would incriminate me—very generic." O'Mara (Heritage) and Austin (Dr. Reddy's) then spoke for almost eight (8) minutes on March 4, 2013.

2420.    The March 6 communication arose from Malek's (Heritage) concern that Dr. Reddy's initial pricing to at least one customer appeared to be lower than he had hoped. Malek (Heritage) emailed O'Mara (Heritage) asking, "[a]ny chance you can talk to them and educate them

on supply and demand economics?" O'Mara's (Heritage") response was "[y]es, they were working

on it yesterday, but [I] will give him a call and discuss."

2421.   On March 13, M.E., a Senior National Accounts Manager at Heritage, told Malek

that he had called his counterpart at Dr. Reddy's about Zoledronic Acid and they would "talk about

it soon." The two spoke on April 3, 2013 and M.E. confirmed that Dr. Reddy's had begun shipping

the 5mg product that day and that pricing would be "in the 500 range." The two continued to speak

throughout April.

2422.   On April 19, 2013, Malek (Heritage) instructed his sales team not to put any collusive

discussions on Zoledronic Acid or other drugs in writing to ensure the conspiracy remained hidden:

"Team: please hold off on emails regarding zoledronic indication, insert, prescribing, etc. take all

questions off line."

2423.   Heritage and Dr. Reddy's continued to police their market allocation agreement. For

example, in November 2013, Dr. Reddy's offered a lower price for Zoledronic Acid to one of

Heritage's customers. When Malek (Heritage) learned of this, he emailed M.E. (Heritage), "When

you spoke to [your counterpart at Dr. Reddy's], weren't they going to chill on share[?]" M.E.

(Heritage) replied. "He told me that he was going to speak to their injectable people and let them

know that they should chill."

2424.   For most of 2013 and 2014, the market for Zoledronic Acid remained stable with

Dr. Reddy's maintaining roughly 60 percent share to Heritage's 40 percent share for the 5mg

formulation.

### 4.   Lupin

2425.   In Patel's initial May 2013 quality competitor ranking list, Lupin was given a ranking

of +2. When Patel updated her quality competitor rankings a year later, Lupin received the highest

possible rating of +3.

2426.   Lupin was awarded the highest score in the quality competitor ranking in 2014 because Berthold of Lupin earned Patel's trust by consistently agreeing to her price increase plans. From May 2013 through April 2014, for example, Patel and Berthold spoke at least seventy-six (76) times by phone. Green, while still at Teva, also had a very strong relationship with Berthold. As discussed above, at times Patel and Green would even coordinate with each other regarding which one of them should coordinate a price increase or customer allocation agreement with Berthold.

2427.   As discussed more fully above, in 2013 – after Patel joined Teva – Teva and Lupin conspired to fix and raise prices on at least the following four drugs: Cefdinir oral suspension, Cefdinir capsules, Cefprozil tablets, and Pravastatin. Then in early 2014, executives at the two companies coordinated Lupin's entrance into the market for Balziva.

2428.   The relationship was so strong between Teva and Lupin that even when Green left Teva, and Patel was out of the office on maternity leave, Berthold still found other executives at Teva to communicate with regarding a price increase for the drug Cephalexin oral suspension. As discussed above, in October 2013, Berthold called Rekenthaler and T.S., a national account executive at Teva, to coordinate Lupin's November 1, 2013 price increase for Cephalexin oral suspension. When Patel returned from maternity leave and began planning the next round of Teva price increases, she continued these communications with Berthold until Teva followed Lupin's price increase on April 4, 2014.

2429.   Patel and Berthold also coordinated a price increase and market allocation scheme with regard to the drug Niacin ER, as Lupin was entering the market in March 2014. Given the successful track record between the two competitor companies, Lupin warranted a +3 in the quality competitor rankings when Patel updated them in May 2014.

### 5.  Par

2430.   In Patel's initial May 2013 quality competitor ranking list, Par was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Par improved to a ranking of +2.

2431.   Par rose in the rankings largely because of several strong relationships between executives at the two companies. For example, T.S. (Teva) had a strong relationship with R.K., a senior sales executive at Par. The two began communicating by telephone in September 2013. Between September 2013 and May 2014, the two spoke at least twenty-seven (27) times by phone.

2432.   Similarly, Rekenthaler (Teva) had a very strong relationship with another senior executive at Par, M.B. Rekenthaler spoke with M.B. frequently throughout 2013 and 2014. From the beginning of 2013 through May 2014, Rekenthaler spoke to M.B. (Par) at least thirty-two (32) times by phone.

2433.   Patel was well aware of these strong relationships and relied on the information that T.S. and Rekenthaler obtained from their communications with senior Par executives in order to make pricing or bidding decisions for Teva's drugs. One such example occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on Labetalol HCL tablets. Patel forwarded the e-mail to T.S. with three question marks: "???" T.S. responded immediately: "left message." The message that T.S. had left was for R.K. at Par, and the two executives spoke five (5) times that same day. After these calls with R.K., T.S. responded back to Patel saying "[l]et's speak on Monday. Just received call back with more information."

2434.   The following Monday, Patel also forwarded the original e-mail (discussing the competitive challenge from Par on Labetalol HCL) to Rekenthaler, saying "[n]eed to make a decision quickly." One minute after receiving that e-mail, Rekenthaler called M.B. (Par) and the two

spoke for eighteen (18) minutes. Shortly after hanging up the phone with M.B., Rekenthaler sent

another e-mail to Patel, stating: "[h]old off on this until I get back with you." Rekenthaler spoke to

M.B. again later that afternoon for three (3) minutes.

2435.   After these discussions between Teva and Par executives, Teva ultimately offered

only a nominal price reduction to that customer – knowing that this would likely concede the

business to Par.

2436.   As discussed more fully above, Teva continued to conspire with Par on various

market allocation and price fixing schemes throughout the remainder of 2014 and into 2015.

### 6.   Greenstone

2437.   Greenstone was not a highly-ranked competitor when Patel first created the quality

competitor ranking list in May 2013. Patel had, at that time, given Greenstone a ranking of "0."

However, when Patel updated her quality competitor rankings in May 2014, Greenstone improved

to a +1 ranking.

2438.   One of the reasons for Greenstone's improvement in the rankings was Patel's

developing relationship with R.H., a national account executive at Greenstone. Patel and R.H. were

former co-workers at ABC and had a longstanding relationship. From the time Patel started her

employment at Teva in April 2013, through the time that she updated the quality competitor

rankings in May 2014, Patel and R.H. communicated by phone or text at least sixty-six (66) times.

Patel also spoke to R.H.'s supervisor, Nailor, numerous times in early 2014 to coordinate

Greenstone and Teva price increases and customer allocation agreements.

2439.   Patel and R.H. (Greenstone) spoke consistently at or around the time of every price

increase effectuated by either company on drugs where they overlapped, including for example: July

3, 2013 – the day of Teva's price increase on Fluconazole; December 2, 2013 the day that

Greenstone sent notices to customers of its price increases on Azithromycin suspension,

Azithromycin oral suspension, and Medroxyprogesterone; and April 4, 2014 – the day that Teva followed Greenstone's price increases on Azithromycin suspension, Azithromycin oral suspension, and Medroxyprogesterone.

2440.   Given the willingness of Greenstone's executives to coordinate price increases with Teva, Patel increased Greenstone's quality competitor ranking in May 2014.

### 7.   Amneal

2441.   In Patel's initial May 2013 quality of competitor ranking list, Amneal was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Amneal improved to a ranking of +2.

2442.   One of the reasons why Amneal rose in the rankings was because of several strong relationships between executives at the two companies. For example, Rekenthaler (Teva) had a strong relationship with S.R.(2), a senior sales executive at Amneal. From May 2013 to May 2014, they spoke eight (8) times by phone, and attended many trade association meetings and customer conferences together as well. Rekenthaler and S.R.(2) were regular participants in an annual golf outing hosted by a packaging contractor in Kentucky, where – as discussed above – the generic drug manufacturer participants (competitors) played golf by day and gathered socially by night, referring to each other as "friends" and "fraternity brothers." (Green and Ostaficiuk were also participants.) As noted above, Rekenthaler and S.R. coordinated price increases on Ranitidine HCL in May 2013. The two coordinated again with respect to Warfarin Sodium tablets several times between May and August 2014. (S.R. also spoke with K.R. of Zydus, another manufacturer of Warfarin Sodium, days before his August conversation with Rekenthaler). And after a brief exit by Amneal from the Warfarin Sodium market in late 2014, S.R spoke with Rekenthaler again in early March 2015, days before Amneal reentered the market at a higher price than it had charged just months earlier.

2443.   Similarly, Patel also developed strong relationships with two Amneal executives: S.R.(1), a senior sales and finance executive at Amneal, and S.R.(2). As discussed above, Patel and S.R.(1) coordinated price increases for the drugs Norethindrone Acetate (September 2014) and Bethanechol Chloride (January 2015).

2444.   Patel also spoke to S.R.(2) regarding Norethindrone Acetate in September 2014, and continued to communicate with S.R.(2) into at least 2015 – sometimes using alternative forms of communication. In addition to their cell phones, the two executives also used Facebook Messenger to coordinate anticompetitive conduct. In the message exchange below (relating to a drug not identified in this Complaint), S.R.(2) informs Patel that Amneal will concede one customer – Econdisc ("E") – so long as Amneal is able to retain another large customer, Red Oak Sourcing ("RO"):



2445.   On the day of this message exchange, Patel and S.R.(2) also spoke by phone for nearly five (5) minutes.

REDACTED – PUBLIC VERSION

### 8.   Rising

2446.   In Patel's initial May 2013 quality competitor ranking list, non-defendant Rising was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Rising improved to a ranking of +2.

2447.   Rising improved in the quality competitor rankings because of the relationship between Rekenthaler and CW-2. In 2013, CW-2 left Sandoz to join Rising. At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate. Teva was one of the competitors already in that market. During several calls in early October 2013, CW-2 coordinated with Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

2448.   Later, in March 2014, CW-2 sought to return the favor. At that time, Rising experienced supply problems for Diflunisal tablets – a two-player market involving only Teva and Rising. In an effort to "play nice in the sandbox," and to further the ongoing understanding between the two competitors, CW-2 contacted Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future. The purpose for the call was to alert Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.

2449.   On April 4, 2014, Teva increased the price on Diflunisal tablets by as much as 182%, as well as Hydroxyzine Pamoate by as much as 165%. In the weeks leading up to those price increases, Rekenthaler communicated several times with CW-2 at Rising to coordinate the increases. The two spoke by phone twice on March 17, 2014 and once on March 31.

2450.   When Rising decided to leave the Diflunisal market in mid-July 2014, CW-2 called Rekenthaler to let him know. Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal. CW-2 and Rekenthaler communicated in advance of Rising's

re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014. On December 3, 2014, Rising re-entered the market for Diflunisal tablets. Its new pricing matched Teva's WAC price increase from April 2014.

2451.    Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with CW-2 (Rising) led Patel to increase Rising's quality competitor ranking in May 2014.

### 9.    Breckenridge

2452.    In Patel's initial May 2013 quality competitor ranking list, she gave Breckenridge a ranking of +1. When Patel updated her quality competitor rankings a year later, Breckenridge improved to a ranking of +2.

2453.    Breckenridge improved in the quality competitor rankings largely because of the strong relationship established between Patel and Rekenthaler and certain executives at Breckenridge, which led to several successful price increases.

2454.    For example, on November 14, 2013, Breckenridge increased the WAC pricing of both Estradiol/Norethindrone Acetate and Cyproheptadine HCL tablets. In the weeks leading up to those Breckenridge price increases, Rekenthaler communicated by phone several times with D.N., a sales executive at Breckenridge. The two spoke twice on October 14, 2013 and once on October 24, 2013. The call on October 24 lasted twenty-six (26) minutes.

2455.    On April 4, 2014, Teva followed the Breckenridge price increases on Estradiol/Norethindrone Acetate tablets increasing the WAC pricing by over 100% and Cyproheptadine HCL tablets increasing the WAC pricing by over 90%, to match Breckenridge's WAC pricing on both products. Teva raised prices even higher on its customer contracts. Teva increased the contract pricing of Estradiol/Norethindrone Acetate by as much as 393%, and the

contract pricing of Cyproheptadine HCL tablets by as much as 526%, depending on the dosage strength.

2456.   As Patel planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to communicate with their counterparts at Breckenridge. Rekenthaler spoke to D.N. at Breckenridge on January 15, 2014 – the day after Patel sent her first list of "Increase Potentials Q1 2014" to K.G. – for nineteen (19) minutes. Similarly, Patel spoke with S.C. – a sales executive at Breckenridge – two times on February 7, 2014, as she was determining whether Teva should provide a bid to a customer. After her discussions with S.C., Teva declined to bid for the business in order to avoid taking market share away from Breckenridge as a result of the price increases.

2457.   As a result of the successful coordination of these price increases between Teva and Breckenridge, Patel increased Breckenridge's quality competitor ranking in May 2014.

### 10.   Glenmark

2458.   Not every Teva competitor saw its quality competitor ranking increase between 2013 and 2014. Glenmark, for example, declined slightly in the rankings. In Patel's initial May 2013 quality competitor ranking list, Glenmark was given a ranking of +3. When Patel updated her quality competitor rankings a year later, Glenmark was given a ranking of +2.

2459.   The reason that Glenmark declined in the rankings was because Patel lost her most valuable relationship at that company – CW-5. CW-5 left Glenmark in April 2014. In the eleven-month period between Patel joining Teva in late April 2013 and CW-5 leaving Glenmark in April 2014, the two competitors communicated by phone or text message one hundred and twenty-one (121) times. They also communicated frequently using an encrypted messaging application, WhatsApp. As discussed more fully above, starting in early May 2013 Teva and Glenmark conspired to fix and raise prices on a number of drugs, including: Adapalene, Nabumetone, Fluconazole tablets, Ranitidine HCL, Moexipril HCL, Moexipril HCL/HCTZ, and Pravastatin.

2460.   In addition to CW-5, Patel also had other contacts at Glenmark – which is why Glenmark did not fall dramatically in the quality competitor rankings when CW-5 left the company. For instance, Patel exchanged forty-four (44) phone calls or text messages with J.C., a sales and marketing executive at Glenmark, between May 2013 and July 2015. Similarly, Patel exchanged thirty-six (36) calls with Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014. As discussed more fully above, Patel continued to coordinate with J.C. and Brown throughout 2014 on several drugs, including Desogestrel/Ethinyl Estradiol and Gabapentin tablets – demonstrating that Glenmark remained a quality competitor even after CW-5 left the company.

### 11.    Camber

2461.   When Patel first created the quality of competitor rankings in early May 2013, she gave Camber a ranking of -2. When Patel revised those rankings one year later in May 2014, Camber's ranking did not change. It remained one of the lowest ranked of all of Teva's competitors.

2462.   Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

2463.   This was evident when, in September 2014, Camber entered the market for two different drugs that overlapped with Teva.

2464.   One of those drugs was Raloxifene HCL tablets.

2465.   Teva had begun marketing Raloxifene HCL in March of that year. Actavis had received approval to begin marketing Raloxifene HCL in 2014 as well but had not yet entered by September 2014.

2466.   The other drug was Lamivudine/Zidovudine – a combination medication also known by the brand name Combivir. Camber had received approval to market a generic form of Combivir in February 2014, but as of September 2014 was still in the process of entering the market. Already in the market were competitors Teva, Aurobindo and Lupin. As discussed more fully above,

Teva, Lupin, and Aurobindo agreed to divide up the generic Lamivudine/Zidovudine market in 2012 when Teva was losing exclusivity on that drug.

2467.    As the anticipated product launches for Raloxifene HCL approached, the new entrants discussed an allocation strategy with Teva to ensure they each received their fair share of the market. On September 9, 2014, Rekenthaler had a twenty-six (26) minute phone call with A.B., a senior sales and marketing executive at Actavis. A short time later, a Teva executive told colleagues that she had "just heard Camber and Actavis expect to launch 9/24."

2468.    Teva's discussions with Actavis escalated over the coming week. On September 10, Rekenthaler exchanged two calls with Falkin (Actavis) lasting fifteen (15) minutes and one (1) minute, respectively. On September 11, the men talked for ten (10) more minutes. On September 16, Rekenthaler spoke by phone a total of six (6) times with different Actavis personnel, including one call with A.B. lasting thirty-four (34) minutes.

2469.    The following morning, in response to an inquiry regarding whether Teva intended to retain a major customer's Raloxifene HCL business, K.G. of Teva replied in the affirmative. Rekenthaler then shared the information he had gathered through his communications with competitors: "I know Actavis will be late. Camber is talking but their [sic] being somewhat unclear as well. I'll know more about them after my trip this week." That same day, on September 17, 2014, Camber sent an offer for Raloxifene HCL to a large Teva customer, Econdisc.

2470.    Rekenthaler and Ostaficiuk, the President of Camber, spent the next three days – September 17 through September 19 – playing golf during the day and socializing at night at an industry outing in Kentucky sponsored by a packaging vendor.

2471.    On September 21, 2014, Ostaficiuk called Rekenthaler and the two spoke for two (2) minutes. The next day, Rekenthaler initiated a series of four (4) phone calls with Ostaficiuk. The two spoke for a total of thirty (30) minutes that day. Notably, these are the first identified phone calls

ever between the two competitors. As a result, Camber sent a revised offer to its potential customer that same afternoon, containing modified prices for Raloxifene HCL.

2472.    On September 24, Patel discussed a Raloxifene HCL allocation strategy with her Teva colleagues in light of Camber's offer to the large Teva customer, Econdisc. She emphasized Camber's expressed commitment to the overarching conspiracy among the competitors – and conveyed information she obtained from Rekenthaler during his conversations with Ostaficiuk – stating: "Camber indicated that they are targeting Econdisc and a small retailer … and then they would be 'done.'"

2473.    As a part of this discussion, K.G. considered whether Teva should just concede Econdisc to Camber and seek to recover that market share with another customer. At 9:07am that morning, Patel informed her supervisor K.G. and numerous others at Teva, that Rekenthaler planned to discuss the matter with Camber:

```
From:   Nisha Patel02
Sent:   Wed 9/24/2014 9:07 AM (GMT-05:00)
To:     ██████████████
Cc:     Dave Rekenthaler; ████████████████████████████
Bcc:
Subject: Re: Econdisc Raloxi'ene Intel

FYI, Dave is working on verifying the Camber price. Stand by.

Sent from my iPhone
```

2474.    Indeed, at 9:28am that morning, Rekenthaler called Ostaficiuk and the two spoke for two (2) minutes. They spoke two more times that day, including one call that lasted eight (8) minutes.

2475.    Some of these calls also related to Camber's entry into the market for Lamivudine/Zidovudine. Teva and Lupin were already in the market for Lamivudine/Zidovudine, and Ostaficiuk was engaging in contemporaneous communications with Rekenthaler of Teva and

REDACTED – PUBLIC VERSION

Berthold of Lupin to negotiate Camber's entry into that market. At least some of those calls on September 24, 2014 are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 5:28:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Rekenthaler, David (Teva) | 8:19:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Berthold, David (Lupin) | 8:21:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Berthold, David (Lupin) | 8:23:00 | 0:10:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 10:35:00 | 0:07:00 |

2476.   On that same day, Berthold also spoke with P.M., a senior operations executive at Aurobindo, for more than eighteen (18) minutes, to close the loop on the Lamivudine/Zidovudine communications.

2477.   On September 25, after discussing with his colleagues which customers Teva should concede in order to give Camber its fair share of the Raloxifene HCL market, and aimed with the information Rekenthaler had gathered from Camber's President, K.G. concluded: "Okay, we will concede additional smaller customer challenges (particularly distributors) since they are not going to target One Stop." Rekenthaler and Ostaficiuk spoke again twice that day.

2478.   That evening, a Camber executive instructed a colleague to gather market intelligence on possible additional customers for Camber's new Raloxifene HCL product but stressed that the company would not bid on any additional Teva accounts "until we know how we do with Econ[disc]."

2479.   On Friday September 26, 2014, Camber publicly announced that it was launching Raloxifene HCL. Rekenthaler called Ostaficiuk that day, for a short one (1) minute call.

2480.   From those telephone calls, Rekenthaler expressed to Ostaficiuk that Teva did not want Camber challenging for any more of its customers, on Raloxifene HCL or Lamivudine/Zidovudine. As a result of this communication, on Monday September 29, 2014 Ostaficiuk sent the following e-mail to his colleagues at Camber:

| Message | |
|---|---|
| From: | Kon Ostaficiuk [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Kon Ostaficiuk] |
| on behalf of | Kon Ostaficiuk |
| Sent: | 9/29/2014 5:27:43 PM |
| To: | [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▆▆▆▆▆▆▆▆▆▆▆ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▆ |
| CC: | ▆▆▆▆▆ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▆ |
| Subject: | RE: McKesson -- dead net prices for OS w/ Riteaid |

Hi Gang,
We do not offer anything to any Teva customers...

Not even a "bad price"!

Please acknowledge...We do not want to upset them more!

Thank you,
Kon

2481.    A.R., a senior sales executive at Camber, replied: "We have not made any offers to any Teva Raloxifene accounts since we received the Econ award. Both Sales and Contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer." A.R. also added that "We are also not seeking any Lupin business on Lamo/Zidovudine." Ostaficiuk replied: "Thank you. We don't want to antagonize either of them and start a war…"

2482.    About a week later, on October 7, 2014, a large Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene HCL business. J.P., a Director of National Accounts at Teva, sent an e-mail to certain employees at Teva, including Rekenthaler, notifying them of her conversation with the customer, and expressing surprise given the agreement Teva had previously reached with Camber: "I thought they were done after securing Econdisc?" Based on his prior conversations with Ostaficiuk, Rekenthaler doubted that Camber made an offer to another Teva customer, stating: "You're positive they sent them an offer?"

2483.    J.P. of Teva "relayed 'the message" to the customer that "the market should be stable at this point" and Teva would be surprised if Camber had intended to make an offer to the customer. After further discussion with the customer, Teva staff learned that it was a

misunderstanding. Camber never actually made the offer but had instead complied with its agreement with Teva.

2484.   The fair share agreement continued to govern as usual until mid-December 2014, when Camber learned of supply problems at Teva on Raloxifene HCL. A Camber employee described the prospect of Teva being on backorder for this drug as a "Game changer." Expressing her understanding of the rules of the conspiracy, she pointed out: "**Fair share only applies when there is not supply constraints.**" Ostaficiuk responded optimistically, but cautiously: "Good luck guys but go fishing and gather information before we commit . . .."

### D.   Other Examples of Price Fixing and Customer Allocation

#### 1.   Adapalene Cream

2485.   On July 6, 2010, Fougera received FDA approval as the first-to-file generic for Adapalene Cream. Two weeks later, on July 20, 2010, Fougera entered the market and published WAC pricing.

2486.   Fougera quickly realized, however, that it would not be alone in the market for long, and that Perrigo would soon emerge as a competitor. On August 9, 2010, Kaczmarek e-mailed D.K., a senior executive at Fougera, regarding ███████████████ stating: ███████████████

███████████████████████████████████████████████████████████████

Similarly, a few weeks later, on August 30, 2010, D.K. informed other Fougera executives: ████

███████████████████████████████████████████████████████████

███████████████████ Several Perrigo representatives attended NACDS, including T.P., Wesolowski, and S.K., a senior Perrigo executive.

2487.   On September 27, 2010, CW-6 of Fougera called T.P. of Perrigo. The call lasted less than one (1) minute. Minutes later, T.P. called CW-6 back and they spoke for three (3) minutes.

**REDACTED – PUBLIC VERSION**

2488.    Two days later, on September 29, 2010, Kaczmarek informed D.K. that Perrigo would be shipping Adapalene Cream in two (2) weeks and sending out offers to customers starting that day. D.K. passed that information along to other senior Fougera executives.

2489.    On October 1, 2010, M.A., a marketing executive at Fougera, e-mailed D.K. to inform him that there had been no publicly reported changes in the Adapalene market.  D.K. responded: ██████████████████████████████████████████

2490.    Between October 5 and October 7, 2010, CW-6 of Fougera and T.P. of Perrigo exchanged several calls. Shortly after hanging up with T.P., CW-6 called his supervisor Kaczmarek to report on his conversations. These calls are detailed in the chart below:

| Date | Ca | Target Name | Direction | Contact Name | Tim | Durati |
|------|------|-------------|-----------|--------------|------|--------|
| 10/5/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 15:52:49 | 0:00:04 |
| 10/5/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 15:53:18 | 0:03:26 |
| 10/5/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:07:16 | 0:00:05 |
| 10/7/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:44:57 | 0:00:40 |
| 10/7/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:53:16 | 0:00:57 |
| 10/7/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:56:59 | 0:10:40 |

2491.    On October 8, 2010, D.K. e-mailed Kaczmarek with a subject line ████████████ stating: ████████████████████ That same day, Kaczmarek called CW-6 and they spoke for two (2) minutes. After that call, CW-6 again exchanged several calls with T.P. of Perrigo. After hanging up with CW-6, T.P. immediately called his supervisor, Wesolowski. These calls are detailed in the chart below:

| | | | | | | |
|------|------|-------------|-----------|--------------|------|--------|
| 10/8/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 10:53:45 | 0:03:30 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 15:59:25 | 0:00:38 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:01:31 | 0:04:47 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:07:04 | 0:00:49 |

2492.    CW-6 of Fougera and T.P. of Perrigo continued to exchange calls in the days leading up to Perrigo's launch of Adapalene Cream. As before, CW-6 and T.P. continued to keep their supervisors, Kaczmarek and Wesolowski, informed of their conversations. These calls are detailed in the chart below:

| Date | Cal | Target Name | Directi | Contact Name | Time | Durati |
|------|-----|-------------|---------|--------------|------|--------|
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:53:56 | 0:01:00 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:16 | 0:00:08 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:46 | 0:05:04 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:01:36 | 0:00:03 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:33:46 | 0:00:36 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:46:18 | 0:15:02 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 15:58:59 | 0:01:40 |
| 10/19/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:37:08 | 0:00:58 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:49:32 | 0:12:42 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:10:46 | 0:04:14 |
| 10/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 13:03:06 | 0:02:35 |
| 10/21/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:05:59 | 0:00:00 |

2493.    On October 25, 2010, Perrigo entered the Adapalene Cream market and published WAC pricing that matched Fougera's WAC pricing exactly. That same day, CW-6 and T.P. spoke again for nearly four (4) minutes.

2494.    From the outset, and consistent with fair share principles, Fougera understood and agreed that it needed to give up 40% of its share of the market to Perrigo. CW-6 of Fougera and

2495.    T.P. of Perrigo also discussed which customers Fougera would give up. For example, the day after Perrigo's entry, on October 26, 2010, CW-6 and T.P. spoke at least four times. Shortly after the last of those calls, CW-6 sent the following e-mail to Kaczmarek regarding ███████ ███████████████ stating:



2496.    Fougera wasted no time in acting on CW-6's recommendations and ceding

significant share to the new entrant, Perrigo. Perrigo, in turn, focused specifically on the list of

customers provided by CW-6. For example, on October 25, 2010, Publix informed Fougera that it

had received a competitive offer for Adapalene Cream and offered Fougera the opportunity to retain

the business. The next day, on October 26, 2010, S.H., a Fougera sales executive, declined to bid

stating, ███████████████████████████████████████████████████

████

2497.    Also on October 25, 2010, NC Mutual informed Fougera that it had received a

competitive offer for Adapalene Cream. On October 28, 2010, CW-3 forwarded the request to

Kaczmarek asking: ██████████████████████████ Kaczmarek responded in the

affirmative. Later that day, CW-3 responded to NC Mutual stating: ██████████████

██████████████████████████

2498.   On October 26, 2010, Rite Aid advised Fougera that it had received a competitive bid for Adapalene Cream. Consistent with the plan, on November 2, 2010, Fougera ceded the account to Perrigo, telling the customer: ███████████████████████ and reasoning that ███████████████████████

2499.   On October 29, 2010, Kroger informed CW-3 that it had received a competitive offer from Perrigo for Adapalene Cream. CW-3 forwarded the e-mail to Kaczmarek asking: ████

██████████████████████████████████████████████████████

█████████████████████████████████ Kaczmarek responded:

██████████████████████████████████████████████████████

█████████████████████████ CW-3 would later acknowledge in his October 2010 monthly recap that the decision not to match Perrigo's offer was a ████████

███████ meant ████████████████████ to the new entrant, Perrigo.

2500.   Further, by the end of October 2010, Fougera had also given up Cardinal's Adapalene Cream business to Perrigo.

2501.   The agreement operated successfully for both Fougera and Perrigo. Fougera was impressed that Perrigo had behaved responsibly by keeping prices high and focusing on the agreed-upon customers as it entered the market for Adapalene Cream. As D.K. noted in an internal e-mail,

██████████████████████████████████████████████████████

███████████████████████ He stated further, ████████████████████████

██████████████████

2502.   Two years later, in November 2012, Sandoz (which had acquired Fougera) left the Adapalene Cream market temporarily due to supply issues. This left Perrigo as the sole manufacturer of the product.

2503.   By early January 2013, Sandoz was making plans for its re-entry into the market.

REDACTED – PUBLIC VERSION

2504.    On January 14, 2013, CW-3 provided M.A., a Sandoz marketing executive, a list of potential targets for Adapalene Cream stating that ███████████████████████████ ████████████████████████████████████████ CW-3 further explained that ████████████ ████████████████████████████████████████████████████████ ██████████████████████ The list of potential targets was organized by historical volume of units purchased and Walgreens was the first name on that list. Wal-Mart was not listed as a target.

2505.    On June 24, 2013, approximately one month before Sandoz's re-launch, CW-3 and T.P. of Perrigo had a ten (10) minute phone call during which T.P. shared Perrigo's non- public dead net pricing for Adapalene Cream for two customers – Walgreens and Optisource. During that conversation, CW-3 recorded those prices in a notebook  as follows:

2506.    On July 15, 2013, Sandoz held a Commercial Operations call during which they discussed, among other things, the Adapalene Cream re-launch scheduled for July 26, 2013. That same day, T.P. and CW-3 exchanged two more calls, both lasting one (1) minute. After exchanging a third call that lasted one (1) minute on July 16, 2013, the two competitors connected on July 17, 2013 and spoke for nineteen (19) minutes. During this call, T.P. provided CW-3 with Perrigo's non-public pricing for Adapalene Cream for a list of customers. T.P. also told CW-3 that Perrigo was not

willing to give up Walgreens to Sandoz. CW-3's contemporaneous notes from this call are detailed below:



2507.    The purpose of conveying this information was so that Sandoz, when it re-entered the market, could target and obtain specific agreed-upon customers with the highest prices possible, to minimize price erosion.

2508.    Also, between July 16, 2013 and July 18, 2013, CW-3 and A.F., a sales executive at Perrigo, exchanged at least nineteen (19) text messages.

2509.    On July 26, 2013, the day of Sandoz's re-launch of Adapalene Cream, CW-3 called CW-1 and they spoke for eight (8) minutes. On this call, CW-3 provided CW-1 with the customer pricing for Adapalene Cream that T.P. had provided to him. Within minutes of hanging up with CW-3, CW-1 sent an internal e-mail, including to Kellum, regarding Adapalene Cream. In that e-mail, CW-1 recommended that Sandoz approach ██████████████████████████

CW-1 also provided the following pricing information for those customers:

2510.    Notably, the price points matched exactly with the price points T.P. had provided to CW-3. In his e-mail, CW-1 also stated that Sandoz would need to bid 30% lower than ABC's current price in order to win the business upon re-launch.

2511.    That same day, on July 26, 2013, Sandoz prepared and sent offers for Adapalene Cream to the three customers CW-1 identified – ABC, McKesson, and Wal-Mart – as well as Rite Aid and Morris & Dickson. Consistent with the prior conversations between CW-3 and T.P. of Perrigo, Sandoz did not submit a bid to Walgreens.

2512.    Later that day, on July 26, 2013, Morris & Dickson accepted Sandoz's bid for Adapalene Cream. Also, that same day, Wal-Mart declined the opportunity – but for reasons other than price – stating:

2513.    The following Monday (the next business day), on July 29, 2013, T.P. of Perrigo called CW-3 twice. Both calls lasted one (1) minute. The next day, on July 30, 2013, CW-3 called T.P. back and they spoke for thirteen (13) minutes. CW-3 hung up and immediately called CW-1 to report about his conversation with the competitor. The call lasted four (4) minutes. That same day, Rite Aid accepted Sandoz's bid for Adapalene Cream.

615

2514.   The next day, on July 31, 2013, Sandoz sent an offer for Adapalene Cream to Econdisc. The next morning, on August 1, 2013, Econdisc notified Perrigo of the offer and gave the incumbent an opportunity to bid to retain the business. Within the hour, T.P. called CW-3. The call lasted one (1) minute. Ten minutes later, T.P. called CW-3 again and they spoke for five (5) minutes. Later that day, in an effort to avoid putting evidence of his collusive conversations in writing, CW-3 sent the following e-mail to CW-1:



That same day, CW-3 and CW-1 spoke for five (5) minutes.

2515.   On August 2, 2013, ABC accepted Sandoz's bid for Adapalene Cream.

2516.   On August 6, 2013, T.P. and CW-3 exchanged two calls lasting four (4) minutes and twelve (12) minutes, respectively. Later that day, T.P. and his colleagues at Perrigo, including his supervisor, Wesolowski, had a conference call to discuss Adapalene Cream. That same afternoon, Perrigo notified Econdisc that it was declining to bid to retain the customer's business. Later that day, Econdisc accepted Sandoz's bid for Adapalene Cream.

2517.   The next day, on August 7, 2013, McKesson accepted Sandoz's offer for Adapalene Cream.

2518.   T.P. of Perrigo and CW-3 continued to talk throughout August 2013 to coordinate Sandoz's smooth entry into the market. For example, between August 12 and August 15, 2013, the two competitors exchanged at least eight calls, including two calls on August 15, 2013 lasting eight (8) minutes and fourteen (14) minutes, respectively. Later that day, M.A., a Sandoz marketing executive, e-mailed CW-1 regarding Adapalene Cream stating that Sandoz's market share was now

25.5% and asking whether Walgreens could be ███████ As detailed above, Sandoz had stayed

away from Walgreens because Perrigo said they would not give up the business.

2519.   Respecting the agreement that the two competitors had arranged, Sandoz stayed

away from Walgreens and instead submitted another offer to Wal-Mart on August 27, 2013. Wal-

Mart, again, summarily refused the offer stating that it ████████████████████ because

Perrigo had been its supplier for less than one year. The next day, on August 28, 2013, CW-3 called

T.P. and they spoke for fourteen (14) minutes. T.P. hung up and spoke with his supervisor,

Wesolowski, for seven (7) minutes.

2520.   As of December 2013, and without the Wal-Mart business, Sandoz had only

obtained approximately 30% share of the Adapalene Cream market. This was well below its

expected share in a two-player market and less than the 47% market share that Sandoz had

maintained prior to leaving the market in November 2012 due to supply issues.

2521.   This underperformance caught the attention of high-level executives at Sandoz. On

January 8, 2014, R.A., a Sandoz finance executive, convened a meeting to discuss the Adapalene

Cream re-launch and the issue of securing more market share on the product. By that time, it had

been decided internally by the sales team that Sandoz would pursue Walgreens – representing

approximately 19% share – to meet its fair share targets on Adapalene Cream.

2522.   That same day, on January 8, 2014, CW-3 called T.P. of Perrigo. The call lasted one

(1) minute. First thing the next morning, CW-3 called T.P. again and they spoke for sixteen (16)

minutes. T.P. and CW-3 would exchange two more calls the following week, on January 13 and

January 16, 2013, lasting one (1) minute and ten (10) minutes, respectively. Immediately upon

hanging up from the ten (10) minute call, CW-3 called CW-1 and they spoke for eight (8) minutes.

2523.   On January 28, 2014, Sandoz held a follow-up meeting to discuss the Adapalene

Cream re-launch and Walgreens as Sandoz's next target. Two days later, on January 30, 2014,

Sandoz met with Walgreens to discuss new product opportunities, including Adapalene Cream. The next day, on January 31, 2014, CW-3 called T.P. and they spoke for eight (8) minutes. Upon hanging up with T.P., CW-3 called CW-1. The call lasted one (1) minute.

2524.   After this series of communications between CW-3 of Sandoz and T.P. of Perrigo, Sandoz submitted a bid to Walgreens for Adapalene on February 14, 2014. Perrigo promptly conceded the customer and Walgreens awarded the business to Sandoz on March 5, 2014. This award brought Sandoz's share back to 47% -- the same percentage it had before exiting the market in 2010.

### 2.      Albuterol Sulfate

2525.   At all relevant times, Mylan and Sun have dominated market for Albuterol Sulfate.

2526.   Prior to 2013, the effective prices for Albuterol Sulfate were stable.

2527.   Beginning in March 2013, the average NADAC price for Albuterol Sulfate rose dramatically.

2528.   For example, Mylan's 100ct Albuterol Sulfate 2mg increased price by over 4,300% from $0.13 to $5.88 on March 6, 2013. Sun's 100ct Albuterol Sulfate 2mg increased 3,400% from $0.13 to $4.70 on April 15, 2013, as illustrated by WAC data:

| Product 2MG | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|
| 100 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,317% |
| 500 ct | Mylan | $0.13 | $5.88 | March 6, 2013 | 4,549% |
| 100 ct | Sun | $0.13 | $4.70 | April 15, 2013 | 3,485% |
| 500 ct | Sun | $0.12 | $4.70 | April 15, 2013 | 3,674% |

### 3.      Alclometasone Dipropionate

2529.   During the relevant time period, Glenmark, Taro, and Sandoz were the primary manufacturers of Alclometasone Dipropionate.

2530.   The market for Alclometasone Dipropionate cream and ointment was mature and at all relevant times had multiple manufacturers.

2531.   After years of relatively low pricing, the prices of Alclometasone Dipropionate cream and ointment sold by Glenmark, Taro, and Sandoz leaped to approximately three times their former prices. By complying with their fair share agreement, Glenmark, Taro, and Sandoz were able to impose and sustain higher prices for Alclometasone Dipropionate.

2532.   <u>Alclometasone Ointment</u>. In May 2013, Sandoz was the exclusive generic manufacturer of Alclometasone Ointment. The other competitors – Taro and Glenmark – had exited the market due to supply issues. However, around this time, Sandoz began experiencing supply issues of its own on Alclometasone Ointment. As a result, Taro and Glenmark – in consultation with Sandoz – used this as an opportunity to raise the price of the product and re-enter at that higher price.

2533.   The competitors began discussing their plans for Alclometasone cream and ointment as early as April 2013. For example, on April 15, 2013 and April 16, 2013, CW-3 (Sandoz) exchanged several calls with Aprahamian (Taro) and Blashinsky (Glenmark). These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:26:00 | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 5:49:00 | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:58:00 | 0:09:00 |
| 4/16/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 6:29:00 | 0:01:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 10:38:00 | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:11:00 |

2534.   On these calls, Blashinsky relayed that Glenmark expected to re-enter the Alclometasone Ointment market in the ███████████ and was seeking ██████ percent share. CW-3 took contemporaneous notes during these conversations, and his complete notes from those calls are pictured below:



2535.    Three days later, on April 19, 2013, CW-3 of Sandoz e-mailed M.A., a Sandoz

marketing executive, stating ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████ However, the true source of CW-3's information was Glenmark,

not a customer. CW-3 wanted a breakdown of sales by customer so that he could understand how

best to divide up customers as Glenmark entered the market.

2536.    On May 23, 2013, Sandoz sent an internal e-mail advising that it could no longer

supply the 45gm formulation of Alclometasone Ointment. At that time, both the 15gm and 60gm

formulations were also on temporary back order. That same day, on May 23, 2013, CW-3 called

Blashinsky and they spoke for four (4) minutes.

2537.   On May 29, 2013, D.S., a Taro sales executive, forwarded Aprahamian an e-mail he received from Cardinal regarding Sandoz's supply issues on Alclometasone Ointment. The next day, Aprahamian responded, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

2538.   Over the next several days, Taro had several calls with Glenmark during which the two competitors coordinated their plans to increase pricing in advance of their re-entry into the Alclometasone Ointment market. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/31/2013 | Voice | Blashinsky, Mitchell | Incoming | D.S. (Taro) | 9:47:00 | 0:03:00 |
| 5/31/2013 | Voice | Blashinsky, Mitchell | Outgoing | D.S. (Taro) | 11:00:00 | 0:19:00 |
| 6/3/2013 | Voice | Blashinsky, Mitchell | Outgoing | Taro Pharmaceuticals | 13:03:00 | 0:06:00 |
| 6/3/2013 | Voice | Blashinsky, Mitchell | Outgoing | Taro Pharmaceuticals | 13:09:00 | 0:14:00 |

2539.   On June 6, 2013, after exchanging e-mails with Taro's supply chain regarding Alclometasone Ointment, Aprahamian sent an internal e-mail stating, ████████████████

████████████████████████████████   The next day, on June 7, 2013, Aprahamian called CW-3 of Sandoz and they spoke for eleven (11) minutes.

2540.   On June 10, 2013, Glenmark re-entered the Alclometasone Ointment market with WAC pricing that was significantly higher than Sandoz's WAC pricing. The next day, on June 11, 2013, Taro issued notices to the three big wholesalers – ABC, Cardinal, and McKesson – announcing it was re-entering the Alclometasone Ointment market at new WAC pricing that matched Glenmark. Taro increased its WAC pricing between 201% and 239%, depending on the formulation.

2541.    That same day, on June 11, 2013, M.A. of Sandoz sent an internal e-mail indicating that Taro had increased pricing on Alclometasone Ointment. J.R., a senior Sandoz marketing executive, responded approvingly: ██████████████████████████████

2542.    The next day, on June 12, 2013, Aprahamian e-mailed Perfetto and J.K., a Taro executive, regarding Alclometasone Ointment stating that Taro had launched the product and ███ ██████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████

2543.    That same day, S.B., a Taro sales executive, e-mailed Aprahamian stating, █████ ██████████████████████████████████ ████████  Aprahamian responded: ████████████████    S.B. replied: ██████████ ██████████████████████████  Aprahamian – not wanting to take more share than Taro was entitled to – responded, ████████████████████████

2544.    <u>Alclometasone Cream</u>. In May 2013, Taro increased its pricing on Alclometasone cream by 223%. Over the next several months, and consistent with their ongoing understandings, Taro's competitors – Sandoz and Glenmark – followed Taro's May 2013 Increases with increases of their own as detailed in the chart below:



2545.   Sandoz followed Taro's price increases on Alclometasone Cream with its own price increases on May 10, 2013, and Glenmark followed Taro's and Sandoz's price increases on Alclometasone Cream shortly thereafter, on May 16, 2013. The following chart details the competitor calls surrounding those increases:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:01:00 |
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:32:00 | 0:01:00 |
| 5/7/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:01:00 | 0:07:00 |
| 5/8/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 2:44:00 | 0:02:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:09:00 | 0:08:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:30:00 | 0:09:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:42:00 | 0:02:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:45:00 | 0:01:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 4:51:00 | 0:07:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 5:29:00 | 0:01:00 |
| 5/13/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 13:10:00 | 0:01:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:01:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 4:00:00 | 0:18:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 5:23:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:56:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:27:00 | 0:05:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:49:00 | 0:05:00 |

2546.   Consistent with their ongoing understandings, Taro exercised restraint, just as its competitors had done, and did not poach customers from its competitors after they followed with price increases of their own. For example, on May 23, 2013, after Glenmark raised its prices, Econdisc, one of Glenmark's large customers, solicited bids on Alclometasone Dipropionate from Taro, seeking a better price. Aprahamian asked D.S., a Taro sales executive, why Econdisc was looking for a bid and D.S. replied:   Aprahamian responded: ███████████ Consistent with Aprahamian's directive, Taro subsequently declined to bid on the business. The reason was their fair share agreement, not inadequate supply.

### 4.   Allopurinol

2547.   During the relevant time period, Actavis, Dr. Reddy's, Mylan, and Par were the primary manufacturers of Allopurinol.

2548.   The market for Allopurinol was mature and at all relevant times had multiple manufacturers.

2549.   For years, the prices for Allopurinol were relatively low and stable. Par/Qualitest, Actavis, Dr. Reddy's, and Mylan all offered prices for Allopurinol tablets for pennies per pill. Dr. Reddy's exited the market in 2012, and prices remained low and stable. In the spring of 2014, there were brief supply disruptions for Allopurinol. Par/Qualitest and Actavis used this as a reason to impose large price increases, which they did almost simultaneously. Actavis announced WAC prices approximately five times higher than its former prices, and Par/Qualitest announced list prices higher than Actavis. Their wholesale prices charged to pharmacies, as reflected by IQVIA's National Sales Perspective database ("NSP" price) increased by even more.

2550.    Mylan did not immediately follow the Actavis and Par/Qualitest price increases, but eventually did so. Approximately six months after Actavis and Par announced their WAC prices, Mylan joined them, announcing WAC prices identical to those of Actavis, and it also raised its NSP prices.

2551.    When prices increased in the Allopurinol market, Dr. Reddy's began to assess whether it should re-enter.

2552.    In August 2014, Dr. Reddy's assessed possible re-entry into the Allopurinol market. Since it would be the fourth manufacturer in the market, the Head of National Accounts at Dr. Reddy's recognized—in line with the fair share agreement—that it should target a 20 to 25% share.

2553.    Dr. Reddy's did decide to re-enter the market. As it ramped up for re-entry, it complied with the fair share agreement between the Allopurinol manufacturers. In January 2015, rather than offer better prices to win market share, Dr. Reddy's announced identical WAC prices as Actavis.

2554.    When Dr. Reddy's began pursuing a fair share of the market, it was careful not to disrupt pricing. For example, in January 2015, as Dr. Reddy's internally discussed an Allopurinol opportunity at a large customer, the Vice President and Head of Prescription Drugs reminded his team, "We just need to be careful we don't spook Qualitest [Par]."

2555.    Dr. Reddy's was similarly careful about abiding by its fair share agreement when opportunities to take Allopurinol business from Mylan arose: "To be frank, even with Mylan having [supply] issues, I feel we should not get too excited with inquiries and disrupt the market, we got our share goal (actually exceeded it) – we should limit any additional business to a couple small strategic customers at most and I feel additional share would be good for the plant."

2556.    Pricing data show steep and parallel price increases beginning in May 2014 by Actavis, Par/Qualitest, and Mylan for Allopurinol tables. Dr. Reddy's joined in the price increases when it re-entered the market.

2557.    Throughout this period, Actavis, Dr. Reddy's, Mylan, and Par met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Allopurinol and their fair share agreement.

2558.    For example, Falkin (Actavis) was in touch with Nesta (Mylan) in September 2014. Falkin (Actavis) also communicated with C.S., Dr. Reddy's Senior Director of National Accounts, in September. Actavis announced its list (WAC) price increases on Allopurinol on September 19, 2014.

2559.    On September 26, 2014, a week after Actavis's price increase, A.S., Actavis VP of Sales, spoke to C.P., VP of National Accounts at Par, for nearly 15 minutes. A few days later, Par announced list (WAC) prices for Allopurinol that were even higher than those of Actavis.

2560.    Falkin (Actavis) also spoke to C.S. (Dr. Reddy's) multiple times in January and in early February. Dr. Reddy's announced its list (WAC) price increases on January 26, 2015.

2561.    Falkin (Actavis) also spoke to Nesta (Mylan) again in March 2015, shortly after Mylan announced its list (WAC) price increases on Allopurinol on March 4, 2015.

### 5.    Amantadine HCL

2562.    During the relevant time period, Sandoz, Upsher-Smith, and Lannett were the primary manufacturers of Amantadine HCL capsules.

2563.    The market for Amantadine HCL capsules was mature and at all relevant times had multiple manufacturers.

2564.    Amantadine HCL capsules had relatively low and stable prices for years. In late 2011, however, Sandoz and Upsher-Smith imposed extraordinary price increases, driving the price of Amantadine HCL capsules to more than five times their former price. They also imposed identical

WAC prices for their capsules.  Lannett, which did not have much presence in the market, made a push into the market in early 2013. Rather than offer lower prices to win customers, Lannett announced an identical list price, and was careful not disturb market pricing, as required by the fair share agreement between Lannett, Upsher-Smith, and Sandoz.

2565.    Pricing data show steep and parallel price increases beginning in December 2011 by Sandoz and Upsher-Smith, which were later joined by Lannett.

2566.    Throughout this period, Sandoz, Upsher-Smith, and Lannett met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Amantadine HCL capsules and their fair share agreement.

2567.    For example, in 2011, as Sandoz and Upsher-Smith began their parallel and coordinated price increases, K.K., a Senior National Account Executive at Sandoz, and D.Z., Upsher-Smith Senior National Account Manager, were in contact throughout that year, with telephone communications in (at least) March, April, July, September, November, and December of 2011, as well as January and February of 2012. In February, Sandoz followed Upsher-Smith's October 2011 increase.

### 6.    Amitriptyline

2568.    At all relevant times, Mylan, Par, and Sandoz have dominated the market for Amitriptyline.

2569.    Prior to 2014, the effective prices for Amitriptyline were stable.

2570.    Beginning in May 2014, the average NADAC price for Amitriptyline rose dramatically.

2571.    These price increases followed the (i) April 1, 2014 HDMA Annual CEO Roundtable Fundraiser in New York, New York, which Mylan, Par, and Sandoz attended. *See* Exhibit A.

2572.   The charts below show average price increases for various dosages of Amitriptyline tablets:





2573.   WAC data confirms that Mylan, Par, and Sandoz increased Amitriptyline prices largely in unison by the following amounts:

REDACTED – PUBLIC VERSION

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 100ct | Sandoz | 00781148801 | $0.05 | $0.57 | 5/23/2014 | 1,032% |
| 1,000ct | Sandoz | 00781148810 | $0.05 | $0.48 | 5/23/2014 | 945% |
| 100ct | Mylan | 00378265001 | $0.05 | $0.57 | 7/16/2014 | 1,032% |
| 1,000ct | Mylan | 00378265010 | $0.05 | $0.57 | 7/16/2014 | 1,157% |
| 100ct | Par | 00603221421 | | $0.57 | 9/26/2014 | |
| 1,000ct | Par | 00603221432 | | $0.48 | 9/26/2014 | |

2574. News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, and market-wide price increases. For example, The *Financial Times* reported on May 12, 2015 that the $1.07 price for a 100 mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[53] The *Boston Globe* similarly reported, in November of the same year, "The cost of the antidepressant drug amitriptyline jumped 2,475 percent, from 4 cents for a 100-milligram pill in 2013 to $1.03 in 2015."[54]

### 7. Atenolol Chlorthalidone

2575. During the relevant time period, Mylan and Actavis were the primary manufacturers of Atenolol Chlorthalidone tablets.

2576. The market for Atenolol Chlorthalidone tablets was mature and at all relevant times had multiple manufacturers.

2577. For years, the prices for Atenolol Chlorthalidone tablets were relatively low and stable. Beginning in the spring of 2014, Mylan and Actavis began to raise the prices of Atenolol Chlorthalidone tablets. By the end of 2014, WAC prices for both manufacturers had more than doubled, and NSP prices for both manufacturers had increased even more.

---

[53] David Crow, *Teva bids for Mylan amid pressure on copycat drugmakers*, Fin. Times, May 12, 2015, available at https://www.ft.com/content/8ff2fc5a-f513-11e4-8a42-00144feab7de.

[54] Priyanka Dayal McCluskey, *As competition wanes, prices for generics skyrocket*, Bos. Globe, Nov. 6, 2015, available at https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.

2578.   As Mylan and Actavis raised prices, they aimed to divide the market between themselves. Whenever market share diverged from a roughly equal split (as happened in a couple of instances when Mylan experienced supply disruptions), they eventually worked back toward a 50/50 division. All the while, Mylan and Actavis were careful not to erode pricing.

2579.   Pricing data show steep and parallel price increases beginning in March 2014 by Mylan and Actavis for Atenolol Chlorthalidone tablets.

2580.   Throughout this period, Mylan and Actavis met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Atenolol Chlorthalidone and their fair share agreement.

2581.   For example, Nesta of Mylan and Falkin of Actavis communicated extensively throughout the time of the price increases.

### 8.     Atropine Sulfate Ophthalmic Solution

2582.   Atropine Sulfate is an anticholinergic and is available as, for example, a 1% Ophthalmic Solution for use in eye examinations to dilate the pupil and to treat certain eye conditions.  It has been available in the United States for over a decade in a generic form.

2583.   The market for Atropine Sulfate Ophthalmic Solution is mature. At all relevant times, there have been multiple manufacturers.

2584.   Valeant and Sandoz dominated the sales of Atropine Sulfate with close to an 80/20 split at all relevant times.

2585.   For several years, the price for Atropine Sulfate 1% ophthalmic solution was relatively stable. Prices began to rise in early 2010 with Valeant and Sandoz coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

2586.   Valeant and Sandoz's prices remained elevated for many years.

2587.   The ability of Valeant and Sandoz to reach agreements on Atropine Sulfate Ophthalmic Solution was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

2588.   The parallel price increases by Valeant and Sandoz are consistent with the Fair Share Agreement.

2589.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

2590.   The agreement between Valeant and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Atropine Sulfate Ophthalmic Solution (1%).

### 9.    Balsalazide Disodium

2591.   During the relevant time period, Mylan, West-Ward and Apotex were the primary manufacturers of Balsalazide Disodium.

2592.   The market for Balsalazide Disodium was mature and at all relevant times had multiple manufacturers.

2593.   For years, the prices for Balsalazide Disodium capsules were relatively low and stable. West-Ward and Mylan were the dominant manufacturers in the market during the earlier years. Apotex joined the market in the spring of 2012 but remained a small player.

2594.   As with other drugs identified in this Complaint, Defendants arranged for manufacturers to exit the market so that they could increase prices. With respect to Balsalazide, West-Ward, Apotex, and Mylan arranged for Mylan to exit the market, which it did in June 2013. West-Ward managed to gain most of Mylan's market share. Apotex, Mylan and West-Ward also controlled the market on Butorphanol Tartrate and Mylan and West-Ward controlled the market for

Captopril. Whereas Mylan exited the Balsalazide, Apotex exited the market for Butorphanol, and West-Ward exited the market for Captopril.

2595.    In January 2014, Apotexa briefly exitied the market for Balsalazide based on what it claimed to be a supply issue. West-Ward immediately increased prices. It raised WAC prices approximately 400% and NSP prices increased as well.

2596.    Upon its re-entry in February 2014, rather than compete for market share, Apotex matched West-Ward's price increase. It announced an identical WAC price, and raised NSP prices even higher than West-Ward.

2597.    Even with the higher prices, Apotex was able to build share. It quickly captured nearly twice the unit sales it had before the price increase, and owing to higher prices, its dollar sales increased more than five-fold. Meanwhile, although it had to cede some share to Apotex, West-Ward's dollar sales more than doubled as a result of the higher market prices.

2598.    Pricing data show steep and parallel price increases beginning in November 2013 by West-Ward and Apotex for Balsalazide Disodium.

2599.    Furthermore, Senior sales executives from Mylan, West-Ward and Apotex communicated directly with each other in furtherance of the conspiracy in order to coordinate the price increases and market allocation for Balsalazide Disodium, as well as Butorphanol Tartrate and Captopril. For example, K.B. of West-Ward was in frequent contact with M.W. (Mylan's Director of National Accounts), with the two communicating by phone at least 20 times between March and June of 2013. Executives from West-Ward, Apotex, and Mylan also met regularly at trade association events frequently throughout this time period, as detailed in Exhibit A..

10.    **Betamethasone Dipropionate**

2600.    During the time period relevant to this Complaint, Sandoz/Fougera and Taro

manufactured various formulations of Betamethasone Dipropionate, including cream, lotion, and

ointment. Additionally, Actavis manufactured cream, ointment, while Perrigo manufactured lotion.

2601.    <u>Lotion, Cream and Ointment</u>. In 2010, Fougera, Perrigo, and Teva were the only

three competitors in the market for Betamethasone Dipropionate lotion.

2602.    On December 16, 2010, CW-6 of Fougera e-mailed Kaczmarek to inform him that

Teva was exiting the market, leaving Fougera and Perrigo as the only competitors. With a strong

collusive understanding firmly in place between Fougera and Perrigo at that point, Kaczmarek was

thrilled with the news and immediately suggested that Fougera take advantage of Teva's departure by

increasing pricing on the product:



2603.    Also on December 16, 2010, Perrigo held an internal meeting to discuss increasing

pricing on Betamethasone Dipropionate. Notes from that meeting stated: ███████████████

████████████████    That same day, T.P. of Perrigo and CW-6 of Fougera exchanged several

calls. After hanging up with T.P., CW-6 called Kaczmarek to update him on their discussions. These

calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/16/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 8:58:29 | 0:00:25 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:12:49 | 0:05:32 |

| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:18:34 | 0:01:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:20:00 | 0:03:51 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:24:02 | 0:05:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 10:00:24 | 0:01:08 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:34:32 | 0:01:04 |

2604.    After this series of phone calls, Perrigo also decided to raise prices – and did so even before Fougera. On January 4, 2011, Perrigo increased its WAC pricing for Betamethasone Dipropionate by 504% to $37.50. That same day, Polman called CW-6 and they spoke for seven minutes. Just minutes after hanging up, CW-6 again called Kaczmarek. The call lasted one minute.

2605.    Three days later, on January 7, 2011, the Fougera sales team held a conference call during which they discussed the upcoming increase on Betamethasone Dipropionate, among other products. That same day, T.P. called CW-6 and they spoke for four minutes. Over the course of the day, the two competitors would exchange several more calls and CW-6 would continue to keep Kaczmarek apprised of his discussions. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:02:00 | 0:04:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:48:35 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:21:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:22:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 11:17:00 | 0:02:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:45:31 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 14:56:11 | 0:00:14 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:00:53 | 0:20:39 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 16:00:36 | 0:04:27 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:05:31 | 0:01:57 |
| 1/7/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Sandoz) | 16:17:40 | 0:01:15 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 17:09:52 | 0:00:00 |

2606.    On January 12, 2011, Fougera followed Perrigo and increased its WAC pricing on Betamethasone Dipropionate to $39.99 – slightly higher than Perrigo's WAC pricing. The next day, on January 13, 2011, CW-6 called T.P. again and they spoke for twelve minutes.

2607.    At the same time that Fougera was coordinating to raise prices on Betamethasone Dipropionate lotion, it also coordinated with Actavis and Taro to increase prices on the ointment

and cream formulations. For example, Actavis increased prices on Betamethasone Dipropionate cream in December 2010, and Fougera and Taro agreed to follow this increase in January 2011, which they ultimately did within days of each other. At the same time that Actavis increased its prices on cream, it also increased its prices on Betamethasone Dipropionate ointment. And although Fougera did not follow this increase until late in 2011, it complied with the fair share agreement to support Actavis' price increase by refraining from taking any of Actavis' customers during this time period.

2608.   In May 2013, Aprahamian and Perfetto of Taro coordinated another round of price increases on Betamethasone Dipropionate cream and lotion, and also augmented Betamethasone Dipropionate, shortly after leaving Actavis for Taro.

### 11.   Betamethasone Dipropionate Clotrimazole

2609.   In early 2011, the competitors in the generic market for Betamethasone Dipropionate Clotrimazole ("CBD") Cream were Fougera, Taro, and Actavis and the competitors in the generic market for CBD Lotion were Fougera and Taro.

2610.   On March 9, 2011, J.R., a senior Actavis pricing executive, circulated internally a proposed price increase plan for four products, including CBD Cream, to take effect on March 28, 2011. Actavis planned to raise WAC prices for CBD Cream by 227% and to increase contract prices to customers by as much as 1100%. Notably, Actavis had not yet conveyed the proposed increases to its customers. In fact, in that March 9, 2011 e-mail, J.R. specifically told his colleagues ███████ ████████████████████

2611.   Even though Actavis had not yet told its customers of these substantial price increases, its competitors, Fougera and Taro, were already aware. For example, on March 9, 2011 – the same day that J.R. circulated the price increase proposal internally at Actavis – D.H., a Fougera sales executive, sent a National Accounts Monthly Recap report for February 2011 to Kaczmarek. In

that recap, D.H. reported that for CBD ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Further, Hicks

reported: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The reference to ▮▮▮▮▮▮▮▮ is a

reference to all of Taro's betamethasone products. Importantly, Taro had not yet raised its prices on

those products.

2612.    Fougera was already aware of its competitors' price increases for CBD products

because, in the preceding month, representatives of Actavis, Fougera, and Taro were in contact with

one another to ensure that each competitor would follow the other's price increases.

2613.    For example, from February 1, 2011 to March 9, 2011, Perfetto, then a senior

Actavis sales and marketing executive, spoke with Blashinsky, then a senior Taro marketing

executive, eight times for a total of approximately fifty-two minutes. During that same time, H.M., a

Taro sales executive, spoke with CW-6 of Fougera three times for a total of approximately fifteen

minutes.

2614.    On March 25, 2011, Actavis informed its customers of the price increases for CBD

Cream. By happenstance, just days before the announcement, Actavis learned that its API costs for

CBD Cream would increase. Actavis immediately recognized that it could use this news to mislead

its customers and provide cover for its illegal price-fixing conspiracy.

2615.    Before the announcements went out, Perfetto e-mailed the Actavis sales executives,

telling them to ▮▮▮▮▮▮▮▮ and to stick to the story that the price increase is ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ One sales executive even went so far as to tell

Econdisc that the increase was necessary because Actavis's ▮▮▮▮▮▮▮▮▮▮▮▮ In reality,

Actavis knew the API ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and were

▮▮▮▮▮▮▮▮▮ for the pricing of prescription medications such as CBD Cream.

2616.    In furtherance of their conspiracy to raise prices, Actavis, Taro, and Fougera remained in contact during the days leading up to Actavis's formal price increase announcement on March 25, 2011, including calls between the following individuals:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:03:40 | 0:01:44 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:50:22 | 0:00:00 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:51:24 | 0:00:34 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:27:28 | 0:02:38 |
| 3/22/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 15:26:45 | 0:02:00 |
| 3/23/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:31:15 | 0:00:24 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 12:44:00 | 0:09:00 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 13:07:00 | 0:15:00 |
| 3/24/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:49:00 | 0:15:00 |

2617.    On March 30, 2011 – just three business days after Actavis sent out its price increase notices for CBD Cream – Fougera sent out notices to its customers stating that it was raising prices for CBD Cream. Those increases, which took effect April 1, 2011, increased Fougera's WAC prices for CBD Cream by 54% and increased contract prices across the board, in some cases by over 1200%. The day after Fougera announced those price increases, CW-6 of Fougera and H.M. of Taro spoke three separate times for a total of eighteen minutes.

2618.    Within days, on April 4, 2011, Taro implemented its own substantial price increases across the board for both CBD Cream and CBD Lotion. For some customers, Taro raised prices for CBD Cream by approximately 1350% and raised prices for CBD Lotion by approximately 960%. The next day, H.M. called CW-6 and they spoke for eighteen minutes.

2619.    On April 14, 2011, Fougera followed Taro with a price increase on CBD Lotion – raising its WAC by 71% and increasing its contract prices across the board, in some cases by over 900%. At the time, Fougera's gross profit margin on CBD Lotion was already ███, yet, with this price increase, their gross profit percentage would soar to ███ Fougera estimated that these increases accounted for an extra ████████ in profit for the rest of 2011 alone.

2620.   In furtherance of the conspiracy, Fougera refrained multiple times from taking customers that approached it for bids. For example, after Taro's increase, Wal-Mart, a Taro customer for CBD Cream and Lotion, asked Fougera to bid for that business. Kaczmarek cautioned ████████████████████████████████ In an effort to conceal the reason for not bidding, Kaczmarek instructed his colleagues that the ████████████████████████ ███████████████████████████ Likewise, when Rite-Aid approached Fougera, Fougera did not even consider making a competitive offer. Instead, a Fougera employee asked internally: ████████████████████████ Kaczmarek determined that Fougera should opt for the latter.

2621.   Shortly after pulling off one massive coordinated price increase, Taro wasted no time planning the next. In an e-mail to Kaczmarek on May 6, 2011, D.K., a senior Fougera executive, detailed how Taro had already approached Fougera about raising CBD prices again:



2622.   By March 5, 2012, Taro reignited its desire to raise prices on CBD Cream. Over the next several weeks, representatives of Taro spoke several times with their contacts at Actavis and Fougera. During these calls, Taro conveyed to its competitors its intentions to increase prices and

secured their commitments not to poach Taro's customers. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/7/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:29:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |
| 3/9/2012 | Voice | CW-6 (Sandoz) | Incoming | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 7:37:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 9:42:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 9:49:00 | 0:02:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 15:34:00 | 0:01:00 |
| 3/16/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 4:51:00 | 0:10:00 |
| 3/17/2012 | Voice | D.S. (Taro) | Outgoing | K.K. (Fougera) | 11:08:00 | 0:02:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:11:00 | 0:05:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:29:00 | 0:01:00 |
| 3/22/2012 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 7:32:00 | 0:13:00 |
| 3/29/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 8:49:00 | 0:05:00 |
| 3/29/2012 | Voice | CW-6 (Sandoz) | Outgoing | H.M. (Taro) | 10:58:00 | 0:05:00 |

2623.    The day after the final calls detailed above, on March 30, 2012, Taro increased its WAC prices for CBD Cream by approximately 7% and its contract prices by 15% for most of its existing customers.

2624.    In May 2012, McKesson twice asked Taro to reduce its price based on comparable sales by competitors. Both times Taro declined, comfortable that its competitors would not poach its business. Taro's confidence was well placed.

2625.    On May 23, 2012, McKesson contacted an Actavis sales executive, asking if Actavis's recent RFP bid still stood because  At 5:02 p.m., the sales executive forwarded McKesson's request to Perfetto and Aprahamian, then a senior pricing executive at Actavis. Perfetto said he was and that Actavis Aprahamian replied, The following day, Perfetto exchanged three calls with Blashinsky of Taro, including one call lasting fourteen minutes. Following his calls with Blashinsky, Perfetto instructed Aprahamian to call him. Aprahamian called Perfetto the next morning on May 25, 2012.

**REDACTED – PUBLIC VERSION**

After that call, an Actavis employee suggested that Actavis should stick by their RFP price and take the business because it was ████████████████████████████████████

Aprahamian, however, responded simply and directly: ██████████

2626.    In the Fall of 2012, a fourth competitor (Prasco) was entering the CBD Cream market. However, Taro and Sandoz (which acquired Fougera in July 2012) were still the only competitors in the CBD Lotion market. Facing new competition on CBD Cream, Sandoz and Taro sought to maximize profits by raising the price of CBD Lotion.

2627.    Starting in late August 2012, Sandoz began planning a 100% price increase on CBD Lotion to take place in October, which – assuming ████████████████████████ – would bring in an estimated additional $3.9 million to Sandoz annually. In the weeks leading up to its planned increase, Sandoz made repeated overtures to Taro to secure that ████████ behavior, including the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/20/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:13:00 | 0:17:00 |
| 9/21/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 8:18:00 | 0:03:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 9:54:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:11:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:04:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:27:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:53:00 | 0:01:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:25:00 | 0:02:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:49:00 | 0:21:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:11:00 | 0:02:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:12:00 | 0:03:00 |
| 10/8/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 10:32:00 | 0:09:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:00:00 | 0:01:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/12/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:01:00 |

2628.    On October 18, 2012, Sandoz increased prices for CBD Lotion, doubling its WAC price (from $61.90 to $123.80) as well as its contract prices. As expected, Taro did not attempt to

poach Sandoz's customers. For example, when MMCAP e-mailed Taro on October 26, 2012 to request a bid from Taro for a dual award in light of Sandoz's increase, Taro did not even respond to the customer's request.

2629.    Taro also made plans to follow the Sandoz price increase. On January 4, 2013, J.J., a senior Taro sales executive, instructed Taro sales executives, including H.S. and D.S., to gather competitive intelligence on CBD Lotion in anticipation of Taro's planned price increase. That same day, H.M. spoke with CW-3 of Sandoz for five minutes. The pair spoke again on January 7, 2013 for thirteen more minutes. Three days later, on January 10, 2013, D.S. spoke with CW-4 of Sandoz for twenty-three minutes.

2630.    On February 12, 2013, Taro instituted its price increase on CBD Lotion, raising WAC by approximately 80% and contract prices by approximately 60%.

2631.    After Taro's increase was issued, news of it spread throughout Sandoz. One Sandoz employee remarked ██████████████████████ Just as Taro did not poach Sandoz's customers when Sandoz raised CBD Lotion prices, Sandoz was careful not to poach Taro's customers. In fact, CW-1, a Sandoz senior pricing executive, specifically instructed Sandoz employees to ██████████████████ for CBD Lotion bids, because ██████████████ ██████████

### 12.    Betamethasone Valerate

2632.    Betamethasone Valerate ("Beta Val"), also known by brand names such as Betamethacot, Beta-Val and Betacort, among others, is a medium strength topical corticosteroid prescribed for the treatment of skin conditions such as eczema and dermatitis, as well as allergies and rashes. It is manufactured in various formulations, including cream, lotion, and ointment. During the time period relevant to this Complaint, Sandoz manufactured each of the three

formulations. Additionally, Taro manufactured cream; G&W and Teva manufactured lotion; and Actavis manufactured both cream and ointment.

2633.   Lotion.  In mid-2011, two companies shared the market for Beta Val Lotion – Fougera with 79% of the market, and Teva with 21% market share.

2634.   In early November 2011, however, Grauso at G&W contacted CW-6 with some important news about G&W's plans to enter the Beta Val Lotion market. Grauso called CW-6 late in  the afternoon of November 9, 2011. They also spoke three times the next morning. Later that day, CW-6 informed his Fougera colleagues that G&W would be launching ███████████ and that he believed Teva had discontinued the product. He opined that, under those circumstances, Beta Val Lotion ████████████████████ Kaczmarek responded: ████████████████ ███

2635.   Fougera promptly began preparing for an even larger price increase than CW-6 had recommended. On December 13, 2011, CW-3, a Fougera sales executive, created a spreadsheet detailing Fougera's upcoming price increases, including a 200% increase in WAC pricing for Beta Val Lotion from $20.00 to $60.00 per 60ml bottle. The average net sales price for the product would go from $10.11 to $30.33.

2636.   With the Fougera price increase details now firm, CW-6 began coordinating the price increase directly with G&W. Between December 14 through December 21, 2011, CW-6 and Grauso spoke by phone 12 times. Fougera's price increase to $60.00 for Beta Val Lotion, went into effect on December 22, 2011.

2637.   CW-6 and Grauso remained in close contact in the days that followed the Fougera price increase, as G&W also finalized plans for its Beta Val Lotion launch, including a twenty minute call on December 28, 2011, Grauso's last day as a G&W employee. During these calls, the

competitors discussed G&W's market share goals and identified customers for G&W to target as it launched.

2638.   On January 9, 2012, Vogel-Baylor of G&W (who had just taken over for Grauso) distributed to her colleagues a ███████████████████████████████████ ███████████████████████ That same day, she sent an e-mail to Wal-Mart announcing the G&W launch. On January 11, 2012, she followed up with a quote, offering to supply the product for $10.40, far below Fougera's newly increased average net sales price. Vogel-Baylor directed her colleagues at G&W to generate a nearly identical offer letter for another customer – Rite Aid – on January 10, 2012, offering a price of $10.20.

2639.   Something had clearly been lost in translation after Grauso's departure, and CW-6 of Fougera set out to figure out what had happened. Late in the afternoon on January 11, 2012, CW-6 placed an urgent call to Grauso, who had recently started at Aurobindo.

2640.   Grauso called him back quickly and the two spoke for five minutes. Immediately upon ending that call, Grauso called his former colleague at G&W, Vogel-Baylor, to convey Fougera's concerns about G&W's drastically underpriced offers. As soon as that call ended, Grauso called CW-6 of Fougera to confirm that he had addressed the problem.

2641.   At 10:02 p.m. that same day, Vogel-Baylor e-mailed Orlofski with the news she had just received about Fougera:

REDACTED – PUBLIC VERSION



2642.    At 7:55 a.m. the following morning, Vogel-Baylor asked that the G&W team resubmit the Rite Aid proposal with a new price of $20.00, bringing it more in line with Fougera's new price.  That same day, G&W also issued a revised price proposal to Wal-Mart, quoting the new price of $20.00.

2643.    Vogel-Baylor explained the sudden about-face to a colleague by saying that she had revised the G&W launch pricing for this product ████████████████████████  The modified schedule included $30.00 for large chains, $32-$75 for small chains, and $38.53 for wholesalers, closely paralleling the new Fougera prices.

2644.    One week later, on January 19, 2012, Vogel-Baylor announced to Orlofski that G&W had already reached its target market share for Beta Val Lotion: ████████████████ ███████████████████████  By following Fougera's price increase, that 45% share equated to $1.6 million in total annual gross sales for G&W.

2645.    In a February 17, 2012 e-mail exchange with a distributor, Orlofski explained G&W's rationale for not seeking additional market share on this product: ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████

644

2646.   Ointment.   As noted above with respect to Betamethasone Dipropionate, Sandoz/Fougera coordinated large price increases across all formulations of Betamethasone beginning in late 2010.

2647.   For Betamethasone Valerate ointment, prices remained at the supracompetitive levels established through this collusion, including during a brief period in 2012, when Sandoz stopped production.

2648.   In early January 2013, Sandoz began making plans to re-enter the market for Betamethasone Valerate and targeted February 15, 2013 as its re-launch date. At that time, Actavis was the only other generic competitor in the market.

2649.   On January 21, 2013, Sandoz held a Commercial Operations call during which the Betamethasone Valerate re-launch was discussed. During that call, CW-3 noted that Sandoz was seeking 40% of the market – which was typical (and consistent with fair share principles) for a second entrant in a two-player market – and was looking for price points and customer information.

2650.   On February 4, 2013, CW-3 called Aprahamian, who at that time was still at Actavis. The call lasted one minute. The next day, February 5, 2013, CW-3 spoke with Aprahamian two more times – with one call lasting twenty-three minutes. Immediately after each call with Aprahamian, CW-3 called Kellum or CW-1 to report back what he had learned. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 10:14:00 | 0:23:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 10:38:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 10:39:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 11:24:00 | 0:03:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:27:00 | 0:01:00 |

2651.   During these calls, Aprahamian provided CW-3 with Actavis's non-public pricing for Betamethasone Valerate at its largest customers, as well as the percentage of the market that each

customer represented. The purpose of providing this specific information was so that Sandoz would

be able to price as high as possible while still obtaining business from specific, agreed-upon

customers that represented an agreed-upon market share. CW-3 took contemporaneous notes in his

Notebook, placing check marks next to Rite Aid and Walgreens, two of the customers that he and

Aprahamian agreed that Sandoz would target. These notes are pictured below:



2652.   Later in the evening on February 5, 2013, J.R., a senior Sandoz marketing executive,

sent an internal e-mail, including to CW-3, stating: ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████

2653.   Two days later, on February 7, 2013, C.P., a pricing analyst at Sandoz, sent an

internal e-mail, including to CW-3, stating that Sandoz planned to send an offer to Walgreens shortly

and would send offers to additional targets once they received feedback from Walgreens. CW-3 responded: ████████████████████████

2654.    On February 13, 2013, CW-3 called Aprahamian and they spoke for nearly sixteen minutes. That same day, on February 13, 2013, Rick Rogerson, a senior pricing executive at Actavis, discussed ceding the Walgreens account to Sandoz, stating in an internal e-mail: ████████████ ████████████████████████████████████████ In response, Aprahamian confirmed that Actavis would be ceding the Walgreens business, stating ████████ ████████████████████████ Two days later, on February 15, 2013, Sandoz re-entered the market and published WAC pricing that matched Actavis's WAC pricing. That same day, on February 15, 2013, Sandoz was awarded the Betamethasone Valerate business at Walgreens.

2655.    On February 19, 2013, Sandoz bid on the Betamethasone Valerate business at Rite Aid. That same day, CW-3 called Aprahamian to let him know. The call lasted less than one minute. On February 28, 2013, Rite Aid awarded the business to Sandoz.

2656.    On March 15, 2013, Sandoz bid on the Betamethasone Valerate business at Cardinal. A few weeks later, on March 27, 2013, Cardinal awarded the business to Sandoz. These three accounts – Walgreens, Rite Aid, and Cardinal – accounted for approximately 32% of the Betamethasone Valerate market.

2657.    On April 1, 2013, Sandoz held a Commercial Operations call during which they discussed, among other items, the status of the Betamethasone Valerate re-launch. CW-3's notes from that call reflect that Sandoz had been able to secure three customers, but was ████████████ one additional customer, OptiSource, to reach its original 40% market share goal.



2658.    The next day, April 2, 2013, CW-3 called and spoke with Aprahamian twice, with one call lasting six minutes.

2659.    On April 4, 2013, Sandoz submitted an offer to Optisource for its Betamethasone Valerate business. Four days later, on April 8, 2013, Optisource awarded Sandoz the business.

### 13.    Bromocriptine Mesylate

2660.    As of December 2012, the three competitors in the market for Bromocriptine were Sandoz (with 65% share), Perrigo (with 30%), and Mylan (with 5%).

2661.    On March 1, 2013, Walgreens reached out to Sandoz asking for a one-time buy for Bromocriptine because Mylan was having supply issues and would be out of the market for two months. On March 4, 2013, S.G. responded to Walgreens stating that Sandoz could not fill the customer's request.

2662.    Viewing Mylan's supply issues as an opportunity, S.G. forwarded his exchange with Walgreens to Kellum asking, ███████████████████ Kellum responded within the hour stating, ████ That same day, March 4, 2013, CW-4, a Sandoz senior sales executive, spoke with Jim Nesta, a senior sales executive at Mylan, for nearly four minutes. The two competitors spoke again on March 11, 2013 for nearly ten minutes.

2663.    On March 22, 2013, Kellum e-mailed the Pricing Committee recommending that Sandoz increase prices on Bromocriptine, among other products. In particular, Kellum sought a

206% increase to Sandoz's WAC pricing for Bromocriptine and noted the reason for the increase was due to ███████████████████

2664.    By March 31, 2013, all members of the Sandoz Pricing Committee (which included Kellum and CW-1, among others) had approved the increase. The very next day, on April 1, 2013, CW-3, a Sandoz senior sales executive, called T.P. of Perrigo – the other competitor on Bromocriptine – and they spoke for seventeen minutes. The next morning, on April 2, 2013, CW-3 called T.P. again and they spoke for five minutes. On this call, CW-3 conveyed to hiscompetitor a list of products that Sandoz planned to increase pricing on in April 2013, including Bromocriptine, as well as the amount of those increases. CW-3's contemporaneous notes from that call are detailed below:



2665.    After hanging up with T.P., CW-3 called Kellum. The call lasted one minute. A few hours later, CW-3 called CW-1, a senior pricing executive at Sandoz, and they spoke for eleven minutes.

2666.    The next day, on April 3, 2013, Sandoz held an internal meeting attended by sales and pricing personnel, including CW-3, CW-4, CW-1, and Kellum, to discuss the upcoming Sandoz price increases, including Bromocriptine.

2667.    Two days later, on April 5, 2013, Sandoz implemented the Bromocriptine increase and raised WAC pricing on the product by 205%.

2668.    Throughout the first three weeks of May 2013, CW-4 spoke with Nesta of Mylan regularly, including on May 8, 13, and 20.

2669.    By late May 2013, Mylan had resolved its supply issues on Bromocriptine and was readying to increase its own price. To that end, on May 22, 2013, Mylan held an internal meeting to discuss Bromocriptine.

2670.    That same day, on May 22, 2013, ABC e-mailed Sandoz to request a bid on Bromocriptine, citing supply issues with its incumbent manufacturer. S.G., a Sandoz sales executive, who had a better idea of Mylan's plans, forwarded the request to Kellum stating ███████████ ████████████████████.

2671.    Sandoz quickly set out to confirm the reason for ABC's request. First thing the next morning, on May 23, 2013, Kellum called L.W., a sales executive at Mylan. The call lasted two minutes. Notably, this was the only call ever between the two competitors according to the available phone records. That same morning, CW-3 spoke twice with T.P. of Perrigo and CW-4 exchanged two calls with Nesta of Mylan. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 8:04:00 | 0:05:00 |
| 5/23/2013 | Voice | L.W. (Mylan) | Incoming | Kellum, Armando (Sandoz) | 8:33:00 | 0:01:55 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 10:49:23 | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 12:40:43 | 0:01:25 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:48:00 | 0:03:00 |

2672.    After speaking with their competitors, CW-3 and T.P. reported back to their superiors, CW-1 and Kellum of Sandoz and Wesolowski of Perrigo. During these calls, Sandoz learned that ABC was in fact Perrigo's customer, and that Perrigo might be leaving the market for Bromocriptine due to supply problems. This call pattern is illustrated in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 8:04:00 | 0:05:00 |
| 5/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 9:13:00 | 0:07:00 |
| 5/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 9:20:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 10:26:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:48:00 | 0:03:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:51:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:14:00 | 0:16:00 |

2673.    After this series of calls, Kellum called S.G. of Sandoz and they spoke for twenty-one minutes. While on the phone with Kellum, sent the following internal e-mail, with a copy to Kellum, regarding the reason for ABC's bid request on Bromocriptine:



2674.    Not wanting to upset the market balance between the competitors, Sandoz ultimately decided to submit an offer to ABC for a one-time buy. However, the customer declined the offer because Sandoz's pricing was too high.

2675.    Just one week later, on May 31, 2013, Mylan re-entered the market and published WAC pricing for Bromocriptine that matched Sandoz's increased pricing. In the days leading up to, and on the day of, Mylan's price increase, the competitors again exchanged several calls. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/28/2013 | Voice | L.W. (Mylan) | Outgoing | CW-3 (Sandoz) | 7:58:00 | 0:07:00 |
| 5/29/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 9:46:30 | 0:12:51 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 11:46:43 | 0:08:32 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:45:59 | 0:00:06 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:54:01 | 0:00:04 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 13:54:45 | 0:03:01 |
| 5/28/2013 | Voice | L.W. (Mylan) | Outgoing | CW-3 (Sandoz) | 14:23:00 | 0:03:00 |
| 5/28/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:29:00 | 0:04:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:21:00 | 0:02:00 |

2676.    As of June 2013, Sandoz decided not to pursue additional market share on Bromocriptine because it had reached its ███████ and achieved a ███████

2677.    Perrigo did not quickly follow the price increases taken by Sandoz and Mylan, in part due to their intermittent supply issues. As a result, Sandoz received several complaints from its customers that Perrigo was selling the product at a cheaper price.

2678.    For example, on July 22, 2013, McKesson e-mailed Sandoz requesting a price reduction for Bromocriptine because a competitor was selling the product at ███████ ███████ The next day, on July 23, 2013, CW-3 called Lance Wyatt of Mylan and they spoke for eight minutes. Within minutes of hanging up, CW-3 called CW-1. The call lasted two minutes. Two days later, Sandoz responded to McKesson and declined to lower its pricing stating, ███████

2679.    On July 29, 2013, McKesson asked that Sandoz reconsider its decision because otherwise it would need to request a bid from Perrigo. That same day, T.P. of Perrigo called CW-3 twice. Both calls lasted one minute. The next morning, CW-3 called T.P. and they spoke for thirteen minutes. During these calls, the competitors discussed the fact that Perrigo had not followed the Sandoz and Mylan price increases on Bromocriptine. However, T.P. assured CW-3 that Perrigo

would not take Sandoz's business at McKesson. CW-3's contemporaneous notes from his

conversation with T.P. are pictured below:



2680.   After hanging up with T.P., CW-3 called CW-1 and they spoke for four minutes. On

this call, CW-3 conveyed to CW-1 what T.P. had told him about Bromocriptine. According to CW-

3, it was not a question of whether Perrigo would follow, but when they would follow. Armed with

this assurance from Perrigo, Sandoz responded to McKesson's request by declining to lower its

pricing and reiterating ██████████████████████████████████

2681.   Similarly, on August 23, 2013, Omnicare, a Sandoz customer, e-mailed Perrigo

stating that they noticed Perrigo's price for Bromocriptine was significantly lower than the other

competitors and asked ████████████████████████████████████████████

P.H., a sales executive at Perrigo, forwarded the e-mail to T.P. asking, ██████████████

█████████████████████████████ To that, T.P. responded, ████████████████

████████████████████ Although Perrigo considered bidding on the business, it

ultimately declined the opportunity. On September 5, 2013, P.H. e-mailed Omnicare stating, ████

███████████████████████████████████████

2682.   Sandoz and Mylan generated a substantial amount of money from Bromocriptine

sales in 2013. For example, on February 4, 2014, Sandoz released a business review report that

detailed how the 2013 price increases for certain drugs delivered upwards of $197 million of revenue

653

for Sandoz after price protection. Among the drugs mentioned, Bromocriptine realized incremental net sales of $3.2 million after price protection.

2683.   Perrigo ultimately followed its competitors and implemented a price increase on Bromocriptine in October 2014.

2684.   On October 2, 2014, T.P. of Perrigo called CW-3 and they spoke for seven minutes. Immediately upon hanging up with CW-3, T.P. called his supervisor, Wesolowski. Less than one week later, on October 7, 2014, Perrigo sent letters to its customers notifying them of the Bromocriptine increase. The next day, on October 8, 2014, CW-3 sent an internal e-mail to Kellum and CW-1, among others, noting that Perrigo ███████████████████████████████ ██████████████████ That same day, CW-3 called Polman and they spoke for four minutes.

### 14.   Butorphanol Tartrate

2685.   During the relevant time period, Mylan, West-Ward, and Apotex were the primary manufacturers of Butorphanol Tartrate.

2686.   The market for Butorphanol Tartrate was mature and at all relevant times had multiple manufacturers.

2687.   For years, the prices for Butorphanol Tartrate nasal spray were relatively low and stable. West-Ward, Mylan, and Apotex were the dominant manufacturers in the market during the earlier years. West-Ward and Mylan had roughly equal and larger shares of the market than did Apotex. In late 2013, Apotex temporarily exited the market, at which point West-Ward and Mylan immediately raised prices. Rather than compete on price to win Apotex's customers, West-Ward and Mylan increased prices by more than 200%, and divided Apotex's share between them evenly.

2688.   In the spring of 2015, Apotex re-joined the market. Rather than offer better prices to win market share, it announced WAC prices identical to West-Ward, and roughly matched NSP prices as well. Even without better pricing, Apotex rapidly gained share, and the market shifted to

roughly equal shares split between Mylan, West-Ward, and Apotex. Even with three manufacturers back in the market, prices did not decline, and have never returned to prior levels.

2689.   Pricing data show steep and parallel price increases beginning in December 2013 by West-Ward and Mylan for Butorphanol Tartrate, which were later matched by Apotex when it re-entered the market.

2690.   Throughout this period, Mylan, West-Ward, and Apotex met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Butorphanol Tartrate and their fair share agreement.

### 15.   Captopril

2691.   During the relevant time period, Mylan, West-Ward, and Wockhardt were the primary manufacturers of Captopril.

2692.   Prior to 2013, Captopril was priced competitively, and cost roughly one cent per dose. However, as with Balsalazide and Butorphanol, Mylan and West-Ward agreed for West-Ward to temporarily halt production in April 2013. Mylan and Wockhardt followed fair share rules, and divided West-Ward's market share roughly evenly between them. Further, Mylan and Wockhardt increased prices by approximately 2000% by the end of 2013.

2693.   In March 2014, West-Ward re-entered the market (less than a year after it halted production). Rather than compete for market share through competitive pricing, Mylan, West-Ward, and Wockhardt increased prices substantially. For the 12.5 mg dosage, this resulted in an increase of approximately one hundred times what it had been before West-Ward halted its production in furtherance of the conspiracy.

2694.   Additionally, Wockhardt and Mylan conceded share to West-Ward in accordance with the fair share rules. Mylan's internal documents indicated that ████████████████████
████████████████████████████████████████████████

2695.   Mylan, Wockhardt and West-Ward communicated directly with each other in furtherance of the conspiracy. For example, M.W. of Mylan (the Director of National Accounts) communicated by phone with K.B. of West-Ward (the National Account Manager) more than 20 times during the spring, including at least six times in June 2013 and for nearly twelve minutes on July 1st, in order to coordinate West-Ward's exit and reentry. Mylan's price increase was announced on July 2, the day after this last call with K.B.

2696.   Additionally, Wockhardt and West-Ward sent representatives to the February 2014 ECRM Retail Pharmacy Efficient Program Planning Session in Amelia Island, Florida. In April, both companies announced large WAC price increases on the heels of Mylan's second list price increase.

2697.   In mid-2015, Wockhardt exited the Captopril market, even though prices were significantly more profitable than they had been just a few years earlier. Upon information and belief, Wockhardt's decision to exit was discussed with Mylan, which agreed to concede market share to Wockhardt on Enalapril in late 2015.

### 16.   Carbamazepine

2698.   During the period relevant to this Complaint, Apotex, Taro, Teva, and Torrent dominated the market for Carbamazepine tablets ("Tablets"); Taro, Teva, and Torrent dominated the market for Carbamazepine chewable tablets ("Chewable Tablets"); and Sandoz and Taro dominated the market for Carbamazepine Extended Release tablets ("Carbamazepine ER").

2699.   Taro was the first generic manufacturer to enter the market for Carbamazepine ER. However, because Novartis – Sandoz' parent – held the patent for branded Carbamazepine (Tergetol), Novartis directed Sandoz to enter the market as an authorized generic during Taro's 180-day exclusivity period.

2700.   Beginning in March 2009, Taro and Sandoz made plans to allocate the Carbamazepine ER market between them in accordance with fair share principles. D.S of Taro and

CW-4 of Sandoz spoke frequently by phone in 2009 to coordinate this allocation. D.S. informed CW-4 that Taro intended to secure 50%-60% of the market, and was targeting Wal-Mart, Walgreens, and Supervalu. CW-4 understood from that conversation that Sandoz should not compete for the customers that D.S. had identified, and that by identifying those specific customers Sandoz would, in turn, know which customers it should target. As requested, CW-4 reported this information to R.T. at Sandoz.

2701.   Based on those conversations, Taro and Sandoz were able to enter the market with little competition, initially leaving generic pricing nearly as high as pricing for the branded drug.

2702.   D.S. and CW-4 continued to communicate competitively sensitive information about the Carbamazepine ER market into 2010. For example, when Taro was delayed in launching the 100mg formulation, Novartis put pressure on R.T. and others at Sandoz to get information about Taro's launch. R.T., in turn, asked CW-4 to obtain the information.

2703.   After exchanging several text messages in January 2010, D.S. informed CW-4 that Taro would not be launching the 100mg formulation because Taro was having trouble filling orders on the other strengths and needed the raw material for those other strengths (which were more profitable for Taro).

2704.   Taro and Sandoz also refused to challenge each other's accounts. For example, on January 5, 2011, CVS provided Sandoz with a list of product opportunities for Sandoz to bid on, including Carbamazepine ER. CW-2, then a senior sales executive at Sandoz, was hesitant, and asked his colleagues if there was any appetite to compete for the business. The purpose for pursuing CVS, he opined, would be ███████████████████████████████████████████████████████ ████████████   He added: ███████████████████████████████ Sandoz ultimately declined to bid on the CVS account because it did not want to ███████████ the successful collusion with Taro.

2705.    M.M., a Sandoz marketing executive, responded that pursuing CVS was tempting given that Taro's market share was higher than Sandoz's, but supply issues created short-term obstacles. Further, the executive concluded that challenging for the business at CVS would ███████ the market and erode pricing. As a result, Sandoz declined to bid on the Carbamazepine XR business at CVS.

2706.    As a result of this collusion, Carbamazepine ER prices remained at supracompetitive levels from the point of generic entry and did not drop significantly from the branded price.

2707.    The companies continued to collude on Carbamazepine into 2013. D.S. and CW-4 spoke by phone on May 16, 2013, and again on May 17, 2013. Upon information and belief, the purpose of these calls was to coordinate a price increase on Carbamazepine ER.

2708.    Following these calls between D.S. and CW-4, both Taro and Sandoz implemented substantial and abrupt price increases on Carbamazepine ER of more than 50%.

2709.    Given their long history of collusion on Carbamazepine ER, not surprisingly, when Taro added Carbamazepine ER to its June 2014 Price Increase list, it described the increase as "Low" risk.

2710.    Taro spoke with each of these competitors in the days leading up to the increases on Carbamazepine ER. The sequence and timing of these calls is listed in the chart below:

REDACTED – PUBLIC VERSION

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/15/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:15:00 |
| 5/19/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:23:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 9:35:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 9:36:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.C. (Wockhardt) | 9:39:00 | 0:09:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:17:00 | 0:01:00 |
| 5/28/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:37:00 | 0:10:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 9:16:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 14:03:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 14:04:00 | 0:05:00 |
| 6/3/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 14:06:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 15:23:00 | 0:01:00 |
| 6/4/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:04:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:54:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:34:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:52:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:14:00 | 0:08:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 6:26:00 | 0:10:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | E.B. (Hi-Tech) | 6:35:00 | 0:01:00 |

2711.   After Taro's price increases for Carbamazepine ER were announced, and consistent with their ongoing understandings, Taro's competitors declined opportunities to bid on customers so as not to take advantage of Taro's price increases, except in those circumstances where they sought additional market share to meet their fair share targets.

2712.   For example, on June 4, 2014, Wal-Mart e-mailed Sandoz asking whether it would like to submit a bid for Carbamazepine ER because Wal-Mart had received a price increase from Taro. Wal-Mart followed up on the request again on June 10, 2014. L.B., a sales executive at Sandoz, e-mailed the request to Defendant Kellum asking, ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████ Not wanting to bid, and instead planning to take a price increase as well, Kellum suggested a pretext: ████████████████████████████████

2713.   On June 23, 2014, McKesson presented Sandoz with an opportunity to take on additional business for several products, including Carbamazepine ER. K.K., a senior sales executive at Sandoz, responded to the customer: ████████████████████████████████████████

REDACTED – PUBLIC VERSION

████████████████████████████████████████████████████████

████████████████████████████████████████████ Less than five minutes later,

Kellum responded to K.K. (without copying the customer) stating: ████████████████████

████████████████████████████████████████████████████████

██████████████████████ K.K. replied: █████████████████████████████████

███████████████████████████████ The next day, K.K. responded to

McKesson, raising the familiar refrain: ████████████████████████████

████████████████████████████████████████████████████

███████████

2714.    Throughout June 2014, Aprahamian exchanged several calls with his contacts at

Taro's principal competitors on Carbamazepine ER – Sandoz and Hi-Tech – to discuss the increases

and coordinate their actions. For example, on June 6, 2014, Aprahamian called E.B., a senior sales

and marketing executive at Hi-Tech twice. Both calls lasted one (1) minute. These were the first calls

ever between the two competitors according to the available phone records. Then, on June 9, 2014,

Aprahamian and E.B. exchanged two more calls, including one call lasting ten (10) minutes.

2715.    On June 20, 2014, Aprahamian engaged in a series of communications with both

CW-3 of Sandoz and E.B. of Hi-Tech. Each time that CW-3 hung up with Aprahamian, he

immediately called his supervisor, Defendant Kellum, to report the conversations. This call pattern

is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:40:00 | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 11:42:00 | 0:01:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:43:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:56:00 | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:07:00 | 0:12:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:40:00 | 0:10:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:50:00 | 0:01:00 |

REDACTED – PUBLIC VERSION

2716.    During these calls, Aprahamian provided CW-3 with Taro's new non-public prices, by class of trade, for Carbamazepine ER (and Fluocinonide). In all, Aprahamian identified more than seventy (70) different price points for these products. CW-3 took contemporaneous notes of these conversations in his Notebook. A snapshot of these notes is pictured below:





2717.   When CW-3 conveyed the price points to Defendant Kellum and CW-1, Kellum was shocked by the size of the increases and asked CW-3 to go back and confirm with Aprahamian that the information was correct. When CW-3 called Aprahamian to confirm, he placed a ✔ next to each price point that he confirmed. When CW-3 later conveyed this information to Kellum, he wrote a second ✔ next to each of the price points.

2718.   Taro also led price increases on other formulations of Carbamazepine.

2719.   In early June 2014, Taro increased prices on all formulations of Carbamazepine tablets, including price increases on the Carbamazepine Tablets and Chewable Tablets of between 200% and 1000%.

2720.   As a result of the overarching fair share agreement, Aprahamian knew that his competitors would follow these massive price increases – which each did for their respective formulations in July 2014.

2721.   Aprahamian continued to speak with Patel by phone in June and July 2014. Additionally, David Rekenthaler of Teva and J.H. (a senior vice president at Apotex) texted and spoke by phone a number of times between June and September 2014. Further, K.G. of Torrent spoke by phone with T.C. of Teva on September 11, 2014.

2722.   Additionally, the competitors complied with the fair share rules during this time period. As an internal Taro spreadsheet indicated in March 2014, ███████████████████ ████████ on chewable tablets. Following this adjustment, the three competitors' market shares for chewable tablets were stable for the remainder of 2014, consistent with fair share principles.

2723.   Due to these collusive communications and each Defendant's commitment to the overarching fair share agreement, prices on Carbamazepine have remained elevated since May 2013. For example, Defendants continue to sell Carbamazepine Tablets at prices more than 700% higher than in early 2014. Additionally, Defendants' prices for Carbamazepine ER are more than 100% higher today than in early 2013, and their prices for Carbamazepine Chewable Tablets are more than 300% higher than before the collusive price increase.

### 17.   Carisoprodol tablets

2724.   Carisoprodol is a muscle relaxant and pain reliever. It is available in Tablet form, including a 350 mg strength and has been available in the United States for many years in a generic form.

2725.   The market for Carisoprodol is mature. At all relevant times, there have been multiple manufacturers.

2726.   Par and Teva dominate sales of Carisoprodol Tablets with each accounting for roughly 55% and 35% of the market, respectively in the relevant times.

2727.   Prices began to rise in early 2011 with Par and Teva coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

2728.   The ability of Par and Teva to reach agreements on Carisoprodol was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

2729.   The parallel price increases by Par and Teva are consistent with the Fair Share Agreement.

2730.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

2731.   The agreement between Par and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Carisoprodol Tablets (350 mg).

### 18.   Cefuroxime Axetil

2732.   During the relevant time frame, Lupin, Aurobindo, and Citron were the primary manufacturers of Cefuroxime Axetil.

2733.   The market for Cefuroxime Axetil was mature and at all relevant times had multiple manufacturers.

2734.   For years, the prices for Cefuroxime Axetil tablets were relatively low and stable. In late 2013, however, Wockhardt exited the market, at which point Lupin and Aurobindo immediately imposed large price increases, even though each had enough supply to compete for more sales. Instead, they each only took a fair share at much higher prices.

2735.   Almost simultaneously, Lupin and Aurobindo announced identical, 500% WAC price increases.

2736.   In line with the higher WAC prices, Lupin's and Aurobindo's NSP prices also increased. Even though Aurobindo's NSP prices increased more than Lupin's, it was able to maintain its fair share of the market. Both manufacturers saw multi-fold increases in Cefuroxime Axetil revenue.

2737.   Not long after the large price increases imposed by Lupin and Aurobindo, Citron entered the market in April 2014. Rather than offer lower prices to compete for share, in late March

2014, Citron announced WAC prices identical to those of Lupin and Aurobindo. Lupin, Aurobindo, and Citron adhered to their fair share agreement to avoid competition. For example, in the spring of 2014, a large customer requested that Aurobindo lower its prices significantly for Cefuroxime Axetil. Internally at Aurobindo, T.G., Director of National Accounts, rejected the idea: "we don't need to be competitive (my opinion)…. If we want to hold firm, I can convey that message."

2738.    Pricing data show steep and parallel price increases beginning in December 2013 by Lupin and Aurobindo for Cefuroxime Axetil, which were matched by Citron when it entered the market.

2739.    Throughout this period, Lupin, Aurobindo, and Citron met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Cefuroxime Axetil and their fair share agreement. For example, David Berthold of Lupin (the VP of sales) spoke with K.S. of Citron (the EVP of Sales) for nearly ten minutes on January 10, 2014, for over thirty minutes on April 10, 2014, three times in June, on July 16, 2014 for fifteen minutes and on July 17, 2014 for fourteen minutes.

2740.    Lupin's Berthold also communicated by phone multiple times in January and February 2014 with P.M. of Aurobindo (the Senior Director of Commercial Operations). Notably, they spoke on the days close to their coordinated WAC price increases. This included conversations on January 23, 2014 for seven minutes; twice on February 4, 2014; three times on February 5; once on February 14 for over eight minutes; once on February 15; three times on February 18; twice on February 20; and once on February 25.

### 19.    Chlorpromazine HCL

2741.    During the period relevant to this Complaint, Sandoz, Mylan, and Upsher-Smith dominated the market for Chlorpromazine.

2742.    The market for Chlorpromazine HCL tablets was mature and at all relevant times had multiple manufacturers.

2743.    In the summer of 2011, after years of relatively low and stable prices for Chlorpromazine HCL tablets, Sandoz, Mylan, and Upsher-Smith colluded to implement a series of abrupt and substantial price increases.

2744.    Pricing data show steep and parallel price increases beginning in July 2011 by Sandoz and Upsher-Smith for Chlorpromazine HCL tablets.

2745.    Throughout this period, Sandoz and Upsher-Smith met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Chlorpromazine HCL tablets and their fair share agreement.  For example, in 2011, K.K., a Senior National Account Executive at Sandoz, and D.Z., Upsher-Smith Senior National Account Manager, were in contact throughout that year, with telephone communications in (at least) March, April, July, September, November, and December of 2011.

2746.    By January 2012, Sandoz and Upsher-Smith WAC prices approximately quadrupled and NSP prices increased nearly 10 times. Both manufacturers' WAC prices eventually exceeded $7.50 (compared to less than 50 cents before they agreed to raise prices) and their NSP prices peaked over █████████████████████████████████████████████████████

2747.    The companies also coordinated price increases through their common purchase of the APIs for Chlorpromazine. For example, on July 1, 2013, D.C. of Upsher-Smith emailed D.P., Armando Kellum, L.J., and others at Sandoz to discuss an increase in the APIs for Chlorpromazine and other drugs. Although the price increase on the API for Chlorpromazine represented a cost increase to the manufacturers of a fraction of a cent per tablet, Sandoz's procurement director asked internally on July 16, 2013, whether there was ████████████████████████████████████████ ████████████████████████ And indeed there was, as that very same day, Kellum circulated a list of

666

drugs for which Sandoz would increase prices that included Chlorpromazine (along with other drugs such as Betamethasone, Cholestyramine, Clomipramine, Etodolac, and Methazolamide for which Kellum and others at Sandoz also communicated with competitors to implement price increases).

2748.   Kellum was able to add Chlorpromazine to the list of pending price increase because senior executives from Mylan, Sandoz, and Upsher-Smith had been in frequent contact by phone during the two months prior to his email. For example, D.Z. of Upsher-Smith spoke with M.A of Mylan and CW-3 of Sandoz a number of times between May and August July 2013. During this same period, James Nesta of Mylan had dozens of calls with CW-4 of Sandoz.

2749.   D.Z. continued to speak with CW-3 of Sandoz and M.A. of Mylan in 2014 and 2015, and the companies continued to coordinate additional price increases on Chlorpromazine. Although Upsher-Smith led another price increase in August 2014, Sandoz and Mylan did not follow until early 2015. However, upon information and belief, D.Z. confirmed with CW-3 and Aigner that the companies would comply with the fair share rules, and refrain from taking Upsher-Smith's customers.

2750.   As a result of these communications, Sandoz, Mylan, and Upsher-Smith were able to increase prices on Chlorpromazine by approximately 1000% between August 2011 and May 2015. Additionally, the companies have been able to maintain prices at supracompetitive levels they established during the conspiracy as of the filing of this Complaint.

### 20.   Cholestyramine

2751.   During the relevant time period, Upsher-Smith, Par, and Sandoz were the primary manufacturers of Cholestyramine.

2752.   The market for Cholestyramine was mature and at all relevant times had multiple manufacturers.

REDACTED – PUBLIC VERSION

2753.    For years, the prices for Cholestyramine were relatively low and stable. Then, in the space of a few months during the summer of 2013, Upsher-Smith, Sandoz, and Par all implemented large and similar price increases in -close succession. The manufacturers all had different list prices for Cholestyramine before the summer, but by the end, they all had identical WAC prices that were much higher than before. Their NSP prices shot straight up as well. Upsher-Smith's prices, for example, approximately quadrupled.

2754.    Pricing data show the steep and parallel price increases beginning in April 2013 by Upsher-Smith, Par, and Sandoz on Cholestyramine.

2755.    Throughout this period, Upsher-Smith, Par, and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Cholestyramine and their fair share agreement.

2756.    For example, D.Z., Upsher-Smith Senior National Account Manager, and C.B., Sandoz Director of National Accounts, spoke briefly on May 29, 2013. Upsher-Smith announced its WAC price increase on June 7, 2013.

2757.    Shortly after raising prices, Upsher-Smith reached out directly to Par. On June 20, 2013, C.O., Upsher-Smith's Director of Strategic Generic Portfolio and Marketing, spoke twice to K.O., Par's VP of National Accounts. The two spoke again on June 25.

2758.    On July 16, Upsher-Smith's M.M., National Account Manager, spoke to Sandoz's C.B. for approximately 14 minutes. Ten days later, on July 26, 2013, Sandoz announced its WAC price increase on Cholestyramine. A few days later, on July 29, Upsher-Smith's C.O. and Par's K.O. spoke again for nearly 20 minutes.

2759.    Par followed the WAC price increase on August 27, 2013. On September 5, K.O. at Par again spoke to C.O. at Upsher-Smith for nearly 22 minutes.

REDACTED – PUBLIC VERSION

### 21.   Ciclopirox

2760.   Ciclopirox, also known by the brand names Loprox and Penlac, is an antifungal medicine that is sold in a variety of formulations including cream, gel, shampoo, solution, and suspension.

2761.   <u>Ciclopirox Cream:</u> In the summer of 2011, the market for Ciclopirox cream was evenly split between four competitors – Perrigo with 26%; Paddock Laboratories, LLC – which was acquired by Perrigo in July 2011 – with 30%; Fougera with 21%; and Glenmark with 21%. Defendant G&W was not in the market at this time.

2762.   On September 21, 2011, however, Vogel-Baylor learned from a customer that Fougera had temporarily discontinued Ciclopirox Cream. Vogel-Baylor forwarded that information to her supervisor, Grauso, who then called CW-6 at Fougera twice to confirm the information. The two competitors also spoke again the next morning.

2763.   G&W saw Fougera's exit as an opportunity to enter the market for Ciclopirox Cream. After confirming Fougera's plans to exit, G&W began making plans to enter the market.

2764.   On October 28, 2011, Vogel-Baylor e-mailed Grauso regarding a meeting she had with Rite Aid concerning G&W's upcoming launches. Regarding Ciclopirox Cream, Vogel-Baylor noted that Rite Aid's current incumbent was Glenmark and stated that ████████████████ ██████████████.

2765.   Throughout January 2012, G&W began formalizing its strategy for the Ciclopirox Cream launch and reached out to various customers to obtain incumbent information, usage, and pricing intelligence.

2766.   On February 3, 2012, Vogel-Baylor e-mailed Orlofski, a senior G&W executive, notifying him that Ciclopirox Cream was now available in small quantities and that several additional

batches would be ready for shipment in the next few weeks. She further stated that she needed to sit down with him to discuss which customers G&W wanted to approach.

2767.   On February 20, 2012, Orlofksi e-mailed Vogel-Baylor with a list of the tasks that she was accountable for. One of those responsibilities was to secure approximately 20% market share of Ciclopirox Cream per the company's launch plan.

2768.   The next day, on February 21, 2012, Orlofski exchanged eight text messages with S.K., a high-level executive at Perrigo. Two days later, on February 23, 2012, the two competitors exchanged an additional ten text messages.

2769.   As of March 2012, Glenmark had 60% share of the Ciclopirox Cream market, Perrigo had 25%, and Fougera had the remaining share even as it was phasing out of the market.

2770.   By March 19, 2012, G&W had secured the Ciclopirox Cream business at Walgreens. Walgreens was a Glenmark customer that accounted for slightly less than G&W's goal of 20% of the market for Ciclopirox Cream.

2771.   On March 23, 2012, Vogel-Baylor asked C.M., a sales executive at G&W, to reach out to Publix to see if the customer would be interested in a bid for Ciclopirox Cream. C.M. responded: ███████████████████████████████████████ Vogel-Baylor responded: ███████ ███████████████████████████████████████ C.M. replied: ██████ ███████████████████████████████████ Vogel-Baylor answered immediately stating: ███████████████████████████████████████████████ ██████████████████████

2772.   On March 27, 2012, C.M. advised Vogel-Baylor that G&W should put together a proposal for Publix and that the customer planned to award G&W the business before the

upcoming RFP. That same day, while they were both at a Rite Aid event in Las Vegas, Nevada, Vogel-Baylor met CW-5, a senior executive at Glenmark, for the first time.

2773.    Two days later, on March 29, 2012, Vogel-Baylor e-mailed CW-5 stating, ███ ████████████████████████████████████████████████ and asked the Glenmark executive to send his full contact information. The next day, CW-5 responded to Vogel-Baylor's e-mail, providing his contact information and adding, ████████████████████████████ After exchanging a few more e-mails, the two then also exchanged several text messages.

2774.    On April 2, 2012, CW-5 e-mailed Vogel-Baylor stating that he had forgotten his cell phone at home and was ███████████████████████████████████████████ ██████

2775.    Throughout the month of April 2012, Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls. During these communications, and others over the next several months, G&W and Glenmark colluded to significantly raise their contract pricing on Ciclopirox Cream almost simultaneously.

2776.    For example, on April 11 and April 12, 2012, Vogel-Baylor and CW-5 exchanged more than fifty text messages and phone calls. In the early morning of April 12, 2012, Vogel-Baylor e-mailed her supervisor, Orlofski, recommending that G&W increase contract pricing for Walgreens and Publix. She suggested a direct price increase for Publix between 57% and 82% and between 233% and 408% for Walgreens, depending on the dosage size.

2777.    On April 18, 2012, Vogel-Baylor e-mailed C.M. at G&W with specific pricing to submit for the upcoming Publix RFP. Regarding Ciclopirox Cream, Vogel-Baylor advised that because G&W was doing a price increase on the product, she was including increased pricing on the bid. Vogel-Baylor further stated that C.M. should discuss this with her before submitting the bid.

That same day, Vogel-Baylor exchanged at least twenty text messages and phone calls with CW-5 of Glenmark.

2778.   That same day, Glenmark also began sending out notices to its customers that it would be increasing its prices for Ciclopirox Cream.

2779.   From April 24 to April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Glenmark, G&W, and Perrigo all attended, including C.M. of Perrigo, Orlofksi and Vogel-Baylor of G&W, and CW-5 of Glenmark.

2780.   C.M. of Perrigo and Orlofski of G&W communicated several times by phone in advance of the conference, as well as on the day the conference began. Between April 19 and 24, 2012, Orlofski and C.M. exchanged at least fifteen text messages. Orlofski also called C.M. once on April 24, 2012. The call lasted less than one minute. Vogel-Baylor and CW-5 of

2781.   Glenmark continued to communicate constantly throughout this time period. On April 24, 2012 alone, Vogel-Baylor exchanged eighty-eight text messages with CW-5.

2782.   That same day, April 24, 2012, Cardinal e-mailed G&W requesting a bid on Ciclopirox Cream. C.M., a sales executive at G&W, forwarded the request to Vogel-Baylor stating: "Clearly, the reason Cardinal wants us to bid on Ciclopirox is due to the price increases." G&W declined to bid on the opportunity.

2783.   The next day, on April 25, 2012, Vogel-Baylor e-mailed C.M. asking him to ████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████

2784.   Two days later, on April 27, 2012, Vogel-Baylor requested that G&W prepare a price increase letter for Walgreens raising the prices for Ciclopirox Cream between 233% and 408% depending on the formulation.

2785.    On May 21, 2012, Plaintiff Kroger, a Glenmark customer, e-mailed Vogel-Baylor asking if G&W would like to bid on Ciclopirox Cream. Vogel-Baylor declined to bid on the opportunity claiming that G&W could not handle the volume.

2786.    On May 24, 2012, Vogel-Baylor e-mailed C.M. asking if he had heard whether Publix would accept the price increase on Ciclopirox Cream. C.M. responded that Perrigo had submitted low pricing on the RFP.

2787.    By this time, Vogel-Baylor had been introduced to CW-6 at Fougera and was communicating with him directly (instead of through Grauso, as she had done previously). Vogel-Baylor knew that CW-6 had a relationship with T.P. at Perrigo, so she reached out to him that same day to have CW-6 act as a conduit between her and T.P. (Perrigo). Immediately upon hanging up with Vogel-Baylor, CW-6 called T.P. (Perrigo). After speaking with T.P. (Perrigo), CW-6 hung up and immediately called Vogel-Baylor back. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/24/2012 | Voice | Vogel-Barylor, Erika (G&W) | Outgoing | CW-6 (Fougera) | 17:35:03 | 0:01:01 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Barylor, Erika (G&W) | 17:39:00 | 0:05:00 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 17:43:00 | 0:02:00 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Barylor, Erika (G&W) | 17:45:00 | 0:01:00 |
| 5/24/2012 | Voice | Vogel-Barylor, Erika (G&W) | Incoming | CW-6 (Fougera) | 17:46:02 | 0:00:44 |

2788.    Later that day, Vogel-Baylor replied to her colleague C.M. stating, ███████████ ██████████████████████████████████████ Vogel-Baylor forwarded Perrigo's pricing to her supervisor, Orlofski.

2789.    On June 4, 2012, G&W sent its price increase notice to Walgreens. In an internal pricing spreadsheet, Perrigo listed its direct pricing at one of its customers on the 15gm, 30gm, and 90gm package sizes as $7.14, $11.22, and $19.39, respectively. Notably, this pricing was even higher than the increased pricing G&W sent to Walgreens on June 4, 2012.

2790.   On June 6, 2012, Vogel-Baylor and CW-5 of Glenmark exchanged eight phone calls. All of the calls lasted less than one minute.

2791.   On June 11, 2012, C.M. of G&W e-mailed Vogel-Baylor stating that he had spoken with Walgreens and the customer had told him ████████████████████████████████ ████████████████████████████████ C.M. stated, ████████████████████████ ████████████████████████████████ Vogel-Baylor responded: ████████ ████████████████████████████████ That same day, Vogel-Baylor and CW-5 of Glenmark exchanged more than eighty text messages.

2792.   Vogel-Baylor forwarded her exchange with C.M. to Orlofski. The next day, on June 13, 2012, Vogel-Baylor exchanged eighteen text messages with CW-5 of Glenmark. G&W ultimately retained the Walgreens business.

2793.   Between June 15, 2012 and June 26, 2012, Vogel-Baylor and CW-5 continued to exchange multiple text messages each day. During that time period, the two competitors exchanged 545 text messages.

2794.   On June 29, 2012, C.M. e-mailed Vogel-Baylor to advise her that MMCAP was requesting a bid on Ciclopirox Cream. Vogel-Baylor asked: ████████████████ C.M. replied: ████████████████████████████████████████████████████████ ████████████████████████ Vogel Baylor responded: ████████████████ Vogel-Baylor later changed her mind and recommended to C.M. that he bid on the MMCAP business. As she explained: ████████████████████████████████████████████ ████████████████████████████

2795.   The following spring, in May 2013, Glenmark coordinated another price increase on Ciclopirox Cream.

2796.    Glenmark's P.D. and Jim Brown, Vice President of Sales, communicated by phone multiple times with Vogel-Baylor (G&W). Vogel-Baylor also communicated with Perrigo via a conduit; A.T., Aurobindo Director of National Accounts, served as a go-between with T.P. (Perrigo).

2797.    Again, the coordination worked. Each company imposed price increases on Ciclopirox cream. As the companies made their price-increase announcements in May 2013, they continued to communicate to ensure that Fair Shares were maintained.

2798.    <u>Ciclopirox Shampoo</u>. During the relevant time frame, the primary manufacturers of Ciclopirox shampoo were Perrigo, Actavis, Taro, and Sandoz.

2799.    In the summer of 2012, Perrigo, Actavis, and Taro were the manufacturers of generic Ciclopirox shampoo. Sandoz (then Fougera) had exited the market in the year prior, but was making plans to re-enter in July 2012. This prompted a series of conspiratorial communications among Sandoz, Perrigo, Taro and Actavis.

2800.    In September 2012, C.B., Sandoz Director of National Accounts, communicated by phone with T.P., Perrigo Director of National Accounts, and H.M., Taro Director of Corporate Accounts. The express purpose of the communications was to coordinate Sandoz's re-entry into the market for Ciclopirox shampoo.

2801.    In November 2012, C.B. (Sandoz) communicated by phone multiple times with Ara Aprahamian, Actavis Director of Pricing, to coordinate on Ciclopirox Shampoo. C.B. (Sandoz) also continued his communications with T.P. (Perrigo) in November to coordinate on pricing and market share for Ciclopirox shampoo.

2802.    In early December 2012, Sandoz re-entered the market. That week, C.B. (Sandoz) again communicated with Aprahamian (Actavis). Meanwhile, T.P. (Perrigo) communicated by phone

REDACTED – PUBLIC VERSION

directly with M.D., Actavis Director of National Accounts. C.B. (Sandoz) communicated again with H.M. (Taro) in mid-December 2012.

2803.    The coordination among conspirators worked. Sandoz launched Ciclopirox shampoo and quickly obtained its Fair Share of the market, as agreed with Actavis, Perrigo and Taro.

2804.    <u>Ciclopirox Solution</u>. During the relevant time period, Akorn, Perrigo, G&W, and Sandoz were the primary manufacturers of Ciclopirox Dermatological Liquid.

2805.    The market for Ciclopirox was mature and at all relevant times had multiple manufacturers.

2806.    For years, the prices of Ciclopirox were relatively low and stable. In the spring of 2013, Akorn and G&W prices shot up, increasing more than 700% in just weeks. Perrigo's prices increased as well, though it took a few months to reach the heights of Akorn and G&W.

2807.    Despite these price increases, each Defendant's share of the market remained relatively stable, as contemplated by the fair share agreement.

2808.    Pricing data shows steep and parallel price increases beginning in April 2013 by Akorn, Perrigo, and G&W on Ciclopirox.

2809.    As of January 2013, Perrigo and G&W were the two dominant suppliers of Ciclopirox Solution, with 46% and 41% share of the market, respectively. Sandoz had 7% share and the remaining 5% of the market was split among non-defendant Hi-Tech, non-defendant Harris Pharmaceutical, and Versapharm.

2810.    Throughout this period, Akorn, Perrigo, and G&W met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Ciclopirox and their fair share agreement.

2811.    For example, Akorn, Perrigo, and G&W all sent representatives to the GPhA Annual Meeting in Orlando, Florida on February 20 to 22, 2013. All three companies also attended the

676

REDACTED – PUBLIC VERSION

NACDS 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida on April 20 to 23, 2013. Shortly after these meetings, each manufacturer's prices for Ciclopirox increased.

2812.   Between April 20 and April 23, 2013, representatives from Perrigo, G&W, and Sandoz attended the NACDS 2013 Annual Meeting in Palm Beach, Florida ("NACDS 2013"). During the conference, the attendees had many opportunities to interact with each other at various programming and social events.

2813.   Vogel-Baylor was among the attendees at NACDS 2013. Immediately upon returning from the conference, on April 24, 2013, Vogel-Baylor prepared a price increase analysis for Ciclopirox Solution and e-mailed it to Orlofski and R.G., a senior G&W executive. Vogel-Baylor proposed increasing WAC pricing by 132% – from $16.00 to $37.15. According to the analysis, the increase would result in over $7.6 million in additional sales revenue to G&W annually. R.G. was excited at the prospect of this large price increase, replying to the e-mail:

> If this works, we'll be transforming a dog into a star (no offense, ███)!

2814.   The following Monday, April 29, 2013, Vogel-Baylor coordinated on the price increase with competitors Perrigo and Sandoz. Vogel-Baylor used CW-6 (then at Aurobindo) as a messenger to communicate with both T.P. of Perrigo and CW-3 of Sandoz. Vogel-Baylor often used CW-6 as a conduit to convey competitively sensitive information to competitors – even on products that Aurobindo did not sell.

2815.   Vogel-Baylor had an early morning phone call with CW-6 on April 29, 2013 that lasted four (4) minutes. After that call ended, CW-6 immediately called T.P. and then CW-3. The phone calls between CW-6 and Vogel-Baylor, T.P., and CW-3 continued throughout the day.

2816.   After the flurry of calls on April 29, 2013, Vogel-Baylor e-mailed J.G., an operations manager at G&W, advising him that she would know the next day whether G&W was going to be able to increase price on Ciclopirox Solution.

2817.   The phone calls between the competitors continued throughout the next day and on May 1, 2013. On April 30, 2013, while speaking with CW-6, CW-3 made the following contemporaneous note in a notebook detailing the amount of the proposed G&W price increase:



2818.   After her calls with CW-6 on May 1, 2013, Vogel-Baylor confirmed to J.G. that G&W would increase the price of Ciclopirox Solution and directed her sales team to start drafting price increase letters to customers.

2819.   On Tuesday, May 7, 2013, Vogel-Baylor and G&W sales representatives began informing customers about the price increases.  Several customers noted that although the product was available from other manufacturers for a lower price, the customer would wait to see what the market did before making G&W a secondary supplier. One customer remarked that product pricing had gotten too low and hoped that more manufacturers would increase pricing. Another customer thanked C.M., a G&W sales executive, for calling him about the price increase before sending the letter and C.M. responded:



When the customer told C.M. he should "feel free to stop practicing," C.M. responded:

REDACTED – PUBLIC VERSION

2820.   On May 8, 2013, Vogel-Baylor e-mailed her "BFF" L.S., an account manager at the customer Ahold, to tell her that G&W was implementing a price increase on Ciclopirox Solution. Ahold was not G&W's customer for the product. Vogel-Baylor wrote that L.S. should "keep [her] eyes out" as a price increase on this product from Ahold's supplier "may be coming."

2821.   By the end of the day on May 9, 2013, G&W's customer Rite Aid had sought a bid from Sandoz for Ciclopirox Solution as a result of the G&W price increase.

2822.   CW-4, a Sandoz senior sales executive, received Rite Aid's bid request and forwarded it to Kellum with the message "?". Kellum responded that the bid request was due to a price increase. C.P., a pricing analyst at Sandoz, asked whether Sandoz should bid for the business or "just leave it alone." Kellum replied, "[l]eave alone." Accordingly, Sandoz did not submit a bid for this business.

2823.   While G&W was in the midst of its price increase on Ciclopirox Solution, CW-6 left the industry and was no longer available to serve as a conduit between the competitors. Going forward, Vogel-Baylor would need to collude with T.P. (Perrigo) directly and use him as a conduit to collude with CW-3 of Sandoz.

2824.   On July 30, 2013, T.P. had a thirteen (13) minute call with CW-3 of Sandoz and exchanged five (5) phone calls with Vogel-Baylor. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 3:38:00 | 0:03:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:19:00 | 0:01:00 |
| 7/30/2013 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 7:09:00 | 0:13:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 8:58:06 | 0:02:33 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 9:29:00 | 0:10:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 14:29:07 | 0:09:05 |

2825.   That same day, Perrigo prepared price increase letters for Ciclopirox Solution. Two days later, on August 1, 2013, Perrigo raised its WAC pricing by 60% -- from $15.00 to $24.00.

2826.   On August 5, 2013, Perrigo's customer Kroger reached out to Vogel-Baylor and asked if G&W would like to bid on Ciclopirox Solution. Vogel-Baylor declined the opportunity, explaining to the customer that it is currently a "4 player market" and G&W "has 45%."

2827.   Later in August, Versapharm, a small player with under 1% of the Ciclopirox Solution market, submitted a bid to Cardinal, a G&W customer. Cardinal reached out to Vogel-Baylor to ask G&W to lower its price. Vogel-Baylor wanted to keep the business but also thought, consistent with fair share principles, that she may need to give it up to VersaPharm because of its low share. Vogel-Baylor asked Orlofski, her supervisor, for his direction on this. Orlofski decided G&W should retain the business, but should use the customer to convey a message to its competitor VersaPharm explaining the fair share understanding and the rules of engagement between generic manufacturers:

> Erika,
>
> I really think we should hold the business. Perhaps Cardinal can pass along that Perrigo is the market share leader and Versapharm should go after one of their accounts. We will not let anything go.
>
> Kurt

2828.   Consistent with Orlofski's recommendation, Vogel-Baylor lowered Cardinal's price on Ciclopirox Solution and sent Cardinal the following e-mail:

> Hi ██,
>
> We are matching the price that you need on the Ciclopirox Solution. Please find attached your new price. Perrigo is the market leader here so the bidder can get share from them! ☺
>
> Please advise on the effective date for the new price.
>
> Thank you very much for giving us the opportunity to keep this item.
>
> Thanks,
> Erika

### 22.    Clindamycin Phosphate

2829.    During the relevant time period, the primary manufactures of these products were: Gel—Sandoz, non-defendant Greenstone; Lotion—Sandoz, Greenstone; Vaginal Cream—Sandoz, Greenstone; and Solution—Sandoz, Greenstone, Perrigo, Taro, Actavis.

2830.    The markets for Clindamycin Phosphate gel, lotion, solution, and vaginal cream were mature and at all relevant times had multiple manufacturers.

### a.    The First Coordinated Price Increase (60ml Solution – Fougera and Greenstone)

2831.    In 2010, Defendants Fougera and Greenstone were the only suppliers in the market for Clindamycin 60ml solution. Fougera – a separate entity that was subsequently acquired by Sandoz in 2012 – temporarily discontinued the product in September 2010, leaving Greenstone as the sole supplier in the market.

2832.    By late 2010, however, Greenstone also began to experience production problems, although it did continue to supply certain select customers. Fougera immediately started preparing to re-enter the market and significantly raise price – in direct coordination with Greenstone.

2833.    On November 1, 2010, Fougera learned that it had Clindamycin 60ml solution in stock and that the product was available for shipping. That day, Kaczmarek stated internally that  In response, a Fougera sales executive indicated that Greenstone That same executive initially suggested that Fougera double its WAC price, from $7.50 to $15.

2834.    Fougera did get the price point with the help of Greenstone. The next day – November 2, 2010 – Fougera scheduled an internal for the call included Kaczmarek, CW-3 and CW-6, among others. Before that conference call, CW-6 of Fougera called Jill Nailor of Greenstone – someone he

generally did not speak with on the phone for social reasons – and the two spoke for nearly six minutes.

2835.   At some point that day, Fougera changed plans and decided to re-enter the market with a much more dramatic WAC price increase than originally suggested the day before, going from $7.50 to $31.50 – or a 320% increase. Customer contract prices increased even higher. Within two days after the price increase, for example, during a conversation with a Fougera national account representative, a customer complained that it had only just recently taken Clindamycin off contract with Fougera but ████████████████████████████ That same day, November 4, 2010, CW-6 and Nailor of Greenstone exchanged twenty-one text messages.

2836.   Based on their communications, Fougera knew that Greenstone would follow its price increase – but it could not tell its customers that. For example, in January 2011, a large wholesaler customer, ABC, approached Fougera asking if it knew whether Greenstone would be following Fougera's price increase on Clindamycin Solution. In an internal Fougera e-mail exchange, CW-3 asked CW-6 (who, as stated above, had spoken with Nailor at Greenstone on the day of the Fougera price increase) if there was ████████████████████████████ ████████████████████ CW-6 responded that he did not have any new information, other than that a Greenstone price increase ████████ When CW-3 pressed for more detail about how quickly it would be coming, CW-6 responded: ████████████████████ Indeed, CW-6 had called Nailor at Greenstone and left a 43-second voicemail immediately before sending that e-mail to CW-3.

2837.   Over the ensuing months, Fougera was contacted by several customers requesting price reductions due to the fact that Greenstone had not yet followed. Fougera continued to coordinate regularly with Greenstone and did not reduce its price, but grew frustrated when its

682

competitor did not promptly follow as expected – internally stating that Greenstone was ███████

███████████████ and that they ████████████ and that they were ████████

2838.   Greenstone did ultimately follow Fougera's price increase with an increase of its own

on Clindamycin Solution in July 2011, but it did not fully match Fougera's public WAC pricing.

Nonetheless, Fougera refused to bid on any of Greenstone's accounts as it did not want to punish

Greenstone for actually raising its prices.

2839.   During this time period, the anticompetitive understanding and coordination

between Fougera and Greenstone applied to the other formulations of Clindamycin as well. For

example, in May 2012 Greenstone notified customers that it would be raising the price of

Clindamycin Gel. Shortly after that, Fougera was approached by a customer asking for a bid on

Clindamycin Gel. In conveying the request to Kaczmarek, a Fougera senior executive explained that

███████████████████████████████████████████████████████████

███████████████████ Kaczmarek agreed.

2840.   The next day, CW-6 exchanged five text messages with Nailor of Greenstone, likely

to convey Fougera's decision not to challenge Greenstone's market share at that customer.

2841.   Similarly, on June 27, 2012, CW-3 at Fougera learned that ABC had put Clindamycin

Gel, Lotion and Cream out to bid ████████████████████ According to CW-3,

████████████████████████ That same day, CW-6 of Fougera placed a call to Nailor

at Greenstone and left a 31-second voicemail.

    b.    **The Second Coordinated Increase (October 2012 – All Formulations – Sandoz and Greenstone)**

2842.   In late July 2012, Sandoz formally acquired Fougera. As discussed more fully below,

even before the acquisition Sandoz had been conspiring separately with Greenstone to fix prices on

Latanoprost Drops, and thus had its own separate relationships with Greenstone.

2843.   After the merger, Sandoz began to scrutinize the Fougera business line and search for ways to maximize revenue for Fougera products in order to meet its pre-merger expectations. Starting in or about August 2012, Kellum (of Sandoz) and Kaczmarek (of Fougera, still with the company during the transition) – now co-workers – were tasked with discussing and identifying a list of price increase candidates from the Fougera drug portfolio.

2844.   By August 1, 2012, Greenstone had identified Clindamycin Solution as a ███████ ████████████████ On August 7, 2012, Kellum called R.H. and the competitors exchanged six text messages. The next day, August 8, 2012, Kellum and R.H. spoke for ten minutes.

2845.   Later that month, on August 22, 2012, Kellum identified Clindamycin, in all of its various formulations, as a price increase candidate. In describing his reasoning, Kellum indicated that the only competitor for all four formulations was Greenstone, █████████████████████████ ████████████████████████ Kellum was referring to his recent successful collusion with Greenstone on Latanoprost drops (discussed below) which had resulted in a significant price increase. In response, Kaczmarek recalled his own experience of Greenstone's failure to follow Fougera's Clindamycin Solution price increase as quickly as he wanted, stating ██ ████████████████████████████████

2846.   Kellum's confidence in Greenstone was based on his own relationship with R.H. of Greenstone, and his prior conversations with her. Kellum pushed forward with the planned price increases for Clindamycin, noting in a late-August 2012 presentation that ████████████ ███████████████████████████████████ ████████████████

2847.   As Sandoz was planning for the Clindamycin price increase in August 2012, Kellum was coordinating with R.H.. For example, on August 29, 2012, a colleague at Sandoz sent Kellum a draft ████████████████████ which included detailed information about the

proposed Clindamycin price increase. After speaking with R.H. of Greenstone that same day for

more than three minutes, Kellum responded to his colleague saying, ██████████████████

████████████████████████████████████████

2848.    Similarly, in September 2012 when Kellum was asked for his ██████████ for the price

increases on Clindamycin, he told colleagues that he expected Greenstone would ████████████

████████████████████████ and follow the Sandoz price increase. Although others at

Sandoz expressed some concern that Greenstone might not follow, Kellum remained confident in

his agreement with R.H. and Greenstone.

2849.    On October 19, 2012, Sandoz implemented price increases on all four formulations

of Clindamycin ranging from 77% for vaginal cream to 188% for gel.

2850.    In the days leading up to the price increases, Kellum continued his coordination – by

phone and text message – with R.H. of Greenstone. As detailed in the table below, Kellum reached

out repeatedly by phone and text message to R.H. at Greenstone in the days leading up to Sandoz's

announcement of the price increases. This culminated in a nearly four minute call between the two

competitors on October 19, 2012 – the day the Sandoz price increases became effective:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/17/2012 | Voice | R.H. (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 13:10:55 | 0:00:00 |
| 10/17/2012 | Voice | R.H. (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 19:03:16 | 0:00:00 |
| 10/18/2012 | Voice | R.H. (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 9:38:07 | 0:00:00 |
| 10/18/2012 | Voice | R.H. (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 13:37:57 | 0:00:00 |
| 10/18/2012 | Voice | R.H. (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 14:14:42 | 0:00:33 |
| 10/18/2012 | Voice | R.H. (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 16:46:17 | 0:00:00 |
| 10/18/2012 | Voice | R.H. (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 17:58:49 | 0:00:00 |
| 10/18/2012 | Voice | R.H. (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 17:59:38 | 0:00:00 |
| 10/18/2012 | Voice | R.H. (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 18:24:33 | 0:00:00 |
| 10/19/2012 | Voice | R.H. (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 8:23:59 | 0:03:56 |

2851.    During these communications, the competitors confirmed their understanding that

Greenstone would follow the Sandoz price increases. With the agreement in hand and understood

between the two competitors, Kellum and R.H. would not need to speak again by phone or text

message for nearly a year-and-a-half, until March 18, 2014 – as Sandoz was preparing for another large increase on Clindamycin (discussed below).

2852.    Greenstone followed the price increases quickly this time, notifying its customers of a price increase on all of Clindamycin formulations on November 27, 2012 – although the WAC price increases did not become effective and publicly visible until December 27, 2012. In the interim period before Greenstone publicly followed the Sandoz price increases, Sandoz made sure to avoid disrupting the market.

2853.    When Greenstone's customers approached Sandoz looking for a lower price, Sandoz refused to bid. Kellum, in particular, ███████████████ that Sandoz avoid bidding as a result of the Greenstone price increases.

2854.    During that same time period, Sandoz's own customers also approached the company, seeing lower public prices from Greenstone and requesting that Sandoz reduce its pricing because they were not yet aware that Greenstone had followed. Knowing that Greenstone would follow, however, Sandoz refused. For example, in early December 2012 Sandoz was approached by its customer McKesson asking Sandoz to reduce its pricing for Clindamycin because Greenstone was offering significantly lower pricing in the market. A Sandoz pricing employee initially responded to the customer by refusing to lower the price, saying ████████████████████████ ████████████████████████████████████████████ ████████████ your e-mail. When the customer challenged those responses and asked for additional details about what intelligence Sandoz was referring to, the pricing employee forwarded the e-mail string to Kellum and CW-1, asking for advice on how to avoid referring to the illegal understanding between the two companies by ███████████ McKesson that ███████████ ████████████████ Kellum responded by instructing the employee to call McKesson and

██████████████████████████ Knowing that a Greenstone increase would be coming, Kellum concluded: ████████████████████████████████████████

2855.   The Greenstone Clindamycin WAC price increases became effective and publicly visible on December 27, 2012. Greenstone followed Sandoz's WAC price increases to the penny on every formulation, with Greenstone's prices on Clindamycin Solution increasing by 416%.

2856.   The coordinated price increases were a success. In a May 2013 Sandoz Planning Meeting, Sandoz noted with respect to Clindamycin: ████████████████████████████████ By May 2014, those price increases had resulted in an additional $61,000,000 in net sales to Sandoz.

### c.   New Entrants on Clindamycin Solution – Actavis, Perrigo and Taro – Do Not Significantly Erode Pricing

2857.   The late-2012 Sandoz and Greenstone price increases got the attention of two competitors – Taro and Perrigo – that had previously obtained approval to market Clindamycin Solution but had not recently been active in the market.

2858.   For example, in a January 2013 internal e-mail Perrigo employees noted that they had ██████████████████████████ on Clindamycin Solution. They noted that Perrigo already possessed approved ANDAs for the product that were ████████████████ ███████████████████████████████████████ ████ Perrigo did indeed begin making plans to return to the market; and was in frequent communication with its competitors at every important step throughout the process.

2859.   Taro similarly had approval to sell Clindamycin Solution; but had not been marketing the product. As early as April 2013, however, Taro began taking steps to bring the product back to market, which included reaching out to competitors. For example, on April 17, 2013, Taro circulated an internal e-mail about a ████████████ for Clindamycin Solution, requesting specific information about material availability in order to estimate an available launch date. That same day, Aprahamian called his contact at Sandoz, CW-3, and the two spoke for four minutes.

2860.   Similarly, Aprahamian scheduled a meeting with colleagues at Taro on June 6, 2013 to discuss Taro's entry into the market for Clindamycin Solution. The day before that meeting, he sent an e-mail internally saying, ████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████ The day after his internal meeting – June 7, 2013 – Aprahamian called CW-3 at Sandoz and the two competitors spoke for nearly eleven minutes.

2861.   Starting in July 2013, Sandoz started having temporary supply problems for Clindamycin Solution, due to a change in the adhesive label which required additional testing. The disruption was temporary, and Sandoz expected to be back in the market by the end of the year. However, this left Greenstone as the only viable competitor while Taro and Perrigo were planning to enter the market.

2862.   Because it was well understood under "fair share" principles that Greenstone would have to concede market share and "play nice in the sandbox" as these new competitors entered the market (and as Sandoz subsequently re-entered the market), it was important for Taro, Perrigo and Sandoz to coordinate with each other in order to avoid competition and minimize price erosion as they re-entered the market.

2863.   Perrigo started preparing in earnest to enter the market for Clindamycin Solution in August 2013. Over the next several weeks, executives at Perrigo, Taro and Sandoz were in almost constant communication, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:32:00 | 0:01:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:05:00 |
| 8/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 17:54:00 | 0:05:00 |
| 8/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 17:07:00 | 0:01:00 |
| 8/6/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:22:00 | 0:04:00 |
| 8/6/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:27:00 | 0:12:00 |
| 8/7/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:45:00 | 0:03:00 |

| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:33:00 | 0:13:00 |
|---|---|---|---|---|---|---|
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 18:19:00 | 0:02:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:47:00 | 0:01:00 |
| 8/8/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 10:32:00 | 0:06:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 16:42:00 | 0:04:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:37:00 | 0:08:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 6:42:00 | 0:03:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:01:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:39:00 | 0:02:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:04:00 | 0:01:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 16:22:00 | 0:01:00 |
| 8/14/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:01:00 | 0:01:00 |
| 8/15/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 12:53:00 | 0:08:00 |
| 8/15/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:09:00 | 0:14:00 |
| 8/21/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:51:00 | 0:08:00 |
| 8/21/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 19:41:00 | 0:05:00 |
| 8/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:54:00 | 0:03:00 |

2864.    On August 28, 2013, at 1:30 p.m. ET, the Perrigo sales team held an internal launch meeting regarding Clindamycin Solution. In advance of that meeting, a Perrigo executive circulated pricing and market share information to the team, including a pricing grid with proposed Perrigo pricing for different ▮▮▮▮ of customers. One of the attached documents listed Perrigo's ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ This led to several more phone calls between Taro, Perrigo, and Sandoz that same day. Aprahamian of Taro and T.P. of Perrigo both spoke to CW-3 of Sandoz in the morning before the 1:30 p.m. ET Perrigo launch meeting. Shortly after the meeting, at 2:36 p.m., Boothe of Perrigo called the Taro main line and spoke to someone at Taro – likely Perfetto – for approximately thirteen minutes.

2865.    Perrigo formally launched and entered the market for Clindamycin Solution on Monday, September 9, 2013 – a week earlier than expected. The week before the launch, as Perrigo was deciding which customers to approach, executives at the company were again in frequent contact with competitors Taro and Sandoz. On Wednesday, September 4, 2013, a Perrigo executive sent an e-mail to the Perrigo sales team about Clindamycin Solution, stating: ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ The next day, T.P. of Perrigo called his contact at Sandoz, CW-3, and the two spoke for approximately ten minutes. The day after that – Friday September 6, 2013 –

**REDACTED – PUBLIC VERSION**

Boothe of Perrigo spoke to Perfetto of Taro for nearly two minutes. Perrigo was quickly able to obtain ABC and Walmart as customers, allowing the company to even exceed its initial market share targets.

2866.   Shortly after Perrigo entered the market, on September 12, 2013, Aprahamian of Taro sent an internal e-mail announcing that ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████

2867.   Over the next several weeks, executives at Taro communicated frequently with their counterparts at Perrigo and Sandoz to determine which customers to target, and how to avoid competing with each other. At least some of those communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/17/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:10:07 | 0:16:39 |
| 9/17/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 19:08:00 | 0:02:00 |
| 9/18/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 11:52:11 | 0:11:14 |
| 9/19/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:41:00 | 0:17:00 |
| 9/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 15:23:00 | 0:01:00 |
| 9/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:24:00 | 0:01:00 |
| 9/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:42:00 | 0:15:00 |
| 9/26/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:37:17 | 0:06:44 |
| 9/26/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 15:22:00 | 0:15:00 |
| 9/27/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 16:00:00 | 0:05:00 |
| 10/1/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 17:56:00 | 0:01:00 |
| 10/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:41:00 | 0:10:00 |
| 10/3/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 16:13:00 | 0:05:00 |
| 10/3/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 18:16:00 | 0:01:00 |
| 10/4/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:32:20 | 0:00:12 |
| 10/4/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:32:52 | 0:04:51 |
| 10/4/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 15:37:00 | 0:02:00 |

2868.   As can be seen in the table above, Aprahamian called CW-3 at Sandoz on October 1, 2013, most likely leaving a voicemail. CW-3 called Aprahamian back the next day, and the two spoke for ten minutes. During that call, Aprahamian and CW-3 talked about specific pricing in the market and which customers Taro should approach as it entered the market. That same day – October 2, 2013 – Aprahamian created a spreadsheet titled ████████████████████████████████ which

690

documented some of the information he had received during that call. In that document,

Aprahamian created an initial pricing model for Taro's upcoming launch of Clindamycin Solution,

based on his conversations with CW-3. The spreadsheet included not only public WAC pricing for

Sandoz, Greenstone and Perrigo, but also in a separate tab of the spreadsheet titled ███████

non-public price points for three potential customers: Rite Aid, Publix, and ABC:



2869.   On October 8, 2013, Taro was busy preparing for the launch. Aprahamian sent an e-

mail to the Taro sales team indicating that Taro was planning to launch Clindamycin Solution ████

████████ and asking those sales executives to reach out to customers and ██████████████

██████ Aprahamian said he was ████████████████████████████████████████████████

████████████████████████████ Consistent with the "fair share" understanding,

Aprahamian indicated that ██████████████████████████████ meaning that Taro

would only target Greenstone customers – not Perrigo – due to Greenstone's very high market

share. Another Taro employee was concurrently creating a ████████████████████████████

with information about the product, recent price trends in the market, competitors, and Taro's

████████████████████ of 20%. That same day, Aprahamian called CW-3 at Sandoz and left a

message. CW-3 returned the call immediately and the two spoke for approximately three minutes.

2870.    Taro also scheduled an internal meeting regarding the Clindamycin launch for October 11, 2013. The day before and the day of that meeting, Aprahamian was again busy communicating with CW-3 of Sandoz. On October 10, 2013, Aprahamian called CW-3 twice – first on CW-3's office line, leaving a message, and then immediately after on his cell phone, leaving another message. The next day – the day of the Taro internal launch meeting – the two competitors spoke three times, with calls lasting three, one, and five minutes, respectively.

2871.    As Aprahamian kept speaking to CW-3 at Sandoz, who was in turn speaking with T.P. at Perrigo, he continued compiling competitively sensitive, non-public price points for various customers. For example, by October 25, 2013, the ███████ tab of Aprahamian's Clindamycin Solution pricing spreadsheet had grown.



2872.    Having this competitively sensitive, non-public information allowed Taro to price as high as possible while still obtaining new business – accomplishing one of the fundamental goals of the "fair share" understanding by minimizing price erosion as it entered the market.

2873.    Taro entered the market for Clindamycin Solution on October 28, 2013, matching

Sandoz, Greenstone and Perrigo's WAC pricing exactly. When launching, Taro quickly targeted and

obtained Rite Aid – not ABC or Walmart – to avoid competing with Perrigo for market share. This

gave Taro approximately 13% market share immediately, almost reaching its target goal with just one

customer.

2874.    When Sandoz subsequently re-entered the market for Clindamycin Solution in early

2014, it also did so in coordination with its competitors. For example, on Monday, February 10,

2014, members of the Sandoz sales team had a conversation about the company's upcoming

relaunch of Clindamycin Solution. As a result of that discussion, it was decided that █████████

███████████████████████████████████

2875.    That same day, Kellum sent an internal e-mail to the Sandoz sales team reminding

them of the important understanding already in place with Greenstone across all of the Clindamycin

formulations, not just the Solution:



2876.    Two days later, on February 12, 2014, CW-3 of Sandoz called Aprahamian of Taro

and the two spoke for seventeen minutes. They spoke again on February 13 for one minute. That

same day – February 13, 2014 – CW-1 of Sandoz sent an internal e-mail again stressing the broader

relationship with Greenstone and the desire not to disrupt that relationship: ███████████

████████████████████████████████████████████████████████████

███████████████████

     2877.   Over the next several weeks until Sandoz re-launched, the four competitors for

Clindamycin Solution – Sandoz, Taro, Perrigo and Greenstone – coordinated through numerous

phone calls, in order to minimize any disruption that might be caused by Sandoz's re-entry:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/14/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 13:04:00 | 0:17:00 |
| 2/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 15:42:00 | 0:02:00 |
| 2/20/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 4:56:11 | 0:00:34 |
| 2/20/2014 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 9:21:00 | 0:03:00 |
| 2/20/2014 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 9:24:00 | 0:11:00 |
| 2/24/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:01:00 |
| 2/26/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 3/1/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 18:06:00 | 0:01:00 |
| 3/5/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 6:48:00 | 0:12:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 8:18:40 | 0:00:16 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 8:23:15 | 0:00:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 9:02:21 | 0:00:09 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Wesolowski, John (Perrigo) | 11:51:57 | 0:00:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 11:53:16 | 0:02:38 |
| 3/13/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 4:05:00 | 0:01:00 |
| 3/13/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 9:42:00 | 0:12:00 |
| 3/18/2014 | Voice | R.H. (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 11:43:38 | 0:00:31 |
| 3/18/2014 | Voice | R.H. (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 12:22:44 | 0:07:39 |

     2878.   Sandoz set its target market share at 25%, choosing to target 20% from Greenstone

and 5% from Perrigo. In a May 2014 internal Sandoz presentation, Sandoz laid out its plan for

reentry, specifically referring to one of its competitors as ███████ rather than ████████



2879.   Ultimately, these coordinated efforts to minimize price erosion were very successful. Even after both Taro and Perrigo's entry, and Sandoz's re-entry, prices for Clindamycin Solution remained significantly higher than they had been prior to the first coordinated price increase. In a ▮▮▮▮▮▮▮▮ presentation to Pfizer in 2017, Greenstone summarized the lock-step price increases in the market for Clindamycin Solution, while also showing relatively minimal price erosion even after two additional competitors had entered the market:



2880.   Indeed, even when Actavis entered the market in early 2015, the competitors'

commitment to the fair share scheme allowed a fifth entrant without materially affecting market

prices. This was because Aprahamian coordinated Actavis' entry with M.D. of Actavis during several

lengthy calls in January 2015. During, Actavis identified which customers to target to gain its fair

share, which allowed Actavis to gain share at the same supracompetitive pricing as the existing

competitors.

> d.   **The Third Coordinated Price Increase (2014 – All Formulations
> Except Solution – Sandoz and Greenstone)**

2881.   Starting in April 2014, Sandoz decided to raise prices on the three formulations of

Clindamycin where Greenstone was still its only competitor. This led to a quick flurry of phone calls

between Greenstone and Sandoz in early April 2014 to confirm the understanding, as shown below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/2/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 13:49:38 | 0:06:59 |
| 4/2/2014 | Voice | R.H. (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 14:52:52 | 0:03:05 |
| 4/2/2014 | Voice | R.H. (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 10:50:27 | 0:00:25 |
| 4/2/2014 | Voice | R.H. (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 11:36:07 | 0:03:04 |

2882.    The phone call between Nailor and Kellum listed above was the first phone call ever between the two, according to phone records. As a result of these calls, Sandoz understood that Greenstone would follow its price increases. During these calls, the competitors also discussed a separate price increase on Eplerenone Tablets, discussed more fully below.

2883.    Sandoz moved quickly, raising its WAC prices on Clindamycin Gel, Clindamycin Lotion, and Clindamycin Cream by approximately 20%, effective April 18, 2014. Shortly after the Sandoz increase, on April 23, 2014, Nailor of Greenstone and Kellum spoke again for nearly fifteen minutes.

2884.    By now, Greenstone understood the need to follow the Sandoz price increases quickly – and did so. It followed the Sandoz WAC increases to the penny less than a month-and-a-half later, with an effective date of June 2, 2014. Shortly before Greenstone followed the Sandoz Clindamycin increases – on May 22, 2014 – R.H. of Greenstone called Kellum of Sandoz twice, leaving him a forty-seven second voicemail. They did not speak again for nearly three months. Similarly, three days before the increases became effective, on May 29, 2014, Nailor of Greenstone called Kellum of Sandoz, leaving him a twenty-six second voicemail. As part of that same price increase, Greenstone also raised its pricing on Eplerenone Tablets.

2885.    Sandoz honored the "fair share" understanding with Greenstone and the agreement to raise prices on Clindamycin. For example, when approached by a customer, Omnicare, on May 28, 2014 to provide a bid for Clindamycin Gel, the first reaction from a Sandoz marketing manager was that Kellum ████████████████████████████████ Omnicare approached Sandoz again in August, asking if Sandoz had enough supply to meet the customer's needs. The e-mail from

Omnicare followed a flurry of phone calls between Kellum and R.H. of Greenstone only a few days prior, on August 14, 2014 (their first calls since May 2014). After receiving the e-mail from Omnicare, CW-3 of Sandoz informed the customer that Sandoz would not do anything that would disrupt the market.

### 23.    Clobetasol Propionate

2886.    In 2009, there were approximately ten Clobetasol Propionate manufacturers. In 2012, Novartis acquired Fougera and in 2013, Akorn acquired Hi-Tech, consolidating the market. By 2014, many Clobetasol Propionate manufacturers exited the market, including Teva and Glenmark.

2887.    Prior to June 2014, prices for Clobetasol Propionate were stable.

2888.    As of June 2014, Sandoz and Hi-Tech were Taro's primary competitors on the various formulations of Clobetasol, including the Cream, Emollient Cream, Gel, Ointment, and Solution. In addition, Wockhardt marketed the Solution.

2889.    Taro spoke with each of these competitors in the days leading up to the increases on Clobetasol. The sequence and timing of these calls is listed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/15/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:15:00 |
| 5/19/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:23:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 9:35:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 9:36:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.C. (Wockhardt) | 9:39:00 | 0:09:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:17:00 | 0:01:00 |
| 5/28/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:37:00 | 0:10:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 9:16:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 14:03:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 14:04:00 | 0:05:00 |
| 6/3/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 14:06:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 15:23:00 | 0:01:00 |
| 6/4/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:04:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:54:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:34:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:52:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:14:00 | 0:08:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 6:26:00 | 0:10:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | E.B. (Hi-Tech) | 6:35:00 | 0:01:00 |

2890.   After Taro's price increases for Clobetasol were announced, and consistent with their ongoing understandings, Taro's competitors declined opportunities to bid on customers so as not to take advantage of Taro's price increases, except in those circumstances where they sought additional market share to meet their fair share targets.

2891.   For example, on June 4, 2014, Cardinal e-mailed Sandoz asking it to bid on its Clobetasol business as a result of the Taro price increase. Kellum responded similarly: ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████

2892.   Further, on June 23, 2014, McKesson presented Sandoz with an opportunity to take on additional business for several products, including Clobetasol. K.K., a senior sales executive at Sandoz, responded to the customer: ███████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████ Less than five minutes later, Kellum responded to K.K. (without copying the customer) stating: ███████████████████

███████████████████████████████████████████████████████████████

███████████████████ K.K. replied: ███████████████████████████████████

███████████████████████ The next day, K.K. responded to McKesson, raising the familiar refrain: ███████████████████████████████████

████████████████████████████████████████████████████████████

███████

2893.   Throughout June 2014, Aprahamian exchanged several calls with his contacts at Taro's principal competitors on Clobetasol (and Carbamazepine ER) – Sandoz and Hi-Tech – to discuss the increases and coordinate their actions.

2894.   For example, on June 6, 2014, Aprahamian called E.B., a senior sales and marketing executive at Hi-Tech twice. Both calls lasted one (1) minute. These were the first calls ever between the two competitors according to the available phone records. Then, on June 9, 2014, Aprahamian and E.B. exchanged two more calls, including one call lasting ten (10) minutes. The next day, on June 10, 2014, E.B. met in-person with B.K., a senior executive at Akorn, and S.G., a sales executive, ██████████████████ regarding Clobetasol.

2895.   On June 20, 2014, Aprahamian engaged in a series of communications with both CW-3 of Sandoz and E.B. of Hi-Tech. Each time that CW-3 hung up with Aprahamian, he immediately called his supervisor, Defendant Kellum, to report the conversations. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:40:00 | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 11:42:00 | 0:01:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:43:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:56:00 | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:07:00 | 0:12:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:40:00 | 0:10:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:50:00 | 0:01:00 |

2896.   During these calls, Aprahamian provided CW-3 with Taro's new non-public prices, by class of trade, for the various formulations of Clobetasol (and Carbamazepine and Fluocinonide. In all, Aprahamian identified more than seventy (70) different price points for these products. CW-3 took contemporaneous notes of these conversations in his Notebook. A snapshot of these notes is pictured in Paragraph 2707 of this Complaint.

2897.   When CW-3 conveyed the price points to Defendant Kellum and CW-1, Kellum was shocked by the size of the increases and asked CW-3 to go back and confirm with Aprahamian that the information was correct. Indeed, Taro had increased WAC pricing on certain formulations of Clobetasol by more than 1000%. When CW-3 called Aprahamian to confirm, he placed a ✓ next to

each price point that he confirmed. When CW-3 later conveyed this information to Kellum, he

wrote a second ✓ next to each of the price points. Armed with this information, Kellum then

directed CW-3 to tell Aprahamian that Sandoz would follow and remarked: ████████████

███████████████

2898.    Similarly, after E.B.'s conversations with Aprahamian, on June 24, 2014, Hi-Tech

held an internal ████████████████████████ which E.B. attended. The agenda for the

call was ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

2899.    Over the next several days, Hi-Tech held several internal meetings during which they

discussed the Clobetasol price increase – including on July 1, July 2, and July 8. E.B. attended all

three meetings. On July 8, the day of the third meeting, E.B. called Aprahamian. The call lasted one

(1) minute. Less than a half hour later, Aprahamian called CW-3 of Sandoz. The call lasted one (1)

minute.

2900.    Three days later, on July 11, 2014, Hi-Tech sent letters to its customers notifying

them that it was increasing WAC pricing on the various formulations of Clobetasol effective August

9, 2014. The new pricing matched Taro's pricing exactly. That same day, Aprahamian exchanged

two calls with CW-3 – lasting three (3) minutes and five (5) minutes – and two calls with E.B – each

lasting one (1) minute. Notably, these were the last calls that Aprahamian and E.B. exchanged,

according to the available phone records.

2901.    Shortly after Hi-Tech increased its price on Clobetasol, the other competitors

followed suit. On July 18, 2014, Sandoz increased its WAC pricing on Clobetasol to match both

Taro and Hi-Tech." On September 2, 2014, Wockhardt increased its WAC pricing on Clobetasol

Solution to match Taro, Hi-Tech, and Sandoz. As had been the pattern, Aprahamian spoke with

**REDACTED – PUBLIC VERSION**

both CW-3 of Sandoz and M.C. of Wockhardt in advance of these price increases. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/8/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.C. (Wockhardt) | 7:46:00 | 0:13:00 |
| 8/13/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 14:10:00 | 0:07:00 |
| 8/14/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 5:48:00 | 0:08:00 |
| 8/14/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 12:03:00 | 0:01:00 |
| 8/14/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 12:04:00 | 0:08:00 |
| 8/21/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:09:00 | 0:02:00 |

2902.   Notably, after the calls highlighted above, Aprahamian and M.C. of Wockhardt would not speak again by phone until June 9, 2015, according to the available phone records.

2903.   Collectively, these Defendants raised prices for Clobetasol Propionate by approximately 1,300% between July 2014 and September 2014.

2904.   According to NADAC data, the average market price for generic Clobetasol Propionate saw the following price increases from July 2014 to September 2014, as shown below:

Clobetasol .05% Ointment (15g): increased by 1,852%;

Clobetasol 0.05% Solution (50mL): increased by 1,176%; and

Clobetasol 0.05% Cream (30g): increased by 1,596%.



702

REDACTED – PUBLIC VERSION







703

2905.   WAC data confirms that Actavis, Hi-Tech, Sandoz, and Taro all increased prices in their Clobetasol Propionate cream largely in unison by the following amounts:

| Clobetasol cream .05%: | Defendant: | Old WAC: | New WAC: | Date of Increase: | Percentage Increase: |
|---|---|---|---|---|---|
| 15gm | Taro | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Hi-Tech | $0.37 | $6.84 | 9-Aug-14 | 1732% |
| 15gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1993% |
| 30gm | Sandoz | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Hi-Tech | $0.32 | $6.84 | 9-Aug-14 | 2026% |
| 30gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Hi-Tech | $0.31 | $6.84 | 9-Aug-14 | 2138% |
| 45gm | Actavis | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Hi-Tech | $0.29 | $6.12 | 9-Aug-14 | 2016% |
| 60gm | Actavis | * | $6.12 | 10-Mar-15 | * |

2906.   Although WAC data is not available for Akorn, Fougera, Morton Grove, Perrigo, Sandoz, and Wockhardt, upon information and belief, they implemented simultaneous and identical price increases for their Clobetasol Propionate products.

2907.   News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases.

2908.   For example, by October 2014, pharmacists expressed outrage at the dramatic price increases. Kushal Patel, a pharmacy manager at Well Future Pharmacy said "Clobetasol, which used

to cost $10 for the entire tube, now costs $300. The same exact medication we got one day. Next day, it's an increase of three thousand percent."[55]

2909. Ascension Health, a hospital system based in Missouri with facilities in 23 states, reported a price increase from $2.89 in 2013 to $198.64 (or 6,773%) in 2014 for a 45-gram tube of generic Clobetasol Propionate cream.[56]

2910. A dermatologist reported the experience of his patient in Tucson, Arizona in 2015. He expressed shock and dismay when his patient informed him that a 60-gram tube of Clobetasol Propionate cream would now cost him $220. The dermatologist was so surprised that he called around to other local pharmacies, all of whom were pricing the product above $200.[57]

2911. Patient reports also corroborate the skyrocketing prices for Clobetasol Propionate. In 2014, Millicent Graves of Williamsburg, Virginia paid $35 for her prescription of Clobetasol Propionate solution, but in 2015, it cost $475.88. And just five weeks later, it rose to $627, overall a 1,691% increase over the course of a few months.[58]

---

[55] Dorothy Tucker, *Prices Soar For Some Generic Drugs – Why?*, CBS CHICAGO, Oct. 31, 2014, http://chicago.cbslocal.com/2014/10/31/prices-soar-for-some-generic-drugs-why/.

[56] Samantha Liss, *Hospitals and Pharmacies Grapple With Rising Drug Prices*, St. Louis Post-Dispatch, Nov. 16, 2014, http://www.stltoday.com/business/local/hospitals-and-pharmacies-grapple-with-rising-drug-prices/article_c6616678-bf8f-5b0e-8df1-9238df0f6919.html.

[57] Norman Levine, *The Tale of the $200 Tube of Clobetasol Cream*, DERMATOLOGY TIMES, Aug. 5, 2015, http://dermatologytimes.modernmedicine.com/dermatology-times/news/tale-220-tube-Clobetasol-cream-2

[58] *Unprecedented Generic Drug Price Spikes Wreaking Havoc*, THE SENIOR CITIZENS LEAGUE, Jul. 6, 2015, http://seniorsleague.org/unprecedented-generic-drug-price-spikes-wreaking-havoc/.

2912.   Express Scripts, a PBM company that compiles its own price index for generic drugs, included Clobetasol Propionate in the top four most significant price increases for 2014[59] and in the top ten for 2015.[60]

2913.   An article in the *Boston Globe* described price changes from 2013 to 2015, when one form of Clobetasol Propionate's price spiked 1,496% from $0.23 per gram to $4.15 per gram. In response, Akorn representative Dewey Steadman said that the company simply reacted to price increases by its competitors, Novartis and Taro. In doing so, he invoked the influence of their market dominance and rejected the possibility of outside price factors: "Following price increases by others in this highly competitive market, Akorn brought Clobetasol's price in line with other generic versions of the product."[61]

2914.   Defendants had numerous opportunities to coordinate their price increases. Key pricing executives from at least Actavis, Sandoz, Taro, and Wockhardt attended the (i) June 1-4, 2014 HDMA Business and Leadership Conference in Phoenix, Arizona; and key executives from at least Actavis, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, and Taro attended the (ii) June 3-4, 2014 GPhA Annual CMC Workshop in Bethesda, Maryland. *See* Exhibit A.

### 24.   Clotrimazole Cream

2915.   In early January 2015, Sandoz was readying to re-launch into the Clotrimazole Cream market. At that time, there were three (3) other competitors in the market – Taro, Glenmark, and

---

[59] *The Reality Behind Generic Drug Inflation,* EXPRESS SCRIPTS, Dec. 30, 2014, http://lab.express-scripts.com/lab/insights/drug-options/the-reality-behind-generic-drug-inflation.

[60] 2015 Drug Trend Report, EXPRESS SCRIPTS, March 2016, *available at* http://lab.express-scripts.com/lab/drug-trend-report/previous-reports.

[61] Priyanka Dayal McCluskey, *As Competition Wanes, Prices for Generics Skyrocket,* THE BOSTON GLOBE, Nov. 6, 2015, https://www.bostonglobe.com/business/2015/11/06/generic-drug-price-increases-alarm-insurers-providers-and-consumers/H3iA9CSxAUylnCdGjLNKVN/story.html.

Major Pharmaceuticals. Sandoz had some supply constraints and was only targeting between 15% and 20% market share as the fourth entrant.

2916.    On the evening of January 7, 2015, A.G., a senior Sandoz launch executive, sent an internal e-mail to the Sandoz launch team, stating that the Pricing Department was preparing pre-launch offers for Clotrimazole Cream to be sent the following week.

2917.    First thing the next morning, on January 8, 2015, CW-3 of Sandoz called Aprahamian of Taro. Aprahamian called him back shortly thereafter. Both calls lasted one (1) minute. That same day, E.D., a Sandoz launch executive, told his colleague CW- 1, a Sandoz senior pricing executive, that CW-3 was getting an additional price point for the Clotrimazole Cream launch. The next day, on January 9, 2015, Aprahamian called CW-3. CW- 3 called him back and they spoke for four (4) minutes.

2918.    First thing the next business day, Monday January 12, 2015, E.D. followed up with an e-mail to CW-3 stating, "[j]ust wanted to follow-up on our conversation from last week re: Clotrimazole. Were you able to get a price point?" CW-3 responded: "Will have the price points for you today."

2919.    That same day, CW-3 called Aprahamian. Aprahamian returned the call and they spoke for seven (7) minutes. On that call, Aprahamian provided CW-3 with Taro's non-public pricing for two different categories of customer – wholesalers and retailers. CW-3 told Aprahamian that Sandoz had limited supply of Clotrimazole Cream and that it planned to target Wal-Mart and Walgreens only. CW-3's contemporaneous notes from the call are detailed below:

REDACTED – PUBLIC VERSION



2920.   Immediately after his call with Aprahamian, CW-3 called CW-1. The call lasted one

(1) minute. Also, later that day CW-3 sent the following e-mail to E.D. at Sandoz, with a copy to

CW-1, conveying the competitively sensitive information he had learned from Aprahamian:



The prices matched exactly the prices that CW-3 had written down in his Notebook.

2921.   The next day, on January 13, 2015, CW-3 spoke with CW-1 for sixteen (16) minutes.

Later that afternoon, Aprahamian called CW-3. CW-3 returned the call and they spoke for eight (8)

minutes.

2922.   On January 29, 2015, Sandoz bid on Clotrimazole Cream at Wal-Mart, a Taro

customer. Wal-Mart e-mailed Aprahamian to inform him of the bid and asked if Taro wanted to bid

to retain the business. Aprahamian responded, "[w]e will review and let you know by Monday if that is OK . . .." That same day, Aprahamian called CW-3 and they spoke for nine (9) minutes.

2923.   The following Monday, February 2, 2015, Aprahamian e-mailed Wal-Mart and declined the opportunity explaining that "[w]e have reviewed your price on the Clotrimazole and unfortunately we are unable to adjust at this time. Certainly appreciate you giving us a crack at this. Please let us know what you decide so we can plan accordingly." Aprahamian then forwarded his response along internally stating: "Heads up, we will be losing this at Walmart due to new entrant."

2924.   On February 9, 2015, Wal-Mart e-mailed Sandoz to notify the company that it had won the Clotrimazole Cream business.

2925.   In March 2015, and consistent with its plans, Sandoz also bid on Clotrimazole Cream at Walgreens, a Glenmark customer.  On March 27, 2015, Walgreens awarded the business to Sandoz.

### 25.   Desonide

2926.   <u>Desonide Lotion</u>. Between 2009 and 2011, Defendants Actavis and Fougera were the only two generic manufacturers of Desonide Lotion. In those years, the competitors instituted WAC price increases that were in lock step with one another. For example, on June 1, 2009, Fougera increased WAC pricing by roughly 90% and Actavis followed and matched on September 1, 2009. Similarly, on July 22, 2011, Actavis increased WAC pricing by nearly 200% and Fougera followed three (3) days later, on July 25, 2011.

2927.   Following the increases, and consistent with fair share principles, the competitors declined opportunities to bid on each other's business so as not to take advantage of the price increases. For example, when CW-3, then a Fougera sales executive, asked CW-6, his colleague at Fougera, whether Walgreens had accepted the 2011 price increase, CW-6 responded:

REDACTED – PUBLIC VERSION



2928.    As of August 2012, the market for Desonide Lotion was evenly split between the two competitors with Sandoz at 56% market share and Actavis at 44%. On August 23, 2012, Defendant Kellum circulated a list of Fougera products that he recommended taking price increases on, including Desonide Lotion.

2929.    Between August 25 and August 28, 2012, the NACDS held its Pharmacy and Technology Conference in Denver, Colorado. Representatives from Defendants Actavis and Sandoz attended the conference, including CW-3 and Kellum of Sandoz and Defendant Aprahamian, then a senior pricing executive at Actavis.

2930.    At the conference, Aprahamian approached CW-3 and told him that Actavis was having supply issues on Desonide Lotion and would be exiting the market for a period of time. CW-3 then passed this information along to Kellum because he knew Kellum was interested in raising the price on Desonide Lotion and would view Actavis's temporary exit from the market as a positive development.

2931.    J.P., a product manager at Sandoz, was tasked with putting together  information for the potential price increases, including on Desonide Lotion. On September 12, 2012, J.P. emailed CW-1, a senior pricing executive at Sandoz, and Kellum asking for input on the rationale for the price increases. Regarding Desonide Lotion, Kellum responded: ███████████████

███████████

2932.   One month later, in October 2012, Kellum asked CW-3 to reach out to Aprahamian to get more specific information regarding Actavis's supply issues on Desonide Lotion. On October 17 and 18, 2012, CW-3 exchanged several calls with Aprahamian. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 9:15:00 | 0:02:00 |
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 14:18:00 | 0:03:00 |
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 16:43:00 | 0:06:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:08:00 | 0:01:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:09:00 | 0:06:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 10:30:00 | 0:01:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:02:00 | 0:02:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 14:07:00 | 0:06:00 |

2933.   Later that evening on October 18, 2012, CW-3 sent the following e-mail to Kellum and other Sandoz colleagues reporting what he had learned from Aprahamian:



2934.   As would become his customary practice, CW-3 referred to his source vaguely as a ▮▮▮▮▮ because he wanted to avoid putting anything incriminating in writing. Further, CW-3 knew that Kellum understood that his true source for the information was not a customer, but rather his contact at Actavis, Aprahamian.

2935.   After confirming their own ability to supply, Sandoz decided to move forward with a price increase on Desonide Lotion. In November 2012, Sandoz generated a price increase analysis for the product. In that analysis, Sandoz assumed ██████████████████████████ ████████████████████

2936.   On December 5, 2012, Sandoz raised its WAC prices for Desonide Lotion by 75%. On the day before and the day of the price increase, CW-3 called Aprahamian twice, letting him know the details of the increase. The calls lasted seven (7) minutes and two (2) minutes, respectively. Several months later, on May 10, 2013, Sandoz again increased WAC pricing for Desonide Lotion – this time by 11%.

2937.   On August 22, 2013, Actavis finally re-entered the Desonide Lotion market  and matched Sandoz's increased pricing. That same day, CW-3 received a text message from A.G., a sales executive at Actavis.

2938.   On August 26, 2013, CW-3 notified the rest of the Fougera sales team that Actavis had re-entered the market. In response, CW-1 sarcastically recommended reducing all Desonide prices by 75%.

2939.   Instead of cutting prices Kellum recommended that Sandoz ██████████████ ████████████████████████ Kellum noted that ████████████████████ ████████████████

2940.   Sandoz proceeded to concede several of its Desonide Lotion customers to  Actavis in order to allow Actavis to regain its market share without eroding the high market pricing. For example, in a December 2013 Business Review, Sandoz noted that it had ████████████████ █████████████████████████████ Several months later, in a Fougera Business Review, Sandoz further stated that the Desonide Lotion ████████████████████ ███████████████████████████████████

2941.   <u>Desonide Ointment</u>.  As discussed in detail above in an earlier Section, Taro and Perrigo coordinated to significantly raise prices on Desonide Ointment in May 2013. At the same time, Taro and Perrigo were also speaking with Sandoz about Desonide Ointment, knowing that Sandoz had plans to re-enter the market.

2942.   Indeed, as early as March 2013, Sandoz began discussing its potential re-entry into the market for Desonide Ointment both internally and with its competitors.

2943.   For example, on March 28, 2013, M.A., a Sandoz marketing executive, sent an internal e-mail, including to CW-3, stating ████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ CW-3 immediately forwarded the e-mail to Defendant Kellum.

2944.   The next morning, on March 29, 2013, CW-3 called Kellum and they spoke for seven (7) minutes. CW-3 then spent the next twenty-five minutes communicating alternately with Defendant Aprahamian and with his superiors at Sandoz. After each call with Aprahamian, CW-3 would immediately hang up and call either Kellum or CW-1. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 9:41:00 | 0:07:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 9:56:00 | 0:10:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 10:06:00 | 0:06:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 10:12:00 | 0:01:00 |

2945.   The next business day, on April 1, 2013, CW-3 called T.P. of Perrigo – the other competitor for Desonide Ointment – and they spoke for seventeen (17) minutes. During that call, T.P. provided CW-3 with a list of products, including Desonide Ointment, for which Perrigo had recently increased prices. Notably, however, Perrigo had not yet increased pricing on several of

those products, including Desonide Ointment. CW-3's contemporaneous notes from that call are

detailed below:



2946.    Later that day, CW-3 typed up the information into an e-mail and forwarded it along

internally, including to Kellum:

714



2947.    The next day, April 2, 2013, CW-3 called Aprahamian and they spoke for six (6) minutes. CW-3 hung up and immediately called T.P. of Perrigo. The call lasted five (5) minutes. On these calls, and as discussed in detail in an earlier Section, the competitors spoke about the products that Taro planned to increase prices on in May 2013, including Desonide Ointment. CW-3's contemporaneous notes from these calls reflect as much:



2948.    Several months later, after both Taro and Perrigo had implemented their price increases on Desonide Ointment, Sandoz was readying to re-enter the market. On December 18,

2013, M.A., a marketing executive at Sandoz, sent the following internal e-mail summarizing the

facts surrounding the re-launch:



2949.    That same day, CW-3 of Sandoz called T.P. of Perrigo and they spoke for five (5)

minutes. CW-3 hung up and called CW-1 twice. First thing the next morning, on December 19,

2013, CW-3 called T.P. again. The call lasted one (1) minute. CW-3 hung up and immediately called

CW-1 and they spoke for four (4) minutes. Later that day, CW-3 spoke with Defendant Aprahamian

at Taro. The call lasted fifteen (15) minutes.

2950.    On January 6, 2014, Sandoz held a Commercial Operations call during which they

discussed, among other things, the Desonide Ointment re-launch. In particular, they discussed the

market share breakdown between Taro and Perrigo, Sandoz's target market share, and the

anticipated re-launch date of January 17, 2014. CW-3's contemporaneous notes from the call are

below:



2951.   Two days later, on January 8, 2014, CW-3 called T.P. of Perrigo. The call lasted one (1) minute. The next day, on January 9, 2014, CW-3 called T.P. again and they spoke for nearly sixteen (16) minutes. During that call, T.P. provided CW-3 with Perrigo's non-public pricing for Desonide Ointment at various customers. T.P. also warned CW-3 not to go after Walgreens. CW-3's contemporaneous notes from that call are below:



2952.   Immediately upon hanging up with T.P., CW-3 called Aprahamian and they spoke for nine (9) minutes. That same day, Defendant Perfetto of Taro and Defendant Boothe of Perrigo also exchanged two calls lasting six (6) minutes and twenty-nine (29) minutes, respectively.

2953.   On January 16, 2014 – the day before Sandoz's anticipated re-launch – CW-3 called T.P. of Perrigo and they spoke for ten (10) minutes. CW-3 hung up and immediately called CW-1. The call lasted eight (8) minutes. A few days later, on January 22, 2014, Aprahamian called CW-3. The call lasted one (1) minute. On January 24, 2014, CW-3 called Aprahamian back and they spoke for twenty-two (22) minutes.

717

2954.   On these calls, T.P. of Perrigo and Aprahamian of Taro provided CW-3 with nonpublic pricing for Desonide Ointment at various customers. The competitors also discussed which customers they would agree to cede to Sandoz. CW-3 contemporaneously listed this information in his Notebook and placed check marks next to the customers that Perrigo and Taro agreed to give up to Sandoz. These notes are below:



2955.   In accordance with their agreement, on January 28 and January 29, 2014, Sandoz submitted bids for Desonide Ointment to Taro's customers Econdisc, McKesson, and Omnicare, and to Perrigo's customer, Rite Aid. In each instance, the competitors declined to reduce their pricing to retain the business. As a result, the customers awarded their Desonide Ointment business to the new entrant, Sandoz.

2956.   On February 13, 2014, Sandoz was presented with the opportunity to supply Cardinal with Desonide Ointment. Not wanting to disturb the delicate market balance it had negotiated with its competitors, CW-1 responded, ███████████████████████

████████████████████████████████████████████

██████████████████████████████

    **26.**    **Digoxin**

2957.   Digoxin was first approved by the FDA in 1975, and forms of it have been on the market in the United States since before the passage of the Federal Food, Drug, and Cosmetic Act in 1938. Variants of the drug, which is derived from the Digitalis lanata plant, have been used since the 18th century.

2958.   In late 2012, Impax and Lannett were the only active domestic manufacturers of Digoxin. Sun, Par and West-Ward re-entered the market in 2014 and Mylan re-entered in 2015. Since that time, Impax, Lannett, Mylan, Par, Sun, and West-Ward have dominated the market for Digoxin.

2959.   Prior to October 2013, effective prices for Digoxin were stable.

2960.   Beginning in October 2013, Impax and Lannett increased their prices abruptly and in unison. During this period, prices for generic Digoxin rose more than 630%.

2961.   As a result, prices across the market rose more than 884% for Digoxin, according to data compiled by the Healthcare Supply Chain Association and released by Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg. Market Price Oct. 2012 | Avg. Market Price June 2014 | Percentage Increase: |
|---|---|---|---|
| Digoxin (single tablet 250mcg) | $0.11 | $1.10 | 884% |

2962.   According to NADAC data, the average market price for generic Digoxin saw the following price increases from November 2013 to February 2014:

      Digoxin 125 mcg tablets: 881%

      Digoxin 250 mcg tablets: 825%

**REDACTED – PUBLIC VERSION**

2963.   These dramatic price increases, initially instituted by Impax and Lannett were maintained even after Par's entry into the market in early 2014, West-Ward's entry soon thereafter, and Mylan's entry in early 2015. In fact, these Defendants including the new entrants continued to increase prices for Digoxin during the first six months of 2014. This is especially telling evidence of collusion, as entry of two (and later three) additional competitors would typically lead to substantial price decreases.

2964.   NADAC data shows that average market prices for Digoxin rose dramatically and remained artificially high after November 2013, as depicted below.



2965.   WAC and AWP data for 0.25mg Digoxin tablets also shows that prices for Digoxin remained relatively stable prior to the November 2013 price increase. This chart was submitted by Dr. Stephen Schondelmeyer, Director of the PRIME Institute at the College of Pharmacy for the University of Minnesota, as part of his testimony at the Senate Hearing on drug price inflation.

**Figure 12. Digoxin 0.25 mg Tablet (Lannett) Price per Day of Therapy:**
**(January 1, 2005 to December 31, 2013)**



2966.   WAC pricing depicted below confirms that Impax, Lannett, Mylan, Par, and West-

Ward all increased their Digoxin prices substantially and largely in unison.

| Package size (0.125 mg) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Lannett | 00527132401 | $0.14 | $1.19 | 10/16/2013 | 734% |
| 1,000ct | Lannett | 00527132410 | $0.12 | $0.99 | 10/16/2013 | 738% |
| 100ct | Impax | 00115981101 | $0.14 | $1.19 | 10/22/2013 | 734% |
| 1,000ct | Impax | 00115981103 | $0.12 | $0.99 | 10/22/2013 | 738% |
| 100ct | Par | 49884051401 | | $1.19 | 1/17/2014 | |
| 1,000 | Par | 49884051410 | | $0.99 | 1/17/2014 | |
| 100ct | West-Ward | 00143124001 | $0.16 | $1.19 | 4/14/2014 | 638% |
| 1,000ct | West-Ward | 00143124010 | $0.13 | $0.99 | 4/14/2014 | 687% |
| 100ct | Mylan | 00378615501 | | $1.19 | 11/17/2014 | |
| 1,000ct | Mylan | 00378615510 | | $0.99 | 11/17/2014 | |

721

2967.    Although WAC data is not available for Sun, upon information and belief, Sun

implemented simultaneous and identical price increases for Digoxin after it re-entered the market.

2968.    News reports and testimonials from physicians and pharmacists corroborate these

dramatic, immediate, market-wide price increases. Bill Drilling, a pharmacy owner in Sioux City,

Iowa, apologized to his customers in December of 2013 because a 3-month supply of digoxin

totaled $113.12, ten times its cost in August. Drilling shared in his customer's outrage, adding "I've

been doing this since 1985, and the only direction that generics-drug prices have gone is down."[62]

2969.    Rob Frankil, another pharmacist who testified before the Senate in November 2014,

offered a similar narrative: "A recent example from my own experience is the price of Digoxin—a

drug used to treat heart failure. The price of this medication jumped from about $15 for 90 days'

supply, to about $120 for 90 days' supply. That's an increase of 800%. One of my patients had to

pay for this drug…The patient called around to try to get the medicine at the old, lower price, but to

no avail."

2970.    Defendants had ample opportunity to coordinate their pricing agreements. Shortly

before the price increase, key executives from at least Impax, Lannett, Mylan, Par, and Sun attended

the October 28-30, 2013 GPhA Fall Technical Conference. *See* Exhibit A.

### 27.    Diphenoxylate Atropine

2971.    During the relevant time period, Mylan and Greenstone were the primary

manufacturers of Diphenoxylate Atropine tablets.

2972.    The market for Diphenoxylate Atropine tablets was mature and at all relevant times

had multiple manufacturers.

---

[62] Alan Katz, BLOOMBERG, *Surprise! Generic-Drug Prices Spike* (Dec. 12, 2013), https://www.bloomberg.com/news/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

REDACTED – PUBLIC VERSION

2973.    For years, the prices for Diphenoxylate Atropine tablets were relatively low and stable. In the space of about six weeks in the spring of 2014, Mylan and Greenstone imposed large and identical price increases on Diphenoxylate Atropine tablets. Mylan and Greenstone announced identical WAC prices that were nearly double the old prices, and their NSP prices tracked each other as well, rising approximately 300% in lockstep fashion.

2974.    Both manufacturers saw an immediate jump in revenue from sales of Diphenoxylate Atropine. Prices have never returned to their former levels, and, for years after the price increases, the dollar sales of Mylan and Greenstone remained remarkably stable.

2975.    Pricing data show steep and parallel price increase beginning in March 2014 by Mylan and Greenstone for Diphenoxylate Atropine tablets.

2976.    Throughout this period, Mylan and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Diphenoxylate Atropine and their fair share agreement.

2977.    For example, M.A., Mylan's National Account Director, communicated by telephone with R.H., Greenstone's Director of National Accounts, on April 3, 4, 22, 28 and 29. Mylan announced its WAC price increases on April 17, 2004.

2978.    When Greenstone followed the increase on June 2, 2004, R.H. again spoke to M.A. on June 24.

### 28.    Divalproex Sodium ER

2979.    At all relevant times, Dr. Reddy's, Mylan, Par, and Zydus dominated the market for Divalproex Sodium ER.

2980.    Prior to June 2013, effective prices for Divalproex Sodium ER were stable.

2981.    In June 2013, Dr. Reddy's, Mylan, Par, and Zydus increased their prices for Divalproex Sodium ER dramatically and largely in unison.

723

REDACTED – PUBLIC VERSION

2982.   As a result, Divalproex Sodium ER prices rose across the market by more than

700%, according to data compiled by the Healthcare Supply Chain Association and released by

Senator Sanders and Representative Cummings, depicted in the chart below:

| Drug | Avg. Market Price Oct. 2012 | Avg. Market Price June 2014 | Percentage Increase: |
|---|---|---|---|
| Divalproex Sodium ER (bottle of 80, 500 mg tablets ER 24H) | $31 | $234 | 736% |

2983.   NADAC data shows that average market prices of Divalproex Sodium ER remained

stable prior to June 2013, but rose dramatically and remained artificially high after September 2013,

as depicted in a sample dosage below. For example, the average market price for Divalproex Sodium

ER increased 920%, from $0.31 per tablet to $3.18 per tablet between September 12, 2013 and

September 19, 2013.



2984.   These dramatic price increases, initially instituted by Mylan and Par, were maintained even after Dr. Reddy's and Zydus' entry into the market in August 2013. WAC pricing, depicted below, confirms that Mylan and Par increased their prices uniformly and largely in unison and Dr. Reddy's and Zydus joined in the price increase when they entered the market, instead of competing on price as would be expected of new entrants:

| Package Size (500mg ER) | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100ct | Mylan | 00378047301 | $0.74 | $3.26 | 6/14/2013 | 338% |
| 500ct | Mylan | 00378047305 | $0.71 | $3.26 | 6/14/2013 | 361% |
| 100ct | Par | 10370051110 | $0.74 | $3.26 | 6/26/2013 | 338% |
| 500ct | Par | 10370051150 | $0.71 | $3.26 | 6/26/2013 | 361% |
| 100ct | Zydus | 68382031501 | | $3.26 | 8/14/2013 | |
| 500ct | Zydus | 68382031505 | | $3.26 | 8/14/2013 | |
| 100ct | Dr. Reddy's | 55111053401 | | $3.26 | 8/14/2013 | |
| 500ct | Dr. Reddy's | 55111053405 | | $3.26 | 8/14/2013 | |

2985.    News reports and testimonials from physicians and pharmacists corroborate these dramatic, immediate, market-wide price increases. According to Spalitto's Pharmacy in Missouri, 500 pills of Divalproex Sodium ER cost $122.99 in May of 2013. By August 2013, the same number of pills skyrocketed to $1,629.95, an increase of 1,225%. "We've been doing this for 30 years. We've never seen anything like this," said the third-generation pharmacy owner.[63]

2986.    Industry experts and audit reports echoed this same narrative. In January 2014, a Morgan Stanley analyst report found that "companies have been raising prices on divalproex....aggressively."[64]

2987.    Defendants had numerous opportunities to coordinate their price increases and market share agreements. Shortly before the price increase, key pricing executives from Dr. Reddy's, Mylan, Par, and Zydus all attended the June 2-5, 2013 GPhA CMC Workshop in Bethesda, Maryland. Among others, Burton (Par, Dr. Reddy's), Nesta (Mylan), Tighe (Mylan), Wyatt (Mylan), Aigner (Mylan), Green (Zydus), and Ronco (Zydus) all attended the June GPhA Workshop.

### 29.    Doxy Hyclate

2988.    Prior to October 2012, prices for Doxy Hyclate were stable.

2989.    Beginning in October 2012, Actavis, Par, Sun, Teva, and West-Ward increased their prices for Doxy Hyclate abruptly and largely in unison. Collectively, these Defendants raised prices for generic Doxy Hyclate by at least 2,000% (for certain dosages, as much as 8,200%) between November 2012 and March 2013.

2990.    As a result, prices rose dramatically and largely in unison. According to a report produced by PRIME Institute and presented by Dr. Stephen Schondelmeyer at a Senate hearing in

---

[63] Rob Low, *Rising Cost Some of Generic Drugs Set to Shock Consumers*, Fox4 (Aug. 14, 2013), https://fox4kc.com/2013/08/14/rising-cost-some-of-generic-drugs-set-to-shock-consumers/.

[64] Morgan Stanley, *Specialty Pharmaceuticals Rx Trends in Pictures* (Jan. 27, 2014).

November 2014, Doxy Hyclate prices rose approximately 2,000% between December 2012 and

December 2013. Dr. Shondelmeyer's report chronicled the retail prices for West-Ward's Doxy

Hyclate prices, depicted in the chart below:

| Drug | Dosage | Manufacturer | NDC Code: | Usual Dose/ Day | Retail price/day (Median) Dec. 2012 | Retail price/day (Median) Dec. 2013 | Percentage Increase |
|---|---|---|---|---|---|---|---|
| Doxycycline Hyclate | 100mg tablet | West-Ward | 00143211205 | 2.00 | $0.36154 | $7.21887 | 1,896% |
| Doxycycline Hyclate | 100mg capsule | West-Ward | 00143314205 | 2.00 | $0.34746 | $7.46247 | 2,047% |

2991.   NADAC data shows that the average market price for Doxy Hyclate rose

dramatically around November 2012 and remained artificially high thereafter, as depicted in the

50mg capsules below:



2992.   WAC and AWP data for West-Ward's 100mg Doxy Hyclate capsules show that

prices for Doxy Hyclate remained relatively stable prior to the November 2012 price increase. This

chart was also submitted by Dr. Stephen Schondelmeyer, as part of his testimony at the Senate

Hearing on drug price inflation.

**Figure 11. Doxycycline Hyclate 100 mg Capsule (West-Ward) Price per Day of Therapy: (January 1, 2005 to December 31, 2013)**



2993.   WAC data confirms that Actavis, Sun, and West-Ward all increased their prices in generic Doxy Hyclate by the following amounts:

| Product | Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|---|
| 100mg capsule | 50ct | West-Ward | 00143314250 | $0.10 | $4.43 | 1/21/2013 | 4,326% |
| 100mg capsule | 500ct | West-Ward | 00143314205 | $0.10 | $4.43 | 1/21/2013 | 4,370% |
| 100mg capsule | 50ct | Actavis | 00591544050 | $0.10 | $2.74 | 2/1/2013 | 2,515% |
| 100mg capsule | 500ct | Actavis | 00591544005 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
| 100mg capsule | 50ct | Sun | 53489011902 | $0.10 | $4.92 | 2/5/2013 | 4,847% |
| 100mg capsule | 500ct | Sun | 53489011905 | $0.06 | $4.92 | 2/5/2013 | 7,844% |
| 100mg tablet | 50ct | Actavis | 00591555350 | $0.10 | $2.74 | 2/1/2013 | 2,515% |

| 100mg tablet | 500ct | Actavis | 00591555305 | $0.10 | $2.74 | 2/1/2013 | 2,663% |
| 100mg tablet | 50ct | Sun | 53489012002 | $0.09 | $4.92 | 2/5/2013 | 5,631% |
| 100mg tablet | 500ct | Sun | 53489012005 | $0.08 | $4.92 | 2/5/2013 | 6,268% |

2994.   Although WAC data is not available for Par, upon information and belief, Par implemented simultaneous and identical price increases in Doxy products.

2995.   Actavis, Par, Sun, Teva, and West-Ward had ample opportunity to conspire and coordinate their price increases and market share agreements. Shortly before or while implementing the price increase, key pricing executives from at least Actavis, Par, Sun, and Teva attended the October 1-3, 2012 GPhA Technical Conference in Bethesda, Maryland. *See* Exhibit A.

2996.   In May of 2013, after the price increase was implemented, Teva discontinued production of Doxy Hyclate – a product it had manufactured for three decades. This act contradicts Teva's self-interest, but furthered Defendants' conspiracy to coordinate pricing and allocate market share across the entire generic pharmaceutical industry.

2997.   In April 2014, DAVA Pharmaceuticals, Inc. ("DAVA"), a company that Endo acquired in August 2014, launched its Doxy Hyclate. Endo was already in discussions to acquire DAVA as of this time (April 2014). This launch led to litigation between DAVA and Chartwell Therapeutics Licensing, LLC ("Chartwell"). In that litigation, Chartwell alleged that DAVA and Endo refused to take delivery of Doxy Hyclate from Chartwell despite demand in the market and conspired to set Doxy Hyclate at an artificially high price.[65] For example, Chartwell cites to an e-mail

---

[65] See *Dava Pharm., LLC v. Chartwell Therapeutics Licensing, LLC*, Index No. 502775/15 (N.Y. Supreme Court, County of Kings).

dated on or about July 11, 2014 where Aram Moezinia[66] e-mailed Chartwell and stated that DAVA's plan was to sell doxycycline "slowly not to disturb pricing." Upon information and belief, all actions taken by DAVA as described in Chartwell's complaint were done at the direction of Endo and targeted at the U.S. market. According to Chartwell, Par and Endo both produced discovery materials to the DOJ and State AGs, whose inquiries focus on at least three drugs that Endo acquired rights to through its acquisition of DAVA, including Doxy Hyclate.

2998.   News reports and testimonials from hospitals and pharmacists corroborate these dramatic, immediate, market-wide price increases. Michael O'Neil, pharmacy manager at Vanderbilt University Medical Center, expresses his concern over the dramatic price increase for Doxy Hyclate, which increased from $10 for a 50-count bottle of 100mg tablets, to $250: "It's a change that occurred overnight," he said in the March 2013 report. Dr. Joshua Vaughn, a veterinarian with the Columbia Hospital for Animals, also lamented the dramatic price increase shortly prior to March 2013, when a doxycycline prescription increased from $77 to nearly $3,000.[67]

### 30.   Econazole

2999.   In the summer of 2014, there were three competitors in the market for Econazole: Perrigo, Taro, and Teligent.

3000.   NADAC data shows that the average market prices for Econazole remained stable prior to June 2014.

3001.   Between January 2011 and September 2013, Econazole cost approximately 12 cents for one month's worth of treatment.

---

[66] Aram Moezinia was a Defendant in the litigation and a Director on DAVA's Board at the time of the merger with Endo

[67] http://www.wsmv.com/story/21616095/sudden-increase-in-cost-of-common-drug-concernsmany.

**REDACTED – PUBLIC VERSION**

3002.    Starting at least as early as July 2014, Fougera, Perrigo, Sandoz, Taro, and Teligent increased their prices for generic Econazole abruptly and in unison. During this period, prices for generic Econazole rose more than 1,657%.

3003.    In 2015, these Defendants' total revenue from sales of Econazole was approximately $145 million. Two years prior, in 2013, that figure was only $10 million.

3004.    According to NADAC data, the average market price for Econazole saw the following price increases from July 2014 to March 2015:

　　　　　Econazole 1% Cream (15g): increased by 853%

　　　　　Econazole 1% Cream (30g): increased by 1,024%

　　　　　Econazole 1% Cream (85g): increased by 929%



3005.    WAC data depicted below confirms that Perrigo, Teligent, and Taro all increased their prices for Econazole cream between July and November 2014 by the following amounts:

| Package Size | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage of Increase |
|---|---|---|---|---|---|---|
| 15gm | Perrigo | 45802046635 | $0.79 | $5.80 | 7/24/2014 | 637% |
| 30gm | Perrigo | 45802046611 | $0.69 | $5.80 | 7/24/2014 | 736% |
| 85gm | Perrigo | 45802046653 | $0.50 | $4.09 | 7/24/2014 | 719% |

731

REDACTED – PUBLIC VERSION

| 15gm | Teligent | 52565002215 | $0.82 | $5.80 | 9/1/2014 | 610% |
|------|----------|-------------|-------|-------|----------|------|
| 30gm | Teligent | 52565002230 | $0.72 | $5.80 | 9/1/2014 | 704% |
| 85gm | Teligent | 52565002285 | $0.52 | $4.09 | 9/1/2014 | 688% |
| 15gm | Taro | 51672130301 | $0.66 | $5.80 | 11/18/2014 | 779% |
| 30gm | Taro | 51672130302 | $0.59 | $5.80 | 11/18/2014 | 890% |
| 85gm | Taro | 51672130308 | $0.42 | $4.09 | 11/14/2014 | 871% |

3006.    Although WAC data is not available for Fougera, upon information and belief, Fougera implemented simultaneous and identical price increases in their Econazole products.

3007.    No supply shortages or other market events can explain the Econazole price increases. The only significant change was Teligent's market entry in February 2013, which should have, but did not, drive prices down.

3008.    Prior to 2012, Teligent focused its business on contract manufacturing. But in late 2012 it sought to enter the market for numerous topical generic products. By September 2013, Teligent had 12 ANDAs pending.  Teligent currently manufactures 20 topical generics covered by 33 ANDAs. For seventeen of the 20 drugs, Teligent directly competes with Taro, and for fifteen of the drugs, Teligent directly competes with Perrigo. This situation in particular lends itself to the Defendants' "fair share" agreement, as these three Defendants can creatively allocate drugs and market share to maintain an artificial equilibrium

3009.    On February 1, 2013, Teligent obtained an ANDA for Econazole from Prasco LLC. Shortly thereafter, Teligent's CEO, Jason Grenfell-Gardner, attended the 2013 GPhA Annual Meeting on February 20-22, 2013 in Orlando, Florida and the 2013 ECRM EPPS Retail Pharmacy Generics conference on February 24-27, 2013 in Dallas, Texas, along with representatives from Perrigo and Taro. Specifically, the CEOs of Perrigo (Joseph Papa) and Taro (Kal Sundaram) joined Teligent's CEO at the 2013 GPhA Annual Meeting.

3010.    When Teligent launched Econazole under its own ANDA, it irrationally increased effective prices immediately, rather than compete for market share on price.

REDACTED – PUBLIC VERSION

3011.    Perrigo began coordinating the price increase in June 2014. On June 17, 2014, Defendant Boothe of Perrigo called a Taro employee – likely Defendant Perfetto – and they spoke for forty-five (45) minutes.

3012.    One week later, on June 25, 2014, S.B., a sales executive at Taro, sent an internal e-mail stating that ███████████████████████████████████████████████ and suggested bidding at Associated Pharmacies. On July 8, 2014, Taro put together an offer for that customer. With regard to Taro's pricing for the bid, Defendant Aprahamian stated: ███████ ████████████████████████████████████████████ Notably, the price of Econazole had not yet gone up – and would not do so for another several weeks.

3013.    On July 18 and July 19, 2014, Defendant Boothe of Perrigo and Defendant Perfetto of Taro exchanged three short calls. The next business day, on July 21, 2014, the two competitors spoke for twenty-six (26) minutes. On July 22, 2014, T.P. of Perrigo spoke with S.M., a sales executive at Teligent, for more than five (5) minutes. Three days later, on July 24, 2014, Boothe called Perfetto again. The call lasted two (2) minutes. Perfetto returned the call and the two competitors spoke for seven (7) minutes.

3014.    That same day, on July 24, 2014, Perrigo instituted a dramatic price increase for Econazole. Customers saw increases ranging from 637% to 735%.

3015.    That morning, Aprahamian notified his colleagues at Taro of the development. He instructed them not to capitalize on any opportunities that might come Taro's way as a result of Perrigo's price increase, saying: ████████████████████████████████████ ███████████████████████ Aprahamian further instructed his team to increase Taro's Econazole price to GPOs to $0.02 under its WAC price with just five (5) days' notice for all such customers. ██████████████████████████████████████████████ ████████████████████

REDACTED – PUBLIC VERSION

3016.     The next day, on July 25, 2014, E.G., a Taro sales executive, placed two calls to S.M. at Teligent. E.G. called S.M. again on August 12, 2014 and they spoke for nearly five (5) minutes. The next day, on August 13, 2014, Defendant Perfetto spoke with Defendant Boothe for eleven (11) minutes.

3017.     The coordination among the competitors bore fruit quickly. Just two weeks later, on September 1, 2014, Teligent increased its WAC prices for Econazole to match Perrigo. Taro's price increases followed two months later, on November 18, 2014. After the Taro increase, a customer forwarded the Taro notification to K.M., a sales executive at Perrigo, stating ███████████████ ████████████████████████████████████████████████

3018.     By May 2015, Sandoz was making plans to re-enter the Econazole market, attracted by the fact that the other players had instituted price increases. CW-3 advocated a relaunch strategy that considered fair share principles as well as Sandoz's ongoing understanding with Perrigo. He advised his colleagues: ███████████████████████████████████████████████████ ███████████████████████████

3019.     On October 1, 2015, W.W., a Sandoz launch executive, e-mailed CW-3 seeking intel on current prices for various customer accounts in anticipation of the upcoming  Econazole re-launch. Less than an hour later, CW-3 called T.P. at Perrigo and they spoke for twenty-seven (27) minutes.

3020.     Later that day, CW-3 responded to his colleague's e-mail with details of Perrigo's pricing at Morris & Dickson. Not wanting to put additional details about his conversation with T.P. in writing, CW-3 copied CW-1, a senior pricing executive at Sandoz, stating:

3021.   On November 30, 2015, Sandoz bid on the Econazole business at Morris & Dickson. Perrigo, however, refused to cede the business to Sandoz because it had already given up one customer to the new entrant and was not inclined to hand over another.

3022.   Intent on working out a deal with the market share leader, CW-3 and T.P. of Perrigo exchanged four calls on December 16, 2015. The next day, on December 17, 2015, Sandoz contacted Morris & Dickson and convinced the customer to consider a revised offer from Sandoz. This time, Perrigo ceded the customer to Sandoz.

3023.   When Sandoz's re-launch of Econazole finally came to fruition in late 2015, it matched its competitors' increased WAC prices.

3024.   Significant price increases shortly followed or occurred at about the time of the following trade conferences: June 1-4, 2014 HDMA 2014 Business and Leadership Conference in Phoenix, Arizona; June 3-4, 2014 GPhA CMC Workshop in North Bethesda, Maryland; October 27-29, 2014 GPhA Fall Technical Conference in Bethesda, MD; February 9-11, 2015 GPhA Annual Meeting in Miami Beach, FL; and February 22- 25, 2015 ECRM 2015 Retail Pharmacy Generic Pharmaceuticals EPPS in Destin, FL. Key executives from Fougera, Perrigo, Sandoz, Taro, and Teligent all attended. *See* Exhibit A.

### 31.   Exemestane tablets

3025.   Exemestane is used to treat certain types of breast cancer. It is available in Tablet form and has been available in the United States for many years as a generic medication.

3026.   The market for Exemestane is mature. At all relevant times, there have been multiple manufacturers of Exemestane.

3027.   West-Ward and non-defendant Greenstone dominate sales of Exemestane Tablets with approximately a 50/50 split of the market in the relevant times.

3028.   For several years, the price for Exemestane was relatively stable. Prices began to rise in late 2013 with Greenstone and West-Ward coordinating their price increases and continuing to maintain supracompetitive pricing for multiple years.

3029.   The ability of Greenstone and West-Ward to reach agreements on Exemestane was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3030.   The parallel price increases by Greenstone and West-Ward are consistent with the Fair Share Agreement.

3031.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

3032.   The agreement between West-Ward and non-defendant Greenstone was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Exemestane Tablets (25 mg).

### 32.      Fluocinolone Acetonide

3033.   During the relevant time period, the primary manufacturers of Fluocinolone Acetonide were: Cream—Sandoz, G&W, Teligent; Ointment—Sandoz, G&W, Teligent; and Solution—Sandoz, Taro, Telligent.

3034.   Before 2012, Sandoz was the sole supplier of Fluocinolone Acetonide cream, ointment and solution. As the sole supplier, Sandoz's WAC prices for cream ointment and solution were well under $1 for each product, and its NSP prices were lower still.

3035.   At an October 3, 2011 meeting of the Fougera Pricing Committee, members discussed their confidence that they were nearly ready to execute the planned increase. Moreover, they discussed the possibility that Fougera could use the impending entry of a competitor into the Fluocinolone market to ensure the success of the price hike, saying: ███████████████ ████████████████████████████████████████

3036.   The market intelligence that the Fougera Pricing Committee had when it convened was the result of at least a week's worth of preparatory conversations that CW-6 had in late September 2011 with the entering competitor – G&W. Between September 20, 2011 and September 27, 2011, CW-6 and Grauso at G&W exchanged five phone calls, speaking for a total of forty-six minutes.

3037.   The conversations between CW-6 and Grauso continued at a vigorous pace over the coming weeks as Fougera moved towards its price increase, and G&W planned for its launch. The two exchanged sixteen calls during October and November 2011:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 11:10:00 | 0:06:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 12:10:00 | 0:01:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 13:08:00 | 0:14:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:22:00 | 0:01:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:53:00 | 0:01:00 |
| 10/11/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:39:00 | 0:02:00 |
| 10/31/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:01:00 | 0:06:00 |
| 11/2/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:49:00 | 0:10:00 |
| 11/9/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:01:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:29:00 | 0:02:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 5:56:00 | 0:07:00 |
| 11/11/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:55:00 | 0:04:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:37:00 | 0:02:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:54:00 | 0:11:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 15:04:00 | 0:04:00 |
| 11/21/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 8:37:00 | 0:05:00 |

3038.    On the morning of December 14, 2011, Fougera learned that G&W had launched Fluocinolone the preceding day and, importantly, that it had done so at nearly the same pricing as Fougera's current (pre-increase) price.

3039.    D.K, a senior executive at Fougera, was quite displeased with the development considering Fougera's impending price increase, saying: ██████████████████████

██████████████████████████████████████

3040.    Less than a half hour later, Kaczmarek called CW-6. The call lasted two minutes. Immediately after hanging up, CW-6 placed a call to Grauso. They spoke for six minutes. Later that day, the competitors exchanged two more calls lasting nine minutes and eighteen minutes, respectively.

3041.    Having received some peace of mind from the conversations between CW-6 and Grauso, D.K. of Fougera sent an internal e-mail recommending that Fougera move forward with the planned price increase on Fluocinolone, adding ████████████████

3042.   To solidify the plan, CW-6 and Grauso placed three more calls to each other that afternoon. Less than an hour after his final call with CW-6, Grauso initiated the first of three calls to his superior, Orlofski, to update him on the Fluocinolone discussions with Fougera. CW-6 also called to update his supervisor, Kaczmarek.

3043.   Six more calls followed between CW-6 and Grauso in the days that followed between December 15, 2011 and December 21, 2011.

3044.   At the conclusion of that series of calls, on December 22, 2011, Fougera increased WAC pricing on Fluocinolone Cream and Ointment by 200%.

3045.   Fougera knew from its discussions with G&W that G&W would follow the price increase. On the morning of December 28, 2011, D.K. of Fougera instructed a co-worker to find out whether G&W had followed Fougera's price increase yet. The co-worker reported that the competitor had not.

3046.   Shortly before noon that day, CW-6 and Grauso had a twenty minute phone conversation. Immediately after that call ended, Grauso called his colleague at G&W, Vogel-Baylor.

3047.   Less than a week later, on January 3, 2012, G&W followed through with its assurances to Fougera, increasing WAC prices on Fluocinolone Cream and Ointment to within pennies of Fougera's prices. D.K. was delighted by the news and agreed with a colleague's suggestion that Fougera would ███████████████████████████████████████████ ████████.

3048.   Almost immediately after G&W announced its prices, Sandoz acknowledged internally that, because G&W had followed the price increase, Sandoz would ███████████████ ████████████████  Over the following weeks, Sandoz declined to bid on multiple accounts to allow G&W to build its fair share of the market. If questions arose about specific accounts that were being let go, Sandoz explained, █████████████████████████████████████████

3049.    In early February 2012, the two companies continued to collaborate on allocating the market between themselves to give the new entrant its fair share. CW-6 called Orlofski on the morning of February 1, 2012, because his regular contact at G&W – Grauso – had left the company for employment at Aurobindo a few weeks earlier. Less than one hour later, Orlofski called CW-6 back. On February 8, 2012, Orlofski called Kaczmarek. Kaczmarek called Orlofski back on February 9, 2012, and the competitors exchanged two more calls the following day, including one call lasting over twenty-five minutes.

3050.    At the conclusion of these communications, on February 14, 2012, Fougera ceded another large customer to G&W, telling Cardinal that it would ███████████████████████████ ███████

3051.    In late 2012, Sandoz (having recently acquired Fougera) learned that Teligent was planning to enter the market. In advance of Teligent's entry, Sandoz raised its WAC prices again, and also made plans to concede to Teligent its fair share of the market. For example, when Ahold sought to negotiate lower pricing from Sandoz based on Teligent's entry on March 6, 2013, CW-1 of Sandoz notified others internally that Sandoz ███████████████████████████ ████████████████████████████████████████████ In exchange for Sandoz and G&W conceding market share, Teligent agreed to match the WAC price increases announced by Sandoz and G&W on each formulation.

3052.    Upon information and belief, the Defendants coordinated these price increases with Teligent by phone and also at various trade association events. For example, Erika Vogel-Baylor of G&W spoke with J.G.G. (Teligent's CEO) and S.M. (Teligent's Director of National Accounts) several times each between November 2013 and May 2014, in order to coordinate Teligent's fair share allocation and also Teligent's entry into the market for Fluocinolone cream (which it did in early 2014).

3053.    Additionally, when Taro entered the market for Fluocinolone in 2015, it did so at the prices set by Sandoz, G&W, and Teligent, and in return, Taro received its fair share of the market from the existing competitors.

3054.    In the solution market, a similar pattern emerged. In late October 2012, in anticipation of Teligent entering the market, Sandoz doubled the list prices of its solution (on top of the tripled prices it had imposed less than a year earlier). Weeks later, Teligent announced virtually identical WAC prices for its new solution products.

3055.    As it had done with G&W earlier that year, internally, Sandoz planned to—and ultimately did—cede approximately 30% of the market to Teligent because it had followed the price increases. Over the ensuing weeks, Sandoz closely monitored the market to ensure that Teligent was getting its fair share.

3056.    When Teligent joined the ointment market in early 2013 and the cream market in mid-2014 it announced list prices nearly identical to those of Sandoz and G&W. And when Taro entered the solution market in the spring of 2015, it matched the list prices of Sandoz and Teligent.

3057.    Pricing data shows steep and parallel price increase beginning in January 2012 for Fluocinolone Acetonide cream, ointment, and solution by Sandoz, G&W, Teligent, and Taro.

3058.    Throughout this period, Sandoz, G&W, Teligent, and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Fluocinolone Acetonide and their fair share agreement.

### 33.    Fluocinonide

3059.    <u>Fluocinonide 0.1% Cream</u>. On January 14, 2014, Perrigo launched Fluocinonide .1% Cream as the first-to-file generic, giving it 180 days of exclusivity against all other generic competitors, except for the authorized generic (the "AG"). Two weeks later, on January 31, 2014, Oceanside launched the AG of Fluocinonide .1% and published WAC pricing that matched Perrigo.

3060.    When Valeant entered the market, the company submitted a bid to Publix for Fluocinonide .1% Cream. After consultation with T.P., a sales executive at Perrigo, and Wesolowski, a senior Perrigo executive, the company decided to ███████ and gave up the business to Valeant.

3061.    As the end of Perrigo's exclusivity approached, Taro and Glenmark both began making plans to enter the Fluocinonide .1% Cream market. Although Sandoz also had plans to enter, manufacturing issues would delay its launch until later in 2015.

3062.    On June 3, 2014, Perfetto of Taro exchanged four (4) calls with Boothe of Perrigo, including one call lasting five (5) minutes.

3063.    On June 9, 2014, A.L., a Taro pricing executive, sent an internal e-mail stating that Taro was nearing the Fluocinonide .1% Cream launch and ███████████████████ A.L. further stated that ███████████████████████████████████████ ████████████████████████████ A.L. also explained, ███████████ ██████████████████████████████████ Attached to the e-mail was a fact sheet about the launch that identified Taro's target market share goal as 15%. Thereafter, Aprahamian responded to A.L. directly to express his approval of the direction the pricing executive had given to the sales team, stating simply: ██████

3064.    At the same time, Glenmark was planning its launch and targeting approximately 25% share of the Fluocinonide .1% Cream market. Over the next several days, Perfetto of Taro exchanged several calls with Boothe of Perrigo and Grauso, a senior executive at Glenmark. These calls among the three competitors are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/12/2014 | Voice | Grauso, Jim (Glenmark) | Incoming | Perfetto, Mike (Taro) | 3:58:00 | 0:09:00 |
| 6/17/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Taro Pharmaceuticals | 12:13:00 | 0:45:00 |
| 6/18/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 6:33:00 | 0:02:00 |
| 6/19/2014 | Voice | Grauso, Jim (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 12:31:00 | 0:27:00 |
| 6/19/2014 | Voice | Grauso, Jim (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 13:00:00 | 0:01:00 |
| 6/19/2014 | Voice | Grauso, Jim (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 13:16:00 | 0:02:00 |

REDACTED – PUBLIC VERSION

3065.   On June 25, 2014, Taro submitted an offer to Publix, a Valeant customer, for Fluocinonide .1% Cream. On June 30, 2014, Publix e-mailed Valeant asking whether the company wanted to bid to retain the business. S.S., a sales executive at Valeant, forwarded the request along internally stating that he had spoken with his contact at Publix who told him that Taro ██████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ After discussing the issue internally, M.S., a marketing executive at Valeant, responded with his agreement: ███████████████████████████████████████ Thereafter, on July 7, 2014, Publix awarded the business to Taro.

3066.   In the days leading up to Taro's and Glenmark's Fluocinonide .1% Cream launch, Aprahamian of Taro and Grauso of Glenmark exchanged several calls, including two calls on July 14, 2014 – the day that both competitors launched the product. These calls are detailed in the chart below:

743

**REDACTED – PUBLIC VERSION**

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/1/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 13:33:00 | 0:18:00 |
| 7/8/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 6:11:00 | 0:07:00 |
| 7/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 6:21:00 | 0:01:00 |
| 7/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 11:55:00 | 0:06:00 |
| 7/14/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 13:26:00 | 0:01:00 |
| 7/14/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 13:31:00 | 0:02:00 |

3067.     On July 14, 2014, Taro and Glenmark published WAC pricing that essentially matched each other. Prior to their entry, the generic market was evenly split between Perrigo (with 56%) and Valeant (with 44%).

3068.     Through the end of July 2014, the competitors continued to talk with each other. Aprahamian and Perfetto of Taro exchanged several calls with Grauso of Glenmark and Perfetto exchanged several calls with Boothe of Perrigo. These calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/18/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 7:35:00 | 0:03:00 |
| 7/18/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 12:10:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:51:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 7/21/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 14:19:00 | 0:26:00 |
| 7/22/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Grauso, Jim (Glenmark) | 12:51:00 | 0:05:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 10:40:00 | 0:02:00 |
| 7/24/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 15:02:00 | 0:07:00 |

3069.     During this time, and in accordance with fair share principles, Perrigo and Valeant both ceded several accounts to the new entrants, Taro and Glenmark. For example, on July 14, 2014, Meijer, a Perrigo customer, e-mailed Glenmark to advise that it was interested in receiving an offer for Fluocinonide .1%. Cream. J.J., a sales executive at Glenmark, forwarded the e-mail to his colleague Jim Brown, a senior sales executive at Glenmark, who responded: ████████████████ ████████████████████████████████████

3070.     Over the next several days, Glenmark secured awards for Fluocinonide .1% Cream at Econdisc, a Valeant customer, and Rite Aid and ABC, both Perrigo customers. With respect to ABC, when J.C., a Glenmark sales executive, received the customer's acceptance she forwarded it

744

along internally, stating, "[a]warded to Glenmark! Signed offer to follow later this morning. Perrigo walked."

3071.   After securing these accounts, J.J. of Glenmark followed up with his colleague Brown regarding Meijer, asking ██████████████████████████████████████ ████████████████████ Brown replied to J.J.'s e-mail stating, ██████████████ ██████████████████████ To that, J.J. responded: ██████████████ ██████

3072.   Notably, after Glenmark bid on Fluocinonide .1% Cream at Econdisc, but before it was awarded the business, the customer e-mailed S.B., a Taro sales executive, asking ██████████ ████████████████████████████████████████████ After forwarding the request along internally, S.B. replied to the customer on July 18, 2014 stating that Taro would not bid for the business. That same day, Aprahamian of Taro spoke with Grauso of Glenmark for three (3) minutes and Perfetto of Taro exchanged a one (1) minute call with Boothe of Perrigo.

3073.   In addition to securing Publix from Valeant in July, Taro also secured business at Walgreens, Optisource, and McKesson from Perrigo that same month. When Optisource awarded Taro the business, the customer noted ████████████████████████████████ ██████████████████████████████ Further, in October and November 2014, Perrigo also gave up its business at Meijer and Omnicare to its competitors.

3074.   Approximately one year later, in September 2015, Sandoz had resolved its manufacturing issues and was readying to enter the Fluocinonide .1% Cream market. At that time, Valeant was the market share leader with 43.93% followed by Glenmark (23.79%), Perrigo (18.33%), and Taro (13.94%).

3075.   On September 18, 2015, W.W., a launch executive at Sandoz, e-mailed Sandoz sales executives CW-3 and W.G., requesting pricing, usage, and incumbent information for Fluocinonide

.1% Cream at three customers that Sandoz was considering targeting – H.D. Smith, Morris & Dickson, and Premier. W.W. stated that ████████████████████████████████████ ████████████████████████████████████████

3076.    On September 24, 2015, CW-1, a Sandoz senior pricing executive, followed up regarding W.W.'s request, asking ████████████████████ CW-3 responded to CW-1 only stating, ████████████ That same day, CW-3 called Aprahamian. The call lasted one (1) minute. An hour and half later, CW-3 called T.P. of Perrigo and they spoke for twenty-three (23) minutes. On this call, T.P. provided CW-3 with contract pricing for Fluocinonide .1% Cream for various customers, including Walgreens, HEB, Target, McKesson, and Econdisc. None of these customers were CW-3's customers. Later that day, CW-3 e-mailed the information he had obtained from his competitor to CW-1, W.W., and others at Sandoz.

3077.    A few days later, on September 28, 2015, Sandoz provided CW-3 with an offer for Fluocinonide .1% Cream to submit to his customer, Morris & Dickson. CW-3 responded stating ████████████████████████████████████████████ and then re-forwarded his e-mail from September 24, 2015.

3078.    The next day, on September 29, 2015, CW-3 called Aprahamian and they spoke for eleven (11) minutes. After that call, CW-3 sent the following e-mail to CW-1 and others at Sandoz:

3079.   Thereafter, Sandoz revised its offer to Morris & Dickson and the customer awarded Sandoz the business. On October 12, 2015, Sandoz also secured the Fluocinonide 1% Cream business at Wal-Mart, a Taro customer:



3080.   <u>Fluocinonide Solution</u>. In early 2011, the competitors in the Fluocinonide Solution market were Teva, Taro, and Fougera. All three competitors produced Fluocinonide Solution in 60ml bottles, while only Taro produced them in 20ml bottles.

3081.   In the beginning of April 2011, Fougera's Fluocinonide Solution products had been on long-term backorder due to quality control issues with the tips of the bottles leaking. As a result, the market was split between Teva (76% market share) and Taro (19% market share) until Fougera returned to production. Fougera was working to re-launch its Fluocinonide Solution products by mid-May 2011.

3082.   On April 21, 2011, Defendant Kaczmarek learned by e-mail that Teva was ▮▮▮▮▮▮▮ Fluocinonide Solution; that is, Teva was stopping production and leaving the market. This meant the only competitors in the market would now be Fougera and Taro.

3083.   Even though it was still on backorder due to supply problems, Fougera viewed Teva's exit as an opportunity to increase prices. In internal calculations of the expected benefit from the pricing action, Fougera assumed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and that

they would split the market 50/50. Fougera estimated that this would provide it with a yearly gain of $4.6 million.

3084.   On May 10, 2011, Fougera raised its WAC pricing for Fluocinonide Solution by 100% from – $12.50 to $25.00 – with the change effective the following day. That evening, Fougera also sent out contract price-change notifications to customers where it had existing contracts for Fluocinonide Solution. With those increases, the average net sales price jumped 800% from $2.50 to $20.

3085.   On May 13, 2011 – three days after Fougera sent out its price changes – CW-6 and H.M. of Taro exchanged two calls, with one call lasting five (5) minutes.

3086.   One week later, on May 20, 2011, Taro followed Fougera's lead by substantially increasing its pricing for Fluocinonide Solution. Taro increased the WAC price for the 20ml and 60ml formulations by 200% and 400%, respectively. Taro also increased average net sales prices by 260% and by over 500% for the 20ml and 60ml formulations, respectively.

3087.   Following their respective price increases, the market share between Taro and Fougera stabilized to rough parity. By September 2011, Fougera had approximately 50% market share and Taro had approximately 48% market share.

3088.   On January 25, 2012, CW-6 and H.M. exchanged several calls. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:36:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:37:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:38:00 | 0:04:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:19:00 | 0:02:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:32:00 | 0:02:00 |

3089.   First thing the next morning, on January 26, 2012, Defendant Kaczmarek sent an e-mail to his Fougera colleagues stating, ███████████████████████████████

748

████████████████████████████████████████████████████████

██████████████████████████ The proposed price increase involved nearly tripling Fougera's WAC price and increasing associated contract prices in a little over two weeks' time.

3090.   This price increase opportunity was viewed as so pressing by Kaczmarek that he asked A.R., a Fougera business analyst, to put together a pricing analysis that evening while flying on a plane because she had a scheduled day off the next day.

3091.   First thing the next morning, on January 27, 2012, Kaczmarek called CW-6 and they spoke for twenty-two (22) minutes. CW-6 hung up and immediately called H.M. of Taro. The call lasted one (1) minute. A few minutes later, CW-6 called H.M. again and they spoke for twenty-one (21) minutes. Later that day, CW-6 called Kaczmarek twice. The calls lasted four (4) minutes and three (3) minutes, respectively.

3092.   Later that evening, on January 27, 2012, Kaczmarek submitted the proposed price increase to the Fougera Pricing Committee. Now, the price increase had grown even larger. The plan was to raise Fougera's WAC price from $25 to $80.99 and increase its average net sales price from $18.08 to $58.57. This increase was estimated to bring in an additional $10.1 million in gross profit for the rest of 2012. Members of the Fougera Pricing Committee enthusiastically embraced the massive price hike, with one member responding: ████████

3093.   On February 13, 2012, CW-6 called H.M. and they spoke for five (5) minutes. The next day, on February 14, 2012, Fougera formally raised its WAC and contract prices for Fluocinonide Solution as planned.

3094.   The increases more than tripled Fougera's WAC price as well as direct and indirect contract prices for its customers. The increase was so dramatic, that third party data vendor Medi-Span – which tracks WAC prices – reached out to Fougera to confirm that the new WAC amount was not an error.

REDACTED – PUBLIC VERSION

3095.    On February 15, 2012, the day after the increases, CW-6 called H.M. again and they spoke for six (6) minutes. Later that day, Defendant Blashinsky, a senior Taro marketing executive, circulated an e-mail informing others within Taro that prices in the Fluocinonide Solution ██████ ████████████████████████████████

3096.    In furtherance of their price increase conspiracy, and consistent with the overarching conspiracy, Taro was careful not to use Fougera's price increase to poach customers and upset market share. Indeed, Taro refused to poach even very small customers. For example, Meijer requested that Taro submit a bid for Fluocinonide Solution. Internally, Taro noted ████████ ██████████████████████████ of market share. Nonetheless, Taro declined to provide Meijer with a bid and instead falsely claimed that Taro did not have inventory to supply them.

3097.    Similarly, HD Smith asked Taro to bid for its Fluocinonide Solution business after Fougera increased. The representative at HD Smith even stated that she ████████████████ ████████████████████████ S.B., a Taro sales executive, relayed this news to J.J., a senior Taro sales executive, who then chastised him for even considering the offer:

3098.   While Taro planned and implemented corresponding price increases, representatives of Taro and Fougera remained in contact, including but not limited to exchanging the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/15/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 7:39:00 | 0:02:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Incoming | CW-6 (Fougera) | 6:00:00 | 0:03:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 6:03:00 | 0:02:00 |
| 2/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:13:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |

3099.   The day after the final calls detailed above, on March 9, 2012, Taro implemented its price increase, which essentially doubled its WAC and contract prices for both the 60ml and 20ml formulations of Fluocinonide Solution.

3100.   <u>Fluocinonide Ointment</u>. In early 2013, the Fluocinonide Ointment market was evenly split between Teva with 50% share and Taro with 42% share.

3101.   On February 12, 2013, Taro increased pricing on several products, including Fluocinonide Ointment. The increase included a 15% increase to WAC.

3102.   On February 21, 2013, M.A., a Sandoz marketing executive, e-mailed Defendant Kellum and other Sandoz executives to advise that Taro had increased pricing on several products for which Sandoz was re-entering the market, including Fluocinonide Ointment. That same morning, CW-3 of Sandoz called H.M. of Taro and they spoke for (9) minutes. Immediately after hanging up with H.M., CW-3 called his supervisor, Defendant Kellum, and they spoke for four (4) minutes.

3103.   One week later, on February 28, 2013, McKesson e-mailed Taro stating that it had received an unsolicited bid on Fluocinonide Ointment and asked whether Taro wanted to bid to retain the business. Later that day, CW-3 called H.M. again and the two competitors spoke for

eleven (11) minutes. First thing the next morning, on March 1, 2013, CW-3 called his boss Kellum, and they spoke for five (5) minutes.

3104.    On March 2, 2013, CW-3 and H.M. exchanged three (3) text messages. That same day, E.G., a Taro sales executive, forwarded the customer request along internally and attached a spreadsheet indicating that McKesson was Taro's largest customer and including the notation:

████████████████████████████

3105.    Two days later, on March 4, 2013, M.L., a Taro pricing executive, forwarded the McKesson request to Defendant Perfetto and other Taro executives suggesting that Taro reduce its pricing by 20% and retract the price increase to retain the business. Perfetto responded that he was okay with this approach, but posed a question: ████████████████████

████████████████████████████████████

3106.    On March 5, 2013, M.L. confirmed that Taro supplied all three wholesalers and Perfetto responded by asking J.J., a senior Taro sales executive, ████████████████

████████████████████████████████████

████████████    After confirming that Taro was primary on all three, J.J. replied, ████████

████████████████████████████████████

████████████████████

3107.    Looking for a creative way to communicate with Sandoz that Taro would rather it approach ABC or Cardinal instead of McKesson, Perfetto reached out to his former colleague at Actavis, Defendant Aprahamian, who he knew had a relationship with CW-3 at Sandoz.[68]

---

[68] Aprahamian was in the process of leaving Actavis at this point, but would not formally begin working at Taro until two weeks later – on March 18, 2013.

3108.    Perfetto asked Aprahamian to speak with CW-3 about Fluocinonide Ointment. The

twoexchanged calls, and Aprahamian reported back to Perfetto what they discussed. These calls are

detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/4/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Aprahamian, Ara (Actavis) | 15:18:00 | 0:14:00 |
| 3/5/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Aprahamian, Ara (Actavis) | 8:01:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:05:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:07:00 | 0:11:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 14:52:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 10:50:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 13:24:00 | 0:03:00 |

3109.    At the same time, CW-3 was reporting back to CW-1, a Sandoz senior pricing

executive, what he had discussed with Aprahamian. Shortly after that discussion, CW-1 emailed

Kellum and F.R., a Sandoz pricing executive, regarding Fluocinonide Ointment stating that he had

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████     Less than an hour later, Kellum called CW-3 and they spoke for twenty-three (23)

minutes. Later that day, CW-3 called Aprahamian. The call lasted less than one (1) minute.

3110.    Having identified ABC as its target, CW-1 then asked CW-3 to contact Taro and

obtain price points for the customer. Following this directive, CW-3 exchanged several calls with

Aprahamian who, in turn, spoke with Perfetto and then relayed the information back to CW-3. This

call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 12:20:06 | 0:00:30 |
| 3/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 12:27:00 | 0:04:00 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | Perfetto, Mike (Taro) | 12:47:00 | 0:01:00 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 12:49:00 | 0:09:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 14:16:00 | 0:03:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:18:00 | 0:01:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:25:00 | 0:05:00 |

3111.   After speaking with Aprahamian for the last time on March 11, 2013, CW-3 called

CW-1 and left him the following voicemail:



3112.   In accordance with the agreement between the two competitors, Sandoz bid on

Fluocinonide Ointment at ABC and Taro promptly conceded the business.

3113.   <u>Fluocinonide Gel</u>: For most of 2015, Taro was the only player in the market, with

Teva and Sandoz having discontinued Fluocinonide Gel from their product lines in late 2014.

3114.   In the fall of 2015, however, G&W was making plans to join Taro in the market by

launching the product that November, after purchasing the product from Teva. G&W built into its

plans an assumption that Taro would cede approximately twenty-five (25%) percent market share to

G&W upon its launch.

3115.   By mid-November, G&W had bumped its product launch date back to December

because of a product testing problem at an outside lab. No longer content with assuming that Taro

would give it a quarter of the market when the launch came to fruition, G&W executives reached

out to the competitor to confirm. On November 17, 2015, Defendant Orlofski of G&W called

Defendant Aprahamian at Taro, and the two competitors spoke for seventeen (17) minutes. Later

that same day, Defendant Perfetto of Taro placed a brief call to Orlofski. M.P., a G&W business

development executive, also continued the dialogue with a call to Perfetto on November 18, 2015.

3116.   On November 20, 2015, Defendant Vogel-Baylor of G&W worked on confirming

that Taro was, indeed, the only competitor with whom G&W had to confer, asking a colleague to

pull information for Fluocinonide Gel: ███████████████████████████

███████████████████ placed another quick call to Perfetto on November 21, 2015.

3117.    Two days later, on November 23, 2015 at 11:25 a.m., Orlofski called Perfetto yet again. They spoke for seven (7) minutes. Less than two hours later, Vogel-Baylor sent Kroger an e-mail with news of the G&W launch of Fluocinonide Gel and a request for information about the purchaser's usage numbers for the product. On November 24, 2015, Kroger responded that G&W would need to offer all three sizes of the product – 15gm, 30gm, and 60gm – before it would consider moving the business. G&W, however, would not be prepared to launch the two smaller sizes until May 2016.

3118.    The Kroger response sent the competitors back to square one in figuring out how to allocate the Fluocinonide Gel market between them. G&W set to work quickly exploring other options. On November 25, 2015, Orlofski called Perfetto and the two competitors spoke for seven (7) minutes.

3119.    On December 3, 2015, Vogel-Baylor reached out to Walgreens asking whether the customer would entertain a bid for Fluocinonide Gel. Vogel-Baylor explained to Walgreens that it was ███████████████████████

3120.    A few days later on December 8, 2015, Aprahamian and Orlofski had a twenty three (23) minute phone conversation. Later that day, Vogel-Baylor moved forward, e-mailing her Walgreens contact to ask where G&W should send its Fluocinonide Gel proposal soliciting Walgreens' business.

3121.    While Vogel-Baylor awaited Walgreens' response, other G&W executives continued their conversations with their counterparts at Taro. On December 13, 2015, Perfetto called M.P. of G&W and they spoke for twenty-nine (29) minutes. The following day, December 14, 2015, Aprahamian called Orlofski and they spoke for nine (9) minutes.

REDACTED – PUBLIC VERSION

3122.    Having gotten the requested information from Walgreens late in the evening on December 14, 2015, and having vetted the plan with its competitor, G&W sent its pricing proposal on Fluocinonide Gel to Walgreens the following day.

3123.    Walgreens contacted Taro two days later, on December 17, 2015, to inform the incumbent of G&W's proposal and to find out whether Taro intended to defend. Taro sales executive C.U. asked Aprahamian: ███████████████  Aprahamian responded simply ███ ███████████████  C.U. wrote back, emphasizing that he was well aware of Taro's cooperative arrangement with its competitors, saying: ███████████████████████ ███████████████

3124.    To keep the lines of communication open, Orlofski called Perfetto first thing the following morning.

3125.    C.U. refrained from responding to Walgreens' question about Taro's intentions in writing, instead cautiously e-mailing his Walgreens contact on December 21, 2015: ██████████ ████████████████"

3126.    Having somehow overlooked C.U.'s request for a phone call, on January 4, 2016 the Walgreens representative again pressed for an answer on what Taro's approach would be on Fluocinonide Gel, asking: ███████████████████  C.U. responded: ███ █████████████████████████████████████████████████ ████████████

3127.    The following day, January 5, 2016, a Taro pricing executive, M.L., confirmed that Taro had voluntarily ceded its Walgreens business to the competitor, telling his colleague: ████ █████████████████████████████████████████

3128.    That same day, a Taro pricing executive, A.L., advised C.U. that he should have someone on the pricing team send e-mails to customers when Taro declines to bid – like the one he

sent to Walgreens for Fluocinonide Gel. As A.L. explained, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

3129.   On January 6, 2016, the day after Taro declined to bid at Walgreens, Vogel-Baylor called C.U. at Taro and they spoke for twenty-five (25) minutes. Notably, this was the only phone call ever between these two competitors according to the available phone records.

3130.   Several months later, on April 26, 2016, C.U. forwarded along internally a monthly tracking spreadsheet entitled: ▮▮▮▮▮▮▮▮▮ In the spreadsheet, C.U. noted with respect to Fluocinonide Gel at Walgreens: ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### 34.   Griseofulvin Microsize Tablets

3131.   Throughout 2013, non-defendant Rising had a virtual monopoly on the Griseofulvin market, with Valeant maintaining only a small percentage of the share.

3132.   On August 7, 2013, Sandoz received FDA approval to market Griseofulvin. Sandoz planned to talk to customers at the NACDS Annual Total Store Expo that weekend and then launch the following week.

3133.   However, on August 14, 2013, Sandoz learned that the Griseofulvin launch would be delayed due to production problems. Despite the delay, Sandoz estimated that it could still realize $2.5 million in sales in 2013 ▮▮▮▮▮▮▮▮▮▮▮ On September 19, 2013, CW-2, then a senior sales and marketing executive at Rising, called CW-3 of Sandoz twice. Both calls lasted one (1) minute. CW-3 returned the calls later that day and they spoke for twenty-one (21) minutes. During these calls, CW-2 and CW-3 discussed Sandoz's manufacturing issues on Griseofulvin and its continued delay in launching the product.

REDACTED – PUBLIC VERSION

3134.   However, just one week later, on September 25, 2013, Sandoz learned that its production problems had been resolved. The following Monday, on September 30, 2013, CW-3 informed CW-2 of this unexpected news in the following text message exchange:



3135.   That same day, CW-2 called CW-3 twice. The calls lasted one (1) minute and eight (8) minutes. That evening, Sandoz held an internal meeting to discuss launch strategy for Griseofulvin, including which customers to approach in order to achieve Sandoz's market share goal.

3136.   Over the next several days, CW-2 of Rising exchanged several calls with CW-3 and L.J., a Sandoz sales executive, during which they discussed pricing for Griseofulvin and the allocation of market share to the new entrant, Sandoz. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/1/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 6:32:00 | 0:01:00 |
| 10/1/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 12:15:00 | 0:10:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 12:35:00 | 0:02:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 13:30:00 | 0:22:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 13:59:00 | 0:03:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 14:46:00 | 0:09:00 |

After this series of communications between the two competitors, on October 2, 2013, Kellum sent an internal e-mail identifying four (4) customers that Sandoz planned to target to obtain approximately 40% share of the Griseofulvin market – CVS (20%), McKesson (8%), Rite Aid (6%),

and ABC (8%). That evening, Sandoz prepared and sent its initial round of offers to CVS and McKesson.

3137.   The next day, on October 3, 2013, CW-2 of Rising exchanged three calls with L.J., the Sandoz sales executive responsible for the McKesson account, and one (1) call with CW-3 that lasted twenty-one (21) minutes. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/3/2013 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 6:23:00 | 0:01:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 6:24:00 | 0:02:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 6:25:00 | 0:05:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 11:34:00 | 0:21:00 |

3138.   On October 4, 2013, McKesson e-mailed CW-2 asking if Rising wanted to submit a bid for Griseofulvin. Rising responded to the request by submitting a high bid so that Sandoz would win the business. On October 7, 2013, McKesson advised Rising that its bid was not competitive and awarded the business to Sandoz.

3139.   On October 8, 2013, CVS e-mailed Sandoz and declined its Griseofulvin offer, stating: ██████████████████████████████████████ ████████████████ Later that evening, CVS e-mailed CW-2 asking whether Rising planned to bid on the business.

3140.   First thing the next morning, on October 9, 2013, CW-2 of Rising and CW-3 of Sandoz exchanged three calls, including one call lasting nine (9) minutes. After these calls, Sandoz reduced its pricing and sent a revised offer to CVS. At the same time, Rising prepared and submitted a high bid to CVS with the intention that Sandoz would win the business.

3141.   However, CVS threw a wrench in the competitors' plans when it refused to accept Rising's high bid that same day stating: ██████████████████████████ Knowing he had agreed to give up the customer to Sandoz, CW-2 asked his colleague to reduce the

CVS offer only slightly – by $10 – and ███████████████ Thereafter, on October 10, 2013, CVS declined the Rising bid and awarded the business to Sandoz.

3142.    On October 15, 2013, Sandoz submitted an offer to Rite Aid for its Griseofulvin business.

3143.    Between October 16 and October 21, 2013, CW-2 of Rising and CW-3 of Sandoz spoke several additional times to coordinate Sandoz's entry. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/16/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 14:37:00 | 0:01:00 |
| 10/17/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 5:12:00 | 0:14:00 |
| 10/17/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 5:27:00 | 0:01:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:06:00 | 0:02:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:45:00 | 0:02:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 9:42:00 | 0:07:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 13:24:00 | 0:06:00 |
| 10/21/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:24:00 | 0:01:00 |
| 10/21/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 8:12:00 | 0:05:00 |

3144.    On these calls, the two competitors discussed Griseofulvin and the accounts that Sandoz had targeted or planned to target. CW-2 also advised CW-3 that Rising would not give up Rite Aid to Sandoz. On October 21, 2013, CW-3 took the following contemporaneous notes in his Notebook:



3145.   First thing the next morning, on October 22, 2013, CW-2 of Rising called CW-3 of Sandoz twice. Both calls lasted one (1) minute. CW-3 returned the call later that morning and they spoke for eight (8) minutes.

3146.   The next day, on October 23, 2013, Rite Aid advised Sandoz that it declined to accept Sandoz's offer for Griseofulvin – as expected, Rising had lowered its pricing to retain the customer. That same day, Sandoz began making plans to approach Wal-Mart and Cardinal as their next targets.

3147.   On October 28, 2013, CW-3 e-mailed Wal-Mart to see if the customer was interested in an indirect bid for Griseofulvin. Wal-Mart replied that it was. The next morning, on October 29, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for twenty-two (22) minutes. During that call, CW-3 informed CW-2 that Sandoz would approach Wal-Mart, and CW-2 agreed that Rising would relinquish that customer. Later that day, Sandoz prepared an offer and sent it to Wal-Mart.

3148.   On November 4, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for twenty-eight (28) minutes. The next day, on November 5, 2013, Wal-Mart accepted Sandoz's offer for Griseofulvin and awarded it the business.

3149.   On November 20, 2013, CW-2 of Rising and L.J. of Sandoz spoke for three (3) minutes. Later that day, Sandoz submitted an offer to Cardinal for its Griseofulvin business.

3150.   On November 22, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for seventeen (17) minutes. Later that day, Rising executives held a Commercial Operations meeting at which CW-2 conveyed that Sandoz needed Rising to relinquish one more account – Cardinal – so that it could meet its share goal. CW-2 advised that Sandoz would be done after Cardinal and would not seek any additional share.

REDACTED – PUBLIC VERSION

3151.    Thereafter, Rising conceded Cardinal, and Cardinal awarded its Griseofulvin business to Sandoz.

3152.    The following Monday, on November 25, 2013, Rising held a sales and marketing meeting during which it discussed Griseofulvin, among other products. CW-2 forwarded the minutes from that meeting to several Rising executives and S.S., a senior Rising executive responded, ███████████████████████████████████████████████████ CW-2 responded with the following e-mail to S.S.:



3153.    To that, S.S. replied, apologizing that he had not put two-and-two together, and stated ████████████

3154.    One year later, on October 15, 2014, Rising increased WAC pricing on Griseofulvin. In advance of the increase, CW-2 of Rising exchanged several calls with L.J. of Sandoz, during which they discussed the price increase. These calls are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/1/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:16:00 | 0:04:00 |
| 10/2/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 13:01:00 | 0:02:00 |
| 10/2/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 15:23:00 | 0:11:00 |
| 10/8/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:47:00 | 0:01:00 |
| 10/8/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 14:57:00 | 0:07:00 |
| 10/13/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:33:00 | 0:08:00 |

Further, CW-2 also met in-person with L.J. and the two men discussed the increase over drinks.

3155.    Even after the Rising price increase, CW-2 of Rising continued to communicate with his former Sandoz colleagues about the increase. For example, on November 12, 2014, CW-3 and CW-2 exchanged the following text messages:



3156.    The next day, on November 13, 2014, CW-2 also exchanged several lengthy calls with CW-3 and L.J. of Sandoz. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 3:05:00 | 0:14:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 3:19:00 | 0:01:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 3:19:00 | 0:20:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 10:51:00 | 0:02:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 13:59:00 | 0:09:00 |

3157.    After speaking with CW-2 of Rising, CW-3 sent an e-mail to CW-1, a Sandoz senior pricing executive, stating only ████████████ CW-1 responded that he was ████████████ and CW-3 replied, ███████████████████████████████████

███████████████

REDACTED – PUBLIC VERSION

As was his customary practice, CW-3 stated that he had learned the information from a ████████ when he had actually obtained the information directly from his competitor, CW-3. Later that day, CW-1 and CW-3 spoke for twelve (12) minutes.

3158.   Sandoz did not follow the Rising price increase immediately because, after conducting several analyses, it determined that the price protection penalties it would have incurred were too high to justify the increase.

3159.   However, by July 2015 those concerns were alleviated. On July 27, 2015, P.C., a Sandoz pricing executive, sent an internal e-mail detailing that Sandoz planned to increase prices the following week on a list of products, including Griseofulvin. P.C. noted that for Griseofulvin, Sandoz was assuming ████████████████   In other words, Sandoz knew that Rising would not seek to take any of its customers after the price increase.

3160.   Two days later, on July 29, 2015, CW-3 of Sandoz called S.G., then a senior sales executive at Rising, and the two competitors spoke for nine (9) minutes. One week later, on August 7, 2015, Sandoz followed Rising's price increase and published WAC pricing that matched its competitor.

## 35.    Halobetasol Propionate

3161.   During the relevant time frame, Perrigo, G&W, Sandoz, and Taro were the primary manufacturers of Halobetasol Propionate cream and ointment.

3162.   The markets for Halobetasol Propionate cream and ointment were mature and at all relevant times had multiple manufacturers.

### a.    The September 2012 Price Increase

3163.   On September 25, 2012, both G&W and Perrigo announced price increases for Halobetasol Cream and Ointment. G&W's price increases took effect on September 28, 2012 and Perrigo's price increases took effect one month later on October 28, 2012.

REDACTED – PUBLIC VERSION

3165.   In the days leading up to the price increases, both Vogel-Baylor of G&W and T.P. of Perrigo had numerous discussions with CW-6 of Aurobindo concerning Halobetasol. Although Aurobindo did not manufacture either form of Halobetasol, Vogel-Baylor and T.P. used CW-6 as a conduit to convey information between them about the price increases. As discussed in detail above, CW-6 had formerly worked at Fougera and had developed relationships with Vogel-Baylor and T.P. of Perrigo during his tenure there.

3166.   For instance, on September 19, 2012, less than one week before the price increases, Vogel-Baylor exchanged three text messages with CW-6. Then, CW-6 called Vogel-Baylor, hung up, and immediately called T.P.. After speaking with T.P., CW-6 hung up and immediately called Vogel-Baylor back, relaying the information he had learned from T.P.. Indeed, within a twenty-minute period, CW-6 had exchanged at least eight calls with Vogel-Baylor and T.P. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

3167.   After speaking with CW-6 for the final time on September 19, 2012, Vogel-Baylor immediately called her boss, Orlofski and spoke to him for thirteen minutes. Similarly, T.P. also reported back to his boss, Wesolowski, a senior executive at Perrigo, exchanging two calls with him totaling roughly six minutes.

3168.   Further, two days later, on September 21, 2012, and then again on September 27, 2012, the day before the G&W price increase went into effect, the same call pattern occurred. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |

3169.   In early November 2012, a customer reached out to G&W asking it to submit a bid for Halobetasol Cream and Ointment because the customer believed its prices were inconsistent with the market.

3170.   After receiving the request, Vogel-Baylor had several calls with CW-6 who, again, served as a conduit between Vogel-Baylor and T.P. to discuss Halobetasol. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:03:00 | 0:03:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:05:00 | 0:05:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:09:00 | 0:04:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:13:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:38:00 | 0:02:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 6:41:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:42:00 | 0:03:00 |

3171.   After this call exchange, Vogel-Baylor sent the following directive to C.M., a sales executive at G&W, instructing him to submit a cover bid to the customer in order to create a false appearance of competition between G&W and Perrigo:



### b.    The March/April 2013 Price Increase

3172.    The competitors colluded to raise the price of Halobetasol again in 2013. This time, there were multiple channels of communication between the competitors. For example, Doug Boothe, Perrigo EVP and General Manager, and K.O, G&W President, spoke twice by telephone on March 19, 2013, texted on March 25 and spoke for approximately seven minutes on March 26. That same day, T.P. of Perrigo once again called CW-6. The call lasted two minutes. Right after that call, CW-6 called Vogel-Baylor. That call lasted one minute.

3173.    The next day, on March 27, 2013, Perrigo increased its WAC pricing for Halobetasol Cream and Ointment by over 250%.

3174.    K.O. at G&W also was communicating with M.P., Taro Chief Commercial Officer, during the same period of time. K.O. tried to connect with M.P. on March 19, 2013 (the same day he had spoken to Doug Boothe at Perrigo) but did not get through. The two did connect, however, on March 21. They text messaged on March 25 (the same day that K.O. texted with Doug Boothe at Perrigo), and had two relatively long conversations (15 and 20 minutes) on March 28, 2013, the day after Perrigo increased its WAC prices.

3175.    They also spoke two weeks later on April 11, 2013, the day that G&W announced WAC price increases for Halobetasol Propionate that were double what it had been just the year before. The next day, the two executives spoke by telephone for approximately 28 minutes.

3176.    G&W told one of its customers, Morris & Dickson, that G&W increased prices in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, in the days leading up to the G&W price increase, Vogel-Baylor and T.P. had again engaged in a game of telephone with CW-6 to coordinate their pricing actions. After speaking with T.P. for four minutes on April 8, 2013, CW-6 immediately called Vogel-Baylor. The call lasted one minute. CW-6 then called Vogel-Baylor a short while later and they spoke for four minutes. Immediately after that call, Vogel-Baylor called her boss, Orlofski. The call lasted a little over one minute.

c.    **Sandoz Launches Halobetasol Cream**

3177.    In December 2013, Sandoz began preparing to re-launch Halobetasol Cream. At that time, G&W had 63% of the market and Perrigo had 36%. Sandoz was targeting 20% market share. Because G&W was the market share leader, Sandoz wanted to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3178.    On December 11, 2013, A.S., a senior Sandoz launch executive, instructed Sandoz employees to reach out to Rite-Aid and Walgreens to learn who their suppliers were for Halobetasol Cream and what their pricing was. Upon learning that both customers were with G&W – the market share leader – Sandoz decided to target those customers.

3179.    On December 12, 2013, Walgreens reached out to G&W to advise that Sandoz had expressed interest in its Halobetasol Cream business. When Vogel-Baylor shared this information with Orlofski, he remarked that G&W ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Although Sandoz submitted a bid for Halobetasol on December 16, 2013, Walgreens declined to move the business because the price was slightly higher than G&W's price.

768

3180.   On December 17, 2013, another one of G&W's customers, Ahold, informed G&W that it had received a bid from Sandoz and was now seeking a lower price from G&W. Vogel-Baylor e-mailed Orlofski stating, ███████████████████████████████████████████ ███████████████████████████████████████ Orlofski responded by asking Vogel-Baylor to call him, noting ██████████████████████████ Later that day, Rite Aid also e-mailed Vogel-Baylor stating that Sandoz had submitted a bid for Halobetasol Cream and requested that G&W lower its price to retain the business.

3181.   Vogel-Baylor tried calling Orlofski three times on December 17, 2013. After the third call, Vogel-Baylor called Polman of Perrigo and they spoke for more than seven minutes.

3182.   Vogel-Baylor hung up with Polman and called Orlofski again. Orlofski returned her call later that day and they spoke for five minutes.

3183.   After speaking with Orlofski, Vogel-Baylor e-mailed Rite-Aid stating, ██████████ ███████████████████████████████████████████████████████████ ███████████████████████ Rite-Aid accepted Sandoz's offer the next day.

3184.   At the same time that Sandoz was going after G&W's Halobetasol customers, it was also approaching some Perrigo customers as well, albeit in coordination with Perrigo. On December 17, 2013, CW-1, a senior Sandoz pricing executive, e-mailed CW-3, a senior Sandoz sales executive, asking him to inquire whether Wal-Mart, a Perrigo customer, was interested in receiving a bid from Sandoz for Halobetasol Cream. CW-3 happened to be meeting with Wal-Mart at that time at its offices in Bentonville, Arkansas.

3185.   Wal-Mart told CW-3 that it was interested in receiving an offer. Thereafter, CW-3 called T.P. of Perrigo. During that call, T.P. provided CW-3 with Perrigo's price points for Halobetasol Cream at Wal-Mart and Omnicare and agreed to give up Wal-Mart to Sandoz. CW-3 took the following contemporaneous notes in his Notebook during that call:

3186.   Also on December 17, 2013, CW-3 responded to an e-mail exchange with CW-1 and Kellum regarding Halobetasol Cream, stating: ██████████████████████████ ████████████████████████████████████████

3187.   Two days later, on December 19, 2013, CW-3 called T.P. again. The call lasted one minute. After hanging up, CW-3 called CW-1, and they spoke for four minutes. That same day, Sandoz sent offers to Wal-Mart and Omnicare. The next day, on December 20, 2014, Kirko Kirkov, a senior Sandoz launch executive, followed up with CW-3 regarding the Wal-Mart offer. CW-3 responded, ██████████████████████████████████████████ ████████████████████████████████

3188.   That same day, Boothe of Perrigo called Orlofski of G&W. The call lasted two minutes. Orlofski returned the call a half hour later and they spoke for eleven minutes. Later that day, Orlofski called Vogel-Baylor and they spoke for more than seventeen minutes.

3189.   On January 8, 2014, CW-3 called T.P. of Perrigo. The call lasted one minute. Later that day, Wal-Mart accepted Sandoz's bid for Halobetasol Cream. CW-3 forwarded the acceptance to his supervisor, CW-1, who asked, █████████████████ CW-3 replied in two separate e-mails sent simultaneously: ████████████████████

3190.   The next day, on January 9, 2014, CW-1 and CW-3 agreed that ██████████████ ████████ That same day, CW-3 called T.P. and they spoke for more than fifteen minutes.

3191.   In early February 2014, K.K. joined G&W as a Director of Sales & Marketing. Once at G&W, K.K. wasted no time using his competitor contacts at Sandoz – CW-3 and CW-4 to coordinate regarding Halobetasol.

3192.   On February 18, 2014, K.K. of G&W e-mailed Vogel-Baylor stating that Sandoz had bid on Halobetasol at Walgreens again and the customer was providing G&W with an opportunity to bid to retain the business. Less, than an hour later, Vogel-Baylor called T.P. at Perrigo and K.K. called CW-3 at Sandoz to coordinate a response. The calls lasted one minute and two minutes, respectively. Immediately after hanging up, K.K. sent Vogel-Baylor the following e-mail:



3193.   After receiving the e-mail, Vogel-Baylor called K.K. He returned the call and they spoke for sixteen minutes. Immediately after hanging up with K.K, Vogel-Baylor sent a text message to T.P. of Perrigo. Later that day, K.K. sent the following e-mail to Vogel-Baylor:



3194.   Two days later, on February 20, 2014, K.K. had still not heard back from CW-3 and so he reached out to his other contact at Sandoz, CW-4, and the competitors spoke for four minutes. Immediately after hanging up, K.K. called Vogel-Baylor and they spoke for four minutes. Later that morning, Vogel-Baylor and K.K. exchanged two more calls lasting thirteen minutes and three minutes, respectively. Upon hanging up with Vogel-Baylor, K.K. sent an internal e-mail, including to Vogel-Baylor, stating ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

Vogel-Baylor later responded: ████████████████████████████

3195.   A few minutes after receiving K.K.'s e-mail, Vogel-Baylor sent a text message to T.P. of Perrigo. A half hour later, she called T.P. and they spoke for more than seven minutes. At around the same time, CW-3 of Sandoz called K.K. and they spoke for minutes. Immediately after hanging up with CW-3, K.K. called Vogel-Baylor to report back what he had learned. That call lasted nineteen minutes.

3196.   Later that afternoon, Vogel-Baylor called her supervisor, Orlofski, to apprise him of the situation and they spoke for twenty-one minutes. Upon hanging up, Vogel-Baylor called K.K.

and they spoke for nearly twelve minutes. Immediately after talking to K.K., Vogel-Baylor called

T.P. of Perrigo one more time that day. The call lasted less than one minute.

3197.   That evening, after his conversation with G&W, CW-3 emailed CW-1 and asked that

he call him ██████████████ Within a half hour of receiving the e-mail, CW-1 called CW-3 and

they spoke for twenty minutes.

3198.   The next morning, on February 21, 2014, CW-3 and CW-1 spoke again for fourteen

minutes. CW-3 hung up and immediately called K.K. of G&W. The call lasted one minute.

Immediately after that call, K.K. called Vogel-Baylor. The call lasted one minute. That same day,

K.K. sent the following response to Walgreens (which accounted for more than 33% of G&W's

business for Halobetasol Cream:



### d.    Taro Launches Halobetasol Cream and Ointment

3199.    In mid-March 2014, Taro was making plans to re-launch Halobetasol Cream and Ointment. Although its launch was ultimately delayed until May 2014 due to issues relating to the FDA, Aprahamian called Vogel-Baylor on March 27, 2014 and they spoke for fourteen minutes. Notably, this was the first phone call ever between these two competitors, according to the available phone records. Four days later, on March 31, 2014, Vogel-Baylor called Aprahamian and they spoke for over five minutes.

3200.    On May 13, 2014, Taro re-entered the Halobetasol Cream and Ointment markets and published WAC pricing that matched its competitors. In the days leading up to the re- launch, all four competitors were speaking frequently by phone. At least some of those calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/7/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:28:00 | 0:04:00 |
| 5/7/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Vogel-Baylor, Erika (G&W) | 7:57:00 | 0:14:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:23:00 | 0:05:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 8:28:00 | 0:02:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:30:00 | 0:01:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:31:00 | 0:01:00 |
| 5/8/2014 | Voice | K.K. (G&W) | Outgoing | CW-3 (Sandoz) | 8:39:00 | 0:01:00 |
| 5/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Wesolowski, John (Perrigo) | 7:18:00 | 0:01:00 |
| 5/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Wesolowski, John (Perrigo) | 7:24:00 | 0:02:00 |

3201.    After the phone calls detailed above, Aprahamian would not speak to Vogel-Baylor again until September 2015. Similarly, the two calls between Aprahamian and Wesolowski of Perrigo are the only calls ever exchanged between the two competitors, according to the available phone records.

3202.    On May 11, 2014, Aprahamian circulated a Fact Sheet including detils regarding the Halobetasol re-launch. Taro stated that ███████████████████████████████

████████████████████████████████████████████████

██████████  The Fact Sheet detailed the following market share breakdown and set Taro's target

market shall goal at 15%:



3203.    On June 10, 2014, Aprahamian instructed a colleague to put together offers for

Halobetasol at Publix (a G&W and Perrigo customer) and HD Smith (a Perrigo customer).

Aprahamian cautioned ████████████████████████████████  That same day,

Perfetto of Taro exchanged three text messages with Orlofski of G&W.

3204.    In response to Taro's offers, T.P. (Perrigo) advised his colleagues: ██████████

████████████████████████████████████████████████████

████████████████████████████

3205.    On June 11, 2014, Vogel-Baylor called T.P. of Perrigo. The call lasted one minute.

The next day, on June 12, 2014, HD Smith informed Taro that Perrigo had proactively revised its

pricing shortly after Taro submitted the bid and asked Taro to lower its bid to win the business.

3206.    On June 17, 2014, Boothe of Perrigo called a Taro employee on his office line. The

call lasted forty-five minutes. Later that day, A.L., a Taro pricing executive, sent an internal e-mail

stating, ██████████████████████████████████████████████

The next day, June 18, 2014, Perfetto called Boothe. That call lasted two minutes.

3207.    Around that same time, G&W employees were having a similar exchange over email. On June 17, 2014, K.K. sent an internal e-mail to Orlofski stating: ██████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████

3208.    On June 18, 2014, Orlofski sent a text message to Perfetto and also called him. The call lasted two minutes. The next morning, on June 19, 2014, Orlofski replied to K.K.'s e-mail stating: ████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████ K.K. then sent an internal e-mail directing that G&W should cede the Publix and Morris & Dickson accounts to Taro. As K.K. explained to his colleagues, it was ████████████████

████████████████████████████████████████████████

3209.    On June 20, 2014, Orlofski exchanged two text messages and two calls with Perfetto, including one call lasting nearly thirty-eight minutes.

3210.    At the same time, G&W was also careful not to take any steps that would throw off its market share balance with Perrigo. For example, on June 18, 2014, Plaintiff HEB, a Perrigo customer, asked G&W to bid on their Halobetasol business. K.K. responded, ████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████

### 36.    Hydrocodone Acetaminophen tablets

3211.    Hydrocodone Acetaminophen is a pain reliever and is available in tablet form in multiple strengths, including 5-325 mg and 10-325 mg Tablets. It has been available in the United States for over a decade in a generic form.

3212.   The market for Hydrocodone Acetaminophen 5-325 mg and 10-325 mg Tablets is mature. At all relevant times, there have been multiple manufacturers.

3213.   Amneal, non-defendant Mallinckrodt, Par, and Teva dominated the sales of Hydrocodone Acetaminophen 5-325 mg and 10-325 mg Tablets in the relevant period with Mallinckrodt, Par, and Teva having roughly equal shares of the 5-325 mg Tablet market, and Amneal having a smaller share. On the 10-325 mg Tablets, Mallinckrodt and Par had large shares of the market, Teva had a smaller but still significant share, and Amneal had a relatively small share of the market.

3214.   For several years, the price for Hydrocodone Acetaminophen was relatively stable. Prices began to rise in mid-2014 with Amneal, Mallinckrodt, Par, and Teva coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

3215.   Amneal, Mallinckrodt, Par, and Teva's prices remained elevated.

3216.   The ability of Amneal, Mallinckrodt, Par, and Teva to reach agreements on Hydrocodone Acetaminophen was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3217.   The parallel price increases by Amneal, Mallinckrodt, Par, and Teva are consistent with the Fair Share Agreement.

3218.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

3219.   The agreement between Amneal, Mallinckrodt, Par, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Hydrocodone Acetaminophen Tablets (5-325, 10-325 mg).

### 37.  Hydrocortisone Valerate

3220.   The two competitors on Hydrocortisone Valerate Cream were Taro and Perrigo. Boothe of Perrigo colluded with Perfetto of Taro to raise the price of Hydrocortisone Valerate Cream in August 2013, including raising WAC pricing by 351% on certain formulations. Building on this success, the competitors colluded to raise the price again in June 2014.

3221.   On June 3, 2014, Taro published increased WAC pricing for the June 2014 Increase products, including Hydrocortisone Valerate. That same day, M.C., a sales executive at Perrigo, sent an internal e-mail advising of the Taro price increases. Wesolowski, a senior executive at Perrigo, responded stating: ███████████████████████ That same day, Boothe and Perfetto exchanged four phone calls, including one call lasting five minutes. Two days later, on June 5, 2014, Boothe followed up with Perfetto again. The call lasted two minutes.

3222.   On July 14, 2014, A.F., a sales executive at Perrigo, sent an internal e-mail asking for a list of products that were due for a price increase. The next day, on July 15, 2014, Doug Boothe, a Perrigo pricing executive responded ██████████████████████████ ███████████████████████ Hydrocortisone Valerate was on the list.

3223.   Over the next several days, Boothe and Perfetto exchanged several calls during which they discussed the price increase on Hydrocortisone Valerate, as well as other products. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/18/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 12:10:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:51:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 7/21/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:20:00 | 0:26:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 10:40:00 | 0:02:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 15:03:00 | 0:07:00 |

3224.   After the lengthy twenty-six minute call between Boothe and Perfetto on July 21, 2014, Perrigo notified its customers on July 22, 2014 that it would be increasing its WAC pricing on

a list of products, including Hydrocortisone Valerate, effective July 24, 2014. Notably, Perrigo was also colluding with competitors regarding other products on its list – Econazole Nitrate Cream (Taro and Teligent) and Hydrocortisone Acetate Suppositories (G&W). These products are discussed in detail below in other subsections of this Complaint.

3225.   Indeed, Teligent's role in agreeing to the price increase on Econazole is reflective of its knowledge of and support for the overarching conspiracy. Without Teligent's support for the Econazole price increase – which Shawn McMorrow promised during his conversations with T.P. of Perrigo and L.G. of Taro in July 2014 – the Econazole price increase would have failed, but so would the market allocation agreements and collusive price increases on those products for which Taro, Perrigo, and Sandoz overlapped, such as Clobetasol, Hydrocortisone Valerate, Halobetasol Propionate, and Imiquimod. This allowed the competitors to implement the ███████████ in which Sandoz would exit the market for certain drugs and Taro would lead price increases with the remaining competitors in those markets. And in return for its express support of the overarching conspiracy, Teligent was rewarded upon Sandoz's reentry into the Econazole market, as Sandoz knew to take share from Perrigo and not Teligent.

### 38.   Latanoprost ophthalmic solution

3226.   As of March 2012, there were three generic manufacturers in the market for

3227.   Latanoprost Drops: Sandoz, Greenstone, and Valeant (sometimes referred to as Bausch & Lomb ("B&L")). Greenstone had the largest market share with 42%, followed by Valeant with 30% and Sandoz with 19%. In April 2012, all three manufacturers raised their prices in direct coordination with one another.

3228.   In early April 2012, Greenstone informed its customers that it would be taking a price increase on Latanoprost Drops. In the days and weeks leading up to the Greenstone price

REDACTED – PUBLIC VERSION

increase notice, Robin Hatosy of Greenstone was coordinating with both Defendant Kellum of

Sandoz and B.P., a sales executive at Valeant, by phone and text message:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 12:35:30 | 0:00:00 |
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:38:54 | 0:00:29 |
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:39:39 | 0:00:46 |
| 3/5/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 9:30:16 | 0:05:18 |
| 3/16/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:26:02 | 0:00:00 |
| 3/16/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:27:11 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 16:21:54 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 20:13:55 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:08:36 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 11:07:59 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:03:57 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:07:02 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:11:17 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:15:28 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:49:42 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:51:14 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:52:14 | 0:00:00 |

3229.   Hatosy consistently acted as the conduit, sharing information between Sandoz and

Valeant in order to secure an agreement from both to raise prices.

3230.   On the day that Greenstone sent out the price increase notices, April 3, 2012, both

CVS and Walgreens approached Sandoz looking for a lower price on Latanoprost Drops. That same

day, Hatosy and Kellum exchanged five (5) text messages while Kellum replied internally to his

colleagues at Sandoz, stating: ██████████████████████████████████

████████████████████████████████████████ Later that evening, Kellum

instructed his sales team not to make any ████████ for Latanoprost and to put the product on

████████████ Kellum also instructed S.G., one of his sales executives, to lie to Walgreens about

why Sandoz was unable to bid, instructing S.G. to ████████████ even though Sandoz had plenty

of supply.

3231.   Sandoz immediately began preparing an increase of its own. On April 4, 2012, Kellum called Hatosy but was unable to connect. He called her again on April 5, 2012, and the two competitors spoke for nearly two (2) minutes.

3232.   On April 6, 2012, Kellum requested a customer list from a colleague so that he could begin calculating the financial impact of a Sandoz price increase. He also added the item ██████████████████████████ to the agenda for that day's ██████████████████ ██████ After some quick calculations, Kellum determined that a Sandoz increase on Latanoprost Drops could increase the company's revenues by up to $14,900,000 per year.

3233.   In a presentation he created that same day to support the Latanoprost price increase, Kellum was intentionally opaque about why Sandoz should take the increase, stating that ██████ ████████████████████████████████████████████████████████████ ██████████████████████ But that was a lie. Kellum had first learned of the Greenstone price increase directly from Hatosy, not a customer. In addition, the Valeant price increase had not even happened yet. In fact, it would not be effective until April 24, 2012, three weeks in the future; Kellum's inside information instead came directly from his prior conversations with his competitor, Greenstone.

3234.   While he was in the midst of planning the Sandoz price increase on April 6, 2012, Kellum also exchanged two (2) more text messages and had a nearly seven (7) minute call with Hatosy of Greenstone. Hatosy, in turn, then called B.P. at Valeant and the two spoke for nearly five (5) minutes. Later that evening, Kellum told colleagues: ██████████████████████████ ████████████████████████████

3235.   Things moved quickly from there. On April 9, 2012, Defendant Kellum sent around an agenda for the Pricing Committee meeting the next day. The agenda included ██████████████ ██████████████████████████ He also called Hatosy of Greenstone but was unable to reach

her. Kellum quickly obtained approval for the Latanoprost price increase; customers were notified of the increase on April 11, 2012, and it became effective on April 13, 2012. As a result of this quick action, Sandoz's price increase became effective even before Greenstone's.

3236.    On April 12, 2012, a large retail pharmacy customer, Rite-Aid, sent Greenstone a request for a bid on Latanoprost. Knowing that this was likely an indication that Sandoz had followed Greenstone's price increase, Hatosy (then using a different surname) forwarded the email directly to Kellum with an approving message:



3237.    That same day, a different customer, Optisource, approached Sandoz – angry that it was not notified in advance of Sandoz's Latanoprost price increase. A Sandoz sales executive told the customer that Sandoz was simply ████████████████████ but Optisource challenged that idea, saying that Valeant – which was also on a secondary contract with that customer – had not raised its price. Questioning Defendant Kellum's intel about the price increases, a senior sales and pricing executive at Sandoz forwarded the e-mail string directly to Defendant Kellum on Friday, April 13, 2012, asking: ████████████████ Kellum immediately responded: ████████████ Kellum's understanding, of course – based on his conversations with Hatosy – was that Valeant would be raising, or already had raised, its price. The following Monday, April 16, 2012, Kellum called Hatosy. She called him back the next day, but they

were unable to connect. On April 18 and 19, 2012, Hatosy and B.P. of Valeant then communicated several times by phone and text message, including one call lasting nearly fourteen (14) minutes.

3238.    On April 24, 2012, Valeant raised its WAC pricing on Latanoprost to a point even higher than Sandoz's. That same day, B.P. of Valeant called Hatosy of Greenstone, likely to report the news.

3239.    Three price increases in the span of roughly three weeks caused a lot of customer activity and confusion – which in turn required additional coordination among the three manufacturers to make sure prices stayed high and the market remained stable. For the most part, Sandoz tried to avoid taking any of its competitors' customers after the price increases, but it did want to pick up one customer to get closer to its "fair share" of the market.

3240.    For example, on Friday May 4, 2012 – shortly after the Greenstone and Valeant price increases became effective – Cardinal approached Sandoz with an opportunity to bid and take the business with a lower price. Kellum called Hatosy that day, but they were unable to connect. He called her again on Monday, and they spoke for more than six (6) minutes. They spoke about Sandoz's desire to obtain another customer, and which customer it should target. Monday morning, before speaking to Hatosy, Kellum responded to the internal Sandoz e-mail saying, ███████████ █████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████ The next day, after speaking to Hatosy, Kellum followed up the e-mail, confirming that Sandoz should pass on Cardinal, stating ██████████████████████████ and ████████████ ████████████████████ Consistent with the agreement reached with Greenstone, Sandoz retained its secondary position with Cardinal, instead of bidding for the primary position, and decided to wait until ABC put its Latanoprost business out to bid and let Greenstone concede that customer instead.

3241.    Around this same time, CW-1 started at Sandoz. He had previously worked with Hatosy at a prior employer and thus had a pre-existing relationship with the Greenstone sales executive. When some confusion arose later in May 2012 around the Cardinal business, Hatosy communicated with both CW-1 and Defendant Kellum from Sandoz, as well as B.P. of Valeant, in order to enforce the agreement already in place among the three manufacturers.

3242.    For example, on the morning of May 31, 2012, B.P. of Valeant and Hatosy of Greenstone exchanged one text message and had several phone calls of varying lengths. In the midst of those communications with B.P., Hatosy was simultaneously communicating with CW-1 of Sandoz using iPhone chat, resulting in the following message exchange:



3243.    As Hatosy explained to CW-1, Valeant (B&L) had the Cardinal business, not Greenstone, but Cardinal was telling Valeant that Sandoz had a lower price in the market. Hatosy expressed the need to call ██████████████ because CW-1 had only recently started at Sandoz and thus did not completely understand the scope of the prior collusive communications between Hatosy and Defendant Kellum about the Latanoprost price increases.

3244.    Immediately following this exchange, Hatosy did call Defendant Kellum, setting off a flurry of calls between the three competitors that day, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:31:29 | 0:00:02 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:31:50 | 0:01:57 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 8:34:24 | 0:03:15 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 8:39:30 | 0:00:59 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 8:43:46 | 0:00:00 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 8:44:31 | 0:00:26 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:45:15 | 0:02:26 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 9:17:22 | 0:02:29 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 10:38:48 | 0:01:01 |

3245.    Over the next several weeks, Hatosy went to great lengths to make sure Sandoz and

Valeant lived up to their agreement to keep prices high across the board for Latanoprost. For

example, between June 26 and 28, 2012, Hatosy and B.P. of Valeant exchanged twelve (12) text

messages.

3246.    After that series of communications, on June 29, 2012, Hatosy reached out again to

CW-1 via iPhone chat:



3247.    At the exact same time that Hatosy was exchanging these iPhone chat messages with

CW-1 at Sandoz, she was also exchanging separate text messages with B.P. of Valeant.

3248.    Those efforts were successful. On July 3, 2012, CW-1 followed up with Hatosy via

iPhone chat message confirming that Sandoz's pricing for Latanoprost was not low at Cardinal – or

any other customer for that matter:



3249.    Again, shortly after receiving this information from CW-1 about Sandoz's pricing, Hatosy sent a text message to B.P. at Valeant. They exchanged several other text messages that same day.

3250.    Greenstone similarly lived up to its agreement to concede the ABC business to Sandoz, allowing Sandoz to get closer to its "fair share" of the Latanoprost market. On June 22, 2012, ABC requested a bid from Sandoz on Latanoprost, as expected, due to the Greenstone price increase. Consistent with the agreement, Greenstone quickly conceded the customer to Sandoz, allowing Sandoz to obtain the business ███████████████████████████████

3251.    As discussed above, this successful effort at price fixing convinced Kellum to recommend further efforts at price fixing with Greenstone on various formulations of Clindamycin beginning in August 2012, continuing through 2014. That history also paved the way for yet another successful price fixing agreement between Sandoz and Greenstone on Eplerenone Tablets, discussed below.

### 39.    Isosorbide Dinitrate

3252.    During the relevant time period, Sandoz, Par, and West-Ward were the primary manufacturers of Isosorbide Dinitrate tablets.

3253.   The market for Isosorbide Dinitrate tablets was mature and at all relevant times had multiple manufacturers.

3254.   For years, the prices of Isosorbide Dinitrate tablets were relatively low and stable. For example, before the spring of 2012, Sandoz and West-Ward had WAC prices for 10 mg tablets of ████████████   and NSP prices of ███████████ Par, which had a negligible presence in the market during that time period, offered similarly low prices.

3255.   On June 6, 2012, Sandoz's C.B, Director of National Accounts, spoke for approximately 25 minutes to M.R., West-Ward's Director of National Accounts. The next week, on June 15, Sandoz announced its large WAC price increases on Isosorbide. The two executives next spoke, for approximately 21 minutes, on October 11.  The next day, West-Ward announced its Isosorbide WAC price increases.

3256.   In July 2012, due to claimed supply disruptions, both Sandoz and West-Ward dramatically increased their prices by approximately 1000%. Following these price increases, internal Sandoz documents kept by Armando Kellum and CW-3 concluded that Sandoz had its fair share of the market for Isosorbide Dinitrate and did not seek more share for this reason.

3257.   Following this price increase, Par sought to increase its presence in the market for Isosorbide Dinitrate. Rather than compete for price, Par knew that Sandoz and West-Ward would concede share. Accordingly, Par matched the 1000% price increase announced by Sandoz and West-Ward.

3258.   These price increases were coordinated by senior sales executives from each of Sandoz, Par, and West-Ward. For example, J.G.G. of West-Ward spoke to K.B. of Sandoz for nearly twenty minutes on September 5, 2012. Likewise, on June 6, 2012, Sandoz's CW-3 spoke for approximately twenty-five minutes to M.R., West-Ward's Director of National Accounts. The next week, on June 15th, Sandoz announced its price increases on Isosorbide. The two executives next

spoke for approximately twenty-one minutes on October 11th, and West-Ward announced its Isosorbide Dinitrate list price increases the next day.

3259.   Pricing data show steep and parallel price increases beginning in March 2012 by Sandoz, West-Ward, and Par for Isosorbide Dinitrate tablets, with prices remaining elevated after the supply disruption was resolved.

3260.   In the spring of 2013, Par made a push into the Isosorbide Dinitrate market. Rather than offer lower prices to customers in order to build market share, Par announced WAC prices that matched Sandoz (and which were higher than West-Ward). Par's NSP prices also were very high, and close to Sandoz and West-Ward. Par announced its WAC price increases on March 11, 2013. Not long after, on March 26, K.O, VP of National Accounts at Par, spoke to M.V., Associate Director of Pricing at Sandoz for approximately 25 minutes.

3261.   In 2013, an internal Sandoz analysis of the Isosorbide Dinitrate market from the files of Kellum shows that Sandoz understood its ▮▮▮▮▮ of the market to be split 50/50 with West-Ward. Because Sandoz's share exceeded 50% at that point in time, it answered the question ▮▮▮▮ ▮▮▮▮▮▮▮▮▮ as ▮▮▮ The analysis explains that Sandoz's did not want to grow sales of Isosorbide Dinitrate, but only to ▮▮▮▮▮▮ Sandoz also noted that Par was entering the market.

3262.   In a spreadsheet maintained by Sandoz's Chris Bihari, he included notes to his superiors (including Kellum) explaining that the Isosorbide Dinitrate market was a ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Notably, there is no mention of a supply disruption as justification for the price increase.

### 40.   Lidocaine HCL

3263.   During the relevant time period, Fougera, Taro, and non-defendant Hi-Tech were the primary manufacturers of Lidocaine HCL 5% ointment.

3264.    The market for Lidocaine HCL 5% ointment was mature and at all relevant times had multiple manufacturers.

3265.    The prices of Lidocaine HCL 5% ointment were relatively low and stable for years.

3266.    In late 2011, Hi-Tech began making plans to launch Lidocaine Ointment. At that time, Fougera was the sole generic manufacturer in the market and had a dominant share of the market. In order to cede share to Hi-Tech—as required by the fair share agreement—Sandoz needed to raise prices to maintain (or even augment) its dollar sales notwithstanding the loss of volume.

3267.    On November 21, 2011, A.R., a Fougera sales executive, forwarded an invitation to CW-6, among others, for a conference call on November 28, 2011 to discuss ██████████ ██████████ referred to Fluocinolone Acetonide – a product on which Fougera and G&W overlapped and where CW-6 was colluding with Grauso of G&W at the same time.

3268.    The next day, on November 22, 2011, E.B. of Hi-Tech called CW-6 and they spoke for seven minutes. Immediately after hanging up, CW-6 called his supervisor, Kaczmarek, and they spoke for four minutes. The November 2011 call between CW-6 and E.B. was the first time that the two competitors had ever spoken by phone (according to the available phone records). During these calls, the two competitors discussed Hi-Tech's entry into the market and Fougera's plan to raise its prices before Hi-Tech entered.

3269.     Fougera held its internal strategy meeting on November 28, 2011. A few days later, on December 2, and then again on December 5, 2011, CW-6 called E.B.. The calls lasted one minute each.

3270.    Later that month, on December 22, 2011, and consistent with the competitors' discussions, Fougera increased WAC pricing for Lidocaine Ointment by 200%.

3271.   Starting in February 2012, as Hi-Tech began preparing in earnest to enter the market, E.B. and CW-6 began speaking more frequently. On February 23, 2012, E.B. of Hi-Tech called CW-6 and they spoke for seven minutes. Immediately upon hanging up, CW-6 called his supervisor, Kaczmarek, to report the conversation. That call lasted one minute. An hour later, Kaczmarek called CW-6 back and they spoke for six minutes. Further, on March 7, 2013, E.B. called CW-6 and they spoke for five minutes. CW-6 called E.B. back a few minutes later. The call lasted one minute. During these calls, the competitors discussed which customers Hi-Tech should target as it entered the Lidocaine market, as well as pricing.

3272.   One week later, on March 13, 2012, Hi-Tech entered the Lidocaine Ointment market and matched Fougera's increased WAC pricing.

3273.   After Hi-Tech entered, and consistent with fair share principles, Fougera gave up several of its Lidocaine Ointment customers to the new entrant. For example, on March 22, 2012, ABC e-mailed Fougera to advise that it had received an offer for Lidocaine Ointment and asked whether Fougera wanted to bid to retain the business. CW-3, then a sales executive at Fougera, asked Kaczmarek how to respond and he directed that CW-3 ▮▮▮▮▮▮ to the new player.

3274.   Similarly, on March 27, 2012, CW-6 advised Kaczmarek that Hi-Tech had made an offer to another customer, Ahold, for Lidocaine Ointment. CW-6 suggested that Fougera ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to which Kaczmarek replied: ▮▮▮▮▮▮

3275.   On May 17, 2012, Wal-Mart e-mailed K.K., another Fougera sales executive, to advise that Fougera was not the lowest bidder on its RFP for Lidocaine Ointment and asked whether Fougera wanted to bid to retain the business. K.K. forwarded Wal-Mart's request to Kaczmarek, asking how he should respond.

3276.   First thing the next morning, Kaczmarek called CW-6 and they spoke for ten minutes. A few hours later, Kaczmarek called CW-6 again and they spoke for three minutes.

Immediately upon hanging up, CW-6 called E.B. of Hi-Tech. The call lasted one minute. A half

hour later, CW-6 called E.B. again. The call lasted one minute. That same morning, Kaczmarek

responded to K.K.'s e-mail stating, ███████████████████████████████████████

████

     3277.    Later that day, Kaczmarek e-mailed the sales team regarding Lidocaine Ointment and

stated that Fougera had already given up CVS, ABC, and Rite Aid, which accounted for 34% market

share, and advised that Fougera was ███████████████████████ A Fougera sales executive,

then reminded Kaczmarek that Fougera had also given up HD Smith and Anda to Hi-Tech.

Therefore, Kaczmarek recommended that Fougera ████████████████████████████████

████ The next day, on May 19, 2012, CW-6 called E.B., speaking for four minutes – likely letting him

know that Fougera was now done conceding customers to the new entrant.

     3278.    One year later, in March 2013, Taro began preparing to re-launch into the Lidocaine

Ointment market. At that time, Sandoz (which by that point had acquired Fougera) had

approximately 56% market share and Hi-Tech had 42%.

     3279.    On March 18, 2013, the same day that Aprahamian started at Taro, Perfetto sent an

internal e-mail, welcoming Aprahamian to the team and listing potential topics for a Monday call.

One of those topics was ███████████████████████████

     3280.    Over the next several days, Aprahamian and CW-3 of Sandoz exchanged several

calls, including a call on March 19, 2013 lasting sixteen minutes and a call on March 21, 2013 lasting

twelve minutes.

     3281.    Later in the day on March 21, 2013, after Aprahamian's conversations with CW-3,

J.J., a senior Taro sales executive, sent an internal e-mail listing Lidocaine Ointment usage numbers

by competitor at various customers and stating: ██████████████████████████████████

███████████████████████████████████████████████████████████████.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████ The next day, on March 22, 2013, Aprahamian called CW-3 again. CW-3

returned the call and the two competitors spoke for seventeen minutes.

3282.    During these calls in March 2013, Aprahamian informed CW-3 that Taro would be

re-entering the Lidocaine Ointment market. CW-3, in turn, provided Aprahamian with non-public

price points that Sandoz was charging to its customers for the product.

3283.    Armed with this competitively sensitive information, on or about March 23, 2013,

Taro re-launched Lidocaine Ointment and matched Sandoz and Hi-Tech WAC pricing. Over the

next two weeks, Aprahamian and CW-3 exchanged numerous calls during which they discussed,

among other things, the allocation of customers to the new entrant, Taro. These calls are listed in

the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/25/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:56:00 | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:15:00 | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:16:00 | 0:06:00 |

3284.    Although Aprahamian wanted CW-3 to tell him which customers to target, CW-3

had a difficult time obtaining that guidance from Kellum. Aprahamian told CW-3 that Taro would

be taking two customers from Sandoz – CW-3 understood that to mean that Taro planned to take

one wholesaler and one retailer.

3285.    On April 5, 2013, J.R., a senior Sandoz marketing executive, sent an internal e-mail

asking, ████████████████████████████████████████████████ CW-3

responded: ██████████████████████████████████████████

████████████████████ J.R. replied by asking Kellum, ████████████████ Kellum

answered by providing his understanding of the conversations between CW-3 and Taro: ██

███████████████████████████████████████████████████████

████████████ Later that day, J.R. sent another e-mail to others at Sandoz stating: ███████

███████████████████

3286.   On April 8, 2013, Taro held a Sales and Marketing conference call. According to the

meeting minutes, Perfetto reported the following: ██████████████████████████

██████████████████████████████ and ████████████████ The next

day, on April 9, 2013, CW-3 called Aprahamian and they spoke for seven minutes.

3287.   On April 15, 2013, Aprahamian and CW-3 exchanged three calls, including one

lasting eighteen minutes and another lasting nine minutes. Later that day, Aprahamian sent an

internal e-mail attaching a ████████████████████ The Summary detailed that,

consistent with fair share principles, Taro's ████████ was ████████ and they had achieved

████████ share. For pricing, Taro matched ████████████████████████

████████████████████████████

3288.   The next day, on April 16, 2013, CW-3 called Aprahamian. Aprahamian returned the

call and the two competitors spoke for eleven minutes. At the same time, J.J. of Taro called E.B., a

senior Hi-Tech sales and marketing executive, and they spoke for eight minutes. Throughout the

rest of April, CW-3 and Aprahamian would exchange at least ten more phone calls.

3289.   In June 2013, Taro circulated a spreadsheet detailing its gains and losses for May

2013 for various products. With respect to Lidocaine Ointment, Taro noted that it did not bid at

Omnicare because ████████████████

3290.    By January 2014, Sandoz held a ███████████████ which included a

presentation on ████████████████████████ The presentation contained a

slide titled, ████████████████████ which included Taro, and identified the Lidocaine

Ointment launch as a key launch for Taro. Sandoz described Taro's ████████████

████ as a ███████████████████████

3291.    Throughout 2014, Sandoz was careful not to disrupt the market balance it had

achieved with Taro and Hi-Tech with regard to Lidocaine Ointment. For example, in March 2014

Sandoz created a list of products to target at Wal-Mart in 2014. With regard to Lidocaine Ointment,

CW-3 responded that Sandoz had ████████████████████████████████

████████████████████████████████████████

███████████

### 41.    Metformin ER

3292.    During the relevant time period, Actavis, Amneal, Lupin, Sun, and Teva dominated

the market for Metformin ER tablets.

3293.    The market for Metformin ER was mature and at all relevant times had multiple

manufacturers.

3294.    For years, the prices for Metformin ER were relatively low, stable, and declining. In

the summer of 2015, Actavis and Lupin began to impose large price increases. Lupin increased

prices more than 300% and Actavis increased prices about 250%.

3295.    Between August 2015 and January 2016, Amneal, Sun, and Teva also each supported

Actavis' and Lupin's price increase by following it themselves and by refraining from adding market

share beyond each Defendant's "fair share" of the market.

3296.    Price data show steep and parallel price increases beginning in June 2015 by Actavis,

Amneal, Sun, Lupin, and Teva for Metformin ER tables.

3297.    Senior sales executives from each Defendant were in active contact with each other during the period in which they implemented the price increase, both by telephone and at trade shows and industry events.

3298.    For example, and as detailed in the phone records tables depicted throughout this Complaint, between July 2015 and February 2016, David Berthold of Lupin was in frequent contact with S.R. and S.R. (both of Amneal); and with Mark Falkin and T.G. of Actavis. Berthold communicated by telephone with Actavis's T.G., in June, July, and October 2015, and again in May, June, and July of 2016. Similarly, during this same time period, Ara Aprahamian (on behalf of Taro's corporate parent, Sun) was in frequent contact with S.R. (Amneal); Rick Rogerson, Mark Falkin, and M.D. of Actavis; and Nisha Patel of Teva.

### 42.    Methadone HCL

3299.    During the relevant time period, West-Ward and non-defendant Mallinckrodt were the primary manufacturers of Methadone HCL tablets.

3300.    The market for Methadone HCL tablets was mature and at all relevant times had multiple manufacturers.

3301.    For years, the prices for Methadone HCL tablets were relatively low and stable. Before the summer of 2014, West-Ward and Mallinckrodt sold Methadone HCL tablets for less than 10 cents per pill. However, in June 2014, West-Ward and Mallinckrodt significantly increased their WAC prices by approximately 200%.

3302.    Pricing data show steep and parallel price increases beginning in June 2014 by West-Ward and Mallinckrodt on Methadone HCL tablets.

3303.    Throughout this period, West-Ward and Mallinckrodt met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Methadone HCL tablets and their fair share agreement.

**REDACTED – PUBLIC VERSION**

3304.    For example, D.S., West-Ward's Senior Director and Head of Sales, and K.K.,

Mallinckrodt's National Account Director, both attended a February 2014 ECRM event at the Omni

Amelia Island Plantation Resort in Amelia Island, Florida. They spoke by phone on May 15, 2014,

and attended the August 2014 NACDS Total Store Expo in Boston. Upon information and belief,

K.K. and D.S. agreed that West-Ward would lead the price increase and Mallinckrodt would follow

it.

3305.    Approximately one month after the NACDS meeting, West-Ward announced WAC

price increases for Methadone HCL tablets. A few weeks later, Mallinckrodt matched West-Ward's

WAC prices.

### 43.    Methylphenidate

3306.    During the relevant time period, Actavis, Sandoz, non-defendant Mallinckrodt, Sun,

Impax (through a predecessor entity Corepharma), and Par were the primary manufacturers of

Methylphenidate.

3307.    The market for Methylphenidate tablets was mature and at all relevant times had

multiple manufacturers.

3308.    For years, the prices of Methylphenidate tablets were relatively low and stable.

3309.    As of November 2012, there were three competitors in the Methylphenidate IR

market – Mallinckrodt with 43% share, Watson (Actavis) with 37%, and Sandoz with 16%. For

Methylphenidate ER, there were only two competitors – Mallinckrodt with 54% share and Sandoz

with 16%.

3310.    On February 13, 2013, L.J., a Sandoz sales executive, sent an internal e-mail stating

that he had heard that Mallinckrodt was experiencing supply issues on Methylphenidate. Further,

L.J. requested the following:



3311.   A few minutes later, D.P., a senior Sandoz sales executive, forwarded L.J.'s email to his sales team, including to CW-3, asking ███████████████████████████████

███████████████████

3312.   That same day, on February 13, 2013, CW-3 called K.K., a senior Mallinckrodt sales executive, and they spoke for sixteen (16) minutes. Immediately upon hanging up, CW-3 called Defendant Aprahamian, then a sales executive at Actavis, and they spoke for sixteen (16) We need to get customer intel on the following important questions: 1) When will Mallinckrodt be back in the market for Methylphenidate SR and IR? Previously we heard June 2013. 2) What caused Mallinckrodt to leave the market? 3) Specifically on Methylphenidate IR, where Watson is also present, will Watson be able to take some of Mallinckrodt's share? minutes. A few hours later, CW-3 called D.P. of Sandoz to report back what he had learned. That call lasted ten (10) minutes.

3313.   Later that day, CW-3 also sent the following e-mail conveying the information he had obtained from his competitors:



3314.   As was his customary practice, CW-3 stated that the sources of his information were

his [REDACTED] to keep out of writing the fact that he obtained the information directly from his

competitors – Mallinckrodt and Actavis (Watson). But CW-3's superiors were aware that the

information was coming directly from Mallinckrodt and Actavis, not a customer.

3315.   Having confirmed Mallinckrodt's supply issues – and the fact that the market share

leader would be out of the market for a period of time – Sandoz immediately set to work on

implementing a price increase on Methylphenidate.

3316.   Indeed, less than one week later, on February 19, 2013, Sandoz prepared a price

increase analysis for Methylphenidate to send to the Pricing Committee for approval. In the analysis,

Sandoz noted that Mallinckrodt had a [REDACTED] and recommended increasing price

by 340% on Methylphenidate IR and 125% on Methylphenidate ER. Sandoz estimated that these

increases would result in the accrual of an additional $12.9 to $36.0 million in profits.

3317.    On March 1, 2013, CW-3 of Sandoz exchanged at least nine (9) text messages with Defendant Kaczmarek, then a senior executive at Mallinckrodt. Through those text messages, the competitors discussed Sandoz's price increase on Methylphenidate and specific customer accounts. During these conversations, CW-3 took the following contemporaneous notes in his Notebook:



3318.    Further, in the days leading up to the Sandoz price increase on Methylphenidate, CW-3 exchanged at least twenty-three (23) calls and text messages with Kaczmarek and K.K. These communications are listed in the chart below:

**REDACTED – PUBLIC VERSION**

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/4/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 12:08:02 | 0:00:00 |
| 3/4/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 12:08:35 | 0:03:14 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 12:50:02 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 15:25:08 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 15:25:40 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 16:50:58 | 0:00:00 |
| 3/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 17:27:43 | 0:01:02 |
| 3/6/2013 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (Mallinckrodt) | 6:53:00 | 0:01:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Outgoing | CW-3 (Sandoz) | 8:06:00 | 0:01:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Incoming | CW-3 (Sandoz) | 8:20:00 | 0:03:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Incoming | CW-3 (Sandoz) | 8:23:00 | 0:02:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 17:46:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:08:09 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:08:43 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:10:26 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:11:07 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:11:55 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:12:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:15:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:17:06 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:18:30 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:20:17 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:21:08 | 0:00:00 |

3319.   During this same time period, CW-3 was also in frequent contact with Defendant

Aprahamian at Actavis, as detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:05:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:07:00 | 0:11:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 10:50:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 15:49:40 | 0:00:23 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:20:06 | 0:00:30 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:27:00 | 0:04:00 |

3320.   After this series of communications with both Mallinckrodt and Actavis, on March 8,

2013, Sandoz followed through with its plans and increased WAC pricing on Methylphenidate IR

between 293% and 449%, depending on the formulation, and on Methylphenidate ER by 125%.

3321.   Three days later, on March 11, 2013, Aprahamian of Actavis called Defendant

Perfetto, at that point a senior executive at Taro, and they spoke for fifty-four (54) minutes. The two

competitors would exchange two more calls that day lasting one (1) minute and three (3) minutes. Immediately upon hanging up with Perfetto, Aprahamian called CW-3 of Sandoz. The call lasted one (1) minute. A few minutes later, Aprahamian called CW-3 again and they spoke for five (5) minutes.

3322.    The next day, on March 12, 2013, Perfetto e-mailed J.K., a senior Taro executive, and G.S., a senior executive at Taro's parent company, Sun, regarding Methylphenidate stating:



3323.    Perfetto's reference to "Mutual" was to one of Taro's sister companies, which was also a subsidiary of Sun. When G.S. of Sun expressed some confusion over what product Perfetto was referring to, he sent the following e-mail to clarify:



3324.   G.S. responded that Methylphenidate was a ▮▮▮▮▮▮▮▮ for Sun and the company was working as quickly as possible to bring it to market.

3325.   Between March 13 and April 2, 2013, CW-3 of Sandoz and Defendant Kaczmarek exchanged at least twenty-nine (29) text messages. During that same time period, CW-3 was also communicating frequently with his contact at Actavis, Aprahamian, who was also in the process of transitioning to a position at Taro (his first day at Taro was March 18, 2013, but he continued to speak frequently with Actavis colleagues after his departure). Those calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 11:42:00 | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 8:07:00 | 0:16:00 |
| 3/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 11:28:00 | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 14:44:00 | 0:01:00 |
| 3/21/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:33:00 | 0:01:00 |
| 3/21/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:34:00 | 0:12:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 8:31:00 | 0:01:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Incoming | CW-3 (Sandoz) | 12:36:00 | 0:18:00 |
| 3/25/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:26:00 | 0:01:00 |

3326.   During his calls with Aprahamian on April 2, 2013, CW-3 took the following contemporaneous notes in his Notebook regarding Methylphenidate:



3327.   Notably, as of April 2, 2013, Actavis had not yet published increased WAC pricing for Methylphenidate IR and would not do so for another several weeks.

3328.    Between April 20 and April 23, 2013, the NACDS held its annual meeting in Palm

Beach, Florida. Representatives from Sandoz, Mallinckrodt, Actavis, Sun, and Taro were all in

attendance. These included senior executives -- D.P. of Sandoz, Defendant Kaczmarek of

Mallinckrodt, G.S. of Sun, and Defendant Perfetto and J.K. of Taro.

3329.    The day after the NACDS annual meeting had concluded, on April 24, 2013, Actavis

published increased WAC pricing for Methylphenidate IR that matched Sandoz's WAC pricing. Two

days later, on April 26, 2013, Sun entered the Methylphenidate IR market and matched its

competitors' WAC pricing. And, one week later, on May 1, 2013, Mallinckrodt reentered the market

and matched competitor WAC pricing on both formulations. That same day, Kaczmarek sent a text

message to CW-3 of Sandoz.

3330.    The day after Mallinckrodt announced that its supply disruption had been resolved,

K.K. – a national accounts director at Mallinckrodt – spoke by phone with CW-3, his former

colleague from Sandoz. Upon information and belief, the purpose of this call was to determine

which customers that Sandoz would concede to Mallinckrodt so that it could regain its market share.

3331.    And that is just what happened. In August 2013, CW-2 and Armando Kellum – both

of Sandoz – acknowledged conceding a large customer ██████████████████████

███████████████ upon reentry into the market.

3332.    In late 2014, Sun's market share was well below what it determined would be its fair

share of 17% in what was then a five-manufacturer market. S.K. and G.S. of Sun then coordinated

with the other Defendants to arrange for Sun to increase its market share on Methylphenidate.

3333.    In 2014 and 2015, Impax and Par entered the Methylphenidate market. Rather than

offer

3334.    In March 2013, Mallinckrodt experienced supply disruptions. Although Mallinckrodt

informed the market that it expected to have the supply disruptions resolved by May or June—and

they, in fact, were resolved in that time frame—Sandoz, Sun, Mallinckrodt, and Actavis used this shortage as an excuse to hike prices and to keep them high.

3335.   Impax and Par, which joined the market later, chose not to offer lower prices to win market share, both . Instead, both eentered at the same inflated prices of Sandoz, Sun, Mallinckrodt, and Actavis. Impax announced identical list prices to the incumbent manufacturers, and although Par announced lower list prices, both Impax and Par NSP prices closely tracked the inflated prices of the other manufacturers.

3336.   As Mallinckrodt's supply challenges became known in early 2013, Sandoz held an internal meeting about the market opportunity. Rather than focus on winning over Mallinckrodt's customers—who all would be looking for a new supplier—Sandoz focused on raising prices.

3337.   Between March 1, 2013, and March 8, 2013, CW-3 (a senior sales executive at Sandoz) and Walt Kaczmarek (a Vice President of Mallinckrodt) spoke by phone four times and exchanged. Following their fourth call of the week on March 8, 2013, Sandoz announced that it was raising its prices on Methylphenidate by 400%.

3338.   Following Sandoz's announcement, T.G., a Director of National Accounts at Watson (later Actavis) spoke with D.P., the VP of Generic Sales of Sandoz for more than 20 minutes on April 21, 2013. Upon information and belief, T.G. confirmed to D.P. that Actavis would follow Sandoz's price increase.

3339.   Two days after the call between T.G. and D.P., S.K. of Sun reported to her superior that Actavis/Watson would raise price effective May 25 (even though Actavis had not yet announced a price increase) and that Mallinckrodt would follow this price increase when it resolved its supply issue.

3340.   Sure enough, on April 25, 2013, Actavis/Watson announced that it was matching Sandoz's 400% price increase.

3341.   Less than a week later, Mallinckrodt sought to re-enter the market and regain the share that it had forfeited during the period of its claimed supply disruption – which lasted just two months. Despite selling the product at competitive levels in February 2013, Mallinckrodt reentered the market at the elevated price set by Sandoz and Actavis.

3342.   The day after Mallinckrodt announced that its supply disruption had been resolved, K.K. – a national accounts director at Mallinckrodt – spoke by phone with CW-3, his former colleague from Sandoz. Upon information and belief, the purpose of this call was to determine which customers that Sandoz would concede to Mallinckrodt so that it could regain its market share.

3343.   And that is just what happened. In August 2013, CW-2 and Armando Kellum – both of Sandoz – acknowledged conceding a large customer ███████████████████████ ███████████████ upon reentry into the market.

3344.   In late 2014, Sun's market share was well below what it determined would be its fair share of 17% in what was then a five-manufacturer market. S.K. and G.S. of Sun then coordinated with the other Defendants to arrange for Sun to increase its market share on Methylphenidate.

3345.   In 2014 and 2015, Impax and Par entered the Methylphenidate market. Rather than offer lower prices to win market share, both entered at the same inflated prices of Sandoz, Sun, Mallinckrodt, and Actavis. Impax announced identical list prices to the incumbent manufacturers, and although Par announced lower list prices, both Impax and Par NSP prices closely tracked the inflated prices of the other manufacturers.

3346.   Consistent with the overarching fair share agreement, Impax and Par communicated with the existing manufacturers to arrange for the seamless transfer of a "fair share" of the market without disrupting the price. For example, J.M., Sun's Manager of National Accounts, spoke with G.B. and K.O. – both senior sales executives at Par – to coordinate Par's entry into the market and arrange for Par to receive fair share in mid-2015.

### 44.     Methylprednisolone

3347.    During the relevant time period, Sandoz, Par, Greenstone, Breckenridge, and Cadista were the primary manufacturers of Methylprednisolone.

3348.    The market for Methylprednisolone 4 mg tablets was mature and at all relevant times had multiple manufacturers.

3349.    For years, the prices of Methylprednisolone were relatively low and stable. In early 2011, Methylprednisolone cost just a few cents per tablet. For example, Cadista sold packages of 21 4 mg tablets for 85 cents each. Between March and June 2011, however, Defendants colluded to implement a massive price increase.

3350.    When some manufacturers had supply disruptions, all manufacturers used it as pretext to increase prices. Although the supply disruption—which in any event did not impact all manufacturers—was resolved in few months, prices never returned to the prior, lower levels.

3351.    Cadista and Sandoz both raised their prices by more than 2000%. For example, the same 21 tablet package that Cadista sold for 85 cents in March cost more than $19.00 by June. Sandoz concurrently imposed the same price increase as Cadista. Although Par and Breckenridge did not announce identical WAC prices, they followed the actual (NSP) prices of the others.

3352.    Qualitest – which was obligated by contractual price protections to maintain its current prices for large customers – complied with the fair share agreement by declining to supply Cadista's and Sandoz's customers. As Qualitest's contractual price obligations for Methylprednisolone phased out, Qualitest also raised its prices in accordance with Sandoz and Cadista.

3353.    Between October 2011 and October 2012, Greenstone and Breckenridge entered the market for Methylprednisolone. Consistent with the fair share agreement, Greenstone and Breckenridge communicated with the other Defendants and confirmed their intentions to enter the

market at the elevated price. For example, in September 2011, D.N., the Director of Sales at Breckenridge, exchanged text messages with G.B., Par's Vice President of National Accounts, both before (August 14) and after (November 14) Breckenridge's entry.

3354.   Similarly, as Greenstone entered the market and ramped up from the spring to the fall of 2012, R.H., a Director of National Accounts at Greenstone, communicated by telephone with M.S., Breckenridge Vice President of Sales, in February and again in November.

3355.   In return, Cadista, Qualitest, and Sandoz conceded market share to the new entrants so that they could receive their "fair share."

3356.   In response to this price increase, customers pushed back on the Defendants to lower their pricing on Methylprednisolone. For example, Walgreens – who was supplied by Cadista – solicited Sandoz to submit a bid in December 2012. Upon learning that Walgreens was soliciting bids, Richard Tremonte, the Vice President of Sales & Marketing at Sandoz, instructed his sales associate that ███████████████████████████████████████████████ ████████████████████████████████ Of course, the ██████ was the collusion between the competitors that led to the price increase in the first place, which Tremonte was unwilling to put in writing. Tremonte confirmed this instruction with Armando Kellum of Sandoz.

3357.   Walgreens continued to seek a lower price on Methylprednisolone in 2013. In September 2013, Kellum of Sandoz intervened again to prevent a sales associate from bidding on the large account, which still belonged to Cadista. Upon learning that a sales executive was working on a bid for Walgreens for Methylprednisolone, Kellum instructed Dave Picard: ███████████ ███████████████████████████████████████████████████ ███████████ Upon learning of Kellum's concern, the sales associate then confirmed to Kellum that he would ████████████████████████████████████ which was a lie. Kellum then pushed harder, admonishing his subordinate: ████████████████████████

3358.   Qualitest and Endo also openly acknowledged in a 2013 internal quarterly business review prepared in July 2013, that they had ███████████████████████████████ ████████████ which had resulted in a $600,000 credit above what Qualitest and Endo had budgeted to sell for Methylprednisolone in the second quarter, notwithstanding the loss of some accounts.

3359.   In September 2013, S.G. of Sandoz wrote to Walgreens about the possibility of picking up additional market share. Kellum quickly followed up with S.G., asking ██████████ ████████████████████████████ S.G. responded, █████████████████████ ██████████████████████████ Kellum admonished, consistent with the fair share agreement between Sandoz and Cadista (and the other manufacturers), ████████████ ████████████████████████████████████████████████████ ████████████████████████ S.G. confirmed to Kellum that Sandoz will ████████ ██████████████

3360.   As a result of these collusive communications and each Defendants' adherence to the fair share agreement, the price increase on Methylprednisolone stuck, and Defendants have been able to sell the drug at supracompetitive levels ever since. Indeed, in August 2012, roughly a year after the initial Methylprednisolone price increase, Kellum of Sandoz conducted an analysis to determine how likely its price increases were to ████████ He determined that, of the 54 products for which Sandoz had increased prices between 2010 and July 2012, the price increases had failed on only two occasions – a success rate of better than 96%.

### 45.   Metronidazole

3361.   At all relevant times, G&W, Heritage, Impax, Sandoz, Teva, and Valeant dominated the market for Metronidazole. Heritage entered the market for Metronidazole in May 2013.

REDACTED – PUBLIC VERSION

3362.    G&W, Sandoz, and Teva conspired to increase the price of Metronidazole cream. Throughout the period, G&W, Sandoz, and Teva had ample opportunity to discuss and coordinate pricing of Metronidazole cream at various trade association and industry events including (i) the August 30-21, 2010 NACDS Pharmacy and Technology Conference in San Diego, California; (ii) the August 27-30, 2011 NACDS Pharmacy and Technology Conference in Boston, Mass. (iii) the April 24-27, 2012 NACDS Annual Meeting; (iv) the February 20-22, 2012 GPhA Annual Meeting in Orlando, Florida; (v) the December 3, 2014 NACDS Foundation and Reception Dinner in New York, N.Y.; and (vi) the April 25-28, 2015 NACDS Annual Meeting in Florida.

3363.    G&W, Impax, Sandoz, and Teva conspired to increase the price of Metronidazole jelly. The Metronidazole jelly price increase occurred shortly after trade association meetings where representatives from G&W, Impax, Sandoz, and Teva were in attendance, such as: (i) April -May 2011 NACDS Annual Meeting; (ii) August 27-30, 2011 NACDS Pharmacy and Technology Conference in Boston; (iii) April 24-27, 2012 NACDS Annual Meeting; and (iv) August 2012 NACDS Pharmacy and Technology Conference.

3364.    Sandoz and Teva conspired to increase the price of Metronidazole lotion. The Metronidazole lotion price increase occurred shortly after trade association meetings where representatives from Sandoz and Teva were in attendance such as: (i) August 30-31, 2010 NACDS Pharmacy and Technology Conference in San Diego; (ii) August 27-30, 2011 NACDS Pharmacy and Technology Conference in Boston; (iii) April 24-27, 2012 NACDS Annual Meeting; (iv) February 20-22, 2012 GPhA Annual Meeting in Orlando, Florida; (v) December 3, 2014 NACDS Foundation and Reception Dinner in New York; and (vi) the April 25-28, 2015 NACDS Annual Meeting in Florida.

3365.    Sandoz and Valeant conspired to increase the price of Metronidazole vaginal. Valeant manufactures a branded metronidazole gel under the name MetroGel vaginal.

REDACTED – PUBLIC VERSION

3366.   The Metronidazole vaginal price increase occurred shortly after trade association meetings where representatives from Sandoz and Valeant were in attendance such as: (i) June 2014 HDMA Business and Leadership Conference; (ii) December 3, 2014, NACDS Foundation and Reception Dinner in New York, New York; and (iii) April 2015 NACDS Annual Meeting.

3367.   Notably, the Metronidazole vaginal price increase occurred around the same time Valeant was also dramatically increasing prices of numerous other drugs. At the end of 2012, Valeant acquired Medicis, which originally manufactured brand MetroGel vaginal, and proceeded to engage in a series of price increases on MetroGel vaginal in 2013 and 2014. Such price increases are a well-known business strategy of Valeant.[69] Valeant was among the generic manufacturers that received a letter as part of the Congressional investigation into generic price increases.

### 46.   Naproxen Sodium

3368.   During the relevant time period, Glenmark and Amneal were the primary manufacturers of Naproxen Sodium tablets.

3369.   The market for Naproxen Sodium tablets was mature and at all relevant times had multiple manufacturers.

3370.   For years, the prices for Naproxen Sodium tablets were relatively low and stable. Prior to 2015, Naproxen Sodium cost pennies per tablet. However, in March 2015, Amneal and Glenmark imposed abrupt and substantial price increases of more than 1000%.

3371.   Price data show steep and parallel price increases beginning in January 2015 by Glenmark and Amneal for Naproxen Sodium tables.

3372.   Amneal and Glenmark communicated directly with each other in furtherance of the conspiracy. For example, Jim Brown of Glenmark (the VP of Sales) and Stephen Rutledge of

---

[69] *See* Sanders and Cummings Press Release (asking Valeant why prices of drugs increased when the only change in the drugs is "the company that owns them").

Amneal (the Senior Director of Sales) frequently communicated during the period when Glenmark and Amneal raised and maintained the prices of Naproxen Sodium. The two executives communicated by phone multiple times per month in every month of 2015 – including before and after their respective price increases – which allowed the companies to increase prices and maintain the fair share rules.

3373.   As a result of this collusion, Defendants charged supracompetitive pricing on Naproxen Sodium to Plaintiffs and others in the United States.

### 47.   Neomycin Polymyxin Hydrocortisone

3374.   Neomycin Polymyxin Hydrocortisone is a topical antibiotic used to treat outer ear infections caused by bacteria. It is available in several forms, including a Solution and has been available in the United States for over a decade in a generic form.

3375.   The market for Neomycin Polymyxin Hydrocortisone Solution (3.5mg-10MU 1%) is mature. At all relevant times, there have been multiple manufacturers.

3376.   Valeant and Sandoz dominate sales of Neomycin Polymyxin Hydrocortisone with about a 70/30 split of the market in the relevant times.

3377.   For several years, the price was relatively stable.  Prices began to rise in Spring 2010 with Valeant and Sandoz coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

3378.   The ability of Valeant and Sandoz to reach agreements on Neomycin Polymyxin Hydrocortisone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3379.   The parallel price increases by Valeant and Sandoz are consistent with the Fair Share Agreement.

3380.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

3381.   The agreement between Valeant and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Neomycin Polymyxin Hydrocortisone Solution (3.5mg-10MU 1%).

### 48.   Nystatin Triamcinolone cream and ointment

3382.   Nystatin Triamcinolone is a steroid medication used to treat fungal infections.  It comes in a Cream and Ointment formulation, among others.

3383.   It has been available in the United States in a generic form for several years.

3384.   During the relevant time frame, Taro, Sandoz, and Teva were the primary manufacturers of Nystatin Triamcinolone.

3385.   Prior to certain Defendants launching Nystatin Triamcinolone, Taro, Sandoz, and Teva engaged in conversations about their launch.  These conversations involved discussions of market and customer allocations.

3386.   The ability of Taro, Sandoz, and Teva to reach agreements on Nystatin Triamcinolone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3387.   The coordination by Taro, Sandoz, and Teva is consistent with the Fair Share Agreement.

3388.   The agreement between Taro, Sandoz, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Nystatin Triamcinolone Cream and Ointment.

3389.

### 49.    Oxycodone Acetaminophen

3390.    During the relevant timeframe, Actavis, Alvogen, Amneal, Aurobindo, non-defendant Mallinckrodt, Mayne, and Par were the primary manufacturers of Oxycodone Acetaminophen.

3391.    The market for Oxycodone Acetaminophen, sometimes abbreviated "Oxy/Apap," was mature and at all relevant times had multiple manufacturers.

3392.    During the time period relevant to this Complaint, Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, Mayne, and Par dominated the market for Oxycodone Acetaminophen. Given the large number of competitors that entered the market for the drug between 2011 and 2015, pricing for Oxycodone Acetaminophen should have fallen substantially over time. Instead, the opposite occurred. For example, by December 2013, Mallinckrodt, Actavis, Alvogen, Amneal and Par all sold 100-tablet bottles of 10/325 mg pills that had cost roughly $18 per bottle throughout 2011 and 2012 for more than $80.

3393.    In the summer of 2013, market prices increased greatly. In the space of less than two months, Mallinckrodt, Alvogen, Amneal, and Actavis more than doubled their NSP prices. Around the same time, Aurobindo and Par re-entered the market. Rather than offer lower prices to win market share, they each entered at even higher prices than had been imposed by Mallinckrodt, Alvogen, Amneal, and Actavis.

3394.    Despite these price increases, each manufacturer's share of the market remained relatively stable, as contemplated by the fair share agreement.

3395.    Pricing data show steep and parallel price increases beginning in August 2013 by Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, and Par for Oxycodone Acetaminophen.

3396.   Throughout this period, Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, and Par met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Oxycodone Acetaminophen and their fair share agreement.

3397.   Although the Defendants did not increase prices on the drug until late 2013, Defendants ensured that the fair share agreement applied as new competitors entered the market. For example, Alvogen received approval to launch Oxy/Apap in July 2012. Upon learning that Alvogen was entering the market for Oxy/Apap, Dr. Reddy's – which did not manufacture the drug – reached out to W.H., Alvogen's EVP of US Commercial Sales, to congratulate him on the approval. W.H. responded that Alvogen's entry "should be a fun ride. We're just trying to find the right spots to fill some holes in the market." In other words, Hill confirmed to a Defendant that did not manufacture the drug that Alvogen was complying with the overarching agreement by not seeking any more than its "fair share" of the market.

3398.   Between July and December 2013, Defendants coordinated to more than quadruple their prices on Oxy/Apap. Mallinckrodt led the price increase, and Actavis, Alvogen, Amneal, and Qualitest quickly followed. Upon information and belief, the campaign to increase prices on the drug was spearheaded by Actavis and Mallinckrodt. Between July 2013 and December 2013, Marc Falkin of Actavis spoke with W.H., Alvogen's EVP of US Commercial Sales; S.R., VP of Sales at Amneal; R.C., the CEO of Aurobindo; and Walt Kaczmarek, Vice President and General Manager at Mallinckrodt. W.H. (Alvogen) and S.R. (Amneal) also coordinated with Aurobindo and Actavis, respectively, during this timeframe. Additionally, Falkin spoke with C.P. of Qualitest at least 10 times between May 2 and May 19, 2014.

3399.   On November 19, 2013, Qualitest received an inquiry from Econdisc to bid for Oxycodone Acetaminophen. Upon learning that the RFP was requested due to a price increase from the incumbent supplier. Qualitest and Endo declined to bid for this business based on its

commitment to the fair share rules. Further, although sales executives from Qualitest participated in the collusion, this was done on Endo's behalf, as it was Endo that held the ANDA for the drug. And following the acquisition of Par by Endo in May 2015, sales executives from Par began to sell Oxycodone Acetaminophen on behalf of Endo as well, adhering to the collusive pricing set before the acquisition, and continuing to abide by the fair share rules.

3400. As a Teva sales executive reported internally in a November 26, 2013 e-mail to T.C., K.G., Rekenthaler, Patel, and others, "Mallinkrodt [sic] recently took a price increase on Acetaminophen/Oxycodone; Actavis is planning to take a price increase." This information proved accurate, as Actavis followed Mallinckrodt's price increase just a few days later. Notably, T.C. of Teva had spoken with W.P. of Qualitest a number of times in the weeks prior to this exchange. Although Teva did not manufacture Oxycodone Acetaminophen, it did manufacture Codeine/Acetaminophen, which is prescribed for similar uses. Reflecting the overarching nature of the conspiracy, Teva therefore communicated with competitors about drugs that it did not manufacture, because it did make drugs that could be substituted those drugs.

3401. Between September and December 2013—when Oxycodone prices were increasing—Actavis's Falkin communicated by telephone with Par (multiple calls in September with J.H., Par Regional VP of Sales), Alvogen (multiple calls in October and November with B.H., Alvogen EVP of Sales), Amneal (voice and text in October with S.R., Amneal VP of Sales) and Aurobindo (communications in November and December with R.C., Aurobindo CEO).

3402. While Falkin was communicating with the rest of the manufacturers, A.S., Actavis VP of Sales, and A.B., Senior VP of Sales and Marketing at Actavis, were communicating with W.K., VP and General Manager at Mallinckrodt, between September and December 2013. Actavis's A.B. also had multiple telephone communications during this period with S.R., Senior Director of Sales Finance at Amneal.

3403.    Alvogen's B.H. also communicated with Aurobindo's J.K., Director of National Accounts, in December 2013 and January 2014.

3404.    Mayne entered the market for Oxycodone Acetaminophen in late 2014. In planning for the launch, Stefan Cross, Mayne's President, encouraged his sales team to engage in "off-line discussions on tendering tactics" with competitors to determine which customers Mayne should target to receive its "fair share." Indeed, upon entry, Mayne received its "fair share" as the eighth entrant into the market without any disruption to price, in accordance with the overarching conspiracy.

3405.    As a result of these collusive communications, Defendants have been able to maintain Oxy/Apap at supracompetitive levels since July 2012.

### 50.    Oxycodone HCL oral solution and tablets

3406.    Oxycodone HCL is an opioid agonist indicated for the management of moderate to severe acute and chronic pain where the use of an opioid analgesic is appropriate. It is available in several forms, including Tablet and Oral Solution, and has been available in the United States for over a decade in generic form.

3407.    The market for Oxycodone HCL is mature. At all relevant times, there have been multiple manufacturers of Oxycodone HCL. Glenmark and Lannett dominated the market for Oxycodone HCL 20mg/ml Oral Solution with roughly an 80/20 split in the relevant times. Par and Teva, along with non-defendant Mallinckrodt dominated the market for Oxycodone HCL 15 mg and 30mg Tablets, with each holding at the relevant times roughly 30% shares of the market in the relevant times.

3408.    For several years, the price for Oxycodone HCL Oral Solution was relatively stable. Prices began to rise in the spring of 2010 with Glenmark and Lannett coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

3409.   Glenmark and Lannett's prices remained elevated for many years.

3410.   The ability of Glenmark and Lannett to reach agreements on Oxycodone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3411.   The parallel price increases by Glenmark and Lannett are consistent with the Fair Share Agreement.

3412.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

3413.   The agreement between Glenmark and Lannett was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Oxycodone HCL Oral Solution (20mg/ml).

3414.   Similarly, for several years, the price of 15 mg and 30 mg Oxymorphone Tablets remained relatively stable. Prices began to rise in the fall of 2013 with Mallinckrodt, Par, and Teva coordinating their price increases and continuing to maintain supracompetitive pricing for multiple years.

3415.   The ability of Mallinckrodt, Par, and Teva to reach agreements on Oxycodone HCL Tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3416.   The parallel price increases by Mallinckrodt, Par, and Teva are consistent with the Fair Share Agreement.

3417.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

3418.   The agreement between Mallinckrodt,Par, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage

817

in market and customer allocation for generic drugs, including Oxycodone HCL Tablets (15 mg and 30 mg).

### 51.  Permethrin

3419.   During the relevant time period, Actavis, Perrigo, and Mylan were the primary manufacturers of Permethrin cream.

3420.   The market for Permethrin cream was mature and at all relevant times had multiple manufacturers.

3421.   Prior to 2010, Perrigo and Actavis sold Permethrin cream for pennies per dose. However, beginning in May 2010, senior executives from Actavis and Perrigo began coordinating to increase prices substantially. On May 27, 2010, M.D. of Actavis (the Director of National Accounts) spoke by phone with T.P. of Perrigo (the Director of National Accounts). Upon information and belief, the two executives reached an agreement to double their WAC prices for Permethrin by July 2010.

3422.   After successfully doubling their prices, M.D. (Mylan) and T.P. (Perrigo) began speaking again in August 2011 to discuss another price increase. The two spoke twice on August 5, and at least four times on August 8, 2011. Upon information and belief, these conversations resulted in an agreement that each company would increase their prices on Permethrin by at least an additional 200% (on top of the 2010 price increase).

3423.   In early 2013, Perrigo and Actavis learned that Mylan would be entering the market. As a result, M.D. (Mylan) and T.P. (Perrigo) spoke again on March 12, 14, and 18 to coordinate yet another price increase of approximately 100%, which Perrigo led by increasing its WAC prices on March 13. M.D. and T.P. then spoke again on April 11, in order to confirm their third successful price increase on Permethrin, which Actavis announced on April 25.

3424.    In June 2013, Mylan entered the market for Permethrin. Even though prices were more than 1000% higher than they had been in 2010, Mylan entered the market at higher prices than either Actavis or Perrigo, and announcing identical WAC prices. Pursuant to the fair share rules, Perrigo and Actavis conceded market share to Mylan.

3425.    To coordinate Mylan's entry and determine which customers Actavis and Perrigo would concede, Jim Nesta of Mylan and T.P. of Perrigo called each other nine times between August 27 and August 28, 2013. Nesta and T.P. then spoke again on November 15, 2013. T.P. also acted as the intermediary between Nesta and M.D. (Mylan), as he continued to speak with M.D. regularly about the Permethrin market, including multiple calls on August 21, August 23rd, September 6th, September 9th, and September 10th and once on September 11th, 2013.

3426.    As a result of this coordination between the three companies, Mylan, Actavis, and Perrigo were able to implement the fair share rules and maintain supracompetitive pricing on Permethrin cream that they sold to Plaintiffs and others in the United States.

3427.    For example, on May 27, 2010—around when Actavis and Perrigo first raised NSP prices—M.D., Actavis's Director of National Accounts spoke by telephone with T.P., Perrigo's Director of National Accounts for nearly 10 minutes.

3428.    The two spoke again the following summer. In late July 2011, Actavis announced a WAC price increase. Shortly thereafter, the Perrigo Director of National Accounts and the Actavis Director of National Accounts spoke for three minutes on August 3. Two days later, Perrigo announced an identical WAC price. That day, the Perrigo Director called the Actavis Director and appears to have left a message. A few days later, on August 8, they finally connected and spoke for nearly 9 minutes.

3429.   This conduct repeated in 2013. This time,. The next day, the Actavis and Perrigo Directors spoke for more than 10 minutes. They spoke again for nearly 25 minutes on April 12., Actavis announced WAC prices identical to those of Perrigo.

3430.   Before Mylan entered the market in late 2013, Mylan's Nesta and Perrigo's T.P. (Director of National Accounts) communicated. On August 27, the two executives exchanged messages but finally connected on the 28th and spoke for 10 minutes. They spoke again on November 15. Perrigo's Director of National Accounts again spoke to M.D., Director of National Accounts at Actavis on August 21, 23 and September 11, 2013.

### 52.   Perphenazine

3431.   During the relevant time period, Qualitest/Par and Sandoz were the primary manufacturers of Perphenazine.

3432.   The market for Perphenazine was mature and at all relevant times had multiple manufacturers.

3433.   In 2007 and 2008, Par and Sandoz sold Perphenazine tablets for less than 40 cents per unit. However, Qualitest left the market in 2009 due to a disruption in supply, and Sandoz dramatically increased prices. When Qualitest re-entered in the summer of 2009, rather than resume its formerly low pricing to compete with Sandoz to win back customers, it matched Sandoz's increased price.

3434.   The market shares of Qualitest and Sandoz are wholly reflective of each company's adherence to the fair share rules. As of May 2010, Qualitest had less than 14% market share, compared to Sandoz's 86.1% share of the market. Over the next year, Sandoz conceded approximately 20% market share to Qualitest, and by May 2011, Qualitest's share was more than 33% compared to 66% for Sandoz. But during this time, despite the fact that Qualitest increased its market share from 13% to 33%, prices charged by both companies remained virtually unchanged.

REDACTED – PUBLIC VERSION

3435.   Indeed, between May 2011 and May 2014, the respective market shares of Qualitest and Sandoz remained essentially fixed, with Par supply roughly one third of the market, and Sandoz supplying the remaining two thirds. As a result of their adherence to the fair share rules, the companies were able to increase prices twice (once in 2011 and again in 2013), and as a result, their average prices roughly doubles from the supracompetitive pricing establishing by Sandoz in 2009. And although executives from Qualitest and Sandoz did communicate regarding their pricing during this time, their adherence to the fair share rules rendered the price increases virtually self-executing. Because each company knew that the other was committed to the conspiracy, the communications about pricing were essentially a formality.

3436.   In mid-2014, the companies reallocated share to be more consistent with fair share rules, and Sandoz conceded additional share to Qualitest so that the two companies had market share close to 50%. Following this reallocation, Sandoz and Qualitest maintained market share within a few percentage points of 50% until at least the end of 2016.

### 53.   Pentoxifylline

3437.   Pentoxifylline, also known by the brand names Pentopak, Pentoxil, and TRENtal, is a medication used to reduce leg pain caused by poor blood circulation.

3438.   During the relevant time frame, Defendants Teva, Mylan, Apotex and Valeant were the primary manufacturers of Pentoxifylline.

3439.   The market for Pentoxifylline was mature and at all relevant times had multiple manufacturers.

3440.   In 2008 and 2009, Teva, Mylan and Apotex NSP unit prices for Pentoxifylline tablets were approximately 7 cents. Beginning at least as early as August 2009, these Defendants agreed to impose significant price increases.

3441.    When Apotex exited the market in late 2009, Mylan and Teva took the opportunity to raise prices significantly. NSP prices more than doubled. Consistent with their Fair Share agreement, Teva and Mylan achieved nearly an equal split of dollar sales during 2010 and most of 2011.

3442.    In October 2011, Apotex re-joined the market. Instead of competing for customers by lowering prices, as would be expected in a competitive generic market, the addition of another manufacturer had the opposite effect; all three manufactures increased prices. By early 2012, Pentoxifylline effective prices had nearly tripled over 2008 levels and remain elevated today.

3443.    The pattern repeated in October 2014 when Valeant entered the market. Teva, Mylan, and Apotex had led a price increase but Valeant was able to coordinate with these companies – through Purcell, Saharyan, and others – to obtain its fair share because the relationships existed between Valeant and the other conspirators to implement the fair share rules. Rather than offer lower prices to win customers, Valeant matched the market pricing of Teva, Mylan and Apotex.

3444.    Throughout this period, Teva, Mylan, Apotex and Valeant met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Pentoxifylline and their fair share agreement.

3445.    For example, during 2010 and 2011, when Teva and Mylan imposed price increases and split the market for Pentoxifylline, the contacts between the two manufacturers were extensive. For example, Teva's Rekenthaler was communicating by phone with Mylan employees at least as early as April 2010.  Rekenthaler communicated with J.K., Mylan Vice President and Executive Director of Sales in April and May 2010.  Rekenthaler also communicated frequently with Jim Nesta, Muylan Vice President of National Accounts, from 2012 until Rekenthaler left Teva in the spring of 2015.

3446.   Rekenthaler was not the only employee to cultivate relationships with Mylan.  R.C., a Teva Vice President of Sales, was, until he left Teva to become the CEO of Aurobindo, in contact with B.P., Mylan's Senior Vice President of National Accounts, as well as Nesta.

3447.   Similarly, in 2014 when Teva wanted to increase its prices for Pentoxifylline, it reached out to coordinate with Mylan and Apotex in the days and weeks leading up to the increase. For example, Teva's Rekenthaler spoke to J.H., a Senior Vice President and General Manager at Apotex, on March 20 for four (4) minutes and March 25, 2013 for two (2) minutes. Then, on the day that Teva imposed price increases, April 4, 2014, Rekenthaler spoke to Nesta of Mylan for six (6) minutes. A week after Teva increased its price – on April 11, 2014 – Rekenthaler followed-up with the SVP at Apotex and the two spoke again for five (5) minutes. During these calls, Rekenthaler gathered Apotex's pricing plans and conveyed them to his Teva colleague, Nisha Patel.

### 54.   Phenytoin Sodium

3448.   During the relevant time period, Mylan, Taro, Amneal, and Sun were the primary manufacturers of Phenytoin Sodium capsules.

3449.   The market for Phenytoin Sodium capsules was mature and at all relevant times had multiple manufacturers.

3450.   For years, the prices for Phenytoin Sodium capsules were relatively low and declining. Mylan, which had a dominant share of the market going back to at least January 2008, kept its NSP prices high, but as a result of its higher prices, Mylan saw its market share erode. Sun, Taro, and Amneal gained market share in the Phenytoin Sodium market. But once shares began to equalize into fair shares, these Defendants were ready to coordinate a price increase.

3451.   In 2014, Mylan, Taro, Amneal, and Sun decided to re-align prices at a much higher level. Price data show steep and parallel price increases beginning in March 2014 by Mylan, Taro, Amneal, and Sun for Phenytoin Sodium capsules.

3452.    Within the space of a few months, Mylan, Taro and Amneal announced price increases that brought their WAC prices to identical levels. The increases ranged from a little less than 200% to more than 300%, but all ended up at the same price.

3453.    Sun did not change its WAC price, but it did dramatically increase the prices it charged its customers. Sun's Phenytoin Sodium NSP prices increased approximately 300% between March 2014 and March 2015, alongside the prices of Taro and Amneal, and ending up higher than Mylan's prices.

3454.    In early April 2014, Taro began formulating its list of products for the June 2014 Increases. On April 3, 2014, Aprahamian exchanged an e-mail with A.S., a pricing executive at Taro, concerning Phenytoin Sodium pricing and, by April 7, 2014, Taro had added the product to its price increase list.

3455.    Three days later, on April 10, 2014, Aprahamian and M.A., a Mylan sales executive, exchanged two calls lasting two minutes and ten minutes, respectively. Notably, the competitors would not speak again by phone until June 4, 2014, one day after Taro increased its pricing on Phenytoin Sodium.

3456.    On April 16, 2014, Walgreens – an Amneal customer – e-mailed Taro asking for a bid on Phenytoin Sodium. After an internal discussion regarding market shares, Aprahamian responded on April 20, 2014 stating: ███████████████████████████████ ███████  On April 24, 2014, Walgreens also e-mailed Mylan, another competitor in the market, asking for a bid on the product.

3457.    Sun also indicated knowledge of the coordinated price increase. On April 21, 2014, W.F., Sun Senior Manager of National Accounts, informed a colleague: "No price increase yet on Phenytoin but I have heard one might be coming." Earlier that day, G.S., President of Sun,

communicated by telephone with Taro's M.P., Chief Commercial Officer. The two communicated by telephone again later that month, and in May, June, July, August and September 2014.

3458.   Between April 26 and 29, 2014, NACDS held its annual meeting in Scottsdale, Arizona. Key representatives from Taro, Mylan, Amneal, and Sun all attended the conference. The attendees included Aprahamian and Perfetto of Taro, Jim Nesta of Mylan, S.R., a pricing executive at Amneal, and G.S., a senior executive at Sun.

3459.   While attending the NACDS annual meeting, the competitors had numerous opportunities at various programming and social events to discuss Phenytoin Sodium, along with other products on which they competed. Indeed, between April 27 and April 29, Nesta of Mylan and S.R. of Amneal exchanged at least twenty-two phone calls and text messages. Further, on April 29, 2014, while still at the NACDS meeting, Aprahamian sent an e-mail to an administrative clerk at Taro, asking, █████████████████████████████████████████████████████

3460.   One month later, on May 29, 2014, the Pricing and Contracts ("P&C") team at Mylan generated a Daily Report listing the Mylan opportunity at Walgreens on Phenytoin Sodium. In the report, Mylan noted that it could supply in July 2014 and identified the product as ████████████████████████████ Notably, no generic manufacturer of Phenytoin Sodium had increased pricing yet, including Amneal.

3461.   In the days leading up to the generation of the P&C Report, Nesta and M.A., a sales executive at Mylan, both communicated multiple times with S.R. of Amneal. These communications are detailed in the chart below:

REDACTED – PUBLIC VERSION

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/27/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 18:44:13 | 0:02:56 |
| 5/28/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 12:14:56 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 15:55:15 | 0:00:14 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:08:45 | 0:00:06 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:09:19 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:20:50 | 0:00:15 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:36:27 | 0:01:23 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:53:02 | 0:05:37 |
| 5/29/2014 | Text | S.R. (Amneal) | Incoming | M.A. (Mylan) | 17:05:22 | 0:00:00 |

3462.   Ultimately, Mylan declined to bid on the Walgreens business, refusing to take the business away from its competitor, Amneal.

3463.   As detailed above, on June 2, 2014 Taro notified its customers that it would be increasing its prices on the June 2014 Increase products, including Phenytoin Sodium. That same day, S.R. of Amneal called both M.A. and Nesta several times. Over the next several days, all three competitors would exchange a number of calls. These are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:46:53 | 0:00:02 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 16:47:32 | 0:00:04 |
| 6/2/2014 | Voice | S.R. (Amneal) | Incoming | Nesta, Jim (Mylan) | 17:02:54 | 0:00:06 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:03:18 | 0:00:03 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:04:14 | 0:00:19 |
| 6/2/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:51:53 | 0:00:46 |
| 6/4/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 13:17:00 | 0:01:00 |
| 6/4/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:21:17 | 0:07:38 |
| 6/4/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 13:51:18 | 0:00:26 |
| 6/5/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:47:00 | 0:00:02 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Incoming | S.R. (Amneal) | 13:47:37 | 0:00:17 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:49:34 | 0:00:05 |
| 6/5/2014 | Text | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:50:12 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:15 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:41 | 0:03:34 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 6:56:00 | 0:02:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | S.R. (Amneal) | 6:57:00 | 0:07:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 12:41:00 | 0:09:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 9:02:00 | 0:04:00 |

3464.   On July 2, 2014, S.K., a sales executive at Sun, sent an internal e-mail advising G.S., a senior executive at Sun, and others, that Amneal had raised pricing on Phenytoin Sodium. However, Amneal would not publish its increased WAC pricing until several months later – on September 1, 2014.

3465.   In the days leading up to July 2, Taro, Mylan, and Amneal continued to communicate. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 12:11:00 | 0:01:00 |
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 13:04:00 | 0:09:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:29:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:35:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 12:19:00 | 0:11:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 10:52:00 | 0:02:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Incoming | S.R. (Amneal) | 11:17:00 | 0:06:00 |
| 7/1/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 6:15:00 | 0:09:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 11:11:00 | 0:04:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:15:00 | 0:06:00 |
| 7/2/2014 | Voice | M.A. (Mylan) | Outgoing | Aprahamian, Ara (Taro) | 11:18:00 | 0:02:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 11:20:00 | 0:04:00 |

3466.   On July 10, 2014, Wal-Mart e-mailed Mylan requesting a bid on Phenytoin Sodium because its incumbent supplier had increased its pricing. That same day, M.A. of Mylan called Aprahamian. The call lasted seven minutes. First thing the next morning, on July 11, 2014, Aprahamian called S.R. of Amneal. S.R. returned the call a few minutes later and they spoke for three minutes. Later that day, Courtney Wilson, a pricing executive at Mylan, sent an internal e-mail regarding the Wal-Mart opportunity stating: ██████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ (emphasis in original).

3467.   On July 14, 2014, Sun followed its competitors and increased pricing on Phenytoin Sodium. Similarly, Mylan followed suit on July 16, 2014, increasing its WAC pricing by 210% to match market pricing.

3468.   On July 31, 2014, Wal-Mart was still looking for a supplier for Phenytoin Sodium and reached out to Taro asking for a bid. E.G., a Taro sales executive, forwarded the request along internally, asking ███████████████ Although it was confirmed that Taro could, in fact, supply the customer, A.L., a Taro pricing executive, advised that E.G. respond to the Wal-Mart request as follows: ████████████████████████████████████████████████ ████████████████████████████████████ To that, Aprahamian replied to Likvornik separately stating – ██████████████████

3469.   One month later, on September 1, 2014, Amneal followed and matched its competitors' WAC pricing. Leading up to the increase, Mylan's Nesta was in touch with A.L., Amneal's Director of Pricing, in June, August and September 2014.

3470.   These Defendants continued to abide by the fair share agreement well after the price increases became effective. For example, in July 2015, Taro chose not to bid on Phenytoin Sodium Capsules for a customer "due to Taro having enough market share." In August 2015, Taro again declined an opportunity because "we have our share."

### 55.   Pilocarpine HCL

3471.   During the relevant time period, Lannett, Actavis, and Impax were the primary manufacturers of Pilocarpine HCL tablets.

3472.   The market for Pilocarpine HCL tablets was mature and at all relevant times had multiple manufacturers.

3473.   Prior to 2014, Pilocarpine tablets cost pennies per dose. However, when Impax claimed to suffer a brief disruption in supply in late 2013, Lannett and Actavis conspired to increase

prices by approximately 200% in March 2014. When Impax re-entered the market in the fall of 2015, it matched or exceeded the prices offered by Actavis and Lannett, but was still able to recover its fair share of the market (because Actavis and Lannett conceded this share back to Impax pursuant to the fair share rules).

3474.   Senior sales executives from Actavis, Lannett and Impax communicated directly with each other in furtherance of the conspiracy. For example, Falkin of Actavis spoke with K.S. of Lannett on November 10th, 22nd and 25th, and December 12th and 13th of 2013, while the two companies were determining what to do in response to Impax's claimed supply disruption. They spoke again on January 17, 2014, twice on February 20th and once on February 27th, just weeks before the two companies imposed their price increases. Likewise, Falkin and M.G. of Impax spoke on November 11, 2013. K.S. of Lannett and D.D. of Impax also spoke once January 15, 2014. Upon information and belief, during these calls, Defendants promised to follow Lannett's price increase and to abide by the fair share rules upon Impax's reentry into the market.

3475.   Pricing data show steep and parallel price increases beginning in January 2014 by Lannett and Actavis for Pilocarpine HCL tables, with Impax joining the price increases when it re-entered the market.

3476.   Throughout this period, Lannett, Actavis, and Impax met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Pilocarpine HCL and their fair share agreement.

3477.   As a result of this coordination, Defendants were able to charge supracompetitive prices on Pilocarpine HCL to Plaintiffs and others in the United States.

### 56.   Potassium Chloride

3478.   During the relevant time period, Upsher-Smith, Sandoz, Actavis, Zydus, and Mylan were the primary manufacturers of Potassium Chloride 8 MEQ, 10 MEQ and 20 MEQ tablets.

3479.   The market for Potassium Chloride tablets was mature and at all relevant times had multiple manufacturers.

3480.   For years, the prices of Potassium Chloride tablets were relatively low and stable. Upsher-Smith, Sandoz, and Actavis were the dominant suppliers in the market in the early years. Upsher-Smith manufactured tablets and marketed and sold them under the brand name KlorCon. Upsher-Smith also supplied tablets to Sandoz, which in turn marketed and sold them under a Sandoz label.

3481.   In the summer of 2010, Upsher-Smith, Sandoz, and Actavis imposed nearly simultaneous and very large price increases. In the space of approximately six weeks, all three manufacturers tripled their WAC prices. Their NSP prices quadrupled.  For example, bottles of 100 tablets of 8 MEQ dosage strength that sold for less than $7.00 at the end of July 2010 increased to more than $42.00 by mid-August.

3482.   Upon information and belief, this price increase was agreed upon during telephone calls between K.K., the Director of Contracts and Pricing at Sandoz, and D.Z., the Senior National Accounts Manager at Upsher-Smith, who spoke several times in August 2010, including before and after price increase. Additionally, representatives of each of the three companies met at trade shows and other industry events throughout Summer 2010.

3483.   In June 2011, Zydus entered the market. Rather than offer better prices to win market share, Zydus entered at the high prices of Upsher-Smith, Sandoz, and Actavis. Prior to Zydus' entry, Kristy Ronco – the company's Associate Vice President of National Accounts – communicated frequently with CW-4 of Sandoz. The purpose of these communications was to determine which accounts Zydus would add in order for the company to receive its "fair share" of the market. In exchange for Zydus' support of the supracompetitive conspiracy pricing for Potassium Chloride, Actavis, Sandoz, and Upsher-Smith each conceded market share to Zydus.

3484.    As of July 1, 2014, Upsher-Smith ceased to market and sell Klor-Con under the Upsher-Smith label, but instead licensed the Klor-Con name to Sandoz. Thus, after July 1, 2014, Sandoz sold Klor-Con Potassium Chloride tablets under the Sandoz label, though the tablets continued to be manufactured by Upsher-Smith.

3485.    In late 2014, Mylan also entered the market for Potassium Chloride. Consistent with the fair share agreement, Jim Nesta of Mylan reached out to Marc Falkin of Actavis in September 2014 to coordinate Mylan's receipt of its "fair share" of the market. Like Zydus, Mylan agreed to support the pricing as already fixed by Actavis, Sandoz, and Upsher-Smith, and in return, the existing manufacturers of Potassium Chloride conceded market share to Mylan.

3486.    Internal Upsher-Smith documents prepared in late 2014 confirmed that the fair share agreement was followed by all competitors, noting that ███████████████████████████████ ███████████ and that ███████████████████████████ The document also advocated for another price increase, noting – wholly consistent with the overarching fair share agreement – that Upsher-Smith could ███████████████████████ in part because ███████████████████████████████████████ and in part because ███████████ ███████████████████████████████████████████

3487.    Throughout this period, Upsher-Smith, Sandoz, Actavis, Zydus, and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Potassium Chloride tablets and their fair share agreement.

3488.    For example, during the summer of 2010, D.Z, the Senior National Account Manager at Upsher-Smith, and K.K., a Senior National Account Executive at Sandoz, communicated numerous times by telephone both before and after the August WAC price increases by Sandoz and Upsher-Smith.

3489.   During the summer of 2011, before Zydus entered the Potassium Chloride ER market, it first communicated with the incumbent suppliers. K.R., Zydus's Assistant Vice President of National Accounts, communicated frequently that summer by telephone, including voice and text messages, with D.L., a Director of National Accounts at Sandoz.

3490.   In the fall of 2014 when Mylan was entering the Potassium Chloride ER market, Mylan's Nesta spoke to Falkin at Actavis twice on September 23, 2014. They also had been communicating over the summer leading up to Mylan's entry. When Mylan finally joined the market, it did so at elevated prices consistent with the fair share and price-fixing agreement.

3491.   As a result of these collusive communications, Defendants have been able to maintain supracompetitive pricing for Potassium Chloride tablets and capsules since August 2010.

### 57.   Prednisone

3492.   During the relevant time period, Actavis, Cadista, Qualitest/Par, and West-Ward were the primary manufacturers of Prednisone tablets.

3493.   The market for Prednisone was mature and at all relevant times had multiple manufacturers.

3494.   Prior to 2013, Prednisone tablets cost pennies per pill. However, beginning in February of 2013, Actavis, Cadista, Qualitest, Roxane, and West-Ward colluded to raise their prices by approximately 200%. In January 2013, a marketing manager at Actavis inquired about the possibility of increasing prices on Prednisone. At the time, Cadista had exited the market temporarily, and Actavis knew from its regular communications with West-Ward that its supply was limited.

3495.   In early March 2013, Qualitest submitted revised pricing to Rite Aid for Prednisone knowing that it would be rejected, which allowed Qualitest to concede the account to Roxane in

accordance with the fair share rules, and in return, Roxane agreed to support the upcoming price increase (which it did).

3496.   Between April and June, Actavis, Roxane, and Qualitest each increased their prices on Prednisone by approximately 200%. Additionally, West-Ward was able to cure its supply issues and followed the price increase as well during this same timeframe. And when Cadista reentered the market in August, it followed the higher pricing as well. Shortly after re-joining the market, on November 1, 2013, M.D. at Cadista spoke for nearly 40 minutes with S.G, VP of Sales and Marketing at West-Ward.  In accordance with the fair share rules, Actavis, Qualitest, and Roxane allowed West-Ward and Cadista to receive their fair share of the market.

3497.   Senior sales executives continued to communicate to implement this agreement. For example, shortly after joining Actavis in July 2013, Mark Falkin began communicating with M.D. of Cadista (the VP of Sales) to coordinate Cadista's reentry into the market. Falkin also spoke regularly with C.P. of Qualitest beginning in September 2013. Additionally, Mark Falkin of Actavis spoke with L.M. of Qualitest twice on May 2, 2014.

3498.   Furthermore, throughout this period, Actavis, Cadista, Par, and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Prednisone tablets and their fair share agreement.

3499.   D.S., who began as Head of Sales at West-Ward in January 2014 after leaving Taro, called K.O., VP of National Accounts at Par, during his first weeks on the job. The two had communicated when D.S. was at Taro, and the practice continued when D.S. moved to West-Ward. D.S. communicated by telephone with K.O. throughout 2014. They communicated in January, February, April, May, June, July, October, November, and December of that year. Prices for Prednisone remained high throughout this time.

3500.   J.H., Par Regional VP of Sales at Par, began communicating with Falkin shortly after Falkin joined Actavis. The two communicated by telephone in September 2013, then throughout 2014, including (at least) in February, March, April, May, June, July, August, and October.

3501.   As a result of this coordination, Defendants were able to charge supracompetitive prices for Prednisone to Plaintiffs and others in the United States.

### 58.   Prednisolone Acetate

3502.   During the relevant timeframe, Sandoz and Greenstone (under the Pacific Pharma label) were the primary manufacturers of Prednisolone Acetate.

3503.   The market for Prednisolone Acetate was mature and at all relevant times had multiple manufacturers.

3504.   For years, the prices for Prednisolone Acetate ophthalmic suspension were relatively low and stable. Between July and November 2013, however, Sandoz and Greenstone coordinated large price increases. WAC prices for Prednisolone Acetate jumped more than 500% and to identical levels. NSP prices jumped a similar amount.

3505.   Senior sales executives from Sandoz and Greenstone communicated directly with each other in furtherance of the conspiracy. As noted with respect to Clindamycin, Latanoprost, and Eplerenone, Kellum of Sandoz was in frequent contact with R.H. and Jill Nailor of Greenstone during this time period, and other executives from both companies also communicated in furtherance of the conspiracy. Indeed, between 2011 and 2014, there were at least 360 communications between senior sales executives of the two companies in furtherance of the conspiracy.

3506.   During this period, Sandoz and Greenstone market shares remained stable owing to their fair share agreement, to which they closely adhered during the relevant period. Sandoz consistently had more than its fair share of the market. As the first generic entrant in what was

essentially a two-player market, Sandoz was arguably entitled to 60% share under the conspiracy's rules. However, Sandoz consistently maintained market share above this threshold, and as such, it was cautious not to bid for any new business on the drug. For example, on January 22, 2014, OptiSource approached Sandoz to see if it was interested in supplying OptiSource members with Prednisolone Acetate. Sandoz's Kellum relayed to his colleagues, █████████████████████ ███████████████████████████████████ Kellum further advised, █████████ ████████████████████████████████████ D.H. at Sandoz agreed with this strategy, and C.B. indicated that he would communicate to OptiSource that ██████████████ █████████████████ Sandoz's Kellum also encouraged his colleagues to walk away from competing for what was presented as a ██████████████████████ to provide Prednisolone Acetate because prices had gone up and were already stabilized.

3507.   Pricing data show steep and parallel price increases beginning in July 2013 by Sandoz and Greenstone on Prednisolone Acetate.

3508.   Throughout this period, Sandoz and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on generic Prednisolone Acetate and their fair share agreement.

3509.   For example, representatives from Greenstone and Sandoz convened at the NACDS 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada on August 10-13, 2013. Less than two weeks later, Sandoz announced a large WAC price increase, which Greenstone promptly followed.

### 59.   Prochlorperazine Maleate Suppositories

3510.   Since at least 2011, G&W and Perrigo have been the only generic suppliers of Prochlorperazine Maleate Suppositories. Throughout 2011 and 2012, G&W and Perrigo priced Prochlorperazine Maleate Suppositories similarly and maintained a virtually even split of the market.

3511.    In mid-January 2013, Perrigo hired Boothe as an executive. On January 25, 2013, Orlofski called Boothe for the first time ever, according to the available phone records.

3512.    A little over one month later, on Friday, March 1, 2013, Boothe and Orlofski met for lunch at an Italian restaurant, Al Dente Ristorante, in Piscataway, New Jersey.

3513.    The next business day, on Monday, March 4, 2013, Orlofski met with Vogel- Baylor in his office at 1:00 p.m. Later that same day, Vogel-Baylor sent an internal e-mail to M.S., a sales analyst at G&W, asking her to run sales reports on Prochlorperazine Maleate Suppositories  in anticipation of a price increase. M.S. provided the requested information to Vogel-Baylor on March 5, 2013.

3514.    On March 7, 2013, Vogel-Baylor e-mailed Orlofski a price increase analysis for Prochlorperazine Maleate Suppositories. Vogel-Baylor recommended increasing WAC pricing by 200% from $35.66 to $106.98.

3515.    On March 19, 2013, G&W implemented the 200% increase. That same day, Orlofski called Boothe. The two competitors would exchange two more phone calls later that day, including one call lasting six (6) minutes. These were the first calls exchanged between Orlofksi and Boothe since their lunch on March 1, 2013, according to the available phone records. Orlofski and Boothe would exchange one text message and one more phone call in March 2013 and would not communicate by phone again until August 30, 2013, according to the available phone records.

3516.    On April 11, 2013, Perrigo announced it would also be increasing its WAC price for Prochlorperazine Maleate Suppositories  by 200% from $34.85 to $104.55. However, Perrigo waited to notify its customers of the specific changes to its contract pricing until after attending the NACDS 2013 annual meeting.

3517.    The NACDS 2013 annual meeting was held at the Sands Expo Convention Center in Palm Beach, Florida between April 20 and April 23, 2013. Boothe, Orlofksi, and Vogel-Baylor

attended the conference and had many opportunities to meet in person to discuss the

Prochlorperazine Maleate Suppositories increases at various programming and social events.

3518.    For example, on Sunday, April 21, 2013, Boothe and Orlofski had dinner together

with W.S., a representative of Pfizer. That same evening, Boothe and Orlofski also attended a wine

tasting hosted by Upsher-Smith. Also on Sunday, Vogel-Baylor told a potential GPO customer that

G&W would need to understand who its incumbent supplier was for Prochlorperazine Maleate

Suppositories, among other drugs, before participating in a bid for new business.

3519.    Over the next several days, Perrigo sent out price increase notices to its customers

for Prochlorperazine Maleate Suppositories specifying its new contract pricing.

3520.    On May 7, 2013, Associated Pharmacies, a Perrigo customer, e-mailed C.M., a sales

executive at G&W, asking for a bid on Prochlorperazine Maleate Suppositories. C.M. declined to bid

on the new business, responding:



3521.    Although G&W turned away this business, a few months later it would take the

customer back in retaliation against Perrigo for taking its Target business through McKesson's One

Stop program. After trading these accounts, the competitors fell back in line with the agreement. By

the fall of 2013, the Prochlorperazine Maleate Suppositories market was again virtually evenly split

between Perrigo and G&W.

### 60. Prochlorperazine Maleate Tablets

3522.    As detailed further above in Section IX.B.12., in August 2014, Patel and Rekenthaler of Teva led price increases on a number of drugs, including Prochlorperazine tablets.

3523.    In order to coordinate the price increase with Mylan, Cadista, and Sandoz, Rekenthaler communicated with Nesta at Mylan on August 7 and August 11. Nesta, in turn, communicated with M.D., a senior sales executive at Cadista Pharmaceuticals, on the same days that he had been communicating with Rekenthaler.

3524.    Further, Sandoz has admitted in its deferred prosecution agreement that, during this time period, it was "conspiring with [Teva] to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States." This collusion extended to Prochlorperazine tablets.

### 61. Propranolol HCL capsules

3525.    At all relevant times, Actavis, Breckenridge, and Upsher-Smith have dominated the market for Propranolol HCL capsules.

3526.    Actavis, Breckenridge, and Upsher-Smith collusively increased prices on Propranolol HCL capsules between December 2013 and October 2014.

3527.    According to NADAC data, various dosage levels of Propranolol HCL capsules saw the following average price increases:

> Propranolol HCL ER 120mg capsules: increased by 181% between December 2013 and July 2014; and

> Propranolol HCL ER 180mg capsules: increased by 174% between December 2013 and October 2014.



3528.   Medicaid reimbursement data also confirms that these Defendants increased their prices abruptly and largely in unison. The following charts depict Medicaid reimbursement rates for exemplary dosage levels of Propranolol HCL capsules.



**REDACTED – PUBLIC VERSION**



3529.    These price increases followed the October 28-30, 2013 GPhA Technical

Conference in North Bethesda, Maryland, which representatives from Actavis, Breckenridge, and

Upsher-Smith attended.

### 62.    Silver Sulfadiazine cream

3530.    Silver Sulfadiazine is an antibiotic used to treat second and third-degree burns. It has

been available in the United States for many years in a generic form. It is available in a Cream

formulation.

3531.    The market for Silver Sulfadiazine 1% Cream is mature. At all relevant times there

have been multiple manufacturers.

3532.    Ascend and Teva dominate sales of Silver Sulfadiazine Cream (1% ) with a roughly

30/70 split of the market.

3533.    For several years, the price for Silver Sulfadiazine was relatively stable. Prices began to

rise in the spring of 2012 with Ascend and Teva coordinating their price increases and continuing to

maintain supracompetitive pricing for many years.

3534.   The ability of Ascend and Teva to reach agreements on Silver Sulfadiazine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3535.   The parallel price increases by Ascend and Teva are consistent with the Fair Share Agreement.

3536.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

3537.   The agreement between Ascend and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Silver Sulfadiazine Cream (1%).

### 63.   Spironolactone HCTZ

3538.   During the relevant time period, Mylan, Sun, and Greenstone were the primary manufacturers of Spironolactone HCTZ.

3539.   The market for Spironolactone HCTZ tablets was mature and at all relevant times had multiple manufacturers.

3540.   After years of relatively low and stable pricing, in early 2013 the prices of Spironolactone HCTZ radically increased. Within approximately one month, Mylan, Sun, and Greenstone each announced WAC price increases of approximately 400%. Their NSP prices also skyrocketed as customers were forced to pay much higher price.

3541.   A little more than a year later, in the summer of 2014, all three manufacturers again raised prices. Almost simultaneously, Mylan, Sun, and Greenstone imposed NSP price increases of approximately 50%.

3542.   Pricing data show steep and parallel price increases beginning in January 2013 for Spironolactone HCTZ by Mylan, Sun, and Greenstone.

3543.   Greenstone, Mylan, and Sun and communicated directly with each other in furtherance of the conspiracy. As noted elsewhere in this Complaint, Jim Nesta of Mylan was in constant contact with Jill Nailor and R.H. of Greenstone throughout the conspiracy, including during the periods that Defendants were implementing their price increases on Spironolactone HCTZ. For example, R.H. and Nesta spoke at least 12 times between February 2013 and April 2013. Nailor and R.H. were likewise in frequent contact with Aprahamian, Perfetto, and CW-1 of Sun's subsidiary, Taro. Additionally, Gary Tighe of Mylan spoke with Chris Urbanski of Sun/Taro for twenty-five minutes on March 17, 2014 and for five minutes on March 18th. M.A. of Mylan and Aprahamian of Taro (and on behalf of Sun) spoke several times during this period: on March 18, 2014, on June 4th, twice on June 6th, once on June 9th, at least three times on July 2nd and for seven minutes on July 10th.

3544.   Also throughout this period, Mylan, Sun, and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Spironolactone HCTZ tablets and their fair share agreement.

3545.   For example, Mylan, Sun, and Greenstone all sent representatives to the GPhA Annual Meeting in Orlando, Florida on February 20 to 22, 2013. All three companies also attended the NACDS 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida on April 20 to 23, 2013. During this time, all three manufacturers announced WAC price increases of more than 400%.

### 64.   Triamcinolone Acetonide

3546.   During the relevant time period, Sandoz, Perrigo, Taro, Par, and Ascend were the primary manufacturers of Triamcinolone Acetonide cream, Sandoz, Perrigo, and Taro were the primary manufacturers of Triamcinolone Acetonide ointment, and Rising and Taro were the primary manufacturers of Triamcinolone Acetonide paste.

3547.   The markets for Triamcinolone Acetonide cream and ointment were mature and at all relevant times had multiple manufacturers.

3548.   As of July 2010, Fougera and Perrigo were the only generic manufacturers in the market for both Triamcinolone Acetonide Cream and Ointment. They took advantage of their already ongoing collusive relationship to raise prices on both products. On July 1, 2010 and again on July 20, 2010, Fougera raised WAC prices for various sizes and formulations of both the cream and the ointment. CW-3, a sales executive at Fougera, later described these price increases as a "strategic decision." On July 21 and July 30, 2010, Perrigo increased its own WAC prices on the same products to comparable levels.

3549.   In the days leading up to, and surrounding these increases, CW-6 and T.P. (Perrigo) exchanged at least eight calls. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/30/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:29:36 | 0:00:59 |
| 7/1/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:32:00 | 0:00:04 |
| 7/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:43:00 | 0:00:07 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:19:10 | 0:00:59 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:22:47 | 0:04:38 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:27:29 | 0:00:04 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:28:03 | 0:03:23 |
| 7/29/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:37:26 | 0:00:33 |

3550.   After the price increases, both companies adhered to their understanding not to poach the other's customers or improperly take advantage of the price increase by seeking additional market share. For example, on July 30, 2010, a Perrigo customer, ABC, provided Fougera an opportunity to bid on its Triamcinolone Acetonide business because of Perrigo's price increase. CW-3 of Fougera e-mailed Kaczmarek, his supervisor, stating, ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

3551.   That same day, Kaczmarek called CW-6. The call lasted two minutes. CW-6 then called T.P. and they spoke for three minutes. CW-6 hung up with T.P., called Kaczmarek back, and they spoke for five minutes. Immediately upon hanging up, Kaczmarek responded to CW-3's e-mail, with a copy to CW-6. Confident that the agreement with Perrigo was strong, Kaczmarek stated, ███████████████████████████████████████████ At the same time, T.P. called his supervisor, Wesolowski, and they spoke for five minutes.

3552.   The following week, on August 3 and 6, K.O. of Par spoke twice with a sales executive from Taro calling from the company's main line. Between October 2010 and March 2011, K.O. spoke at least 10 times with D.S. of Taro, and also exchanged calls with Taro's main company line during this period as well (which makes it impossible to determine from phone records whether she was speaking with D.S. or someone else from Taro). Upon information and belief, K.O. communicated to D.S. that Par was following the price increase on Triamcinolone Acetate as well, and that Par would also follow the fair share rules and not poach market share from the other manufacturers.

3553.   Specifically, in the cream market, Fougera, Perrigo, and Par approximately tripled their prices in the second half of 2010 to bring them in line with those of Taro. In early 2011, Taro then proceeded to more than double its prices. Although Taro's prices were much higher than Fougera, Perrigo, and Par, it was nonetheless able to maintain a relatively stable share of the market, consistent with their fair share agreement. As Taro noted in an internal document in 2012, ████████ ███████████████████████

3554.   Specifically in the ointment market, Fougera and Perrigo imposed significant price increases between June and September 2010.  Their prices more than tripled and remained at supracompetetive levels thereafter. When Taro re-launched its ointment in June 2011, rather than

offer lower prices to win customers, it entered the market at even higher prices than Fougera and Perrigo, thus entering without disturbing the already high prices.

3555.    Pricing data for Triamcinolone Acetonide cream and ointment show the parallel and inflated pricing by Fougera, Perrigo, Taro, Par, and Ascend.

3556.    Throughout this period, Fougera, Perrigo, Taro, Par, and Ascend met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Triamcinolone Acetonide cream and ointment and their fair share agreement.

3557.    For example, in the summer of 2010, Fougera and Perrigo raised prices for Triamcinolone Acetonide cream significantly to match those of Taro. Par, which also increased its prices, did not raise them to the same level as the others. A series of communications between Par and Taro followed, after which Par raised its prices to the same level as the others. On August 3 and 6, 2010, K.O., a Vice President of National Accounts at Par, received two calls from the Taro offices. On October 11, 2010, the same Par VP had a brief call with D.S., Assistant Vice President of National Accounts at Taro. The Par VP received another call from Taro's offices on December 10 and had calls with D.S. (the Taro AVP of National Accounts) on January 24, 25 and February 22, 2011, and also received a text message on March 18 from the Taro executive. On April 5, 2011, the Par VP received yet another call from the Taro offices. Shortly thereafter, Par's cream prices steeply increased to the same heights as Taro, Fougera, and Perrigo. When Taro raised its cream prices even higher in June 2011, the Taro and Par executives spoke again for approximately 6 minutes on June 28, 2011.

3558.    The Taro AVP was also communicating with Perrigo, and had telephone calls with A.F., a National Account Director at Perrigo, on January 24 and February 10, 2011.

3559.    During this period, the same AVP at Taro also was communicating with Fougera. As Taro was entering the ointment market in June 2011, D.S. (Taro AVP) received a call from D.L., a

Director of National Accounts at Fougera. They spoke for approximately 3 minutes. Taro entered the ointment market at prices even higher than the already inflated prices imposed by Fougera and Perrigo. The two spoke again on July 6, 2011.

3560.   In May 2012, Ascend entered the cream market. Less than a week before, on April 26, G.W., Ascend's Vice President of National Accounts, spoke twice on the telephone with G.B., Vice President of National Accounts at Par. When Ascend did enter the market days later, it did so at the inflated prices that Par, Perrigo, Fougera, and Taro already had imposed. Shortly after Ascend entered the market, its VP of National Accounts spoke to D.S., the AVP at Taro (on July 11, 19 and 20). The Taro AVP also was in touch with his contacts at Par (July 12) and Sandoz (June 11, 15 and August 17).

3561.   As of October 2013, non-defendant Rising and Taro were the two competitors in the market for Triamcinolone Acetonide paste and each maintained approximately 50% market share.

3562.   Triamcinolone Paste. In October 2013, Rising was considering implementing a price increase on Triamcinolone Acetonide paste. Prior to increasing the price, CW-2, then a senior sales and marketing executive at Rising, reached out to D.S., a Taro sales executive, to discuss the increase.  These calls are detailed in the chart below. CW-2 felt internal pressure to make money on the product and wanted assurance from D.S. that Taro would follow before Rising raised prices.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/27/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 13:32:00 | 0:02:00 |
| 9/30/2013 | Voice | CW-2 (Rising) | Incoming | D.S. (Taro) | 5:41:00 | 0:04:00 |
| 10/11/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 12:09:00 | 0:02:00 |
| 10/14/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 9:31:00 | 0:04:00 |

3563.    Two days after the final call detailed above, on October 16, 2013, Rising increased its WAC pricing for Triamcinolone Acetonide paste by 25%. Two weeks later, on November 1, 2013, Taro published increased WAC pricing that matched Rising's pricing exactly.

3564.    Prior to implementing the increase, Aprahamian of Taro described in an internal e-mail that Taro was ███████ its prices ██████████████████ and noted that the risk of losing business was ████ Indeed, the risk was ████ because CW-2 and D.S. had discussed the increase in advance and Taro had confidence that Rising would respect its market position and not poach its customers.

### 65.    Timolol Maleate

3565.    During the relevant time period, Valeant and Sandoz were the primary manufacturers of Timolol Maleate.

3566.    The market for Timolol Maleate was mature and at all relevant times had multiple manufacturers.

3567.    For years, the prices for Timolol Maleate ophthalmic gel forming solution were relatively low and stable.

3568.    On internal spreadsheets, Sandoz kept track of their market share for Timolol Maleate versus what they viewed as their fair share of that market, and – consistent with the fair share rules – declined to compete for business that would have resulted in Sandoz getting more than its fair share. For example, in May 2013 Sandoz decided not to bid for one of Valeant's accounts because ████████████████ Similarly, following the successful price increase, a Sandoz executive advised CW-1 and CW-3 that Sandoz should continue to refrain from bidding on Valeant accounts because ████████████████

3569.    Not long afterward, beginning in November 2013, Sandoz and Valeant coordinated to increase their prices on Timolol Maleate. Valeant first initiated a modest WAC price increase of

approximately 25% in November 2013. In January 2014, Sandoz responded with a WAC increase of more than 200%. One month later, Valeant raised its prices again, matching Sandoz's price increase. WAC prices more than tripled, as did NSP prices. Even as prices increased, market share remained roughly split between the companies.

3570.   Valeant and Sandoz communicated directly with each other in furtherance of the conspiracy. For example, both companies sent representatives to the February 2014 ECRM Retail Pharmacy Efficient Program Planning Session in Amelia Island, Florida. Sandoz had raised its list (WAC) prices before the conference, and Bausch announced the second portion of its price increases in March.

3571.   Throughout this period, Valeant and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Timolol Maleate and their fair share agreement.

3572.   For example, both companies sent representatives to the ECRM Retail Pharmacy Efficient Program Planning Session at the Omni Amelia Island Plantation Resort in Amelia Island, Florida on February 23-26, 2014. Sandoz had raised its WAC prices shortly before the conference. Valeant announced its own WAC price increases for Timolol Maleate shortly after the conference, on March 12, 2014.

### 66.   Tobramycin Dexamethasone

3573.   Tobramycin Dexamethasone is an antibiotic used to treat bacterial eye infections. It has been available in the United States for over a decade in a generic form.

3574.   The market for Tobramycin Dexamethasone is mature. At all relevant times, there have been multiple manufacturers.

3575.   Valeant and Sandoz dominate sales of Tobramycin Dexamethasone Ophthalmic Liquid (0.3-0.1%) with about a 50/50 split of the market in the relevant times.

3576.   For several years, the price for Tobramycin Dexamethasone was relatively stable. Prices began to rise at the end of 2012 with Valeant and Sandoz coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

3577.   The ability of Valeant and Sandoz to reach agreements on Tobramycin Dexamethasone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3578.   The parallel price increases by Valeant and Sandoz are consistent with the Fair Share Agreement.

3579.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

3580.   The agreement between Valeant and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Tobramycin Dexamethasone Ophthalmic Liquid (0.3-0.1%).

### 67.   Trazodone HCL

3581.   Trazodone HCL is a serotonin uptake inhibitor that is used to treat depression.  It is available in tablet form in several strengths, including 100 mg Tablets. It has been available in the United States for over a decade in a generic form.

3582.   The market for Trazodone HCL is mature. At all relevant times, there have been multiple manufacturers of Trazodone HCL.  Teva and Par dominated the market for Trazodone HCL 100mg Tablets, with Teva holding about 70% of the market and Par holding about 15% within that timeframe.  Apotex and Sun each held smaller shares.

3583.   For several years, the price for 100 mg Trazodone HCL tablets was relatively stable. Prices began to rise in early 2015 with Apotex, Par, Sun, and Teva coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

3584.   The ability of Apotex, Par, Sun, and Teva to reach agreements on Trazodone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

3585.   The parallel price increases by Apotex, Par, Sun, and Teva are consistent with the Fair Share Agreement.

3586.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

3587.   The agreement between Apotex, Par, Sun, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including 100mg Trazodone HCL Tablets (100 mg).

### 68.   Triamterene HCTZ

3588.   During the relevant time period, Actavis, Mylan, Sandoz, and Apotex were the primary manufacturers of Triamterene HCTZ tablets and Mylan, Sandoz, and Lannett were the primary manufacturers of Triamterene HCTZ capsules.

3589.   In late 2011, Mylan led price increases on both capsules and tablets, and Sandoz and Actavis followed shortly thereafter. Mylan's price increases were between 100% and 300%, depending on the strength and formulation. Throughout this time period, CW-1 of Sandoz was in constant contact with Edgar Escoto, Mylan's Director of National Accounts. Indeed, the two spoke hundreds of times in 2011 and 2012. Additionally, Armando Kellum of Sandoz spoke with Rick Rogerson of Actavis on May 5, 2011, July 28, 2011, and September 28, 2011, and M.W. of Mylan

spoke with J.R. (Sandoz's Executive Director of Marketing) in November 2011. As a result of this coordination, each of the three companies announced their price increases on the formulations of Triamterene HCTZ that each manufactured by November 2011.

3590.    Prior to 2012, neither Apotex nor Lannett manufactured Triamterene HCTZ. However, in a familiar pattern, both entered the market in early 2012 after the existing manufacturers imposed large price increases. However each company received its fair share of the market after the incumbent suppliers followed the fair share rules, and both Apotex (on tablets) and Lannett (on capsules) were able to enter the market at prices that were higher than the existing market prices.

3591.    Additionally, to determine which tablet customers it should bid on, M.B. of Actavis spoke with T.K. (a National Account Manager at Apotex) on March 8 and March 16, 2012.

3592.    Similarly, J.K. (Mylan's VP of Sales) coordinated with K.S. (Lannett's VP of Sales) on April 19, 20, and 23, to determine which customers Lannett should bid on to get its fair share of the capsules market.

REDACTED – PUBLIC VERSION

E.     **Involvement of Distributors in the Overarching Conspiracy.**

1.     **Introduction**

3593.   Certain major drug distributors (namely ABC,[70] Cardinal,[71] McKesson,[72] Morris & Dickson,[73] and Walgreens / WBAD,[74] collectively the "Distributors") were used by Defendants to prevent price erosion by "stabilizing" and "settling" the market and to facilitate, if not encourage, coordinated price increases. These Distributors are drug wholesalers that purchase from the Defendants.

3594.   The Distributors and the Defendants agreed with one another that the industry operated on a fair share basis in order to control prices.

---

[70] AmerisourceBergen Drug Corporation ("ABC") is a Delaware corporation with a principal place of business in Chesterbrook, Pennsylvania. On January 3, 2018, ABC acquired H.D. Smith, LLC ("H.D. Smith"). Formerly known as H.D. Smith Wholesale Drug Co., H.D. Smith, was a Delaware corporation and limited liability company with a principal place of business in Springfield, Illinois. At the time of its acquisition, it was the largest wholesaler of drugs to independent pharmacies in the United States. Unless addressed individually, ABC and H.D. Smith are collectively referred to as ABC.

[71] Cardinal Health, Inc. ("Cardinal") is an Ohio Corporation with a principal place of business in Dublin, Ohio. On July 6, 2015, Cardinal acquired The Harvard Drug Group, LLC ("Harvard"). Unless addressed individually, Cardinal Health and Harvard are collectively referred to as "Cardinal." At all times relevant to the Complaint, Cardinal distributed one or more of the Subject Drugs in this District and throughout the United States.

[72] McKesson Corp. ("McKesson") is a Delaware corporation with a principal place of business in Irving, Texas.

[73] Morris & Dickson Co., LLC ("Morris & Dickson") is a Louisiana limited liability company with a principal place of business in Shreveport, Louisiana.

[74] Walgreens Boots Alliance, Inc. ("WBA") is a Delaware corporation with a principal place of business in Deerfield, Illinois. Walgreens Boots Alliance Development GmbH ("WBAD") is WBA's drug purchasing arm. It is incorporated in Switzerland, with a principal place of business in Bern, Switzerland. It was formed in 2012 as a joint venture between Alliance Boots and Walgreens Co. and later became a subsidiary of WBA. Since 2013, WBAD has negotiated and purchased generic drugs on behalf of ABC and WBA under the terms of an agreement that extends until 2026. Unless addressed individually, WBA and WBAD are collectively referred to as "Walgreens." In more recent communications relevant to the price-fixing conspiracy, conspirators refer to "WBAD." In sections of this complaint describing the earlier days of the conspiracy (circa 2011), conspirators refer to "Walgreens," "WAG" or "Wags," WBA and WBAD had not yet been formed and WAG was the stock ticker of the business formerly known as Walgreens.

    a.   On April 23, 2012, Lannett told Cardinal that ████████████████
████████████████ Lannett hoped to reach its ███████████████
Lannett added that the strategy might be hampered by ██████████

    b.   In September 2013, a WBA generics buyer agreed with Dr. Reddy's Senior Director
of National Accounts that it was inappropriate for Apotex to continue to seek share
for a certain drug because Apotex already had more than 70% share in a two-player
market.

3595.    "Fair share" was consistently used as a conspiratorial term of art in the discussions
between the Distributors and the Defendants.

    a.   On November 3, 2014, Dr. Reddy's executives discussed a ██████████ of fair
share in a 6-player market. The Senior Director and Head of National Accounts
noted that they had spoken with multiple distributors and had highlighted fair share
as a reason to do business with Dr. Reddy's.

    b.   On July 10, 2014, WBAD asked Taro for a call to discuss a Mylan price increase and
noted that Taro was █████████████████████ Because Walgreens so
frequently involved itself in market allocation schemes, Heritage noted that
Walgreens ██████████████████████ and that ███████████████
███████████████

    c.   In January 2015, a WBAD category manager told Teva that Teva was entitled to
additional business because Teva was ██████ its fair share. He wrote 'fair share'
in quotes because he understood the term of art and the associated rules.

    d.   In October 2015, Teva told Cardinal that it was ███████████████ of an opioid
addiction treatment and ███████████████████

e.   In April 2016, Taro sent offers to McKesson along with a note that the Taro
salespeople were still looking for their fair share of the market for that particular
drug.

3596.   Discussions and decisions based on fair share were effective because the Distributors
and the Defendants alike collectively understood the meaning of the term and its rules. The
Defendants knew that the Distributors required no further explanation in order to carry out
Defendants' common goals.

3597.   The Distributors often requested from the Defendants a summary of the current fair
share arrangement. On more than one occasion, Teva's emails to distributors included spreadsheet
attachments showing each manufacturer's current accounts and the corresponding market share so
that distributors would understand the balance of share of that drug, handle bids in accordance with
the fair share arrangement, and pass updates to other manufacturers about the intentions of their
competitors.

3598.   The Distributors went beyond the normal course of business in their
communications with their suppliers, the Defendants. A distributor must necessarily discuss its own
purchases with its suppliers, the manufacturers. But the Distributors did more: they were an
instrumentality in anticompetitive communications that affected the market as a whole.

3599.   The reason for the Distributors' involvement in the conspiracy was that they—like
the Defendants—benefit from higher prices for generic drugs. The Distributors and Defendants
called, texted, emailed, messaged through cellular telephone applications, and met with one another
regarding their common interest in higher prices marketwide. For example, in May 2012, at a widely-
attended trade show organized by H.D. Smith, manufacturers and wholesaler distributors discussed
price increases for topical creams and ointments. Over email, a Fougera national accounts executive
reported ███████████████████████████████████████████████████████

█████████████████████████ because they can pass along the increase and █████████████

████████████████████

3600.   For example, McKesson's SEC 10-K filing from 2014 confirms that it benefits from higher prices and may lose profits when the manufacturer-level price increases decrease in frequency or decrease in magnitude:

> A significant portion of our distribution arrangements with the manufacturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby we benefit when the manufacturers increase their prices as we sell our existing inventory at the new higher prices. For these manufacturers, a reduction in the frequency and magnitude of price increases, as well as restrictions in the amount of inventory available to us, could have a material adverse impact on our gross profit margin.

3601.   ABC also admits that it has reason to benefit from higher prices in its 2014 10-K, and in filings in subsequent years.

> [ABC's] gross profit from brand-name and generic manufacturers continues to be subject to fluctuation based upon the timing and extent of manufacturer price increases. If the frequency or rate of branded and generic pharmaceutical price increases slows, our results of operations could be adversely affected. In addition, generic pharmaceuticals are also subject to price deflation. If the frequency or rate of generic pharmaceutical price deflation accelerates, our results of operations could be adversely affected.

3602.   From 2013 to 2016—the key years during which the market allocation and price increase schemes took full effect—the revenue of Cardinal, ABC, and McKesson increased by 20%, 67%, and 55%, respectively.

3603.   In another example of a distributor's desire to pay higher prices, when Heritage listed injections of the bone cancer drug Zoledronic Acid for sale at around $500, the oncology supply division of ABC told Heritage that the distributor ███████████████████████

3604.    Indeed, the Distributors encouraged the Defendants to increase prices. For example, in spring 2014, Harvard called Heritage and ██████████████ how much Heritage should increase its prices given competing bids of competitors. Harvard and Heritage reviewed 24 drugs and Harvard suggested that Heritage should raise prices on 19 of the 24. The price increases ranged from 10% to 40% higher than Heritage's price at the time. Internal Heritage emails confirm that both sides were pleased with the mutual effort to raise prices.

3605.    Cardinal had several discussions with Sandoz concerning a way to adjust contracts to make it easier for manufacturers like Sandoz to increase prices. At the time, Cardinal knew it should conceal such efforts. Sandoz reported Cardinal's stance as follows:



3606.    Ultimately, because of Cardinal's fears that the plan might become public, the plan was canceled at that time. But Cardinal did agree that it was a ███████████████████ and ultimately Sandoz took other steps with Cardinal ████████████████████████████████ ███████ In June 2013, Sandoz noted that it had also made similar arrangements with McKesson.

3607.    Likewise, in April 2014 Morris & Dickson sought an across-the-board increase in the list price of Oxycodone. According to one of her documents, Sun's Knoblauch was left with the impression that Morris & Dickson preferred a price increase after she discussed it with two individuals from that company, including during an in-person meeting at the ECRM trade conference. Morris & Dickson later wrote to clarify that it was interested in a price increase only so long as it was ████████████████ meaning all the distributors would pay higher prices.

3608.    The following sections provide further examples of each of the Distributors roles in the conspiracy generally, and then illustrate these roles with respect to specific drugs.

### 2.   ABC

3609.   Sandoz employee notes from a 2015 trade association meeting list ███████████ as the first criterion of ABC's philosophy on pricing. And a Mylan internal presentation identified ABC as a distributor that followed the ███████ model.

3610.   Many of the most active conspirators identified in this Complaint worked for ABC at some point in their careers. Nisha Patel, whose computer files and dozens of acts of price-fixing are the main corpus of evidence for this complaint, began her pharmaceutical career at ABC. Marc Kikuchi arranged fair share deals as a Senior Vice President at ABC before he became a CEO at Zydus. He is presently a CEO at Dr. Reddy's.

3611.   In March 2013, ABC and Walgreens-Boots Alliance entered into a long-term agreement (now extended until 2026) to collaborate on the purchase of drugs, including all purchases from the Defendants. In practice, this meant that distributors who had formerly worked separately to allocate fair share and facilitate price increases among the Defendants were now officially working together. ABC and WBAD employees often joined one another's email threads and discussed allocations and price increases with the Defendants as a group. For example, when Teva was gathering intelligence about whether a lesser-known competitor would be ██████ after a certain account, Teva's Senior Director of Sales and Trade relations said she would ████████████ ██████████████████████████████ the three men who were among the WBAD and ABC executives that repeatedly were involved in the fair share conspiracy.

3612.   By 2017, WBAD ABC controlled a combined 26% of the volume of all generic drugs purchased in the United States.

### a.   Buprenorphine

3613.   In March 2016, Teva and Sun communicated through ABC to coordinate Sun's entry into the Buprenorphine market. On March 15, 2016, Teva's Senior Director of National Sales

emailed ABC's Director of Global Generic Sourcing with a request that ABC broker the market

allocation: ███████████████████████████████████████████

███████████████████████████████████████ The ABC Director

responded, ███████████████████████████ and the Teva executive thanked her ██

██████ The next day, ABC wrote:



3614.   By March 22, 2016, ABC had communicated with Sun on behalf of Teva so that the

two could calibrate their share targets. An ABC executive wrote to Teva that she ████████

██████████████ The details included were that Sun's ██████████████████████ and

that Sun was ███████████████████ wrote T.C. on behalf of Teva. Sun then minimized

bidding on Teva accounts but, where it did do so, Teva knew that Sun's goals were limited and Teva

could concede the account without fear of further loss of business. Sun knew it could bid at a higher

price and still win or retain the business because Teva would not defend every account.

b.   **Dextroamphetamine Amphetamine IR**

3615.   In the first quarter of 2014, Actavis, Aurobindo, and Teva allocated the market for

Dextroamphetamine Amphetamine IR through ABC.

3616.   By March 18, 2014, ABC had communicated with Aurobindo about this drug and

then communicated to Teva that Aurobindo wanted only a 10% share of the market. ABC knew

that Teva would be able to maintain more accounts at higher prices once it was informed about

Aurobindo's intention not to compete for share. That same day, Rekenthaler of Teva had a thirty-

minute telephone call with a senior executive at Aurobindo in which they discussed the allocation

for Dextroamphetamine Amphetamine IR.

3617.   ABC's communications enabled Teva to make fair share arrangements to divide the market with a third manufacturer, Actavis. On March 17, 2014, Patel of Teva had multiple calls with Rogerson of Actavis and Rekenthaler spoke with Falkin, also of Actavis. Rekenthaler and Falkin spoke again seven times on March 20, 2014 to discuss allocation of the market for Dextroamphetamine Amphetamine IR.

3618.   On April 16, 2014, Teva learned of a challenger at one of its accounts but not its identity. Patel informed her superiors that the challenger was Actavis and recommended that Teva concede the account to Actavis. At 1:43pm, she communicated to another colleague that the decision had been made to concede. She then called Rogerson at Actavis at 1:55pm to tell him that Teva would play fair.

### c.      Loperamide

3619.   Mylan and Teva coordinated a price increase on Loperamide through ABC. On June 16, 2014, ABC's Dave Vietri pointed out to Teva that Mylan had raised its prices on Loperamide in April, but that Teva had failed to follow the price increase. ABC had spoken with Mylan regarding the price increases and wanted Teva to raise the price, too.

3620.   Teva did in fact plan to follow Mylan's increase, and planned to have ABC tell Mylan this. Patel of Teva had discussed the future price increase with ABC at a recent HDMA conference. Teva understood that Mylan would keep the price high only so long as it expected Teva to play fair and follow with its own increase. Conversely, ███████████████████████████████████ ████████████████████ Patel also knew that ABC executives wanted to see higher prices from the manufacturers in order to ███████████████ She noted that ABC would ███████████ ███████████ to quickly increase the price of Loperamide. But Patel was irked that Teva was the secondary (i.e., backup) supplier and that Teva was being asked to increase its price without

being offered the primary slot. She wanted Mylan and ABC to ▇▇▇▇▇▇▇ before announcing that Teva would increase its price.

3621.    Because Teva did in fact plan to support Mylan's increase and had been in discussions with ABC regarding a coordinated increase, the other members of the Teva team considered this unacceptable. On a separate email thread excluding Patel, a Teva Senior Director wrote that Patel was ▇▇▇▇▇▇▇ for letting ABC and Mylan ▇▇▇▇ A Teva Director of National Accounts agreed that it was ▇▇▇▇▇▇▇▇▇▇▇▇▇ for Teva to delay the price increase and the response to ABC. They described her unwillingness to immediately play fair as ▇▇▇ and discussed whether Patel should be reported to superiors. Teva followed through with its price increase on August 28, 2014

### d.    Modafinil

3622.    On May 22, 2014, Teva learned that a new market entrant—a co-conspirator manufacturer not named as a defendant in this complaint—had challenged Teva's share of Modafinil sales at ABC. Internally, Teva employees wondered whether the ▇▇▇▇▇ action was to concede because they were unfamiliar with this competitor. They decided to discuss the competitor's intentions with ABC. During a call the following day, two individuals from ABC informed Teva that the new entrant would not compete for any further Modafinil share if it could win the ABC business. Patel of Teva, who had worked at ABC the previous year, remarked that this competitor would ▇▇▇▇▇ if it won the ABC business.

3623.    The Teva team then analyzed its market share and found that Teva had recently dropped from ▇▇▇▇▇ share, which Teva considered far too low in a five-player market (although its annualized gross profit for the drug had only dropped from ▇▇▇▇▇▇▇▇ ▇▇▇ Par and Mylan had higher share, and the fair share rules dictated that the bigger players should be first to cede share. Thus, Teva decided to communicate back via ABC that the competitor

███████████████████████████████ and ████████████████████████

██████

3624.   Ultimately, ABC convinced Teva to give up the account for the benefit of the

market. A few months later, on September 22, 2014, an individual at Teva could not remember why

Teva had conceded and guessed it was perhaps related to a supply problem. ABC wrote to remind

Teva that it was in fact an arranged concession:



(ellipses in original). Teva's Senior Director of Sales and Trade Relations responded that she would

██████████████ from ABC over the phone.

3625.   The reference to the ██████████ refers to a method used by the conspirators to

allocate share without competition. Instead of listing all the drugs in a catalog and then collecting

bids from the manufacturers, the Distributors—including Cardinal, McKesson, ABC, and WBAD—

began to request "wish lists" from the Defendants.

3626.   Bidding resulted in lower prices when incumbents were offered a chance to

counterbid (a "right of first refusal" or "ROFR"). The goal of wish lists was to allow the Defendants

to signal to one another that they wanted win or keep certain accounts for certain drugs without

forcing them to actually bid against one another. At the same time, the items left off the wish list

allowed the Distributors to identify for the Defendants the products of which their competitors had

expressed little interest in selling.

3627.   The next day, after ABC reminded Teva that Modafinil was part of the ██████

██████ D.V. (ABC) called Teva. A Teva employee took notes of the call. ABC admitted the purpose

of the wish list and said that ABC would review the wish lists from seven of the major

manufacturers and would ███████████████████████████████████████

████████████████████████████████████

3628.    WBAD was also involved with ABC's anticompetitive use of wish lists. WBAD's

executives were clear that their goal was to pre-arrange which products would be primarily sold by

which Defendant so that, once any bidding occurred, each Defendant would be secure in knowing it

could win the business without having to put forth an aggressive price. ███████████████

█████████████████████████████████████████wrote WBAD's F.H. to Dr. Reddy's.

He then requested that Dr. Reddy's provide a wish list of items that Dr. Reddy's would pursue if

competition could be minimized or eliminated. ████████████████████████████████

████████████████████████████████████████████

e.    **Pioglitazone Metformin HCL IR Tablets**

3629.    Prior to February 2013, Mylan and Teva were the only competitors in the

market for Pioglitazone Metformin. As a result of settling patent litigation with the brand

manufacturer, Mylan was entitled to 180 days exclusivity as the first-to-file generic and Teva earned

the right to market the authorized generic. During that period, Mylan and Teva split the market

equally with Teva controlling 48% share and Mylan controlling 52%.

3630.    Mylan and Teva's 180-day exclusivity period expired on February 13, 2013

and Aurobindo and Torrent Pharmaceuticals entered the market on that date. Although Sandoz also

planned to enter at that time, the company ran into regulatory obstacles that delayed its launch until

April 16, 2013.

3631.    In advance of Aurobindo's entry, CW-6 and Grauso were in frequent

communication with their contacts at Mylan and Teva to discuss, among other things, Aurobindo's

entry into the Pioglitazone Metformin market. On these calls, the competitors spoke about pricing

and the allocation of market share to the new entrant.

REDACTED – PUBLIC VERSION

3632.     For example, in the week leading up to Aurobindo's entry on February 13,

2013, CW-6 exchanged at least nine calls with Jim Nesta, a senior sales executive at Mylan. At the

same time, Grauso was communicating with his contacts at Teva, exchanging at least twenty-one

callswith sales executives Kevin Green and T.S. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 9:23:00 | 0:06:00 |
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 14:25:00 | 0:02:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:33:00 | 0:22:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 12:12:00 | 0:07:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 15:20:00 | 0:03:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:04:00 | 0:05:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:41:00 | 0:21:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:56:00 | 0:08:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 10:34:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 10:40:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 10:41:00 | 0:02:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 11:21:00 | 0:11:00 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 13:55:05 | 0:00:19 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 14:04:28 | 0:02:17 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:38:09 | 0:00:04 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 15:41:26 | 0:00:03 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:58:28 | 0:00:27 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 16:09:54 | 0:03:40 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 16:19:22 | 0:00:04 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 13:01:14 | 0:00:29 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 14:06:26 | 0:00:52 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:52:00 | 0:12:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 6:26:00 | 0:39:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:35:00 | 0:45:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:53:00 | 0:09:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 11:11:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 12:19:00 | 0:02:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 12:42:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:58:00 | 0:01:00 |

3633.   Illustrating the substance of these calls, on February 12, 2013, T.S. spoke to Grauso

at Aurobindo for forty-five minutes. Shortly after that call, T.S. sent an internal e-mail stating, ██

██████████████████████████████████ Cardinal was a Mylan customer.

863

REDACTED – PUBLIC VERSION

3634.   At the same time, Mylan and Teva were communicating with each other. In the week leading up to Aurobindo's entry on February 13, 2013, Green of Teva exchanged at least seventeen calls with Nesta of Mylan. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:19:51 | 0:00:13 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:29:54 | 0:00:05 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:01:05 | 0:00:07 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:17:07 | 0:00:06 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:53:33 | 0:08:47 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:16:25 | 0:00:10 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 17:19:23 | 0:00:10 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 8:26:12 | 0:00:05 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:08:59 | 0:29:51 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:44:04 | 0:11:18 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:14:42 | 0:06:03 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:31:39 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:45:09 | 0:12:58 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:09:47 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:18:15 | 0:08:38 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:44:01 | 0:03:25 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 19:17:42 | 0:04:15 |

3635.   Similarly, Green of Teva exchanged several calls with his contacts at Sandoz, Kellum and CW-2. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | CW-2 (Sandoz) | 4:24:00 | 0:05:00 |
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | Kellum, Armando (Sandoz) | 11:04:00 | 0:01:00 |
| 2/7/2013 | Voice | CW-2 (Sandoz) | Outgoing | Green, Kevin (Teva) | 12:29:00 | 0:02:00 |
| 2/10/2013 | Voice | Green, Kevin (Teva) | Incoming | Kellum, Armando (Sandoz) | 9:09:00 | 0:06:00 |
| 2/12/2013 | Voice | Kellum, Armando (Sandoz) | Outgoing | Green, Kevin (Teva) | 7:15:00 | 0:08:00 |

3636.   On February 7, 2013, the same day that Green talked to both Kellum and CW-2, both of those Sandoz employees participated in a conference call in which they discussed ███ ██████████████ on Pioglitazone Metformin.

3637.   The new entrants, Sandoz and Aurobindo, were also communicating directly with each other regarding Pioglitazone Metformin. For example, CW-3 of Sandoz and CW-6 of

REDACTED – PUBLIC VERSION

Aurobindo exchanged at least six calls between February 13 and February 19, 2013. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/13/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:51:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:36:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:16:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:03:00 | 0:01:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:06:00 | 0:04:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:52:00 | 0:01:00 |

    3638.   During their calls on February 19, 2013, CW-6 and CW-3 discussed specific customers and price points for Pioglitazone Metformin, and the fact that Aurobindo had already picked up Cardinal as a customer. CW-3's contemporaneous notes are pictured below:



    3639.   By mid-April, Aurobindo had secured approximately 20% of the Pioglitazone Metformin market, including Cardinal, a portion of the CVS business, Costco, and several other smaller customers.

    3640.   Between February 24 and February 27, 2013, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas. Representatives from Aurobindo, Sandoz and

Torrent attended, including A.T. and Grauso from Aurobindo, C.B. and Kellum from Sandoz, and K.G., Vice President of Sales from Torrent.

3641.    On February 28, 2013, Kellum sent an internal e-mail to other Sandoz executives regarding the ███████████████████████ With respect to Pioglitazone Metformin, after convening with the other manufacturers in Texas, Kellum was confident that the market would be ████████████████████ owing to the fact that ████████████ ███████████████████████████████████

Kellum used typical euphemisms for conspiratorial conduct: ████████ meant that Aurobindo and Torrent could be expected not to compete on price, but instead to abide by the Fair Share agreement; ████████ meant that Sandoz would be sure to coordinate directly with the other manufacturers so as not to disrupt the market pricing.

3642.    Kellum kept his word, and Sandoz did its ████████ before launching in April. C.B. (Sandoz) communicated by phone with A.T. (Aurobindo) multiple times during that month. The two discussed in detail pricing and customers for Pioglitazone Metformin.

3643.    Sandoz also did its ████████ with Teva that month. Green (Teva) communicated by phone multiple times in April 2013 with P.K. (Sandoz).

3644.    A month and a half later, on April 16, 2013, Sandoz finally received FDA approval to market Pioglitazone Metformin. The next day, CW-1, a Sandoz senior pricing executive, emailed the sales team stating: ████████████████████████ ████████████████████████ ████ Six minutes later, CW-1 e-mailed CW-3 individually, asking him to ██████████ ████████

3645.    That same day, CW-3 exchanged two calls with CW-6 of Aurobindo lasting two minutes and six minutes. The next day, on April 18, 2013, the two competitors spoke again for ten

minutes. During that call, CW-6 provided CW-3 with Aurobindo's dead net prices at several

customers, including Cardinal and CVS. CW-3's contemporaneous notes from that call are pictured

below:



3646.   At the same time, Sandoz was speaking with Teva. On April 18 and April 19, 2013,

CW-2, a Sandoz senior sales executive, spoke three times with Green of Teva, including two calls

lasting four minutes and one call lasting eight minutes.

3647.   Later in the evening on April 19, 2013, CW-1 e-mailed Kellum and others at Sandoz

regarding Pioglitazone Metformin stating, ████████████████████████████████████████

████████████████████████████████████████████████ Others at

Sandoz agreed, and Sandoz submitted an offer to ABC on April 22, 2013.

3648.   On April 23, 2013, ABC contacted Teva executives Green and Rekenthaler. ABC's

message was that Sandoz had entered the market for Pioglitazone Metformin IR and wanted Teva,

the biggest player, to give Sandoz the ABC business. ABC made clear that Teva's decision on whether to concede to Sandoz would affect the overall competition in the Pioglitazone Metformin IR market because Sandoz would not compete further. ABC wrote to Teva: ███████████ ███████████████████████████████████████████████████████████ ███████████████████████████

3649.    Within minutes, Green emailed his Teva team ██████████████████ ███████  A Teva Senior Director replied, ████████████████ and noted that Teva had maintained most of its accounts. Green agreed that there was no sense in maintaining the business. In accordance with fair share, Teva conceded the account to Sandoz.

3650.    Three days later, on April 26, 2013, Teva declined to bid to retain the business and noted in Delphi, its internal tracking database, that ████████████████████████ ████████████████████████ and stated the reason for the concession was ████████ ███████████████  That same day, ABC awarded the business to Sandoz.

3651.    Also, that same day, on April 26, 2013, Sandoz officially entered the market and published WAC pricing that matched its competitors.

3652.    A week later, a Sandoz employee who did not have a pricing or sales role wondered whether Sandoz might pursue Rite Aid's business for Pioglitazone-Metformin IR. A Sandoz Associate Director of Pricing said it was an interesting proposition ████ he wrote, ████████ ██████████  He knew Sandoz had just told Teva, via ABC, that Sandoz would be ████████ ████████████  meaning it would no longer compete with Teva for share.

3653.    Sandoz's entry prompted even more communication between the competitors. Between May 8 and May 20, Nesta of Mylan spoke with CW-4 of Sandoz three times and with Green of Teva more than 20 times. Additionally, Grauso of Aurobindo spoke with K.G. of Torrent

on May 16, 2013.  In addition to Green (Teva), Grauso (Aurobindo) communicated by phone directly with Nisha Patel at Teva in the second half of 2013.

3654.   Through this coordination, Teva and Mylan conceded significant market share of Pioglitazone Metformin to Sandoz, Taro, Aurobindo, and Torrent, and in return, the new entrants agreed to support the supracompetitive pricing and not compete for market share in excess of their fair share.

### 3.   Cardinal

3655.   Cardinal communicated pricing and other confidential details among the Defendants. For example, on January 20, 2014, Teva submitted a bid to Cardinal and added a note requesting that Cardinal relay a message to Perrigo: ███████████████████████████████████ ████████████████████████████████ Eight days later, over the telephone, Cardinal agreed that it would ███████████████████████ Cardinal informed Perrigo that Teva would compete no further if allowed to take the Cardinal account, but, on this occasion, Perrigo wanted to keep Cardinal's business.

3656.   Cardinal's generic drug buyers were in constant contact with the Defendants and were aware of the rules of the scheme to concede share among the Defendants. Cardinal knew that the goal was to reach fair share. For example, on May 11, 2012, Teva's Senior Director of National Sales told an executive at Cardinal about a change in plans for the HIV/AIDS drug Combivir. Teva had made plans to supply Cardinal but had won more than its fair share of business, thereby violating its understandings with competitors Lupin and Aurobindo. Teva apologized for the confusion and wrote that, because Teva had won too much other business—more than its fair share—Teva would ██████████████████████ to its competitors. Cardinal's executive replied that he understood and then asked Teva for a favor.

3657.    Cardinal executives told the Defendants that Cardinal wanted to prevent price erosion by maintaining current customer allocations. For example, in December 2012, a Cardinal executive in charge of generic drug purchasing explained to Teva on a telephone call why he wanted to keep the current market allocation fixed—doing otherwise by allowing Teva to take share from Sun would ███████████ as Sun would seek share elsewhere by lowering its prices.

3658.    Cardinal's involvement in the overarching conspiracy continued even after the creation of Red Oak Sourcing in 2014. Red Oak is a joint venture between Cardinal and CVS Health that is, according to its website, ████████████████████ ███████ Red Oak employees negotiate on behalf of both Cardinal and CVS Health. Some of the same employees who were involved in the overarching conspiracy while at Cardinal accepted new positions at Red Oak and continued to be involved with price-fixing among the Defendants, except that they were now responsible for an even larger share of the market.

3659.    The Red Oak executives often requested that the Defendants provide charts showing the current allocation of market share. These overviews were requested so that Red Oak could more knowledgeably engage with the Defendants on fair share. For example, on multiple occasions, including at the end of April 2015 and in mid-August 2015, Red Oak requested that Teva provide comparative market share charts showing which customers had been allocated to which manufacturers. Teva replied in an email titled ████████████ making clear that it was Red Oak that sought the information. The spreadsheets contained a breakdown of the current market share of each manufacturer for the requested drugs.

a.    **Imiquimod**

3660.    On February 25, 2010, Fougera received FDA approval to market Imiquimod Cream. At that time, Fougera was the only generic manufacturer in the market and it used that as an opportunity to set a high price for the product.

3661.   Less than two months later, on April 13, 2010, Perrigo announced that it would be the AG for Imiquimod Cream. That same day, D.K., a senior Fougera executive, sent the following e-mail to Kaczmarek, also a senior Fougera executive:



3662.   Later that same day, Kaczmarek called CW-6, a senior sales executive at Fougera, and they spoke for nearly four minutes. CW-6 hung up and immediately called T.P., a sales executive at Perrigo, and they spoke for nearly nine minutes. When CW-6 hung up with T.P., he promptly called Kaczmarek back. That call lasted less than one minute.

3663.   It is rare that the entry of a generic competitor would cause prices to actually increase – but it did so in this case. Three days later, on Friday, April 16, 2010, in advance of Perrigo's entry into the market, Fougera increased its WAC pricing for Imiquimod Cream. That same day, CW-6 called T.P. The call lasted more than two minutes. Immediately after hanging up, CW-6 called his supervisor, Kaczmarek, and they ultimately spoke for more than six minutes. Immediately after hanging up with Kaczmarek, CW-6 called T.P. back. The call lasted one minute.

3664.   The next business day, Monday April 19, 2010, Perrigo sent an internal e-mail stating that ███████████████████████████████████████████████████████████ As a result of the increase, Perrigo's WAC pricing would end up even slightly higher than Fougera's.

REDACTED – PUBLIC VERSION

That same day, John Wesolowski, a senior executive at Perrigo, called T.P. and they spoke for nearly six minutes. This set off another rush of communications between T.P. of Perrigo and CW-6 of Fougera, with each of them concurrently reporting the results of those communications to their superiors, Wesolowski and Kaczmarek. These calls, which all occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:04:44 | 0:05:51 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:16:56 | 0:00:26 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:34:36 | 0:03:48 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:39:16 | 0:07:13 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:48:29 | 0:03:42 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:52:43 | 0:03:16 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:54:33 | 0:08:49 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:56:29 | 0:06:39 |

3665.    The following week, between April 24 and April 27, 2010, the NACDS held its annual meeting in Palm Beach, Florida. Several executives from Fougera and Perrigo were in attendance, including Kaczmarek, D.K., and CW-6 from Fougera and Wesolowski and S.K., senior executives from Perrigo.

3666.    Fougera and Perrigo executives were speaking about Perrigo's launch throughout the conference. On April 26, 2010, T.P. and CW-6 spoke by phone for seven minutes. Immediately after that call, CW-6 hung up and called Kaczmarek, speaking for four minutes.

3667.    Similarly, on April 27, 2010, D.K. e-mailed Kaczmarek while they were still at the NACDS meeting, stating that he needed ████████████████████████████████ ████████████████████████████████████████████████

3668.    On April 28, 2010, Perrigo officially entered the Imiquimod Cream market and published WAC pricing that was slightly higher than Fougera's. That same day, D.K. e-mailed Fougera executives with an update regarding his conversations at the NACDS meeting. With respect to Imiquimod Cream, D.K. stated, ████████████████████████████████

██████████████ D.K. explained that Fougera gave up McKesson and ABC to Perrigo because

██████████████████████████████████████████ He also noted that he was

pleased that Perrigo has ██████████████████████████████████

██████ CW-3, a sales executive at Fougera, expressed confusion that Fougera had lost ABC's

business. Kaczmarek explained that ████████████████ CW-3 replied: ██████████████

██████████████

3669.   On April 30, 2010, a senior Fougera executive, L.B., demanded an urgent

explanation from D.K. as to why Fougera was willing to give up both McKesson and ABC. D.K.

reminded Boesch that it was inevitable that Perrigo would take some of the market. D.K. also

explained: ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████ D.K. stated that Perrigo's share would likely settle in the range of

30-40% ████████████████████████████████████

██████████████████

3670.   Consistent with fair share principles and the prior discussions between the

competitors, by April 30, 2010 Fougera had given up more than ten of its Imiquimod customers to

Perrigo.

3671.   On May 16, 2010, Fougera was preparing an internal presentation regarding

Imiquimod Cream, which included a statement that ████████████████████████████████

While reviewing the presentation, Boesch challenged D.K. about the statement, asking ██████

████████████████████████████████████████████████

D.K. assured Boesch that ████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████████████
███████

3672.   The next day, on May 17, 2010, CW-6 and T.P. exchanged at least six calls, including one lasting more than six minutes, likely to confirm (again) the agreement in place between the two competitors.

3673.   Several months later, on September 8, 2010, CW-6 circulated a press release to the Fougera sales team announcing that Perrigo had received its own ANDA approval to market generic Imiquimod Cream. Previously, Perrigo had been selling the AG through a license with a branded manufacturer. That same day, CW-6 called T.P. That call lasted less than a minute. T.P. called CW-6 back almost immediately, and they spoke for more than two minutes.

3674.   On September 27, 2010, CW-6 gave a presentation to Fougera's parent company titled ███████████████████████ during which he noted that Fougera had given up Imiquimod share to Perrigo and that, with regard to the larger fair share understanding, Fougera is ████████████████████████████████████ Later that year, in November 2010, CW-6 also noted in his monthly recap that ██████████████████ in the Imiquimod market.

3675.   Fougera also continued to monitor the status of other competitors' plans to enter the Imiquimod market. For example, on February 7, 2011, a Glenmark employee called CW-6, and they spoke for four minutes. Later that day, CW-6 e-mailed Kaczmarek and D.K. regarding Imiquimod Cream that █████████████████████████████████████████████
████████████

3676.   Although Fougera was fortunate that Glenmark had no near-term plans to enter the Imiquimod Cream market, another competitor – Sandoz – did receive FDA approval on February 28, 2011 to launch the product. That same day, CW-6 of Fougera and T.P. of Perrigo exchanged at least five calls, including two calls lasting two minutes each.

3677.    On March 1, 2011, one of Fougera's customers, NC Mutual, also e-mailed CW-3, a sales executive at Fougera, to tell him that Sandoz was launching Imiquimod. CW-3 promptly forwarded the e-mail to Kaczmarek. That same day, CW-6 called T.P. and they spoke for more than three minutes.

3678.    When Sandoz entered the market, it did so seamlessly – initially taking comparable share from the existing competitors Fougera and Perrigo.

3679.    For example, in late February and early March, Sandoz made offers to ABC, a Perrigo customer, and Rite Aid, a Fougera customer. In total, the customers accounted for approximately 13% of the Imiquimod Cream market (ABC at 8% and Rite Aid at 5%).

3680.    On March 3, 2011, Fougera declined to bid to retain the Rite Aid business and gave up its primary position to Sandoz. The next day, on March 4, 2011, Kellum of Sandoz followed up with S.G., a sales executive at Sandoz, stating, ████████████████████████████ ████████████████████████████████████████ Later that day, Perrigo followed suit and declined to bid to retain the ABC business. That same day, CW-6 called T.P. and they spoke for four minutes. A few minutes later, Kaczmarek called CW-6 and they spoke for nearly five minutes.

3681.    Around this same time, Taro was also starting to make plans to enter the market. Between March 6 and March 10, 2011, representatives from Fougera, Perrigo, Sandoz, and Taro were all in attendance together at the ECRM Retail Pharmacy Generic Pharmaceutical Conference in Champions Gate, Florida. These representatives included CW-6 from Fougera, T.P. from Perrigo, CW-4 and Kellum from Sandoz, and H.M. and D.S., sales executives from Taro.

3682.    On March 7, 2011, while at the ECRM conference, CW-4 of Sandoz and D.S. of Taro spoke on the phone for four minutes. Later that day, Kellum – CW-4's boss sent an internal e-mail from ECRM stating that he had ██████ Taro may be entering the Imiquimod Cream market.

Also, while at the ECRM conference, CW-6 of Fougera and T.P. of Perrigo spoke once by phone on March 9, 2011. The call lasted one minute. By March 9, 2011, Sandoz had acquired approximately 13% of the Imiquimod Cream market and Kellum recommended that they ████████████████ ██████████████████████████████████ referred to a group of direct purchasers including Plaintiff HEB, Ahold, Schnucks, and Giant Eagle. These were all Perrigo customers, and Sandoz intended to obtain their Imiquimod business ████████████████████████████ ███████████████████████████████████ Those customers were the only additional customers whose business Sandoz was seeking. To that end, Kellum conveyed to S.G., a sales executive at Sandoz, that ████████████████████████████████ ███████████████████████████████████████

Ultimately, on March 17, 2011, Perrigo conceded the consortium business to Sandoz.

3683.   On March 10, 2011, Kellum provided additional color for his recommendation that Sandoz only go after smaller Fougera customers moving forward, explaining that ████████████ ███████████████████████████████████████████ ███████████████████████

3684.   A month or so later, on April 15, 2011, Taro received FDA approval to market Imiquimod Cream. Taro immediately began coordinating its entry with competitors. On April 17, 2011, D.S. of Taro and CW-4 of Sandoz exchanged two calls, with one call lasting twelve minutes. Within an hour of ending the second call, CW-4 called her supervisor, Kellum, and they spoke for five minutes. The next day, on April 19, 2011, D.S. called CW-4 again. The call lasted one minute.

3685.   On these calls, D.S. conveyed to CW-4 that Taro had gotten FDA approval for Imiquimod Cream but advised that Taro would not formally launch until June. D.S. also told CW-4 that Taro had already received a pre-commitment from Econdisc, a large GPO customer, and now would only go after smaller customers. CW-4 understood that D.S. shared this information with her

so that she knew Taro would not attack Sandoz at large customers and, if it did compete for smaller customers, it was only to obtain its fair share of the market. CW-4 also understood that Sandoz should not compete for the Econdisc business, and in return, Taro ██████████████████████ ██████████████████████████████.

3686.    Perrigo and Fougera were also simultaneously coordinating how they would react to Taro's entry. For example, on April 18, 2011, Kaczmarek informed the Fougera sales executives that Taro had received FDA approval to market Imiquimod Cream and asked, ████████████████████ ██████████ This set off a flurry of communications that same day between CW-6 of Fougera and T.P. of Perrigo, who were both concurrently reporting to, and taking direction from, their supervisors, Kaczmarek and Wesolowski. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:17:23 | 0:00:27 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:43:08 | 0:04:09 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:56:57 | 0:02:44 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 17:00:05 | 0:00:08 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:08:22 | 0:03:25 |
| 4/18/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 21:41:15 | 0:06:03 |

3687.    Three days later, on April 21, 2011, CW-6 decided to reach out to Taro directly and called H.M., a sales executive at Taro. The two men spoke for eight minutes. Upon hanging up, CW-6 called Kaczmarek. The call lasted one minute. First thing the next morning, CW-6 sent a text message to T.P. of Perrigo.

3688.    By early July 2011, Taro was finally starting to enter the Imiquimod Cream market. On July 5, 2011, T.P. reached out to CW-6 of Fougera. The call lasted only two minutes, but it set off another rush of communications among the three competitors – Perrigo, Fougera, and Taro – to make sure they were on the same page regarding Taro's entry. These calls, which all occurred within the span of approximately fifteen minutes, are detailed in the chart below:

REDACTED – PUBLIC VERSION

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 9:12:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:13:00 | 0:01:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:18:00 | 0:06:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:23:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:25:00 | 0:02:00 |

3689.    At the same time, D.S. of Taro was coordinating with CW-4 of Sandoz. On July 7, 2011, D.S. of Taro called CW-4 of Sandoz. The call lasted two minutes. CW-4 returned the call and they spoke for sixteen minutes. A few hours later, CW-4 called D.S. and they spoke for another four minutes.

3690.    On July 14, 2011, CW-6 of Fougera called H.M. at Taro again and they spoke for nine minutes. As soon as CW-6 hung up he called his boss, Kaczmarek, and the two spoke for five minutes. Later that day, Kaczmarek e-mailed the Fougera sales team stating, █████████████ ███████████████████████████████████████

3691.    On July 26, 2011, a customer, MedCo, informed Perrigo that it had received a competitive offer for Imiquimod Cream and asked if Perrigo could match the price. MedCo declined to disclose who made the offer. This sparked another flurry of phone communications starting first thing the next morning between Perrigo, Taro and Fougera, as detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 5:52:47 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:19:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:39:00 | 0:01:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:40:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:55:00 | 0:01:00 |
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 7:00:17 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:27:00 | 0:08:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 7:40:00 | 0:04:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:06:05 | 0:04:17 |

3692.    The next day, on July 28, 2011, Perrigo declined to bid to retain the MedCo business. That same day, CW-6 of Fougera called T.P. of Perrigo. The call lasted one minute. T.P. returned the call and they spoke for six minutes.

REDACTED – PUBLIC VERSION

3693.   On August 8, 2011, D.S. of Taro called CW-4 of Sandoz again. They ultimately spoke for seventeen minutes. On that call, D.S. informed CW-4 that Taro had officially been awarded the Econdisc business and the secondary position at Cardinal and that Taro could not support any more customers. CW-4 understood this to mean that the market would remain strong with no price erosion and Sandoz would not have to relinquish any additional customers to Taro. Later that evening, on August 8, 2011, CW-4 passed along competitive intelligence to the effect that Taro █████████████████████████████████████████████████████████████

3694.   On August 19, 2011, Hannaford – a retail pharmacy customer – advised CW-6 that it had received a competitive offer for Imiquimod Cream, but similarly would not identify which competitor made the offer. Thereafter, CW-6 spoke several times with T.P. (Perrigo) and H.M. (Taro), in an effort to discover which competitor made the offer. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:07:00 | 0:02:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:09:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:10:00 | 0:06:00 |

1518. During those calls, CW-6 was able to confirm that Taro had in fact made the offer. Later that day, CW-6 sent the e-mailed Kaczmarek that Hannaford received a competitive offer on Imiquimod, but would not tell him █████████████████████████ Despite not getting this info from the customer, CW-6 reported █████████████████████ CW-5 responded again that he thought they should ███████████████ Kaczmarek ultimately agreed with this assessment, and Fougera conceded the account to Taro.

3695.   The goal of these communications between the various competitors on Imiquimod Cream – Fougera, Perrigo, Sandoz, and Taro – was always to avoid competition and minimize the

price erosion that would typically come with the entry of new competitors. The results were highly successful.

3696.   The next day, on August 20, 2011, D.K., a senior executive at Fougera, sent an e-mail to other senior Fougera executives regarding Imiquimod Cream stating, ███████████

████████████████████████████████████████████████████████

████████████████████████████████

3697.   Throughout September 2011, H.M. of Taro, CW-6 of Fougera, and T.P. of Perrigo spoke several times by phone during which they discussed, among other things, Taro's new capacity to take on additional market share for Imiquimod Cream and how that should be accommodated in the market. As always, CW-6 and T.P. kept their supervisors, Kaczmarek and Wesolowski, informed of the content of those conversations. Some of these calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:22:00 | 0:01:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:24:00 | 0:04:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:49:00 | 0:02:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:46:00 | 0:01:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:31:14 | 0:12:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:23:00 | 0:04:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:29:00 | 0:01:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:39:00 | 0:03:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 12:46:00 | 0:04:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:49:00 | 0:01:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:12:00 | 0:01:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:19:00 | 0:01:00 |
| 9/26/011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:26:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 5:48:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:50:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:04:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:46:35 | 0:05:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:05:00 | 0:03:00 |
| 9/27/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 8:42:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:24:00 | 0:01:00 |

3698.   After this series of calls, on September 30, 2011, Kaczmarek e-mailed other Fougera sales executives, including D.K., to advise them that Taro had made an offer for Imiquimod Cream

at Wal-Mart, a Fougera customer. Kaczmarek explained that ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████ Kaczmarek reluctantly recommended that

Fougera give up Wal-Mart's business and ████████████████████ Kaczmarek noted

that, if Fougera defended Wal-Mart's business, Taro would likely just go after other customers at

lower and lower prices ████████████████ On the other hand, if Fougera gave up Wal-

Mart, Taro would hopefully ██████████████████████████████████

██████████████ D.K. agreed with Kaczmarek's recommendation and Fougera

ultimately ceded the business to Taro in order to keep the market stable.

3699.   On February 7, 2014, a Cardinal executive called Teva and said he had explained to

Perrigo that Teva was ███████████████ and would be done with competition but had

been unsuccessful in persuading certain people at Perrigo to play fair on this drug (Imiquimod

cream). Teva employees were frustrated that the Perrigo employee in charge had either missed the

signal or had decided not to play fair on this drug. They were ████████████████████████

███████████████████

### 4.   H.D. Smith

3700.   H.D. Smith was a pharmaceutical distributor that sold to dispensers of prescription

drugs including independent pharmacies and hospitals, reimbursement for which are in most cases

provided by payors such as Plaintiff. H.D. Smith was wholly acquired by ABC in January 2018.

3701.   Because the individuals responsible for arranging supply contracts for H.D. Smith

were in constant contact with the Defendants, they understood that, according to the rules of fair

share, Defendants agreed to act ████████████ by conceding share to new entrants and refusing to

steal share when another competitor increased prices. For example, on multiple occasions in the

spring and summer of 2015, Teva told H.D. Smith that Teva would not lower prices and would concede business to other manufacturers ████████████████████████████████

3702.   H.D. Smith's employees were aware of the fair share rules and the pricing consequences of not following them. For example, on March 4, 2014, Dr. Reddy's complained to H.D. Smith that another manufacturer not named in this complaint was not playing fair: ████
████████████████████████████████████████████████████████████████
████ H.D. Smith replied that it would have ██████ to give Dr. Reddy's its ██████ but lamented that the competitor continued to lower the prices for this specific drug and left H.D. Smith with no choice. A few days later, on March 7, 2014, Dr. Reddy's reiterated the message for H.D. Smith to relay to other manufacturers. ████████████████████████████████
████████████████████████████████████████

3703.   As illustrated below, H.D. Smith was involved in the fair share conspiracy and facilitated supracompetitive prices for generic drugs.

### a.   **Acyclovir**

3704.   In November 2014, Heritage and Zydus allocated the market for Acyclovir through H.D. Smith.

3705.   On November 10, 2014 when Zydus had recently entered the market for Acyclovir, Heritage's Associate Director for Pricing and Contracts recommended that Heritage ██████ from certain accounts where Zydus sought share. Vice President of Marketing Operations L.S. disagreed that the fair share rules required Heritage to give up business at H.D. Smith:



3706.   The Heritage team wanted to retain the H.D. Smith business and thought it was fair to do so but did not want Zydus to consider them irrational for refusing to give up share. A.S. of

**REDACTED – PUBLIC VERSION**

Heritage then agreed with H.D. Smith's D.M. that Mando would remind Zydus not to target Heritage because they had a common goal in keeping prices elevated across the market. A.S. was the Heritage contact person for H.D. Smith.  On November 10, 2014, L.S. recommended to A.S.:



3707.   L.S. knew that his colleague A.S. would ███████████ to send a message to Zydus via D.M. at H.D. Smith because L.S. was the former Director of Generic Pharmaceuticals Business Development at H.D. Smith. He had worked closely with D.M. A.S. replied ██████ and specifically confirmed that she would ████████████████

3708.   At an in-person meeting on November 17, 2014, A.S. communicated ███████████ to H.D. Smith so that Zydus would know Heritage was already below its fair share and that Zydus needed to target ██████████ in order to avoid price erosion.

3709.   In an internal Heritage email on November 19, 2014 L.S. mentioned the price stability rationale behind the discussions with H.D. Smith: ████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████ L.S. added that Sather would follow up with Dena Mando from H.D. Smith ████████████████████████████ ███████████████████████████████ In another email, L.S. confirmed that ████████████████████████████

### b.   **Valganciclovir**

3710.   On September 21, 2015, Dr. Reddy's, Camber, and Aurobindo allocated the market for Valganciclovir through H.D. Smith. H.D. Smith asked Dr. Reddy's for a new price for Valganciclovir due to a competing bid from Camber, a new entrant in the market. Dr. Reddy's

decided to concede the H.D. Smith account to Camber. Conceding accounts to new entrants is one of the key principles of the Defendants' overarching fair share agreement. Dr. Reddy's Director of Marketing C.W. wrote: █████████████████████████████████████████████████████

Dr. Reddy's Senior Director & Head of National Accounts V.B. added:

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

3711.   H.D. Smith had told the Dr. Reddy's team that the bid from Camber would be ████████ They then learned from H.D. Smith that the price being offered by Camber was twice as high as they had expected. V.B. (Dr. Reddy's) wrote: ████████████████████████ ██████████████████████████████████████████████████ ████████████████

3712.   On September 22, 2015, K.N. (Dr. Reddy's Senior Director of National Accounts) emailed D.M. (H.D. Smith) to make clear that the reason for the concession was to avoid competition between manufacturers: ██████████████████████ K.N. wrote to D.M.: ██ ███████████████████████████████████████████████████ ██████████████████████

3713.   The next day, September 23, 2015, K.N. asked her Dr. Reddy's colleagues to reconsider the decision to walk away. If H.D. Smith could not buy Valganciclovir from Dr. Reddy's, it would fall short of the purchase points needed to qualify for a Dr. Reddy's loyalty program, and Neely felt that that would hurt her sales relationship with H.D. Smith.

3714.   The Dr. Reddy's team changed its mind and decided to keep the H.D. Smith business, but they worried that refusing to concede to Camber would disrupt the overarching fair

share agreement. Camber would see Dr. Reddy's defending its current contracts and would be inclined to ███████████████ thereby eroding price, to the detriment of all.

3715.   K.N. then asked D.M. at H.D. Smith to tell the competition directly: ████████ ████████████████████████████████ In this context, █████████████ is meant to indicate that the price is the 'right' price and should be maintained. Neely knew that both H.D. Smith and Camber would understand this meaning of the term ███████████████ and Camber would then know to keep prices around $1200 rather than lowering them to $600 to obtain share.

3716.   D.M. agreed to pass the price-fixing message to Camber so long as H.D. Smith could keep the contract at the $1200-level price plus the loyalty points: ████████████████ she wrote. K.N. replied ████████ and then wrote to her team at Dr. Reddy's: █████████████ ████████████████████████████████

3717.   Dr. Reddy's Senior Director & Head of National Accounts V.B. wanted to double-check that H.D. Smith would get the message through to Camber. He asked K.N.: ████████████ ████████████████████████████████

3718.   That evening, D.M. and K.N. met for drinks at K.N.'s home before dining together at a restaurant at the W Hotel in Hoboken. K.N. confirmed once again that the new entrant was Camber, and that H.D. Smith would be willing to serve as a price-fixing liaison. K.N. replied to V.B. at 6:13 pm: ████████████████████████████████ ████████████████████

3719.   H.D. Smith remained in contact a few days later as Aurobindo entered the market. On September 28, 2015, K.N. wrote: ████████████████████████████████ ████████████████████████████████ Mando replied

████████████ As a result of the H.D Smith's involvement in this scheme, Camber, Dr. Reddy's, and Aurobindo were able to maintain high prices for Valganciclovir.

**5.      Harvard**

3720.    Harvard is a formerly independent drug distributor that was wholly acquired by Cardinal in 2016. Both before and after the acquisition, multiple Harvard employees were involved in the overarching fair share scheme. The acquisition did not disrupt the channels of collusive communication between the Defendants. At a meeting in 2016, ABC told Sandoz that Cardinal's acquisition of Harvard would serve to keep the number of players in the market stable and ████ ████████████

3721.    Generic drug manufacturers have two main ways of making sales to distributors such as Harvard. The simplest is when a customer requests a ████████████ or ████████████ of a specific number of units. The manufacturer responds with a price—which is often the WAC price or very close to it—and if the customer accepts, the drugs are shipped. The second and far more prevalent means of selling generic drugs is through ongoing supply contracts, typically renegotiated at least once a year. The customer sends a request for proposal ("RFP") either for a single drug or for a list of drugs and receives bids from the manufacturers. Incumbent manufacturers are usually given a chance to counterbid the lowest bid, and the process may involve multiple rounds of bidding. The manufacturer with the lowest net price typically wins the bid and sometimes the runner-up is also awarded a ████████████ contract, to be used as a backup or for a certain percentage of purchases. Until the next RFP or renegotiation, the customer can place orders for drugs and pay the RFP contract price rather than the published list price.

3722.    During rounds of RFP bidding for multiple generic drugs at other distributors, Harvard passed messages between the Defendants so that they could ██████ one another's pricing. For example, at least one Harvard employee used a private email account to send RFP details to the

private email accounts of individuals at two or more of the Defendants. The use of private emails was designed to avoid detection because the conspirators knew that exchanging confidential details during RFPs was not an acceptable business practice.

### a.    Eplerenone

3723.    During the relevant time frame, Sandoz and Greenstone were the primary manufacturers of Eplerenone.

3724.    While Greenstone was coordinating with Sandoz in April 2014 to follow Sandoz's price increases on various formulations of Clindamycin, it was also coordinating to lead a price increase on Eplerenone Tablets.

3725.    Originally, Greenstone planned its Eplerenone price increase to become effective on May 1, 2014, but sometime in mid-April that increase was delayed. Shortly after the decision was made to delay the Eplerenone price increase, on April 22, 2014, Nailor of Greenstone called Kellum and left a message. They traded voicemails until they were able to speak the next day for nearly fifteen minutes.

3726.    Greenstone planned its increases of Clindamycin and Eplerenone together, as it was coordinating with Sandoz – and both increases ultimately became effective on June 2, 2014.

3727.    Shortly before the increases became effective, on May 29, 2014, Nailor of Greenstone called Kellum of Sandoz, leaving him a twenty-six second voicemail.

3728.    Sandoz's intent was always to follow Greenstone's Eplerenone price increase, rather than compete for market share. Sandoz began preparing to follow Greenstone's Eplerenone price increase in early July 2014. However, because of price protection terms with several of Sandoz's customers, the company decided to delay the roll-out of its Eplerenone price increase (and several others) until it made more financial sense and Sandoz would be able to limit any contractual penalties that would arise as a result of the increase.

3729.   Ultimately, Sandoz followed Greenstone's price increase on Eplerenone on October 10, 2014. Sandoz increased its pricing by as much as 270% to certain customers. During the time period after Greenstone's price increase and before Sandoz could follow, the two competitors continued to coordinate by phone, including a number of calls between Kellum and R.H. of Greenstone in August 2014. Shortly after the Sandoz price increase became effective, on October 15, 2014, Kellum and Nailor of Greenstone also communicated briefly.

3730.   In 2015, Greenstone also allocated the market for Eplerenone with Upsher-Smith, who purchased the drug from Sandoz.

3731.   Upsher-Smith and Greenstone communicated through Harvard to allow Upsher-Smith to reach fair share without targeting Sandoz's customers.

3732.   On or about May 7, 2015, Upsher-Smith's Senior National Account Manager communicated with Harvard's Director of Sourcing/Supplier Relations to send the message that Greenstone needed to concede share to Upsher-Smith. Upsher-Smith had also sent a nearly identical message via Morris & Dickson about a week earlier, on April 28, 2015: ████████████████ ████████████████████████████████

3733.   Harvard's Director of Sourcing/Supplier relations or another individual at Harvard passed the message to Greenstone. By May 12, 2015, Harvard confirmed to Upsher-Smith that Greenstone would concede the business to Upsher-Smith, as requested, consistent with the rules of the fair share understanding.

3734.   A few weeks later, at an HDMA trade association meeting on June 6, 2015, Sandoz representatives told Harvard representatives that Sandoz greatly appreciated Harvard's work in passing confidential competitive information between the manufacturers ████████████

### b.    Metoprolol Succinate ER

3735.    By January 2014, Dr. Reddy's, Actavis, and Par had secured an agreement to maintain or increase the price of Metoprolol Succinate ER through two Harvard employees. Contemporaneous notes taken by a member of the Par sales team state that:



3736.    By the time these notes were circulated in January 2014, Harvard had confirmed with each of the manufacturers (Dr. Reddy's, Actavis, and Par) that each would follow a price increase by its competitors. Later in 2014, Harvard once again confirmed and then individually reiterated to Dr. Reddy's, Actavis, and Par that they were all mutually willing to ███████ any increase.

### 6.    McKesson

3737.    McKesson shared the view that low-priced market entrants were irresponsible and that to offer low prices for a drug was to 'trash the market.' On trip to India in 2014, McKesson executives noted to former Heritage President and admitted conspirator Malek that another competitor had ██████ the market for Zoledronic Acid 4mg injections with too low a price and, as a result, the competitor had been punished by other industry participants and never picked up significant share.

3738.    The Defendants were aware that the key generics buyers at McKesson understood the fair share system, particularly because of McKesson's extensive involvement in multiple levels of the pharmaceutical supply chain. For example, in certain circumstances, McKesson is a direct competitor of the Defendants because it bid on contracts to supply large retailers such as Target. On one such occasion, Teva conceded the account to McKesson in accordance with the fair share

agreement. McKesson also owns and operates a generic drug manufacturer known as Northstar, and sold drugs including Pravastatin.

3739.   McKesson knew to provide the Defendants the information they needed in order to avoid competition. For example, on August 10, 2015 a Perrigo employee wrote to McKesson:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

3740.   The email contained nothing more than that message and the numerical code for three product sizes of hydrocortisone cream, but another individual at McKesson understood what she needed to do in order to further Perrigo's desire not to compete with G&W. She asked a subordinate to determine the ▮▮▮▮▮▮▮▮ and upon receiving the answer, told Perrigo that a bid at McKesson would not disrupt much of G&W's business.

a.   **Amikacin**

3741.   In the summer of 2014, when a customer requested that Heritage reduce its price on Amikacin, Heritage said that it was aware that Teva's price was slightly lower but that it did not wish to reduce its prices in to gain market share. The Heritage team decided they were ▮▮▮▮▮▮ at the current price ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3742.   On October 10, 2014, Heritage's Neal O'Mara reported that he had had positive conversations with an individual at McKesson who was willing to coordinate with other manufacturers to help Heritage gain share for Amikacin. This person apparently believed it was inappropriate to provide Heritage with precise prices but O'Mara noted that ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

3743.   Despite her supposed unwillingness to discuss prices, what the individual at McKesson was in fact willing to do was to communicate Heritage's intent to compete for only a

limited fair share so that Heritage would not face competition upon Teva's right of first refusal. By October 14, 2014, O'Mara reported that McKesson would help arrange the fair share conspiracy by communicating with Teva:



3744.   McKesson successfully passed the message to Teva. With assurances that Heritage would act responsibly in a two-player market. Heritage and Teva were then careful not to compete.

3745.   By a year later, October 1, 2015, Teva had raised both its list prices and its contract prices for both the 500mg/2mL and 1g/4mL dosage forms of Amikacin by over 50%. Heritage's Katie Brodowski said she had ███████████████ that Teva would also increase its contract prices and would therefore ███████████ Upon learning of the confirmation of the price increase Heritage's VP of Marketing Operations wrote that it was ███████████ and Brodowski responded: ███████████████████ (Ellipsis in original.)

3746.   When contacted by customers looking to avoid high prices, Heritage supported Teva's price increase by refusing to lower prices. Heritage wrote that it ███████████████ ███████████████ because ███████████████████

b.   **Lamotrigine ER**

3747.   At a sales and marketing meeting held in April 2013, the Dr. Reddy's sales team arrived with certain unspecified competitor intelligence regarding Lamotrigine ER.

3748.   In June 2013, the Dr. Reddy's team was planning to enter the market for Lamotrigine ER in either in July or August. The only other competitors at the time were Par and Wockhardt, although the latter had supply problems.

3749.   On June 17, 2013 a member of the Dr. Reddy's sales team wrote an internal email about a customer that wanted a bid on Lamotrigine ER. She advised that they should ███████████

██████████████████████████████ If Par was unwilling to concede the business, an aggressive offer would only have the result of driving down prices. Thus, it was important for Dr. Reddy's to know which accounts Par would defend or concede.

3750.   The same day, Dr. Reddy's Director of National Accounts told colleagues that he had spoken to McKesson and confirmed that McKesson was still with Par and added that ████ ██████████████████████████████ Senior Director Victor Borelli told his colleagues that ABC had communicated to him that Par wanted to keep the ABC account.

3751.   McKesson then communicated with Dr. Reddy's and Par to arrange a market allocation between the two manufacturers. Dr. Reddy's remained concerned that Par might mistake Dr. Reddy's attempts to seek only a limited part of the Lamotrigine ER market for a move to take unfair share. That would then risk that Par would lower prices to retain the account, and this could disrupt the market and drive prices lower. Dr. Reddy's Senior Director for Prescription Marketing wrote: ████████████████████████████████████ ████████████████████████████

3752.   Dr. Reddy's Director of National Accounts replied with assurances that he had ████ ████████ to Par through McKesson, an account that Par did not want to concede. He also said he would meet with McKesson's Senior Director of Generic Product Management in person to discuss the rationale of McKesson's decisions concerning Par and Dr. Reddy's. This was the same McKesson executive who would later be involved in the allocation of the market for Capecitabine between Teva and Dr. Reddy's in 2014. That same day, June 26, 2013, Dr. Reddy's had knowledge Par would be willing to ████████ from another major account.

3753.   In October 2015, Dr. Reddy's and a manufacturer not named as a defendant in this complaint (Wilshire) allocated fair share for Lamotrigine ER through WBAD.

3754.    On October 28, 2015, Dr. Reddy's executives had dinner with WBAD's Director of Generic Pharmaceutical Sourcing. The next morning, he told them he had received a bid for 25% of the Walgreens business from a competitor and encouraged Dr. Reddy's to concede this account in exchange for no further competition from the competitor: ████████████████████████ ████████████████████████████████████████████████████ ████████████████████

3755.    Dr. Reddy's responded that it believed the competitor ██████████████████ ██████████████ and Reddy's thought that had already been achieved, fair share style, by taking share ████████████████████████ Dr. Reddy's noted that although its ██████████ would be to retain the business because ████████████████████████ it would ████████████ and its decision would depend on its knowledge of the market share targets of its competitor, and asked WBAD ██████████████████ Dr. Reddy's added that it would ██████████ WBAD for an update on the competitors' ██████████ ████████

3756.    Dr. Reddy's then directed a national account manager to ████████████████ ██████████████ Reddy's was concerned that the plan had gone awry, because Par was supposed to have conceded all portions of the McKesson business to Wilshire, thereby giving Wilshire its fair share of 20%. But Wilshire had bid only on a portion of the McKesson business, and Dr. Reddy's was ████████████ this happened. Dr. Reddy's later learned that Wilshire intended to bid the remainder and communicated back to McKesson that this was appropriate because Wilshire should be targeting Par and not Dr. Reddy's accounts.

3757.    WBAD continued to be involved in arranging allocation of share through 2016. By this time, Actavis had entered the Lamotrigine ER market. On April 11, 2016, Dr. Reddy's learned of a challenge at WBAD. At this point, Dr. Reddy's was waiting for confirmation that the challenger

was Actavis, because, even though Dr. Reddy's was ▅▅▅▅▅▅▅ it knew it needed to play fair

and ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ in order to confirm for Actavis that it was ▅▅▅

▅▅▅ Dr. Reddy's Senior Director for National Accounts noted that she wanted to speak with

WBAD to obtain ▅▅▅▅ and had called and emailed but had not yet received the competitive

information she expected from WBAD. Dr. Reddy's Director of Prescription Marketing asked: ▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅ The Senior Director said she was ▅▅▅▅▅▅▅▅

▅▅▅▅▅ from an individual at WBAD. Once again, Dr. Reddy's requested the information

because it knew that WBAD would communicate share intentions back and forth between the

manufacturers.

### 7.   Morris & Dickson

3758.   The Defendants were frank about their adherence to fair share in communications

with Morris & Dickson. For example, on March 17, 2015, a Sandoz Director of National Accounts

sent an offer to Morris & Dickson seeking additional volume for the drug Diclofenac gel, but

wanted to make clear to Morris & Dickson and Sandoz's competitors (in this case, Global, a division

of Impax) that this additional share was fair and not an act of competitive aggression. ▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ As another

example, in September 2014, when a new entrant made an offer to supply Morris & Dickson with

Hydralazine, Sather of Heritage wrote to her contact at Morris & Dickson and explained that, as per

an earlier discussion between the two, Heritage would concede the account to the new entrant

because ▅▅▅▅▅▅▅▅▅▅▅▅

3759.   As a smaller wholesaler, Morris & Dickson had a strategy of offering competitive

intelligence and facilitating fair share in exchange for preferable treatment from the Defendants. For

example, on May 14, 2014, E.L. of Morris & Dickson requested a discount on Clonidine-TTS patch

from Teva. Teva's Associate Director of National Accounts wrote to Patel ██████████████

███████████████████████████████ Patel agreed: ████████████████████

████████████████████████████████████████████████████████████████

███████████████████ However, Patel wanted Teva to concede the Morris & Dickson account

to Actavis rather than offer a price reduction because ████████████████████████

████████████████████████████████ Patel said, ██████████████████

██████████████████████████████████ The Teva team was

insistent █████████████████████████████████████████████████████

████████

3760.    As another example, in May 2014, Sullivan of Lannett met with Morris & Dickson to

obtain confidential information about how other manufacturers would support price increases. In

her notes she remarked that Morris & Dickson ████████████████████████████

████████████████████████████████ Later that same week, she had dinner with

two Morris & Dickson employees along with S. of Heritage.

3761.    Like the other distributors, Morris & Dickson ensured that lines of communication

remained open among the Defendants even whA.en they were reluctant to speak to one another

directly. For example, in March 23, 2015, Morris &Dickson's Dale Kelley learned from a new

contact at Apotex that Apotex did not yet have a launch date for generic Nasonex, which was

contrary to the industry perception that Apotex would launch imminently. The next day Kelley

forwarded that email directly to an individual at Sandoz, who replied ████████

a.    **Eszopiclone**

3762.    Teva, Dr. Reddy's, Mylan, Lupin, Glenmark, Sun, and non-defendant Roxane

launched Eszopiclone on April 15, 2014. In the months leading up to the launch, the various

manufacturers sought to obtain ██████████████ with customers including the Distributors. The

Distributors, including Morris & Dickson, helped the Defendants to allocate the market with minimal competition by relaying their intentions regarding share, preferred account targets, and pricing.

3763.   Months before launch, on February 6, 2014, Cardinal reached out to Dr. Reddy's to begin gathering information about the likely allocation plan. Cardinal wrote ████████████ ████████████████████████████████████████ ████████████████████████ That evening, a Reddy's executive provided the answer to Cardinal's key question—"████████████████████ and directed a more junior Dr. Reddy's employee to send Cardinal that answer. Cardinal's purpose in asking about Dr. Reddy's market share goals was so that it could discuss Dr. Reddy's market share goals with the other manufacturers seeking pre-commitments.

3764.   Because of the large number of competitors, the Defendants and Roxane were confused about pricing and share intentions, despite their frequent sharing of information. On March 25, 2013, Dr. Reddy's received a voicemail from a customer that explained that new bids were being sent because manufacturers were ████████████████████ and that Glenmark and Sun/Caraco also sensed that the market had shifted. The Dr. Reddy's team was puzzled by this but knew they could contact ABC and Morris & Dickson to learn about their competitors' intentions.

3765.   On April 2, 2014, Dale Kelly at Morris & Dickson reached out to Susan Knoblach at Sun to help avoid price erosion on Eszopiclone. He gave her the pricing proposals that had been sent to Morris & Dickson by four manufacturers. He added that Roxane and another manufacturer were ████████████████████████████████████████ ████████████████████████████

### 8.    Walgreens / WBAD

3766.    Walgreens/WBAD is a major drug distributor that operates a chain of over 9,000 pharmacies. WBAD has a long-term agreement to purchase generic drugs together with ABC. The same individuals who were involved in market allocation and price increase schemes for Walgreens continued to do the same after Walgreens formed WBAD, and continued to do so when WBAD combined its drug purchasing efforts with ABC. WBAD executives were equally as responsible for ABC's purchases and involvement in the collusion with the Defendants as those who were official employed by ABC. For example, on April 9, 2015, a Teva executive wrote to WBAD that she had ███████████████████████████████ and then communicated Teva's expectation that ████████████ a portion of the ABC business to Dr. Reddy's, then Reddy's would be ███ competing.

3767.    WBAD executives consistently shuttled between the Defendants so that they would know each other's market share goals and intentions not to compete. The following excerpt from an email regarding the drug Fluconazole, written by Dr. Reddy's Senior Director of National Accounts, is typical of WBAD's involvement in fair share. On a Sunday morning in October 2015 she wrote:



3768.    Walgreens and later WBAD employees were in close contact with the generic drug manufacturers that participated in the fair share conspiracy. For example, in March 2014, WBAD relayed a message from Dr. Reddy's to Teva. Dr. Reddy's wanted Teva to know that it was underbidding Teva's accounts for Moxifloxacin because Dr. Reddy's believed Teva ███████ ███ at the launch of the product. Dr. Reddy's wanted Teva to know that it was still committed to the overarching agreement, but that here, Dr. Reddy's should be allowed to offer lower prices and take share without further retaliation because Teva had not conceded accounts as it should have.

3769.    Two years later, in April 2016, another WBAD executive continued to be involved in anticompetitive activity regarding the same drug. He informed Teva that a new entrant wanted only limited share on Moxifloxacin, implying that Teva should concede, and then, as a reward for playing fair, told Teva ███████████████████████ in the portfolio ████████████████████ ██████████████████████

### a.    Disulfiram

3770.    In July 2014, Teva and Breckenridge allocated the market for Disulfiram through WBAD. WBAD reached out to T.C. at Teva to inform her that WBAD had received a competitive offer on Disulfiram tablets from Breckenridge (at the time, the only other competitor). In the same email, WBAD passed Breckenridge's market share intentions to Teva: ████████████████ ██████████████

3771.    A Teva employee calculated the percentage of total market share represented by WBAD and expressed to colleagues that Breckenridge was ██████████████████████ meaning that Breckenridge must have miscalculated, because WBAD's large account would by itself surpass Breckenridge's stated market share goal. Teva subsequently successfully matched the competing bid to maintain the account and looked for other smaller accounts it could cede to Breckenridge.

### b.    Isotretinoin

3772.    In March 2013, Teva and Dr. Reddy's allocated the market for Isotretinoin through WBAD and ABC. Dr. Reddy's John Adams reported in an internal email on March 27, 2013:



3773.   Although Marc Kikuchi is presently the CEO role at Dr. Reddy's, at the time of the email he was at ABC. In August 2014, Dr. Reddy's added the drug to its ████████ to WBAD, asking to be given the ABC business along with other drugs.

3774.   By April 9, 2015, Teva had conceded CVS, Cardinal, and ABC to Dr. Reddy's, although Teva was internally divided on whether to concede ABC. The Senior Director, for one, commented ██████████████████████████ and that it was ████████ because Teva ██████████████████████ Nevertheless, she was overruled because, given Teva's earlier concessions, ██████████████ would ██████████████ which was considered fair in what appeared at the time to be a three-player market.

3775.   Teva then discussed that it needed to ████████████ via ABC regarding Isotretinoin. That afternoon, the Teva Senior Director wrote to WBAD and ABC executives ███ ██████████████████" and that the Teva team hoped the Dr. Reddy's team would understand that ████████████████

c.   **Montelukast Sodium**

3776.   On December 20, 2012, Dr. Reddy's and Mylan allocated the market for Montelukast Sodium through what was then Walgreens. An individual at Walgreens gave Dr. Reddy's the name of the drug and the message ██████████████████████ In response, an individual at Dr. Reddy's wrote:



3777.   Having received the signal from Walgreens, Dr. Reddy's did not need to directly communicate with Mylan regarding this drug to implement a market allocation as per the rules of the overarching fair share agreement. The Dr. Reddy's team knew from prior discussions and

dealings with Mylan that Mylan would want the Walgreens account, that the fair share agreement meant Dr. Reddy had to ███████████████ and the estimated share value of Walgreens plus one other account, so Dr. Reddy's could calculate whether Mylan had achieved its fair share.

3778. Earlier that year, Cardinal had been involved in communications between Dr. Reddy's and the other manufacturer of Montelukast Sodium, Teva, to allocate the market for that drug before Mylan's entry. Internal Teva emails from July 2012 note:



### d. **Omeprazole Sodium Bicarbonate**

3779. On August 3, 2016, Dr. Reddy's and Valeant/Oceanside allocated the market and discussed a price increase for Omeprazole Sodium Bicarbonate through WBAD.

3780. Although they spoke on the telephone, their emails reflect the conversation. Dr. Reddy's V.B. wrote to WBAD:



WBAD replied: ████████████████████████████████

3781. V.B. then wrote on a separate email to his Dr. Reddy's colleagues: ████████ ████████████████████████████████████████ ROS refers to Red Oak Sourcing, indicating that WBAD was willing to discuss what the prices should be for Red Oak Sourcing, which controls the purchasing for Cardinal.

e.      **Progesterone and Vancomycin**

3782.    In late 2012 and early 2013, Akorn and Watson (now Actavis) allocated the market

for Progesterone and Vancomycin through an individual at what was then Walgreens (now WBAD),

with the explicit goal of preserving pricing in the overall marketplace.

3783.    During the week of February 18, 2013, two Akorn employees—including the

Director of Sales, National Accounts—held a call with Walgreens during which they arranged for

Walgreens to communicate with Akorn's competitor regarding a fair share arrangement for at least

Progesterone and Vancomycin. After the call, ███████████ to their discussion, Akorn sent bullet

points noting the fact that Akorn had significantly less market share than Watson/Actavis and

confirming that Walgreens would ask Watson/Actavis to concede one of the drugs to Akorn:



3784.    Walgreens then passed the message to Actavis so Actavis would know Akorn would

not compete fully and was seeking only limited share.

3785.    A week later, Walgreens and the Akorn employees scheduled a conference call to

discuss the Akorn-Watson allocation arrangement. Akorn sent a reminder email to Walgreens with

an admission that Walgreens had also been involved in another fair share deal involving the topical

anesthetic drug Lidocaine:



(In 2012, when an unknown manufacturer ██████████████████████ Akorn had

given up the Lidocaine business because Walgreens had insisted it would be ███████████████

These communications involving multiple drugs demonstrate the interdependent nature of the overarching fair share agreement.

3786.    Walgreens transmitted the message to Watson/Actavis. Later, Walgreens told Akorn that Watson/Actavis wanted to keep the product and that Akorn should not make further attempts to compete with Actavis because doing so would only drive the price down to a dollar and would not serve to ████████████████████ Akorn asked if Walgreens would instead award it Vancomycin without seeking a response price from the incumbent supplier, ████████████ ████ a fourth drug, Ketorolac 0.4% 5 ml.

3787.    Watson/Actavis was able to keep the business without having to lower its price. Rather than going ████████████ the average price per 125mg capsule of Vancomycin remained above $10.00 for several years and did not drop below $5.00 until after Akorn and Actavis/Watson were sued in this litigation.

f.    **Sumatriptan**

3788.    In June 2016, writing from Bern, Switzerland, a WBAD executive wrote that he needed to discuss Sumatriptan autoinjectors with Dr. Reddy's. The next day, June 28, 2016, Dr. Reddy's Senior Director and Head of National Accounts Victor Borelli spoke with WBAD's Director of Global Generic Pharmaceutical Sourcing to arrange a truce with Teva regarding the Sumatriptan autoinjector. An email from the Reddy's senior director corroborates:



As on other occasions, WBAD had spoken with Teva about its market share goals, found out which accounts Teva wanted to target or retain to meet those goals, and then relayed that information. In this episode, WBAD specifically did this ██████ for Dr. Reddy's because Dr. Reddy's

had helped WBAD with last-minute one-time buys when WBAD had to fill gaps in supply ███

████████ .

## XIII.  CONCIOUSNESS OF GUILT

3789.    The Defendants were aware that their conduct was illegal. They all made consistent
efforts to avoid communicating with each other in writing, or to delete written electronic
communications after they were made. There are numerous examples, discussed throughout this
Complaint, where Teva employees indicated that they could not talk by e-mail, but had additional
information that they could only convey personally. This was part of a consistent effort by these
individuals, as well as individuals at other Defendants, to avoid putting incriminating information in
writing, in order to evade detection.

3790.    Going back to at least 2012, for example, Heritage executives took overt steps to
conceal their illegal activity and destroy evidence of wrongdoing.

3791.    None of the e-mail accounts maintained by Heritage had any document retention
policy associated with them. Heritage executives were aware of this and utilized the lack of a
company retention policy to routinely destroy e-mails that memorialized their illegal conduct.
Heritage executives were aware that in order to permanently destroy an e-mail, however, the e-mail
had to be deleted from more than just the recipient's in-box. For example, on June 27, 2012,
Heritage CEO Glazer sent an e-mail to Malek titled "Email" instructing: "Clean your sent file out as
well."

3792.    Glazer continued to remind Malek not to put any evidence of his illegal conduct into
writing. In a text message dated June 26, 2014, Glazer sternly warned Malek about his use of e-mail:
"No emails about products, price and competitors."

3793.   That same day, in an e-mail to the entire sales team at Heritage, Glazer made the point as clearly as possible: "We don't talk about pricing dynamics and competition on emails. If you have questions – you can call JM or me directly and then punch yourself in the face."

3794.   Heritage was not alone in its efforts to conceal its illegal activity. For example, in June 2014, shortly after a text message exchange between K.A. of Citron and Anne Sather from Heritage wherein the two competitors discussed and agreed to raise the price of Glyburide, K.S. from Citron called D.L. at Heritage, informing him that she had been "looped" in on Heritage's plan. According to Sather's notes, K.S. told D.L. that Heritage employees should not communicate with Citron through e-mail, but should instead call L.S., the Vice President of Sales at Citron, if they had information to convey.

3795.   As another example, when Green wanted to speak with a particular competitor, he would routinely send a text message to that competitor, saying only "call me." Again, this was done to avoid putting any potentially incriminating communications in writing. Patel learned this technique from Green, shortly after starting at Teva, and adopted a similar strategy for communicating with competitors.

3796.   Kellum of Sandoz was also aware that what he and others at Sandoz were doing was illegal. Kellum had received antitrust training and knew that conspiring with competitors to fix or raise prices, or to allocate customers or markets, was a violation of the antitrust laws. Kellum would routinely admonish Sandoz employees for putting anything incriminating into e-mails, and voiced concern that the conduct they were engaging in – if discovered – could result in significant liability. As a result of Kellum's admonishments, Sandoz employees (including Kellum himself) routinely lied in e-mails about the sources of their information to camouflage their conduct, claiming they learned the information from a customer instead of a competitor.

3797.   Similarly, Nailor of Greenstone instructed her subordinates to avoid putting any sensitive market intelligence in writing.

3798.   As Defendants became more aware that they were under state and federal investigation, there was even more urgency to avoid detection. For example, on June 2, 2015, after it had become public that Connecticut and the DOJ were investigating the industry, Malek sent Sather a text message stating: "Just got your email on meprobamate. Let's avoid emailing about other manufacturers and having discussions with them. Can be misconstrued based on what we are hearing elsewhere…." Heritage did not produce the referenced e-mail in response to Connecticut's subpoena, even though the subpoena sought all such documents. Upon information and belief, the referenced e-mail has, along with other relevant documents, been deleted by Heritage.

3799.   As further evidence that the price increases discussed above were not the result of normal market factors, the massive price spikes that were occurring in the industry in 2013 and 2014 slowed dramatically after the State of Connecticut commenced its antitrust investigation in July 2014. This was not a coincidence. Generic drug manufacturers in the industry – including the Defendants in this case – understood that they were under scrutiny and did not want to draw further attention to themselves.

3800.   In January 2015, Sandoz conducted an analysis of the price increases in the generic drug industry in 2013 and 2014, with an early look toward 2015. In its report, Sandoz found that "For the years 2013 and 2014, there were 1,487 SKU 'large price increases' (WAC increase greater than 100%)[;] of this 12% (178 SKUs) were increased by more than 1000%." The number of "large price increases," however, began to decline after the Plaintiff States commenced their investigation. Even so, the already-high prices for most of these drugs did not go down but remain at significantly inflated, anti-competitive levels.

## XIV.   SPOILATION OF EVIDENCE

3801.   Many of the individuals named above, and other employees of the various

Defendants, took active steps to delete their conspiratorial communications with competitors, and

destroy evidence of their illegal behavior.

3802.   As set forth above, Heritage failed to maintain a document retention policy and took

active steps to have e-mails destroyed. Furthermore, upon information and belief, Glazer, Malek and

certain other Heritage employees also deleted all text messages from their company iPhones

regarding their illegal communications with competitors.

3803.   As another example, Patel produced text messages – in response to the States'

subpoena – going back as far as early 2014. Prior to producing those text messages, however, Patel

had deleted all of her text communications with competitors from the same time period, including

many text messages with Aprahamian, Brown, Cavanaugh, Grauso, Green, Nailor, Rekenthaler and

Sullivan; and many other text messages with employees of Dr. Reddy's, Glenmark (including CW-5),

Greenstone (including R.H.), Par, Sandoz, Upsher-Smith and Zydus.

3804.   Patel deleted these text messages after a conversation with Rekenthaler in early 2015,

when Rekenthaler warned Patel to be careful about communicating with competitors. Rekenthaler

was aware of the government investigations that had been commenced and told Patel that the

government was showing up on people's doorsteps. Sometime after that, Patel deleted her text

messages with competitors.

3805.   G.S. of Mayne, realizing the illegal nature of the agreements she entered into, also

deleted from her cell phone several of the most incriminating text messages between her and Sather

before the data on her phone was imaged and produced to Connecticut.

3806.   Apotex also destroyed an entire custodial file for one of its key employees (B.H., a

senior sales executive), after the States requested it through an investigatory subpoena in July 2017.

As discussed above, B.H. was involved in coordinating two significant price increases with Patel of Teva in 2013, which resulted in Apotex soaring in the quality competitor rankings. After the States' subpoena was issued, Apotex destroyed B.H.'s custodial file – and did not inform the States that it had done so for over a year.

## XV.  OBSTRUCTION OF JUSTICE

3807.   Many of the Defendants have been coordinating consistently to obstruct the ongoing government investigations and to limit any potential response. This coordination goes back at least as far as October 2014, when Congress first started investigating price increases in the generic drug industry.

3808.   When the federal government executed a search warrant against Patel at her home on June 21, 2017, she immediately called Rekenthaler (from another phone because her phone had been seized) even though Rekenthaler was no longer employed at Teva and was by that point the Vice President of Sales at Apotex. Rekenthaler then immediately called Cavanaugh and C.B., another senior Teva executive. Rekenthaler spoke several times to Cavanaugh before then calling his own attorney and speaking twice. Later that day, Patel called Rekenthaler two more times to coordinate her response to the government.

3809.   Other Defendants took similar action in response to events in the States' investigation. Several were speaking frequently at or around the time a subpoena was issued, or when the States were engaging in substantive discussions with their counsel. As just one example, on July 17, 2018 the States sent a subpoena to Grauso, through his counsel. That same day, Grauso spoke to Aprahamian for more than twelve (12) minutes. The States then set up a conference call with Grauso's counsel for July 25, 2018. The day before that call – July 24, 2018 –Aprahamian spoke to his lawyer, and then shortly thereafter called Grauso. The next day, shortly after a conversation

between the States and counsel for Grauso, Aprahamian and Grauso spoke again, this time for nearly seven (7) minutes.

## XVI.   PLAINTIFF'S PURCHASES AND ANTITRUST INJURY

3810.   Because of Defendants' illegal conduct, Plaintiff has been compelled to pay artificially-inflated prices for each of the Subject Drugs listed above. Those prices have been substantially higher than the prices that Plaintiff would have paid for the Subject Drugs but for Defendants' collusion.

3811.   Economic theory dictates that overcharges at higher levels of the distribution chain generally get passed down thorugh the distribution chain resuling in higher prices at every level below.  This is particularly true given the structure of the pharmaceutical drug industry.

3812.   Consequently, Plaintiff has sustained substantial losses and damages to its business and property in the form of overcharges. The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

3813.   Defendants' unlawful conduct has successfully eliminated competition in the market, and Plaintiff has sustained, and continues to sustain, significant losses in the form of artificially inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

3814.   Defendants, through their unlawful acts, reduced competition in the United States market for the Subject Drugs, increased prices, and caused antitrust injury to Plaintiff.

3815.   Prices for the Subject Drugs have been and will continue to be inflated as a direct and foreseeable result of Defendants' anticompetitive conduct. The inflated prices that Plaintiff has paid, and will continue to pay, are traceable to, and the foreseeable result of, Defendants' unlawful conduct. Plaintiff therefore seeks injunctive relief as well as damages for all injuries proximately caused by the unlawful conduct.

REDACTED – PUBLIC VERSION

## XVII.  INTERSTATE TRADE AND COMMERCE

3816.   Defendants are the leading manufacturers and suppliers of the Subject Drugs sold in the United States. At all material times, the Subject Drugs were manufactured and sold by Defendants, directly or through one of more of their affiliates, throughout the United States in a continuous and uninterrupted flow through interstate commerce, including through and into this District.

3817.   Between at least 2012 and the present, in connection with the purchase and sale of the Subject Drugs, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

3818.   Defendants' and their co-conspirators' activities were within the flow of interstate commerce, intending to have and having a substantial effect on interstate commerce in the United States.

3819.   Defendants' and their co-conspirators' conduct, including the marketing and sale of the Subject Drugs, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce in the United States.

3820.   The conspiracy alleged herein has directly and substantially affected interstate commerce; Defendants deprived Plaintiff and others of the benefit of free and open competition in the purchase of the Subject Drugs within the United States.

3821.   Defendants' agreement to increase, fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of the Subject Drugs, and their actual inflating, fixing, maintaining, or artificially stabilizing prices of the Subject Drugs, were intended to have, and have had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## XVIII. TOLLING AND FRAUDULENT CONCEALMENT

3822.   The claims asserted in this Complaint have been tolled as Defendants engaged in affirmative and fraudulent concealment of the conspiracies alleged in this Complaint.

3823.   Defendants knew their actions were illegal and consistently took overt steps to conceal their illegal conduct and destroy evidence of their agreements.

3824.   Among other things, as alleged in the State AG Complaint No. 2, Defendants' executives took affirmative steps to conceal and destroy evidence of their wrongdoing since as early as 2012. These steps included failing to maintain a document retention policy, instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withholding documents subject to subpoenas, and deleting text messages from their telephones, as alleged in paragraphs 158, 546, 647, 1117, among others, of the State AG Complaint No. 2, which is incorporated by reference.

3825.   Furthermore, Defendants spoke and met in secret to conceal the conspiracies, often under the pretext of legitimate trade association and industry activities as set forth above and took steps (beyond those alleged above) to ensure that communications relating to the conspiracies were not recoded in writing. In some cases, as alleged above, price increases were staggered to conceal the existence of the price-fixing agreements. Also, as alleged above, Defendants engaged in bid coordination and straw bidding activity, which were intended to, and did, give a false impression of competition among Defendants.

3826.   Plaintiff acted with due diligence at all relevant times by, among other things, monitoring available prices for the Subject Drugs and seeking to obtain the most competitive prices possible, efforts that were hindered by Defendants' concealment. As a result, Plaintiff did not know or reasonably suspect the existence of the claims alleged in this Complaint more than four years

before the filing of this Complaint, nor was Plaintiff aware of any facts more than four years before

filing this Complaint that would have put it on reasonable notice of its claims.

## XIX.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

3827.   Discovery is necessary to determine the full scope of Defendants' conspiracy,

including years, products, and participants. Plaintiff reserves all rights to amend or supplement this

Complaint to add additional Defendants, claims, years, products, or other allegations based upon

discovery and further investigation.

## XX.   CAUSES OF ACTION

### COUNT I

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

3828.   Molina incorporates by reference the preceding allegations.

3829.   Heritage knowingly, intentionally, and conspiratorially engaged in anticompetitive

agreements designed to drive up the cost of at least the drugs listed below in the United States (the

"Heritage Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Acetazolamide ER
> Acyclovir
> Amikacin
> Doxycycline
> Fosinopril HCTZ
> Glipizide-Metformin
> Glyburide
> Glyburide-Metformin
> Hydralazine HCL
> Leflunomide
> Meprobamate
> Methimazole
> Nimodipine
> Nystatin
> Paromomycin
> Propranolol
> Theophylline ER

Verapamil
Zoledronic Acid

3830.    Heritage has committed at least one overt act to further the conspiracy alleged in this Complaint. Heritage's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Heritage Drugs throughout the United States.

3831.    The conspiracy realized its intended effect; Heritage has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Heritage Drugs.

3832.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Heritage Drugs;

      b.    Molina was deprived of the benefits of free and open competition in the sale of the Heritage Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Heritage Drugs was unlawfully restrained, suppressed, or eliminated.

3833.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Heritage Drugs until the market achieves a steady state.

3834.    As a direct and proximate result of Heritage's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Heritage Drugs than it would have paid in the absence of Heritage's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3835.    There is no legitimate, non-pretextual, pro-competitive business justification for Heritage's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3836.   Heritage's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3837.   Heritage's conduct violated the following state antitrust or competition practices laws:

 a. Ala. Code §6-5-60, with respect to purchases in Alabama.

 b. Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

 c. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

 d. Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

 e. Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

 f. N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

 g. N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

 h. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

 i. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

 j. Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

 k. Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

3838.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Heritage's unlawful activities.

3839.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

3840.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

3841.   For these additional reasons, Heritage's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT II

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Heritage and All Other Defendants Under Joint and Several Liability)

3842.   Molina incorporates by reference the preceding allegations.

3843.   Heritage engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Heritage's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Heritage Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3844.   There was and is a gross disparity between the price for the Molina Purchases of Heritage Drugs and the value received, given that more cheaply priced Heritage Drugs should have been available, and would have been available, absent Heritage's illegal conduct.

3845.   By engaging in the foregoing conduct, Heritage engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

   a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

   c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

   d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

  e. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

  f. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

  g. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

  h. S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

  i. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

  j. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

  k. Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT III

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

3846. Molina incorporates by reference the preceding allegations.

3847. Heritage has benefitted from artificial prices in the sale of the Heritage Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3848. Heritage's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Heritage Drugs by Molina.

3849. Molina has conferred upon Heritage an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3850. It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Heritage Drugs.

3851. It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Heritage Drugs, as it is not liable and would not compensate Molina for the impact of Heritage's unlawful conduct.

REDACTED – PUBLIC VERSION

3852.   The economic benefit of overcharges derived by Heritage through charging supracompetitive and artificially inflated prices for the Heritage Drugs is a direct and proximate result of Heritage's unlawful conduct.

3853.   The economic benefits derived by Heritage rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Heritage.

3854.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Heritage to be permitted to retain any of the overcharges for the Heritage Drugs derived from Heritage's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3855.   Heritage is aware of and appreciates the benefits bestowed upon it by Molina.

3856.   Heritage should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3857.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Heritage traceable to Molina.

## COUNT IV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Heritage and All Other Defendants Under Joint and Several Liability)

3858.   Molina incorporates by reference the preceding allegations.

3859.   Heritage knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Heritage Drugs. Heritage injured Molina through this conduct.

916

3860.   But for Heritage's scheme to inflate the price of the Heritage Drugs, Molina would have purchased lower-priced Heritage Drugs.

3861.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Heritage Drugs than it would have paid absent Heritage's continuing anticompetitive conduct.

3862.   Molina has purchased substantial amounts of the Heritage Drugs during the relevant period.

3863.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Heritage's conduct violates Sections 1 and 2 of the Sherman Act.

3864.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Heritage's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT V

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Teva and All Other Defendants Under Joint and Several Liability)

3865.   Molina incorporates by reference the preceding allegations.

3866.   Teva knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Teva Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Acetazolamide
> Adapalene
> Amikacin
> Amiloride HCL/HCTZ
> Amoxicillin/Clavulanate
> Amphetamine/Dextroamphetamine ER & IR
> Azithromycin

**REDACTED – PUBLIC VERSION**

Baclofen
Bethanechol Chloride
Budesonide
Bumetanide
Buspirone HCL
Cabergoline
Capecitabine
Carbamazepine
Cefdinir
Cefprozil
Celecoxib
Cephalexin
Cimetidine
Ciprofloxacin HCL
Clarithromycin ER
Clemastine Fumarate
Clonidine TTS
Clotrimazole
Cyproheptadine HCL
Desmopressin Acetate
Desogestrel/Ethinyl Estradiol (Kariva)
Dexmethylphenidate HCL ER
Dextroamphetamine Sulfate ER
Diclofenac Potassium
Dicloxacillin Sodium
Diflunisal
Diltiazem HCL
Disopyramide Phosphate
Disulfiram
Doxazosin Mesylate
Doxycycline
Drospirenone and Ethinyl Estradiol (Ocella)
Enalapril Maleate
Entecavir
Epitol
Estazolam
Estradiol
Estradiol Tablets
Estradiol/Norethindrone Acetate (Mimvey)
Ethambutol HCL
Ethinyl Estradiol/Levonorgestrel (Portia and Jolessa)
Ethinyl Estradiol/Norethindrone (Balziva)
Ethosuximide
Etodolac
Fenofibrate
Fluconazole
Fluocinonide
Fluoxetine HCL

918

REDACTED – PUBLIC VERSION

Flurbiprofen
Flutamide
Fluvastatin Sodium
Gabapentin
Glimepiride
Glipizide-Metformin
Glyburide
Glyburide-Metformin
Griseofulvin
Hydralazine
Hydrocodone Acetaminophen
Hydroxyurea
Hydroxyzine Pamoate
Imiquimod
Irbesartan
Isoniazid
Isotretinoin
Ketoconazole
Ketoprofen
Ketorolac Tromethamine
Labetalol HCL
Lamivudine/Zidovudine (Combivir)
Leflunomide
Loperamide HCL
Medroxyprogesterone
Metformin ER
Methotrexate
Metronidazole
Modafinil
Moexipril HCL
Moexipril HCL/HCTZ
Montelukast
Nabumetone
Nadolol
Niacin ER
Nitrofurantoin MAC
Norethindrone Acetate
Nortriptyline HCL
Nystatin
Omega-3-Acid Ethyl Esters
Ondansetron
Oxaprozin
Oxybutynin Chloride
Paricalcitol
Penicillin VK
Pentoxifylline
Pioglitazone-Metformin
Piroxicam

Pravastatin
Prazosin HCL
Prochlorperazine
Propranolol HCL
Raloxifene HCL
Ranitidine HCL
Sotalol HCL
Sumatriptan
Tamoxifen Citrate
Temozolomide
Theophylline ER
Tobramycin
Tolmetin Sodium
Tolterodine
Topiramate Sprinkle
Trazodone HCL
Warfarin Sodium

3867.    Teva has committed at least one overt act to further the conspiracy alleged in this Complaint. Teva's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Teva Drugs throughout the United States.

3868.    The conspiracy realized its intended effect; Teva has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Teva Drugs.

3869.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teva Drugs;

    b.    Molina was deprived of the benefits of free and open competition in the sale of the Teva Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Teva Drugs was unlawfully restrained, suppressed, or eliminated.

3870.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Teva Drugs until the market achieves a steady state.

3871.    As a direct and proximate result of Teva's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Teva Drugs than it would have paid in the absence of Teva's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3872.    There is no legitimate, non-pretextual, pro-competitive business justification for Teva's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3873.    Teva's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3874.    Teva's conduct violated the following state antitrust or competition practices laws:

   a.    Ala. Code §6-5-60, with respect to purchases in Alabama.

   b.    Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

   c.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

   d.    Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

   e.    Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

   f.    N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

   g.    N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

   h.    10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

   i.    R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

   j.    Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

   k.    Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

3875.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Teva's unlawful activities.

3876.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

3877.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

3878.    For these additional reasons, Teva's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT VI

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Teva and All Other Defendants Under Joint and Several Liability)

3879.    Molina incorporates by reference the preceding allegations.

3880.    Teva engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Teva's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Teva Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3881.    There was and is a gross disparity between the price for the Molina Purchases of Teva Drugs, and the value received, given that more cheaply priced Teva Drugs should have been available, and would have been available, absent Teva's illegal conduct.

3882.    By engaging in the foregoing conduct, Teva engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

      a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

      c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

      d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

      e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

      f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

      g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

      h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

      i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

      j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

      k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT VII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Teva and All Other Defendants Under Joint and Several Liability)

3883.    Molina incorporates by reference the preceding allegations.

3884.    Teva has benefitted from artificial prices in the sale of the Teva Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3885.    Teva's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Teva Drugs by Molina.

3886.    Molina has conferred upon Teva an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

REDACTED – PUBLIC VERSION

3887.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Teva Drugs.

3888.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Teva Drugs, as it is not liable and would not compensate Molina for the impact of Teva's unlawful conduct.

3889.   The economic benefit of overcharges derived by Teva through charging supracompetitive and artificially inflated prices for the Teva Drugs is a direct and proximate result of Teva's unlawful conduct.

3890.   The economic benefits derived by Teva rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Teva.

3891.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Teva to be permitted to retain any of the overcharges for the Teva Drugs derived from Teva's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3892.   Teva is aware of and appreciates the benefits bestowed upon it by Molina.

3893.   Teva should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3894.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Teva traceable to Molina.

## COUNT VIII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Teva and All Other Defendants Under Joint and Several Liability)

3895.   Molina incorporates by reference the preceding allegations.

924

REDACTED – PUBLIC VERSION

3896.    Teva knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Teva Drugs. Teva injured Molina through this conduct.

3897.    But for Teva's scheme to inflate the price of the Teva Drugs, Molina would have purchased lower-priced Teva Drugs.

3898.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Teva Drugs than it would have paid absent Teva's continuing anticompetitive conduct.

3899.    Molina has purchased substantial amounts of the Teva Drugs during the relevant period.

3900.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Teva's conduct violates Sections 1 and 2 of the Sherman Act.

3901.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Teva's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT IX

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Actavis and All Other Defendants Under Joint and Several Liability)

3902.    Molina incorporates by reference the preceding allegations.

3903.    Actavis knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Actavis Drugs"). This conspiracy was *per se* unlawful price-fixing.

Allopurinol

925

Ammonium Lactate
Amphetamine/Dextroamphetamine ER & IR
Atenolol Chlorthalidone
Betamethasone Dipropionate
Betamethasone Dipropionate Augmented
Betamethasone Dipropionate Clotrimazole
Betamethasone Valerate
Budesonide
Buspirone HCL
Carisoprodol
Celecoxib
Ciclopirox
Ciprofloxacin HCL
Clarithromycin ER
Clindamycin Phosphate
Clobetasol Propionate
Clonidine TTS
Desmopressin Acetate
Desogestrel/Ethinyl Estradiol (Kariva)
Desonide
Dextroamphetamine Sulfate ER
Disopyramide Phosphate
Doxycycline
Drospirenone and Ethinyl Estradiol (Ocella)
Estazolam
Estradiol
Fluocinonide
Flutamide
Glyburide-Metformin
Griseofulvin
Hydroxyzine Pamoate
Labetalol
Metformin ER (F)
Methylphenidate
Metoprolol Succinate
Metronidazole
Nabumetone
Nortriptyline HCL
Nystatin
Nystatin Triamcinolone
Oxycodone HCL
Oxycodone/Acetaminophen
Permethrin
Pilocarpine HCL
Potassium Chloride
Prednisone
Progesterone
Promethazine HCL

Propranolol HCL
Silver Sulfadiazine
Tamoxifen Citrate
Terconazole
Topiramate Sprinkle
Triamterene HCTZ
Ursodiol
Vancomycin HCL
Verapamil

3904.   Actavis has committed at least one overt act to further the conspiracy alleged in this
Complaint. Actavis' anticompetitive acts had a substantial and foreseeable effect on commerce by
raising and fixing prices of the Actavis Drugs throughout the United States.

3905.   The conspiracy realized its intended effect; Actavis has benefited, and continues to
benefit, from its anticompetitive agreements which has artificially inflated the prices of the Actavis
Drugs.

3906.   The contract, combination, or conspiracy had the following direct, substantial, and
reasonably foreseeable effects on United States commerce:

  a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or
       stabilized prices at supracompetitive levels for the Actavis Drugs;

  b.   Molina was deprived of the benefits of free and open competition in the sale of
       the Actavis Drugs in the United States market; and

  c.   Competition in establishing the prices paid for the Actavis Drugs was unlawfully
       restrained, suppressed, or eliminated.

3907.   Even after free and open competition begins, Molina will continue to pay
supracompetitive prices for the Actavis Drugs until the market achieves a steady state.

3908.   As a direct and proximate result of Actavis' unlawful conduct, Molina has been
injured in its business and property in that it has paid more for the Actavis Drugs than it would have

paid in the absence of Actavis' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3909.  There is no legitimate, non-pretextual, pro-competitive business justification for Actavis' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3910.  Actavis' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3911.  Actaivis's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

3912.  In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Actavis' unlawful activities.

REDACTED – PUBLIC VERSION

3913.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

3914.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

3915.    For these additional reasons, Actavis' conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT X

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

3916.    Molina incorporates by reference the preceding allegations.

3917.    Actavis engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Actavis' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Actavis Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3918.    There was and is a gross disparity between the price for the Molina Purchases of Actavis Drugs, and the value received, given that more cheaply priced Actavis Drugs should have been available, and would have been available, absent Actavis' illegal conduct.

3919.    By engaging in the foregoing conduct, Actavis engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

      a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.  Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.  S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.  Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XI

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

3920.   Molina incorporates by reference the preceding allegations.

3921.   Actavis has benefitted from artificial prices in the sale of the Actavis Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3922.   Actavis' financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Actavis Drugs by Molina.

3923.   Molina has conferred upon Actavis an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3924.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Actavis Drugs.

3925.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Actavis Drugs, as it is not liable and would not compensate Molina for the impact of Actavis' unlawful conduct.

3926.    The economic benefit of overcharges derived by Actavis through charging supracompetitive and artificially inflated prices for the Actavis Drugs is a direct and proximate result of Actavis' unlawful conduct.

3927.    The economic benefits derived by Actavis rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Actavis.

3928.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Actavis to be permitted to retain any of the overcharges for the Actavis Drugs derived from Actavis' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3929.    Actavis is aware of and appreciates the benefits bestowed upon it by Molina.

3930.    Actavis should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3931.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Actavis traceable to Molina.

## COUNT XII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

3932.    Molina incorporates by reference the preceding allegations.

REDACTED – PUBLIC VERSION

3933.   Actavis knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Actavis Drugs. Actavis injured Molina through this conduct.

3934.   But for Actavis' scheme to inflate the price of the Actavis Drugs, Molina would have purchased lower-priced Actavis Drugs.

3935.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Actavis Drugs than it would have paid absent Actavis' continuing anticompetitive conduct.

3936.   Molina has purchased substantial amounts of the Actavis Drugs during the relevant period.

3937.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Actavis' conduct violates Sections 1 and 2 of the Sherman Act.

3938.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Actavis' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XIII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

#### (As to Akorn and All Other Defendants Under Joint and Several Liability)

3939.   Molina incorporates by reference the preceding allegations.

3940.   Akorn knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Akorn Drugs"). This conspiracy was *per se* unlawful price-fixing.

Clobetasol Propionate

932

Lidocaine

3941.   Akorn has committed at least one overt act to further the conspiracy alleged in this Complaint. Akorn's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Akorn Drugs throughout the United States.

3942.   The conspiracy realized its intended effect; Akorn has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Akorn Drugs.

3943.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Akorn Drugs;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the Akorn Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Akorn Drugs was unlawfully restrained, suppressed, or eliminated.

3944.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Akorn Drugs until the market achieves a steady state.

3945.   As a direct and proximate result of Akorn's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Akorn Drugs than it would have paid in the absence of Akorn's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3946.   There is no legitimate, non-pretextual, pro-competitive business justification for Akorn's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3947.   Akorn's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

      a.   Akorn's conduct violated the following state antitrust or competition practices laws:

      b.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      c.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      d.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      e.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

      f.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

      g.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

      h.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

      i.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

      j.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

      k.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

      l.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

3948.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Akorn's unlawful activities.

3949.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

3950.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

3951.    For these additional reasons, Akorn's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XIV

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Akorn and All Other Defendants Under Joint and Several Liability)

3952.    Molina incorporates by reference the preceding allegations.

3953.    Akorn engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Akorn's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Akorn Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3954.    There was and is a gross disparity between the price for the Molina Purchases of Akorn Drugs, and the value received, given that more cheaply priced Akorn Drugs should have been available, and would have been available, absent Akorn's illegal conduct.

3955.    By engaging in the foregoing conduct, Akorn engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.    Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

REDACTED – PUBLIC VERSION

    h.    S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.    Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Akorn and All Other Defendants Under Joint and Several Liability)

3956.    Molina incorporates by reference the preceding allegations.

3957.    Akorn has benefitted from artificial prices in the sale of the Akorn Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3958.    Akorn's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Akorn Drugs by Molina.

3959.    Molina has conferred upon Akorn an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3960.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Akorn Drugs.

3961.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Akorn Drugs, as it is not liable and would not compensate Molina for the impact of Akorn's unlawful conduct.

3962.    The economic benefit of overcharges derived by Akorn through charging supracompetitive and artificially inflated prices for the Akorn Drugs is a direct and proximate result of Akorn's unlawful conduct.

3963.    The economic benefits derived by Akorn rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Akorn.

REDACTED – PUBLIC VERSION

3964.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Akorn to be permitted to retain any of the overcharges for the Akorn Drugs derived from Akorn's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

3965.    Akorn is aware of and appreciates the benefits bestowed upon it by Molina.

3966.    Akorn should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

3967.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Akorn traceable to Molina.

## COUNT XVI

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Akorn and All Other Defendants Under Joint and Several Liability)

3968.    Molina incorporates by reference the preceding allegations.

3969.    Akorn knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Akorn Drugs. Akorn injured Molina through this conduct.

3970.    But for Akorn's scheme to inflate the price of the Akorn Drugs, Molina would have purchased lower-priced Akorn Drugs.

3971.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Akorn Drugs than it would have paid absent Akorn's continuing anticompetitive conduct.

REDACTED – PUBLIC VERSION

3972.   Molina has purchased substantial amounts of the Akorn Drugs during the relevant period.

3973.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Akorn's conduct violates Sections 1 and 2 of the Sherman Act.

3974.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Akorn's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

3975.   Molina incorporates by reference the preceding allegations.

3976.   Alvogen knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Alvogen Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Exemestane
> Labetalol HCL
> Nitrofurantoin MAC
> Oxycodone/ Acetaminophen

3977.   Alvogen has committed at least one overt act to further the conspiracy alleged in this Complaint. Alvogen's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Alvogen Drugs throughout the United States.

3978.   The conspiracy realized its intended effect; Alvogen has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Alvogen Drugs.

3979.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Alvogen Drugs;

    b.    Molina was deprived of the benefits of free and open competition in the sale of the Alvogen Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Alvogen Drugs was unlawfully restrained, suppressed, or eliminated.

3980.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Alvogen Drugs until the market achieves a steady state.

3981.    As a direct and proximate result of Alvogen's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Alvogen Drugs than it would have paid in the absence of Alvogen's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

3982.    There is no legitimate, non-pretextual, pro-competitive business justification for Alvogen's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

3983.    Alvogen's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

3984.    Alvogen's conduct violated the following state antitrust or competition practices laws:

    a.    Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.    Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

3985.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Alvogen's unlawful activities.

3986.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

3987.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

3988.   For these additional reasons, Alvogen's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

3989.   Molina incorporates by reference the preceding allegations.

3990.   Alvogen engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Alvogen's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Alvogen Drugs at prices restrained by competition and forced to pay artificially inflated prices.

3991.   There was and is a gross disparity between the price for the Molina Purchases of Alvogen Drugs, and the value received, given that more cheaply priced Alvogen Drugs should have been available, and would have been available, absent Alvogen's illegal conduct.

3992.   By engaging in the foregoing conduct, Alvogen engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

3993.   Molina incorporates by reference the preceding allegations.

3994.   Alvogen has benefitted from artificial prices in the sale of the Alvogen Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

3995.   Alvogen's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Alvogen Drugs by Molina.

3996.   Molina has conferred upon Alvogen an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

3997.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Alvogen Drugs.

3998.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Alvogen Drugs, as it is not liable and would not compensate Molina for the impact of Alvogen's unlawful conduct.

3999.   The economic benefit of overcharges derived by Alvogen through charging supracompetitive and artificially inflated prices for the Alvogen Drugs is a direct and proximate result of Alvogen's unlawful conduct.

4000.   The economic benefits derived by Alvogen rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Alvogen.

4001.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Alvogen to be permitted to retain any of the overcharges for the Alvogen Drugs derived

REDACTED – PUBLIC VERSION

from Alvogen's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4002.    Alvogen is aware of and appreciates the benefits bestowed upon it by Molina.

4003.    Alvogen should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4004.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Alvogen traceable to Molina.

## COUNT XX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

4005.    Molina incorporates by reference the preceding allegations.

4006.    Alvogen knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Alvogen Drugs. Alvogen injured Molina through this conduct.

4007.    But for Alvogen's scheme to inflate the price of the Alvogen Drugs, Molina would have purchased lower-priced Alvogen Drugs.

4008.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Alvogen Drugs than it would have paid absent Alvogen's continuing anticompetitive conduct.

4009.    Molina has purchased substantial amounts of the Alvogen Drugs during the relevant period.

4010.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Alvogen's conduct violates Sections 1 and 2 of the Sherman Act.

4011.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Alvogen's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXI

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

#### (As to Amneal and All Other Defendants Under Joint and Several Liability)

4012.    Molina incorporates by reference the preceding allegations.

4013.    Amneal knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Amneal Drugs"). This conspiracy was *per se* unlawful price-fixing.

>Bethanechol Chloride
>Hydrocodone Acetaminophen
>Metformin ER
>Naproxen Sodium
>Norethindrone Acetate
>Oxycodone/Acetaminophen
>Phenytoin Sodium
>Ranitidine HCL
>Warfarin

4014.    Amneal has committed at least one overt act to further the conspiracy alleged in this Complaint. Amneal's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Amneal Drugs throughout the United States.

4015.    The conspiracy realized its intended effect; Amneal has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Amneal Drugs.

4016.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

 a. Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Amneal Drugs;

 b. Molina was deprived of the benefits of free and open competition in the sale of the Amneal Drugs in the United States market; and

 c. Competition in establishing the prices paid for the Amneal Drugs was unlawfully restrained, suppressed, or eliminated.

4017. Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Amneal Drugs until the market achieves a steady state.

4018. As a direct and proximate result of Amneal's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Amneal Drugs than it would have paid in the absence of Amneal's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4019. There is no legitimate, non-pretextual, pro-competitive business justification for Amneal's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4020. Amneal's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4021. Amneal's conduct violated the following state antitrust or competition practices laws:

 a. Ala. Code §6-5-60, with respect to purchases in Alabama.

 b. Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

 c. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

 d. Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

 e. Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4022.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Amneal's unlawful activities.

4023.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4024.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4025.   For these additional reasons, Amneal's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XXII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

4026.   Molina incorporates by reference the preceding allegations.

4027.   Amneal engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Amneal's anticompetitive, deceptive, unfair, unconscionable, and

fraudulent conduct, Molina was deprived of the opportunity to purchase the Amneal Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4028.    There was and is a gross disparity between the price for the Molina Purchases of Amneal Drugs, and the value received, given that more cheaply priced Amneal Drugs should have been available, and would have been available, absent Amneal's illegal conduct.

4029.    By engaging in the foregoing conduct, Amneal engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

       a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

       b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

       c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

       d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

       e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

       f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

       g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

       h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

       i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

       j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

       k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XXIII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

4030.    Molina incorporates by reference the preceding allegations.

4031.   Amneal has benefitted from artificial prices in the sale of the Amneal Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4032.   Amneal's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Amneal Drugs by Molina.

4033.   Molina has conferred upon Amneal an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4034.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Amneal Drugs.

4035.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Amneal Drugs, as it is not liable and would not compensate Molina for the impact of Amneal's unlawful conduct.

4036.   The economic benefit of overcharges derived by Amneal through charging supracompetitive and artificially inflated prices for the Amneal Drugs is a direct and proximate result of Amneal's unlawful conduct.

4037.   The economic benefits derived by Amneal rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Amneal.

4038.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Amneal to be permitted to retain any of the overcharges for the Amneal Drugs derived from Amneal's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4039.   Amneal is aware of and appreciates the benefits bestowed upon it by Molina.

4040.   Amneal should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

REDACTED – PUBLIC VERSION

4041.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Amneal traceable to Molina.

## COUNT XXIV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

4042.    Molina incorporates by reference the preceding allegations.

4043.    Amneal knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Amneal Drugs. Amneal injured Molina through this conduct.

4044.    But for Amneal's scheme to inflate the price of the Amneal Drugs, Molina would have purchased lower-priced Amneal Drugs.

4045.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Amneal Drugs than it would have paid absent Amneal's continuing anticompetitive conduct.

4046.    Molina has purchased substantial amounts of the Amneal Drugs during the relevant period.

4047.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Amneal's conduct violates Sections 1 and 2 of the Sherman Act.

4048.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Amneal's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## COUNT XXV

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Apotex and All Other Defendants Under Joint and Several Liability)**

4049.    Molina incorporates by reference the preceding allegations.

4050.    Apotex knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Apotex Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Balsalazide Disodium
> Butorphanol Tartrate
> Carbamazepine
> Doxazosin Mesylate
> Epitol
> Etodolac
> Fluticasone Propionate
> Leflunomide
> Omega-3-Acid Ethyl Esters
> Oxybutynin Chloride
> Pentoxifylline
> Pravastatin
> Tizanidine
> Trazodone HCL
> Triamterene HCTZ

4051.    Apotex has committed at least one overt act to further the conspiracy alleged in this Complaint. Apotex's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Apotex Drugs throughout the United States.

4052.    The conspiracy realized its intended effect; Apotex has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Apotex Drugs.

4053.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Apotex Drugs;

b.   Molina was deprived of the benefits of free and open competition in the sale of the Apotex Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Apotex Drugs was unlawfully restrained, suppressed, or eliminated.

4054.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Apotex Drugs until the market achieves a steady state.

4055.   As a direct and proximate result of Apotex's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Apotex Drugs than it would have paid in the absence of Apotex's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4056.   There is no legitimate, non-pretextual, pro-competitive business justification for Apotex's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4057.   Apotex's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4058.   Apotex's conduct violated the following state antitrust or competition practices laws:

a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4059.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Apotex's unlawful activities.

4060.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4061.   All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4062.   For these additional reasons, Apotex's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XXVI

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

4063.   Molina incorporates by reference the preceding allegations.

4064.   Apotex engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Apotex's anticompetitive, deceptive, unfair, unconscionable, and

REDACTED – PUBLIC VERSION

fraudulent conduct, Molina was deprived of the opportunity to purchase the Apotex Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4065.   There was and is a gross disparity between the price for the Molina Purchases of Apotex Drugs, and the value received, given that more cheaply priced Apotex Drugs should have been available, and would have been available, absent Apotex's illegal conduct.

4066.   By engaging in the foregoing conduct, Apotex engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

   a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

   c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

   d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

   e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

   f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

   h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

   i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

   j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

   k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XXVII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

4067.   Molina incorporates by reference the preceding allegations.

953

4068.    Apotex has benefitted from artificial prices in the sale of the Apotex Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4069.    Apotex's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Apotex Drugs by Molina.

4070.    Molina has conferred upon Apotex an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4071.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Apotex Drugs.

4072.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Apotex Drugs, as it is not liable and would not compensate Molina for the impact of Apotex's unlawful conduct.

4073.    The economic benefit of overcharges derived by Apotex through charging supracompetitive and artificially inflated prices for the Apotex Drugs is a direct and proximate result of Apotex's unlawful conduct.

4074.    The economic benefits derived by Apotex rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Apotex.

4075.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Apotex to be permitted to retain any of the overcharges for the Apotex Drugs derived from Apotex's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4076.    Apotex is aware of and appreciates the benefits bestowed upon it by Molina.

4077.    Apotex should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4078.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Apotex traceable to Molina.

## COUNT XXVIII

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Apotex and All Other Defendants Under Joint and Several Liability)

4079.    Molina incorporates by reference the preceding allegations.

4080.    Apotex knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Apotex Drugs. Apotex injured Molina through this conduct.

4081.    But for Apotex's scheme to inflate the price of the Apotex Drugs, Molina would have purchased lower-priced Apotex Drugs.

4082.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Apotex Drugs than it would have paid absent Apotex's continuing anticompetitive conduct.

4083.    Molina has purchased substantial amounts of the Apotex Drugs during the relevant period.

4084.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Apotex's conduct violates Sections 1 and 2 of the Sherman Act.

4085.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Apotex's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXIX

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Ascend and All Other Defendants Under Joint and Several Liability)**

4086.    Molina incorporates by reference the preceding allegations.

4087.    Ascend knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Ascend Drug"). This conspiracy was *per se* unlawful price-fixing.

> Nimodipine
> Silver Sulfadiazine

4088.    Ascend has committed at least one overt act to further the conspiracy alleged in this Complaint. Ascend's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Ascend Drug throughout the United States.

4089.    The conspiracy realized its intended effect; Ascend has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Ascend Drug.

4090.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Ascend Drug;
>
> b.    Molina was deprived of the benefits of free and open competition in the sale of the Ascend Drug in the United States market; and
>
> c.    Competition in establishing the prices paid for the Ascend Drug was unlawfully restrained, suppressed, or eliminated.

4091.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Ascend Drug until the market achieves a steady state.

4092.   As a direct and proximate result of Ascend's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Ascend Drug than it would have paid in the absence of Ascend's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4093.   There is no legitimate, non-pretextual, pro-competitive business justification for Ascend's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4094.   Ascend's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4095.   Ascend's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4096.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Ascend's unlawful activities.

4097.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4098.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4099.    For these additional reasons, Ascend's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XXX

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

4100.   Molina incorporates by reference the preceding allegations.

4101.   Ascend engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Ascend's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Ascend Drug at prices restrained by competition and forced to pay artificially inflated prices.

4102.   There was and is a gross disparity between the price for the Molina Purchases of Ascend Drug, and the value received, given that more cheaply priced Ascend Drug should have been available, and would have been available, absent Ascend's illegal conduct.

4103.   By engaging in the foregoing conduct, Ascend engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

   a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

   c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

   d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

   e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

   f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

   h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

   i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

   j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

   k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XXXI

## UNJUST ENRICHMENT UNDER STATE LAW

**(As to Ascend and All Other Defendants Under Joint and Several Liability)**

4104.   Molina incorporates by reference the preceding allegations.

4105.   Ascend has benefitted from artificial prices in the sale of the Ascend Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

4106.   Ascend's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Ascend Drug by Molina.

4107.   Molina has conferred upon Ascend an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4108.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Ascend Drug.

4109.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Ascend Drug, as it is not liable and would not compensate Molina for the impact of Ascend's unlawful conduct.

4110.    The economic benefit of overcharges derived by Ascend through charging supracompetitive and artificially inflated prices for the Ascend Drug is a direct and proximate result of Ascend's unlawful conduct.

4111.    The economic benefits derived by Ascend rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Ascend.

4112.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Ascend to be permitted to retain any of the overcharges for the Ascend Drug derived from Ascend's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4113.    Ascend is aware of and appreciates the benefits bestowed upon it by Molina.

4114.    Ascend should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4115.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Ascend traceable to Molina.

REDACTED – PUBLIC VERSION

## COUNT XXXII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

4116.    Molina incorporates by reference the preceding allegations.

4117.    Ascend knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Ascend Drug. Ascend injured Molina through this conduct.

4118.    But for Ascend's scheme to inflate the price of the Ascend Drug, Molina would have purchased lower-priced Ascend Drug.

4119.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Ascend Drug than it would have paid absent Ascend's continuing anticompetitive conduct.

4120.    Molina has purchased substantial amounts of the Ascend Drug during the relevant period.

4121.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Ascend's conduct violates Sections 1 and 2 of the Sherman Act.

4122.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Ascend's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXXIII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Aurobindo and All Other Defendants Under Joint and Several Liability)**

4123.    Molina incorporates by reference the preceding allegations.

4124.    Aurobindo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Aurobindo Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amphetamine/Dextroamphetamine IR
> Cefpodoxime Proxetil
> Cefuroxime Axetil
> Dextroamphetamine Sulfate ER
> Fosinopril HCTZ
> Gabapentin
> Glyburide
> Glyburide-Metformin
> Lamivudine/Zidovudine (Combivir)
> Nafcillin Sodium
> Oxacillin Sodium
> Oxycodone/Acetaminophen
> Penicillin VK
> Pioglitazone HCL

4125.    Aurobindo has committed at least one overt act to further the conspiracy alleged in this Complaint. Aurobindo's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Aurobindo Drugs throughout the United States.

4126.    The conspiracy realized its intended effect; Aurobindo has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Aurobindo Drugs.

4127.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Aurobindo Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Aurobindo Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Aurobindo Drugs was unlawfully restrained, suppressed, or eliminated.

4128.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Aurobindo Drugs until the market achieves a steady state.

4129.   As a direct and proximate result of Aurobindo's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Aurobindo Drugs than it would have paid in the absence of Aurobindo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4130.   There is no legitimate, non-pretextual, pro-competitive business justification for Aurobindo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4131.   Aurobindo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4132.   Aurobindo's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4133.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Aurobindo's unlawful activities.

4134.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4135.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4136.   For these additional reasons, Aurobindo's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XXXIV

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

4137.   Molina incorporates by reference the preceding allegations.

4138.   Aurobindo engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a

direct and proximate result of Aurobindo's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Aurobindo Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4139.   There was and is a gross disparity between the price for the Molina Purchases of Aurobindo Drugs, and the value received, given that more cheaply priced Aurobindo Drugs should have been available, and would have been available, absent Aurobindo's illegal conduct.

4140.   By engaging in the foregoing conduct, Aurobindo engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XXXV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

4141.   Molina incorporates by reference the preceding allegations.

4142.    Aurobindo has benefitted from artificial prices in the sale of the Aurobindo Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4143.    Aurobindo's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Aurobindo Drugs by Molina.

4144.    Molina has conferred upon Aurobindo an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4145.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Aurobindo Drugs.

4146.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Aurobindo Drugs, as it is not liable and would not compensate Molina for the impact of Aurobindo's unlawful conduct.

4147.    The economic benefit of overcharges derived by Aurobindo through charging supracompetitive and artificially inflated prices for the Aurobindo Drugs is a direct and proximate result of Aurobindo's unlawful conduct.

4148.    The economic benefits derived by Aurobindo rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Aurobindo.

4149.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Aurobindo to be permitted to retain any of the overcharges for the Aurobindo Drugs derived from Aurobindo's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4150.    Aurobindo is aware of and appreciates the benefits bestowed upon it by Molina.

4151.    Aurobindo should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

REDACTED – PUBLIC VERSION

4152.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Aurobindo traceable to Molina.

## COUNT XXXVI

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

4153.   Molina incorporates by reference the preceding allegations.

4154.   Aurobindo knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Aurobindo Drugs. Aurobindo injured Molina through this conduct.

4155.   But for Aurobindo's scheme to inflate the price of the Aurobindo Drugs, Molina would have purchased lower-priced Aurobindo Drugs.

4156.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Aurobindo Drugs than it would have paid absent Aurobindo's continuing anticompetitive conduct.

4157.   Molina has purchased substantial amounts of the Aurobindo Drugs during the relevant period.

4158.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Aurobindo's conduct violates Sections 1 and 2 of the Sherman Act.

4159.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Aurobindo's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## COUNT XXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Breckenridge and All Other Defendants Under Joint and Several Liability)**

4160.   Molina incorporates by reference the preceding allegations.

4161.   Breckenridge knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Breckenridge Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Cyproheptadine HCL
> Disulfiram
> Estradiol/Norethindrone Acetate (Mimvey)
> Methylprednisolone
> Propranolol HCL

4162.   Breckenridge has committed at least one overt act to further the conspiracy alleged in this Complaint. Breckenridge's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Breckenridge Drugs throughout the United States.

4163.   The conspiracy realized its intended effect; Breckenridge has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Breckenridge Drugs.

4164.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Breckenridge Drugs;
>
> b.   Molina was deprived of the benefits of free and open competition in the sale of the Breckenridge Drugs in the United States market; and
>
> c.   Competition in establishing the prices paid for the Breckenridge Drugs was unlawfully restrained, suppressed, or eliminated.

4165.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Breckenridge Drugs until the market achieves a steady state.

4166.   As a direct and proximate result of Breckenridge's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Breckenridge Drugs than it would have paid in the absence of Breckenridge's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4167.   There is no legitimate, non-pretextual, pro-competitive business justification for Breckenridge's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4168.   Breckenridge's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4169.   Breckenridge's conduct violated the following state antitrust or competition practices laws:

   a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

   b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

   c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

   d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

   e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

   f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

   h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

   i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

   j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4170.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Breckenridge's unlawful activities.

4171.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4172.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4173.    For these additional reasons, Breckenridge's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XXXVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

4174.   Molina incorporates by reference the preceding allegations.

4175.   Breckenridge engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Breckenridge's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Breckenridge Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4176.   There was and is a gross disparity between the price for the Molina Purchases of Breckenridge Drugs, and the value received, given that more cheaply priced Breckenridge Drugs should have been available, and would have been available, absent Breckenridge's illegal conduct.

4177.    By engaging in the foregoing conduct, Breckenridge engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XXXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

4178.    Molina incorporates by reference the preceding allegations.

4179.    Breckenridge has benefitted from artificial prices in the sale of the Breckenridge Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4180.    Breckenridge's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Breckenridge Drugs by Molina.

4181.    Molina has conferred upon Breckenridge an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4182.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Breckenridge Drugs.

4183.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Breckenridge Drugs, as it is not liable and would not compensate Molina for the impact of Breckenridge's unlawful conduct.

4184.    The economic benefit of overcharges derived by Breckenridge through charging supracompetitive and artificially inflated prices for the Breckenridge Drugs is a direct and proximate result of Breckenridge's unlawful conduct.

4185.    The economic benefits derived by Breckenridge rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Breckenridge.

4186.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Breckenridge to be permitted to retain any of the overcharges for the Breckenridge Drugs derived from Breckenridge's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4187.    Breckenridge is aware of and appreciates the benefits bestowed upon it by Molina.

4188.    Breckenridge should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4189.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Breckenridge traceable to Molina.

972

REDACTED – PUBLIC VERSION

# COUNT XL

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Breckenridge and All Other Defendants Under Joint and Several Liability)

4190.    Molina incorporates by reference the preceding allegations.

4191.    Breckenridge knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Breckenridge Drugs. Breckenridge injured Molina through this conduct.

4192.    But for Breckenridge's scheme to inflate the price of the Breckenridge Drugs, Molina would have purchased lower-priced Breckenridge Drugs.

4193.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Breckenridge Drugs than it would have paid absent Breckenridge's continuing anticompetitive conduct.

4194.    Molina has purchased substantial amounts of the Breckenridge Drugs during the relevant period.

4195.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Breckenridge's conduct violates Sections 1 and 2 of the Sherman Act.

4196.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Breckenridge's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XLI

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

### (As to Cadista and All Other Defendants Under Joint and Several Liability)

4197.   Molina incorporates by reference the preceding allegations.

4198.   Cadista knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Cadista Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Methylprednisolone
> Prednisone
> Prochlorperazine

4199.   Cadista has committed at least one overt act to further the conspiracy alleged in this Complaint. Cadista's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Cadista Drugs throughout the United States.

4200.   The conspiracy realized its intended effect; Cadista has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Cadista Drugs.

4201.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Cadista Drugs;

b.   Molina was deprived of the benefits of free and open competition in the sale of the Cadista Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Cadista Drugs was unlawfully restrained, suppressed, or eliminated.

4202.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Cadista Drugs until the market achieves a steady state.

4203.   As a direct and proximate result of Cadista's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Cadista Drugs than it would have paid in the absence of Cadista's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4204.   There is no legitimate, non-pretextual, pro-competitive business justification for Cadista's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4205.   Cadista's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4206.   Cadista's conduct violated the following state antitrust or competition practices laws:

  a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

  b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

  c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

  d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

  e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

  f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

  g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

  h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

  i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

  j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

  k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

4207.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Cadista's unlawful activities.

4208.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4209.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4210.    For these additional reasons, Cadista's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XLII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Cadista and All Other Defendants Under Joint and Several Liability)

4211.   Molina incorporates by reference the preceding allegations.

4212.   Cadista engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Cadista's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Cadista Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4213.   There was and is a gross disparity between the price for the Molina Purchases of Cadista Drugs, and the value received, given that more cheaply priced Cadista Drugs should have been available, and would have been available, absent Cadista's illegal conduct.

4214.   By engaging in the foregoing conduct, Cadista engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

   a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

   c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

   d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

   e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

   f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

   h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

   i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

   j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

   k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XLIII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Cadista and All Other Defendants Under Joint and Several Liability)

4215.   Molina incorporates by reference the preceding allegations.

4216.   Cadista has benefitted from artificial prices in the sale of the Cadista Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4217.   Cadista's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Cadista Drugs by Molina.

4218.   Molina has conferred upon Cadista an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4219.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Cadista Drugs.

4220.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Cadista Drugs, as it is not liable and would not compensate Molina for the impact of Cadista's unlawful conduct.

4221.    The economic benefit of overcharges derived by Cadista through charging supracompetitive and artificially inflated prices for the Cadista Drugs is a direct and proximate result of Cadista's unlawful conduct.

4222.    The economic benefits derived by Cadista rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Cadista.

4223.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Cadista to be permitted to retain any of the overcharges for the Cadista Drugs derived from Cadista's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4224.    Cadista is aware of and appreciates the benefits bestowed upon it by Molina.

4225.    Cadista should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4226.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Cadista traceable to Molina.

## COUNT XLIV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Cadista and All Other Defendants Under Joint and Several Liability)

4227.   Molina incorporates by reference the preceding allegations.

4228.   Cadista knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Cadista Drugs. Cadista injured Molina through this conduct.

4229.   But for Cadista's scheme to inflate the price of the Cadista Drugs, Molina would have purchased lower-priced Cadista Drugs.

4230.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Cadista Drugs than it would have paid absent Cadista's continuing anticompetitive conduct.

4231.   Molina has purchased substantial amounts of the Cadista Drugs during the relevant period.

4232.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Cadista's conduct violates Sections 1 and 2 of the Sherman Act.

4233.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Cadista's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XLV

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT
## OF TRADE UNDER STATE LAWS

### (As to Camber and All Other Defendants Under Joint and Several Liability)

4234.    Molina incorporates by reference the preceding allegations.

4235.    Camber knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Camber Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Hydralazine
> Lamivudine/Zidovudine (Combivir)
> Raloxifene HCL
> Valganciclovir

4236.    Camber has committed at least one overt act to further the conspiracy alleged in this Complaint. Camber's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Camber Drugs throughout the United States.

4237.    The conspiracy realized its intended effect; Camber has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Camber Drugs.

4238.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Camber Drugs;

b.    Molina was deprived of the benefits of free and open competition in the sale of the Camber Drugs in the United States market; and

c.    Competition in establishing the prices paid for the Camber Drugs was unlawfully restrained, suppressed, or eliminated.

4239.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Camber Drugs until the market achieves a steady state.

4240.   As a direct and proximate result of Camber's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Camber Drugs than it would have paid in the absence of Camber's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4241.   There is no legitimate, non-pretextual, pro-competitive business justification for Camber's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4242.   Camber's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4243.   Camber's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

4244.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Camber's unlawful activities.

4245.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4246.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4247.    For these additional reasons, Camber's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XLVI

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Camber and All Other Defendants Under Joint and Several Liability)

4248.   Molina incorporates by reference the preceding allegations.

4249.   Camber engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Camber's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Camber Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4250.   There was and is a gross disparity between the price for the Molina Purchases of Camber Drugs, and the value received, given that more cheaply priced Camber Drugs should have been available, and would have been available, absent Camber's illegal conduct.

REDACTED – PUBLIC VERSION

4251.   By engaging in the foregoing conduct, Camber engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

   a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

   c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

   d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

   e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

   f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

   h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

   i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

   j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

   k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XLVII

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Camber and All Other Defendants Under Joint and Several Liability)**

4252.   Molina incorporates by reference the preceding allegations.

4253.   Camber has benefitted from artificial prices in the sale of the Camber Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4254.   Camber's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Camber Drugs by Molina.

4255.   Molina has conferred upon Camber an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4256.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Camber Drugs.

4257.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Camber Drugs, as it is not liable and would not compensate Molina for the impact of Camber's unlawful conduct.

4258.   The economic benefit of overcharges derived by Camber through charging supracompetitive and artificially inflated prices for the Camber Drugs is a direct and proximate result of Camber's unlawful conduct.

4259.   The economic benefits derived by Camber rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Camber.

4260.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Camber to be permitted to retain any of the overcharges for the Camber Drugs derived from Camber's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4261.   Camber is aware of and appreciates the benefits bestowed upon it by Molina.

4262.   Camber should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4263.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Camber traceable to Molina.

REDACTED – PUBLIC VERSION

## COUNT XLVIII

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Camber and All Other Defendants Under Joint and Several Liability)

4264.    Molina incorporates by reference the preceding allegations.

4265.    Camber knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Camber Drugs. Camber injured Molina through this conduct.

4266.    But for Camber's scheme to inflate the price of the Camber Drugs, Molina would have purchased lower-priced Camber Drugs.

4267.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Camber Drugs than it would have paid absent Camber's continuing anticompetitive conduct.

4268.    Molina has purchased substantial amounts of the Camber Drugs during the relevant period.

4269.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Camber's conduct violates Sections 1 and 2 of the Sherman Act.

4270.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Camber's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XLIX

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Citron and All Other Defendants Under Joint and Several Liability)**

4271.   Molina incorporates by reference the preceding allegations.

4272.   Citron knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Citron Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Cefuroxime Axetil
> Fluconazole
> Fosinopril HCTZ
> Glyburide
> Glyburide-Metformin

4273.   Citron has committed at least one overt act to further the conspiracy alleged in this Complaint. Citron's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Citron Drugs throughout the United States.

4274.   The conspiracy realized its intended effect; Citron has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Citron Drugs.

4275.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Citron Drugs;

b.   Molina was deprived of the benefits of free and open competition in the sale of the Citron Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Citron Drugs was unlawfully restrained, suppressed, or eliminated.

4276.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Citron Drugs until the market achieves a steady state.

4277.   As a direct and proximate result of Citron's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Citron Drugs than it would have paid in the absence of Citron's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4278.   There is no legitimate, non-pretextual, pro-competitive business justification for Citron's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4279.   Citron's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4280.   Citron's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4281.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Citron's unlawful activities.

4282.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4283.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4284.    For these additional reasons, Citron's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT L

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Citron and All Other Defendants Under Joint and Several Liability)

4285.   Molina incorporates by reference the preceding allegations.

4286.   Citron engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Citron's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Citron Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4287.   There was and is a gross disparity between the price for the Molina Purchases of Citron Drugs, and the value received, given that more cheaply priced Citron Drugs should have been available, and would have been available, absent Citron's illegal conduct.

REDACTED – PUBLIC VERSION

4288.   By engaging in the foregoing conduct, Citron engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LI

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Citron and All Other Defendants Under Joint and Several Liability)

4289.   Molina incorporates by reference the preceding allegations.

4290.   Citron has benefitted from artificial prices in the sale of the Citron Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4291.   Citron's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Citron Drugs by Molina.

4292.   Molina has conferred upon Citron an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4293.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Citron Drugs.

4294.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Citron Drugs, as it is not liable and would not compensate Molina for the impact of Citron's unlawful conduct.

4295.   The economic benefit of overcharges derived by Citron through charging supracompetitive and artificially inflated prices for the Citron Drugs is a direct and proximate result of Citron's unlawful conduct.

4296.   The economic benefits derived by Citron rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Citron.

4297.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Citron to be permitted to retain any of the overcharges for the Citron Drugs derived from Citron's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4298.   Citron is aware of and appreciates the benefits bestowed upon it by Molina.

4299.   Citron should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4300.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Citron traceable to Molina.

## COUNT LII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Citron and All Other Defendants Under Joint and Several Liability)

4301.   Molina incorporates by reference the preceding allegations.

4302.   Citron knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Citron Drugs. Citron injured Molina through this conduct.

4303.   But for Citron's scheme to inflate the price of the Citron Drugs, Molina would have purchased lower-priced Citron Drugs.

4304.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Citron Drugs than it would have paid absent Citron's continuing anticompetitive conduct.

4305.   Molina has purchased substantial amounts of the Citron Drugs during the relevant period.

4306.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Citron's conduct violates Sections 1 and 2 of the Sherman Act.

4307.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Citron's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

# COUNT LIII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT
## OF TRADE UNDER STATE LAWS

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

4308.    Molina incorporates by reference the preceding allegations.

4309.    Dr. Reddy's knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Dr. Reddy's Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Allopurinol
> Ciprofloxacin HCL
> Divalproex Sodium ER
> Eszopiclone
> Fluconazole
> Glimepiride
> Isotretinoin
> Lamotrigine ER
> Meprobamate
> Metoprolol Succinate ER
> Montelukast
> Omeprazole-Sodium Bicarbonate
> Oxaprozin
> Paricalcitol
> Ranitidine HCL
> Sumatriptan
> Tizanidine
> Valganciclovir
> Zoledronic Acid

4310.    Dr. Reddy's has committed at least one overt act to further the conspiracy alleged in this Complaint. Dr. Reddy's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Dr. Reddy's Drugs throughout the United States.

4311.    The conspiracy realized its intended effect; Dr. Reddy's has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Dr. Reddy's Drugs.

4312.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Dr. Reddy's Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Dr. Reddy's Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Dr. Reddy's Drugs was unlawfully restrained, suppressed, or eliminated.

4313.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Dr. Reddy's Drugs until the market achieves a steady state.

4314.   As a direct and proximate result of Dr. Reddy's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Dr. Reddy's Drugs than it would have paid in the absence of Dr. Reddy's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4315.   There is no legitimate, non-pretextual, pro-competitive business justification for Dr. Reddy's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4316.   Dr. Reddy's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4317.   Dr. Reddy's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4318.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Dr. Reddy's unlawful activities.

4319.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4320.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4321.    For these additional reasons, Dr. Reddy's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LIV

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

4322.   Molina incorporates by reference the preceding allegations.

4323.  Dr. Reddy's engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Dr. Reddy's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Dr. Reddy's Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4324.  There was and is a gross disparity between the price for the Molina Purchases of Dr. Reddy's Drugs, and the value received, given that more cheaply priced Dr. Reddy's Drugs should have been available, and would have been available, absent Dr. Reddy's illegal conduct.

4325.  By engaging in the foregoing conduct, Dr. Reddy's engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.  Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.  S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.  Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

4326.    Molina incorporates by reference the preceding allegations.

4327.    Dr. Reddy's has benefitted from artificial prices in the sale of the Dr. Reddy's Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4328.    Dr. Reddy's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Dr. Reddy's Drugs by Molina.

4329.    Molina has conferred upon Dr. Reddy's an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4330.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Dr. Reddy's Drugs.

4331.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Dr. Reddy's Drugs, as it is not liable and would not compensate Molina for the impact of Dr. Reddy's unlawful conduct.

4332.    The economic benefit of overcharges derived by Dr. Reddy's through charging supracompetitive and artificially inflated prices for the Dr. Reddy's Drugs is a direct and proximate result of Dr. Reddy's unlawful conduct.

4333.    The economic benefits derived by Dr. Reddy's rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Dr. Reddy's.

4334.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Dr. Reddy's to be permitted to retain any of the overcharges for the Dr. Reddy's Drugs

derived from Dr. Reddy's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4335.  Dr. Reddy's is aware of and appreciates the benefits bestowed upon it by Molina.

4336.  Dr. Reddy's should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4337.  A constructive trust should be imposed upon all unlawful or inequitable sums received by Dr. Reddy's traceable to Molina.

## COUNT LVI

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Dr. Reddy's and All Other Defendants Under Joint and Several Liability)

4338.  Molina incorporates by reference the preceding allegations.

4339.  Dr. Reddy's knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Dr. Reddy's Drugs. Dr. Reddy's injured Molina through this conduct.

4340.  But for Dr. Reddy's scheme to inflate the price of the Dr. Reddy's Drugs, Molina would have purchased lower-priced Dr. Reddy's Drugs.

4341.  Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Dr. Reddy's Drugs than it would have paid absent Dr. Reddy's continuing anticompetitive conduct.

4342.  Molina has purchased substantial amounts of the Dr. Reddy's Drugs during the relevant period.

4343.  Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Dr. Reddy's conduct violates Sections 1 and 2 of the Sherman Act.

4344.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Dr. Reddy's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

#### (As to Emcure and All Other Defendants Under Joint and Several Liability)

4345.   Molina incorporates by reference the preceding allegations.

4346.   Emcure knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Emcure Drug"). This conspiracy was *per se* unlawful price-fixing.

> Doxycycline

4347.   Emcure has committed at least one overt act to further the conspiracy alleged in this Complaint. Emcure's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Emcure Drug throughout the United States.

4348.   The conspiracy realized its intended effect; Emcure has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Emcure Drug.

4349.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Emcure Drug;
>
> b.   Molina was deprived of the benefits of free and open competition in the sale of the Emcure Drug in the United States market; and

    c.   Competition in establishing the prices paid for the Emcure Drug was unlawfully restrained, suppressed, or eliminated.

4350.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Emcure Drug until the market achieves a steady state.

4351.   As a direct and proximate result of Emcure's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Emcure Drug than it would have paid in the absence of Emcure's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4352.   There is no legitimate, non-pretextual, pro-competitive business justification for Emcure's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4353.   Emcure's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4354.   Emcure's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4355.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Emcure's unlawful activities.

4356.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4357.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4358.    For these additional reasons, Emcure's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Emcure and All Other Defendants Under Joint and Several Liability)

4359.   Molina incorporates by reference the preceding allegations.

4360.   Emcure engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Emcure's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Emcure Drug at prices restrained by competition and forced to pay artificially inflated prices.

REDACTED – PUBLIC VERSION

4361.   There was and is a gross disparity between the price for the Molina Purchases of the Emcure Drug, and the value received, given that more cheaply priced Emcure Drug should have been available, and would have been available, absent Emcure's illegal conduct.

4362.   By engaging in the foregoing conduct, Emcure engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

      a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

      c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

      d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

      e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

      f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

      g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

      h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

      i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

      j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

      k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LIX

## UNJUST ENRICHMENT UNDER STATE LAW

**(As to Emcure and All Other Defendants Under Joint and Several Liability)**

4363.   Molina incorporates by reference the preceding allegations.

4364.   Emcure has benefitted from artificial prices in the sale of the Emcure Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

4365.   Emcure's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Emcure Drug by Molina.

4366.   Molina has conferred upon Emcure an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4367.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Emcure Drug.

4368.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Emcure Drug, as it is not liable and would not compensate Molina for the impact of Emcure's unlawful conduct.

4369.   The economic benefit of overcharges derived by Emcure through charging supracompetitive and artificially inflated prices for the Emcure Drug is a direct and proximate result of Emcure's unlawful conduct.

4370.   The economic benefits derived by Emcure rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Emcure.

4371.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Emcure to be permitted to retain any of the overcharges for the Emcure Drug derived from Emcure's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4372.   Emcure is aware of and appreciates the benefits bestowed upon it by Molina.

4373.   Emcure should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4374.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Emcure traceable to Molina.

REDACTED – PUBLIC VERSION

## COUNT LX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Emcure and All Other Defendants Under Joint and Several Liability)

4375.   Molina incorporates by reference the preceding allegations.

4376.   Emcure knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Emcure Drug. Emcure injured Molina through this conduct.

4377.   But for Emcure's scheme to inflate the price of the Emcure Drug, Molina would have purchased lower-priced Emcure Drugs.

4378.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Emcure Drug than it would have paid absent Emcure's continuing anticompetitive conduct.

4379.   Molina has purchased substantial amounts of the Emcure Drug during the relevant period.

4380.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Emcure's conduct violates Sections 1 and 2 of the Sherman Act.

4381.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Emcure's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXI

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Epic and All Other Defendants Under Joint and Several Liability)**

4382.    Molina incorporates by reference the preceding allegations.

4383.    Epic knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Epic Drug"). This conspiracy was *per se* unlawful price-fixing.

Ursodiol

4384.    Epic has committed at least one overt act to further the conspiracy alleged in this Complaint. Epic's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Epic Drug throughout the United States.

4385.    The conspiracy realized its intended effect; Epic has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Epic Drug.

4386.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Epic Drug;

      b.    Molina was deprived of the benefits of free and open competition in the sale of the Epic Drug in the United States market; and

      c.    Competition in establishing the prices paid for the Epic Drug was unlawfully restrained, suppressed, or eliminated.

4387.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Epic Drug until the market achieves a steady state.

4388.   As a direct and proximate result of Epic's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Epic Drug than it would have paid in the absence of Epic's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4389.   There is no legitimate, non-pretextual, pro-competitive business justification for Epic's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4390.   Epic's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4391.   Epic's conduct violated the following state antitrust or competition practices laws:

   a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

   b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

   c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

   d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

   e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

   f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

   h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

   i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

   j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

   k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4392.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Epic's unlawful activities.

4393.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4394.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4395.    For these additional reasons, Epic's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LXII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Epic and All Other Defendants Under Joint and Several Liability)

4396.   Molina incorporates by reference the preceding allegations.

4397.   Epic engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Epic's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Epic Drug at prices restrained by competition and forced to pay artificially inflated prices.

4398.   There was and is a gross disparity between the price for the Molina Purchases of Epic Drug, and the value received, given that more cheaply priced Epic Drug should have been available, and would have been available, absent Epic's illegal conduct.

4399.   By engaging in the foregoing conduct, Epic engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

     a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LXIII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Epic and All Other Defendants Under Joint and Several Liability)

4400.   Molina incorporates by reference the preceding allegations.

4401.   Epic has benefitted from artificial prices in the sale of the Epic Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

4402.   Epic's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Epic Drug by Molina.

4403.   Molina has conferred upon Epic an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4404.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Epic Drug.

4405.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Epic Drug, as it is not liable and would not compensate Molina for the impact of Epic's unlawful conduct.

4406.   The economic benefit of overcharges derived by Epic through charging supracompetitive and artificially inflated prices for the Epic Drug is a direct and proximate result of Epic's unlawful conduct.

4407.   The economic benefits derived by Epic rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Epic.

4408.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Epic to be permitted to retain any of the overcharges for the Epic Drug derived from Epic's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4409.   Epic is aware of and appreciates the benefits bestowed upon it by Molina.

4410.   Epic should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4411.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Epic traceable to Molina.

## COUNT LXIV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Epic and All Other Defendants Under Joint and Several Liability)

4412.   Molina incorporates by reference the preceding allegations.

REDACTED – PUBLIC VERSION

4413.    Epic knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Epic Drug. Epic injured Molina through this conduct.

4414.    But for Epic's scheme to inflate the price of the Epic Drug, Molina would have purchased lower-priced Epic Drug.

4415.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Epic Drug than it would have paid absent Epic's continuing anticompetitive conduct.

4416.    Molina has purchased substantial amounts of the Epic Drug during the relevant period.

4417.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Epic's conduct violates Sections 1 and 2 of the Sherman Act.

4418.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Epic's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXV

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to G&W and All Other Defendants Under Joint and Several Liability)

4419.    Molina incorporates by reference the preceding allegations.

4420.    G&W knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "G&W Drug"). This conspiracy was *per se* unlawful price-fixing.

Betamethasone Valerate

1009

Calcipotriene
Ciclopirox
Ethambutol HCL
Fluocinolone Acetonide
Fluocinonide
Halobetasol Propionate
Hydrocortisone Acetate
Hydrocortisone Valerate
Metronidazole
Mometasone Furoate
Prochlorperazine Maleate
Promethazine HCL

4421.    G&W has committed at least one overt act to further the conspiracy alleged in this Complaint. G&W's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the G&W Drug throughout the United States.

4422.    The conspiracy realized its intended effect; G&W has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the G&W Drug.

4423.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

     a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the G&W Drug;

     b.   Molina was deprived of the benefits of free and open competition in the sale of the G&W Drug in the United States market; and

     c.   Competition in establishing the prices paid for the G&W Drug was unlawfully restrained, suppressed, or eliminated.

4424.    Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the G&W Drug until the market achieves a steady state.

4425.    As a direct and proximate result of G&W's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the G&W Drug than it would have

1010

REDACTED – PUBLIC VERSION

paid in the absence of G&W's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4426.   There is no legitimate, non-pretextual, pro-competitive business justification for G&W's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4427.   G&W's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4428.   G&W's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4429.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of G&W's unlawful activities.

REDACTED – PUBLIC VERSION

4430.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4431.   All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4432.    For these additional reasons, G&W's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LXVI

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to G&W and All Other Defendants Under Joint and Several Liability)

4433.   Molina incorporates by reference the preceding allegations.

4434.   G&W engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of G&W's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the G&W Drug at prices restrained by competition and forced to pay artificially inflated prices.

4435.   There was and is a gross disparity between the price for the Molina Purchases of G&W Drug, and the value received, given that more cheaply priced G&W Drug should have been available, and would have been available, absent G&W's illegal conduct.

4436.   By engaging in the foregoing conduct, G&W engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

   a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.  Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.  S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.  Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LXVII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to G&W and All Other Defendants Under Joint and Several Liability)

4437.  Molina incorporates by reference the preceding allegations.

4438.  G&W has benefitted from artificial prices in the sale of the G&W Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

4439.  G&W's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the G&W Drug by Molina.

4440.  Molina has conferred upon G&W an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4441.  It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the G&W Drug.

4442.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the G&W Drug, as it is not liable and would not compensate Molina for the impact of G&W's unlawful conduct.

4443.   The economic benefit of overcharges derived by G&W through charging supracompetitive and artificially inflated prices for the G&W Drug is a direct and proximate result of G&W's unlawful conduct.

4444.   The economic benefits derived by G&W rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting G&W.

4445.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for G&W to be permitted to retain any of the overcharges for the G&W Drug derived from G&W's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4446.   G&W is aware of and appreciates the benefits bestowed upon it by Molina.

4447.   G&W should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4448.   A constructive trust should be imposed upon all unlawful or inequitable sums received by G&W traceable to Molina.

## COUNT LXVIII

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to G&W and All Other Defendants Under Joint and Several Liability)

4449.   Molina incorporates by reference the preceding allegations.

4450.   G&W knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the G&W Drug. G&W injured Molina through this conduct.

4451.   But for G&W's scheme to inflate the price of the G&W Drug, Molina would have purchased lower-priced G&W Drug.

4452.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the G&W Drug than it would have paid absent G&W's continuing anticompetitive conduct.

4453.   Molina has purchased substantial amounts of the G&W Drug during the relevant period.

4454.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that G&W's conduct violates Sections 1 and 2 of the Sherman Act.

4455.   Molina A seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by G&W's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXIX

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Generics Bidco and All Other Defendants Under Joint and Several Liability)**

4456.   Molina incorporates by reference the preceding allegations.

4457.   Generics Bidco knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Generics Bidco Drugs"). This conspiracy was *per se* unlawful price-fixing.

Baclofen

Propranolol HCL

4458.   Generics Bidco has committed at least one overt act to further the conspiracy alleged in this Complaint. Generics Bidco's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Generics Bidco Drugs throughout the United States.

4459.   The conspiracy realized its intended effect; Generics Bidco has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Generics Bidco Drugs.

4460.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Generics Bidco Drugs;

   b.   Molina was deprived of the benefits of free and open competition in the sale of the Generics Bidco Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Generics Bidco Drugs was unlawfully restrained, suppressed, or eliminated.

4461.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Generics Bidco Drugs until the market achieves a steady state.

4462.   As a direct and proximate result of Generics Bidco's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Generics Bidco Drugs than it would have paid in the absence of Generics Bidco's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4463.   There is no legitimate, non-pretextual, pro-competitive business justification for Generics Bidco's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4464.    Generics Bidco's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4465.    Generics Bidco's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

      e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

      f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

      g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

      h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

      i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

      j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

      k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4466.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Generics Bidco's unlawful activities.

4467.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

REDACTED – PUBLIC VERSION

4468.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4469.    For these additional reasons, Generics Bidco's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LXX

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Generics Bidco and All Other Defendants Under Joint and Several Liability)

4470.   Molina incorporates by reference the preceding allegations.

4471.   Generics Bidco engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Generics Bidco's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Generics Bidco Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4472.   There was and is a gross disparity between the price for the Molina Purchases of Generics Bidco Drugs, and the value received, given that more cheaply priced Generics Bidco Drugs should have been available, and would have been available, absent Generics Bidco's illegal conduct.

4473.   By engaging in the foregoing conduct, Generics Bidco engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

1018

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LXXI

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Generics Bidco and All Other Defendants Under Joint and Several Liability)

4474.   Molina incorporates by reference the preceding allegations.

4475.   Generics Bidco has benefitted from artificial prices in the sale of the Generics Bidco Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4476.   Generics Bidco's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Generics Bidco Drugs by Molina.

4477.   Molina has conferred upon Generics Bidco an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4478.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Generics Bidco Drugs.

4479.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Generics Bidco Drugs, as it is not liable and would not compensate Molina for the impact of Generics Bidco's unlawful conduct.

REDACTED – PUBLIC VERSION

4480.   The economic benefit of overcharges derived by Generics Bidco through charging supracompetitive and artificially inflated prices for the Generics Bidco Drugs is a direct and proximate result of Generics Bidco's unlawful conduct.

4481.   The economic benefits derived by Generics Bidco rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Generics Bidco.

4482.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Generics Bidco to be permitted to retain any of the overcharges for the Generics Bidco Drugs derived from Generics Bidco's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4483.   Generics Bidco is aware of and appreciates the benefits bestowed upon it by Molina.

4484.   Generics Bidco should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4485.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Generics Bidco traceable to Molina.

## COUNT LXXII

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Generics Bidco and All Other Defendants Under Joint and Several Liability)

4486.   Molina incorporates by reference the preceding allegations.

4487.   Generics Bidco knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Generics Bidco Drugs. Generics Bidco injured Molina through this conduct.

4488.   But for Generics Bidco's scheme to inflate the price of the Generics Bidco Drugs, Molina would have purchased lower-priced Generics Bidco Drugs.

4489.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Generics Bidco Drugs than it would have paid absent Generics Bidco's continuing anticompetitive conduct.

4490.   Molina has purchased substantial amounts of the Generics Bidco Drugs during the relevant period.

4491.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Generics Bidco's conduct violates Sections 1 and 2 of the Sherman Act.

4492.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Generics Bidco's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXIII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

4493.   Molina incorporates by reference the preceding allegations.

4494.   Glenmark knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Glenmark Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Adapalene
> Alclometasone Dipropionate
> Ciclopirox
> Desogestrel/Ethinyl Estradiol (Kariva)
> Desoximetasone

> Fluconazole
> Fluocinonide
> Fluticasone Propionate
> Fosinopril HCTZ
> Gabapentin
> Hydralazine
> Moexipril HCL
> Moexipril HCL/HCTZ
> Mometasone Furoate
> Nabumetone
> Naproxen Sodium
> Norethindrone Acetate
> Ondansetron
> Pravastatin
> Ranitidine HCL

4495.   Glenmark has committed at least one overt act to further the conspiracy alleged in this Complaint. Glenmark's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Glenmark Drugs throughout the United States.

4496.   The conspiracy realized its intended effect; Glenmark has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Glenmark Drugs.

4497.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Glenmark Drugs;

   b.   Molina was deprived of the benefits of free and open competition in the sale of the Glenmark Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Glenmark Drugs was unlawfully restrained, suppressed, or eliminated.

4498.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Glenmark Drugs until the market achieves a steady state.

4499.   As a direct and proximate result of Glenmark's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Glenmark Drugs than it would have paid in the absence of Glenmark's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4500.   There is no legitimate, non-pretextual, pro-competitive business justification for Glenmark's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4501.   Glenmark's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4502.   Glenmark's conduct violated the following state antitrust or competition practices laws:

a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

4503.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Glenmark's unlawful activities.

4504.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4505.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4506.    For these additional reasons, Glennmark's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LXXIV

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

4507.    Molina incorporates by reference the preceding allegations.

4508.    Glenmark engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Glenmark's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Glenmark Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4509.    There was and is a gross disparity between the price for the Molina Purchases of Glenmark Drugs, and the value received, given that more cheaply priced Glenmark Drugs should have been available, and would have been available, absent Glenmark's illegal conduct.

4510.   By engaging in the foregoing conduct, Glenmark engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LXXV

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Glenmark and All Other Defendants Under Joint and Several Liability)**

4511.   Molina incorporates by reference the preceding allegations.

4512.   Glenmark has benefitted from artificial prices in the sale of the Glenmark Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4513.   Glenmark's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Glenmark Drugs by Molina.

4514.   Molina has conferred upon Glenmark an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4515.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Glenmark Drugs.

4516.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Glenmark Drugs, as it is not liable and would not compensate Molina for the impact of Glenmark's unlawful conduct.

4517.   The economic benefit of overcharges derived by Glenmark through charging supracompetitive and artificially inflated prices for the Glenmark Drugs is a direct and proximate result of Glenmark's unlawful conduct.

4518.   The economic benefits derived by Glenmark rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Glenmark.

4519.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Glenmark to be permitted to retain any of the overcharges for the Glenmark Drugs derived from Glenmark's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4520.   Glenmark is aware of and appreciates the benefits bestowed upon it by Molina.

4521.   Glenmark should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4522.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Glenmark traceable to Molina.

REDACTED – PUBLIC VERSION

## COUNT LXXVI

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

4523.   Molina incorporates by reference the preceding allegations.

4524.   Glenmark knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Glenmark Drugs. Glenmark injured Molina through this conduct.

4525.   But for Glenmark's scheme to inflate the price of the Glenmark Drugs, Molina would have purchased lower-priced Glenmark Drugs.

4526.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Glenmark Drugs than it would have paid absent Glenmark's continuing anticompetitive conduct.

4527.   Molina has purchased substantial amounts of the Glenmark Drugs during the relevant period.

4528.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Glenmark's conduct violates Sections 1 and 2 of the Sherman Act.

4529.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Glenmark's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Hi-Tech and All Other Defendants Under Joint and Several Liability)**

4530.   Molina incorporates by reference the preceding allegations.

4531.   Hi-Tech knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Hi-Tech Drugs"). This conspiracy was *per se* unlawful price-fixing.

>    Clobetasol Propionate
>    Lidocaine

4532.   Hi-Tech has committed at least one overt act to further the conspiracy alleged in this Complaint. Hi-Tech's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Hi-Tech Drugs throughout the United States.

4533.   The conspiracy realized its intended effect; Hi-Tech has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Hi-Tech Drugs.

4534.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Hi-Tech Drugs;

b.   Molina was deprived of the benefits of free and open competition in the sale of the Hi-Tech Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Hi-Tech Drugs was unlawfully restrained, suppressed, or eliminated.

4535.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Hi-Tech Drugs until the market achieves a steady state.

4536.   As a direct and proximate result of Hi-Tech's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Hi-Tech Drugs than it would have paid in the absence of Hi-Tech's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4537.   There is no legitimate, non-pretextual, pro-competitive business justification for Hi-Tech's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4538.   Hi-Tech's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4539.   Hi-Tech's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

      e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

      f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

      g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

      h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

      i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

      j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4540.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Hi-Tech's unlawful activities.

4541.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4542.   All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4543.   For these additional reasons, Hi-Tech's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LXXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Hi-Tech and All Other Defendants Under Joint and Several Liability)

4544.   Molina incorporates by reference the preceding allegations.

4545.   Hi-Tech engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Hi-Tech's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Hi-Tech Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4546.   There was and is a gross disparity between the price for the Molina Purchases of Hi-Tech Drugs, and the value received, given that more cheaply priced Hi-Tech Drugs should have been available, and would have been available, absent Hi-Tech's illegal conduct.

REDACTED – PUBLIC VERSION

4547. By engaging in the foregoing conduct, Hi-Tech engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d. Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h. S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k. Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LXXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Hi-Tech and All Other Defendants Under Joint and Several Liability)

4548. Molina incorporates by reference the preceding allegations.

4549. Hi-Tech has benefitted from artificial prices in the sale of the Hi-Tech Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4550. Hi-Tech's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Hi-Tech Drugs by Molina.

4551. Molina has conferred upon Hi-Tech an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4552.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Hi-Tech Drugs.

4553.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Hi-Tech Drugs, as it is not liable and would not compensate Molina for the impact of Hi-Tech's unlawful conduct.

4554.    The economic benefit of overcharges derived by Hi-Tech through charging supracompetitive and artificially inflated prices for the Hi-Tech Drugs is a direct and proximate result of Hi-Tech's unlawful conduct.

4555.    The economic benefits derived by Hi-Tech rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Hi-Tech.

4556.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Hi-Tech to be permitted to retain any of the overcharges for the Hi-Tech Drugs derived from Hi-Tech's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4557.    Hi-Tech is aware of and appreciates the benefits bestowed upon it by Molina.

4558.    Hi-Tech should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4559.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Hi-Tech traceable to Molina.

REDACTED – PUBLIC VERSION

## COUNT LXXX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Hi-Tech and All Other Defendants Under Joint and Several Liability)

4560. Molina incorporates by reference the preceding allegations.

4561. Hi-Tech knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Hi-Tech Drugs. Hi-Tech injured Molina through this conduct.

4562. But for Hi-Tech's scheme to inflate the price of the Hi-Tech Drugs, Molina would have purchased lower-priced Hi-Tech Drugs.

4563. Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Hi-Tech Drugs than it would have paid absent Hi-Tech's continuing anticompetitive conduct.

4564. Molina has purchased substantial amounts of the Hi-Tech Drugs during the relevant period.

4565. Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Hi-Tech's conduct violates Sections 1 and 2 of the Sherman Act.

4566. Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Hi-Tech's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXXI

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

#### (As to Impax and All Other Defendants Under Joint and Several Liability)

4567.   Molina incorporates by reference the preceding allegations.

4568.   Impax knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Impax Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amphetamine/Dextroamphetamine ER and IR
> Calcipotriene
> Cyproheptadine HCL
> Dextroamphetamine Sulfate ER
> Digoxin
> Lidocaine
> Methylphenidate
> Metronidazole
> Mometasone Furoate
> Pilocarpine HCL

4569.   Impax has committed at least one overt act to further the conspiracy alleged in this Complaint. Impax's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Impax Drugs throughout the United States.

4570.   The conspiracy realized its intended effect; Impax has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Impax Drugs.

4571.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Impax Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Impax Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Impax Drugs was unlawfully restrained, suppressed, or eliminated.

4572.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Impax Drugs until the market achieves a steady state.

4573.   As a direct and proximate result of Impax's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Impax Drugs than it would have paid in the absence of Impax's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4574.   There is no legitimate, non-pretextual, pro-competitive business justification for Impax's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4575.   Impax's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4576.   Impax's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.    10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.    R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.    Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.    Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4577.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Impax's unlawful activities.

4578.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4579.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4580.    For these additional reasons, Impax's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

**COUNT LXXXII**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Impax and All Other Defendants Under Joint and Several Liability)**

4581.    Molina incorporates by reference the preceding allegations.

4582.    Impax engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Impax's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Impax Drugs at prices restrained by competition and forced to pay artificially inflated prices.

REDACTED – PUBLIC VERSION

4583.   There was and is a gross disparity between the price for the Molina Purchases of Impax Drugs, and the value received, given that more cheaply priced Impax Drugs should have been available, and would have been available, absent Impax's illegal conduct.

4584.   By engaging in the foregoing conduct, Impax engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LXXXIII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Impax and All Other Defendants Under Joint and Several Liability)

4585.   Molina incorporates by reference the preceding allegations.

4586.   Impax has benefitted from artificial prices in the sale of the Impax Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4587.   Impax's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Impax Drugs by Molina.

4588.   Molina has conferred upon Impax an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4589.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Impax Drugs.

4590.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Impax Drugs, as it is not liable and would not compensate Molina for the impact of Impax's unlawful conduct.

4591.   The economic benefit of overcharges derived by Impax through charging supracompetitive and artificially inflated prices for the Impax Drugs is a direct and proximate result of Impax's unlawful conduct.

4592.   The economic benefits derived by Impax rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Impax.

4593.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Impax to be permitted to retain any of the overcharges for the Impax Drugs derived from Impax's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4594.   Impax is aware of and appreciates the benefits bestowed upon it by Molina.

4595.   Impax should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4596.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Impax traceable to Molina.

## COUNT LXXXIV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Impax and All Other Defendants Under Joint and Several Liability)

4597.   Molina incorporates by reference the preceding allegations.

4598.   Impax knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Impax Drugs. Impax injured Molina through this conduct.

4599.   But for Impax's scheme to inflate the price of the Impax Drugs, Molina would have purchased lower-priced Impax Drugs.

4600.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Impax Drugs than it would have paid absent Impax's continuing anticompetitive conduct.

4601.   Molina has purchased substantial amounts of the Impax Drugs during the relevant period.

4602.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Impax's conduct violates Sections 1 and 2 of the Sherman Act.

4603.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Impax's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXXV

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Lannett and All Other Defendants Under Joint and Several Liability)**

4604.   Molina incorporates by reference the preceding allegations.

4605.   Lannett knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Lannett Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Acetazolamide
> Amantadine HCL
> Ammonium Lactate
> Baclofen
> Calcipotriene Betamethasone Dipropionate
> Digoxin
> Doxycycline
> Erythromycin
> Fluticasone Propionate
> Hydrocortisone Acetate
> Levothyroxine
> Methazolamide
> Pilocarpine HCL
> Promethazine HCL
> Tacrolimus
> Triamterene HCTZ
> Ursodiol

4606.   Lannett has committed at least one overt act to further the conspiracy alleged in this Complaint. Lannett's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Lannett Drugs throughout the United States.

4607.   The conspiracy realized its intended effect; Lannett has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Lannett Drugs.

4608.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.  Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lannett Drugs;

b.  Molina was deprived of the benefits of free and open competition in the sale of the Lannett Drugs in the United States market; and

c.  Competition in establishing the prices paid for the Lannett Drugs was unlawfully restrained, suppressed, or eliminated.

4609.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Lannett Drugs until the market achieves a steady state.

4610.   As a direct and proximate result of Lannett's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Lannett Drugs than it would have paid in the absence of Lannett's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4611.   There is no legitimate, non-pretextual, pro-competitive business justification for Lannett's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4612.   Lannett's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4613.   Lannett's conduct violated the following state antitrust or competition practices laws:

a.  Ala. Code §6-5-60, with respect to purchases in Alabama.

b.  Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.  Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4614.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Lannett's unlawful activities.

4615.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4616.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4617.   For these additional reasons, Lannett's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT LXXXVI

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

4618.   Molina incorporates by reference the preceding allegations.

4619.   Lannett engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Lannett's anticompetitive, deceptive, unfair, unconscionable, and

fraudulent conduct, Molina was deprived of the opportunity to purchase the Lannett Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4620.   There was and is a gross disparity between the price for the Molina Purchases of Lannett Drugs, and the value received, given that more cheaply priced Lannett Drugs should have been available, and would have been available, absent Lannett's illegal conduct.

4621.   By engaging in the foregoing conduct, Lannett engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT LXXXVII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

4622.   Molina incorporates by reference the preceding allegations.

4623.   Lannett has benefitted from artificial prices in the sale of the Lannett Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4624.   Lannett's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Lannett Drugs by Molina.

4625.   Molina has conferred upon Lannett an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4626.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Lannett Drugs.

4627.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Lannett Drugs, as it is not liable and would not compensate Molina for the impact of Lannett's unlawful conduct.

4628.   The economic benefit of overcharges derived by Lannett through charging supracompetitive and artificially inflated prices for the Lannett Drugs is a direct and proximate result of Lannett's unlawful conduct.

4629.   The economic benefits derived by Lannett rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Lannett.

4630.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Lannett to be permitted to retain any of the overcharges for the Lannett Drugs derived from Lannett's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4631.   Lannett is aware of and appreciates the benefits bestowed upon it by Molina.

4632.   Lannett should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4633.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Lannett traceable to Molina.

## COUNT LXXXVIII

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Lannett and All Other Defendants Under Joint and Several Liability)

4634.   Molina incorporates by reference the preceding allegations.

4635.   Lannett knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Lannett Drugs. Lannett injured Molina through this conduct.

4636.   But for Lannett's scheme to inflate the price of the Lannett Drugs, Molina would have purchased lower-priced Lannett Drugs.

4637.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Lannett Drugs than it would have paid absent Lannett's continuing anticompetitive conduct.

4638.   Molina has purchased substantial amounts of the Lannett Drugs during the relevant period.

4639.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Lannett's conduct violates Sections 1 and 2 of the Sherman Act.

4640.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Lannett's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXXIX

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Lupin and All Other Defendants Under Joint and Several Liability)**

4641.    Molina incorporates by reference the preceding allegations.

4642.    Lupin knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Lupin Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Cefdinir
> Cefprozil
> Cefuroxime Axetil
> Cephalexin
> Drospirenone and Ethinyl Estradiol (Ocella)
> Ethambutol HCL
> Ethinyl Estradiol/Norethindrone (Balziva)
> Fenofibrate
> Irbesartan
> Lamivudine/Zidovudine (Combivir)
> Metformin ER (F)
> Niacin ER
> Pravastatin

4643.    Lupin has committed at least one overt act to further the conspiracy alleged in this Complaint. Lupin's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Lupin Drugs throughout the United States.

4644.    The conspiracy realized its intended effect; Lupin has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Lupin Drugs.

4645.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or
>
> stabilized prices at supracompetitive levels for the Lupin Drugs;

b.  Molina was deprived of the benefits of free and open competition in the sale of the Lupin Drugs in the United States market; and

c.  Competition in establishing the prices paid for the Lupin Drugs was unlawfully restrained, suppressed, or eliminated.

4646.  Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Lupin Drugs until the market achieves a steady state.

4647.  As a direct and proximate result of Lupin's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Lupin Drugs than it would have paid in the absence of Lupin's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4648.  There is no legitimate, non-pretextual, pro-competitive business justification for Lupin's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4649.  Lupin's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4650.  Lupin's conduct violated the following state antitrust or competition practices laws:

a.  Ala. Code §6-5-60, with respect to purchases in Alabama.

b.  Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.  Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.  N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.  N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4651.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Lupin's unlawful activities.

4652.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4653.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4654.    For these additional reasons, Lupin's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XC

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

4655.   Molina incorporates by reference the preceding allegations.

4656.   Lupin engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Lupin's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Lupin Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4657.   There was and is a gross disparity between the price for the Molina Purchases of Lupin Drugs, and the value received, given that more cheaply priced Lupin Drugs should have been available, and would have been available, absent Lupin's illegal conduct.

4658.   By engaging in the foregoing conduct, Lupin engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

     a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

     c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

     d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

     e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

     f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

     g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

     h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

     i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

     j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

     k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XCI

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

4659.   Molina incorporates by reference the preceding allegations.

4660.   Lupin has benefitted from artificial prices in the sale of the Lupin Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4661.   Lupin's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Lupin Drugs by Molina.

4662.   Molina has conferred upon Lupin an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4663.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Lupin Drugs.

4664.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Lupin Drugs, as it is not liable and would not compensate Molina for the impact of Lupin's unlawful conduct.

4665.   The economic benefit of overcharges derived by Lupin through charging supracompetitive and artificially inflated prices for the Lupin Drugs is a direct and proximate result of Lupin's unlawful conduct.

4666.   The economic benefits derived by Lupin rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Lupin.

4667.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Lupin to be permitted to retain any of the overcharges for the Lupin Drugs derived from Lupin's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4668.   Lupin is aware of and appreciates the benefits bestowed upon it by Molina.

4669.   Lupin should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4670.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Lupin traceable to Molina.

## COUNT XCII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

4671.   Molina incorporates by reference the preceding allegations.

4672.   Lupin knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Lupin Drugs. Lupin injured Molina through this conduct.

4673.   But for Lupin's scheme to inflate the price of the Lupin Drugs, Molina would have purchased lower-priced Lupin Drugs.

4674.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Lupin Drugs than it would have paid absent Lupin's continuing anticompetitive conduct.

4675.   Molina has purchased substantial amounts of the Lupin Drugs during the relevant period.

4676.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Lupin's conduct violates Sections 1 and 2 of the Sherman Act.

4677.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Lupin's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## COUNT XCIII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Mayne and All Other Defendants Under Joint and Several Liability)**

4678.    Molina incorporates by reference the preceding allegations.

4679.    Mayne knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Mayne Drug"). This conspiracy was *per se* unlawful price-fixing.

> Doxycycline
> Oxycodone/Acetaminophen

4680.    Mayne has committed at least one overt act to further the conspiracy alleged in this Complaint. Mayne's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Mayne Drug throughout the United States.

4681.    The conspiracy realized its intended effect; Mayne has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Mayne Drug.

4682.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Mayne Drug;

    b.    Molina was deprived of the benefits of free and open competition in the sale of the Mayne Drug in the United States market; and

    c.    Competition in establishing the prices paid for the Mayne Drug was unlawfully restrained, suppressed, or eliminated.

4683.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Mayne Drug until the market achieves a steady state.

4684.   As a direct and proximate result of Mayne's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Mayne Drug than it would have paid in the absence of Mayne's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4685.   There is no legitimate, non-pretextual, pro-competitive business justification for Mayne's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4686.   Mayne's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4687.   Mayne's conduct violated the following state antitrust or competition practices laws:

   a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

   b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

   c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

   d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

   e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

   f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

   h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

   i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

   j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

   k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4688.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Mayne's unlawful activities.

4689.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4690.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4691.     For these additional reasons, Mayne's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XCIV

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Mayne and All Other Defendants Under Joint and Several Liability)

4692.    Molina incorporates by reference the preceding allegations.

4693.    Mayne engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Mayne's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Mayne Drug at prices restrained by competition and forced to pay artificially inflated prices.

4694.    There was and is a gross disparity between the price for the Molina Purchases of Mayne Drug, and the value received, given that more cheaply priced Mayne Drug should have been available, and would have been available, absent Mayne's illegal conduct.

4695.    By engaging in the foregoing conduct, Mayne engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

   a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

   c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

   d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

   e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

   f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

   h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

   i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

   j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

   k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XCV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Mayne and All Other Defendants Under Joint and Several Liability)

4696.    Molina incorporates by reference the preceding allegations.

4697.    Mayne has benefitted from artificial prices in the sale of the Mayne Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

4698.    Mayne's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Mayne Drug by Molina.

4699.    Molina has conferred upon Mayne an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4700.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Mayne Drug.

4701.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Mayne Drug, as it is not liable and would not compensate Molina for the impact of Mayne's unlawful conduct.

4702.    The economic benefit of overcharges derived by Mayne through charging supracompetitive and artificially inflated prices for the Mayne Drug is a direct and proximate result of Mayne's unlawful conduct.

4703.    The economic benefits derived by Mayne rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Mayne.

4704.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Mayne to be permitted to retain any of the overcharges for the Mayne Drug derived from Mayne's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4705.    Mayne is aware of and appreciates the benefits bestowed upon it by Molina.

4706.    Mayne should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4707.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Mayne traceable to Molina.

REDACTED – PUBLIC VERSION

## COUNT XCVI

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Mayne and All Other Defendants Under Joint and Several Liability)

4708.   Molina incorporates by reference the preceding allegations.

4709.   Mayne knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Mayne Drug. Mayne injured Molina through this conduct.

4710.   But for Mayne's scheme to inflate the price of the Mayne Drug, Molina would have purchased lower-priced Mayne Drug.

4711.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Mayne Drug than it would have paid absent Mayne's continuing anticompetitive conduct.

4712.   Molina has purchased substantial amounts of the Mayne Drug during the relevant period.

4713.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Mayne's conduct violates Sections 1 and 2 of the Sherman Act.

4714.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Mayne's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## COUNT XCVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Morton Grove and All Other Defendants Under Joint and Several Liability)**

4715.   Molina incorporates by reference the preceding allegations.

4716.   Morton Grove knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Morton Grove Drug"). This conspiracy was *per se* unlawful price-fixing.

Clobetasol Propionate

4717.   Morton Grove has committed at least one overt act to further the conspiracy alleged in this Complaint. Morton Grove's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Morton Grove Drug throughout the United States.

4718.   The conspiracy realized its intended effect; Morton Grove has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Morton Grove Drug.

4719.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Morton Grove Drug;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the Morton Grove Drug in the United States market; and

      c.   Competition in establishing the prices paid for the Morton Grove Drug was unlawfully restrained, suppressed, or eliminated.

4720.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Morton Grove Drug until the market achieves a steady state.

REDACTED – PUBLIC VERSION

4721.   As a direct and proximate result of Morton Grove's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Morton Grove Drug than it would have paid in the absence of Morton Grove's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4722.   There is no legitimate, non-pretextual, pro-competitive business justification for Morton Grove's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4723.   Morton Grove's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4724.   Morton Grove's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4725.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Morton Grove's unlawful activities.

4726.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4727.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4728.    For these additional reasons, Morton Grove's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT XCVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Morton Grove and All Other Defendants Under Joint and Several Liability)

4729.    Molina incorporates by reference the preceding allegations.

4730.    Morton Grove engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Morton Grove's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Morton Grove Drug at prices restrained by competition and forced to pay artificially inflated prices.

4731.    There was and is a gross disparity between the price for the Molina Purchases of Morton Grove Drug, and the value received, given that more cheaply priced Morton Grove Drug should have been available, and would have been available, absent Morton Grove's illegal conduct.

REDACTED – PUBLIC VERSION

4732.   By engaging in the foregoing conduct, Morton Grove engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT XCIX

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Morton Grove and All Other Defendants Under Joint and Several Liability)**

4733.   Molina incorporates by reference the preceding allegations.

4734.   Morton Grove has benefitted from artificial prices in the sale of the Morton Grove Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

4735.   Morton Grove's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Morton Grove Drug by Molina.

4736.   Molina has conferred upon Morton Grove an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4737.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Morton Grove Drug.

4738.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Morton Grove Drug, as it is not liable and would not compensate Molina for the impact of Morton Grove's unlawful conduct.

4739.   The economic benefit of overcharges derived by Morton Grove through charging supracompetitive and artificially inflated prices for the Morton Grove Drug is a direct and proximate result of Morton Grove's unlawful conduct.

4740.   The economic benefits derived by Morton Grove rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Morton Grove.

4741.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Morton Grove to be permitted to retain any of the overcharges for the Morton Grove Drug derived from Morton Grove's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4742.   Morton Grove is aware of and appreciates the benefits bestowed upon it by Molina.

4743.   Morton Grove should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4744.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Morton Grove traceable to Molina.

## COUNT C

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Morton Grove and All Other Defendants Under Joint and Several Liability)

4745.    Molina incorporates by reference the preceding allegations.

4746.    Morton Grove knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Morton Grove Drug. Morton Grove injured Molina through this conduct.

4747.    But for Morton Grove's scheme to inflate the price of the Morton Grove Drug, Molina would have purchased lower-priced Morton Grove Drug.

4748.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Morton Grove Drug than it would have paid absent Morton Grove's continuing anticompetitive conduct.

4749.    Molina has purchased substantial amounts of the Morton Grove Drug during the relevant period.

4750.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Morton Grove's conduct violates Sections 1 and 2 of the Sherman Act.

4751.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Morton Grove's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## COUNT CI

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Mylan and All Other Defendants Under Joint and Several Liability)**

4752.   Molina incorporates by reference the preceding allegations.

4753.   Mylan knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Mylan Drugs"). This conspiracy was *per se* unlawful price-fixing.

>           Albuterol Sulfate
>           Allopurinol
>           Amiloride HCL/HCTZ
>           Amitriptyline
>           Atenolol Chlorthalidone
>           Benazepril HCTZ
>           Bromocriptine Mesylate
>           Budesonide
>           Buspirone HCL
>           Butorphanol Tartrate
>           Capecitabine
>           Captopril
>           Cimetidine
>           Clomipramine
>           Clonidine TTS
>           Diclofenac Potassium
>           Digoxin
>           Diltiazem HCL
>           Diphenoxylate Atropine
>           Divalproex Sodium ER
>           Doxazosin Mesylate
>           Doxycycline
>           Enalapril Maleate
>           Estradiol
>           Fenofibrate
>           Fluoxetine HCL
>           Flurbiprofen
>           Fluvastatin Sodium
>           Glipizide-Metformin
>           Haloperidol
>           Ketoconazole
>           Ketoprofen
>           Ketorolac Tromethamine

Levothyroxine
Loperamide HCL
Methotrexate
Modafinil
Montelukast
Nadolol
Nitrofurantoin MAC
Pentoxifylline
Permethrin
Phenytoin Sodium
Pioglitazone HCL
Piroxicam
Potassium Chloride
Prazosin HCL
Prochlorperazine
Promethazine HCL
Propranolol HCL
Sotalol HCl
Spironolactone HCTZ
Tamoxifen Citrate
Tizanidine
Tolmetin Sodium
Tolterodine
Triamterene HCTZ
Trifluoperazine HCL
Valsartan HCTZ
Verapamil

4754.    Mylan has committed at least one overt act to further the conspiracy alleged in this Complaint. Mylan's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Mylan Drugs throughout the United States.

4755.    The conspiracy realized its intended effect; Mylan has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Mylan Drugs.

4756.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Mylan Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Mylan Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Mylan Drugs was unlawfully restrained, suppressed, or eliminated.

4757.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Mylan Drugs until the market achieves a steady state.

4758.   As a direct and proximate result of Mylan's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Mylan Drugs than it would have paid in the absence of Mylan's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4759.   There is no legitimate, non-pretextual, pro-competitive business justification for Mylan's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4760.   Mylan's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4761.   Mylan's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4762.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Mylan's unlawful activities.

4763.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4764.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4765.    For these additional reasons, Mylan's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

4766.   Molina incorporates by reference the preceding allegations.

4767.   Mylan engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Mylan's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Mylan Drugs at prices restrained by competition and forced to pay artificially inflated prices.

REDACTED – PUBLIC VERSION

4768.   There was and is a gross disparity between the price for the Molina Purchases of Mylan Drugs, and the value received, given that more cheaply priced Mylan Drugs should have been available, and would have been available, absent Mylan's illegal conduct.

4769.   By engaging in the foregoing conduct, Mylan engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CIII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

4770.   Molina incorporates by reference the preceding allegations.

4771.   Mylan has benefitted from artificial prices in the sale of the Mylan Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4772.   Mylan's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Mylan Drugs by Molina.

4773.   Molina has conferred upon Mylan an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4774.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Mylan Drugs.

4775.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Mylan Drugs, as it is not liable and would not compensate Molina for the impact of Mylan's unlawful conduct.

4776.   The economic benefit of overcharges derived by Mylan through charging supracompetitive and artificially inflated prices for the Mylan Drugs is a direct and proximate result of Mylan's unlawful conduct.

4777.   The economic benefits derived by Mylan rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Mylan.

4778.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Mylan to be permitted to retain any of the overcharges for the Mylan Drugs derived from Mylan's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4779.   Mylan is aware of and appreciates the benefits bestowed upon it by Molina.

4780.   Mylan should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4781.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Mylan traceable to Molina.

REDACTED – PUBLIC VERSION

## COUNT CIV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

4782.    Molina incorporates by reference the preceding allegations.

4783.    Mylan knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Mylan Drugs. Mylan injured Molina through this conduct.

4784.    But for Mylan's scheme to inflate the price of the Mylan Drugs, Molina would have purchased lower-priced Mylan Drugs.

4785.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Mylan Drugs than it would have paid absent Mylan's continuing anticompetitive conduct.

4786.    Molina has purchased substantial amounts of the Mylan Drugs during the relevant period.

4787.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Mylan's conduct violates Sections 1 and 2 of the Sherman Act.

4788.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Mylan's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CV

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT
## OF TRADE UNDER STATE LAWS

### (As to Par and All Other Defendants Under Joint and Several Liability)

4789.   Molina incorporates by reference the preceding allegations.

4790.   Par knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Par Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Allopurinol
> Amitriptyline
> Baclofen
> Budesonide
> Cabergoline
> Carisoprodol
> Cholestyramine
> Dexmethylphenidate HCL ER
> Digoxin
> Divalproex Sodium ER
> Doxazosin Mesylate
> Doxycycline
> Entecavir
> Fluoxetine HCL
> Flutamide
> Hydralazine
> Hydroxyurea
> Isosorbide Dinitrate
> Labetalol HCL
> Lamotrigine ER
> Nystatin
> Methimazole
> Methotrexate
> Methylphenidate
> Methylprednisolone
> Metoprolol Succinate ER
> Modafinil
> Omega-3-Acid Ethyl Esters
> Oxybutynin Chloride
> Oxycodone HCL
> Oxycodone/Acetaminophen
> Perphenazine
> Prednisone

Propranolol HCL
Trazodone HCL
Triamcinolone Acetonide

4791.   Par has committed at least one overt act to further the conspiracy alleged in this Complaint. Par's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Par Drugs throughout the United States.

4792.   The conspiracy realized its intended effect; Par has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Par Drugs.

4793.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Par Drugs;

      b.   Molina was deprived of the benefits of free and open competition in the sale of the Par Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Par Drugs was unlawfully restrained, suppressed, or eliminated.

4794.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Par Drugs until the market achieves a steady state.

4795.   As a direct and proximate result of Par's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Par Drugs than it would have paid in the absence of Par's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4796.   There is no legitimate, non-pretextual, pro-competitive business justification for Par's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4797.   Par's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4798.   Par's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4799.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Par's unlawful activities.

4800.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

REDACTED – PUBLIC VERSION

4801.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4802.   For these additional reasons, Par's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CVI

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Par and All Other Defendants Under Joint and Several Liability)

4803.   Molina incorporates by reference the preceding allegations.

4804.   Par engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Par's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Par Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4805.   There was and is a gross disparity between the price for the Molina Purchases of Par Drugs, and the value received, given that more cheaply priced Par Drugs should have been available, and would have been available, absent Par's illegal conduct.

4806.   By engaging in the foregoing conduct, Par engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

      a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

      c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

      d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

REDACTED – PUBLIC VERSION

    e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CVII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Par and All Other Defendants Under Joint and Several Liability)

4807.   Molina incorporates by reference the preceding allegations.

4808.   Par has benefitted from artificial prices in the sale of the Par Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4809.   Par's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Par Drugs by Molina.

4810.   Molina has conferred upon Par an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4811.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Par Drugs.

4812.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Par Drugs, as it is not liable and would not compensate Molina for the impact of Par's unlawful conduct.

REDACTED – PUBLIC VERSION

4813.    The economic benefit of overcharges derived by Par through charging supracompetitive and artificially inflated prices for the Par Drugs is a direct and proximate result of Par's unlawful conduct.

4814.    The economic benefits derived by Par rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Par.

4815.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Par to be permitted to retain any of the overcharges for the Par Drugs derived from Par's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4816.    Par is aware of and appreciates the benefits bestowed upon it by Molina.

4817.    Par should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4818.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Par traceable to Molina.

## COUNT CVIII

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Par and All Other Defendants Under Joint and Several Liability)

4819.    Molina incorporates by reference the preceding allegations.

4820.    Par knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Par Drugs. Par injured Molina through this conduct.

4821.    But for Par's scheme to inflate the price of the Par Drugs, Molina would have purchased lower-priced Par Drugs.

REDACTED – PUBLIC VERSION

4822.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Par Drugs than it would have paid absent Par's continuing anticompetitive conduct.

4823.   Molina has purchased substantial amounts of the Par Drugs during the relevant period.

4824.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Par's conduct violates Sections 1 and 2 of the Sherman Act.

4825.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Par's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CIX

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

4826.   Molina incorporates by reference the preceding allegations.

4827.   Perrigo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Perrigo Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Adapalene
> Ammonium Lactate
> Betamethasone Dipropionate
> Betamethasone Dipropionate Augmented
> Bromocriptine Mesylate
> Calcipotriene Betamethasone Dipropionate
> Ciclopirox
> Clindamycin Phosphate
> Clobetasol Propionate
> Desonide
> Econazole

Erythromycin
Fenofibrate
Fluocinonide
Fluticasone Propionate
Halobetasol Propionate
Hydrocortisone Acetate
Hydrocortisone Valerate
Imiquimod
Methazolamide
Nystatin
Permethrin
Prochlorperazine Maleate
Promethazine HCL
Tacrolimus
Triamcinolone Acetonide

4828.  Perrigo has committed at least one overt act to further the conspiracy alleged in this Complaint. Perrigo's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Perrigo Drugs throughout the United States.

4829.  The conspiracy realized its intended effect; Perrigo has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Perrigo Drugs.

4830.  The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Perrigo Drugs;

   b.   Molina was deprived of the benefits of free and open competition in the sale of the Perrigo Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Perrigo Drugs was unlawfully restrained, suppressed, or eliminated.

4831.  Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Perrigo Drugs until the market achieves a steady state.

1078

REDACTED – PUBLIC VERSION

4832.   As a direct and proximate result of Perrigo's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Perrigo Drugs than it would have paid in the absence of Perrigo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4833.   There is no legitimate, non-pretextual, pro-competitive business justification for Perrigo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4834.   Perrigo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4835.   Perrigo's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4836.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Perrigo's unlawful activities.

4837.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4838.   All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4839.    For these additional reasons, Perrigo's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CX

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

**(As to Perrigo and All Other Defendants Under Joint and Several Liability)**

4840.   Molina incorporates by reference the preceding allegations.

4841.   Perrigo engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Perrigo's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Perrigo Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4842.   There was and is a gross disparity between the price for the Molina Purchases of Perrigo Drugs, and the value received, given that more cheaply priced Perrigo Drugs should have been available, and would have been available, absent Perrigo's illegal conduct.

4843.   By engaging in the foregoing conduct, Perrigo engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXI

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

4844.   Molina incorporates by reference the preceding allegations.

4845.   Perrigo has benefitted from artificial prices in the sale of the Perrigo Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4846.   Perrigo's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Perrigo Drugs by Molina.

4847.   Molina has conferred upon Perrigo an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4848.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Perrigo Drugs.

4849.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Perrigo Drugs, as it is not liable and would not compensate Molina for the impact of Perrigo's unlawful conduct.

4850.   The economic benefit of overcharges derived by Perrigo through charging supracompetitive and artificially inflated prices for the Perrigo Drugs is a direct and proximate result of Perrigo's unlawful conduct.

4851.   The economic benefits derived by Perrigo rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Perrigo.

4852.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Perrigo to be permitted to retain any of the overcharges for the Perrigo Drugs derived from Perrigo's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4853.   Perrigo is aware of and appreciates the benefits bestowed upon it by Molina.

4854.   Perrigo should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4855.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Perrigo traceable to Molina.

## COUNT CXII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

4856.   Molina incorporates by reference the preceding allegations.

4857.    Perrigo knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Perrigo Drugs. Perrigo injured Molina through this conduct.

4858.    But for Perrigo's scheme to inflate the price of the Perrigo Drugs, Molina would have purchased lower-priced Perrigo Drugs.

4859.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Perrigo Drugs than it would have paid absent Perrigo's continuing anticompetitive conduct.

4860.    Molina has purchased substantial amounts of the Perrigo Drugs during the relevant period.

4861.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Perrigo's conduct violates Sections 1 and 2 of the Sherman Act.

4862.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Perrigo's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXIII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Greenstone and All Other Defendants Under Joint and Several Liability)

4863.    Molina incorporates by reference the preceding allegations.

4864.    Greenstone knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Greenstone Drugs"). This conspiracy was *per se* unlawful price-fixing.

Azithromycin

Cabergoline
Fluconazole
Medroxyprogesterone
Oxaprozin
Penicillin VK
Piroxicam
Tolterodine

4865.   Greenstone has committed at least one overt act to further the conspiracy alleged in this Complaint. Greenstone's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Greenstone Drugs throughout the United States.

4866.   The conspiracy realized its intended effect; Greenstone has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Greenstone Drugs.

4867.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Greenstone Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Greenstone Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Greenstone Drugs was unlawfully restrained, suppressed, or eliminated.

4868.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Greenstone Drugs until the market achieves a steady state.

4869.   As a direct and proximate result of Greenstone's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Greenstone Drugs than it would have paid in the absence of Greenstone's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4870.   There is no legitimate, non-pretextual, pro-competitive business justification for Greenstone's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4871.   Greenstone's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4872.   Greenstone's conduct violated the following state antitrust or competition practices laws:

      a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

      b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

      c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

      e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

      f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

      g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

      h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

      i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

      j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

      k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4873.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Greenstone's unlawful activities.

REDACTED – PUBLIC VERSION

4874.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4875.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4876.    For these additional reasons, Greenstone's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXIV

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

**(As to Greenstone and All Other Defendants Under Joint and Several Liability)**

4877.   Molina incorporates by reference the preceding allegations.

4878.   Greenstone engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Greenstone's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Greenstone Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4879.   There was and is a gross disparity between the price for the Molina Purchases of Greenstone Drugs, and the value received, given that more cheaply priced Greenstone Drugs should have been available, and would have been available, absent Greenstone's illegal conduct.

4880.   By engaging in the foregoing conduct, Greenstone engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.  Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.  S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.  Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Greenstone and All Other Defendants Under Joint and Several Liability)

4881.   Molina incorporates by reference the preceding allegations.

4882.   Greenstone has benefitted from artificial prices in the sale of the Greenstone Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4883.   Greenstone's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Greenstone Drugs by Molina.

4884.   Molina has conferred upon Greenstone an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4885.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Greenstone Drugs.

4886.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Greenstone Drugs, as it is not liable and would not compensate Molina for the impact of Greenstone's unlawful conduct.

4887.   The economic benefit of overcharges derived by Greenstone through charging supracompetitive and artificially inflated prices for the Greenstone Drugs is a direct and proximate result of Greenstone's unlawful conduct.

4888.   The economic benefits derived by Greenstone rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Greenstone.

4889.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Greenstone to be permitted to retain any of the overcharges for the Greenstone Drugs derived from Greenstone's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4890.   Greenstone is aware of and appreciates the benefits bestowed upon it by Molina.

4891.   Greenstone should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4892.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Greenstone traceable to Molina.

## COUNT CXVI

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Greenstone and All Other Defendants Under Joint and Several Liability)

4893.   Molina incorporates by reference the preceding allegations.

4894.    Greenstone knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Greenstone Drugs. Greenstone injured Molina through this conduct.

4895.    But for Greenstone's scheme to inflate the price of the Greenstone Drugs, Molina would have purchased lower-priced Greenstone Drugs.

4896.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Greenstone Drugs than it would have paid absent Greenstone's continuing anticompetitive conduct.

4897.    Molina has purchased substantial amounts of the Greenstone Drugs during the relevant period.

4898.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Greenstone's conduct violates Sections 1 and 2 of the Sherman Act.

4899.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Greenstone's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXVII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

4900.    Molina incorporates by reference the preceding allegations.

4901.    Sandoz knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Sandoz Drugs"). This conspiracy was *per se* unlawful price-fixing.

Adapalene

Alclometasone Dipropionate
Amantadine HCL
Amitriptyline
Amoxicillin/Clavulanate
Amphetamine/Dextroamphetamine IR
Atropine Sulfate
Benazepril HCTZ
Betamethasone Dipropionate
Betamethasone Dipropionate Augmented
Betamethasone Dipropionate Clotrimazole
Betamethasone Valerate
Bromocriptine Mesylate
Budesonide
Bumetanide
Calcipotriene
Calcipotriene Betamethasone Dipropionate
Carbamazepine
Cefdinir
Cefpodoxime Proxetil
Cefprozil
Chlorpromazine HCL
Cholestyramine
Ciclopirox
Clemastine Fumarate
Clindamycin Phosphate
Clobetasol Propionate
Clomipramine
Clotrimazole
Desonide
Desoximetasone
Dexmethylphenidate HCL ER
Diclofenac Potassium
Dicloxacillin Sodium
Ethinyl Estradiol/Levonorgestrel (Portia and Jolessa)
Econazole
Eplerenone
Erythromycin
Etodolac
Fluocinolone Acetonide
Fluocinonide
Fluticasone Propionate
Fosinopril HCTZ
Griseofulvin
Halobetasol Propionate
Haloperidol
Hydroxyzine Pamoate
Imiquimod
Isoniazid

Isosorbide Dinitrate
Ketoconazole
Labetalol HCL
Latanoprost
Levothyroxine
Lidocaine
Lidocaine HCL
Methazolamide
Methylphenidate
Methylprednisolone
Metronidazole
Nabumetone
Nadolol
Nafcillin Sodium
Nystatin
Nystatin Triamcinolone
Oxacillin Sodium
Oxaprozin
Penicillin VK
Perphenazine
Pioglitazone-Metformin
Potassium Chloride
Prednisolone Acetate
Prochlorperazine
Ranitidine HCL
Tacrolimus
Temozolomide
Terconazole
Timolol Maleate
Tizanidine
Tobramycin
Tobramycin Dexamethasone
Triamcinolone Acetonide
Triamterene HCTZ
Trifluoperazine HCL
Valsartan HCTZ

4902.   Sandoz has committed at least one overt act to further the conspiracy alleged in this Complaint. Sandoz's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Sandoz Drugs throughout the United States.

4903.   The conspiracy realized its intended effect; Sandoz has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Sandoz Drugs.

4904.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sandoz Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Sandoz Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Sandoz Drugs was unlawfully restrained, suppressed, or eliminated.

4905.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Sandoz Drugs until the market achieves a steady state.

4906.   As a direct and proximate result of Sandoz's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Sandoz Drugs than it would have paid in the absence of Sandoz's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4907.   There is no legitimate, non-pretextual, pro-competitive business justification for Sandoz's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4908.   Sandoz's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4909.   Sandoz's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4910.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Sandoz's unlawful activities.

4911.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4912.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4913.    For these additional reasons, Sandoz's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

4914.   Molina incorporates by reference the preceding allegations.

4915.    Sandoz engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Sandoz's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Sandoz Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4916.    There was and is a gross disparity between the price for the Molina Purchases of Sandoz Drugs, and the value received, given that more cheaply priced Sandoz Drugs should have been available, and would have been available, absent Sandoz's illegal conduct.

4917.    By engaging in the foregoing conduct, Sandoz engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

      a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

      c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

      d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

      e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

      f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

      g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

      h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

      i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

      j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

      k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

## COUNT CXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

4918.   Molina incorporates by reference the preceding allegations.

4919.   Sandoz has benefitted from artificial prices in the sale of the Sandoz Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4920.   Sandoz's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Sandoz Drugs by Molina.

4921.   Molina has conferred upon Sandoz an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4922.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Sandoz Drugs.

4923.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Sandoz Drugs, as it is not liable and would not compensate Molina for the impact of Sandoz's unlawful conduct.

4924.   The economic benefit of overcharges derived by Sandoz through charging supracompetitive and artificially inflated prices for the Sandoz Drugs is a direct and proximate result of Sandoz's unlawful conduct.

4925.   The economic benefits derived by Sandoz rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Sandoz.

4926.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Sandoz to be permitted to retain any of the overcharges for the Sandoz Drugs derived

from Sandoz's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4927.   Sandoz is aware of and appreciates the benefits bestowed upon it by Molina.

4928.   Sandoz should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4929.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Sandoz traceable to Molina.

## COUNT CXX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

4930.   Molina incorporates by reference the preceding allegations.

4931.   Sandoz knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Sandoz Drugs. Sandoz injured Molina through this conduct.

4932.   But for Sandoz's scheme to inflate the price of the Sandoz Drugs, Molina would have purchased lower-priced Sandoz Drugs.

4933.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Sandoz Drugs than it would have paid absent Sandoz's continuing anticompetitive conduct.

4934.   Molina has purchased substantial amounts of the Sandoz Drugs during the relevant period.

4935.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Sandoz's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

4936.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Sandoz's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXXI

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

#### (As to Stride and All Other Defendants Under Joint and Several Liability)

4937.    Molina incorporates by reference the preceding allegations.

4938.    Stride knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Stride Drugs"). This conspiracy was *per se* unlawful price-fixing.

Hydralazine

4939.    Stride has committed at least one overt act to further the conspiracy alleged in this Complaint. Stride's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Stride Drugs throughout the United States.

4940.    The conspiracy realized its intended effect; Stride has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Stride Drugs.

4941.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Stride Drugs;

    b.    Molina was deprived of the benefits of free and open competition in the sale of the Stride Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Stride Drugs was unlawfully restrained, suppressed, or eliminated.

4942.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Stride Drugs until the market achieves a steady state.

4943.   As a direct and proximate result of Stride's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Stride Drugs than it would have paid in the absence of Stride's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4944.   There is no legitimate, non-pretextual, pro-competitive business justification for Stride's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4945.   Stride's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4946.   Stride's conduct violated the following state antitrust or competition practices laws:

a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4947.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Stride's unlawful activities.

4948.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4949.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4950.    For these additional reasons, Stride's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXXII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Stride and All Other Defendants Under Joint and Several Liability)

4951.   Molina incorporates by reference the preceding allegations.

4952.   Stride engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Stride's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Stride Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4953.   There was and is a gross disparity between the price for the Molina Purchases of Stride Drugs, and the value received, given that more cheaply priced Stride Drugs should have been available, and would have been available, absent Stride's illegal conduct.

4954.   By engaging in the foregoing conduct, Stride engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXXIII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Stride and All Other Defendants Under Joint and Several Liability)

4955.   Molina incorporates by reference the preceding allegations.

4956.   Stride has benefitted from artificial prices in the sale of the Stride Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4957.   Stride's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Stride Drugs by Molina.

4958.   Molina has conferred upon Stride an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4959.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Stride Drugs.

4960.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Stride Drugs, as it is not liable and would not compensate Molina for the impact of Stride's unlawful conduct.

4961.   The economic benefit of overcharges derived by Stride through charging supracompetitive and artificially inflated prices for the Stride Drugs is a direct and proximate result of Stride's unlawful conduct.

4962.   The economic benefits derived by Stride rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Stride.

4963.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Stride to be permitted to retain any of the overcharges for the Stride Drugs derived from Stride's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

4964.   Stride is aware of and appreciates the benefits bestowed upon it by Molina.

4965.   Stride should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

4966.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Stride traceable to Molina.

## COUNT CXXIV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Stride and All Other Defendants Under Joint and Several Liability)

4967.   Molina incorporates by reference the preceding allegations.

1101

4968.   Stride knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Stride Drugs. Stride injured Molina through this conduct.

4969.   But for Stride's scheme to inflate the price of the Stride Drugs, Molina would have purchased lower-priced Stride Drugs.

4970.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Stride Drugs than it would have paid absent Stride's continuing anticompetitive conduct.

4971.   Molina has purchased substantial amounts of the Stride Drugs during the relevant period.

4972.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Stride's conduct violates Sections 1 and 2 of the Sherman Act.

4973.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Stride's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXXV

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Sun and All Other Defendants Under Joint and Several Liability)**

4974.   Molina incorporates by reference the preceding allegations.

4975.   Sun knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Sun Drugs"). This conspiracy was *per se* unlawful price-fixing.

Albuterol Sulfate

> Buprenorphine
> Digoxin
> Doxycycline
> Eszopiclone
> Hydrocodone Acetaminophen
> Metformin ER
> Methylphenidate
> Nimodipine
> Nystatin
> Oxycodone HCL
> Paromomycin
> Phenytoin Sodium
> Spironolactone HCTZ
> Tizanidine
> Trazodone HCL

4976.   Sun has committed at least one overt act to further the conspiracy alleged in this Complaint. Sun's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Sun Drugs throughout the United States.

4977.   The conspiracy realized its intended effect; Sun has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Sun Drugs.

4978.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sun Drugs;

    b.   Molina was deprived of the benefits of free and open competition in the sale of the Sun Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Sun Drugs was unlawfully restrained, suppressed, or eliminated.

4979.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Sun Drugs until the market achieves a steady state.

REDACTED – PUBLIC VERSION

4980.    As a direct and proximate result of Sun's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Sun Drugs than it would have paid in the absence of Sun's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

4981.    There is no legitimate, non-pretextual, pro-competitive business justification for Sun's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

4982.    Sun's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

4983.    Sun's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

4984.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Sun's unlawful activities.

4985.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

4986.    All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

4987.    For these additional reasons, Sun's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXXVI

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Sun and All Other Defendants Under Joint and Several Liability)

4988.    Molina incorporates by reference the preceding allegations.

4989.    Sun engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Sun's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Sun Drugs at prices restrained by competition and forced to pay artificially inflated prices.

4990.    There was and is a gross disparity between the price for the Molina Purchases of Sun Drugs, and the value received, given that more cheaply priced Sun Drugs should have been available, and would have been available, absent Sun's illegal conduct.

4991.    By engaging in the foregoing conduct, Sun engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.  Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.  S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.  Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXXVII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Sun and All Other Defendants Under Joint and Several Liability)

4992.  Molina incorporates by reference the preceding allegations.

4993.  Sun has benefitted from artificial prices in the sale of the Sun Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

4994.  Sun's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Sun Drugs by Molina.

4995.  Molina has conferred upon Sun an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

4996.  It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Sun Drugs.

4997.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Sun Drugs, as it is not liable and would not compensate Molina for the impact of Sun's unlawful conduct.

4998.   The economic benefit of overcharges derived by Sun through charging supracompetitive and artificially inflated prices for the Sun Drugs is a direct and proximate result of Sun's unlawful conduct.

4999.   The economic benefits derived by Sun rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Sun.

5000.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Sun to be permitted to retain any of the overcharges for the Sun Drugs derived from Sun's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

5001.   Sun is aware of and appreciates the benefits bestowed upon it by Molina.

5002.   Sun should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

5003.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Sun traceable to Molina.

## COUNT CXXVIII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Sun and All Other Defendants Under Joint and Several Liability)

5004.   Molina incorporates by reference the preceding allegations.

5005.   Sun knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Sun Drugs. Sun injured Molina through this conduct.

5006.   But for Sun's scheme to inflate the price of the Sun Drugs, Molina would have purchased lower-priced Sun Drugs.

5007.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Sun Drugs than it would have paid absent Sun's continuing anticompetitive conduct.

5008.   Molina has purchased substantial amounts of the Sun Drugs during the relevant period.

5009.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Sun's conduct violates Sections 1 and 2 of the Sherman Act.

5010.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Sun's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXXIX

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Taro and All Other Defendants Under Joint and Several Liability)**

5011.   Molina incorporates by reference the preceding allegations.

5012.   Taro knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Taro Drugs"). This conspiracy was *per se* unlawful price-fixing.

Acetazolamide

Adapalene
Alclometasone Dipropionate
Ammonium Lactate
Betamethasone Dipropionate
Betamethasone Dipropionate Augmented
Betamethasone Dipropionate Clotrimazole
Betamethasone Valerate
Carbamazepine
Ciclopirox
Clindamycin Phosphate
Clobetasol Propionate
Clomipramine
Clotrimazole
Desonide
Desoximetasone
Econazole
Enalapril Maleate
Epitol
Etodolac
Fluocinolone Acetonide
Fluocinonide
Fluticasone Propionate
Halobetasol Propionate
Hydrocortisone Valerate
Imiquimod
Ketoconazole
Lidocaine HCL
Metronidazole
Nortriptyline HCL
Nystatin
Nystatin Triamcinolone
Phenytoin Sodium
Promethazine HCL
Terconazole
Triamcinolone Acetonide
Warfarin Sodium

5013.    Taro has committed at least one overt act to further the conspiracy alleged in this

Complaint. Taro's anticompetitive acts had a substantial and foreseeable effect on commerce by

raising and fixing prices of the Taro Drugs throughout the United States.

5014.    The conspiracy realized its intended effect; Taro has benefited, and continues to

benefit, from its anticompetitive agreements which has artificially inflated the prices of the Taro

Drugs.

5015.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

  a. Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Taro Drugs;

  b. Molina was deprived of the benefits of free and open competition in the sale of the Taro Drugs in the United States market; and

  c. Competition in establishing the prices paid for the Taro Drugs was unlawfully restrained, suppressed, or eliminated.

5016.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Taro Drugs until the market achieves a steady state.

5017.   As a direct and proximate result of Taro's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Taro Drugs than it would have paid in the absence of Taro's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

5018.   There is no legitimate, non-pretextual, pro-competitive business justification for Taro's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

5019.   Taro's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

5020.   Taro's conduct violated the following state antitrust or competition practices laws:

  a. Ala. Code §6-5-60, with respect to purchases in Alabama.

  b. Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

  c. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

5021.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Taro's unlawful activities.

5022.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

5023.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

5024.   For these additional reasons, Taro's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXXX

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Taro and All Other Defendants Under Joint and Several Liability)

5025.   Molina incorporates by reference the preceding allegations.

REDACTED – PUBLIC VERSION

5026.    Taro engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Taro's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Taro Drugs at prices restrained by competition and forced to pay artificially inflated prices.

5027.    There was and is a gross disparity between the price for the Molina Purchases of Taro Drugs, and the value received, given that more cheaply priced Taro Drugs should have been available, and would have been available, absent Taro's illegal conduct.

5028.    By engaging in the foregoing conduct, Taro engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

     a.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     b.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

     c.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

     d.    Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

     e.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

     f.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

     g.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

     h.    S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

     i.    Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

     j.    Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

     k.    Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

COUNT CXXXI

UNJUST ENRICHMENT UNDER STATE LAW

**(As to Taro and All Other Defendants Under Joint and Several Liability)**

5029.   Molina incorporates by reference the preceding allegations.

5030.   Taro has benefitted from artificial prices in the sale of the Taro Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

5031.   Taro's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Taro Drugs by Molina.

5032.   Molina has conferred upon Taro an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

5033.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Taro Drugs.

5034.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Taro Drugs, as it is not liable and would not compensate Molina for the impact of Taro's unlawful conduct.

5035.   The economic benefit of overcharges derived by Taro through charging supracompetitive and artificially inflated prices for the Taro Drugs is a direct and proximate result of Taro's unlawful conduct.

5036.   The economic benefits derived by Taro rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Taro.

5037.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Taro to be permitted to retain any of the overcharges for the Taro Drugs derived from Taro's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1113

REDACTED – PUBLIC VERSION

5038.   Taro is aware of and appreciates the benefits bestowed upon it by Molina.

5039.   Taro should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

5040.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Taro traceable to Molina.

## COUNT CXXXII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Taro and All Other Defendants Under Joint and Several Liability)

5041.   Molina incorporates by reference the preceding allegations.

5042.   Taro knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Taro Drugs. Taro injured Molina through this conduct.

5043.   But for Taro's scheme to inflate the price of the Taro Drugs, Molina would have purchased lower-priced Taro Drugs.

5044.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Taro Drugs than it would have paid absent Taro's continuing anticompetitive conduct.

5045.   Molina has purchased substantial amounts of the Taro Drugs during the relevant period.

5046.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Taro's conduct violates Sections 1 and 2 of the Sherman Act.

5047.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

caused by Taro's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXXXIII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Teligent and All Other Defendants Under Joint and Several Liability)

5048.   Molina incorporates by reference the preceding allegations.

5049.   Teligent knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Teligent Drug"). This conspiracy was *per se* unlawful price-fixing.

> Econazole
> Fluocinolone Acetonide

5050.   Teligent has committed at least one overt act to further the conspiracy alleged in this Complaint. Teligent's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Teligent Drug throughout the United States.

5051.   The conspiracy realized its intended effect; Teligent has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Teligent Drug.

5052.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teligent Drug;

b.   Molina was deprived of the benefits of free and open competition in the sale of the Teligent Drug in the United States market; and

    c.   Competition in establishing the prices paid for the Teligent Drug was unlawfully restrained, suppressed, or eliminated.

5053.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Teligent Drug until the market achieves a steady state.

5054.   As a direct and proximate result of Teligent's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Teligent Drug than it would have paid in the absence of Teligent's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

5055.   There is no legitimate, non-pretextual, pro-competitive business justification for Teligent's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

5056.   Teligent's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

5057.   Teligent's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

     i.    R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

     j.    Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

     k.    Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

5058.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Teligent's unlawful activities.

5059.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

5060.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

5061.    For these additional reasons, Teligent's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

**COUNT CXXXIV**

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to Teligent and All Other Defendants Under Joint and Several Liability)**

5062.    Molina incorporates by reference the preceding allegations.

5063.    Teligent engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Teligent's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Teligent Drug at prices restrained by competition and forced to pay artificially inflated prices.

REDACTED – PUBLIC VERSION

5064.   There was and is a gross disparity between the price for the Molina Purchases of Teligent Drug, and the value received, given that more cheaply priced Teligent Drug should have been available, and would have been available, absent Teligent's illegal conduct.

5065.   By engaging in the foregoing conduct, Teligent engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXXXV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Teligent and All Other Defendants Under Joint and Several Liability)

5066.   Molina incorporates by reference the preceding allegations.

5067.   Teligent has benefitted from artificial prices in the sale of the Teligent Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

5068.   Teligent's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Teligent Drug by Molina.

5069.   Molina has conferred upon Teligent an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

5070.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Teligent Drug.

5071.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Teligent Drug, as it is not liable and would not compensate Molina for the impact of Teligent's unlawful conduct.

5072.   The economic benefit of overcharges derived by Teligent through charging supracompetitive and artificially inflated prices for the Teligent Drug is a direct and proximate result of Teligent's unlawful conduct.

5073.   The economic benefits derived by Teligent rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Teligent.

5074.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Teligent to be permitted to retain any of the overcharges for the Teligent Drug derived from Teligent's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

5075.   Teligent is aware of and appreciates the benefits bestowed upon it by Molina.

5076.   Teligent should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

5077.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Teligent traceable to Molina.

## COUNT CXXXVI

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Teligent and All Other Defendants Under Joint and Several Liability)**

5078.    Molina incorporates by reference the preceding allegations.

5079.    Teligent knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Teligent Drug. Teligent injured Molina through this conduct.

5080.    But for Teligent's scheme to inflate the price of the Teligent Drug, Molina would have purchased lower-priced Teligent Drug.

5081.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Teligent Drug than it would have paid absent Teligent's continuing anticompetitive conduct.

5082.    Molina has purchased substantial amounts of the Teligent Drug during the relevant period.

5083.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Teligent's conduct violates Sections 1 and 2 of the Sherman Act.

5084.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Teligent's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## COUNT CXXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Torrent and All Other Defendants Under Joint and Several Liability)**

5085.    Molina incorporates by reference the preceding allegations.

5086.    Torrent knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Torrent Drug"). This conspiracy was *per se* unlawful price-fixing.

Carbamazepine
Pioglitazone HCL

5087.    Torrent has committed at least one overt act to further the conspiracy alleged in this Complaint. Torrent's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Torrent Drug throughout the United States.

5088.    The conspiracy realized its intended effect; Torrent has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Torrent Drug.

5089.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.    Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Torrent Drug;

b.    Molina was deprived of the benefits of free and open competition in the sale of the Torrent Drug in the United States market; and

c.    Competition in establishing the prices paid for the Torrent Drug was unlawfully restrained, suppressed, or eliminated.

5090.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Torrent Drug until the market achieves a steady state.

5091.   As a direct and proximate result of Torrent's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Torrent Drug than it would have paid in the absence of Torrent's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

5092.   There is no legitimate, non-pretextual, pro-competitive business justification for Torrent's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

5093.   Torrent's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

5094.   Torrent's conduct violated the following state antitrust or competition practices laws:

   a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

   b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

   c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

   d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

   e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

   f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

   h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

   i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

   j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

   k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

5095.    In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Torrent's unlawful activities.

5096.    A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

5097.    All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

5098.    For these additional reasons, Torrent's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXXXVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Torrent and All Other Defendants Under Joint and Several Liability)

5099.    Molina incorporates by reference the preceding allegations.

5100.    Torrent engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Torrent's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Torrent Drug at prices restrained by competition and forced to pay artificially inflated prices.

5101.    There was and is a gross disparity between the price for the Molina Purchases of Torrent Drug, and the value received, given that more cheaply priced Torrent Drug should have been available, and would have been available, absent Torrent's illegal conduct.

1123

5102.   By engaging in the foregoing conduct, Torrent engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

     a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

     c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

     d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

     e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

     f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

     g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

     h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

     i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

     j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

     k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXXXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Torrent and All Other Defendants Under Joint and Several Liability)

5103.   Molina incorporates by reference the preceding allegations.

5104.   Torrent has benefitted from artificial prices in the sale of the Torrent Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

5105.   Torrent's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Torrent Drug by Molina.

5106.   Molina has conferred upon Torrent an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

5107.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Torrent Drug.

5108.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Torrent Drug, as it is not liable and would not compensate Molina for the impact of Torrent's unlawful conduct.

5109.    The economic benefit of overcharges derived by Torrent through charging supracompetitive and artificially inflated prices for the Torrent Drug is a direct and proximate result of Torrent's unlawful conduct.

5110.    The economic benefits derived by Torrent rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Torrent.

5111.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Torrent to be permitted to retain any of the overcharges for the Torrent Drug derived from Torrent's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

5112.    Torrent is aware of and appreciates the benefits bestowed upon it by Molina.

5113.    Torrent should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

5114.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Torrent traceable to Molina.

## COUNT CXL

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Torrent and All Other Defendants Under Joint and Several Liability)

5115.   Molina incorporates by reference the preceding allegations.

5116.   Torrent knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Torrent Drug. Torrent injured Molina through this conduct.

5117.   But for Torrent's scheme to inflate the price of the Torrent Drug, Molina would have purchased lower-priced Torrent Drug.

5118.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Torrent Drug than it would have paid absent Torrent's continuing anticompetitive conduct.

5119.   Molina has purchased substantial amounts of the Torrent Drug during the relevant period.

5120.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Torrent's conduct violates Sections 1 and 2 of the Sherman Act.

5121.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Torrent's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CXLI

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)**

5122.  Molina incorporates by reference the preceding allegations.

5123.  Upsher-Smith knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Upsher-Smith Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Amantadine HCL
> Baclofen
> Chlorpromazine HCL
> Cholestyramine
> Eplerenone
> Oxybutynin Chloride
> Potassium Chloride
> Propranolol HCL

5124.  Upsher-Smith has committed at least one overt act to further the conspiracy alleged in this Complaint. Upsher-Smith's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Upsher-Smith Drugs throughout the United States.

5125.  The conspiracy realized its intended effect; Upsher-Smith has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Upsher-Smith Drugs.

5126.  The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.  Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Upsher-Smith Drugs;

b.  Molina was deprived of the benefits of free and open competition in the sale of the Upsher-Smith Drugs in the United States market; and

1127

    c.   Competition in establishing the prices paid for the Upsher-Smith Drugs was unlawfully restrained, suppressed, or eliminated.

5127.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Upsher-Smith Drugs until the market achieves a steady state.

5128.   As a direct and proximate result of Upsher-Smith's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Upsher-Smith Drugs than it would have paid in the absence of Upsher-Smith's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

5129.   There is no legitimate, non-pretextual, pro-competitive business justification for Upsher-Smith's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

5130.   Upsher-Smith's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

5131.   Upsher-Smith's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

5132.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Upsher-Smith's unlawful activities.

5133.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

5134.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

5135.    For these additional reasons, Upsher-Smith's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXLII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

5136.   Molina incorporates by reference the preceding allegations.

5137.   Upsher-Smith engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Upsher-Smith's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Upsher-Smith Drugs at prices restrained by competition and forced to pay artificially inflated prices.

REDACTED – PUBLIC VERSION

5138. There was and is a gross disparity between the price for the Molina Purchases of Upsher-Smith Drugs, and the value received, given that more cheaply priced Upsher-Smith Drugs should have been available, and would have been available, absent Upsher-Smith's illegal conduct.

5139. By engaging in the foregoing conduct, Upsher-Smith engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXLIII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

5140. Molina incorporates by reference the preceding allegations.

5141. Upsher-Smith has benefitted from artificial prices in the sale of the Upsher-Smith Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

5142.   Upsher-Smith's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Upsher-Smith Drugs by Molina.

5143.   Molina has conferred upon Upsher-Smith an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

5144.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Upsher-Smith Drugs.

5145.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Upsher-Smith Drugs, as it is not liable and would not compensate Molina for the impact of Upsher-Smith's unlawful conduct.

5146.   The economic benefit of overcharges derived by Upsher-Smith through charging supracompetitive and artificially inflated prices for the Upsher-Smith Drugs is a direct and proximate result of Upsher-Smith's unlawful conduct.

5147.   The economic benefits derived by Upsher-Smith rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Upsher-Smith.

5148.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Upsher-Smith to be permitted to retain any of the overcharges for the Upsher-Smith Drugs derived from Upsher-Smith's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

5149.   Upsher-Smith is aware of and appreciates the benefits bestowed upon it by Molina.

5150.   Upsher-Smith should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

5151.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Upsher-Smith traceable to Molina.

## COUNT CXLIV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Upsher-Smith and All Other Defendants Under Joint and Several Liability)

5152.   Molina incorporates by reference the preceding allegations.

5153.   Upsher-Smith knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Upsher-Smith Drugs. Upsher-Smith injured Molina through this conduct.

5154.   But for Upsher-Smith's scheme to inflate the price of the Upsher-Smith Drugs, Molina would have purchased lower-priced Upsher-Smith Drugs.

5155.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Upsher-Smith Drugs than it would have paid absent Upsher-Smith's continuing anticompetitive conduct.

5156.   Molina has purchased substantial amounts of the Upsher-Smith Drugs during the relevant period.

5157.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Upsher-Smith's conduct violates Sections 1 and 2 of the Sherman Act.

5158.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Upsher-Smith's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## COUNT CXLV

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Valeant and All Other Defendants Under Joint and Several Liability)**

5159.   Molina incorporates by reference the preceding allegations.

5160.   Valeant knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Valeant Drug"). This conspiracy was *per se* unlawful price-fixing.

> Atropine Sulfate
> Enalapril Maleate
> Fluocinonide
> Latanoprost
> Metronidazole
> Omeprazole Sodium
> Pentoxifylline
> Timolol Maleate
> Tobramycin Dexamethasone

5161.   Valeant has committed at least one overt act to further the conspiracy alleged in this Complaint. Valeant's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Valeant Drug throughout the United States.

5162.   The conspiracy realized its intended effect; Valeant has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Valeant Drug.

5163.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Valeant Drug;
>
> b.   Molina was deprived of the benefits of free and open competition in the sale of the Valeant Drug in the United States market; and

1133

    c.   Competition in establishing the prices paid for the Valeant Drug was unlawfully restrained, suppressed, or eliminated.

5164.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Valeant Drug until the market achieves a steady state.

5165.   As a direct and proximate result of Valeant's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Valeant Drug than it would have paid in the absence of Valeant's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

5166.   There is no legitimate, non-pretextual, pro-competitive business justification for Valeant's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

5167.   Valeant's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

5168.   Valeant's conduct violated the following state antitrust or competition practices laws:

    a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

    b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

    c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

    e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

    f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

5169.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Valeant's unlawful activities.

5170.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

5171.   All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

5172.   For these additional reasons, Valeant's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CXLVI

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

5173.   Molina incorporates by reference the preceding allegations.

5174.   Valeant engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Valeant's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Valeant Drug at prices restrained by competition and forced to pay artificially inflated prices.

5175.   There was and is a gross disparity between the price for the Molina Purchases of Valeant Drug, and the value received, given that more cheaply priced Valeant Drug should have been available, and would have been available, absent Valeant's illegal conduct.

5176.    By engaging in the foregoing conduct, Valeant engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d.  Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.  S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.  Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CXLVII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

5177.    Molina incorporates by reference the preceding allegations.

5178.    Valeant has benefitted from artificial prices in the sale of the Valeant Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

5179.    Valeant's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Valeant Drug by Molina.

5180.    Molina has conferred upon Valeant an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

5181.    It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Valeant Drug.

5182.    It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Valeant Drug, as it is not liable and would not compensate Molina for the impact of Valeant's unlawful conduct.

5183.    The economic benefit of overcharges derived by Valeant through charging supracompetitive and artificially inflated prices for the Valeant Drug is a direct and proximate result of Valeant's unlawful conduct.

5184.    The economic benefits derived by Valeant rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Valeant.

5185.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Valeant to be permitted to retain any of the overcharges for the Valeant Drug derived from Valeant's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

5186.    Valeant is aware of and appreciates the benefits bestowed upon it by Molina.

5187.    Valeant should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

5188.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Valeant traceable to Molina.

REDACTED – PUBLIC VERSION

## COUNT CXLVIII

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

5189.   Molina incorporates by reference the preceding allegations.

5190.   Valeant knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Valeant Drug. Valeant injured Molina through this conduct.

5191.   But for Valeant's scheme to inflate the price of the Valeant Drug, Molina would have purchased lower-priced Valeant Drug.

5192.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Valeant Drug than it would have paid absent Valeant's continuing anticompetitive conduct.

5193.   Molina has purchased substantial amounts of the Valeant Drug during the relevant period.

5194.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Valeant's conduct violates Sections 1 and 2 of the Sherman Act.

5195.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Valeant's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## COUNT CXLIX

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Versapharm and All Other Defendants Under Joint and Several Liability)**

5196.   Molina incorporates by reference the preceding allegations.

5197.   Versapharm knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Versapharm Drug"). This conspiracy was *per se* unlawful price-fixing.

Ethosuximide

5198.   Versapharm has committed at least one overt act to further the conspiracy alleged in this Complaint. Versapharm's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Versapharm Drug throughout the United States.

5199.   The conspiracy realized its intended effect; Versapharm has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Versapharm Drug.

5200.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Versapharm Drug;

b.   Molina was deprived of the benefits of free and open competition in the sale of the Versapharm Drug in the United States market; and

c.   Competition in establishing the prices paid for the Versapharm Drug was unlawfully restrained, suppressed, or eliminated.

5201.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Versapharm Drug until the market achieves a steady state.

REDACTED – PUBLIC VERSION

5202.    As a direct and proximate result of Versapharm's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Versapharm Drug than it would have paid in the absence of Versapharm's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

5203.    There is no legitimate, non-pretextual, pro-competitive business justification for Versapharm's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

5204.    Versapharm's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

5205.    Versapharm's conduct violated the following state antitrust or competition practices laws:

     a.  Ala. Code §6-5-60, with respect to purchases in Alabama.

     b.  Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

     c.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

     d.  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

     e.  Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

     f.  N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

     g.  N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

     h.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

     i.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

     j.  Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

     k.  Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

5206.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Versapharm's unlawful activities.

5207.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

5208.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

5209.   For these additional reasons, Versapharm's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CL

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Versapharm and All Other Defendants Under Joint and Several Liability)

5210.   Molina incorporates by reference the preceding allegations.

5211.   Versapharm engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Versapharm's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Versapharm Drug at prices restrained by competition and forced to pay artificially inflated prices.

5212.   There was and is a gross disparity between the price for the Molina Purchases of Versapharm Drug, and the value received, given that more cheaply priced Versapharm Drug should have been available, and would have been available, absent Versapharm's illegal conduct.

REDACTED – PUBLIC VERSION

5213.    By engaging in the foregoing conduct, Versapharm engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

     a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

     c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

     d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

     e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

     f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

     g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

     h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

     i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

     j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

     k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

### COUNT CLI

### UNJUST ENRICHMENT UNDER STATE LAW

**(As to Versapharm and All Other Defendants Under Joint and Several Liability)**

5214.    Molina incorporates by reference the preceding allegations.

5215.    Versapharm has benefitted from artificial prices in the sale of the Versapharm Drug resulting from the unlawful and inequitable acts alleged in this Complaint.

5216.    Versapharm's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Versapharm Drug by Molina.

5217.    Molina has conferred upon Versapharm an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

5218.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Versapharm Drug.

5219.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Versapharm Drug, as it is not liable and would not compensate Molina for the impact of Versapharm's unlawful conduct.

5220.   The economic benefit of overcharges derived by Versapharm through charging supracompetitive and artificially inflated prices for the Versapharm Drug is a direct and proximate result of Versapharm's unlawful conduct.

5221.   The economic benefits derived by Versapharm rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Versapharm.

5222.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Versapharm to be permitted to retain any of the overcharges for the Versapharm Drug derived from Versapharm's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

5223.   Versapharm is aware of and appreciates the benefits bestowed upon it by Molina.

5224.   Versapharm should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

5225.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Versapharm traceable to Molina.

## COUNT CLII

**DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT**

**(As to Versapharm and All Other Defendants Under Joint and Several Liability)**

5226.    Molina incorporates by reference the preceding allegations.

5227.    Versapharm knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Versapharm Drug. Versapharm injured Molina through this conduct.

5228.    But for Versapharm's scheme to inflate the price of the Versapharm Drug, Molina would have purchased lower-priced Versapharm Drug.

5229.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Versapharm Drug than it would have paid absent Versapharm's continuing anticompetitive conduct.

5230.    Molina has purchased substantial amounts of the Versapharm Drug during the relevant period.

5231.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Versapharm's conduct violates Sections 1 and 2 of the Sherman Act.

5232.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Versapharm's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## COUNT CLIII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to West-Ward and All Other Defendants Under Joint and Several Liability)**

5233.   Molina incorporates by reference the preceding allegations.

5234.   West-Ward knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "West-Ward Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Balsalazide Disodium
> Butorphanol Tartrate
> Captopril
> Digoxin
> Doxycycline
> Exemestane
> Fluticasone Propionate
> Isosorbide Dinitrate
> Methadone HCL
> Methotrexate
> Prednisone

5235.   West-Ward has committed at least one overt act to further the conspiracy alleged in this Complaint. West-Ward's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the West-Ward Drugs throughout the United States.

5236.   The conspiracy realized its intended effect; West-Ward has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the West-Ward Drugs.

5237.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the West-Ward Drugs;

b. Molina was deprived of the benefits of free and open competition in the sale of the West-Ward Drugs in the United States market; and

c. Competition in establishing the prices paid for the West-Ward Drugs was unlawfully restrained, suppressed, or eliminated.

5238.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the West-Ward Drugs until the market achieves a steady state.

5239.   As a direct and proximate result of West-Ward's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the West-Ward Drugs than it would have paid in the absence of West-Ward's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

5240.   There is no legitimate, non-pretextual, pro-competitive business justification for West-Ward's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

5241.   West-Ward's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

5242.   West-Ward's conduct violated the following state antitrust or competition practices laws:

a. Ala. Code §6-5-60, with respect to purchases in Alabama.

b. Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d. Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e. Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f. N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

5243.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of West-Ward's unlawful activities.

5244.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

5245.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

5246.    For these additional reasons, West-Ward's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CLIV

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to West-Ward and All Other Defendants Under Joint and Several Liability)

5247.   Molina incorporates by reference the preceding allegations.

5248.   West-Ward engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of West-Ward's anticompetitive, deceptive, unfair, unconscionable, and

fraudulent conduct, Molina was deprived of the opportunity to purchase the West-Ward Drugs at prices restrained by competition and forced to pay artificially inflated prices.

5249.   There was and is a gross disparity between the price for the Molina Purchases of West-Ward Drugs, and the value received, given that more cheaply priced West-Ward Drugs should have been available, and would have been available, absent West-Ward's illegal conduct.

5250.   By engaging in the foregoing conduct, West-Ward engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

   a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

   c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

   d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

   e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

   f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

   h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

   i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

   j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

   k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CLV

## UNJUST ENRICHMENT UNDER STATE LAW

**(As to West-Ward and All Other Defendants Under Joint and Several Liability)**

5251.   Molina incorporates by reference the preceding allegations.

5252.   West-Ward has benefitted from artificial prices in the sale of the West-Ward Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

5253.   West-Ward's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the West-Ward Drugs by Molina.

5254.   Molina has conferred upon West-Ward an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

5255.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the West-Ward Drugs.

5256.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the West-Ward Drugs, as it is not liable and would not compensate Molina for the impact of West-Ward's unlawful conduct.

5257.   The economic benefit of overcharges derived by West-Ward through charging supracompetitive and artificially inflated prices for the West-Ward Drugs is a direct and proximate result of West-Ward's unlawful conduct.

5258.   The economic benefits derived by West-Ward rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting West-Ward.

5259.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for West-Ward to be permitted to retain any of the overcharges for the West-Ward Drugs derived from West-Ward's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

5260.   West-Ward is aware of and appreciates the benefits bestowed upon it by Molina.

5261.   West-Ward should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

REDACTED – PUBLIC VERSION

5262.   A constructive trust should be imposed upon all unlawful or inequitable sums received by West-Ward traceable to Molina.

## COUNT CLVI

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to West-Ward and All Other Defendants Under Joint and Several Liability)

5263.   Molina incorporates by reference the preceding allegations.

5264.   West-Ward knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the West-Ward Drugs. West-Ward injured Molina through this conduct.

5265.   But for West-Ward's scheme to inflate the price of the West-Ward Drugs, Molina would have purchased lower-priced West-Ward Drugs.

5266.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the West-Ward Drugs than it would have paid absent West-Ward's continuing anticompetitive conduct.

5267.   Molina has purchased substantial amounts of the West-Ward Drugs during the relevant period.

5268.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that West-Ward's conduct violates Sections 1 and 2 of the Sherman Act.

5269.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by West-Ward's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## COUNT CLVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Wockhardt and All Other Defendants Under Joint and Several Liability)**

5270.   Molina incorporates by reference the preceding allegations.

5271.   Wockhardt knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Wockhardt Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Captopril
> Clobetasol Propionate
> Enalapril Maleate
> Erythromycin
> Fluticasone Propionate

5272.   Wockhardt has committed at least one overt act to further the conspiracy alleged in this Complaint. Wockhardt's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Wockhardt Drugs throughout the United States.

5273.   The conspiracy realized its intended effect; Wockhardt has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Wockhardt Drugs.

5274.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Wockhardt Drugs;

   b.   Molina was deprived of the benefits of free and open competition in the sale of the Wockhardt Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Wockhardt Drugs was unlawfully restrained, suppressed, or eliminated.

5275.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Wockhardt Drugs until the market achieves a steady state.

5276.   As a direct and proximate result of Wockhardt's unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Wockhardt Drugs than it would have paid in the absence of Wockhardt's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

5277.   There is no legitimate, non-pretextual, pro-competitive business justification for Wockhardt's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

5278.   Wockhardt's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

5279.   Wockhardt's conduct violated the following state antitrust or competition practices laws:

a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

5280.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Wockhardt's unlawful activities.

5281.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

5282.   All relevant times, MCI was headquartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

5283.    For these additional reasons, Wockhardt's conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CLVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

5284.   Molina incorporates by reference the preceding allegations.

5285.   Wockhardt engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Wockhardt's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Wockhardt Drugs at prices restrained by competition and forced to pay artificially inflated prices.

5286.   There was and is a gross disparity between the price for the Molina Purchases of Wockhardt Drugs, and the value received, given that more cheaply priced Wockhardt Drugs should have been available, and would have been available, absent Wockhardt's illegal conduct.

1153

REDACTED – PUBLIC VERSION

5287.   By engaging in the foregoing conduct, Wockhardt engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

    a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

    e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

    i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CLIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

5288.   Molina incorporates by reference the preceding allegations.

5289.   Wockhardt has benefitted from artificial prices in the sale of the Wockhardt Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

5290.   Wockhardt's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Wockhardt Drugs by Molina.

5291.   Molina has conferred upon Wockhardt an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

5292.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Wockhardt Drugs.

5293.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Wockhardt Drugs, as it is not liable and would not compensate Molina for the impact of Wockhardt's unlawful conduct.

5294.   The economic benefit of overcharges derived by Wockhardt through charging supracompetitive and artificially inflated prices for the Wockhardt Drugs is a direct and proximate result of Wockhardt's unlawful conduct.

5295.   The economic benefits derived by Wockhardt rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Wockhardt.

5296.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Wockhardt to be permitted to retain any of the overcharges for the Wockhardt Drugs derived from Wockhardt's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

5297.   Wockhardt is aware of and appreciates the benefits bestowed upon it by Molina.

5298.   Wockhardt should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

5299.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Wockhardt traceable to Molina.

## COUNT CLX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Wockhardt and All Other Defendants Under Joint and Several Liability)**

5300.   Molina incorporates by reference the preceding allegations.

5301.   Wockhardt knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Wockhardt Drugs. Wockhardt injured Molina through this conduct.

5302.   But for Wockhardt's scheme to inflate the price of the Wockhardt Drugs, Molina would have purchased lower-priced Wockhardt Drugs.

5303.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Wockhardt Drugs than it would have paid absent Wockhardt's continuing anticompetitive conduct.

5304.   Molina has purchased substantial amounts of the Wockhardt Drugs during the relevant period.

5305.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Wockhardt's conduct violates Sections 1 and 2 of the Sherman Act.

5306.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Wockhardt's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## COUNT CLXI

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Zydus and All Other Defendants Under Joint and Several Liability)**

5307.   Molina incorporates by reference the preceding allegations.

5308.   Zydus knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States (the "Zydus Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Acetazolamide
> Acyclovir
> Clarithromycin ER
> Divalproex Sodium ER
> Etodolac
> Fenofibrate
> Haloperidol
> Niacin ER
> Paricalcitol
> Potassium Chloride
> Pravastatin
> Topiramate Sprinkle
> Warfarin Sodium

5309.   Zydus has committed at least one overt act to further the conspiracy alleged in this Complaint. Zydus' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Zydus Drugs throughout the United States.

5310.   The conspiracy realized its intended effect; Zydus has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Zydus Drugs.

5311.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

  a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Zydus Drugs;

1157

b.   Molina was deprived of the benefits of free and open competition in the sale of the Zydus Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Zydus Drugs was unlawfully restrained, suppressed, or eliminated.

5312.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Zydus Drugs until the market achieves a steady state.

5313.   As a direct and proximate result of Zydus' unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Zydus Drugs than it would have paid in the absence of Zydus' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

5314.   There is no legitimate, non-pretextual, pro-competitive business justification for Zydus' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

5315.   Zydus' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

5316.   Zydus' conduct violated the following state antitrust or competition practices laws:

a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

    h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

    k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

5317.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Zydus' unlawful activities.

5318.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

5319.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

5320.   For these additional reasons, Zydus' conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CLXII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

5321.   Molina incorporates by reference the preceding allegations.

5322.   Zydus engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Zydus' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Zydus Drugs at prices restrained by competition and forced to pay artificially inflated prices.

REDACTED – PUBLIC VERSION

5323.   There was and is a gross disparity between the price for the Molina Purchases of Zydus Drugs, and the value received, given that more cheaply priced Zydus Drugs should have been available, and would have been available, absent Zydus' illegal conduct.

5324.   By engaging in the foregoing conduct, Zydus engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

     a.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     b.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

     c.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

     d.   Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

     e.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

     f.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

     g.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

     h.   S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

     i.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

     j.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

     k.   Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CLXIII

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

5325.   Molina incorporates by reference the preceding allegations.

5326.   Zydus has benefitted from artificial prices in the sale of the Zydus Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

5327.   Zydus' financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Zydus Drugs by Molina.

5328.   Molina has conferred upon Zydus an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

5329.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Zydus Drugs.

5330.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Zydus Drugs, as it is not liable and would not compensate Molina for the impact of Zydus' unlawful conduct.

5331.   The economic benefit of overcharges derived by Zydus through charging supracompetitive and artificially inflated prices for the Zydus Drugs is a direct and proximate result of Zydus' unlawful conduct.

5332.   The economic benefits derived by Zydus rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Zydus.

5333.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Zydus to be permitted to retain any of the overcharges for the Zydus Drugs derived from Zydus' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

5334.   Zydus is aware of and appreciates the benefits bestowed upon it by Molina.

5335.   Zydus should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds it received.

5336.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Zydus traceable to Molina.

REDACTED – PUBLIC VERSION

## COUNT CLXIV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Zydus and All Other Defendants Under Joint and Several Liability)

5337.   Molina incorporates by reference the preceding allegations.

5338.   Zydus knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Zydus Drugs. Zydus injured Molina through this conduct.

5339.   But for Zydus' scheme to inflate the price of the Zydus Drugs, Molina would have purchased lower-priced Zydus Drugs.

5340.   Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Zydus Drugs than it would have paid absent Zydus' continuing anticompetitive conduct.

5341.   Molina has purchased substantial amounts of the Zydus Drugs during the relevant period.

5342.   Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Zydus' conduct violates Sections 1 and 2 of the Sherman Act.

5343.   Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Zydus' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

### COUNT CLXV

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (ALL SUBJECT DRUGS)

### (As to All Defendants)

5344.   Molina incorporates by reference the preceding allegations.

5345.   Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

5346.   Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Subject Drug prices throughout the United States.

5347.   The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

5348.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Molina has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

b.   Molina was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

5349.   Even after free and open competition begins, Molina will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

REDACTED – PUBLIC VERSION

5350.   As a direct and proximate result of Defendants' unlawful conduct, Molina has been injured in its business and property in that it has paid more for the Subject Drugs than it would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

5351.   There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

5352.   Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

5353.   Defendants' conduct violated the following state antitrust or competition practices laws:

   a.   Ala. Code §6-5-60, with respect to purchases in Alabama.

   b.   Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases in California.

   c.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

   d.   Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to purchases in Michigan.

   e.   Miss. Code Ann. §§ 75-21-1, et seq., with respect to purchases in Mississippi.

   f.   N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to purchases in New Mexico.

   g.   N.Y. Gen. Bus. Law §§ 340, et seq., with respect to purchases in New York.

   h.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

   i.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

   j.   Utah Code Ann. §§ 76-10-3101, et seq., with respect to purchases in Utah.

   k.   Wis. Stat. §§ 133.01, et seq., with respect to purchases in Wisconsin.

REDACTED – PUBLIC VERSION

5354.   In addition, there is a direct, substantial and reasonably foreseeably effect upon trade and commerce in California (both intrastate and interstate) as a result of Defendants' unlawful activities.

5355.   A substantial number of significant events to the conspiracy took place and were performed in California, including communications in furtherance of the conspiracy that were sent from or received in California.

5356.   All relevant times, MCI was head quartered in Long Beach, California and is ultimately financially responsible for the financial performance of all state health plans.  MHI is the assignee of claims from Molina's subsidiary state health plans as described in paragraph 154.

5357.    For these additional reasons, Defendants' conduct violated Cal. Bus. & Prof. Code §§ 16700, et seq.

## COUNT CLXVI

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW
### (ALL SUBJECT DRUGS)

### (As to All Defendants)

5358.   Molina incorporates by reference the preceding allegations.

5359.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Molina was deprived of the opportunity to purchase the Subject Drugs at prices restrained by competition and forced to pay artificially inflated prices.

5360.   There was and is a gross disparity between the price for the Molina Purchases of the Subject Drugs, and the value received, given that more cheaply priced generic drugs should have been available, and would have been available, absent Defendants' illegal conduct.

1165

REDACTED – PUBLIC VERSION

5361. By engaging in the foregoing conduct, Defendants engaged in unfair competition or deceptive acts and practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq, and/or the following state laws:

     a. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

     b. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

     c. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

     d. Minn. Stat. §§ 325F.68, et seq., with respect to purchases in Minnesota.

     e. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

     f. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

     g. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

     h. S.C. Code §§ 39-5-20, et seq., with respect to purchases in South Carolina.

     i. Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

     j. Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

     k. Wis. Stat. §§ 100.18, et seq., with respect to purchases in Wisconsin.

## COUNT CLXVII

## UNJUST ENRICHMENT UNDER STATE LAW (ALL SUBJECT DRUGS)

### (As to All Defendants)

5362. Molina incorporates by reference the preceding allegations.

5363. Defendants have benefitted from artificial prices in the sale of the Subject Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

5364. Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for the Subject Drugs by Molina.

5365. Molina has conferred upon Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Molina.

5366.   It would be futile for Molina to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Subject Drugs.

5367.   It would be futile for Molina to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Subject Drugs, as it is not liable and would not compensate Molina for the impact of Defendants' unlawful conduct.

5368.   The economic benefit of overcharges derived by Defendants through charging supracompetitive and artificially inflated prices for the Subject Drugs is a direct and proximate result of Defendants' unlawful conduct.

5369.   The economic benefits derived by Defendants rightfully belong to Molina, as it paid anticompetitive and monopolistic prices during the relevant periods, benefiting Defendants.

5370.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for the Subject Drugs derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

5371.   Defendants are aware of and appreciate the benefits bestowed upon them by Molina.

5372.   Defendants should be compelled to disgorge in a common fund for the benefit of Molina all unlawful or inequitable proceeds they received.

5373.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Molina.

## COUNT CLXVIII

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)

**(As to All Defendants)**

5374.    Molina incorporates by reference the preceding allegations.

5375.    Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Subject Drugs. Defendants injured Molina through this conduct.

5376.    But for Defendants' scheme to inflate the price of the Subject Drugs, Molina would have purchased lower-priced Subject Drugs.

5377.    Molina has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Subject Drugs than it would have paid absent Defendants' continuing anticompetitive conduct.

5378.    Molina has purchased substantial amounts of the Subject Drugs during the relevant periods.

5379.    Molina seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

5380.    Molina seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

REDACTED – PUBLIC VERSION

## XXI.   DEMAND FOR JUDGMENT

WHEREFORE, Molina demands judgment against Defendants, as follows:

A.   Declaring the acts alleged herein to constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. §§ 1-2;

B.   Judgment against Defendants, jointly and severally, awarding Molina actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre-judgment and post-judgment interest at the statutory rates;

C.   Awarding Molina its reasonable costs and expenses, including attorneys' fees; and

D.   Awarding all other legal or equitable relief as the Court deems just and proper.

## XXII.  JURY DEMAND

Molina demands a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38(b).

Dated: December 15, 2020

Respectfully submitted:

**LOWEY DANNENBERG, P.C.**

By:   *Laura K. Mummert*
Laura K. Mummert, PA ID # 85964
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, Pennsylvania 19428
Tel: 215-399-4770
LMummert@lowey.com

**LOWEY DANNENBERG, P.C.**

Peter D. St. Phillip, PA ID # 70027
Thomas Skelton
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel. 914-997-0500
PStPhillip@lowey.com
TSkelton@lowey.com

REDACTED – PUBLIC VERSION

**SCHNEIDER WALLACE COTTRELL
KONECKY LLP**

Todd Schneider
Jason Kim
Matt Weiler
Kyle Bates
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel.: 415-421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com
KBates@schneiderwallace.com

*Counsel for Molina Healthcare, Inc.*