# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| | |
| This Document Relates to:<br><br>*Molina Healthcare Inc. v. Actavis Elizabeth LLC, et al.*<br>*Humana Inc. v. Actavis Elizabeth LLC, et al.*<br>*Humana Inc. v. Actavis Elizabeth LLC, et al.*<br>*Humana Inc. v. Actavis Elizabeth LLC, et al.* | HON. CYNTHIA M. RUFE<br><br>***LEAVE TO FILE GRANTED ON SEPT. 9, 2025 (16-MD-2724 Dkt No. 3644)***<br><br>20-CV-00695<br>18-CV-03299<br>19-CV-04862<br>20-CV-06303 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL AND LAW FIRM

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ..................................................................................................... 1

II.  BACKGROUND ...................................................................................................... 5

III. ARGUMENT .......................................................................................................... 11

    A.   Legal Standard ............................................................................................. 12

    B.   Mr. Nielsen's Violations of Rule 1.11 Materially Disadvantage
        Defendants and Threaten the Integrity of the Judicial Proceedings ..................... 14

        1.   *Rule 1.11(c): Disqualification is warranted because Mr. Nielsen's
            violation of Rule 1.11(c) materially disadvantages Defendants.* .............. 17

        2.   *Rule 1.11(a): Disqualification is warranted because Mr. Nielsen's
            violation of Rule 1.11(a) threatens the integrity of the judicial
            proceedings* .......................................................................................... 24

    C.   Without a Timely and Effective Screen, Mr. Nielsen's Violations Should
        Be Imputed to Lowey ................................................................................... 28

IV.  CONCLUSION ....................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Allied Realty of St. Paul, Inc. v. Exch. Nat'l Bank of Chi.*,
283 F. Supp. 464 (D. Minn. 1968),
*aff'd*, 408 F.2d 1099 (8th Cir. 1969) ................................................................16

*Brice v. Hoffert*,
2016 WL 3981361 (E.D. Pa. July 25, 2016) ....................................................13

*Brown v. Dist. of Columbia Bd. of Zoning Adjustment*,
486 A.2d 37 (D.C. 1984) ...................................................................................18

*Celgene Corp. v. KV Pharm. Co.*,
2008 WL 2937415 (D.N.J. July 29, 2008) .......................................................26

*Cheng v. GAF Corp.*,
631 F.2d 1052 (2d Cir. 1980),
*vacated on other grounds*, 450 U.S. 903 (1981) ...............................................29

*Connecticut v. Aurobindo*, *Connecticut v. Teva*, and *Connecticut v. Sandoz*,
No. 3:16-cv-02056-MPS, ECF No. 682 ..........................................................7, 8

*Decora Inc. v. DW Wallcovering, Inc.*,
899 F. Supp. 132 (S.D.N.Y. 1995) ...................................................................29

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*,
567 F.2d 225 (2d Cir. 1977)...............................................................................22

*Gen. Motors Corp. v. New York*,
501 F.2d 639 (2d Cir. 1974)...............................................................................16

*Goodwine v. City of New York*,
2016 WL 379761 (S.D.N.Y. Jan. 29, 2016) ...........................................4, 17, 25

*Green v. City of New York*,
2011 WL 2419864 (S.D.N.Y. June 7, 2011) ....................................................24

*Henry v. Delaware River Joint Toll Bridge Comm'n*,
2001 WL 1003224 (E.D. Pa. Aug. 24, 2001) ...................................................13

*Heyliger v. Collins*,
2014 WL 910324 (N.D.N.Y. Mar. 10, 2014) ...................................................26

*Hilo Metals Co. v. Learner Co.*,
258 F. Supp. 23 (D. Haw. 1966) ..................................................................16, 17

*In re Boy Scouts of Am.*,
  35 F.4th 149 (3d Cir. 2022) ..........................................................................13

*In re Generic Pharm. Pricing Antitrust Litig.*,
  2017 WL 4582710 (J.P.M.L. Aug. 3, 2017) ....................................................24

*In re Generics Pharms. Pricing Antitrust Litig.*,
  No. 2:16-MD-02724 (Feb. 21, 2018) ................................................................6

*In re Kirchner*,
  2010 WL 1855861 (Bankr. E.D. Pa. May 5, 2010) ........................................13

*In re Maxus Energy Corp.*,
  49 F.4th 223 (3d Cir. 2022) ..........................................................................13

*In re Nat'l Prescription Opiate Litig.*,
  2019 WL 1274555 (N.D. Ohio Mar. 20, 2019) ....................................... *passim*

*In re Sofaer*,
  728 A.2d 625 (D.C. 1999) ..............................................................................24

*Inorganic Coatings, Inc. v. Falberg*,
  926 F. Supp. 517 (E.D. Pa. 1995) ..................................................................12

*James v. Teleflex, Inc.*,
  1999 WL 98559 (E.D. Pa. Feb. 24, 1999) ......................................................27

*Jordan v. Phila. Hous. Auth.*,
  337 F. Supp. 2d 666 (E.D. Pa. 2004) ............................................................13

*Kronberg v. LaRouche*,
  2010 WL 1443934 (E.D. Va. Apr. 9, 2010) ........................................... *passim*

*Price v. Admiral Ins. Co.*,
  481 F. Supp. 374 (E.D. Pa. 1979) .............................................................22, 27

*Ross v. Canino*,
  461 A.2d 585 (N.J. 1983)................................................................................15

*Sec. Inv. Prot. Corp. v. Vigman*,
  587 F. Supp. 1358 (C.D. Cal. 1984) ..............................................................24

*United States v. Hammad*,
  858 F.2d 834 (2d Cir. 1990)............................................................................12

*United States v. Miller*,
  624 F.2d 1198 (3d Cir. 1980)..................................................................4, 12, 13

*United States v. Nedrow,*
    1991 U.S. Dist. LEXIS 19427 (W.D. Pa. Nov. 27, 1991) ................................................12

*United States v. Philip Morris Inc.,*
    312 F. Supp. 2d 27 (D.D.C. 2004) ........................................................................4, 17, 28

*United States v. Villaspring Health Care Ctr., Inc.,*
    2011 WL 5330790 (E.D. Ky. Nov. 7, 2011)........................................................14, 16, 20

## STATUTES

Conn. Gen. Stat. Ann. § 1-84(a) ........................................................................................23

Conn. Gen. Stat. Ann. § 1-84(c) ........................................................................................23

Conn. Gen. Stat. Ann. § 1-84b(a) ......................................................................................26

Conn. Gen. Stat. § 35-42................................................................................................5, 20

Conn. Gen. Stat. § 35-42(c) .................................................................................................6

False Claims Act ..........................................................................................................14, 17

Venue Act ...........................................................................................................................24

## RULES

Conn. R. Prof. Cond. 1.11............................................................................................11, 25

Local Rule 83.6 ..............................................................................................................1, 11

N.Y. R. Prof. Cond. 1.11...................................................................................................11

Rule 1.0(e)..........................................................................................................................26

Rule 1.7 ..............................................................................................................................15

Rule 1.9 .........................................................................................................................15, 22

Rule 1.11 ....................................................................................................................*passim*

Rule 1.11(a)................................................................................................................*passim*

Rule 1.11(a)(2)...............................................................................................................24, 25

Rule 1.11(b) ........................................................................................................................28

Rule 1.11(c)................................................................................................................*passim*

Rule 1.11 cmt. 3 .................................................................................................................17

Rule 1.11(d) ...........................................................................................................................15

Rule IV ...................................................................................................................................1

Rule IV.B ..............................................................................................................................11

Rule 408 ..................................................................................................................................8

In accordance with Pennsylvania's Rules of Professional Conduct ("PRPC") 1.11, EDPA Local Rule 83.6 (Rule IV), and the Court's inherent authority, the undersigned Defendants respectfully move the Court for an order disqualifying Mr. W. Joseph Nielsen and Lowey Dannenberg, P.C. ("Lowey") from participating in the above-captioned actions (the "Actions") on behalf of Plaintiffs Molina Healthcare, Inc. ("Molina") and Humana Inc. ("Humana").

## I.    INTRODUCTION

Mr. Nielsen's representation of Molina and Humana is the "clearest. . . violation of Rule 1.11 of the Model Rules of Professional Conduct" that one of the country's foremost leading ethics experts has "ever encountered." Ex. 1, Expert Report of W. Bradley Wendel ("Wendel Report"), ¶ 1 (observing that Pennsylvania adopted Model Rule 1.11). Defendants bring this motion to prevent Mr. Nielsen's violation from further threatening the integrity of these judicial proceedings, materially prejudicing Defendants, and undermining the public trust in the legal system.

For over a decade, Mr. Nielsen led Connecticut and 53 other states and territories in investigating Defendants for the same alleged anticompetitive conduct at issue here. Mr. Nielsen used his governmental authority to obtain confidential information from, *inter alia,* attorney proffers, settlement negotiations, witness interviews, subpoena demands, and discussions with other government agencies—much of which cannot be shared with private plaintiffs like Humana and Molina. Based on information that Mr. Nielsen developed, the states brought various actions against Defendants. The private actions by Molina and Humana (and others) followed, parroting the states' allegations.

Then, leveraging the information obtained as a public official, Mr. Nielsen secured employment at Lowey and immediately began representing Molina and Humana. In fact, Lowey and Mr. Nielsen publicly touted how Mr. Nielsen's "deep knowledge of evidence [obtained in his

government position] . . . will well serve his new private clients as their cases head to trial."[1] In bringing this "deep knowledge of evidence" obtained as a lead government enforcer to "serve his new private clients," Mr. Nielsen violated Pennsylvania's Rule 1.11(c).

