# **<u>EXHIBIT 1</u>**

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br><br>HON. CYNTHIA M. RUFE |
| This Document Relates to:<br>*Molina Healthcare Inc. v. Actavis Elizabeth LLC, et al.*<br>*Humana Inc. v. Actavis Elizabeth LLC, et al.*<br>*Humana Inc. v. Actavis Elizabeth LLC, et al.*<br>*Humana Inc. v. Actavis Elizabeth LLC, et al.* | 20-CV-00695<br>18-CV-03299<br>19-CV-04862<br>20-CV-06303 |

## Expert Report of W. Bradley Wendel

### Introduction and Summary of Opinion

1.      I have been retained by counsel for certain defendants in the above proceeding, to render an opinion regarding the compliance with applicable rules of professional conduct by former Connecticut Assistant Attorney General W. Joseph Nielsen ("Nielsen"), and the law firm Lowey Dannenberg, P.C. ("Lowey"), in support of Defendants' Motion to Disqualify Nielsen and Lowey. As explained in more detail below, this is the clearest instance I have ever encountered of a violation of Rule 1.11 of the Model Rules of Professional Conduct, the rule prohibiting certain representations in private practice by former government lawyers and adopted in Pennsylvania. Rule 1.11 requires former government lawyers to refrain from disclosing or making adverse use of two categories of confidential information: (i) information relating to the representation of the former government entity client and (ii) "confidential government information," which is defined in the rule as non-public information obtained under government authority that could be used in a subsequent proceeding to the material disadvantage of the person to whom it pertains. In addition, and to provide a robust zone of protection around this confidential information, Rule 1.11 prohibits a former government lawyer from representing a client in any matter in which the lawyer participated personally and substantially while a public employee. Some of these prohibitions may be consentable with the informed authorization of the former government agency. I am unaware of evidence of a waiver by the Connecticut Attorney

General's office, much less that the Connecticut Attorney General's office gave its consent after being properly informed about the applicable ethical issues. Absent the informed consent of Nielsen's former employer, the subsequent representation by Nielsen of private clients is impermissible. Even if such informed consent was obtained, other prohibitions are non-waivable and absolutely prohibit the representation Nielsen is currently engaged in.

2.     As for Lowey, other lawyers in the firm may at one point have been in a position to permissibly represent the private clients that Nielsen is prohibited from representing, provided that an effective screening mechanism was established in a timely manner. In the absence of evidence of a timely and effective screen, however, Nielsen's disqualification is imputed to the entire firm, which must be disqualified to protect the confidential information safeguarded by Rule 1.11. To my knowledge, the Lowey law firm has not implemented any screening procedures to isolate Nielsen from other lawyers in the firm or ensured that Nielsen will be apportioned no part of the fee from the representation. In such a case, under the Rules, Nielsen should be disqualified.

<u>Qualifications</u>

3.     I am the Edwin H. Woodruff Professor of Law at Cornell Law School in Ithaca, New York. I have been a tenured Professor of Law at Cornell Law School since 2006. From 2004 to 2006, I was an Associate Professor of Law at Cornell Law School. Prior to joining the Cornell faculty, I was an Associate Professor of Law at Washington and Lee University from 2003 to 2004 and Assistant Professor of Law at Washington and Lee University from 1999 to 2003. Prior to that, I was an Associate in Law at Columbia University School of Law from 1997 to 1999. Prior to that, I served as judicial law clerk to the Honorable Andrew J. Kleinfeld on the United States Court of Appeals for the Ninth Circuit from 1996 to 1997. Prior to that, I worked as a products liability litigator at Bogle & Gates in Seattle, Washington. I am admitted to practice in New York. I was initially admitted to practice in Washington State in 1994 but recently resigned my Washington inactive status. I received a B.A. from Rice University, a J.D. from Duke Law School, and an LL.M. and J.S.D. from Columbia Law School. I am an elected member of the American Law Institute. My qualifications are set out more fully in my CV, which is attached as Exhibit A to this Declaration.

4.     My primary areas of academic teaching, research, and consulting specialization are legal ethics, professional responsibility, and the law governing lawyers. I am a co-editor of an influential law school casebook, Hazard, Koniak, Cramton, Cohen & Wendel, *The Law and Ethics of Lawyering*, in its Seventh Edition, with Foundation Press; the sole author of a textbook, Wendel, *Professional Responsibility:*

*Examples and Explanations*, also in its Seventh Edition, with Aspen Publishers; and co-editor of an annually updated rules supplement, Martyn, Fox & Wendel, *The Law Governing Lawyers: National Rules, Standards, Statutes, and State Lawyer Codes*, also with Aspen Publishers. In addition, I have published numerous law review articles on these topics (set out more fully in my CV at Exhibit A hereto). I have regularly taught law school courses on legal ethics and professional responsibility for 26 years, frequently teach CLE programs on legal ethics for practicing lawyers throughout the country (including internal law firm training programs), and serve as a consultant and expert witness regarding legal ethics and professional responsibility nationwide (including several recent engagements involving the Pennsylvania rules). Since 2007, I have been a member of the drafting committee for the Multistate Professional Responsibility Examination (MPRE) and became vice chair of the committee in 2022. From 2011 to 2012, I served as a Reporter to a working group within the ABA Commission on Ethics 20/20, which considered amendments to the ABA Model Rules of Professional Conduct. In 2012, I was the recipient of the Sanford D. Levy Memorial Award from the New York State Bar Committee on Professional Ethics. I am a member of the New York State Bar Association's Committee on Standards of Attorney Conduct (COSAC), which considers amendments to the New York Rules of Professional Conduct.

5.      Within the last four years, I have testified by deposition or in court, or in an arbitral tribunal in the following matters:

- Arbitration (Parties Confidential), Testimony at arbitration hearing, Mar. 8, 2024.
- Arbitration (Parties Confidential), Testimony at arbitration hearing, Feb. 6, 2023.
- Arbitration (Parties Confidential), Testimony at arbitration hearing, Aug. 29, 2022.
- Guo v. Clark Hill PLC and Thomas K. Ragland, United States District Court for the District of Columbia, Case No. 1:19-cv-3195-JEB. Deposition, Nov. 24, 2021.

6.      I am being compensated at my usual rate of $1,050 per hour for my work on this matter. The compensation I receive in this matter is not dependent on my analysis, opinions, testimony (if any) or outcome of this matter.

## Summary of Material Facts

7.      In preparing this Report I have relied on the papers filed by counsel in support of Defendants' Motion to Disqualify and the following documents: a copy of Joseph Nielsen's LinkedIn profile; Facebook post from Lowey Dannenberg, P.C.; media reports on the state lawsuits against generic drug manufacturers; email response from Peter St. Phillip to Ed Duffy (July 19, 2025) including Ed Duffy's email of the previous

3

day; letter from Defendants to Peter D. St. Phillip and W. Joseph Nielsen (Aug. 1, 2025); and email from Peter St. Phillip to Jeffrey Bank (Aug. 6, 2025); email threads including Joseph Nielsen; ████████████████████████ ████████████████████ Apotex Corp., and the Heritage Defendants; the transcript of the September 12, 2023, deposition of Jeremy Pearlman (the Rule 30(b)(6) designee for the State of Connecticut); transcripts of status conferences in this MDL from January 4, 2019, and February 21, 2018. In certain instances I have indicated below where counsel has provided me with background information.

8.      W. Joseph Nielsen is a former Assistant Attorney General in the state of Connecticut. According to a press release put out by the Lowey law firm, Nielsen spent 19 years in the Connecticut Attorney General's office.[1] Beginning in 2014, he was the sole attorney responsible for the investigation on behalf of the state of Connecticut, which eventually widened into an investigation including lawyers from numerous other states. The press release succinctly describes Nielsen's involvement in this matter:

> Most recently, Joe headed a team of 54 states and U.S. territories prosecuting one of the largest antitrust conspiracies in U.S. history. Having received limited information that certain generic pharmaceutical manufacturers raised the prices of generic drugs, Joe sprang into action and issued civil investigative demands. He then led a team of lawyers reviewing reams of produced documents and discovered massive industry wrongdoing, including several collusive price increases that exceeded 1000%. During the last decade, Joe has litigated this sprawling case on behalf of the states.

9.      Nielsen now represents private plaintiffs Molina Healthcare, Inc., and Humana, Inc., in the same "matter," as that term is defined in Rule 1.11(e),[2] in which he represented the State of Connecticut:

> Joe's efforts on the Generics case will continue even as he has returned to private practice. With Lowey representing many of the largest institutional buyers of generic drugs in the Nation, including Aetna, Humana, Elevance Health, and over 70 other health insurers, Joe's deep knowledge of evidence and extensive litigation expertise will well serve his new private clients as their cases head to trial.

---

[1] "Former Assistant Attorney General Joseph Nielsen Joins Lowey Dannenberg as Partner," available at https://perma.cc/J7PY-GT56 (last visited Aug. 20, 2025).
[2] Rule 1.11(e) defines "matter" as "any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties." PRPC 1.11(e).

.

10.    In the course of the literally decade-long investigation of generic drug manufacturers, Nielsen made frequent use of government authority to demand information from manufacturers. A news article from 2017 describes Nielsen's presentation to government lawyers from other states about the evidence he had gathered:

> [A]t an antitrust conference sponsored by NAAG, the National Association of Attorneys General, Connecticut was looking for help in advancing an investigation Nielsen had largely conducted himself, following a trail of suspiciously cozy communications from one drug company to another.
>
> The lights dimmed, and Nielsen began projecting images of evidence gathered over two years about how prices were set in the $75 billion generic drug industry. For 90 minutes, he shared phone records, emails and text messages Connecticut obtained by subpoena.[3]

The article notes that "[d]etails of the investigation remain confidential." However, it refers to evidence such as text messages that were shared confidentially with other state AGs as part of the widening investigation. I understand that Nielsen obtained confidential information through, among other means, the issuance of over 300 Civil Investigative Demands to companies, individuals, and third parties; receiving confidential attorney proffers from companies and individuals; and interviewing and meeting with cooperating witnesses. In several instances, this information was withheld from production under a claim of privilege, confirming that the government believes the information is confidential and protected from disclosure in this case.[4]

<u>Opinion</u>

11.    As explained below, Nielsen violated Pennsylvania Rule 1.11(a) and 1.11(c) by representing private clients in a matter in which he had previously worked personally and substantially in the Connecticut Attorney General's office and by representing clients whose interests are adverse to the defendants in this matter, as defined by Rule 1.11(e), in a proceeding in which confidential government information could be used to the defendants' material disadvantage.

---

[3] Mark Pazniokas, "How a Small-State AG's Office Plays in the Big Leagues," CT Mirror (Jan. 27, 2017).

[4] ███████████████████████████████████████████████████████

12. To my knowledge, the Connecticut AG's office has not provided informed consent to Nielsen's representation of the private plaintiffs in this matter. Representing these clients without the informed consent of the government agency, given his personal and substantial participation in the matter while in government practice, would constitute a violation of Pennsylvania Rule 1.11(a).

13. Moreover, consent cannot cure the potential for adverse use of confidential government information. By representing private clients whose interests are adverse to a person or entity to whom confidential government information pertains, in a matter in which the information could be used to the material advantage of those persons or entities, Nielsen violated Pennsylvania Rule 1.11(c).

14. The personal disqualification of a lawyer who participated personally and substantially in a matter (Rule 1.11(a)), or who had access to confidential government information (Rule 1.11(c)), is presumed to extend to the private law firm that hired the former government lawyer. The presumptive imputed disqualification of the hiring firm may be rebutted if the hiring law firm implements timely and effective screening procedures, which include apportioning the personally disqualified lawyer no part of the fee resulting from the representation of the relevant client.

15. To my knowledge, the Lowey law firm has not implemented any screening procedures to isolate Nielsen from other lawyers in the firm or ensured that Nielsen will be apportioned no part of the fee from the representation. Nielsen's disqualification is therefore imputed to all lawyers in the firm. This imputed disqualification gives effect to the presumption that an incoming lawyer has shared confidential information from his former employment with other lawyers in the hiring firm.

## A.     Applicable Law.

16. Rule IV.B, part of Rule 83.6, of this Court's Local Rules of Civil Procedure, provides that the Pennsylvania Rules of Professional Conduct will constitute the standards of professional conduct for attorneys appearing in this Court:

> The Rules of Professional Conduct adopted by this court are the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania, as amended from time to time by that state court, except as otherwise provided by specific rule of this Court . . ..

17.    Mr. Nielsen is admitted to practice in Connecticut, and was a long-time government lawyer in Connecticut. He is now working for a law firm in New York. However, the rules to be applied to the consideration of this motion to disqualify Mr. Nielsen and the firm of Lowey Dannenberg, P.C., are the Pennsylvania Rules of Professional Conduct ("Pennsylvania Rules," short-cited as "Pa. Rule xx"). Pennsylvania Rule 8.5(b)(1) provides as follows:

> In any exercise of the disciplinary authority of this jurisdiction, the rules of professional conduct to be applied shall be . . . for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits shall be applied, unless the rules of the tribunal provide otherwise;

Since the rules of this tribunal do not provide otherwise, and indeed expressly adopt the Pennsylvania Rules, those are the rules that apply to the conduct of Mr. Nielsen and the firm.

18.    In the event that other state rules apply, the opinions stated in this Report would be unchanged. Rule 1.11 is one of the ABA Model Rules that was varied the least by jurisdictions that adopted it. For example, I verified that the Connecticut version of Rule 1.11 is substantively identical to Model Rule 1.11 and Pennsylvania Rule 1.11, with the exception of an added subsection (e), having to do with grievance counsel, disciplinary counsel, and bar counsel, as well as members of the Statewide Grievance Committee and grievance panels, which has no application here.

### B.    Conflicts Rules as "Risk Rules."

19.    In applying Rule 1.11 to this proceeding, it is vital to remember a foundational premise of conflict of interest rules. Conflicts rules are intended to protect against the *risk* that a lawyer will disclose or make adverse use of protected confidential information. It is emphatically not the case that a conflicts rule is violated only when there has been actual, proven disclosure of confidential information, let alone when that disclosure has caused harm to an adverse party. It is not a defense in any way that the former government lawyer has not actually disclosed or used confidential information obtained under government authority.  A conflict exists because of, and at the moment there is, a *risk* of adverse use of confidential information. This is a basic point in the law governing lawyers and has been clearly established in the law for several decades. *See, e.g.,* Kevin C. McMunigal, "Rethinking Attorney Conflict of Interest Doctrine," 5 Geo. J. Legal Ethics 823 (1992). The principle that conflicts rules are risk rules, not requiring a showing of actual harm, or actual disclosure or adverse use of confidential information,

applies to successive-representation conflicts. *See, e.g., Western Sugar Coop. v. Archer-Daniels-Midland Co.*, 98 F. Supp. 3d 1074, 1090-91 (C.D. Cal. 2015).

20.    To the extent a party seeking disqualification can show that there has been actual harm, in the form of disclosure or adverse use by a lawyer of confidential information, that evidence strongly supports the conclusion that the lawyer had a conflict of interest because there was a risk of such disclosure or misuse. However, proof of actual disclosure is not required. As a comment to the rule on successive-representation conflicts explains:

> Application of paragraph (b) depends on a situation's particular facts, aided by inferences, deductions or working presumptions that reasonably may be made about the way in which lawyers work together. A lawyer may have general access to files of all clients of a law firm and may regularly participate in discussions of their affairs; it should be inferred that such a lawyer in fact is privy to all information about all the firm's clients. In contrast, another lawyer may have access to the files of only a limited number of clients and participate in discussions of the affairs of no other clients; in the absence of information to the contrary, it should be inferred that such a lawyer in fact is privy to information about the clients actually served but not those of other clients. In such an inquiry, the burden of proof should rest upon the firm whose disqualification is sought.

Pa. Rule 1.9, cmt. [6]. This is what I refer to as the "virtual" aspect of analyzing access to, and disclosure of, confidential information. The analysis relies on inferences and working presumptions about what information a lawyer would have access to in a given representation.

21.    The virtual analysis of disclosure or adverse use of confidential information applies to the former government conflicts rule. For example, consider Pennsylvania Rule 1.11(c), which protects non-clients against the disclosure or adverse use of confidential government information. That rule prohibits a lawyer from representing a private client whose interests are adverse to a person in a matter in which confidential government information *could be used* to the material disadvantage of that person. The italicized language shows the "risk rules" or "virtual" aspect of the analysis. The rule does not require a showing of actual use of confidential information to the material disadvantage of the person to require the disqualification of a former government lawyer. Rather, disqualification is required as a prophylactic measure, to ensure that confidential government information is not misused on behalf of the private litigant in the same matter. *See also* ABA Formal Op. 24-509 (2024), at 4-5 ("The Rule

does not require that the confidential government information has been or will be used by the lawyer, only that it *could* be used to the material disadvantage of a person.")

22.    Lowey lawyer, Mr. St. Phillip, acknowledged that Nielsen is in possession of confidential government information. Additional evidence may be developed by the defendants in discovery of the actual adverse use of this information on behalf of the plaintiffs in this MDL. While evidence of actual misuse of confidential government information would be sufficient to show a violation by Nielsen and Lowey of Rule 1.11(c), it is not necessary.

### C.    Overview of Pennsylvania Rule 1.11: The Former Government Lawyer Conflicts Rule.

23.    The former government lawyer conflicts rule, Pennsylvania Rule 1.11, recognizes that government lawyers have special powers and privileges, including access to confidential information whose disclosure to the government was compelled by law, and that this power may be unfairly misused to the detriment of private individuals or entities. *See* 1 Geoffrey C. Hazard, W. William Hodes & Peter R. Jarvis, *The Law and Ethics of Lawyering* (3d ed. & Supp.), at § 15.2. The rule also recognizes that government lawyers, like all lawyers, owe duties of loyalty and confidentiality to their former client, here a government agency. Thus, Rule 1.11 recognizes duties to both the former client and to citizens whose confidential information was available to a former government lawyer now in private practice.

24.    Rule 1.11 has several important differences from Rule 1.9, the rule on successive representation conflicts in the private sector. First, as discussed in further detail below, Rule 1.11 is not limited to "side-switching" conflicts. Unlike Rule 1.9, there is no "material adversity" element in Rule 1.11. As a consequence, the prohibition on representing clients in a matter in which the lawyer participated personally and substantially while in government service applies in cases where a government lawyer moves to a law firm representing a party that is aligned with the government's position or interests in the litigation. This is necessary due to the risk that the information will be misused to the detriment of the litigation adversaries of the new private client. Second, where Rule 1.9 leaves the word "matter" undefined (leaving its definition up to judicial elaboration on the substantial relationship test), Rule 1.11(e) specifically defines "matter" as including a judicial proceeding involving specific parties. Third, in addition to protecting the confidential information of the former government employer, via the express incorporation of Rule 1.9(c) into Rule 1.11(a)(1), the former government lawyer rule provides additional protection for "confidential government information." This is defined by Rule 1.11(c) as information obtained under government authority which the

government is prohibited from disclosing and is not otherwise available to the public. A lawyer having had access to confidential government information may not represent a private client whose interests are adverse to a person in a matter in which the confidential government information could be used to that party's material disadvantage. The purpose of that prohibition is to "prevent the lawyer's improper use of his or her official position and to protect others from the exploitation of confidential government information, acquired by the lawyer while serving as a public officer or employee." ABA Formal Opinion 24-509 (2024).

25.     In my opinion, Nielsen violated at least two different provisions of Pennsylvania Rule 1.11: (i) the prohibition in Rule 1.11(a)(2) on representing a private client in a matter in which he participated personally and substantially as a government lawyer; and (ii) the prohibition in Rule 1.11(c) on representing a private client with interests adverse to those of the defendants in matters in which confidential government information can be used to the defendants' material disadvantage. Both of these violations will be explained in more detail below.

**D.     Nielsen Violated Pennsylvania Rule 1.11(c) by Representing a Private Client Whose Interests are Adverse to the Defendants in a Matter in Which Confidential Government Information May Be Used to the Material Disadvantage of the Defendants.**

26.     Rule 1.11(c) differs from the successive-representation conflicts rule for private-sector lawyers by including a separate section protecting citizens whose information has been obtained by the government under its authority. This information is referred to as "confidential government information" and defined as follows:

> As used in this Rule, the term "confidential government information" means information that has been obtained under governmental authority *and* which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public *or* has a legal privilege not to disclose *and* which is not otherwise available to the public.

Pa. Rule 1.11(c) (emphasis added). A former government lawyer is prohibited from "represent[ing] a private client whose interests are adverse to [a] person in a matter in which [confidential government] information could be used to the material disadvantage of that person." *Id.* Note that the prohibition is on *representing* the private client at all, not merely on making adverse use of confidential government information. The reason is, again, that conflicts rules are risk rules, which regulate prophylactically to provide robust safeguards against harm to affected parties. Unlike the prohibition on

representing private parties where the former government lawyer had participated personally and substantially in the matter while in government service, the prohibition on representing a private client where the moving lawyer knows confidential government information cannot be waived. *See* Ellen J. Bennett & Helen W. Gunnarsson, *Annotated Model Rules of Professional Conduct* (9th ed. 2019), at p. 216.

27.     The policy underlying Rule 1.11(c) is to protect citizens who provide confidential information to the government pursuant to government authority from having that information exploited on behalf of non-governmental adversaries in litigation. This provision of the former government lawyer conflicts rule is not directly aimed at protecting the government's own legitimate expectations of confidentiality and loyalty. Those are safeguarded in the first instance by Rule 1.11(a). Rather, Rule 1.11(c) recognizes that persons and individuals who have shared information with the government under official authority or any degree of compulsion have no practical means of controlling the subsequent use of that information in the hands of private parties who are unauthorized recipients of the information. Similarly, government agencies (including agencies other than those that employed the former lawyer) benefit from this Rule because it incentivizes candid and fulsome disclosure of information by private parties and encourages agencies to share information with each other. These settled expectations concerning the use of confidential government information would be violated if former government attorneys could weaponize that information on behalf of private clients.

28.     Summarizing the prohibition on misuse of confidential government information, the definition of confidential government information in Rule 1.11(c) has three elements: [i] knowledge of information obtained under government authority; [ii] which the government is prohibited by law from disclosing or has a legal privilege not to disclose; and [iii] not otherwise publicly available. Once it is established that a lawyer possesses confidential information, Rule 1.11(c) states a prohibition on representation of private clients:

> [A] lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person.

Pa. Rule 1.11(c).

11

29.   <u>Obtained under government authority</u>. Confidential government information is limited to information obtained under government authority. As a recent ABA ethics opinion explains:

> This includes information obtained pursuant to a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power.

ABA Formal Op. 24-509, at 4. Importantly, confidential government information need not have been obtained from the party against whom it may be used adversely. *See* ABA Formal Op. 24-509, at 3. In this case, for example, Nielsen may have learned information from another manufacturer or from another enforcement agency that could be used to the material detriment of one of the defendants in this proceeding.

30.   In this case, Nielsen had access to a trove of information obtained under government authority. For example,

- Nielsen interviewed witnesses cooperating with government investigations and received attorney proffers while serving as the lead prosecutor for the Connecticut Attorney General, which provided him information about the conduct and communications of certain individuals and Defendants.[5]

- Nielsen served over 300 Civil Information Demands (CIDs)[6] on pharmaceutical companies, individuals, and third parties, which reportedly provided Nielsen access to nearly 12 million phone records and "over 20 million documents."[7]

---

[5] ██████████████████████████████████████████████████████████████████ *see also* Jeremy Pearlman, Associate Attorney at State of Connecticut, 30(b)(6) deposition (Sept. 12, 2023) at 22:13-19; 161:11-164:16; 211:12 – 212:21; 172:19-173:16; 181:1-25; 182:6-14;

[6] Pursuant to statute, *see* CT Gen Stat § 35-42 (2024), a CID represents a demand by the Attorney General, which may be enforced by a court order in the event of noncompliance, *see id*. § 35-42(f).

[7] Bill Whitaker, *Sweeping lawsuit accuses top generic drug companies, executives of fixing prices*, CBS News (May 12, 2019), https://www.cbsnews.com/news/sweeping-lawsuit-accuses-top-generic-drug-companies-executives-of-fixing-prices-60-minutes-2019-05-12/.

- Nielsen acted under his government authority to negotiate[8] and enter settlement agreements[9] with certain manufacturers and individuals to resolve the Connecticut AG investigation and prosecution, many of which require the settling party to cooperate and assist the Connecticut and other Attorneys General in their investigations.

31.     <u>Disclosure prohibited by law or legally privileged</u>. Information known to a former government lawyer is *confidential* government information if its disclosure is prohibited by law or the government authority has a legal privilege to object to disclosing it. A significant portion of the information known by Nielsen, learned in the course of the Connecticut AG's investigation, is legally required to be maintained as confidential. For example, the Connecticut statute governing investigatory subpoenas (CIDs), provides as follows:

> (1) All documentary material furnished to the Attorney General, the Attorney General's deputy or any assistant attorney general designated by the Attorney General, pursuant to a demand issued under subsection (a) of this section, shall be held in the custody of the Attorney General, or the Attorney General's designee, and *shall not be available to the public. . ..*

> (2) All documentary material or other information furnished voluntarily to the Attorney General, the Attorney General's deputy or any assistant attorney general designated by the Attorney General, for suspected violations of the provisions of this chapter, and the identity of the person furnishing such documentary material or other information, shall be held in the custody of the Attorney General, or the Attorney General's designee, and *shall not be available to the public. . ..*

CT Gen Stat § 35-42(c) (2024) (emphasis added). The statute also provides authority for the Attorney General to demand oral or written testimony which, similarly, is required to be held in confidence:

---

[8] *See* Hearing Tr. *Connecticut v. Aurobindo, Connecticut v. Teva,* and *Connecticut v. Sandoz,* Case No. 3:16-cv-02056-MPS, ECF No. 682, at 47:2-19 ("The other thing is, I have been having settlement conversations on and off with Sandoz's counsel since before the spin-off, not including Mr. Ondeck, who's new to the case, but with prior counsel.").

[9] ██████████████████████████████████████████████████████████
██████████████████████████ ECF No. 722-3 (Heritage; Feb. 26, 2025), ECF No. 3313-1 (Apotex; March 31, 2025).

The Attorney General, his or her deputy or any assistant attorney general designated by the Attorney General, may during the course of an investigation of any violations of the provisions of this chapter by any person (1) issue in writing and cause to be served upon any person, by subpoena, a demand that such person appear before him or her and give testimony as to any matters relevant to the scope of the alleged violations. Such appearance shall be under oath and a written transcript made of the same, a copy of which shall be furnished to such person appearing, and *shall not be available for public disclosure*; and (2) issue written interrogatories prescribing a return date which would allow a reasonable time to respond, which responses shall be under oath and *shall not be available for public disclosure*.

CT Gen Stat § 35-42(e) (2024) (emphasis added).

32.     In addition, when parties in the civil litigation have issued discovery requests for information pertaining to the Connecticut AG's investigation, lawyers for the plaintiffs have objected and asserted evidentiary privileges.

33.     It is also possible that Nielsen has access to information obtained under governmental authority by enforcers in other states or the federal government, and shared with the Connecticut Attorney General's office under a nondisclosure agreement. If that is the case, then the combination of the other state's authority and the NDA would render this shared information also confidential government information for the purposes of Pennsylvania Rule 1.11(c).

34.     Thus, a considerable amount of information known by Nielsen is either prohibited by statute from being disclosed to the public or is subject to a claim of privilege. Therefore, in my opinion, it is within the scope of confidential government information as defined in Pennsylvania Rule 1.11(c).

35.     <u>Not otherwise publicly available</u>. A significant portion of the information learned by Nielsen in the course of the Connecticut AG's investigation is not publicly available. It was learned only through the course of the civil investigation, including through subpoenas, CIDs, confidential interviews with officers of the target companies and other individuals, and settlement negotiations and agreements with individuals and companies, including proffers to the government. In sum, Mr. Nielsen can use confidential information that he was only able to obtain in his capacity as a government enforcer to determine strategy and drive settlement negotiations in the private actions.

36.     For these reasons, in my opinion, the information known by Nielsen, which was learned in the course of his service in the Connecticut Attorney General's office, is defined as confidential government information under Pennsylvania Rule 1.11(c).

37.     <u>Scope of disqualification</u>. Once it is established that a lawyer moving from government service to private practice possesses confidential government information, Rule 1.11(c) prohibits the *representation* of certain private clients. The rule does not prohibit only the adverse use of confidential government information. Again, because conflicts rules protect against the risk of harm or prejudice to the parties, the rule precludes the representation altogether:

> [A] lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person.

Pa. Rule 1.11(c).

38.     The term "that person" in Rule 1.11(c) refers to the person about whom confidential government information was learned. That refers to the defendants in this proceeding. To the extent the information known by Nielsen could be used to the material disadvantage of the defendants, Rule 1.11(c) requires that Nielsen withdraw from representation of the plaintiffs in this proceeding.

39.     There are numerous ways in which the information known by Nielsen could be used to the material disadvantage of the defendants. For example:

- Nielsen could use information learned in settlement negotiations he led on behalf of the Connecticut AG about a company's willingness and ability to resolve the private actions. He could use that information in making strategic decisions as to how best litigate the claims in the private actions and focus efforts towards those Defendants he has learned through confidential discussions are more able to pay, or towards Defendants that have shown a greater willingness to settle.

- Nielsen could use information learned during interviews with cooperating witness and confidential attorney proffers about conduct of other

15

Defendants or witnesses to make strategic decisions about which witnesses to call at trial and how to examine witnesses.

- Nielsen could use information obtained from documents or other materials obtained during the investigation pursuant to CIDs and other investigative techniques to make strategic decisions about which witnesses to call or questions to ask at trial in private actions.

- Nielsen could advise expert witnesses based on information he has obtained through government investigative techniques and direct them to focus on, address, or ignore certain issues based on his unique understanding.

- Nielsen could use information learned while working with DOJ and other government agencies during the investigation to request that the DOJ produce interview notes and memoranda from meetings the DOJ had with certain witnesses and/or their counsel (Indeed, Nielsen has already signed a subpoena directed at DOJ to produce such materials).

- Nielsen could target Defendants for settlement where he knows or suspects, from settlement negotiations or attorney proffers, those Defendants that are more willing to settle, and leverage those settlements and the threat of joint and several liability to procure other settlements for his new clients that Lowey would not otherwise be able to obtain.

In sum, Mr. Nielsen could use confidential information that he was only able to obtain in his capacity as a government enforcer to determine strategy and drive settlement negotiations in the private actions.

40.    Summarizing the analysis of Pennsylvania Rule 1.11(c), in my opinion a considerable amount of information known by Nielsen is confidential government information as defined by the rule, and it may be used in the representation of private clients in this MDL proceeding to the material disadvantage of the defendants in this proceeding. Therefore, under the Rules, Nielsen should be personally prohibited from representing the plaintiffs in this proceeding.

**E.     In the Absence of Informed Consent, Nielsen Violated Pennsylvania Rule 1.11(a)(2) by Representing a Client in the Private Sector in a Matter on Which He Participated Personally and Substantially While in Government Service.**

41.     Pennsylvania Rule 1.11(a)(2) defines the scope of prohibited private-sector employment for a former government lawyer:

> Except as law may otherwise expressly permit, a lawyer who has formerly served as a public officer or employee of the government . . . shall not otherwise represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent to the representation.

There are, therefore, three elements to this provision of the former-government lawyer conflicts rule: [i] same "matter"; [ii] personal and substantial participation; and [iii] informed consent by the appropriate government agency.

42.     <u>Not limited to side-switching</u>. Unlike Rule 1.9, which regulates lawyers moving from one private-sector employer to another, Rule 1.11 does not prohibit subsequent representation only in "side-switching" cases. Rule 1.9(a) prohibits subsequent representation of a new client only where that client's interests are materially adverse to those of an old client. There is no material adversity term in Rule 1.11(a). *See also* 1 Geoffrey C. Hazard, W. William Hodes & Peter R. Jarvis, *The Law and Ethics of Lawyering* (3d ed. & Supp.), at § 15.2 ("Rule 1.11(a)(2) prohibits a former government lawyer from representing another client in any 'matter' in which he or she had 'participated personally and substantially,' *whether or not the new representation is adverse to the government*") (emphasis in original). A lawyer moving from government employment to the private sector may not represent *any* client in the same matter in which the lawyer participated personally and substantially while in government. That prohibition applies to clients on the same side of the "v." – as in this case, where Nielsen moved from the Connecticut AG's office to a private law firm representing plaintiffs in the antitrust litigation.

43.     The reason for the prohibition on representing *any* private party, regardless of whether they are aligned in interest with a lawyer's former government employer, is that governmental parties do not have the same stance of adversity to other parties as a private party would. One of the fundamental ethical obligations of a lawyer for the government is to ensure that justice is done, even if that means, for example,

declining to bring a case, dismissing a case voluntarily, or refraining from bringing certain types of arguments. There is also greater public concern that government attorneys not be incentivized to bring cases against parties with a view toward private gain, and otherwise ensuring the integrity of their decision making, including in their access to confidential information. Certain post-employment actions by former government lawyers could bear significantly on the integrity of the earlier proceeding. For this reason, the prohibition on subsequent private representation in Rule 1.11 is not limited to instances of side-switching.

44.    <u>Definition of matter</u>. The term "matter" in Rule 1.11(a)(2) is defined in Rule 1.11(e)(1) as

> any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties . . ..

The reason this term is defined separately in Rule 1.11(e) is to narrow the scope of disqualification of former government lawyers, compared with what it would be under Rule 1.9(b). The restriction of "matter" to a proceeding or controversy involving a specific party or parties is intended to exclude general, recurring situations calling for the exercise of legal judgment, such as agency rulemaking proceedings or advising government agencies on the application of law. The concern for unfairness to specific parties and abuse of government authority, which underlies all of Rule 1.11 is not present in these situations involving only general familiarity with an area of law.

45.    <u>Personal and substantial participation</u>. There is no question that Nielsen is representing the plaintiffs in this MDL in the same matter in which he participated personally and substantially as a government lawyer. The Lowey firm's press release refers to Nielsen continuing to work on "this case" or "the Generics case," while referring to the decade or more of time he spent working on the matter as a lawyer in the Connecticut AG's office. Beyond this admission by the plaintiffs' law firm, the history of this MDL confirms that it is the same matter on which Nielsen worked while in government practice. In 2017 the Judicial Panel on Multidistrict Litigation (JPML) ordered the transfer of the antitrust enforcement action brought by forty states (the "state action") to MDL 2724 pending in the Eastern District of Pennsylvania before Judge Rufe. *See In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 2017 WL 4582710 (Aug. 3, 2017). The JPML found that the actions warranted transfer under 28 U.S.C. § 1407:

> There will be significant overlap in the factual and legal issues presented by the actions currently in the MDL and the State Action. As all arise from the same factual core, they will involve common discovery of defendants and third parties.

*Id.* at *1. The Panel actually refers to "a three-year investigation by the Attorney General of Connecticut that preceded the complaint," *id.* at *2, which is the matter on which Nielsen worked while in that office. The Panel further found:

> The States' claims, like those of the private plaintiffs, stem from the same government investigation into anticompetitive conduct in the generic pharmaceuticals industry.

*Id.* at *2.

46.    The Section 1407 standard used by the JPML is narrower than the definition of "matter" in Pennsylvania Rule 1.11(e). Summarizing the definition from the rule, a matter is "any judicial . . . proceeding . . . involving a specific party or parties." The JPML found that the states' claim in the MDL and the private parties' claim "stem from the same government investigation," that is, the one spearheaded by the Connecticut AG's office. This identity of interests satisfies the definition of the same matter in Pennsylvania Rule 1.11.

47.    The element of personal and substantial participation is easily satisfied here. The term "personal and substantial" is not defined in the rule or comments. However, it is generally understood to exclude matters that were merely pending in the same office during the lawyer's period of service. *See* 1 Geoffrey C. Hazard, W. William Hodes & Peter R. Jarvis, *The Law and Ethics of Lawyering* (3d ed. & Supp.), § 15.4, at 15-15, and Illus. 15-3.[10] A case I taught for many years, which was in our casebook for several editions, *Securities Investor Protection Corp. v. Vigman*, 587 F. Supp. 1358 (C.D. Cal. 1984), involved two federal government lawyers who moved into private practice (significantly, not switching sides, but representing investor plaintiffs in a matter in which they had represented an enforcement agency). One lawyer had signed the complaint and trial brief in the government matter; the other lawyer had appeared at trial as counsel of record, supervising a junior colleague. *Id.* at 1366-67. The district court

---

[10] The phrase "personal and substantial" is borrowed from the Ethics in Government Act of 1978, 18 U.S.C. § 207, where it is defined as participation "through decision, approval, disapproval, recommendation, the rendering of advice, investigation or other such activities." *See* Ellen J. Bennett & Helen W. Gunnarsson, *Annotated Model Rules of Professional Conduct* (9th ed. 2019), at p. 211.

had no difficulty concluding that both lawyers had participated personally and substantially in the matter.

48.    Nielsen did more than just participate in the matter while at the Connecticut AG's office. His involvement was extensive, hands-on, and for a long period of time. According to his LinkedIn profile, he was the *sole* attorney responsible for a two-and-a-half year investigation by the state. And when others joined the investigation (whether from the Connecticut AG's office or from other states), Mr. Nielsen was the lead attorney, having been appointed by the Court as liaison counsel for the other state plaintiffs and as touted on his LinkedIn page, among other places. He formulated the strategy of the investigation, conducted discovery, issued CIDs, interviewed witnesses, negotiated with counsel for opposing parties, compiled a massive database of documents, and filed complaints in federal court. Nielsen also was involved in sharing information among state and federal government enforcement agencies.

49.    <u>Informed consent</u>. Informed consent is a defined term in the Pennsylvania Rules:

> "Informed consent" denotes the consent by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.

Pa. Rule 1.0(e). As a comment to the rule indicates, informed consent requires a fulsome explanation by the lawyer of the risks and benefits of agreement:

> The lawyer must make reasonable efforts to ensure that the client or other person possesses information reasonably adequate to make an informed decision. Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives.

Pa. Rule 1.0, cmt. [6]. Prudent lawyers memorialize in writing the disclosure they provided to clients as part of the process of obtaining informed consent, in the event that it is necessary to demonstrate that the client was fully informed.[11]

50.     I am unaware of any evidence that Nielsen obtained the informed consent of the Connecticut Attorney General's office to his representation of the private plaintiffs in this matter. I reviewed correspondence between counsel for defendants and lead counsel at Lowey in which defendants requested confirmation that the Connecticut AG's office had provided informed consent; Lowey and Nielsen refused to answer.

51.     For these reasons, in my opinion, Nielsen is personally disqualified under Rule 1.11(a)(2) from representing the private plaintiffs in this action.

### F.    Nielsen's Conflicts Are Imputed to Lowey Because the Firm Did not Implement Timely and Effective Screening Measures.

52.     When a law firm is seeking to hire a former government lawyer, it may be concerned about the risk that the incoming lawyer may be personally disqualified from representing firm clients under Rule 1.11(a) or 1.11(c). Because this risk could potentially shut down lateral hiring of lawyers from government practice, Rule 1.11 has long contained a screening provision. (Screening was recognized in the rules for former government lawyers long before it was recognized, in Rule 1.10, for lawyers moving from one private firm to another.) Screening makes it possible for a firm to avoid having the personally disqualified lawyer's "taint" or prohibition imputed to the other lawyers in the firm. In this case, the entire Lowey firm might have avoided being disqualified as a result of Nielsen's violations of Rule 1.11(a) and 1.11(c) if the firm had implemented timely and effective screening procedures.

53.     Pennsylvania Rule 1.11(b) states that no lawyer in a firm with which the personally disqualified lawyer is associated may knowingly undertake or continue representation unless the personally disqualified lawyer is timely screened and written notice is provided to the appropriate government agency. In other words, screening and notice are the only way a law firm can avoid disqualification if it employs a lawyer who is personally disqualified under Rule 1.11(a) or 1.11(c).

---

[11] The Connecticut version of Rule 1.11(a)(2) specifies that the appropriate government agency must give its informed consent *confirmed in writing*. "Confirmed in writing" is a defined term in the Connecticut rules, and means the consent was either given in writing or, if given orally, memorialized in a writing that the lawyer promptly transmits to the person confirming the oral consent. In this respect, Connecticut's version of Rule 1.11 is the same as the ABA Model Rule version, while Pennsylvania's omits the requirement that the consent be confirmed in writing.

54.     The screening provision for Rule 1.11(c), on confidential government information, is contained with the rule itself. The last sentence in Rule 1.11(c) states:

> A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom.

As with disqualification under Rule 1.11(a), a law firm may avoid imputed disqualification, resulting from hiring a personally disqualified lawyer, only by timely and effective implementation of a screening procedure.

55.     The definition of a screen (sometimes called a firewall or ethics wall) is given in Pennsylvania Rule 1.0(k):

> "Screened" denotes the isolation of a lawyer from any participation in a matter through the timely imposition of procedures within a firm that are reasonably adequate under the circumstances to protect information that the isolated lawyer is obligated to protect under these Rules or other law.

The elements of an effective screen are set out in Comment [9] to this Rule:

> The purpose of screening is to assure the affected parties that confidential information known by the personally disqualified lawyer remains protected. The personally disqualified lawyer should acknowledge the obligation not to communicate with any of the other lawyers in the firm with respect to the matter. Similarly, other lawyers in the firm who are working on the matter should be informed that the screening is in place and that they may not communicate with the personally disqualified lawyer with respect to the matter. Additional screening measures that are appropriate for the particular matter will depend on the circumstances. To implement, reinforce and remind all affected lawyers of the presence of the screening, it may be appropriate for the firm to undertake such procedures as a written undertaking by the screened lawyer to avoid any communication with other firm personnel and any contact with any firm files or other information, including information in electronic form, relating to the matter, written notice and instructions to all other firm personnel forbidding any communication with the screened lawyer relating to the matter, denial of access by the screened lawyer to firm files or other information, including information in electronic form, relating to the matter, and periodic reminders of the screen to the screened lawyer and all other firm personnel.

22

An essential element of a screen is timeliness, as emphasized by Comment [10] to the Rule:

> In order to be effective, screening measures must be implemented as soon as practical after a lawyer or law firm knows or reasonably should know that there is a need for screening.

A screen may satisfy all of the elements described in Comment [9], and yet be ineffective if it is not established in a timely matter.

56.    In addition, Pennsylvania Rules 1.11(b)(1) and 1.11(c) specify that the personally disqualified lawyer is apportioned no part of the fee from the matter from which he is personally disqualified. In order to avoid imputed disqualification, Lowey would also have to establish that Nielsen was apportioned no part of the fee from its representation of the plaintiffs in this proceeding.

57.    It can be a fact question whether a screen satisfies the standards in Rule 1.0(k) for effectiveness. In this case, however, I am not aware of any evidence that the Lowey firm has established any screen at all. If there is no such screen then the Lowey firm should be prohibited from representing the plaintiffs in this MDL proceeding.

Conclusion

58.    In my opinion, the representation by Nielsen of the plaintiffs in this MDL is prohibited, both by Rule 1.11(a), because Nielsen participated personally and substantially in this matter while in government services, and by Rule 1.11(c), because Nielsen knows confidential government information that may be used by the plaintiffs to the material disadvantage of the defendants. In the absence of a timely and effective screen, the Lowey firm should be prohibited from representing the plaintiffs for the same reasons.

Dated September 3, 2025
Ithaca, Tompkins County, New York


W. Bradley Wendel

23

# **EXHIBIT 2**

# AMERICAN BAR ASSOCIATION
STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY

**Formal Opinion 509**                                        **February 28, 2024**

### Disqualification to Prevent the Misuse of "Confidential Government Information"

*Model Rule of Professional Conduct 1.11(c) protects a person from the misuse of certain information that the government used its authority to acquire. The confidential government information protected by Rule 1.11(c) is defined by the Rule as information obtained under government authority which the government is prohibited from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public. The Rule provides that a lawyer who acquired confidential government information about a person while serving as a government officer or employee is disqualified from representing a "private client" whose interests are adverse to that person. The purpose is to prevent the confidential government information from being used to the material disadvantage of that person. The Rule applies regardless of whether the lawyer seeking to represent the private client has left government employ or office or maintains a private law practice (e.g., a part-time practice) while still in government employ or office. The Rule applies to a lawyer representing a "private client," meaning a client whom the lawyer represents in private practice, regardless of whether the client is a public entity or private individual or entity.*

### Introduction

Rule 1.11 of the ABA Model Rules of Professional Conduct is titled "Special Conflicts of Interest for Former and Current Government Officers and Employees."[1] This Opinion clarifies the scope of Rule 1.11(c), a disqualification provision that protects against the misuse of "confidential government information."[2] The Opinion begins by explaining this provision and highlighting how it differs from the ordinary confidentiality obligations that the Model Rules establish for lawyers generally, including but not limited to current and former government lawyers. The opinion then addresses two areas of potential ambiguity: (1) whether the Rule applies to a current government lawyer representing a private client; (2) and the definition of "private client."

---

[1] This opinion is based on the ABA Model Rules of Professional Conduct as amended by the ABA House of Delegates through August 2023. The laws, court rules, regulations, rules of professional conduct, and opinions promulgated in individual jurisdictions are controlling.

[2] When used in this opinion, the phrase "confidential government information" means "information that has been obtained under government authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public" as defined by Rule 1.11(c). Additional discussion of this concept can be found at section I of this opinion.

## Opinion

### I. Rule 1.11(c)

In general, under the Model Rules, lawyers representing a public or government entity or official[3] have the same confidentiality obligations as lawyers for private individuals and private entities, although statutes and regulations may establish additional confidentiality obligations. Rules 1.6(a), 1.8(b) and 1.9(c) generally provide that both during and after the representation, a lawyer may not reveal information relating to the client's representation or use such information to the client's disadvantage without the client's informed consent, unless an exception applies. Further, to prevent the misuse of such information, a former client's lawyer generally may not represent another person when that person's interest  is materially adverse to the former client if the new matter is the same as or substantially related to the earlier one, unless the former client consents.  Rule 1.18 imposes similar (although not entirely identical) obligations and restraints when a lawyer learns information from a prospective client.

In the case of a lawyer who serves, or served, in or on behalf of the government, there is an additional confidentiality provision that is the subject of this Opinion.  ABA Model Rule of Professional Conduct 1.11(c) provides:

> (c) Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this Rule, the term "confidential government information" means information that has been obtained under governmental authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public. A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom.

The objective of the Rule is to "prevent the lawyer's improper use of his or her official position" and to protect others from the exploitation of confidential government information, acquired by the lawyer while serving as a public officer or employee.[4]

---

[3] When used in this opinion, both the adjectives "public" and "government" are used to describe officers and employees to whom this Rule applies. The title of Rule 1.11 uses the adjective "government" while the text of Rule 1.11 uses the term "public" to describe the officers and employees. The Committee believes they mean the same thing.

[4] ART GARWIN, A LEGISLATIVE HISTORY: THE DEVELOPMENT OF THE ABA MODEL RULES OF PROFESSIONAL CONDUCT 1983-2013, 279 (2013).

Rule 1.11(c) differs in several significant respects from the ordinary confidentiality rules. First, Rule 1.11(c) provides for disqualification in some circumstances to protect against the misuse of certain government information adversely to any "person" (i.e., an individual or an entity)[5] to whom the information relates (which may or may not be the person from whom the government obtained the information), rather than adversely only to a former client.[6]

Second, Rule 1.11(c) refers to confidential government information about a person "acquired when the lawyer was *a public officer or employee*," indicating that the rule applies irrespective of whether lawyers served in a representational capacity when they acquired the confidential government information. This furthers the Rule's objective because there is the same need to protect the information from misuse regardless of the lawyer's role or status in the government when the lawyer obtained the information. For instance, a lawyer who also is a police officer is a public officer for purposes of Rule 1.11(c).[7] That lawyer is subject to Rule 1.11(c) when that lawyer possesses information, acquired when serving as a police officer, that the lawyer knows is confidential government information that could be used to the material disadvantage of a person whose interests are adverse to the lawyer's private client in a matter.[8] Accordingly, the Rule applies to lawyers who acquire confidential government information while serving as legislators, public executives, and other public officers who are not representing the government as legal counsel.[9]

Third, Rule 1.11(c) does not protect all government information but only protects certain information about a person acquired by the lawyer while serving as a public officer or employee. In particular, it protects "information that has been obtained under governmental authority and which . . . the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public." Comment [4] to Rule 1.11

---

[5] In general, the Model Rules use the term "person" to refer to anyone—e.g., an individual or an entity (such as a corporation or a public entity)—and not exclusively to an individual. *See, e.g.*, MODEL RULES OF PROF'L CONDUCT R. 4.2 & 4.4(a).

[6] Typically, Rule 1.11(c) applies when a lawyer, having acquired confidential government information while in government service, seeks to use the information adversely to a party other than the government. But the Rule can apply equally if the lawyer were to seek to use the information adversely to the government. For example, if a lawyer serving in public office were to learn confidential government information, the Rule would apply if the lawyer were to seek to use the information on behalf of a private client in litigation against the government, assuming the other requirements of the Rule were met.

[7] Whether a practicing lawyer who is also a police officer has a conflict of interest that would prohibit that lawyer from representing particular clients, such as criminal defendants, will depend on the facts and is not the subject of this opinion.

[8] N.Y.S. Bar Ass'n Comm. on Prof'l Ethics Op. 1187 (2020) ¶ 8 ("If the police officer-lawyer is aware of confidential government information such as unfavorable employment reviews or non-public job discipline imposed on another police officer who is a witness in a traffic court matter against the police officer-lawyer's private client and if that information "could be used to the material disadvantage" of the officer-witness in plea negotiations or for impeachment purposes, then the police officer-lawyer may not represent the traffic court defendant in that matter.")

[9] *See* N.Y.S. Bar Ass'n Comm. on Prof'l Ethics Op. 1169 (2019) (Rule 1.11(c) applies to a lawyer who gains confidential government information in the position of Town Supervisor, even when he did not work on the matter and came across the information by happenstance); Utah State Bar, Ethics Advisory Comm. Op. 15-01, 2015 WL 3513297, at *3 (2015) (opining that Rule 1.11(a)(2) applied to a lawyer who formerly served as a member of the Utah Board of Pardons and Parole; Philadelphia Bar Ass'n, Prof'l Guidance Comm. 2012-2, 2012 WL 7148213, at *1 (2012) ("Rule 1.11 does not contemplate whether the specific duties of the public officer or employee are categorized as attorney/non-attorney.").

explains that government lawyers are prohibited from disclosing or using "confidential government information about a person," as defined in the Rule, because the government itself has an obligation to protect such information.[10]

A lawyer serving as a government officer or employee may learn this information in various ways, whether because the lawyer is working on the particular matter or because another public officer or employee shares it with the lawyer in the course of the lawyer's work.[11] If the lawyer was serving in a representative capacity, Rule 1.11(c) protects information also protected by Rule 1.6. Rule 1.11(c) also may extend to information not protected under 1.6 if the information was acquired by a lawyer while serving as a public officer or employee, but not as a lawyer representing the government, meaning the lawyer learned the information in a nonrepresentational capacity.[12]

Fourth, Rule 1.11(c) limits confidential government information to information "obtained under government authority." This includes information obtained pursuant to a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power. Further, Rule 1.11(c) does not apply to all information obtained under government authority, but only to information that, at the time the Rule is applied, the government is legally prohibited from disclosing to the public or has a legal privilege not to disclose if the information is not otherwise publicly available.[13] Whether government information is publicly available—e.g., whether it can be obtained through routine discovery—will be a question of fact. So is the question of whether the information "could be used to [the person's] material disadvantage."[14] The Rule does not require that the confidential

---

[10] MODEL RULES OF PROF'L CONDUCT R. 1.11 cmt. [4].

[11] *See* N.Y.S. Bar Ass'n Comm. on Prof'l Ethics Op. 1169 (2019) ¶ 16 & 17.

[12] *Id.*

[13] *See* Or. State Bar Formal Op. 2005-120 (2015) at 13. This conceptualization of "confidential government information" is analogous to the definition of "nonpublic information" in 5 C.F.R. § 2635.703(b) ("Use of nonpublic information"). This regulation stipulates that a federal government employee "shall not engage in a financial transaction using nonpublic information or allow the improper use of nonpublic information to further his own private interest or that of another[.]" Section 2635.703(b) defines "nonpublic information" as information that an employee obtains due to Federal employment and that he knows or reasonably should know: "(1) Is routinely exempt from disclosure under 5 U.S.C. 552 or is protected from disclosure by statute, Executive order or regulation; (2) Is designated as confidential by an agency; or (3) has not actually been disseminated to the general public and is not authorized to be made available to the public on request."

[14] In some circumstances courts have found that confidential government information providing "strategic insights" or "roadmaps" is disqualifying. *See, e.g.*, *In re* Nat'l Prescription Opiate Litigation, 2019 WL 1274555 (N.D. Ohio, E.D. 2019) (under 1.11(c) court disqualified former Executive Assistant United States Attorney from participation as plaintiff's private counsel in portions of Opioid Multi District Litigation where that attorney had previously received confidential government information shared in the "spirit of confidence and trust" that could now materially disadvantage the third-party); N.Y. State Bar Ethics Op. 1148 (2018) (knowing how agency usually handles child support enforcement matters, untethered to personal and substantial involvement in or confidential information about specific mater, insufficient to disqualify former agency lawyer from representing respondents against agency); United States v. Villaspring Health Care Ctr., 2011 WL 5330790 (E.D. KY. C.D. 2011) (based in part on Rule 1.11(c), disqualifying lawyer from defending facility (Villaspring) because as assistant attorney general he gained "strategic insights such as knowledge of the strengths and weaknesses of the evidence" by interviewing facility's former employees); Kronberg v. LaRouche, 2010 W.L. 1443934 (E.D. Va. Apr. 9, 2010) (disqualification necessary to protect the integrity of the judicial system where former prosecutor obtained confidential government information that could be used to the material disadvantage of one or more defendants in spite of the passage of 20 years, because the information provided him at minimum with a "mental roadmap"); *but see* Baltimore County v. Barnhart, 30 A. 3d 291 (Md. Ct. Spec. App. 2011) (former county attorney who dealt with county's pension obligations did not

government information has been or will be used by the lawyer, only that it *could* be used to the material disadvantage of a person.[15]

## II. ABA Model Rule of Professional Conduct 1.11(c) applies to lawyers currently serving and those who formerly served as public officers or employees.

It is sometimes observed that Rule 1.11(c) applies to lawyers who are former public officers and employees, which is true. But the Rule does not apply *exclusively* to lawyers who formerly served as public officers or employees. Rule 1.11(c) applies equally to a full or part time lawyer who currently serves or formerly served as a government officer or employee when the lawyer (1) represents a private client outside of the lawyer's government employment and (2) possesses information, acquired when the lawyer was a government officer or employee, that the lawyer knows is confidential government information that could be used to the material disadvantage of a person whose interests are adverse to the lawyer's private client in a matter.

When proposed in 1983 by the Kutak Commission, Model Rule 1.11 initially aimed to establish guidelines for addressing conflicts of interest relating to the "revolving door" – i.e., lawyers moving from government service to private practice.[16] The original Rule 1.11 was titled, "Successive Government and Private Employment."[17] The Ethics 2000 Commission, however, recommended expanding the Rule's scope to address conflicts for lawyers *currently and formerly* serving the government as well as those "moving from one government agency to another."[18] In its report to the ABA House of Delegates the Ethics 2000 Commission explained, "an expanded Rule 1.11 … combines for the first time in a single rule a lawyer's duties when opposing a former client, and the special obligations of a government employee not to abuse the power of public office."[19] The Ethics 2000 Commission recommended, and the ABA House of Delegates adopted, the Rule's re-title to "Special Conflicts of Interest for Former and Current Government Officers and Employees" along with amendments to the text of the Rule.[20]

The wording of Model Rule 1.11(c) differs from that of the other provisions of Model Rule 1.11. Rules 1.11(a) and (b) apply explicitly and exclusively to "a lawyer who has *formerly* served as a

---

acquire confidential information she could use to county's detriment in representing county retiree in pension dispute).

[15] Comment [8] explains that the disqualification requirement of Rule 1.11(c) applies only when the lawyer has "actual knowledge" of the confidential government information, not when the information merely can be imputed to the lawyer. *See* Babineaux v. Foster*, 2005 WL 711604 (E.D. La. 2005) (defendant's motion to disqualify plaintiff's counsel from lawsuit against City based on counsel's previous employment as Assistant City Attorney denied in part because absent actual knowledge of confidential government information, presumption that attorney acquired confidential government information not sufficient to result in disqualification); N.Y.S. Bar Ass'n Comm. on Prof'l Ethics Op. 1169 (2019), para. 17.

[16] The Commission on the Evaluation of Professional Standards (Kutak Commission) was appointed in 1997 to review and revise the Model Code of Professional Responsibility. The 1983 Model Rules of Professional Conduct was its product. Garwin, *supra* note 4, at xii.

[17] *Id.* at 278.

[18] *Id.* at 291.

[19] ETHICS 2000 REPORT 401, ABA HOUSE OF DELEGATES, at 5
www.americanbar.org/content/dam/aba/administrative/professional_responsibility/report_hod_082001.pdf.

[20] Garwin, *supra* note 4, at 288 (2013); PREAMBLE AND SCOPE REPORTER'S EXPLANATION OF CHANGES, https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/e2k_migated/10_85rem.pdf (see Ethics 2000 Commission Reporters Explanation of Changes at 40).

public officer or employee of the government."[21] These provisions require the former government lawyer to adhere to the confidentiality duty of Model Rule of Professional Conduct 1.9(c), governing the preservation of information relating to the representation of a former client. Paragraphs (a) and (b) also set out when the lawyer who formerly served as a public officer or employee of the government is disqualified from representing a client in a matter in which the lawyer participated personally and substantially as a government officer or employee and when the conflict is imputed to other lawyers in the personally disqualified lawyer's firm.[22]

Rule 1.11(d) applies explicitly to "a lawyer *currently* serving as a public officer or employee."[23] It subjects the currently serving lawyer to other conflict rules (Model Rules 1.7 and 1.9) and imposes other conflict-of-interest restrictions.[24]

---

[21] ABA Model Rule of Professional Conduct, Rule 1.11(a) and (b) provides:

(a) Except as law may otherwise expressly permit, a lawyer who has formerly served as a public officer or employee of the government:

(1) is subject to Rule 1.9(c); and

(2) shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation.

(b) When a lawyer is disqualified from representation under paragraph (a), no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter unless:

(1) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(2) written notice is promptly given to the appropriate government agency to enable it to ascertain compliance with the provisions of this rule.

[22] In general, to encourage lawyers to enter government service, the disqualification standards in these provisions are less restrictive than the standards for lawyers who move between private law firms. Comment [4] to Rule 1.11 explains, "a former government lawyer is disqualified only from particular matters in which the lawyer participated personally and substantially … The limitation of disqualification in paragraphs (a)(2) and (d)(2) to matters involving a specific party or parties, rather than extending disqualification to all substantive issues on which the lawyer worked, serves a similar function." *See* Douglas R. Richmond, *As the Revolving Door Turns: Government Lawyers Entering or Returning to Private Practice and Conflicts of Interest*, 65 ST. LOUIS U. L.J. 325, 350 (2021).

[23] ABA Model Rule of Professional Conduct 1.11(d) provides:

(d) Except as law may otherwise expressly permit, a lawyer currently serving as a public office or employee:

(1) is subject to Rules 1.7 and 1.9; and

(2) shall not:

(i) participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment, unless the appropriate government agency gives its informed consent, confirmed in writing; or

(ii) negotiate for private employment with any person who is involved as a party or as lawyer for a party in a matter in which the lawyer is participating personally and substantially, except that a lawyer serving as a law clerk to a judge, other adjudicative officer or arbitrator may negotiate for private employment as permitted by Rule 1.12(b) and subject to the conditions stated in Rule 1.12(b).

[24] Notably, another difference between Rule 1.11 (a) and (d) and Rule 1.11(c) is that the conflict under Rule 1.11(c) is not consentable. Rule 1.11(c) does not authorize the government, the client, or person against whom the information might be used to waive the conflict arising under the Rule. *See, e.g.*, S.C. Bar Ethics Advisory Op. 97-41 (1998) (former special prosecutor may represent victims in civil suit against criminal defendant being prosecuted by solicitor's office if solicitor's office consents, unless she had access to confidential information that could lead to unfair advantage); Pa. Bar Ass'n Legal Ethics and Prof'l Responsibility Comm. Op. 94-132 (1994) (former government lawyer who obtains confidential government information while employed by the Department of Justice

Against this background, and for several reasons, the Committee reads the phrase "a lawyer having information that the lawyer knows is confidential government information about a person" to include not only lawyers formerly serving as public officers or employees but also lawyers who are *currently* serving as public officers or employees.

To begin with, unlike Rules 1.11(a), (b) and (d), the language of Rule 1.11(c) does not expressly limit the paragraph's application to lawyers who currently or formerly served as government officers or employees. Rather it provides, in pertinent part:

> [A] lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person.

By its terms, the rule applies to any "lawyer having information that the lawyer knows is confidential government information about a person," without regard to whether that lawyer is currently or formerly in government service.

The phrase "acquired when the lawyer was a public officer or employee" refers to a lawyer who was in government service at the time the lawyer acquired the confidential government information, not to a lawyer who is no longer in service with the government when the information would be used for a private client's benefit. In other words, the clause in context does not refer to the lawyer's employment status when seeking to "represent a private client." Rather, it refers to the lawyer's employment status with the government at the time the lawyer "acquired" the confidential government information.

Further, this reading accomplishes the objective of the Rule and leads to the soundest result. There is no less need to restrict the misuse of confidential government information for private clients when the lawyer is still employed by the government or serving as an official of the government even if part-time. We do not perceive any countervailing considerations that would justify exempting current public officers and employees from a disqualification provision designed to prevent that lawyer from misusing confidential government information for a private client's benefit.

Other authorities have similarly concluded that Rule 1.11(c) applies not only to lawyers after they leave government service but also to lawyers currently serving as public officers or employees who, outside their government service, represent private clients. For example, the New York State Bar Association's ethics committee applied Rule 1.11(c) to a lawyer who concurrently served as a town supervisor and maintained a private law practice.[25] Citing an earlier opinion of its own, that ethics committee observed that the Rule is designed to disqualify even part-time public officers from accepting private clients. This application, the opinion recognized, would prevent

---

may not represent a client in a matter in which she was involved as government lawyer, even with government consent).

[25] *See* N.Y. State Bar Ethics Op. 1169 (2019), *supra* note 8.

the private client from retaining the lawyer to gain an improper advantage through the lawyer's public office and would also avoid public suspicion about the client gaining such an advantage.[26]

Likewise, the Nebraska State Bar Association's ethics committee concluded that part-time county attorneys may not represent private clients in family law matters that involve support of a minor where, through their public office, those part-time county attorneys have access to systems that contain a wealth of confidential government information that could be used against an adverse party.[27]

In sum, lawyers currently serving as public officers or employees are not exempt from Rule 1.11(c). Rule 1.11(c) applies, for example, to lawyers in private practice who are appointed to be special prosecutors and continue to represent private clients, to lawyers who represent private clients and are also part-time prosecutors or attorneys general, and to lawyers who represent private clients and are also hired as counsel for a town or municipality.

## III. Defining "private client" as used in ABA Model Rule of Professional Conduct 1.11(c)

Model Rule 1.11(c) applies to "a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee" when that lawyer represents a "private client." This raises the question of whether a "private client" is a client whom the lawyer represents in the lawyer's private practice (i.e., outside the scope of the lawyer's public employment), or a client who is a private person or entity (as opposed to a government entity or public official), or both.

Rule 1.11(c) applies in the very least to private persons and entities whom a lawyer represents in private practice, whether that practice follows government service or is concurrent with it. This interpretation is consistent with the ABA Formal Opinion 342 (1975) in which the Committee determined that the term "private employment" in the text of ABA Model Code of Professional Responsibility Disciplinary Rule 9-101(B), the predecessor to Model Rule 1.11(a)'s disqualification provision, "refers to employment as a private practitioner."[28] The opinion explained, "If one underlying consideration is to avoid the situation where government lawyers may be tempted to handle assignments so as to encourage their own future employment in regard to those matters, the danger is that a lawyer may attempt to derive undue financial benefit from fees in connection with subsequent employment, and not that he may change from one salaried government position to another."[29]

Additionally, the term "private client" also includes *public* entities and officials whom the lawyer represents in private practice, if those clients are not legally entitled to employ the confidential

---

[26] *Id.*

[27] *See* Neb. Lawyers' Advisory Comm. Op. 22-01 (2022); *see also* R.I. Ethics Advisory Panel Op. 2016-03 (2016) (although "the rationale of the Rule applies as well to concurrent government and private employment," Rule 1.11 is inapplicable because "the inquiring attorney [who served as a part-time judge] has not acquired disqualifying confidential information about City in his role as municipal court judge").

[28] *See* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 342 (1975) (issued to interpret DR 9-101(B) after the Model Code was amended to incorporate imputed disqualification. DR 9-101(B) read: "A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.").

[29] *Id.* at 2.

information.[30] This conclusion is consistent not only with the Rule's purpose but also with a federal appellate decision, General Motors Corp. v. City of New York,[31] which was well-known to the Ethics 2000 Commission when it drafted Rule 1.11. Applying New York's version of the Code of Professional Responsibility, the court disqualified a former United States Department of Justice lawyer—who had transitioned from government service to private practice in a law firm—from representing the city of New York. The city was suing General Motors and wanted to hire the lawyer and his firm. While assigned to the Department's Antitrust Division, the lawyer had substantial responsibility in a Department of Justice antitrust suit against General Motors. The Court, interpreting New York's Code of Professional Responsibility and Canon 9, found that the lawyer was engaged in "private employment" for purposes of DR 9-101(B) because the lawyer was practicing in a private firm.

The Rule is plainly intended, in part, to prevent a lawyer from using confidential government information on behalf of a private (i.e., non-governmental) individual or entity whom the lawyer represents in full-time or part-time private practice and who is not entitled to exploit the information. However, as the *General Motors* case illustrates, there is no less need to protect against the misuse of confidential government information on behalf of a *public* entity that differs from the one to whom the information belongs and that is not entitled to use the information.

Accordingly, a lawyer who served as a public officer or employee, and who obtained confidential government information about a person while working for the government, would be subject to the Rule when the lawyer, in private employment, represents any client that is not entitled to use the information. Typically, the new client will be a private person whom the lawyer represents in private practice, but the Rule is not limited to this scenario.[32]

The Rule does not apply, however, when a current government lawyer represents a party, including a private individual, in the lawyer's role as a government lawyer. For example, as permitted by law, a government lawyer may represent a government employee in the employee's personal capacity.[33] Likewise, the Rule by its terms does not apply to lawyers who transfer from one

---

[30] Rule 1.11(c) prefaces its disqualification requirement with the phrase, "Except as law may otherwise expressly permit." Regardless of whether the law specifically authorizes the lawyer's representation, the Rule should not apply in the situation in which the lawyer's client is legally permitted to use the information in question. When the law permits the client to use the confidential government information that the lawyer acquired while in government service, the reason for the disqualification provision – i.e., to prevent the improper use of confidential government information – is inapplicable, and the client's countervailing interest in counsel of choice outweighs any conceivable interest in a wooden application of the rule. *Cf.* MODEL RULES OF PROF'L CONDUCT, Scope, para. [14] ("The Rules of Professional Conduct are rules of reason.").

[31] 501 F.2d 639 (2d Cir. 1974).

[32] The Rule does not, however, apply to a lawyer who served as a public officer or employee, obtained confidential government information about a person while working for the government, and transitioned to work in private practice where the lawyer represents the same government entity (e.g., an agency, commission, bureau or board) as a client. Although the term "private client" might be read broadly to include any client whom the lawyer represents in private practice, it would not serve the Rule's purpose to disqualify a lawyer from representing a public entity that is legally entitled to use the information in question.

[33] *See, e.g.*, Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971); 28 C.F.R. §§ 50.15, 50.16.

government position to another and undertake a representation in their role as a government lawyer.[34]

## Conclusion

Model Rule of Professional Conduct 1.11(c) applies to a lawyer who acquired confidential government information while the lawyer was employed by or an official of the government, regardless of whether the lawyer seeking to represent the private client has now left government employ or office or maintains a private law practice (e.g., a part-time practice) while still in government employ or office. The Rule applies to the representation of a "private client," which can be any client represented in the lawyer's private practice that is not legally entitled to use the confidential government information in question.

---

**AMERICAN BAR ASSOCIATION STANDING COMMITTEE ON ETHICS AND PROFESSIONAL RESPONSIBILITY**

321 N. Clark Street, Chicago, Illinois 60654-4714 Telephone (312) 988-5328
CHAIR: Bruce Green, New York, NY ■ Mark A. Armitage, Detroit, MI ■ Matthew Corbin, Olathe, KS ■ Robinjit Kaur Eagleson, Lansing, MI ■ Brian Shannon Faughnan, Memphis, TN ■ Hilary P. Gerzhoy, Washington, D.C. ■ Wendy Muchman, Chicago, IL ■ Hon. Jennifer A. Rymell, Fort Worth, TX ■ Tim Pierce, Madison, WI ■ Charles Vigil, Albuquerque, NM

**CENTER FOR PROFESSIONAL RESPONSIBILITY:** Mary McDermott, Lead Senior Counsel

**©2024 by the American Bar Association. All rights reserved.**

---

[34] Where the particular government lawyer possesses relevant "confidential government information" that the lawyer is not permitted to use, then wholly apart from the Rule, the government may opt to assign a different lawyer to the matter to protect against misuse of the information. Further, regardless of whether the disqualification rule applies, courts have discretion to disqualify lawyers as necessary to prevent the misuse of confidential information. *See, e.g.*, MODEL RULES OF PROF'L CONDUCT R. 1.10, cmt. 7 (recognizing that even when a law firm satisfies the rule's screening requirement for a personally disqualified lawyer who moved to the firm, "tribunals may consider additional factors in ruling upon motions to disqualify a lawyer from pending litigation"). And, of course, there are potential remedies, including employment sanctions and civil liability, if a lawyer were to misuse confidential government information.

# **<u>EXHIBIT 3</u>**



# Former Assistant Attorney General Joseph Nielsen Joins Lowey Dannenberg as Partner



Lowey Dannenberg, P.C. is pleased to welcome its newest partner, Joseph Nielsen, to the firm. Joe built a storied career in private and public roles representing victims of antitrust conspiracies in the technology and pharmaceutical industries.

During his 19 years at the Connecticut Attorney General's Office, Joe gained extensive experience building antitrust cases from the ground up. After years of developing evidence of antitrust violations, Joe and a team of public antitrust enforcers successfully tried to verdict the claims made by 33 State Attorney Generals that Apple and several large book publishers conspired to raise e-book prices. When a Southern District of New York court found that Apple had violated the antitrust laws after a three-week trial on liability, Apple agreed to pay $400 million if its appeals were rejected. They were, and Joe's multi-year effort paid off, and the victims received meaningful results.

Most recently, Joe headed a team of 54 states and U.S. territories prosecuting one of the largest antitrust conspiracies in U.S. history. Having received limited information that certain generic pharmaceutical manufacturers raised the prices of generic drugs, Joe sprang into action and issued civil investigative demands. He then led a team of lawyers reviewing reams of produced documents and discovered massive industry wrongdoing, including several collusive price increases that exceeded 1000%. During the last decade, Joe has litigated this sprawling case on behalf of the states.

Joe's efforts on the Generics case will continue even as he has returned to private practice. With Lowey representing many of the largest institutional buyers of generic drugs in the Nation, including Aetna, Humana, Elevance Health, and over 70 other health insurers, Joe's deep knowledge of evidence and extensive litigation expertise will well serve his new private clients as their cases head to trial. In addition to the Generics case, Lowey is proud to represent many of these clients in other antitrust and marketing cases, letting Joe bring his prodigious skill set to complement the vigorous representation of these claims in the long term.

"When I was considering a move back to private practice, I had worked with many good firms across the Nation with experience in antitrust and pharmaceutical litigation. But my first choice was never in doubt – I wanted to work for Lowey.  No firm has the experience, judgment, and client roster in affirmative pharmaceutical litigation that Lowey has. I'm simply delighted to get to work." Said **Joseph Nielsen**, Partner at Lowey Dannenberg, P.C.

"We are very excited for Joe to roll up his sleeves and join our Healthcare Litigation Team. Our clients are all thrilled that we can bring this type of proven leader to their important cases and impose discipline on instances where the pharmaceutical industry's excesses result in unnecessary costs of delivering healthcare to their members." Said **Peter St. Phillip**, Lowey Dannenberg's President and Head of Litigation.

Contact Joe at jnielsen@lowey.com

If you suffered a loss on your investments or would like to inquire about joining an action to recover your loss under the federal securities laws, please complete the form below.

An attorney will contact you at no cost to provide you information about joining the action and answer your questions. Please note that submission of this form does not by itself form an attorney-client relationship nor does filing out this form mean you have joined any lawsuit.

## Name *

| | |
|---|---|
| First | Last |

## Email *

## State *

## Phone

(201) 555-0123

## News

☐ I wish to receive news and updates.

## Comment or Message *

## Custom Captcha *

9 + 7 =

Submit



More than 50 years of landmark results.

## Practices

Commodities

Antitrust

Health Care

Securities

Whistleblower

Commercial

## Firm

About

Team

News

Security Manual

Our Team

## Contact Us

**Office:** (914) 997-0500

**Company:** info@lowey.com

New York

Pennsylvania

Copyright © Lowey Dannenberg, P.C. 2022  |  Privacy Policy | Disclaimer

# **<u>EXHIBIT 4</u>**

# FN 3 EXHIBIT 4

# PLACEHOLDER SUBMITTED VIA FLASH DRIVE

# **EXHIBIT 5**

## Investigation of generic 'cartel' expands to 300 drugs

Washington Post.com

December 10, 2018

Copyright 2018 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2018, The Washington Post Co. All Rights Reserved.

# The Washington Post

**Section:** NATIONAL-ECONOMY

**Length:** 1804 words

**Byline:** By Christopher Rowland

## Body

Executives at more than a dozen generic-drug companies had a form of shorthand to describe how they conducted business, insider lingo worked out over steak dinners, cocktail receptions and rounds of golf.

The "sandbox," according to investigators, was the market for generic prescription drugs, where everyone was expected to play nice.

"Fair share" described dividing up the sales pie to ensure that each company reaped continued profits. "Trashing the market" was used when a competitor ignored these unwritten rules and sold drugs for less than agreed-upon prices.

The terminology reflected more than just the clubbiness of a powerful industry, according to authorities and several lawsuits. Officials from multiple states say these practices were central to illegal price-fixing schemes of massive proportion.

The lawsuit and related cases picked up steam last month when a federal judge ruled that more than 1 million emails, cellphone texts and other documents cited as evidence could be shared among all plaintiffs.

Investigation of generic 'cartel' expands to 300 drugs

What started as an antitrust lawsuit brought by states over just two drugs in 2016 has exploded into an investigation of alleged price-fixing involving at least 16 companies and 300 drugs, Joseph Nielsen, an assistant attorney general and antitrust investigator in Connecticut who has been a leading force in the probe, said in an interview. His comments in an interview with The Washington Post represent the first public disclosure of the dramatically expanded scale of the investigation.

The unfolding case is rattling an industry that is portrayed in Washington as the white knight of American health care.

"This is most likely the largest cartel in the history of the United States," Nielsen said. He cited the volume of drugs in the schemes, that they took place on American soil and the "total number of companies involved, and individuals."

The alleged victims were American health-care consumers and taxpayers, who foot the bills for overcharges on common antibiotics, blood-pressure medications, arthritis treatments, anxiety pills and more, authorities say. The costs flowed throughout the system, hitting hospitals, pharmacists and health insurance companies. They hit consumers who lack prescription drug coverage and even those with insurance, because many plans have high deductibles and gaps on prescription drug benefits.

In just one instance of extraordinary cost spikes, the price of a decades-old drug to ease asthma symptoms, albuterol, sold by generic manufacturers Mylan and Sun, jumped more than 3,400 percent, from 13 cents a tablet to more than $4.70. The example is documented in a lawsuit brought against the generic industry by grocery chains including Kroger.

"Everyone is paying the price," Nielsen said. He offered a single word to explain the behavior: "Greed."

While precise estimates of alleged overcharges have not been released, generic-industry sales were about $104 billion in 2017. Excessive billings of even a small fraction of annual sales over several years would equal billions of dollars in added costs to consumers, according to investigators.

Generic manufacturers reject the accusations. They contend officials lack evidence of a conspiracy and have failed to prove anti-competitive behavior.

Among the 16 companies accused are some of the biggest names in generic manufacturing: Mylan, Teva and Dr. Reddy's. Mylan denied wrongdoing in an emailed statement. Sun, Teva and Dr. Reddy's did not respond to requests for comment. In a court filing, Teva said allegations of a price-fixing conspiracy "are entirely conclusory and devoid of any facts."

But investigators say voluminous documentation they have collected, much of it under seal and not available to the public, shows the industry to be riddled with price-fixing schemes. The plaintiffs now include 47 states. The investigators expect to unveil new details and add more defendants in coming months, which will put more pressure on executives to consider settlements.

Two former executives of one company, Heritage Pharmaceuticals, have pleaded guilty to federal criminal charges and are cooperating with the Justice Department in a parallel criminal case. A Justice Department spokesman declined to comment.

The alleged collusion transformed a cutthroat, highly competitive business into one where sudden, coordinated price spikes on identical generic drugs became almost routine. Competing executives were so chummy they had an alphabetical rotation for who picked up the tab at their regular dinners, according to a person familiar with the investigation who spoke on the condition of anonymity because the case remains under investigation.

Annual trade conferences and "Girls Night Out" cocktail meetings were other prime opportunities to swap sensitive information about markets and prices, according to court documents.

"It's particularly ironic since the whole idea of generic drugs was we would get a lower price," said Henry Waxman, the Democratic former California congressman who co-wrote the 1984 law establishing the Food and Drug Administration's rules for generics. "If generic versions are higher than need be through rigged systems, that undercuts the whole idea."

Generics account for 90 percent of the prescriptions written in the United States but just 23 percent of costs, according to the industry trade group, the Association for Accessible Medicines.

And generic drugs do act as a check on soaring drug bills fueled by brand-name manufacturers. In the Medicare prescription-drug program, according to a government study, prices on a benchmark set of older generic drugs dropped 14 percent between 2010 to 2015.

But for some generic manufacturers, the anti-competitive agreements drove up prices on most, if not all, of the products they sold, according to the states.

Officials say they have documented price increases of up to 2,000 percent. Throughout 2013 and 2014, soaring generic prices sparked consternation at drugstores and among state and federal lawmakers. Independent pharmacists said they were dismayed to learn of the price-fixing allegations.

"There's old, old drugs that have been around a long time, and all of a sudden their price has increased by hundreds of percent and we don't know why," said J.D. Fain, owner of Pieratt's Pharmacy in Giddings, Tex., a small town an hour drive east of Austin.

Unlike the brand-name drug industry, which gets years of patent exclusivity for novel drugs, generic companies operate in a market that was designed to save consumers and taxpayers large sums through aggressive competition. When the FDA grants approval for a generic product, the first company in the door gets six months of exclusive rights to market the drug. The price discount from the brand-name product is relatively small, say 10 percent.

Prices plunge as much as 50 percent once a second generic enters the market, the FDA has estimated. And by the time six or seven generic companies are competing on a particular drug, the price has declined 75 percent.

Rigging the market has turned that model upside down for some drugs, state officials say.

"It makes me angry," said Eric Belldina, an operator of pharmacies in Masontown and Morgantown in West Virginia. "Most people think when their prices go up it's because of a raw-ingredient shortage, not thinking the companies are sitting down, saying, 'Hey, let's do this.' "

The states' lawsuit contains particularly pointed allegations againstMylan and its president, Rajiv Malik, who is personally named as a defendant. Mylan faced public scrutiny in 2016 for raising the price of its EpiPen, to treat allergic reactions, by about500 percent.

Although the EpiPen was not a generic product at the time, the outcry from physicians, patient groups and members of Congress drew negative attention to the second-largest generic manufacturer.

While traveling in the United Kingdom in 2013, Malik took a phone call from an executive of a competing firm, Heritage, the states say in their lawsuit. Heritage had won FDA approval to market a version of the antibiotic doxycycline called Doxy DR, which is used to treat acne and a long list of infections.

That would put it in direct competition with Mylan for sales of the drug.

During the transatlantic phone call, Malik and the Heritage executive, Jeff Glazer, agreed to divide up the sandbox, the U.S. market for sales of Doxy DR, according to the lawsuit by states and similar complaints by independent pharmacies and grocery-store chains.

During subsequent conversations, according to the complaints, Mylan agreed not to sell Doxy DR to CVS and the wholesaler McKesson - sales volume worth about 30 percent of the U.S. market for the drug. As part of the alleged deal, Heritage agreed not to set a low price.

Without a reduction in price, U.S. consumers ended up the biggest losers in the deal.

Mylan said it has no evidence its executives did anything wrong. "We have been investigating these allegations thoroughly and have found no evidence of price fixing on the part of Mylan or its employees," the company said in a statement. "Mylan has deep faith in the integrity of its president, Rajiv Malik, and stands behind him fully."

Heritage did not return repeated phone messages seeking comment. Glazer and another Heritage executive, Jason Malek, pleaded guilty in 2017 to federal charges of conspiring to rig prices and stifle competition. The terms of their plea agreements said they are cooperating with a Justice Department criminal probe.

A drug to treat bone issues related to cancer, zoledronic acid, was the subject of another alleged price-fixing scheme, this time between Heritage and Dr. Reddy's. Heritage became the first generic manufacturer of the drug in the spring of 2013, but Dr. Reddy's was close behind. Executives at the companies cut deals so each got a "fair share" of the market, while also conspiring to fix an inflated price, the complaints said.

Dr. Reddy's, which did not respond to requests for comment, wound up with about 60 percent of the market and Heritage claimed 40 percent, according to the states' lawsuit.

Investigation of generic 'cartel' expands to 300 drugs

Investigators cited evidence that executives knew they were acting illegally. As the discussions with Dr. Reddy's took place, according to the complaints, a Heritage executive "sent a text message to his entire sales team reminding them not to put their pricing discussions with competitors in writing."

Mysterious price spikes continue to roil pharmacies and patient groups occasionally, though widespread price collusion was curtailed after authorities issued subpoenas in recent years, said Michael Cole, a Connecticut assistant attorney general actively involved in the case. But many drugs remain at artificially inflated prices.

"There have not been rollbacks in the price increases," he said. "We're still paying."

christopher.rowland@washpost.com

## Notes

PUBLISHER: Washington Post

## Classification

**Language:** ENGLISH

**Publication-Type:** Web Publication

**Journal Code:** WPCOM

**Subject:** INVESTIGATIONS (93%); GENERIC DRUGS (91%); LITIGATION (91%); NEGATIVE BUSINESS NEWS (91%); PRICE FIXING (91%); ANTITRUST & TRADE LAW (90%); BUSINESS INVESTIGATIONS (90%); BUSINESS TORTS (90%); CARTELS (90%); RESTRAINT OF TRADE (90%); SUITS & CLAIMS (90%); CONSUMERS (89%); CRIMINAL INVESTIGATIONS (89%); GENERIC PRODUCTS (89%); ANTITRUST LITIGATION (78%); INTERVIEWS (78%); NEGATIVE NEWS (78%); PHARMACISTS (78%); PRICES (78%); JUDGES (74%); ATTORNEYS GENERAL (73%); RESPIRATORY DISORDERS & INJURIES (73%); GOVERNMENT BODIES & OFFICES (72%); ASTHMA (60%); c34 Anti-Competition Issues (%); c151 Earnings (%); gorgnz Criminal Enterprises (%); c15 Financial Performance (%); ccat Corporate/Industrial News (%); gcat Political/General News (%); gcrim Crime/Legal Action (%); ncat Content Types (%); nfact Factiva Filters (%); nfcpin C&E Industry News Filter (%)

**Industry:** GENERIC DRUGS (91%); PRICE FIXING (91%); PHARMACEUTICALS INDUSTRY (90%); GENERIC PRODUCTS (89%); HEALTH CARE (89%); HEALTH INSURANCE (89%); PRESCRIPTION DRUG INSURANCE (89%); PRESCRIPTION DRUGS (89%); INSURANCE

Investigation of generic 'cartel' expands to 300 drugs

DEDUCTIBLES (78%); PHARMACEUTICALS & BIOTECHNOLOGY (78%); PHARMACISTS (78%); INSURANCE (77%); ANTIBIOTICS (73%); ATTORNEYS GENERAL (73%); CARDIOVASCULAR DRUGS (73%); MANUFACTURING (73%); INSURANCE COVERAGE (65%); GROCERY STORES & SUPERMARKETS (62%); MOBILE & CELLULAR TELEPHONES (53%); i257 Pharmaceuticals (%); igeneri Generic/Biosimilar Drugs (%); i951 Health Care/Life Sciences (%)

**Geographic:** CONNECTICUT, USA (79%); UNITED STATES (95%); NORTH AMERICA (79%); usa United States; namz North America

IP Descriptors: business, economy

**Load-Date:** January 30, 2025

**End of Document**

# **EXHIBIT 6**

# **FILED UNDER SEAL**

# **EXHIBIT 7**

**60 Minutes**    |    Full Episodes    Overtime    60 Minutes on Paramount+    60 Minutes Channel

60 MINUTES - NEWSMAKERS

# Sweeping lawsuit accuses top generic drug companies, executives of fixing prices



By **Bill Whitaker**
May 12, 2019 / 7:09 PM EDT / CBS News

▶

**Sweeping lawsuit accuses top generic drug
companies, executives of fixing prices**

It might be the biggest price-fixing scheme in U.S. history. On Friday, Connecticut
and a coalition of more than 40 states filed a 500-page lawsuit accusing the
biggest generic drug makers of a massive, systematic conspiracy to bilk
consumers out of billions of dollars. It's a more sweeping version of a similar
lawsuit the states filed in 2016 that's still being litigated. The generic industry
vehemently denies the allegations.

Congress established the current generic industry in 1984 to push prices down. The idea was that once patents on brand name drugs expired, generic makers would compete to make drugs more affordable. But 1,215 generics, many of them the most prescribed drugs, jumped on average more than 400 percent in a single year.

Connecticut has been examining the generic drug industry for almost five years. Tonight, we'll take you inside its investigation and show you how two dogged attorneys built the cases the state attorney general calls the most egregious examples of corporate greed he has ever seen.



William Tong

William Tong: It's an industry-wide conspiracy. And I think it answers one of the biggest questions all of us are asking, which is why are prescription drugs so expensive? And I think we know why now. Because the prices of generic drugs are fixed. And there's a widespread conspiracy to rig the market.

Connecticut Attorney General William Tong says his office found evidence of price fixing by dozens of generic drug industry sales directors, marketers, CEOs dating back to 2006.

Watch CBS News

Bill Whitaker: How many drugs are we talking about?

William Tong: Hundreds. Hundreds of drugs.

Bill Whitaker: What kinds of drugs?

William Tong: Every kind of drug that touches our everyday lives. I'll give you an example, Bill. This is my bottle of doxycycline. It is a common antibiotic that I take every day for a skin condition. And there is a conspiracy around doxycycline. And so sitting here today as the attorney general of the state of Connecticut, I'm one of the victims.

Between 2013 and  2014, a bottle of doxycycline shot up 8,281 percent from $20 to more than $1800. A bottle of asthma medication, albuterol sulfate, jumped more than 4000 percent, from $11 to $434. Pravastatin, a cholesterol drug, up more than 500 percent, from $27 a bottle to $196.

The sudden price spikes caught the attention of Congress, which called a hearing; the Department of Justice, which launched an investigation; and the state of Connecticut, which now has filed two lawsuits.

William Tong: This is a phased approach And we're focusing on all the major players.

Bill Whitaker: So is it your contention that these companies are putting Americans' lives at risk?

William Tong: Yes, you know, it's $100 billion market. We're talking about the drugs that America takes every day to live. And they're profiteering off of that in a highly illegal way. They're just taking advantage.

Bill Whitaker: The industry says that the prices went up because of market forces and because of drug shortages. These explanations don't wash with you?

William Tong: No. I mean they've said this to me to my face. And–

Bill Whitaker: Why don't you believe that?

William Tong: Because we have evidence, hard evidence, in the form of text messages, emails, documents, witnesses that demonstrate clearly that it wasn't about product shortages. It was about profit. It was about cold, hard greed.



Correspondent Bill Whitaker with Joe Nielsen and Mike Cole

Watch CBS News

How can he say that? Because of what these two sleuth attorneys uncovered. Mike Cole heads the antitrust division in the Connecticut Attorney General's office. Joe Nielsen is his lead prosecutor on this case. They've worked together for more than a decade reaching multi-million dollar settlements with big names like Apple and Bank of America. This, they say, is their biggest case yet.

Michael Cole: This particular industry – the generic drug industry – touches everybody.

Joe Nielsen: 90 percent of all prescriptions filled in this country are filled with generic drugs.

In the summer of 2014, Cole and Nielsen spotted a newspaper article about a sharp rise in the price of a decades-old generic heart medication called digoxin.

Bill Whitaker: So you read the article and something just didn't smell right?

Michael Cole: I guess you could say you get a little bit of a sixth sense after you do this type of work for a long period of time which we both have. So we did a little bit more due diligence. And we sent out three subpoenas.

Bill Whitaker: What did you think you would find?

Michael Cole: We were looking for communications amongst competitors. When you do this kind of work it's really not one hot document, as they say, that's gonna prove a case. It's kind of like putting together a puzzle, a piece at a time.

The puzzle grew into a monster. Three subpoenas turned into more than 300 to major generic drug companies, dozens of employees and phone companies. Over the course of the investigation, the subpoenas generated almost 19 million internal documents and phone records. There were so many pieces, Joe Nielsen couldn't make out the big picture at first. For more than two years, he was the only one working the case. He spent days at his office desk and many nights at his dining room table looking for patterns. He eventually bought software used by

8/25/25, 2:08 PM
Case 2:20-cv-00695-CMR Document 287-4 Filed 09/10/25 Page 59 of 565
Watch CBS News
Sweeping lawsuit accuses top generic drug companies, executives of fixing prices - 60 Minutes - CBS News

law enforcement to investigate drug cartels, so he could analyze nearly 12 million phone logs.

Bill Whitaker: And this allowed you to do what?

Joe Nielsen: Well, this allows you within five minutes to look at someone's entire phone records and see the history of who they communicated with, when.

Nielsen saw a picture emerge of a cozy relationship among industry competitors with lots of phone chatter right before they increased prices apparently in lock step.

Joe Nielsen: You know, we can see that competitor A is talking to competitor B five times on one day. And what that allows us to do is to go into our document database and look on that day at what they were saying.

It all snapped into sharp focus when he matched phone logs to thousands of text messages from Heritage Pharmaceuticals. Nielsen says this exchange, with competitor Citron Pharma, showed collusion to increase the price of a diabetes medication. The text messages implicate two other companies: Aurobindo and Teva, the world's largest generic drug maker. The national accounts manager at Heritage wrote:

**A.S.: "We are raising the price right now – just letting you know, Teva says they will follow"**
**A.S.: "Aurobindo agrees too"**

A corporate account representative from Citron answered:

**KA: "...we are def [initely] in to raise pricing ... are doing this immediately"**

The Heritage executive responded:

**AS: "We are raising our customers 200% over current market price."**

Bill Whitaker: So what's wrong with these companies talking to each other?

Watch CBS News

Joe Nielsen: If they were talking about– their families or, you know, a barbecue that they went to, there would be nothing wrong with it. But when they talk about raising prices and they agree to do that then it's completely and totally illegal.

Take the case of the antifungal drug Nystatin. As you can see with this graph, the price held steady at $68 a bottle for years, but in April 2013 Sun Pharmaceuticals almost doubled the price to $131. Right after the increase there was this flurry of phone calls between Sun and competitors, Heritage and Teva.

Joe Nielsen: So you see a phone call between Heritage and Sun pharmaceuticals lasting over 45 minutes.

After dozens of calls like this, first Teva, then Heritage followed Sun's lead and jacked up the price of Nystatin to $142 a bottle. Joe Nielsen also found messages that seemed to show companies, including Pfizer, conspiring to divvy up the market for other drugs. The lawsuit filed Friday states: "Pfizer, acting through its wholly-owned subsidiary and alter ego... Greenstone, entered into agreements with Teva and... other competitors to allocate and divide customers and markets... and to fix and raise prices." It refers to this email from Teva as evidence.

"[T]ell Greenstone we are playing nice in the sandbox and we will let them have [the ... customer]."

Bill Whitaker: Play nice in the sandbox. What does that mean?

Joe Nielsen: Avoid competing with each other, take your fair share and don't go after anything more than that. Keep the prices as high as you can.

Bill Whitaker: But I thought the whole point of generic drugs was to have competition and keep the price down?

8/25/25, 2:08 PM
Sweeping lawsuit accuses top generic drug companies, executives of fixing prices - 60 Minutes - CBS News
Case 2:20-cv-00695-CMR Document 287-4 Filed 09/10/25 Page 61 of 565
Watch CBS News

Joe Nielsen: That's the point for us, but that's what the companies who are selling the generic drugs want to avoid.

William Tong: I think what we've come upon is that the generic drug industry is the largest private sector corporate cartel in history.

Bill Whitaker: What is the effect of that on you? Me? Average consumer?

William Tong: It's devastating. it affects health insurance premiums and health insurance plans. It impacts Medicare and Medicaid. And it is a chain reaction that drives up the price of American healthcare to unnatural heights.

We reached out to the companies mentioned in our report for comment. Pfizer, which advertises on this broadcast, denies any wrongdoing and says it has cooperated with the Connecticut Attorney General. It says its subsidiary, Greenstone, intends to vigorously fight the claims. Sun issued this statement: "Sun Pharma is committed to the highest level of ethics and integrity... We believe the allegations made in these lawsuits are without merit and we will continue to vigorously defend against them."

In court filings Sun and other drug makers have argued there's no proof of an overarching conspiracy. The industry trade group told us generic prices declined three straight years from 2016.

William Tong: There has been some leveling off. But I don't think that means that the conspiracy has ended. They're still unnaturally high. What we haven't seen is if they stopped colluding you would expect prices to go down dramatically. You would expect competition to ensue and one competitor would go after another. And they'd start undercutting each other on price. That hasn't happened.

Case 2:20-cv-00695-CMR   Document 287-4   Filed 09/10/25   Page 62 of 565



Dr. Thomas Pliura

Bill Whitaker: Are you seeing patients today?

Dr. Thomas Pliura: I am.

Dr. Tom Pliura is feeling the impact of rising generic drug prices. He runs a clinic that serves 14,000 people in rural, southern Illinois. This is a federally designated, "health care shortage area," which is a bureaucratic way of saying there aren't enough doctors around here.

Three quarters of his patients are on Medicare or Medicaid. Both government programs set limits on reimbursements for drugs. The rising generic prices have created a medical emergency for him. Since the government won't cover the increased costs, his patients or his clinic must.

Dr. Thomas Pliura: We've been able to– to keep the doors open. But it's getting harder and harder. And with these tremendous– spikes– it's a problem.

Bill Whitaker: The impact of the rising prices is so great that it might put you out of business?

8/25/25, 2:08 PM
Sweeping lawsuit accuses top generic drug companies, executives of fixing prices - 60 Minutes - CBS News
Case 2:20-cv-00695-CMR Document 287-4 Filed 09/10/25 Page 63 of 565

Watch CBS News

Dr. Thomas Pliura: No question about it. We've had that discussion right here in this building.

He worries his patients will suffer. So, Dr. Pliura has joined unions, pharmacies, school employees and other plaintiffs that have filed dozens of class action lawsuits in the wake of Connecticut's investigation, all accusing generic drug makers of fixing prices.

Bill Whitaker: That's a big fight for a small clinic in rural Illinois to pick.

Dr. Thomas Pliura: I think somebody has to raise their hand. Somebody has to say, "You know– it's wrong, what's going on." you can't put people in a position where they're forced to either pay their rent or buy food and forego their medication." And that's what's – that's what's happening all over the U.S.

William Tong: As an attorney general, I look at that and I say, "How can they do that?" And I think what we've concluded is they know it's illegal. And– and it's not that they're too big to fail. It's that they're just too big to care.

Bill Whitaker: That sounds harsh. Too big to care.

William Tong: That's the only conclusion I think anyone can draw when they see this evidence. And so then you start wondering why would they do this? Because there's just too much money to be made.

Connecticut Attorney General Tong told us he and the other state attorneys general are continuing to investigate the generic drug industry and plan to file more lawsuits.

William Tong: This conspiracy has caused billions and billions of dollars in damages to the people of Connecticut and states across the country. And we're gonna take them on in court and hold them accountable. And they're gonna pay for the money they stole from the American people.

*Produced by Marc Lieberman and Ali Rawaf. Associate producer, Ian Flickinger*

Watch CBS News

---

In:    **Pfizer**

### Bill Whitaker

Bill Whitaker is an award-winning journalist and 60 Minutes correspondent who has covered major news stories, domestically and across the globe, for more than four...

© 2019 CBS Interactive Inc. All Rights Reserved.

**Featured**

Kilmar Abrego Garcia Facing Deportation To Uganda

4 Journalists Reportedly Among Dead In Israeli Strike

Jerome Powell Speech

Epstein Video

**Follow Us On**

YouTube

Facebook

Instagram

X

**Privacy**

Privacy Policy

California Notice

Your Privacy Choices

Terms of Use

**More from CBS News**

Newsletters

Podcasts

**Watch CBS News**

Download Our App

Brand Studio

Sitemap


**Company**

About Paramount

Advertise With Paramount

Join Our Talent Community

Help

Feedback


Copyright ©2025 CBS Interactive Inc. All rights reserved.

# **EXHIBIT 8**

         

Home · My Network · Jobs · Messaging · Notifications · Me ▾ · For Business ▾ · Try Premium f





## Joseph Nielsen ⛨

Competition Lawyer - Trial Attorney



- Lowey Dannenberg, P.C.



- Seton Hall University School of Law

Middlefield, Connecticut, United States · **Contact info**

**106 connections**

Message    **+ Follow**    More

## About

27 years of legal experience across public and private sectors, including the last 19 years in antitrust enforcement. Expertise in conducting and managing affirmative antitrust and consumer protection enforcement investigations of all types. Trial experience in large, complex antitrust and commercial litigation. Experience taking high-stakes depositions (fact and expert witnesses, senior executives, in-person and remote, trial and Fifth Amendment depositions). Lead attorney on several high-profile, large multi-state antitrust investigations, litigations and settlements resulting in hundreds of millions of dollars in restitution and penalties against some of the largest companies in the U.S. and the world. Admitted to practice in the State of Connecticut, United States District Court for the District of Connecticut, Second and Third Circuit Courts of Appeal, and the United States Supreme Court.

## Featured

| Link | Link | Link |
|------|------|------|
|  | | |
| AG Tong: Drug companies to pay damages for price-fixing in CT-... | 60 Minutes - Sweeping lawsuit accuses top generic drug... | How... plays... |
| CT Insider | cbsnews.com | CT Mi... |

## Activity

109 followers

**Joseph hasn't posted yet**

Recent posts Joseph shares will be displayed here.

Show all activity →

## Experience



**Partner**
Lowey Dannenberg, P.C. · Full-time
Jul 2025 - Present · 2 mos
White Plains, New York, United States

**Assistant Attorney General**
Connecticut Attorney General's Office · Full-time
Aug 2006 - Jul 2025 · 19 yrs
Hartford, Connecticut, United States

Responsible for all phases of civil antitrust enforcement on behalf of the Connecticut Attorney General, including: developing, conducting and managing affirmative civil antitrust investigations; representing the Attorney General (and often large groups of other states) in settlement negotiations and litigation in state and federal courts. First chair litigation and trial experience in several large, complex antitrust matters in state and federal court. Notable matters include:

Generic Drugs - Sole attorney responsible for two-and-a-half year investigation by the State of Connecticut uncovering potentially widespread anti-competitive conduct in the market for generic pharmaceutical products, which was highlighted on 60 Minutes in May 2019. The investigation resulted in the formation of a large, multi-state working group and three separate enforcement actions against several large pharmaceutical companies and executives, which are currently pending. Currently acting as lead and liaison counsel on behalf of 54 states and territories.

Electronic Books - Lead attorney responsible for uncovering collusion among five of the six largest book publishers in the U.S. and Apple, Inc. relating to Apple's introduction of the iPad tablet in 2010. Worked closely with the Texas Attorney General and DOJ Antitrust Division (civil) to investigate and prosecute the case. One of the lead attorneys participating in a 3-week trial resulting in a finding of liability against Apple. Delivered the opening statement at trial on behalf of 33 plaintiff states. Responsible for negotiating settlements in excess of $670 million for consumers nationwide. Worked closely with external compliance monitor to ensure Apple complied with the judgment after the fact.

Reinsurance - Lead attorney responsible for investigating and prosecuting anti-competitive conduct in the reinsurance industry, resulting in a first-of-its-kind litigation against the largest reinsurance broker in the world.

♡ Public Speaking, Legal Writing and +3 skills

**Judicial Law Clerk**
United States District Court, District of Connecticut · Full-time
Jun 2004 - Aug 2006 · 2 yrs 3 mos
Hartford, Connecticut, United States

Judicial Law Clerk for the Honorable Donna F. Martinez, United States Magistrate Judge. Responsible for drafting orders and opinions, l ...see more

♡ Legal Writing and Legal Research



**Litigation Associate**
McCarter & English, LLP · Full-time
Aug 1998 - Jun 2004 · 5 yrs 11 mos
Hartford, Connecticut, United States

Responsible for all phases of state and federal litigation practice. First and second chair trial, arbitration, deposition and mediation experien ...see more

♡ Trial Practice, Trials and +3 skills

## Education



**Seton Hall University School of Law**
Doctor of Law - JD
Sep 1995 - May 1998

Valedictorian; summa cum laude
Member, Seton Hall Law Review, 1996-98; Articles Editor, 1997-98



**University of Connecticut**
Bachelor of Arts - BA, Political Science and Government
Sep 1989 - May 1994

Varsity Letterman for the Division 1 Men's soccer team in 1989 and 1990. Big
East Champions and NCAA Tournament participants (1989). ...     ...see more

Show all 3 educations →

## Skills

**Trial Practice**

 Litigation Associate at McCarter & English, LLP

**Trials**

 Litigation Associate at McCarter & English, LLP

Show all 11 skills →

## Honors & awards

**High School Soccer All American (1989)**
Issued by National Soccer Coaches Association of America · May 1989

Named to the NSCAA All-American team for soccer during senior year in high school.
Set Connecticut state records for goals scored in a single season and career that...

## Interests

**Companies**     Schools



**The Ohio State University**
645,294 followers

+ Follow



**University of Connecticut**
259,953 followers

+ Follow

Show all companies →



See who's hiring
on LinkedIn.



More profiles for you

**James Lotstein** · 3rd+
Adjunct Professor at University of Connecticut School of Law

[ Message ]

**George Springer, Jr.** · 3rd+
Partner at Rogin Nassau LLC

[ Message ]

**Rahul Darwar** · 3rd+
Trial Attorney, Antitrust Division, U.S. Department of Justice

[ Message ]

**Samuel Shapiro** · 3rd+
Assistant Attorney General at Connecticut Office of the Attorney General

[ Message ]

**William O'Sullivan** · 3rd+
Owner, O'Sullivan McCormack Jensen & Bliss PC

[ Message ]

Show all

Explore Premium profiles



**Tarrance Taylor** 🔗 · 3rd+
Specializing in IT Project Management and Sales |
Driving Revenue Through Strategic Sales Approaches

[ + Follow ]

**Nazira Khan** 🔗 · 3rd+
Business Analyst @ Auxo Innovations | Data Analysis, Reporting

[ Message ]

**Helal Hossen** 🔗 · 3rd+
Graduate Teaching Assistant University of Texas at Dallas.

[ ⬈ Message ]



**Lynne Boyle Trafton** 🔗 · 3rd+
Research Assistant @ The Work at Home Woman, LLC | Operational
Excellence, Communication

[ ⬈ Message ]

People you may know
From Joseph's school

**Kylie Cohen**
Associate Director, Career Services

[ 👤 Connect ]

**Lori Munyan**
Human Resources Director at Encompass Health



Connect

**Liza Montesano**
Partner at Schreck Rose Dapello Adams Berlin & Dunham LLP

Connect

**Meredith Burt, MSJ, RN, CHC** ✓
Compliance, Privacy Officer and Senior Director of RiskManagement @ Brattleboro Memorial Hospital | Master's in Health and Hospital Law

Connect

**Lauren Ianelli** 🔲
JD Candidate at Seton Hall University School of Law

Connect

Show all

**You might like**
Pages for you

**UN Jobs and NGO Jobs**
Non-profit Organizations
2,614,108 followers

+ Follow

**International Careers Updates**
Non-profit Organizations
1,051,850 followers

+ Follow

Show all

See who's hiring on LinkedIn.

About                          Accessibility              Talent Solutions                          Questions?
                                                                                                      Visit our Help Center.
Professional Community Policies  Careers                  Marketing Solutions

Privacy & Terms ▾              Ad Choices                 Advertising                                Manage your account and privacy
                                                                                                      Go to your Settings.
Sales Solutions                Mobile                     Small Business

Safety Center                                                                                         Recommendation transparency
                                                                                                      Learn more about Recommended Content.

LinkedIn Corporation © 2025

Select Language

English (English)

# **EXHIBIT 9**

Report an accessibility issue.

# The Office of the Attorney General
# William Tong
<sup></sup>(https://portal.ct.gov/ag)

Attorney General Tong Announces Significant Updates in Multistate Litigation Against Generic Drug Manufacturers Over Conspiracies to Inflate Prices and Limit Competition

## Press Releases



**10/31/2024**

## Attorney General Tong Announces Significant Updates in Multistate Litigation Against Generic Drug Manufacturers Over Conspiracies to Inflate Prices and Limit Competition

**If you bought certain generic prescription drugs in the United States between January 1, 2010 and December 31, 2018, you could be eligible for money**

(Hartford, CT) — Attorney General William Tong today led a coalition of 50 states and territories announcing two significant cooperation agreements and settlements with Heritage Pharmaceuticals and Apotex totaling $49.1 million to resolve allegations that both companies engaged in widespread, long-running conspiracies to artificially inflate and manipulate prices, reduce competition, and unreasonably restrain trade with regard to numerous generic prescription drugs. As part of their settlement agreements, both companies have agreed to cooperate in the ongoing multistate litigations led by Connecticut against 30 corporate defendants and 25 individual executives. Both companies have further agreed to a series of internal reforms to ensure fair competition and compliance with antitrust laws. A motion for preliminary approval of the $10 million settlement with Heritage will be filed today in the United States District Court for the District of Connecticut in Hartford. A settlement with Apotex for $39.1 million is contingent upon obtaining signatures from all necessary states and territories and will be finalized and filed in the U.S. District Court in the near future.

The settlements come as the states prepare for the first trial to be held in Hartford, Connecticut.

If you purchased a generic prescription drug manufactured by either Heritage or Apotex between 2010 and 2018, you may be eligible for compensation. To determine your eligibility, call 1-866-290-0182 (Toll-Free), email info@AGGenericDrugs.com or visit www.AGGenericDrugs.com.

"Heritage and Apotex both participated in widespread conspiracies to jack up prices and block competition for generic prescription drugs. Their brazen collusion cost American families and our public healthcare programs millions of dollars. Both companies are now cooperating with our ongoing litigation, and we are very confident in our case heading toward our first trial in Connecticut," **said Attorney General Tong.**

Connecticut's Assistant Attorney General Joseph Nielsen is the lead attorney for a coalition of nearly all states and territories filing three antitrust complaints, starting first in 2016 under the leadership of then-Attorney General George Jepsen. The **first Complaint (https://portal.ct.gov/AG/Press-Releases-Archived/2017-Press-Releases/AG-Jepsen-Leads-Coalition-in-New-Expanded-Complaint-in-Federal-Generic-Drug-Antitrust-Lawsuit)** included Heritage and 17 other corporate Defendants, two individual Defendants, and 15 generic drugs. Two former executives from Heritage Pharmaceuticals, Jeffery Glazer and Jason Malek, have since **entered into settlement agreements (https://portal.ct.gov/AG/Press-Releases-Archived/2017-Press-Releases/AG-Jepsen-States-Reach-Settlements-Cooperation-Agreements-with-Two-Former-Executives-in-Generic-Drug)** and are cooperating. The **second Complaint (https://portal.ct.gov/-/media/AG/Downloads/GDMS Complaint 51019 FINAL REDACTED PUBLIC VERSIONpdf)** was filed in 2019 against Teva Pharmaceuticals and 19 of the nation's largest generic drug manufacturers. The Complaint names 16 individual senior executive Defendants. The third complaint, to be tried first, focuses on 80 topical generic drugs that account for billions of dollars of sales in the United States and names 26 corporate defendants and 10 individual defendants. Six additional pharmaceutical executives have entered into settlement agreements with the States and have been cooperating to support the States' claims in all three cases.

The cases all stem from a series of investigations built on evidence from several cooperating witnesses at the core of the different conspiracies, a massive document database of over 20 million documents, and a phone records database containing millions of call detail records and contact information for over 600 sales and pricing individuals in the generics industry. Each complaint addresses a different set of drugs and defendants, and lays out an interconnected web of industry executives where these competitors met with each other during industry dinners, "girls nights out", lunches, cocktail parties, golf outings and communicated via frequent telephone calls, emails and text messages that sowed the seeds for their illegal agreements. Throughout the complaints, defendants use terms like "fair share," "playing nice in the sandbox," and "responsible competitor" to describe how they unlawfully discouraged competition, raised prices and enforced an ingrained culture of collusion. Among the records obtained by the States is a two-volume notebook containing the contemporaneous notes of one of the States' cooperators that memorialized his discussions during phone calls with competitors and internal company meetings over a period of several years.

Alaska, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, U.S. Virgin Islands, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, and Puerto Rico joined in today's announcement.

Lead Assistant Attorney General Joseph Nielsen and Assistant Attorneys General Alex Frisbee, Kyle Ainsworth, Cara Moody, Paralegal Gaile Colaresi and Deputy Associate Attorney General Nicole Demers, Chief of the Antitrust Section – along with former team members Assistant Attorneys General Laura Martella and Christine Miller, and retired Assistant Attorneys General Michael Cole, Rachel Davis, and Toni Conti – assisted the Attorney General in this matter.

FEEDBACK +

Twitter: **@AGWilliamTong (https://twitter.com/AGWilliamTong )**

Facebook: **CT Attorney General (https://www.facebook.com/CTAttorneyGeneral/)**

## Media Contact:

Elizabeth Benton

**elizabeth.benton@ct.gov (mailto:elizabeth.benton@ct.gov)**

## Consumer Inquiries:

860-808-5318

**attorney.general@ct.gov (mailto:attorney.general@ct.gov)**

# EXHIBIT 10

Speak with an adviser **678.821.3508 (tel:678-821-3508)**



HOME (HTTPS://BEINOVENTIVE.COM/)    CULTURE
RESULTS (HTTPS://BEINOVENTIVE.COM/RESULTS/)
INSIGHTS (HTTPS://BEINOVENTIVE.COM/INSIGHTS/)
CONTACT (HTTPS://BEINOVENTIVE.COM/CONTACT/)

(https://beinoventive.com)

START HERE



HOME (HTTPS://BEINOVENTIVE.COM/)    CULTURE
RESULTS (HTTPS://BEINOVENTIVE.COM/RESULTS/)
INSIGHTS (HTTPS://BEINOVENTIVE.COM/INSIGHTS/)
CONTACT (HTTPS://BEINOVENTIVE.COM/CONTACT/)

(https://beinoventive.com)

START HERE

INDUSTRY NEWS

# 40 States Sue Generic Drug Makers for Collusion (https://beinoventive.com/40-states-sue-generic-drug-makers-for-collusion/)

🕔 July 23, 2019(https://beinoventive.com/40-states-sue-generic-drug-makers-for-collusion/)

The heat is growing on the pharmaceutical industry after more than 40 US states filed a lawsuit accusing generic drug makers of engaging in a massive price-fixing scheme.

The lawsuit accuses 20 companies of conspiring to fix prices of more than 100 generic drugs, including some that are used to treat cancer and diabetes. The defendants include the largest producer of generic medicine in the world: Teva Pharmaceuticals.

The new lawsuit comes after a five-year investigation that uncovered a scheme through which "coordinated price hikes on identical generic drugs became almost routine," according to an investigative report by the *Washington Post*. The suit covers the period from July 2013 to January 2015.

The companies and executives would "routinely communicate with one another directly, divvy up customers to create an artificial equilibrium in the market" to keep generic drug prices artificially high, the lawsuit says.

Privacy - Terms

The scale of the alleged collusion was summed up by Joseph Nielsen, an assistant attorney general and antitrust investigator in Connecticut, whose office has taken the lead in the investigation: "This is most likely the largest cartel in the history of the United States," he told the *Washington Post* last December.

In announcing the recent lawsuit, he cited e-mails, text messages, telephone records and testimony from former company executives that indicate a "multi-year conspiracy to fix prices and divide market share for huge numbers of generic drugs."

This is not the only litigation. Pharmacies and other businesses have filed their own lawsuits against the generic drug makers. One such suit documents huge price hikes – like a 3,400% increase in the price of an anti-asthma medication – and investigators believe that generic drug producers colluded to raise prices in tandem or not make their products available in some markets or through specific pharmacy chains.

## SIGNIFICANCE OF THE STATES' SUIT

The multi-state lawsuit is important because generics account for 90% of pharmaceutical spending in the U.S. Despite that, they only account for 23% of the total drug spend in the country, according to the Association for Accessible Medicines.

With so many prescriptions being written, the savings to consumers could be huge if the drug makers are found to have fixed pricing and they subsequently change their ways. What's not clear, though, is whether it would actually spur changes in pricing by the companies.

According to the lawsuit, the drug companies allegedly conspired to manipulate prices on dozens of medicines between July 2013 and January 2015.

It accuses Teva and others of "embarking on one of the most egregious and damaging price-fixing conspiracies in the history of the United States."

Connecticut Attorney General William Tong, who filed the suit, said the investigation had exposed why the cost of health care and prescription drugs was so high in the U.S.

GENERIC DRUGS (HTTPS://BEINOVENTIVE.COM/TAG/GENERIC-DRUGS/)

INOVENTIVE SOLUTIONS (HTTPS://BEINOVENTIVE.COM/TAG/INOVENTIVE-SOLUTIONS/)

PRICING CARTEL (HTTPS://BEINOVENTIVE.COM/TAG/PRICING-CARTEL/)

f   Share (https://www.facebook.com/sharer/sharer.php?u=https%3A%2F%2Fbeinoventive.com%2F40-states-sue-generic-drug-makers-for-collusion%2F)

🐦 Tweet (http://twitter.com/intent/tweet?text=40+States+Sue+Generic+Drug+Makers+for+Collusion&url=https%3A%2F%2Fbeinoventive.com%2F40-states-sue-generic-drug-makers-for-collusion%2F)







UNCATEGORIZED (HTTPS://BEINOVENTIVE.COM/CATEGORY/UNCATEGORIZED/)

UNCATEGORIZED
(HTTPS://BEINOVENTIVE.COM/CATEGORY/UNCATEGORIZED/)

**Report Details 3 Trends Driving Employers' Health Care Costs (https://beinoventive.com/report-details-3-trends-driving-**

**Besides Health Insurance and 401(k)s, These Are the Benefits Employees Value Most (https://beinoventive.com/besides-health-insurance-and-401ks-these-are-the-benefits-**

UNCATEGORIZED
(HTTPS://BEINOVENTIVE.COM/CATEGORY/UNCATEGORIZED/)

**Generics and Biosimilars the Key to Reducing Drug Spending (https://beinoventive.com/generics-and-biosimilars-the-key-to-**

## GET RESULTS

Call **678-821-3508**
Email **results@beinoventive.com**
Weekdays **9:00am to 5:00pm**

## INOVENTIVE INSIGHTS

**Gain access to actionable info to help your business grow**

Privacy Policy (/privacy-policy)

©2025 Inoventive Solutions

Powered By AgencyAnnex.com (http://agencyannex.com)

©2025 Inoventive Solutions

Privacy Policy (/privacy-policy)

Powered By AgencyAnnex.com (http://agencyannex.com)

# EXHIBIT 11

```
                 UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                    .    Case No. 2:16-MD-02724-CMR
GENERIC PHARMACEUTICALS
PRICING ANTITRUST LITIGATION.
                             .    U.S. Courthouse
                         .       601 Market Street
                             .    Philadelphia, PA 19106
                             .
                             .
      .
            .
                             .    February 21, 2018
. . . . . . . . . . . . ..        10:38 a.m.

       TRANSCRIPT OF MOTION ARGUMENTS AND STATUS CONFERENCE
              BEFORE HONORABLE CYNTHIA M. RUFE
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the States:          W. JOSEPH NIELSON, ESQ.
                         Attorney General's Office - ELM
                         55 Elm Street
                         Hartford, CT  06106

For Defendants:          GEORGE G. GORDON, ESQ.




Audio Operator:          M. MANI

Transcriber:             UBIQUS REPORTING, INC.
                         61 Broadway, Suite 1400
                         New York, NY 10006
                         212-346-6666
                         Email: infousa@ubiqus.com


             Proceedings recorded by electronic sound
        recording, transcript produced by transcription service.
```

**I N D E X**

<u>PAGE</u>

<u>MOTION ARGUMENTS</u>
W. Joseph Nielson, Esq.                      4
George G. Gordon, Esq.                       41
Roberta D. Liebenberg, Esq.                  62

W. Joseph Nielson, Esq. - Rebuttal           63
George G. Gordon, Esq. - Rebuttal            65


<u>STATUS UPDATES</u>
Dianne M. Nast, Esq.                         67
Roberta D. Liebenberg, Esq.                  68
Jan P. Levine, Esq.                          71
William J. Blechman, Esq.                     74


<u>EXHIBITS</u>                              <u>ID.</u>   <u>EVD.</u>

STATUS CONFERENCE

1           COURTROOM DEPUTY:  All rise.  Court is now in

2    session, for United States District Court for the Eastern

3    District of Pennsylvania, the Honorable Cynthia Rufe, now

4    presiding.

5           THE COURT:  Good morning, everyone.

6           CHORUS OF VOICES:  Good morning, Your Honor.

7           MALE VOICE:  Good morning, Your Honor.

8           THE COURT:  Please be seated.  So, we understood

9    today as our fifth status conference, in the Generic

10   Pharmaceuticals Pricing Antitrust Litigation, as having not

11   only the status conference, but also oral argument on a pending

12   motion, and general discussion as to a number of other items.

13   We were prepared to start with the status conference.  Then I

14   was requested to consider starting with the oral argument this

15   morning, which was fine.  I just need to know if the videotape

16   is going to work for us today.  Is that settled yet?  Not

17   really?

18           MR. GEORGE G. GORDON, ESQ.:  Your Honor, George

19   Gordon.  That's fine.  We have hard copies.  We can – we can do

20   it the old-fashioned way.

21           THE COURT:  Oh, I'm really good at old fashioned.

22   That's fine.  But if everyone wants to still proceed, with the

23   oral argument first, we will do so.

24           MR. GORDON:  Yes, Your Honor.

25           THE COURT:  With a hard copy.  Okay.  Then, let's

STATUS CONFERENCE

1  start.  It is the – and I don't know if any of you are

2  affected, as I am, but they are tearing up and renovating the

3  hallways, the twelfth-floor hallways, outside chambers and in

4  the back of the courtroom are now just dust and I get affected.

5  So, excuse me, if I start sneezing and coughing.  Or if you do,

6  I'm sorry about that.  Let's – let's address the motion of the

7  States.  Who will be arguing?

8          MR. W. JOSEPH NIELSON, ESQ.:  Good morning, Your

9  Honor.  Joe Nielson, from the State of Connecticut.

10          THE COURT:  Mr. Nielson, good morning.

11          MR. NIELSON:  And Your Honor, it is actually two

12  separate motions that we filed.  It is a motion for leave to

13  file a consolidated amended claim, and a motion for separate

14  government track.  The issues raised, by the Defendants, in

15  opposition to both, are largely the same, which is that the

16  Plaintiff states should not be allowed to allege an overarching

17  conspiracy, in the consolidated amended complaints.

18          THE COURT:  I have read the briefing.

19          MR. NIELSON:  So, I am going to address both

20  simultaneously, since they all hinge on this one critical

21  issue, Your Honor.  With respect to the motion for leave to

22  amend standard, we think the standard is very clear.  There

23  seems to be some dispute as to how – how much analysis is

24  required of the consolidated amended complaint, before leave

25  can be granted.  Rule 15 – the standard starts with Rule 15,

STATUS CONFERENCE

1   which say leave should be granted freely when justice so

2   requires.  That liberal standard, in allowing amendments of the

3   pleadings, has been applied uniformly throughout the federal

4   courts.  We have cited to cases where even you, Your Honor, in

5   prior cases, have said, given the liberal standard for

6   amendment of the pleadings, opponents who wish to declare a

7   proposed amendment futile have a heavy burden, and if a

8   proposed amendment is not clearly futile, then denial of leave

9   to amend is improper.  And we have cited several other trial –

10  District Court decisions, in this circuit, which have said Rule

11  15 Futility Analysis does not require the parties to engage in

12  the equivalent of substantive motion practice, upon the new

13  proposed claim.

14          So, the issue here is whether we have pled enough

15  facts, regarding an overarching conspiracy, in our consolidated

16  amendment complaint, to allow the amendment.

17          We think, under any standard, however you want to

18  look at it, Your Honor, the proposed complaint passes muster.

19  If we are looking at it under a 12B6 standard, the complaint is

20  sufficient, as long as – accepting all factual allegations as

21  true, the claims are at least plausible.

22          Now, in their papers, Your Honor, Defendants

23  consistently refer to our consolidated amended complaint using

24  words such as vague, conclusory, paper thin, bare, meager,

25  amorphous, innocuous, implausible, and even nonsensical.  But

STATUS CONFERENCE

1   frankly, they don't address a single allegation in the

2   complaint.  They ignore a majority of them, Your Honor.

3          So, I want to take some time to go through the facts,

4   as alleged, because I think that is important here, in

5   determining whether there is an overarching conspiracy or not.

6   It is a long complaint, Your Honor.  So, please bear with me.

7   I'm going to try to summarize them, the best I can, but this

8   may take a while.

9          Starting with paragraph 58, Your Honor, it says our

10  complaint alleges that the Defendants, in this action, are all

11  drug manufacturers, or suppliers, who compete with one another,

12  for the sale of generic pharmaceutical drugs, which are

13  ultimately sold to consumers.  The complaint alleges that the

14  corporate defendants, in this case, are among the largest

15  generic manufacturers in the industry.  Each has a broad

16  portfolio of generic drugs, and competitors for pharmaceutical

17  products fluctuate given the shifting pharmaceutical landscape,

18  as drugs lose exclusivity, and as manufacturers decide to enter

19  or exit an existing drug market.  That is paragraph 63, Your

20  Honor.

21         So, in other words, every generic manufacturer

22  defendant is a potential future competitor of the other

23  defendants, on a host of different drugs, not just the ones

24  that are at issue in this complaint.  And there are many

25  reasons why a manufacturer could enter a new drug market, Your

STATUS CONFERENCE

1    Honor.

2          THE COURT:  So, Mr. Nielson, are you anticipating

3    that additional drugs would be named, as the litigation

4    proceeds?

5          MR. NIELSON:  Not in this complaint, Your Honor.  The

6    way we have structured this complaint is based on the

7    involvement of – of one common participant, which is the

8    Defendant Heritage.  Based on our investigation, there

9    certainly will be additional complaints.  We are doing our best

10   to try to bring these cases in an orderly and – and organized

11   fashion, Your Honor.  But absolutely, there will be additional

12   complaints, in the future.  They will likely be focused on

13   specific defendants and – and the drugs that they sell.

14         THE COURT:  Because you – you do name a number of

15   drugs, all of which, in a panoply of allegations, and I really

16   do think that one of my problems here is not just substantive

17   law and procedure, but MDL consolidation and coordination of

18   the functions of the MDL, which is why you are here, under some

19   kind of protest, because you didn't really want to come to the

20   MDL.  But we have to do that.  And I think that how discovery

21   proceeds is largely to be coordinated amongst all the parties,

22   and it is a different type of allegation that you are making.

23   Not so different that it is foreign, but it will involve

24   additional and separate types of inquiries.  And there is

25   nothing wrong with that.  But I do think that is part of the

STATUS CONFERENCE

1  genesis of the defense opposition, but not total.

2          MR. NIELSON:  No, absolutely.  They – they raised the

3  prejudice arguments, and how alleging an overarching conspiracy

4  would upend the current carefully crafted – excuse me –

5  structure of the MDL.  But—

6          THE COURT:  [Interposing] But just let me say

7  something.

8          MR. NIELSON:  Sure.

9          THE COURT:  As carefully crafted as counsel and the

10  Court have tried to be, up to this point, it has never been

11  contemplated, by the Court, that the structure wouldn't change.

12  It needs to change, as facts are discovered, evidence is

13  discovered, as parties and claims change.  And we have to make

14  room, so we are still at the very flexible stage.  And it

15  doesn't bother me, at all, that we are considering a variation

16  on the structure.  Everything has to be cohesive, however.  So,

17  I know you want to ask, and retort to all those rather, I

18  guess, insulting adjectives that you listed, but I – I want to

19  be sure that when you argue before the JPML, that your action

20  doesn't fall within the scope of the MDL.  Were you then

21  contemplating that you already had this overarching conspiracy

22  theory?

23          MR. NIELSON:  I think it—

24          THE COURT:  [Interposing] And that is why it didn't

25  fit?

STATUS CONFERENCE

1          MR. NIELSON:  At the time, yes.  We certainly had

2   that view of the case, of our – of our, you know, our view of

3   the case included that overarching conspiracy element to it,

4   and we were at a point where we had not yet amended the

5   complaint.  But yeah, that was part of it, certainly.

6          THE COURT:  Okay.  And part of it was that you had a

7   sovereign enforcement action.

8          MR. NIELSON:  Absolutely.

9          THE COURT:  And – and alleging different facts,

10  seeking different remedies, etcetera.  JPML did not think that

11  the transfer was inappropriate, nevertheless.  So, how will

12  your proposal, as outlined in both of your motions, fulfill the

13  JPML stated goals of eliminating duplicative discovery,

14  preventing inconsistent pretrial rulings, and conserving the

15  resources of everyone – parties, counsel and the Court?

16         MR. NIELSON:  Your Honor, there is no question that

17  we have committed to cooperating in discovery and we have

18  already started to do that.  We have been working with the

19  class plaintiffs and the Defendants, on a host of discovery

20  issues.  We don't anticipate the fact that we have a separate

21  government track, to impact discovery at all.  We are in the

22  process – you will learn more about this, during the status

23  conference portion of this, but we are in the process of

24  ironing out discovery requests that will be sent out shortly,

25  on behalf of all the Plaintiffs.  And, you know, so, – so,

STATUS CONFERENCE

1   discovery will be coordinated.  We are committed to that, and

2   we certainly expect that to happen.

3          In terms of the claims that we are bringing, and how

4   they are different, I don't think, frankly, you'll – you'll

5   learn, again, you are aware of the Kroger Plaintiff's

6   complaint, the direct action Plaintiffs who have filed a – what

7   appears to be an even broader overarching conspiracy claim than

8   we have, Your Honor, which includes not only the drugs that are

9   at issue in our complaint, but every other drug in the MDL.

10         THE COURT:  Additional.

11         MR. NIELSON:  So, in terms of, you know, expanding

12  discover, or expanding the claims, again I think that ship has

13  sailed, so to speak.

14         THE COURT:  Mm hmm.

15         MR. NIELSON:  And not to steal the class Plaintiff's

16  thunder, but I think you are going to hear, during the status

17  conference portion, that the class Plaintiffs are – are seeking

18  to expand their claims as well, to include an overarching

19  conspiracy.  So, from a practical standpoint, Your Honor, I

20  don't think granting our leave to amend, to add these

21  overarching conspiracy claims, and having a separate government

22  track, and – and I think, I didn't get a copy of it, but I

23  believe there was a motion filed, by the Kroger Plaintiffs last

24  night, asking for a separate direct-action track, as well.

25         THE COURT:  It hasn't been responded to, by anyone,

STATUS CONFERENCE

1  because it was filed on the 16th.

2          MR. NIELSON:  Right.  So, - so, I don't think that

3  there is anything about granting the Plaintiff States motions

4  that is going to impact, adversely, on what is going to happen

5  in the MDL, Your Honor.  It is just—

6          THE COURT:  [Interposing] And the coordination of

7  discovery?

8          MR. NIELSON:  Absolutely, we are committed to that.

9          THE COURT:  Alright.  So, address the potential

10  prejudice that is alleged, to the Defendants.

11          MR. NIELSON:  Well, you know, the prejudice is that

12  we have one complaint.  And that we have joint and – potential

13  joint and several liability among the Defendants.  And that

14  potential discovery is broader than it would have been absent

15  an overarching conspiracy claim.  Those – that is what I

16  understand the Defendants arguments about prejudice to be.  And

17  I don't think any of them are valid arguments, Your Honor.

18  Like I said, the discovery will be broad.  There will be other

19  Plaintiffs alleging overarching conspiracy.  So, that is not an

20  issue.  And joint and several liabilities is a matter of law,

21  as a result of the allegations.  If – if our allegations

22  survive muster, that is – that's just, you know, a byproduct of

23  there being an overarching conspiracy.  And that is not, in and

24  of itself, prejudicial.  That is, you know, a matter of law.

25  So, as far as the prejudice arguments go, Your Honor, I don't

STATUS CONFERENCE
1  think they have much merit, frankly.

2        THE COURT:  Alright.  Another practical area that I

3  need you to address, and then you can argue whatever you want,

4  alright?  You say that the separate tracks are somewhat

5  complicated, by certain states not joining in on everything

6  else that other states are alleging.  For example, Court 4, of

7  your proposed amended complaint, is brought by all the

8  Plaintiff States except for California, against Defendants

9  Heritage and Dr. Ready.  And all other corporate Defendants,

10  under joint and several liability, alleging that horizontal

11  conspiracy, to allocate markets and fix prices, for the generic

12  drug, and only one drug is mentioned here, Meprobamate, in

13  violation of Section 1 of the Sherman Act.

14        So, for example, what effect does California's non-

15  participation have, on the allegations?

16        MR. NIELSON:    Practically speaking it has no

17  effect.  The – the fact that California is not joining that

18  particular count, just means that here is one less Plaintiff,

19  pursuing those claims.  California, based on everything I

20  understand, has just been in a – has a much longer approval

21  process than many states.  It is a much bigger state, with a

22  lot more bureaucracy and infrastructure and – and they are in

23  the process of seeking approval, but they have not gotten it

24  yet.  I don't think California will be asserting claims that

25  are outside of the scope of this MDL, Your Honor, or outside of

STATUS CONFERENCE

 1  the scope of this case.

 2          THE COURT:  So,--

 3          MR. NIELSON:  [Interposing] They may ultimately join

 4  that count, if they get approval.

 5          THE COURT:  Alright.  So, under the theory of your

 6  proposed amended complaint, this particular Count 4 allegation,

 7  is asserted against all Defendants.  Even though only Heritage

 8  and Dr. Ready sell this particular drug?  Do I have that

 9  correct?

10          MR. NIELSON:  Correct.  It is under the principles of

11  joint and several liability.  It is – it goes to the

12  overarching conspiracy, Your Honor.

13          THE COURT:  Okay.  Alright, the floor is yours.

14          MR. NIELSON:  Thank you.  So, just going back to the

15  complaint, and again, I think it makes sense to explain a lot

16  of this, because I can see that you are having some concern

17  about the idea of a count alleged, on a drug, involving two

18  companies, being applied through joint and several liability.

19  But when you understand the operation of the – the overarching

20  conspiracy, I think it will make sense.

21          THE COURT:  It's not – it is not a concern that is

22  limited to the Court, and may not be dispositive, at all, on

23  your motions – not at this point.  But it is, quite frankly,

24  going to engender a vigorous and consolidated defense, because

25  it is affecting, by your allegations, everyone.  So,--

STATUS CONFERENCE

1          MR. NIELSON:  [Interposing] Understood.

2          THE COURT:  It is a very expansive type of

3    overarching conspiracy implementing joint and several

4    liability.  It's—

5          MR. NIELSON:  [Interposing] Understood.  Understood.

6          THE COURT:  Go ahead.

7          MR. NIELSON:  And it is a byproduct of the agreement

8    that is widespread across the industry, Your Honor, and we – we

9    do thoroughly allege the facts relating to that throughout the

10   complaint.  And going back to – to my presentation on the

11   facts, Your Honor, you know, these – these manufacturers are

12   all competitors, with one another, on some drugs, but more

13   importantly, they are all future competitors on other drugs.

14   So, there is an expectation that drugs will come off patent,

15   and they will be in a position where they are competing with

16   each other, when they are both seeking approval from the FDA,

17   to sell the drug.  They – drugs have supply problems.

18   Manufacturers go in and out of the market.  They have to

19   reenter the market.  They buy andas [phonetic], from each

20   other, Your Honor.  There are mergers where they acquire

21   portfolios of drugs, where the andas are already approved and

22   they can start selling immediately.  There are divestiture

23   sales, as a result of mergers, where they are required to

24   divest certain portfolios of drugs, or certain specific drugs.

25   So, at any time, these manufacturers are potential competitors

STATUS CONFERENCE

1    with one another.

2         And that is an important point, Your Honor, because

3    the Defendants have – what the Defendants have tried to do is,

4    they have tried to slice up our complaint, into these

5    individual examples of the overarching conspiracy, these

6    individual agreements on specific drugs, and they have tried to

7    say there's – there is no basis for any allegation that, for

8    example, Ascend, who makes one drug, would ever agree to fix

9    the price on an unrelated drug that they don't actually sell.

10   And that, again, misunderstands the focus of the overarching

11   agreement, which is much broader than any one specific drug.

12   This agreement is an understanding among all these competitors,

13   that whenever they do enter a specific market, for a specific

14   product, there is an expectation that they will be able to

15   reach out to their competitors and divvy up the markets, in

16   accordance with this understanding that they have, about how

17   these markets are all allocated.  And you will see the many,

18   many examples, in the complaint of that, Your Honor.  And I'm

19   going to go through some of them, so it makes sense.

20        But that is an important distinction between the

21   generic drug industry and, for example, the auto parts

22   industry, which is a case where the Defendants heavily rely on

23   that case.  It is factually completely different, the

24   industries.

25        And so, the complaint goes on, Your Honor, to allege

STATUS CONFERENCE

1   that the generic drug industry is structured in a way that

2   allows Defendants, both current and potential future

3   competitors, to meet and communicate with each other, directly

4   and in person, on a frequent basis.  That is paragraph 76.  The

5   complaint discusses all of these trade association and customer

6   conferences, which are sort of industry sponsored events, were

7   they get together, and they use these opportunities to share

8   competitively sensitive information, concerning upcoming bids,

9   generic drug markets, pricing strategies, and pricing terms, in

10  their contracts, with customers.  And the Defendants say that

11  these are conclusory allegations.  If you look at them, in

12  isolation, without looking at the rest of the complaint, you

13  might be able to make that argument, Your Honor, but in a

14  conspiracy case, Courts are obligated to look at the entire

15  context of the allegations.  There, you know, there are many,

16  many examples of where the Defendants are getting together, at

17  these trade shows and customer conferences, throughout the

18  complaint.  And I will point some of them out, as we go

19  through.  But the – the complaint actually alleges that between

20  February 20th, 2013 and December 20th, 2013, which is a 41-week

21  period, there were actually 44 different trade shows and

22  customer conferences where these Defendants had the opportunity

23  to get together and meet in person.  And there are actual

24  examples, from among those 44, where they were getting together

25  and colluding, on – on various specific drugs, and in general,

STATUS CONFERENCE

1   about the markets, and larger pricing strategies and things

2   like that.

3           So, in addition to all these industry sponsored

4   meetings, and – and conferences, Your Honor, the complaint also

5   alleges that they are getting together separately, outside of

6   the scope of these conferences.  They are having steak dinners,

7   girls' nights out, women in the industry meetings, which is,

8   you know, dinners and things like that.  All of these

9   competitors are in geographic proximity.  There is a band

10  between New York and Philadelphia, through New Jersey, of where

11  they are all situated, and it makes it very easy for them to

12  get together.

13          You will see paragraphs 83 and 84 discuss some of the

14  steak dinners, Your Honor.  And I'm not going to read from any

15  of the quoted material, that was filed under seal, but you can

16  see, from reading those allegations, that these are regularly

17  occurring events.  These are not isolated instances.  The

18  girls' nights out, and the women in the industry meetings, Your

19  Honor, if you look, in particular, at paragraph 87, the quoted

20  material in that paragraph demonstrates that these Defendants

21  were sharing competitively sensitive information, during these

22  get togethers.  And these meetings and get togethers, described

23  in these paragraphs, show that these Defendants were getting

24  together – even Defendants who were not competing, with one

25  another, on drugs identified in the complaint, were getting

1    together.  This is not a situation where our complaint is

2    taking examples of very specific conspiracies limited to one

3    drug at a time and trying to apply an overarching conspiracy

4    based just on those specific isolated examples, which is what

5    you would think we were doing, if you read the Defendants

6    papers.  But it is not accurate.

7           So, the complaint, Your Honor, goes on and says, as a

8    result of all these communications, and these get togethers,

9    the Defendants are well aware of each other's current and

10   future business plans.  That is paragraph 89.  This familiarity

11   and these communications, have led to an understanding and an

12   agreement amongst all of them, that each competitor is entitled

13   to its fair share of the market.  Whether that market is a

14   particular generic drug, or a number of generic drugs.  And

15   again, Your Honor, this is another important point, because the

16   Defendants have tried to isolate these into specific examples

17   of individual conspiracies, when in fact, that is not the case.

18   These agreements go well beyond one isolated drug.  And you

19   will see many examples of that.

20           THE COURT:  But do you make any other allegations

21   that other than social events, in the industry umbrella – under

22   the umbrella of everybody in the industry – that actual

23   business was discussed, or that any of these meetings, alleged

24   by you, are guises or fraudulently represented to be just

25   social or professional associations?  I mean it's – really, you

STATUS CONFERENCE

1  could have a group of women lawyers get together, but they are

2  not disclosing client information.  They are getting together

3  for other purposes.  And believe me, that happens.  I want to

4  be clear that there is some substance and meat on those bones

5  that you are alleging.

6         MR. NIELSON:  Yes, absolutely, we are getting to

7  that.  Your Honor, there are dozens and dozens of examples of

8  where the Defendants have used these industry events, and these

9  dinners to – to collude.  And yes, there are many examples of

10  that, throughout the complaint, and we have had a very broad,

11  ongoing investigation, Your Honor, that has gone well beyond

12  these particular drugs, in this complaint.  And I can tell you

13  that those allegations are not conclusory in any way.  There

14  are many, many examples of it.  But we will get to them, and I

15  apologize if I'm going on, but we will get there, Your Honor.

16         So, the complaint also talks about the purpose of

17  this larger understanding, and overarching conspiracy, is to

18  avoid price competition.  In essence, the Defendants don't want

19  to compete, and drive down prices.  That is the common goal,

20  you will see in paragraphs 89 and 97.  It – it specifies that.

21  And these rules of the road, Your Honor, the complaint alleges,

22  have been in place since at least 2006.  And again, in other

23  words, this is another important point, the – the overarching

24  conspiracy was in place well before any of these specific

25  examples, of the overarching conspiracy actually occurred.

STATUS CONFERENCE

1            It is not a case where we are taking these isolated

2    instances and saying because they colluded these 15 times,

3    there was an overarching conspiracy.  That has been in place

4    for a long time.  These are just examples of how that

5    understanding operates, in the market.

6            So, the rules as discussed – are discussed and

7    defined, specifically, in paragraph 90, Your Honor.  Each

8    competitor is entitled to a certain share of the market, based

9    on the number of competitors in that particular drug market,

10   with a potential adjustment based on the timing of their entry.

11   Generally speaking, if a manufacturer is the first to enter a

12   particular drug market, that manufacturer is entitled to a

13   little bit more market share.  And those manufacturers that are

14   coming in much later, to the market, are – are entitled to a

15   little less.  This is the way the rules have been – have

16   evolved.  So, that is the understanding, and that is in

17   paragraph 90.

18           The complaint also makes it clear that there is no

19   specific way to apportion market share, Your Honor.  Market

20   share is determined by the number of customers that a

21   particular drug manufacturer sells to.  So, for example, if –

22   if Mylon has two or three customers, for a particular drug,

23   that represent 50% of the market, that could change in any

24   given year.  McKesson or Cardinal, or one of these large

25   purchasers might stop buying as much of that particular drug,

1  and their market share would then go down.  So, it's - it's a

2  variable.  But the agreement here, and you will see

3  consistently how this takes place, in the market, the agreement

4  is that these Defendants will be able to reach out to each

5  other, and communicate, and discuss and divide up the market,

6  in accordance with these principles.  So, there is no specific

7  percentage share that is required.

8          And you will see, Your Honor, that this overarching

9  conspiracy, the larger understanding among these Defendants, is

10  expressed using very specific language.  I won't repeat it,

11  because a lot of it is - is under seal, but they are using the

12  same terms over and over again, and even when the terms differ

13  slightly, they have the same meaning and it's - it's obvious,

14  when you read them, that they have the same meaning.  They are

15  just variants of the same thing.  It all has to do with how

16  these Defendants are going to treat each other, when they enter

17  the market.

18          And you will see, for example, Your Honor, one of the

19  sections of our complaint, the section dealing with overarching

20  conspiracy is entitled "Playing Nice in the Sandbox."  And I

21  would refer the Court to paragraph 104, which provides an

22  example - a specific example, of a situation between Teva and

23  an unidentified Defendant, an unidentified manufacturer - we

24  didn't seek to - to pursue claims based on that particular

25  drug, in this case, but it is another example of how this

STATUS CONFERENCE

1   overarching conspiracy is effectuated upon the entry of one

2   generic company into a market.

3          And so, you will see there that when this competitor

4   entered the market, a customer actually, a large customer of

5   Teva, communicated with Teva saying this company is entering

6   the market.  We think you should give up these – this

7   particular customer, to this new entrant, and they used that

8   magic language of playing nice in the sandbox, and – and

9   everybody – so that everybody is happy when they enter the

10  market.

11         And so, these terms, Your Honor, are used in

12  communications between the Defendants in this case, but

13  obviously, given that example, they are used beyond the

14  Defendants in this case, as well.  Customers are aware of what

15  it means.  These other generic manufacturers are also aware, of

16  what it means.  And the fact that they are all using the

17  similar terminology, Your Honor, is evidence that there is this

18  larger understanding, among all of the Defendants.

19         So, getting to your – to one of your questions, Your

20  Honor, with regard to do they actually specifically collude?

21  They have the opportunity to collude, but do they specifically

22  collude?  Yes, they do, Your Honor.  Defendants all

23  communicate, with each other, when necessary, to implement the

24  larger understanding.  There are dozens of – of examples of

25  this, and I will get to them.  There are also tables of phone

STATUS CONFERENCE

1  communications, in the complaint, Your Honor, which show this

2  is not a situation where all of the communications were

3  funneled through one common participant.   Which again, that -

4  that happened in the auto parts case.   That is not the case

5  here.

6           Although they all do speak, with the one common

7  participant, in this case, which is Heritage, and you can see

8  those phone calls in Table 1, which is in paragraph 94, Your

9  Honor.   But it goes well beyond that.   For example, paragraph

10  95 shows that they spoke even more with Teva.   So, for example,

11  there are thousands of phone calls between Teva and all of

12  these Defendants, in a one-year period.   That was overlapping

13  with some of the allegations in the complaint.   So, I think

14  there are three times as many calls, with Teva, as there were

15  with Heritage.

16           So, Your Honor, that is the background, in terms of

17  what the complaint alleges, about the overarching conspiracy.

18  But I think it is important to look at the individual examples,

19  as well, and to focus on some of those, because they show

20  exactly how the overarching conspiracy operated in practice.

21           Defendants would like you to look at each of these

22  examples, in isolation, without looking at it in context, but

23  obviously, the - the - as the Supreme Court has said, the

24  character and effect of the conspiracy are not to be judged by

25  dismembering it, and viewing it sperate parts, but only by

STATUS CONFERENCE

1    looking at it as a whole.  And so, I am just going to take you

2    through some of the examples, Your Honor.

3            For example, nimodipine, there was – there is

4    allegations, in paragraphs 115 through 134, about an agreement

5    that involved Heritage and Sun.  And you can see, by June 2012

6    – and this is paragraphs 119 through 121, Your Honor, you can

7    see specific communications between Heritage and Sun, in June

8    of 2012, which show that both of them understood the

9    overarching conspiracy completely.  So, if you want to focus –

10   I'm not sure if you want – you have a copy of the amended

11   complaint, Your Honor.

12           THE COURT:  Not up here.

13           MR. NIELSON:  You don't?

14           THE COURT:  Well, yes, I do.  Yes, I do.

15           MR. NIELSON:  So, if you look at paragraphs 119

16   through 121, Your Honor, there is redacted portions, which I'm

17   not going to repeat, specifically, but you can see, if you read

18   those, their understanding of – they use the magic words, the –

19   the understanding of the market, and how they were – how the

20   market, in this instance, was being divvied up between them.

21   Sun was concerned, you can see, in paragraph 119, about getting

22   its appropriate percentage of the market.  Heritage agreed that

23   that was an important concern and that everybody was entitled

24   to that.  And they just wanted to increase prices as well.  So,

25   everybody had their acceptable portion of the market, but

STATUS CONFERENCE

1    Heritage wanted to raise price as well.

2          So, you can see some – some – in paragraph 123, also

3    Your Honor, this is in response to one of your earlier

4    questions, you can see that Heritage and Sun, specifically in

5    this instance, were using these trade shows and customer

6    conferences to communicate this information about the

7    overarching conspiracy.  Paragraph 123, there is a long quote

8    there that is redacted.  But they discuss, specifically having

9    these communications at a particular trade show, and then,

10   paragraph 128 confirms that they did, in fact, have those

11   conversations – those collusive conversations, at the trade

12   show.

13          So, with regard to this particular example, Your

14   Honor, Sun – so, they – they allocate the market, in accordance

15   with these overarching principles, Your Honor.  Then they use

16   that stable market to raise price.  And then, at some point,

17   Sun has supply problems, and has to exit the market.  Heritage

18   tell Sun that when you get back in the market, just call us,

19   and we'll do the same thing over and over again.  So, and that

20   is paragraph 131.  The expectation is that when they reenter

21   the market, this overarching conspiracy will still apply, Your

22   Honor.

23          And this is again, going back, it is a good example

24   of how companies are coming in and out of these markets, and

25   why it is important that these Defendants have this larger

STATUS CONFERENCE

1    understanding, because it impacts what these companies can do,

2    when they enter the market.  They don't want this ruinous

3    competition, to drive prices down, and spoil, you know, their

4    profits.  And that is what the – the common goal here is.

5           The complaint talks about another agreement, with

6    regard to nimodipine, Your Honor, in paragraphs 135 to 148.

7    This occurred when Sun was actually out of the market.  A new

8    company, Ascend, enters the market.  And it, again, follows the

9    same pattern.  Ascend enters the market.  Heritage says – what

10   does Heritage do?  They immediately reach out to Ascend, and

11   they discuss allocating one-third of the market to Ascend, in

12   exchange for not competing on price.   And again, the fact that

13   they are allocating one-third of the market, or proposing that

14   allocation, with regard to Ascend, is consistent, with the

15   rules of the road, and the overarching conspiracy that a

16   company that enters the market, a little later, down the road,

17   is entitled to a little less than its proportional share.  So,

18   you see the conduct playing out.  They are following the rules

19   of the road.  And after the conversations, with Ascend, what

20   does Heritage do?  It raises its prices, and it starts

21   identifying customers, to allocate to Ascend.  And that is in

22   paragraph 139.

23          Then, when Ascend ultimately enters the market, what

24   happens?  It enters at a price that, per tablet, is even higher

25   than Heritage, which again, makes no sense, if the goal of

STATUS CONFERENCE

1   Ascend was to come in and compete for market share.  It would

2   not come in at a higher price.  That is paragraph 146.

3            The example, of zoledronic acid, Your Honor, involves

4   Heritage and Dr. Reddi's.  It is paragraphs 149 through 164.

5   And again, this follows the same pattern.  Vacid is coming off

6   patent.  There are no generic manufacturers at the time.

7   Heritage decides it is going to be there and ready to market

8   that drug, on the first day that it can, legally, under the

9   law, and it knows that Dr. Reddi's will be doing that, as well.

10  So, Heritage immediately reaches out, to Dr. Reddi's, to

11  discuss divvying up the market when they enter, on that

12  specific date.  Heritage also reached out, to many other

13  customers.  You can see those – those allegations, paragraphs

14  151 through 153, Your Honor.  They reached out to companies who

15  are Defendants, in this case, and non-Defendants, in this case,

16  as well, to see if they would be entering the market.  And

17  again, this – this shows that this is the way the industry

18  works.  And it is not limited to any specific drug or instance,

19  or Defendant, frankly.

20           And the one quote, Your Honor, I would like you to

21  focus on, if you could, is paragraph 153.  And this is – this

22  is really the quotation from the Dr. Reddi's representative

23  that kind of sums up the overarching conspiracy.  The

24  Defendants – and it is redacted, so I'm not going to repeat it.

25  But the Defendants contend that this is a – even though it is a

STATUS CONFERENCE

1  communication between competitors, about how to divvy up the

2  market, the Defendants contend that this is a – an isolated

3  situation, addressing zoledronic acid only.  But it's clear, if

4  you read that quote, Your Honor, the Dr. Reddi's representative

5  is not just talking about zoledronic acid.  He couldn't be

6  talking just about zoledronic acid, because he already knows

7  that he is not going to be the first company into the market.

8  So, this quote is really a broader understanding of – of the

9  way things work.  And this is a communication between two

10 competitors, talking about the overarching conspiracy, Your

11 Honor.

12         Again, zoledronic acid is another example, of these

13 Defendants using these – the customer conferences to discuss

14 these issues routinely.  If you see paragraph 160, Your Honor,

15 they are specifically talking about how Heritage and Dr.

16 Reddi's were at a customer conference, and they were trying to

17 talk about these issues.

18         So, just moving on, and I know this is going on, but

19 I think it is important to make the point, Your Honor, and I

20 know it is hard to wrap your mind around an overarching

21 conspiracy like this, in this context, but these examples are

22 all, I think, good to demonstrate that.

23         So, the probimate, Your Honor, is another example of

24 Heritage and Dr. Reddi's colluding on a drug, in accordance

25 with the overarching conspiracy principles.  Paragraphs 165

STATUS CONFERENCE

1   through 179 address that.  These conversations were going on

2   between Heritage and Dr. Reddi's, at the same exact time, as

3   the prior conversations regarding zoledronic acid.  So, again,

4   these – these companies, these Defendants are engaging in this

5   conduct, in a widespread fashion.  It is not limited to any one

6   specific instance.  This is the way the industry works.

7           By 2013, Heritage and Dr. Reddi's were allocating the

8   market, in accordance with this larger understanding, on market

9   share.  Paragraph 166 demonstrates that, Your Honor.  Again,

10  Heritage, there is a stable market in place.  They had an

11  appropriate allocation of the market, that everyone was happy

12  with, but Heritage wanted to raise price.  So, it specifically

13  communicates with Dr. Reddi's, and tells Dr. Reddi's that it

14  wants to maintain the existing share, which is a core

15  principle, one of the rules of the road, while at the same time

16  raising price.  Dr. Reddi's agrees to do that.  And the

17  allegations, in that section, Your Honor, show exactly how the

18  – the larger understanding was implemented.  Heritage

19  intentionally doesn't bid, on certain business, from Dr.

20  Reddi's.  You can see this in paragraphs 172 and 173, in order

21  to maintain the appropriate balance, the appropriate market

22  share allocation.  And both companies get to maintain their

23  market share and raise prices.

24          The goal, among these Defendants, is always, Your

25  Honor, to maintain a level playing field, first.  And then,

STATUS CONFERENCE

1   secondarily, raise prices if they can.  The quote, in paragraph

2   175, demonstrates this clearly.  And again, it is redacted.

3   But if you look at the second to last paragraph there, the goal

4   is to maintain an appropriate balance, in the market, Your

5   Honor.

6           Doc CDR is another example of this happening, in a

7   couple of different instances.  This is Heritage and Mylon,

8   Your Honor, paragraphs 180 through 217.  And again, it follows

9   the classic pattern.  Heritage enters the market.  What do they

10  do?  They immediately reach out to Mylon and discuss how they

11  can allocate customers, so that Heritage can enter the market

12  without competing on price.  These are conversations between

13  high level executives, Your Honor, the CEO of Heritage, and the

14  President of Mylon, who is also a Defendant in this action.

15  The President of Mylon agrees to give up two large customers,

16  which represent about 30 percent of the market, to Heritage,

17  without competition.  And again, this is consistent with the

18  overarching rules of the road.  They are entitled to a little

19  less than their appropriate fair market balance share,

20  proportional share, because they are coming in at a later time

21  than Mylon.  So, it is consistent.  The Defendant, Rashid

22  Malik, uses the magic words, in paragraph 188.  This is common

23  lingo.  He is talking about how they are going to treat Mylon.

24  He says that you have done this for us, in the past, on another

25  drug.  So, of course, we will do this for you here.  So, this

STATUS CONFERENCE

1    is a quid pro quo.  This is going beyond just Doc CRD, to other

2    drugs where they have had this experience, in the past, Your

3    Honor.  That is paragraph 188.

4         And the same thing happens, again, Your Honor, when

5    Main, Defendant Main enters the market, for Doc CDR.  Main is

6    the – the minute it understands it is going to enter the – the

7    market for Doc CDR, immediately reaches out to Heritage to talk

8    about allocating markets.  There is text message exchanges,

9    between the representatives, about specific allocation of

10   customers, which customers – that is in paragraph 226.

11   Paragraph 221 demonstrates that the Heritage representative

12   knows the Main representative very well, from prior meetings,

13   in the industry, and therefore feels comfortable having these

14   illegal communications.  Again, this goes beyond the drugs that

15   issue.  This is the understanding and the way it works.  And

16   ultimately, Heritage offers to give up a large customer, to

17   Main, if Main retracts a bid, at a separate, different

18   customer.  And they continue to allocate markets, amongst each

19   other and going forward.  And those allegations are all in

20   there, Your Honor.

21        And the pattern, from these examples, Your Honor,

22   I've – I just went through six, as quickly as I could, and then

23   there is the sevenths example involving Teva and an

24   unidentified Defendant – or non-Defendant, I apologize, Your

25   Honor; in paragraph 104.  But they show that this is

STATUS CONFERENCE

1   consistently the way it works.  That there is common language

2   used, to describe the understanding.  And when you view all

3   these allegations, in context, as the Court is required to do,

4   Your Honor, it clearly permits an inference that there was a

5   larger understanding, in place, between the Defendants.

6           We have a whole other section, Your Honor, of the

7   complaint, a long section with regard to agreements to fix

8   prices.  There are many, many examples there, as well.  I am

9   not going to go through them all.  I understand that you want

10  me to move it along.

11          THE COURT:  I don't think you have to go through any

12  of them, actually, because you have a very long complaint, with

13  a lot of allegations.

14          MR. NIELSON:  Right.

15          THE COURT:  But, as you relate your allegations, to

16  your premise of an overarching conspiracy, as well as

17  individual conspiracies, that you can emphasize.

18          MR. NIELSON:  Okay.  And that is what I plan to do.

19  So, just giving you the highlights, from the agreements to fix

20  prices.  Those allegations, they clearly show that these

21  companies are communicating about multiple drugs at once.  This

22  is not an isolated, specific instance, in a one-off basis.

23  Heritage and Teva are having specific communications, about

24  seven drugs at one time.  Teva is going to lead on two, follow

25  on the others.  Heritage will lead on five.  Heritage and Mylon

STATUS CONFERENCE

1    are having communications about three specific drugs, at one

2    time.  But in addition to that, Your Honor, Mylon is agreeing

3    to the price increases that Heritage is - is suggesting,

4    because Mylon has its own separate list of price increases that

5    it wants to implement.  So, again, it is going beyond even the

6    three drugs, that are at issue in the complaint.

7         Heritage and Citron are talking about multiple drug

8    price increases, in - in one - there is a text message

9    exchange, between the sale representatives, in paragraph 347,

10    Your Honor.  They are talking about three different drugs and

11    how - and about agreements with multiple competitors, and how

12    those competitors will react to price increases, demonstrating

13    an understanding of how others are acting, in the market.

14    Heritage and Sun are talking about multiple drugs.  Heritage

15    and Activist are talking about multiple drugs - all in the same

16    conversations.  Those - those allegations also demonstrate

17    crisscrossing communications between other Defendants, not just

18    Heritage.  This is, again, not a situation like the auto parts

19    case, where the Plaintiffs are alleging that because each of

20    these Defendants colluded with Heritage, then they call

21    colluded with each other.  That was the allegation, in Auto

22    Parts, fundamentally different here, Your Honor.

23         You can see acetazolamide, Tevis communicating with

24    Zitus, after talking to Heritage.  The fozinople HCTZ, you see

25    Paravindo and Sandos communicating, Arabendo and Glenmark

STATUS CONFERENCE

1  Communicating, Citron and Arabendo communicating, Citron and

2  Glenmark communicating.  And it goes on.  Flip – glipizide

3  metformin, Tevan and Mylon are communicating.  Glyburide,

4  Citron and Arabendo are communicating.  Glyburide Metformin,

5  Teva and Activist are communicating, Activist and Arabindo are

6  communicating.  And on Verapamil, Mylon and Activist are

7  communicating.  They are all communicating with each other, in

8  collusion with one another.  It is not, at all, the same as

9  auto parts, or some of the other cases mentioned by the

10 Defendants.

11      They are even communicating about drugs they don't

12 sell, Your Honor.  They have an interest in what other people

13 are doing, in the market.   You see paragraph 376, Heritage and

14 Citron are discussing whether Heritage will be raising the

15 prices of Glyburide Metformin, even though Citron doesn't sell

16 that drug.

17      Paragraphs 378 and 452, Heritage and – Heritage and

18 Sun are having communications about the separate discussions

19 between Heritage and Activist, about raising prices, on two

20 drugs that Sun doesn't sell.  So, Sun is actually looking for

21 general information about Activist's price increase practices.

22      You see, in these paragraphs, Your Honor, examples of

23 large scale price increase discussions, at industry

24 conferences, going back to what you mentioned earlier – are

25 they really using these conferences for these illegal purposes?

STATUS CONFERENCE

1   Yes, they are.  I would point you to paragraph 287, which talks

2   about an MM cap conference, in May of 2014.  You will see, from

3   those allegations, that a Heritage representative engages in

4   discussions with numerous manufacturers, beyond just the

5   Defendants in this case, about pricing strategies, generally.

6   She is not just talking about the specific drugs that were

7   listed, in the complaint, or the specific drugs that Heritage

8   was even trying to increase prices on, at the time.  These are

9   just widespread  examples of collusion, at these industry

10  conferences.

11          And again, I mentioned this earlier, but they have

12  knowledge of what others will do, in a given situation.  These

13  Defendants know, because they have done this before.  It is

14  part of the way the industry works.  So, you see, paragraph

15  347, Your Honor, discussions between Heritage and Citron, about

16  Glyburide, Heritage indicates that – explaining what Teva will

17  do, with regard to market share and allocating the markets.

18  How they are going to play it, basically.  Paragraph – same

19  paragraph Citron demonstrates an understanding about how Teva

20  normally handles price increases, what their typical reaction

21  is to price increases.  The only way they would know that, Your

22  Honor, is if they had done that before.

23          And so, just wrapping up this – the factual

24  discussion, Your Honor, these price fixing allegations also

25  show constant adherence to these larger fair share principles,

1  in the face of competitor's price increases.  So, what you see

2  is competitors routinely refusing to bid, and take advantage of

3  other's price increases, based on this understanding that they

4  all must maintain their fair share of the market.  So, what

5  would normally happen, when a competitor raises prices, a

6  customer will say, well, I'm going to go try to get a better

7  deal, from one of their competitors, and they would offer that

8  opportunity.  But here, clearly, it is – it's a constant

9  occurrence where they refuse to bid, to take that market share,

10  because they have this understanding in effect.

11         You'll see it happening in doxaminol, doxycycline

12  monohydrate, paragraph 262.  Parr indicates that it is not

13  going to take any new opportunities, when it learns Lynnette

14  increases prices.  You see that happening in glyburide, Your

15  Honor, paragraph 348, where when Citron enters the market,

16  Heritage internally discusses it and says we have to be willing

17  to give up market share, to this new entrant.  Also, on

18  glyburide, Your Honor, Teva and Arabindo both refused to take

19  Heritage customers, after they have specific conversations to

20  that effect, with Heritage.  So, Heritage says we want to

21  maintain our market share, don't bid, they don't.

22         Leflunomide, when Teva leaves the market, Your Honor,

23  Heritage and Apateks discuss how they will divide that market

24  share, evenly, before they go on and increase prices, in

25  accordance with Heritage's plan to raise prices.  You see it

STATUS CONFERENCE

1  happening in nystatin, Your Honor, where Teva refuses to bid,

2  in the face of Heritage price increases, after discussions with

3  Heritage.   And the same thing with theophylline, Heritage

4  agreed to follow Teva's price increases.   Teva internally

5  discusses it, in advance of any of these opportunities coming,

6  and says we are not going to take advantage of any of these

7  opportunities, after the price increase.

8          So, I know that was a long discussion, on the facts,

9  but I think it would be helpful, for the Court, to have a good

10  understanding of – of what is really alleged, in the complaint,

11  Your Honor.

12          Now, with regard to the law, on overarching

13  conspiracy, the Defendants make a lot of arguments about why

14  the consolidated amended complaint does not properly allege an

15  overarching conspiracy, but one thing that they do not do is

16  compare this particular case, and this complaint, to any

17  comparable case or complaint.   So, the auto parts case, that

18  they rely heavily on, I have described some of the differences

19  already.   There are more.   The insurance brokerage litigation

20  is – is so far afield that we didn't even mention it in our

21  briefs, Your Honor.   Factually, it is just so distinct and

22  different.   But the law looks at three factors, in determining

23  whether a Plaintiff has properly alleged an overarching

24  conspiracy.   Is there a common goal, among the co-conspirators?

25  Yes, we have described that, in detail, so far.

STATUS CONFERENCE

1  Interdependence – is there interdependence among the parties?

2  It is important that all the parties agree, in order for this

3  conspiracy to operate efficiency – efficiently?  And that is

4  clear here.  This wouldn't work if companies were competing and

5  driving prices down.  The conspiracy just doesn't work that

6  way.  And the overlap.  The third factor is overlap, Your

7  Honor.  And there is obviously a significant overlap here.  The

8  Heritage is involved in all of these.  But Teva is involved in

9  seven of the specific examples, plus I – I mentioned another

10  example that Teva was involved in.  So, they are in at least

11  eight of these drugs.  Mylon is involved in four specific

12  examples, plus there are references to Mylon having done this

13  in the past, with Heritage.  And agreeing to the Heritage price

14  increases, because it wanted to increase prices on other drugs.

15          So, there is – there is – many of these companies are

16  involved in many of these drugs.  There are some companies that

17  are only involved in one.  But those companies clearly followed

18  the pattern, of the overarching conspiracy, when they entered

19  the market.  For example, Ascend enters the market for

20  nimodipine, engages in these conversations, and follows the

21  rules of the road.  Apatex divvies up – talks to Heritage about

22  divvying up the market.  So, clearly, they are all connected

23  here, Your Honor.

24          But just briefly, in their - - reply brief, the

25  Defendants made a – a point that we had failed to properly

 1  address the auto parts case and the insurance brokerage case.

 2  So, I do want to just go through why those cases are different.

 3        I have explained why the – the markets in auto – the

 4  market, in auto parts, is fundamentally different here.  In the

 5  – in the auto parts case, the Court found that the Defendants

 6  and the co-conspirators, would not reach an agreement to

 7  collude on products that they neither make nor sell.  And in

 8  that industry, Your Honor, that makes sense, because you have a

 9  situation where someone who sells air conditioning units would

10  not reasonably expect to be competing with someone who makes

11  steering wheels, or starters, or something like that.  They

12  make different products.  They are, you know, completely

13  different.

14        THE COURT:  Just like different drugs for different

15  purposes, and treatment.

16        MR. NIELSON:  There is – there is a lot more

17  likelihood that a generic manufacturer will be competing with

18  some of these other Defendants, or other generic manufacturers,

19  than the example I gave, Your Honor.  Fundamentally, it is

20  different.

21        And the Defendants seek to important that industry,

22  which is factually different, into this case, and import that

23  logic and – and it just doesn't – it doesn't make sense, Your

24  Honor.

25        In this case, it makes sense, for these Defendants,

STATUS CONFERENCE

1    to have this agreement in place, so that when they enter into a

2    – any market, when they decide to sell any drug, whether it is

3    for diabetes, or any other type of, you know, whether it is a

4    cream, or an ointment, or a gel, or a tablet, or anything, they

5    have that ability to talk.  The likelihood is that they will

6    have – they will be entering into these agreements, and they

7    will be competing with these other companies.  And having that

8    agreement is helpful to them, Your Honor.

9         The nature of the conspiracy, in auto parts, was also

10   fundamentally different.  The auto parts complaint, Your Honor,

11   alleged that each defendant willingly agreed to, and did

12   conspire with DENZO, which is the common participant in all of

13   those conspiracies.  It is the one company, out of all of them,

14   that made every one of those 18 auto parts.  And the

15   Plaintiffs, in that case, alleged that by conspiring with

16   DENZO, they conspired with each other.  And again, that is

17   fundamentally distinct, to what we are alleging here.

18        There were no allegations, in auto parts, that these

19   defendants were not conspiring with each other, except through

20   DENZO, Your Honor.  The auto parts court, in the decision

21   denying motion for leave to amend, to allow the Plaintiffs to

22   allege an overarching conspiracy, found specifically that there

23   are no allegations, in the consolidated ended complaints, of

24   deals between makers of different component parts, and no

25   inference arises of knowledge outside of each Defendants own

1    specific deals.  And again, I have run through some of those

2    factual allegations, demonstrating that is not the case here.

3         The auto parts court also found that there are no

4    allegations to support that a defendant knew of other

5    defendants' conduct, for other products.  Again, that is a

6    difference.  And these consolidate, amended complaints, this is

7    the auto parts court case, Your Honor said the consolidated

8    amended complaint merely advances allegations of separate

9    conspiratorial conduct between different makers of different

10   parts.

11        And lastly, Your Honor, the – the auto parts court

12   was significantly persuaded by the fact that the DOJ Antitrust

13   Division, had engaged in a six-year criminal investigation, and

14   had consistently determined that there was no overarching

15   conspiracy  in that case.  Obviously, that has not happened

16   here yet, as far as I am aware.  And then, lastly, on the

17   insurance brokerage case, Your Honor, fundamentally different

18   case.  In that case, there were insurance brokers who had

19   contingent commission agreements, with insurance companies.

20   Essentially, they were kickbacks where if they – if they gave

21   an insurance company enough business, they would get money

22   back.  So, they had incentives to – to give these agreements.

23   To give insurance business to these insurers, and in that case,

24   the Plaintiffs alleged that there was an agreement among the

25   brokers, not to disclose these contingent commission

STATUS CONFERENCE

1  agreements, and the resulting profits.  The — the supporting

2  allegations were essentially that the brokers engaged in

3  similar  schemes, which all contained similar contingent

4  commission agreements, in that they had similar discloses, on

5  ARISSA forms, that they submitted to the government.

6           There was no evidence, in that case, of any actual

7  communications or collusion among the brokers.  And the Court

8  found that the evidence there was consistent with these brokers

9  acting in their own independent self-interests.  So, the reason

10  we didn't raise that case, as a comparable example, in our

11  brief, Your Honor, is because factually it is completely

12  different.  And I think, you know, for those reasons, Your

13  Honor, we believe we have properly alleged an overarching

14  conspiracy, in our consolidated - - complaint.  Leave to amend

15  should be granted, and also the Court should grant our motion

16  for a separate government track, as well.

17           THE COURT:  Alright.  You did mention, however, that

18  four of the states, and they are included, in your proposed

19  consolidated amended complaint.  And that is Arkansas and the

20  four states that you mentioned, do not desire to amend their

21  complaints — Missouri, New Mexico and West Virginia, and the

22  District of Columbia.  They have not amended their complaint.

23           MR. NIELSON:  They are seeking to join this

24  complaint.  They have never been part of any prior complaints.

25  So, they — they don't need to seek leave to amend.  But they

STATUS CONFERENCE

1  want, for efficiency purposes, they want to joint this

2  complaint, Your Honor.  It is not that they don't want to

3  amend.

4          THE COURT:  Alright.  I think I was a bit confused by

5  that.  But the dependents - no dependents have filed any

6  responsive pleadings, or Rule 12 motions, in the Arkansas case.

7          MR. NIELSON:  Correct.

8          THE COURT:  So, that um—

9          MR. NIELSON:  They don't need to seek leave to amend.

10  They are joining our motion, just because the other 40 states,

11  there were responsive pleadings filed, and we technically would

12  need leave to amend.  But the purpose of joining all these

13  states together, in one consolidated complaint, Your Honor, as

14  for efficiency.  And we understood, during the status

15  conference last September, that that is what you wanted.  And

16  we think it makes sense.  So, that is why we are seeking leave

17  to amend, to add all those state into the one consolidated

18  complaint.

19          THE COURT:  Alright, thank you.

20          MR. NIELSON:  Thank you.

21          THE COURT:  Now, how are we proceeding, with the

22  Defense position?

23          MR. GORDON:  Your Honor, George Gordon, from Decker.

24  I am counsel for Lynnette, but I will be represent - I will be

25  making argument on behalf of all of the Defendants names in the

STATUS CONFERENCE

1    proposed consolidated amended complaint.

2         THE COURT:  Very well.

3         MR. GORDON:  I do have just – and I promise just a

4    few slides, which were coming up on the screen, but are no

5    longer.  So, we can do this by – by hard copy, if I may

6    approach?

7         THE COURT:  You may.  Thank you.

8         MR. GORDON:  Your Honor, the Plaintiff States' Motion

9    to Amend should be denied, because the proposed amended

10   complaint purports to state an overarching conspiracy, but

11   doesn't actually allege a plausible, factual basis that

12   connects the allegedly separate independent conspiracies, into

13   a – an overarching conspiracy.  And I think actually what you

14   heard, from counsel for the States, emphasizes that point.

15        Counsel for the States said that the Defense it

16   trying to improperly compartmentalize the alleged conspiracy,

17   in the consolidated amended complaint.  But if you look at the

18   consolidated amended complaint, other than Count 19, which is

19   an aggregation of all of the individual state law claims, each

20   of the counts, in the consolidated amended complaint, purports

21   to state a claim for an individual drug conspiracy among the

22   manufacturers of that drug.  The complaint is organized along

23   individual drug conspiracies.  And then, the examples that

24   counsel gave, walking the Court through a number of examples of

25   allegedly how this overarching conspiracy operated, also each

STATUS CONFERENCE

1  related to the alleged implementation of a single drug

2  conspiracy, whether it be with respect to zoledronic acid, or

3  meprobamate or doxy DR or the other examples.  And that example

4  – and that – that pattern is consistent throughout the

5  complaint.  If – you know, other than the examples that he

6  raised, if you look at other examples of allegations, in the

7  complaint, take – take the one drug, for example, that my

8  client, Lynnette makes, which is doxycycline mono, the

9  allegations regarding doxycycline mono relate to alleged

10  communications related to doxycycline mono.  There are no

11  allegations related to any communications regarding other

12  drugs.  There are no allegations related to any communications

13  using the – the phrases – they are going to cherry pick phrases

14  – that they, the States point to.  And there are no allegations

15  relating to any supposed overarching conspiracy that relate to

16  any drug other than the drug that – that Lynnette makes.  That

17  same pattern is followed, Your Honor, throughout the

18  consolidated – proposed consolidated amended complaint.

19          And the law is very clear, that simply alleging a

20  series of parallel, separate, independent alleged conspiracies,

21  with respect to a particular product, does not give rise to an

22  inference that they were part of some overarching conspiracy,

23  regardless of the fact that there may be allegedly a number of

24  them, and regardless of the fact that they may share some

25  similar characteristics.

1      THE COURT:  But I think, out of fairness, the amended

2   complaint also proposes that the market has been impacted by

3   these separate series of alleged conspiracies.  That could only

4   occur if there was an overarching conspiracy, if you will.

5      MR. GORDON:  There is – but there are no factual

6   allegations, Your Honor, explaining why that is the case.  That

7   is, why the separate individual conspiracies were not

8   achievable without some overarching conspiracy.

9      THE COURT:  And the resulting impact on the market,

10   which is higher prices for all.

11      MR. GORDON:  Well, that is a – that is a result—

12      THE COURT:  [Interposing] I can see a battery of

13   experts coming in to say yeah or nay on that one.

14      MR. GORDON:  Well, it's a – there are – there are

15   allegedly higher prices, for each of the individual drugs, that

16   are alleged to be subject to a conspiracy, in the complaint.

17   That – that doesn't all of a sudden, give rise to a massive

18   general overarching conspiracy.  There is no – there is no –

19   and let me step back, for a - for a second, Your Honor, and

20   talk a little bit about the products that are at issue here.

21   And just kind of from – from first principles, in terms of the

22   economics of antitrust markets.

23      There is a lot of reference, in the consolidated

24   amended complaint, and in argument, to Defendants, as a whole,

25   and generic drugs, as a whole.  But products don't compete with

STATUS CONFERENCE

1   each other or affect each other's price simply because they are

2   made by manufacturers who happen to participate in the same

3   general industry.  They actually – they actually do need to be

4   substitutable, for one another.  And then you look at – in auto

5   parts, and I will talk a little bit about auto parts, in a bit,

6   because we think it is actually fairly closely to all four – on

7   all fours with this case.  If you take, you know, the – the

8   products in auto parts, as an example, parts that aren't

9   substitutes, so you know, windshield wipers and air

10  conditioning systems don't compete with each other.  The price

11  of windshield wipers is not going to affect the volume sold, or

12  the price of air conditioning systems.

13          And the drug products that are at issue in this case,

14  Your Honor, are the same, in that sense.  They are the same – –

15  in – in auto parts.  That is these drugs are very different

16  drugs.  They serve different functions.  They have different

17  active ingredients.  The actual drug substance is different.

18  The dosage forms are different.  You take, for example, we head

19  about nimodipine.  One thing that is different about auto parts

20  is that the products are much easier to pronounce, Your Honor.

21  Which is mentioned in Counts 1 and 2, of the complaint, which

22  is a drug to treat bleeding blood vessels in the brain, with

23  zoledronic acid that is mentioned in Count 3, is a drug that is

24  used to treat certain bone diseases or, in some dosage forms,

25  high blood calcium that can occur with certain cancers.  And

STATUS CONFERENCE

1   doxycycline monohydrate, which I mentioned is manufactured by

2   my client, Lynnette, is used to treat certain bacterial

3   infections and to prevent malaria.  And I could go on, Your

4   Honor, but the – the point is that the products that this – in

5   this case, although all pharmaceutical products, are just as

6   distinct as the type of products that are at issue in auto

7   parts.

8           And the notion that well, you know, any of these –

9   any of these companies could just kind of, you know, on a whim,

10  jump in and out of – of any of these markets ignores a few

11  things.  Number one, there are no allegations, in the complaint

12  – in the proposed consolidated amended complaint, Your Honor,

13  that – that the companies – that any of the Defendants had an

14  interest in the intention to, or the ability to, enter any of

15  the markets that they are not in.  And – and if you take a look

16  at – at the slides – take a look at the first slide that we

17  have, Your Honor, nine – it's not just a few, of the Defendants

18  that are only in one drug, it is actually nine.  It's – it's

19  half of the corporate Defendants only manufacture one of the

20  drugs that is allegedly the subject of this overarching

21  conspiracy.

22          THE COURT:  It is not lost on my, counsel, that if

23  there is some type of agreement, or conspiracy, no matter how

24  it is described, or parsed out, if you have all of these

25  companies, and there is only one drug, of generics, that comes

1   out of the patent expiration, then that, in itself, raises

2   questions, does it not?  Most – most companies are frothing at

3   the – at the bit, to get into the generic market.

4           MR. GORDON:  It depends on – it depends on the facts

5   and circumstances of the drugs, Your Honor.

6           THE COURT:  Yes, it does.

7           MR. GORDON:  I mean it can – it can—

8           THE COURT:  [Interposing] Just like the facts and

9   circumstances that can be proven, not just alleged, but proven,

10  over the course of this litigation.

11          MR. GORDON:  Well, and – and – and – but – but the

12  point is, Your Honor, the facts aren't even alleged, in the

13  complaint.  That is, they are asking to an amend a complaint,

14  to state a claim for an overarching conspiracy that, for

15  example, you know if you take the first column here, that

16  Ascend, which was only – only alleged to have made nimodipine,

17  somehow conspired, not just on nimodipine, but on all 14 other

18  drugs, because that – because in theory, they could, in some

19  hypothetical situation, enter one of these other markets, when

20  there are no allegations that that is anything other than

21  entirely speculative.  That they had any interest or intent or

22  incentive.  And there are a lot of constraints to entering

23  these markets, Your Honor.  In addition to—

24          THE COURT:  [Interposing] Well, maybe that is the

25  wrong example, because Sun also is in that market.

STATUS CONFERENCE

1          MR. GORDON:  Right.  Well, the—

2          THE COURT:  [Interposing] According to your diagram.

3          MR. GORDON:  For a number of these products, Your

4    Honor, just because there is only – there is the manufacturers

5    only alleged to have made one of the drugs, that does not mean

6    there is only one manufacturer in the market.  Right, for a

7    number of these drugs, there are still multiple manufacturers

8    in the market, it is just that the Defendant is only alleged to

9    have made one drug, out of the 14, or the 15 rather, that are

10   allegedly subject to the conspiracy.

11         And there are a lot of constraints to entering these

12   markets, Your Honor.  I mean, in addition to the regulatory

13   overlay, there is the – you have to – you have to obtain

14   adequate supply of the active ingredient.  You have to have the

15   manufacturing capacity and manufacturing capability to make the

16   drug.  There are a lot of reasons.  There is a host of reasons

17   why a particular generic manufacturer may or may not decide to

18   enter a particular market.

19         And if you look at the next chart, Your Honor, you

20   know five more of the alleged Defendants manufacture three or

21   fewer, of the drugs.  And again, so, what that means is you

22   have 14 Defendants who don't manufacture at least a dozen, at

23   least 12 of the drugs, of the 15 drugs that are allegedly the

24   subject of the conspiracy.  And – and so,--

25         THE COURT:  [Interposing] Clearly, there is no

1  allegation, from any source, of any Plaintiff's complaint that

2  says every single manufacturer was involved in a conspiracy on

3  every single drug.

4         MR. GORDON:   That's – Your Honor, in the State A.G.'s

5  complaint, that is exactly what they are alleging.   Because

6  they have said –

7         THE COURT:   [Interposing] Overarching conspiracy does

8  not mean literally every single drug, every single

9  manufacturer, but a course of action, a course of business, a

10  course of dealing.   That is what they are alleging.

11         MR. GORDON:   But they – but they have alleged, Your

12  Honor, in each count, relating to each drug, they have

13  identified the particular manufacturers of that drug, and then

14  they have added an allegation – the same allegation in each of

15  them – that each and every other Defendant is jointly and

16  severally liable.

17         THE COURT:   Yes, that's – that is the catchall

18  phrase.

19         MR. GORDON:   Correct.   Which – which – which means –

20  which means what they are saying is that each and every generic

21  manufacturer that is named in the complaint, is liable for the

22  alleged conspiracy for each and every one of these drugs, even

23  though that they did not make.

24         THE COURT:   Alright.   So, what is your basis for

25  denying leave to amend, when you could address those by

STATUS CONFERENCE

1  appropriate motions to dismiss?

2        MR. GORDON:  Well, Your Honor, it's – it's – I don't

3  think there is that much daylight between us and the States,

4  regarding the standard.  I think we both agree that a motion to

5  amend – that the Court can deny a motion to amend, if the

6  complaint is futile.  The case law, including Your Honor's

7  decision in the Lundy case, make it clear that the futility

8  standard is effectively the 12 – is a 12B6 standard.  That is

9  if the complaint is not going to survive a motion to dismiss,

10  then it is futile.  And Your Honor, the – you know, from – from

11  the Defendant's perspective, the time to deal with these issues

12  is now.  There is no reason to wait.  The complaint, on its

13  face, does not state a plausible factual basis showing any

14  connection between these different, separate conspiracies.  And

15  the motion to dismiss stage, in this case, once the – you know,

16  whatever complaint proceeds, in whatever form, is going to be

17  already complicated enough, dealing with whatever individual

18  motions are filed by the Defendants that are alleged to have

19  been party to the individual drug conspiracies—

20        THE COURT:  [Interposing] Alright, but you argued –

21  well, the Defense argued before the JPML, not you specifically,

22  that consolidation was appropriate, that there were stated

23  goals to eliminate duplicative discovery, and prevent

24  inconsistent pretrial rulings, conserve resources of everyone,

25  and – and it had to be anticipated that if multiple parties,

STATUS CONFERENCE

1   that is States, were going to be thrust into the MDL, to join

2   others, that they would be given a chance to file an amended

3   complaint, which this Court prefers, as a consolidated

4   complaint.  We do that with every Plaintiff's group.  So,

5   anticipating that, what is the real concern here?  The real

6   concern is that you want me to decide this on a motion to

7   dismiss standard.  You want me to say, no, you have not alleged

8   enough, that's out.

9           MR. GORDON:  Your Honor, we think that yes, because

10  we think that the—

11          THE COURT:  [Interposing] But that is not being

12  futile.  That's not futile.

13          MR. GORDON:  No, we are saying—

14          THE COURT:  [Interposing] And that is not like a

15  Lundy case.  Not at all.

16          MR. GORDON:  Because it wouldn't – because it would

17  not survive a motion to dismiss.  So, therefore, the amendment

18  is futile.  That's – that's – that is the standard.  I think it

19  is also what Your Honor described in Harris v. Stedman case.

20  That if a – if a complaint would not survive a motion to

21  dismiss, then it is futile.  I mean there are other grounds for

22  futility.  We are not arguing those other grounds.  We are

23  arguing that it is futile because this complaint, as currently

24  pled, would not withstand a motion to dismiss.

25          THE COURT:  Okay.  That's – that's your position.

STATUS CONFERENCE

1  And I have read your briefs on that.  But tell me how there is

2  prejudice, to any Defendants, if the Court allows an amended

3  consolidated complaint, in this form.  We go through motions to

4  dismiss.  We get through discovery.  And then we have summary

5  judgement.  And if they don't prover it, they don't prove it.

6  And it can't go further.  What is the real prejudice here?

7         MR. GORDON:  The real prejudice, Your Honor, is that

8  because of the allegations regarding joint and several

9  liability, that each and every one of the Defendants,

10  regardless of whether they make a drug or not, is going to have

11  to, not just participate in discovery – it is not a discovery

12  burden, are just – or it is not just a discovery burden, but

13  they are also going to have to prepare a defense, and become

14  enmeshed in the record, for each and every drug that is named

15  in the consolidated – proposed consolidated amended complaint.

16  Which means not only will they have to participate in

17  discovery, not only will they have to attend the depositions,

18  but they are going to have to develop a defense related to the

19  operations and markets that they have no connection with.  That

20  is – that's the burden, and it's – it's that kind of burden—

21         THE COURT:  [Interposing] That is a factual

22  determination.  If they have no connection to a market, of a

23  particular drug, then there shouldn't be any evidence of it in

24  – found in discovery.  So, what is the prejudice?

25         MR. GORDON:  But – but Your Honor, the – because they

STATUS CONFERENCE

1    are going to – because they are still facing allegations of

2    joint and several liability, and – and this is exactly the kind

3    of prejudice that Twombly was cautioning against.  And – and

4    which is why it cautioned courts to make sure there was a

5    plausible, factual basis to allow complaints to proceed.  And

6    that was in a case involving one alleged conspiracy, involving

7    one marketplace. Let alone one involving 15 alleged

8    conspiracies, involving 15 separate market places.  And here,

9    Your Honor, the problem is the facts aren't even alleged. It is

10   not just that they don't exist, they are not alleged.

11           So, if you look at, for example, again I will take

12   doxycycline monohydrate, because it is the one I am most

13   familiar with, you look at the allegations, in the complaint.

14   There is allegations again, relate only to communications

15   related to doxycycline monohydrate.  They only relate to

16   communications – alleged communications between manufacturers

17   of doxycycline monohydrate.  There are no allegations of any

18   communications with – with respect to any agreements outside of

19   doxycycline monohydrate or related to drugs other than

20   doxycycline monohydrate.  So, there is nothing connecting to –

21   there is no – the States use the phrase connective tissue, in

22   their brief.  Their connective tissue doesn't connect anything.

23   There is no connection between the separate individual

24   conspiracies.

25           And if – if Your Honor looks at the – at the last

STATUS CONFERENCE

1  slide. So, what – what this slide illustrates, Your Honor, is

2  the – is how frankly infrequently the few phrases that the

3  States pick up, in their amended complaint, and it –

4  particularly the ones that are referenced just for reference

5  purposes, in paragraphs 90, 103 and 104, how infrequently they

6  actually, when you actually drill down and look at the facts,

7  and not the conclusory statements of the description of the

8  conspiracy, but the actual facts related to their supposed

9  connection – connective tissue, how frequently those phrases

10 are used.

11       They allegedly show up, if you look over to the third

12 column, from the right, in three Defendants' documents, out of

13 the 17 corporate Defendants, they reference four of the

14 individual drugs, out of the 15 drugs alleged in the complaint,

15 and only six, Your Honor, of the – the corporate Defendants as

16 in – are in communications with respect to six of the corporate

17 Defendants.  And – and even in those communications, Your

18 Honor, they are in relation to particular individual drug

19 conspiracies.  They are not used in allegations related to

20 some, you know, establishing some general principle that

21 applies to other drugs.

22       And so, what the means is that there are 14

23 Defendants whose documents are not alleged to reflect the use

24 of those communications, with respect to generic – any generic

25 drug.  Not even the ones that they allegedly compete in.  There

1    are 11 drugs, out of the 15 that are not even referenced in the

2    context of this, you know these – these particular phrases.

3    And there are 11 Defendants that are not alleged, in any

4    communication relating to any drug, to ever – have ever heard

5    or ever used this phrase – these phrases, which they – the

6    States claim these are a code, in the industry.  It is an

7    industrywide code.  But when you actually look at their

8    allegations, they don't show up with respect to these – these

9    supposed code words don't show up with respect to

10   communications involving the vast majority of Defendants and

11   involving the vast majority of – of drugs.  So, there is

12   nothing that – that connects these alleged conspiracies

13   together.

14           The – the States, in their briefing, also talk about

15   the – I think what they term crisscrossing communications.  You

16   know, allegations related to communications among the

17   Defendants, related to various drugs.   And I think counsel for

18   the States, you know, ran through some examples, of them.

19   Those communications, again, Your Honor, relate to – all they

20   really do is rehash the allegations in support of the

21   individual drug conspiracies.

22           The – the trade association meetings, the

23   opportunities to conspire, and the law is very clear, in the

24   Third Circuit, that – that the mere opportunity to conspire,

25   without more, is not enough to state a claim for conspiracy,

STATUS CONFERENCE

1  let alone the kind of massive overarching conspiracy that the

2  States are – are pleading here.  And the law is also clear,

3  Your Honor, and – and you know, this is – this is insurance

4  brokerage, it is auto parts.  In insurance brokerage, there was

5  a different type of conspiracy.  That is true.  But in terms of

6  the general conspiracy principles that are applied in that

7  case, and what has to be shown, to link together different

8  members of the conspiracy, those principles apply with equal

9  force in this case.  In that case, the – the Court found that

10 there was no connection between the – you know, vertical

11 conspiracy between the brokers and the insurers, and the

12 allegation was that those – the brokers also had horizontal

13 conspiracy between them.  But the Court said you need to – you

14 need to have some allegation that there was some – some

15 connection, some communication, between the brokers.  Some –

16 something that connects them together, in the conspiracy, and

17 there wasn't.

18        And the same is true here.  There is nothing that

19 connects the manufacturers of doxycycline monohydrate to a

20 conspiracy involving zoledronic acid.  Particularly when a

21 number of the manufacturers didn't even make zoledronic acid,

22 or 14 or 13 of the other drugs, that are named in the

23 complaint.  That – that connective tissue just simply isn't

24 there.

25        And with respect to auto parts, Your Honor, just – I

STATUS CONFERENCE

1  do just want to kind of pause, on auto parts, because it – it

2  really is on – on all fours, with the situation that Your Honor

3  faces with the proposed amended complaint.  And it was a – an

4  amended complaint, a proposed amended complaint, just like this

5  one.  There was the allegation of – of separate conspiracies

6  involving separate auto parts, and it wasn't just the Denso

7  participation that the Plaintiffs relied on, in that case, to

8  try to stitch these conspiracies together.  And I'm just – you

9  know, I'm just going to read from auto parts.  And this is –

10  it's 2016 West Law 8200512, and this is at page star three.

11       It says the IPP is the indirect purchasers were –

12  that were proposing the amended complaint, contend that these

13  allegations show that the conspiracy did not begin as a parts

14  conspiracy, and the CAC's allege a macro, industry wide

15  conspiracy, which is supported by dozens of representatives,

16  micro examples, of Defendants' agreement to respect each other

17  commercial rights, and incumbent rights to specific OEM

18  business.  So, it is the same type of allegation here.  That

19  there was an overarching conspiracy that each of the

20  Defendants, and each of their respective parts, would respect

21  each other's rights and – and incumbencies, that is, you know,

22  people who were in the market, and the share that gave them,

23  and – and yet the Court, in actually looking at the specifics

24  of the allegations, denied the – the motion to amend, for – for

25  reasons that – that apply with equal force to this case.

STATUS CONFERENCE

1    The Court found there were no facts showing

2   agreements between manufacturers of different products.  That

3   is products that, you know, a – a manufacturer agreeing, with

4   another manufacturer, for a product that the first manufacturer

5   did not make.  Same is true here.  There were no facts showing

6   that each Defendant was aware of, let alone knowingly

7   participated in, agreements related to products that they did

8   not make.  And there were no facts showing that each – each and

9   every Defendant was aware of other Defendants' conduct related

10  to other products.  And as a result, Judge Patawny, in that

11  case, concluded that the allegations – they merely advanced

12  allegations of separate individual conspiracies, and

13  conspiratorial conduct between different products, different

14  Defendants related different products.  And the same is true

15  here.

16      At most, what the States have alleged, allegations of

17  separate individual conspiracies, between Defendants making

18  different drugs.  In every case to consider we – what we

19  believe are – are similar types of allegations, that is

20  allegations involving products, markets, or services, in which

21  all the Defendants did not compete.  In addition to auto parts,

22  we cited Precision Associates, the optical disc drive case,

23  Iowa Ready-mix Concrete, came out the same way, as auto parts.

24      And – and the States have not cited a single case

25  that actually supports allowing them to move forward with an

STATUS CONFERENCE

1  overarching conspiracy that involves drugs and products that

2  the vast majority of the Defendants didn't make.  And where

3  there is no allegation and no facts, that the Defendants were

4  even aware of, let alone knowingly participated in,

5  conspiracies with respect to products that they did not make.

6  You know, they cite to the Doll Case.  They cite to the New

7  Jersey Tax Lien case.  In each of those cases, the Defendants

8  actually provided the services or participated in the

9  marketplace, that was alleged to have been the subject of the

10  conspiracy.  Very different cases and very different

11  situations than raised by the States complaints.

12          THE COURT:  Even so, how would discovery proceed

13  differently if the joint amended consolidated complaint was

14  actually approved?  Would it be any different?  Because Defense

15  has really doubled down on prejudice, and you have mentioned

16  that you have to prepare joint defenses or different defenses,

17  because of joint and several liability.

18          MR. GORDON:  Right.

19          THE COURT:  And well, how does impact on anything, in

20  the mechanics of this case?

21          MR. GORDON:  Well, what is impacts, I mean in certain

22  ways, obviously, and I – you know, and we would – we would work

23  with the States and with the private planners, to coordinate,

24  with respect to making sure discovery moved forward, in the

25  most efficient way possible, regardless of how this complaint

STATUS CONFERENCE

1  proceeds.

2          As a practical matter, the way it impacts discovery,

3  and the burden is places on the Defendants, is that each

4  Defendant is going to have to participate in discovery related

5  to each and every drug market.  They are going to have to

6  participate in attending depositions.  My client, Lynnette,

7  which only makes doxy monohydrate, is going to have to

8  participate in depositions, potentially question witnesses,

9  related to each of the other 14 drugs, because it is – it's now

10 being alleged to be jointly and severally liable, for conduct

11 in those markets.  And that is going to be multiplied across

12 all 17 Defendants, and all 15 drugs.

13         And – and so, with respect to – it's – it's not just

14 simply a question of, for example the burden of, you know,

15 gathering documents and engaging in the mechanics of discovery,

16 it is related to the burden of actually having to participate

17 in discovery, if – if a generic drug manufacturer is only

18 alleged to have participated in a particular conspiracy related

19 to a particular drug, then it can focus its efforts on building

20 a defense related to that particular conspiracy.  If it is

21 alleged to have participated in a conspiracy, in which it is

22 jointly and severally liable for the conduct relating to

23 manufacturers of each and every drug, regardless of whether it

24 made those drugs, then it has to participate in discovery with

25 respect to each and every one of those drugs.

STATUS CONFERENCE

1    And – and Your Honor, if they had properly pled an

2    overarching conspiracy, then I think the Court would say well,

3    that's, you know, that's what you have to live with.  But that

4    is the point, they haven't.  They have not pled the kind of

5    connection, between these conspiracies, that you need, to put

6    Defense under that burden.

7        THE COURT:  But that is a common Defendants'

8    position, in all of the motions pending before this Court.

9    That in the discovery motions, in the recent protective orders,

10   with the motions to dismiss that are pending, and I am not

11   expressing any view on merits of any motions, or any

12   complaints, as they now are – are filed.  But it does sound, to

13   me, as if, in each of these situations, and opportunities, the

14   Defendants want to keep everything separate.  I don't think

15   that is the premise of the case, however.

16       MR. GORDON:  Yeah, and I think there is a fundamental

17   difference, between the positions the Defendants are taking,

18   with respect to the individual drug conspiracies that were –

19   have been alleged, by the – the private Plaintiffs thus far, in

20   the case, and – and the situation that is posed by the State

21   A.G. complaint.  Because the State A.G. complaint, again, it is

22   not just a – an issue of the burden of participating in the

23   mechanics of discovery.  You know, it—

24       THE COURT:  [Interposing] No, it is more than that.

25   It is more what you do with the discovery when – once it is

STATUS CONFERENCE

1  disclosed.  And what is the use of it?  And we are far away

2  from determining evidentiary matters, but I see it – I see it

3  happening.  And it may not be fair to put you on this spot,

4  because you are arguing about this.  But I see it all the way

5  through.  And as broad as the Plaintiffs can get their case,

6  the Defense's best position is to keep it fragmented and

7  segment – in segments.  But unfortunately, the MDL process does

8  not allow that, for me.  So, while I make substantive rulings,

9  on matters of law, and pleading, it is not going to make much

10  difference when it comes to the – the prejudice that clients

11  will face in developing their defenses.

12          MR. GORDON:  Your Honor, I understood, and I

13  understand the evidentiary issues will have to be decided, as

14  the case develops. No question.  And – and there is no reason,

15  under the, you know, existing case management, and I

16  understand, and a hundred percent get the idea that there has

17  to be some flexibility, in terms of the case management

18  structure, because the case may develop over time.  But there

19  is no reason why the current case management structure can't

20  accommodate separate complaints, from the States, just like it

21  has, I think quite well, the separate complaints from the

22  private Plaintiffs thus far in the case.  And – and we are not

23  objecting – and Your Honor has already set up a system where,

24  with respect to each drug, there is a – a separate track or

25  separate sub docket, whatever you want to call it—

STATUS CONFERENCE

1          THE COURT:  [Interposing] That is a docketing

2     feature.  And that's all that is.

3          MR. GORDON:  But – but you know what?  But – but it

4     is also allowed, the structure had given the parties, and the

5     Court, an enormous amount of flexibility, not just with respect

6     to docketing, but with respect to how to manage the case, going

7     forward.  For example, the – the approach that was taken, on

8     the motion to dismiss, and being able to kind of group the

9     cases into three tranches, based on individual drugs, has

10    allowed the motion to dismiss practice to proceed, at least

11    somewhat orderly, as compared to what the alternative might

12    have been.  There may be other situations down the road, in

13    which it will make sense, and the parties would obviously meet

14    and confer and discuss and present Your Honor with a proposal,

15    to organize proceedings, in the case, on a drug by drug basis.

16    The existing case management structure makes it very easy to do

17    that.  But there are some things in which it may not make sense

18    to do it on a drug by drug basis.  And the existing case

19    management structure doesn't require it, either.

20          That is why we believe the States should be required

21    to file separate complaints relating to each of the individual

22    drug conspiracies, the docket number of the docket for each of

23    the drugs involved assigned, sub dockets – the States can have

24    a sub docket for their case.  They have already been appointed

25    separate liaison counsel, so the issue of impinging on their

STATUS CONFERENCE

 1  sovereignty, in the way decisions are made, has been taken care

 2  of.  It is very clear that lead counsel for each of the

 3  Plaintiffs groups, that their responsibilities are limited to

 4  the Plaintiffs groups, for which they are lead counsel.  And

 5  they would not be making decisions for the States.  That is

 6  already clear, in Your Honor's orders.

 7          So, these issues – these issues of impinging on the

 8  States' sovereignty, and their ability to decide how to

 9  progress their case, are already dealt with, in the case.  So,

10  there is no – there is no need to change anything about the

11  existing case management structure.

12          THE COURT:  Alright.

13          MR. GORDON:  In the case.

14          THE COURT:  Okay, thank you.  Do you have something

15  else?

16          MR. GORDON:  No, Your Honor.  I think that's it.

17          THE COURT:  Thank you.

18          MR. GORDON:  Thank you.

19          THE COURT:  Let me just clarify, if the private

20  Plaintiffs have any position.  When I say private, I am talking

21  about the structured classes that we had or tracks we had

22  developed here.  I did not note any position, of the Plaintiffs

23  for or against.  Would either – would any of you like to

24  address any matters that you just witnessed?  Ms. Liebenberg?

25          MS. ROBERTA D. LIEBENBERG, ESQ.:  Yes, Your Honor.

STATUS CONFERENCE

1   We don't take a position, but we do support the – the – the

2   separate track that the government has proposed.  We believe

3   that we will be able to continue to coordinate discovery, with

4   the State A.G.'s.  When we get to the status parts, the DPP's

5   and IRP's are also contemplating an overarching – filing an

6   overarching conspiracy complaint similar to what the State A.G.

7   have done, with respect to many of the drugs that are

8   encompassed in the State A.G. complaint.

9               THE COURT:  In addition to the pending amended—

10              MS. LIEBENBERG:  [Interposing] Yes, Your Honor.

11              THE COURT:  -consolidated complaint?

12              MS. LIEBENBERG:  Yes.

13              THE COURT:  Alright, thank you.

14              MS. LIEBENBERG:  Thank you.

15              THE COURT:  Ms. Nast, or Mr. Cuneo?

16              MR. JON CUNEO, ESQ.:  Your Honor, we – – for Kroger

17  direct action –

18              THE COURT:  [Interposing] I am not addressing you

19  yet.

20              [LAUGHTER]

21              MR. CUNEO:  I am only advising because we filed a

22  statement, in connection with—

23              THE COURT:  [Interposing] That's okay.  I'll call on

24  you when I need you.

25              MR. CUNEO:  As long as I am being responsive.

STATUS CONFERENCE

1          THE COURT:  Mr. Cuneo.

2          MR. CUNEO:  We would like to identify with the – the

3   statements of the – –.

4          THE COURT:  Okay.  Alright.  Anything else?  Now, I

5   would like to know, Mr. Nielson, if you have any very brief

6   rebuttal, on the two motions?

7          MR. NIELSON:  Just very briefly, a couple of points,

8   Your Honor.  The question here, assuming the Court is going to

9   apply the motion to dismiss 12B6 standard, is whether it is

10  plausible that there is an overarching conspiracy.  That is

11  what we are talking about here.  I think the Defendants are

12  asking you to conclude that it is not plausible, under any

13  circumstances, that there could be an overarching conspiracy

14  between companies that make different drugs.  And I think the

15  fundamental point there is the difference between competitors

16  and potential competitors.  The law, black letter antitrust

17  law, prohibits agreements between potential competitors, as

18  equally as it does agreements between potential – between

19  current competitors.  And I think we have explained, you know,

20  in great detail, why this is an agreement between potential –

21  in many cases, potential competitors, in some case current

22  competitors, that is beneficial for all of them.  And there are

23  reasons why they would want to do it.

24          Counsel discussed the auto parts decision, and – and

25  read some parts.  I would suggest, if you have concerns about

STATUS CONFERENCE

1    the auto parts case and its application, go back and read the

2    whole case and you will understand the differences—

3              THE COURT:  [Interposing] Do you know how many times

4    we have read the auto parts case?

5              MR. NIELSON:  Yes.

6              [LAUGHTER]

7              MR. NIELSON:  I have actually gone back and read the

8    complaint, the proposed complaint, and it is just – it is very

9    far afield, in terms of the detail alleged in there.  And – and

10   the – the interconnections among the various groups.

11             But one – just one last point, Your Honor.  Even if

12   there was no overarching conspiracy alleged, in the

13   consolidated amended complaint, the Plaintiff States would

14   still – still be seeking a separate government track.  These

15   agreements are interconnected.  They involve a common

16   participant.  They will all involve common discovery of the

17   same sales representatives, over and over again.  The – the

18   conduct – there are communications between Heritage, for

19   example, and Teva, involving seven different drugs at one time.

20   It would be nonsensical, from our perspective, to break that

21   into seven – seven different cases, Your Honor.

22             Equally, the communications, with Mylon, you know

23   there is an ongoing understanding with Mylon.  There was

24   collusion going on in 2013, on doxy DR.  There were price

25   increases going on in 2014, on other drugs.  So, our position

STATUS CONFERENCE

1  is, respectfully, that even if there was no overarching

2  conspiracy, we would still seek a separate government track.

3  We would still seek to plead these agreements, all involving

4  Heritage, together in one.

5              THE COURT:  Thank you.

6              MR. GORDON:  Your Honor, if I just may take a minute?

7              THE COURT:  Is there rebuttal?

8              MR. GORDON:  On the – on the point, Your Honor, about

9  the – that counsel made, regarding the, in theory that you

10  could have a conspiracy involving potential competitors, our

11  position is that that's not – our position is not that that is

12  legally impossible.  Our position is that the facts, as pled,

13  in this case, don't support – there are no allegations that –

14  that show that these Defendants are actually potential

15  competitors.  Sufficiently, I mean there were a lot of words

16  thrown around in argument, that they are likely to be

17  competitors.  There are no facts on those things, in – in the

18  complaint, Your Honor.  There are no facts, again, showing

19  intent, intention, ability for the – in any one of these drugs,

20  let alone all 15 of them, for each of these Defendants.

21           The States have had three and a half years of

22  investigation.  They have reviewed, by their own words,

23  millions of documents, including texts, including emails.  If

24  those facts were – were available, the facts connecting the

25  various different conspiracies, the facts supporting the notion

STATUS CONFERENCE

1  that these are actual potential competitors, they would be in

2  the complaint.  And they are not there, Your Honor.  There

3  simply – there is no basis, in that complaint, to allege – to –

4  to hold each and every Defendant jointly and severally liable,

5  for conduct related to each and every drug.  The facts just

6  aren't there today.  They are not in the complaint.  And they

7  should not be permitted to proceed, with the complaint that

8  attempts to hold each and every Defendant jointly and severally

9  liable for each and every conduct related to each and every

10  drug, when – when most of the Defendants didn't make most of

11  the drugs.  Based on the facts that are alleged, in the

12  Complaint.

13          And they say, Mr. Nielson said that this conspiracy

14  had been going on for a long time, since 2006, I think he said,

15  in his argument.  But there are no allegations, in the

16  complaint, of any communications before 2012 – 2013.  And there

17  are no allegations relating to – with respect to the

18  overarching conspiracy, you know, when it was formed, by whom

19  it was formed, the kind of requisite, you know, who, what,

20  when, where, of this conspiracy.  And so, the Defendants,

21  again, my client, Lynnette, Your Honor, isn't on notice of when

22  it allegedly entered into this – this vast overarching

23  conspiracy.  Who – what communications joined it to this

24  overarching conspiracy?  That is not – that's not anywhere

25  disclosed, in the consolidated amendment complaint.

STATUS CONFERENCE

1          THE COURT:   Alright, counsel, thank you.

2          MR. GORDON:   Thank you, Your Honor.

3          THE COURT:   We will address everything else that

4   remains before the Court, after a brief recess.   It has been a

5   long morning, and we will be right back.   I'll take the matter

6   under advisement.

7               [END FILE Courtroom 12A_2010221-1036]

8               [START FILE Courtroom 12A_20180221-1235]

9          COURTROOM OFFICER:   All rise.

10          THE COURT:   Give everybody a chance to scramble.

11   Please be seated, everyone.   Let us please now address the

12   joint proposed agenda items, and the status conference should

13   begin, and we will take up all of the matters therein.   And

14   let's hear about the forthcoming Class Action Complaints

15   concerning additional pharmaceutical products, please.   Good

16   afternoon, Ms. Nast.

17          MS. DIANNE M. NAST, ESQ.:   Good afternoon, Your

18   Honor.   Yes, as we have mentioned, to the Court, a number of

19   times, in the past, there – there will be suits filed for

20   additional drugs.   Ms. Liebenberg just referred to it.   We are

21   still in the analysis and data study time, but we expect to

22   file that complaint reasonably soon.   We don't have a precise

23   date yet.   In the meantime, while we are working on that, we

24   have also been meeting and coordinating with the States.

25   Yesterday, we had a full afternoon with counsel for the States,

1   with Mr. Blechman.  And we have - Your Honor lifted the stay on

2   discovery, with the idea that it won't begin for three months.

3   So, in the meantime, we are going to - we have got document

4   requests to serve, which we know won't be responded to until

5   that three-month period runs.  We have 30 B6 deposition notices

6   that we are organizing, third party discovery.  So, we're - we

7   are up and running with - with discovery plans, and with

8   coordinating with everybody.  We are all in one group, on one

9   page.

10          THE COURT:  Okay.  That sounds great to me, except we

11   have this leftover ESI issue, on the protocol order.

12          MS. LIEBENBERG:  I can address that, Your Honor.  I

13   have good news, for the Court, on that.

14          THE COURT:  Okay.  We'll get to that, then.

15          MS. NAST:  Yes, we have a - we have a date certain

16   for submitting that.  Ms. Liebenberg will give you a little

17   more detail.

18          THE COURT:  Okay.  Thank you.

19          MS. NAST:  Thank you.

20          MS. LIEBENBER:  You know, Your Honor, we always try

21   to bring some good news, to these status conferences.  So, we

22   did have a call with Ms. Levine, yesterday, with Liz on for the

23   Defense.  And we have agreed that we would submit an ESI

24   protocol, to you, by March 23rd, and we would indicate, as we

25   have done, in the other orders, the areas of disagreement.  But

STATUS CONFERENCE

1  we believe that having a specific deadline will ensure the—

2       THE COURT:  [Interposing] Okay.

3       MS. LIEBENBERG:  -efficient and effective

4  negotiation, on the protocol, so that we can get that submitted

5  that to you.

6       THE COURT:  And I would so order, then, March 23rd is

7  the deadline for the Plaintiffs submission.  I am very

8  interested in facilitating that process, so that when I do get

9  to see the Plaintiffs' position, and the Defense response, I am

10  going to determine whether we should be really thinking about

11  getting an ESI expert in here, to be a master.  And I – since I

12  said the word, I know, in the early states of this MDL, I threw

13  out that suggestion, but I did not get any sense of need, from

14  the leadership.  I do think, as discovery proceeds, we need to

15  be thinking about that.  And we need to be thinking about more

16  than just one master.  ESI is in its own realm.  Discovery is

17  very large a responsibility and may even involve some other

18  types of masters.  I would like everybody to start thinking

19  about that, in terms of what do you project might be needed

20  down the road?  How do we utilize it?  And whether or not you

21  have any suggestions.

22       MS. LIEBENBERG:  Thank you, Your Honor.  We will take

23  that under advisement.  Thank you.

24       THE COURT:  Thank you.  And there is a proposed

25  preservation order, with a missing Exhibit A.  Has that been

STATUS CONFERENCE

1    resolved yet?

2            MS. LIEBENBERG:  I'm sorry.  Oh yes, we have resolved

3    that, too, Your Honor.  One, the – the discovery, there is –

4    there is no prohibition on the discovery being three months.

5    We were going to be – we are going to be producing our

6    discovery and serving it and – and they will respond however

7    they are going to respond .

8            THE COURT:  Yeah, the 90-day stay sort of threw me.

9            MS. LIEBENBERG:  Yes.  Yes,--

10           THE COURT:  [Interposing] I don't think that is what

11   I signed.

12           MS. LIEBENBERG:  -that's not applicable.  Yes.

13           THE COURT:  Okay.  But what about this—

14           MS. LIEBENBERG:  [Interposing] But with respect to

15   the preservation order, Your Honor, I spoke with Ms. Levine,

16   again yesterday, and given that the stay has been lifted, we

17   believe that we don't need the preservation order.  What we

18   have, in place, is fine.  So, we are not going to be in further

19   negotiations on that.

20           THE COURT:  Alright.

21           MS. LIEBENBERG:  Take that off the table, as well.

22           THE COURT:  So, that is off the table.

23           MS. LIEBENBERG:  Yes.  More good news.

24           THE COURT:  And that leaves the Joint Stipulation and

25   Proposed Order of Voluntary Dismissals of various cases,

STATUS CONFERENCE

1    various Plaintiffs, various Defendants.  And I know this is a

2    stipulation, and it makes sense to me, but I am always looking

3    at the logistics and how to follow up on whether or not the

4    implementation in the docket is accurate.  And I reviewed this,

5    again yesterday, and I said this – this could be very helpful,

6    in moving discovery forward, to sign this and file it.  But I

7    would ask that Plaintiffs and Defense designate one of your

8    many able persons to monitor the dockets to make sure that the

9    dockets are representing what is in this order.  We will also,

10   but I have found too often that that is complicated, and here,

11   in our case, it may be further complicating.  So, we can help

12   the Clerk's Office, which does a yeoman's job, working with us,

13   but I would just like you all to know, I will sign this Joint

14   Stipulation.  But I want that to be followed up on, because I

15   think that it will clarify some of the issues that I keep

16   hearing, about, you know, the complications of discovery.

17            MS. LIEBENBERG:  We will do that, Your Honor.  Thank

18   you.

19            THE COURT:  Alright?  Thank you.  Anything more on

20   the Plaintiffs side?  And I think before I hear from counsel,

21   in the Kroger matter, I would like to get Ms. Levine's response

22   and any additional information.

23            MS. JAN P. LEVINE, ESQ.:  On which issue, Your Honor?

24   Do you want my response?

25            FEMALE VOICE 1:  Everything.

STATUS CONFERENCE

1  MS. LEVINE:  Everything?

2  THE COURT:  On everything you care to talk about.

3  MS. LEVINE:  You want me to argue the overarching

4  conspiracy here?  I – I think the one item that hasn't been

5  addressed yet is really the timing for motions to dismiss, on

6  Group 2 and Group 3.

7  THE COURT:  Right.

8  MS. LEVINE:  And I think when PTO 35, with the dates,

9  was entered, it was entered with a cover letter that I would

10  like to hand up, to the Court, explaining that the dates were

11  necessarily might have to change, --

12  THE COURT:  [Interposing] Right.

13  MS. LEVINE:  -depending on where we were.

14  THE COURT:  Well, we can tell you, we are working on

15  the motions to dismiss.  And I firmly believe that how we rule

16  on those might very well guide the remaining motion practice.

17  MS. LEVINE:  Right.  And that was exactly the idea of

18  the different groups.  So, I think this letter is coming

19  through, it was a joint letter, that points out the parties

20  wanted to bring to Your Honor's attention, their joint

21  understanding that the deadlines in this proposed pretrial

22  order, may necessarily be tentative, as the Court's rulings on

23  the motions to dismiss, in case management Group 1, could

24  impact scheduling for case management Groups 2 and 3,

25  including, but not limited to, amending consolidated amended

STATUS CONFERENCE

1   complaints and briefing motions to dismiss.

2            So, what we were thinking, is the best schedule would

3   really be to hold the present dates in abeyance, and to reset

4   those, for you know, 45 days after Your Honor rules, on the

5   Group 1.  And maybe we can revisit this, at the argument time,

6   of Group 1, when we are all together again.  Does that make

7   sense?

8            THE COURT:  Well, it makes sense.  Do you all agree

9   with that?

10           MS. LIEBENBERG:  As you saw, in the status agenda,

11   the class planners all agreed that the schedule that was set,

12   by Your Honor, in Pretrial Order number 35, should remain in

13   effect, but we absolutely recognize that the decisions that you

14   will be rendering, on Group 1, may implicate the motion and

15   brief – the briefing schedule, and therefore, an adjustment to

16   the schedule may be necessary.

17           THE COURT:  Alright.  I am going to adjust the

18   schedule.  And I think the 45 days, after the Court rules on

19   the pending motions to dismiss, in Group 1, is the new

20   operative order.  And the – and that will apply to Group 2

21   cases.  Group 3 cases will similarly be forwarded, in dates.

22   Alright?

23           MS. LEVINE:  Thank you, Your Honor.

24           MS. LIEBENBERG:  That's fine, Your Honor.  Thank you.

25           THE COURT:  Very good.  And I think I would like now

STATUS CONFERENCE

1    to address the new action that has been filed, into the MDL,

2    which we will refer to as the Kroger Action.  It is 284 of

3    2018.  And the Kroger Plaintiffs refer to themselves as

4    Direction Action Plaintiffs.  Counsel?  Mr. Blechman?

5              MR. WILLIAM J. BLECHMAN, ESQ.:  Thank you, Your

6    Honor.  William Blechman from Kenny Nockwalter, on behalf of

7    the Kroger Direct Action Plaintiffs, and I appreciate—

8              THE COURT:  [Interposing] And you see, this is what

9    they call the finale – the grand finale.  And it is often a

10   highlight of our status conferences.

11             MR. BLECHMAN:  I will try to live up to that, Your

12   Honor.  Your Honor, there are three points that I would like to

13   address to the Court, in connection with the Kroger Direct

14   Action Plaintiffs case.  The first is, with respect to the

15   actual situation of what I will refer to as the Kroger case, in

16   the MDL, the Court's pretrial order number 1 provides that

17   cases that are filed, in this District, are, in the words of

18   that order, automatically consolidated with the MDL case.  But,

19   in talking with my colleagues, there is some question, among

20   some at least, about whether we are actually part of the MDL,

21   by virtue of that order, or not.

22             THE COURT:  No, not yet.

23             MR. BLECHMAN:  And this is a point, as to which, from

24   our point of view, there – there does not need to be any real

25   dispute.  And so, our suggestion, to the Court, subject to the

STATUS CONFERENCE

1    Court's approval, would be the entry of an administrative

2    order, of some sort, merely and only recognizing that the

3    Kroger case is centralized as part of the MDL.

4          Point number 2, with respect to the response to the

5    Kroger's Direct-Action Plaintiffs complaint, we have had

6    discussions with liaison counsel for the Defendants.  We have

7    reached a point where I think we have an understanding, or

8    agreement in principle.  It is informed, I am sure, by what

9    Your Honor has done in this courtroom today, with regard to

10   their stipulation.  And I think the appropriate course for me

11   to take, at this point, is simply to alert the Court that we

12   have had those discussions, that we have had concrete specifics

13   about when a response would come, and I think rather than

14   getting ahead, I will confer further with counsel, but we

15   expect to be able to file a stipulation, with Your Honor, with

16   respect to the response to the Kroger Direct Action Plaintiffs

17   complaint.

18         THE COURT:  That's fine.

19         MR. BLECHMAN:  Third, the third point is the actual

20   modest changes to some pretrial orders that Your Honor has

21   entered, to accommodate the presence, in the MDL, of direction

22   action – of Private Direct-Action Plaintiffs cases.  The Court

23   has entered a number of orders, in this case, that have

24   provided structure to this large MDL.  All of those orders that

25   deal with Plaintiffs pertain to the class Plaintiffs, which is

STATUS CONFERENCE

1    understandable, because up until the filing—

2            THE COURT:  [Interposing] That is all that had been

3    filed.

4            MR. BLECHMAN:  Yes, Your Honor.  At this point, now,

5    with the Kroger Direct Action Plaintiffs case having been

6    filed, I don't really think there is any dispute that the class

7    lawyers cannot represent the Kroger Plaintiffs, and vice versa.

8    We represent different constituencies with different fiduciary

9    duties.

10           Therefore, as I read the Court's pretrial orders, the

11    – the solution, to accommodate the Direct-Action Plaintiffs, in

12    the structure of the MDL, would be one in which there are just

13    minor tweaks to three pretrial orders, to align the fiduciary

14    duties, between the Class and Direct-Action Plaintiffs, with

15    the structure of the case.

16           Those changes are as follows.  First, in pretrial

17    order number 33, Your Honor, in our papers, I – I said order

18    24, but Class counsel was helpful in reminding me that was

19    superseded.  So, it would be pretrial order number 33.  In that

20    order, we respectfully suggest that there be a – an express

21    recognition, by this Court, of a separate group or track, for

22    Direct Action Plaintiffs.  To the extent that Your Honor, in

23    the context of the structure of this case, is looking for

24    someone to be the point person, for that, and it has been

25    suggested to me, by counsel with whom I have conferred in this

STATUS CONFERENCE

1  case, that given the way the Court has structured the case,

2  that may be advisable.  And in my experience, I think it would

3  be.  We have volunteered to accept that role, based on the

4  experience that we have in other MDLs in precisely this

5  situation.

6       Number two is pretrial order number 31.  The order

7  that would — that would — the Court would enter, if Your Honor

8  is inclined to do so, would merely and only provide that the

9  reference to Plaintiffs, in that order, refers throughout only

10  to Class Plaintiffs.  And third, with respect to pretrial order

11  number 37, two minor tweaks there, Your Honor.  First is the

12  reference to Plaintiffs refer to only Class Plaintiffs, and the

13  reference to Lead Counsel, throughout, should refer to Lead

14  Class Counsel.

15       Finally, Your Honor, on returning to the point of

16  coordination that I mentioned to you before.  Mindful of the

17  fact that in cases like this, it is not uncommon for there to

18  be other Direct-Action Plaintiffs' cases filed, and I suspect

19  there will be.  And after conferring with Class Counsel, for

20  purposes of the sustainability of the structure that I am

21  suggesting to Your Honor, to the extent that you think it

22  appropriate now to do so, we would suggest to the Court that it

23  appoint us as liaison counsel for the Direct-Action Plaintiffs.

24  The structure that I Have described to Your Honor, is one

25  which, in my experience, has been used by most MDL antitrust

STATUS CONFERENCE

1    cases that I have been in.  On page 3, footnote 4, of our

2    papers, we identify eight such cases.  Of those eight cases, I

3    have been, or my firm has been liaison counsel in, I think four

4    – I think five of those cases.  So, this is something about

5    which we – we know a thing or two about.  This is no small

6    undertaking . We have no interest in any other cases.  But

7    frankly, we recognize, over time, based on experience, that –

8    as I think the Court does, in the way it has already set up

9    this MDL – that a well-organized case benefits all parties.

10   And in my point of view, all Plaintiffs, including our clients.

11           And therefore, Your Honor, for those reasons, we

12   respectfully suggest that the Court enter an order modifying

13   the pretrial orders that I have identified, in the manner that

14   I have described.

15           THE COURT:  Thank you, Mr. Blechman.  I am always

16   pleased to see a well-organized type of proposal.  And I have

17   little doubt that there will be more, in the way of Direct

18   Action Plaintiffs filed – filing cases here.  But I have yet to

19   see that.  You are the only one standing – you and your three

20   Plaintiff clients.  And while that is fine, it doesn't create,

21   necessarily, a superstructure within or without the MDL.  It

22   does include you, in the MDL.  I don't see any reason not to.

23   So, we will enter an order to that effect.  But until I see the

24   landscape, of what else may be coming, it is best not to

25   appoint any leadership, no offense.  You will be considered—

STATUS CONFERENCE

1      MR. BLECHMAN:  [Interposing] None taken.

2      THE COURT:  -obviously, first, because you are the

3  first applicant.  But, in the meantime, you are counsel for

4  your cases and you will be able and are permitted to

5  participate in all the phases of the discovery and I will put

6  it at that.   And any pleadings, you will be representing your

7  own.  No one else will be representing your clients, at this

8  time.  So, and we understand that the Class Plaintiffs'

9  leadership are not interested in taking on your cause, because

10 we - we see the obvious problems.  And I have yet - I would

11 like to - I know that no one has really had much of a chance to

12 respond do your Motion to Modify these pretrial orders, but is

13 there any accommodation that could be made, that we could look

14 at, because I did review this and it seemed to me that we could

15 do it with a separate order, or we could leave these orders in

16 place, for the Classes, and clarify that they are for the

17 Classes.

18      MS. LIEBENBERG:  May I, Your Honor?

19      THE COURT:  Ms. Liebenberg, I think that would be

20 helpful, to get this resolved now.

21      MR. BLECHMAN:  Thank you, Your Honor.

22      THE COURT:  Thank you, Mr. Blechman.

23      MS. LIEBENBERG:  We spoke with Mr. Blechman,

24 yesterday.  We received his Motion to Modify - it is pretrial

25 orders 21, not 31, and 37 - and late Friday night.  Which those

STATUS CONFERENCE

1  orders specifically set out, it appointed lead counsel and

2  steering committees, and set out their duties and

3  responsibilities, for the DPPs, the EPPs, and the IRPs.  And

4  pretrial order number 37 is specifically identifies that it

5  applies only to the DPPs, the EPPs, and the IRPs.  And, in

6  fact, it does, in paragraph three, of the pretrial order 37,

7  instructs lead counsel to coordinate the exact relief that Mr.

8  Blechman is seeking.

9       It seems to us that the more appropriate way to

10  proceed is something similar to what happened with the State

11  A.G.'s, and perhaps a separate order similar to pretrial order

12  number 36, which appointed the State A.G.'s as liaison counsel.

13       THE COURT:  Thank you.  Does the Defense have any

14  position?

15       MS. LEVINE:  Yes.  I think we are in agreement with

16  Class Plaintiffs, that we don't think the present orders should

17  be disrupted.  If you want to clarify that the Kroger DAPs are

18  coming in, and the are officially in the MDL, we are certainly

19  fine with that, and we will coordinate with Mr. Blechman, who I

20  know well, for the future of the case.

21       THE COURT:  Good.

22       MS. LEVINE:  Thank you.

23       THE COURT:  Thank you.  Alright.  Yes, Mr. Blechman?

24       MR. BLECHMAN:  Thank you, Your Honor.  Thank you,

25  Your Honor.  I – I can't quite tell, from what the Class has

STATUS CONFERENCE

1    suggested, and so, if I might just ask a question, a

2    clarification.  Is the Court contemplating recognizing by

3    separate order, the existence of a separate Direct-Action

4    Plaintiffs track or group?

5              THE COURT:  At this time, I am not certain,--

6              MR. BLECHMAN:  [Interposing] Okay.

7              THE COURT:  -whether that is necessary.  Because I

8    don't know, yet, how large it would be, and how it would be

9    organized itself.  We could come in with multiple plaintiff

10   cases.  We could come in with single plaintiff cases.  We could

11   have – we could have all the drugs alleged to have been the

12   subjects of conspiracies, overarching and not, the complaints

13   could be completely different.  We would have to see how

14   cohesive that group would be.

15             MR. BLECHMAN:  If I might respond?

16             THE COURT:  You may.

17             MR. BLECHMAN:  Thank you, Your Honor.  In my

18   experience, doing this sort of thing, for a while, there are

19   not necessarily absolute similarities among Direct Action

20   Plaintiffs cases, just as you have seen, there are differences,

21   at times, among other kinds of plaintiffs and their cases.  But

22   that has never, in my experience, and I don't suggest now being

23   any impediment to the way in which Direct Action Plaintiffs,

24   themselves, coordinate and speaking with a voice, single, when

25   it comes to issues of coordination, and things of that sort.

STATUS CONFERENCE

 1          So, I get the fact that the Court wants to see the

 2   landscape, about how – what other case – what other Direct

 3   Action cases come in, but the concern we have is that the way

 4   we read the orders, the – without – if there is not recognized,

 5   a Direct Action Plaintiffs group – either case or group, and if

 6   the pretrial orders are not recognized to be modified to

 7   provide the Class Counsel and Lead Counsel for the Class, don't

 8   speak for us, can't bind us, and so forth, then we are left in

 9   this no man's land where it – that uncertainty plays out, which

10   matters to us, because as – as I have heard today, there are

11   protocols and other points that are being negotiated where we

12   would have an interest.

13          There are a lot of people, in this courtroom, who are

14   very familiar faces here.  There is a lot of talent, on both

15   sides of the V, in this case, including in this courtroom.  The

16   one thing that most all of us know how to do really well,

17   because of the experience – the common experiences we have had,

18   in a variety of these cases, is how to coordinate.  And if I

19   thought, for a moment, that anything I suggested to Your Honor

20   would in any way complicate the cohesion, the coordination –

21   those are the Court's words – and the flexibility of what you

22   are trying to accomplish here, I wouldn't stand before you and

23   – and suggest that you – you consider some sort of prophylactic

24   order, along the lines that we have suggested.  If you – other

25   than that, Your Honor, if you have questions, I will answer,

STATUS CONFERENCE

1    but I – I have said my piece.

2              THE COURT:  I don't have questions.  I – except that

3    I'm sure we will end up at the same place, but the filing of

4    one type of action doesn't necessarily premeditate or predict

5    the coordination of a separate track, yet.  Because you are

6    being allowed to file your case directly into the MDL, which

7    is, at the discretion of this Court, is a way to coordinate

8    that.  If I didn't allow that, I would have to have

9    justification for it.  I can't find any.  But that doesn't

10   necessarily create a separate and equal branch of this

11   Plaintiffs hierarchy, not yet.  I have to see the force.  And I

12   will be looking for that.  But I'm going to put a time limit on

13   that.   And I'm going to say we'll see what shakes out, and we

14   will look at this in 90 days and 60 – 90 days or six months,

15   and see how large is this body that needs its own tweaking and

16   its own rules.  I will, however, clarify that you are the

17   master of your case, at this time.  And there is no control, by

18   any Class representatives of your decision-making authority.

19   And yet, at the same time, I have established a hierarchy here,

20   overarching hierarchy of Plaintiffs leadership, which is not

21   limited to classes.  They all happen to have classes, except

22   for the States.  That's not a class, as far as I can tell.  It

23   is individual states.  So, you see, we can make room for that.

24             MR. BLECHMAN:  Very well, Your Honor.

25             THE COURT:  And I – I will do it in that hybrid

STATUS CONFERENCE

 1    fashion, for now.

 2              MR. BLECHMAN:   Thank you, Your Honor.   Thank you for

 3    your—

 4              THE COURT:   [Interposing] And I will do it without

 5    prejudice.   Okay?

 6              MR. BLECHMAN:   Thank you.

 7              THE COURT:   You're welcome.   Anything else, from

 8    Plaintiffs?

 9              MS. LIEBENBERG:   No, Your Honor.

10              THE COURT:   Anything else from Defense?

11              MS. LEVINE:   No, Your Honor.

12              THE COURT:   Alright.   Well, with that, I thank you

13    very much.   We will take the oral argument matters under

14    advisement, but I hope to decide that very promptly so that

15    everyone knows what page they are on.

16              CHORUS OF VOICES:   Thank you, Your Honor.

17              THE COURT:   Thank you all.

18                             *  *  *  *  *

90

# **C E R T I F I C A T I O N**

I, Joyce A. Waser, court approved transcriber, certify that the
foregoing is a correct transcript from the official electronic
sound recording of the proceedings in the above-entitled
matter, and to the best of my ability.


_____

        DATE:  March 2, 2018

# EXHIBIT 12

## FILED UNDER SEAL

# **EXHIBIT 13**

# FILED UNDER SEAL

# EXHIBIT 14

## FILED UNDER SEAL

# EXHIBIT 15

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| STATE OF CONNECTICUT, et al., | No. 3:16-cv-02056-MPS |
| *Plaintiffs,* | |
| v. | |
| AUROBINDO PHARMA USA, INC., et al., | |
| *Defendants.* | |
| STATE OF CONNECTICUT, et al., | No. 3:19-cv-00710-MPS |
| *Plaintiffs,* | |
| v. | |
| TEVA PHARMACEUTICALS USA, INC. et al., | |
| *Defendants.* | |
| STATE OF CONNECTICUT, et al., | No. 3:20-cv-00802-MPS |
| *Plaintiffs,* | |
| v. | |
| SANDOZ, INC., et al., | |
| *Defendants.* | February 26, 2025 |

**DECLARATION IN SUPPORT OF THE STATES' MOTION FOR FINAL APPROVAL
OF SETTLEMENT WITH HERITAGE PHARMACEUTICALS INC., EMCURE
PHARMACEUTICALS LTD., AND SATISH MEHTA**

I, Elin S. Alm, hereby declare and state as follows:

1.      I am an Assistant Attorney General and the Director of the Consumer Protection

and Antitrust Division of the North Dakota Office of Attorney General. This Declaration is based

upon my personal knowledge and information provided by my State colleagues.

2.    Attached as Exhibit 1 is a true and correct copy of the proposed settlement agreement (the "Settlement") between the Plaintiff States and Heritage Pharmaceuticals Inc., Emcure Pharmaceuticals Ltd., and Satish Mehta (collectively "Heritage Defendants"). Capitalized terms in this Declaration incorporate the defined terms from the Settlement.

3.    I provide this Declaration in support of Plaintiff States' Motion for Final Approval of the Settlement with Heritage Defendants.

4.    Since 2016, the States have litigated claims alleging that Heritage Defendants (manufacturers of generic drugs) conspired with non-settling Defendants (other manufacturers of generic drugs) in violation of federal and state antitrust and consumer protection laws to artificially inflate and maintain the prices for generic drugs.

5.    The States' allegations against the manufacturers of generic drugs span three different complaints, collectively referred to as the States' Actions: (1) a complaint focused on agreements involving Heritage, filed in December 2016, *Connecticut et al. v. Aurobindo Pharma USA, Inc., et al.*, 3:16-cv-02056 (the "Heritage Action" and this "Action") which after amendments encompasses 15 drugs; (2) a complaint focused on over 100 different drugs centered on agreements involving Teva Pharmaceuticals, filed in 2019, *Connecticut et al. v. Teva Pharmaceuticals USA, Inc., et al.*, 3:19-cv-00710; and (3) a complaint focused primarily on dermatology products concerning over 80 different drugs, filed in 2020 (the "Dermatology Action"), *Connecticut et al. v. Sandoz, Inc., et al.*, 3:20-cv-00802.  In each of the complaints, the States also allege an overarching conspiracy for the drugs and anticompetitive acts in that action.

6.    The Heritage Defendants are the first group of defendants to agree to a settlement in the States' Actions, making the Settlement an "ice-breaker" settlement.

2

7.    The Settlement is entered by attorneys general of fifty states, commonwealths, D.C., and territories in the United States whose interests are aligned in enforcing federal and state law and vigorously pursuing remedies for their states, consumers, and state agencies.

8.    Based on information and data the States have obtained through discovery and analysis provided by the States' experts, it is estimated that the total amount of overcharge associated with sales by Heritage Defendants during the period at issue in the litigation is approximately $57 million, of which it is understood that consumers and state agencies may have paid somewhere around 40% or $22.8 million. Recognizing the cooperation that Heritage provided, a first-in discount, the risks of litigation, and the time value of money, the states settled for $10 million.

9.    The States have and will continue to vigorously litigate the States' Actions.  The States have engaged in extensive discovery and motion practice and have zealously prosecuted this case. The States' investigation and litigation work, including motion practice, discovery, and expert work and expert discovery, has allowed the States to gain an excellent understanding of the three cases.

10.    This Settlement reflects not only the strengths and weaknesses of the claims against Heritage Defendants, but also the value of the cooperation that Heritage Defendants have agreed to provide to aid in the continued prosecution of this case against other defendants.  Additionally, this Settlement's status as an "ice-breaker" settlement adds value in that it may help spur other defendants to settle or engage in settlement negotiations.

11.    The settlement negotiations were conducted at arm's length and in good faith. Throughout the settlement process, Heritage Defendants have been represented by counsel with significant expertise in complex antitrust litigation. The Assistant Attorneys General in the offices

3

of the Attorneys General for Connecticut, New York, and Massachusetts, who led the settlement

negotiations on behalf of the States, individually and collectively, have extensive experience with

antitrust investigations and litigation.

12.     The States contracted with Rust Consulting, Inc ("Rust"), a nationally recognized

notice and administration company, to act as Notice and Claims Administrator to implement a

Notice Plan.

13.     The Settlement and the States' Notice Plan was submitted to the court for

preliminary approval on October 31, 2024, and was approved by the Court on December 2, 2024.

*See* ECF No. 675 (3:16-cv-02056-MPS).  The approved Notice Plan was implemented by the

States through Rust, and the Notice Plan achieved each of the planned objectives. *See* Declaration

of Tiffany Janowicz filed herewith.

14.     The Notice Plan provided for an earned media program, which included press

releases distributed by the States and by Rust.  At least 35 Attorneys General issued press releases

or social media posts announcing the Settlement and informing potentially eligible consumers that

they may be eligible for compensation, and included the following message:

> If you purchased a generic prescription drug manufactured by either
> Heritage or Apotex between 2010 and 2018, you may be eligible for
> compensation. To determine your eligibility, call 1-866-290-0182
> (Toll-Free), email info@AGGenericDrugs.com or visit
> www.AGGenericDrugs.com.

15.     The Settlement was well received by consumers, as shown by the absence of

objections and the limited number of exclusion requests.

16.     The Settlement provides substantial and guaranteed benefits to consumers and state

agencies and avoids the significant delays, costs, burdens, and uncertainties of continuing

protracted and contentious litigation with Heritage Defendants.

17.     Pursuant to the terms of the Settlement, Heritage Defendants paid $10 million to the States on September 30, 2024, which payment was deposited into escrow with Huntington Bank, and which is accruing interest. Out of the $10 million, $6 million was placed in an escrow account for later distribution to Eligible Consumers, state Medicaid agencies, and non-Medicaid state agencies (referred to as the "Restitution Account"), and the remaining $4 million was placed in a different escrow account (referred to as the "Cost Account").

18.     The States are not currently requesting approval of an allocation and distribution plan for the Restitution Account. The States are endeavoring to develop and build toward an efficient and effective distribution to Eligible Consumers.  The States intend to file a motion for approval of an allocation and distribution plan when it is determined, based on the circumstances, including the amount of funds recovered in the States Actions, to be appropriate and efficient to do a distribution to consumers.  The $6 million allocated to the Restitution Account will be held in escrow for a later distribution pursuant to a Court-approved distribution plan for Eligible Consumers, as well as Medicaid agencies and non-Medicaid state agencies if required by law, whose claims are being released.

19.     The Preliminary Approval Order approved a total of $600,000 to be disbursed from the Cost Account for Settlement Administration Costs.  *See* ECF No. 645-4 (3:16-cv-02056-MPS). The States are using these funds to pay the Notice and Claims Administrator for the costs of providing notice to consumers of the settlement.  Upon final approval of the Settlement, the States intend to use the balance of the $4 million in the Cost Account, after Settlement Administration Costs are paid, to finance the States' prosecution of the States' Actions and as provided in the Settlement.

20.     The States maintain that the proposed Settlement with Heritage Defendants is fair,

reasonable, and adequate and in the best interest of the Plaintiff States and their residents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 26, 2025, in Bismarck, North Dakota.

/s/ Elin S. Alm
Elin S. Alm

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **The State of Connecticut,** *et al.* | |
| **Plaintiffs,** | **3:16-cv-02056-MPS** |
| **v.** | |
| **Aurobindo Pharma USA, Inc.,** *et al.* | **August 30, 2024** |
| **Defendants.** | |

## SETTLEMENT BETWEEN THE STATES ON THE ONE HAND, AND DEFENDANTS HERITAGE PHARMACEUTICALS INC., EMCURE PHARMACEUTICALS LTD. AND SATISH MEHTA ON THE OTHER HAND

This Settlement Agreement is made and entered into this 30th day of August 2024 by and among Heritage Pharmaceuticals Inc. ("Heritage"), Emcure Pharmaceuticals Ltd. ("Emcure"), Satish Mehta ("Mr. Mehta") (collectively "Defendants" or "Released Parties") and the States, by and through their respective Attorneys General from the jurisdictions of:

> Connecticut, Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, U.S. Virgin Islands, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

Defendants and the States shall collectively be referred to as the "Parties."

WHEREAS, the States are prosecuting claims in *Connecticut et al v. Aurobindo Pharma USA, Inc., et al*, Case No. 3:16-cv-02056 (D. Conn.); *Connecticut et al v. Teva Pharmaceuticals USA, Inc. et al*, 3:19-cv-00710-MPS (D. Conn.); and *Connecticut et al v. Sandoz, Inc. et al*, 3:20-cv-00802-MPS (D. Conn.) upon remand from the multidistrict litigation in the Eastern District of Pennsylvania, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, Master Docket No. 16-MD-2724, including *Connecticut v. Actavis Holdco U.S. Inc.*, No. 2:17-cv-03768 (E.D. Pa.) (the "Action" or collectively, the "States' Actions");

WHEREAS, the States allege in the Action that Defendants violated various antitrust and consumer protection laws by price-fixing and allocating markets for specified drugs;

WHEREAS, arm's-length settlement negotiations have taken place between the States and Defendants, and the result is this Settlement Agreement, which embodies all the terms and conditions of the settlement between the States and Defendants (the "Settlement Agreement");

WHEREAS, the States have concluded that it is in the best interests of the States to enter into this Settlement Agreement; and

WHEREAS, Defendants have concluded that it is in the best interests of Defendants to enter into this Settlement Agreement;

NOW, THEREFORE, in exchange for the mutual obligations described below, the States and Defendants hereby enter into this Settlement Agreement on the following terms and conditions:

## I. DEFINITIONS

As used in this Settlement Agreement:

"Costs Account" means forty percent (40%) of the Settlement Payment, which the States will hold in escrow and use to pay for Settlement Administration Costs and, upon final approval of the Settlement Agreement, for costs of litigating the States' claims, subject to approval of the District Court. To the extent that monies in the Cost Account are not used to offset costs of States litigating in the multistate actions, any remaining funds may be used for any of the following: (1) Deposit into a state antitrust or consumer protection account (e.g., revolving account, trust account) for use in accordance with the laws governing the account; (2) Deposit into a fund exclusively dedicated to assisting any State to defray the costs of experts, economists and consultants in multistate antitrust investigations and litigations, including healthcare related investigations and litigation; (3) antitrust or consumer protection enforcement, including healthcare-related enforcement, by an individual State or multiple States; or (4) for any other use permitted by state law at the sole discretion of that State's Attorney General.

"Eligible Consumers" mean natural persons who purchased, directly or indirectly, any of the drugs specified in the Action and the two other actions brought by the States pending in the

States' Actions, whether through a cash payment in the absence of insurance, or through insurance, paid a co-pay, deductible, or co-insurance payment.

"Enforcement Period" means a 10-year period from the execution of this Settlement Agreement.

"Final Approval Order" means the order to be entered by the United States District Court for Connecticut or any other presiding federal District Court (the "District Court") that grants final approval of this Settlement Agreement. The Parties intend that the Final Approval Order will include: (1) an affirmance by the District Court that the Notice Plan (as defined below) has been completed; (2) a determination by the District Court that the Settlement Agreement is approved finally as fair, reasonable, and adequate for Eligible Consumers and any other entities on whose behalf the States are settling and releasing their claims for which such approval is needed; (3) an order from the District Court that the monies in the Restitution Account (as defined below) be held in escrow for later distribution pursuant to a District Court-approved distribution plan for Eligible Consumers, as well as Medicaid agencies and non-Medicaid state agencies if required by law, whose claims are being released; and (4) an order from the District Court that monies in the Costs Account are to be disbursed to the States.

"Local Entity(ies)" means any county, city, town, or other local governmental entity.

"Notice Plan" means the plan specifying the manner and content of notifying Eligible Consumers of this Settlement Agreement and informing Eligible Consumers of their rights to comment on or to exclude themselves from the States' Actions and this Settlement Agreement. The Parties contemplate that the Notice Plan will take ninety (90) days or such other time period set by the District Court. The Notice Plan will specify the way in which Eligible Consumers are to be notified of the States' Actions and this Settlement Agreement. The Notice Plan will

recognize a second notification to Eligible Consumers, potentially following a later settlement, may be necessary prior to distribution of funds.

"Preliminary Approval Order" means an order to be entered by the District Court that preliminarily approves this Settlement Agreement. The Parties intend that the Preliminary Approval Order will include the following provisions: (1) preliminary approval of this Settlement Agreement as fair, reasonable, and adequate and in the best interests of Eligible Consumers and any other entities on whose behalf the States are settling and releasing their claims and for which such approval is needed; and (2) approval of the Notice Plan.

"Related Case" means any case in or coordinated with MDL 2724 (E.D. Pa.).

"Released Parties" means Heritage (and all its current and former employees, personnel, agents, and representatives, except for Jeffrey Glazer and/or Jason Malek) and Emcure (and all its current and former employees, personnel, agents, and representatives, including, but not limited to, Mr. Mehta) individually and collectively.

"Restitution Account" means sixty percent (60%) of the Settlement Payment, which the States will hold in escrow for later distribution to victims of the anticompetitive acts alleged by the States, including Eligible Consumers, Medicaid state agencies, and other state agencies whose claims are being released by the States. These amounts are intended to compensate these persons and entities for monies taken from them as the result of these alleged anticompetitive acts.

"Settlement Administration Costs" means costs to be paid for all actual, customary, and reasonable costs and fees incurred in the administration of this Settlement Agreement, which includes costs and fees incurred for the purpose of (1) compiling necessary Eligible Consumer information and providing notice directly to Eligible Consumers and including notice by

publication or paid media as may be needed to effectuate adequate notice, (2) completing

administrative tasks, and (3) processing information gathered about Eligible Consumers. Such

Settlement Administration Costs expressly include those fees or costs payable to the settlement

administrator appointed by the States.

## II. SETTLEMENT PAYMENT AND USE OF THAT PAYMENT

Heritage, Emcure, and Mr. Mehta shall pay to the States $10,000,000.00 (the "Settlement

Payment"), within five (5) business days after full execution of the Settlement Agreement by all

Parties. The Settlement Payment shall be held in escrow by the States pending final approval of

the Settlement Agreement.

Forty percent (40%) of the Settlement Payment – or $4,000,000.00 – will be placed in the

Costs Account and the States will use such funds to pay Settlement Administration Costs and,

upon final approval of the Settlement Agreement, the past and future costs of litigating the

States' claims. Disbursements for Settlement Administration Costs not to exceed a total of

$600,000 may be withdrawn from the Costs Account before final approval of the Settlement

Agreement and without further District Court order upon preliminary approval of the Settlement

Agreement.

Sixty percent (60%) of the Settlement Payment – or $6,000,000.00 – will be placed in the

Restitution Account. Any distribution to Eligible Consumers, and where required by law,

Medicaid agencies, and other non-Medicaid state agencies, shall only be distributed at a future

date according to a distribution plan submitted to and approved by the District Court that may

include any subsequent settlements. The Parties acknowledge that the Settlement Payment paid

by Defendants under this Settlement Agreement constitutes adequate restitution for alleged

injury to Eligible Consumers, Medicaid agencies, and other non-Medicaid state agencies under

the States' claims, and the States confirm that any such Eligible Consumers, Medicaid agencies, and other non-Medicaid state agencies shall look solely to the funds in the Restitution Account in settlement and satisfaction of all claims asserted by the States that are released hereunder against the Released Parties.

The Parties agree and understand that any distribution plan is to be considered by the District Court separately from the District Court's consideration of the fairness, reasonableness, and adequacy of the resolution set forth in the Settlement Agreement, and any order or proceedings relating to any distribution plan shall not operate to terminate or cancel the Settlement Agreement or affect the finality of the Final Approval Order, or any other orders entered pursuant to the Settlement Agreement. If the District Court denies final approval of the Settlement Agreement, the full amounts in the Restitution Account and the Costs Account shall be refunded to Defendants within five (5) business days, which shall be the full Settlement Payment less any amounts expended for Settlement Administration Costs not to exceed a total of $600,000.

## III. RELEASED AND RESOLVED CLAIMS

The States release the Released Parties from all claims that the States brought or could have brought against the Released Parties (except on behalf of Local Entities)[1] in the Action brought by States relating to the drugs specified in the Action based on the conduct alleged in that Action, namely, antitrust, consumer protection, fraud or false claims act, "overarching conspiracy," unjust enrichment and disgorgement claims. The States covenant not to sue the Released Parties for all claims that the States brought or could have brought against other

---

[1] Additionally, the states of Florida, Idaho, Illinois, and Missouri do not release the claims they brought or could have brought on behalf of business entities, defined as any partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company, foundation, trust, or any other commercial or business entity or association.

defendants for any other drug for which the States assert a claim in any of the States' Actions based on the conduct alleged in the States' Actions, namely, antitrust, consumer protection, fraud or false claims act, "overarching conspiracy," unjust enrichment, and disgorgement claims. The claims released and the claims on which the States covenant not to sue are collectively referred to as "Released and Resolved Claims."

As permitted by law, each State fully and finally releases and forever discharges the Released Parties from all Released and Resolved Claims. Each State hereby covenants and agrees that it shall not sue or otherwise seek to establish or impose liability, in any capacity and on behalf of itself or any other person or entity or class thereof, against any Released Party based, in whole or in part, on any of the Released and Resolved Claims.

Notwithstanding any term in this Settlement Agreement, Released and Resolved Claims specifically do not include claims unrelated to competition, including:

Any civil or administrative liability under state revenue codes;

Any civil or administrative liability related to a State's Medicaid program under any statute, regulation, or rule for any conduct other than the conduct alleged in the States' complaints, including, but not limited to, state or federal false claims act, anti-kickback or off-label marketing violations for the specified drugs;

Any criminal liability;

Any breach of contract or any liability for expressed or implied warranty claims or other liability for defective or deficient products and services provided by Defendants;

Any liability for unfair or deceptive representations made in the marketing or advertising or for off-label marketing claims for the specified drugs to the extent that such claims are not predicated on the conduct alleged in the Action; and

Any securities-based liability.

**Preservation of Claims against Other defendants**. Heritage's sales of drugs specified in the Action shall, to the extent permitted or authorized by law, remain in the Action against

other defendants in the Action as a potential basis for restitution and other monetary claims and shall be asserted as a part of any joint and several liability claims against other defendants in the Action or against other persons other than the Released Parties.

In addition, the Parties expressly waive, release, and forever discharge any and all provisions, rights, and benefits conferred by § 1542 of the California Civil Code, which reads:

> Section 1542. General Release; extent. A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor;

or by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code. The Parties may discover facts other than or different from what the Party believes to be true with respect to price-fixing, market allocation, or bid-rigging within the time periods mentioned in the States' complaints filed by the States in the States' Actions in the MDL concerning the Released and Resolved Claims, but each Party expressly waives and fully, finally and forever settles, releases, resolves, and discharges, upon this Settlement Agreement becoming final, any suspected or unsuspected, asserted or unasserted, contingent or non-contingent claim that would otherwise fall within the definition of Released and Resolved Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts. This provision shall not in any way expand the scope of the Released and Resolved Claims and shall not convert what is a limited release into a general release.

## IV. COOPERATION

Defendants have to date provided substantial cooperation to the States in the form of providing an account of the facts known to them that are potentially relevant to the claims in the Action; furnishing documents and data in their possession, custody, or control that are potentially

relevant to the States' claims in the Action; and exercising best efforts to secure and facilitate

cooperation from cooperating individuals covered by their conditional leniency agreements and

to make themselves available for interviews.  Under this Settlement Agreement, the States do not

intend to, and will not, take any actions to oppose or otherwise interfere with Defendants' efforts

to obtain from the District Court a determination that Defendants have provided satisfactory

cooperation, pursuant to ACPERA Section 213(c), with respect to their obligations under Section

213(b).  For the purposes of clarity, providing truthful, factual responses to questions posed to

the States' counsel by the District Court regarding Defendants' cooperation shall not constitute a

violation of this provision.  Defendants shall continue to provide such cooperation to the States,

and their respective counsel, as a condition of this Settlement Agreement.  Additional areas of

cooperation shall include the following:

A.      Reasonable efforts to assist the States to understand data produced by Heritage

and/or Emcure, including consulting with technical personnel to address questions posed by the

States' respective data consultants, and to provide any additional information or data reasonably

necessary to understand or clarify the data or otherwise render it admissible, and to provide

additional data as may be reasonably necessary.

B.      Reasonable efforts to authenticate and lay the foundation to admit as business

records any documents identified by the States for use in any of the three States' Actions in the

MDL brought by the States.

C.      Identification of persons who are or were working for Heritage and/or Emcure

who are likely to have relevant information about the alleged conduct in this Action, including

whether such persons remain under the control of Defendants.  The Parties agree for purposes of

this provision that Defendants need not produce Mr. Mehta for an interview unless the States can

demonstrate that he has information relevant to States' claims that cannot be provided by other witnesses.

     D.     Attorney proffers on Heritage's, Emcure's, Mr. Mehta's, and current and former employees' knowledge and roles in the conduct alleged in this Action, to the extent not already provided.

     E.     Best efforts to provide access to persons identified in (C) and (G) for interviews, including Matthew Edelson and Anne Sather, to the extent not already provided.

     F.     Production of witnesses identified in (C) and (G) for testimony at trial to the extent that such witnesses are under Defendants' control, and best efforts to produce for testimony at trial witnesses not under Defendants' control.  Defendants will notify the States as reasonably in advance as feasible if any potential witness's status changes with regards to being under Defendants' control.

     G.     Identification of persons at Heritage and/or Emcure who are likely to have relevant information concerning Heritage's pricing information contained in other defendants' documents, and the accuracy of this information, for drugs named in the States' complaints.

     H.     Identification of price increases implemented by Heritage during the relevant time period for each drug named in the States' complaints as to which States allege Heritage entered into a product-specific conspiracy, including identification of supportive documents and data by Bates number.

## V. REQUESTS FOR APPROVAL AND NOTICE

     The States intend to seek approval from the District Court for the actions that the Parties contemplate for use of the Settlement Payment, including the contemplated later distribution of settlement proceeds to Eligible Consumers and other entities being released by the States to the

extent that such approval is required.  After this Settlement Agreement is finally executed, the

States will file a motion for preliminary approval of the Settlement Agreement.  The States will

provide a copy of such motion (including all exhibits and attachments to such motion) to

Defendants in advance of filing.

The States shall disseminate notice of the potential approval of this Settlement

Agreement according to the Notice Plan to potentially affected Eligible Consumers and other

entities being released by the States, and, to the extent required, any other notice, to the extent

that such notice is required in the manner and within the time directed by the District Court.

The States shall file with the District Court and as directed by the District Court a Motion

for a Final Approval Order.  At least seven (7) days prior to filing their Motion for a Final

Approval Order, the States shall provide a copy of such motion (including all exhibits and

attachments to such motion) to Defendants.

## VI. QUALIFIED SETTLEMENT FUND

A.     The "State Escrow" (a "Settlement Fund") will be established by order of the

District Court at Huntington Bank with such bank serving as escrow agent ("Escrow Agent")

subject to one or more escrow agreements mutually acceptable to the Parties.  Each Settlement

Fund is established to resolve and satisfy one or more claims described in the preamble to this

Settlement Agreement, and each shall be subject to the District Court's continuing supervision

and control.  In addition, the Attorneys General shall make such elections as necessary or

advisable to carry out the provisions of this Section VI.  Such elections shall be made in

compliance with the procedures and requirements contained in any applicable regulations.

B.     The Parties intend that the Settlement Fund shall be a "qualified settlement fund"

within the meaning of Treasury Regulation § 1.468B-1, shall act in a manner consistent with the

treatment of the Settlement Fund as such a qualified settlement fund, and shall not take a position in any filing or before any tax authority that is inconsistent with such treatment.  All provisions of this Settlement Agreement shall be interpreted in a manner that is consistent with the Settlement Fund being a "qualified settlement fund" within the meaning of Treasury Regulation § 1.468B-1.  The administrators for the State Escrow shall be California, New York and Ohio (each, in such capacity, an "Administrator").  The Administrator shall cause the timely and proper filing of all informational and other tax returns necessary or advisable with respect to the applicable Settlement Fund (including without limitation the returns described in Treasury Regulation §§ 1.468B-2(k)(1) and (l)(2)).  The Administrator shall make a "relation-back election" (as defined in Treasury Regulation § 1.468B-1(j)), if available, to permit the Settlement Fund to be treated as a qualified settlement fund from the earliest permitted date.  It shall be the responsibility of the Administrator to cause the timely and proper preparation and delivery of the necessary documentation with respect to the Settlement Fund for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

       C.     The Escrow Agent shall cause the Settlement Fund to be invested in short-term instruments backed by the full faith and credit of the United States Government or fully insured in writing by the United States Government, or money market funds rated Aaa and AAA, respectively, by Moody's Investor Services and Standard and Poor's, invested substantially in such instruments, and shall reinvest any income from these instruments and the proceeds of these instruments as they mature in similar instruments at their then current market rates.  The Released Parties shall bear no risk related to the Settlement Fund.  The Settlement Fund shall be deemed and considered to be in custodia legis of the District Court and shall remain subject to

the jurisdiction of the District Court, until such time as the funds therein shall be distributed pursuant to this Settlement Agreement or further order(s) of the District Court.

D. All (i) taxes (including any estimated taxes, interest, or penalties) arising with respect to the income earned on a Settlement Fund, including any taxes or tax detriments that may be imposed upon any Released Party with respect to income earned on a Settlement Fund for any period during which such Settlement Fund does not qualify as a qualified settlement fund for federal or state income tax purposes ("Taxes"); and (ii) expenses and costs incurred in connection with the operation and implementation of a Settlement Fund (including expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) tax returns with respect to the Settlement Fund ("Tax Expenses")), shall be paid out of such Settlement Fund.

E. No Released Party nor their respective counsel shall have any liability or responsibility with respect to a Settlement Fund for the Taxes or the Tax Expenses or the filing of any tax returns or other documents with the Internal Revenue Service or any other taxing authority. The Escrow Agent and Attorneys General respectively shall indemnify and hold the Released Parties harmless for Taxes and Tax Expenses (including taxes payable by reason of such indemnification). Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Settlement Fund and shall be timely paid by the Administrator out of the Settlement Fund without prior order from the District Court and the Administrator shall be obliged (notwithstanding anything herein to the contrary) to withhold from distribution to any claimants authorized by the District Court any funds necessary to pay such amounts including the establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treasury Regulation § 1.468B-2(l)(2)). No

Released Party shall be responsible or have any liability therefore or for any reporting requirements that may relate thereto. The Parties agree to cooperate with each other and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this Paragraph VI.E.

## VII. NO ADMISSION

Neither the settlement, the Settlement Payment, nor the Settlement Agreement shall be used or construed by any person as an admission of liability by Defendants to any party or person or be deemed evidence of any violation of any statute or law or admission of any liability or wrongdoing by the Released Parties, or of the truth of any of the claims or allegations asserted against Defendants in any of the Related Cases.

## VIII. BENEFIT AND BINDING EFFECT

The terms of this Settlement Agreement shall be binding on and shall inure to the benefit of the Parties and their successors. The Parties do not intend this Settlement Agreement, or any part hereof, or any aspect of the settlement or the releases, to extend to, to release, or otherwise to affect in any way any rights that the Attorneys General have or may have against any other person, party or entity whatsoever, other than the Released Parties.

## IX. MISCELLANEOUS

Defendants may file the Settlement Agreement and/or the Final Approval Order in any action that may be brought against them to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment, bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

Connecticut, New York, and North Dakota (the "Representative States") are expressly authorized by the States to take all appropriate action required or permitted to be taken pursuant to the Settlement Agreement to effectuate its terms in consultation with the States.

Each counsel or other person executing the Settlement Agreement on behalf of any Party warrants that such person has full authority to do so.

This Settlement Agreement contains the entire agreement and understanding of the Parties. There are no additional promises or terms of the Settlement Agreement other than those contained herein. This Settlement Agreement shall not be modified except in writing signed by the States and Defendants or by their authorized representatives.

All dates and time periods in this Settlement Agreement shall be calculated pursuant to the Federal Rules of Civil Procedure. All such dates and time periods may be modified if mutually agreed upon, in writing, signed by counsel for Liaison States and Defendants or by their authorized representatives.

Each of the Parties hereto participated materially in the drafting of this Settlement Agreement. None of the Parties hereto shall be considered the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter thereof.

The captions contained in this Settlement Agreement are inserted only as a matter of convenience and in no way define, limit, extend, or describe the scope of this Settlement Agreement or the intent of any provision hereof.

The terms of the Settlement Agreement shall control in the event there are any conflicting terms in any related document.

The Settlement Agreement and any related documents shall be subject to, governed by and construed, interpreted, and enforced pursuant to the internal laws of the Commonwealth of Pennsylvania, without regard to any choice of law principles.

The District Court shall retain jurisdiction with respect to the implementation and enforcement of the terms of the Settlement Agreement, and all States, Heritage, and Emcure hereby submit to the exclusive jurisdiction of the District Court for purposes of implementing and enforcing the Settlement Agreement.

Any and all notices, requests, consents, directives, or communications by any Party intended for any other Party shall be in writing and shall, unless expressly provided otherwise be provided by United States mail and electronic mail to:

For the States:

Robert L. Hubbard
Assistant Attorney General
28 Liberty Street, 20th floor
New York, NY 10005
212 416-8267
Robert.Hubbard@ag.ny.gov

*Counsel for New York*

W. Joseph Nielsen
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
860-808-5396
860-808-5040
joseph.nielsen@ct.gov

*Liaison Counsel for the States*

Elin S. Alm
Assistant Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
(701) 328-5570
ealm@nd.gov

*Counsel for North Dakota*

For Defendants:

Edward B. Schwartz
Reed Smith LLP
1301 K Street NW

Gregory Vose
Amy M. Kerlin
Reed Smith LLP

Washington DC 20005
eschwartz@reedsmith.com

*Counsel for the Defendants*

225 Fifth Avenue
Pittsburgh, PA 15222
gvose@reedsmith.com
akerlin@reedsmith.com

*Counsel for the Defendants*

Any one of the Parties may, from time to time, change the address to which such notices, requests, consents, directives, or communications are to be delivered, by giving the other Parties prior written notice of the changed address, in the manner herein above provided, ten (10) calendar days before the change is effective.

**Choice of Venue**. Heritage and Emcure irrevocably consent to the venue of the United States District Court in which the Action is pending, currently the District of Connecticut, in any action or proceeding to enforce the obligations contained in this Settlement Agreement. Service of any summons and/or complaint, and any other process which may be served on Heritage or Emcure may be made by mailing via registered mail or delivering a copy of such process to the address last provided by Heritage and Emcure to the States or by mailing or delivering a copy of such process to Defendants' counsel in the Action.

**Costs and Expenses**. In conjunction with final approval of the Settlement Agreement, the States reserve the right to seek costs and expenses. The Defendants shall not be liable for any costs, attorneys' fees, other fees, or expenses of any of the attorneys, experts, advisors, agents, or representatives for the States, but any such costs, fees, and expenses as approved by the District Court shall be paid out of the Settlement Fund. Defendants agree to take no position on any requests by the States for costs and expenses.

**Legal Compliance and Prospective Injunctive Relief**. Heritage covenants that it has not, since January 1, 2016, engaged in any per se price-fixing, market allocation, or bid rigging

-17-

as to any generic pharmaceutical product, including any product named in the States'
complaints. Heritage further covenants, that it, along with its current directors, officers, and
employees shall not, directly or indirectly, maintain, solicit, suggest, advocate, discuss or carry
out any unlawful agreement with any actual or potential competitor in the generic
pharmaceutical industry to: (a) fix prices for generic pharmaceuticals; (b) submit courtesy, cover,
or otherwise non-competitive, bids or proposals for the supply, distribution or sale of generic
pharmaceuticals; (c) refrain from bidding on, or submitting proposals for, the supply,
distribution, or sale of generic pharmaceuticals; or (d) allocate customers for the sale of generic
pharmaceuticals for the Enforcement Period. These covenants are a material term of this
Settlement Agreement.

     The Parties agree that the covenants in the (i) Legal Compliance and Prospective
Injunctive Relief section and (ii) Business Reform section shall be enforceable upon entry of the
Settlement Agreement. The covenants shall further be implemented as part of the District Court's
approval of the Settlement Agreement and shall be fully enforceable thereafter as part of the
District Court's approval orders for the remaining duration of these covenants. The Parties also
specifically agree that the States may file a new action based on violation of these covenants.

     **Business Reforms**. Heritage represents to the States that it has implemented, and shall
continue to maintain during the Enforcement Period, a written "Antitrust Compliance Manual,"
on which all current Heritage employees have been trained, including its employees engaged in
activities relating to the pricing or sale of generic pharmaceuticals. Each Heritage employee is
required to sign an acknowledgment form stating that they have read, and will abide by, the
Antitrust Compliance Manual. Heritage also implemented, and will continue to conduct during
the Enforcement Period, periodic antitrust training sessions for its employees at least once per

year.  Such antitrust training has been delivered by an attorney with relevant experience in the field of antitrust law, and Heritage keeps attendance at each training session to ensure that all employees receive the training.  Heritage has developed effective lines of communication for its employees engaged in activities relating to the pricing or sale of generic pharmaceuticals, and Heritage's training sessions, and the Antitrust Compliance Manual, include clear instructions to those attending that, if they identify any problematic conduct undertaken by any Heritage employee might violate the antitrust laws, that they are required to contact Heritage's General Counsel and/or the Chief Compliance Officer.  Heritage's training sessions, and the Antitrust Compliance Manual, also make clear the consequences of any antitrust violations.

Heritage has appointed, and will maintain during the Enforcement Period, a Chief Compliance Officer, who serves to enforce Heritage's Antitrust Compliance Manual and monitor Heritage's employees to ensure that there are no further violations of the antitrust laws during the Enforcement Period.  The Chief Compliance Officer shall advise and report to Heritage's Board of Directors, and shall be responsible for ensuring Heritage's performance of the following:

- Furnishing a copy of the Settlement Agreement, within thirty (30) days of the entry of the Final Approval Order, to each member of Heritage's Board of Directors, to its Chief Executive Officer, to each of its Senior Vice-Presidents, and to each of Heritage's employees engaged, in whole or in part, in activities relating to the pricing or sale of generic pharmaceuticals;

- Furnishing a copy of the Settlement Agreement in a timely manner to each officer, director, or employee who succeeds to any position identified above; and

-19-

- Maintain its Antitrust Compliance policy and continue to conduct comprehensive and effective antitrust training for Heritage employees engaged in activities relating to the pricing or sale of generic pharmaceuticals on an annual basis.

Upon discovery or receipt by Heritage's General Counsel or Chief Compliance Officer of a credible notification of a potential violation of the covenants in this Section or the Legal Compliance and Prospective Injunctive Relief Section of this Agreement, Heritage shall take appropriate action to: (a) immediately terminate or modify Heritage's conduct to assure continued compliance with this Settlement Agreement (if necessary); and (b) within ten (10) business days of such discovery or receipt, provide to the designated Representative States in writing, a description of the actual or potential violation of this Settlement Agreement and the corrective actions taken (if any).

**Counterparts**. This Settlement Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Signatures provided by facsimile transmission, or in Adobe Portable Document Format (PDF) sent by electronic mail, shall be deemed to be original signatures and this Term Sheet may be delivered by email of PDF files.

Edward B. Schwartz
REED SMITH LLP
1301 K Street NW, Suite 1100
Washington, DC 20005
Phone: (202) 414-9200
Fax: (202) 414-9299
eschwartz@reedsmith.com

*Counsel for Defendants Heritage*
*Pharmaceuticals Inc., Emcure*
*Pharmaceuticals Ltd., and Satish Mehta*

Dated: ___September 19, 2024___

_W. Joseph Nielsen_

W. Joseph Nielsen
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
860-808-5396
joseph.nielsen@ct.gov

Liaison Counsel for the States

Dated: 11/15/23

*/s/ Jeff Pickett*_____
Jeff Pickett
Senior Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 269-5100
Fax: (907) 276-3697
jeff.pickett@alaska.gov

*Counsel for Alaska*

Dated:   May 28, 2024_____

FOR PLAINTIFF STATE OF ARIZONA

KRISTIN K. MAYES
ATTORNEY GENERAL

_(signature)_

_____

Robert A. Bernheim
Unit Chief Counsel
Vinny Venkat
Assistant Attorney General
Antitrust & Privacy Unit
Consumer Protect & Advocacy Section
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004
Tel: (602) 542-5025
robert.bernheim@azag.gov
vinny.venkat@azag.gov
consumer@azag.gov

_Counsel for Arizona_

Dated: July 19, 2024

PLAINTIFF STATE OF CALIFORNIA
ROB BONTA
ATTORNEY GENERAL

Dated: May 28, 2024

By: _____
Emilio Varanini
Supervising Deputy Attorney General
Healthcare Rights and Access Section
California Office of the Attorney General
455 Golden Gate Avenue, Ste. 11000
San Francisco, Ca. 94102
Phone #: 415-510-3541
E-mail: Emilio.Varanini@doj.ca.gov

*Attorneys for Plaintiff State of California*

_/s/ Ian L. Papendick_
Ian L. Papendick
Assistant Attorney General
Colorado Department of Law, Antitrust Unit
1300 Broadway, Seventh Floor
Denver, Colorado 80203
Telephone: 720.508.6193
Email: ian.papendick@coag.gov
_Counsel for State of Colorado_
_Philip J. Weiser Attorney General_

Dated:  March 14, 2024

Adam Gitlin
Chief, Antitrust and Nonprofit
Enforcement Section
400 6th St. NW, 10th Fl.
Washington, DC 20001
Tel: (202) 442-9864
Adam.Gitlin@dc.gov

*Counsel for District of Columbia*

Dated: MARCH 18, 2024

FOR PLAINTIFF STATE OF DELAWARE

KATHLEEN JENNINGS
ATTORNEY GENERAL

Michael A. Undorf
Deputy Attorney General
Delaware Department of Justice
820 N. French St., 5th Floor
Wilmington, DE 19801
(302) 683-8816
michael.undorf@delaware.gov

Attorney for Plaintiff State of Delaware

Dated:  May 22, 2024

FOR PLAINTIFF STATE OF FLORIDA
ASHLEY MOODY
ATTORNEY GENERAL


By: _____
John Guard
Chief Deputy Attorney General
Nicholas J. Weilhammer
Associate Deputy Attorney General for Enforcement
Lizabeth A. Brady
Director, Antitrust Division
Liz.Brady@myfloridalegal.com
Timothy Fraser
Senior Assistant Attorney General
Timothy.Fraser@myfloridalegal.com
Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel:     (850) 414-3300
Fax:    (850) 488-9134

STATE OF GEORGIA

<u>/s/ Logan Winkles</u>
Christopher Carr, Attorney General
Logan Winkles, Deputy Attorney General
Ron Stay, Sr. Asst. Attorney General
Charles Thimmesch, Sr. Asst. Attorney General
Office of the Georgia Attorney General
40 Capitol Sq. SW
Atlanta, GA 30334
(404) 458-3626
cthimmesch@law.ga.gov

*Attorneys for the State of Georgia*

Dated 5/29/2024

John K. Olson
Deputy Attorney General
Consumer Protection Division
954 West Jefferson Street, Second Floor
Boise, ID  83720-0010
Tel: (208) 332-3549
John.Olson@ag.idaho.gov

*Counsel for Idaho*

Dated: December 5, 2023

*s/ Brian M. Yost*
Brian M. Yost, Assistant Attorney General
David Buysse, Deputy Division Chief
Daniel Betancourt, Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., Floor 23
Chicago, Illinois 60603
Tel: (872) 276-3598
Brian.Yost@ilag.gov

*Counsel for the Plaintiff State of Illinois*

Dated: November 21, 2023

By: _/s/ Tamara Weaver_
Deputy Attorney General
Indiana Government Center South – 5th Fl.
302 W. Washington Street
Indianapolis, IN  46204-2770
Phone: (317) 234-7122
Email:  Tamara.Weaver@atg.in.gov

_Counsel for Indiana_

Noah Goerlitz
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Tel: (515) 725-1018
noah.goerlitz@ag.iowa.gov

*Counsel for Iowa*

Dated: <u>May 20, 2024</u>

FOR PLAINTIFF STATE OF KANSAS

KRIS W. KOBACH
ATTORNEY GENERAL


 _/s/Lynette R. Bakker_____
Lynette R. Bakker
First Assistant Attorney General
Christopher Teters
Assistant Attorney General
Antitrust & Business Organizations
Public Protection Division
Office of the Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Tel: (785) 296-3751
lynette.bakker@ag.ks.gov
chris.teters@ag.ks.gov

*Counsel for Kansas*

Jonathan E. Farmer
Deputy Executive Director of Consumer Protection
Office of the Attorney General of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Tel: 502-696-5448
Fax: 502-573-8317
Jonathan.Farmer@ky.gov

*Counsel for the Commonwealth of Kentucky*

Dated: February 21, 2024

PLAINTIFF STATE OF LOUISIANA

LIZ MURRILL
LOUISIANA ATTORNEY GENERAL

BY: _____
John J. Kelley, Section Chief
William H. Rogers, Jr., Assistant Attorney General
Public Protection Division
Office of the Louisiana Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Tel. (225) 326-6400
Fax (225) 326-6499
KelleyJ@ag.louisiana.gov
rogersw@ag.louisiana.gov


Dated:_____

FOR PLAINTIFF STATE OF MAINE:

AARON M. FREY
ATTORNEY GENERAL

*/s/ Christina M. Moylan*
Christina M. Moylan
Chief, Consumer Protection Division
Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333-0006
Phone: 207.626.8800
christina.moylan@maine.gov

Attorney for Plaintiff State of Maine

Dated: May 22, 2024

Schonette J. Walker
Assistant Attorney General
Chief, Antitrust Division
200 Saint Paul Place
19th Floor
Baltimore, Maryland 21202
410.576.6473
swalker@oag.state.md.us

*Counsel for Plaintiff State Maryland*

Dated: July 9, 2024

_Michael MacKenzie_

Michael MacKenzie
Deputy Chief, Antitrust Division
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Michael.Mackenzie@mass.gov

*Counsel for Massachusetts*

Dated: 11/15/2023

Jonathan Comish
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI  48909
(517) 335-7632
ComishJ@michigan.gov

*Counsel for State of Michigan*

Dated:  June 24, 2024

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
ATTORNEY GENERAL

*/s/ Jon M. Woodruff*
Jon M. Woodurff
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
Tel: (651) 300-7425
jon.woodruff@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

Dated: July 12, 2024

FOR PLAINTIFF STATE OF MISSISSIPPI
LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By: /s/ Tricia L. Beale
Tricia L. Beale (MSB #99113)
Consumer Protection Division
Mississippi Attorney General's Office
1141 Bayview Ave., Suite 402
Biloxi, Mississippi 39530
Telephone:  228-386-4404
tricia.beale@ago.ms.gov

FOR THE STATE OF MISSOURI

ANDREW BAILEY
ATTORNEY GENERAL

By: _____
Michael Schwalbert
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago,mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

Dated: August 12, 2024

_/s/ Brent Mead_
Brent Mead
_Deputy Solicitor General_
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Telephone: (406)444-0584
Email: brent.mead2@mt.gov

_Counsel for the State of Montana_

Dated:  May 28, 2024

/s/ *Colin P. Snider*
Colin P. Snider
Assistant Attorney General
2115 State Capitol
P.O. Box 98920
Lincoln, NE 68509
T: (402) 471-7759
E: colin.snider@nebraska.gov

*Attorney for the State of Nebraska*

FOR PLAINTIFF STATE OF NEVADA

AARON D. FORD
Nevada Attorney General

Lucas J. Tucker
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
8945 West Russell Road., Suite 204
Las Vegas, Nevada 89148
Nevada Bar No. 10252
LTucker@ag.nv.gov

STATE OF NEW HAMPSHIRE
JOHN M. FORMELLA
Attorney General

By: _____
Alexandra C. Sosnowski
Assistant Attorney General
Consumer Protection and Antitrust Bureau
One Granite Place South
Concord, NH 03301
Tel: (603) 271-2678
Alexandra.C.Sosnowski@doj.nh.gov

*Counsel for New Hampshire*

Dated: 5/21/2024

**FOR PLAINTIFF STATE OF NEW JERSEY**

MATTHEW J. PLATKIN
ATTORNEY GENERAL


 */s/ Yale A. Leber*
Yale A. Leber
Deputy Attorney General
New Jersey Office of Attorney General
124 Halsey Street
5th Floor Newark, NJ 07101
(973) 648-3070

*Counsel for the State of New Jersey*

Dated:  November 22, 2023

/s/Jeff Dan Herrera
Jeff Dan Herrera
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
Tel: (505) 490-4878
jherrera@nmdoj.gov

*Counsel for New Mexico*

Dated: 30 October 2024

**New York's signature of the Heritage settlement**

LETITIA JAMES
Attorney General of the State of New York

CHRISTOPHER D'ANGELO
Chief Deputy Attorney General
Economic Justice Division

ELINOR R. HOFFMANN
Chief, Antitrust Bureau

ROBERT L. HUBBARD
SAAMI ZAIN
BENJAMIN COLE
Assistant Attorneys General
28 Liberty Street, 20th floor
New York, NY 10005
212 416-8267
Robert.Hubbard@ag.ny.gov

ATTORNEYS FOR THE STATE OF NEW YORK

PLAINTIFF STATE OF NORTH CAROLINA
JOSHUA H. STEIN
ATTORNEY GENERAL

By: /s/ Jessica V. Sutton
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6000
Fax: (919) 716-6050
jsutton2@ncdoj.gov

Counsel for Plaintiff State of North Carolina

Dated: June 12, 2024

STATE OF NORTH DAKOTA
Drew H. Wrigley
Attorney General


Elin S. Alm
Assistant Attorney General
Consumer Protection & Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Tel: (701) 328-5570
ealm@nd.gov

*Counsel for North Dakota*

Dated:  December 6, 2023

Edward E. Manibusan
Attorney General
Commonwealth of the Northern Mariana Island
Caller Box 10007
Saipan, MP 96950
Tel: (670) 237-7500
attorney_general@cnmiag.org

*Counsel for The Commonwealth of the Northern Mariana Island*

Dated: 2/27/2024

FOR PLAINTIFF STATE OF OHIO:

DAVE YOST
ATTORNEY GENERAL


*/s/ Edward J. Olszewski*
Edward J. Olszewski
Assistant Section Chief, Antitrust
Office of Ohio Attorney General
30 East Broad Street, 26th Floor
Columbus, Ohio 43215
Phone: 614.466.4328
Edward.Olszewski@OhioAGO.gov

Attorney for Plaintiff State of Ohio

Dated: May 21, 2024

**FOR PLAINTIFF STATE OF OKLAHOMA**

GENTNER DRUMMOND
ATTORNEY GENERAL


*/s/ Caleb J. Smith*
Caleb J. Smith, OBA No. 33613
Assistant Attorney General
Consumer Protection Unit
Office of the Oklahoma Attorney General
15 West 6th Street
Suite 1000
Tulsa, OK 74119
Tel. (918) 581-2230
Fax (918) 938-6348
Email: caleb.smith@oag.ok.gov

*Counsel for the State of Oklahoma*

*/s/ Cheryl F. Hiemstra*

_____

Cheryl F. Hiemstra  #133857
Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel:  (503) 934-4400
Cheryl.Hiemstra@doj.Oregon.gov

*Counsel for the State of Oregon*

Dated May 21, 2024

*/s/ Tracy W. Wertz*
Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section
Joseph S. Betsko
Assistant Chief Deputy Attorney General
Jessica Kuehn
Deputy Attorney General
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Phone: (717) 787-4530
Fax: (717) 787-1190
twertz@attorneygeneral.gov

*Counsel for the Commonwealth of Pennsylvania*

Dated: May 23, 2024

**FOR PLAINTIFF CONMMONWEALTH OF PUERTO RICO**


DOMINGO EMANUELLI-HERNÁNDEZ
ATTORNEY GENERAL


*/s/ Guarionex Díaz-Martínez*
Guarionex Díaz-Martínez
Assistant Attorney General, Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, Exts. 1201, 1204
gdiaz@justicia.pr.gov

*Counsel for Commonwealth of Puerto Rico*

Dated:  July 9, 2024

FOR PLAINTIFF STATE OF RHODE ISLAND:

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Stephen N. Provazza*

Stephen N. Provazza (Bar No. 10435)
Assistant Attorney General
Chief, Consumer and Economic Justice Unit
Office of the Attorney General - State of Rhode Island
150 South Main Street
Providence, RI 02903
sprovazza@riag.ri.gov

Attorney for Plaintiff State of Rhode Island

Dated: August 13, 2024

THE STATE OF SOUTH CAROLINA
ALAN WILSON
Attorney General

CLARK KIRKLAND, JR.
Assistant Attorney General
1000 Assembly Street
Rembert C. Dennis Building
Post Office Box 11549
Columbia, South Carolina 29211-1549
Phone: 803-734-0057
Fax: 803-734-0097
Email: ckirklandjr@scag.gov

_s/  Jonathan K. Van Patten_
Jonathan K. Van Patten
Assistant Attorney General
1302 East Highway 14  Suite 1
Pierre, SD  57501-8501
Tel.:  (605) 773-3215
Jonathan.VanPatten@state.sd.us

_Counsel for South Dakota_

Dated:  6/25/2024

**State of Tennessee**
**Jonathan Skrmetti**
**Attorney General**

Austin C. Ostiguy
Assistant Attorney General
Daniel Lynch
Assistant Attorney General
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 532-7271
Austin.Ostiguy@ag.tn.gov
Counsel for Tennessee
Dated:  8/15/2024

Executed May 21, 2024

Respectfully submitted,

FOR PLAINTIFF STATE OF UTAH
SEAN D. REYES
UTAH ATTORNEY GENERAL


Marie W.L. Martin
Deputy Division Director,
Office of the Attorney General of Utah
including as counsel for the Utah Division
of Consumer Protection
160 East 300 South, 5th Floor
P.O. Box 140874
Salt Lake City, UT 84114-0874
Tel: 801-366-0375
Fax: 801-366-0378
mwmartin@agutah.gov
dsonnenreich@agutah.gov

*Attorneys for the State of Utah*

Respectfully Submitted,

GORDON C. RHEA, ESQ.
ATTORNEY GENERAL

Dated: October 22, 2024

By: _____

Christopher M. Timmons
Acting Chief, Civil Division
V.I. Bar No. R2147
213 Estate La Reine
Kingshill, V.I.  00850
(340) 773-0295
christopher.timmons@doj.vi.gov
*Counsel for Government of the Virgin Islands*

**FOR PLAINTIFF STATE OF VERMONT**

CHARITY R. CLARK
ATTORNEY GENERAL


 _/s/ Jill S. Abrams_
Jill S. Abrams
Director, Consumer Protection and Antitrust
109 State Street
Montpelier, Vermont 05609
(802) 828-1106
Jill.abrams@vermont.gov

*Counsel for Vermont*

**FOR PLAINTIFF COMMONWEALTH OF VIRGINIA**

JASON S. MIYARES
ATTORNEY GENERAL


  */s/ Tyler T. Henry*
Tyler T. Henry
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Tel: (804) 692-0485
THenry@oag.state.va.us

*Counsel for Virginia*

_s/_ Paula Pera C.
Paula Pera C.
Holly A. Williams
Assistant Attorneys General, Antitrust Division
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel: (206) 389-2848
paula.pera@atg.wa.gov
holly.williams@atg.wa.gov

_Counsel for Washington_

Dated: 2/21/2024

/s/ Douglas L. Davis
Douglas L. Davis
Senior Assistant Attorney General
Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, WV 25326
Tel: (304) 558-8986
douglas.l.davis@wvago.gov

*Counsel for the State of West Virginia*


Dated: May 21, 2024

**FOR PLAINTIFF STATE OF WISCONSIN:**

JOSHUA L. KAUL
ATTORNEY GENERAL OF WISCONSIN

<u>/s/ *Laura E. McFarlane*</u>
Laura E. McFarlane
Assistant Attorney General

Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-8911
mcfarlanele@doj.state.wi.us

*Attorneys for the Plaintiff State of Wisconsin*

Michael T. Kahler
Senior Assistant Attorney General
Consumer Protection and Antitrust Unit
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7196
mike.kahler@wyo.gov

*Counsel for Wyoming*

Date: 2-15-2024

# EXHIBIT 16

EXHIBIT 1

# Settlement Agreement

This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.) (the "MDL"). [1]

WHEREAS, the Attorneys General and the EPPs are each pursuing or have previously pursued claims in the MDL and/or in the District of Connecticut;

WHEREAS, the Attorneys General have asserted claims on behalf of themselves and for or on behalf of State Entities;

WHEREAS, the Attorneys General have also asserted claims for Consumers, as defined below;

WHEREAS, certain of the Attorneys General have also asserted claims for Corporate Entities, as defined below;

WHEREAS, the EPPs have asserted claims on behalf of themselves and the EPP Settlement Class Members, as defined below;

WHEREAS, together the EPPs and the Attorneys General assert claims for or on behalf of all Consumers, State Entities, and Corporate Entities;

WHEREAS, the Attorneys General and the EPPs have concluded that resolving their claims against Apotex through settlement is in the public interest, including in the interest of those for whom or on whose behalf they assert claims;

WHEREAS, despite Apotex's belief that it has good defenses, Apotex has agreed to enter into this Agreement to avoid the further expense and other burdens of litigation, to obtain the dismissals, covenants, and releases contained in this Agreement, and to put to rest with finality the cases that have been brought by the Attorneys General and the EPPs against Apotex;

NOW, THEREFORE, in consideration of the mutual promises and other good and valuable consideration provided in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

---

[1] This Agreement is intended to settle all cases and claims brought by the Attorneys General against Apotex that have at any time been pending in the MDL, regardless of whether those cases and claims remain in the MDL or have been or may be remanded to any other court.

## I. Definitions

A.    "Actions" means EPP Actions and State Actions, as defined in Paragraphs L and AA of this Section.

B.    "Apotex Releasees" are defined as Apotex and its parents, subsidiaries, and affiliates, and their respective predecessors, successors, heirs, executors, administrators, and assigns, as well as any current and former officers, directors, employees,[2] attorneys, stockholders, principals, managers, partners, members, agents, representatives, trustees, insurers, and owners thereof.

C.    "Attorneys General" are defined as the Attorneys General of each state, commonwealth, district, and territory that asserts claims in the MDL (or in any court to which the State Actions have been or may be remanded[3]) as well as those that are otherwise signatories to this Agreement.

D.    "Code" is defined as the Internal Revenue Code of 1986, as amended.

E.    "Conduct" means any act or omission of the Apotex Releasees or of persons or entities alleged to be co-conspirators of the Apotex Releasees concerning price fixing, market allocation, bid-rigging, and/or any other anticompetitive and/or unfair conduct based in whole or in part on the allegations in the Actions, in connection with the manufacture, sale, and/or distribution of Drugs at Issue or any other generic drug for which claims could have been asserted based on any facts alleged in any of the complaints filed or otherwise pending at any time in the Actions, including all formulations and strengths of those drugs, and/or any overarching conspiracy claims involving any of the Drugs at Issue or based in whole or in part on facts alleged in the Actions.

F.    "Consumers" are defined as natural persons for whom an Attorney General has the power to act, whether pursuant to the Attorney General's parens patriae authority or otherwise; as well as natural persons for whom the EPPs are asserting claims (*i.e.*, all natural persons who are potential members of the EPP Settlement Class).  For purposes of clarity, the term "Consumers" does not include any State Entity, any county, city, town, or other local entity, or any Corporate Entity.

G.    "Corporate Entities" are defined as corporate (and other business) entities for whom an Attorney General has asserted a claim in the MDL (or any court to which the State

---

[2] "Apotex Releasees" does not include any current or former Apotex employee named as an individual defendant in the MDL prior to the Effective Date with respect to that individual's conduct while employed at any company other than Apotex.

[3] As of April 25, 2024, the State Actions have been remanded to the United States District Court for the District of Connecticut.  *See* Case No. 3:16-cv-02056, ECF No. 353 (D. Conn.); Case No. 3:19-cv-710 (D. Conn.); Case No. 3:20-cv-00802, ECF No. 15 (D. Conn.).

2

Actions have been or may be remanded), whether pursuant to the Attorneys General's parens patriae authority or otherwise, as well as corporate (and other business) entities for which the EPPs are asserting claims (*i.e.*, all corporate and other business entities that are potential members of the EPP Settlement Class).

H.     "Defendant" means any party named as a defendant in any of the Actions at any time up to and including the date of the court's Final Approval Order, as defined in Paragraph S of this Section.

I.     "Drugs at Issue" means the drugs listed in Appendix A.

J.     "Effective Date" shall be the date on which the final signatory of this Agreement executes this Agreement. The Attorneys General and the EPPs will have 60 calendar days from the date of Apotex's signature to execute this Agreement, absent written agreement from Apotex for a reasonable period of additional time. If all Attorneys General and EPPs have not executed this Agreement within 60 calendar days of the date of Apotex's signature, Apotex shall have the right to terminate this Agreement upon written notice.

K.     "End-Payer Plaintiffs" means those EPP Settlement Class Members, as defined in Paragraph I.Q, who were named plaintiffs in any of the EPP Actions as of the Effective Date, or who have been or are subsequently added as named plaintiffs in any of the EPP Actions prior to the entry of final judgment against Apotex in the EPP Actions.

L.     "EPP Actions" means the following cases:  *In re: Pravastatin Cases*, No. 2:16-pv-27242 (E.D. Pa.); *In re Albuterol Cases*, 2:16-al-27242 (E.D. Pa.); *In re Amitriptyline Cases*, 2:16-am-27242 (E.D. Pa.); *In re Baclofen Cases*, 2:16-bc-27242 (E.D. Pa.); *In re Benazepril HCTZ Cases*, 2:16-bz-27242 (E.D. Pa.); *In re Clobetasol Cases*, 2:16-cb-27242 (E.D. Pa.); *In re Clomipramine Cases*, 2:16-cm-27242 (E.D. Pa.); *In re Digoxin Cases*, 2:16-dg-27242 (E.D. Pa.); *In re Desonide Cases*, 2:16-ds-27242 (E.D. Pa.); *In re Divalproex ER Cases*, 2:16-dv-27242 (E.D. Pa.); *In re Doxycycline Cases*, 2:16-dx-27242 (E.D. Pa.); *In re Econazole Nitrate Cases*, 2:16-ec-27242 (E.D. Pa.); *In re Fluocinonide Cases*, 2:16-fl-27242 (E.D. Pa.); *In re Glyburide Cases,* 2:16-gl-27242 (E.D. Pa.); *In re Lidocaine/Prilocaine Cases*, 2:16-ld-27242 (E.D. Pa.); *In re Levothyroxine Cases*, 2:16-lv-27242 (E.D. Pa.); *In re Propranolol Cases*, 2:16-pp-27242 (E.D. Pa.); *In re Ursodiol Cases*, 2:16-ur-27242 (E.D. Pa.); *1199SEIU National Benefit Fund v. Actavis Holdco U.S., Inc.*, No. 2:18-cv-02401 (E.D. Pa.); *1199SEIU National Benefit Fund v. Actavis Holdco U.S., Inc.*, No. 2:19-cv-06011 (E.D. Pa.), and any other action or proceeding filed in the MDL or otherwise pursued by or on behalf of any End-Payer Plaintiff or any other EPP Settlement Class Member for Released Claims prior to the entry of the Final Approval Order.

M.     "EPP Releasors" shall refer to the End-Payer Plaintiffs and all other EPP Settlement Class Members, as defined in Paragraphs K and Q, and to their past and present parents, subsidiaries, and affiliates, and their respective predecessors, successors, heirs, executors, administrators, and assigns, as well as any current and former officers, directors, employees, attorneys, stockholders, principals, managers, partners, members, agents, representatives, trustees, insurers, and owners thereof.

3

N.     "EPP Settlement Amount" is the aggregate sum of $48,000,000 USD, all of which shall constitute restitution within the meaning of Section 162(f)(2) of the Code and 26 C.F.R. § 1.162-21(e)(4)(i).  No part of the EPP Settlement Amount is paid (a) in respect of any claim for the trebling of damages (as opposed to actual damages), (b) to reimburse any government or governmental entity for investigation or litigation costs, or (c) for or in lieu of any fine, penalty, forfeiture, or punitive damages.  To the extent that any party hereto is required to report the EPP Settlement Amount or any portion thereof under Section 6050X of the Code, such party shall report such amount as restitution.  Except as set forth in this Paragraph, the EPPs take no position on tax treatment of the payments under the Agreement.  The EPP Settlement Amount shall be allocated among the EPP Settlement Class Members as determined by the EPP Settlement Class Counsel and approved by the court, and Apotex shall have no obligation in connection with such allocation.

O.     "EPP Settlement Class" shall be defined as all persons and entities in each of the 50 United States (except Indiana and Ohio), as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for any Drugs at Issue, other than for resale, from May 1, 2009 to December 31, 2019.  This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal governmental entities; (c) all State Entities identified by the Attorneys General in Appendix B; (d) all State Entities of the States specified in Paragraph I.O.1 (except for cities, towns, municipalities, counties or other local governmental entities of that State with self-funded prescription drug plans, all of which are included in the class[4]).  For the avoidance of doubt, the class does not include (i) persons or entities who only purchased Drugs at Issue for purposes of resale or directly from Defendants;[5] (ii) fully insured employers to the extent that they use fully-insured plans (*i.e.*, employers that purchased insurance covering 100% of their reimbursement obligation to members); and (iii) pharmacy benefit managers.

1.     The State Entities from the following States are excluded from the definition of EPP Settlement Class:  California, Connecticut, Florida, Illinois,[6] Maine, Oregon, Pennsylvania, Washington, and Wyoming.  The Attorneys General of the remaining States do not object to the State Entities of their respective States being included in the EPP Settlement Class (with those State Entities having the right to submit

---

[4] The Attorneys General do not object to the inclusion of the local government entities described herein in the EPP Settlement Class.

[5] Where a putative class member has purchases that meet the definition of the EPP Settlement Class, but also has purchases that fall within the exclusion set forth in Paragraph I.O.(e), that putative class member is included in the EPP Settlement Class only with respect to those purchases that meet the definition of the EPP Settlement Class.

[6] The exclusion of Illinois' State Entities from the definition of EPP Settlement Class does not include public corporations, including public universities and health systems.  Those public corporations that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for any Drugs at Issue, other than for resale, from May 1, 2009 to December 31, 2019 are included within the definition of the EPP Settlement Class.

a valid and timely request for exclusion, like any other potential class member).

P.     "EPP Settlement Class Counsel" shall refer to the law firm of Fine, Kaplan and Black, R.P.C.

Q.     "EPP Settlement Class Member" means each potential member of the EPP Settlement Class who has not submitted a timely and valid request to be excluded from the EPP Settlement Class.

R.     "Federal Settlement Agreement" means the separate civil settlement agreement that Apotex entered into with the United States on September 30, 2021, which includes a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the U.S. Department of Health and Human Services.

S.     "Final Approval Order" means the order to be entered by the District Court in the MDL (and, with respect to any Action that has been or may be remanded from the MDL, the court to which such Action has been or may be remanded) which gives final approval of this Settlement Agreement and releases all Released Claims.  The Parties intend for the Final Approval Order to include provisions: (1) finding this Settlement Agreement (i) as having been entered into in good faith and (ii) as being fair, reasonable, and adequate, including within the meaning of Fed. R. Civ. P. 23, where applicable, and directing its consummation pursuant to its terms, as to: (i) the EPP Releasors (including the EPP Settlement Class); and (ii) the State Releasors; (2) finding that the notice given constitutes due, adequate, and sufficient notice and meets the requirements of due process and the Federal Rules of Civil Procedure; (3) finding that all members of the EPP Settlement Class who have not executed timely and valid requests for exclusion shall be bound by this Settlement Agreement, including the release provisions and covenant not to sue set forth in this Settlement Agreement; (4) incorporating the releases set forth in Section VI, and forever barring the EPP Releasors and the State Releasors from asserting any Released Claims (as defined in Paragraph I.X); (5) retaining exclusive jurisdiction over the Settlement and this Agreement, including the administration and consummation of this Settlement; (6) directing that all claims by and on behalf of the EPP Releasors, and the State Releasors be dismissed with prejudice as to Apotex Releasees only and, except as provided for herein, with prejudice and without costs or attorney's fees recoverable under 15 U.S.C. § 15(a); and (7) determining pursuant to Fed. R. Civ. P. 54(b) that there is no just reason for delay and directing that the Final Approval Order in the Actions as to the Apotex Releasees shall be final and immediately appealable.

T.     "Final Court Approval" means the court with jurisdiction over each of the Actions (the District Court in the MDL or, in the event of remand, the court to which the State Actions have been or may be remanded) has entered, in each of the Actions, the Final Approval Order, and the time to appeal or to seek permission to appeal from the court's approval of this Agreement and entry of the order and final judgment as to Apotex has expired in each Action and no motion or other pleading has been filed seeking to set aside, enjoin, or in any way alter the Final Approval Order or the entry of judgment in any Action or to toll the time for appeal of the Final Approval Order or the judgment in any Action, or, if appealed, approval of this

5

Agreement and the final judgment in each Action as to Apotex has been affirmed in its entirety by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review. It is agreed that the provisions of Rule 60 of the Federal Rules of Civil Procedure shall not be taken into account in determining the above-stated times.

U.      "Generic Pharmaceutical Products" shall mean the generic version of any brand name drug, including all dosages, forms, and strengths of such drug, regardless of whether they are included in any of the complaints filed in the MDL.

V.      "Notice Period" means the time period allotted for EPP Settlement Class Members, those Consumers and Corporate Entities on whose behalf the Attorneys General have asserted claims, and anyone else for whom notice is required to (i) object to this Settlement or (ii) file a timely and valid request for exclusion.

W.      "Preliminary Approval Order" means an order to be entered by the District Court in the MDL (and the Court to which the State Actions have been or may be remanded) which the Parties intend will include the following provisions: (1) conditional certification of the EPP Settlement Class for settlement purposes; (2) preliminary approval of this Settlement Agreement with respect to the EPP Settlement Class (i) as having been entered into in good faith and (ii) as being fair, reasonable, adequate and in the best interests of the members of the EPP Settlement Class; and (3) preliminary approval of this settlement with respect to the Attorneys General (i) as having been entered into in good faith and (ii) as being fair, reasonable, adequate and in the best interests of State Entities, if required by law, and Consumers and Corporate Entities for whom the Attorneys General assert claims in their parens patriae or other representative authority and for any other purposes for which court approval may be necessary.

X.      "Released Claims" means any and all manner of claims, counter-claims, demands, actions, rights, liability, costs, debts, expenses, attorneys' fees, judgments, and civil and administrative causes of action of any type, including both monetary and injunctive, that were asserted or that could have been asserted, whether known or unknown, whether accrued or unaccrued, against the Apotex Releasees arising out of or relating to the Conduct. Released Claims include claims arising out of the Conduct under (1) federal or state antitrust laws, (2) unfair competition or consumer protection laws, (3) any civil or administrative monetary cause of action (including for civil damages and/or civil fines or penalties), (4) any remedies for any claims submitted or caused to be submitted to the State's Medicaid program, including under the False Claims Act (codified at 31 U.S.C. §§ 3729-3733) or any State's counterpart to the federal False Claims Act, and (5) any other statute or common or equitable law. In addition, the Attorneys General and the State Entities listed on Appendix B shall not seek to impose fines or penalties on the Apotex Releasees or to exclude or debar them from any market for the manufacture, sale, or distribution of Generic Pharmaceutical Products in connection with the Conduct, except as set out in 2(b) below.

1.      Released Claims include all claims based on any and all rights (including

6

by assignment) to bring claims based on damages incurred by another person or entity.[7]

2.      For the Attorneys General, Released Claims do not include: (a) claims under state revenue codes; (b) claims for mandatory exclusion from a state's Medicaid program as prescribed by federal or state law; or (c) any criminal liability.

3.      For the End Payer Releasors, Released Claims do not include (1) any claims based on direct purchases of the Drugs at Issue; (2) any claims based on indirect purchases of Drugs at Issue for purposes of resale; and (3) claims under laws other than those of the United States relating to purchases made by the EPP Releasors outside of the United States.

4.      Released Claims also do not include claims that do not arise out of the Conduct, including claims: (a) for breach of contract, express or implied warranty, or defective or deficient products and services provided by Apotex; (b) for unfair or deceptive marketing or advertising of Drugs at Issue or for off-label marketing claims; (c) for violations of the securities laws; (d) for reverse payment, "pay for delay," sham litigation, sham citizen petition, "Walker Process" fraud or other means of reducing or impairing competition other than the Conduct; (e) arising from or relating to the unfair and/or deceptive marketing, promotion, or sale of opioids (other than the Conduct) (including public nuisance claims), or the control or diversion of opioids (including suspicious order monitoring and state-law Controlled Substances Acts); (f) asserted in any currently pending litigation that is not (and never has been) part of the MDL; (g) for any civil or administrative liability related to a State's Medicaid program under any statute, regulation, or rule, including the False Claims Act or any State's counterpart to the federal False Claims Act, anti-kickback or off-label marketing violations, that do not arise out of the Conduct; (h) based on obligations created by this Agreement.

Y.      "Settlement Amounts" means the State Settlement Amount and the EPP Settlement Amount.

Z.      "States" means all states, commonwealths, districts, and territories that assert claims in the MDL (or the court to which the State Actions have been or may be remanded), including Alaska, Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota,

---

[7] This includes claims assigned to the State of Florida, *see, e.g.*, *State of Connecticut, et al. v. Sandoz Inc. et al.*, Amended Complaint, No. 2:20-cv-03539, ECF No. 62, ¶ 1860 (noting that certain claims of Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") and/or Cardinal Health, Inc. have been assigned to the state of Florida), claims assigned to the State of California, *see id.* ¶ 2117 (noting that certain "vendors and intermediaries" assigned claims to the state of California), and claims assigned to the State of New York, *see, e.g., State of Connecticut, et al. v. Teva Pharmaceuticals USA, Inc.*, Amended Complaint, No. 2:19-cv-02407, ECF No. 106, ¶ 1586 (noting that certain claims of MMCAP and/or Cardinal Health, Inc. have been assigned to the state of New York).

Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, Virgin Islands, Washington, West Virginia, Wisconsin, and Wyoming in their sovereign, proprietary, or any other capacities.

AA.    "State Actions" means the following cases: *State of Connecticut et al. v. Aurobindo Pharma USA, Inc. et al.*, No. 2:17-cv-3768 (E.D. Pa.); *State of Connecticut v. Aurobindo Pharma USA, Inc.,* No. 3:16-cv-2056 (D. Conn.); *State of Connecticut v. Teva Pharmaceuticals USA, Inc.*, No. 2:19-cv-02407 (E.D. Pa. ); *State of Connecticut v. Teva Pharmaceuticals USA, Inc.*, No. 3:19-cv-710 (D. Conn.); *State of Connecticut, et al. v. Sandoz Inc. et al.*, No. 2:20-cv-03539 (E.D. Pa.); *State of Connecticut v. Sandoz, Inc.*, No. 3:20-cv-00802 (D. Conn) and any other action or proceeding asserting claims based on the Conduct, filed or otherwise pursued by or on behalf of any of the Attorneys General or any of the State Entities listed on Appendix B.

BB.    "State Entity" means any agency, bureau, board, commission, committee, department, division, or other organizational unit of any state government, except for those of any county, city, town, or other local entity or political subdivision.

CC.    "State Releasors" means the (a) Attorneys General and State Entities listed on Appendix B (which include, among other State Entities, each State's Medicaid agency); (b) State Entities that accept a distribution of settlement proceeds from the Attorneys General's settlements in the MDL or, in the event of remand, any court to which the State Actions have been or may be remanded, (c) the Consumers and Corporate Entities on whose behalf the Attorneys General assert claims, to the extent those Consumers and Corporate Entities do not submit a timely and valid request for exclusion from the settlement under this Agreement and the Actions.

DD.    "State Settlement Amount" is the aggregate sum of $39,100,000 USD, 70% ($27,370,000 USD) of which shall constitute restitution within the meaning of Section 162(f)(2) of the Code and 26 C.F.R. § 1.162-21(e)(4)(i)).

1.    No part of the State Settlement Amount that constitutes restitution is paid (a) in respect of any claim for the trebling of damages (as opposed to actual damages), or (b) for or in lieu of any fine, penalty, forfeiture, or punitive damages, and no part of the amount specified as restitution in the preceding sentence is paid to reimburse any Attorney General, any State Entity, or any other government or governmental entity for investigation or litigation costs.  The party or parties required to report all or any portion of the State Settlement Amount under Section 6050X of the Code shall report no less than 70% of such portion as restitution.  Except as set forth in this Paragraph, the Attorneys General take no position on tax treatment of the payments under the Settlement.

2.    The State Settlement Amount shall be allocated among the State Entities that are State Releasors as determined by the Attorneys General, and among Consumers as determined by the Attorneys General with the EPP Settlement Class Counsel

8

consulting and Corporate Entities as determined by the EPP Settlement Class Counsel with the Attorneys General consulting and approved by the court, and Apotex shall have no obligation in connection with such allocation.  The amounts allocated to the State Entities that are State Releasors shall be received by the respective State Attorneys General Offices to be allocated for any use permitted under state law at the sole discretion of the State's Attorney General.

> 3.     The States will also hold the remaining 30% of the State Settlement Amount in escrow and for use in paying for the expenses identified in Section X and, upon final approval of this Agreement, for costs of litigating the States' claims both collectively or individually, subject to approval of the court.  To the extent that monies in the cost account are not used to offset costs of States litigating in the State Actions, any remaining funds may be used for any of the following: (1) Deposit into a state antitrust or consumer protection account (e.g., revolving account, trust account) for use in accordance with the laws governing the account; (2) Deposit into a fund exclusively dedicated to assisting any state to defray the costs of experts, economists and consultants in multistate antitrust investigations and litigations, including healthcare related investigations and litigation; (3) Antitrust or consumer protection enforcement, including healthcare-related enforcement, by an individual State or multiple States; or (4) For any other use permitted by state law at the sole discretion of that State's Attorney General.

## II.      Payment of the Settlement Amounts

A.     Apotex will pay or cause to be paid the State Settlement Amount pursuant to the written payment instructions provided by the Attorneys General within the later of: (1) thirty (30) calendar days after the date of the Preliminary Approval Order or (2) thirty (30) calendar days after receiving written payment instructions from the Attorneys General.  The Attorneys General's written payment instructions shall direct at least 70% of the State Settlement Amount to be paid directly into an escrow account (the "State Escrow"), pending Final Court Approval of this Agreement and the distribution of settlement funds from the State Escrow pursuant to the States' allocation plan, including to State Entities that are State Releasors and Consumers, to compensate them for any alleged harm resulting from the alleged Conduct.  The remaining 30% of the State Settlement Amount shall also be held in escrow, and used pursuant to Section I.DD.3, above.

B.     Apotex will pay or cause to be paid the EPP Settlement Amount pursuant to the written payment instructions provided by EPP Settlement Class Counsel within the later of: (1) thirty (30) calendar days after the date of the Preliminary Approval Order or (2) thirty (30) calendar days after receiving written payment instructions from the EPP Settlement Class Counsel.  The EPP Settlement Class Counsel's written payment instructions shall direct the entire EPP Settlement Amount to be paid directly into an escrow account (the "EPP Escrow"), pending Final Court Approval of this Agreement and the distribution of settlement funds from the EPP Escrow.

C.     Apotex shall have no obligation to make any other payments of any kind in

connection with this Agreement. Apotex also shall have no obligations with respect to the allocation or distribution of any of the Settlement Funds. The State Releasors and EPP Releasors shall have no other recovery of any kind from Apotex or the other Apotex Releasees, other than from the State Settlement Amount and EPP Settlement Amount, respectively, including for attorneys' fees, costs, service awards, damages, penalties, or injunctive or other relief of any kind.

## III.    Preliminary and Final Court Approval

A.    The Attorneys General and the EPPs shall promptly (and in no event more than thirty (30) calendar days after the Effective Date) file a motion(s) for a Preliminary Approval Order, including their respective proposed notice(s) and notice plan(s) to inform potential EPP Settlement Class Members, those Consumers and Corporate Entities on whose behalf the Attorneys General have asserted claims, and anyone else for whom notice is required, of their right (i) to object to this Agreement or (ii) to file a timely and valid request for exclusion. The Attorneys General and the EPPs will coordinate in providing notice in order to minimize cost and avoid duplication.

B.    In the event that the court fails to give preliminary approval to this Agreement, then the Parties shall in good faith seek to agree on revisions to this Agreement that would remedy any issues preventing preliminary approval while retaining the spirit of the Agreement. If they are unable to agree on such revisions despite their good faith efforts, they shall each have the option to rescind this Agreement.

C.    Within sixty (60) calendar days of the Preliminary Approval Order and the court's approval of the allocation plans, notice(s) and notice plan(s) submitted by the Attorneys General and the EPPs to the court, or such other time as directed by the court, the Attorneys General and EPPs shall implement their notice plan(s), providing EPP Settlement Class Members, those Consumers and Corporate Entities on whose behalf the Attorneys General have asserted claims, and anyone else for whom notice is required notice of their rights (i) to object to this Agreement or (ii) to file a timely and valid request for exclusion. To the extent permitted by law, the notice will provide that EPP Settlement Class Members and those Consumers and Corporate Entities on whose behalf the Attorneys General have asserted claims who opt out of either Apotex's settlement with the EPPs (the "EPP Settlement") or Apotex's settlement with the Attorneys General (the "AG Settlement") will also be required to opt out of the other settlement.

D.    EPP Settlement Class Members and those Consumers and Corporate Entities on whose behalf the Attorneys General have asserted claims shall be given notice as required by the Federal Rules of Civil Procedure. Costs for the notice will be paid from the State Escrow and EPP Escrow, but shall be limited to $500,000 from each of those two escrow accounts.

E.    Within thirty (30) calendar days following the conclusion of the Notice Period or as otherwise agreed by the Parties or directed by the court(s), the Attorneys General and EPPs shall file with the court that has jurisdiction over their particular Action(s) a Motion(s) for a Final Approval Order. At least seven (7) calendar days prior to filing their Motion for a Final

Approval Order, Plaintiffs shall provide a copy of such motion (including all exhibits and attachments to such motion) to Apotex for review.

## IV.  Exclusions

A.    Subject to court approval (by the court that has jurisdiction over the particular Action(s)), any Consumer or Corporate Entity may seek to be excluded from the AG Settlement by submitting a valid and timely request for exclusion.  The Attorneys General, State Entities identified on Appendix B, and other State Entities that accept a distribution of settlement proceeds from the Attorneys General's settlements in the MDL or, in the event of remand, in any court to which the State Actions have been or may be remanded, are bound by this Agreement upon execution and have no right to seek exclusion.  Any Consumer or Corporate Entity that submits a valid and timely request for exclusion will not be eligible to receive a distribution of any portion of the State Settlement Amount and will have no rights with respect to the AG Settlement.  Apotex reserves all legal rights and defenses as to all such persons or entities that submit a valid and timely request for exclusion, and nothing in this Agreement shall be used against Apotex in any proceeding involving such persons or entities.

B.    Subject to court approval, in any written request for exclusion from the AG Settlement, the Consumer or Corporate Entity seeking exclusion must state his, her, or its full name, address, telephone number and e-mail address and include a statement that he, she, or it wishes to be excluded from the AG Settlement.

C.    Subject to court approval, any person or entity that is a potential member of the EPP Settlement Class may seek to be excluded from the EPP Settlement by submitting a valid and timely request for exclusion.  Any such person or entity that submits a valid and timely request for exclusion will not be eligible to receive a distribution of any portion of the EPP Settlement Amount and will have no rights with respect to the EPP Settlement.  Apotex reserves all legal rights and defenses as to all such persons or entities, and nothing in this Agreement shall be used against Apotex in any proceeding involving such persons or entities.

D.    Subject to court approval, in any written request for exclusion from the EPP Settlement, the person or entity seeking exclusion from the EPP Settlement must state his, her, or its full name, address, telephone number and e-mail address and include a statement that he, she, or it wishes to be excluded from the EPP Settlement.  Any self-insured entity that seeks exclusion for its prescription drug plan (or health plan with prescription drug benefits) shall state the name of the plan with specificity.  Any person or entity seeking to exclude another person or entity, e.g., an insurer seeking to exclude its Administrative Services Only ("ASO") clients, must identify with specificity each such person or entity it seeks to exclude and must submit documentation showing its authority to exclude each such person or entity.  In addition, any person or entity that seeks to exclude from the EPP settlement any claims assigned to that person or entity must submit documentation showing its assignment and authority to exclude those claims.

E.    To the extent legally permissible, a Consumer or Corporate Entity may not seek

11

exclusion from either the AG Settlement or the EPP Settlement, while not seeking exclusion from the other. To the extent legally permissible, any Consumer or Corporate Entity that submits a valid and timely request for exclusion from either settlement shall be deemed to have requested exclusion from both. (However, the Attorneys General, State Entities listed on Appendix B, and State Entities that accept a distribution of settlement proceeds from the Attorneys General's settlements in the MDL or, in the event of remand, any court to which the State Actions have been or may be remanded, shall be bound by the AG Settlement and ineligible for exclusion.)

F. Subject to court approval, a request for exclusion that does not comply with all of the provisions set forth in the applicable notice will be invalid, and the person or entity (including, with respect to the AG Settlement and State Actions, any Consumer or Corporate Entity) serving such an invalid request shall be bound by this Agreement, including the AG Settlement (with respect to any Consumer or Corporate Entity) and the EPP Settlement (with respect to any EPP Settlement Class Member), upon Final Court Approval.

G. The Attorneys General and the EPP Settlement Class Counsel shall, within ten (10) calendar days of the deadline for submitting a request for exclusion (the "Opt-Out Deadline"), provide Apotex with a list of, and copies of, all requests for exclusion. The Attorneys General and EPP Settlement Class Counsel shall file with their Motion(s) for Final Approval a list of all persons and entities that timely and validly requested exclusion.

H. Any of the Parties may dispute an exclusion request, in which case they shall, if possible, seek to resolve the disputed exclusion request by agreement within thirty (30) calendar days of the Opt-Out Deadline. If necessary, the Parties will seek court approval of any such resolutions. If the Parties are unable to resolve any such disputes, the Parties will submit such unresolved disputes to the court for decision.

## V.    Impact of Exclusions on the Agreement

A. Impact on the EPP Settlement Amount

1. The EPP Settlement Amount shall be reduced pursuant to a confidential calculation agreed to by the Parties that takes into account the percentage of the potential EPP Settlement Class Members that submit a valid and timely request for exclusion from the EPP Settlement Class (the "Opt-Out Percentage"). The amount by which the original EPP Settlement Amount set forth in Paragraph I.N exceeds the revised EPP Settlement Amount after reduction for exclusions (the "Opt-Out Reduction") shall be returned to Apotex, along with a pro rata portion of interest accrued on the EPP Escrow. Apotex and EPP Settlement Class Counsel shall cooperate in good faith in determining the amount of this reduction.

2. In the event that more than a confidential percentage of the total EPP Settlement Class agreed to by the Parties submits a valid and timely request for exclusion, Apotex will have the right in its sole discretion to terminate the settlement and receive full reimbursement of the EPP Settlement Payment, along with interest accrued

12

on the EPP Escrow, less the amount spent on class notice and other administrative expenses, up to $500,000.

3.     Within thirty (30) calendar days after the Opt-Out Deadline, EPP Settlement Class Counsel shall inform Apotex of the Opt-Out Percentage and the Opt-Out Reduction.  EPP Settlement Class Counsel shall explain the basis for their calculations and provide any supporting data or documentation reasonably requested by Apotex.

4.     Apotex shall within fifteen (15) calendar days thereafter inform EPP Settlement Class Counsel if Apotex disputes the calculations provided by EPP Settlement Class Counsel.

5.     If there is no dispute about the calculations provided by EPP Settlement Class Counsel, and the Opt-Out Percentage is greater than the confidential percentage agreed to by the Parties, Apotex shall also inform EPP Settlement Class Counsel within fifteen (15) calendar days after receiving the information required under Paragraph V.A.3 whether it elects to terminate the Agreement with respect to its settlement with the EPPs and the EPP Settlement Class.

6.     If there is no dispute and either Apotex's right to terminate has not vested, or Apotex has not elected to terminate as provided herein, then the amount of the Opt-Out Reduction shall be returned to Apotex, along with a pro rata portion of interest accrued on the EPP Escrow, within thirty (30) calendar days thereafter.  If there is no dispute and Apotex has elected to terminate as provided herein, then the full EPP Settlement Amount shall be returned to Apotex, along with all interest accrued on the EPP Escrow, minus the expenses authorized and actually incurred pursuant to Section X, within thirty (30) calendar days thereafter.

7.     If Apotex informs EPP Settlement Class Counsel that there is a dispute concerning these calculations, Apotex and EPP Settlement Class Counsel will seek in good faith to resolve that dispute.  If they are unable to come to agreement within fifteen (15) calendar days, either party may submit the dispute to the court.  If based on the court's order, Apotex is entitled to terminate the Agreement with respect to the settlement with the EPPs and the EPP Settlement Class, Apotex shall inform EPP Settlement Class Counsel of its election within ten (10) calendar days of that order.  If Apotex does not elect to terminate (or is not entitled to elect to terminate), then the amount of the Opt-Out Reduction shall be returned to Apotex, along with a pro rata portion of interest accrued on the EPP Escrow, within thirty (30) calendar days of the court's order.  If Apotex does elect to terminate, then the full EPP Settlement Amount shall be returned to Apotex, along with all interest accrued on the EPP Escrow, minus the expenses authorized and

13

actually incurred pursuant to Section X, within thirty (30) calendar days of the court's order.

## VI.    Release and Covenant Not To Sue

A.    In consideration of Apotex's obligations under this Agreement, the State Releasors and the EPP Releasors (on behalf of themselves and their respective past and present parents, subsidiaries, and affiliates, as well as their past and present general and limited partners, stockholders, officers, directors, employees, agents, attorneys, servants, predecessors, successors, heirs, executors, administrators, and representatives) hereby release, acquit, and forever discharge all of the Apotex Releasees (including past and present parents, subsidiaries, divisions, affiliates, stockholders, and general or limited partners, as well as all past and present officers, directors, employees, trustees, insurers, agents, attorneys, and any other representatives thereof) from all Released Claims.

B.    The State Releasors and the EPP Releasors may discover facts other than or different from those which they know or believe to be true with respect to the Released Claims, but the State Releasors and the EPP Releasors expressly waive and fully, finally, and forever settle and resolve, any known or unknown, suspected or unsuspected, contingent or non-contingent claims arising out of the Conduct that they have released or for which they have covenanted not to sue, without regard to the subsequent discovery or existence of such different or additional facts.

C.    With respect to the Released Claims, the State Releasors and the EPP Releasors expressly waive and release, any and all provisions, rights, and benefits under any law of any state or territory in the United States, or principle of common law that provides that a general release does not extend to claims that the creditor or releasing party does not know of or suspect to exist in his or her favor at the time of executing the release.

D.    That includes California Civil Code § 1542.  With respect to the Released Claims, the State Releasors and the EPP Releasors expressly waive and release all provisions, rights, and benefits under California Civil Code § 1542. That provision states as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

E.    The State Releasors and the EPP Releasors absolutely, unconditionally, and irrevocably covenant not to bring, file, or otherwise assert any Released Claim, or to cause or assist to be brought, filed, or otherwise asserted any Released Claims, or to otherwise seek to establish liability for any Released Claims against any Apotex Releasees in any forum whatsoever, whether on their own behalf or on behalf of any other natural person or entity, including any State, State Entity, political subdivision (including any county, city, township, or

14

municipality), Consumer, or Corporate Entity, to the fullest extent permitted by law.

F.     As part of the proposed court orders to be submitted to the court with the motion for final approval under Section III of this Agreement, the Attorneys General and the EPPs shall dismiss with prejudice all claims against Apotex in the Actions.  All Released Claims shall be finally, fully, and forever resolved, settled, compromised, and released, with prejudice, and the Apotex Releasees shall not be named a defendant in any future new or amended complaint arising out of or related to the Released Claims.

G.     This Agreement resolves claims only against the Apotex Releasees, and except as specifically provided herein, is not intended to affect in any way the rights that the Attorneys General or EPPs may have against any other party, person, or entity that is not included within the definition of Apotex Releasees.

## VII.     Compliance and Reporting to State Attorneys General

A.     Apotex covenants to the Attorneys General that it shall not, for seven years from the execution of this Agreement, engage in any price-fixing, bid-rigging, or market allocation as to any Generic Pharmaceutical Product in violation of Section 1 of the Sherman Act.  Upon good cause shown, the Attorneys General may petition the court for a three-year extension of this covenant.  That covenant shall be implemented as part of the proposed court orders to be submitted to the court with the motion for Final Court Approval under Paragraph III.A of this Agreement.

B.     In addition, for the duration of the CIA, Apotex covenants to the Attorneys General that it will substantially maintain its existing compliance program, as set out in the documents shared with the Attorneys General prior to the date of entry of this Agreement. Apotex may make reasonable, non-material changes to its compliance program from time to time and will provide an annual report to the Attorneys General as to its compliance program, by email to up to four designated contacts identified in advance by the Attorneys General.  That report shall specify any changes to Apotex's compliance program since the last report, shall provide detail as to whether the requirements of the program were carried out over the course of the past year, and shall confirm that all sales officers and employees, and any other officers and employees involved in pricing, have attended Apotex's compliance training within the past 12 months.  That covenant shall be implemented as part of the proposed court orders to be submitted to the court with the motion for Final Court Approval.

C.     Apotex shall in this same report to the Attorneys General: (a) confirm that it is in substantial compliance with the terms of the CIA, including its obligations to maintain a compliance officer, compliance committee, and compliance training program; and (b) either confirm that no potential antitrust violations have been identified or provide a brief description of any potential antitrust violations disclosed pursuant to Apotex's obligations under the CIA.

D.     During this same time period, Apotex shall submit to the jurisdiction of the court in the MDL (or any other court to which the State Actions have been or may be remanded) for

purposes of enforcing the provisions in this Section VII.

E.    All reports that Apotex provides to the Attorneys General under this Paragraph shall be designated "Highly Confidential" pursuant to the protective order entered in the MDL, as well as the protective order(s) entered in any other court to which any of the State Actions have been or may be remanded, and shall not be disclosed to anyone other than the Attorneys General or used for any purpose other than to enforce this Agreement.[8]

## VIII.    Discovery, Authentication and Cooperation

A.    As of the Effective Date, continuing unless this Agreement is terminated as provided herein, neither the Attorneys General nor the EPPs shall serve any discovery requests on Apotex, take depositions of Apotex, file any motions against Apotex, or take any other adverse action against Apotex in the MDL (or in any court to which any State Action has been or may be remanded) or any related litigation except to enforce the terms of this Agreement. Likewise, as of the Effective Date, continuing unless this Agreement is terminated as provided herein, Apotex shall not serve any discovery requests on the Attorneys General or the EPPs, take depositions of the Attorneys General or the EPPs, file any motions against the Attorneys General or the EPPs, or take any other adverse action against the Attorneys General or the EPPs in the MDL (or in any court to which any State Action has been or may be remanded) or any related litigation except to enforce the terms of this Agreement. For the avoidance of doubt, the Attorneys General and the EPPs may continue to attend depositions of current and former Apotex employees and may question those employees as it relates to the prosecution of claims against the non-Apotex Defendants. Counsel for Apotex may likewise continue to attend depositions of current and former employees of the Attorneys General and the EPPs, and of any other individuals represented by the Attorneys General or the EPPs, and may question those individuals as it relates to Apotex's defense of claims brought by MDL plaintiffs other than the Attorneys General or the EPPs.

B.    The Attorneys General and the EPPs shall continue to have the same rights that they currently have to receive discovery provided by Apotex to other parties in the MDL (or in any court to which any State Action has been or may be remanded) pursuant to the protective order governing the use of documents and other information produced in the MDL, as well as the protective order(s) entered in any other court to which any of the State Actions has been or may be remanded. In addition, Apotex will use reasonable efforts to provide information necessary to authenticate and admit up to 150 documents produced by Apotex, by affidavit if permitted by the court and by witness testimony at trial if necessary.

C.    Similarly, Apotex shall continue to have the same rights that it currently has to receive discovery provided by the Attorneys General and the EPPs to other parties in the Actions pursuant to the protective order governing the use of documents and other information produced

---

[8] The Attorneys General agree to seek a protective order in any court to which any State Action has been or may be remanded, providing for "Highly Confidential" treatment of such information, at least equivalent to the protection provided under the protective order in the MDL.

in the MDL (and in any other court to which any of the State Actions has been or may be remanded).  In addition, the Attorneys General and the EPPs shall use reasonable efforts to provide information necessary to authenticate up to 150 documents each produced by the Attorneys General or the EPPs, by affidavit if permitted by the court and by witness testimony at trial if necessary.

        D.      In addition to the above, Apotex agrees to provide cooperation to the Attorneys General and EPPs as set forth in Appendix C.  All such cooperation shall be treated by the Attorneys General and the EPPs as "highly confidential" and not disclosed to any other party in the MDL or any related proceedings (including in any other court to which any State Action has been or may be remanded).

        E.      Apotex will also in good faith consider reasonable requests from the Attorneys General or the EPPs for additional assistance that does not impose an undue burden on Apotex. The Attorneys General and the EPPs will likewise in good faith consider reasonable requests from Apotex for additional assistance that does not impose an undue burden on the Attorneys General and/or the EPPs.

        F.      Apotex shall not be required to produce any documents or otherwise disclose information protected by the work product doctrine, attorney-client privilege, common-interest privilege, joint-defense privilege, or any other applicable doctrine or privilege; or disclosure of which is prohibited by any relevant law (including foreign laws), government entities, or court order.

## IX.      Qualified Settlement Fund

        A.      Each of the State Escrow and the EPP Escrow (each, a "Settlement Fund") will be established by order of the court at Huntington Bank with such bank serving as escrow agent ("Escrow Agent") subject to one or more escrow agreements mutually acceptable to the Parties. Each Settlement Fund is established to resolve and satisfy one or more claims described in the preamble to this Agreement, and each shall be subject to the court's continuing supervision and control.  In addition, the Attorneys General and EPP Settlement Class Counsel shall make such elections as necessary or advisable to carry out the provisions of this Section IX.  Such elections shall be made in compliance with the procedures and requirements contained in any applicable regulations.

        B.      The Parties intend that each Settlement Fund shall be a "qualified settlement fund" within the meaning of Treasury Regulation § 1.468B-1, shall act in a manner consistent with the treatment of each Settlement Fund as such a qualified settlement fund, and shall not take a position in any filing or before any tax authority that is inconsistent with such treatment.  All provisions of this Agreement shall be interpreted in a manner that is consistent with each Settlement Fund being a "qualified settlement fund" within the meaning of Treasury Regulation § 1.468B-1.  The administrator for the EPP Escrow shall be a claims administrator selected by EPP Settlement Class Counsel and approved by the court, and the administrator for the State Escrow shall be Attorneys General of New York, Oregon, and Florida (each, in such capacity, an

17

"Administrator").  Each Administrator shall cause the timely and proper filing of all informational and other tax returns necessary or advisable with respect to the applicable Settlement Fund (including without limitation the returns described in Treasury Regulation §§ 1.468B-2(k)(1) and (l)(2)).  Each Administrator shall make a "relation-back election" (as defined in Treasury Regulation § 1.468B-1(j)), if available, to permit the applicable Settlement Fund to be treated as a qualified settlement fund from the earliest permitted date.  It shall be the responsibility of each Administrator to cause the timely and proper preparation and delivery of the necessary documentation with respect to the applicable Settlement Fund for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

C.    The Escrow Agents shall cause the Settlement Funds to be invested in short-term instruments backed by the full faith and credit of the United States Government or fully insured in writing by the United States Government, or money market funds rated Aaa and AAA, respectively, by Moody's Investor Services and Standard and Poor's, invested substantially in such instruments, and shall reinvest any income from these instruments and the proceeds of these instruments as they mature in similar instruments at their then current market rates.  Apotex shall bear no risk related to the Settlement Funds.  The Settlement Funds shall be deemed and considered to be in custodia legis of the court, and shall remain subject to the jurisdiction of the court, until such time as the funds therein shall be distributed pursuant to this Agreement or further order(s) of the court.

D.    All (i) taxes (including any estimated taxes, interest, or penalties) arising with respect to the income earned on a Settlement Fund, including any taxes or tax detriments that may be imposed upon Apotex or any other Apotex Releasees with respect to income earned on a Settlement Fund for any period during which such Settlement Fund does not qualify as a qualified settlement fund for federal or state income tax purposes ("Taxes"); and (ii) expenses and costs incurred in connection with the operation and implementation of a Settlement Fund (including expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) tax returns with respect to the Settlement Fund ("Tax Expenses")), shall be paid out of such Settlement Funds.

E.    Neither Apotex nor any other Apotex Releasee nor their respective counsel shall have any liability or responsibility with respect to a Settlement Fund for the Taxes or the Tax Expenses or the filing of any tax returns or other documents with the Internal Revenue Service or any other taxing authority.  Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the applicable Settlement Fund and shall be timely paid by the Administrators out of such Settlement Fund without prior order from the court and each Administrator shall be obliged (notwithstanding anything herein to the contrary) to withhold from distribution to any claimants authorized by the court any funds necessary to pay such amounts including the establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treasury Regulation § 1.468B-2(l)(2)).  Neither Apotex nor any Apotex Releasee shall be responsible or have any liability for any reporting requirements that may relate thereto.  The Parties agree to cooperate with each

18

other and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this Paragraph IX.E.

F.    If this Agreement does not receive the Final Approval Order, then the Settlement Funds (net of costs incurred and expended in accordance with Paragraph IX.D and including interest accrued) shall be returned to Apotex within thirty (30) calendar days of the court's final determination in accordance with that determination.

## X.    Payment of Expenses

A.    Apotex agrees to permit use of a maximum of USD $500,000 of each of the Settlement Funds toward (i) the cost of providing notice to the potential members of the EPP Settlement Class and those on whose behalf the Attorneys General assert claims, and (ii) the costs of administration of the Settlement Funds prior to final court approval after the EPP Settlement Amount and State Settlement Amount are each paid into the Escrow Accounts.  To the extent such expenses have been actually incurred or paid for notice and administration costs, those notice and administration expenses (up to the maximum of USD $500,000 from each of the respective Settlement Funds) are not recoupable if this settlement does not become final or is terminated.  The Escrow Agents shall return all remaining portions of the Settlement Funds (net of costs incurred and expended in accordance with Paragraph IX.D and including interest accrued) to Apotex should this Agreement not receive Final Court Approval.  Apotex shall not be liable for any of the costs or expenses of the litigation incurred by EPPs or Attorneys General in the Actions or otherwise, including attorneys' fees; fees and expenses of expert witnesses and consultants; and costs and expenses associated with discovery, motion practice, hearings before the court or Special Master, appeals, trials, or the negotiation of other settlements, or for the claims administration process under this Agreement and costs, except to the extent that any such costs or expenses are awarded from the Settlement Funds by court order.

## XI.    The Settlement Funds

A.    The EPP Releasors and State Releasors shall look solely to the Settlement Funds for settlement and satisfaction against the Apotex Releasees of all Released Claims and shall have no other recovery against Apotex or any of the Apotex Releasees for any Released Claims.

B.    After this Agreement receives Final Court Approval, and at a time to be determined by EPP Settlement Class Counsel and the Attorneys General, respectively, the Settlement Funds shall be distributed in accordance with the plans to be submitted, subject to approval by the court.  In no event shall Apotex or any Apotex Releasee have any responsibility, financial obligation, or liability whatsoever with respect to the investment or distribution of the Settlement Funds, or the administration of the Settlement Funds, including the costs and expenses of such investment, distribution and administration.

## XII.   EPP Settlement Class Counsel's Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards for Class Representatives

A.    EPPs and EPP Settlement Class Counsel shall be reimbursed subject to court

19

approval and indemnified solely out of the EPP Escrow for their costs and expenses. Apotex and the other Apotex Releasees shall not be liable for any costs, fees, or expenses of any of EPPs' or the EPP Settlement Classes' respective attorneys, experts, advisors, agents, or representatives. All such costs, fees, and expenses as approved by the court shall be paid out of the EPP Escrow.

B.      EPP Settlement Class Counsel may, after Preliminary Approval of this Agreement at a time to be determined in their sole discretion, submit an application to the court ("Fee and Expense Application") for the following payments to be made to EPP Settlement Class Counsel after Final Court Approval of this Agreement: (i) an award of attorneys' fees not in excess of one third of the sum of the EPP Settlement Amount and any interest accrued thereon while in the EPP Escrow, plus (ii) reimbursement of expenses and costs incurred in connection with prosecuting the Actions ("Fee and Expense Award"). In addition, EPP Settlement Class Counsel may, at a time to be determined in their sole discretion, submit an application for incentive awards to be paid to the EPP class representatives. EPP Settlement Class Counsel reserve the right to make additional applications from time to time for fees and expenses incurred and reasonable incentive awards, but in no event shall the Apotex Releasees be responsible to pay any such additional fees and expenses except to the extent they are paid out of the EPP Escrow.

C.      Subject to court approval, EPPs and EPP Settlement Class Counsel shall be reimbursed and paid solely out of the EPP Escrow for all expenses including attorneys' fees and past, current, or future litigation expenses and incentive awards. Attorneys' fees and expenses awarded by the court shall be payable from the EPP Escrow upon award, notwithstanding the existence of any timely filed objections thereto, or potential appeal therefrom, or collateral attack on the settlement or any part thereof, subject to EPP Settlement Class Counsel's obligation to make appropriate refunds or repayments to the EPP Escrow, if and when, as a result of any appeal and/or further proceedings on remand, or successful collateral attack, the fee or award of expenses is reduced or reversed, or in the event this Agreement is rescinded or terminated pursuant to Sections V or XIII.

D.      The procedure for and the allowance or disallowance by the court of the application by EPP Settlement Class Counsel for attorneys' fees, costs, and expenses, and incentive awards for class representatives to be paid out of the EPP Escrow are not part of this Agreement, and are to be considered by the court separately from the court's consideration of the Parties' good faith in entering into this Agreement and of the fairness, reasonableness, and adequacy of the settlement under this Agreement. Any order or proceeding relating to the Fee and Expense Application, or any appeal from any such order shall not operate to terminate or cancel this Agreement, or affect or delay the finality of the judgment approving the settlement.

E.      Other than to pay the EPP Settlement Amount, as provided herein, neither Apotex nor any other Apotex Releasee shall have any responsibility for, or interest in, or liability whatsoever with respect to any payment to EPP Settlement Class Counsel of any Fee and Expense Award in the Actions.

F.      Neither Apotex nor any other Apotex Releasee shall have any responsibility for, or interest in, or liability whatsoever with respect to the allocation among EPP Settlement Class

20

Counsel and/or any other person who may assert some claim thereto, of any Fee and Expense Award that the court may make in the Actions.

## XIII.    Rescission If Agreement Is Not Approved or Final Judgment Is Not Entered

A.    In the event that the court fails to grant Final Court Approval to this Agreement, then the Parties shall in good faith seek to agree on revisions to this Agreement that would remedy any issues preventing Final Court Approval while retaining the spirit of the Agreement. If they are unable to come to agreement on such revisions, despite their good faith efforts, they shall each have the option to rescind this Agreement.

B.    A modification or reversal on appeal of any amount of EPP Settlement Class Counsel's fees and expenses awarded by the court out of the Settlement Funds shall not be deemed a basis to rescind this Agreement.

C.    Written notice of the exercise of any right to rescind provided for under this Section XIII shall be made according to the terms herein.

D.    In the event that this Agreement does not receive Final Court Approval, or this Agreement otherwise is terminated or rescinded by any party under any provision herein, then: (i) this Agreement shall be of no force or effect, except as expressly provided in Paragraph XIII.A and XIII.B or other portions of this Agreement; (ii) the Settlement Funds (with any interest accrued thereon) shall be returned forthwith to Apotex less only disbursements made in accordance with Section IX and Section X of this Agreement (and as otherwise consistent with Paragraph IX.F); and (iii) Apotex shall be entitled to any tax refunds owing to the Settlement Funds.  At the request of Apotex, and at Apotex's expense, the Attorneys General and EPP Settlement Class Counsel shall cause to be filed claims for any tax refunds owed to the Settlement Funds and pay the proceeds, after deduction of any fees and expenses incurred with filing such claims for tax refunds, to Apotex.  All expressly reserve all of their rights, claims and defenses if this Agreement does not receive Final Court Approval or is otherwise terminated or rescinded.

E.    Further, and in any event, Apotex, the Attorneys General, and End-Payer Plaintiffs agree that this Agreement, whether or not it receives Final Court Approval or is otherwise terminated or rescinded by any Party under any provision herein, and any and all negotiations, documents, and discussions associated with it, shall not be deemed or construed to be an admission or evidence of (i) any violation of any statute or law or of any liability or wrongdoing whatsoever by Apotex or any other Apotex Releasees, or (ii) the truth of any of the claims or allegations contained in the Actions or any other pleading filed in the MDL or any court to which any State Actions have been or may be remanded.  Evidence derived from this Agreement, and any and all negotiations, documents, and discussions associated with it shall not be discoverable or used in any way, whether in the Actions or in any other action or proceeding, against Apotex or other Apotex Releasees (except to enforce this Agreement).

21

**XIV.   Adjustment to Settlement Funds/Limited Most Favored Nations**

A.      In the event that the EPPs enter into a settlement agreement or binding term sheet, at any time prior to 6 months after the Effective Date, with any of the other Defendants in the MDL that have entered into a deferred prosecution agreement as of the Effective Date, with that settlement agreement or binding term sheet containing more favorable financial terms, then the EPPs shall return to Apotex a percentage of the EPP Settlement Payment, under the confidential terms agreed to by the Parties.  This Limited Most Favored Nations provision shall not apply to any settlement with a Defendant that has filed for bankruptcy or has made a credible showing of financial stress.

**XV.   Notice**

A.      Notice to Apotex pursuant to this Settlement Agreement shall be sent by registered United States mail, return receipt requested, and electronic mail to:

> April N. Williams
> WilmerHale
> 2100 Pennsylvania Avenue NW
> Washington, DC 20037
> april.williams@wilmerhale.com

> James W. Matthews
> Foley & Lardner LLP
> 111 Huntington Ave.
> Boston, MA 02199
> jmatthews@foley.com

> Max B. Chester
> Foley & Lardner LLP
> 777 E. Wisconsin Ave.
> Milwaukee, WI 53202
> mchester@foley.com

B.      Notice to End-Payer Plaintiffs or EPP Settlement Class pursuant to this Settlement Agreement shall be sent by registered United States mail return receipt requested and electronic mail to Lead Counsel:

> Roberta D. Liebenberg
> Jeffrey S. Istvan
> Fine, Kaplan and Black, R.P.C.
> One South Broad Street
> 23rd Floor
> Philadelphia, PA 19107
> rliebenberg@finekaplan.com

22

jistvan@finekaplan.com

C.      Notice to Attorneys General pursuant to this Settlement Agreement shall be sent by registered United States mail return receipt requested and electronic mail, including to Lead Counsel:

Christopher Teters
Assistant Attorney General, Public Protection Division
Office of Kansas Attorney General Kris Kobach
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
(785) 296-3751
chris.teters@ag.ks.gov

## XVI.   Miscellaneous

A.      This Agreement shall not be deemed or construed to be an admission of liability or of any violation of any statute or law or of any wrongdoing by the Apotex Releasees.  Nor shall this Agreement be deemed as an admission by the Apotex Releasees of any of the allegations or claims by the Attorneys General or the EPPs.  Nor shall the Agreement be used as an admission as to the strength or weakness of any party's claims or defenses.  This Agreement may not be used by the Attorneys General, the EPPs, or anyone else in any pending or future civil, criminal, or administrative action or proceeding against the Apotex Releasees, except in a proceeding or action to enforce this Agreement.

B.      This Agreement may be executed in counterparts, each of which will be deemed an original, but which together will constitute one and the same instrument, and a facsimile signature or PDF signature shall be deemed an original signature for purposes of executing this Agreement.  In addition, the state Medicaid agencies listed on Appendix B will sign on a separate form, unless otherwise agreed-to in writing by Apotex.

C.      This Agreement, together with the confidential understandings identified herein, contains the entire Agreement between the parties, and no other understandings or agreements, verbal or otherwise, exist between the parties, except as set forth or referred to herein.

D.      This Agreement (other than the Cooperation Agreement, which is governed by its own terms) may not be modified, changed, cancelled, rescinded, amended, or varied (except under the specific termination provisions set forth herein), nor may any or all of its terms be waived, except by a writing signed by all of the parties.

E.      None of the parties to this Agreement shall be considered to be the drafter of this Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement.

F.      Where this Agreement requires either party to provide notice or any other

23

communication or document to the other, such notice shall be in writing, and shall be provided as set forth in Section XV.

       G.     This Agreement shall be governed by, construed by, and enforced in accordance with the laws of the State of Connecticut, including Conn. Gen. Stat. Ann. § 52-572h, barring contribution against a settling defendant.  In addition, the law of each state (including, e.g., Cal. Civ. Pro. Code § 877 and N.Y. Gen. Oblig. Law § 15-108) continues to apply with respect to all settlements entered into and judgments entered in connection with claims related to the Conduct and based on that state's law.  Consistent with such law, this Agreement is conditioned upon the court's finding that it was entered into in good faith.  In addition, Apotex has entered into supplemental agreements with certain States (Delaware, Georgia, Idaho, Maryland, Mississippi, New Mexico, Pennsylvania, and South Dakota) and the EPPs respectively that provide additional obligations concerning claims for contribution.  The parties agree that venue for any and all matters or disputes arising out of this Agreement and asserted by or against the EPPs shall lie solely in the U.S. District Court for the Eastern District of Pennsylvania.  Any and all matters or disputes arising out of this Agreement and asserted by or against the Attorneys General shall lie in the District Court to which the State Actions have been or may be remanded.

       H.     Each party affirms that this Agreement has been executed by its authorized representative, who is acting within his or her capacity and authority and that by his or her signature this representative is binding the Party on behalf of whom the Agreement is executed to the terms and conditions of this Agreement.

IT IS HEREBY AGREED by the undersigned as of:

24

**FINE, KAPLAN AND BLACK, R.P.C.**

By: _____          Date: _11/7/24_____

Roberta D. Liebenberg
Jeffrey S. Istvan
Counsel for EPPs

**WILMER CUTLER PICKERING HALE
AND DORR LLP**

**FOLEY & LARDNER LLP**

By: _Steve Cherry_____         Date: _9/9/2024_____

Steven F. Cherry
April N. Williams
James W. Matthews
Counsel for Apotex Corp.

/s/ Jeff Pickett
Jeff Pickett
Senior Assistant Attorney General
State of Alaska, Department of Law
1031 W. 4th Ave., Suite 200
Anchorage, AK 99501
Tel: (907) 269-5275
jeff.pickett@alaska.gov

*Counsel for the State of Alaska*

Dated: October 21, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## ALASKA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Alaska (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: _09/20/24_    Signature: _____

Name: _ARNE SOLDWEDEL_

Position/Title: _DEPUTY DIRECTOR, ASST. ATTORNEY GENERAL_

_ALASKA MFCU_

**Single State Agency for Medicaid Signature:**

Dated: 9/23/24

Signature: _____

Name: Emily Ricci

Position/Title: Deputy Commisioner/Medicaid Director

State of Alaska Department of Health

/s/ Robert A. Bernheim
Robert A. Bernheim
Unit Chief Counsel
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004
Tel: (520) 628-6507
Robert.Bernheim@azag.gov

*Counsel for the State of Arizona*

Dated: October 21, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## ARIZONA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Arizona (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: _8-1-24_        Signature: _____

Name: _STEVEN J. DUPUIS_

Position/Title: _AZ MFCU DIRECTOR_

_____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**Single State Agency for Medicaid Signature:**

Dated: 8.1.2024

Signature:

Name: Vanessa J. Templeman

Position/Title: Inspector General

Arizona Health Care Cost Containment System, Office of Inspector General

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

/s/ Emilio Varanini
Emilio Varanini
Supervising Deputy Attorney
General
Office of the Attorney General California
455 Golden Gate, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3541
E-mail: Emilio.Varanini@doj.ca.gov

*Attorney for the State of California*

Dated: October 21, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR CALIFORNIA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of California (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**


Date:  July 11, 2024

_____
Randal L. Glaser
Supervising Deputy Attorney General
California Department of Justice
Office of the Attorney General
Division of Medi-Cal Fraud and Elder Abuse


*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**CALIFORNIA**

Dated: 9/4/2024      Signature: Judith Recchio   Digitally signed by Judith Recchio
                                                  Date: 2024.09.05 08:51:25 -07'00'

Name: Judith Recchio

Position/Title: Deputy Director and Chief Counsel

Department of Health Care Services

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

Edward E. Manibusan
Attorney General
Commonwealth of the Northern Mariana Island
Caller Box 10007
Saipan, MP 96950
Tel: (670) 237-7500
attorney_general@cnmioag.org

*Counsel for The Commonwealth of the Northern Mariana Island*

Dated: _____9/24/2024_____

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

Dated: __09/26/2024__     Signature: _____

Name:     Vicenta R. Borja

Position/Title:     Acting Director,
Commonwealth Medicaid Agency

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

FOR PLAINTIFF STATE OF COLORADO
PHILIP J. WEISER
ATTORNEY GENERAL

/s/ *Robin Alexander*
Robin Alexander
Assistant Attorney General
Colorado Department of Law
Consumer Protection Section
1300 Broadway, Ninth Floor
Denver, Colorado 80203
Telephone: 720.508.6235
Email: Robin.Alexander@coag.gov

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
### Colorado

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Colorado (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 8/5/2024_____   Signature: _____

Name:     Crystal Littrell

Position/Title:     First Assistant Attorney Genera/Director

Colorado Medicaid Fraud Control Unit

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**Colorado**


Dated: 7/24/2024    Signature: _____

Name: Kim Bimestefer

Position/Title: HCPF, Executive Director

/s/ W. Joseph Nielsen
W. Joseph Nielsen
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Ave.
Hartford, CT 06106
Tel: (860) 808-5030
joseph.nielsen@ct.gov

*Counsel for the State of Connecticut*

Dated: October 21, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR CONNECTICUT

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Connecticut (the "State") regarding the Settlement Agreement described as follows:

> This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7/24/24    Signature: _Marjorie Szanski_

Name: _Marjorie Szanski_

Position/Title: _Supervisory Assistant State's Attorney_
_Director Medicaid Fraud Control Unit_

**Single State Agency for Medicaid Signature:**

Dated:                          Signature: _A B Reeves_____
**_9/6/24_____**
                                Name:      Andrea Barton Reeves, J.D._____

                   Position/Title:   Commissioner_____

                                     Connecticut Department of Social Services___

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

Adam Gitlin
Chief, Antitrust and Nonprofit
Enforcement Section
400 6th St. NW, 10th Fl.
Washington, DC 20001
Tel: (202) 442-9864
Adam.Gitlin@dc.gov

*Counsel for District of Columbia*

Dated: 10/1/2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## THE DISTRICT OF COLUMBIA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the District of Columbia (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the District of Columbia has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the District of Columbia and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 09/12/2024          Signature: *Lavan Griffith*

Name:     LaVan Griffith

Position/Title:     Assistant Inspector General - Director

D.C.Office of Inspector General - MFCU

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR THE
DISTRICT OF COLUMBIA**

Dated: ___9/30/2024___     Signature: _____

Name: _____
Wayne Turnage

Position/Title: _____
Director

_____
D.C. Department of Health Care Finance

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

Michael A. Undorf
Deputy Attorney General
Delaware Department of Justice
820 N. French St., 5th Floor
Wilmington, DE 19801
(302) 683-8816
michael.undorf@delaware.gov

*Counsel for the State of Delaware*

Dated:  October 22, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR DELAWARE

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Delaware (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7/16/24

Signature: /s/Stephen McDonald

Name: Stephen McDonald

Position/Title: Director

Medicaid Fraud Control Unit

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT SIGNATURE PAGE FOR DELAWARE**

Dated: _7/16/2024 | 7:40 AM EDT_    Signature: _Andrew Wilson_

DocuSigned by:

35F947C98C8B499...

Name: Andrew Wilson

Position/Title: Director

Division of Medicaid & Medical Assistance (DMMA)

**FOR PLAINTIFF STATE OF FLORIDA**
**ASHLEY MOODY**
**ATTORNEY GENERAL**


By: _____

John Guard
Chief Deputy Attorney General
Nicholas J. Weilhammer
Associate Deputy Attorney General for Enforcement
Lizabeth A. Brady
Director, Antitrust Division
Liz.Brady@myfloridalegal.com
Timothy Fraser
Senior Assistant Attorney General
Timothy.Fraser@myfloridalegal.com
Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel:   (850) 414-3300
Fax:   (850) 488-9134

Dated 10/31/2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR FLORIDA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Florida (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 10/31/2024          Signature: _____

Name: John M. Guard

Position/Title: Chief Deputy Attorney General

State of Florida

John Guard
E-signed 2024-10-31 10:59AM EDT
john.guard@myfloridalegal.com

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
Apotex-1206

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**FLORIDA**

Dated: 10/18/2024   Signature:

Name: Andrew T. Sheeran

Position/Title: General Counsel

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

STATE OF GEORGIA

/s/ Logan Winkles
Christopher Carr, Attorney General
Logan Winkles, Deputy Attorney General
Ron Stay, Sr. Asst. Attorney General
Charles Thimmesch, Sr. Asst. Attorney General
Office of the Georgia Attorney General
40 Capitol Sq. SW
Atlanta, GA 30334
(404) 458-3626
cthimmesch@law.ga.gov

*Attorneys for the State of Georgia*

Dated 11/6/2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR GEORGIA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Georgia (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7/31/24      Signature: _____

Name: Jim Mooney

Position/Title: Deputy Attorney General

Medicaid Fraud Division

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
GEORGIA**

Dated: 7/30/2024    Signature: *Melanie Simon*

Name: Melanie Simon

Position/Title: General Counsel

Georgia Department of Community Health

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

/s/ Noah Goerlitz
Noah Goerlitz
Assistant Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
Tel: (515) 725-1018
noah.goerlitz@ag.iowa.gov

*Attorney for Plaintiff State of Iowa*

Dated: October 21, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR IOWA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Iowa (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated:   7/19/24          Signature:   *Tricia Dieleman*

                          Name:        Tricia Dieleman

                          Position/Title:   Assistant Attorney General for the Iowa MFCU

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**IOWA**


Dated: 07/19/2024          Signature: _____

                           Name:  Elizabeth Matney

                           Position/Title: Director, Iowa Medicaid & Division of Administration and HHS
                                            Deputy Director

                           _____


*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

John K. Olson
Deputy Attorney General
Consumer Protection Division
954 West Jefferson Street, Second Floor
Boise, ID  83720-0010
Tel: (208) 332-3549
John.Olson@ag.idaho.gov

*Counsel for Idaho*

Dated: Sept 16, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR IDAHO

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Idaho (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: _07/16/2024_       Signature: _Ashley Klenski_

Name: _Ashley Klenski_

Position/Title: _Director_

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**Single State Agency for Medicaid Signature:**

Dated: **_7-15-2024_____**     Signature:     *Juliet Charron*

Name:     Juliet Charron

Position/Title:     Deputy Director, Medicaid and Behavioral Health,
Idaho Department of Health and Welfare

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

*/s/ Brian M. Yost*
Brian M. Yost, Assistant Attorney General
David Buysse, Deputy Division Chief
Daniel Betancourt, Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., Floor 23
Chicago, Illinois 60603
Tel: (872) 276-3598
Brian.Yost@ilag.gov

*Counsel for the State of Illinois*

Dated: October 23, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
### Illinois

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Illinois (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into _In re Generic Pharmaceuticals Pricing Antitrust Litigation_, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 8/6/24       Signature: _Heather D'Orazio_

Name: Heather D'Orazio

Position/Title: Director, IL Medicaid Fraud Control Unit

_In re Generic Pharmaceuticals Pricing Antitrust Litigation_, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
Illinois**


Dated: 8/6/24          Signature:  _____

                        Name:      Elizabeth M. Whitehorn

                        Position/Title:  Director, Illinois Department of Healthcare and

                                         Family Services


*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

By:  /s/ Tamara Weaver
Deputy Attorney General
Indiana Government Center South – 5th Fl.
302 W. Washington Street
Indianapolis, IN  46204-2770
Phone: (317) 234-7122
Email:  Tamara.Weaver@atg.in.gov

*Counsel for Indiana*

Dated: October 22, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR INDIANA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Indiana (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into** *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, **MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated:
___8/29/2024_____

Signature: *Matthew Whitmire*

Name: Matthew Whitmire

Position/Title: Director

Indiana Medicaid Fraud Control Unit

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
INDIANA**

Dated: **8/29/2024**

Signature:

Name:

Position/Title:

_____
Cora A. Steinmetz

_____
Medicaid Director

_____
Family & Social Services Administration

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

FOR PLAINTIFF STATE OF KANSAS

KRIS W. KOBACH
ATTORNEY GENERAL


 _/s/Lynette Bakker_____
Lynette R. Bakker
First Assistant Attorney General
Christopher Teters
Assistant Attorney General
Antitrust & Business Organizations
Public Protection Division
Office of the Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Tel: (785) 296-3751
lynette.bakker@ag.ks.gov
chris.teters@ag.ks.gov

*Counsel for Kansas*

Dated: October 15, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## KANSAS

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Kansas (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 8/12/24          Signature: _____

Name: Victor Braden

Position/Title: Deputy Attorney General

Office of the Kansas Attorney General

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
KANSAS

Dated: Aug 5, 2024      Signature: _____

Name: Janet Stanek

Position/Title: Secretary

Kansas Department of Health and Environment

Jonathan E. Farmer
Deputy Executive Director of Consumer Protection
Office of the Attorney General of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Tel: 502-696-5448
Fax: 502-573-8317
Jonathan.Farmer@ky.gov

*Counsel for the Commonwealth of Kentucky*

Dated: October 18, 2024

**MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
KENTUCKY**

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Kentucky (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 07/14/24     Signature: _Matt Klein_

Name: _Matthew Kleinert_

Position/Title: _Executive Director_

_Ky MFCU_

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
KENTUCKY**

Dated: 07/24/24        Signature:  *Lisa D. Lee*

                       Name:      Lisa D. Lee

                       Position/Title:  Commissioner

                                   Kentucky Department for Medicaid Services

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

PLAINTIFF STATE OF LOUISIANA

LIZ MURRILL
LOUISIANA ATTORNEY GENERAL

BY:

John J. Kelley, Section Chief
William H. Rogers, Jr., Assistant Attorney General
Public Protection Division
Office of the Louisiana Attorney General
1885 North Third Street
Baton Rouge, LA 70802
Tel. (225) 326-6400
Fax (225) 326-6499
KelleyJ@ag.louisiana.gov
rogersw@ag.louisiana.gov


Dated:_____

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR LOUISIANA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Louisiana (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7/23/2024        Signature: _Matthew P Stafford J._

Name: Matthew P. Stafford, Jr.

Position/Title: Director

Medicaid Fraud Control Unit

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
LOUISIANA**

Dated: 9/30/24

Signature: _Michael Harrington_

Name: _Michael Harrington_

Position/Title: _Secretary LDH_

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

[Signature Block for Apotex Settlement / Filings]


/s/ William Matlack
WILLIAM MATLACK
Chief, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 963-2414
William.matlack@mass.gov

*Counsel for the Commonwealth of Massachusetts*

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR COMMONWEALTH OF MASSACHUSETTS

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the Commonwealth of Massachusetts (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 8/5/24

Signature: Ian Marinoff
Digitally signed by Ian Marinoff
Date: 2024.08.05 16:03:32 -04'00'

Name: Ian R. Marinoff

Position/Title: Managing Attorney, Medicaid Fraud Division

Massachusetts Office of the Attorney General

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
COMMONWEALTH OF MASSACHUSETTS**

Dated: 9/11/24        Signature: _Kathleen E Walsh_

                  Name: _Kathleen E Walsh_

Position/Title: _Secretary_

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

Schonette J. Walker
Assistant Attorney General
Chief, Antitrust Division
200 Saint Paul Place
19th Floor
Baltimore, Maryland 21202
410.576.6473
swalker@oag.state.md.us

*Counsel for Plaintiff State Maryland*

Dated: November 7, 2024

# MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR MARYLAND

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Maryland (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 16 July 2024    Signature: _____

Name: W. Zak Shirley

Position/Title: Director

Maryland MFVU

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
MARYLAND**

Dated: 11/4/2024          Signature: _____

                          Name: Laura Herrera Scott

                          Position/Title: Secretary

                          _____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

FOR PLAINTIFF STATE OF MAINE:

AARON M. FREY
ATTORNEY GENERAL

*/s/ Christina M. Moylan*
Christina M. Moylan
Chief, Consumer Protection Division
Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333-0006
Phone: 207.626.8800
christina.moylan@maine.gov

Attorney for Plaintiff State of Maine

Dated: November 6, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## MAINE

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Maine (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: _9/30/2024_    Signature: _____

William R. Savage
Assistant Attorney General, Director,
Maine's Medicaid Fraud Control Unit
OFFICE OF THE ATTORNEY GENERAL

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**STATE OF MAINE**


Dated: _10-1-2024_          Signature: _Sara Gagné-Holmes_

                             Name:      Sara Gagné-Holmes

                    Position/Title:     Acting Commissioner


*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

Jonathan Comish
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI  48909
(517) 335-7632
ComishJ@michigan.gov

*Counsel for State of Michigan*

Dated:  October 21, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## MICHIGAN

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Michigan (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated:  __July 25, 2024__    Signature: _____

Name:    Timothy C. Erickson

Position/Title:    First Assistant Attorney General

Health Care Fraud Division

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**MICHIGAN**

Dated: 7/30/24         Signature: _____

                       Name: _____
                                   Meghan E. Groen

                       Position/Title: _____
                                   Senior Deputy Director

                       Michigan Department of Health and Human Services

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

/s/ Jon M. Woodruff
Jon M. Woodruff
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Tel: (651) 300-7425
jon.woodruff@ag.state.mn.us

*Counsel for the State of Minnesota*

Dated: October 30, 2024

# MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## Minnesota

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Minnesota (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 9-20-24

Signature: _____

Name: Nicholas Wanka

Position/Title: Director, Minnesota MFCU

Minnesota Attorney General's Office

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
Minnesota**

Dated: __9-19-2024__    Signature: _____

Name: Thomas Johnson

Position/Title: Deputy Inspector General

Minnesota Department of Human Services

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

FOR THE STATE OF MISSOURI

ANDREW BAILEY
ATTORNEY GENERAL

By: _____

Michael Schwalbert
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago,mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR MISSOURI

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Missouri (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7 Nov 24                  Signature: _____

                                 Name:        Arvids V. Petersons

                                 Position/Title:  Chief Counsel/Director
                                                  Missouri Attorney General's Office
                                                  Medicaid Fraud Control Unit

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
MISSOURI**

Dated: 11-07-2024    Signature: _____

                      Name:      Robert Knodell
                                  _____

          Position/Title:        Director
                                  _____

                                  Missouri Department of Social Services
                                  _____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

FOR PLAINTIFF STATE OF MISSISSIPPI
LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By: /s/ Tricia L. Beale
Tricia L. Beale (MSB #99113)
Consumer Protection Division
Mississippi Attorney General's Office
1141 Bayview Ave., Suite 402
Biloxi, Mississippi 39530
Telephone: 228-386-4404
tricia.beale@ago.ms.gov

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR MISSISSIPPI

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of MISSISSIPPI (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: August 2, 2025

Signature: Marlin A. Miller

Name: MARLIN A. MILLER

Position/Title: DIRECTOR MFCU, MISSISSIPPI

## SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
## SIGNATURE PAGE FOR MISSISSIPPI

Dated: 10/31/24        Signature: *Cindy H. Bradshaw*

                 Name:   Cindy H. Bradshaw

          Position/Title:   Executive Director

                         Mississippi Division of Medicaid

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

FOR PLAINTIFF STATE OF MONTANA

AUSTIN KNUDSEN
ATTORNEY GENERAL


 _/s/Brent Mead_____
Brent Mead
*Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 200151
Helena, MT 59620-0151
Telephone: (406)444-2026
Email: brent.mead2@mt.gov

*Counsel for Montana*

Dated: October 7, 2024

**MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR MONTANA**

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Montana (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: **9 July 2024**      Signature:     *gree W Gee*

Name:     _____

Position/Title:     Bree Williamson Gee _____

Assistant Attorney General for the State of Montana

_____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**Single State Agency for Medicaid Signature for Montana:**

Dated: 8/1/2024        Signature:    _R de Camara_

Name:        
Rebecca de Camara

Position/Title:        
Acting Medicaid and Health Services Executive Director

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

PLAINTIFF STATE OF NORTH CAROLINA
JOSHUA H. STEIN
ATTORNEY GENERAL

By: */s/ Jessica V. Sutton*
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6000
Fax: (919) 716-6050
jsutton2@ncdoj.gov

Counsel for Plaintiff State of North Carolina

Dated: November 6, 2024

1

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## NORTH CAROLINA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of North Carolina (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated:  9/30/2024        Signature:  _F. Edward Kirby_

                          Name:  F. Edward Kirby, Jr.

                          Position/Title:  Senior Deputy Attorney General, Director

                          North Carolina Medicaid Fraud Control Unit

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

Docusign Envelope ID: 87583763-817E-41A8-96AB-DDEEB65A5716

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**NORTH CAROLINA**

Dated: 10/01/24 | 8:57 AM EDT

Signature: *Jay Ludlam*
06565C1C2A8F4C8...

Name: Jay Ludlam

Position/Title: Deputy Secretary, NC Medicaid

NCDHHS, Division of Health Benefits

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

STATE OF NORTH DAKOTA
Drew H. Wrigley
Attorney General


Elin S. Alm
Assistant Attorney General
Director, Consumer Protection & Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Tel: (701) 328-5570
ealm@nd.gov

*Counsel for North Dakota*

Dated: October 18, 2024.

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## NORTH DAKOTA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of NORTH DAKOTA (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7/29/24    Signature: _Marina Spahr_

Name: Marina Spahr

Position/Title: Director, MFCU, Assistant Attorney General

Assistant Attorney General

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
NORTH DAKOTA**

7/31/24

Dated: _____       Signature: _____

                              Name:      Sara E. Stolt
                              _____

                              Position/Title:  Deputy Commissioner
                                               _____

                              Health & Human Services
                              _____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation,* MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

FOR PLAINTIFF STATE OF NEBRASKA

MICHAEL T. HILGERS
ATTORNEY GENERAL

 _/s/ Colin P. Snider_____
Colin P. Snider
Assistant Attorney for Antitrust
Nebraska Department of Justice
2115 State Capitol
Lincoln, NE 68509
T: (402) 471-7759
E: colin.snider@nebraska.gov

*Attorney for the State of Nebraska*

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR NEBRASKA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Nebraska (the "State") regarding the Settlement Agreement described as follows:

> This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7.18.2024    Signature: _____

Name: D. Mark Collins

Position/Title: Ass't Atty General & MFCU Director

Nebraska Dept of Justice

**Single State Agency for Medicaid Signature:**

Dated: **7/23/24**    Signature: _Matthew Ahern_____

Name: _Matthew Ahern_____

Position/Title: _Interim Medicaid Director_____

_____

PLAINTIFF STATE OF NEW HAMPSHIRE
JOHN M. FORMELLA
Attorney General


By: /s/Alexandra C. Sosnowski
Alexandra C. Sosnowski
Assistant Attorney General
Consumer Protection and Antitrust Bureau
One Granite Place South
Concord, NH 03301
Tel: (603) 271-2678
Alexandra.C.Sosnowski@doj.nh.gov

*Counsel for the State of New Hampshire*

Dated: 10/22/2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## NEW HAMPSHIRE

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of New Hampshire (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: August 2, 2024      Signature: _____

Name:      Thomas T. Worboys

Position/Title:      Senior Assistant Attorney General

Director, Medicaid Fraud Control Unit

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
[STATE]**

Dated: *08/03/24*     Signature:

Name:     Henry D. Lipman

Position/Title:     New Hampshire Medicaid Director

*/s/ Yale A. Leber*

Yale A. Leber

Deputy Attorney General

Division of Law

Antitrust Litigation and Competition Enforcement

124 Halsey Street

PO Box 45029

Newark, NJ 07101

Tel: (862) 381-4150

Yale.Leber@law.njoag.gov

*Counsel for the State of New Jersey*

**MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
NEW JERSEY**

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of New Jersey (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7/8/2024          Signature: _____

Al Garcia
Interim Insurance Fraud Prosecutor
Office of the Attorney General

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**Single State Agency for Medicaid Signature  for New Jersey:**

Dated: 7/26/24        Signature:  _Gregory Woods_____
                                   Gregory Woods
                                   Assistant Commissioner
                                   Division of Medical Assistance and Health Services
                                   Department of Human Services

/s/ Jeff Dan Herrera
Jeff Dan Herrera
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
Tel: (505) 490-4878
jherrera@nmdoj.gov

*Counsel for the State of New Mexico*

Dated: October 25, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## NEW MEXICO

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of New Mexico (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7-30-24        Signature: 

Name:    Joseph Martinez

Position/Title:    Acting Director

NM  MFCU  NMDOJ

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
NEW MEXICO

Dated: 7/30/24          Signature:  *Mark Reynolds*

Name:  Mark Reynolds

Position/Title:  General Counsel

New Mexico Health Care Authority

**New York's signature of the Apotex settlement**

Respectfully submitted,

LETITIA JAMES
Attorney General of the State of New York

CHRISTOPHER D'ANGELO
Chief Deputy Attorney General
Economic Justice Division

ELINOR R. HOFFMANN
Chief, Antitrust Bureau
AMY MCFARLANE
Deputy Bureau Chief, Antitrust Bureau


_____ /s/ Robert L. Hubbard _____
ROBERT L. HUBBARD
SAAMI ZAIN
Assistant Attorneys General
28 Liberty Street, 20th Floor
New York, NY 10005
212 416-8267
Robert.Hubbard@ag.ny.gov

ATTORNEYS FOR THE STATE OF NEW YORK

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
### New York

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of New York (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: _____**2/12/2025**      Signature: _____

Name: _____
       Paul J. Mahoney

Position/Title: _____
       Ass't Deputy Attorney General
       for Medicaid Fraud Control

       _____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

FOR PLAINTIFF STATE OF NEVADA

AARON D. FORD
Nevada Attorney General

Lucas J. Tucker
Senior Deputy Attorney General
Nevada Attorney General, Bureau of Consumer Protection
8945 West Russell Road, Suite 204
Las Vegas, Nevada 89148
(702) 486-3256
ltucker@ag.nv.gov


Date:  October 21, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR NEVADA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Nevada (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: **10/21/2024**____    Signature: _____

Name: ___Stacie Weeks_____

Position/Title: ___Administrator_____

_____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**NEVADA**


Dated: 10/21/2024__        Signature: _____

                    Name: _____Stacie Weeks_____

              Position/Title: ___Administrator_____

                    _____


*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

FOR PLAINTIFF STATE OF OHIO:

DAVE YOST
ATTORNEY GENERAL


*/s/ Edward J. Olszewski*
Edward J. Olszewski
Assistant Section Chief, Antitrust
Office of Ohio Attorney General
30 East Broad Street, 26th Floor
Columbus, Ohio 43215
Phone: 614.466.4328
Edward.Olszewski@OhioAGO.gov

Attorney for Plaintiff State of Ohio

Dated: November 5, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR OHIO

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Ohio (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: __8/5/2024__     Signature: _____

Name: _____
Benjamin Karrasch

Position/Title: _____
Section Chief Health Care Fraud Ohio Attorney

General's Office _____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
Ohio**

Dated:
August 1, 2024

Signature: _____

Name: Maureen M. Corcoran

Position/Title: Director

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

FOR PLAINTIFF STATE OF OKLAHOMA

GENTNER DRUMMOND
ATTORNEY GENERAL

_____

Robert J. Carlson, OBA #19312
Senior Assistant Attorney General
15 West Sixth Street, Suite 1000
Tulsa, Oklahoma 74119
(918) 581-2885 – Telephone
(405) 522-0085 – Facsimile
robert.carlson@oag.ok.gov
*Counsel for Plaintiff State*

Dated:  November 13, 2024

# MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR OKLAHOMA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Oklahoma (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: _____      Signature: _Charles A. Dickson, III_____

Name: _____Charles Dickson_____

Position/Title: _____Deputy Attorney General_____

_____Oklahoma Attorney General's Office_____

**Single State Agency for Medicaid Signature:**

Dated: _____    Signature: _*Elizabeth Cooper*_____
                                   Elizabeth Cooper (Aug 5, 2024 15:04 CDT)

                        Name: _____
                                        Elizabeth Cooper

                Position/Title: _____
                                    Chief Administrative Officer

                                 _____
                                    Oklahoma Health Care Authority

# MFCU Signature Page -- Apotex-1206 FINAL

**Final Audit Report**        2024-08-05

| | |
|---|---|
| Created: | 2024-08-02 |
| By: | Jamie Bloyd (jamie.bloyd@oag.ok.gov) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAS4zEH8CzyV0J4ziNfMWu7LgwoePUGHHN |

## "MFCU Signature Page -- Apotex-1206 FINAL" History

📄 Document created by Jamie Bloyd (jamie.bloyd@oag.ok.gov)
2024-08-02 - 6:08:51 PM GMT

✉️ Document emailed to elizabeth.cooper@okhca.org for signature
2024-08-02 - 6:09:48 PM GMT

📄 Email viewed by elizabeth.cooper@okhca.org
2024-08-05 - 8:00:43 PM GMT

✍️ Signer elizabeth.cooper@okhca.org entered name at signing as Elizabeth Cooper
2024-08-05 - 8:04:12 PM GMT

✍️ Document e-signed by Elizabeth Cooper (elizabeth.cooper@okhca.org)
Signature Date: 2024-08-05 - 8:04:14 PM GMT - Time Source: server

✉️ Document emailed to Charles Dickson (charles.dickson@oag.ok.gov) for signature
2024-08-05 - 8:04:16 PM GMT

📄 Email viewed by Charles Dickson (charles.dickson@oag.ok.gov)
2024-08-05 - 10:04:37 PM GMT

✍️ Document e-signed by Charles Dickson (charles.dickson@oag.ok.gov)
Signature Date: 2024-08-05 - 10:04:56 PM GMT - Time Source: server

✅ Agreement completed.
2024-08-05 - 10:04:56 PM GMT

🅰️ **Adobe Acrobat Sign**

*/s/ Gina Ko*

_____

Gina Ko #121049
Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 934-4400
Gina.Ko@doj.Oregon.gov
   *Counsel for the State of Oregon*


Dated September 30, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR OREGON

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Oregon (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7/22/2024       Signature: _____

Name:     Sheen Y. Wu

Position/Title:  Director/AIC - Medicaid Fraud Control Unit

Oregon Department of Justice

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
OREGON**

Dated: 07.25.2024        Signature: _____

Name: Fritz Jenkins

Position/Title: Adminstrator for Program Integrity

Oregon Health Authority

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

*/s/ Tracy W. Wertz*
Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section
Joseph S. Betsko
Assistant Chief Deputy Attorney General
Jessica Kuehn
Deputy Attorney General
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Phone: (717) 787-4530
Fax: (717) 787-1190
twertz@attorneygeneral.gov

*Counsel for the Commonwealth of Pennsylvania*

Dated: October 25, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR PENNSYLVANIA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of **PENNSYLVANIA** (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7/18/24          Signature: _____

Name: HEATHER M. ALBRIGHT

Position/Title: CHIEF DEPUTY ATTORNEY GENEAL/DIRECTOR

_____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
PENNSYLVANIA**

Dated: 7/17/24          Signature:

Name:          KAREN L. FICKES

Position/Title:          DIRECTOR, BUREAU OF PROGRAM INTEGRITY

DEPARTMENT OF HUMAN SERVICES

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**FOR PLAINTIFF CONMMONWEALTH OF PUERTO RICO**


DOMINGO EMANUELLI-HERNÁNDEZ
ATTORNEY GENERAL


*/s/ Guarionex Díaz-Martínez*
Guarionex Díaz-Martínez
Assistant Attorney General, Antitrust Division
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, Exts. 1201, 1204
gdiaz@justicia.pr.gov

*Counsel for Commonwealth of Puerto Rico*

Dated:  October 10, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## PUERTO RICO

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Puerto Rico (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7/30/24       Signature: _____

Name: LUIS FREIRE

Position/Title: DIRECTOR PRMFCU

_____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**Single State Agency for Medicaid Signature for Puerto Rico:**

Dated: 8|2|2024    Signature: _____

Name: _____

Position/Title: _____

_____

*/s/ Stephen N. Provazza*

Stephen N. Provazza (Bar No. 10435)
Assistant Attorney General
Chief, Consumer and Economic Justice Unit
Office of the Attorney General - State of Rhode Island
150 South Main Street
Providence, RI 02903
Tel: (401) 274 4400
sprovazza@riag.ri.gov

Counsel for the State of Rhode Island


Dated: October 24, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## RHODE ISLAND

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of RHODE ISLAND (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: **8/5/2024**      Signature: _____*/s/ Andrea Mauro, Esq.*_____

Name: _____Andrea M. Mauro_____

Position/Title: _Special Assistant Attorney General_

Medicaid Fraud Control Unit
Office of the Rhode Island Attorney General

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
RHODE ISLAND**

Dated:

**7/29/2024**

Signature: _//Jane E. Morgan Esq.//_

Name: JANE E. MORGAN

Position/Title: DEPUTY DIRECTOR, MEDICAID GENERAL COUNSEL

EOHHS, RHODE ISLAND

_In re Generic Pharmaceuticals Pricing Antitrust Litigation_, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

THE STATE OF SOUTH CAROLINA
ALAN WILSON
Attorney General

/s/ Clark Kirkland, Jr.___
Clark Kirkland, Jr.
Assistant Attorney General
Office of the Attorney General
State of South Carolina
P.O. Box 11549
Columbia, SC 29211
Tel: (803) 734-0057
ckirkland@scag.gov

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## SOUTH CAROLINA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit, dba Vulnerable Adults and Medicaid Provider Fraud, for the State of South Carolina (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: _7/24/2024_      Signature: _S G Opet_

Name: _Stephanie G. Opet_

Position/Title: _Director, Medicaid Fraud Control Unit_

_South Carolina Office of the Attorney General_

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
SOUTH CAROLINA**

Dated: 7/25/2024     Signature: _W. Scott T_____

Name:     W. Scott Talbert

Position/Title:     Assistant General Counsel

South Carolina Department of Health and Human Services

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

Dated: 10/24/2024      Signature: _Jonathan K Van Patten_

Name: JONATHAN K VAN PATTEN

Position/Title: ASSISTANT ATTORNEY GENERAL

STATE OF SOUTH DAKOTA

# MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
# SOUTH DAKOTA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of South Dakota (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 7/30/24       Signature: _____

Name: _Mandy Miiller_

Position/Title: _Director, SD Medicaid Fraud Control Unit_

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**Single State Agency for Medicaid Signature:**

Dated: 07/31/2024     Signature: *Heather Petermann*

Name: Heather Petermann

Position/Title: South Dakota State Medicaid Director

Division of Medical Services, Dept of Social Services

Austin Ostiguy
Assistant Attorney General
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 532-7271
Austin.Ostiguy@ag.tn.gov

*Counsel for Tennessee*

Dated:  11/05/2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR TENNESSEE

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Tennessee regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 08/12/2024          Signature: _____

Name: Michael E. Cox

Position/Title: Director

Tennessee MFCU

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**TENNESSEE**

Dated:                          Signature: _____
  **11.3.2024**

                                Name:    Stephen Smith
                                        _____

                                Position/Title: Director
                                        _____

                                        _____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

Respectfully Submitted,

GORDON C. RHEA, ESQ.
ATTORNEY GENERAL

By: _____

Dated: October __, 2024

Christopher M. Timmons
Acting Chief, Civil Division
V.I. Bar No. R2147
213 Estate La Reine
Kingshill, V.I.  00850
(340) 773-0295
christopher.timmons@doj.vi.gov
*Counsel for Government of the Virgin Islands*

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## UNITED STATES VIRGIN ISLANDS

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of UNITED STATES VIRGIN ISLANDS] (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: July 22, 2024          Signature: _____

                              Name: _Julita de Leon._____

                              Position/Title: _____

                              _____

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**UNITED STATES VIRGIN ISLANDS**

Dated: 9/3/2024       Signature: *Gary A. Smith*

                      Name: Gary Smith

          Position/Title: Medicaid Director

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

Executed November 4, 2024

Respectfully submitted,

FOR PLAINTIFF STATE OF UTAH
SEAN D. REYES
UTAH ATTORNEY GENERAL


_____
Marie W.L. Martin
Deputy Division Director,
Office of the Attorney General of Utah
including as counsel for the Utah Division
of Consumer Protection
160 East 300 South, 5th Floor
P.O. Box 140830
Salt Lake City, UT 84114-0830
Tel: 801-366-0375
Fax: 801-366-0378
mwmartin@agutah.gov
dsonnenreich@agutah.gov

*Attorneys for the State of Utah*

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR UTAH

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Utah (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: _09/10/2024_     Signature: _Kaye Lynn Wootton_

Name: _Kaye Lynn Wootton_

Position/Title: _MFCU Director/Assistant Attorney General_

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**UTAH**

Dated: 09/19/2024          Signature: _Jennifer Strohecker_____

                           Name:      Jennifer Strohecker_____

                           Position/Title: Director, Division of Integrated Healthcare____

                                      _____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**FOR PLAINTIFF COMMONWEALTH OF VIRGINIA**

JASON S. MIYARES
ATTORNEY GENERAL


  */s/ Tyler T. Henry*
Tyler T. Henry
Senior Assistant Attorney General
Antitrust Unit
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Tel: (804) 692-0485
THenry@oag.state.va.us

*Counsel for Virginia*

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## THE COMMONWEALTH OF VIRGINIA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the Commonwealth of Virginia (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: ___7/24/24___    Signature: _____

Name: Randall L. Clouse, Director and Chief

Position/Title: Health Care Fraud & Elder Abuse Section

Virginia Attorney General's Office

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**THE COMMONWEALTH OF VIRGINIA**

Dated: July 19, 2024    Signature: _____

Name: Cheryl J. Roberts, J.D.

Position/Title: Director

Department of Medical Assistance Services

/s/ Jill S. Abrams
Assistant Attorney General
109 State Street
Montpelier, Vermont 05609
(802) 828-1106
Jill.abrams@vermont.gov

Counsel for the State of Vermont

Dated: October 21, 2024

# MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
# THE STATE OF VERMONT

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Vermont (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into** *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, **MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: _8/1/2024_    Signature: *Elizabeth L. Anderson*
                                 Signed by:
                                 0F9E4A04C4424DD...

Name: Elizabeth L. Anderson

Position/Title: AAG & Director, Medicaid Fraud and Residential Abuse Unit

Office of the Vermont Attorney General

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**Single State Agency for Medicaid Signature:**

Dated: _8/1/2024_

Signature: Sandi Hoffman
B34E5A2F3ED5411...

Name: Sandi Hoffman

Position/Title: Deputy Commissioner

Department of Vermont Health Access,
Vermont Agency of Human Services

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**FOR PLAINTIFF STATE OF WASHINGTON**

ROBERT W. FERGUSON
ATTORNEY GENERAL

*s/ Paula Pera C.*
Paula Pera C.
Holly A. Williams
Assistant Attorneys General, Antitrust Division
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Tel: (206) 464-7744
paula.pera@atg.wa.gov
holly.williams@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

Dated: 10/29/2024

**MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
[WASHINGTON]**

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of [WASHINGTON] (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.


**MFCU Signature:**


Dated:  10/4/24          Signature:  *Larissa Payne*

                         Name:       Larissa Payne

                         Position/Title:  Director, Medicaid Fraud Control Division


*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
SIGNATURE PAGE FOR
[WASHINGTON]**

Dated: 10/04/2024          Signature: _Charissa Fotinos MD, MSc_____

                          Name: Charissa Fotinos, MD, MSc

                  Position/Title: Medicaid Director and Behavioral Health Medical Director

                          Washington State Health Care Authority

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

s/ Laura E. McFarlane
Laura E. McFarlane
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-8911
mcfarlanele@doj.state.wi.us

*Counsel for the State of Wisconsin*

Dated: October 23, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
### Wisconsin

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of [Wisconsin] (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: ___8/2/24___     Signature: _____/s/ Daniel Hess_____

Name: _____Daniel Hess_____

Position/Title: _____Director_____

_____Medicaid Fraud Control and Elder Abuse Unit_____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT**
**SIGNATURE PAGE FOR**
**WISCONSIN**

Dated: **8-2-2024**___    Signature:

Name:    Anthony J. Baize

Position/Title:    Inspector General

WI Dept. of Health Services

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

/s/ Douglas L. Davis
Douglas L. Davis
Senior Assistant Attorney General
Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, WV 25326
Tel: (304) 558-8986
douglas.l.davis@wvago.gov

*Counsel for the State of West Virginia*


Dated: September 30, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
## WEST VIRGINIA

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of West Virginia (the "State") regarding the Settlement Agreement described as follows:

**This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 8.23.24        Signature: _____

Name: _John C. Blair_

Position/Title: _Director_

_____

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

# SINGLE STATE AGENCY APPROVAL OF APOTEX-1206 SETTLEMENT
## SIGNATURE PAGE FOR
## WEST VIRGINIA

Dated: ___08/23/2024___     Signature: _____

                      Name:     Cynthia Beane, MSW, LCSW

          Position/Title:     Commissioner, WV Department of Human Services,

                              Bureau for Medical Services

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

*/s/ Cameron W. Geeting*
Cameron W. Geeting
Senior Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY 82002
Tel: (307) 777-3795
cameron.geeting1@wyo.gov
*Counsel for the State of Wyoming*
Dated: October 21, 2024

## MEDICAID FRAUD CONTROL UNIT SIGNATURE PAGE FOR
### Wyoming

As conditioned herein, this Signature Page shall serve as the Statement of Review and Approval as to Form of the Medicaid Fraud Control Unit for the State of Wyoming (the "State") regarding the Settlement Agreement described as follows:

> **This Settlement Agreement ("Agreement") is made and entered into by and among Apotex Corp. ("Apotex"), the Attorneys General (as defined below), and the End-Payer Plaintiffs (as defined below, the "EPPs") (together, the "Parties"), to settle the cases that were brought by the Attorneys General and the EPPs respectively against Apotex in the cases currently or previously consolidated into *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).**

The Medicaid Fraud Control Unit for the State has reviewed the Agreement and, with respect to the release of Medicaid claims (as particularly specified in, and as limited by, the Agreement), approves the Agreement as to form.

This approval, as limited herein, is conditional upon Execution of the Agreement by the State and the other Parties to the Agreement, and upon the Agreement's approval by a court of proper jurisdiction.

**MFCU Signature:**

Dated: 07/29/2024    Signature: _____

Name:    Travis J. Kirchhefer

Position/Title:    Director & Sr. Assistant Attorney General

Medicaid Fraud Control Unit
Office of the Wyoming Attorney General

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

**Single State Agency for Medicaid Signature:**

Dated:                          Signature:
_7/29/2024_____
_                               Name:
                                                _Andrew Chapin_____
                                Position/Title
                                :               _Program Integrity Section Manager_

                                                _Division of Healthcare Financing,_
                                                _Wyoming Department of Health_

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.)
**Apotex-1206**

Appendix A

AG Drugs at Issue

|  |
|---|
| Acetazolamide |
| Adapalene |
| Alclometasone Dipropionate |
| Amiloride HCL/HCTZ |
| Ammonium Lactate |
| Amoxicillin/Clavulanate |
| Amphetamine/Dextroamphetamine |
| Azithromycin |
| Baclofen |
| Benazepril HCTZ |
| Betamethasone Dipropionate |
| Betamethasone Dipropionate Augmented |
| Betamethasone Valerate |
| Bethanechol Chloride |
| Bromocriptine Mesylate |
| Budesonide |
| Bumetanide |
| Buspirone Hydrochloride |
| Cabergoline |
| Calcipotriene Betamethasone Dipropionate Ointment |
| Calcipotriene Solution |
| Capecitabine |
| Carbamazepine |
| Cefdinir |
| Cefpodoxime Proxetil Oral Suspension |
| Cefpodoxime Proxetil Tablets |
| Cefprozil |
| Celecoxib |
| Cephalexin (Cefalexin) |
| Chlorpromazine HCL |
| Cholestyramine |
| Ciclopirox |
| Cimetidine |

| |
|---|
| Ciprofloxacin HCL Tablet |
| Clarithromycin |
| Clemastine Fumarate |
| Clindamycin Phosphate |
| Clobetasol |
| Clomipramine HCL |
| Clonidine TTS |
| Clotrimazole |
| Cyproheptadine HCL |
| Desmopressin Acetate |
| Desogestrel and Ethinyl Estradiol [Kariva] |
| Desonide |
| Desoximetasone |
| Dexmethylphenidate HCL [Focalin] |
| Dextroamphetamine Sulfate ("Dex Sulfate") |
| Diclofenac Potassium |
| Dicloxacillin Sodium |
| Diflunisal |
| Diltiazem HCL |
| Disopyramide Phosphate |
| Doxazosin Mesylate |
| Doxycycline Hyclate |
| Doxycycline Monohydrate |
| Drospirenone and Ethinyl Estradiol |
| Econazole |
| Enalapril Maleate |
| Entecavir |
| Epitol |
| Eplerenone |
| Erythromycin |
| Estazolam |
| Estradiol |
| Estradiol and Norethindrone Acetate [Mimvey] |
| Ethambutol HCL |
| Ethinyl Estradiol and Levonorgestrel [Portia and Jolessa] |
| Ethosuximide |
| Etodolac |
| Fenofibrate |
| Fluconazole |

| |
|---|
| Fluocinolone Acetonide |
| Fluocinonide |
| Fluoxetine HCL |
| Flurbiprofen |
| Flutamide |
| Fluticasone Propionate |
| Fluvastatin Sodium |
| Fosinopril HCTZ |
| Gabapentin |
| Glimepiride |
| Glipizide-Metformin |
| Glyburide |
| Glyburide-Metformin |
| Griseofulvin |
| Halobetasol Propionate |
| Haloperidol |
| Hydrocortisone Valerate |
| Hydroxyurea |
| Hydroxyzine Pamoate |
| Imiquimod |
| Irbesartan |
| Isoniazid |
| Ketoconazole |
| Ketoprofen |
| Ketorolac Tromethamine |
| Labetalol HCL |
| Lamivudine/Zidovudine |
| Latanoprost |
| Leflunomide |
| Levothyroxine |
| Lidocaine Ointment |
| Loperamide HCL |
| Medroxyprogesterone |
| Meprobamate |
| Methazolamide |
| Methotrexate Sodium |
| Methylphenidate |
| Metronidazole |
| Moexipril HCL |

| |
|---|
| Moexipril HCL HCTZ |
| Mometasone |
| Nabumetone |
| Nadolol |
| Nafcillin |
| Niacin |
| Nimodipine |
| Nitrofurantoin (Macrocrystalline) |
| Norethindrone Acetate |
| Norethindrone and Ethinyl Estradiol [Balziva] |
| Nortriptyline Hydrochloride |
| Nystatin |
| Nystatin/Triamcinolone |
| Omega-3-Acid Ethyl Esters |
| Oxacillin |
| Oxaprozin |
| Oxybutynin Chloride |
| Paricalcitol |
| Paromomycin |
| Penicillin VK |
| Pentoxifylline |
| Phenytoin Sodium |
| Pioglitazone-Metformin |
| Piroxicam |
| Pravastatin |
| Prazosin HCL |
| Prochlorperazine |
| Propranolol |
| Raloxifene HCL |
| Ranitidine HCL |
| Tacrolimus |
| Tamoxifen Citrate |
| Temozolomide |
| Terconazole |
| Theophylline |
| Tizanidine HCL |
| Tobramycin Sulfate |
| Tolmetin Sodium |
| Tolterodine Tartate |

| |
|---|
| Topiramate |
| Triamcinolone Acetonide |
| Trifluoperazine HCL |
| Valsartan HCTZ |
| Verapamil |
| Warfarin Sodium |
| Zoledronic Acid |

EPP Drugs at Issue

| | Molecule Name | Form | Strength |
|---|---|---|---|
| 1 | ACETAZOLAMIDE | TABLET | 125MG |
| 1 | ACETAZOLAMIDE | TABLET | 250MG |
| 1 | ACETAZOLAMIDE ER | CAPSULE | 500MG |
| 2 | ADAPALENE | CREAM | 0.10% |
| 2 | ADAPALENE | GEL | 0.10% |
| 2 | ADAPALENE | GEL | 0.30% |
| 3 | ALBUTEROL | TABLET | 2MG |
| 3 | ALBUTEROL | TABLET | 4MG |
| 4 | ALCLOMETASONE DIPROPIONATE | CREAM | 0.05% |
| 4 | ALCLOMETASONE DIPROPIONATE | OINTMENT | 0.05% |
| 5 | ALLOPURINOL | TABLET | 100MG |
| 5 | ALLOPURINOL | TABLET | 300MG |
| 6 | AMANTADINE HCL | CAPSULE | 100MG |
| 7 | AMILORIDE HCL/HCTZ | TABLET | 5-50MG |
| 8 | AMITRIPTYLINE | TABLET | 10MG |
| 8 | AMITRIPTYLINE | TABLET | 25MG |
| 8 | AMITRIPTYLINE | TABLET | 50MG |
| 8 | AMITRIPTYLINE | TABLET | 75MG |
| 8 | AMITRIPTYLINE | TABLET | 100MG |
| 8 | AMITRIPTYLINE | TABLET | 150MG |
| 9 | AMMONIUM LACTATE | CREAM | 12% |
| 9 | AMMONIUM LACTATE | LOTION | 12% |
| 10 | AMOXICILLIN/CLAVULANATE POTASSIUM | TABLET CHEWABLE | 200-28.5MG |
| 10 | AMOXICILLIN/CLAVULANATE POTASSIUM | TABLET CHEWABLE | 400-57MG |
| 11 | AMPHETAMINE/DEXTROAMPHETAMINE (MAS) (ADDERALL) | TABLET | 5MG |
| 11 | AMPHETAMINE/DEXTROAMPHETAMINE (MAS) (ADDERALL) | TABLET | 10MG |
| 11 | AMPHETAMINE/DEXTROAMPHETAMINE (MAS) (ADDERALL) | TABLET | 20MG |
| 11 | AMPHETAMINE/DEXTROAMPHETAMINE (MAS) (ADDERALL) | TABLET | 30MG |
| 11 | AMPHETAMINE/DEXTROAMPHETAMINE ER (MAS) (ADDERALL) | CAPSULE | 5MG |
| 11 | AMPHETAMINE/DEXTROAMPHETAMINE ER (MAS) (ADDERALL) | CAPSULE | 10MG |
| 11 | AMPHETAMINE/DEXTROAMPHETAMINE ER (MAS) (ADDERALL) | CAPSULE | 15MG |
| 11 | AMPHETAMINE/DEXTROAMPHETAMINE ER (MAS) (ADDERALL) | CAPSULE | 20MG |
| 11 | AMPHETAMINE/DEXTROAMPHETAMINE ER (MAS) (ADDERALL) | CAPSULE | 25MG |
| 11 | AMPHETAMINE/DEXTROAMPHETAMINE ER (MAS) (ADDERALL) | CAPSULE | 30MG |
| 12 | ATENOLOL/CHLORTHALIDONE | TABLET | 50-25MG |
| 12 | ATENOLOL/CHLORTHALIDONE | TABLET | 100-25MG |
| 13 | ATROPINE SULFATE | SOLUTION | 1% |
| 14 | AZITHROMYCIN | ORAL SUSPENSION | 100MG/5ML |
| 14 | AZITHROMYCIN | ORAL SUSPENSION | 200MG/5ML |
| 15 | BACLOFEN | TABLET | 10MG |
| 15 | BACLOFEN | TABLET | 20MG |
| 16 | BALSALAZIDE DISODIUM | CAPSULE | 750MG |
| 17 | BENAZEPRIL HCTZ | TABLET | 10-12.5MG |

| | Molecule Name | Form | Strength |
|---|---|---|---|
| 17 | BENAZEPRIL HCTZ | TABLET | 20-12.5MG |
| 17 | BENAZEPRIL HCTZ | TABLET | 20-25MG |
| 18 | BETAMETHASONE DIPROPIONATE | CREAM | 0.05% |
| 18 | BETAMETHASONE DIPROPIONATE | LOTION | 0.05% |
| 18 | BETAMETHASONE DIPROPIONATE | OINTMENT | 0.05% |
| 19 | BETAMETHASONE DIPROPIONATE AUGMENTED | LOTION | 0.05% |
| 20 | BETAMETHASONE DIPROPIONATE/CLOTRIMAZOLE | CREAM | 0.05% |
| 20 | BETAMETHASONE DIPROPIONATE/CLOTRIMAZOLE | CREAM | 0.10% |
| 20 | BETAMETHASONE DIPROPIONATE/CLOTRIMAZOLE | LOTION | 0.05% |
| 20 | BETAMETHASONE DIPROPIONATE/CLOTRIMAZOLE | LOTION | 0.10% |
| 21 | BETAMETHASONE VALERATE | CREAM | 0.10% |
| 21 | BETAMETHASONE VALERATE | LOTION | 0.10% |
| 21 | BETAMETHASONE VALERATE | OINTMENT | 0.10% |
| 22 | BETHANECHOL CHLORIDE | TABLET | 5MG |
| 22 | BETHANECHOL CHLORIDE | TABLET | 10MG |
| 22 | BETHANECHOL CHLORIDE | TABLET | 25 MG |
| 22 | BETHANECHOL CHLORIDE | TABLET | 50 MG |
| 23 | BROMOCRIPTINE MESYLATE | TABLET | 2.5MG |
| 24 | BUDESONIDE | SOLUTION | 0.25MG/2ML |
| 24 | BUDESONIDE | SOLUTION | 0.5MG/2ML |
| 24 | BUDESONIDE | SOLUTION | 1MG/2ML |
| 24 | BUDESONIDE DR | CAPSULE | 3MG |
| 25 | BUMETANIDE | TABLET | 0.5MG |
| 25 | BUMETANIDE | TABLET | 1MG |
| 25 | BUMETANIDE | TABLET | 2MG |
| 26 | BUSPIRONE HCL | TABLET | 5MG |
| 26 | BUSPIRONE HCL | TABLET | 7.5MG |
| 26 | BUSPIRONE HCL | TABLET | 10MG |
| 26 | BUSPIRONE HCL | TABLET | 15MG |
| 26 | BUSPIRONE HCL | TABLET | 30MG |
| 27 | BUTORPHANOL TARTRATE | SPRAY | 10MG/ML |
| 28 | CABERGOLINE | TABLET | 0.5MG |
| 29 | CALCIPOTRIENE | SOLUTION | ALL STRENGTHS |
| 30 | CALCIPOTRIENE BETHAMASONE DIPROPRIONATE | OINTMENT | 0.064%/0.005% |
| 31 | CAPECITABINE | TABLET | 150MG |
| 31 | CAPECITABINE | TABLET | 500MG |
| 32 | CAPTOPRIL | TABLET | 12.5MG |
| 32 | CAPTOPRIL | TABLET | 25MG |
| 32 | CAPTOPRIL | TABLET | 50MG |
| 32 | CAPTOPRIL | TABLET | 100MG |
| 33 | CARBAMAZEPINE | TABLET | 200MG |
| 33 | CARBAMAZEPINE | TABLET CHEWABLE | 100MG |
| 33 | CARBAMAZEPINE ER | TABLET | 100MG |
| 33 | CARBAMAZEPINE ER | TABLET | 200MG |
| 33 | CARBAMAZEPINE ER | TABLET | 400MG |
| 34 | CARISOPRODOL | TABLET | 350MG |
| 35 | CEFDINIR | CAPSULE | 300MG |
| 35 | CEFDINIR | SOLUTION | 125MG/5ML |
| 35 | CEFDINIR | SOLUTION | 250MG/5ML |
| 36 | CEFPODOXIME PROXETIL | ORAL SUSPENSION | 50MG/5ML |
| 36 | CEFPODOXIME PROXETIL | ORAL SUSPENSION | 100MG/5ML |
| 36 | CEFPODOXIME PROXETIL | TABLET | 100MG |
| 36 | CEFPODOXIME PROXETIL | TABLET | 200MG |
| 37 | CEFPROZIL | TABLET | 250MG |
| 37 | CEFPROZIL | TABLET | 500MG |
| 38 | CEFUROXIME AXETIL | TABLET | 250MG |

| | Molecule Name | Form | Strength |
|---|---|---|---|
| 38 | CEFUROXIME AXETIL | TABLET | 500MG |
| 39 | CELECOXIB | CAPSULE | 50MG |
| 39 | CELECOXIB | CAPSULE | 100MG |
| 39 | CELECOXIB | CAPSULE | 200MG |
| 39 | CELECOXIB | CAPSULE | 400MG |
| 40 | CEPHALEXIN (CEFALEXIN) | SOLUTION | 125MG/5ML |
| 40 | CEPHALEXIN (CEFALEXIN) | SOLUTION | 250MG/5ML |
| 41 | CHLORPROMAZINE HCL | TABLET | 10MG |
| 41 | CHLORPROMAZINE HCL | TABLET | 25MG |
| 41 | CHLORPROMAZINE HCL | TABLET | 50MG |
| 41 | CHLORPROMAZINE HCL | TABLET | 100MG |
| 41 | CHLORPROMAZINE HCL | TABLET | 200MG |
| 42 | CHOLESTYRAMINE | PACKET/ORAL SOLID | 4G |
| 42 | CHOLESTYRAMINE | POWDER | 4G |
| 43 | CICLOPIROX | CREAM | 0.77% |
| 43 | CICLOPIROX | SHAMPOO | 1% |
| 43 | CICLOPIROX | SOLUTION | 8% |
| 44 | CIMETIDINE | TABLET | 200MG |
| 44 | CIMETIDINE | TABLET | 300MG |
| 44 | CIMETIDINE | TABLET | 400MG |
| 44 | CIMETIDINE | TABLET | 800MG |
| 45 | CIPROFLOXACIN HCL | TABLET | 100MG |
| 45 | CIPROFLOXACIN HCL | TABLET | 250MG |
| 45 | CIPROFLOXACIN HCL | TABLET | 500MG |
| 45 | CIPROFLOXACIN HCL | TABLET | 750MG |
| 46 | CLARITHROMYCIN ER | TABLET | 500MG |
| 47 | CLEMASTINE FUMARATE | TABLET | 1.34MG |
| 47 | CLEMASTINE FUMARATE | TABLET | 2.86MG |
| 48 | CLINDAMYCIN PHOSPHATE | GEL | 1% |
| 48 | CLINDAMYCIN PHOSPHATE | LOTION | 1% |
| 48 | CLINDAMYCIN PHOSPHATE | SOLUTION | 1% |
| 48 | CLINDAMYCIN PHOSPHATE | VAGINAL CREAM | 2% |
| 49 | CLOBETASOL | CREAM | 0.05% |
| 49 | CLOBETASOL | E CREAM | 0.05% |
| 49 | CLOBETASOL | GEL | 0.05% |
| 49 | CLOBETASOL | OINTMENT | 0.05% |
| 49 | CLOBETASOL | SOLUTION | 0.05% |
| 50 | CLOMIPRAMINE | CAPSULE | 25MG |
| 50 | CLOMIPRAMINE | CAPSULE | 50MG |
| 50 | CLOMIPRAMINE | CAPSULE | 75MG |
| 51 | CLONIDINE | PATCH | 0.1MG/24HR |
| 51 | CLONIDINE | PATCH | 0.2MG/24HR |
| 51 | CLONIDINE | PATCH | 0.3MG/24HR |
| 52 | CLOTRIMAZOLE | SOLUTION | 1% |
| 53 | CYPROHEPTADINE HCL | TABLET | 4MG |
| 54 | DESMOPRESSIN ACETATE | TABLET | 0.1MG |
| 54 | DESMOPRESSIN ACETATE | TABLET | 0.2MG |
| 55 | DESONIDE | CREAM | 0.05% |
| 55 | DESONIDE | LOTION | 0.05% |
| 55 | DESONIDE | OINTMENT | 0.05% |
| 56 | DESOXIMETASONE | OINTMENT | 0.05% |
| 56 | DESOXIMETASONE | OINTMENT | 0.25% |
| 57 | DEXMETHYLPHENIDATE HCL ER (DEXMETH ER) (FOCALIN) | CAPSULE | 5MG |
| 57 | DEXMETHYLPHENIDATE HCL ER (DEXMETH ER) (FOCALIN) | CAPSULE | 15MG |

| | Molecule Name | Form | Strength |
|---|---|---|---|
| 57 | DEXMETHYLPHENIDATE HCL ER (DEXMETH ER) (FOCALIN) | CAPSULE | 20MG |
| 57 | DEXMETHYLPHENIDATE HCL ER (DEXMETH ER) (FOCALIN) | CAPSULE | 40MG |
| 58 | DEXTROAMPHETAMINE SULFATE (DEX SULFATE) | TABLET | 2.5MG |
| 58 | DEXTROAMPHETAMINE SULFATE (DEX SULFATE) | TABLET | 5MG |
| 58 | DEXTROAMPHETAMINE SULFATE (DEX SULFATE) | TABLET | 7.5MG |
| 58 | DEXTROAMPHETAMINE SULFATE (DEX SULFATE) | TABLET | 10MG |
| 58 | DEXTROAMPHETAMINE SULFATE (DEX SULFATE) | TABLET | 15MG |
| 58 | DEXTROAMPHETAMINE SULFATE (DEX SULFATE) | TABLET | 20MG |
| 58 | DEXTROAMPHETAMINE SULFATE (DEX SULFATE) | TABLET | 30MG |
| 58 | DEXTROAMPHETAMINE SULFATE ER (DEX SULFATE ER) | CAPSULE | 5MG |
| 58 | DEXTROAMPHETAMINE SULFATE ER (DEX SULFATE ER) | CAPSULE | 10MG |
| 58 | DEXTROAMPHETAMINE SULFATE ER (DEX SULFATE ER) | CAPSULE | 15MG |
| 59 | DICLOFENAC POTASSIUM | TABLET | 50MG |
| 60 | DICLOXACILLIN SODIUM | CAPSULE | 250MG |
| 60 | DICLOXACILLIN SODIUM | CAPSULE | 500MG |
| 61 | DIFLUNISAL | TABLET | 500MG |
| 62 | DIGOXIN | TABLET | 0.125MG |
| 62 | DIGOXIN | TABLET | 0.25MG |
| 63 | DILTIAZEM HCL | TABLET | 120MG |
| 63 | DILTIAZEM HCL | TABLET | 30MG |
| 63 | DILTIAZEM HCL | TABLET | 60MG |
| 63 | DILTIAZEM HCL | TABLET | 90MG |
| 64 | DIPHENOXYLATE/ATROPINE | TABLET | 2.5MG;0.025MG |
| 65 | DISOPYRAMIDE PHOSPHATE | CAPSULE | 100MG |
| 65 | DISOPYRAMIDE PHOSPHATE | CAPSULE | 150MG |
| 66 | DIVALPROEX ER | TABLET | 250MG |
| 66 | DIVALPROEX ER | TABLET | 500MG |
| 67 | DOXAZOSIN MESYLATE | TABLET | 1MG |
| 67 | DOXAZOSIN MESYLATE | TABLET | 2MG |
| 67 | DOXAZOSIN MESYLATE | TABLET | 4MG |
| 67 | DOXAZOSIN MESYLATE | TABLET | 8MG |
| 68 | DOXYCYCLINE HYCLATE | CAPSULE | 50MG |
| 68 | DOXYCYCLINE HYCLATE | CAPSULE | 100MG |
| 68 | DOXYCYCLINE HYCLATE | TABLET | 100MG |
| 68 | DOXYCYCLINE HYCLATE DR | TABLET | 75MG |
| 68 | DOXYCYCLINE HYCLATE DR | TABLET | 100MG |
| 68 | DOXYCYCLINE HYCLATE DR | TABLET | 150MG |
| 68 | DOXYCYCLINE MONOHYDRATE | TABLET | 50MG |
| 68 | DOXYCYCLINE MONOHYDRATE | TABLET | 75MG |
| 68 | DOXYCYCLINE MONOHYDRATE | TABLET | 100MG |
| 68 | DOXYCYCLINE MONOHYDRATE | TABLET | 150MG |
| 69 | DROSPIRENONE/ETHINYL ESTRADIOL (OCELLA) | TABLET | 3MG-0.02MG |
| 69 | DROSPIRENONE/ETHINYL ESTRADIOL (OCELLA) | TABLET | 3MG-0.03MG |
| 70 | ECONAZOLE | CREAM | 1% |
| 71 | ENALAPRIL MALEATE | TABLET | 2.5MG |
| 71 | ENALAPRIL MALEATE | TABLET | 5MG |
| 71 | ENALAPRIL MALEATE | TABLET | 10MG |
| 71 | ENALAPRIL MALEATE | TABLET | 20MG |
| 72 | ENTECAVIR | TABLET | 0.5MG |
| 72 | ENTECAVIR | TABLET | 1MG |
| 73 | EPLERENONE | TABLET | 25MG |
| 73 | EPLERENONE | TABLET | 50MG |
| 74 | ERYTHROMYCIN | SOLUTION | ALL STRENGTHS |
| 75 | ESTAZOLAM | TABLET | 1MG |

| | Molecule Name | Form | Strength |
|---|---|---|---|
| 75 | ESTAZOLAM | TABLET | 2MG |
| 76 | ESTRADIOL | TABLET | 0.5MG |
| 76 | ESTRADIOL | TABLET | 1MG |
| 76 | ESTRADIOL | TABLET | 2MG |
| 77 | ESTRADIOL/NORETHINDRONE ACETATE (MIMVEY) | TABLET | 1-0.5MG |
| 78 | ETHAMBUTOL HCL | TABLET | 100MG |
| 78 | ETHAMBUTOL HCL | TABLET | 400MG |
| 79 | ETHINYL ESTRADIOL/DESOGESTREL [KARIVA] | TABLET | 0.15/0.02-0.01MG |
| 79 | ETHINYL ESTRADIOL/DESOGESTREL [KARIVA] | TABLET | 0.15-0.02-0.01MG |
| 79 | ETHINYL ESTRADIOL/DESOGESTREL [KARIVA] | TABLET | 0.15-0.03MG |
| 80 | ETHINYL ESTRADIOL/LEVONORGESTREL (PORTIA,JOLESSA) | TABLET | ALL STRENGTHS |
| 81 | ETHOSUXIMIDE | CAPSULE | 250MG |
| 81 | ETHOSUXIMIDE | ORAL SOLUTION | 250MG/5ML |
| 82 | ETODOLAC | CAPSULE | 200MG |
| 82 | ETODOLAC | CAPSULE | 300MG |
| 82 | ETODOLAC | TABLET | 400MG |
| 82 | ETODOLAC | TABLET | 500MG |
| 82 | ETODOLAC ER | TABLET | 400MG |
| 82 | ETODOLAC ER | TABLET | 500MG |
| 82 | ETODOLAC ER | TABLET | 600MG |
| 83 | EXEMESTANE | TABLET | 25MG |
| 84 | FENOFIBRATE | TABLET | 48MG |
| 84 | FENOFIBRATE | TABLET | 145MG |
| 85 | FLUCONAZOLE | TABLET | 50MG |
| 85 | FLUCONAZOLE | TABLET | 100MG |
| 85 | FLUCONAZOLE | TABLET | 150MG |
| 85 | FLUCONAZOLE | TABLET | 200MG |
| 86 | FLUOCINOLONE ACETONIDE | CREAM | 0.01% |
| 86 | FLUOCINOLONE ACETONIDE | CREAM | 0.03% |
| 86 | FLUOCINOLONE ACETONIDE | OINTMENT | 0.03% |
| 86 | FLUOCINOLONE ACETONIDE | SOLUTION | 0.01% |
| 87 | FLUOCINONIDE | CREAM | 0.05% |
| 87 | FLUOCINONIDE | CREAM | 0.10% |
| 87 | FLUOCINONIDE | E CREAM | 0.05% |
| 87 | FLUOCINONIDE | GEL | 0.05% |
| 87 | FLUOCINONIDE | OINTMENT | 0.05% |
| 87 | FLUOCINONIDE | SOLUTION | 0.05% |
| 88 | FLUOXETINE HCL | TABLET | 10MG |
| 88 | FLUOXETINE HCL | TABLET | 15MG |
| 88 | FLUOXETINE HCL | TABLET | 20MG |
| 88 | FLUOXETINE HCL | TABLET | 60MG |
| 89 | FLURBIPROFEN | TABLET | 50MG |
| 89 | FLURBIPROFEN | TABLET | 100MG |
| 90 | FLUTAMIDE | CAPSULE | 125MG |
| 91 | FLUTICASONE PROPIONATE | SPRAY | 50MCG |
| 91 | FLUTICASONE PROPIONATE | LOTION | 0.05% |
| 92 | FLUVASTATIN SODIUM | CAPSULE | 20MG |
| 92 | FLUVASTATIN SODIUM | CAPSULE | 40MG |
| 93 | FOSINOPRIL HCTZ | TABLET | 10-12.5MG |
| 93 | FOSINOPRIL HCTZ | TABLET | 20-12.5MG |
| 94 | GABAPENTIN | TABLET | 600MG |
| 94 | GABAPENTIN | TABLET | 800MG |
| 95 | GLIMEPIRIDE | TABLET | 1MG |
| 95 | GLIMEPIRIDE | TABLET | 2MG |
| 95 | GLIMEPIRIDE | TABLET | 4MG |

| | Molecule Name | Form | Strength |
|---|---|---|---|
| 96 | GLIPIZIDE/METFORMIN | TABLET | 2.5-250MG |
| 96 | GLIPIZIDE/METFORMIN | TABLET | 2.5-500MG |
| 96 | GLIPIZIDE/METFORMIN | TABLET | 5-500MG |
| 97 | GLYBURIDE | TABLET | 1.25MG |
| 97 | GLYBURIDE | TABLET | 2.5MG |
| 97 | GLYBURIDE | TABLET | 5MG |
| 98 | GLYBURIDE/METFORMIN | TABLET | 1.25-250MG |
| 98 | GLYBURIDE/METFORMIN | TABLET | 2.5-500MG |
| 98 | GLYBURIDE/METFORMIN | TABLET | 5-500MG |
| 99 | GRISEOFULVIN | SUSPENSION (MICROSIZE) | 125MG/5ML |
| 99 | GRISEOFULVIN | MICROSIZE TABLET | 250MG |
| 99 | GRISEOFULVIN | MICROSIZE TABLET | 500MG |
| 100 | HALOBETASOL PROPIONATE | CREAM | 0.05% |
| 100 | HALOBETASOL PROPIONATE | OINTMENT | 0.05% |
| 101 | HALOPERIDOL | TABLET | 0.5MG |
| 101 | HALOPERIDOL | TABLET | 1MG |
| 101 | HALOPERIDOL | TABLET | 2MG |
| 101 | HALOPERIDOL | TABLET | 5MG |
| 101 | HALOPERIDOL | TABLET | 10MG |
| 101 | HALOPERIDOL | TABLET | 20MG |
| 102 | HYDRALAZINE HCL | | |
| 102 | HYDROCORTISONE ACETATE | SUPPOSITORIES | 10MG |
| 103 | HYDROCORTISONE ACETATE | SUPPOSITORIES | 25MG |
| 103 | HYDROCORTISONE ACETATE | SUPPOSITORIES | 30MG |
| 103 | HYDROCORTISONE ACETATE | SUPPOSITORIES | 50MG |
| 104 | HYDROCORTISONE VALERATE | CREAM | 0.20% |
| 105 | HYDROXYUREA | CAPSULE | 500MG |
| 106 | HYDROXYZINE PAMOATE | CAPSULE | 25MG |
| 106 | HYDROXYZINE PAMOATE | CAPSULE | 50MG |
| 106 | HYDROXYZINE PAMOATE | CAPSULE | 100MG |
| 107 | IMIQUIMOD | CREAM | 12.5MG/G |
| 107 | IMIQUIMOD | CREAM | 37.5MG/G |
| 107 | IMIQUIMOD | CREAM | 50MG/G |
| 108 | IRBESARTAN | TABLET | 75MG |
| 108 | IRBESARTAN | TABLET | 150MG |
| 108 | IRBESARTAN | TABLET | 300MG |
| 109 | ISONIAZID | TABLET | 100MG |
| 109 | ISONIAZID | TABLET | 300MG |
| 110 | ISOSORBIDE DINITRATE | TABLET | 5MG |
| 110 | ISOSORBIDE DINITRATE | TABLET | 10MG |
| 110 | ISOSORBIDE DINITRATE | TABLET | 20MG |
| 110 | ISOSORBIDE DINITRATE | TABLET | 30MG |
| 111 | KETOCONAZOLE | CREAM | 2% |
| 111 | KETOCONAZOLE | TABLET | 200MG |
| 112 | KETOPROFEN | CAPSULE | 50MG |
| 112 | KETOPROFEN | CAPSULE | 75MG |
| 113 | KETOROLAC TROMETHAMINE | TABLET | 10MG |
| 114 | LABETALOL HCL | TABLET | 100MG |
| 114 | LABETALOL HCL | TABLET | 200MG |
| 114 | LABETALOL HCL | TABLET | 300MG |
| 115 | LAMIVUDINE/ZIDOVUDINE (COMBIVIR) | TABLET | 150-300MG |
| 115 | LAMIVUDINE/ZIDOVUDINE (COMBIVIR) | TABLET | 300-150MG |
| 116 | LATANOPROST | SOLUTION | 0.01% |
| 117 | LEFLUNOMIDE | TABLET | 10MG |
| 117 | LEFLUNOMIDE | TABLET | 20MG |

| | Molecule Name | Form | Strength |
|---|---|---|---|
| 118 | LEVOTHYROXINE | TABLET | 0.025MG |
| 118 | LEVOTHYROXINE | TABLET | 0.05MG |
| 118 | LEVOTHYROXINE | TABLET | 0.075MG |
| 118 | LEVOTHYROXINE | TABLET | 0.088MG |
| 118 | LEVOTHYROXINE | TABLET | 0.1MG |
| 118 | LEVOTHYROXINE | TABLET | 0.112MG |
| 118 | LEVOTHYROXINE | TABLET | 0.125MG |
| 118 | LEVOTHYROXINE | TABLET | 0.137MG |
| 118 | LEVOTHYROXINE | TABLET | 0.15MG |
| 118 | LEVOTHYROXINE | TABLET | 0.175MG |
| 118 | LEVOTHYROXINE | TABLET | 0.2MG |
| 118 | LEVOTHYROXINE | TABLET | 0.3MG |
| 119 | LIDOCAINE HCL | OINTMENT | 5% |
| 120 | LIDOCAINE/PRILOCAINE | CREAM | 2.5%-2.5% |
| 121 | LOPERAMIDE HCL | CAPSULE | 2MG |
| 122 | MEDROXYPROGESTERONE ACETATE | TABLET | 2.5MG |
| 122 | MEDROXYPROGESTERONE ACETATE | TABLET | 5MG |
| 122 | MEDROXYPROGESTERONE ACETATE | TABLET | 10MG |
| 123 | MEPROBAMATE | TABLET | 200MG |
| 123 | MEPROBAMATE | TABLET | 400MG |
| 124 | METFORMIN (F) ER | TABLET | 500MG |
| 124 | METFORMIN (F) ER | TABLET | 1000MG |
| 125 | METHADONE HCL | TABLET | 10MG |
| 125 | METHADONE HCL | TABLET | 5MG |
| 126 | METHAZOLAMIDE | TABLET | 25MG |
| 126 | METHAZOLAMIDE | TABLET | 50MG |
| 127 | METHIMAZOLE | | |
| 128 | METHOTREXATE | TABLET | 2.5MG |
| 129 | METHYLPHENIDATE | TABLET | 5MG |
| 130 | METHYLPHENIDATE | TABLET | 10MG |
| 130 | METHYLPHENIDATE | TABLET | 20MG |
| 130 | METHYLPHENIDATE ER | TABLET | 20MG |
| 131 | METHYLPREDNISOLONE | TABLET | 4MG |
| 132 | METRONIDAZOLE | TABLET | |
| 133 | MOEXIPRIL HCL | TABLET | 7.5MG |
| 133 | MOEXIPRIL HCL | TABLET | 15MG |
| 134 | MOEXIPRIL HCL/HCTZ | TABLET | 7.5-12.5MG |
| 134 | MOEXIPRIL HCL/HCTZ | TABLET | 15-12.5MG |
| 134 | MOEXIPRIL HCL/HCTZ | TABLET | 15-25MG |
| 135 | MOMETASONE FUROATE | CREAM | 0.10% |
| 135 | MOMETASONE FUROATE | OINTMENT | 0.10% |
| 135 | MOMETASONE FUROATE | SOLUTION | 0.10% |
| 136 | NABUMETONE | TABLET | 500MG |
| 136 | NABUMETONE | TABLET | 750MG |
| 137 | NADOLOL | TABLET | 20MG |
| 137 | NADOLOL | TABLET | 40MG |
| 137 | NADOLOL | TABLET | 80MG |
| 138 | NAFCILLIN SODIUM | INJECTABLE VIALS | ALL STRENGTHS |
| 139 | NAPROXEN SODIUM | TABLET | 275MG |
| 139 | NAPROXEN SODIUM | TABLET | 550MG |
| 140 | NEOMYCIN/POLYMYXIN/HYDROCORTISONE | SOLUTION | 3.5MG-10MU 1% |
| 141 | NIACIN ER | TABLET | 500MG |
| 141 | NIACIN ER | TABLET | 750MG |
| 141 | NIACIN ER | TABLET | 1000MG |
| 142 | NIMODIPINE | CAPSULE | 30MG |
| 143 | NITROFURANTOIN/MACROCRYSTALLINE | CAPSULE | 25MG |

| | Molecule Name | Form | Strength |
|---|---|---|---|
| 143 | NITROFURANTOIN/MACROCRYSTALLINE | CAPSULE | 50MG |
| 143 | NITROFURANTOIN/MACROCRYSTALLINE | CAPSULE | 100MG |
| 144 | NORETHINDRONE ACETATE | TABLET | 5MG |
| 145 | NORETHINDRONE/ETHINYL ESTRADIOL (BALZIVA) | TABLET | 0.4-0.035MG-MCG |
| 146 | NORTRIPTYLINE HCL | CAPSULE | 10MG |
| 146 | NORTRIPTYLINE HCL | CAPSULE | 25MG |
| 146 | NORTRIPTYLINE HCL | CAPSULE | 50MG |
| 146 | NORTRIPTYLINE HCL | CAPSULE | 75MG |
| 147 | NYSTATIN | CREAM | 100MU |
| 147 | NYSTATIN | OINTMENT | 100MU |
| 147 | NYSTATIN | TABLET | 500MU |
| 148 | NYSTATIN/TRIAMCINOLONE | CREAM | 0.10% |
| 148 | NYSTATIN/TRIAMCINOLONE | OINTMENT | 0.10% |
| 149 | OMEGA 3 ACID ETHYL ESTERS | CAPSULE | 1G |
| 150 | OXACILLIN SODIUM | INJECTABLE VIALS | ALL STRENGTHS |
| 151 | OXAPROZIN | TABLET | 600MG |
| 152 | OXYBUTYNIN CHLORIDE | TABLET | 5MG |
| 153 | OXYCODONE/ACETAMINOPHEN | TABLET | 5-325MG |
| 153 | OXYCODONE/ACETAMINOPHEN | TABLET | 7.5-325MG |
| 153 | OXYCODONE/ACETAMINOPHEN | TABLET | 10-325MG |
| 154 | OXYCODONE HCL | TABLET | 5MG |
| 154 | OXYCODONE HCL | TABLET | 15MG |
| 154 | OXYCODONE HCL | TABLET | 30MG |
| 155 | PARICALCITOL | CAPSULE | 1MCG |
| 155 | PARICALCITOL | CAPSULE | 2MCG |
| 155 | PARICALCITOL | CAPSULE | 4MCG |
| 156 | PAROMOMYCIN | CAPSULE | 250MG |
| 157 | PENICILLIN V POTASSIUM | TABLET | 250MG |
| 157 | PENICILLIN V POTASSIUM | TABLET | 500MG |
| 158 | PENTOXIFYLLINE ER | TABLET | 400MG |
| 159 | PERMETHRIN | CREAM | 5% |
| 160 | PERPHENAZINE | TABLET | 2MG |
| 160 | PERPHENAZINE | TABLET | 4MG |
| 160 | PERPHENAZINE | TABLET | 8MG |
| 160 | PERPHENAZINE | TABLET | 16MG |
| 161 | PHENYTOIN SODIUM ER | CAPSULE | 100MG |
| 162 | PILOCARPINE HCL | TABLET | 5MG |
| 163 | PIOGLITAZONE METFORMIN HCL | TABLET | 15MG/500MG |
| 163 | PIOGLITAZONE METFORMIN HCL | TABLET | 15MG/850MG |
| 164 | PIROXICAM | CAPSULE | 10MG |
| 164 | PIROXICAM | CAPSULE | 20MG |
| 165 | POTASSIUM CHLORIDE ER | TABLET | 8MEQ |
| 165 | POTASSIUM CHLORIDE ER | TABLET | 10MEQ |
| 165 | POTASSIUM CHLORIDE ER | TABLET | 20MEQ |
| 166 | PRAVASTATIN | TABLET | 10MG |
| 166 | PRAVASTATIN | TABLET | 20MG |
| 166 | PRAVASTATIN | TABLET | 40MG |
| 166 | PRAVASTATIN | TABLET | 80MG |
| 167 | PRAZOSIN HCL | CAPSULE | 1MG |
| 167 | PRAZOSIN HCL | CAPSULE | 2MG |
| 167 | PRAZOSIN HCL | CAPSULE | 5MG |
| 168 | PREDNISOLONE ACETATE | SOLUTION/LIQUID EYE | 1% |
| 169 | PREDNISONE | TABLET | 1MG |
| 169 | PREDNISONE | TABLET | 2.5MG |
| 169 | PREDNISONE | TABLET | 5MG |
| 169 | PREDNISONE | TABLET | 10MG |

| | Molecule Name | Form | Strength |
|---|---|---|---|
| 169 | PREDNISONE | TABLET | 20MG |
| 170 | PROCHLORPERAZINE | SUPPOSITORY | 25MG |
| 170 | PROCHLORPERAZINE | TABLET | 5MG |
| 170 | PROCHLORPERAZINE | TABLET | 10MG |
| 171 | PROMETHAZINE | SUPPOSITORY | 12.5MG |
| 171 | PROMETHAZINE | SUPPOSITORY | 25MG |
| 171 | PROMETHAZINE | SUPPOSITORY | 50MG |
| 172 | PROPRANOLOL | TABLET | 10MG |
| 172 | PROPRANOLOL | TABLET | 20MG |
| 172 | PROPRANOLOL | TABLET | 40MG |
| 172 | PROPRANOLOL | TABLET | 60MG |
| 172 | PROPRANOLOL | TABLET | 80MG |
| 172 | PROPRANOLOL ER | CAPSULE | 60MG |
| 172 | PROPRANOLOL ER | CAPSULE | 80MG |
| 172 | PROPRANOLOL ER | CAPSULE | 120MG |
| 172 | PROPRANOLOL ER | CAPSULE | 160MG |
| 173 | RALOXIFENE HCL | TABLET | 60MG |
| 174 | RANITIDINE HCL | CAPSULE | 150MG |
| 174 | RANITIDINE HCL | CAPSULE | 300MG |
| 174 | RANITIDINE HCL | TABLET | 150MG |
| 175 | SILVER SULFADIAZINE | CREAM | 1% |
| 176 | SPIRONOLACTONE/HCTZ | TABLET | 25-25MG |
| 177 | TACROLIMUS | OINTMENT | 0.03% |
| 177 | TACROLIMUS | OINTMENT | 0.10% |
| 178 | TAMOXIFEN CITRATE | TABLET | 10MG |
| 178 | TAMOXIFEN CITRATE | TABLET | 20MG |
| 179 | TEMOZOLOMIDE | CAPSULE | 5MG |
| 179 | TEMOZOLOMIDE | CAPSULE | 20MG |
| 179 | TEMOZOLOMIDE | CAPSULE | 100MG |
| 179 | TEMOZOLOMIDE | CAPSULE | 140MG |
| 179 | TEMOZOLOMIDE | CAPSULE | 180MG |
| 179 | TEMOZOLOMIDE | CAPSULE | 250MG |
| 180 | TERCONAZOLE | VAGINAL CREAM | 0.40% |
| 180 | TERCONAZOLE | VAGINAL CREAM | 0.80% |
| 181 | THEOPHYLLINE ER | TABLET | 100MG |
| 181 | THEOPHYLLINE ER | TABLET | 200MG |
| 181 | THEOPHYLLINE ER | TABLET | 300MG |
| 181 | THEOPHYLLINE ER | TABLET | 400MG |
| 181 | THEOPHYLLINE ER | TABLET | 450MG |
| 181 | THEOPHYLLINE ER | TABLET | 600MG |
| 182 | TIMOLOL MALEATE | GEL | 0.25% |
| 182 | TIMOLOL MALEATE | GEL | 0.50% |
| 183 | TIZANIDINE HCL | TABLET | 2MG |
| 183 | TIZANIDINE HCL | TABLET | 4MG |
| 184 | TOBRAMYCIN | SOLUTION | 300MG/5ML |
| 185 | TOBRAMYCIN/DEXAMETHASONE | SOLUTION | 0.3-0.1% |
| 186 | TOLMETIN SODIUM | CAPSULE | 400MG |
| 187 | TOLTERODINE TARTRATE | TABLET | 1MG |
| 187 | TOLTERODINE TARTRATE | TABLET | 2MG |
| 187 | TOLTERODINE TARTRATE ER | CAPSULE | 2MG |
| 187 | TOLTERODINE TARTRATE ER | CAPSULE | 4MG |
| 188 | TOPIRAMATE | CAPSULE | 15MG |
| 188 | TOPIRAMATE | CAPSULE | 25MG |
| 189 | TRAZODONE HCL | TABLET | 100MG |
| 190 | TRIAMCINOLONE ACETONIDE | CREAM | 0.03% |
| 190 | TRIAMCINOLONE ACETONIDE | CREAM | 0.10% |

| | Molecule Name | Form | Strength |
|---|---|---|---|
| 190 | TRIAMCINOLONE ACETONIDE | CREAM | 0.50% |
| 190 | TRIAMCINOLONE ACETONIDE | OINTMENT | 0.03% |
| 190 | TRIAMCINOLONE ACETONIDE | OINTMENT | 0.10% |
| 190 | TRIAMCINOLONE ACETONIDE | OINTMENT | 0.50% |
| 190 | TRIAMCINOLONE ACETONIDE | PASTE | 0.03% |
| 190 | TRIAMCINOLONE ACETONIDE | PASTE | 0.10% |
| 190 | TRIAMCINOLONE ACETONIDE | PASTE | 0.50% |
| 191 | TRIAMTERENE/HCTZ | CAPSULE | 37.5-25MG |
| 191 | TRIAMTERENE/HCTZ | TABLET | 37.5MG-25MG |
| 191 | TRIAMTERENE/HCTZ | TABLET | 75-50MG |
| 192 | TRIFLUOPERAZINE HCL | TABLET | 1MG |
| 192 | TRIFLUOPERAZINE HCL | TABLET | 2MG |
| 192 | TRIFLUOPERAZINE HCL | TABLET | 5MG |
| 192 | TRIFLUOPERAZINE HCL | TABLET | 10MG |
| 193 | URSODIOL | CAPSULE | 300MG |
| 194 | VALSARTAN HCTZ | TABLET | 80-12.5MG |
| 194 | VALSARTAN HCTZ | TABLET | 160-12.5MG |
| 194 | VALSARTAN HCTZ | TABLET | 160-25MG |
| 194 | VALSARTAN HCTZ | TABLET | 320-12.5MG |
| 194 | VALSARTAN HCTZ | TABLET | 320-25MG |
| 195 | VERAPAMIL | TABLET | 40MG |
| 195 | VERAPAMIL | TABLET | 80MG |
| 195 | VERAPAMIL | TABLET | 120MG |
| 195 | VERAPAMIL SR | CAPSULE | 120MG |
| 195 | VERAPAMIL SR | CAPSULE | 180MG |
| 195 | VERAPAMIL SR | CAPSULE | 240MG |
| 196 | WARFARIN SODIUM | TABLET | 1MG |
| 196 | WARFARIN SODIUM | TABLET | 2MG |
| 196 | WARFARIN SODIUM | TABLET | 2.5MG |
| 196 | WARFARIN SODIUM | TABLET | 3MG |
| 196 | WARFARIN SODIUM | TABLET | 4MG |
| 196 | WARFARIN SODIUM | TABLET | 5MG |
| 196 | WARFARIN SODIUM | TABLET | 6MG |
| 196 | WARFARIN SODIUM | TABLET | 7.5MG |
| 196 | WARFARIN SODIUM | TABLET | 10MG |
| 197 | ZOLEDRONIC ACID | IV CONCENTRATE | 4MG/5ML |
| 197 | ZOLEDRONIC ACID | IV SOLUTION | 5MG/100ML |

Appendix B

| | |
|---|---|
| Alaska | • Attorney General for the State of Alaska<br>• Alaska Department of Health (Medicaid)<br>• Alaska Department of Corrections<br>• All other executive branch state agencies that purchased drugs |
| Arizona | • Attorney General for the State of Arizona<br>• Arizona Health Care Cost Containment System (AHCCCS) (Medicaid) |
| California | • Attorney General for the State of California<br>• California Department of Health Care Services (DHCS – Medicaid)<br>• California Public Employees Retirement System (CalPERS) to the extent that its clients are state agencies (local entities that are clients of CalPERS are excluded).<br>• California State University (CSU)<br>• California Department of State Hospitals (DSH) California Department of Corrections and Rehabilitation (CDCR)<br>• University of California (UC)<br>• California Department of General Services<br>• All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| Colorado | • Attorney General for the State of Colorado<br>• Colorado Department of Health Care Policy and Financing (Medicaid)<br>• All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| Connecticut | • Attorney General for the State of Connecticut<br>• Department of Social Services (as administrator of Medicaid)<br>• Department of Mental Health and |

1

|                        |                                                                                                                                                                                                                                                                                          |
|------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                        | Addiction Services<br>• Department of Developmental Services<br>• Department of Public Health<br>• Department of Veterans Affairs<br>• Department of Corrections<br>• All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| Delaware               | • Attorney General for the State of Delaware<br>• Delaware Division of Medicaid and Medical Assistance (Medicaid) |
| District of Columbia   | • Attorney General for the District of Columbia<br>• Department of Health Care Finance (Medicaid) |
| Florida                | • Attorney General for the State of Florida<br>• Florida Agency for Health Care Administration (Medicaid)<br>• Department of Management Services<br>• Department of Children and Families<br>• Department of Corrections<br>• Department of Health<br>• All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| Georgia                | • Attorney General for the State of Georgia<br>• Georgia Department of Community Health (Medicaid) |
| Idaho                  | • Attorney General for the State of Idaho<br>• Idaho Department of Health and Welfare, Division of Medicaid (Medicaid)<br>• Idaho State Entities with MMCAP purchases, as listed in the MMCAP data production when filtered for Idaho. |
| Illinois               | • Attorney General for the State of Illinois<br>• Illinois Department of Healthcare and Family Services (Medicaid) |

- Department of Central Management Services Department of Veterans Affairs (DVA)
- All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs (where public universities and health systems are not State Entities)

Indiana

- Attorney General for the State of Indiana
- Indiana Family and Social Services Administration (Medicaid)
- Department of Health
- Department of Administration
- Personnel Department
- State Police
- Veterans' Home
- All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs

Iowa

- Iowa Office of the Attorney General
- Iowa Department of Health and Human Services (Medicaid)

Kansas

- Attorney General for the State of Kansas
- Kansas Department of Health and Environment (Medicaid)
- Kansas Division of Health Care Finance
- Kansas State Employee Health Plan (Kansas Department of Administration),
- Kansas State Entities with MMCAP purchases:
  - (1) Adair Acute Care Pharmacy, Osawatomie State Hospital
  - (2) Emporia State University- Student Health
  - (3) Fort Hays State University- Student Health
  - (4) Kansas Neurological Institute
  - (5) Kansas Soldiers Home
  - (6) Kansas State School for the Blind

|  | |
|---|---|
|  | o (7) Kansas State School for the Deaf |
|  | o (8) Kansas State University-VMTH |
|  | o (9) Kansas State University- Lafen |
|  | o (10) Kansas Department of Health & Environment 340B STD |
|  | o (11) Kansas Department of Health & Environment 340B TB |
|  | o (12) Larned Stated Hospital |
|  | o (13) Osawatomic State Hospital |
|  | o (14) Parsons State Hospital & Training Center |
|  | o (15) Pharmacy Practice Integrated Lab, University of Kansas |
|  | o (16) Pittsburg State University 340B |
|  | o (17) Pittsburg State University, Student Health |
|  | o (18) Rainbow Mental Health Facility |
|  | o (19) Watkins Health Center Pharmacy, University of Kansas |
|  | o (20) Wichita Pharmacy Skills Lab, University of Kansas |
|  | o (21) Wichita State University Student Health) |
| Kentucky | • Kentucky Office of the Attorney General<br>• Kentucky Cabinet for Health and Family Services (Medicaid) |
| Louisiana | • Attorney General for the State of Louisiana<br>• Louisiana Department of Health (Medicaid) |
| Maine | • Attorney General for the State of Maine<br>• Maine Department of Health and Human Services Office of MaineCare Services (Medicaid)<br>• All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |

Maryland

- Maryland Office of the Attorney General
- Maryland Department of Human Services (Medicaid)

Massachusetts

- Attorney General for the State of Massachusetts
- MassHealth (Medicaid)
- State Office of Pharmacy Services (SOPS)
- Group Insurance Commission (GIC)

Michigan

- Attorney General for the State of Michigan
- Michigan Health & Human Services (Medicaid)
- Michigan Department of Attorney General
- Michigan Department of Health and Human Services
- Michigan Department of Corrections
- Michigan Civil Service Commission
- Michigan Department of Technology, Management, and Budget
- All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs

Minnesota

- Office of the Minnesota Attorney General
- Minnesota Department of Human Services
- Minnesota Department of Corrections
- Minnesota Department of Veterans Affairs
- Minnesota Management and Budget

Mississippi

- Attorney General for the State of Mississippi
- Mississippi Division of Medicaid (Medicaid)
- Mississippi Department of Insurance
- Mississippi Department of Health
- All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs during the relevant time period (or from May 1, 2009 to the

Effective Date)

| | |
|---|---|
| Missouri | • Attorney General for the State of Missouri<br>• Missouri Department of Social Services (Medicaid) |
| Montana | • Montana Office of the Attorney General<br>• Montana Department of Public Health and Human Services (Medicaid) |
| Nebraska | • Nebraska Office of the Attorney General<br>• Department of Health and Human Services (Medicaid)<br>• Department of Administrative Services<br>• Department of Corrections<br>• Department of Veterans' Affairs<br>• All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| Nevada | • Attorney General for the State of Nevada<br>• Nevada Department of Health & Human Services Division of Health Care Financing and Policy (Medicaid)<br>• Nevada Public Employees' Benefits Program University of Nevada School of Medicine Department of Health and Human Services (HHS)- Division of Public and Behavioral Health<br>• Department of Health and Human Services (HHS)- Division of Child and Family Services<br>• Department of Health and Human Services- Division of Aging & Disability Services<br>• Nevada Department of Corrections; and<br>• All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| New Hampshire | • Attorney General for the State of New Hampshire<br>• New Hampshire Department of Health & |

|  | Human Services (Medicaid) |
| New Jersey | • Attorney General for the State of New Jersey<br>• State of New Jersey, Department of Human Services, Division of Medical Assistance & Health Services (Medicaid) |
| New Mexico | • New Mexico Department of Justice<br>• New Mexico Human Services Department (Medicaid)<br>• New Mexico Department of Health<br>• New Mexico State Entities that made MMCAP purchases |
| New York[9] | • Attorney General for the State of New York<br>• State Department of Health (Medicaid)<br>• MMCAP State Entities, listed in the MMCAP production when you filter for New York. State Entities purchasing through MMCAP include hospitals operated by the State Office of Mental Health |
| North Carolina | • Attorney General for the State of North Carolina<br>• North Carolina Medicaid, Division of Health Benefits (Medicaid) |
| North Dakota | • Attorney General for the State of North Dakota<br>• North Dakota Health & Human Services, Medical Services Division (Medicaid) |
| Northern Mariana Islands | • Office of the Attorney General for the Commonwealth of the Northern Mariana Islands<br>• Commonwealth Medicaid Center (Medicaid)<br>• All other State Entities that purchased, or |

---

[9] The definition of Released Claims in Paragraph I.X is specifically modified to reflect that the State of New York does not release or waive its permissive exclusion or debarment authority as to the Apotex Releasees.

|  |  |
|---|---|
|  | • provided reimbursement for the purchase of, generic drugs |
| Ohio | • Attorney General for the State of Ohio<br>• Ohio Department of Medicaid (Medicaid) |
| Oklahoma | • Office of the Oklahoma Attorney General<br>• Oklahoma Healthcare Authority (Medicaid)<br>• All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| Oregon | • Attorney General for the State of Oregon<br>• Oregon Health Authority<br>• Health Authority Medicaid Program (Medicaid) Health Authority CAREAssist Program<br>• Health Authority- Oregon Educators Benefit Board & Oregon Public Employees Benefit Board<br>• Department of Corrections<br>• All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| Pennsylvania | • Attorney General for the State of Pennsylvania<br>• Pennsylvania Department of Human Services (Medicaid)<br>• All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| Puerto Rico | • Attorney General for Puerto Rico<br>• Administración de Seguros de Salud de Puerto Rico<br>• Departamento de Correccion y Rehabilitacion<br>• Puerto Rico Department of Health (Medicaid)<br>• All other State Entities that purchased, or provided reimbursement for the purchase |

|  | of, generic drugs other than (1) public corporations, and (2) public instrumentalities[10] |
| --- | --- |
| Rhode Island | • Rhode Island Office of the Attorney General<br>• Department of Human Services Medicaid Program |
| South Carolina | • Attorney General for the State of South Carolina<br>• South Carolina Healthy Connections (Medicaid) |
| South Dakota | • Attorney General for the State of South Dakota<br>• South Dakota Department of Social Services (Medicaid)<br>• South Dakota Department of Health<br>• South Dakota Department of Labor and Regulations |

---

[10] "Public corporation" and "public instrumentality" are defined as follows: Any public instrumentality that offers financial and/or social services to the People of Puerto Rico on behalf of the Government of the Commonwealth of Puerto Rico, but as an independent juridical entity. The definition shall include all the public-private corporation, to wit, any corporation that issues stocks and is organized pursuant to private corporations laws, but is controlled, in whole or in part, by the Government of the Commonwealth of Puerto Rico. The term shall refer, but is not limited to the Electric Power Authority; the Aqueduct and Sewer Authority; the University of Puerto Rico; the Automobile Accident Compensation Administration; the State Insurance Fund Corporation; the Labor Relations Board; the Public Building Authority; the Port Authority; the Government Development Bank; the Industrial Development Company; the Metropolitan Bus Authority; the Health Insurance Administration; the Trade and Export Company; the Motion Picture, Arts, Sciences, and Industry Development Corporation; the Highway and Transportation Authority; the Farm Insurance Corporation; the Rural Development Corporation; the Land Authority; the Land Administration; the Maritime Transport Authority; the Convention Center District Authority; the Solid Waste Authority; the Caribbean Basin Project Financing Authority; the Municipal Finance Agency; the Industrial, Tourist, Educational, Medical, and Environmental Pollution-Control Facilities Financing Authority; the Puerto Rico Infrastructure Financing Authority; the Housing Finance Authority; the Public Finance Corporation; the Economic Development Bank for Puerto Rico; the Corporation for the Revitalization of Urban Centers and Areas; the Right to Work Administration; the National Parks Company; the Corporation of Industries for the Blind, the Mentally Retarded and Other Disabled Persons of Puerto Rico; the Puerto Rico and Caribbean Cardiovascular Center Corporation; the Puerto Rico Medical Services Administration; the National Guard Institutional Trust; the Employment and Training Enterprises Corporation; the Corporation for the Supervision and Insurance of Cooperatives; the Port of the Americas Authority; the Company for the Integral Development of the Cantera Peninsula; the Puerto Rico Conservatory of Music Corporation; the Musical Arts Corporation; the Institute of Puerto Rican Culture; the Martin Pe†a Canal ENLACE Project Corporation; the Authority for the Redevelopment of Land and Facilities of the Roosevelt Roads Naval Station; the Traffic Safety Commission; the Administration for Integral Child Care and Development; Administration; and any other Public Corporations and Instrumentalities that are created and comply with the definition herein."

|  | • South Dakota Department of Veterans Affairs |
|  | • South Dakota Department of Human Services |
|  | • South Dakota Department of Human Resources |
| Tennessee | • Attorney General for the State of Tennessee |
|  | • Tennessee Department of Finance & Administration, Division of TennCare (Medicaid) |
|  | • Tennessee Department of Finance & Administration, Division of Benefits Administration |
|  | • All State Entities that indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for any Drugs at Issue, other than for resale, from May 1, 2009 to the Effective Date. |
| Utah | • Attorney General for the State of Utah |
|  | • Utah Department of Health & Human Services (Medicaid) |
|  | • Division of Consumer Protection |
|  | • All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| Vermont | • Attorney General for the State of Vermont |
|  | • Agency of Human Services, Department of Vermont Health Access (Medicaid) |
|  | • All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| Virginia | • Attorney General for the State of Virginia |
|  | • Virginia Department of Medicaid Assistance Services (Medicaid) |
| Virgin Islands | • Attorney General for the U.S. Virgin Islands |

|  | • Virgin Islands Department of Human Services—Office of Medicaid (Medicaid) |
|  | • All other State Entities that purchased the drugs at issue, or that provided reimbursement for the purchase of the drugs at issue, during the period that is the subject of this action |
| Washington | • Attorney General for the State of Washington |
|  | • Washington State Department of Social and Health Services |
|  | • Washington State Health Care Authority (Medicaid) |
|  | • Department of Corrections |
|  | • Department of Labor and Industries (L&I) |
|  | • Eastern State Hospital, Department of Social and Health Services (DSHS) |
|  | • Western State Hospital, Department of Social and Health Services (DSHS) |
|  | • All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| West Virginia | • Attorney General for the State of West Virginia |
|  | • WV Dept. of Health and Human Services, Bureau for Medical Services (Medicaid) |
|  | • WV Public Employees Insurance Agency |
| Wisconsin | • Attorney General for the State of Wisconsin |
|  | • Wisconsin Department of Health Services (Medicaid) |
|  | • All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs |
| Wyoming | • Attorney General for the State of Wyoming |
|  | • Wyoming Department of Health (Medicaid) |

- All other State Entities that purchased, or provided reimbursement for the purchase of, generic drugs

Appendix C

# APOTEX CORP. COOPERATION AGREEMENT

**A. Preamble**

1.      This Cooperation Agreement (the "Agreement") is made between Apotex Corp. ("Apotex"), the Attorneys General, and the End-Payer Plaintiffs, as those terms are defined in the Settlement Agreement between them.

2.      The purpose of this Agreement is to set forth the terms and process by which Apotex will provide substantial cooperation to the Attorneys General and the End-Payer Plaintiffs in connection with their prosecution of claims in the Actions entitled *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (Rufe, J.) (the "Actions") or any court to which their actions have been or may be remanded.

3.      Apotex on the one hand and the Attorneys General and the End-Payer Plaintiffs on the other hand agree that Apotex's substantial cooperation pursuant to this Agreement is material to the Settlement Agreement to be entered by them.

**B. Scope of Substantial Cooperation**

4.      Within fourteen (14) calendar days of the Preliminary Approval Order, Apotex's counsel shall provide to the Attorneys General and the End Payer Plaintiffs a list of the known persons who are likely to have relevant information concerning the allegations in the Actions, indicating (1) who are current or former employees; (2) the persons who are under Apotex's control; and (3) for those persons who are not under Apotex's control, information sufficient to contact them directly or through their attorney.

5.      Beginning no later than twenty-one (21) calendar days of the Preliminary Approval Order, Apotex's counsel shall undertake reasonable efforts to provide the Attorneys General and the End-Payer Plaintiffs collectively with a verbal attorney proffer[s] on up to a total of eight (8) generic pharmaceutical drugs selected by the Attorneys General and the End-Payer Plaintiffs within five (5) days after the Effective Date (including all formulations) manufactured by Apotex identified in the Attorneys General's and the End-Payer Plaintiffs' complaints, and more if agreed by the Attorneys General and the End-Payer Plaintiffs on the one hand and Apotex on the other hand.  The proffer(s) shall be given at an agreed-upon date(s) and an agreed-upon location(s) or virtually. Each proffer shall provide a reasonably detailed description of the principal facts known to Apotex that are relevant to the conduct alleged in the Actions, including facts concerning the alleged involvement of Apotex and other defendants in the Actions, and including in particular all facts previously provided to the U.S. Department of Justice ("DOJ") or any other U.S. or state government investigative authority, in response to subpoenas, civil investigative demands, or otherwise, relating to the allegations in the Actions.

6.      Within the attorney proffers provided pursuant to ¶ 5 above, Apotex's counsel shall also verbally provide to counsel for the Attorneys General and the End Payer Plaintiffs, where applicable, non-privileged summaries of interviews with persons identified pursuant to ¶ 4 above, to the extent the witness was previously interviewed by Apotex's counsel. If the written materials prepared by Apotex's counsel as described herein reference or are supported by documents or data, Apotex's counsel shall provide the Bates number assigned by them to those documents or data in the Actions.

7.      Within 28 business days of the Preliminary Approval Order, Apotex shall undertake reasonable efforts to provide the Attorneys General and the End Payer Plaintiffs collectively access to up to four (4) witnesses identified pursuant to ¶ 4 above, for a period of time up to four (4) hours each.

8.      Apotex agrees to use reasonable efforts to assist the Attorneys General and the End Payer Plaintiffs to understand data produced by Apotex, including consulting with technical personnel to address questions posed by the Attorneys' General and End Payer Plaintiffs' data consultants, and to provide any additional information or data reasonably necessary to understand or clarify the data or otherwise render it usable by the Attorneys General's and End-Payer Plaintiffs' experts and admissible.

9.      The Attorneys General and the End-Payer Plaintiffs shall have the right to receive, subject to the protective order in the MDL, all documents, interrogatory responses, and responses to requests for admission produced by Apotex to any other plaintiff in the MDL. Apotex likewise shall have the right to receive, subject to the protective order in the MDL (and in any court to which the State Actions have been or may be remanded), all documents, interrogatory responses, and responses to requests for admission produced by the Attorneys General and the End-Payer Plaintiffs to any other defendant in the MDL or in any other court to which their claims have been or may be remanded.

10.     Apotex agrees to use reasonable efforts to authenticate and lay the foundation to admit as business records, where applicable, collectively up to one hundred and fifty (150) documents and/or things produced by Apotex in the Actions (or more if good cause is shown) to confirm the authenticity of the documents produced by Apotex in the Actions, and to confirm,

where applicable, that such documents and data produced by Apotex qualify as business records, whether by declarations, depositions, hearings and/or trial testimony as may be necessary for the Actions to render such documents and data admissible at trial.

11.    Apotex agrees to use reasonable best efforts to produce collectively up to four (4) current or former Apotex employees as witnesses live at any trial of the Attorneys' General and End Payer Plaintiffs' claims in the Actions.

12.    By no later than the day upon which the Attorneys General and the End Payer Plaintiffs move for final approval of the Settlement, the Parties shall set forth any modifications to the scope of cooperation under this agreement in a separate letter agreement (signed by the counsel identified in Section XV of the Settlement Agreement) among them to be provided to the Court if the Court so requires, and if so required, to be filed *in camera* with Court permission.

### C.  No Waiver of Privileges, Evidentiary Protections, or Confidentiality Obligations

13.    Notwithstanding any other provision of this Agreement, Apotex may assert where applicable the work product doctrine, the attorney-client privilege, and the common interest privilege (collectively, "Privileged Material") and shall not disclose any information provided by other defendants pursuant to a common interest agreement. The Attorneys General and the End-Payer Plaintiffs shall not request disclosure of Privileged Material, and a refusal to provide Privileged Material shall not be deemed a breach of this Agreement by Apotex. The Attorneys General and the End-Payer Plaintiffs shall be free to use statements, testimony, materials or information provided under this Agreement in any motion, opposition or other pleading in the Actions or as evidence at trial in this case. The Attorneys General and the End-Payer Plaintiffs will not otherwise disclose any statements, testimony, materials or information provided under

this Agreement to any other party in the Actions, including any other plaintiff, or to any third

party. The Attorneys General, End-Payer Plaintiffs, and Apotex are permitted to describe orally

the scope of cooperation required under this Agreement with counsel for other defendants, but

cannot otherwise disclose the information provided under this Agreement.

# EXHIBIT 17

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
 2

 3    - - - - - - - - - - - - - - - - x
      STATE OF CONNECTICUT, ET AL.        No. 3:16-CV-2056 (MPS)
 4
      vs.
 5
      AUROBINDO PHARMA USA, INC., ET AL.
 6    - - - - - - - - - - - - - - - - x
      STATE OF CONNECTICUT, ET AL.        No. 3:19-CV-710 (MPS)
 7
      vs.
 8
      TEVA PHARMACEUTICALS USA, INC.
 9    - - - - - - - - - - - - - - - - x
      STATE OF CONNECTICUT, ET AL.        No. 3:20-CV-802 (MPS)
10
      vs.
11
      SANDOZ, INC., ET AL.
12    - - - - - - - - - - - - - - - - x

13
                      DECEMBER 3, 2024
14
                        11:01 A.M.
15
                   ZOOM MOTION HEARING
16

17                    450 Main Street
                   Hartford, Connecticut
18

19        BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

20

21

22

23    COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
                       (860) 212-6937
24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer.
```

2

```
 1    APPEARANCES:

 2
      FOR THE PLAINTIFF STATE OF CONNECTICUT:
 3
                 CONNECTICUT ATTORNEY GENERAL'S OFFICE
 4                    55 Elm Street
                      Post Office Box 120
 5                    Hartford, Connecticut 06101-0120
                 BY:  W. JOSEPH NIELSEN, AAG
 6
      FOR THE DEFENDANT SANDOZ, INC.:
 7
                 PROSKAUER ROSE LLP
 8                    1001 Pennsylvania Avenue, NW
                      Suite 600 South
 9                    Washington, D.C. 20004
                 BY:  CHRISTOPHER EMRICH ONDECK, ESQ.
10
                 DAY PITNEY LLP
11                    One Stamford Plaza
                      263 Tresser Boulevard
12                    Stamford, Connecticut 06901
                 BY:  THOMAS D. GOLDBERG, ESQ.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      THE COURT:  All right.  Good morning everyone.  Let me

2   just -- this is Judge Shea, and we're on the record in the

3   Sandoz case, 20-CV-802, and the other two cases, which are the

4   Heritage case, 16-CV-2056, and the Teva case, 19-CV-710, as I

5   believe -- I believe the States have moved for a prejudgment in

6   all three cases.

7      And if I could just first verify that our court

8   reporter, Ms. Monette, is on the line and can hear.

9      COURT REPORTER:  Yes, I can.

10     THE COURT:  All right, great.

11     I see we're joined by lots of people.  Welcome

12  everyone.  I will just ask counsel who will be arguing the

13  matter today to identify yourselves for the parties.

14     So for the States, who will be speaking?

15     MR. NIELSEN:  Your Honor, Joe Nielsen from the

16  Connecticut Attorney General's Office.

17     THE COURT:  For the defendants?

18     MR. ONDECK:  Good morning, Your Honor.  It's myself

19  and a colleague, so it's Chris Ondeck from Proskauer Rose for

20  Sandoz, Inc., and also with my colleague Tom Goldberg for the

21  same entity from the Day Pitney law firm.

22     THE COURT:  Sure, sure.  Welcome all of you.

23     So I have read the briefs.  I believe there were --

24  there were several briefs.  There was -- I believe there was,

25  obviously, the plaintiff's opening briefs.  There were -- there

1  was a brief by Sandoz and then I believe a supplemental brief

2  by Sandoz, and then there was a reply by the State and I

3  believe a sur-reply by Sandoz.  I hope I have them all.  I've

4  read all the ones that I know about.  I've read, I believe,

5  most of the case law.  I've studied the statutes.  So I think

6  I'm ready.

7           And, obviously, as I indicated on the docket, this is

8  not meant to be kind of the final word on the issue, although

9  it's possible, after hearing the remarks today, I may make a

10 final decision.  I won't be ruling on the call.

11          So I have a series of questions that I thought I would

12 start with perhaps Mr. Nielsen for the States, and then I'll

13 have some questions for Mr. Goldberg and Mr. Ondeck.

14          Mr. Nielsen, I get the sense that the States filed

15 this motion following the spin-off of Sandoz by its Swiss

16 parents and perhaps out of the concern that the States, for

17 example, reference the idea that the parents had loaded Sandoz

18 with debt and so perhaps out of the concern that Sandoz may not

19 be in a position to pay a judgment in this case.  Is that -- is

20 that the reason that the States filed?  And if so, does that

21 concern still exist?  And if so, why?

22          MR. NIELSEN:  Yes, Your Honor, that is the exact

23 reason we filed this.  We're not seeking to obtain prejudgment

24 remedies against all of the defendants willy-nilly.  There was

25 a reason for this.  It was due to the spin-off.  And we did

1  explain a lot of the basis for our reasons in the motion for

2  preliminary injunction and TRO that we had filed prior to the

3  spin-off, which we incorporated by reference, but I can give

4  you the docket number of that just in case you don't have it.

5        THE COURT:  Okay.

6        MR. GOLDBERG:  It is the main MDL docket, so

7  16-MD-2724, and it's ECF No. 2580.  And the memo of law is, I

8  think, 2580-1.  And it's in the memo of law around pages 8

9  through 11 where we go through all the information that was

10 taken from the Novartis and Sandoz spin-off documents, the

11 prospectus and the supplemental filings that they made.

12        But essentially, after the spin-off, the new Sandoz

13 entity is operating with very little cash on hand, limited cash

14 on hand and massive debt.  So they took on $3.75 billion in

15 debt, a large majority of which is to be paid directly to

16 Novartis.  And they reserved $87 million total for all of their

17 contingent liability, including all the litigation in this

18 case, not just the States' litigation but also private

19 plaintiffs.  That is a woefully inadequate number.

20        The new entity won't have the insurance that it had

21 when it was a part of the Novartis company and concedes in the

22 filings that the new -- whatever new insurance it does have may

23 not be sufficient to cover its claims.  There's a tax agreement

24 between Novartis and the new Sandoz entity that imposes all tax

25 obligations as a result of the spin-off on the new Sandoz

1    company.  And there's also limits on how Sandoz can actually

2    operate its business.

3          So, for example --

4          THE COURT:  Before you go through -- I think I get the

5    overall picture.  I mean, you can elaborate if you want.  But

6    my impression was that that motion for preliminary injunction

7    was ultimately withdrawn by the States.  If so -- first of all,

8    what relief did it seek?  Did it seek to stop the transaction,

9    the spin-off, or unwind the spin-off?  And why was the motion

10   withdrawn?

11         MR. NIELSEN:  Yeah.  So we sought to block the

12   spin-off.

13         THE COURT:  Okay.

14         MR. NIELSEN:  And according to the public documents,

15   the spin-off was scheduled to happen on a specific date.  And

16   we filed our motion for preliminary injunction and TRO in

17   advance of that.  But in the lead-up to after we filed the

18   motion and in the lead-up to that date, Sandoz -- Novartis

19   filed a special appearance.  They responded.  They gave us more

20   information about the spin-off.

21         And we learned for the first time that in the

22   background Novartis had already moved Sandoz, Inc., from

23   Novartis, as a subsidiary of Novartis, to a subsidiary of a new

24   entity, Sandoz AG, which was a Swiss entity.  So the only thing

25   that was left to happen on the date of the, quote, unquote,

1    spin-off was a transaction between two Swiss entities.  And we

2    no longer felt like -- that was new information.  We did not

3    know that based on the public filings until after we filed our

4    motion for TRO and preliminary --

5             THE COURT:  So your view was essentially "We're too

6    late"?

7             MR. NIELSEN:  Yeah.  We didn't think the court would

8    have the authority or jurisdiction to block a transaction

9    between two foreign Swiss entities at that point.  Prior --

10             THE COURT:  Can I ask you, why doesn't the same logic

11   apply here?  In other words, you know, sometimes a PJR is

12   sought because there's a concern that someone will -- a

13   defendant will somehow dissipate assets, transfer them and, you

14   know, the party's thinking "Well, look, if I wait till the

15   litigation, you know, reaches a final judgment, I may end up,

16   you know, with something that's judgment proof and so maybe

17   that's why I'll seek an attachment now."

18             It sounds like from what you're saying, though, to the

19   extent -- and I'm not taking any view on this.  But to the

20   extent that Sandoz has somehow limited or sharply restricted

21   its ability to pay a final judgment in this case, that that has

22   already occurred.  No?

23             MR. NIELSEN:  It has already occurred.  And the

24   current operating entity is much less capitalized to satisfy a

25   judgment down the line, which is why we'd like to try to secure

1    whatever we can now, as soon as we can, because, you know,

2    anything can happen over the next couple years till we get to a

3    trial and have a judgment -- I mean, we have three cases

4    against the Sandoz entity.  So, you know, the point here is to

5    try to secure whatever and as much of what we can before --

6    Sandoz might get hit with a judgment in another civil case.

7              THE COURT:  Sure.  You mentioned -- you mentioned

8    three cases.  I actually wanted to go right there.  Of course,

9    in one of those cases I just recently allowed you to bring the

10   parents in, in the Teva case.  I granted the motion to amend.

11   So, in fact, you're going to be allowed to sue the parents in

12   that case.

13             Now, I don't know where that will lead.  You know,

14   they will, I'm sure, file motions to dismiss.  But for the

15   moment you're going to be allowed to bring them in.

16             And I'm wondering if that doesn't -- that doesn't,

17   shall we say, alleviate to some degree at least the need for

18   the motion.  Because doesn't the Teva case also plead an

19   overarching conspiracy?  That's their -- that's why the

20   defendants are making all their claims; right?  Aren't you

21   saying essentially in all three cases that this actually was an

22   industry-wide conspiracy and so, in theory, if you won and

23   proved that, you would get full relief -- no? -- in all -- in

24   any one of the cases?

25             Or let's just take the Teva case, since that's the

1  case that I've allowed you to add the parents to.  If you, in

2  fact, proved all the allegations of the complaint in that case,

3  am I correct that you are, in fact, alleging an overarching

4  conspiracy affecting really the entire generic drug industry in

5  that case, or is that not correct?  And if so, if it is

6  correct, if you prove that, wouldn't you be able to get against

7  the Sandoz parents all the same money that you would be

8  entitled to in, say, in the Sandoz case or not?

9       MR. NIELSEN:  No.  So the way we pled the cases are --

10  is each case is a separate series of individual conspiracies

11  that are bound together by this overarching conspiracy.

12       THE COURT:  Okay.

13       MR. NIELSEN:  The overarching conspiracy itself is

14  broader than any of the complaints.  But for each of the

15  separate complaints, we've limited the action to damages for

16  those specific drugs and combinations of defendants in that

17  respective case.  So in our Heritage case, there's 15 specific

18  drugs.  In the Teva case, there's 114 different specific drugs.

19  And in the Dermatology case, it's 80 specific, different

20  altogether drugs.

21       THE COURT:  I see.

22       MR. NIELSEN:  So the liability in the Teva case will

23  be limited to the 114 drugs in that specific Teva case.  We're

24  not seeking relief beyond the boundaries of those specific

25  drugs in each complaint.  We are alleging that the overarching

1    conspiracy is the common thread between those individual

2    conspiracies in that particular case, yes.  But we're not --

3         THE COURT:  I think I understand what you're saying

4    because your view is -- if I understand correctly -- because

5    the three complaints concern separate drugs, there's no overlap

6    in the drugs between the three complaints, that necessarily the

7    damages would be defined by those -- the sales of those drugs;

8    is that right?

9         MR. NIELSEN:  Correct, correct.

10         THE COURT:  All right.  Let me move on to a different

11    question.  I'll certainly allow others to comment on that

12    later.

13         Another question for you, Mr. Nielsen, this concerns a

14    little bit the notice I placed on the docket last night

15    concerning the *Chemical Bank vs. Haseotes* case from the Second

16    Circuit.  And I don't suggest that case answers every question

17    that's been raised by this motion.  I just didn't see that

18    particular case cited in the briefs.  I might have missed it.

19    There were similar cases cited.

20         But the point of mentioning that case was that case,

21    and other cases that the defendants cite, has language that may

22    be important here because that case says, as I understand it,

23    that an order directing property located outside of the state

24    to be brought into the state is a remedy properly treated as an

25    injunction.  That's a quote from page 572 of the *Chemical Bank*

1  case.  And that's, of course, what the defendants are arguing.

2  And, of course, an injunction in the Second Circuit you have to

3  show either likelihood of success on the merits or serious

4  questions going to the merits and also irreparable harm.

5       Your motion doesn't seek to make such a showing from

6  what I understand.  And so -- and the reason this is

7  significant is, of course, Sandoz has put in a declaration

8  saying "We have no property in Connecticut."  So what do you

9  make of all that, Mr. Nielsen?

10       MR. NIELSEN:  So I've read -- the *Chemical Bank* case

11  is analyzing New York law, New York prejudgment remedy statutes

12  and the case law defining New York law.  Connecticut law,

13  obviously, is different.  Connecticut case law there is a split

14  of authority on the injunction requirement and the --

15       THE COURT:  Yeah, but I'll interrupt you a little bit

16  because I think the portion that I read really isn't limited to

17  New York.  It's true that the case involves a New York

18  prejudgment remedy and does discuss the New York prejudgment

19  remedy statute, you're right.  But the language that I read

20  doesn't seem to be limited from that.

21       And, I would add, right after the sentence that says

22  "The first remedy Chemical seeks here is an order directing

23  that property located outside of the state be brought into New

24  York so that it will be subject to the attachment order,"

25  comma, "a remedy properly treated as an injunction.  See

1  *Inter-Regional Financial Group vs. Hashemi*," which is a 1977

2  Second Circuit case that arose in Connecticut.

3       And so -- and that case says that an order -- also

4  says that an order -- that actually involved when Judge Newman

5  was on the district court a long time ago.  That case also

6  involved an order to bring property in that case into

7  Connecticut so that it could be attached -- I believe they were

8  share certificates in that case.  And *Inter-Regional*, the

9  Second Circuit decision upholding Judge Newman's ruling, was

10  that that was -- that Judge Newman had correctly treated that

11  as an injunction.

12       And so I don't think the -- I don't think that the

13  proposition that an order of a federal court requiring a

14  defendant to bring assets into the jurisdiction so that they

15  may be attached should be treated as an injunction, I don't

16  think that proposition is specific to state law.  At least

17  that's not the way I read these cases, but I'm happy to have

18  you push back.

19       MR. NIELSEN:  Yeah, so I will push back on that, but I

20  also have a second point --

21       THE COURT:  Okay.

22       MR. NIELSEN:  -- which is this whole discussion may be

23  a bit premature until we actually find out what assets Sandoz

24  has and whether we need to ask the Court to bring them in to

25  the state or not.  And we have other alternative options there

1    as well.

2              But before we get to that --

3              THE COURT:  Yeah.

4              MR. NIELSEN:  -- let me just discuss this case.  So

5    the reason I suggest that, you know, the analysis under

6    Connecticut law might be different, is there is a line of cases

7    starting with a Judge Cabranes case.

8              THE COURT:  Yeah, the 1992 decision, I think.

9              MR. NIELSEN:  Yeah.

10             THE COURT:  I'm familiar with that case.

11             MR. NIELSEN:  Shortly before he went to the Second

12   Circuit, he issued that decision and essentially said that

13   under Connecticut law the court has ancillary powers to

14   effectuate a prejudgment remedy.  And the ancillary authority

15   is what would allow this to happen without a showing of --

16             THE COURT:  Yeah, I'm familiar with the case.  I don't

17   think it's been kindly treated since.  It's been criticized in

18   the Judge Dorsey ruling and I think in other rulings, including

19   a Judge Meyer ruling from 2014.

20             I also find it a little bit hard to square with lots

21   of case law, which both parties cite correctly in the briefs,

22   that the PJR statute is strictly construed because it's in

23   derogation of Connecticut law.  As you know, there are four

24   different types of prejudgment remedy authorized in the

25   Connecticut PJR statute, one of which is attachment, but an

14

1   injunction itself is not authorized.  And so it's a little bit

2   hard to square the notion that it would be somehow ancillary to

3   issue an injunctive order when -- in light of the case law,

4   clear case law from the Connecticut courts, saying that the

5   statute must be strictly construed and that there are only four

6   types of prejudgment remedies authorized.  I'm struggling with

7   that, frankly.

8        MR. NIELSEN:  Understood.  It's a fair point.  There's

9   a split of authority.  I mean, the way I read the case law is

10  requiring irreparable harm to secure a monetary judgment in a

11  case is making it almost impossible to obtain that relief.  And

12  it really is inconsistent with the prejudgment remedy statute

13  in Connecticut generally to require that because it's not

14  required in the statute.

15       But that being said, I'm aware of the --

16       THE COURT:  Let me ask you this:  Suppose I did adopt

17  the view that you would need to satisfy the traditional

18  standards of an injunction in order to obtain that relief.

19  Would you be able to show irreparable harm here?

20       MR. NIELSEN:  Well, I think, you know, looking at the

21  *Haseotes* case, the *Chemical Bank* case, where they suggest

22  showing that the debtor was attempting to dissipate assets in

23  an effort to frustrate a judgment, if that is the showing

24  that's required to establish irreparable harm, I think we can

25  make a very good showing of that.  And we've cited to a lot of

1   that stuff.

2           THE COURT:  Well, really, so what you talked about

3   earlier was the spin-off and the loading up.  But I think what

4   those cases are talking about is sort of evidence that the

5   defendant is -- you had some evidence, I don't know, Sandoz is

6   currently siphoning off money or something like that.  I mean,

7   you don't have any evidence like that right now, do you?

8           MR. NIELSEN:  No, we don't.  We haven't been able to

9   do any discovery into that.  We have no ability to know that

10  one way or another.  So I understand your point, that, you

11  know, the debt that Sandoz is currently paying back to

12  Novartis, for example, I think that's a current effort to

13  siphon off assets.  It is literally taking Sandoz's money and

14  moving it to Novartis, just calling it debt.  You know, that

15  type of thing, I do think that is probably as close as we're

16  going to be able to get to that showing based on the

17  information we have right now.

18          I would -- if we could just put a pin in that though,

19  I do think we may be getting a little bit ahead of ourselves --

20          THE COURT:  Okay.

21          MR. NIELSEN:  -- just in the sense that, you know, the

22  Court has the ability to issue a prejudgment remedy, a writ of

23  attachment for a billion dollars, without specifying the

24  specific assets to attach.  And that's what we're asking for,

25  and I think that's what we've shown probable cause.

1          THE COURT:  Well, why would it make sense to do that,

2     Mr. Nielsen, if, in fact, they don't have any property in

3     Connecticut?  I mean, I'm going to have a lot of questions

4     about this later.  Why should we go through all that, though,

5     if -- I mean, maybe you don't take the declaration at face

6     value.  We could say, well, maybe we could have a deposition

7     about that.  We could talk about that.

8          But supposing that for a moment that we do take the

9     declaration at face value and say "Well, look, we have a sworn

10    statement saying they don't have any bank accounts, they don't

11    have any land, etc., in Connecticut, in fact, there's nothing

12    in Connecticut to attach," why go through all this trouble?

13          MR. NIELSEN:  Because I think there's good case law to

14    support that we could take the writ of attachment lawfully

15    issued by a Connecticut court to another state and get that

16    writ of attachment domesticated in that state by a district

17    court in that state and effectuate an attachment that way.

18          For example, New Jersey is a state where Sandoz is

19    headquartered.  And there's a New Jersey case where a writ of

20    attachment executed or issued by a Kentucky court was taken

21    into the District of New Jersey, and the court analyzed whether

22    the Kentucky court had properly issued the writ of

23    attachment --

24          THE COURT:  Prejudgment attachment in that case?

25          MR. NIELSEN:  Yes, a prejudgment attachment, and

1   effectuated it in New Jersey.  So I think we would have that,

2   at least that option, to try to go to New Jersey or another

3   state where property is located and potentially do the same

4   thing.

5           THE COURT:  All right.  Let me hear from the

6   defendants on the discussion we've been having so far.

7           I had really asked two sets of questions.  One had to

8   do with why they wanted the relief.  If you want to speak to

9   that, you can, or comment on it, something Mr. Nielsen said.

10  And the other was, of course, we kicked off with the *Chemical*

11  *Bank* case.

12          I don't know, Attorney Goldberg, Attorney Ondeck,

13  which one of you is going to go first?

14          MR. ONDECK:  Judge Shea, it's Chris Ondeck.  I might

15  give some answers, and Mr. Goldberg would be much more

16  knowledgeable about the Connecticut statute and the judges.

17  But I might just speak to the first question, the first topic

18  that you had asked my colleague Mr. Nielsen about, if I could?

19          THE COURT:  Yes.

20          MR. ONDECK:  So the context of this we think is

21  important.  And this was two related motions filed before Judge

22  Rufe, one which tried to block the spin-off, which occurred a

23  year ago.  So that's over.

24          And the motions -- the motion before Your Honor right

25  now we're discussing -- and I'll give the ECF number.  It's in

1   the MDL docket, and it's ECF 2582.  And at page 3, the motion,

2   the instant motion, says that the other motion that was filed

3   simultaneously, quote, that motion or memorandum of law are

4   incorporated herein by reference.

5          So, you know, I'm glad that there's been no confusion

6   that they -- somehow was coincidence they were filed on the

7   same day.  They incorporate each other.  Half of all the

8   briefing on this was dropped.  That motion was withdrawn.

9          And we don't agree with the representation made on

10  behalf of the State AGs in any regard.  And so I just want to

11  get that on the record, because this is on the record, about

12  the spin-off and corporate transaction to make independent a

13  Sandoz AG and its wholly-owned subsidiary Sandoz, Inc., as

14  being a fraudulent conveyance.  I just want to -- I've said

15  that to make that clear.

16         We don't need to argue it though.  It occurred.  And

17  the States didn't pursue it.

18         Now, the States here are making representations that

19  isn't evidence and wasn't litigated as to why they voluntarily

20  ceased their actions, but it's over.  And almost all the cases

21  that are cited by either side here, as Your Honor correctly

22  noted, are in a situation where the entity that was sought to

23  be subject to a prejudgment remedy was about to dispose of some

24  assets, about to sell the -- like Mr. Demetrie Haseotes in

25  *Chemical Bank* was about to dispose of his ownership of stock in

1    a oil refinery that was the, you know, potential security at

2    issue.  And it was stopped.  And then the securities were

3    either ordered or not ordered to come into the state, typically

4    not ordered, other than the *Homa* case.

5            Here, it's been a year.  And I have to say this motion

6    I could have seen it being simultaneously dismissed, but it's

7    an anachronism.  In that year Sandoz, Inc., has operated.  It's

8    publicly reported.  It had operating revenues of $9.6 billion.

9    That's a lot more than many of the other defendants in this

10   case.  It has 23,000 employees.  That's a lot more than many of

11   the other defendants in this case.

12           The motion, which is incorporated by reference, said

13   that Sandoz was, quote, an empty shell.  Well, that's just

14   patently false, and we have a year of operations since then.

15   So that's the first thing we'd like to point to, Your Honor.

16           Any type of incipient act that was about to occur,

17   it's occurred.  And the sky hasn't fallen.  Sorry for speaking

18   so bluntly.  Sandoz has continued to operate.  It's a

19   substantial, well-founded entity, and we think that speaks

20   quite clearly to the reasons for this.  And then eventually --

21   and I'll speak right to it now -- we do think a showing of

22   irreparable harm would need to be made, and it has not been

23   made right now.

24           So we think one avenue is the States would need to

25   withdraw without prejudice or have their motion dismissed

1    without prejudice and then determine if they would like to

2    refile and try to make that showing.  And that would be up to

3    their discretion.

4         But the second issues we haven't talked about.  And I

5    heard my colleague, Mr. Nielsen, mention that they would like

6    to seek a billion dollars, which has all kinds of problems, a

7    billion-dollar writ from this Court.  There are the other

8    motions that we think we have a very strong case that the

9    States, plural, as sovereigns, do not come within the

10   enumerated entities variable to use the Connecticut state PJR

11   motion.

12        THE COURT:  Yeah, I'm going to get to that.  I'm going

13   to get to that.

14        MR. ONDECK:  I'll stop there.

15        THE COURT:  Mr. Goldberg, did you want to add anything

16   on the first two areas?

17        MR. GOLDBERG:  Yeah, thank you, Judge.  I don't have a

18   lot to add to Your Honor's comments on the scope of the Court's

19   authority.  I think not only the *Chemical Bank* case, as you

20   pointed out, the *Roberts* case that Judge Meyer decided, and

21   Judge Dorsey's decision, all the analysis in those cases we

22   think is right and we think Your Honor's right.  This would

23   require injunctive relief showing irreparable harm.  They have

24   not alleged irreparable harm as part of the current motion, so

25   they can't get that kind of relief unless they refile.

1        As a matter of fact, the fact that Judge Meyer even

2   raised the issue whether, given strict construction in the

3   Connecticut statute, there even is authority to grant an

4   injunction under Connecticut law, and he didn't need to reach

5   that because he found no irreparable harm.  But that issue was

6   at least out there.

7        So if they can only reach assets in Connecticut,

8   there's nothing here, you know, that that --

9        THE COURT:  What do you make of Mr. Nielsen's

10  suggestion, though, that, you know, "Judge, just give us the

11  order" --

12       MR. GOLDBERG:  Yeah.

13       THE COURT:  -- "and we'll take it elsewhere"?

14       MR. GOLDBERG:  Your Honor, I have to be honest.  I've

15  never heard of domesticating a PJR.  I don't know.  There could

16  be some case in New Jersey.  There could be cases elsewhere

17  that you can take a Connecticut provisional remedy, go into

18  state court, and on the basis deprive somebody of their assets.

19  I would want to look.  Your Honor's familiar with *Connecticut*

20  *v. Doehr*.  I would want to look and see what the jurisdictional

21  and due process basis is for that.

22       I've never heard of that before.  This is the first

23  I've ever heard of it.  It's not cited in their briefs, so I

24  can't address any particular cases.

25       THE COURT:  All right.  Let's go to the arguments that

1   Mr. Ondeck mentioned, and this time I'll begin with either Mr.

2   Ondeck or Mr. Goldberg, whichever wants to start.

3          So this was an interesting one, the issue of the

4   definition of "person" in the statute.  And I read carefully

5   also Judge Sheldon's opinion.

6          And, you know, this is kind of where I ultimately kind

7   of sank my teeth into it.  I think that it's a good argument

8   about the fact that, well, the statute doesn't include "state"

9   in the definition of "person."  And, you know, there is this

10  "means and includes" point that Judge Sheldon makes.  But I'm

11  not a hundred percent sure I agree with him on that.

12         The one point he does make, though, that I did find to

13  be -- which I'll ask you about, is he points out that, of

14  course, the PJR statute doesn't actually create a right to an

15  attachment at all.  All it says is:  If you want to get -- If

16  you're a person and, therefore, you can get a prejudgment

17  remedy, and you want to get a prejudgment remedy, you have

18  attachment or garnishment, then you have to follow these

19  procedures.

20         And he points out that 52-279, as the State knows,

21  does create a substantive right to an attachment for all

22  complaints.  And when I read the other provisions in that

23  chapter, most of which deal with the mechanics of sending the

24  officer out.  How do you attach a share certificate?  How do

25  you attach miscellaneous?

1        But it seems fairly clear from several of those

2   statutes, for example, 52-284, 52-285, 52-327, that that set of

3   statutes, beginning with 52-279 which creates the substantive

4   rights and attachment, do include both prejudgment and

5   post-judgment attachments.  They're not just talking about

6   post-judgment attachments.  Because initially I think that was

7   the defendants' argument.

8        In other words, those statutes that I just mentioned

9   do seem to contemplate that the attachment can issue -- in

10  fact, "will" issue -- well before judgment, sometimes before

11  the complaint is served.  So that statute, 52-279, does seem to

12  include prejudgment attachments.  And so then the question is:

13  Well, all right, what do you make of all this?

14       And so I realize that the prejudgment remedy statute

15  says the word "prejudgment remedy," and it says you can't do it

16  unless you comply with this statute.  But, you know, one way to

17  read all this -- and Judge Sheldon sort of suggests this and

18  then rejects it -- is to say:  Well, okay, the State is not --

19  you know, is not encompassed within the 52-278a et seq.

20  statutes, but the State can still get an attachment under

21  52-279.  It's just not bound by the procedures.  He didn't go

22  that way.

23       But I'm kind of wondering why that's not -- if you're

24  right about the definition of "person," why that wouldn't be

25  the logical next step.

1          MR. GOLDBERG:  Thank you, Judge.  I'll take this one.

2          THE COURT:  Okay.

3          MR. GOLDBERG:  Let's start with the idea that there is

4    this statute that was enacted, 52-278a et seq., and it provides

5    a specific procedure.  It does require a person.  And the

6    question is:  Does the person include a state?

7          And, you know, we've cited all the general

8    presumption:  the person does include a sovereign, the fact

9    that the statutes are in derogation of the common law as

10   strictly construed, the fact that they filed in this case their

11   application under 278a as a person, that they followed the

12   procedures that are under the statutory scheme as a person.

13   And then you get to the question:  Okay, are they a person?

14         I will point out that Judge Sheldon's decision was

15   before the enactment of the statute.  Now, that's the plain

16   reading statute, back in the days when the court was starting

17   to -- the Supreme Court -- was starting to be a little more

18   flexible, let's say, in their statutory construction.  And so

19   it did predate the legislature saying "No, you've got to go

20   back and actually read the statutes and try to put them into

21   context."

22         And I will admit 279 is a bit of a mess trying to

23   figure out what the point of it is after 278a was enacted, at

24   least for prejudgment attachments.  But on the other hand, if

25   you read it that anybody can do what they want and not follow

1  the procedure, then what's the point of having this extensive

2  scheme that you've set out in the prejudgment remedy statute

3  and in particular where it's been set out to make sure that a

4  lot of the concerns previously that there weren't the

5  protections in place for defendants being met?

6        I do want to mention, some of the argument is set

7  forth in our sur-reply, and I don't know if Your Honor saw

8  Justice Zarella's report.

9        THE COURT:  I did.

10       MR. GOLDBERG:  I know that was submitted in a foreign

11  jurisdiction.  You don't need an expert on Connecticut law.

12  But Justice Zarella did go into, and we'd ask you to at least

13  take into account for the quality of the analysis for how you

14  deem whatever weight that would carry, but explaining why the

15  textual construction he thinks of Judge Sheldon is just not

16  correct.

17       THE COURT:  But he might be correct on that score, but

18  I don't see how that helps you with 52-279.  I mean, one answer

19  to your argument about "What's the point of 52-278a?" is:

20  Well, the point is it binds all persons, but the State is not a

21  person.

22       I mean, it seems odd to me that the state, in light of

23  the purposes of 52-278, which was to deal with *Doehr* and the

24  constitutional concerns, wouldn't have included the state.  But

25  if you're -- you know, the literal reading of the statute, you

```
 1   know, it doesn't say that the state's part of a person and the
 2   like.  I'm not seeing how all the textual analysis in the world
 3   helps you with 52-279.
 4        MR. GOLDBERG:  Um-hmm.  Well, I don't think I can
 5   explain it any better or more persuasively than Justice Zarella
 6   did in pages 6 and 7 of his report.  I refer you to that.
 7        THE COURT:  All right.
 8        MR. GOLDBERG:  I will throw out one thought that we've
 9   had on this because I think one place we're in agreement on is
10   that this issue there's no dispositive authority; right?
11        THE COURT:  Correct, correct.
12        MR. GOLDBERG:  And Judge Sheldon, he's a very
13   well-regarded judge, but he's a trial judge.  This is an
14   important issue that the Supreme Court has never looked at.
15   And we wonder, rather than Your Honor having to make a guess as
16   to it, does it make sense to allow the Supreme Court take a
17   look at this?
18        THE COURT:  Well, we're going to get to the sort of
19   practicalities of this in a little while, because I have a lot
20   of questions about that too.  I had the same thought.  This is
21   kind of a big issue.  Should I be really the one, as a federal
22   judge, kind of weighing in on this?  So I did think of the
23   possibility of certification, but that does tend to slow things
24   down.  So -- but it's a fair point.
25        So okay.  Was there anything else you wanted to tell
```

1   me on that issue, the "person" issue, Mr. Goldberg?

2           MR. GOLDBERG:  No, Your Honor.

3           THE COURT:  All right.  Very well.

4           Mr. Nielsen, did you want to respond on that issue?

5           MR. NIELSEN:  Yeah.  I mean, just a couple points,

6   Your Honor.  With regard to Justice Zarella's report, I mean,

7   it is what it is.  It's -- you know, he was paid to write the

8   report and, you know --

9           THE COURT:  I would have thought so.

10          MR. NIELSEN:  And, you know, I don't think that

11  carries a lot of weight under the circumstances here.  What I

12  think carries weight is the analysis courts have done on this

13  issue.  Judge Sheldon was the only one to exhaustively analyze

14  the statutory scheme.

15          I think you're right, the only alternative here is the

16  States are not bound by the PJR statute requirements and can

17  get a prejudgment attachment under 279 without meeting all

18  those standards.  I think everyone thinks that that's probably

19  not the right answer.  We agree.  There are due process

20  requirements and things that would likely apply to us.  And so

21  we applied under 52-278a, you know, like the State of

22  Connecticut has done several times in the past.

23          I would just say no court has ever, at any level in

24  Connecticut, found that the state is not a person under the

25  prejudgment remedy statutes and cannot obtain a prejudgment

1    remedy.  Courts have granted the state prejudgment remedies.

2          Superior court judge granted one to the State earlier

3    this year against Stone Academy.  I don't know if you're

4    familiar with that situation.  But there was a whole issue

5    about that academic institution and their issues.  The State

6    was granted a prejudgment remedy in that case for $5 million.

7    There was no question that the State was entitled to do that.

8          We cited a bunch of other cases where, from the

9    Supreme Court of Connecticut down, there were references to the

10   fact that the State would be entitled to do this.  Judge

11   Sheldon also mentions some of those cases as well.

12         So I just don't think there would be any authority for

13   you to find that the State is not able to obtain a prejudgment

14   remedy under the statutory scheme under Connecticut law.

15         THE COURT:  All right.  Let me move on to some of the

16   what I've been describing as sort of practical issues, what

17   this hearing would look like, how sort of it would fit with the

18   Court's overall management of these big cases, enormous cases.

19         And so, Mr. Nielsen, let me start with you.  The

20   defendants point out that you've got this long declaration in

21   there about the guilty pleas -- or, excuse me, I should be more

22   specific -- the deferred prosecution agreement and the guilty

23   pleas by corporate executives.  And so I can kind of see why

24   you take the position "Look, we have a strong case on

25   liability," at least as to the drugs involved in those matters.

1    But I didn't see a lot in the declaration by way of something

2    the Court could sink its teeth into for calculating damages.

3    And, of course, we would need an evidentiary hearing anyways

4    here.

5         And so I guess where I'm going is, I don't see how we

6    would do this hearing, a PJR hearing, without fairly extensive

7    testimony, including from damages experts.  In other words, I'm

8    well aware of the case law which is cited in your brief and the

9    defendants' brief about how probable cause is a lower standard

10   than preponderance of the evidence, that it's not supposed to

11   be a full-blown trial, that the damages, you know, are an

12   estimate, that -- but at the end of the day, you know, the

13   Court still has to say:  All right, well, is there probable

14   cause to believe that damages of X -- in your case you'd say a

15   billion -- will be rendered in a judgment in this case?

16        And in order for me to approach that question, I would

17   need to know, all right, well, how do we measure damages in an

18   antitrust case?  And my understanding is typically through an

19   analysis of overcharges.  And almost always, in my

20   understanding, that's going to come through expert testimony.

21        They're going to say "Look, here's the price the

22   transaction took place at.  This is how we figure, you know,

23   what a competitive price would have been.  Here's the

24   difference.  And that's your damages."  And that's usually a

25   fairly involved analysis.  They'll define the market, and

1    they'll talk about the industry and the like.

2         I'm not seeing how we'd do this hearing in less

3    than -- in a case this big, I mean, I don't see how we could do

4    it in less than three weeks.  But you tell me.

5         I'm not -- how would we -- just even if -- even if

6    Sandoz would take the position "Hey, look, we concede

7    liability," which clearly they're not, the damages alone might

8    not take three weeks, but it would take probably a day and a

9    half at a minimum of expert testimony from each side and some

10   buildup for the facts so that the experts could kind of latch

11   onto the facts.

12        I just -- this is not a -- this is not a two-day

13   hearing.  This is a long hearing.  Do you not think so?

14        MR. NIELSEN:  I think there are ways to abbreviate it,

15   Your Honor.  I mean, we've had expert discovery already.  Our

16   expert witness has issued a report.  Well, we've had multiple

17   expert witnesses issue reports.  They've been cross-examined

18   already.  They've been -- the defendants have submitted their

19   own experts.  So we'll split it in terms of liability and

20   damages.  The evidence is really not in dispute on liability.

21   The defendants, Sandoz, had the opportunity to dispute all that

22   deposition testimony.  And it goes well beyond just the

23   deferred prosecution agreements and the guilty pleas.

24        There are, you know, a handful of former Sandoz

25   employees who have testified about the agreements that they

1  reached and the conduct that they engaged in over a period of
2  many years with all these different defendants.  It's all in
3  the record.  All those witnesses have been subject to extensive
4  cross-examination.  You know, many of these depositions took
5  six, seven, eight days.
6       THE COURT:  But did Sandoz have to file a brief in
7  opposition to a motion for prejudgment remedy that laid out all
8  of its evidence on liability?  Ordinarily, 52-278a, assuming
9  the facts, constitutes a hearing.  So they seem to basically
10  take the position "Look, here's the legal problems, Judge, but
11  we don't concede liability and we don't think they've even
12  given you a basis to calculate damages."  That was my more or
13  less understanding of their position.
14       MR. NIELSEN:  I mean, I -- my understanding of the PJR
15  statute is that, you know, the hearing could be very, very
16  limited.  The submissions can be done largely on the papers.
17  Oftentimes these happen at the beginning of a case where
18  there's no discovery.
19       So, you know, yes, an evidentiary hearing might be
20  required, but defendants at least need to, you know, articulate
21  what their defenses would be.  They didn't articulate a single
22  defense to liability.
23       THE COURT:  But we know -- we know -- I mean, we're
24  not at the beginning of the case.  So we know that they -- in
25  fact, this is another, you know, sort of issue I've been

1    thinking about.  I know at a minimum that they're going to

2    raise a statute of limitations defense; right?  I mean, that's

3    the subject of summary judgment briefing as I understand it.

4         And, of course, that raises the question for the

5    Court -- of course, I got a lot to do in these cases, and one

6    of them is to decide these massive summary judgment motions,

7    which are, you know, well beyond what we typically see in this

8    court in terms of size.  And I'm going to be working on that,

9    and I'm going to be also at the same time holding a hearing on

10   whether -- you know, as you know, under the statute I have to

11   take account of defenses as well, the PJR statute.  And I'm

12   going to be deciding summary judgment, you know, the statute of

13   limitations on a probable cause standard or two.  This is going

14   to be rather time consuming, it seems to me.  No?

15        MR. NIELSEN:  Well, I think, given the standard, I

16   don't know that it is.  I mean, we're prepared to give you a

17   hearing and summarize the evidence.  We have videotaped

18   deposition transcripts, you know, excerpts we can show you of

19   all the testimony.  We can abbreviate it.  We can make that

20   showing for you.

21        I think defendants are entitled to make an argument

22   that somehow we are precluded from bringing our case by the

23   statute of limitations.  But, I mean, I think you can get a

24   flavor for the argument and make a probable cause determination

25   based on argument.  And if they have evidence to support that

1    statute of limitations defense, then obviously they can present

2    it.  But --

3            THE COURT:  But as a matter of due process, wouldn't

4    they be allowed to cross-examine witnesses at the hearing?  In

5    other words, they -- you know, I don't know where all these

6    depositions were taken, whether they were seen as trial-type

7    depositions or whether Sandoz would bring its own witnesses to

8    the hearing.  I don't know any of those things.

9            And so you're sort of suggesting that the Court would

10   sort of decide it on the basis of deposition testimony on the

11   liability issues?

12           MR. NIELSEN:  Sandoz has been the lead cross-examiner

13   on every one of our cooperating witness depositions of former

14   Sandoz employees.  They've had days and days and days to

15   cross-examine.  These depositions have all been taken as

16   trial-type depositions.  So they've already had that

17   opportunity.  They can present their excerpts of their

18   cross-examination from those witnesses as well.

19           I understand -- I understand the Court's concern on

20   the -- on the -- how extensive this could be, but I do think

21   there are ways to abbreviate this so the Court can understand,

22   yeah, there's probable cause here.

23           THE COURT:  And you would also put on your damages

24   expert to show --

25           MR. NIELSEN:  Yeah.

1   THE COURT: -- "Look, you know, this is how we get to

2 a billion dollars or more."

3   MR. NIELSEN: And we could do that the same way

4 because he's already -- they've all been deposed. They've been

5 cross-examined as well.

6   The reports are very, very detailed, and they far

7 surpass the $1 billion amount that we're asking for in all

8 three of our cases. And these are expert reports that are

9 limited to just the Dermatology case. But the numbers are --

10 the disgorgement numbers are 2.75 billion for Sandoz alone just

11 in the Dermatology case. The damages numbers, if you're just

12 looking at Sandoz sales only, not joint and several liability,

13 we're already talking $535 million. So even assuming no joint

14 and several liability, you just treble the damages, you're

15 already above $1 billion. There's civil penalties. All of

16 this is articulated.

17   THE COURT: Sorry. I got sidetracked. You're

18 seeking -- am I right, you're seeking the PJR in all three

19 cases; right?

20   MR. NIELSEN: Correct.

21   THE COURT: All right. That's what I thought.

22   MR. NIELSEN: And we haven't done the expert reports

23 in all three, just on the Dermatology alone, but that more than

24 satisfies the 1 billion.

25   THE COURT: I see. I see.

1    Do the defendants want to speak on sort of the

2  practicalities here of handling the hearing?  What do the

3  defendants think on how long such a hearing would take?  What

4  kind of witnesses would the defendants contemplate calling and

5  the like?

6    MR. ONDECK:  Your Honor, it's Chris Ondeck again.  I

7  think Your Honor hit the nail on the head with the complexity.

8  So the probable cause standard is what it is, but there's a

9  required standard that needs to be met there, that there be a

10  valid liability claim and a valid damages claim, validity.

11    And Your Honor also hit the point that I mentioned,

12  which is this motion -- I almost want to call it the original

13  motion because it's so much short of oral representations are

14  being made now that seem not in the papers.  But the motion

15  that's before the Court is for all three cases, $1 billion.

16  They say they didn't pluck that number out of the air.

17  Whatever.  They ended up with a pretty round number to say they

18  didn't pluck it out of the air, 1 billion for all three cases.

19    And we have a statutory right to set forth our

20  defenses for each of the three cases, which I understand

21  representation made now that they are an overarching conspiracy

22  but each is its own claim.  So that's all three cases at that

23  hearing, some of which are in very different stages.  So three

24  weeks could be very optimistic.  So it's our fact witness

25  defenses, and it's our experts.

1     And then over to damages, there's just no way this is
2     the damages number.  And the dispute on that would be
3     extraordinarily extensive.

4     I think that might be why not a single case that I'm
5     aware of in any of the briefing or research we've done ever has
6     involved a PJR claim in this type of antitrust case, which does
7     involve claims, by the way, of joint and several liability.  So
8     it would be claims of -- on both liability and the evidence
9     involved and the damages of Sandoz's potential liability for
10    the acts of everyone else in the alleged conspiracy.

11    We're heading toward essentially a full-blown trial in
12    the biggest antitrust case in the United States, this here, as
13    well as the MDL.  And the idea -- and nothing like this has
14    ever been done and for all the legal impediments that we
15    mentioned and the due process impact on us and all the other
16    defendants are going to be filing a lot, a claim that the harm
17    that this does to their right to defend the case.

18    When we have pending summary judgment motions --
19    that's another procedural aspect.  PJR typically is in the
20    instance that we've described, when there's an event that's
21    about to occur that has not yet occurred and the entity,
22    typically not the State, is seeking to preserve some assets and
23    protect its interests.  Here the events already occurred that's
24    being argued about.  And I think Your Honor's right to balance
25    that.

1       I don't know of a single case that was an antitrust

2 case where dispositive summary judgment briefs had been filed.

3 They're pending before the court.

4       And I think, as Your Honor said, the Court will be

5 better served, and the States would as well, by proceeding with

6 the briefing and argument on those briefs first.  There's no

7 claim that there's anything imminent about to happen vis-a-vis

8 the PJR and the assets.  The events occurred.  We're here down

9 the road.  There's been no argument that anything negative has

10 happened with Sandoz, Inc.  It's a much larger and more

11 well-funded company than many of the other defendants.  Some

12 might be bigger; some might be smaller.  There's no urgency to

13 this.

14       Just in terms of staging, we urge the States to

15 withdraw this without prejudice.  But we urge the Court to stay

16 it and then proceed with the things that are live right now

17 that the States are going to need to do and we're going to need

18 to do, which is to complete the summary judgment briefing.

19       THE COURT:  I do have one question for you, Mr.

20 Ondeck, on the admissions.  And maybe I misunderstood because

21 the States didn't really focus on it that much in their brief.

22 They mention it but don't focus on it.

23       In the DPA it includes an admission by Sandoz that

24 Sandoz participated in conspiracies as to certain drugs and

25 that, quote, Sandoz's sales of generic drugs affected by these

1    conspiracies totaled more than $500 million, end quote.

2         Now, I realize that is not a statement of what the

3    damages were.  Simply because that's the volume of sales that

4    were affected does not mean that's the overcharges.  However,

5    it would provide -- I would have thought it would make an

6    expert's work easier, right, if the expert said:  Look, if

7    Sandoz is acknowledging that the sales of generic drugs

8    affected by conspiracies in which it participated totaled more

9    than half a billion dollars, I'll just take half a billion as

10   sort of the volume of sales, and I'll just, you know, analyze

11   the market -- I shouldn't say "just" analyze.  That's a lot of

12   work.  So that part's not simple.  But I'll come up with a

13   theory of overcharge here that would say, in the typical sale,

14   the overcharge is 30 percent or something like that.

15        Why wouldn't that simplify things considerably?  You'd

16   still need to hear from the experts, clearly, the plaintiffs'

17   expert and your expert, who would contest it.  But that's an

18   admission that, as I understand it, says:  We participated in

19   these conspiracies.  They were unlawful.  They violated the

20   antitrust laws, and the sales of generic drugs affected by our

21   conduct totaled more than half a billion.  I would put out the

22   "more than."  Let's just say totaled half a billion.

23        Now, obviously, the State's seeking a billion-dollar

24   PJR, so that's not what I'm talking about.  I'm talking about

25   it would seem fair -- well, I won't say "simple," but I would

1  say -- I would say it would seem that it could be done on a

2  more expedited basis than a month-long, two-month-long hearing

3  for the Court simply to absorb expert testimony on how much

4  that half a billion was an overcharge and make an estimate of

5  probable cause and say "Well, I've listened to the experts.

6  Half of it was an overcharge.  So I grant a PJR of $250

7  million."

8         Am I misreading that admission or misunderstanding it?

9  And why wouldn't it be considerably simpler to -- I'm not

10 suggesting that the State has pointed me towards that.  But I

11 did notice that, and I'm wondering why that wouldn't be a more

12 expedited track for the State to pursue here.

13        MR. ONDECK:  Your Honor, I hear what you're saying

14 about the DPA.  And I can give a one-sentence answer and a

15 little explanation, because that's not the claim the States

16 made here.  They have not said "We are suing for civil recovery

17 for something that is coterminous with the five drugs" --

18 five.Remember, it's subject to the Sandoz, Inc., DPA.

19        Remember, we heard those numbers:  Derm, 80 drugs;

20 Teva, 114 drugs; right?  The DPA was five drugs.  And then I

21 would describe it as very limited.

22        That DPA concerned really Sandoz and its conduct with,

23 honestly, two other companies.  And even in the Derm case alone

24 before Your Honor, by my count the amount of corporate

25 defendants that we have is 26 named corporate entities, 16

1   corporate families that are a part of the -- let's call it the

2   three-company DPA.  We got 10 individuals in just the Derm case

3   alone.

4           The second is so it's not the wrong drugs, but it is

5   a -- it is a tiny subset of the evidence that will be at issue

6   that the State has taken depositions on, all those 300

7   depositions that you heard about, cooperating witnesses.  They

8   didn't limit it to the DPAs, neither the limiting on the drugs

9   nor the time period.  So the DPAs are going to be a lot less

10  dispositive, in fact, not dispositive at all, on many of the

11  key issues that the States will need to prove where the claims

12  they have asserted.

13          So I would say in terms of the complexity, Your Honor,

14  it is as you originally thought.  There's no shortcut just

15  because of the sort of headline fact that Sandoz entered into a

16  very limited DPA.

17          And I'd add to that, Your Honor, we've heard

18  representations by my colleague Mr. Nielsen that the evidence

19  is all in and not contested.  That's not true on a couple

20  levels:  one, there would need to be fact witnesses and

21  cross-examination; two, we haven't heard mention of something

22  that's happened with one of the defendants in this case.  And

23  I'll just raise it for Your Honor's attention.

24          One of the individual defendants in this case is a

25  person named Mr. Kellum, K-e-l-l-u-m.  And up until fairly

1    recently, Mr. Kellum had not given fact testimony because he

2    was asserting his rights under the Fifth Amendment.  A few

3    months ago, he filed an answer in this case and -- as an

4    individual defendant and did not assert the Fifth Amendment.

5    And so the States were on notice as of that moment.

6         More recently, and I don't know if it's been reviewed

7    by the Court, but the States know, Mr. Kellum executed a

8    declaration.  He is not invoking his Fifth Amendment rights, as

9    is his right, and has provided denials as to fundamental fact

10   issues that are involved in the conspiracy, claims by the

11   States.  And that is attached to the joint defense motion on

12   overarching conspiracy.  That's a live issue.

13        I don't know if the States are going to want to take

14   additional discovery on that.  They may want to take his

15   deposition.  And we'd be willing --

16        THE COURT:  I'm sorry, just so I understand, Mr.

17   Ondeck, you're saying the States have attached to one of their

18   summary judgment motions a declaration by Mr. Kellum which he

19   has denied.

20        MR. ONDECK:  The defendants.

21        THE COURT:  Yeah, I did understand that.  I just

22   misspoke.  The defendants have attached a declaration by Mr.

23   Kellum to one of their summary judgment motions that have been

24   served on the States.

25        MR. ONDECK:  Yes, Your Honor.  And that's just one

1    example.  I want to be conscious of the Court's time.  Probably

2    two dozen additional fact issues that are in dispute.

3         We don't agree, and we set forth in our briefs, our

4    explanation that we don't think the case is proved, nor the

5    damages, by the DPA, which isn't what the States chewed on,

6    coterminous with the DPA.

7         I was just raising to the Court's attention something

8    that wasn't in the briefs, a fundamental -- it was one of the

9    cooperating witnesses where we have a new declaration.  So the

10   evidence on some issues is very much in dispute.

11        THE COURT:  All right.  Mr. Nielsen, did you want to

12   comment on Mr. Ondeck's remarks the last few minutes?

13        MR. NIELSEN:  Yes.  First of all, Armando Kellum was

14   not a cooperating witness.  He was someone who pled guilty to

15   price fixing, and he's an individual in our cases.  Yes, he did

16   assert the Fifth Amendment for two days straight to every

17   question we asked.  We had not heard -- we've never heard from

18   his counsel that he's recanting the Fifth formally and will

19   actually testify at a deposition.

20        We did see the answer and the affidavit that he has

21   now submitted on behalf of Sandoz.  So we will, obviously, have

22   to address that as an issue because he asserted the Fifth to

23   everything previously and now is seeking to recant that.

24   That's an issue.

25        But the bottom line is, there can be disputed issues.

1   The standard is "probable cause."  It's a very low standard.

2   It's much lower than "preponderance of the evidence."

3         We have multiple witnesses who testify as to their

4   collusion and the agreements they reached with competitors on a

5   very, very large amount of drugs.  The testimony's corroborated

6   by evidence, you know, documents, phone records, all the other

7   circumstantial things that usually plaintiffs have to rely on

8   completely.  Here we have all of that.  Sitting on top of it is

9   all this witness testimony saying "Yeah, that's what we did,

10   and we did it all the time."

11         So there can be disputed issues and the Court can

12   still say:  Well, I think there's still probable cause here.

13   The evidence is pretty overwhelming.

14         You know, this witness who pled guilty is now

15   cooperating with the defendant; and, you know, likely he will

16   be indemnified, his judgment against him if we get one by the

17   company.  And so taking all that into account --

18         THE COURT:  Mr. Nielsen, let me ask you this though:

19   You know, it seems fairly clear to me that I can't do this in a

20   short hearing.  I just -- I don't think there's any way to do

21   that in a case this size, this complicated, given the Court's

22   obligation to fully respect both parties' due process rights.

23         Do the States really want the Court to be focusing on

24   this for a month or so?  I mean, you know, however long it's

25   going to take.

 1          I mean, obviously, in such a hearing, I could impose
 2     time limits.  I would, because it isn't supposed to be a full
 3     trial on the merits.  But, by the same token, you know, if
 4     you're seeking a billion-dollar attachment, I can't truncate
 5     the defendants' presentation too much.
 6          And the other thing is that I guess as another
 7     question for you, which is, so as Mr. Ondeck points out, many
 8     of the defenses that they're going to raise at such a hearing
 9     are also being raised in their summary judgment briefing.  I
10     mean, suppose we had a month-long PJR in whenever, the
11     summertime of next year, and the Court issued a PJR for, you
12     know -- for the States of some large amount of money.  And then
13     the Court decided that actually the States have a good statute
14     of limitations defense on summary judgment.  They win on their
15     statute of limitations defense.  What does the Court do then?
16     Does it have to modify the PJR?  Does it dissolve the
17     attachment?
18          I'm just kind of trying to keep the pieces here.  And
19     considering the case as a whole, I'm just wondering why it
20     makes sense to do this now.
21          MR. NIELSEN:  Yeah, I mean, I understand it's
22     complicated.  I don't think there's any merit to a statute of
23     limitations defense in this case.  I really don't.  So I'm not
24     concerned about that happening.  That could happen in any case
25     where a prejudgment remedy gets issued early on.  And the

1    States desperately feel like we need a prejudgment remedy

2    against Sandoz in this case.  So --

3            THE COURT:  Well, why desperately?  That's not the

4    part I'm understanding.

5            MR. NIELSEN:  Well -- I'm sorry, Your Honor.

6            THE COURT:  Go ahead.  You go ahead.

7            MR. NIELSEN:  Well, just because -- just almost

8    anything could happen in this case.  Um, you know, Sandoz could

9    lose another civil case in the meantime, or some financial

10   problem could happen to Sandoz and they go under and there's no

11   money.

12           THE COURT:  According to Mr. Ondeck, I don't know if

13   you agree -- first of all, is Sandoz, Inc., a public company?

14           MR. NIELSEN:  I believe they're owned, wholly owned,

15   by Sandoz AG in Switzerland at this point after the spin-off is

16   my understanding.

17           THE COURT:  Mr. Ondeck?

18           MR. ONDECK:  They're publicly traded, and their

19   ultimate parent now is Sandoz AG.

20           THE COURT:  I got it.

21           MR. NIELSEN:  Are they publicly traded in Switzerland

22   though?

23           MR. ONDECK:  This is the kind of thing, Your Honor, I

24   think the States should go back to the drawing board and

25   rethink this and they could, I think, upon some investigation,

1    could see that in the year since they said that something very

2    bad would happen, three days or five days before the closing,

3    that nothing very bad did happen.

4         THE COURT:  Well, actually, while we're on that,

5    because I was going to mention this to Mr. Nielsen, you said

6    they had, I think, 9.6 billion in sales.  Is that publicly

7    reported?

8         MR. ONDECK:  Yes, Your Honor.

9         THE COURT:  So let me ask you this, Mr. Nielsen:  That

10   is something that is publicly reported.  They had 9.6 billion

11   in sales last year.  It doesn't sound to me like they're on the

12   brink of bankruptcy.  But, again, I don't know.  You have more

13   information than I do.  So correct me if I'm wrong.  But it

14   doesn't sound like it.

15        MR. NIELSEN:  Well, we do know -- so I would say a few

16   things, some of which I can speak in more detail about, others

17   I can't as much.  But we know from all of the spin-off details

18   that they're going to carry very little cash on hand, so they

19   don't -- they have revenues, but they have $3.75 billion in

20   debt.  So a lot of those revenues are being funneled straight

21   to Novartis.  They've only reserved $87 million to pay

22   liability in this case, in all cases, in any case that's

23   pending against them, frankly.

24        So, yes, they have a lot of gross sales.  Where is the

25   money going?  That we don't know.  A lot of it's going back to

1    Novartis.  So that's one thing I will tell you.

2         The other thing is, I have been having settlement

3    conversations on and off with Sandoz's counsel since before the

4    spin-off, not including Mr. Ondeck, who's new to the case, but

5    with prior counsel.  And it has been made very clear, not just

6    to me --

7         MR. ONDECK:  Your Honor, before we get into this, Mr.

8    Nielsen, we've got a 408 issue that I'm a little worried we're

9    going to --

10        THE COURT:  Yeah, probably not a great idea to involve

11   me in those discussions, Mr. Nielsen.

12        MR. NIELSEN:  I don't want to give any details other

13   than to say we have reasons to understand that Sandoz will not

14   be able to satisfy a judgment in this case moving forward.

15        THE COURT:  Let's do this, folks --

16        MR. ONDECK:  That's a problem.  I disagree, Your

17   Honor.

18        THE COURT:  Okay.  Let's do this.  I'm not going to

19   try to resolve that issue.

20        I think I -- unless counsel thinks there's some

21   critical issue that I've missed, I think I've asked more or

22   less all the questions I wanted to ask today.  I think there's

23   one bit of follow-up I would like to see.

24        Mr. Nielsen, earlier on we were discussing the

25   question -- and Mr. Goldberg mentioned it too -- the question

1  of whether, as he put it, one can domesticate a PJR.  And in

2  particular you mentioned a New Jersey case.  I'd be interested

3  in seeing that case and any other authority that you have

4  suggesting that a PJR issued under the Connecticut statute by a

5  Connecticut court, or a federal court in Connecticut, can be

6  taken to another state and a -- and used to attach property in

7  the other state.

8        I would have thought -- I don't know how other states'

9  PJR statutes work, but I would have thought, in light of Rule

10  64 and its language about the court, that that might be an

11  issue for that in terms of the location of the court.  But even

12  if it's not, I would think that the attachment would have to

13  comply with the other states' PJR law if there is one.  But I

14  don't know.  This is a new subject sort of.  It's not in the

15  briefs.

16        MR. NIELSEN:  I can give you the cite of the case and

17  the name if you like.

18        THE COURT:  I tell you what.  I think I would like a

19  little more than a cite.  I think I would like a little bit of

20  briefing on this question, because you raised it.  It's not in

21  the original briefs.  I think it would be worth the parties

22  filing short supplemental briefs on this issue.  By "short" I

23  mean let's limit it to 10 pages each.

24        And it probably makes sense, just because you raised

25  it, Mr. Nielsen, for you to go first.  So if you could provide

1   a supplemental brief to the Court on that question -- would you

2   be able to do it in 14 days, or would that be too fast?

3          MR. NIELSEN:  Yes, Your Honor.

4          THE COURT:  Okay.  And then could I get a supplemental

5   brief responding to the defendants' [sic] supplemental brief in

6   14 days thereafter from the Defense?

7          MR. ONDECK:  Yes, Your Honor.

8          THE COURT:  So the question to be addressed is this

9   question of if, in fact, there's no property of Sandoz here in

10  Connecticut and, you know, does the Court, nonetheless, have

11  authority and does it make sense for the Court to use that

12  authority to issue an attachment in whatever amount is

13  established by probable cause to enable the state to take that

14  attachment to another state where Sandoz does have property and

15  either domesticate it or use that, the Court's order, to obtain

16  an attachment in another state, either in compliance with that

17  state statute or in some other manner?  That would be helpful

18  to understand what the Court's authority is and whether that's

19  been done before.  I think that would be helpful to me to

20  understand that, because that was a new one I hadn't really

21  thought about.

22          So those are the issues I'd like to see the parties

23  address in the briefs.  And as I say, why don't we limit it to

24  10 pages each.  I don't really want sur-replies or anything

25  like that.  I think two briefs is enough, that is to say, one

1  brief from the Defense -- excuse me -- one brief from the

2  States, one brief from the Defense is enough.  If I have some

3  questions, we can have further discussion.  But hopefully I can

4  figure it out for myself at that point.  So we'll issue an

5  order to that effect.

6         I'm not going to issue any ruling on this before today

7  or before I read those supplemental briefs.

8         MR. ONDECK:  Your Honor, I hate to interrupt.  I do

9  have one thing I would like to put on the record, if I may, and

10 I apologize.

11        THE COURT:  Yes.

12        MR. ONDECK:  There's been representation just a minute

13 ago about settlement discussions with Sandoz, Inc.  And I just

14 want to put on the record that's not in the briefing, and it

15 was raised here.  And we're greatly troubled.  We've done some

16 caucusing in the few seconds since then.  But we are -- we are

17 seriously troubled by any officer of the court, particularly a

18 government attorney, intentionally seeking to disclose and

19 disclosing in part, despite my objection, confidential

20 settlement communications and making a fact representation

21 about them.  We will take that up separately as appropriate,

22 Your Honor.  And I do want to have that on the record.

23        THE COURT:  All right.  Let me just say something.  I

24 mean, you can do what you want.  For what it's worth, I

25 didn't -- I didn't hear any substance.  I heard that there were

 1    discussions with previous counsel and this had something to do

 2    with the State's concerns.

 3          MR. ONDECK:  All our co-defendants are on the call as

 4    well, Your Honor.

 5          THE COURT:  I hear you.  I hear you.  You can do what

 6    you need to do on that.  And I'll obviously consider any

 7    responses as well.

 8          So -- but I'd like to focus on this.  And so we'll

 9    issue an order that just incorporates what I just said, the

10    briefs within 14 days of each other, and as I say, we'll go

11    from there.

12          Thank you all for participating today.  I found the

13    argument to be helpful.  Thanks very much.

14       (Proceedings concluded at 12:15 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4    STATE OF CONNECTICUT, ET AL.          No. 3:16-CV-2056 (MPS)
     vs.
5    AUROBINDO PHARMA USA, INC., ET AL.

6
     STATE OF CONNECTICUT, ET AL.          No. 3:19-CV-710 (MPS)
7    vs.
     TEVA PHARMACEUTICALS USA, INC.
8

9    STATE OF CONNECTICUT, ET AL.          No. 3:20-CV-802 (MPS)
     vs.
10   SANDOZ, INC., ET AL.

11

12

13              I, Julie L. Monette, RDR, CRR, CRC, Official

14   Court Reporter for the United States District Court for the

15   District of Connecticut, do hereby certify that the foregoing

16   pages are a true and accurate transcription of my shorthand

17   notes taken in the aforementioned matter to the best of my

18   skill and ability.

19

20

21                   /S/ JULIE L. MONETTE
                     _____
22                   Julie L. Monette, RDR, CRR, CRC
                     Official Court Reporter
23                   450 Main Street - Clerk's Office
                     Hartford, Connecticut 06103
24                   (860) 212-6937

25

# **EXHIBIT 18**

# **FILED UNDER SEAL**

# **EXHIBIT 19**

# **FILED UNDER SEAL**

# **EXHIBIT 20**

# **FILED UNDER SEAL**

# EXHIBIT 21

# FILED UNDER SEAL

**<u>EXHIBIT 22</u>**



Follow the latest developments in US antitrust enforcement and litigation

# States considering industry ban for pharma execs

Anna Langlois

11 March 2025



*Connecticut assistant attorney general Joe Nielsen (Credit: Jordan Sabillo)*

States prosecuting generic drug manufacturers and their leadership for price-fixing may seek to bar the executives from working in the pharmaceutical industry because none received jail time, a top attorney working the case has said.

Speaking at GCR Live: Cartels on Tuesday, Joe Nielsen, an assistant attorney general for the State of Connecticut, said state enforcers will seriously consider pursuing stringent relief should they prevail in the long-running price-fixing litigation because the Department of Justice did not secure prison sentences for any individuals it charged on related allegations.

"We have to start thinking about other aspects of injunctive relief – whether we can ban them from working in the industry or about other things that could actually deter the conduct. Otherwise we're in a situation where everyone walked away from this without a single person going to jail or really paying a significant amount," Nielsen said.

Nielsen said deterrence is particularly important given the "very, very strong evidence" unearthed by the investigations.

Bans for executives named in the civil suit – including Taro Pharmaceuticals executive Ara Aprahamian and G&W Laboratories' James Grauso – could have a powerful deterrent effect, he added.

Nielsen noted that several state enforcers joined the Federal Trade Commission in seeking a lifetime ban against Vyera Pharmaceuticals founder Martin Shkreli. The government and state attorneys general alleged that "Pharma Bro" illegally monopolised an HIV medicine.

In 2024, the US Court of Appeals for the Second Circuit upheld the lifetime ban against Shkreli after concluding he would likely harm competition again and possibly endanger lives.

Dozens of states led by Connecticut brought three sprawling lawsuits against at least 16 generic pharmaceutical manufacturers including Sandoz, Teva Pharmaceuticals and Aurobindo Pharma between 2016 and 2020.

The states allege several overarching price-fixing and market allocation schemes impacting generic equivalents for popular dermatology treatments, seizure medications and many other prescriptions.

The DOJ opened criminal investigations and brought charges against seven of those companies and several individuals.

The Antitrust Division reached a landmark deferred prosecution agreement with Teva in August 2023, culminating in more than $681 million in criminal penalties collected from the generic drugmakers.

Taro Pharmaceuticals, Apotex, Sandoz, Rising Pharmaceuticals and Heritage Pharmaceuticals also reached DPAs with the government.

Some former executives, like Sandoz's pricing director Hector Armando Kellum, pleaded guilty to their part in the conspiracy. However, the government dismissed the charges against a Taro Pharmaceuticals executive in 2023.

On Tuesday, Nielsen said the nature of the pharmaceutical industry played a large role in the relief the government could feasibly pursue.

Convictions and guilty pleas under the Sherman Act require debarment, preventing companies from entering into new or existing contracts with the federal government.

"I think the unique part about it was mandatory debarment, in terms of the resolutions, which won't be an issue in many other industries," Nielsen said.

The conference concluded today.

8/28/25, 11:01 AM
Case 2:20-cv-00695-CMR   Document 387-4   Filed 09/10/25   Page 520 of 565
States considering industry ban for pharma execs - Global Competition Review

## Anna Langlois

Senior news reporter, GCR USA

Anna.Langlois@lbresearch.com

**View full biography**

Copyright © Law Business Research   Company Number: 03281866 VAT: GB 160 7529 10

# EXHIBIT 23



15 YEARS *of trusted journalism*

JUSTICE

# How a small-state AG's office plays in the big leagues



by **Mark Pazniokas**
January 27, 2017 @ 5:00 am



Now litigated by 40 states, it was Joe Nielsen's alone for two years.  CREDIT: MARK PAZNIOKAS / CTMIRROR.ORG

Joe Nielsen and Mike Cole, antitrust lawyers from the Connecticut attorney general's office, waited for colleagues from nearly three dozen states to settle into a chilly conference room at the Hotel Kabuki in San Francisco's Japantown. No one was admitted without signing a pledge not to divulge what Nielsen was about to share.

How a small-state AG's office plays in the big leagues



Now litigated by 40 states, the generic drug price-fixing case was Joe Nielsen's alone for two years.  CREDIT: MARK PAZNIOKAS / CTMIRROR.ORG

It was late September. Their boss, Attorney General George Jepsen, was preparing to sue a half-dozen drug companies, alleging price fixing on two generic drugs, an antibiotic and a diabetes medication. But his office suspected fraud on a broader, nearly unimaginable scale.

Prices on 1,200 generics had jumped an average of 448 percent from July 2013 to July 2014, the month Connecticut opened its investigation on suspicions by Cole, who supervises 13 lawyers and four investigators in the state's antitrust and fraud unit. The cost to consumers and health insurers was staggering.

Now, at an antitrust conference sponsored by NAAG, the National Association of Attorneys General, Connecticut was looking for help in advancing an investigation Nielsen had largely conducted himself, following a trail of suspiciously cozy communications from one drug company to another.

The lights dimmed, and Nielsen began projecting images of evidence gathered over two years about how prices were set in the $75 billion generic drug industry. For 90 minutes, he shared phone records, emails and text messages Connecticut obtained by subpoena.

Some of the lawyers congregated at the back of the room. Cole feared they were leaving, ready to sneak out for dinner after a long day of meetings. But Cole realized the room had no heat, a likely consequence of an ongoing, advertised $25 million renovation to update the tired Kabuki. The lawyers weren't bored, just tired and cold.

When the lights came up, they gave Nielsen a standing ovation.

**Connecticut filed suit** in U.S. District Court in Hartford on Dec. 15 — joined by 19 other states who had lawyers in the room at the Hotel Kabuki, attended a subsequent show-and-tell in Hartford or otherwise were drawn to the case that promises to become the next big thing in multi-state litigation by state attorneys general.

Six weeks later, 40 states have signed on, new subpoenas are going out, and the investigation is growing beyond the companies named in the suit. From his office in Hartford, Nielsen is sharing evidence with colleagues around the country on a secure document-sharing platform based in Ohio.

### The rise of state attorneys general

Call it legal crowdsourcing.

By banding together — most times on a non-partisan basis, other times not — state attorneys general routinely take the lead on what once was left to private class-action lawsuits, individual states or the U.S. Department of Justice.



The lawsuits can complement DOJ cases. Within days of its initial subpoenas in the drug case — publicly traded targets disclosed the receipt of the demands for documents — federal criminal investigators reached out to Cole and gladly accepted leads.

Or they can fill a vacuum, as when Jepsen stepped into a space vacated by the feds after the inauguration of President Trump. With the backing of 16 other attorneys general, Jepsen asked a federal appeals court Monday to grant them intervenor status in a case that could decide whether the Consumer Financial Protection Bureau retains a measure of autonomy, led by a single director who serves a five-year term and can be fired by a president only for cause.

Attorney General George Jepsen  CREDIT: CTMIRROR.ORG

The Obama administration was contesting a divided appellate court ruling that essentially rendered the director an at-will employee, contrary to what Congress intended in the Dodd-Frank reforms passed in response to the financial collapse of 2008.

Jepsen's filing quoted media reports that Trump has indicated a desire to fire the director and possibly gut the financial protection bureau.

"Given the position of the president-elect and the new administration," Jepsen's office wrote in a motion drafted before Trump's inauguration, "it is urgent that the State Attorneys General intervene in order to protect the interests of their States and their States' citizens in an independent CFPB."

Jepsen, the president of the National Association of Attorneys General, circulated the motion to every member. The only ones who signed on were Democrats.

"Some of the multi-state actions are partisan, yes," Jepsen said in an interview. "I expect, as Trump follows through as he appears to be with his campaign promises, you'll see a lot of activity among Democratic attorneys general."

One potential target of multi-state litigation is a current member of NAAG, the Republican attorney general of Oklahoma and Trump's nominee to head the Environmental Protection Agency, Scott Pruitt.

A skeptic of human-caused climate change, Pruitt has repeatedly questioned the necessity and efficacy of clean water and clean air laws and regulation as attorney general, setting up a conflict with Democratic attorneys general.  In a public statement after his nomination, Pruitt said, "The American people are tired of seeing billions of dollars drained from our economy due to unnecessary EPA regulations."

Jepsen said state attorneys general have long broken on partisan issues without harming their ability to work together on non-partisan issues.

"That shouldn't obscure the fact that throughout it all we maintained positive bipartisan relationships at the national level," Jepsen said.

He pointed to the recent multi-state settlement with Moody's, one of the credit-rating agencies accused of misleading investors about the quality of relatively exotic investments known as residential mortgage-backed securities and collateralized debt obligations, a factor in the financial collapse of 2008.

Case 2:20-cv-00695-CMR    Document 287-4    Filed 09/10/25    Page 526 of 565

It arose from a lawsuit originated by Connecticut in 2010 under Jepsen's predecessor, Attorney General Richard Blumenthal, now a U.S. senator. The $864 million settlement involved 20 states and the Department of Justice and produced $31.5 million for Connecticut.

Jepsen, 62, a graduate of Harvard's law school and its Kennedy School of Government, is only Connecticut's third elected attorney general since the office became full-time after the election of Joseph I. Lieberman in 1982. Jepsen was elected in 2010, re-elected in 2014 and is expected to seek a third term in 2018.

He said Connecticut tends to "punch above its weight" in multi-state lawsuits.  He credits Cole and his staff with devising the legal strategy that led to a price-fixing case against the publishers of electronic books.

"We can play. You don't need to be New York or Texas or California to do this stuff," Cole said. "You have to know how to do your craft."

Aaron Bayer has seen the development of state attorneys general into a coherent legal and regulatory force from the perspective of the pursuer and the pursued.

He was the deputy attorney general under Blumenthal and now is a litigation partner at Wiggin & Dana, where one of his jobs is to advise clients how to respond to state and federal investigations.

"In the evolution of state attorneys general multi-state actions, they have become more common, more sophisticated and well-coordinated over time," Bayer said. "I don't think any company wants to be the subject of a multi-state."

An investigation by a single investigator in a small state can quickly blossom into a national monster. All that is needed is a reasonable cause to inquire, a low legal standard.

### A news story and an email opens investigation

In the case of the pricing of generic drugs, the reasonable cause was a just-posted New York Times story Cole read at home on a summer's evening about curious price

increases imposed by makers of digoxin, one of the oldest known heart medicines, and other generic drugs.

The story by Elisabeth Rosenthal was headlined **"Rapid Price Increases for Some Generic Drugs Catch Users by Surprise."** As soon as he finished the story, Cole emailed it without comment to Nielsen at 9:10 p.m. on July 8, 2014. No direction was necessary.



Mike Cole, head of the antitrust and fraud unit, flanked by Joe Nielsen and Laura Martella. CREDIT: MARK PAZNIOKAS / CTMIRROR.ORG

Some quick research found an odd pattern. Four companies had been in the market before the price increases. Two dropped out, a new one entered the market and the remaining two raised their prices, Nielsen said, "exactly the same amount, to the same price point."

Cole got permission to open an investigation on July 10. The first subpoenas went out by the end of the week, and their receipt by their publicly traded targets was disclosed July 15, drawing inquiries from the industry press and the Justice Department.

Details of the investigation remain confidential. With Jepsen's permission, Cole outlined a broad timeline, saying that in early 2015, after six months of solo work by Nielsen, the office obtained text messages from Heritage Pharmaceuticals that "took the investigation to a new level." The company is one of the six defendants in the Connecticut lawsuit.

The messages obtained from Heritage were among competitors. Only heavily redacted versions were quoted in the version of the lawsuit that is public, but Jepsen called them "mind-boggling."

Some of the material was shared with the Department of Justice, which had been in contact with Cole and Nielsen. Four months after Connecticut's first subpoena went out, the feds convened a grand jury in Philadelphia, apparently chosen for proximity to the industry. About 40 generic drug makers can be found between New York City and Philly.

8/25/25, 2:16 PM
Case 2:20-cv-00695-CMR    Document 287-4    Filed 09/10/25    Page 528 of 565
How a small state AG's office plays in the big leagues

Since the Justice Department was conducting a criminal investigation, the flow of information was one-way. "We can share with them," said Cole, a former Justice Department lawyer. "They can't share with us."

By last summer, Cole saw the need for more help, both the resources to look deeper into the evidence of price-fixing and the muscle that would be necessary to eventually open settlement talks. Corporations generally talk settlements only if a universal, multi-state resolution is possible.

In early fall, Cole arranged for Laura Martella, an assistant attorney general working on a case against RBS Securities, to shift to the drug investigation as soon as she was available.  RBS was about to agree to a $120 million settlement over its handling of mortgage-backed securities.

And on Sept 28, 2016, Cole and Nielsen met their colleagues at the Hotel Kabuki, presenting each with a confidentiality agreement to sign as the price of admission to Nielsen's show and tell.

Nielsen shared the text messages and other evidence, projecting them on a screen in a presentation that began at 5 p.m. and ran through 7:30 p.m. The beginnings of a small working group fell into place. It had been 26 months since Cole sent an email to Nielsen. Connecticut no longer was working alone.

Digoxin, the drug at the center of the story that originally caught Cole's attention, was not part of the lawsuit. But the investigation, Cole said, is continuing.

© 2025 The Connecticut News Project. All Rights Reserved

Powered by Newspack

# **EXHIBIT 24**

# **FILED UNDER SEAL**

# EXHIBIT 25



# Antitrust

## Lowey Dannenberg: leaders in high–stakes *Antitrust Litigation*

Experts in the prosecution of anticompetitive practices.

Lowey Dannenberg has 50 years of experience representing sophisticated clients in complex securities, antitrust and RICO-based litigation, successfully achieving billions of dollars in recovery on behalf of consumers and investors. As one of the premier antitrust law practices in the United States, Lowey serves clients impacted by anticompetitive conduct and forced to pay higher prices in a wide range of markets, from consumer products to financial derivatives, as a result of conspiracies, boycotts, exclusive dealing arrangements, and other misconduct. Our experienced antitrust class action lawyers can help you chart the best course through antitrust litigation to fight activities that restrain price competition.

Our antitrust class action lawyers have represented individuals and institutions victimized by anti-competitive practices, helping to bring monopolists and those involved in unlawful price-fixing conspiracies to justice. With landmark outcomes in cases involving collusion, pay-for-delay tactics, price-fixing, and more, we can help you to evaluate potential antitrust claims if you believe you may have been impacted by conduct that violates the antitrust laws.

# Representative Cases

## Ongoing Prosecution of Leading Antitrust Cases

**Euribor.** Lowey Dannenberg is leading the prosecution against the global financial institutions responsible for the setting of the Euro Interbank Offered Rate ("Euribor"), a global reference rate used to benchmark, price and settle over $200 trillion of financial products, including Euribor futures contracts traded on the NYSE LIFFE exchange. Defendants settled with global regulators, paid billions in fines, and were granted ACPERA conditional leniency from the DOJ for alleged anti-competitive conduct in the Euribor market. To date, Lowey Dannenberg has secured settlement agreements from three of the defendants — Barclays, Deutsche Bank, and HSBC —totaling $309 million. The Court preliminarily approved all three settlements. The case is currently pending before Judge P. Kevin Castel and the litigation is ongoing.

*Sullivan v. Barclays PLC et al.,* Case No. 13-cv-2811 (S.D.N.Y.)

**London Silver Fixing.** Lowey Dannenberg was appointed co-lead counsel in a class action, alleging that a group of 8 major financial institutions colluded to fix the outcome of the London Silver Fix, a global benchmark that impacts the value of more than $30 billion in silver and silver financial instruments. The case alleges violations of the CEA and antitrust laws in a conspiracy to fix prices in the over-the-counter silver and silver futures market. To date, Lowey's antitrust lawyers have secured a $38 million settlement from defendant Deutsche Bank and valuable cooperation material that it is using in the ongoing prosecution of the case against the remaining defendants.

*In re London Silver Fixing Ltd. Antitrust Litigation,* Case No. 14-md-2573 (VEC) (S.D.N.Y.)

**Swiss Franc LIBOR.** Lowey Dannenberg is the court-appointed sole lead counsel in a class action against numerous global financial institutions responsible for setting the London Interbank Offered Rate for the Swiss Franc (Swiss Franc LIBOR). Defendants settled with global regulators, paid billions in fines and were granted leniency by the European Commission for alleged anti-competitive conduct in the Swiss Franc LIBOR and Swiss Franc LIBOR derivatives market. To date, Lowey has secured a $22 million settlement from one defendant, JP Morgan, which Judge Sidney Stein preliminarily approved. Litigation against the remaining Defendants is still ongoing.

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG et al.,* Case No. 15-cv-0871 (S.D.N.Y.)

**SIBOR/SOR.** Lowey Dannenberg filed a proposed class action in July 2015 alleging that the 20 global financial institutions responsible for setting the Singapore Interbank Offered Rate ("SIBOR") and the Singapore Swap Offer Rate ("SOR") manipulated these benchmark rates to benefit their own derivatives positions at the expense of U.S. investors. The Monetary Authority of Singapore investigated, finding manipulation by these financial institutions in SIBOR and SOR, imposing fines and other remedial measures. In August 2017, Judge Alvin K. Hellerstein sustained plaintiffs' Sherman Act claims against defendants Bank of America, Citibank, JPMorgan Chase Bank.

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A., et al.,* 16-cv-5263 (S.D.N.Y.)

**Generic Pharmaceuticals Price Fixing.** Lowey Dannenberg represents 34 of the nation's largest health insurers, including Anthem, Aetna, Humana, and 25 BlueCross BlueShield licensees in connection with their claims relating to widespread price-fixing of generic pharmaceutical products. Some of this litigation has been centralized before the Honorable Cynthia M. Rufe in In re

Generic Pharmaceuticals Pricing Antitrust Litig., MDL No. 2724 (E.D. Pa.). Lowey Dannenberg's clients collectively purchased billions of dollars of these drugs during the alleged price-fixing conspiracies

The case is pending before The Honorable Cynthia M. Rufe and the litigation is ongoing.

# Landmark
## *Outcomes*

*"The Lowey[] complaint reveals a particularly outstanding effort due to the thorough and contemporaneous nature of the allegations...[and] feature[s] attorneys with laudable expertise in handling class actions in general and CEA and antitrust law in particular."*

~ HON. VALERIE E. CAPRONI, UNITED STATES DISTRICT JUDGE, S.D. NEW YORK

Lowey Dannenberg is the court-appointed co-lead counsel in a class action alleging that several major financial institutions colluded to fix the outcome of the London Silver Fix, a global benchmark that impacts the value of more than $30 billion in silver and silver financial instruments. To date, Lowey has secured $38 million in settlement. The case is pending before the Hon. Judge Valerie E. Caproni.

*In re London Silver Fixing Ltd. Antitrust Litigation*, Case No. 14-md-2573 (VEC) (S.D.N.Y.)

*"The Lowey[] complaint reveals a particularly outstanding effort due to the thorough and contemporaneous nature of the allegations...[and] feature[s] attorneys with laudable expertise in handling class actions in general and CEA and antitrust law in particular."*

~ HON. VALERIE E. CAPRONI, UNITED STATES DISTRICT JUDGE, SOUTHERN DISTRICT OF NEW YORK

# Landmark *Outcome*

Lowey Dannenberg is the court-appointed co-lead counsel in a class action alleging that several major financial institutions colluded to fix the outcome of the London Silver Fix, a global benchmark that impacts the value of more than $30 billion in silver and silver financial instruments. To date, Lowey has secured $38 million in settlement. The case is pending before the Hon. Judge Valerie E. Caproni.

*In re London Silver Fixing Ltd. Antitrust Litigation, Case No. 14-md-2573 (VEC) (S.D.N.Y.)*

# Additional Notable Achievements

**Cardizem.** In 1998, Lowey Dannenberg filed the first-ever pay-for-delay class action on behalf of consumers and third party payers against Aventis S.A. and Andrx Corp., alleging the brand pharmaceutical company engaged in anti-competitive agreements regarding the blood pressure drug Cardizem CD to prevent more affordable generic equivalents from entering the market. Lowey served as lead counsel and argued before the United States Court of Appeals for the Sixth Circuit in a landmark decision that unanimously affirmed a summary judgment of *per se* liability against defendants. Lowey successfully negotiated an $80 million class settlement.

*In re Cardizem CD Antitrust Litigation, MDL No. 1278 (E.D. Mich.)*

**Wellbutrin.** Lowey Dannenberg served as class counsel in a generic pay-for-delay case against GlaxoSmithKline and Valeant (f/k/a Biovail), alleging they formed an anti-competitive agreement to prevent the market entry of a cheaper, generic version of the blockbuster antidepressant drug, Wellbutrin XL. Lowey achieved a $11.75 settlement with Valeant.

*In re Wellbutrin XL Antitrust Litig., Case No. 08 Civ. 2433 (E.D. Pa.)*

**Litton Loan Servicing**. Lowey Dannenberg served as class counsel and recovered $4.1 million on behalf of a class of homeowners who alleged that several mortgage servicers colluded to force them to buy unnecessary lender-placed insurance on their property.

*Lyons v. Litton Loan Servicing LP, et al., No. 13-cv-00513 (S.D.N.Y.)*

# Have a Case You Think We Can Help With?

Contact Our Office Now



More than 50 years of landmark results.

## Practices

Commodities

Antitrust

Health Care

Securities

Whistleblower

Commercial

## Firm

About

Team

News

Security Manual

Our Team

## Contact Us

**Office:** (914) 997-0500

**Company:** info@lowey.com

New York

Pennsylvania

Copyright © Lowey Dannenberg, P.C. 2022 | Privacy Policy | Disclaimer

# EXHIBIT 26



 **Lowey Dannenberg, P.C.**
July 8 · 🌐

Lowey Dannenberg P.C. is thrilled to welcome our newest partner, Joseph Nielsen. For the past 19 years, he has been an Assistant Attorney General for the Antitrust Department of the state of Connecticut.

Joe brings over 27 years of experience in handling complex antitrust matters in the technology and pharmaceutical industries and now will provide leadership and expertise to Lowey.

He will join Lowey's Healthcare Litigation Team in the New York Office in White Plains.

L... **See more**

▪ Like                    ▪ Comment

## Log in or sign up for Facebook to connect with friends, famil...

Log In          or          Create new account

# EXHIBIT 27

# FILED UNDER SEAL

# **EXHIBIT 28**

# **FILED UNDER SEAL**

# EXHIBIT 29



North Dakota Law Review

Volume 27 | Number 2                                                                    Article 14

1951

# Canons of Professional Ethics of the American Bar Association

American Bar Association

How does access to this work benefit you? Let us know!

Follow this and additional works at: https://commons.und.edu/ndlr

 Part of the Law Commons

### Recommended Citation

American Bar Association (1951) "Canons of Professional Ethics of the American Bar Association," *North Dakota Law Review*: Vol. 27: No. 2, Article 14.
Available at: https://commons.und.edu/ndlr/vol27/iss2/14

This Note is brought to you for free and open access by the School of Law at UND Scholarly Commons. It has been accepted for inclusion in North Dakota Law Review by an authorized editor of UND Scholarly Commons. For more information, please contact und.commons@library.und.edu.

# Canons of Professional Ethics of the American Bar Association[*]

## Preamble

In America, where the stability of Courts and of all departments of government rests upon the approval of the people, it is peculiarly essential that the system for establishing and dispensing Justice be developed to a high point of efficiency and so maintained that the public shall have absolute confidence in the integrity and impartiality of its administration. The future of the Republic, to a great extent, depends upon our maintenance of Justice pure and unsullied. It cannot be so maintained unless the conduct and the motives of all members of our profession are such as to merit the approval of all just men.

No code or set of rules can be framed, which will particularize all the duties of the lawyer in the varying phases of litigation or in all the relations of professional life. The following canons of ethics are adopted by the American Bar Association as a general guide, yet the enumeration of particular duties should not be construed as denial of the existence of others equally imperative, though not specifically mentioned.

## 1. The Duty of the Lawyer to the Courts

It is the duty of the lawyer to maintain towards the courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office but for the maintainence of its supreme importance. Judges, not being wholly free to defend themselves, are peculiarly entitled to receive the support of the Bar against unjust criticism and clamor. Whenever there is proper ground for serious complaint of a judicial officer, it is the right and duty of the lawyer to submit his grievances to the proper authorities. In such cases, but not otherwise, such charges should be encouraged and the person making them should be protected.

---

[*] These Canons of Ethics, which have been adopted in toto by the North Dakota State Bar Association, are printed herein in response to numerous requests by members of the Bar.

## 2. The Selection of Judges

It is the duty of the Bar to endeavor to prevent political considerations from outweighing judicial fitness in the selection of Judges. It should protest earnestly and actively against the appointment or election of those who are unsuitable for the Bench; and it should strive to have elevated thereto only those willing to forego other employments, whether of a business, political or other character, which may embarrass their free and fair consideration of questions before them for decision. The aspiration of lawyers for judicial position should be governed by an impartial estimate of their ability to add honor to the office and not by a desire for the distinction the position may bring to themselves.

## 3. Attempts to Exert Personal Influence on the Court

Marked attention and unusual hospitality on the part of a lawyer to a Judge, uncalled for by the personal relations of the parties, subject both the Judge and the lawyer to misconstructions of motive and should be avoided. A lawyer should not communicate or argue privately with the Judge as to the merits of a pending cause, and he deserves rebuke and denunciation for any device or attempt to gain from a Judge special personal consideration or favor. A self-respecting independence in the discharge of professional duty, without denial or diminution of the courtesy and respect due the Judge's station, is the only proper foundation for cordial personal and official relations between Bench and Bar.

## 4. When Counsel for an Indigent Prisoner

A lawyer assigned as counsel for an indigent prisoner ought not to ask to be excused for any trivial reason, and should always exert his best efforts in his behalf.

## 5. The Defense or Prosecution of Those Accused of Crime

It is the right of the lawyer to undertake the defense of a person accused of crime, regardless of his personal opinion as to the guilt of the accused; otherwise innocent persons, victims only of suspicious circumstances, might be denied proper de-

fense. Having undertaken such defense, the lawyer is bound by all fair and honorable means, to present every defense that the law of the land permits, to the end that no person may be deprived of life or liberty, but by due process of law.

The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible.

### 6. Adverse Influences and Conflicting Interests

It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.

It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed.

### 7. Professional Colleagues and Conflicts of Opinion

A client's proffer of assistance of additional counsel should not be regarded as evidence of want of confidence, but the matter should be left to the determination of the client. A lawyer should decline association as colleague if it is objectionable to the original counsel, but if the lawyer first retained is relieved, another may come into the case.

When lawyers jointly associated in a cause cannot agree as to any matter vital to the interest of the client, the conflict of opinion should be frankly stated to him for his final determination. His decision should be accepted unless the nature of the

difference makes it impracticable for the lawyer whose judgment has been overruled to cooperate effectively. In this event it is his duty to ask the client to relieve him.

Efforts, direct or indirect, in any way to encroach upon the professional employment of another lawyer, are unworthy of those who should be brethren at the Bar; but, nevertheless, it is the right of any lawyer, without fear or favor, to give proper advice to those seeking relief against unfaithful or neglectful counsel, generally after communication with the lawyer of whom the complaint is made.

### 8.  Advising Upon the Merits of a Client's Cause

A lawyer should endeavor to obtain full knowledge of his client's cause before advising thereon, and he is bound to give a candid opinion of the merits and probable result of pending or contemplated litigation. The miscarriages to which justice is subject, by reason of surprises and disappointments in evidence and witnesses, and through mistakes of juries and errors of Courts, even though only occasional, admonish lawyers to beware of bold and confident assurances to clients, especially where the employment may depend upon such assurance. Whenever the controversy will admit of fair adjustment, the client should be advised to avoid or to end the litigation.

### 9.  Negotiations With Opposite Party

A lawyer should not in any way communicate upon the subject of controversy with a party represented by counsel; much less should he undertake to negotiate or compromise the matter with him, but should deal only with his counsel. It is incumbent upon the lawyer most particularly to avoid everything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him as to the law.

### 10.  Acquiring Interest in Litigation

The lawyer should not purchase any interest in the subject-matter of the litigation which he is conducting.

### 11. Dealing With Trust Property

The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client.

Money of the client or collected for the client, or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him.

### 12. Fixing the Amount of the Fee

In fixing fees, lawyers should avoid charges which overestimate their advice and services, as well as those which undervalue them. A client's ability to pay cannot justify a charge in excess of the value of the service, though his poverty may require a less charge, or even none at all. The reasonable requests of brother lawyers, and of their widows and orphans without ample means, should receive special and kindly consideration.

In determining the amount of the fee, it is proper to consider: (1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the cause; (2) whether the acceptance of employment in the particular case will preclude the lawyer's appearance for others in cases likely to arise out of the transaction, and in which there is a reasonable expectation that otherwise he would be employed, or will involve the loss of other employment while employed in the particular case or antagonisms with other clients; (3) the customary charges of the Bar for similar services; (4) the amount involved in the controversy and the benefits resulting to the client from the services; (5) the contingency or the certainty of the compensation; and (6) the character of the employment, whether casual or for an established and constant client. No one of these considerations in itself is controlling. They are guides in ascertaining the real value of the service.

In determining the customary charges of the Bar for similar services, it is proper for a lawyer to consider a schedule of

minimum fees adopted by a Bar Association, but no lawyer should permit himself to be controlled thereby or follow it as his sole guide in determining the amount of his fee.

In fixing fees it should never be forgotten that the profession is a branch of the administration of justice and not a mere money-getting trade.

### 13. CONTINGENT FEES

A contract for a contingent fee, where sanctioned by law, should be reasonable under all the circumstances of the case, including the risk and uncertainty of the compensation, but should always be subject to the supervision of a Court as to its reasonableness.

### 14. SUING A CLIENT FOR A FEE

Controversies with clients concerning compensation are to be avoided by the lawyer so far as shall be compatible with his self-respect and with his right to receive reasonable recompense for his services; and lawsuits with clients should be resorted to only to prevent injustice, imposition or fraud.

### 15. HOW FAR A LAWYER MAY GO IN SUPPORTING A CLIENT'S CAUSE

Nothing operates more certainly to create or to foster popular prejudice against lawyers as a class, and to deprive the profession of that full measure of public esteem and confidence which belongs to the proper discharge of its duties than does the false claim, often set up by the unscrupulous in defense of questionable transactions, that it is the duty of the lawyer to do whatever may enable him to succeed in winning his client's cause.

It is improper for a lawyer to assert in argument his personal belief in his client's innocence or in the justice of his cause.

The lawyer owes "entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learning and ability," to the end that nothing be taken or be witheld from him, save by the rules of law, legally applied. No fear of judicial disfavor

or public unpopularity should restrain him from the full discharge of his duty. In the judicial forum the client is entitled to the benefit of any and every remedy and defense that is authorized by the law of the land, and he may expect his lawyer to assert every such remedy or defense. But it is steadfastly to be borne in mind that the great trust of the lawyer is to be performed within and not without the bounds of the law. The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane. He must obey his own conscience and not that of his client.

## 16. Restraining Clients From Improprieties

A lawyer should use his best efforts to restrain and to prevent his clients from doing those things which the lawyer himself ought to do, particulalry with reference to their conduct towards Courts, judicial officers, jurors, witnesses and suitors. If a client persists in such wrongdoing the lawyer should terminate their relation.

## 17. Ill Feeling and Personalities Between Advocates

Clients, not lawyers, are the litigants. Whatever may be the ill feeling existing between clients, it should not be allowed to influence counsel in their conduct and demeanor toward each other or toward suitors in the case. All personalities between counsel should be scrupulously avoided. In the trial of a cause it is indecent to allude to the personal history or the personal peculiarities and idiosyncrasies of counsel on the other side. Personal colloquies between counsel which cause delay and promote unseemly wrangling should also be carefully avoided.

## 18. Treatment of Witnesses and Litigants

A lawyer should always treat adverse witnesses and suitors with fairness and due consideration, and he should never minister to the malevolence or prejudices of a client in the trial or conduct of a case. The client cannot be made the keeper of the lawyer's conscience in professional matters. He has no right to demand that his counsel shall abuse the opposite par-

ty or indulge in offensive personalities. Improper speech is not excusable on the ground that it is what the client would say if speaking in his own behalf.

### 19.  Appearance of Lawyer as Witness for His Client

When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client.

### 20.  Newspaper Discussion of Pending Litigation

Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally they are to be condemned. If the extreme circumstances of a particular case justify a statement to the public, it is unprofessional to make it anonymously. An ex parte reference to the facts should not go beyond quotation from the records and papers on file in the court; but even in extreme cases it is better to avoid any ex parte statement.

### 21.  Punctuality and Expedition

It is the duty of the lawyer not only to his client, but also to the Courts and to the public, to be punctual in attendance, and to be concise and direct in the trial and disposition of causes.

### 22.  Candor and Fairness

The conduct of the lawyer before the Court and with other lawyers should be characterized by candor and fairness.

It is not candid or fair for the lawyer knowingly to misquote the contents of a paper, the testimony of a witness, the language or the argument of opposing counsel, or the language of a decision or a text-book; or with knowledge of its invalidity, to cite as authority a decision that has been overruled, or a statute that has been repealed; or in argument to assert as a fact that which has not been proved, or in those jurisdictions where a side has the opening and closing arguments to

mislead his opponent by concealing or witholding positions in his opening argument upon which his side then intends to rely.

It is unprofessional and dishonorable to deal other than candidly with the facts in taking the statements of witnesses, in drawing affidavits and other documents, and in the presentation of causes.

A lawyer should not offer evidence, which he knows the Court should reject, in order to get the same before the jury by argument for its admissibility, nor should he address to the Judge arguments upon any point not properly calling for determination by him. Neither should he introduce into an argument, addressed to the court, remarks or statements intended to influence the jury or bystanders.

These and all kindred practices are unprofessional and unworthy of an officer of the law charged, as is the lawyer, with the duty of aiding in the administration of justice.

### 23. Attitude Toward Jury

All attempts to curry favor with juries by fawning, flattery, or pretended solicitude for their personal comfort are unprofessional. Suggestions of counsel, looking to the comfort or convenience of jurors, and propositions to dispense with argument, should be made to the Court out of the jury's hearing. A lawyer must never converse privately with jurors about the case; and both before and during the trial he should avoid communicating with them, even as to matters foreign to the cause.

### 24. Right of Lawyer to Control the Incidents of the Trial

As to incidental matters pending the trial, not affecting the merits of the cause, or working substantial prejudice to the rights of the client, such as forcing the opposite lawyer to trial when he is under affliction or bereavement; forcing the trial on a particular day to the injury of the opposite lawyer when no harm will result from a trial at a different time; agreeing to an extension of time for signing a bill of exceptions, cross-interrogation and the like, the lawyer must be allowed to judge. In such matters no client has a right to demand that his counsel shall be illiberal, or that he do anything therein repugnant to his own sense of honor and propriety.

### 25.  TAKING TECHNICAL ADVANTAGE OF OPPOSITE COUNSEL—AGREEMENTS WITH HIM

A lawyer should not ignore known customs or practice of the Bar or of a particular Court, even when the law permits, without giving timely notice to the opposing counsel. As far as possible, important agreements, affecting the rights of clients, should be reduced to writing; but it is dishonorable to avoid performance of an agreement fairly made because it is not reduced to writing, as required by rules of Court.

### 26.  PROFESSIONAL ADVOCACY OTHER THAN BEFORE COURTS

A lawyer openly and in his true character may render professional services before legislative or other bodies, regarding proposed legislation and in advocacy of claims, before departments of government, upon the same principles of ethics which justify his appearance before the Courts; but it is unprofessional for a lawyer so engaged to conceal his attorneyship, or to employ secret personal solicitations, or to use means other than those addressed to the reason and understanding to influence action.

### 27.  ADVERTISING, DIRECT OR INDIRECT

It is unprofessional to solicit professional employment by circulars, advertisements, through touters, or by personal communications or interviews not warranted by personal relations. Indirect advertisements for professional employment, such as furnishing or inspiring newspaper comments, or procuring his photograph to be published in connection with causes in which the lawyer has been or is engaged or concerning the manner of their conduct, the magnitude of the interest involved, the importance of the lawyer's position, and all other life-self-laudation, offend the traditions and lower the of our profession and are reprehensible; but the customary use of simple professional cards is not improper.

Publication in reputable law lists in a manner consistent with the standards of conduct imposed by these canons of brief biographical and informative data is permissible. Such data must not be misleading and may include only a state-

ment of the lawyer's name and the names of his professional associates; addresses, telephone numbers, cable addresses; branches of the profession practiced; date and place of birth and admission to the Bar; schools attended, with dates of graduation, degrees and other educational distinctions; public or quasi-public offices; posts of honor; legal authorships; legal teaching positions; memberships and offices in bar associations and committees thereof, in legal and scientific societies and legal fraternities; the fact of listings in other reputable law lists; *the names and addresses of references;* and, with their written consent, the names of clients regularly represented. A certificate of compliance with the Rules and Standards issued by the Special Committee on Law Lists may be treated as evidence that such list is reputable.

### 28. STIRRING UP LITIGATION, DIRECTLY OR THROUGH AGENTS

. It is unprofessional for a lawyer to volunteer advice to bring a lawsuit, except in rare cases where ties of blood, relationship or trust make it his duty to do so. Stirring up strife and litigation is not only unprofessional, but it is indictable at common law. It is disreputable to hunt up defects in titles or other causes of action and inform thereof in order to be employed to bring suit or collect judgment, or to breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office, or to remunerate policemen, court or prison officials, physicians, hospital attaches or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick and the injured, the ignorant or others, to seek his professional services. A duty to the public and to the profession devolves upon every member of the Bar, having knowledge of such practices upon the part of any practitioner, immediately to inform thereof to the end that the offender may be disbarred.

### 29. UPHOLDING THE HONOR OF THE PROFESSION

Lawyers should expose without fear or favor before the proper tribunals corrupt or dishonest conduct in the profession,

and should accept without hesitation employment against a member of the Bar who has wronged his client. The counsel upon the trial of a cause in which perjury has been committed owe it to the profession and to the public to bring the matter to the knowledge of the prosecuting authorities. The lawyer should aid in guarding the Bar against the admission to the profession of candidates unfit or unqualified because deficient in either moral character or education. He should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice.

### 30. Justifiable and Unjustifiable Litigations

The lawyer must decline to conduct a civil cause or to make a defense when convinced that it is intended merely to harass or to injure the opposite party or to work oppression or wrong. But otherwise it is his right, and, having accepted retainer, it becomes his duty to insist upon the judgment ot the Court as to the legal merits of his client's claim. His appearance in Court should be deemed equivalent to an assertion on his honor that in his opinion his client's case is one proper for judicial determination.

### 31. Responsibility for Litigation

No lawyer is obliged to act either as adviser or advocate for every person who may wish to become his client. He has the right to decline employment. Every lawyer upon his own responsibility must decide what employment he will accept as counsel, what causes he will bring into Court for plaintiffs, what cases he will contest in Court for defendants. The responsibility for advising questionable transactions, for bringing questionable suits, for urging questionable defenses, is the lawyer's responsibility. He cannot escape it by urging as an excuse that he is only following his client's instructions.

### 32. The Lawyer's Duty in Its Last Analysis

No client, corporate or individual, however powerful, nor any cause, civil or political, however important, is entitled to receive, nor should any lawyer render, any service or advice involving disloyalty to the law whose ministers we are, or dis-

respect of the judicial office, which we are bound to uphold, or corruption of any person or persons exercising a public office or private trust, or deception or betrayal of the public. When rendering any such improper service or advice, the lawyer invites and merits stern and just condemnation. Correspondingly, he advances the honor of his profession and the best interests of his client when he renders service or gives advice tending to impress upon the client and his undertaking exact compliance with the strictest principles of moral law. He must also observe and advise his client to observe the statute law, though until a statute shall have been construed and interpreted by competent adjudication, he is free and is entitled to advise as to its validity and as to what he conscientiously believes to be its just meaning and extent. But above all a lawyer will find his highest honor in a deserved reputation for fidelity to private trust and to public duty, as an honest man and as a patriotic and loyal citizen.

### 33.  PARTNERSHIPS—NAMES

Partnerships among lawyers for the practice of their profession are very common and are not to be condemned. In the formation of partnerships and the use of partnership names, care should be taken not to violate any law, custom or rule of court locally applicable. Where partnerships are formed between lawyers who are not all admitted to practice in the courts of the state, care should be taken to avoid any misleading name or representation which would create a false impression as to the professional position or privileges of the member not locally admitted. In the formation of partnerships for the practice of law, no person should be admitted or held out as a practitioner or member who is not a member of the legal profession, duly authorized to practice, and amenable to professional discipline. In the selection and use of a firm name, no false, misleading, assumed or trade name should be used. The continued use of the name of a deceased or former partner when permissible by local custom, is not unethical, but care should be taken that no imposition or deception is practiced through this use. When a member of the firm, on becoming a judge, is precluded from practicing law, his name should not be continued in the firm name.

Partnerships between lawyers and members of other professions or nonprofessional persons should not be formed or permitted where any part of the partnership's employment consists of the practice of law.

## 34. DIVISION OF FEES

No division of fees for legal services is proper, except with another lawyer, based upon a division of service or responsibility.

## 35. INTERMEDIARIES

The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties by or in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigent are not deemed such intermediaries.

A lawyer may accept employment from any organization, such as an association, club or trade organization, to render legal services in any matter in which the organization, as an entity, is interested, but this employment should not include the rendering of legal services to the members of such an organization in respect to their individual affairs.

## 36. RETIREMENT FROM JUDICIAL POSITION OR PUBLIC EMPLOYMENT

A lawyer should not accept employment as an advocate in any matter upon the merits of which he has previously acted in a judicial capacity.

A lawyer, having once held public office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ.

## 37. CONFIDENCES OF A CLIENT

It is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyer's employment, and extends as

well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client.

If a lawyer is accused by his client, he is not precluded from disclosing the truth in respect to the accusation. The announced intention of a client to commit a crime is not included within the confidences which he is bound to respect. He may properly make such disclosures as may be necessary to prevent the act or protect those against whom it is threatened.

### 38. COMPENSATION, COMMISSIONS, AND REBATES

A lawyer should accept no compensation, commissions, rebates, or other advantages from others without the knowledge and consent of his client after full disclosure.

### 39. WITNESSES

A lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal action without the consent of opposing counsel or party. In doing so, however, he should scrupulously avoid any suggestion calculated to induce the witness to suppress or deviate from the truth, or in any degree to affect his free and untrammeled conduct when appearing at the trial or on the witness stand.

### 40. NEWSPAPERS

A lawyer may with propriety write articles for publications in which he gives information upon the law; but he should not accept employment from such publications to advise inquirers in respect to their individual rights.

### 41. DISCOVERY OF IMPOSITION AND DECEPTION

When a lawyer discovers that some fraud or deception has been practiced, which has unjustly imposed upon the Court

or a party, he should endeavor to rectify it; at first by advising his client, and if his client refuses to forego the advantage thus unjustly gained, he should promptly inform the injured person or his counsel, so that they may take appropriate steps.

### 42. Expenses

A lawyer may not properly agree with a client that the lawyer shall pay or bear the expenses of litigation; he may in good faith advance expenses as matter of convenience, but subject to reimbursement.

### 43. Approved Law Lists

It is improper for a lawyer to permit his name to be published in a law list the conduct, management or contents of which are calculated or likely to deceive or injure the public or the profession, or to lower the dignity or standing of the profession.

### 44. Withdrawal from Employment as Attorney or Counsel

The right of an attorney or counsel to withdraw from employment, once assumed, arises only from good cause. Even the desire or consent of the client is not always sufficient. The lawyer should not throw up the unfinished task to the detriment of his client, except for reasons of honor or self-respect. If the client insists upon an unjust or immoral course in the conduct of his case, or if he persists over the attorney's remonstrance in presenting frivolous defenses, or if he deliberately disregards an agreement or obligation as to fees or expenses, the lawyer may be warranted in withdrawing on due notice to the client, allowing him time to employ another lawyer. So also when a lawyer discovers that his client has no case and the client is determined to continue it; or even if the lawyer finds himself incapable of conducting the case effectively. Sundry other instances may arise in which withdrawal is to be justified. Upon withdrawal from a case after a retainer has been paid, the attorney should refund such part of the retainer as has not been clearly earned.

### 45. Specialists

The canons of the American Bar Association apply to all branches of the legal profession; specialists in particular branches are not to be considered as exempt from the application of these principles.

### 46. Notice of Specialized Legal Service

Where a lawyer is engaged in rendering a specialized legal service directly and only to other lawyers, a brief, dignified notice of that fact, couched in language indicating that it is addressed to lawyers, inserted in legal periodicals and like publications, when it will afford convenient and beneficial information to lawyers desiring to obtain such service, is not improper.

### 47. Aiding the Unauthorized Practice of Law

No lawyer shall permit his professional services, or his name, to be used in aid of, or to make possible, the unauthorized practice of law by any lay agency, personal or corporate.

### Oath of Admission

The general principles which should ever control the lawyer in the practice of his profession are clearly set forth in the following Oath of Admission to the Bar, formulated upon that in use in the State of Washington, and which conforms in its main outlines to the "duties" of lawyers as defined by statutory enactments in that and many other States of the Union—duties which they are sworn on admission to obey and for the wilful violation of which disbarment is provided.

I DO SOLEMNLY SWEAR:

I will support the Constitution of the United States, and the Constitution of the State of North Dakota.*

I will maintain the respect due to Courts of Justice and judicial officers;

I will not counsel or maintain any suit or proceeding which shall appear to me to be unjust, nor any defense except such

---

* As adapted to North Dakota.

as I believe to be honestly debatable under the law of the land;

I will employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the Judge or jury by any artifice or false statement of fact or law;

I will maintain the confidence and preserve inviolate the secrets of my client, and will accept no compensation in connection with his business except from him or with his knowledge and approval;

I will abstain from all offensive personality, and advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged;

I will never reject, from any consideration personal to myself, the cause of the defenseless or oppressed, or delay any man's cause for lucre or malice. SO HELP ME GOD.

# **EXHIBIT 30**

# **FILED UNDER SEAL**

# EXHIBIT 31

# FILED UNDER SEAL