**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| IN RE GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION<br><br>This document relates to:<br><br>*Molina Healthcare Inc. v. Actavis Elizabeth LLC, et al.*, 20-CV-00695<br><br>*Humana Inc. v. Actavis Elizabeth LLC, et al.*, 18-CV-03299<br><br>*Humana Inc. v. Actavis Elizabeth LLC, et al.*, 19-CV-04862<br><br>*Humana Inc. v. Actavis Elizabeth LLC, et al.*, 20-CV-06303 | MDL 2724<br><br>16-MD-2724<br><br>Hon. Cynthia M. Rufe |
|---|---|

**PLAINTIFFS HUMANA INC. AND MOLINA HEALTHCARE INC.'S MEMORANDUM OF LAW IN OPPOSITION TO CERTAIN DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL AND LAW FIRM**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................ 1

II. FACTS ........................................................................................ 4

A. All plaintiffs in this MDL and in Connecticut have access to the same set of information.4

B. Lowey Dannenberg's History of Representing Humana & Representation In This Matter. 10

III. ARGUMENT ........................................................................................11

A. Legal Standards ........................................................................................11

B. Mr. Nielsen has not violated Rule 1.11(a) of the Pennsylvania Rules of Professional Conduct because Connecticut has given its informed consent, confirmed in writing, to his representation of Humana and Molina. ........................................................................................ 13

C. Mr. Nielsen has no "confidential governmental information" that "could be used" to the "material disadvantage of" defendants under Rule 1.11(c) of the Pennsylvania Rules of Professional Conduct. ........................................................................................ 14

1. Defendants fail to explain why Mr. Nielsen's negotiation of settlement agreements with "numerous parties" means he has access to "confidential government information" .......... 20

2. Lowey's MDL Clients have the exact same "information from interviewing, and obtaining proffers and evidence from, and signing agreements with, cooperating witnesses" as Mr. Nielsen had while employed at the Connecticut AG's office. .................................. 21

3. Defendants have not demonstrated that Mr. Nielsen's privileged "communication with other state and federal enforcers" yielded any information solely available to the government or "confidential government information." .................................................... 22

4. Documents produced in response to civil investigatory subpoenas – even those subject to the claw back procedure outlined in PTO 70 – are not "confidential government information." ........................................................................................ 23

5. Defendants have not shown that Mr. Nielsen's "strategic insights" and "roadmaps" of evidence are "confidential government information" given that Lowey's MDL Clients have been working with Mr. Nielsen for more than five years to develop these same insights and roadmaps based on information in the MDL discovery record. .......................................... 24

6. Mr. St. Phillip did not admit that Mr. Nielsen has "confidential government information" under Rule 1.11(c). ........................................................................................ 25

D. Even if there were a violation of 1.11(c), the Third Circuit's *Boy Scouts* factors all favor denial of the request for disqualification ........................................................................ 26

1. Humana and Molina's ability to retain loyal counsel of their choice is prominent under the circumstances. ........................................................................................ 27

2. Mr. Nielsen's ability to practice without undue restriction would be harmed by disqualification. 28

3. Because Defendants lack actual facts to make their arguments, their disqualification motion appears to be a litigation strategy to sideline their most immediate opponents as this first bellwether case heads toward trial. 28

4. Because Mr. Nielsen wields no "confidential government information," denying disqualification will *preserve* the integrity of these legal proceedings, as it eliminates the risk that the public will perceive the unfairness of a meritless disqualification motion sidelining him. 29

5. Denying disqualification will prevent unfair prejudice to Lowey's MDL Clients. 30

IV. CONCLUSION 30

## TABLE OF AUTHORITIES

### Cases

*Anne Arundel Cnty., Maryland v. Express Scripts, Inc.*,
Civ. No. MJM-24-90, 2025 WL 254807 (D. Md. Jan. 21, 2025) .......... 15

*Carlyle Towers Condominium Assoc. v. Crossland Savings*, *FSB,*
944 F. Supp. 341 (D.N.J. 1996) .......... 30

*Cohen v. Oasin*,
844 F. Supp. 1065 (E.D. Pa. 1994) .......... 12

*Desiano v. Warner-Lambert Co.*,
326 F.3d 339 (2d Cir. 2003) .......... 10

*F.T.C. v. Actavis*,
570 U.S. (2013) .......... 10

*In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*,
685 F.3d 353 (3d Cir. 2012) .......... 10

*In re Boy Scouts of Am.*,
35 F.4th 149 (3d Cir. 2022) .......... 11, 26, 27, 29

*In re Cardizem CD Antitrust Litig.*,
332 F.3d 896 (6th Cir. 2003) .......... 10

*In re Nat'l Prescription Opiate Litig.*, Case,
No. 1:17-md-2804, 2019 WL 1274555 (N.D. Ohio Mar. 20, 2019) .......... 15

*In re Nat'l Prescription Opiate Litig* 2804,
No. 1:17-md-2804, 2024 WL 3387288 (N.D. Ohio Mar. 18, 2024) .......... 15, 16, 17

*In re: Generic Pharm. Pricing Antitrust Litig.*,
MDL No. 2724, 2017 WL 4582710 (J.P.M.L. Aug. 3, 2017) .......... 4, 33

*Jackson v. Rehm & Hoss Co.*,
366 F. App'x 342 (3d Cir. 2010) .......... 11

*Olson v. Sauk Cnty.*,
No. 22-CV-562-WMC, 2024 WL 3273357 (W.D. Wis. July 2, 2024, at *6) .......... 21

*People v. OptumRx Inc.*,
B343828, 2025 WL 2542288 (Cal. Ct. App. Sept. 4, 2025) .......... 18, 20, 24, 25

*Reg'l Employers' Assur. Leagues Voluntary Employees' Beneficiary Ass'n Tr. v. Castellano*,
No. CIV A 03-6903, 2009 WL 1911671 (E.D. Pa. July 1, 2009) .......... 12

*SST Castings, Inc. v. Amana Appliances, Inc.*,
250 F. Supp. 2d 863 (S.D. Ohio 2002) ... 12

*The People of the State of California, Plaintiff-Respondent v. OptumRx, Inc., Defendant-Appellant, et al.*,
No. B343828, 2025 WL 1449577 (Cal Ct. App. May 2, 2025) ... 17

*United States v. Miller,*
624 F.2d 1198 (3d Cir. 1980) ... 11, 26

**Statutes**

Connecticut General Statutes § 35-42 ... 5, 23

**Rules**

Rule 1.11 ... 3

Rule 1.11(a) of the Pennsylvania Rules of Professional Conduct ... 13

Rule 1.11(c) of the Pennsylvania Rules of Professional Conduct ... passim

**Other Authorities**

ABA Formal Opinion 509 ... 14, 15, 16, 20, 22

## I. INTRODUCTION

The MDL Court and all plaintiff groups have taken significant steps over the past seven years to ensure that every plaintiff has access to all available information, thereby preventing any party from having an unfair advantage. In January 2019, the Court entered Pretrial Order ("PTO") 70,[1] requiring the production of all the States' investigatory files—including all issued subpoenas and produced documents in the States' investigation. *See* PEX 4, 5, & 6 to *Declaration of Peter St. Phillip in Opposition to Certain Defendants' Motion to Disqualify Plaintiffs' Counsel and Law Firm ("St. Phillip Decl.*).[2]

The States entered into broad Common Interest Agreements ("CIAs") with all private plaintiff groups' counsel in the MDL (including Lowey) to make sure all plaintiffs were on a level playing field and could coordinate, freely share information and attorney work product, and strategize to efficiently develop their cases.[3] The States arranged for private plaintiffs to obtain their own settlements with the cooperating witnesses ("CWs"), which included access to the attorney proffer information provided by counsel for the CWs to the States. For more than the last six years, lawyers at Lowey Dannenberg, P.C. ("Lowey") have worked side-by-side with Mr. Nielsen and the other state enforcers in strategizing over depositions, briefs, and other preparations of their case, as the Court encouraged them to do. Together, through discovery in this MDL, the private plaintiffs and States have collectively turned the States' 3.5 million investigatory documents into a discovery record of over 71.5 million documents and nearly 400

[1] PTO 70 was subsequently amended by PTO 106 and PTO 143.
[2] Mr. St. Phillip's Declaration attaches Lowey's MDL Clients' exhibits referenced herein. The exhibits are designated *infra* as "PEX" followed by a numeral. For ease of reference, we attach an index of these exhibits to this memorandum of law at "Attachment A."
[3] Exemplars of the CIAs were provided to the Court *in camera* before PTO 70 was entered.

depositions. Lowey continues to coordinate, strategize, and share information with the States even now, and Mr. Nielsen's move to Lowey will not change that.

