# PEX 1

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724 |
| | 16-MD-2724 |
| This document relates to: | Hon. Cynthia M. Rufe |
| *Molina Healthcare Inc. v. Actavis Elizabeth LLC, et al.*, 20-CV-00695 | |
| *Humana Inc. v. Actavis Elizabeth LLC, et al.*, 18-CV-03299 | |
| *Humana Inc. v. Actavis Elizabeth LLC, et al.*, 19-CV-04862 | |
| *Humana Inc. v. Actavis Elizabeth LLC, et al.*, 20-CV-06303 | |

**Expert Report of Rebecca Roiphe**

Summary of Report

1. I have been retained by Lowey Dannenberg, P.C. (Lowey) to provide an expert opinion on questions of professional conduct raised in the above captioned matter. Certain defendants have moved to disqualify Lowey and W. Joseph Nielsen from representing plaintiffs, Humana Inc. (Humana) and Molina Healthcare Inc. (Molina), due to an alleged conflict of interest arising from Nielsen's former employment at the Connecticut Attorney General's office. (Connecticut AG). Disqualification would be inappropriate because Nielsen did not have a conflict of interest under Rule 1.11 and has, to the contrary, acted in an exemplary manner, in accordance with his professional obligations.

2. The rules of professional conduct protect both government agencies and private parties when lawyers leave government service for private practice. Neither interest is even remotely at risk, let alone harmed, in this case. Nielsen obtained informed consent from the Connecticut AG's office confirmed in writing to represent the plaintiffs in this case. Furthermore, Nielsen has no confidential government information that could be used to the disadvantage of the defendants because all the information that he obtained as a government attorney was previously shared with the plaintiffs. As the ABA recently explained, Rule 1.11(c) does "not apply in the situation in which the lawyer's client is legally permitted to use the information in question." ABA Opinion 24-509, at 9, n. 30.

Qualifications

3. My qualifications to provide an expert opinion on questions of lawyers' professional conduct are fully laid out in my CV, which is attached to this declaration.

4. I received my BA from Columbia College, my Ph.D. in American history from the University of Chicago, and my JD from Harvard Law School. I served as a law clerk to the Honorable Bruce Selya of the U.S. Court of Appeals for First Circuit.

5. I have been a member of the full-time faculty at New York Law School since 2007. Before that, I taught for two years at Fordham Law School. I am currently the Joseph Solomon Distinguished Professor of Law. I formally served as Co-Dean for Faculty Development at New York Law School. I run the Institute for Professional Ethics and co-chair the Criminal Justice Institute at NYLS. Prior to teaching, I was an associate at Wilmer, Cutler & Pickering, LLP (one of the predecessor firms to WilmerHale) and then worked as an Assistant District Attorney in the New York County District Attorney's Office, where I prosecuted complex financial frauds. I am admitted to practice law in New York.

6. I have regularly taught classes in legal ethics at New York Law School. I speak at CLE and other educational programs and have written extensively on the subject. My academic work includes law review articles, book chapters, and essays. I am a contributing editor to Jotwell, an online journal, where I review works in legal ethics. In 2020, I received the New York State Bar Association's Sanford Levy award for a lifetime of work in legal ethics.

7. I regularly help organize and participate in conferences and other programs for legal academics and practitioners on the rules of professional conduct and lawyers' ethics.

8. I have engaged in various other work relating to professional ethics, much of it involving drafting and interpreting the American Bar Association (ABA) and New York rules of professional conduct. I was the reporter to the New York State Bar Association's Committee on the Standards of Attorney Conduct ("COSAC") from 2018-2019 and a member of COSAC thereafter. I recently completed a seven-year term as liaison from the American Association of Law Schools to the American Bar Association ("ABA") Standing Committee on Ethics and Professional Responsibility. This committee drafts ABA ethics opinions and suggests changes to the Model Rules of Professional Conduct. As a subject matter expert for the National Conference of Bar Examiners, I also draft and review questions for the Multistate Professional Responsibility Exam.

9. In addition, I frequently comment as an expert in law and legal ethics in the media. I regularly appear on CBS News where I am a legal news analyst. I also appear on CNN and MSNBC, and have been a guest on multiple podcasts grappling with current issues in law, politics, and ethics. In addition to my academic articles, I have written opinion pieces on law and legal ethics in The New York Times, Slate, The Washington Post, The Hill, The New York Law Journal, The New York Review of Books Daily, as well as other popular news outlets. I am frequently consulted by journalists for my expertise and am quoted regularly in The New York Times, The Wall Street Journal, The Washington Post, as well as other publications.

<u>Relevant Facts</u>

10. In preparing this report, I have relied on the following: (1) The *Humana I* Second Amended Generics Antitrust Case Complaint; (2) Pretrial Orders, Nos. 45, 70, 90, 105, 106, 143 and 158 in Generics Pharmaceuticals Pricing Antitrust Litigation; (3)

2

Declaration of Peter D. St. Phillip, Jr. in Opposition to Certain Defendants' Motion to Disqualify Plaintiff's Counsel and Law Firm; (4) Declaration of W. Joseph Nielsen in Opposition to Certain Defendants' Motion to Disqualify Plaintiff's Counsel and Law Firm as well as conversations and email communications with Peter St. Phillip, W. Joseph Nielsen, and other attorneys at Lowey.

11. Lowey began representing Humana around 2003 in cases across the country seeking recovery for overpayments of the cost of certain drugs. St. Phillip Decl. at ¶ 9. Over the course of the following 22 years, Lowey continued to represent Humana in related proceedings and built up significant institutional knowledge. Humana hired Lowey to represent it in the current antitrust case in March 2018 and two years later, Molina engaged the firm to represent it in its own related litigation. These cases along with a coalition of states' investigations were consolidated with other private parties' litigation as part of MDL 2724. St. Phillip Decl. at ¶¶ 11,12; Nielsen Decl. at ¶¶ 12-13.

12. Lowey has expended close to 50,000 hours on behalf of Humana and Molina. It has invested years advising these clients of developments, strategizing with the State AGs and private plaintiffs over written discovery, drafting and responding to motions, trial issues, bellwether selection efforts, expert needs, data issues, defensive discovery positions, attorney proffers, securing and evaluating confidential witness information, document hosting issues and review, settlement strategies, and a variety of other tasks. St. Philip Decl. at ¶¶ 16-19.

13. During this time, the State AGs entered into Common Interest Agreements with private plaintiffs and shared all information, evidence, opinion, mental impressions, strategy, and work product with these private plaintiffs, including Humana and Molina. Nielsen Decl. at ¶ 15. Thus, Humana and Molina had access to all the same information as the Connecticut AG. Lowey lawyers worked closely with the State AGs in developing common theories of damages, working with common consultants, sharing views on offensive and defensive discovery, motion practice, settlement strategies, trial preparation, as well as data collection and management. St. Phillip Decl., at ¶¶ 13, 14.

