# PEX 2

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION<br><br>This document relates to:<br><br>*Molina Healthcare Inc. v. Actavis Elizabeth LLC, et al.*, 20-CV-00695<br><br>*Humana Inc. v. Actavis Elizabeth LLC, et al.*, 18-CV-03299<br><br>*Humana Inc. v. Actavis Elizabeth LLC, et al.*, 19-CV-04862<br><br>*Humana Inc. v. Actavis Elizabeth LLC, et al.*, 20-CV-06303 | MDL 2724<br>16-MD-2724<br>Hon. Cynthia M. Rufe |

**Expert Report of Stewart L. Cohen, Esq.**

**<u>Introduction</u>**

I have been consulted by Lowey Dannenberg, P.C. ("Lowey") and attorney Joseph Nielsen, Esq. ("Nielsen") in the referenced matters to apply my knowledge, experience, education and training to review their professional conduct pursuant to the Pennsylvania Rules of Professional Conduct, Pennsylvania Code, Title 24, Chapter 81, Subchapter A ("PRCP"), specifically the allegations of misconduct made in a motion of certain defendants (the Defendants) to disqualify Lowey and Nielsen. The purpose of this report is to offer my assistance to the Court to evaluate facts in issue, based on the PRCP and the various sources cited in this report. In offering opinions, I have applied the PRCP, as well as principles and methods used by the Disciplinary Board of the Supreme Court of Pennsylvania (Board) to the facts of this case. My conclusion is that neither Nielsen nor Lowey violated the Rules, and that based on the facts presented, there is no basis for any charge that they violated the Rules.

**<u>Qualifications</u>**

My Resume is attached to this Report. I am a trial lawyer, and in my 48 years at the Bar, I have represented individuals, corporations, the Commonwealth of Pennsylvania, municipalities and counties. I was honored to serve the Supreme Court of Pennsylvania Disciplinary Board for over 18 years, first as a Member of a Hearing Committee from 1992 to 1998 and again from 2001 to 2007, at which time I was appointed as a Member of Disciplinary Board where I served from 2007 until 2013 including terms as Board Vice Chair from 2011 to 2012 and as Board Chair from 2012 to 2013. During that time, I evaluated and/or adjudicated hundreds of disciplinary Board Opinions that I authored regarding attorney misconduct are publicly available. As a Board Member I also reviewed and approved or rejected proposed Petitions for Discipline (charges of attorney misconduct) submitted by the Office of Disciplinary Counsel, which is required before any charges are filed. In addition, I reviewed, evaluated and voted on each case that came before the Board during my term (except for one case in which I recused). In the early 2020s the Disciplinary Board appointed me to serve as a Special Master in two lengthy and involved disciplinary cases that went to trial.

As a result of my service on the Board, I have considerable experience regarding the investigation and evaluation of charges of attorney misconduct, and I am very experienced with the due process protections, procedures, and adjudication of charges against attorneys in Pennsylvania. As a Member and the Chair of the Disciplinary Board, I had responsibility to oversee complaints against Pennsylvania licensed attorneys, including referrals from trial court Judges throughout the Commonwealth, US District Court Judges, and the Judges of the Third Circuit Court of Appeals. I was also selected as Special Mediator by a Judge in the US District Court for the Eastern District of Pennsylvania and successfully resolved a much-publicized dispute between two Pennsylvania law firms that included numerous claims of misconduct and violations of PRCP.

<u>The Principles and Procedures for Evaluating Attorney Misconduct in Pennsylvania</u>

The principles and procedures followed in the Pennsylvania attorney disciplinary process are grounded in the Rules of Disciplinary Enforcement (PRDE), 204 Pa. Code §§ 81.1 et seq (Pennsylvania Code) and the PRCP both promulgated by the Supreme Court of Pennsylvania. The PRDE establishes the authority, structure, and procedures governing the Office of Disciplinary Counsel, the Board, and the adjudicatory process. The primary authorities under PRDE are: Rule 207: Establishes the Office of Disciplinary Counsel, its powers, and duties to investigate allegations of misconduct; Rule 208: Governs the procedure for disciplinary enforcement, including investigations, petitions for discipline, hearings before hearing committees, and review by the Disciplinary Board; Rule 209: Provides authority for subpoenas and investigatory powers of disciplinary counsel; Rule 210–218: Detail procedures for hearings, reports, Board review, and final disposition by the Supreme Court; Rules 207–208: Investigation, probable cause determination, and filing of petitions; Rule 208(b)–(d): Assignment of cases to Hearing Committees, evidentiary hearings, and committee reports; Rule 208(f): Review by the Disciplinary Board and issuance of written opinions; and Rule 208(g): Final disciplinary action

by the Supreme Court of Pennsylvania. These processes and procedures are designed to ensure that allegations of attorney misconduct or violations of the PRCP are investigated, reviewed, and adjudicated in a structured and fair manner, including a determination that there is probable cause PaRDE, Rules 207-208. In evaluating this matter, I am using the processes and procedures used by the Board.