Indeed, Rule 1.11(c) was intended to prohibit this very conduct, i.e., prohibit former government enforcers in private practice from potentially using the information learned in the government to the material disadvantage of others. As the ABA explained last year in a formal ethics opinion, "the objective of the Rule is to 'prevent the lawyer's improper use of his or her official position' and to protect others from the exploitation of confidential government information . . . ." Ex. 2, A.B.A. Comm. on Ethics & Pro. Resp., Formal Op. 509 (2024) at 2-3. This prophylactic rule is designed to *head off* any "unfair advantage [that] *could* accrue to the private client." PRPC 1.11 cmt. 4 (emphasis added).

There is no doubt that Mr. Nielsen obtained his "deep knowledge of evidence" through his lead role prosecuting these cases.[2] Using his powers as a government official, Mr. Nielsen: (1)

---

[1] Ex. 3, Lowey Dannenberg, Former Assistant Attorney General Joseph Nielsen Joins Lowey Dannenberg as Partner, https://lowey.com/news/former-assistant-attorney-general-joseph-nielsen-joins-lowey-dannenberg-as-partner/ [**https://perma.cc/J7PY-GT56**].

[2] Ex. 3, Lowey Dannenberg, *supra* note 1 ("Having received limited information that certain generic pharmaceutical manufacturers raised the prices of generic drugs, Joe sprang into action and issued civil investigative demands. He then led a team of lawyers reviewing reams of produced documents and discovered massive industry wrongdoing"); Ex. 4, *S51 E30: Generic drug makers accused of price fixing*, 60 Minutes (May 12, 2019), https://www.paramountplus.com/shows/video/UpGUFKuFIdBNTUMB_Xb3MmfXY_P2RHYB/?ftag=CNM-00-10abb6c [hereinafter *S51 E30*]; *see also* Ex. 5, Christopher Rowland, *Investigation of generic 'cartel' expands to 300 drugs*, The Wash. Post, https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to-300-drugs/2018/12/09/fb900e80-f708-11e8-863c-9e2f864d47e7_story.html (last visited Aug. 15, 2025) (describing Mr. Nielsen as the "antitrust investigator in Connecticut who has been a leading force in the probe," who sat for an interview with The Washington Post to make the "first public disclosure of the dramatically expanded scale of the investigation."); Ex. 7, Bill Whitaker, *Sweeping lawsuit accuses top generic drug companies, executives of fixing prices*, CBS News (May 12, 2019), https://www.cbsnews.com/news/sweeping-lawsuit-accuses-top-generic-drug-companies-executives-of-fixing-prices-60-minutes-2019-05-12/.

received confidential attorney proffers from numerous companies and individuals; (2) discussed and negotiated potential settlements with defendants (*e.g.*, Heritage and Apotex) and cooperating witnesses; (3) issued over 300 Civil Investigative Demands (CIDs) to various companies, individuals, and third parties; (4) interviewed and met with cooperating witnesses; (5) exchanged information exclusively with other enforcers from State Attorneys General offices (including at a meeting where state agencies had to sign confidentiality agreements in order to view some of the evidence); (6) discussed ongoing criminal and civil investigations with the Department of Justice (DOJ) and Federal Trade Commission (FTC); and (7) accessed attorney work product and related investigative materials that remains withheld as privileged by the Connecticut Attorney General and other States' Attorneys General.

Yet, Mr. Nielsen and Lowey have paid this glaring ethical violation short shrift. When Defendants immediately raised the concern to Lowey, Lowey's lead attorney, Peter St. Phillip, admitted that Mr. Nielsen had confidential information from his government service and made only an unworkable promise that Mr. Nielsen will not share that confidential information. Ex. 6, Peter St. Phillip's email dated August 6, 2025. That dismissive response only confirms the ethical violation. Rule 1.11(c) "does not require that the confidential government information has been or will be used by the lawyer, only that it *could* be used to the material disadvantage of a person." Ex. 2, A.B.A. Formal Op. 509 at 4-5. Defendants should not have to risk Mr. Nielsen *potentially* using his confidential information to advantage his new clients (even unintentionally). Nor should these proceedings risk potential jurors being biased by the government's once highly visible lead enforcer now appearing for a private plaintiff. Nor should public confidence in the government's impartiality be imperiled, by allowing even the perception of private, pecuniary motives on the part of public officials.

Mr. Nielsen's and Lowey's *potential* exploitation of confidential information, insights, and impressions to the unfair advantage of Defendants *is* the violation.[3] Disqualifying Mr. Nielsen and Lowey is the only "appropriate means of enforcing the applicable disciplinary rule[s]," protecting the integrity of these proceedings, and preventing prejudice to Defendants. *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980); *United States v. Philip Morris Inc.*, 312 F. Supp. 2d 27, 44 (D.D.C. 2004) (recognizing disqualification as "the only appropriate remedy"); *Goodwine v. City of New York*, 2016 WL 379761, at *11 (S.D.N.Y. Jan. 29, 2016) (recognizing need for disqualification because Rule 1.11 violations "posed a significant risk of trial taint"); *see also generally* Wendel Report.

Mr. Nielsen's central role as the former lead government enforcer here leaves no choice but to disqualify him.[4] Moreover, in such circumstances, the Professional Rules impute the disqualification to the attorney's law firm, unless that firm can show that a *timely* and *effective* screen was erected and the attorney receives no fees from the impacted matter. Lowey has made no effort to show either. Defendants request that this Court disqualify Lowey or otherwise order appropriate relief "to give[] effect to the presumption that [Mr. Nielsen] has shared confidential information" and mitigate the risk to Defendants as well as to the integrity of these judicial proceedings. Ex. 1, Wendel Report ¶¶ 15, 52-57.[5]

---

[3] Mr. Nielsen also violated Rule 1.11(a) by representing a private client in the matter in which he participated "personally and substantially" while in government service without "informed consent" from the Connecticut Attorney General. *See infra* III(B)(2).

[4] Former government attorneys with far less confidential information than that of Mr. Nielsen's have been disqualified for similar ethics violations. *See infra* n. 36 and accompanying text.

[5] Defendants reserve all rights, including but not limited to seeking sanctions against the parties.

## II.    BACKGROUND

Mr. Nielsen worked as a Connecticut Assistant Attorney General for 19 years.[6] Starting in or around 2014, Mr. Nielsen was the "[s]ole attorney responsible for [a] two-and-a-half year investigation by the State of Connecticut" into generic pharmaceutical antitrust issues.[7] Mr. Nielsen also expanded that role to exchange evidence and coordinate with other states and the federal government as to their respective investigations, ultimately leading to a series of complaints in federal court against dozens of defendants and concerning hundreds of drugs.[8] Numerous lawsuits by private plaintiffs, parroting those allegations, followed.

Mr. Nielsen's central role in Connecticut's investigation was widely publicized, including in a 2019 interview broadcast on CBS's 60 Minutes.[9] In his role as lead (and often only) government enforcer, Mr. Nielsen issued over 300 Civil Investigative Demands (CIDs)[10] under Conn. Gen. Stat. § 35-42, which bars disclosure of all "documentary material or other information" produced to the Attorney General, to the public. He built a "massive document database of over 20 million documents,"[11] including emails, text messages, and call detail records—all of which

---

[6] *See* Ex. 8, LinkedIn, Joseph Nielsen, https://www.linkedin.com/in/joseph-nielsen-73aaaa244/ **[https://perma.cc/5NCN-REBK]** (last visited Aug. 15, 2025) [hereinafter *Nielsen LinkedIn*].

[7] *Id.*; *see also* Ex. 7, Bill Whitaker, *supra* note 2 ("For more than two years, [Mr. Nielsen] was the only one working the case.").

[8] *Id.*

[9] Ex. 4, S51 E30, *supra* note 2; *see also* Ex. 5, Christopher Rowland, *supra* note 2 ("Joseph Nielsen, an assistant attorney general and antitrust investigator in Connecticut who has been a leading force in the probe . . . the dramatically expanded scale of the investigation.").

[10] Ex. 7, Bill Whitaker, *supra* note 2.

[11] Ex. 7, Bill Whitaker, *supra* note 2; Ex. 9, Office of Att'y Gen., Press Release: Attorney General Tong Announces Significant Updates in Multistate Litigation Against Generic Drug Manufacturers Over Conspiracies to Inflate Prices and Limit Competition., CT.gov (Oct. 31, 2024), https://portal.ct.gov/ag/press-releases/2024-press-releases/attorney-general-tong-announces-updates-in-litigation-against-generic-drug-manufacturers **[https://perma.cc/3N6W-SMN6]**.