Under these circumstances, where government investigatory materials have all been turned over in discovery in the MDL, Rule 1.11(c) has no application for multiple reasons. *First*, that rule applies only when there is "confidential government information." Because the States' investigatory files have been obtained by the other parties in this MDL through routine civil discovery, that governmental information is not considered "confidential" under the rule. "Confidential government information" under Rule 1.11(c) is limited to information that only the government can compel or obtain, such as grand jury testimony. Information learned during settlement discussions is not "confidential government information" because it is not compelled. Mental roadmaps or strategic insights based on information available through civil discovery are also not considered confidential government information. *Second*, when documents and information are already available to all other plaintiffs (including in this case Humana and Molina), Defendants cannot establish that the information could be used to their "material disadvantage" as a result of the hiring of a former government enforcer.

Before certain[4] Defendants ("Moving Defendants") filed this motion, Lowey's MDL clients (Humana and Molina, collectively "Lowey's MDL Clients") asked defense counsel to prepare a log detailing the source and times when Mr. Nielsen obtained confidential government information that was not already produced to Lowey's MDL Clients. Lowey's MDL Clients sought to determine if Moving Defendants could identify a specific instance where Mr. Nielsen

---

[4] Of the defendants that have not filed for bankruptcy, Glenmark Pharmaceuticals, Inc., Impax Pharmaceuticals, LLC (f/k/a Impax Pharmaceuticals, Inc.), Lupin Pharmaceuticals, Inc., Upsher-Smith Laboratories, LLC, and West-Ward Pharmaceuticals, Corp. have not joined the motion.

was exposed to any such information, and it gave Moving Defendants a mechanism to do so without requiring them to disclose confidential content. Moving Defendants ignored Lowey's MDL Clients' request. They did so because Mr. Nielsen has no information that Lowey's MDL Clients do not already have and have not already had access to for years in the discovery record (and through CIAs). While Moving Defendants strain to identify something that Mr. Nielsen knows beyond what Lowey's MDL Clients already knew, they fail. The Venn diagram overlying the State AGs' knowledge and Lowey's MDL Clients' knowledge depicts one circle only.

Defendants hired an expert who claims, seemingly without understanding the most important facts and law relevant to this issue, that this is the clearest violation of Rule 1.11 he has ever seen. In response, Lowey and Mr. Nielsen have retained two experts: (1) a renowned academic in the field of ethics—Rebecca Roiphe, Joseph Solomon Distinguished Professor of Law at New York Law School—who conducted an exhaustive examination of the factual record in this case and determined that there is no violation of Rule 1.11 based on these facts and the governing law, and that Mr. Nielsen "acted in an exemplary manner, in accordance with his professional obligations"; and (2) a long-time member of the Disciplinary Board of the Supreme Court of Pennsylvania—Stewart Cohen of Cohen, Placitella & Roth, P.C.—who analyzed the Defendants' Motion and the evidence underlying it and determined that any petition to the Disciplinary Board based on such a lack of evidence and the Rules would be flatly rejected. According to these experts, Moving Defendants had no factual basis to bring this motion. The assumptions contained in their brief are no substitute for facts, and do not meet their heavy burden and high standard of proof.

Moving Defendants' unsupported argument that Mr. Nielsen did not obtain the informed consent of the Connecticut Attorney General's Office also fails. There is no evidence whatsoever

to support that claim, and it is not Mr. Nielsen's burden to produce such evidence to defeat this Motion. Even so, Mr. Nielsen's Declaration confirms that he obtained the informed consent of the Connecticut Attorney General's Office and attaches written proof of that confirmation.

Moving Defendants here (Lowey's MDL Clients' adversaries) should not be permitted to erase the deep knowledge that Lowey, Mr. Nielsen, and other plaintiffs' counsel secured together in building all plaintiffs'—including Lowey's MDL Clients'—cases over the past six-plus years. To do so would give the Moving Defendants an unfair advantage and gravely prejudice Humana in particular as it prepares for the first bellwether trial in this MDL. The Court should do what Judge Polster (and several other courts in the Opioids litigation) did when faced with a nearly identical factual scenario and motion—deny Defendants' Motion and refuse to disqualify Lowey's MDL Clients' longstanding, chosen representation.

## II. FACTS

### A. All plaintiffs in this MDL and in Connecticut have access to the same set of information.

The States' cases were transferred into MDL 2724 so that they would be "coordinated" with the other cases in the MDL. *See* PEX 7, *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, 2017 WL 4582710, at *2 (J.P.M.L. Aug. 3, 2017) (finding that although the State AG actions may be "further advanced with respect to discovery on account of a three-year investigation by the Attorney General of Connecticut that preceded the [Plaintiff States'] complaint . . . [g]iven the significant discovery that remains, there is ample scope to eliminate duplication and enhance the convenience of the parties, the witnesses, and the courts through coordinated proceedings in the MDL.")

On February 13, 2018, the Court entered Pretrial Order No. 45 (Protective Order). PEX 8. Rejecting the defendants' effort to segregate discovery by drug, the Protective Order allowed for the sharing of information across the MDL. Paragraph 1.7 of the Protective Order provided that,

to the extent produced in discovery in the MDL, any State Action Investigation Materials ("AG materials") would be treated as Protected Materials under the Protective Order's terms. *Id.* at 3-4. This Order was necessary under Connecticut General Statutes § 35-42, the statute under which the States secured the AG materials.

On June 6, 2018, private plaintiffs filed a motion for access to an unredacted version of the States' Consolidated Amended Complaint and to certain investigatory materials obtained by the States. PEX 9. The States and the DOJ did not oppose the motion; Defendants did. The parties argued the motion on July 11, 2018, when Mr. Nielsen voiced his personal opinion that "the production of the State AG materials would significantly advance this MDL" by allowing the plaintiffs to coordinate, and that the defendants would have equal access to the State AG investigatory materials. PEX 10 at 133.

In their motion for access, the private plaintiffs argued that access to the AG Documents "will enable Plaintiffs to efficiently coordinate among themselves regarding discovery planning and execution, including identifying potential custodians, deponents, depositions, and third-party discovery targets." PEX 11 at 2.[5] Indeed, private plaintiffs argued that:

> [g]ranting Private Plaintiffs access to the AG Documents avoids such unnecessary delay [associated with private plaintiffs seeking to discover the same information on their own] and forecloses Defendants from inhibiting cooperation among all Plaintiffs by ensuring Private Plaintiffs and the Plaintiff States are working from the same set of documents.

PEX 11 at 10.

In opposing the private plaintiffs' motion for access, Moving Defendants explicitly conceded that "granting the Motion would eliminate the statutory confidentiality protections

[5] *See also* PEX 11 at 8 ("access to the AG Documents would enable all Plaintiffs to more efficiently coordinate discovery objectives and priorities, and avoid expensive and burdensome duplication of discovery, as contemplated by the Protective Order and the JPML Transfer Orders.").

under which the investigatory materials were produced." PEX 12 at 4-5. The Defendants also made it clear that they understood that the States were sharing information with the private plaintiffs. *Id.* at 6 ("If the two-step strategy Plaintiffs seek to execute is allowed to continue—(1) the State Plaintiffs proceed with their 'investigative' procurement of materials for use in this MDL without regard to the Court's Orders concerning the scope of discovery, and (2) the State Plaintiffs provide those materials without limitation to the Private Plaintiffs—any efforts by the Court or special master to exercise control over discovery will be frustrated."). And Defendants also understood that what private plaintiffs were seeking was "sweeping and unlimited access to government investigative materials." PEX 12 at 5.[6]

The States emphasized repeatedly that all of the documents obtained pursuant to their civil investigatory subpoenas were the subject of civil discovery in the MDL. PEX 10 at 38:14-22 ("the Defendants have the right to serve a discovery request on the investigating agency and ask for whatever information that they had that they believe is relevant to the case. And that's no different here, Your Honor. The entire solution to the whole fairness problem is a discovery request from the Defendants to the State AGs asking for information that we have that's relevant. That would obviate all of this, but the Defendants don't want to do that because then it becomes

[6] *See also* PEX 10 at 10:10-12 ("What the Plaintiffs are asking for is extraordinary, access to the entirety of law enforcement files."); at 112:15-20 ("And the plaintiffs want all of it. And the solution that the AGs and the Plaintiffs give is let's just make all of it available to the Defendants and available to the Plaintiffs, effectively, Your Honor, making the scope of discovery in this case a function of what the States care to investigate."); at 113:2-4 ("And they're asking for the wholesale release into this case of everything that the States have gathered and will gather in this case."); at 118:19-23 ("what we're hearing is, no, you know what, we'll just give it all to the Defendants and we'll give it all to the Plaintiffs and then we'll go on our way but the universe of information, Your Honor, we're going to be dealing with is way beyond what's before the Court."); at 122:22-23 (defense counsel acknowledging "the idea that we're just going to introduce everything" into the MDL); at 126:22-25 ("I read the requests as any documents that the Attorney Generals received through their subpoena authority from any of the Defendants here or from third parties.").