14. The court issued a series of pretrial orders designed to ensure that the parties had access to all the same materials, including all responses to state investigatory subpoenas. These pretrial orders permitted the states and private plaintiffs to share information freely. Nielsen Decl. at ¶ 16. All of the states' materials, including the Connecticut AG's work, were treated as Protected Materials under the order and shared accordingly. *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, 2017 WL 4582710, at *4 (J.P.M.L. Aug. 3, 2017). Specifically, the Connecticut AG's subpoenas and responses were deemed discovery material and distributed to the parties to the MDL. PTO 70 (1/31/19); PTO 90 (May 31, 2019); PTO 106 (Oct. 25, 2019); PTO 143 (Oct. 14, 2020). Certain highly-sensitive material produced and shared pursuant to these orders was subject to a claw-back provision, but this limitation applied equally to the state attorneys general and private parties. Nielsen Decl. at ¶ 16; (PTO 70), ECF No. 841 at ¶ 7, p. 3. Thus, Humana and Molina had access to all the relevant material and information in the Connecticut AG's possession.

15. The states not only shared documents and other evidence with the private parties, but also coordinated all aspects of the litigation. Pursuant to these orders and agreements, Lowey's clients, private plaintiffs, and the state attorneys general have had weekly calls, fully collaborating on all aspects of the case, including preparing proffers, depositions, and interrogatories, and brainstorming other strategies. St. Phillip Decl., at ¶¶ 16, 18. The states also shared information about cooperating witnesses, including attorney proffers,

3

with the private parties, including Humana and Molina. Nielsen Decl. at ¶¶ 16, 18.

16. Even if the parties had not entered into common interest agreements and shared all information and strategies, the private parties, including Humana and Molina, would have had access to all the responses to the Connecticut AG's investigative subpoenas through routine discovery.  Nielsen Decl. at ¶ 4.

17. Nielsen did not obtain any information from DOJ or other agencies, and DOJ was, in fact, forbidden from sharing its grand jury information by Federal Rule of Criminal Procedure 6(e). Nielsen Decl. at ¶¶ 7-10.

18.  W. Joseph Nielsen joined Lowey in July 2025.  Prior to doing so, he advised the Connecticut AG's Office of his intention to represent Humana and Molina, as well as other insurers alleging price fixing in MDL 2724. After sharing information about the representation and discussing risks and alternatives, Nielsen obtained the informed consent of the Chief Ethics Officer of the Connecticut AG's office.  He later received an email and a letter from the Connecticut AG, which comprised written confirmation of this consent. Nielsen Decl. at ¶¶ 31-35, Ex. A, B.

19. Prior to joining the firm, Nielsen and the other Lowey lawyers involved in the case agreed that Nielsen would not share any information related to the Connecticut AG's settlement activity. St. Phillip Decl. at ¶ 5. Nielsen has not participated in any settlement discussions and has not shared any information he gained during these discussions with other Lowey lawyers. Nielsen Decl. at ¶ 36.

Opinion

**A.  Summary of Opinion**

20.  Nielsen and Lowey did not violate any rules of professional conduct and have instead operated in complete accordance with their professional obligations. Rule 1.11(a) prevents former government employees from representing a client in "a matter in which the lawyer has participated personally and substantially as a public officer or employee, unless the appropriate government agency gives informed consent." Nielsen did not violate Rule 1.11(a) because he obtained informed consent, confirmed in writing, from the Connecticut AG's office to represent the plaintiffs in this case. Nielsen Decl., at ¶¶ 31-35.  Even if the current litigation were the same matter as the case he worked on while in government service, the government agency's informed consent resolves any conflict and allows the former government lawyer to proceed with the representation.  Penn. Rule 1.11(a)(2)

21.  Rule 1.11(c) prevents a former government lawyer from representing a client if he obtained "confidential government information" that could be used to the material disadvantage of a private party. Nielsen did not violate this provision because all the information he obtained while working at the Connecticut AG's office has already been shared with the plaintiffs in this case.  As such it was not "confidential government information" and could not "materially disadvantage" the government. Penn. Rule 1.11(c).

22. Because there is no conflict of interest, Nielsen is not precluded from representing Humana and Molina, the firm is not required to screen Nielsen from participation in the matter, and both Nielsen and Lowey are permitted to continue in the representation.

4

**B.  Choice of Law**

23.  The Pennsylvania Rules of Professional Conduct apply to this case.  Pennsylvania Rule 8.5(b)(1) provides, "for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits shall be applied, unless the rules of the tribunal provide otherwise."  The litigation at issue is pending in United States District Court for the Eastern District of Pennsylvania, which has adopted the Pennsylvania Rules of Professional Conduct. Local Rules of Civil Procedure, Rule 83.6, IV.B.

24. Because the Pennsylvania rule is almost identical to the ABA Model Rule of Professional Conduct, national commentary on the scope and meaning of the model rule is persuasive. The only relevant difference in the two rules is that the Model Rule requires "informed consent, confirmed in writing" to waive a conflict, while the Pennsylvania Rule only requires "informed consent."  Nielsen complied with both rules, by obtaining informed consent confirmed in writing from the Connecticut AG's Office.

**C. Overview of the Relevant Provisions of the Pennsylvania Rules of Professional Conduct**

25. Rule 1.11, often referred to as the "revolving door" rule, regulates conflicts of interest for former government lawyers. The rule seeks to balance several goals. While it protects the government as a former client and prevents private parties from gaining an unfair advantage against adversaries, it is also careful not to "inhibit transfer of employment to and from government service." Penn. Rule 1.11, cmt 4. This is necessary to avoid "imposing too severe a deterrent against entering public service." *Id*. In fact, the current rule was drafted so as to ensure that it did not unduly restrict former government lawyers from taking on private clients and thereby discourage capable lawyers from entering public service. Art Garwin, *A Legislative History: The Development of the ABA Model Rules of Professional Conduct*, 1982-2013 291 (2013). In addition, the rule recognizes that private parties can benefit from representation by government lawyers with deep knowledge and expertise in the relevant law, procedure, and rules. Giving private clients access to expert lawyers is in the public interest because it will ensure greater compliance with the law. Restatement (Third) of the Law Governing Lawyers §133, cmt. b.

26. Rule 1.11(a) protects the government by preventing its employees from acting disloyally so as to secure private employment when they leave public service.  Restatement (Third) of the Law Governing Lawyers §133, cmt. b.  Thus, it provides that former government lawyers may not "represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent to the representation." Penn. Rule 1.11(a)(2).  Nielsen did not violate this rule because he received the Connecticut AG's informed consent, confirmed in writing. Nielsen Decl., at ¶¶ 31-35, Exs. A, B.

27. Rule 1.11(c) protects private parties, by preventing lawyers from representing a client when they have confidential government information that could be used to harm a third party.  Thus Pennsylvania Rule 1.11(c) states:

> a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee may not represent a private client whose interests are adverse to that person

5

in a matter in which the information could be used to the material disadvantage of that person.

Nielsen did not violate this provision because all the relevant information he gained while working for the government was previously shared with the plaintiffs in this case. ABA Ethics Op. 24-509, at 9, n.30.

**C. Nielsen Did Not Violate Rule 1.11(a)(2) Because He Obtained Informed Consent from the Connecticut AG's Office**

28. Nielsen complied with Rule 1.11(a)(2) because he received informed consent to represent Humana and Molina from the Connecticut AG's office.  He later received written confirmation of this consent, which is required by the model rule but not by Pennsylvania's Rules of Professional Conduct. Rule 1.11(a) is designed to protect the government agency.  Geoffrey C. Hazard, W. Walter Hodes & Peter Jarvis, The Law of Lawyering §16.11 (4th ed. 2020). Pennsylvania Rule 1.11(a)(2) provides: that a former government officer or employee may not "represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent to the representation."  Because this section of the rule was drafted to protect the government, not private parties, informed consent from the government agency at which the lawyer worked is sufficient to resolve the conflict.