As relevant to my opinions here, once the Office of Disciplinary Counsel ("ODC"—the independent office which investigates and prosecutes) decides that it wants to file charges, ODC must seek approval from the Board.

1. Submission of a Petition for Discipline: If disciplinary counsel believes that probable cause exists, they prepare a proposed Petition for Discipline outlining the alleged RPC violations and produce evidence that supports the violations before any charges are filed.
2. Review by the Board: The proposed petition is submitted to a Member of the Disciplinary Board for authorization. This step ensures that charges are not filed unilaterally by disciplinary counsel without oversight.
3. Authorization to File: If the reviewing Board Member agrees that probable cause exists, disciplinary counsel is authorized to file the Petition for Discipline formally with the Board. If not, the matter may be dismissed or returned for further investigation.

## Concise Statement of Facts

Based on the record presented, I considered the following facts:

1. Nielsen is an attorney employed by the law firm of Lowey and is counsel of record for Lowey's MDL Clients; he began working at Lowey on July 7, 2025. Prior to working at Lowey, he was employed at the Connecticut Office of the Attorney General ("CT AGO") for approximately nineteen (19) years. Nielsen Declaration, ¶ 1-2.

2. Peter D. St. Phillip, Jr (Phillip) is an attorney employed by the law firm Lowey Dannenberg, P.C. ("Lowey"), counsel of record for Humana, Inc. and Molina Healthcare, Inc. ("Lowey's MDL Clients"). St. Phillip Declaration, ¶ 1.

3. The Connecticut Attorney General is the chief civil enforcer of the antitrust laws in the State of Connecticut. The Connecticut Attorney General does not have any authority to prosecute criminal antitrust violations. Nielsen Declaration, ¶ 3.

4. The investigative techniques available to the CT AGO are outlined in Conn. Gen. Stat. § 35-42 and are generally the same as those available to private litigants in routine civil discovery – except that the CT AGO can use such techniques "pre-complaint,"; *i.e.*, before filing a civil enforcement action. Under Conn. Gen. Stat. § 35-42, the CT AGO does not have the authority to convene a grand jury, obtain search

warrants, seize evidence, or conduct surveillance and undercover operations. Nielsen Declaration, ¶ 4.

5. Nielsen first started investigating a potential antitrust violation in the generic pharmaceutical industry on behalf of the CT AGO in July 2014. The investigation started with a focus on one drug but gradually expanded over time to include investigations of many additional drugs (the "States' Investigations"). Nielsen Declaration, ¶ 5.

6. During the course of the States' Investigations, Neilsen interacted with attorneys from the United States Department of Justice ("DOJ") on occasion. Although at times he provided DOJ with information he obtained, he never received any information from the DOJ that is not otherwise available to all litigants in MDL 2724, Nielsen Declaration, ¶ 7.

7. Federal Rule of Criminal Procedure 6(e) precludes the DOJ from providing any confidential government information obtained through the grand jury process, and the DOJ has historically been very secretive about its investigations. Nielsen Declaration, ¶ 7.

8. The DOJ intervened in MDL 2724 and sought to stay any discovery relating to its investigations. The MDL Court granted those requests and imposed a stay on any discovery relating to the DOJ investigations (including questions relating to any information requested by or provided to DOJ) until June 14, 2024 – long after the States' Investigations had concluded. *See* Pretrial Order ("PTO") No. 276 (Modifying Pretrial Order No. 214 and Terminating Limited Stay of Discovery), 2:16-md-02724-CMR, ECF No. 3002 (6/14/24). Nielsen Declaration, ¶ 8.

9. Any recent attempts Nielsen made to gain access to information relating to the DOJ investigations, including signing subpoenas issued to the DOJ or the United States Postal Service, have been done in coordination with all Private Plaintiffs in MDL 2724, and all documents produced in response to those subpoenas have been made available to all parties. Nielsen Declaration, ¶ 9.

10. Nielsen also had some interactions with attorneys at the Federal Trade Commission ("FTC") during the course of the States' Investigations, but to his knowledge the FTC has not conducted any investigation of its own relating to price fixing or market allocation in the generic pharmaceutical industry, and Nielsen never received any information from the FTC related to the States' Investigations, or to any subject matter that would fall within the scope of MDL 2724.  Nielsen Declaration, ¶ 10.

11. As of late 2016, until the time Nielsen left the CT AGO, he was working exclusively on the States' Investigations and litigations relating to price fixing and market allocation conduct in the generic pharmaceutical industry, to the exclusion of all other cases. Nielsen Declaration, ¶ 11.