(continued...)

are confidential and statutorily barred from disclosure to the public.[12]  *See* Conn. Gen. Stat. § 35-42(c). Mr. Nielsen also procured special software to analyze nearly 12 million phone logs,[13] but successfully opposed production of both the software and any resulting analyses.[14]

Additionally, Mr. Nielsen received multiple confidential proffers from attorneys representing companies and individuals. These types of proffers result from the unique leverage of government enforcers, and attorneys typically give them only to the government to avoid prosecution. ███████████████████████████████████████████████ ████████████████████████████████████████████ As shown in correspondence scheduling the proffers, Mr. Nielsen suggested to "talk offline" to receive the information and recollection of the employee.[16] Mr. Nielsen, of course, has gained strategic

---

*see also* Ex. 10, *40 States Sue Generic Drug Makers for Collusion*, Industry News, Inoventive Benefits Consulting (July 23, 2019), https://beinoventive.com/40-states-sue-generic-drug-makers-for-collusion/ [**https://perma.cc/4LDW-9D7G**]; Ex. 4, *Generic drug makers accused of price fixing*, CBS News (May 10, 2019), https://www.cbsnews.com/news/generic-drug-makers-accused-of-price-fixing-60-minutes/ [**https://perma.cc/T4ZF-T9AF**] [hereinafter *CBS News*]; *see also* Ex. 11, Status Conf. Tr., *In re Generics Pharms. Pricing Antitrust Litig.*, No. 2:16-MD-02724 (Feb. 21, 2018) (discussing the confidential nature of the investigations and the Party's lack of access to the fruits of the investigation).

[12] *See* Ex. 11, Status Conf. Tr., *In re Generics Pharms. Pricing Antitrust Litig.*, No. 2:16-MD-02724 (Feb. 21, 2018) (discussing the confidential nature of the investigations and the Party's lack of access to the fruits of the investigation); *see* █████████████████████████████████████

[13] Ex. 7, Bill Whitaker, *supra* note 2.



[16] *Id.*

insights and mental impressions from those confidential proffers, *e.g.*, whether individuals were forthcoming with information and whether counsel appeared evasive or skeptical of the information. And, it is presumed Mr. Nielsen received additional insights and impressions in his exchanges about such proffers with other enforcers, including the DOJ, the FTC, and other State Attorneys General.

Mr. Nielsen also led confidential settlement negotiations with Defendant companies and individual employees of those companies on behalf of Connecticut and several states.[17] Ultimately, Mr. Nielsen signed settlement agreements on behalf of Connecticut with two MDL Defendants, Heritage Inc. and Apotex Corp., ECF No. 722-3 (Ex. 15, Heritage; Feb. 26, 2025), ECF No. 3313-1 (Ex. 16, Apotex; Mar. 31, 2025) and three former Sandoz employees █████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████

Because of those agreements and negotiations, Mr. Nielsen obtained substantive confidential information unavailable to the public, non-settling companies (other non-settling Defendants). He undoubtedly has unique insight into how Defendants assess the merits, value the claims, approach settlement negotiations, and is able or unable to satisfy any judgment or settlement demand. He cannot unlearn any of that. In fact, Lowey has *admitted* Mr. Nielsen

---

[17] *See e.g.,* Ex. 17, Hearing Tr. at 47:2-19, *Connecticut v. Aurobindo, Connecticut v. Teva*, and *Connecticut v. Sandoz*, No. 3:16-cv-02056-MPS, ECF No. 682 ("The other thing is, I have been having settlement conversations on and off with Sandoz's counsel since before the spin-off, not including Mr. Ondeck, who's new to the case, but with prior counsel.").
███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

possesses confidential information from those settlement efforts, and that the information was not available to Lowey, Molina, or Humana.[19] Notably, Mr. Nielsen has already once wrongfully disclosed confidential information about one Defendant's settlement negotiations in a preliminary court hearing.[20] Despite Mr. St. Phillip's vague promise that Mr. Nielsen will not explicitly disclose additional confidential information gained from settlement negotiations, Defendants' concerns are not hypothetical.

Further, Mr. Nielsen led efforts to interview and/or obtain testimony from former executives from generic manufacturers, including Defendants in these actions.[21] Mr. Nielsen and Connecticut have never produced transcripts or interview notes from those proceedings, claiming privilege. *See* Ex. 21, Jeremy Pearlman, Associate Attorney at State of Connecticut, 30(b)(6) deposition (Sept. 12, 2023) at 22:13-19 ("Q: So you—not all of the documents that you have reviewed have been produced in discovery in this litigation. A. Correct. Q: Why is that? A: Privileged. I reviewed privileged information."); *see also id.* at 34:9-23 (claiming privilege over whether Connecticut ever monitored the generic pharmaceuticals industry); *see id.* at 211:12-212:21 (claiming privilege when asked about alleged overarching conspiracies among Teva, Heritage and the dermatology complaint); *see id.* at 161:11-164:16 (objection without a basis regarding a Generic Drug Price Spike Working Group formed in December 2014 by State Offices of Attorneys General as "a multi-state investigation into possible causes of generic drug price

---

[19] *See* Ex. 6, Peter St. Phillip's email dated August 6, 2025.

[20] *See* Ex. 17, Hearing Tr. at 47:2-19, *Connecticut v. Aurobindo*, *Connecticut v. Teva*, and *Connecticut v. Sandoz*, No. 3:16-cv-02056-MPS, ECF No. 682 ("The other thing is, I have been having settlement conversations on and off with Sandoz's counsel since before the spin-off, not including Mr. Ondeck, who's new to the case, but with prior counsel."); *id.* at 50:12-51:11 (Defendant's counsel raising the issue of a Rule 408 violation following mention that Mr. Nielsen was involved in confidential settlement negotiations with then-Defendant Sandoz).

[21] Ex. 4, CBS News, *supra* note 11.

increases," including Mr. Nielsen's participation); *see id.* at 172:19-173:16 (objecting without basis when asked if Mr. Nielsen, or anyone else at the Connecticut AG, had reviewed a summary of drugs and prices); *id.* at 181:1-25 (objecting to questions as to Mr. Nielsen's involvement); *see id.* at 182:6-14 (objecting to whether Mr. Nielsen participated in calls or meetings regarding alleged price spikes).

As one result of his investigative efforts, Mr. Nielsen declared that the States were considering banning individual executives from the industry "given the 'very, very strong evidence' unearthed by the investigations."[22] Nobody but Mr. Nielsen and the states knew which "individual executives" were on that list or what "'very, very strong evidence'" supported it, but now Plaintiffs Molina and Humana could use Mr. Nielsen's insight, evidence, and knowledge of which individuals may feel threatened by a potential ban to their advantage in calling or questioning witnesses at trial.

As his investigation continued, Mr. Nielsen filed the first complaint on behalf of Connecticut and other states in 2016.[23] He was appointed "lead and liaison counsel on behalf of 54 states and territories" and ultimately filed three complaints on behalf of those governments.[24] Throughout his time as Assistant Attorney General, Mr. Nielsen was also purportedly meeting with and providing "leads" to the DOJ,[25] which was conducting both criminal and civil

---

[22] Ex. 22, Anna Langlois, *States considering industry ban for pharma execs*, GCR USA (March 11, 2025), https://globalcompetitionreview.com/gcr-usa/article/states-considering-industry-ban-pharma-execs [**https://perma.cc/28VX-TKHX**].

[23] *Id.* at 1.

[24] Mr. Nielsen personally signed two of the complaints and his name appears in the signature block on a third.

[25] Ex. 23, Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, CT Mirror (Jan. 27, 2017), https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.

investigations.[26] The private actions that followed, including the complaints filed by Molina and Humana, were largely copied from the states' complaints. Ex. 24.

After over ten years of investigating and litigating generic pricing claims for the governments, on July 1, 2025, Mr. Nielsen withdrew as counsel for Connecticut, and a week later entered appearances for Molina and Humana in this MDL as a new partner at Lowey. *See* ECF Nos. 3502, 3521. Lowey is a small firm with 39 attorneys across two offices that "represents 34 of the nation's largest health insurers, including Anthem, Aetna, Humana, and 25 BlueCross BlueShield licensees in connection with their claims relating to [alleged] widespread price-fixing of generic pharmaceutical products."[27]

On July 8, 2025, Lowey announced on its website and via social media[28] Mr. Nielsen's hiring, highlighting his government experience and advertising his role in the Generics MDL: "Joe's efforts on the Generics case will continue even as he has returned to private practice. With Lowey representing many of the largest institutional buyers of generic drugs in the Nation . . . Joe's deep knowledge of evidence and extensive litigation expertise will well serve his new private clients as their cases head to trial."[29]

Defendants immediately raised their ethics concerns during the July 10, 2025, liaison status conference. Declaration of Chul Pak ("Pak Decl.") ¶ 2. Mr. St. Phillip dismissed these concerns, responding that Lowey had conducted appropriate diligence. *Id.* The next week, on July 18, 2025,

---

[26] Ex. 4, CBS News, *supra* note 11.

[27] Ex. 25, Lowey Dannenberg: leaders in high-stakes Antitrust Litigation, https://lowey.com/antitrust/ [**https://perma.cc/NJY9-5MSU**]. This includes the Molina and Humana cases in this MDL, Aetna actions in Connecticut and Pennsylvania state courts, and writs to file actions by various insurers in Pennsylvania state court.

[28] Ex. 26, Lowey Dannenberg, Welcome Joseph Nielsen, Partner, Facebook (July 8, 2025) https://www.facebook.com/photo/?fbid=1066479142289002&set=ecnf.100067807787514.

[29] Ex. 3, Lowey Dannenberg, *supra* note 1.

Defendants met and conferred with Lowey about the purported diligence and the scope of Mr. Nielsen's role at the firm, at which point Mr. St. Phillip admitted that: (1) he did not know whether Mr. Nielsen had received prior consent from the Connecticut Attorney General's office for this representation (as required by Rule 1.11(a)); (2) Lowey had not obtained an ethics opinion; (3) Mr. Nielsen was not in any way restricted from working on the Molina and Humana matters; and (4) Mr. Nielsen had confidential information from settlement-related communications, but claimed that Mr. Nielsen would not share it.