MDL discovery.").[7] And Moving Defendants did not contest that fact. *Id.* at 125:7-16 ("this is really not about whether the Plaintiffs will get the documents. . . . this is not a case like *Pearson* where absent the production from that agency the Plaintiffs would not get the documents. Here they will.").[8]

In granting the private plaintiffs' motion for access, the Court expressed its desire for "the parties to move discovery forward collaboratively." PEX 13 at 10. All "AG Documents" (subpoenas issued by States and documents produced in response to subpoenas) were deemed "Discovery Material" in MDL 2724 and produced into the discovery record, starting in late 2018.[9] The States filed their third and final complaint on June 10, 2020 and did not serve any

---

[7] *See also id.* at 55:23-25 ("Defendants certainly could obtain discovery of materials that the States obtained through the use of our investigatory subpoena powers, so that is an option."); at 64:13-22 ("I just wanted to make it clear that I think the solution to all of this is that the Defendants, like they would in any other case, can serve a discovery request on the Plaintiff States for any information that the Plaintiff States have that is relevant to the MDL. They will have notice of what we have. There won't be any issues in terms of them being surprised at depositions or anything like that, and that's what happens in every other case I've ever been involved in. It's the first, number one, document request served by a defendant"); at 65:15-16 ("if they served a discovery request asking for that it would be turned over."); at 133:19-25 ("it's the Connecticut Attorney General's Office's position that there is nothing in *Brown and Brown* or in the Connecticut Anti-Trust Act which would prohibit the production of investigatory materials in a subsequent litigation if it was done pursuant to a court order after the responding parties had the opportunity to object and raise whatever concerns they have.").

[8] *See also id.* at 126:1-2 ("absent that production [in Pearson] there was no other way to get the documents. Not true here."); at 128:16-18 ("We would not object [to producing the AG Documents to private plaintiffs] just because they went to the Connecticut Attorney General also").

[9] *See* PEX 13 at 12 ("All AG Documents are deemed to be Discovery Material and shall be treated as Highly Confidential or Outside Counsel Eyes Only information pending further order of the Court upon recommendation of the Special Master and Special Discovery Master"); *see also* PEX 4 (PTO 70 approving R&R and implementing AG Access Protocol); PEX 14 (PTO 90 broadening definition of "Private Plaintiffs" in PTO 70 to include Humana Inc. and United HealthCare; thereby giving Humana access to AG Documents); PEX 5 (PTO 106 modifying PTO 70 to include any new AG subpoenas issued, or documents obtained, through May 10, 2019); PEX 6 (PTO 143 modifying PTO 70 and PTO 106 to include any new AG subpoenas issued, or documents obtained, through June 10, 2020).

additional investigatory subpoenas or obtain any additional documents (through their investigatory powers) after that date. *See* Nielsen Decl. at ¶¶ 14, 29.

In PTO 70, the Court ordered all of the State AG investigatory material produced into MDL discovery subject only to a limited claw back procedure. This procedure allowed Defendants to claw back certain documents produced to the States (and private plaintiffs), but only if the documents fell within certain narrow categories: "(a) competitively sensitive or trade secret information; (b) business information *unrelated to allegations in any MDL pleading*; or (c) personal or embarrassing information *unrelated to any allegation in the MDL* . . . ." PEX 4 at ¶ 7 (emphasis added). The documents "clawed back" by Defendants through this process became inaccessible to both the State AGs and the private plaintiffs equally, again maintaining the symmetry of information for all plaintiffs. Nielsen Decl. at ¶ 16.

The purpose of the AG Access protocol was to ensure that the States and private plaintiffs were on a "level playing field" in jointly prosecuting their claims in the MDL.[10] In order to

[10] *See* PEX 10 at 40:17-24 ("it is efficient to provide the Private Plaintiffs with some information so that they can be on a level playing field . . . . They're not on a level playing field at all right now in terms of – in terms of the amount of information they have…"); at 92:19-25 ("our motion is for access to a large trove of relevant material that has already been collected, gathered, and that can be produced to us with little burden to any other party in the case. Access to that information will . . . put ours on a similar footing to the other parties in this case who already have access to the material."); at 93:3-6 ("We're seeking full and fair access to material that underlies our case, under the theory that all litigants should have a fair and rapid access to the underlying that should guide this litigation."); at 102:2-13 ("in transferring the State Plaintiffs into this MDL the JPML intended that the parties avoid duplicative discovery. Depositions are to be taken once. Rule 45 subpoenas should be served once. And rulings on discovery issues should be made once. To coordinate effectively, the private Plaintiffs and the State Plaintiffs must be able to operate from the same core set of documents and must be able to freely discuss those documents. We must be able to discuss witnesses, lines of deposition questions, and strategize about how to get key documents into evidence, just as Defendants are free to discuss their common strategies on their side of the aisle using documents in their possession."); at 133:2-11 (Nielsen: "I do want to convey at least my own personal opinion which is that the production of the State AG materials would significantly advance this MDL. It would allow the Plaintiffs to coordinate. . . . And my understanding of the process would be that if it was produced to the private Plaintiffs it would be produced to the

coordinate, the States entered into broad common interest agreements ("CIAs") with constituents from each of the various private plaintiff groups, including directly with Lowey. St. Phillip Decl. at ¶¶ 13–17; Nielsen Decl. at ¶ 15. Exemplars of these CIAs were provided to the Court, *in camera*, at the Court's request, on July 16, 2018. Nielsen Decl. at ¶ 17. The CIA between the State AGs and Humana and Lowey is largely identical to the exemplars submitted to the Court *in camera*. *Id*. Since the agreements were executed more than six (6) years ago, the State AGs and Humana, Molina, and other private plaintiffs have met regularly pursuant to their CIAs to share confidential information and discuss strategy, to coordinate discovery requests to Defendants, to collectively take nearly four hundred depositions, and to jointly prosecute their cases. St. Phillip Decl. at ¶ 16; Nielsen Decl. at ¶ 21.

To promote even further extensive sharing of information among all plaintiffs, the States arranged for their CWs to enter separate settlements with the private plaintiffs in the MDL. St. Phillip Decl. at ¶ 14; Nielsen Decl. at ¶ 19. After those agreements were entered, and subject to the CIAs, the States shared attorney proffer information previously obtained from counsel representing the various CWs. *Id*. The States and private plaintiffs also coordinated and collectively met with the CWs to prepare for their depositions in the MDL. *Id.*

As of the filing of this Opposition, the current MDL discovery record includes 71,175,341 total documents. *See* St. Phillip Decl. at ¶ 20. Of this total, the States produced investigatory files containing 3,576,759 documents, representing approximately 5% of the total discovery record. *Id.* More than 380 depositions have been taken in this MDL to date, with many more scheduled over the coming days and weeks. St. Phillip Decl. at ¶ 20; Nielsen Decl. at ¶ 21.

---

Defendants. Everyone would have access to that."); at 136:5-7 ("what the Plaintiffs are asking for is the production by the States of everything, not just the subpoenas that were issued…").