29. This subsection of the rule is designed to protect the former government employer, which is why the government agency's consent is sufficient to resolve any conflict.  The Connecticut AG gave its informed consent. Furthermore, Nielsen informed the Connecticut AG that the defendants had filed a motion to disqualify, giving it the opportunity to respond.  The Connecticut AG did not respond, quite obviously because it did not object to the representation. Nielsen Decl., at ¶ 32.

30. Nielsen did not violate this rule because he obtained informed consent from the Connecticut AG's Office.  Informed consent is defined as "the consent by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Penn. Rule 1.0(e).  Nielsen received informed consent to the representation prior to leaving the Connecticut AG's Office. Nielsen Decl., at ¶¶ 31-32.  He later obtained written confirmation of this consent in an email (Nielsen Decl., at ¶ 34, Ex. A) and a letter. (Nielsen Decl., at ¶ 35, Ex. B). The written confirmation is not required by Pennsylvania Rules of Professional Conduct but further supports his conscientious compliance with professional obligations.

**D. Nielsen did not Violate Rule 1.11(c) because All Confidential Government Information Was Shared with the Plaintiffs**

31. Rule 1.11 prevents lawyers from using confidential government information to harm private parties.  Thus Pennsylvania Rule 1.11(c) states:

> a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of

that person.

The rule defines "confidential government information" as (a) "information that has been obtained under governmental authority;" (b) at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose;" and (c) "which is not otherwise available to the public."  Id.

32. The ABA recently explained that Rule 1.11(c) does not apply where, as in this case, "the lawyer's client is legally permitted to use the information in question." ABA Formal Op. 24-509, at 9, n.30.   The opinion explains: "when the law permits the client to use the confidential government information that the lawyer acquired while in government service, the reason for the disqualification provision – i.e., to prevent the improper use of confidential government information – is inapplicable, and the client's countervailing interest in counsel of choice outweighs any conceivable interest in a wooden application of the rule. Cf. Model Rules of Prof'l Conduct, Scope, para. [14] ("The Rules of Professional Conduct are rules of reason.")." Humana and Molina are longtime clients of Lowey and depriving it of counsel of choice would be particularly damaging given the length of the relationship and the breadth of knowledge the firm has of their businesses. It would be particularly inappropriate to deprive the clients of their counsel of choice in this case because there was no rule violation. The plaintiffs had legal access to all the confidential government information Nielsen obtained as an Assistant Attorney General. St. Phillip Decl., at ¶ 13; Nielsen Decl., at ¶ 21.

33. <u>The information was publicly available.</u>  The information that Nielsen gained while at the Connecticut AG's Office was "publicly available" and therefore did not constitute confidential government information.  The ABA recently explained that "[w]hether information is publicly available" is a question of fact that will depend on whether "it can be obtained by routine discovery." ABA Formal Op. 24-509, at 4.  The information gained by Nielsen while at the Connecticut AG's Office was all available through routine discovery in the MDL. Nielsen Decl., at ¶ 4.  In a civil case, the AG's investigatory authority is essentially the same as private litigants, but the Connecticut AG can use these methods prior to filing a complaint. Conn. Gen. Stat. § 35-42; Nielsen Decl., at ¶ 4.

34. The defendants' expert notes that the plaintiffs' attorneys have objected when the defendants issued discovery requests for information related to the Connecticut AG's investigation. Wendel Expert Report, ¶ 32.  The objection seems to be that the Connecticut AG has lawfully shared its investigatory material with private parties through a court approved MDL, not that Nielsen's position gives them unfair access to such materials.  Rule 1.11(c) is only concerned with situations in which the lawyer's former government employment is the source of the advantage, not a court ordered MDL.

35. Courts have consistently echoed the ABA's understanding that materials available through routine discovery are not confidential government information.  These courts have further explained that the mere fact that discovery materials are subject to a protective order does not transform them into confidential government information. People v. OptumRX Inc., 2025 WL 2542288, *1 (Cal. Ct. App. 2d Dist. 2025) ("We agree with the many courts that have considered this issue already: information that may be obtained through routine discovery in civil litigation, even if it is subject to a protective order, is "available to the public," and not confidential government information under rule 1.11(c).").

36. <u>The information could not materially disadvantage defendants</u>. Even if the information were "confidential government information," which it is not, the rule only proscribes representation if the client's access to the information could "materially disadvantage" the defendants. Penn. Rule 1.11(c).  If the plaintiffs already have access to the same documents and information as the former government lawyer, the lawyer's knowledge of it from his previous work for the government cannot cause any harm, let alone "materially disadvantage" the private party.

37. Courts have also interpreted the language of the rule to accord with this common-sense reading that information that has been shared with the plaintiffs cannot "materially disadvantage" the private party. *In re: National Prescription Opiate Litig.*, Case No. 1:17-md-2804, 2777, *11 (N.D. Ohio Mar. 18, 2024) (Polster, J.) (when materials are "available to all plaintiffs' counsel" they cannot be used to the "material disadvantage" of any defendant because "the information is (or should be) already known by other plaintiff firms"), *In re: OptumRx, Inc.*, Case No. 24-3396, ECF No. 7-1 at 3 (6th Cir. Oct. 22, 2024) (denying OptumRx's petition for mandamus, finding that "OptumRx faces no material disadvantage from any information Motley Rice obtained in the Chicago, D.C., and Hawaii investigations because it should have already been produced into the MDL discovery repository pursuant to the district court's case management orders and discovery rulings"); *Anne Arundel County, Maryland v. Express Scripts, Inc.*, Civ. No. MJM-24-90, 2025 WL 254807, *9 (D. Md. Jan. 21, 2025) (finding no "material disadvantage" to defendants because "[a]ll of the information that Motley Rice obtained from OptumRx during the Chicago, D.C., and Hawaii investigations has been placed into the MDL discovery repository" and "[t]he mere fact that Motley Rice may have access to the documents for longer does not rise to the level of material disadvantage")

38. Nielsen could not make adverse use of any confidential government information because the private parties already had access to all of the same information.  The Connecticut AG's office entered into Common Interest agreements with the plaintiffs that allowed for broad access to work product and related communications. St. Phillip Decl. ¶ 13.  When Humana and Molina were added to the MDL and were covered by the court's protective order, they joined the existing common interest agreements and accessed all the information, including all the evidence gathered and information known to the Connecticut AG. *See* Geoffrey C. Hazard, W. Walter Hodes & Peter Jarvis, *The Law of Lawyering* (4th ed. 2020), at §16.12 (noting that the rule does not apply unless the former government lawyer has a "special advantage" in using the confidential government information).  As the defendants' own expert explains, Rule 1.11(c) is designed to prevent confidential government information from winding up in the "hands of private parties who are unauthorized recipients of the information." Wendel Expert Report at ¶ 27.  Of course, Humana and Molina are *authorized* to use this information by the court and therefore even the defendant's expert would seemingly concede that the rule does not apply.

39. The defendants' expert lays out different categories of information that Nielsen could have obtained at the Connecticut AG's office.  Even if Nielsen had gained these types of information, it would not preclude representation of Humana and Molina because either (a) it is not "confidential government information" under the rule's definition; or (b) the information was already known to the plaintiffs and it is therefore "publicly available" and incapable of materially disadvantaging the defendants. We address each of the expert's examples below.