12. On December 15, 2016, a multi-state coalition of States ("the States"), led by the State of Connecticut and its counsel of record Nielsen, filed their first lawsuit relating to price fixing and market allocation in the generic pharmaceutical industry, in the United States District Court for the District of Connecticut. Nielsen Declaration, ¶ 12.

13. That case was transferred to MDL 2724 on August 3, 2017, and was consolidated with other private cases for pretrial purposes, but not for trial. The States subsequently filed two additional actions in the District of Connecticut – on May 10, 2019, and June 10, 2020 – that were also consolidated into MDL 2724 for pretrial purposes only. Nielsen Declaration, ¶ 13.

14. The States filed their third and final Complaint on June 10, 2020, and did not serve any additional investigatory subpoenas or obtain any documents pursuant to their investigatory authority after that date. In other words, the States' Investigations concluded by, at the latest, June 10, 2020. Nielsen Declaration, ¶ 14.

15. Once consolidated in MDL 2724 for pretrial purposes, the States entered into Common Interest Agreements ("CIAs") with all the various plaintiff groups and all direct action (Private Plaintiffs), including Humana Inc. ("Humana") and Lowey. These CIAs called for broad sharing of information, including confidential material, attorney work product, mental impressions, strategies, and opinions, subject to a common interest among the plaintiffs in jointly prosecuting their respective cases without waiving any privileges. Nielsen Declaration, ¶ 15.

16. In order to ensure that the plaintiffs in MDL 2724 were all on a level playing field, had access to the same information, and could coordinate discovery in MDL 2724 efficiently, the MDL Court also granted the Private Plaintiffs' motion for access to the State AGs' Investigatory Materials, including all subpoenas issued by the States during their Investigations, and all documents produced by Defendants or any third parties in response to any such subpoenas. *See* PTO 70, as amended by PTO 90, PTO 106 and PTO 143. Pursuant to those Court Orders, the States produced all their investigatory materials into the discovery record in MDL 2724. Nielsen Declaration, ¶ 16.

17. At the request of Judge Rufe during an oral argument on July 11, 2018, exemplars of the CIAs between the States and Private Plaintiffs were submitted to the MDL Court *in camera*, via hand delivery, on July 18, 2018, by Roberta Liebenberg. The CIAs between the States and Humana and Lowey are identical in all material respects to the exemplars that were submitted to the Court *in camera* on July 18, 2018. Nielsen Declaration, ¶ 17.

18. From 2018 until he left the CT AGO on July 3, 2025, Nielsen shared information extensively – including confidential information, work product and strategic roadmaps and insights – with the Private Plaintiffs in MDL 2724, including Humana, Molina Healthcare Inc. ("Molina"), and Lowey. He met regularly with Private Plaintiffs – often many times a week – to discuss strategy, prepare pleadings,

coordinate discovery, prepare for hundreds of depositions, and jointly prosecute our respective cases. Nielsen Declaration, ¶ 18.

19. The States also ensured that Private Plaintiffs were able to enter into their own settlement agreements with the States' cooperating witnesses ("CWs"), to promote coordination among the plaintiffs, provide Private Plaintiffs with access to all information received by the States (including attorney proffers), and to efficiently prepare the CWs for their depositions. Pursuant to the CIAs and these private settlements with the CWs, the States were able to extensively share information relating to the CWs with the Private Plaintiffs, including Humana, Molina and Lowey, and coordinate with the Private Plaintiffs on strategy to prepare for their depositions. Nielsen Declaration, ¶ 19.

20. The States also coordinated with their vendor for telephone record analysis to ensure that the Private Plaintiffs had access to the same software as the States. Although the software is normally only provided to law enforcement, an exception was made for purposes of this case due to the extensive coordination between the States and the Private Plaintiffs. Nielsen Declaration, ¶ 20.

21. In the 5+ years since the States' Investigations concluded, Nielsen has extensively shared, pursuant to the CIAs, all the important and material information about these cases with the Private Plaintiffs, including Humana, Molina, and Lowey. The purpose of doing that was to create the best evidentiary record possible. This benefited the States because, although Nielson took lead in several of the "most important depositions in these cases," he could not take a large majority of them. As of September 2025, more than three hundred and eighty (380) depositions have taken place in MDL 2724. Nielsen and the States Attorney Generals shared all material information, including strategic roadmaps and insights, with Private Plaintiffs before these depositions to help ensure that they collectively could create the best evidentiary record possible, which was ultimately in the best interests of all plaintiffs, including the States. Nielsen Declaration, ¶ 21.