Defendants requested documentation of any consent from Connecticut, but on July 19, 2025, Mr. St. Phillip "decline[d] to provide any further information concerning Mr. Nielsen's communications with his former employer." Ex. 27, Peter St. Phillip's email dated July 19, 2025. Defendants then issued a preservation notice to Mr. St. Phillip and Mr. Nielsen on August 1, 2025. Ex. 28, Defendants' August 1, 2025, email to Peter St. Philip. Mr. St. Phillip responded on August 6, 2025, again admitting that Mr. Nielsen possesses confidential information. Ex. 6, Peter St. Phillip's email dated August 6, 2025.

## III.    ARGUMENT

This Court should exercise its inherent power to disqualify counsel to remedy violations of ethical rules and to protect the integrity of these proceedings. Mr. Nielsen's conduct is a textbook example of a violation of the Pennsylvania Rules of Professional Conduct ("PRPC")[30]—a former government enforcer leveraging his confidential government information to make money for his

---

[30] Rule 83.6 of this Court's Local Rules of Civil Procedure provides that the Pennsylvania Rules of Professional Conduct govern the standards of professional conduct for attorneys appearing in this Court. E.D. Pa. Local Rule 83.6 (Rule IV.B); PRPC 8.5(b)(1) (providing that applicable rules are "the rules of the jurisdiction in which the tribunal sits"); *see also* Ex. 1, Wendel Report ¶¶ 16-18. Mr. Nielsen is also licensed in Connecticut and New York, both of which have adopted substantially similar versions of Rule 1.11 that Mr. Nielsen has also violated. *Compare* PRPC 1.11, *with* Conn. R. Prof. Cond. 1.11, *and* N.Y. R. Prof. Cond. 1.11. Ex. 1, Wendel Report ¶¶ 17-18.

new private clients, his new private firm, and himself to the potential detriment of his adversaries and the integrity of the judicial process. Specifically, Mr. Nielsen's conduct violates PRPC Rules 1.11(c) and 1.11(a), which prohibit former government employees—like Mr. Nielsen—from representing private clients in matters in which they previously participated as a government employee and from which they obtained confidential government information.

Given the seriousness of Mr. Nielsen's ethical violations and the risk his continued representation poses to the integrity of these proceedings and Defendants, the only appropriate remedy is to disqualify Mr. Nielsen. Finally, Pennsylvania's Rules are clear that Mr. Nielsen's disqualification is imputed to Lowey in the absence of timely and effective safeguards, and Lowey has failed to demonstrate that anything less than disqualification would appropriately mitigate the threat to these proceedings.

### A.    Legal Standard

The Court's "power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it." *Miller*, 624 F.2d at 1201. "[C]ourts have vital interests in protecting the integrity of their judgments, maintaining public confidence in the integrity of the bar, eliminating conflicts of interest, and protecting confidential communications between attorneys and their clients." *Inorganic Coatings, Inc. v. Falberg*, 926 F. Supp. 517, 519 (E.D. Pa. 1995) (citation omitted). Indeed, "[t]he Rules of Professional Conduct are designed to 'safeguard the integrity of the profession and preserve public confidence in our system of justice.'" *United States v. Nedrow*, 1991 U.S. Dist. LEXIS 19427, at *12-13 (W.D. Pa. Nov. 27, 1991) (quoting *United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1990)). When counsel violates a disciplinary rule, a court may order disqualification if it determines that "disqualification is an appropriate means of enforcing the applicable disciplinary rule, given the

ends that the disciplinary rule is designed to serve." *Henry v. Delaware River Joint Toll Bridge Comm'n*, 2001 WL 1003224, at *1 (E.D. Pa. Aug. 24, 2001) (citing *Miller*, 624 F.2d at 1201). A court may also "use its inherent authority to disqualify counsel or a firm for reasons beyond those in the incorporated rules." *In re Maxus Energy Corp.*, 49 F.4th 223, 227 n.1 (3d Cir. 2022).

In determining whether to disqualify counsel, a court must consider the "specifics of the case," including whether disqualification would "preserv[e] the integrity of legal proceedings" and "prevent[] unfair prejudice." *In re Boy Scouts of Am.*, 35 F.4th 149, 160 (3d Cir. 2022). "The most significant policy weighing in favor of disqualification is the court's interest in 'protecting the integrity of the proceedings and maintaining public confidence in the judicial system.'" *Jordan v. Phila. Hous. Auth.*, 337 F. Supp. 2d 666, 678 (E.D. Pa. 2004) (quoting *Henry*, 2001 WL 1003224, at *6). Although the moving party "bears the burden of showing that the representation is impermissible," any "doubts regarding the existence of a violation of an ethical rule should be construed in favor of disqualification," *Henry*, 2001 WL 1003224, at *1, as should any "doubts as to whether an attorney's disqualification is warranted." *Brice v. Hoffert*, 2016 WL 3981361, at *2 (E.D. Pa. July 25, 2016).

"Any attorney, not just a former client's attorney, has standing, and, indeed, the obligation, to call a conflict of interest to the attention of the court because attorneys must report any actual or potential ethical violations." *In re Kirchner*, 2010 WL 1855861, at *2, *5 (Bankr. E.D. Pa. May 5, 2010) (finding that non-client "has standing to raise a conflict of interest" under Pennsylvania Rules of Professional Conduct and imposing limitations on scope of counsel's engagement). As the comments to Rule 1.11 make clear, the rule applies "regardless of whether a lawyer is adverse

to a former client and are thus designed not only to protect the former client, but also to prevent a lawyer from exploiting public office for the advantage of another client." PRPC 1.11 cmt. 3.[31]

Indeed, because Rule 1.11 protects both former clients *and non-clients*, courts routinely grant motions brought by non-clients to disqualify counsel who, as here, were previously involved in related government investigations and prosecutions. *See*, *e.g.*, *Kronberg v. LaRouche*, 2010 WL 1443934, at *3-5 (E.D. Va. Apr. 9, 2010) (disqualifying former federal prosecutor who had obtained "confidential government information" about the defendant in prior criminal prosecutions); *United States v. Villaspring Health Care Ctr., Inc.*, 2011 WL 5330790, at *4-6 (E.D. Ky. Nov. 7, 2011) (disqualifying former state assistant attorney general who had previously represented state in investigation that led to False Claims Act litigation against defendant); *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *4-5 (N.D. Ohio Mar. 20, 2019) (disqualifying former federal prosecutor who had received "confidential government information" about parties from prior government work on an opioid task force).

## B. Mr. Nielsen's Violations of Rule 1.11 Materially Disadvantage Defendants and Threaten the Integrity of the Judicial Proceedings

Rule 1.11 specifically governs "Special Conflicts of Interest for Former and Current Government Officers and Employees." PRPC 1.11. This "special" rule exists because "[g]overnment attorneys … are subject to even closer scrutiny than private lawyers." *Ross v.*

---

[31] The ABA also recognized the rule protects anyone, noting that Rule 1.11(c) "differs" from "ordinary confidentiality rules" in that it provides for disqualification "to protect against the misuse of certain government information adversely to any 'person'… to whom the information relates (which may or may not be the person from whom the government obtained the information), rather than adversely only to a former client." Ex. 2, A.B.A. Formal Op. 509 at 3; Ex. 1, Wendel Report ¶¶ 24, 42-43.

*Canino*, 461 A.2d 585, 589 (N.J. 1983).[32] The closer scrutiny is intended to protect against the "unfair advantage" and threat to the integrity of the judicial process that could result when a government lawyer enters private practice. PRPC 1.11 cmt. 4. Indeed, Rule 1.11 prophylactically restricts current government attorneys from "negotiat[ing] for private employment with any person who is involved as a party or as a lawyer for a party in a matter in which the lawyer is participating personally and substantially." *Id.* 1.11(d)(2).[33]

For government attorneys who later enter private practice, Rule 1.11 sets boundaries for future representations. *First*, Rule 1.11(c) restricts former government attorneys from working on matters in which the attorney possesses confidential government information. *Id.* 1.11(c). No consent or waiver can cure this conflict. It is intentionally strict "to prevent the lawyer's improper use of his or her official position and to protect others from the exploitation of confidential government information, acquired by the lawyer while serving as a public officer or employee." Ex. 2, A.B.A. Formal Op. 509 at 2 (citation omitted). *Second*, Rule 1.11(a) prohibits former government attorneys from representing a private client in matters that he or she worked on "personally and substantially" in government practice, unless the former government agency gives informed consent. PRPC 1.11(a). This blanket prohibition protects the public trust in our government agencies and our judicial proceedings.[34]

---

[32] Private attorneys are subject only to Rules 1.7 and 1.9, both of which protect client confidences and ensure undivided loyalty to clients, whether in concurrent and subsequent actions. Government attorneys are subject to those rules as well as Rule 1.11.

[33] Mr. Nielsen likely violated Rule 1.11(d) by seeking and negotiating employment with Lowey while at the Connecticut Attorney General (given he joined Lowey less than a week after withdrawing from his representation of Connecticut).

[34] The term "matter" in Rule 1.11 includes: "any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties." PRPC 1.11(e). The "matter . . . may continue in another form. . . . [and] the lawyer should consider the extent to which the (continued...)