**B. Lowey Dannenberg's History of Representing Humana & Representation In This Matter.**

Lowey established a practice group in the late 1990s that was solely dedicated to representing large health insurers in litigation against pharmaceutical manufacturers. *See* St. Phillip Decl. at ¶ 8. Over the course of the last 25 years, it has succeeded in convincing courts to adopt pathbreaking legal theories favorable to health insurers' interests in recovering damages for fraud and antitrust violations.[11]

Lowey began representing Humana in 2003 by seeking recoveries for overpayments of the cost of drugs and in cases of medical expenses of members injured by drugs marketed by pharmaceutical companies. *Id.* at ¶ 9. Over the course of the ensuing 22 years, Lowey has built up significant institutional knowledge of the inner workings of Humana's pharmacy business and operations. *Id.* at ¶¶ 10–11.

In March 2018 and May 2020, respectively, Humana and Molina hired Lowey and its co-counsel, Schneider[2] Wallace Cottrell Kim, LLP ("Schneider Wallace") to represent them in seeking recovery against the several generic pharmaceutical companies alleged to have violated the antitrust laws in this MDL. *Id.* at ¶ 12. Over the course of this MDL representation, Lowey lawyers and paralegals have expended 49,096 hours of (unaudited) unreimbursed time representing its clients. *Id.* at ¶ 19. The firm participated meaningfully in advising their clients of MDL developments, strategizing with the State AGs and private plaintiffs over written discovery,

[11] *See, e.g., Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003)(first court to hold that an insurer can sue the maker of a prescription drug for fraudulent marketing following a recall); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003)(holding that settlement of Hatch-Waxman patent litigation among branded and generic pharmaceutical companies can constitute a *per se* violation of the antitrust laws), *later abrogated by F.T.C. v. Actavis*, 570 U.S. 176 (2013); *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 685 F.3d 353, 355 (3d Cir. 2012) (first court to recognize a private right of action under the Medicare Secondary Payer Act to recover an insurer's member's medical expenses from a tortfeasor).

drafting and responding to motions, and working on trial issues, bellwether selection efforts, expert needs, data issues, defensive discovery positions, attorney proffers, securing and evaluating confidential witness information, document hosting issues and review, settlement strategies, and a variety of other tasks. *Id.* at ¶¶ 13–18. Along the way, Lowey lawyers shared their work product in accordance with their CIAs with other plaintiffs' counsel.

## III. ARGUMENT

### A. Legal Standards

Defendants omit the full standards governing their Motion. While disqualification derives from the Court's "inherent authority to supervise the professional conduct of attorneys appearing before it," Def. Br. at 12, Defendants fail to mention that the decision is generally "committed to the sound discretion of the district court." *United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir. 1980). Nor do they mention that *Miller* holds that "disqualification never is automatic" upon a finding that a disciplinary rule "prohibits an attorney's appearance in a case." *Id.* (citations omitted). The district court must "consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." *Id.* (citations omitted). Relevant factors to evaluate include: "the ability of litigants to retain loyal counsel of their choice, the ability of attorneys to practice without undue restriction, preventing the use of disqualification as a litigation strategy, preserving the integrity of legal proceedings, and preventing unfair prejudice." *In re Boy Scouts of Am.*, 35 F.4th 149, 160 (3d Cir. 2022) ("*Boy Scouts*").

The Third Circuit considers disqualification of counsel a "drastic remedy." *Boy Scouts*, 35 F.4th at 161; *see also Jackson v. Rehm & Hoss Co.*, 366 F. App'x 342, 347 (3d Cir. 2010) ("extreme remedy of attorney disqualification."). A party seeking to disqualify counsel shoulders

a heavy burden and a high standard of proof. *See Cohen v. Oasin*, 844 F. Supp. 1065, 1067 (E.D. Pa. 1994) ("The party seeking to disqualify opposing counsel bears the burden of clearly showing that continued representation would be impermissible. Vague and unsupported allegations are not sufficient to meet this standard. Generally, motions to disqualify opposing counsel are not favored.") (internal citations omitted); *see also Reg'l Employers' Assur. Leagues Voluntary Employees' Beneficiary Ass'n Tr. v. Castellano*, No. CIV A 03-6903, 2009 WL 1911671 at *2 (E.D. Pa. July 1, 2009) ("In this district, motions to disqualify are an 'extreme sanction' that should not be imposed lightly."). "The extreme sanction of disqualification should only be utilized when there is a 'reasonable possibility that some specifically identifiable impropriety' actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice." *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d 863, 865 (S.D. Ohio 2002) (internal quotation marks and citations omitted).

Here, Defendants have failed to meet their heavy burden to show that "some specifically identifiable impropriety actually occurred." As Humana's and Molina's experts, Professor Roiphe and Attorney Cohen, demonstrate through a rigorous examination of the factual record in this case and a detailed review of Defendants' motion, Defendants had no factual basis to bring this motion at all. *See* PEX 1 Expert Report of Rebecca Roiphe ("Roiphe Rpt.") at ¶¶ 1-2, 20-22, 42; PEX 2 Expert Report of Stewart Cohen ("Cohen Rpt.") at ¶¶ 55, 59-61. Indeed, Stewart Cohen, using the practices and procedures of the Supreme Court of Pennsylvania Disciplinary Board (of which he was a member for many years) as a guide, found specifically that "defendants have neither made any offer of proof, nor met their burden to demonstrate any facts to establish that they will suffer material disadvantage as a result of Nielsen joining Lowey."

Cohen Rpt. at ¶¶ 55, 61 ("In my opinion there are no facts that support the finding that probable cause exists, or that there was a violation of Rule 1.11(a)(2) by Lowey or Nielsen").

Defendants have also not demonstrated that even if the Court believes that Mr. Nielsen should be disqualified (and he should not) that that disqualification should be extended to the Lowey firm. The Lowey firm has prosecuted this action on behalf of Humana and Molina since at least 2018, expended significant attorney time in moving this MDL efficiently and effectively forward, and is currently slated to bring the first bellwether to trial in this MDL on behalf of Humana.

**B. Mr. Nielsen has not violated Rule 1.11(a) of the Pennsylvania Rules of Professional Conduct because Connecticut has given its informed consent, confirmed in writing, to his representation of Humana and Molina.**

Without *any* factual basis, Defendants state that "Mr. Nielsen also violated Rule 1.11(a) by representing a private client in the matter in which he participated 'personally and substantially' while in government service without 'informed consent' from the Connecticut Attorney General." (Def. Br. at 4 n.3). Not so.

Rule 1.11(a) of the Pa. Rules of Prof. Conduct proscribes representation of a private client "in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, *unless the appropriate government agency gives its informed consent to the representation.*" (Pa. R. Prof. Conduct 1.11(a) (emphasis added)). Here, Mr. Nielsen responsibly advised the Connecticut Attorney General of his proposed representation of Humana and Molina and secured the informed consent of Connecticut, which has since been confirmed in writing multiple times. *See* Nielsen Decl. at ¶¶ 31-35, Exhibits A & B; *see also* Roiphe Rpt. at ¶¶ 1-2, 20-22, 24, 26, 28-30, 42; Cohen Rpt. at ¶¶ 59-61 ("Out of an abundance of caution, Nielsen sought consent, which is the conduct of a thoughtful lawyer, 'doing the right thing.'").

### C. Mr. Nielsen has no "confidential governmental information" that "could be used" to the "material disadvantage of" defendants under Rule 1.11(c) of the Pennsylvania Rules of Professional Conduct.

Throughout their brief, Moving Defendants assert that Mr. Nielsen could use "confidential governmental information" to their material disadvantage and must be disqualified as a result under Rule 1.11(c) of the Pa. R. Prof. Conduct. Def. Br. at III.A-B. Careful review of the rule and the brief, however, reveals that the defendants point to no "confidential governmental information" in support of their misguided theory. Roiphe Rpt. at ¶¶ 1-2, 20-22, 31-39, 42; Cohen Rpt. at ¶ 55. Because this Court required all information acquired by the States to be produced to the private parties starting in 2018, and because the plaintiffs have been sharing confidential information, attorney work product, mental roadmaps and strategic insights since then pursuant to their CIAs to collectively develop the current discovery record, Humana and Molina have gained no special knowledge by Mr. Nielsen joining Lowey. Roiphe Rpt. at ¶¶ 1-2, 20-22, 31-39, 42; Cohen Rpt. at ¶ 55.