- *Nielsen could use information learned in settlement negotiations he led on behalf of the Connecticut AG about a company's willingness and ability to resolve the private actions. He could use that information in making strategic decisions as to how best*

8

*litigate the claims in the private actions and focus efforts towards those Defendants he has learned through confidential discussions are more able to pay, or towards Defendants that have shown a greater willingness to settle.*

This is not "confidential government information." Confidential government information is defined as information that: "the government is prohibited by law from disclosing to the public or has a *legal privilege* not to disclose." Penn. Rule 1.11(c) (emphasis added) While settlement discussions may be confidential, they do not comprise "confidential government information" unless there is some legal privilege involved. *See California v. OptumRx Inc.*, B343828, 2025 WL 2542288, \*6 (Cal. Ct. App. Sept. 4, 2025) ("Confidential government information is limited to information 'obtained under government authority,' which includes information obtained pursuant to a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power" and "[c]onfidential government information is information that only the government can obtain, such as grand jury testimony") (citing ABA Ethics Op. 24-509 at p. 2). Even if this were confidential government information, Humana and Molina had access to this information through the common interest agreements and protective orders. St. Phillip Decl., at ¶¶ 13-17.

- *Nielsen could use information learned during interviews with cooperating witness and confidential attorney proffers about conduct of other Defendants or witnesses to make strategic decisions about which witnesses to call at trial and how to examine witnesses.*

Pursuant to the common interest agreements and protective orders, the private parties and states coordinated with regard to strategy. They specifically discussed attorney proffers and shared all information gained from cooperating witnesses. St. Phillip Decl., at ¶ 16. Thus, this information does not count as "confidential government information" that "could be used to the material disadvantage" of defendants. ABA Ethics Op. 24-509, at p. 9, n. 30; *see also In re: National Prescription Opiate Litig.*, Case No. 1:17-md-2804, 2024 WL 3387288, \*11 (N.D. Ohio Mar. 18, 2024) (Polster, J.) (when materials are "available to all plaintiffs' counsel" they cannot be used to the "material disadvantage" of any defendant because "the information is (or should be) already known by other plaintiff firms.").

- *Nielsen could use information obtained from documents or other materials obtained during the investigation pursuant to CIDs and other investigative techniques to make strategic decisions about which witnesses to call or questions to ask at trial in private actions.*

The states and private parties shared all materials obtained during the investigation. Thus, Humana and Molina already had legal access to all documents and other information gained through CIDs and other investigative techniques. St. Phillip Decl., at ¶¶ 13-17. Thus, this information does not count as "confidential government information" that "could be used to the material disadvantage" of defendants. ABA Ethics Op. 24-509, at p. 9, n. 30; *see also In re: National Prescription Opiate Litig.*, Case No. 1:17-md-2804, 2024 WL 3387288, \*11 (N.D. Ohio Mar. 18, 2024) (Polster, J.) (when materials are "available to all plaintiffs' counsel" they cannot be used to the "material disadvantage" of any defendant because "the information is (or should be) already known by other plaintiff firms").

- *Nielsen could advise expert witnesses based on information he has obtained through government investigative techniques and direct them to focus on, address, or ignore certain issues based on his unique understanding.*

9

It is unclear what the expert witness means by "unique understanding," but again, the private parties and states coordinated on strategy for six years so any understanding that Nielsen had was anything but "unique." St. Phillip Decl., at ¶¶ 13-17. Any information gained through investigative techniques was shared with private parties and so Humana and Molina already had legal access to it. As such, it is not "confidential government information" that "could be used to the material disadvantage" of defendants. ABA Ethics Op. 24-509, at p. 9, n. 30

- *Nielsen could use information learned while working with DOJ and other government agencies during the investigation to request that the DOJ produce interview notes and memoranda from meetings the DOJ had with certain witnesses and/or their counsel (Indeed, Nielsen has already signed a subpoena directed at DOJ to produce such materials.*

    Nielsen did not have access to any confidential information from the DOJ or any other government agency. And, in fact, DOJ personnel were forbidden from sharing any information with Nielsen by Federal Rule of Criminal Procedure 6(e). Nielsen Decl. at ¶¶ 7-8.

- *Nielsen could target Defendants for settlement where he knows or suspects, from settlement negotiations or attorney proffers, those Defendants that are more willing to settle, and leverage those settlements and the threat of joint and several liability to procure other settlements for his new clients that Lowey would not otherwise be able to obtain.*

    Once again, information about any defendant's willingness to settle is not "confidential government information" because the government is not prohibited by law from disclosing it to the public, nor is there a legal privilege not to disclose it. Penn. Rule 1.11(c). As the ABA explained: "Confidential government information is limited to information 'obtained under government authority,' which includes 'information obtained pursuant to a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power.' ABA Formal Op. 24-509, at 2. It does not, therefore, include knowledge about defendants' willingness to settle. This sort of information might be confidential under Rule 1.9(c) in which case Nielsen is not permitted to disclose or use the information under 1.11(a)(1) but it does not qualify as "confidential government information" under 1.11(c). Nielsen has been careful not to disclose any *confidential* information and has absented himself from settlement discussions and strategy meetings, leaving that to another attorney at Lowey in order to safeguard his confidentiality obligations.

**D. Nielsen Did Not Violate Rule 1.11(a)(1) Because He Did Not Share Any Confidential Settlement Information**

40. Mr. Nielsen has no "confidential government information" that could be used to the disadvantage of the plaintiffs. The rules also protect the government by preventing former government lawyers from using or revealing any confidential information. Pennsylvania Rule 1.11(a)(1). To the extent that there is any remaining confidential information, Nielsen has not and will not reveal it. St. Philip Decl., at ¶ 5; Nielsen Decl. at ¶ 36.

41. To the extent that there was any confidential information gained during settlement conversations, Mr. Nielsen was and is careful not to use or reveal this information. He did

not participate in any settlement discussion and did not discuss anything he learned from the settlement conferences he conducted while at the Connecticut Attorney General's Office. St. Phillip Decl. at ¶ 5; Nielsen Decl., at ¶ 36.

### Conclusion

42. In my opinion, Nielsen and Lowey are permitted to represent Humana and Molina because Nielsen did not violate Rule 1.11.  Nielsen obtained informed consent to the representation from the Connecticut AG as required by Rule 1.11(a). Nielsen did not violate Rule 1.11(c) because he did not obtain any confidential government information that could be used to the material disadvantage of the defendants. This is because the plaintiffs had lawful access to all the information gained pursuant to the Connecticut AG's authority, which was shared with plaintiffs through court order.

11

Date: September 29, 2025
New York, New York

_____
Rebecca Roiphe

# EXHIBIT A

**REBECCA ROIPHE**

Joseph Solomon Distinguished Professor of Law
New York Law School
185 West Broadway
New York, NY 10013
212.431.2804
rebecca.roiphe@nyls.edu

**CURRENT EMPLOYMENT**

**New York Law School**, New York, NY                                      2007-present
Joseph Solomon Distinguished Professor of Law

Director, the Institute for Legal Ethics
Co-director, Criminal Justice Institute

Courses: American Legal History, Criminal Procedure, Ethics in Criminal Practice, Professional Responsibility.