22. Although the States were coordinating and sharing information with the other Private Plaintiffs in MDL 2724 for pretrial purposes, Nielsen never filed an appearance on behalf of, or sought to personally represent, any private plaintiff, including Humana or Molina, in any particular case or matter involving those Private Plaintiffs, during his employment with the CT AGO. Nor did he have any privileged attorney-client communications with any private plaintiff, including Humana or Molina, regarding any of those private cases until after he left the CT AGO and joined Lowey. Nielsen Declaration, ¶ 22.

23. The enforcement actions brought by the States, including the CT AGO, are not all identical to the actions brought by the Private Plaintiffs in MDL. As just one example of the differences, the *Humana I* Bellwether Complaint, which is scheduled to go to trial next September, involves a different combination of drugs and defendants than any of the States' actions. The *Humana I* Complaint involves 21 drugs – including at

least 5 drug conspiracies (Amitriptyline, Digoxin, Divalproex, Doxycycline Hyclate (regular), and Ursodiol), that the States have never sued on at all. Nielsen Declaration, ¶ 23.

24. The States' enforcement actions were remanded from MDL 2724 to the District of Connecticut in April 2024. Since then, the States have continued to coordinate and share information with Private Plaintiffs in MDL 2724, including Humana, Molina and Lowey, pursuant to their CIAs. Nielsen Declaration, ¶ 24.

25. Nielsen's last day of employment at the CT AGO was July 3, 2025. Nielsen Declaration, ¶ 25.

26. Before Nielsen accepted a position at Lowey, he extensively researched his ethical obligations and professional responsibilities under the Rules of Professional Conduct as well as the Connecticut State Ethics Code. He reviewed the relevant rules, opinions from the American Bar Association ("ABA") and the Connecticut Office of State Ethics, and case law interpreting the relevant rules. Nielsen Declaration, ¶ 26.

27. Based on Nielsen's research and review of the ethical rules, opinions and cases, and his knowledge of the factual record here, he was confident that none of the rules would preclude his employment at Lowey, or his representation of Humana, Molina or other plaintiffs in any private actions. Nielsen Declaration, ¶ 27.

28. When analyzing his obligations under Rule of Professional Conduct 1.11 Nielsen relied in particular on ABA Formal Opinion 24-509 – an opinion which states that Rule 1.11(c) "should not apply in the situation in which the lawyer's [new] client is legally permitted to use the information in question. When the law permits the [new] client to use the confidential information that the lawyer acquired while in government service, the reason for the disqualification provision – i.e., to prevent the improper use of confidential government information – is inapplicable, and the client's countervailing interest in counsel of choice outweighs any conceivable interest in a wooden application of the rule." ABA Formal Opinion 24-509 (Feb. 28, 2024) (citation omitted). Nielsen Declaration, ¶ 28.

29. Because (1) the States' Investigations concluded in 2020, and the States have taken no investigatory actions since then, (2) all of the States' Investigatory Materials were produced into discovery in MDL 2724 and shared with all Private Plaintiffs, including Humana and Molina, (3) the States entered into CIAs with all Private Plaintiffs and shared all other confidential material, work product, strategic roadmaps, and insights, in order to collectively develop the discovery record in this case, including access to attorney proffers and other confidential information provided to the States, (4) the States and Private Plaintiffs collectively turned the States' 3.5 million investigatory documents into a discovery record including more than 71.5 million documents and nearly four hundred depositions, and (5) Nielsen personally worked side-by-side with attorneys at Lowey and other private law firms for the past six years to jointly develop the entire factual record in this case, Nielsen was confident that Lowey (and

7

therefore Humana and Molina) had access to, and was legally permitted to use, all of the same information he had in his possession as a government attorney since at least 2020.  Nielsen Declaration, ¶ 29.

30. Nielsen also reviewed and relied on case law, including several recent decisions in the context of the Opioids litigation, which have consistently held that information that can be obtained within the scope of routine civil discovery (like the information gathered by the States during their civil Investigations) is not "confidential government information" under Rule 1.11(c), and that if the government information has been produced in discovery and is available to Private Plaintiffs, it cannot be used to the "material disadvantage" of those defendants.  *See In re National Prescription Opiate Litig.*, MDL 2804, 2024 WL 3387288, *10-12 (N.D. Ohio Mar. 18, 2024) (responses to state civil investigatory demands are "otherwise available" within the meaning of Rule 1.11(c) and "the materials therefore do not constitute confidential information" and finding that because the documents were available to all plaintiffs' counsel, they could not be used to the material disadvantage of defendant); *In re: OptumRx, Inc.*, No. 24-3396, ECF No. 7-1 at 3 (6th Cir. Oct. 22, 2024) (denying mandamus petition, finding that "OptumRx faces no material disadvantage from any information Motley Rice obtained in the Chicago, D.C., and Hawaii investigations because it should have already been produced into the MDL discovery repository pursuant to the district court's case management orders and discovery rulings" and "any information previously obtained by Motley Rice has already been incorporated into Plaintiffs' general litigation strategies and discovery requests at this point"); *Anne Arundel County, Maryland v. Express Scripts, Inc.*, Civ. No. MJM-24-90, 2025 WL 254807, *9 (D. Md. Jan. 21, 2025) (finding that information obtained through government subpoenas had all been produced in discovery, and therefore OptumRx "fails to show that it faces any greater disadvantage from the involvement of the County's Motley Rice counsel than it does from its non-Motley Rice attorneys" and "[t]he mere fact that Motley Rice may have had access to the documents for longer [because it previously represented 3 state governments] does not rise to the level of a material disadvantage"). Nielsen Declaration, ¶ 30.