Rules 1.11(c) and 1.11(a) both preclude attorneys from doing exactly what Mr. Nielsen is doing here. Indeed, the rules of professional conduct have precluded this conduct for the last 100 years. *See, e.g.*, Ex. 29, Canons of Pro. Ethics of the Am. Bar Ass'n, 27 N.D. L. Rev. 243, 256 (1951) ("A lawyer, having once held office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ." (citing Canon 36)). These prohibitions apply even when the former government attorney "stays on the same side" to represent private clients against those that he investigated or prosecuted while in the government. *Allied Realty of St. Paul, Inc. v. Exch. Nat'l Bank of Chi.*, 283 F. Supp. 464, 464, 467, 470 (D. Minn. 1968) (disqualifying former government lawyer from litigating against corporate executives whom the lawyer criminally prosecuted as a "Special Assistant United States Attorney" because a lawyer may not "avail himself, after his government service, of a private legal retainer which involves . . . the use of his knowledge of a particular case or proceeding" obtained in government service), *aff'd*, 408 F.2d 1099 (8th Cir. 1969); *Hilo Metals Co. v. Learner Co.*, 258 F. Supp. 23, 25-27 (D. Haw. 1966) (disqualifying former DOJ lawyer in a private antitrust action against companies whom the lawyer investigated while with the DOJ); *Gen. Motors Corp. v. New York*, 501 F.2d 639, 648-52 (2d Cir. 1974) (disqualifying lawyer in suit against GM when the lawyer previously investigated GM in matters because "the overlap of issues is so plain" and "the involvement while in Government employ [is] so direct").[35]

---

matters involve the same basic facts, the same or related parties, and the time elapsed." *Id.*1.11 cmt. 10; *see also* Ex. 1, Wendel Report ¶¶ 9, 24, 44 (explaining the term "matter").

[35] While violations like Mr. Nielsen's are rare (because the rules clearly prohibit such conduct), federal courts do disqualify attorneys when they occur. For Rule 1.11(c) disqualifications, *see Kronberg*, 2010 WL 1443934, at \*3-5; *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at \*4-6 (ordering disqualification where former prosecutor had received "confidential government information" about parties in connection with prior government work); *Villaspring*, 2011 WL

(continued . . .)

### 1.    Rule 1.11(c): Disqualification is warranted because Mr. Nielsen's violation of Rule 1.11(c) materially disadvantages Defendants.

Rule 1.11(c) provides:

> Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee may not represent a private client whose interests are adverse to that person in a matter in which the information *could* be used to the material disadvantage of that person.

PRPC 1.11(c) (emphasis added).[36]

Rule 1.11(c) is designed "to prevent a lawyer from exploiting public office for the advantage of another client." PRPC Rule 1.11 cmt. 3; *Kronberg*, 2010 WL 1443934, at *3-5. The rule recognizes that "unfair advantage *could* accrue to the private client by reason of access to confidential government information about the client's adversary obtainable only through the lawyer's government service." PRPC 1.11 cmt. 4 (emphasis added). "Courts and the bar have called it fundamentally unfair for a former government attorney, newly in private practice, to use specific information obtained by the exercise of government power—information that otherwise

---

5330790, at *4-6 (ordering disqualification where former assistant attorney general had previously represented state in investigation that led to False Claims Act litigation against defendant). For Rule 1.11(a) disqualifications, *see, e.g.*, *Goodwine*, 2016 WL 379761, at *3-4 (finding disqualification necessary to address "significant risk of trial taint" posed by former government attorney who had personally and substantially participated in the matter during government service); *Philip Morris*, 312 F. Supp. 2d at 44 (finding disqualification to be "the only appropriate remedy" where former government attorney had personally and substantially participated in the matter).

[36] Rule 1.11(c) "does not authorize the government, the client, or the person against whom the information might be used to waive the conflict arising under the Rule." Ex. 2, A.B.A. Formal Op. 509 at 6 n.24; *see also* Pa. Bar Ass'n Comm. on Legal Ethics & Pro. Resp., Informal Op. 94-132 (1994) ("With respect to any confidential information, if the Inquirant has confidential information that she gained as a result of her employment with the government, then she is barred from representing Company Y. If she has confidential information then the government agency cannot consent to her representation."); *Hilo*, 258 F. Supp. 23 (despite getting DOJ consent, former DOJ attorney disqualified from representing private plaintiff in a matter similar to the one he had worked on during his government service).

would not be available to their client—to the prejudice of opposing private party litigants. This unfairness exists even if the former client, the government, is not prejudiced by the lawyer's subsequent use of the information." *Brown v. Dist. of Columbia Bd. of Zoning Adjustment*, 486 A.2d 37, 45 (D.C. 1984) (en banc) (citations omitted).

To confirm, it is a "foundational premise" that the rule "protect[s] against the *risk* that a lawyer will disclose or make adverse use of protected confidential information. . . . It is not a defense in any way that the former government lawyer has not actually disclosed or used" the information. Ex. 1, Wendel Report ¶ 19. The prohibition also applies even when the former government attorney represents a private client whose interests are aligned with the government and there is no traditional conflict of interest resulting from the move. *Kronberg*, 2010 WL 1443934, at *3-5.

Mr. Nielsen has violated Rule 1.11(c). First, Mr. Nielsen was a "public officer or employee" for over 19 years. Second, while a public officer or employee, Mr. Nielsen acquired "confidential government information" about Defendants during the 11 years he spent investigating and prosecuting these Defendants. Third, Mr. Nielsen is currently representing two "private client[s] [Humana and Molina] whose interests are adverse" to Defendants. Finally, Mr. Nielsen's representation is "in a matter in which the information *could* be used to the material disadvantage of that" party. PRCP 1.11(c) (emphasis added); *see also* Ex. 1, Wendel Report ¶ 40 ("[I]n my opinion a considerable amount of information known by Nielsen is confidential government information as defined by the rule, and it may be used in the representation of private clients in this MDL proceeding to the material disadvantage of the defendants in this proceeding. Therefore, under the Rules, Nielsen should be personally prohibited from representing the plaintiffs in this proceeding.").

Mr. Nielsen and Lowey might argue that the information is not confidential because documents produced to Connecticut during its investigation were subsequently re-produced in the MDL to all parties.  Bank Decl. ¶ 2; *see also* Ex. 6. That argument falls flat. Rule 1.11(c) defines "confidential government information" as "information that has been obtained under governmental authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public." PRPC 1.11(c). The definition makes no mention of whether the private client now has possession of the information.

Nevertheless, Mr. Nielsen *has* confidential government information that has *never* been disclosed, including information Mr. Nielsen and the States fought to keep confidential. Indeed, the lead attorney at Lowey, Mr. St. Phillip, *admitted twice* that Mr. Nielsen possesses such confidential government information that neither Lowey nor its clients had prior to Mr. Nielsen's arrival. Bank Decl. ¶ 2; *see also* Ex. 6. That admission alone satisfies the second element of Rule 1.11(c), but the depth and breadth of confidential government information possessed by Mr. Nielsen is vast:

1. Mr. Nielsen negotiated and signed settlement agreements with numerous parties as a government attorney; Mr. Nielsen's unique insights regarding the parties' positions will benefit Molina and Humana in any of their settlement negotiations with those same parties (and possibly others), as well as in litigating the merits.

2. Mr. Nielsen interviewed, obtained proffers and evidence from, signed settlement agreements with, and intimately knows the various cooperating witnesses; he is bringing that confidential information and strategy – gained under government authority – to bear in favor of Molina and Humana, which otherwise do not have the same relationship with

each of those witnesses.[37]

3. Mr. Nielsen coordinated with other state and federal enforcers, who provided him with additional confidential information – some of which he has refused to produce on the basis of privileges solely available to the government, *see supra* at 8, and at note 14.

4. Mr. Nielsen possesses confidential government information obtained by the State of Connecticut pursuant to investigatory subpoenas issued under Conn. Gen. Stat. § 35-42. Indeed, it is reported that over 300 CIDs were issued that resulted in "over 20 million" documents produced. Ex. 7, Bill Whitaker, *supra* note 2. Not all of these documents were produced to and retained by private Plaintiffs, despite Mr. St. Phillip's comments.[38]

5. Mr. Nielsen spent over ten years as a lead government enforcer developing "strategic insights" and "roadmaps" of evidence, and those qualify as "confidential" as well. *See, e.g.*, *Villaspring*, 2011 WL 5330790, at *6 (disqualifying lawyers in part based on Rule 1.11(c) from defending the facility because, as assistant attorney general, he had gained "strategic insights[] such as knowledge of the strengths and weaknesses of the evidence" by interviewing facility's former employees).

Simply put, there are numerous materials, insights, and impressions that were not (and could not) be produced to the parties here. Even so, it matters not to Rule 1.11(c) that the parties might have

---

[37] To the extent it would aid the Court's decision, certain Defendants who have participated in such communications and meetings with Mr. Nielsen can provide further details to the Court *in camera*.

[38] ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

some of the confidential information now. All of it (or virtually all) remains "confidential government information" under Rule 1.11(c).