The Court should start with the Rule. Rule 1.11(c) begins with the phrase "[e]xcept as law may otherwise expressly permit...." ABA Formal Opinion 509—an opinion defendants liberally rely on in their brief (Def. Br. at 14 n.31, 15, 17 n.36 & 21)—explains the meaning of this prefatory phrase:

> Regardless of whether the law specifically authorizes the lawyer's representation, ***the Rule should not apply in the situation in which the lawyer's client is legally permitted to use the information in question. When the law permits the client to use the confidential government information that the lawyer acquired while in government service, the reason for the disqualification provision – i.e., to prevent the improper use of confidential government information – is inapplicable****, and the client's countervailing interest in counsel of choice outweighs any conceivable interest in a wooden application of the rule.*

ABA Formal Opinion 509, at 9 n.30 (emphasis added and citation omitted). In this case, the Court made sure that all plaintiffs had the same information and required the production of all

investigatory material to all private plaintiffs. *See* PEX 4 (PTO 70); PEX 14, (PTO 90); PEX 16 (PTO 105); PEX 5 (PTO 106); and PEX 6 (PTO 143). And the plaintiffs have spent many years since the States' investigations concluded sharing confidential information, work product, strategic insights, and mental roadmaps to collectively develop these cases. St. Phillip Decl. at ¶ 16; Nielsen Decl. at ¶ 21. So, the rule has no application in this setting. Roiphe Rpt. at ¶¶ 1-2, 20-22, 31-39, 42; Cohen Rpt. at ¶ 55. Incredibly, neither the Moving Defendants nor their expert, Professor Wendel, reference this part of the ABA Opinion.

ABA Formal Opinion 509 also describes how "confidential government information" under Rule 1.11(c) does not apply to all information obtained under governmental authority. Moving Defendants failed to cite this part of the opinion as well. The Formal Opinion provides some guidance on what information is "not otherwise available to the public." *See* ABA Formal Op. 509 at 3. "Rule 1.11(c) does not apply to all information obtained under government authority[.]" *Id.* at 4. Rather, "[w]hether government information is publicly available—e.g., whether it can be obtained through routine discovery—will be a question of fact." *Id.; see also Anne Arundel Cnty., Maryland v. Express Scripts, Inc.*, Civ. No. MJM-24-90, 2025 WL 254807 at *9 (D. Md. Jan. 21, 2025) ("*Anne Arundel Cnty.*").[12]

[12] Defendants anticipated this argument (Def. Br. at 19) and cite one of Judge Polster's decisions disqualifying a former government lawyer *who switched sides* after being an instrumental federal prosecutor in the Opioids Task Force. Def. Br. at 14, 16 n.35, 21 (citing *In re Nat'l Prescription Opiate Litig.*, Case No. 1:17-md-2804, 2019 WL 1274555 (N.D. Ohio Mar. 20, 2019). Defendants did not cite Judge Polster's subsequent opinion distinguishing his prior ruling where, as here, plaintiffs' counsel did not switch sides, and the entire set of investigatory materials had been produced to the MDL document repository for all to share. *See In re National Prescription Opiate Litig.*, MDL No. 2804, Case No. 1:17-md-2804, 2024 WL 3387288 (N.D. Ohio Mar. 18, 2024) (denying Rule 1.11(c) disqualification motion of plaintiffs' counsel on grounds that governmental investigatory information was produced in the MDL discovery record), *pet. for a writ of mandamus denied*, *In re Optum Rx, Inc.,* No. 24-3396, ECF Nos. 7 and 8 (6th Cir. Oct. 22, 2024).

These exact issues under Rule 1.11(c) have been addressed several times recently in the context of the Opioids litigation—where discovery and access to information from government investigations was handled similarly to what Judge Rufe has done in MDL 2724. In the Opioids MDL, Judge Polster "set forth important procedures to promote the coordination and consolidation of these knotty cases." *In re Nat'l Prescription Opiate Litig.*, 2024 WL 3387288 at *11. Among those was the obligation for all defendants to review and produce "documents previously produced pursuant to ***any*** civil investigation, litigation, and/or administrative action by federal (including Congressional), state, or local governmental entities involving the marketing or distribution of opioids and shall produce to the [MDL Repository] non-privileged documents ***relevant to the claims in this MDL proceeding***." *Id.* (emphasis in original). The Motley Rice firm—which had been appointed as co-lead counsel for the Plaintiffs' Executive Committee in the Opioids MDL—was separately retained by the City of Chicago, the District of Columbia, and the State of Hawaii to conduct civil enforcement investigations on behalf of each of those governmental entities. *Id.* at *1-3. During those government investigations, Motley Rice issued government subpoenas and obtained the production of documents from defendants. *Id.* Defendant OptumRx thereafter moved to disqualify Motley Rice, contending that the firm, "through its work for the governments of Chicago, Washington D.C., and Hawaii in their separate Investigations, obtained 'confidential government information' about OptumRx that could be used to OptumRx's material disadvantage in the Opioid MDL." *Id.*

In a thorough opinion, Judge Polster analyzed Rule 1.11(c), ABA Formal Opinion 509, and relevant case law and determined that Motley Rice should not be disqualified. *First*, Judge Polster found that the information obtained by Motley Rice pursuant to government subpoenas was not even "confidential government information" under the Rule because it was otherwise

subject to routine civil discovery. *Id.* at *10-11 ("The Court cannot conclude that the subject of a government investigation can turn all its business information produced in response to a CID into 'confidential government information' simply by designating it as confidential when they produce it. This is why the ABA Opinion explains that '[w]hether government information is publicly available – *e.g.*, whether it can be obtained through routine discovery – ***will be a question of fact.***") (emphasis in original) (citation omitted). *Second*, Judge Polster found that because the information produced in response to government subpoenas was required to be produced into the MDL discovery repository anyway, those documents were "available to all plaintiffs' counsel" and "Motley Rice cannot now use any of the information it obtained from OptumRx during the Investigations to the material disadvantage of OptumRx; *the information is (or should be) already known by other plaintiff firms*." *Id.* at *11 (emphasis added).[13]

In a string of decisions since then, several other courts across the country have come to similar conclusions based on the same record. For example, in *Anne Arundel Cnty,* decided in January this year, the court found that because all the information obtained by Motley Rice during the government investigations was available to all other counsel as part of the MDL discovery repository, OptumRx failed to show that it faced "any greater disadvantage" by facing Motley Rice than it would facing plaintiff's "non-Motley Rice attorneys" and "[t]he mere fact that Motley Rice may have had access to the documents for longer does not rise to the level of

[13] OptumRx thereafter filed a petition for writ of mandamus, which was rejected by the Sixth Circuit Court of Appeals. Case No. 24-3396, ECF No. 7-1 at 3 (6th Cir. Oct. 22, 2024); *see also The People of the State of California, Plaintiff-Respondent v. OptumRx, Inc., Defendant-Appellant, et al.*, No. B343828, 2025 WL 1449577 at *46 (Cal Ct. App. May 2, 2025) ("OptumRx faces no material disadvantage from any information Motley Rice obtained in the [government] investigations because it should have already been produced into the MDL discovery repository pursuant to the district court's case management orders and discovery rulings" and "any information previously obtained by Motley Rice has already been incorporated into Plaintiffs' general litigation strategies and discovery requests at this point.").

material disadvantage." *Anne Arundel Cnty.* at *9 (citations omitted); *see also* PEX 17 *City of Boston v. Express Scripts, Inc.*, No. 1:24-cv-10525-PBS (D. Mass. Oct. 18, 2024) (ECF No. 94) ("Optum fails to demonstrate that it would suffer a material disadvantage since the MDL defendants were required to produce all documents previously produced in response to the Chicago, Washington D.C., and Hawaii opioid investigations into the MDL repository"). Similarly, in *People v. OptumRx Inc.*, B343828, 2025 WL 2542288 (Cal. Ct. App. Sept. 4, 2025), the Court of Appeals in California found that the information obtained by Motley Rice through government subpoenas could not be considered "confidential government information" under Rule 1.11(c). The Court first held that "[c]onfidential government information is limited to information 'obtained under government authority,' which includes 'information obtained pursuant to a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power.'" *Id.* at *6. But the Court also found that not all information "obtained under government authority" is confidential: "[c]onfidential government information is information that only the government can obtain, such as grand jury testimony" and is limited to "information obtained through the exercise of government power that a regular civil litigant could not obtain simply through discovery." *Id.* In addition, the Court held that "Motley Rice's insights or mental roadmap derived from publicly available documents were not confidential government information." *Id.*