Service: Appointments Committee, Curriculum Committee, Promotion & Tenure Committee, Faculty Equity Committee.

| | |
|---|---|
| **Co-Dean for Faculty Scholarship** | 2017-2023 |
| **CBS News Legal Analyst** | 2019-present |
| **MPRE Subject Matter Expert** | 2018-present |
| **Liaison, ABA Standing Committee on Professional Ethics** | 2018-2025 |
| **Member, Committee on the Standards of Attorney Conduct of the New York State Bar Association** | 2019-present |
| **AALS Professional Responsibility Section Executive Board Member** | 2021-present |
| **New York State Bar Association Task Force on Artificial Intelligence** | 2023-2024 |
| **Member, Mayor's Advisory Committee on the Judiciary** | 2024-present |

**EDUCATION**

**University of Chicago:**  Ph.D. in American History, June 2002

> Dissertation: *Law and the Modern Soul, 1870–1930*
> MA Thesis: *Reforming Women: Science, Maternalism, and the Treatment of Delinquent Girls in the 1920s*
> Dissertation Committee: Amy Dru Stanley, Jan Goldstein, George Chauncey

**Harvard Law School:**  J.D. *cum laude*, June 2000

**Columbia University:**  B.A. in American Literature and History, June 1993

**CLERKSHIP**

**The Honorable Bruce Selya,** Providence, RI                                    2000-2001
United States Court of Appeals for the First Circuit.

**AWARDS AND FELLOWSHIPS**

**Heterodox Academy Siegel Center Research Fellowship**              Fall 2024

**Otto Walter Award for Best Article Written by a Full-Time Faculty**    2020, 2023
**Member at NYLS**

**The Sanford D. Levy Memorial Award for Lifetime Achievement**          2020
**in Legal Ethics,** New York State Bar Association

**Golieb Fellowship**, New York University School of Law      September 2001 - May 2002

**Smith-Doheny Prize for Essay on Legal Ethics**, Notre Dame Law School    July 2000
*The Citizen Lawyer: Liberal Individualism and the Origin of Professional Ethics.*

**American Psychological Association Prize**                              August 1997
*A Modern Day Prometheus: Clifford Beers and the Mental Hygiene*
*Movement, 1908–1914.*

**William T. Hutchinson Fellowship**, University of Chicago              1996–1997

**Phoenix Fellowship**, University of Chicago                            1994–1996

**PUBLICATIONS:  ACADEMIC ARTICLES**

*Under Political Pressure: How Courts And Congress Can Help Prosecutors Seek Justice,*
Yale L. J. Forum (forthcoming 2025) (with Bruce Green)

*Can Prosecutors Preserve Public Confidence in Their Nonpartisanship and If So, How?*,
93 Fordham L. Rev. 1177 (2025) (with Bruce Green)

*Why We Should Not Sanction Trump's Lawyers*, Cardozo L. Rev. (forthcoming 2025)

*Public Confidence, Judges, and Politics on and off the Bench*, 87 Law & Contemp.
Probs. 183 (2024) (with Bruce Green)

*Prosecutors' Independence*, in Research Handbook on the Sociology of Legal Ethics
(2024) (with Bruce Green)

*Diverse Origins – New Directions,* ch. in Julian Webb ed., LEADING WORKS IN LEGAL
ETHICS (Routledge 2023)

*Depoliticizing Federal Prosecution*, 100 Denver L. Rev. 817 (2023) (with Bruce Green)

*A Fiduciary Theory of Progressive Prosecution*, 60 Am. Crim. L. Rev. 1431 (2023) (with Bruce Green)

*Rule 8.4(g), Discriminatory Speech, and The First Amendment*, 50 HOFSTRA L. REV. 543 (2022) (with Bruce Green)

*Lawyers and the Lies They Tell,* 69 WASH. U. J. OF LAW & POL'Y 38 (2022) (with Bruce Green)

*Impeaching Legal Ethics*, 49 FL. S. U. L. REV.449 (2022) (with Bruce Green)

*Who Should Regulate Politicization of the DOJ?,* 35 NOTRE DAME J. OF L., ETHICS, & PUBLIC POL'Y.671 (2021) (with Bruce Green)

*A Typology of Department of Justice Lawyers' Roles and Responsibilities*, 98 N.C. L. REV. 1077 (2020)

*A Fiduciary Theory of Prosecution* (with Bruce Green)*,* 69 AM. U. L. REV. 101 (2019).

*Punishment Without Process: Victim Impact Proceedings for Dead Defendants,* Fordham L. Rev. Online (Nov. 2019) (with Bruce Green).

*Learning to Live With Judicial Partisanship,* Florida Law Review Forum (Aug. 2019) (with Bruce Green).

*May Federal Prosecutors Take Direction From the President?,* 87 FORDHAM L. REV. 1817 (April 2019).

*Can a Good Person Be a Good Prosecutor in the Era of Krasner and Sessions?*, FORDHAM L. REV. ONLINE (2018).

*Judicial Activism in Trial Courts,* 74 N.Y.U. SURVEY OF AM. L. 365 (2019) (with Bruce Green)

*Can the President Control the Department of Justice,* 70 ALABAMA L. REV. 1 (2018) (with Bruce Green)

*The Duty to Charge in Police Use of Excessive Force Cases*, 65 CLEV. ST. L. R. 505 (2017)

*Rethinking Prosecutors' Conflicts of Interest,* 58 B.C. L. REV. 463 (2017) (with Bruce Green)

*The Decline of Professionalism*, 29 GEO. J. L. ETHICS 649 (2016).

*Redefining Professionalism,* 26 U. FL. J. OF L. AND PUB. POL'Y 193 (2016)

*Behind the Nylon Curtain: Social Cohesion, Law, and the Disaggregation of American Culture*, 32 Touro L. Rev. 63 (2016)

*Tilting at Stratification: Against a Divide in Legal Education*, 16 NEV. L. J. 227 (2015)

*A History of Professionalism: Julius Henry Cohen and the Professions as a Route to*

*Citizenship,* 40 FORDHAM URBAN L. J. 33 (2012).

*The Ethics of Willful Ignorance*, 24 GEO. J. OF L. ETHICS 187 (2011).

*Lawyering at the Extremes: The Representation of Tom Mooney, 1916-1939*, 77 FORDHAM L. REV. 1731 (2009).

*Regulating Discourtesy on the Bench*, 64 N.Y.U ANN. SURVEY OF AM. LAW 497 (2009) (with Bruce Green).

*The Most Dangerous Profession*, 39 CONN. L. REV. 603 (2006).

*The Serpent Beguiled Me: A History of the Entrapment Defense*, 33 SETON HALL L. REV. 257-302 (2003).

Comment, *Proposed Anti-Paparazzi Legislation*, 36 HARV. J.L. ON LEGIS. 250 (Winter 1999).

**PUBLICATIONS:  SHORTER PIECES**

*Law ± Power*, Persuasion (May 19, 2025).

*De-Weaponizing the Federal Government*, VOTING RIGHTS & DEMOCRACY FORUM, Feb. 28, 2023, https://fordhamdemocracyproject.com/2023/02/28/de-weaponizing-the-federal-government/ (with Bruce Green)

*Stopping the Zombie Apocalypse*, a review of Maya Steinitz, Zombie Litigation: Claim Aggregation, Litigant Autonomy, and Funders' Intermeddling, __ Cornell L. Rev. __ (forthcoming, 2025), available at SSRN, Jotwell (Nov. 1, 2024).