31. Prior to leaving the CT AGO, Nielsen provided the AGO  with clear, detailed notice of where  he was planning to go work in private practice, and who he would potentially represent. Nielsen informed the AGO that as part of his responsibilities at Lowey he intended to represent Humana, Molina and other insurers in private lawsuits alleging price fixing and market allocation conduct pending in MDL 2724 and elsewhere, where the State of Connecticut was not a party. CT AGO was aware of those lawsuits because the States were consolidated in MDL 2724 and had coordinated with those Private Plaintiffs from 2017 through 2024. Nielsen offered to answer any additional questions the AGO  had about his future employment, the clients he would be representing, or the cases he would be involved in. Nielsen Declaration, ¶ 31.

32. The CT AGO had no objection to Nielsen working at Lowey, or representing Humana, Molina or other private insurers in their own separate lawsuits. Nielsen Declaration, ¶ 32.

33. When the Defendants filed their Motion to Disqualify, Nielsen provided the CT AGO with notice of the motion and an opportunity to respond. Nielsen Declaration, ¶ 33.

34. After the Defendants filed their motion, and in advance of the September 11, 2025 general status conference in MDL 2724, Neilsen received an email from Nicole Demers, the Deputy Associate Attorney General and Chief of the Antitrust Section at the Connecticut Office of the Attorney General, informing him that the Office had authorized him to make the following representation to the Court if the matter came up during the status conference: "The Office was informed where Joe would be working, the plaintiffs he would be representing and the Office, noting his ethical obligations and responsibility to adhere to them, did not object." Nielsen Declaration, ¶ 34, including Exhibit A.

35. In addition, since then the CT AGO provided Nielsen with a letter dated September 24, 2025, which confirms that before leaving the CT AGO, waived any objection to his employment at Lowey, or his representation of Humana, Molina or other insurers in private litigation. Nielsen Declaration, ¶ 35, including Exhibit B.

36. Prior to hiring Nielsen and Lowey agreed that Nielsen would not share information with anyone at Lowey or any representative of Lowey's MDL Clients concerning settlement activity conducted by Connecticut or any other State AG. St. Phillip Declaration, Declaration ¶ 5.

37. Since joining Lowey, Nielsen has not participated in any settlement discussions on behalf of Humana, Molina or any other Lowey client, nor has he discussed with any Lowey attorneys any information he may have learned during settlement discussions that he participated in when employed at the CT AGO. Nielsen Declaration, ¶ 36.

38. The Lowey firm has "represented Humana since the late 1990s, Lowey has continuously maintained a practice group that represents health insurers in litigation matters against pharmaceutical manufacturers ("Lowey's Healthcare Team"). This group advances claims of overcharges they paid for prescription medicine and recovery of medical expenses they paid to treat their members' injuries associated with claims of personal injury from ingesting drugs. He has been a member of this group since May of 1999." St. Phillip Declaration ¶ 8.

39. Since approximately 2003, Lowey has represented Humana's interests in a variety of pharmaceutical cost recovery litigation in courts across the country. St. Phillip Declaration ¶ 9.

9

40. During the past 23 years of representing Humana, Lowey's Healthcare Team has acquired significant information about the inner workings of the company's pharmacy businesses. This knowledge will greatly benefit Humana in preparing for the upcoming bellwether trial and in representing its interests generally in this litigation. St. Phillip Declaration ¶ 11.

41. There was full cooperation agreement among the State AGs and the Private Plaintiffs. These "Common Interest Agreements allowed Private Plaintiffs broad access to attorney work product and related communications for coordinating matters related to the litigation, including developing common theories of damages, working with common consultants, sharing common views on offensive and defensive discovery, motion practice, settlement strategies, trial preparation, data collection and management, and the PEN link software that the Defendants reference in their brief." St. Phillip Declaration ¶ 13.