Mr. Nielsen and Lowey might also try to dispute that the information has been or will be "used to the material disadvantage" of Defendants. But an attorney *need not actually use* the confidential information to be disqualified; it is sufficient that he or she "*could*" use those confidences. Ex. 1, Wendel Report ¶ 19 ("It is emphatically not the case that a conflicts rule is violated only when there has been actual, proven disclosure of confidential information . . . ."); *see also In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *6. Rule 1.11(c) bars the *potential* exploitation of government information for private litigants where the information *could* be used to the detriment of the adverse party. Ex. 1, Wendel Report ¶ 21 ("[D]isqualification is required as a prophylactic measure, to ensure that confidential government information is not misused. . . ."); *see also* Ex. 2, A.B.A. Formal Op. 509 at 4-5; *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *6 ("Nor is it necessary to try to determine whether Ms. Rendon has used any of this information in defending Endo, as Rule 1.11(c) prohibits representation when the information could be used to the material disadvantage of Cleveland or Cuyahoga County.").

This prophylactic rule is necessary to preserve the integrity of judicial proceedings and for practical reasons: it would be difficult, if not impossible, to prove that a former government attorney used confidential information to disadvantage the adverse party in many circumstances – for example, deciding ***not*** to ask a witness a particular question because an earlier government interview revealed such testimony would be unhelpful to the attorney's new clients or not making a counteroffer in a settlement negotiation based on information learned while negotiating settlements on behalf of the government.

Indeed, inherent in Rule 1.11(c) is the idea that government consent cannot prevent the

unfair advantage to a private party, given that consent will not erase a former government attorney's knowledge of confidential information or enable the conflicted attorney to avoid using the confidential information to zealously represent his or her new private client. *Cf. Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 236 (2d Cir. 1977) (describing how "[e]ven the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it to telling advantage in the subsequent litigation" in analyzing a Rule 1.9 violation (citation omitted)). Rule 1.11(c) also recognizes that the former government attorney brings "strategic insights" and "roadmaps" that potentially enhance the value of information, even if the information were also in the private plaintiffs' possession. *See Kronberg*, 2010 WL 1443934, at *4 ("At the very least, Markham surely has a mental roadmap concerning [defendant and the alleged conduct] that was shaped at least in part by his access to confidential government information.").

Here, there is no doubt that Mr. Nielsen *could* use his confidential information, insights, and roadmaps to disadvantage Defendants. In fact, to zealously represent Molina and Humana, he would *need to* use all the confidential information, evidence, and experience he gained as Connecticut's lead government enforcer. To that end, he and Lowey have bragged about how he will leverage his unique government experience for this case, and he cannot unlearn the confidential information he already knows.[39]

Mr. St. Phillip's casual statement that Mr. Nielsen would not disclose his confidential information fixes nothing. *See Price v. Admiral Ins. Co.*, 481 F. Supp. 374, 379 (E.D. Pa. 1979) (disqualifying both the former government attorney and his new law firm and explaining that the Court may believe the accused attorney's promises not to disclose to be "fully credible," but what

---

[39] Ex. 3, Lowey Dannenberg, *supra* note 1.

matters is the public believing it to be credible). His promise is also of no value because even if Mr. Nielsen does not explicitly share his confidential information with other Lowey attorneys or with his clients, the Lowey press release makes clear that Mr. Nielsen was hired to *use* the confidential information to the detriment of Defendants in these Actions.

As just some examples of how confidential government information "*could*" be used here, Mr. Nielsen can push Lowey to litigate claims against certain Defendants more aggressively than against others based on what he learned in confidential settlement discussions. Mr. Nielsen can push Lowey for settlement with certain Defendants with stronger defenses based on what he learned during attorney proffers. Mr. Nielsen can strategically tailor questions to witnesses in depositions and at trial based on what he learned interviewing confidential government witnesses. Mr. Nielsen can also push for discovery from the DOJ and other government agencies based on the information he learned working with these agencies—something that Mr. Nielsen has *already* done on behalf of private Plaintiffs. Ex. 30, Plaintiffs' Notice of Subpoena.

Mr. Nielsen cannot unlearn his "deep knowledge" and avoid using it as he represents Molina and Humana without violating his duties to *those* clients, making this a quintessential violation of Rule 1.11(c). Ultimately, given Mr. Nielsen's deeply personal and substantial involvement in these matters, it is impossible to list all the ways in which he could use all his confidential government information to the advantage of his new clients and disadvantage of Defendants.  But there is no question that Rule 1.11(c) has been violated.[40]

---

[40] A similar rule is contained in Connecticut Public Officials and State Employees' Code of Ethics (the "Code"). That rule prohibits any former state employee from "disclos[ing] or us[ing] confidential information acquired in the course of and by reason of his official duties, for financial gain for himself or another person." Conn. Gen. Stat. Ann. § 1-84(a); *see also id.* § 1-84(c). As Lowey's press release touted, Mr. Nielsen is using (or at the very least, intends to use) confidential information obtained during his tenure as an AAG for the financial gain of his new clients (and undoubtedly Lowey and himself).

### 2.    *Rule 1.11(a): Disqualification is warranted because Mr. Nielsen's violation of Rule 1.11(a) threatens the integrity of the judicial proceedings*

Lowey has done nothing to dispute that Mr. Nielsen violated Rule 1.11(a). Rule 1.11(a)(2) prohibits a former government employee from "represent[ing] a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent to the representation." The central inquiry is whether the attorney is "handling overlapping matters" that he participated in "personally and substantially as a public officer." *In re Sofaer*, 728 A.2d 625, 650 (D.C. 1999); *Sec. Inv. Prot. Corp. v. Vigman*, 587 F. Supp. 1358, 1364 (C.D. Cal. 1984) (the matter is overlapping if it is "in connection with" the matter with which the government attorney was involved). Further, Rule 1.11(a) is "[n]ot limited to side-switching," i.e., it prohibits a government lawyer from "represent[ing] *any* client in the same matter" and does not require the new client to be adverse to the government. Ex. 1, Wendel Report ¶ 42.

There is no question here that the Molina and Humana Actions overlap with the investigation and litigation proceedings initiated and led by Mr. Nielsen while he was an Assistant Attorney General. The Judicial Panel on Multidistrict Litigation (JPML) found the States' generic pricing actions related to the private Plaintiffs' actions and coordinated them for pre-trial proceedings in the same MDL (until 2024 when the States, under Mr. Nielsen's leadership, sought remand to Connecticut under the Venue Act). MDL 2724, ECF No. 336; *In re Generic Pharm. Pricing Antitrust Litig.*, 2017 WL 4582710 (J.P.M.L. Aug. 3, 2017). Indeed, the drugs and defendants in the Molina and Humana actions are at issue in the cases brought by Connecticut and the other states, and both private and state cases arise from the same corpus of factual allegations. The fact that Connecticut is not a party to the Molina and Humana actions is of no import. *See Green v. City of New York*, 2011 WL 2419864, at *2

(S.D.N.Y. June 7, 2011) (disqualifying an attorney under Rule 1.11 and noting that "matters might be the same even though they pertain to different lawsuits with different parties").

Nor is there any question that Mr. Nielsen's participation in those overlapping matters was "personal[] and substantial[]": Mr. Nielsen *led* Connecticut's investigation and enforcement efforts. *See supra* Section II. Courts have disqualified former government attorneys pursuant to Rule 1.11(a) for substantially less involvement than Mr. Nielsen has had here. For example, in *Goodwine*, the court ordered disqualification despite representations that the former government officer had limited access to legal files and that she "worked on other matters." 2016 WL 379761, at *3. In doing so, the *Goodwine* court explained that an attorney's involvement must only "be of some substance" to trigger Rule 1.11(a). *Id.* Here, there is no dispute that Mr. Nielsen's prior work as an Assistant Attorney General was sufficiently personal and substantial to trigger Rule 1.11(a).

The only possible question under Rule 1.11(a) is whether Mr. Nielsen obtained "informed consent" from the Connecticut Attorney General's office. *See* PRPC 1.11(a)(2). Defendants have asked multiple times if Mr. Nielsen obtained consent, and if so, to produce proof. Crickets. Mr. Nielsen has failed to produce *any* consent or even affirmatively state that he received *any* type of consent from his former agency.[41] Not that *any* consent would do; Mr. Nielsen would need to show

---

[41] The equivalent rule in Connecticut requires that the agency provide "informed consent, confirmed in writing." Conn. R. Prof. Cond. 1.11(a)(2). Dr. Wendel further observed that "[p]rudent lawyers memorialize in writing the disclosure they provided to clients as part of the process of obtaining informed consent, in the event that it is necessary to demonstrate that the client was fully informed." Ex. 1, Wendel Report ¶ 49. Moreover, Mr. Nielsen's silence as to consent makes it impossible to know whether, even if Connecticut provided consent, it was "informed." It is hard to imagine the Attorney General of Connecticut knowingly agreed to let its former lead counsel use his experience and confidential information to interfere with the States' cases and settlements in the same ways the States have attempted to disrupt private plaintiffs. *See* Bank Decl. ¶ 2; Ex. 6. It is also hard to imagine the Attorney General of Connecticut knowingly allowed its former lead counsel to use confidential information to extract settlement dollars that could be used to resolve the Connecticut case.

that he obtained "informed consent," which "denotes the consent by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." PRPC 1.0(e); *see also* Ex. 1, Wendel Report ¶ 49 (explaining "informed consent requires a fulsome explanation by the lawyer of the risks and benefits of agreement"); *Cf. Celgene Corp. v. KV Pharm. Co.*, 2008 WL 2937415, at *8 (D.N.J. July 29, 2008) (holding that consent was not "informed" within meaning of Rule 1.0(e) where firm did not communicate "adequate information or explanation about the risks of the proposed course of conduct" or proffer any "reasonably available alternatives"). Again, Mr. Nielsen has not shown any consent, let alone anything close to the requisite "informed consent."