Like in the Opioids cases, the documents and information gathered here by the States during their civil antitrust investigations are not "confidential government information." Roiphe Rpt. at ¶¶ 1-2, 20-22, 31-39, 42; Cohen Rpt. at ¶ 54 ("These rulings and ABA Formal Opinions establish a consistent theme: once investigatory materials are incorporated into civil discovery and made available to all parties, as was done in this MDL over 6 years ago, they lose their

confidential character, and prior access does not create an ethical bar to representation"). All of the documents and information obtained by the States were subject to routine civil discovery in this case. The parties have all admitted this in prior arguments before the Court. *See supra* II.A. They are therefore not confidential.[14] Also like in the Opioids litigation, all of the investigatory materials obtained by the States have been produced into the discovery record in this MDL, pursuant to the Court's Orders. *See* PEX 4 (PTO 70); PEX 14, (PTO 90); PEX 16 (PTO 105); PEX 5 (PTO 106); and PEX 6 (PTO 143). Because they are available to all plaintiffs' counsel, *and have been for many years*, they cannot be used to the material disadvantage of any defendant. Roiphe Rpt. at ¶¶ 1-2, 20-22, 31-39, 42; Cohen Rpt. at ¶ 55.

Neither Moving Defendants nor their expert address ***any*** of these decisions. Instead of citing or analyzing the relevant case law, Moving Defendants highlight five categories of information that Mr. Nielsen supposedly has that Lowey's MDL Clients do not have: (1) settlement agreements he negotiated and signed with "numerous parties"; (2) information from interviewing, and obtaining proffers and evidence from, and signing agreements with, CWs; (3) communications with other state and federal enforcers; (4) "clawed back" documents withheld from the production to private plaintiffs; and (5) "strategic insights" gained as a lead government enforcer for ten years. As shown below, none of these categories of documents qualify as "confidential government information" nor could they "be used to the material disadvantage of" Moving Defendants.

[14] Indeed, when Defendants opposed the Private Plaintiffs' Motion for Access to the AG materials, they explicitly conceded that granting the motion (which the Court did) "would eliminate the statutory confidentiality protections under which the investigatory materials were produced." PEX 12 at 4-5.

**1. Defendants fail to explain why Mr. Nielsen's negotiation of settlement agreements with "numerous parties" means he has access to "confidential government information"**

Defendants claim that Mr. Nielsen's "unique insights regarding the parties' positions will benefit Humana and Molina in any of their settlement negotiations with those same parties." *See* Def. Br. at 19. Information provided during voluntary settlement discussions, however, is not considered "confidential government information" under Rule 1.11(c). *See People v. OptumRx Inc.*, 2025 WL 2542288 at *6 ("[c]onfidential government information is limited to information 'obtained under government authority,' which includes 'information obtained pursuant to a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power.'"); Roiphe Rpt. at ¶ 39. Even the Moving Defendants' expert concedes this fact. *See* Ex. 1 to Banks Decl., Wendel Rpt., at ¶ 29 ("[c]onfidential government information is limited to information obtained under government authority," which he explains is defined by ABA Formal Op. 509 as "information obtained pursuant to a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power."). Information learned solely from settlement discussions with defense counsel does not derive from any "government power"—rather, it could only have been *volunteered* by an adversary to *reduce* the financial demands of the government. Indeed, there is no practical possibility that experienced defense counsel would reveal anything outside of the vast information already available to both private plaintiffs and the States that could be used to materially disadvantage his or her client.

In addition, Mr. Nielsen has not and will not disclose those positions to Lowey's MDL Clients, so even if they could be considered confidential government information (they cannot) they could not be used to "materially disadvantage" defendants. Nielsen Decl. at ¶ 36. And even if he did, as any lawyer with even a rudimentary understanding of settlement negotiations knows, a party's position can change based on passage of time, intervening decisions from the court, a

defendant's change in financial status, whether it is dealing with a public or private client, and nearly innumerable other factors. Defendants have thus not met their high burden to demonstrate that Mr. Nielsen's participation in settlement discussions with defendants resulted in him learning any confidential governmental information or would run the risk of any material disadvantage for these defendants. Cohen Rpt. at ¶ 55; Roiphe Rpt. at ¶ 39.

Because there is no specific showing by any moving defendant that settlement discussions "could be used" by Mr. Nielsen or Lowey "to materially disadvantage" a particular defendant, no defendant has even demonstrated standing to bring this motion. *See Olson v. Sauk Cnty.*, No. 22-CV-562-WMC, 2024 WL 3273357, at *6 (W.D. Wis. July 2, 2024, at *6) ("As an initial matter, it is unclear whether Olson has standing to rely on Rule 1.11(c) as a basis for disqualification because it is not clear that the reports he identifies contain any confidential information about *him*.") (emphasis in original). Nor could Defendants make that showing as Mr. Nielsen has not and will not participate in settlement discussions on behalf of Humana, Molina, or any other Lowey client in this case. *See* Nielsen Decl. at ¶ 36.

**2. Lowey's MDL Clients have the exact same "information from interviewing, and obtaining proffers and evidence from, and signing agreements with, cooperating witnesses" as Mr. Nielsen had while employed at the Connecticut AG's office.**

Lowey's MDL Clients joined the CIAs between private parties and the States when they entered the case. *See* St. Phillip Decl. at ¶ 15; Nielsen Decl. at ¶ 15. These agreements allow for the disclosure and use of all information, including any proffers and evidence from CWs. *See* St. Phillip Decl. at ¶ 14-18; Nielsen Decl. at ¶ 15. Lowey lawyers attended some of these proffers, reviewed work product detailing the information in them, and cooperated with the States in preparing for them. The States also made sure that private plaintiffs were able to enter into their own settlement agreements with the CWs to promote coordination among the plaintiffs, provide private plaintiffs with access to all information received by the States (including attorney

proffers), and to efficiently prepare the CWs for their depositions. St. Phillip Decl. at ¶ 14; Nielsen Decl. at ¶ 19. No aspect of the communications with CWs or their counsel concerning either the evidence or the negotiations over the settlement agreements is "confidential government information" as private plaintiffs were involved in, or privy to, all of that information. Roiphe Rpt. at ¶¶ 38-39; Cohen Rpt. at ¶ 55; *see also* ABA Formal Opinion 509 at 9 n.30 (Rule 1.11(c) does not apply when the lawyer's client is legally permitted to use the information in question). Once again, defendants fail to meet their high burden of demonstrating that information relating to proffers and agreements with CWs is "confidential government information." Cohen Rpt. at ¶ 55 ("The defendants have neither made any offer of proof, nor met their burden to demonstrate any facts to establish that they will suffer material disadvantage as a result of Nielsen joining Lowey.")

**3. Defendants have not demonstrated that Mr. Nielsen's privileged "communication with other state and federal enforcers" yielded any information solely available to the government or "confidential government information."**

Moving Defendants offer no proof in support of their claim that Mr. Nielsen's communications with other state and federal enforcers constitute "confidential government information" which could be used to their "material disadvantage." Def. Br. at 20. First, as Mr. Nielsen's declaration demonstrates, he received no information from any federal enforcer that he did not already have from his access to the investigatory and discovery materials accessible to all private plaintiffs in the MDL, including Lowey's MDL Clients. *See* Nielsen Decl. at ¶¶ 7-10. And any recent attempts to obtain information related to the DOJ's federal investigation have been done in coordination with the other private plaintiffs, including Humana and Molina. *Id.* ¶ 9. Second, private plaintiffs, including Lowey's MDL Clients, have had equal access to representatives from other State AGs' offices and have been collaborating with them over the documents, depositions, and experts for more than half a decade. *See* St. Phillip Decl. at ¶¶ 13-

18. Once more, Defendants fail to demonstrate that any "confidential governmental information" was obtained through communications with state or federal enforcers that could be used by Lowey's MDL Clients to their "material disadvantage." Roiphe Rpt. at ¶ 39; Cohen Rpt. at ¶ 55.