*A GOP U.S. Attorney Does the Right Thing in Eric Adams' Corruption Case*, U.S. News and World Report, Feb. 14, 2025. (with Bruce Green)

*Ed Martin is the Wrong Person to Investigate Biden-Era Prosecutors*, The Hill, Feb. 8, 2025. (with Bruce Green)

*Firing of Jack Smith's Team is a Threat to Rule of Law,* Law360, Jan. 31, 2025. (with Bruce Green)

*New York Mayor Adams Attacks Federal Prosecutor's Independence, Appeals to Trump*, National Law Journal, Jan. 24, 2025. (with Bruce Green)

*We Are Talking About the New York Case All Wrong,* New York Times, Apr. 29, 2024.

*They Have Established the Backbone of the Case: Three Lawyers Dissect the Trump Trial,* New York Times, May 14, 2024. (with David French and Keith Wittington).

*De-Weaponizing Federal Government,* Fordham Voting Rights and Democracy Project, Feb. 28, 2023 (with Bruce Green).

*The Rise and Fall of Jews at Law Schools,* Sapir, Vol. 6, Summer 2022.

*Is Obedience Always Support? Government Lawyers in Evil Regimes*: a review of David Luban, *Complicity and Lesser Evils: A Tale of Two Lawyers*, Jotwell, Aug. 5, 2022.

*The Right Way to Replace New York's Chief Judge*, The Daily News, July 31, 2022

*Congress Must Protect DOJ Independence,* The Daily News, Oct. 14, 2021 (with Bruce Green).

*As the Giuliani Case Goes Forward, Courts Should Think Deeply About the First Amendment*, Washington Post, June 25, 2021 (with Bruce Green).

*Is Jeffrey Clark's Secret Conversation with Trump Privileged?*, Just Security, Feb. 5, 2021 (with Bruce Green).

*A January Massacre Averted and the Lawyers Who Helped*, N.Y.L.J., Jan. 28, 2021 (with Bruce Green).

*Trump's Lawsuits are Good for American Democracy,* The Hill, Nov. 9, 2020 (with Bruce Green).

*Congress Needs to Empower DOJ to Hold Prosecutors Accountable*, Bloomberg Law, Oct. 2, 2020. (with Bruce Green).

*The Justice Department is Now as Corrupt as the President,* The Daily Beast, May 7, 2020.

*Fight the Power,* a Review of Lonnie T. Brown, Defending the Public's Enemy: The Life and Legacy of Ramsay Clark (2019), Jotwell, Apr. 21, 2020.

*The Judge in Epstein's Case Should Not Turn the Dismissal into a Drama For the Victims,* New York Law Journal, August 26, 2019. (with Bruce Green).

*When Your Boss Trump Punches, Hit Back,* The Daily Beast, August 12, 2019.

*Barr was Wrong: Mueller was Dead Right on Trump and Obstruction*, The Daily Beast, May 7, 2019.

*Are Make Believe Juries as Good for Prosecutors as Real Ones?*: a Review of Anna Offit, *Prosecuting in the Shadow of the Jury*, 133 Nw. U. L. Rev. (forthcoming, 2019) (May 14, 2019)

*America Should Be Grateful to Mueller for His Decision Not to Accuse Trump of a Crime,* Slate (Apr. 22, 2019)

*Criticize Giuliani All You Want But Don't Take Away His Law License*, New York Law Journal (Feb. 7, 2019)

*Will the Real William Barr Please Stand Up*, Politico (Jan. 16, 2019).

*Can Lawyers Represent Hostile Foreign Governments in the Mueller Probe?,* New York Law Journal (Jan. 11, 2018).

*Paul Manafort's Lawyers May Have Broken the Law: They Should Be Held Accountable*, Slate (Sept. 19, 2018).

*Pardoning Paul Manafort Might Not Be Such a Bad Idea if Manafort Wants to Take a Risk,* USA Today (Aug. 27, 2017) (with Bruce Green)

*Judge Kavanaugh and Justice Kennedy Do Not Have Conflicts of Interest,* The Hill (July 13, 2018) (with Bruce Green).

*The Life of the Law Cannot be Coded,* Review of Frank Pasquale, *A Rule of Persons, Not Machines: The Limits of Legal Automation*, George Wash. L. Rev. (forthcoming 2018), Jotwell (June 4, 2018).

*Can the Rule of Law Survive Trump?,* New York Review of Books Daily (June 1, 2018)

*The Life of the Law Cannot Be Coded,* a review of Frank Pasquale, A Rule of Persons Not Machines: The Limits of Legal Animation, Geo. Wash. L. Rev. (forthcoming 2018), June 4, 2018.

*The President is Chief Executive But Does Not Control the Mueller Probe*, The Hill (March 26, 2018) (with Bruce Green)

*Can Lawyers Be Heroes? A review of Brad Wendel, Government Lawyers in the Trump Administration,* Jotwell, May 11, 2017, available at http://legalpro.jotwell.com/

*Are Prosecutors The Constitution's Gatekeepers? Review of Russell M. Gold, Beyond the Judicial Fourth Amendment: The Prosecutor's Role,* JOTWELL, May 2015.

*Book Review*, LAURA WITTERN-KELLER AND RAYMOND WITTERSKI, JR., THE MIRACLE CASE: FILM CENSORSHIP AND THE SUPREME COURT, 28 LAW AND HIST. REV. (2010).

*Batman and the Jewish Question*, NY Times, Op-ed (July 2, 1992).


**SAMPLE PODCASTS**

The Devil's Advocate, April 2025
Politicology

How Critical Legal Studies Transformed Law Schools, Jan. 2025
Heterodox Academy

Judicial Ethics in the Modern Era, Apr. 2022
The Federalist Society

The Trump Organization Indicted, July 2021
Lawfare

The Rise of Critical Social Justice and Its Deleterious Effects
NAVI

Agree to Disagree: The Election Lawsuits, Nov. 2020
Open to Debate

The Cohen Tapes, Aug. 2018
Legal Talk Network

Trump's Challenge to Prosecutorial Independence, May 2018
Slate

**SELECT PRESENTATIONS**

*The Duties of Lawyers to Constitutional Governance*
AALS Annual Meeting, Washington DC
January 2024

*"The Stop Trump Summit"*
The New Republic
October 2023

*Judicial Ethics in the Modern Era*
The Federalist Society, Webinar
April 2022

*Legal Ethics After Trump: Where Do We Go From Here*
Burns Center for Ethics and the Practice of Law, Cardozo Law School
Feb. 2021

*Who Should Police the Politization of the DOJ?*
Notre Dame Symposium, The Ethics of Government Service.
Feb. 2021

*Keynote: Prosecutorial Independence in the Trump Administration*
Canadian Association for Legal Ethics
Oct. 2019.

*A Typology of DOJ Lawyers*
North Carolina Law Review Symposium, Legal Ethics in the Trump Administration
Oct. 2019.

*May Federal Prosecutors Take Direction from The President?*
American Academy of Law Schools Annual Meeting
January 2019.