42. In furtherance of this cooperation, the State AGs arranged for Lowey's MDL Clients and the other Private Plaintiffs to enter into settlement agreements with the witnesses who were cooperating with the State AGs. After Lowey's MDL Clients joined in these agreements, the State AGs shared their attorney proffer information with the Private Plaintiffs, including Lowey's MDL Clients. Lowey lawyers thereafter strategized with the State AGs and participated in preparations for the depositions of cooperating witnesses. St. Phillip Declaration ¶ 14.

43. Once they were coordinated into the MDL and were subject to the Court's protective order in this case, Lowey's MDL clients joined in the existing Common Interest Agreements (CIAs). St. Phillip Declaration, ¶ 15.

44. "The Common Interest Agreements were signed more than 6 years ago. Since that time, Lowey's MDL Clients, the other Private Plaintiffs, and the State AGs have held weekly calls to discuss common strategy, and teams of lawyers populated with counsel for both public and private counsel have met regularly to share evaluations of evidence, depositions, information garnered from cooperating witnesses, and all other manner of sharing of strategy and work product.  Several Lowey lawyers have participated substantively in these efforts. The States and Private Plaintiffs' counsel have worked collaboratively to share costs associated with the litigation, including Special Master fees, deposition costs, maintenance of the MDL document repository, and expert and consulting fees. Without this sharing, the MDL would not have been able to proceed efficiently." St. Phillip Declaration ¶ 16.

45.  "Lowey lawyers have worked hand-in-glove in advancing this litigation with all other private and public counsel in this case continuously since their MDL Clients entered the litigation. These lawyers have collaborated on preparing for attorney proffers, receiving proffers, developing settlement strategy, preparing for depositions, taking depositions, communicating and collaborating over requests for admissions,

10

requests for production, interrogatories, subpoenas, review of produced documents, preparing for status conferences, delivering argument and participating in negotiations with Special Master Marion, developing bellwether selection strategies, negotiating with defendants over scheduling issues, discovery, and trial strategy." St. Phillip Declaration ¶ 18.

46. "As of September 16, 2025, Lowey's books and records reveal that from inception to date, Lowey legal personnel have logged 49,096 (unaudited) hours of work performed in connection with representing its clients in prosecuting antitrust and related claims against the Defendants." St. Phillip Declaration ¶ 19.

47. "As of September 24, 2025, the MDL discovery record includes approximately 71.175 million documents. Of this total, the States produced their investigatory files which contained approximately 3.57 million documents. More than three hundred and eighty (380) depositions have been taken in this deposition to date, with many more scheduled over the coming weeks". St. Phillip Declaration ¶ 20.

## Opinions

Based upon my experience, education and training, and my review of the materials referred to in this report, I express the following opinions within a reasonable degree of certainty:

A. **There is no violation of Rule 1.1(c) by either Nielsen or Lowey. This rule does not apply because all information was shared, publicly available or incapable of materially disadvantaging defendants.**

48. Rule 1.11(c) prohibits a lawyer who has formerly served as a public officer or employee from representing a private client in connection with a matter only if the lawyer possesses "confidential government information" about a person that could be used to the material disadvantage of that person. The Rule defines confidential government information as information "obtained under governmental authority" that the government is prohibited by law from disclosing or has a legal privilege not to disclose, and which is not otherwise available to the public.

49. The Connecticut Attorney General does not have any authority to prosecute criminal antitrust violations and accordingly had no authority to convene a grand jury, obtain search warrants, seize evidence, or conduct surveillance and/or undercover operations. Conn. Gen. Stat. § 35-42

50. The cases were consolidated by an MDL Transfer Order dated 8/13/2017, PEX 7, *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, 2017 WL 4582710, at *4 (J.P.M.L. Aug. 3, 2017).

11

51. Once the cases were consolidated the States executed CIAs with all the Private Plaintiffs there was a broad sharing of information, including confidential material, attorney work product mental impressions, strategies, and opinions. Nielsen Declaration ¶¶ 15, 21; St. Phillip Declaration ¶ 13. The MDL Court granted Private Plaintiffs' full access to the State AGs' investigatory materials, including all subpoenas issued by the States during their investigations, and all documents produced by defendants or any third parties in response to any such subpoenas. The States and Private Plaintiffs' counsel met weekly to prepare, coordinate for depositions, and shared strategic roadmaps and insights, for hundreds of depositions to "jointly prosecute" their respective cases. Nielsen Declaration ¶¶ 18, 21; St. Phillip Declaration ¶ 16.

52. ABA Formal Opinion 24-509 states that Rule 1.11(c) "should not apply in the situation in which the lawyer's [new] client is legally permitted to use the information in question. When the law permits the [new] client to use the confidential information that the lawyer acquired while in government service, the reason for the disqualification provision – i.e., to prevent the improper use of confidential government information – is inapplicable, and the client's countervailing interest in counsel of choice outweighs any conceivable interest in a wooden application of the rule." ABA Formal Opinion 24-509 at 9 n.30 (Feb. 28, 2024) (citation omitted).