Regardless, even consent from the agency would not immunize conduct like Mr. Nielsen's, where a former government attorney's representation of a private client in a matter could "unfairly prejudice another party in a private lawsuit." *See Heyliger v. Collins*, 2014 WL 910324, at *4-5 (N.D.N.Y. Mar. 10, 2014) ("I find that, even if the BCDA had provided written consent to Attorney Jackson with respect to his representation of the Binghamton Press defendants, he nonetheless would still be precluded by the rules of professional conduct from his representation of those defendants."). Mr. Nielsen's violation of Rule 1.11(a) provides yet another basis for disqualification.[42]

Here, more than most cases, Mr. Nielsen's violation of Rule 1.11(a) will undermine the integrity of these judicial proceedings. For over a decade, Mr. Nielsen publicly touted his

---

[42] A similar rule is contained in Connecticut's Code. The Code prohibits any former state employee from "represent[ing] anyone other than the state, concerning any particular matter (1) in which he participated personally and substantially while in state service, and (2) in which the state has a substantial interest." Conn. Gen. Stat. Ann. § 1-84b(a).

government investigation and litigation in an interview with The Washington Post, and an appearance on the nationally-broadcast 60 Minutes, all while maintaining his position as lead and liaison counsel for the state plaintiffs. Like the former prosecutor in *Price*, it is undeniable that Mr. Nielsen was "closely and substantially" involved in the matter. 481 F. Supp. at 378. But Mr. Nielsen went even a step further, going out of his way to ensure that the public knew of his role, and then leveraging that role to land a lucrative private sector job in litigations he fomented. And now, Lowey and Mr. Nielsen have doubled down on his prior government role and proclaimed publicly that Mr. Nielsen will use his experience, information, and "deep knowledge of evidence" to benefit private plaintiffs in this litigation, to the material disadvantage of Defendants.

The potential "taint" at trial is obvious: Mr. Nielsen's years of public promotion invites the risk that a juror will know that the government's former top lawyer has put his weight on the scale in favor of private plaintiffs, Molina and Humana. This taint alone guarantees any unfavorable result to Defendants will be appealed. It would undermine the value of Humana I as a bellwether because it would no longer be representative for other plaintiffs not represented by a top former government enforcer. In short, disqualification is necessary to protect the integrity of trial proceedings. Mr. Nielsen's representation of Plaintiffs threatens the very outcome that the Rules of Professional Conduct, the Ethics Code, and the Court's power to disqualify are designed to prevent—erosion of public trust and integrity. *See James v. Teleflex, Inc.*, 1999 WL 98559, at *2 (E.D. Pa. Feb. 24, 1999) (explaining that courts have power to disqualify counsel to "further the courts' interests in protecting the integrity of their judgments [and] maintaining public confidence in the integrity of the bar").

### C.    Without a Timely and Effective Screen, Mr. Nielsen's Violations Should Be Imputed to Lowey

Mr. Nielsen's violations should be imputed to Lowey, unless a timely and effective screen was put in place and Mr. Nielsen takes no part in the fees generated from the Actions. Rule 1.11(b) states:

> When a lawyer is disqualified from representation under [Rule 1.11(a)], no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter unless . . . the disqualified lawyer is screened from any participation. . . .

Rule 1.11(c) similarly states:

> A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom.

Thus, the only way Lowey can avoid disqualification was to erect an *effective* screen in a *timely* manner and ensure Mr. Nielsen receives no fees from the Actions. *See Philip Morris*, 312 F. Supp. 2d 27 (disqualifying law firm pursuant to 1.11(b) after firm failed to ethically screen former government attorney from the litigation); Ex. 1, Wendel Report ¶ 53 ("In other words, screening and notice are the only way a law firm can avoid disqualification if it employs a lawyer who is personally disqualified under Rule 1.11(a) or 1.11(c).").

But there is no indication any screen has been erected. Lowey has not identified a screen, nor any other measures that timely and effectively protected Defendants from Mr. Nielsen's misuse of confidential information. In fact, Lowey and Mr. Nielsen expressly disclaimed the need for protective measures and confirmed that there are "no restrictions" on Mr. Nielsen's representation of Molina and Humana. Bank Decl. ¶ 2. Courts and the ABA have recognized that when a former government attorney, like Mr. Nielsen, possesses the types of confidential information described in this motion, the lack of a timely and effective screen can result in the misuse of that information throughout the firm—even if the attorney does not explicitly disclose

-28-

the information. Ex. 2, A.B.A. Formal Op. 509 at 4 n.14 (citing *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555); *see also* Ex. 1, Wendel Report ¶ 52 ("In this case, the entire Lowey firm *might* have avoided being disqualified as a result of Nielsen's violations of Rule 1.11(a) and 1.11(c) *if* the firm had implemented timely and effective screening procedures.") (emphasis added).

Accordingly, Defendants raised their concerns about Mr. Nielsen's representation at the July 10, 2025, status conference—just two days after Mr. Nielsen had filed his notices of appearance—but Mr. St. Phillip waved away any concerns, representing to the Court that there were no issues and that appropriate diligence had been conducted. However, based on Mr. St. Phillip's later representations to Defendants, there is no indication that such diligence has been done. Defendants subsequently raised concerns on a July 18, 2025, phone call and in an August 1, 2025, letter. Lowey and Mr. Nielsen were on notice to attempt to mitigate any harm and chose not to do so.

Rule 1.11 expressly forbids a law firm from continuing its representation in the absence of effective screening measures. To erect a screen now would be closing the barn door long after the horses left. Moreover, courts have often found screening measures ineffective in small firms like Lowey. *See, e.g.*, *Decora Inc. v. DW Wallcovering, Inc.*, 899 F. Supp. 132, 141 (S.D.N.Y. 1995) (finding that screening mechanisms "cannot be effective" in 40-attorney firm where disqualified attorney had "close working relationship" with colleagues working on the case); *Cheng v. GAF Corp.*, 631 F.2d 1052, 1058 (2d Cir. 1980), *vacated on other grounds*, 450 U.S. 903 (1981) (finding screening mechanism ineffective in "relatively small" 35-attorney firm, even where disqualified attorney was not "personally involved" in the case).

In the absence of a timely and effective screen and a restriction in sharing any fees, disqualification of Lowey is an appropriate remedy to mitigate the risk to these judicial proceedings. Ex. 1, Wendel Report ¶ 57 ("In this case, however, I am not aware of any evidence that the Lowey firm has established any screen at all. If there is no such screen then the Lowey firm should be prohibited from representing the plaintiffs in this MDL proceeding."); *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *5 (disqualifying firm that failed to "timely screen" former prosecutor who violated Rule 1.11). By allowing Lowey to continue, it only rewards Lowey's reckless disregard for the rules after their client was selected for a bellwether.

## IV.    CONCLUSION

For these reasons, the Court should disqualify Mr. Nielsen from representing Plaintiffs in these Actions; the Court should further disqualify Lowey or otherwise order appropriate relief to give effect to the imputed violations and mitigate the risk to Defendants and these judicial proceedings. To the extent there is the need for limited discovery as to Lowey's actions, Defendants respectfully request that issue be referred to Special Master Stengel for prompt resolution.


Date: September 4, 2025                    Respectfully submitted,


                                    /s/ Jeffrey C. Bank
                                    Jeffrey C. Bank
                                    Seth C. Silber
                                    WILSON SONSINI GOODRICH &
                                    ROSATI
                                    1700 K Street, NW, 5th Floor
                                    Washington, D.C. 20006
                                    Telephone: (202) 973-8800
                                    Facsimile: (866) 974-7329
                                    jbank@wsgr.com

ssilber@wsgr.com

/s/ George G. Gordon
George G. Gordon
Julia Chapman
Forrest Lovett
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104-2808
Tel: (215) 994-2382
Fax: (215) 655-2240
george.gordon@dechert.com
julia.chapman@dechert.com
forrest.lovett@dechert.com

D. Brett Kohlhofer
Christie Boyden
DECHERT LLP
1900 K Street NW
Washington, D.C.
Tel: (202) 261-3300
Fax: (202) 261-3333
d.brett.kohlhofer@dechert.com
christie.boyden@dechert.com

*Attorneys for Defendant Lannett Company, Inc.*

Chul Pak
Michael Sommer
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
cpak@wsgr.com
msommer@wsgr.com

*Counsel for the Mylan Defendants*

/s/ David Fioccola
Grant Esposito
David Fioccola
PROSKAUER ROSE LLP
Eleven Times Square New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
gesposito@proskauer.com
dfioccola@proskauer.com

Christopher Ondeck
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Tel: (202) 416-5865
Fax: (202) 416-6899
ondeck@proskauer.com

*Counsel for Defendants Sandoz Inc. and Fougera Pharmaceuticals Inc.*

/s/ Robin D. Adelstein
Robin D. Adelstein
Mark A. Robertson
Kimberly Fetsick
Abigail Schwarz
Dewey Jude Gonsoulin, III
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone: (212) 318-3000
Facsimile: (212) 408-5100
robin.adelstein@nortonrosefulbright.com
mark.robertson@nortonrosefulbright.com
kimberly.fetsick@nortonrosefulbright.com
abigail.schwarz@nortonrosefulbright.com
dewey.gonsoulin@nortonrosefulbright.com


Mark Angland
NORTON ROSE FULBRIGHT US LLP
779 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: (202) 662-0200
Facsimile: (202) 662-4643
mark.angland@nortonrosefulbright.com