**4. Documents produced in response to civil investigatory subpoenas – even those subject to the claw back procedure outlined in PTO 70 – are not "confidential government information."**

Defendants contend that documents provided to the State of Connecticut "pursuant to investigatory subpoenas issued under Conn. Gen. Stat. § 35-42" are confidential government information, and that "[n]ot all of these documents were produced to and retained by private plaintiffs" – referencing in a footnote the claw-back process under PTO 70. Def. Br. at 20 & n.38. Under PTO 70, however, Defendants were only allowed to claw back certain narrow categories of documents including documents "unrelated to any allegation in the MDL." PEX 4 at ¶ 7. Moving Defendants do not explain how Mr. Nielsen could possibly use documents that are "unrelated to any allegation in the MDL" to their material disadvantage. In addition, all of those "clawed back" documents pursuant to PTO 70 were clawed back equally from both the States and the private plaintiffs – so Mr. Nielsen's access to those documents was exactly the same as the private plaintiffs' access. Nielsen Decl. at ¶ 16.

As outlined above, the documents produced in response to Connecticut's civil investigatory demands were all subject to routine civil discovery in this MDL and do not constitute "confidential government information" under Rule 1.11(c). *See supra* II.A; Roiphe Rpt. at ¶¶ 1-2, 20-22, 31-39, 42. They have also been produced to all private plaintiffs – *see* PEX 4 (PTO 70); PEX 14, (PTO 90); PEX 16 (PTO 105); PEX 5 (PTO 106); PEX 6 (PTO 143); Nielsen Decl. at ¶ 16 – and therefore cannot be used to the material disadvantage of any

Defendant. Roiphe Rpt. at ¶¶ 31-39; Cohen Rpt. at ¶ 55. Again, Moving Defendants fail to meet their heavy burden and high standard of proof. Cohen Rpt. at ¶ 55.

**5. Defendants have not shown that Mr. Nielsen's "strategic insights" and "roadmaps" of evidence are "confidential government information" given that Lowey's MDL Clients have been working with Mr. Nielsen for more than five years to develop these same insights and roadmaps based on information in the MDL discovery record.**

"Strategic insights" and "roadmaps" of evidence do not qualify as "confidential government information" under Rule 1.11(c) because, as Moving Defendants' expert, Professor Wendel acknowledges, they do not derive from "information obtained pursuant to a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power" that is not discoverable by private parties. *See* Ex. 1 to Bank's Decl., Wendel Rpt. at ¶ 29 (citing ABA Formal Op. 509); *see also* Roiphe Rpt. at ¶¶ 39.

The most recent case evaluating a similar claim of prejudice arising from "strategic insights" and "roadmaps" under Rule 1.11(c) is instructive. There, on September 5, 2025, the Second District, Division 5 of the California Court of Appeals affirmed a trial court's ruling that Motley Rice should not be disqualified from representing the City of Los Angeles because they did not acquire "confidential government information" while previously representing other government entities under Rule 1.11(c). 2025 WL 2542288, at *2, *7. There—like here—defendant Optum RX argued that "Rule 1.11(c) was not limited to documents, but encompassed other confidential information about Optum Rx." *Id.* at *3. This information "included strategic insights and mental roadmaps that could be developed from an investigation, such as the strengths and weaknesses of the evidence compiled against a party." *Id.* (*compare* with Def. Br. at 20 ("Mr. Nielsen spent over ten years as a lead government enforcer developing 'strategic insights' and 'roadmaps' of evidence, and those qualify as 'confidential' as well." (citation omitted)).

The California Court of Appeals concluded that "[i]t is clear that 'confidential government information' within the meaning of rule 1.11(c) is information obtained through the exercise of government power that a regular civil litigant could not obtain simply through discovery." *Id.* at *6. In addition, the court concluded that:

> Motley Rice's insights or mental roadmap derived from publicly available documents were not confidential government information. …. If preparing status updates for government clients based on non-confidential government information was sufficient to trigger disqualification, it would apply in every case….

*Id*. Because defendants have made no showing that Mr. Nielsen acquired any knowledge, "strategic insights," or "roadmaps" based on the narrow definition of "confidential government information," Defendants have not met their burden to demonstrate a violation of Rule 1.11(c). *See* Cohen Rpt. at ¶55 ("Nielsen shared all material information, strategic roadmaps and insights with all Private Plaintiffs for years, as part of the process to jointly undertake hundreds of depositions and review millions of documents in 'the best interests of all plaintiffs and States' to 'ensure the best evidentiary record possible.'" The scenarios suggested by the expert for the defense are not consistent with the facts and make no common sense in this litigation."); Roiphe Rpt. at ¶ 39.

**6. Mr. St. Phillip did not admit that Mr. Nielsen has "confidential government information" under Rule 1.11(c).**

Given the absence of evidence that Mr. Nielsen has "confidential governmental information," that "could be used to the material disadvantage of" the Moving Defendants, the Moving Defendants seize on a statement purportedly made by Mr. St. Phillip on a phone call and an email he wrote concerning Mr. Nielsen's obligations to protect Connecticut's attorney-client communications. Specifically, in his August 6, 2025 email, Mr. St. Phillip stated that Mr. Nielsen was "[redacted]

[REDACTED]

[REDACTED].” Ex. 6 to Bank Decl. (emphasis supplied). The Moving Defendants mischaracterize this email to claim that “Mr. St. Phillip *admitted twice* that Mr. Nielsen possesses such ***confidential government information*** that neither Lowey nor its clients had prior to Mr. Nielsen’s arrival.” Def. Br. at 19 (emphasis in bold supplied). The text of the email simply does not fit Moving Defendants’ narrative.

While Mr. Bank also stated in his Declaration that Mr. St. Phillip “confirmed” that “Mr. Nielsen had confidential government information about settlement-related communications from his prior role,” Mr. St. Phillip disputes this characterization, declaring that he has “not learned anything from Mr. Nielsen concerning Connecticut’s settlement activity in this MDL. Prior to hiring Mr. Nielsen, we agreed that he would not share any information with anyone at Lowey or any representative of Lowey’s MDL Clients concerning settlement activity conducted by Connecticut or any other State AG concerning any of the issues in this MDL.” *See* Bank Decl. at ¶ 2; St. Phillip Decl. at ¶ 5. Neither statement is an admission that Mr. Nielsen indeed possesses any “confidential government information” as that phrase is defined in Rule 1.11(c). Because Mr. St. Phillip’s statements did not relate at all to the narrow set of “confidential governmental information” defined by Rule 1.11(c), these comments do not constitute “admissions” that can substitute for the Moving Defendants’ burden of proof.

**D. Even if there were a violation of 1.11(c), the Third Circuit’s *Boy Scouts* factors all favor denial of the request for disqualification**

As explained above, even if Mr. Nielsen was in possession of “confidential government information” which “could be used to materially disadvantage” Moving Defendants—which he is not—disqualification is neither automatic nor the proper remedy. *Miller*, 624 F.2d at 1201. In *In re Boy Scouts of America*, the Third Circuit has set forth factors that the Court should

generally evaluate in determining if the Draconian remedy of disqualification is the only possible remedy: "[1] the ability of litigants to retain loyal counsel of their choice, [2] the ability of attorneys to practice without undue restriction, [3] preventing the use of disqualification as a litigation strategy, [4] preserving the integrity of legal proceedings, and [5] preventing unfair prejudice." *Boy Scouts*, 35 F.4th at 160 (citations omitted). As discussed *infra*, these factors all favor denial of the motion.

**1. Humana and Molina's ability to retain loyal counsel of their choice is prominent under the circumstances.**

Lowey Dannenberg, P.C. is a long-standing loyal counsel for Humana in pharmaceutical overcharge cases. The firm has continually represented Humana in pharmaceutical overcharge cases for the last 23 years in courts across the Country. *See* St. Phillip Decl. at ¶¶ 9-11 (chronicling these representations). Over the course of these many years and representations, Lowey lawyers have gained critical knowledge of the inner workings of Humana's pharmacy business, which has assisted Humana in prosecuting pharmaceutical cost recovery matters for the better part of two decades, well before Mr. Nielsen joined Lowey in July 2025. Disqualification of Humana's long-standing counsel due to its adversaries' suppositions about amorphous secret information would result in substantial prejudice to Humana.