*May Prosecutors Take Direction from The President?*
Rutgers Law School
December 2018

*Judicial Activism*
Symposium, Sentencing Reform From the Bench
New York University School of Law
March 2018

*Can a Good Person Be a Good Prosecutor?*
Yale Law School
Feb. 2018

*The President, the Department of Justice, and Prosecutorial Independence*
Legal Ethics Schmooze
U.C.L.A Law School
July 2017

*Cardozo, Tammany Hall, and the Legal Profession*
Conference on Justice Cardozo
Touro Law Center
March 2017

*The Duty to Charge*
U. of Ct. L. School Faculty Workshop
March 2017

*The Decline of Professionalism*
Ethics "Schmooze"
Stanford Law School, June 2016

*Rethinking Prosecutors' Conflicts of Interest*
Criminal Ethics "Schmooze"
Fordham Law School, June 2016

*Stratification: Two Tiers of Law School in Historical Context*
SALT Teaching Conference, UNLV, October 2014

*Dream Team or Nightmare?: Celebrity Defense Attorneys and a New Profession*
Criminal Ethics "Schmooze"
Fordham Law School, June 2013

*Professionalism for the 21ˢᵗ Century: Lawyers' Independence in Context*
New York Ethics Roundtable, March 2013

*The Ethics of Willful Ignorance*
Ethics "Schmooze"
Fordham Law School, June 2010

*Lawyering at the Extremes: The Representation of Tom Mooney, 1916-1939*
The Lawyer's Role in a Contemporary Democracy
Fordham Law School, September 2008

*A Brief History of the Accounting Profession*
Corporate Governance after Sarbanes Oxley: Is There Real Change?
New York Law School, April 2007

*Liberalism in the Twenty-First Century: An Historical Perspective*.
The University of Maryland Law School, March 2006.

Moderator. Panel, *Statutory Interpretation in the Lawyer's Counseling Role*
Fordham Law Centennial Conference: The Internal Point of View in Law and Ethics,
February 2006.

## RELATED WORK EXPERIENCE

**Fordham University School of Law,** New York, NY                    2005-2007
Visiting Assistant Professor.

**New York County District Attorney's Office,** New York, NY     July 2002-July 2005
Assistant District Attorney in Securities Fraud Unit.

**Wilmer, Cutler & Pickering**, New York, NY                    Jan. 2002-July 2002
Associate in litigation department.

**Debevoise & Plimpton LLP**, New York, NY                         Summer 2000
Summer Associate

**Paul, Weiss, Rifkind, Wharton & Garrison LLP**, New York, NY          Summer 1999
Summer Associate

**Hill & Barlow**, Boston, MA                                      Summer 1998
Summer Associate

## OTHER RELATED ACTIVITIES

Alvin Bragg, District Attorney, Manhattan District Attorneys Office, Transition Team,
Ethics Committee, Nov. 2021-Dec. 2021.

Subject Matter Expert, MPRE, National Conference of Bar Examiners, 2018-present

Liaison to the ABA Committee on Professional Ethics from the AALS, 2017-present

Reporter for the Committee on the Standards of Attorney Conduct for the New York
State Bar Association, 2017-2019

Contributing Editor, JOTWELL – LEGAL PROFESSION

Admitted to Practice: New York

New York City Bar Association: Member

Democratic Judicial Screening Panel, New York, NY, 2014

New York City Bar Association, Committee on Professional Responsibility.  September
2005-present.

## SELECT MEDIA APPEARANCES

Rachel Maddow, MSNBC, Dec. 6, 2022

Morning Edition, NPR, Apr. 8, 2021

All in with Chris Hayes, MSNBC, Oct. 13, 2021.

Last Word with Lawrence O'Donnell, MSNBC, Aug. 4, 2021

All in with Chris Hayes, MSNBC, June 15, 2021.

Rachel Maddow, MSNBC, May 27, 2021.

CNN New Day, CNN, May 26, 2021

All in with Chris Hayes, MSNBC, May 25, 2021.

NPR, Weekend Edition, Sept. 27, 2020.

Brooke Baldwin, CNN, Aug. 29, 2018, Aug. 27, 2019

Anna Cabrera, CNN, Dec. 4, 2018.

Katy Tur on MSNBC, June 4, 2018.

The Beat with Ari Melber on MSNBC, May 22, 2018

The Last Word with Lawrence O'Donnell on MSNBC, Feb. 11, 2019

Vice News, July 9, 2020.

CBS News: regular appearances.
Full list of media appearances available on request

**SELECT MEDIA QUOTES, PODCASTS, AND OTHER SHORTER POSTS**

Quoted in, Justice Officials Tell Prosecutors to Drop the Charges Against Eric Adams, Wash. Post, Feb. 10, 2025.

Quoted in, As Trump Continues to Insult E. Jean Carroll, 2nd Defamation Trial Opens, N.Y. Times, Jan. 15, 2024.

Quoted in, *The Lawyers Sam Bankman Fried Once Trusted Are Drawing Criticism*, N.Y. Times, Sept. 21, 2023.

Quoted in, *The ChatGPT Lawyer Explains Himself*, NY Times, June 8, 2023.

Quoted in, After Defamation Finding, Trump Against Says Carroll Lied, N.Y. Times, May 11, 2023.

Quoted in, Prosecutor in Trump Case Wades Into Treacherous Political Waters, N.Y. Times, Mar. 20, 2023.

Quoted in, Prosecutors Say FTX Was Engaged in a 'Massive, Yearslong Fraud', N.Y. Times, Dec. 13, 2022.

Quoted in, Michael Avenatti Will Represent Himself During the Remainder of His Trial N.Y. Times, Jan, 25, 2022

Quoted in, Ghislane Maxwell's Unusual Request, Allow Anonymous Defense Witnesses, N.Y. Times, Dec. 13, 2021.

Quoted in, N.Y. Prosecutors Set Sights on New Trump Target: Widely Different Valuations on the Same Properties, Wash Post, Nov. 22, 2021.

Quoted in, These are the Legal Threats Cuomo Will Face After He Resigns, N.Y. Times, Aug. 10, 2021.

Featured in, Jewish Institute for Liberal Values Podcast, May 27, 2021.

Featured in, In Lieu of Fun with Kate Klonick and Benjamin Wittes, May 26, 2021.

Quoted in, "Prosecutor in Manhattan Criminal Probe Convenes a Grand Jury to Hear Evidence, Weigh Potential Charges," Wash. Post, May 25, 2021.


Quoted in, *Proud Boys Leader Enrique Tarrio is Representing Himself in Court*, Vice News, May 4, 2021.

Quoted in, *Manhattan District Attorney Candidates Throw Out Traditional Playbook*, WSJ, Mar. 15, 2021.

Quoted in, The Defense Suggests That Maxwell's Accusers Are Seeking to Profit but Doesn't Say How, N.Y. Times, Dec. 10, 2021.

Quoted in, *If Trump's a Tax Cheat, His Criminal Reckoning has Finally Arrived?*, Vice News, Feb. 26, 2021.

Featured in, Prosecutorial Discretion—Police Killings and Sexual Abuse, Talks on Law, Jan. 26, 2021.

Quoted in, Katie Benner, *Barr Leaves a Legacy Defined by Trump*, N.Y. Times, Dec. 28, 2020.

Quoted in, William K. Rashbaum and Benjamin Weiser, *As Soon as Trump Leaves Office, He Faces Greater Risk of Prosecution*, N.Y. Times, Nov. 13, 2020.