53. Recent decisions in the Opioid MDL litigation have addressed the question of the confidentiality of information obtained through routine discovery decisively. These decisions, while not precedential, are thorough, well-reasoned, persuasive, and highly pertinent. These cases are highly fact sensitive.

- In *In re National Prescription Opiate Litig.*, MDL 2804, 2024 WL 3387288 (N.D. Ohio Mar. 18, 2024), the court held that responses to state civil investigatory demands were "otherwise available" within the meaning of Rule 1.11(c). Because these materials had been produced into the MDL discovery repository, they no longer constituted confidential government information. The court emphasized that once discovery equalized access, no party could claim a material disadvantage from opposing counsel's prior access.
- The Sixth Circuit echoed this reasoning in *In re: OptumRx, Inc.*, No. 24-3396 (6th Cir. Oct. 22, 2024). Denying a mandamus petition, the court found that OptumRx faced no material disadvantage from plaintiffs' counsel's prior access to investigatory materials. The court underscored that all such information "should have already been produced into the MDL discovery repository" and was therefore incorporated into general litigation strategies and discovery requests.
- Similarly, in *Anne Arundel County, Maryland v. Express Scripts, Inc.*, Civ. No. MJM-24-90, 2025 WL 254807 (D. Md. Jan. 21, 2025), the court rejected a disqualification motion, reasoning that investigatory materials obtained through government

12

subpoenas had already been produced in discovery. The court held that the mere fact that certain counsel had earlier access did not rise to the level of a material disadvantage under Rule 1.11(c).

54. These rulings and ABA Formal Opinions establish a consistent theme: once investigatory materials are incorporated into civil discovery and made available to all parties, as was done in this MDL over 6 years ago, they lose their confidential character, and prior access does not create an ethical bar to representation.

55. The defendants' expert suggests several possible scenarios where Nielsen could have confidential information. However, each of these scenarios involve information that Nielsen and Lowey do not have, and/or is publicly available, and/or do not involve confidential government information as defined under the Rule 1.11 (c) which the "government is prohibited by law from disclosing to the public or has a legal privilege not to disclose." The defendants have neither made any offer of proof, nor met their burden to demonstrate any facts to establish that they will suffer material disadvantage because of Nielsen joining Lowey. To the contrary, to create these scenarios, Defendants ignored the substantial, complete and necessary cooperation required by the States and private parties imposed by the MDL Transfer Order in this massive piece of litigation. These imaginary scenarios are based on information that is not confidential government information, and/or information and material that was shared among States and private parties in the MDL, pursuant to the CIA, and/or information that was protected by the DOJ and not shared with either the private parties or the States. Finally, Nielsen shared all material information, strategic roadmaps and insights with all Private Plaintiffs for years, as part of the process to jointly undertake hundreds of depositions and review millions of documents in "the best interests of all plaintiffs and States" to "ensure the best evidentiary record possible." The scenarios suggested by the expert for the defense are not consistent with the facts and make no common sense in this litigation. One example is Defendants' scenario whereby Nielsen would use information obtained from CW or other sources to make decisions about evidence at trial. The problem is that the States and Private Plaintiffs fully cooperated and coordinated, and that information is not "confidential governmental information" that "materially disadvantages" the defendants.

It is my opinion there is no basis for any disciplinary charges to be filed against either Nielsen or Lowey for a violation Rule 1.11 (c). There are no special conflicts of interest for Nielsen or Lowey. The evaluation by Nielsen of his obligations, and his decision to obtain informed consent and a waiver of any objection (assent) by the CT AGO was thorough. The vetting process by Lowey was thorough and correct. In my opinion any implication that Nielsen or Lowey were required as a matter of law to do anything additional given these facts and in these circumstances is not required under the Rules.

**B. There is no violation of Rule 1.11(a)(2) by either Nielsen or Lowey. Nielsen complied by obtaining informed consent from the CT AGO, confirmed in writing.**

56. The Defendants seek disqualification under Rule 1.11(a)(2) of the PRCP, which they explain in their brief, "prohibits a former government employee from 'represent[ing] a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, *unless the appropriate government agency gives its informed consent to the representation.*"  Def. Br. at 24 (emphasis added).

57. Given that there is no confidential government information in Nielsen's possession, there was no need to obtain informed consent. That said, out of an abundance of caution, Nielsen did seek consent and receive assent from CT AGO. Nielsen Declaration ¶¶ 31, 34-35.