*Counsel for Defendants Bausch Health
Americas, Inc.; Bausch Health US LLC;
Oceanside Pharmaceuticals, Inc.*


/s/ Donald W. Hawthorne
Donald W. Hawthorne
CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
101 Park Avenue
New York, NY 10178
T: 212-696-6949
dhawthorne@curtis.com

*Counsel for Defendant Breckenridge
Pharmaceutical, Inc.*

/s/ Steven E. Bizar
Steven E. Bizar
Agnese Whitt
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Tel: (215) 994-4000
steven.bizar@dechert.com
agnese.whitt@dechert.com

*Counsel for Citron Pharma, LLC*

/s/ Brian T. Feeney
Brian T. Feeney
GREENBERG TRAURIG, LLP
1717 Arch Street
Suite 400
Philadelphia, PA 19103
Tel.: (215) 988-7812
Fax: (215) 717-5265
brian.feeney@gtlaw.com

Roger B. Kaplan
Aaron Van Nostrand
GREENBERG TRAURIG, LLP
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Tel.: 973.360.7900
Fax: 973.301.8410
kaplanr@gtlaw.com
vannostranda@gtlaw.com

*Counsel for Defendant Dr. Reddy's Laboratories, INC.*

/s/ Carlos Ortiz
Carlos Ortiz
Kayley B. Sullivan
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Email: kbsullivan@bakerlaw.com
Email: cortiz@bakerlaw.com

Mary Pat Brogan
BAKER & HOSTETLER LLP
127 Public Square #2000
Cleveland, OH 44114
Telephone: (216) 861-7020
Email: mbrogan@bakerlaw.com

*Counsel for Defendants Heritage Pharmaceuticals Inc., Emcure Pharmaceuticals, Ltd., and Satish Mehta*

/s/ Sheron Korpus
Sheron Korpus
Seth A. Moskowitz
Seth Davis
KASOWITZ LLP
633 Broadway
New York, New York 10019 Tel: (212) 506-1700
Fax: (212) 506-1800
skorpus@kasowitz.com
smoskowitz@kasowitz.com
sdavis@kasowitz.com
*Counsel for Defendants Teva Pharmaceuticals USA, Inc., Barr Pharmaceuticals, Inc., Pliva, Inc., Actavis Elizabeth, LLC, Actavis Holdco U.S., Inc., and Actavis Pharma, Inc.*

/s/ April N. Williams
April N. Williams
Claire Bergeron
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, D.C. 20037
Tel: (202) 663-6000
Fax: (202) 663-6363
april.williams@wilmerhale.com
claire.bergeron@wilmerhale.com

Terry M. Henry
Melanie S. Carter
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Tel: (215) 569-5644
Fax: (215) 832-5644
THenry@blankrome.com
MCarter@blankrome.com

*Attorneys for Defendant Apotex Corp.*

*/s/ John M. Taladay*
John M. Taladay
Christopher P. Wilson
Edward W. Duffy
JoAnna B. Adkisson

Michael A. Munoz
BAKER BOTTS LLP
700 K Street NW
Washington, DC 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
john.taladay@bakerbotts.com
christopher.wilson@bakerbotts.com
ed.duffy@bakerbotts.com
joanna.adkisson@bakerbotts.com
michael.munoz@bakerbotts.com

Matthew M. Hilderbrand
BAKER BOTTS LLP
401 South 1st Street, Suite 1300
Austin, TX 78704
Telephone: (512) 322-2500
Facsimile: (512) 322-3613
matthew.hilderbrand@bakerbotts.com

Lauri A. Kavulich
CLARK HILL PLC
2001 Market Street, Suite 2620
Philadelphia, PA 19103
Telephone: (215) 640-8500
Facsimile: (215) 640-8501
lkavulich@clarkhill.com

Lindsay S. Fouse
CLARK HILL PLC
301 Grant St, 14th Floor
Pittsburgh, PA 15219
Telephone: (412) 394-7711
Facsimile: (412) 394-2555
lfouse@clarkhill.com
*Counsel for Defendants Sun Pharmaceutical*
*Industries, Inc., Mutual Pharmaceutical*
*Company, Inc., Taro Pharmaceuticals*
*U.S.A., Inc. and Taro Pharmaceutical*

*/s/ J. Clayton Everett, Jr.*
J. Clayton Everett, Jr.
William S.D. Cravens
Molly R. Maidman
Y. Frank Ren
MORGAN, LEWIS & BOCKIUS
LLP 1111 Pennsylvania Avenue, NW
Washington, DC 20004 Telephone:
+1.202.739.3000 Facsimile:
+1.202.739.3001
clay.everett@morganlewis.com
william.cravens@morganlewis.com
molly.maidman@morganlewis.com
frank.ren@morganlewis.com

Harvey Bartle IV
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
Telephone: +1.215.963.5000
Facsimile: +1.215.963.5001
harvey.bartle@morganlewis.com

*Counsel for Defendants Perrigo New*
*York, Inc., Perrigo Company plc*

*/s/ Douglas M. Tween*
Douglas M. Tween
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 903-9072
douglas.tween@linklaters.com

*Counsel for Defendant Strides Pharma, Inc.*

/s/ Benjamin H. Diessel

Benjamin H. Diessel
Ariela C. Anhalt
Emmett Gilles
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, CT 06510
Tel: (203) 498-4400
Fax: (203) 782-2889
bdiessel@wiggin.com
aanhalt@wiggin.com
egilles@wiggin.com

Nathan E. Denning
Gabriella E. Bensur
Chloe S. Booth
Michael W. Kucharski
WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
Tel: (212) 551-2600
Fax (212) 551-2888
ndenning@wiggin.com
gbensur@wiggin.com
cbooth@wiggin.com
mkucharski@wiggin.com

Christopher Bailes
WIGGIN AND DANA LLP
50 S. 16th Street, Suite 2925
Philadelphia, PA 19102
Tel: (215) 998-8318
Fax: (215) 988-8384
cbailes@wiggin.com

*Counsel for Defendant Aurobindo Pharma
USA, Inc.*

/s/ Jason R. Parish

Jason R. Parish
BUCHANAN INGERSOLL & ROONEY PC
1700 K Street, NW, Suite 300
Washington, D.C. 20006
Tel.: (202) 452-7900
Fax: (202) 452-7989
Email: jason.parish@bipc.com

Bradley J. Kitlowski
BUCHANAN INGERSOLL & ROONEY PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
Tel.: (412) 562-8800
Fax: (412) 562-1041
Email: bradley.kitlowski@bipc.com

Caroline B. Warren
BUCHANAN INGERSOLL & ROONEY PC
Carillon Tower
227 West Trade Street, Suite 600
Charlotte, NC 28202
Tel.: (704) 444-3371
Fax: (704) 444-3490
Email: caroline.warren@bipc.com

*Counsel for Defendant Zydus
Pharmaceuticals (USA) Inc.*

_/s/ W. Gordon Dobie_
W. Gordon Dobie
Frank A. Battaglia
WINSTON & STRAWN LLP
35 W. Wacker Dr.
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
wdobie@winston.com

Irving Wiesen
LAW OFFICES OF IRVING L. WIESEN,
P.C.
420 Lexington Ave. – Suite 2400
New York, NY 10170
Tel: (212) 381-8774
Fax: (646) 536-3185
iwiesen@wiesenlaw.com

_Counsel for Defendant Ascend
Laboratories, LLC_

_/s/ Ilana H. Eisenstein_
Ilana H. Eisenstein
Whitney Cloud
Ben C. Fabens-Lassen
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
ilana.eisenstein@dlapiper.com
whitney.cloud@dlapiper.com
ben.fabens-lassen@dlapiper.com

_Counsel for Defendants Pfizer Inc.
and Greenstone LLC_

_/s/ Stephan Matanovic_
Stephan Matanovic (Pa. No. 83459)
Bailey Duquette P.C.
57 N. 2nd Street, 2nd Floor
Philadelphia, PA 19106
215.660.7600
stephan@baileyduquette.com

James Bailey
Bailey Duquette P.C.
104 Charlton St., 1W
New York, NY 10014
212.658.1946
james@baileyduquette.com

Darrell Prescott
Darrell Prescott Law Office P.C.
104 Charlton Street, 1-W
New York, NY
(917) 510-3165
dp@darrellprescott.com

_Counsel for Defendant G&W Laboratories, Inc._

_/s/ Brian J. Smith_
Brian J. Smith
WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation
1700 K Street, NW, 5th Floor
Washington, D.C. 20006
Telephone: (202) 973-8800
Facsimile: (866) 974-7329
brian.smith@wsgr.com
*Admitted only in Illinois & Maine

_Counsel for Defendant Mayne Pharma Inc._

_/s/ Peter G. Siachos_
Peter G. Siachos
GORDON REES SCULLY MANSUKHANI LLP
677 King Street, Suite 450
Charleston, SC 29403
Telephone: (843) 278-5900
Facsimile: (843) 804-4691
psiachos@grsm.com

Clair E. Wischusen
GORDON REES SCULLY MANSUKHANI LLP
277 S. Washington Street, Suite 550
Alexandria, VA 22314
Telephone: (703) 650-7030
Facsimile: (202) 800-2999
cwischusen@grsm.com

_Counsel for Defendant Epic Pharma, LLC_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served on September 4, 2025, with a copy of this document via the Court's CM/ECF system.

*/s/ Jeffrey C. Bank*
Jeffrey C. Bank