In addition, as the Court knows, Mr. Nielsen is a unique lawyer relative to this litigation. As the Moving Defendants recognize in their papers, he has extensive knowledge of the facts of the case gained over many years of investigating and litigating this matter. *See* Nielsen Decl. at ¶¶ 5-21. Lowey lawyers have strategized with Mr. Nielsen concerning the discovery record for

years. Humana and Molina's choice of counsel for this litigation would be meaningfully impaired should the Court disqualify Mr. Nielsen and/or Lowey.[15]

**2. Mr. Nielsen's ability to practice without undue restriction would be harmed by disqualification.**

Mr. Nielsen has spent more than a decade of his professional career building the cases underlying this MDL and has unparalleled knowledge of the massive MDL discovery record. *Id.* His contributions to Humana's bellwether trial team and Molina's continued prosecution of its case simply cannot be overstated. Given his extraordinary effort and dedication to this matter to the exclusion of all else, Mr. Nielsen's ability to practice law without undue restriction has unique resonance under the circumstances. Roiphe Rpt. at ¶ 25 ("the current rule was drafted so as to ensure that it did not unduly restrict former government lawyers from taking on private clients and thereby discourage capable lawyers from entering public service").

**3. Because Defendants lack actual facts to make their arguments, their disqualification motion appears to be a litigation strategy to sideline their most immediate opponents as this first bellwether case heads toward trial.**

The Court entered its scheduling order on Humana's bellwether cases on August 28, 2025. PEX 3 (PTO 306). This motion was filed a week later. In their motion, Moving Defendants failed to cite *any* of the recent prominent *and* adverse Opioids cases where: (1) "confidential government information" was narrowly construed in similar circumstances; and (2) MDL courts

---

[15] *See* Roiphe Rpt. at ¶ 25 ("Giving private clients access to expert lawyers is in the public interest because they will ensure greater compliance with the law"); *id. at* ¶ 32 ("Humana and Molina are longtime clients of Lowey and depriving it of counsel of choice would be particularly damaging given the length of the relationship and the breadth of knowledge the firm has of their businesses. It would be particularly inappropriate to deprive the clients of their choice of counsel in this case because there was no rule violation"); Cohen Rpt. at ¶ 55 ("There is no special conflicts of interest for Nielsen or Lowey. The evaluation by Nielsen of his obligations, and his decision to obtain informed consent and a waiver of any objection (assent) by the CT AGO was thorough. The vetting process by Lowey was thorough and correct. In my opinion any implication that Nielsen or Lowey were required as a matter of law to do anything additional given these facts and in these circumstances is not required under the Rules.").

have required government investigatory materials to be produced to private plaintiffs. *See supra* at III.C. Despite Lowey's explicit request, Moving Defendants failed to engage with Lowey in specifying specific details about when and in what settings Mr. Nielsen received any purported confidential government information. Coupled with the filing of this motion was a nearly contemporaneous barrage of discovery served on Humana that included approximately 1,456 Requests for Admission and 279 separate contention Interrogatories. All this occurred within the last 30 days of the bellwether discovery period that will come to an end today. *See* PEX 3 (PTO 306).

Under the circumstances, Lowey's MDL Clients could be forgiven for suspecting that this disqualification effort represents (at least in part) an effort to distract Humana's lawyers from their preparations for the first bellwether trial. Denial of the motion would therefore discourage these unsupported motions for disqualification as a litigation strategy, a form of sharp practice explicitly disfavored in this jurisdiction. *Boy Scouts*, 35 F.4th at 160.

4. **Because Mr. Nielsen wields no "confidential government information," denying disqualification will *preserve* the integrity of these legal proceedings, as it eliminates the risk that the public will perceive the unfairness of a meritless disqualification motion sidelining him.**

The Court must carefully exercise its discretion in considering a disqualification motion brought by a party's adversary. Unless the motion is supported by significant evidence that the adverse party is unduly prejudiced by having to face the counsel at issue, the public perception of disqualification could swing in the opposite direction. If the Court were to disqualify Mr. Nielsen and Lowey at this time on this record, the integrity of the judicial proceedings could very well be called into question by public observers. The perception could be that the defendants succeeded in excluding Humana's long-standing lawyers and the most knowledgeable lawyer on the plaintiff's side of the "v" at a critical juncture. All without any concrete evidence that they will

be impaired in defending the case (as exemplified by 5 defendants not even joining the motion). Under the circumstances, Lowey's MDL Clients believe that denying the disqualification motion would serve to *preserve* the integrity of the judicial system, rather than *impair* it. *See Carlyle Towers Condominium Assoc. v. Crossland Savings*, *FSB,* 944 F. Supp. 341, 345 (D.N.J. 1996) ("When pondering the proper outcome for a specific case, '[c]ourts must exercise extreme caution not to act under the misguided belief that disqualification raises the standard of legal ethics and the public's respect; the opposite effect is just as likely—encouragement of vexatious tactics, which increase public cynicism about the administration of justice.'").

**5. Denying disqualification will prevent unfair prejudice to Lowey's MDL Clients.**

Lowey has represented private clients in this MDL since 2018, when it prepared and filed the *Humana I* Complaint. Lowey has dedicated many senior and junior lawyers to this representation over the course of the 7 years that it has represented these clients. Lowey's books and records reveal that its lawyers and staff have collectively devoted nearly 50,000 hours to representing its clients in prosecuting claims against the Moving Defendants. With Humana's case proceeding to trial next September and Molina's ongoing work preparing its case, disqualifying Mr. Nielsen or Lowey would render most of these significant efforts to understand the claims, documents, depositions, and preparations for trial, futile. Any claimed prejudice to Moving Defendants in having Mr. Nielsen represent Lowey's MDL Clients (to the extent any exists) would pale in comparison to the prejudice to Lowey's MDL Clients associated with having to start that significant work over. Roiphe Rpt. at ¶ 32.

## IV. CONCLUSION

For the foregoing reasons, the Court should exercise its sound discretion to deny Defendants' motion to disqualify Mr. Nielsen and his firm, Lowey Dannenberg, P.C.

Dated: October 1, 2025

Respectfully submitted,

*/s/ Peter D St. Phillip, Jr.*

Peter D. St. Phillip, Jr.
Pa. No. 70027

W. Joseph Nielsen
Raymond P. Girnys
Noelle Ruggiero
Alexis Castillo
Thomas Griffith

LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
pstphillip@lowey.com
jnielsen@lowey.com
rgirnys@lowey.com
nuggiero@lowey.com
acastillo@lowey.com
tgriffith@lowey.com

Matthew A. Cartwright
LOWEY DANNENBERG, P.C.
100 Front Street, Suite 520
West Conshohocken, PA 19428
Telephone: (215) 399-4770
mcartwright@lowey.com
Pa. No. 46871

*Counsel for Humana Inc. and Molina Healthcare, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served on October 1, 2025, with a copy of this document via the Court's CM/ECF System.

Respectfully submitted,

*/s/ Peter D St. Phillip, Jr.*
Peter D. St. Phillip, Jr.

APPENDIX A

PEX. 1    Expert report of Professor Rebecca Roiphe

PEX. 2    Expert report of Stewart L. Cohen, Esq.

PEX. 3    Pretrial Order No. 306, ECF No. 340

PEX. 4    Pretrial Order No. 70, ECF No. 841

PEX. 5    Pretrial Order No. 106, ECF No. 1142

PEX. 6    Pretrial Order No. 143, ECF No. 1556

PEX. 7    Transfer Order, *In re: Generic Pharms. Pricing Antitrust Litig.*, No. MDL 2724, 2017 WL 4582710 (U.S. Jud. Pan. Mult. Lit. Aug. 3, 2017)

PEX. 8    Pretrial Order No. 45, ECF No. 561

PEX. 9    Private Plaintiffs' Motion for an Order Authorizing Access, ECF No. 606

PEX. 10    Transcript of Oral Arguments on Discovery Motions, ECF No. 652

PEX. 11    Private Plaintiffs' Memorandum in Support of Their Motion for an Order Authorizing Access, ECF No. 606-1

PEX. 12    Certain Defendants' Response in Opposition to Private Plaintiffs' Motion for Unfettered Access to Law Enforcement Investigatory Materials, ECF No. 628

PEX. 13    Order, ECF No. 758

PEX. 14    Pretrial Order No. 90, ECF No. 1012

PEX. 15    Humana Inc.'s Second Amended Complaint, ECF No. 109

PEX. 16    Pretrial Order No. 105, ECF No. 1135

PEX. 17    Excerpt of the docket of *The City of Boston et al v. Express Scripts, Inc. et al*, 1:24-cv-10525 (2024)