Quoted in, Alison Frankel, *Trump's Election Litigation: Boom or Blow to Public Faith in the Court System,* Reuters, Nov. 10, 2020.

Quoted in, William K. Rashbaum and Benjamin Weisser, *DA is Investigating Trump and His Company for Fraud, Filing Says*, N.Y. Times, Aug. 3, 2020.

Quoted in, Corinne Ramey, *Harvey Weinstein Set to Stand Trial on Sex-Crime Charges,* Wall St. J., Jan. 5, 2020.

Quoted in, Joseph Goldstein, *Why 7 Police Officers Were Blacklisted in Brooklyn,* N.Y. Times, Nov. 7, 2019.

Quoted in, Victoria Bekiempis, *Harvey Weinstein's Accusers Will Be Able to Testify in His Upcoming Sexual Assault Trial,* Vulture, Aug. 16, 2019.

Quoted in, *Felicity Huffman's Guilty Plea Could Bring 4 Months in Jail*, N.Y. Times, May 13, 2019.

Quoted in, *The Mueller Report Makes a Damning Case that Trump Obstructed Justice*, Vice News, Apr. 18, 2019

Quoted in, *This is Just the Beginning for Julian Assange*, Vice News, Apr. 11, 2019

Quoted in, *JP Morgan Hack Suspect May Be Helping the U.S.: Here's What He May Offer*, Bloomberg News, Mar. 16, 2019.

Quoted in, *College Admission Scandal's Other Big Names are Titans of Finance and Law,* N.Y. Times, Mar. 13, 2019.

Quoted in, *How Does William H. Macy Fit into the College Admission Scandal,* Vanity Fair, Mar. 13, 2019.

Quoted in, *Did Wilkie's Reaction to Admission Scandal Miss the Mark?*, Law 360, Mar. 13, 2019.

Quoted in, *Double Jeopardy? New York Law Could Trump a Pardon Backstop*, Washington Post, Mar. 13, 2019.

Quoted in, *Cohen's Testimony is Bad News for Don Jr.*, Vice News, Feb. 28, 2019.

Quoted in, *SEC Wants Elon Musk Held in Contempt of Court For Tesla Post on Twitter*, N.Y. Times, Feb. 26, 2019.

Quoted in, *What Will Happen to El Chapo's Wife, Emma Coronel*?, The Daily Beast, Feb. 12, 2019.

Quoted in, *Bezos Could Put National Enquirer Brass in Jail,* The Daily Beast, Feb. 8, 2019.

Quoted in, *Trump's Threats Against Cohen's Family Look a Lot Like Witness Tampering, Former Prosecutors Say*, Vice News, Jan 24, 2019.

Quoted in, *Law Firm to Pay $4.6 Million in Case Tied to Manafort and the Ukraine*, N.Y. Times, Jan. 18, 2019.

Quoted in, *Cohen's Public Testimony is a Problem for Trump and Possibly Mueller Too,* Vice News, Jan. 11, 2019.

Quoted in, *Why Michael Cohen, Trump's Fixer, Confessed to it All,* N.Y. Times, Dec. 3, 2018.

Reviewed in, Melissa Mortavazi, Professional Responsibility as a Limitation on Executive Power, Jotwell, Dec. 6, 2018.

Quoted in, *Why Big Law is Taking on Trump Over Immigration,* N.Y. Times, Nov. 21, 2018.

Quoted in, *A Fugitive Financier's Charm Offensive Has P.R. Firms Proceeding With Caution*, N.Y. Times, Nov. 13, 2018.

Quoted in, *How is This Legal?: Trump's Appointment of Matthew Whitaker to Acting Attorney General is Raising All Sorts of Reg Flags,* Vice News, Nov. 8, 2018.

Quoted in, *How an ex-Marijuana Farmer Became Conservatives' Latest Hope to Take Down Robert Mueller,* Vice News, Oct. 23, 2018.

Quoted in, *Tesla Chief Elon Musk is Sued by S.E.C. in Move That Could Oust Him*, N.Y. Times, Sept. 28, 2018.

Podcast Interview, *Can the President Control the Department of Justice?*, Reuter's On the Case, Sept. 21, 2018.

Quoted in, *Manafort Plea Delivers Yet Another Embarrassment for Skadden*, Bloomberg, Sept. 14, 2018.

Quoted in, *Flippers Not Welcome at Trial, Judge Rules,* N.Y. Times, Aug. 28, 2018.

Quoted in, *Stormy Daniels Isn't Backing Down,* Vogue, Aug. 28, 2018.

Quoted in, *Close Family Ties Between Queens Judges, Prosecutors Raise Appearance Concerns*, New York Law Journal, Aug. 7, 2018.

Legal Talk Network, *The Cohen Tapes*, Podcast, July, 2018.

Quoted in, *Michael Cohen Secretly Recorded Trump. Does That Make Him a Bad Lawyer?*, Washington Post, July 26, 2018.

Quoted in, *In Corruption Retrial Dean Skelos Takes the Stand in Own Defense*, N.Y. Times, July 7, 2018.

Quoted in, *3 Women Who Had Encounters with Harvey Weinstein Question Lawyer's Motives*, N.Y. Times, June 2, 2018.

Quoted in, *Is Trump's War on DOJ Obstruction*, Vice News, May 23, 2018.

Quoted in, Charlie Savage, *By Demanding an Investigation, Trump Challenged a Constraint on his Power*, N.Y. Times, May 21, 2018

Interviewed in, Isaac Chotiner, *Trump's Assault to Prosecutorial Independence*, Slate, May 22, 2018.

Interviewed in, *Trump's Challenge to Prosecutorial Independence*, Slate Trumpcast, May 23, 2018.

Quoted in, *Where's Harvey*, N.Y. Times, Mar. 9, 2018

Quoted in, *Move On, Judge Tells Defense Lawyers in Corruption Trial*, N.Y. Times, Feb. 14, 2018.

Quoted in, *You Can Put a Suit on a Problematic Witness but Will Jurors Believe Him*, N.Y. Times, Feb. 12, 2018.

Quoted in, *Former Trump Policy Adviser George Papadopoulos Misled FBI about Meetings with Russian Nationals During the Campaign*, N.Y. Daily News, Oct. 30, 2017.

Quoted in, *Vance May 'Rethink' Attorney Donations Amid Weinstein, Trump Fallout*, NYLJ, Oct. 12, 2017.

A History of Prosecutorial Independence, American Constitutional Society Blog, available at https://www.acslaw.org/acsblog/a-history-of-prosecutorial-independence-in-america

Quoted in *Sheldon Silver Isn't Out of the Woods Yet as He Faces Retrial in Corruption Case*, New York Daily News, July 2017.

Interviewed in, *The Power of the Prosecutor*, Talks on Law, available at https://www.talksonlaw.com/talks/the-power-of-the-prosecutor

Quoted in *Chastised, Not Charged, as Prosecutors Shed Tradition of Silence*, New York Times, March 24, 2017

Interviewed in *Ethics of U.S. Attorney General Jeff Sessions and the Investigations into Connections Between the Trump Campaign and Russia*, Wisconsin Public Radio, March 3 2017.

Quoted in *Police Shooting of Mentally-Ill Woman Frames Crucial Test for Clark*, New York Law Journal, Dec. 13, 2016.