58. With respect to any alleged concerns about any confidential information obtained in settlement discussions there is no offer from Defendants regarding what Nielsen allegedly learned. Moreover, there is no legitimate concern that Nielsen would discuss any confidential CT AGO settlement information because: 1) prior to hiring Nielsen and Lowey agreed that Nielsen would not share information with anyone at Lowey or any representative of Lowey's MDL Clients concerning settlement activity conducted by Connecticut or any other State AG. St. Phillip Declaration, Declaration ¶ 5; and 2) Nielsen has not participated in any settlement discussions on behalf of Humana, Molina or any other Lowey client, nor has he discussed with any Lowey attorneys any information he may have learned during settlement discussions that he participated in when employed at the CT AGO. Nielsen Declaration, ¶ 36.

59. Nielsen complied with Rule 1.11(a)(2).

60. Pennsylvania Rules 1.0 and 1.11 do not require written informed consent. Moreover, under Pennsylvania Rule 1.0 [6] "in determining whether the information and explanation are reasonably adequate, relevant factors include whether the client or other person is experienced in legal matters, generally and in making decisions of the type involved, and whether the client or other person is independently represented by other counsel in giving the consent."  Under these circumstances, assent by the supervising attorneys in the CT AGO is indisputably adequate.

61. Out of an abundance of caution, Nielsen sought consent, which is the conduct of a thoughtful lawyer, "doing the right thing."

14

In my opinion there are no facts that support the finding that probable cause exists, or that there was a violation of Rule 1.11(a)(2) by Lowey or Nielsen.

BY: _____

Stewart L. Cohen, Esquire

Date: 10/1/25

15

# EXHIBIT A

September 30, 2025

**Concise Resume**

STEWART L. COHEN, ESQUIRE
Cohen, Placitella & Roth, P.C.
2001 Market Street – Suite 2900
Philadelphia, PA 19103

**Synopsis:**   Stewart L. Cohen is a founding member of the law firm Cohen, Placitella & Roth, P.C. where he has practiced since 1990, and is an experienced trial lawyer representing plaintiffs in complex civil litigation. Born in Philadelphia, Pennsylvania in 1952, he was admitted to the Pennsylvania Bar in 1977, and was subsequently admitted to the New York and the New Jersey Bars.

He has been repeatedly selected by his peers to be included in the *Best Lawyers of America®*, and since 2010 his law firm has been selected as one of the *Best Law Firms in America ®* by U.S. News and World Report. He has served as lead and trial counsel  in a wide variety of cases including, for example, a 2005 $25 Million jury verdict in a personal injury case (for a traumatic brain injury), which was recognized that year by *The National Law Journal* to be one of the "Top 100 Verdicts in the United States, and a $36 Million recovery on behalf of the Commonwealth of Pennsylvania in 2013 for environmental damage to the Ryerson Station State Park and Dam, which was reported as the "Top Verdict and Settlement" that year in Pennsylvania by the *Legal Intelligencer*.

Mr. Cohen served the  Pennsylvania Supreme Court's Disciplinary Board in various roles over 18 years, including two 6 year terms (1992-1998 and 2001-2007)  on  Hearing Committees, and was then appointed by the Supreme Court and served another 6 years as a Board Member (2007-2013), during which he served as Vice Chair (2011-2012) and then Chair (2012-2013). He was also appointed by the Supreme Court and served another 6 years (2016- 2022) as a Member of the Pennsylvania Board of Law Examiners, where he served as Vice Chair (2020-2021) and then Chair (2021-2022). Among other community and charitable activities over the years, he has served as a board member and President of the Board of the Brain Injury Association of Pennsylvania, and as an officer and member of the Board of United Cerebral Palsy of Philadelphia.

Mr. Cohen has been an invited and keynote speaker and at many events and institutions, including those at Harvard Medical School, Yale Medical School, Temple University School of Law, Wiedner University School of Law, Penn State University, and programs presented by the Pennsylvania and Philadelphia Bar Associations.

**Education:** Temple University School of Law, J.D., 1977; Pennsylvania State University, B.A., Phi Beta Kappa, with high distinction in the Honors Program, 1973

**Community and Public Service Activities (Partial List):** Member, Temple University Board of Trustees (2025 – present); Member, Federal Judicial Nominating Committee (January 2015 – present); Member, Vice Chair, and  Chair, Pennsylvania Board of Law Examiners (April 2016 – 2022); Member, Vice Chair and Chair, Disciplinary Board of Supreme Court of Pennsylvania (April 2007-2013); Brain Injury Association of Pennsylvania, President and Board Member  (2001-2010); United Cerebral Palsy of Philadelphia and Vicinity, Officer and Board Member (2002-2012); and Lower Merion Township, Member and Chair of the Environmental Advisory Council; and Member and Vice Chair of the Planning Commission  (1988-1994).